No. 25-1279

# In the United States Court of Appeals for the Fourth Circuit

PFLAG, INC., et al.,
*Plaintiffs-Appellants*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,
*Defendants-Appellee*s.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND, GREENBELT DIVISION
(NO. 8:25-CV-00338) (THE HON. BRENDAN ABELL HURSON)

**BRIEF OF DETRANSITIONERS AS *AMICI CURIAE* IN
SUPPORT OF DEFENDANTS-APPELLEES**

JESSE D. FRANKLIN-MURDOCK
DHILLON LAW GROUP INC.
177 Post Street
Suite 700
San Francisco, California
(415) 433-1700

JOSH DIXON
CENTER FOR AMERICAN LIBERTY
PO Box 200942
Pittsburgh, PA 15251-0942
(703) 687-0942

*Attorneys for Amici Curiae
Detransitioners*

# TABLE OF CONTENTS

INTEREST OF THE AMICI CURIAE ........................................................ 1

INTRODUCTION ................................................................................ 2

ARGUMENT ..................................................................................... 4

    I.   *Chloe Brockman's Story* ......................................................... 4

    II.  *Luka Hein's Story* ................................................................ 11

    III. *Kaya Clementine Breen's Story* ........................................... 15

    IV. *Amici's Experience Illustrate the Wisdom of Executive Order 14187* ....... 21

CONCLUSION ................................................................................. 24

CERTIFICATE OF COMPLIANCE ....................................................... 25

CERTIFICATE OF SERVICE .............................................................. 26

## INTEREST OF THE AMICI CURIAE[1]

*Amici curiae* are three detransitioners—that is, individuals who underwent medical interventions to assist them in identifying as the opposite sex but later desisted in their transgender identity. Each of the *amici* are women who underwent transgender medical interventions as minors and continue to suffer harm related to the ill-conceived care they received. All three *amici* are engaged in litigation against the medical providers who irreparably harmed them.

*Amicus* Chloe Brockman, a/k/a Chloe Cole, is a twenty-year old California resident. Ms. Brockman received puberty blockers and testosterone at age thirteen, followed by a double mastectomy at age fifteen. At age sixteen, Ms. Brockman detransitioned and resumed living as a girl.

*Amicus* Luka Hein is a twenty-three-year-old Nebraska resident. Ms. Hein received a double mastectomy followed by testosterone, both at age sixteen. The following year, Ms. Hein's doctor recommended that Ms. Hein undergo a partial hysterectomy as the next stage in her "transition." Fortunately, Ms. Hein did not undergo this procedure. At age twenty, Ms. Hein detransitioned and resumed living as a woman.

*Amicus* Kaya Clementine Breen is a twenty-year-old California resident. Ms.

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), Amici affirm that no party or counsel for any party authored this brief in whole or in part and that no one other than Amici or its counsel contributed any money that was intended to fund the preparation or submission of this brief. The parties have consented to this filing.

1

Breen received puberty blockers at age twelve, testosterone at age thirteen, and a double mastectomy at age fourteen. At age seventeen, Ms. Breen's doctor recommended that she receive a hysterectomy. As with Ms. Hein, Ms. Breen fortunately did not undergo this procedure. When Ms. Breen was nineteen, she detransitioned and resumed living as a woman.

All three *amici* were permanently maimed by health care providers who placed them on the "gender affirming care" pipeline of puberty blockers, cross-sex hormones, and breast removal rather than provide them with the mental health counseling they desperately needed. *Amici* have an interest in ensuring that the government is not handcuffed from protecting vulnerable minors with stories similar to their own.

## INTRODUCTION

*Amici Curiae* Chloe Brockman, a/k/a Chloe Cole, Luka Hein, and Kaya Clementine Breen were each emotionally troubled girls whose traumatic experiences, youthful curiosity, and exposure to online influencers led them to believe they were transgender. Rather than provide *amici* with the mental health treatment they desperately needed, *amici*'s health care providers in California and Nebraska simply "affirmed" them in their transgender identity, providing them with puberty blockers, cross-sex hormones, and double mastectomies so they could attempt to live as boys—all before they had reached the age of eighteen. *Amici*

2

detransitioned and are each living as women. While *amici* are each involved in litigation against the health care providers who maimed them, no amount of money will ever restore their amputated breasts, much less their lost adolescence.

*Amici* understand that while they each had unique experiences, they are not alone: there are burgeoning numbers of detransitioners who suffered irreparable harm at the hands of health care providers whose moral and professional obligation was to care for them. *Amici* support Executive Order 14187, entitled "Protecting Children from Chemical and Surgical Mutilation," because they believe it will help protect minors who, like them, experience confusion regarding their gender that results from emotional trauma and untreated psychological comorbidities. Their own experiences make clear that without governmental oversight, countless other children will face the tragic and lifelong consequences caused by the administration of "gender affirming care" to vulnerable youth.

There is widespread agreement among experts in the field that having a transgender identity is not biologically determined. Nonetheless, a small minority of children experience confusion and discomfort regarding their sex, often correlated with other psychological maladies. These children need what *amici* needed but did not receive—thorough and comprehensive mental health treatment guided by the first principal of medical ethics: Do No Harm. Without Executive Order 14187, *amici* fear that these children will be treated like them, subjected to medical

3

interventions, carrying lifelong complications, to which no child is competent to consent and which no child should receive.

For the following reasons, *amici* respectfully support Defendants-Appellants' request that the Court reverse the district court's order and rule in their favor.

**ARGUMENT**

*Amici* are each young women with different family backgrounds and life experiences. Yet they each were led to believe by their doctors and mental health providers that the answer to their problems were medical interventions designed to eliminate their female characteristics and give them male characteristics. After emerging from difficult periods of adolescence, *amici* realized something they believed they knew as teenagers was not the case—they were not boys who were "trapped in the wrong body," but rather, vulnerable girls who needed care. Each of their stories illustrate the grave harm that can occur if proponents of transgender medicine are free to perform experimental care on children without guardrails imposed by the government.

## I.     Chloe Brockman's Story

Chloe Brockman's childhood in California's Central Valley was marked by significant emotional and psychological challenges. Beginning at a young age, Chloe struggled with anxiety, depression, ADHD, and frequent social isolation due to these mental health issues. Around age six, Chloe began developing an interest in male

4

clothing, but it was not until age nine that she confronted the growing disconnect she felt between her biological sex and her social identity as a female. Chloe believed—due to her exposure to television, the internet, social media, and pornography—that her body needed to conform to various aesthetic standards to be regarded as a genuine female. While the women Chloe saw online had large breasts and voluptuous bodies, Chloe had small breasts and a thinner, more muscular body. Chloe, while still just a child, internalized the belief that she was—and would always be—unworthy of social acceptance as a female.

As her body matured, Chloe was exposed to the unavoidable difficulties of becoming a fully grown woman. Conversations about the discomfort of menstrual cycles, the pains of pregnancy and childbirth, and the unfortunate and very real possibility that she would experience sexual harassment or violence at some point during her life pervaded Chloe's youth. Simultaneously, Chloe did not appreciate the positive aspects of life as a female, including the joys of motherhood and the intimacy she could one day share with a loving, caring spouse. Chloe's focus on the drawbacks of womanhood worked in tandem with both her lack of appreciation of its benefits and her unresolved mental health challenges to make Chloe fearful of her future as a woman, all while further isolating her from her peers.

In her isolation, Chloe sought out online forums where she could discuss her feelings and connect with individuals who had similar stories. Chloe spent hours

each day reading posts made by various LGBT activist groups and transgender influencers, all of whom praised and promoted other transgender individuals, especially those who underwent surgical transitions. To Chloe—a girl with minimal social connections—this degree of acceptance and praise was intoxicating. Although she remained exclusively attracted to males, she began to view transitioning as a way to escape the pitfalls she expected to experience in her future while achieving the social approval and acceptance that she longed for but did not receive at school or with friends. Chloe did not wait long before beginning this process.

In May 2017, at the age of twelve, Chloe wrote a letter to her parents expressing her desire to be referred to as "Kai" instead of Chloe and that she wanted to be treated as a boy. Her parents were hesitant to go along with Chloe's wishes, but being unsure of how they should proceed, they sought advice from medical professionals. Within one month, Chloe had an initial consultation with a child psychologist, who affirmed Chloe's belief that she was a boy without any additional exploration of its causes or Chloe's motivations.

Over the next several years, Chloe had similar experiences with various other mental health providers. Despite Chloe's decision to report her anxiety, depression, and other mental health challenges to these providers—in addition to her belief that she was a boy—at no time did these providers suggest any causal relationship between Chloe's mental health symptoms and her beliefs regarding her gender or in

any way attempt to perform independent evaluations of these symptoms. Instead, these providers rapidly and consistently affirmed Chloe's beliefs about her gender identity, ignoring their potential causes and going so far as to tell her that taking steps such as binding her breasts would be helpful and that going through sex-reassignment treatment—including the use of puberty blockers and testosterone—would be necessary to resolve her mental health struggles. These evaluations culminated in Chloe's referral to an endocrinologist to begin her medicalization at age thirteen: puberty blockers designed to stop her normal puberty from progressing, followed by testosterone injections to give her outwardly male features.

Like the other medical professionals overseeing Chloe's care, the endocrinologist responsible for handling her treatment did not take steps to ensure that her mental health symptoms were adequately evaluated, nor did she express any hesitation due to Chloe's young age. Moreover, Chloe was not informed about the inherent risks of puberty blockers (a drug used to treat prostate cancer and chemically castrate sex offenders, among other things, which physicians use off-label to suppress a patient's normal, healthy puberty). At no point was she made aware that she might one day re-identify with her biological sex, nor was she informed of the physical and psychological challenges that could arise from such desistance. Regarding the treatment itself, Chloe was not fully informed of the fertility risks it posed or the impact it would have on the  function of her sexual

organs. She was not told that her sexual organs would atrophy and desiccate, that she would eventually need a hysterectomy and a phalloplasty—or have the chest of a man and the genitals of a woman. At thirteen, Chloe did not give any significant weight to how these issues may affect her. Instead, she focused entirely on taking whatever steps she needed to feel comfortable and achieve social acceptance in the moment.

However, Chloe's choice to begin transitioning did not have its desired effect. After several months of receiving puberty blockers and cross-sex hormone treatments, Chloe's mental health had not improved. Her social situation had remained similarly unchanged. On one occasion, a boy from Chloe's class groped her breast in front of her classmates. This incident of sexual assault exacerbated Chloe's concerns about being female and led Chloe to conclude that she needed to remove her breasts to protect herself from further unwanted sexual contact. When Chloe informed her endocrinologist that she wanted to receive a double mastectomy to remove her breasts permanently, her endocrinologist, entrusted with safeguarding the health of a vulnerable young woman, affirmed Chloe's decision without even a basic inquiry into the psychological motivations behind her request.

Chloe then began the process of having her breasts removed. While the decision to pursue such a monumental and irreversible elective surgery would ordinarily call for a significant degree of care and consideration, Chloe was not

afforded the time necessary to make an informed decision. At a gender clinic in Oakland, California, Chloe and her parents met with a "gender specialist," who, after a two-hour meeting, approved Chloe for surgery, readily acquiescing to Chloe's wishes without any meaningful evaluation of her underlying mental health issues and without adequately informing Chloe of the impact the surgery would have. Indeed, all Chloe was told was that the surgery was necessary for her to overcome her mental health challenges and that she would not be able to breastfeed following the surgery—a consequence fourteen-year-old Chloe was incapable of meaningfully considering. Chloe was not told that her mental health issues might not go away, and she was not told of the long-term social implications of having female genitals but no breasts. On June 4, 2020, less than one year later, at the age of fifteen, and after only one additional presurgical consultation—conducted virtually—Chloe's healthy breasts were permanently removed.

Contrary to the expectations that Chloe's doctors and online influencers had given her, the surgery did little to alleviate Chloe's mental health challenges. Chloe had significant markings where her breasts used to be, the presence of which was highlighted by the black grafts that had been used to complete the surgery. Chloe found her physical appearance revolting. In addition, Chloe began to experience significant internal conflict about her new gender status: her anxiety and depression worsened; she developed suicidal ideation; and she began to regret her decision as

9

she started to grapple fully with the reality that she was unlikely to be able to give birth to and care for a child as a mother. Motivated by her substantial feelings of remorse and the realization that she was, and always had been, female, Chloe decided to begin detransitioning in May 2021.

The process of detransitioning was anything but simple. After years of taking cross-sex hormones, Chloe's body had undergone permanent changes, including developing broader shoulders, a more prominent jaw, a larger ribcage, more narrow hips, an Adam's apple, and a masculine voice. Once Chloe stopped taking the hormones, she experienced issues with clotting, incontinence, and general digestive health. Her joints began to ache regularly, and she experienced sporadic pains shooting across her back. In addition, her skin began to separate from the grafts she received during her double mastectomy, and she lost all erogenous sensation in her chest area. Psychologically, Chloe fared even worse. She became intensely suicidal for the first time in her life. Her depression became severe, and she was unable to focus on school, resulting in her failing out of high school during her senior year. Moreover, Chloe was unable to reintegrate socially as a female, as she had never learned how to socialize with females as a woman during the years in which she underwent her transition. Chloe also frequently experienced social harassment because of her masculine voice and physical appearance, which served only to worsen her mental health and further isolate her.

Although, in recent years, Chloe has found purpose in sharing her story to educate and inform children and parents alike of the realities of transitioning, the scars—both physical and otherwise—of her experience remain. Nevertheless, Chloe is committed to ensuring that no other children who feel uncomfortable in their own skin are rushed into a decision with consequences that they cannot possibly comprehend.

## II.  Luka Hein's Story

In 2015, Luke Hein's life began to fracture. At the young age of thirteen, her parents divorced, and the instability that followed cast Luka into a period of deep uncertainty and confusion. Splitting her time between two homes in Nebraska, Luka struggled with a growing sense of isolation and began to question who she was. Within one year of the divorce, Luka's academic performance collapsed, she developed unhealthy eating habits, and she began experiencing severe anxiety and panic attacks. Luka's internal psychological struggles soon began to manifest externally—she became easily angered, and she began cutting herself and experiencing suicidal thoughts. Although Luka eventually began counseling, saw a psychiatrist, and was put on antipsychotic drugs to treat depression and generalized anxiety disorder, her mental health continued its downward spiral.

In early 2017, Luka's mental health deteriorated to the point that she was placed in a partial psychiatric care program. After Luka left the program, she was

exposed to an older man online, who coerced her into sending him sexually explicit images. When Luka eventually refused to send the man more photos, he threatened her. The police investigation that followed contributed to the trauma Luka experienced from this event, and the negative effect that this incident had on Luka's mental health motivated her psychiatrist to return her to the intensive partial psychiatric care program in May 2017. Luka's treatment became more rigorous, and her medications were increased.

Unfortunately, Luka's more intensive course of treatment did little to stem the tide of her worsening psychological health. Luka had entered puberty, and she became deeply uncomfortable with her developing body, especially her breasts—a feeling exacerbated by the exploitation she had experienced online. Hoping to alleviate her distress, Luka turned to online forums, where she discovered transgender influencers who extolled the virtues of hormone therapy and surgery, claiming that taking such steps could ease Luka's suffering. Motivated by the views of these commentators, Luka began binding her breasts, transferred from an all-girls school, changed her name, and told her mental health providers and her parents that she was transgender and wanted to receive "top surgery"—the permanent surgical removal of her breasts.

It was at this time that Luka began receiving treatment from providers at a gender clinic at a university hospital. The gender clinic providers worked in tandem

to accelerate Luka's "gender-affirming" treatment. After a mere fifty-five-minute session with one provider, Luka was diagnosed with gender identity disorder, and the providers began steering her toward surgery. Throughout 2017, Luka continued to experience significant familial and academic turmoil, and her mental health condition worsened. Rather than help Luka process the physical changes she was experiencing as a result of puberty and treat her underlying mental health problems, Luka's mental health providers encouraged Luka to seek support from LGBT support groups, discussed chest-binding, and ultimately referred Luka, then fifteen years old, to the gender clinic for "top surgery."

In January 2018, Luka had her first appointment with a plastic surgeon. Despite having never met Luka before, the surgeon immediately diagnosed Luka with gender identity disorder and began planning for a double mastectomy. The surgeon acknowledged that the ordinary approach would be to wait until Luka was older, but he suggested that delaying surgery could harm Luka psychologically—a claim not supported by Luka's medical history. Although the surgeon acknowledged that the decision would ultimately be left to Luka, her parents, and her therapist, Luka's providers stated that avoiding the surgery would put Luka at an increased risk of suicide, even though Luka had not expressed suicidal thoughts for nearly a year prior to surgery. However, trusting that Luka's providers were gender experts, Luka's parents ultimately consented to the surgery.

On July 3, 2018, Luka was seen by the plastic surgeon for a preoperative evaluation for "transgender mastectomy." The surgeon noted that Luka's therapist had attested to the appropriateness of the surgery, but in reality, Luka's therapist had merely reiterated that Luka desired "top surgery" without commenting on the appropriateness of the procedure. Instead of confirming that the surgery was in Luka's best interest, the plastic surgeon proceeded with the preoperative evaluation.

During this evaluation, the surgeon informed Luka of various risks associated with the surgery. Luka was told that she might suffer from postoperative infection, bleeding, and scarring and that the surgery might result in a suboptimal aesthetic result. However, the surgeon never told Luka of the most severe consequence of the surgery: Luka may eventually regret the surgery, and nothing could be done to reverse its effects in the future. On July 26, 2018, Luka's healthy breasts were surgically removed.

Luka's providers were not content with the removal of her breasts, viewing her "transition" as incomplete. Within four months of her surgery, Luka was placed on testosterone, even though the prescribing physician failed to inform Luka of the profound effects testosterone would have on her physiologically and psychologically. Within the following year, the same physician also recommended that Luka have a partial hysterectomy as the next step in her transition. Deeply alarmed by this suggestion, Luka's parents objected. Although Luka never received

the hysterectomy, she continued taking testosterone for four more years, during which time she experienced heart irregularities, aching joints, and pelvic pain. Due to these troubling symptoms, Luka stopped taking testosterone in late 2022.

In early 2023, Luka informed one of her providers that she no longer identified as male. Luka explained she was experiencing significant pain because of the long-term use of testosterone and that she now understood that she was in no position at the age of sixteen to consent to a surgery that would permanently change her life. In response to this, the provider did little more than tell Luka that this was just another step on her gender journey and that she should seek further mental health counseling, the very thing that should have been done from the start.

Over the past two years, Luka has made every effort to share her story with other young individuals who are confused about their gender identity. While Luka herself may not be able to recover fully from the harm she suffered, she takes solace in the knowledge that her experiences may help prevent another child from being forced down the same path she was.

## III.  Kaya Clementine Breen's Story

As a young child in Southern California, Clementine Breen was, by all appearances, a typical "girly girl." She was joyful, expressive, in touch with the arts, and deeply imaginative. She never expressed any feelings of confusion about her gender or indicated in any way that she felt like a boy. As Clementine began to grow

15

and mature, however, serious mental health challenges lurking beneath that cheerful exterior began to surface.

Throughout Clementine's latter childhood years, she began to suffer from a complex array of mental health issues, including anxiety, depression, presumed autism, and undiagnosed post-traumatic stress disorder. Many of these issues likely surfaced due to Clementine's extraordinarily difficult upbringing. Around the ages of six and seven, Clementine was repeatedly sexually abused. At the same time, Clementine had to manage being raised alongside her brother, whose severe autism caused him to act out violently and made him highly volatile. Around age ten, both of Clementine's grandmothers—to whom Clementine was close—passed away within one month of each other. In addition, Clementine's dog passed away the day after one of her grandmothers' funerals. Together, these events created an emotionally disturbing home environment for Clementine that exacerbated her underlying psychological conditions—conditions that demanded compassionate, patient, and mindful professional care.

Unfortunately, Clementine did not receive such care. When Clementine began puberty around age eleven, she began meeting with a school counselor to address her worsening mental condition. At one of these meetings, she expressed to her counselor that she thought her life would be easier if she were a boy—an understandable view considering the sexual abuse Clementine had experienced only

a few years earlier. Rather than explore these feelings with Clementine, however, the counselor took Clementine's statement and extrapolated from it that Clementine must be transgender. The counselor then notified Clementine's parents of her conclusion.

Clementine's parents were caught off guard by this supposed diagnosis. Unsure of how to proceed, they sought guidance from purported "experts" in the field of gender health at a youth gender medicine center.

Clementine first met with the center's providers in December 2016, just after turning twelve. Within minutes—without a single formal psychological evaluation, without consulting other doctors, and without exploring the underlying mental health challenges Clementine faced—the doctor with whom Clementine met diagnosed her with gender dysphoria and told her that she was "trans." The doctor then immediately recommended that Clementine be put on puberty blockers to prevent her body from going through the "wrong puberty" and to prevent the "irreversible" changes of female puberty. The doctor recommended that Clementine have a puberty blocker surgically implanted in her arm and ordered the implant that same day. On March 6, 2017—less than three months after Clementine's first visit—Clementine received the puberty blocker implant.

From there, Clementine was rushed along the "gender affirming care" pipeline with little regard for whether these severe treatments were in any way indicated for

her. On September 9, 2017, a gender center doctor recommended that Clementine be put on testosterone to keep her transition "on track." Although Clementine was initially unsure of taking testosterone, her doctor convinced her it was necessary if Clementine ever wanted to "pass" as a biological male. Clementine's parents, however, were strictly opposed to this course of treatment. To convince them, the doctor falsely told them that Clementine was suicidal and presented them with a false dilemma: either they come to terms with having a living son, or they accept that they will have a dead daughter. Operating under the belief that refusing to consent to the treatment would lead Clementine to kill herself, Clementine's parents consented to the use of testosterone. Clementine began using testosterone in January 2018, at thirteen years old and just thirteen months after her initial visit to the gender center.

The effects of the testosterone quickly made themselves known to Clementine and her family. Clementine developed acne, grew more body hair, spoke in a lower register, and had a substantially increased libido. Noting these changes, Clementine's physician recommended that she have a double mastectomy, emphasizing that having such a procedure early in her transition would maximize the likelihood of her chest closely resembling that of a biological male.

To have this surgery, Clementine needed to provide her surgeon with a letter of recommendation from her primary care physician and a letter from a mental health professional stating that she was a good candidate for "gender-affirming" double

mastectomy. The gender center doctor readily provided the letter. In addition, Clementine's therapist—a therapist Clementine had begun seeing at the recommendation of the gender center doctor—also provided the letter. The therapist quickly attributed everything Clementine struggled with to her status as a transgender individual and ultimately remarked in her letter that the surgery was necessary to remedy Clementine's gender dysphoria. After producing these letters, Clementine's double mastectomy was scheduled for May 2019, when Clementine was just fourteen years old.

As with the puberty blockers and testosterone, Clementine received surgery without her providers ever closely evaluating her to see whether she actually needed this drastic procedure. Clementine's surgeon did not meet her in person until the morning before the operation. He did not thoroughly discuss the risks of the surgery with her, and he did not provide her mother with a consent form until around 6 a.m. on the day of the surgery—roughly one hour before the surgery was scheduled to begin. Around 7 a.m., both of Clementine's healthy breasts were permanently removed.

After the surgery, Clementine's mental health began to unravel further. For the first time in her life, Clementine started feeling symptoms of depression, intense anger, and thoughts of suicide. She could not focus, began harming herself, and developed a severe eating disorder. She experienced auditory and visual

hallucinations, reporting that she heard voices and saw large figures looming behind her. To combat these symptoms, Clementine was placed on antidepressants and anti-anxiety medications by psychiatrists. Through it all, however, Clementine's providers at the gender center continued to reinforce the notion that the solution to Clementine's newly developing mental health symptoms—which they only tacitly acknowledged, if at all—was to press on with her treatment for her supposed gender dysphoria, going so far as to increase Clementine's testosterone dosage and recommend a "gender-affirming" hysterectomy.

After Clementine received these life-altering procedures and experienced only worsening mental health, Clementine and her family began to doubt the competency of the care she was receiving at the gender center. Accordingly, Clementine sought care from alternative providers, including a dialectical behavior therapist. Through this new course of therapy, Clementine began to realize that many of her mental health struggles were a byproduct of unresolved trauma from the abuse she experienced throughout her childhood and adolescence, not from being transgender. In response to this, Clemetine reduced her testosterone use, eventually eliminating it altogether in early 2024. As she did, her mental health issues began to resolve. Clementine's mental health further improved when she began once again identifying as female.

Sadly, much of the damage is already done. Clementine's voice and body have

been permanently masculinized due to her long-term use of testosterone, and she has an Adam's apple that she cannot afford to remove surgically. Because of her years of undergoing "gender-affirming" care, she may be infertile.

Clementine is currently pursuing an education at UCLA and working to put her past behind her. Although the worst of her mental health challenges have subsided, she still struggles with social integration. Most of her friends only know her as the boy "Finn," requiring her to disclose her female identity in public settings repeatedly. Despite the steps she has taken to rebuild her life, she has been permanently scarred because of the "gender-affirming" care she suffered through for years.

## IV.   *Amici*'s Experience Illustrate the Wisdom of Executive Order 14187.

Chloe, Luka, and Clementine grew up in different families in different parts of the country and faced unique challenges. While *amici* received similar courses of transgender medicine, they saw different providers in varying medical settings. Yet the commonalities in each of *amici*'s stories reveal that something has gone dreadfully wrong in America's medical system, particularly in the emergent gender clinics that rush to diagnose troubled youth with gender dysphoria, suppress their puberties, manipulate their endocrine systems with cross-sex hormones, and perform sex-reassignment surgeries on their patients, all before they reach adulthood.

*Amici* each presented with some degree of discomfort about their female sex. Yet in each case, competent mental health providers could and should have dug

deeper. In Chloe's case, her providers should have perceived how Chloe's discomfort with her sex derived from a perceived disconnect between her ideal of womanhood and her own body, fears about experiences of womanhood exacerbated by a sexual assault, and the social acceptance she received from the LGBT community online all led her to believe she was transgender and would benefit from hormonal and surgical interventions. Luka, meanwhile, experienced deep discomfort with her breasts in a period marked by familial instability and severe mental health problems, which resulted in her acquiescing to the surgical removal of her breasts as part of transgender care, followed by a testosterone regimen. Clementine, meanwhile, suffered from various mental health issues, which were made worse by the passing of two close relatives and her pet, and her experience growing up with her severely autistic brother, found herself on the "gender affirming care" pipeline simply because she mused about how life may be easier if she was a boy. All three *amici* had difficult childhoods that led them to seek refuge in the personal transformation and social acceptance they saw in transgender care.

Rather than recognize this adolescent escapism, *amici*'s providers took *amici* at their word and provided them with irreversible and harmful medical interventions designed to give them male features, while turning a blind eye to the true problems plaguing these girls. All three *amici* continue to suffer on a day-to-day basis from the unnecessary medical interventions they received, including unwanted male

22

features, aching joints, heart irregularities, post-operative complications, questions about their ability to conceive a child, and the sad realization that even if they can, they will never be able to breastfeed that child. None of the *amici* were able to appreciate that they would experience these harms. And even if their doctors had warned them as to some of the side effects, they were simply too young to consider the possibility that their discomfort with their gender would resolve with age, and that they may regret taking male hormones and removing their breasts, as they do now.

Executive Order 14187 will help protect countless children from undergoing the profound, and completely avoidable, harm that befell Chloe, Luka, and Clementine. While a majority of states have restricted "gender affirming care" for minors, gender clinics across the country continue to dole out cross-sex hormones to confused and troubled minors before shunting them to a surgeon for the next phase of their transition. Ultimately, it is incumbent on mental health providers, endocrinologists, and surgeons to protect minors like *amici* by adhering to their Hippocratic Oath and principles of evidence-based medicine. But the stories of detransitioners show that there is an immediate need for the government to protect vulnerable children by taking a more active role in regulating, rather than funding and promoting, the administration of cross-sex hormones and sex-reassignment surgeries to minors.

The federal government took a major step to protect future detransitioners who need individualized, comprehensive care who may find themselves at a gender clinic assembly line. But the trial court's injunction handcuffs the government from taking this basic, commonsense step to protect some of society's most vulnerable people. Out of compassion for others like themselves, Chloe, Luka, and Clementine ask this Court to reverse.

## CONCLUSION

For the foregoing reasons, *amici* respectfully support Defendants-Appellants' request that the Court reverse the district court's order and rule in their favor.

May 27, 2025.
San Francisco, CA.

Respectfully submitted,

/s/ *Jesse D. Franklin-Murdock*
Jesse D. Franklin-Murdock

JESSE D. FRANKLIN-MURDOCK
DHILLON LAW GROUP INC.
177 Post Street
Suite 700
San Francisco, California 94108
(415) 433-1700

JOSH DIXON
CENTER FOR AMERICAN LIBERTY
PO Box 200942
Pittsburgh, PA 15251-0942
(703) 687-0942

*Attorneys for Amici Curiae
Detransitioners*

24

## CERTIFICATE OF COMPLIANCE
### WITH TYPEFACE AND WORD COUNT LIMITATIONS

I, Jesse D. Franklin-Murdock, counsel for Amici Curiae Detransitioners and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), that the attached Brief is proportionately spaced, has a typeface of 14 points or more, and contains 5410 words.

/s/ *Jesse D. Franklin-Murdock*
JESSE D. FRANKLIN-MURDOCK

May 27, 2025.
San Francisco, CA.

## CERTIFICATE OF SERVICE

I, Jesse D. Franklin-Murdock, counsel for Amici Curiae Detransitioners and a member of the Bar of this Court, certify that, on May 27, 2025, a copy of the attached Brief was filed electronically through the CM/ECF system with the Clerk of this Court. The participants in this case are registered CM/ECF users, and the CM/ECF system will accomplish service.

/s/ *Jesse D. Franklin-Murdock*
JESSE D. FRANKLIN-MURDOCK

May 27, 2025.
San Francisco, CA.