No. 25-1279

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

PFLAG, INC., et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Maryland

## BRIEF FOR APPELLANTS

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

BRAD HINSHELWOOD
JACOB CHRISTENSEN
*Attorneys, Appellate Staff*
*Civil Division, Room 7525*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-5048*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................. iii

INTRODUCTION................................................................................1

STATEMENT OF JURISDICTION ....................................................3

STATEMENT OF THE ISSUES.........................................................3

PERTINENT STATUTES AND REGULATIONS ................................4

STATEMENT OF THE CASE .............................................................5

     A.   The Executive Orders .............................................................5

     B.   Proceedings Below..................................................................8

          1.   The complaint...................................................................8

          2.   The preliminary injunction..........................................10

SUMMARY OF ARGUMENT ...........................................................13

STANDARD OF REVIEW................................................................16

ARGUMENT ....................................................................................16

I.   Plaintiffs Have No Likelihood of Success on the Merits of the
    Sweeping Facial Claims They Asserted ........................................17

     A.   The President acted within his authority in issuing the
          Executive Orders.................................................................18

          1.   The President properly exercises supervisory
               authority over the Executive Branch ..........................23

          2.   The district court misconstrued the Executive
               Orders.............................................................................31

B.    The Executive Orders do not discriminate based on sex or transgender status ............................................................ 38

      1.    Equal protection claim .................................................. 39

      2.    Statutory discrimination claims .................................. 54

II.   Plaintiffs Also Failed to Establish the Remaining Preliminary Injunction Factors ........................................ 56

III.  At Minimum, the District Court's Universal Injunction Is Overbroad ........................................................................ 58

CONCLUSION ........................................................................ 65

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                       **Page(s)**

*Adarand Constructors, Inc. v. Pena,*
    515 U.S. 200 (1995) ........................................................................... 40

*Bostock v. Clayton County,*
    590 U.S. 644 (2020) ...........................................................................55

*Building & Constr. Trades Dep't v. Allbaugh,*
    295 F.3d 28 (D.C. Cir. 2002) ................................................. 24, 27, 37

*California Hum. Dev. Corp. v. Brock,*
    762 F.2d 1044 (D.C. Cir. 1985) ......................................................... 27

*CASA de Md., Inc. v. Trump,*
    971 F.3d 220, 258 (4th Cir. 2020), *reh'g en banc granted,*
    981 F.3d 311 (4th Cir. 2020), *appeal dismissed*
    (4th Cir. Mar. 11, 2021) ....................................................................62

*CASA, Inc. v. Trump,*
    763 F. Supp. 3d 723 (D. Md. 2025) ...................................................60

*Chen Zhou Chai v. Carroll,*
    48 F.3d 1331 (4th Cir. 1995)..............................................................24

*City & Cnty. of San Francisco v. Trump,*
    897 F.3d 1225 (9th Cir. 2018) ..................................................... 36, 53

*Clark v. Jeter,*
    486 U.S. 456 (1988) .......................................................................... 40

*Crouch v. Anderson,*
    No. 24-90, 2025 WL 1787678 (U.S. June 30, 2025) .......................... 39

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ...........................................................................62

iii

*Davis v. Passman*,
  442 U.S. 228 (1979) ....................................................... 39-40

*FCC v. Beach Commc'ns, Inc.*,
  508 U.S. 307 (1993) ............................................................ 51

*Federal Express Corp. v. U.S. Dep't of Com.*,
  39 F.4th 756 (D.C. Cir. 2022) ...................................... 22, 23

*Folwell v. Kadel*,
  No. 24-99, 2025 WL 1787687 (U.S. June 30, 2025) .................... 39, 55

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) ............................................... 48

*Hecox v. Little*,
  104 F.4th 1061 (9th Cir. 2024), *cert. granted*,
  No. 24-38, 2025 WL 1829165 (U.S. July 3, 2025) ............................ 49

*HIAS, Inc. v. Trump*,
  985 F.3d 309 (4th Cir. 2021) ...................................... 35, 36

*Hunt v. Washington State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ............................................................ 61

*INS v. Legalization Assistance Project of the L.A. Cnty. Fed'n of Lab.*,
  510 U.S. 1301 (1993) ......................................................... 58

*Kadel v. Folwell*,
  100 F.4th 122 (4th Cir. 2024) .............................................. 39, 52, 55

*L.W. ex rel. Williams v. Skrmetti*,
  83 F.4th 460 (6th Cir. 2023), *aff'd*,
  145 S. Ct. 1816 ................................................................. 49

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ........................................................... 28

*MicroStrategy Inc. v. Motorola, Inc.*,
  245 F.3d 335 (4th Cir. 2001) .............................................................. 16

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) ................................................................... 37, 38

*Morton v. Ruiz*,
  415 U.S. 199 (1974) ....................................................................... 27

*Mountain Valley Pipeline, LLC v. Western Pocahontas Props. Ltd.*
  *P'ship*, 918 F.3d 353 (4th Cir. 2019) ................................................ 56

*Myers v. United States*,
  272 U.S. 52 (1926) ......................................................................... 24

*New York v. Ferber*,
  458 U.S. 747 (1982) ....................................................................... 58

*Nken v. Holder*,
  556 U.S. 418 (2009) ....................................................................... 57

*Nuclear Regul. Comm'n v. Texas*,
  145 S. Ct. 1762 (2025) ................................................. 22, 30, 31, 32

*Pendleton v. Jividen*,
  96 F.4th 652 (4th Cir. 2024) ........................................................... 16

*Polselli v. IRS*,
  598 U.S. 432 (2023) ....................................................................... 35

*Proposed Executive Order Entitled "Federal Regulation,"*
  5 Op. O.L.C. 59 (1981) .................................................................. 24

*Reno v. Flores*,
  507 U.S. 292 (1993) ....................................................................... 22

*Scoggins v. Lee's Crossing Homeowners Ass'n*,
  718 F.3d 262 (4th Cir. 2013) .................................................... 22, 31

v

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) ...................................................... 29-30

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ............................................................................ 28

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ............................................................................ 63

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ............................................................................ 62

*Trump v. AFGE*,
    No. 24A1174, 2025 WL 1873449 (U.S. July 8, 2025) .................. 19, 20

*Trump v. CASA, Inc.*,
    Nos. 24A884, 24A885, 24A886,
    2025 WL 1773631 (U.S. June 27, 2025) ........... 3, 15, 58, 59, 60, 61, 64

*United States v. Chapman*,
    666 F.3d 220 (4th Cir. 2012) ........................................................52-53

*United States v. Skrmetti*,
    145 S. Ct. 1816 (2025) ................... 2, 14, 39, 41, 42, 43, 44, 45, 46, 47,
                      48, 49, 50, 51, 53, 54, 55, 56, 57

*Virginia Int'l Terminals, Inc. v. Edwards*,
    398 F.3d 313 (4th Cir. 2005) .............................................................25

*Weinberger v. Wiesenfeld*,
    420 U.S. 636 (1975) ............................................................................ 40

*Winter v. NRDC*,
    555 U.S. 7 (2008) ........................................................................ 16, 17

**U.S. Constitution:**

Art. II, § 1, cl. 1 ...................................................................................... 23

Art. II, § 3 ............................................................................................... 23

Amend. XIV, § 1 ................................................................ 40

**Statutes:**

Affordable Care Act,
    42 U.S.C. § 18116 .................................................... 10, 54, 55

Education Amendments of 1972,
    20 U.S.C. § 1681 *et seq* ...............................................54-55

Public Health Service Act:
    42 U.S.C. § 241 *et seq.* .................................................. 28
        42 U.S.C. § 241(a) ................................................. 28
        42 U.S.C. § 241(a)(3) .......................................... 28
        42 U.S.C. § 241(b)(1) .......................................... 28
        42 U.S.C. § 241(b)(3) .......................................... 28
        42 U.S.C. § 241(c) ............................................... 28
        42 U.S.C. § 247b ................................................. 28
        42 U.S.C. § 247b(a) ............................................ 29
        42 U.S.C. § 247b(k) ............................................ 29
        42 U.S.C. § 284(b)(2) .......................................... 28
        42 U.S.C. § 300u-1 .............................................. 28
        42 U.S.C. § 300u-2 .............................................. 28
        42 U.S.C. § 300u-3 .............................................. 28
        42 U.S.C. § 300w-7 ........................................ 10, 54
        42 U.S.C. § 300w-7(a)(2) ..................................... 55

28 U.S.C. § 1292(a)(1) .................................................... 3

28 U.S.C. § 1331 ............................................................ 3

28 U.S.C. § 1346 ............................................................ 3

28 U.S.C. § 1361 ............................................................ 3

**Regulatory Materials:**

45 C.F.R. § 75.210(b)(1)(ii) .............................................. 29

45 C.F.R. § 75.300(a) .............................................................. 29

*Defending Women from Gender Ideology Extremism and*
  *Restoring Biological Truth to the Federal Government,*
  90 Fed. Reg. 8615 (Jan. 30, 2025) ........................... 5, 6, 18, 25, 26, 33

Exec. Order No. 14,151, § 2,
  90 Fed. Reg. 8339 (Jan. 20, 2025) ...................................................... 20

Exec. Order No. 14,173,
  90 Fed. Reg. 8633 (Jan. 21, 2025) ...................................................... 20

Exec. Order No. 14,210, § 3(c),
  90 Fed. Reg. 9669 (Feb. 14, 2025) ...................................................... 19

*Protecting Children from Chemical and Surgical Mutilation,*
  90 Fed. Reg. 8771 (Feb. 3, 2025) ......... 5, 6, 7, 18, 25, 26, 33, 45, 51, 53

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ......................................................... 3

Fed. R. Civ. P. 65(d) .............................................................. 63

**Other Authority:**

Hilary Cass, *Independent Review of Gender Identity Services*
  *for Children and Young People: Final Report* (Apr. 2024) ................ 51

## INTRODUCTION

The district court entered a universal preliminary injunction against Executive Orders issued by President Trump in which he directed federal agencies under his supervision to exercise their discretion, to the extent they may do so consistent with applicable law, to avoid the federal funding of gender ideology and specified sex transition interventions for children under age 19. This lawsuit, filed just two weeks after the President issued the Executive Orders, does not challenge any agency action taken in response to the Executive Orders, but is premised instead on hypothetical actions agencies might take based on as-yet-unidentified statutory authorities. Indeed, plaintiffs do not invoke any statutory cause of action at all. Rather, they have asserted sweeping "facial," *ultra vires* challenges to the Executive Orders on the purported ground that they violate Constitutional separation of powers and discriminate based on sex in violation of statutes and the Fifth Amendment's equal protection guarantee. The district court's ruling that plaintiffs are likely to succeed on the merits of these claims suffers from multiple legal errors.

For one thing, plaintiffs failed to satisfy the heavy burden applicable to their facial, *ultra vires* challenge, which required them to show that no set of circumstances exists under which any agency could take any hypothetical action to carry out the policies of the Executive Orders that is even plausibly within its statutory and constitutional authority. Federal agencies often have discretion, within the limits Congress has established, to determine priorities for federal funds or to take other discretionary steps with respect to funding, and the President may direct them to exercise that discretion in a particular way. That is all the Executive Orders here do. They are not self-executing and do not themselves terminate any funding but instead direct agencies to implement the policies therein consistent with applicable law, and they reflect a proper exercise of the President's supervisory authority over the Executive Branch.

Furthermore, plaintiffs' constitutional and statutory discrimination claims are foreclosed by the Supreme Court's recent decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), which held that a Tennessee law addressing materially indistinguishable sex transition interventions on minors did not classify based on sex or

"transgender status" and did not violate equal protection. *Skrmetti* controls here.

The district court's preliminary injunction rests on multiple legal errors and should be vacated in its entirety. At minimum, the court's "nationwide" injunction extending relief to nonparties across the country cannot survive *Trump v. CASA, Inc.*, Nos. 24A884, 24A885, 24A886, 2025 WL 1773631 (U.S. June 27, 2025).

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1346, and 1361. (JA47–48.) The district court granted plaintiffs' motion for a preliminary injunction on March 4, 2025 (JA988–989), and the government timely appealed on March 21, 2025 (JA990). *See* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

Executive Order 14,168 directs federal agencies to take necessary steps "as permitted by law" to assess grant conditions and grantee preferences to ensure that federal grant funds do not promote "gender ideology." Executive Order 14,187 directs agencies that provide

3

research or education grants to medical institutions to take appropriate steps "consistent with applicable law" to ensure that institutions receiving federal research or education grants end the "chemical and surgical mutilation" of children. The district court entered a "nationwide" injunction enjoining defendants from implementing these directives.

This appeal presents the following issues:

(1)    Whether the district court erred in concluding that plaintiffs had a likelihood of success on their claim that the Executive Orders were facially *ultra vires*;

(2)    Whether plaintiffs faced irreparable harm and satisfied the remaining preliminary injunction factors; and

(3)    Whether the district court's "nationwide" preliminary injunction is at minimum overbroad.

## PERTINENT STATUTES AND REGULATIONS

Pertinent authorities are reproduced in the addendum to this brief.

4

## STATEMENT OF THE CASE

### A.    The Executive Orders

On January 20, 2025, President Trump signed Executive Order 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 30, 2025) (the "Defending Women EO").  And, on January 28, 2025, the President signed Executive Order 14,187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Feb. 3, 2025) (the "Protecting Children EO").

The Defending Women EO establishes that "the policy of the United States [is] to recognize two sexes, male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality."  Preamble, § 2.  Section 3(e) of the Defending Women EO states:  "Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology."  Section 3(g) of the Defending Women EO likewise states:  "Federal funds shall not be used to promote gender ideology.  Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology."  The Defending Women EO defines "gender ideology" to

5

include "the idea that there is a vast spectrum of genders that are

disconnected from one's sex," with the term "sex" referring to "an

individual's immutable biological classification as either male or

female." § 2(a), (f). The final section of the Defending Women EO

reiterates: "This order shall be implemented consistent with applicable

law and subject to the availability of appropriations"; and "[n]othing in

this order shall be construed to impair or otherwise affect … the

authority granted by law to an executive department or agency." § 8(a),

(b).

The Protecting Children EO declares the "policy of the United

States" to be "that it will not fund, sponsor, promote, assist, or support

the so-called 'transition' of a child from one sex to another." § 1.

Section 4 of the Protecting Children EO states:

> *Defunding Chemical and Surgical Mutilation.* The head of
> each executive department or agency (agency) that provides
> research or education grants to medical institutions,
> including medical schools and hospitals, shall, consistent
> with applicable law and in coordination with the Director of
> the Office of Management and Budget, immediately take
> appropriate steps to ensure that institutions receiving
> Federal research or education grants end the chemical and
> surgical mutilation of children.

The Protecting Children EO defines the term "child" or "children" to mean "an individual or individuals under 19 years of age." § 2(a). And it defines the "chemical and surgical mutilation" of children to mean "the use of puberty blockers … to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex"; "the use of sex hormones … to align an individual's physical appearance with an identity that differs from his or her sex"; and "surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions." § 2(c). The Protecting Children EO further states that these chemical and surgical interventions are sometimes "referred to as 'gender affirming care.'" *Id.*

Like the Defending Women EO, the final section of the Protecting Children EO makes clear that "this order shall be implemented consistent with applicable law and subject to the availability of appropriations," § 11(b), and that "nothing in this order shall be construed to impair or otherwise affect … the authority granted by law to an executive department or agency," § 11(a).

7

### B.   Proceedings Below

### 1.   The complaint

Plaintiffs, several individuals and two membership organizations (JA48–51), filed this lawsuit on February 4, 2025, two weeks after the President signed the Executive Orders, and then filed an amended complaint on February 11, 2025 (JA43–87).  The complaint named as defendants President Trump, the U.S. Department of Health and Human Services and two of its components, the National Science Foundation, and the heads of those agencies and components.  (JA51–52.)

The individual plaintiffs are trans-identifying individuals under age 19 and some parents of these individuals.  (JA49–51.)  The complaint alleges that the Executive Orders cover sex transition interventions that these individuals were receiving, or were scheduled to receive, but that the issuance of the Executive Orders has caused medical institutions receiving federal grants to stop providing these interventions to children under age 19, including the individual plaintiffs.  (JA49–51, JA67–74.)

8

The membership organization plaintiffs are PFLAG, Inc. and GLMA. The individual plaintiffs above are members of PFLAG. (JA49.) According to the complaint, "PFLAG has more than 550,000 members and supporters nationwide, including many families of transgender youth who currently receive or will soon need to access the medical treatment for gender dysphoria that the Executive Orders seek to prohibit." (JA48–49.) The complaint alleges that PFLAG's members have been harmed by the cancellation of sex transition interventions for children under age 19 caused by the Executive Orders. (JA74.) According to the complaint, "GLMA's membership includes approximately 1,000" health professionals, including some "who work at medical institutions receiving grant funding from" the federal government. (JA48–49.) The complaint alleges that some GLMA members have been harmed by the Executive Orders because their employers have prohibited them from providing sex transition interventions for patients under age 19 and that other GLMA members are employed on projects, or are students at medical institutions, that could lose federal funding. (JA75–76.)

As relevant here, the complaint asserts that Section 3(g) of the Defending Women EO and Section 4 of the Protecting Children EO (1) exceed the President's constitutional authority under separation of powers principles (the First Claim for Relief) (JA76–78); and (2) discriminate based on sex, in violation of the equal protection component of the Fifth Amendment's Due Process Clause, Section 1557 of the Affordable Care Act (42 U.S.C. § 18116), and Section 1908 of the Public Health Service Act (42 U.S.C. § 300w-7) (the Second and Fourth Claims for Relief) (JA78–79, JA81–82).  For relief, the complaint seeks a declaration that the Executive Orders are unlawful and injunctive relief enjoining defendants "from implementing or enforcing Section 3(g) of the [Defending Women EO] and the [Protecting Children EO] or otherwise withholding federal funding based on the fact that a healthcare entity provides gender affirming medical care."  (JA83–84.)

## 2.    The preliminary injunction

The district court granted plaintiffs a temporary restraining order on February 13, 2025 (JA88–89); and, on March 4, 2025, the district court issued a preliminary injunction (JA988–989).

In issuing the preliminary injunction, the district court held that plaintiffs' claims were ripe for judicial review because plaintiffs "have brought a facial challenge" to the constitutionality of the Executive Orders, which the court said presents a "legal question" that "does not depend on future uncertainties." (JA934.) The court said that because "hospitals across the country immediately paused or cancelled gender-affirming care for youth in direct response to the Executive Orders," it "need not wait for the agencies to identify specific funding programs affected by the Executive Orders to ripen the case for judicial review" (JA935–936) and that to do so "would certainly impose hardship on [p]laintiffs" (JA938). The court further held that plaintiffs' claims were otherwise reviewable—not under the Administrative Procedure Act or any other statute providing for a cause of action against an agency, but as *ultra vires*, nonstatutory review claims. (JA939–949.)

Turning to the merits, the district court held that plaintiffs were likely to succeed on their claims that the challenged portions of the Executive Orders exceed the President's authority and unlawfully discriminate based on sex and "transgender status." (JA950–978.) The court further held that plaintiffs would suffer irreparable harm absent

11

an injunction (JA978–980) and that the balance of the equities and the public interest favored an injunction (JA980–982).

As to the scope of the injunction, the district court rejected the government's position that any injunction should be limited to the individual plaintiffs named in the complaint and to those members of the plaintiff organizations who had standing and had been identified. The court said that "[s]ignificant confusion would result from preventing agencies from conditioning funding on certain medical institutions, while allowing conditional funding to persist as to other medical institutions." (JA983.) The court held that because PFLAG and GLMA have members "located throughout the country," "an injunction of nationwide scope is necessary to provide complete relief." (JA984.) Accordingly, the district court entered a preliminary injunction that universally enjoins the defendants "from conditioning, withholding, or terminating federal funding under Section 3(g) of Executive Order 14, 168 and Section 4 of Executive Order 14,187, based on the fact that a healthcare entity or health professional provides gender-affirming medical care to a patient under the age of nineteen." (JA988–989.)

## SUMMARY OF ARGUMENT

Plaintiffs here do not challenge any concrete action any agency has taken pursuant to the Executive Orders. They have instead brought a facial *ultra vires* challenge, which requires them to show that *no* agency could take *any* hypothetical action to carry out the policies of the Executive Orders that is even plausibly within its statutory and constitutional authority. Plaintiffs cannot meet that near-insurmountable burden. Congress may impose limits on how federal funds are spent, but within those limits, federal agencies often have discretion to determine priorities or take other discretionary steps with respect to funding, and the President, as the head of the Executive Branch, may direct federal agencies to exercise that discretion in a particular way. The Executive Orders here direct federal agencies to exercise whatever discretion they have under existing law to avoid funding "gender ideology" or "gender affirming care," and there are multiple circumstances in which an agency may reasonably do so. The district court misapplied the standard for facial challenges in concluding that the Executive Orders had to affirmatively identify statutory authorization for their policies, rather than recognizing that

13

plaintiffs bear the burden of demonstrating that no plausibly lawful applications of the Executive Orders exist. Plaintiffs fail to meet that burden in no small part because their suit is premised on hypothetical actions agencies might take based on as-yet-unidentified statutory authorities.

The same problems doom plaintiffs' constitutional and statutory discrimination claims, which are likewise premised on hypothetical actions agencies have not identified, much less taken. Those points alone are sufficient basis to reverse. But even if it were necessary to consider those claims on their merits, they fail because the Executive Orders do not classify based on sex or transgender status. The Supreme Court's recent decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), forecloses plaintiffs' constitutional and statutory discrimination claims. Like the Tennessee law that prohibited sex transition interventions on minors in *Skrmetti*, the Executive Orders at most merely classify based on age and medical use and are, therefore, subject only to rational basis review, which they easily satisfy under *Skrmetti*. The Executive Orders would also satisfy heightened scrutiny, were it applicable. Therefore, the Executive Orders do not violate the

14

Constitution's equal protection guarantee. And because they do not discriminate "based on sex" under *Skrmetti*, plaintiffs' statutory discrimination claims likewise fail.

The district court also misapplied the remaining preliminary injunction factors. The injunction improperly intrudes on the President's authority to instruct subordinate officials to carry out policy and undermines the implementation of policies that respond to the reasonable concerns about identified medical interventions for minors that the Supreme Court recognized in *Skrmetti*.

Finally, even if a preliminary injunction were appropriate, the Supreme Court's decision in *Trump v. CASA, Inc.*, Nos. 24A884, 24A885, 24A886, 2025 WL 1773631 (U.S. June 27, 2025), makes clear that the district court's universal preliminary injunction is overbroad. *CASA* explains that a federal court's power is limited to "administer[ing] complete relief *between the parties*," *id.* at *11, and expressly rejects many of the rationales the district court advanced for universal relief. And complete relief to the plaintiffs who have established standing before the district court—several named plaintiffs and a few additional members of the plaintiff associations—is plainly

15

possible by limiting the injunction to protect those institutions at which those individuals receive or provide the interventions covered by the Executive Orders.

## STANDARD OF REVIEW

This Court "review[s] the grant or denial of a preliminary injunction for abuse of discretion, recognizing that preliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001). "A ruling that rests on an error of law is necessarily an abuse of discretion." *Pendleton v. Jividen*, 96 F.4th 652, 656 (4th Cir. 2024).

## ARGUMENT

Injunctive relief is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC*, 555 U.S. 7, 22 (2008). To be entitled to a preliminary injunction, plaintiffs had to clearly show "that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance

16

of equities tips in [their] favor, and that an injunction is in the public interest." *Id.* at 20.  The district court abused its discretion in ruling that plaintiffs met this high standard, and its preliminary injunction should be vacated.

## I.    Plaintiffs Have No Likelihood of Success on the Merits of the Sweeping Facial Claims They Asserted

Plaintiffs failed to demonstrate that they are likely to succeed on the merits of their claims.  In ruling otherwise, the district court misinterpreted the terms and legal effect of the Defending Women EO and the Protecting Children EO and misunderstood the threshold requirements for plaintiffs' claims.

Congress may pass, and the President may sign, Acts imposing limits on how federal funds may be spent.  But while respecting those limits, federal agencies may often exercise their discretion to determine where funds go.  And the President, as the head of the Executive Branch, may direct federal agencies to exercise that discretion in a particular way.

That is all the Executive Orders here do.  They direct federal agencies to exercise what discretion they have under existing law to avoid funding "gender ideology" or "gender affirming care."  Because the

17

Executive Orders merely tell agencies how to exercise their discretion within the limits established by law—and do not themselves terminate any funding—plaintiffs' facial challenge to the President's authority to issue the Executive Orders is meritless. Plaintiffs' constitutional and statutory discrimination claims fail too, because the Executive Orders do not classify based on sex or transgender status, and they easily satisfy rational basis review; and even if they did classify on either of these bases, they would survive heightened scrutiny.

## A.    The President acted within his authority in issuing the Executive Orders

Plaintiffs here do not challenge any action actually taken by an agency pursuant to the Executive Orders. They instead have brought a freestanding suit depending on the premise that the Executive Orders impose some immediate obligation on agencies to act unlawfully in managing federal grant programs. That conclusion ignores the plain text of the Executive Orders, which direct the President's subordinates to take steps "as permitted by law," Defending Women EO § 3(e), or "consistent with applicable law," Protecting Children EO § 4. The President may instruct subordinate officials on how to exercise any discretion they possess in carrying out their duties, and to the extent

18

plaintiffs are actually harmed by some exercise of agency discretion, they would be free to challenge that action in the future.

The Supreme Court's recent grant of a stay in *Trump v. AFGE*, No. 24A1174, 2025 WL 1873449 (U.S. July 8, 2025), underscores the point. There, an executive order directed agencies to "undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law." Exec. Order No. 14,210, § 3(c), 90 Fed. Reg. 9669, 9670 (Feb. 14, 2025). The plaintiffs sued to challenge the order and an implementing memorandum from the Office of Personnel Management and Office of Management and Budget that directed agencies to submit RIF plans for review, asserting that the RIFs would be unlawful without congressional authorization. The district court entered a preliminary injunction barring implementation of the order and memorandum, without reviewing any actual agency plan for a RIF. The Supreme Court stayed the injunction, explaining that the government was "likely to succeed on its argument that the Executive Order and Memorandum are lawful" and emphasizing that the district court had "enjoined further implementation or approval of the plans based on its view about the illegality of the Executive Order and Memorandum, not

19

on any assessment of the plans themselves." *AFGE*, 2025 WL 1873449, at *1. As Justice Sotomayor observed in her concurrence, "the relevant Executive Order directs agencies to plan reorganizations and reductions in force 'consistent with applicable law,'" and because the "plans themselves" were not before the Court, it had "no occasion to consider whether they can and will be carried out consistent with the constraints of law." *Id.*

This Court likewise recently granted a stay of a preliminary injunction for similar reasons in *National Association of Diversity Officers in Higher Education v. Trump*, No. 25-1189 (4th Cir. Mar. 14, 2025) (Addendum). There, the district court had enjoined the government from enforcing two executive orders that instructed agencies "to terminate, to the maximum extend allowed by law," all "diversity, equity, and inclusion" programs within federal grant and contract processes, finding the provisions likely unconstitutional. *Id.* slip op. at 2; *see* Exec. Order No. 14,151, § 2, 90 Fed. Reg. 8339 (Jan. 20, 2025); Exec. Order No. 14,173, 90 Fed. Reg. 8633 (Jan. 21, 2025). This Court found that the government was likely to succeed on the merits and granted a stay, with several concurring opinions emphasizing that

20

the case "[did] not challenge any particular agency action implementing the [e]xecutive [o]rders," slip op. at 9 (Rushing, J., concurring), that the executive orders merely "direct executive policy and actors," *id.* at 5 (Diaz, C.J., concurring), and that the executive orders did "not on their face violate" the Constitution, *id.* at 7 (Harris, J., concurring); *see also id.* at 9 (Rushing, J., concurring) (highlighting "serious questions about the ripeness of [the] lawsuit").

Here, the district court's conclusion is especially inappropriate given the task plaintiffs set for themselves with this suit.  Because there is no agency action at issue, plaintiffs cannot proceed under the Administrative Procedure Act, and plaintiffs identify no other statutory basis for judicial review.  Nor can they obtain injunctive relief against the President's issuance of the Executive Orders.  Instead, plaintiffs have brought a nonstatutory *ultra vires* action that seeks to enjoin actions agencies might take pursuant to the Executive Orders, and they have expressly framed that challenge as a "'facial challenge' to the [Executive] Orders' constitutionality."  (JA168).

Plaintiffs' suit thus faces significant barriers.  First, nonstatutory *ultra vires* suits are "strictly limited" and are not available "simply

21

because an agency has arguably reached a conclusion which does not comport with the law," but instead may be invoked "only when an agency has taken action entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute." *Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. 1762, 1775–76 (2025) (cleaned up); *see also Federal Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 766 (D.C. Cir. 2022) ("To be ruled ultra vires, the challenged action must contravene a clear and specific statutory mandate, and the statutory construction adopted by an agency will be held impermissible only if it is utterly unreasonable.") (cleaned up).  Such nonstatutory review claims "rarely succeed[]," *Nuclear Reg. Comm'n*, 145 S. Ct. at 1776, and are especially unlikely to do so here; because plaintiffs assert a facial challenge, they must demonstrate that "*no set of circumstances exists* under which the [Executive Orders] would be valid," *Reno v. Flores*, 507 U.S. 292, 301 (1993) (emphasis added).

Thus, to succeed here, plaintiffs must show that any hypothetical action an agency could possibly take in response to the Executive Orders would contravene some specific statutory or constitutional prohibition—indeed, that any action taken pursuant to an

22

interpretation of statutory grant authority conferred by Congress would be "utterly unreasonable." *Federal Express Corp.*, 39 F.4th at 766. Plaintiffs cannot meet that imposing standard, both given the plain text of the orders and the inherent uncertainty about what actions agencies might take to implement them. Indeed, adjudicating plaintiffs' suit in this posture—where the entire focus of the action is on hypothetical actions plaintiffs believe agencies might take in the future under as-yet-unidentified statutory authorities—is inappropriate. *See Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013) (noting that a suit is not ripe for review if dependent on "future uncertainties").

### 1. The President properly exercises supervisory authority over the Executive Branch

The President issued the challenged Executive Orders as an exercise of his authority to supervise and direct the actions of his subordinates in the Executive Branch. The Constitution provides that the "executive power shall be vested in a President of the United States of America," U.S. Const. art. II, § 1, cl. 1, who "shall take care that the laws be faithfully executed," *id.* § 3. The President's constitutional

authority under these provisions necessarily encompasses "general administrative control of those executing the laws," *Myers v. United States*, 272 U.S. 52, 164 (1926), throughout the Executive Branch. As the Supreme Court explained long ago:

> The ordinary duties of officers prescribed by statute come under the general administrative control of the President by virtue of the general grant to him of the executive power, and he may properly supervise and guide their construction of the statutes under which they act ….

*Id.* at 135; *see also Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1339 (4th Cir. 1995) (recognizing "the President's general constitutional powers to direct the exercise of powers statutorily delegated to executive branch officials"); *Building & Const. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) ("[The President's] faithful execution of the laws enacted by the Congress … ordinarily allows and frequently requires the President to provide guidance and supervision to his subordinates."); *Proposed Executive Order Entitled "Federal Regulation,"* 5 Op. O.L.C. 59, 63 (1981) (concluding that the President may "require agencies to exercise their discretion, within statutory limits," in accordance with the terms of an executive order).

24

That is precisely what the Defending Women EO and the Protecting Children EO do.  Invoking the authority vested in the President "by the Constitution and the laws of the United States of America," the Executive Orders direct federal agencies to exercise what discretion they have under existing law to avoid funding "gender ideology" or "gender affirming care."  *See* Defending Women EO, pmbl., § 3(e), (g); Protecting Children EO, pmbl., § 4.

Specifically, the Defending Women EO directs agencies to "take all necessary steps, *as permitted by law*, to end the Federal funding of gender ideology," § 3(e) (emphasis added), and subsequently directs agencies to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology," § 3(g).  Although § 3(g) does not expressly restate the qualifier that is explicit in § 3(e)—"as permitted by law"—the two provisions must be read together because they appear in the same section and address the same subject matter.  *See Virginia Int'l Terminals, Inc. v. Edwards*, 398 F.3d 313, 317 (4th Cir. 2005) (recognizing the "longstanding canon of interpretation" that "adjacent statutory subsections that refer to the same subject matter … must be read *in pari materia* as if they were a single statute").  And in

25

any event, the Defending Women EO as a whole is to be "implemented consistent with applicable law." § 8(b).  Accordingly, the relevant provisions of the Defending Women EO direct agencies to exercise their discretion only to the extent permitted by law to end the federal funding of gender ideology.

The Protecting Children EO similarly directs that agencies "shall, *consistent with applicable law …,* immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children"—which has been called "gender affirming care."  § 4 (emphasis added).  And that Executive Order, too, directs in closing that it "shall be implemented consistent with applicable law."  § 11(b).

Therefore, the plain language of the Executive Orders directs agencies to avoid funding "gender ideology" and "gender affirming care" within the limits established by existing applicable law.  Consequently, if an executive agency, such as the Department of Health and Human Services, may lawfully implement the Executive Orders, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Orders, then the Executive Orders

26

themselves instruct the agency to follow the law. *See Allbaugh*, 295 F.3d at 33. "The mere possibility that some agency might make a legally suspect decision to … deny funding" based on the Executive Orders "does not justify an injunction." *Id.*

None of this offends the separation of powers. Congress may confer discretion on the Executive Branch over funding in a variety of ways that could affect the ability to implement the Executive Orders here. Congress may create grant programs that leave discretion to the Executive Branch in their implementation and selection of worthy projects to fund, and "the allocation of grant funds among various eligible recipients, none of which has any statutory entitlement to them, is traditionally a matter 'committed to agency discretion by law.'" *California Hum. Dev. Corp. v. Brock*, 762 F.2d 1044, 1052 (D.C. Cir. 1985) (Scalia, J., concurring); *see Morton v. Ruiz*, 415 U.S. 199, 230 (1974) (recognizing an agency's "power to create reasonable classifications and eligibility requirements in order to allocate the limited funds available to [it]"). Similarly, the Supreme Court has held that "[t]he allocation of funds from a lump-sum appropriation is [an] administrative decision traditionally regarded as committed to agency

27

discretion" by law.  *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993).  "After all," the Court explained, "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."  *Id.*  That may well include, in appropriate cases, allocating funds based on priorities set forth in Executive Orders.

In addition, while Congress may directly "attach conditions on the receipt of federal funds," it may equally delegate that power to the Executive Branch, conditioning receipt of funds "upon compliance by the recipient with federal . . . administrative directives."  *South Dakota v. Dole*, 483 U.S. 203, 206 (1987).

One example is illustrative.  The Public Health Service Act, 42 U.S.C. § 241 *et seq.*, confers broad authority on the Secretary of Health and Human Services to fund research and to award research grants for various purposes.  *See, e.g.*, 42 U.S.C. § 241(a), (a)(3), (b)(1), (b)(3), (c); *id.* § 247b; *id.* § 284(b)(2); *id.* §§ 300u-1, 300u-2, 300u-3.  These include grants to universities, hospitals, laboratories, and other public or private institutions for research projects relating to human physical and mental diseases.  *Id.* §§ 241(a), (a)(3), 284(b)(2).  The Secretary may also

28

make grants to States and other public entities to assist them with the costs of establishing and maintaining preventive health service programs, *id.* § 247b(a), and to States and other public and nonprofit private entities for research, public education, and training of healthcare professionals in the prevention and control of diseases, *id.* § 247b(k).

While these programs are subject to some restrictions from Congress—such as that projects funded under § 241(a)(3) must be "recommended by the advisory council"—none of these statutory authorities contains any affirmative requirement that grants be used to support "gender affirming care" or "gender ideology." Consequently, an agency's implementation of the Executive Orders' directives to avoid funding these particular activities would not conflict with these statutory grant authorizations. And more generally, HHS regulations have long recognized that grant terms may "include statutory, *executive order*, other Presidential directive, or regulatory requirements that apply by specific reference and are not program-specific." 45 C.F.R. § 75.210(b)(1)(ii) (emphasis added); *see also id.* § 75.300(a); *Sherley v.*

*Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) (upholding agency's funding policies based on executive order and within congressional limits).

As these points illustrate, there are multiple circumstances in which an agency may reasonably implement the Executive Orders:  in choosing between multiple applicants for a limited pool of funds, when Congress makes a lump-sum appropriation to an agency, or when Congress authorizes agencies to impose conditions on grants, agencies may act consistent with the Executive Orders and the relevant statutes. Plaintiffs thus cannot plausibly claim that *every* conceivable action that might be taken under one or more of these authorities would be "entirely in excess of [the agency's] delegated powers and contrary to a *specific prohibition* in a statute."  *Nuclear Regul. Comm'n*, 145 S. Ct. at 1776.  Much less can they claim to have shown that every conceivable action that could be taken under every grant program would be not only contrary to a specific prohibition, but so obviously so as to be *ultra vires*.

## 2.    The district court misconstrued the Executive Orders

As noted above, plaintiffs have not challenged any concrete action by any agency taken pursuant to the Executive Orders.[1]  It is thus unclear what actions agencies will take, as well as what statutory authorities might be relevant to those hypothetical future actions. Whether viewed as a ripeness issue because plaintiffs' challenge is dependent on contingent future events, *see Scoggins*, 718 F.3d at 270, or as a failure to meet their burden to show that there is no action any agency could possibly take pursuant to the Executive Orders that would not be *ultra vires*, *see Nuclear Reg. Comm'n*, 145 S. Ct. at 1776; *Reno*, 507 U.S. at 301, plaintiffs' challenge cannot succeed at this stage.

The district court tried to solve this problem by misreading the Executive Orders and inverting the relevant analysis for plaintiffs' facial *ultra vires* claim.  Rather than requiring plaintiffs to demonstrate

---

[1] The district court pointed out that, after the Executive Orders were issued, two agency components issued notices (which have since been rescinded) to grant recipients stating that grant funds may not be used for activities that do not align with the Executive Orders.  (JA926–927.)  The Centers for Disease Control and Prevention also temporarily terminated several grants that it reinstated less than two weeks later. (JA991–992.)  Plaintiffs, however, have not asserted any claims challenging these actions.

31

that there is *no* hypothetical action that *any* agency could take that would not manifestly contravene a clear statutory or constitutional prohibition, *see Nuclear Regul. Comm'n*, 145 S. Ct. at 1776, the court believed that an injunction was warranted because the government had "point[ed] to no statutory authority reflecting the supposed will of Congress as it relates to gender-affirming care for individuals under the age of nineteen" (JA957) and repeatedly faulted the government for not identifying "specific authorization" for any hypothetical future actions consistent with the Executive Orders (JA953, JA955).  But that gets matters exactly backwards:  it is plaintiffs' burden to show that their facial *ultra vires* challenge succeeds, not the government's burden to prove the negative as to actions no agency has yet taken under as-yet-unidentified statutory authorities.

Indeed, the district court faulted the Executive Orders for not identifying every statutory authority supporting their implementation, characterizing the government's argument as a "*post-hoc* invocation of provisions" on which the Orders "did not purport to rely."  (JA953.)  But that only underscores that a significant point of the Executive Orders was to direct agencies to determine how to carry out the Executive

32

Orders consistent with law—in other words, to ascertain which authorities agencies might invoke to lawfully implement the orders. That the orders themselves did not cite every statutory authority or delegation is thus unsurprising, and it would have been impractical in any event given the large number of agencies at which the Executive Orders were directed and the many different federal funding statutes applicable to them, differing with each agency. Instead, the orders invoked the President's Article II authority to supervise the Executive Branch and "the laws of the United States of America," Defending Women EO, pmbl., § 3(e), (g); Protecting Children EO, pmbl., § 4, and no more is required for a Presidential directive to agencies to take steps to reflect administration policy consistent with law.

The district court's shifting frames of reference underscore the point. The court at one point declared that the "Executive Branch exceeded its power under Article II by refusing to spend" funds Congress had appropriated. Op. 34. But, as noted, plaintiffs did not challenge any particular decision to withhold, suspend, or decline to grant funds appropriated by Congress. It is thus unclear how the

33

agencies could have "exceeded [their] power" by "refusing to spend" funds when plaintiffs did not challenge any such action.

Similarly, confronted with an agency's statutory authority "to exercise discretion to allocate funds and determine research priorities," the district court responded that "no provision" in a statute "authorizes agencies to condition the *entirety* of their federal funding for those under the age of nineteen," which goes "well beyond determining research priorities."  (JA954–955.)  Of course, if agencies possess some discretion to "determine research priorities," then there are plainly lawful applications of the Executive Orders here that preclude an injunction.  But more generally, the district court erred in assuming that the Executive Orders would be applied in this sweeping fashion.  Agencies must determine on a case-by-case basis whether the law applicable to each grant program permits the agency to condition the grant in accordance with the policies and directives of the Executive Orders.  Thus, there is no basis to assume—in the absence of any concrete action being challenged—that agencies will adopt the course of conduct the district court relied on.

The district court's assumptions about unlawful action also required ignoring the plain language of the Executive Orders. The district court believed that the clear instruction in each order to follow applicable laws should be disregarded as "boilerplate." (JA958.) That reasoning erroneously gives no effect to the terms of the Executive Orders that direct agencies to follow the statutory law applicable to them. The interpretation of an executive order necessarily begins with its text, and the basic interpretive maxim that courts "ordinarily aim to give effect to every clause and word of a statute," *Polselli v. IRS*, 598 U.S. 432, 441 (2023), applies here.

The district court founded its disregard for the text on this Court's decision in *HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021). But *HIAS* only underscores the flaws in plaintiffs' suit here. There, an executive order directed two specific agencies to establish a new criterion for refugee resettlement under the Refugee Act, and it provided that the Secretary of State could override this new requirement if inconsistent with "the policies and strategies established under 8 U.S.C. [§] 1522(a)(2)(B) and (C) or other applicable law." *Id.* at 317. The State Department then issued a notice explaining how it

35

would implement the executive order, and plaintiffs brought suit under the APA.  *Id.* at 315, 317–18.

Thus, in *HIAS*, the relevant agency had made clear how it would implement the executive order at issue, and the plaintiffs proceeded under the APA, not through a nonstatutory *ultra vires* suit.  And in that concrete context, this Court held that the "savings clause" of the executive order, which directed compliance with applicable law, was merely "theoretical" because there was no mechanism provided by the executive order or the implementing policy for affected parties to actually invoke it, nor were there any standards for applying it even if it could be invoked.  *HIAS*, 985 F.3d at 325.  The Court further held that applying the savings clause in that case "would nullify the 'clear and specific' substantive provisions of the [executive order]," and the savings clause could not "override" the order's meaning.  *Id.* (quoting *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018)).

Here, by contrast, it is entirely unclear what statutory schemes might be at issue or what actions agencies might take under those statutory schemes.  Plaintiffs have not challenged any implementing policy by any agency.  In these circumstances, the Executive Orders'

36

direction that agencies follow the law cannot be treated as merely "theoretical."  Rather, as was the case in *Allbaugh*, 295 F.3d at 33, "if an executive agency … may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law."

_____

At bottom, the district court's erroneous criticisms underscore both the premature nature of this suit and the fundamental unsuitability of a facial challenge.  Plaintiffs' choice to litigate this question as a "facial challenge" to the Executive Orders' constitutionality (JA168) "comes at a cost."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).  "For a host of good reasons, courts usually handle constitutional claims case by case, not en masse."  *Id.*  As is true in this case, "[c]laims of facial invalidity often rest on speculation about the law's coverage and its future enforcement.  And facial challenges threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways."  *Id.*

(citation omitted).  The Supreme Court has "therefore made facial challenges hard to win."  *Id.*

This case perfectly illustrates the point.  The case depends entirely on "speculation" about the "coverage" and "future enforcement" of the Executive Orders, *NetChoice*, 603 U.S. at 723, including what grants might be affected, what statutory authorities might apply to action taken by an agency, and precisely what the relevant agency might require.  Plaintiffs would, of course, be free to challenge some future action by an agency that they believe is inconsistent with the statutes governing that action.  But this sort of blunderbuss challenge to hypothetical future actions cannot support a preliminary injunction.

## B.    The Executive Orders do not discriminate based on sex or transgender status

The same problems are inherent in plaintiffs' constitutional and statutory discrimination claims, which likewise lodge facial *ultra vires* challenges to hypothetical future actions agencies might take, and those claims cannot form the basis for an injunction for the same reasons. But even if considered, plaintiffs' constitutional and statutory discrimination claims (JA78–79, JA81–82) lack merit.  The Executive Orders do not discriminate based on sex or transgender status, and they

38

easily survive rational basis review.  Nor is transgender status a suspect class triggering heightened scrutiny.  Even if it were, and even assuming that the Executive Orders classify based on either sex or transgender status, they would still survive heightened scrutiny.

The district court's determination that plaintiffs are likely to succeed on the merits of their constitutional and statutory discrimination claims rested on this Court's decision in *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) (en banc).  (*See* JA966–978.)  But, on June 30, 2025, the Supreme Court granted the petitions for writ of certiorari in that case, vacated the judgment, and remanded the case "for further consideration in light of *United States v. Skrmetti*, 605 U.S. __ (2025)," 145 S. Ct. 1816 (2025).  *Folwell v. Kadel*, No. 24-99, 2025 WL 1787687 (U.S. June 30, 2025); *Crouch v. Anderson*, No. 24-90, 2025 WL 1787678 (U.S. June 30, 2025).  The Supreme Court's decision in *Skrmetti* forecloses plaintiffs' constitutional and statutory discrimination claims challenging the Executive Orders here.

### 1.    Equal protection claim

The Due Process Clause of the Fifth Amendment "forbids the Federal Government to deny equal protection of the laws," *Davis v.*

*Passman*, 442 U.S. 228, 234 (1979), and the Fourteenth Amendment prohibits the States from denying to any person within their jurisdiction "the equal protection of the laws," U.S. Const. amend. XIV, § 1. "[T]he equal protection obligations imposed by the Fifth and the Fourteenth Amendments" are "indistinguishable." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995); *see also Weinberger v. Wiesenfeld*, 420 U.S. 636, 638, n.2 (1975).

Under the equal protection analysis, courts "apply different levels of scrutiny to different types of classifications." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Typically, a classification in the law need only be "rationally related to a legitimate governmental purpose." *Id.* "Classifications based on race or national origin," on the other hand, are suspect and receive "the most exacting scrutiny." *Id.* And "[b]etween these extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny, which generally has been applied to discriminatory classifications based on sex or illegitimacy." *Id.*

The district court here applied intermediate (or heightened) scrutiny based on its determination that "the Executive Orders facially classify based on transgender status." (JA973.) But the Supreme

40

Court's recent decision in *Skrmetti* makes clear that the Executive
Orders here—which focus on specific forms of medical interventions for
children age 19 and under—are reviewed under, and survive, rational
basis review.

> **a.    The Supreme Court in *Skrmetti* upheld
> a state law prohibiting the same
> interventions at issue here for minors**

In *Skrmetti*, the Supreme Court held that Tennessee's child-
protection law proscribing sex transition interventions for minors,
including the use of puberty blockers, cross-sex hormones, and surgery
to address gender dysphoria, was not subject to heightened scrutiny
because it did not classify based on sex or "transgender status."  145 S.
Ct. 1816.  In particular, the Tennessee law prohibited a healthcare
provider from "[s]urgically removing, modifying, altering, or entering
into tissues, cavities, or organs of a human being," or "[p]rescribing,
administering, or dispensing any puberty blocker or hormone" for the
purpose of (1) "[e]nabling a minor to identify with, or live as, a
purported identity inconsistent with the minor's sex," or (2) "[t]reating
purported discomfort or distress from a discordance between the minor's
sex and asserted identity."  *Id.* at 1826.  The Tennessee law was limited,

41

however, in that it did not restrict the administration of puberty blockers or hormones to individuals 18 and over.  And it did not fully ban the administration of such drugs to minors:  a healthcare provider could administer puberty blockers or hormones to treat a minor's congenital defect, precocious puberty, disease, or physical injury.  The Tennessee law expressly excluded the following from the definitions of "congenital defect" and "disease":  "gender dysphoria, gender identity disorder, [and] gender incongruence."  *Id.* at 1826–27.

The Supreme Court held that the Tennessee law was not subject to heightened review because it merely classified "based on age" and "based on medical use," and "[c]lassifications that turn on age or medical use are subject to only rational basis review."  *Skrmetti*, 145 S. Ct. at 1829.  The Court explained that the law classified on the basis of age because "[h]ealthcare providers may administer certain medical treatments to individuals ages 18 and older but not to minors."  *Id.*  And it also classified on the basis of medical use because "[h]ealthcare providers may administer puberty blockers or hormones to minors to treat certain conditions but not to treat gender dysphoria, gender identity disorder, or gender incongruence."  *Id.*

42

The Court rejected the plaintiffs' contention that the Tennessee law "relies on sex-based classifications," noting that "[n]either of the above classifications"—on the basis of age or medical use—"turns on sex." *Skrmetti*, 145 S. Ct. at 1829. Rather, the Court explained, the law "prohibits healthcare providers from administering puberty blockers and hormones to *minors* for certain *medical uses*, regardless of a minor's sex." *Id.* (emphases in original). The mere fact that the law used "sex-based language" in proscribing certain medical treatments did not "sweep [the law] within the reach of heightened scrutiny," the Court said, especially not in the medical context where certain treatments and procedures "are uniquely bound up in sex." *Id.* at 1829–30. And, because the law's classifications were "neither covertly nor overtly based on sex," the plaintiffs' argument that the law evinced "sex-based stereotyping" was "misplaced." *Id.* at 1832.

The Court also rejected the argument that the Tennessee law's application turns on sex by "prohibit[ing] certain treatments for minors of one sex while allowing those same treatments for minors of the opposite sex." *Skrmetti*, 145 S. Ct. at 1830. That argument "contort[s] the meaning of the term 'medical treatment'" by omitting "the

43

underlying medical concern the treatment is intended to address"—
under the Tennessee law, "*no* minor may be administered puberty
blockers or hormones to treat gender dysphoria, gender identity
disorder, or gender incongruence," and "minors of *any* sex may be
administered puberty blockers or hormones for other purposes." *Id.* at
1830–31 (emphases in original).

The Court further held that the Tennessee law likewise did not
discriminate against trans-identifying individuals or classify on the
basis of transgender status, without deciding whether trans-identifying
individuals are a suspect class to begin with. *Skrmetti*, 145 S. Ct. at
1832–33. Specifically, the Court concluded that the Tennessee law's
prohibition on medical interventions for gender dysphoria, gender
identity disorder, and gender incongruence did not discriminate against
trans-identifying individuals because "there is a 'lack of identity'
between transgender status and the excluded medical diagnoses," given
that some but not all trans-identifying individuals might seek the
excluded interventions. *Id.* at 1833.

The Court thus applied rational basis review. And, finding that
the Tennessee law "clearly" met that standard, the Court held that it

44

did not violate the equal protection guarantee of the Fourteenth

Amendment.  *Skrmetti*, 145 S. Ct. at 1835–37.

> ### b. The Executive Orders are materially indistinguishable from the Tennessee law upheld in *Skrmetti*

Like the Tennessee law at issue in *Skrmetti*, the Protecting

Children EO classifies based on age and medical use.  The Order

addresses specified sex transition interventions—the use of puberty

blockers, cross-sex hormones, and certain surgical procedures[2]—for

children under age 19, but not for older individuals.  §§ 2(a), (c), 4.

These classifications, which "turn on age or medical use[,] are subject to

only rational basis review."  *Skrmetti*, 145 S. Ct. at 1829.

As in *Skrmetti*, neither of the above classifications turns on sex or

transgender status.  Rather, the Protecting Children EO singles out the

---

[2] To be precise, the specified interventions identified in the Protecting Children EO are (1) "the use of puberty blockers … to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex"; (2) "the use of sex hormones … to align an individual's physical appearance with an identity that differs from his or her sex"; and (3) "surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions."  § 2(c).

45

use of puberty blockers, cross-sex hormones, and surgeries for certain
*medical uses* or purposes, regardless of the individual's sex or
transgender status.  *See Skrmetti*, 145 S. Ct. at 1829, 1832–33.  The fact
that only trans-identifying individuals may seek the referenced
interventions for those purposes does not change this conclusion.  *Id.* at
1833 (finding no discrimination based on transgender status even
though "only transgender individuals seek treatment for" the excluded
diagnoses).  Nor does the fact that the Protecting Children EO uses
"sex-based language" to describe the interventions mean that it
classifies based on sex.  "[The Supreme Court] has never suggested that
mere reference to sex is sufficient to trigger heightened scrutiny.  Such
an approach, moreover, would be especially inappropriate in the
medical context" because "[s]ome medical treatments and procedures
are uniquely bound up in sex."  *Id.* at 1829 (citation omitted).

The district court here concluded that the Protecting Children EO
"facially differentiate[s] on the basis of transgender identity" because it
covers a trans-identifying individual's use of hormones to align the
individual's physical appearance with an identity that differs from his
or her sex, whereas "[t]he same course of treatment … is available to a

patient who is not" trans-identifying "and not undergoing the course of treatment 'to align [his or her] physical appearance with an identity that differs from his or her sex.'" (JA968–969.) But the Supreme Court rejected this same reasoning in *Skrmetti* because it "contort[s] the meaning of the term 'medical treatment'" by ignoring "the underlying medical concern the treatment is intended to address." 145 S. Ct. at 1830. The use of hormones to align a person's physical appearance with an identity that differs from his or her sex—*i.e.*, a "sex transition" intervention—is not the same medical treatment as the use of hormones to treat, for example, a congenital defect or other disease. *Id.* at 1830–31. The Protecting Children EO's coverage of the former but not the latter does not turn on sex or transgender status; rather, it is based on medical use. *Id.* at 1831.

The Defending Women EO likewise makes no classification of persons based on sex or transgender status; indeed, Section 3(e) and 3(g) do not draw lines based on anyone's status. The court regarded the Defending Women EO as "slightly vaguer" than the Protecting Children EO, but even so it interpreted the Defending Women EO "as doing exactly what Section 4 of the [Protecting Children EO] does—cease

47

funding institutions, including medical institutions, that provide gender-affirming medical care to patients under the age of nineteen," emphasizing "that Plaintiffs only seek a preliminary injunction enjoining … Section 3(g) of the [Defending Women EO] to the extent it conditions funding on whether a medical institution provides gender-affirming medical care for those under nineteen." (JA969–971.) But insofar as the district court understood the two Executive Orders to be identical in this respect, there is no basis for subjecting the Defending Women EO to a different level of scrutiny or reaching any different result.

Finally, although this Court need not reach the issue in light of *Skrmetti*, trans-identifying individuals are not a suspect class that triggers heightened scrutiny to begin with. Although we recognize this Court has held otherwise, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607 (4th Cir. 2020), the Supreme Court has never held that trans-identifying individuals are a suspect class, *Skrmetti*, 145 S. Ct. at 1832. Trans-identifying individuals do not exhibit "obvious, immutable, or distinguishing characteristics" that define them as "a discrete group"; have not, "[a]s a historical matter, … been subjected to discrimination";

48

and are not a "politically powerless" group, *id.* at 1851–55 (Barrett, J.,
concurring); *accord id.* at 1860–67 (Alito, J., concurring in part and
concurring in the judgment); *see also L.W. ex rel. Williams v. Skrmetti*,
83 F.4th 460, 486–87 (6th Cir. 2023), *aff'd*, 145 S. Ct. 1816. *But see
Hecox v. Little*, 104 F.4th 1061, 1079 (9th Cir. 2024) ("[G]ender identity
is at least a 'quasi-suspect class'"), *cert. granted*, No. 24-38, 2025 WL
1829165 (U.S. July 3, 2025). Defendants respectfully maintain that this
Court's ruling in *Grimm* that trans-identifying individuals are a suspect
class was incorrect and should be overruled.

### c.    *Skrmetti* confirms that the Executive Orders have a rational basis for their classifications

"The rational basis inquiry employs a relatively relaxed standard"
under which a classification will be upheld "so long as there is any
reasonably conceivable state of facts that could provide a rational basis
for the classification." *Skrmetti*, 145 S. Ct. at 1835. "Where there exist
plausible reasons for the relevant government action, [the court's]
inquiry is at an end." *Id.*

Here, the Protecting Children EO covers what are essentially the
same sex transition interventions for children that the Tennessee law at

49

issue in *Skrmetti* prohibited for minors.  Like that law, the Protecting Children EO's classifications based on age and medical use easily satisfy the rational basis inquiry, as does the Defending Women EO to the extent it is construed "as doing exactly what Section 4 of the [Protecting Children EO] does" (JA969–970)).  *See Skrmetti*, 145 S. Ct. 1835–37.

In *Skrmetti*, the Supreme Court held that the Tennessee statute survived rational basis review because of concerns that interventions may have "irreversibl[e]" and long-term effects and that "minors lack the maturity to fully understand and appreciate the life-altering consequences of such procedures and [may later] express[] regret for medical procedures that were performed on or administered to them for such purposes when they were minors."  145 S. Ct. at 1835–36; *see id.* at 1841–43 (Thomas, J., concurring) (citing studies about the risks associated with the use of puberty blockers, hormones, and surgery to address gender dysphoria).  The Court also observed current "medical and scientific uncertainty" about the risks and benefits associated with administering puberty blockers and hormones to address gender dysphoria, and it pointed out that there are "open questions regarding

50

basic factual issues" on these matters. *Id.* at 1836–37 (majority
opinion); *see id.* at 1837 (citing Hilary Cass, *Independent Review of
Gender Identity Services for Children and Young People: Final Report*
22 (Apr. 2024)). That "ongoing debate" provided further justification for
Tennessee's statute as responding to that "uncertainty," while also
noting the potential for "less invasive approaches that are likely to
result in better outcomes for the minor." *Id.* at 1836. As the Court
concluded, "[t]he Equal Protection Clause does not resolve these
disagreements," which are instead left to "the people, their elected
representatives, and the democratic process." *Id.* at 1837.

Those same considerations provide the "reasonably conceivable"
basis to support the effectively identical Protecting Children EO
required by rational basis review, *FCC v. Beach Commc'ns, Inc.*, 508
U.S. 307, 313 (1993), which expressly echoes many of the same concerns
about the long-term effects of the interventions—such as "sterilization"
or other "lifelong medical complications," and the potential risks of
"regret" by this "vulnerable" population, Protecting Children EO § 1.
Indeed, the Executive Orders here even more straightforwardly satisfy
rational basis review: unlike the state law in *Skrmetti*, the Executive

51

Orders do not purport to ban the identified sex transition interventions, but instead address only funding issues surrounding those interventions.

Because the Executive Orders' age-based and medical-use classifications are rationally related to their purpose in protecting the health and welfare of children, plaintiffs' equal protection challenge must fail.

But even if this Court were to conclude that heightened scrutiny applies, the Executive Orders would still survive that inquiry for the reasons explained above. The district court found that the means employed by the Protecting Children EO are not "substantially related to the important government interest of protecting children." (JA978.) But that conclusion was, again, grounded mostly in this Court's decision in *Kadel*, 100 F.4th 122, that has since been vacated by the Supreme Court. (JA974–978.) The district court also noted that the Protecting Children EO addresses sex transition interventions "for those under *nineteen*, not simply children" (JA974), without explaining why that mattered. But regardless, a perfect means-end fit is not required under intermediate scrutiny. *United States v. Chapman*, 666 F.3d 220, 231

52

(4th Cir. 2012). Nor does the fact that the Order is directed specifically at sex transition interventions and not at all risky medical procedures for children undermine its constitutionality. *Cf. Skrmetti*, 145 S. Ct. at 1836 ("It may be true … that puberty blockers and hormones carry comparable risks for minors no matter the purposes for which they are administered. But it may also be true … that those drugs carry greater risks when administered to address gender dysphoria, gender identity disorder, and gender incongruence.").[3]

The bulk of the district court's heightened scrutiny analysis is grounded in the "ongoing debate," *Skrmetti*, 145 S. Ct. at 1836, about the risks and benefits associated with sex transition interventions. (JA974–977.) As noted, the Supreme Court recognized in *Skrmetti* that there is substantial "medical and scientific uncertainty" in this area and

---

[3] In a footnote elsewhere in its opinion, the district court suggested that the Protecting Children EO might address treatments even outside the realm of "gender affirming care." (JA973.) That interpretation is implausible because the Order expressly describes the interventions it addresses as "gender affirming care," § 2, and has as its purpose the implementation of a policy to end federal funding for "the so-called 'transition' of a child from one sex to another," § 1. *See San Francisco*, 897 F.3d at 1238 ("[T]he interpretation of an Executive Order begins with its text, which must be construed consistently with the Order's object and policy.").

that "open questions regarding basic factual issues" remain. 145 S. Ct. at 1836, 1837; *see also id.* at 1841 (Thomas, J., concurring) (rejecting as "untenable" the claim that "'overwhelming evidence' supports the use of puberty blockers and cross-sex hormones for treating pediatric gender dysphoria, and that this view represents 'the overwhelming consensus of the medical community'"). Given the experimental and often irreversible nature of sex transition interventions, the Executive Orders' means are substantially related to the government's important interest in protecting the health and welfare of children.

### 2.    Statutory discrimination claims

The Supreme Court's decision in *Skrmetti* also dooms plaintiffs' statutory discrimination claims under Section 1557 of the Affordable Care Act (ACA), 42 U.S.C. § 18116, and Section 1908 of the Public Health Service Act (PHSA), 42 U.S.C. § 300w-7. (JA78–79.)

Section 1557 of the ACA provides that an individual shall not be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any health program or activity that receives federal financial assistance on any of several grounds, including "on the basis of sex" under Title IX of the Education Amendments of 1972 (20

54

U.S.C. § 1681 *et seq*.). 42 U.S.C. § 18116. Section 1908 of the PHSA

provides that no person shall "on the ground of sex" or religion be

excluded from participation in, be denied the benefits of, or be subjected

to discrimination under, any program or activity funded under the

PHSA. 42 U.S.C. § 300w-7(a)(2).

The district court, relying on *Bostock v. Clayton County*, 590 U.S.

644 (2020), and on this Court's decision in *Kadel*, 100 F.4th 122, held

that discrimination on the basis of sex under these provisions includes

discrimination on the basis of "transgender status." (JA967–968.) As

noted, however, the Supreme Court has since vacated the judgment in

*Kadel* in light of its decision in *Skrmetti*. *Folwell v. Kadel*, No. 24-99,

2025 WL 1787687. And, without deciding whether *Bostock* extends

beyond the Title VII context, *Skrmetti* held that *Bostock* did not alter

the Court's analysis that the Tennessee law at issue in that case did not

turn on sex or transgender status. 145 S. Ct. at 1834. The Court

explained that "changing a minor's sex or transgender status does not

alter the application of" the Tennessee law; therefore, under *Bostock's*

"but-for causation standard," neither sex nor transgender status is the

55

but-for cause of a minor's inability to obtain a sex transition intervention that is prohibited by the Tennessee law. *Id.*

So too here. As demonstrated above, the Executive Orders do not classify based on sex or transgender status, and neither sex nor transgender status is the but-for cause that triggers their application under *Bostock. See Skrmetti*, 145 S. Ct. at 1834. Therefore, plaintiffs' statutory discrimination claims are without merit under *Skrmetti*, and the Court need not decide whether either statute's prohibition of sex discrimination extends to discrimination based on transgender status.

## II.  Plaintiffs Also Failed to Establish the Remaining Preliminary Injunction Factors

The remaining preliminary injunction factors—irreparable harm, the balance of equities, and the public interest—likewise favor the government. *See Mountain Valley Pipeline, LLC v. Western Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) ("Each of [the] four [preliminary injunction] requirements must be satisfied.").

First, plaintiffs cannot show irreparable harm. As demonstrated above, plaintiffs do not challenge any actual agency action taken pursuant to the Executive Orders, and the mere "prospect" than an agency might act unlawfully—notwithstanding the directives of the

56

Orders themselves—does not qualify as irreparable harm. Similarly, the district court's view that plaintiffs face irreparable harm from "diminished access to high-quality health care" (JA979) conflicts with the Supreme Court's recognition that there is at minimum "medical and scientific uncertainty" about the risks and benefits associated with "sex transition" interventions for minors, *Skrmetti*, 145 S. Ct. at 1836; *id.* at 1836–37; *see also id.* at 1840 (Thomas, J., concurring) ("[T]here is no medical consensus on how best to treat gender dysphoria in children."), including concerns about irreversible consequences that children may come to regret as adults, *see id.* at 1841–43 (citing studies).

As for the remaining factors, allowing the injunction to stand undermines important interests of the government and the public, whose interests "merge" in this context, *Nken v. Holder*, 556 U.S. 418, 435 (2009), in protecting the health and welfare of children. "A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens," and the Supreme Court has accordingly "sustained legislation aimed at protecting the physical and emotional well-being of youth even when

57

the laws have operated in the sensitive area of constitutionally protected rights." *New York v. Ferber*, 458 U.S. 747, 757 (1982).

In addition, the district court's injunction improperly intrudes on the President's authority to direct his subordinates to take action to implement an administration's policy objectives, and that intrusion "into the workings of a coordinate branch of the Government" likewise inflicts irreparable harm on the government. *INS v. Legalization Assistance Project of the L.A. Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers); *see also Trump v. CASA, Inc.*, Nos. 24A884, 24A885, 24A886, 2025 WL 1773631, at *14 (U.S. June 27, 2025).

## III. At Minimum, the District Court's Universal Injunction Is Overbroad

The district court here entered an expressly "nationwide" preliminary injunction that applies to the government's dealings with nonparties not before the court. (JA982–986; *see* JA49–51.) The Supreme Court has subsequently made clear that the equitable authority of district courts is limited to "administer[ing] complete relief *between the parties*." *Trump v. CASA, Inc.*, Nos. 24A884, 24A885, 24A886, 2025 WL 1773631, at *11 (U.S. June 27, 2025). The injunction

58

here fails to comport with this basic rule, and if it were to stand at all, it should be narrowed to apply only to grant recipients that provide services to or employ the named plaintiffs and association members who have demonstrated standing in this case.

The rationales the district court adopted in granting universal relief cannot survive *CASA*. The district court believed that because its merits conclusions on constitutional questions would be "applicable to jurisdictions throughout the country," nationwide relief was appropriate. (JA984; *accord* JA983, JA986.) But as *CASA* explained, "the question is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." 2025 WL 1773631, at *11. The district court also said that a "piecemeal approach" was "not appropriate" (JA983; *accord* JA985), but *CASA* makes clear that that is the normal course of litigation: once a party has received complete relief, providing relief to nonparties "would not render [the party's] relief any more complete." *Id.*

Similarly, the district court noted that the plaintiffs here included membership organizations and that members of those organizations are

59

"located throughout the country," and it therefore concluded that universal relief—which extends beyond members of the organizations—was required. (JA984.) But the Supreme Court rejected an identical argument in *CASA*, where a district court had granted a universal injunction to a membership organization on the same theory. *See CASA*, 2025 WL 1773631, at *17 (Thomas, J., concurring); *CASA, Inc. v. Trump*, 763 F. Supp. 3d 723, 746 (D. Md. 2025).

The district court also suggested at times that providing "complete relief" to the plaintiffs required a universal injunction. (JA982, JA984, JA986.) Insofar as those statements depended on the nature of the associational plaintiffs as having members "located throughout the country" (*see, e.g.*, JA984), they cannot survive *CASA*.

More generally, there is no basis to conclude that narrower relief would not completely remedy plaintiffs' injuries. The individual plaintiffs and other members of PFLAG who submitted declarations allege that they received treatment, or were scheduled to receive treatment, affected by the Executive Orders, and identified the institutions providing treatment. (JA49–51; JA377–409; JA423–429.) Similarly, the members of GLMA who submitted declarations identified

the institutions at which they work and for which they fear the loss of federal funds. (JA411–416, JA418–421, JA445–448, JA450–453.) Those injuries would plainly be fully remedied by an injunction that barred application of the Executive Orders to the identified institutions. And even if plaintiffs could identify any lingering injury not fully remedied by that relief, those lingering effects would not justify the sweeping remedy of a universal injunction that applies to nonparties. *See CASA*, 2025 WL 1773631, at *12 (explaining that complete relief is a "maximum" and not a "guarantee").

No different rule applies because two associational plaintiffs are present. Those organizations would be entitled to relief, if at all, only on behalf of those among their current members who establish their standing. *See CASA*, 2025 WL 1773631, at *15 (staying injunctions insofar as they are "broader than necessary to provide complete relief to each plaintiff with standing to sue"). Those associations do not assert standing in their own right, but only "assert the claims of [their] members." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977). (JA48–49, JA74–76.) Members without standing plainly have no claim the organizations could assert, and such members

61

cannot receive an injunction they have no standing to seek. "[S]tanding is not dispensed in gross," and "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). A plaintiff must "demonstrate standing for each claim he seeks to press" because Article III requires courts to determine whether "the particular plaintiff is entitled to an adjudication of the *particular claims* asserted." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *cf. CASA de Md., Inc. v. Trump*, 971 F.3d 220, 258 (4th Cir. 2020) ("[S]tanding is not a clown car into which all interested parties may pile, provided the driver-cum-plaintiff has met its requirements."), *reh'g en banc granted*, 981 F.3d 311 (4th Cir. 2020), *appeal dismissed* (4th Cir. Mar. 11, 2021).

Here, the associations have not, and could not, allege that every member has standing. PFLAG asserts that it has "more than 550,000 members and supporters nationwide," of whom an unspecified number ("many") are "families of transgender youth who currently receive or will soon need to access the medical treatment for gender dysphoria that the Executive Orders seek to prohibit." (JA48–49). Similarly, GLMA asserts that it has "approximately 1,000 member physicians,

62

nurses, advanced practice nurses, physician assistants, researchers and

academics, behavioral health specialists, health-profession students,

and other health professionals throughout the country," which

"includes" some unspecified number of members "who work at medical

institutions receiving grant funding from" the federal government.

(JA49).

It is obvious from these descriptions that many or all of the

unidentified members lack standing themselves to assert the claims in

the complaint. And without providing anything to identify members

with standing, plaintiffs cannot seek relief on behalf of unidentified

members on the theory that *some* unidentified members have standing.

*See Summers v. Earth Island Inst.*, 555 U.S. 488, 497–98 (2009).

Plaintiffs thus cannot assert that these unidentified members are

entitled to universal relief—or, for that matter, *any* relief—without

providing the basic information necessary to establish their standing

and to tailor any relief to their alleged injuries.

Basic principles of equity require that an enjoined defendant must

know against whom it must refrain from acting. *See* Fed. R. Civ. P.

65(d). The associations here cannot forgo pleading or joining specific

claims or available class-action procedures for litigating those claims; assert that they have large, dispersed, and anonymous memberships; claim only an unidentified fraction have standing; and still demand injunctive relief for all members. That exceeds the traditional bounds of equity and, hence, the district court's authority to provide equitable relief.

In sum, it is plain that the only individuals identified as having standing in this case would receive complete relief from an injunction limited to the facilities at which they provide or receive interventions addressed by the Executive Orders. Any broader injunction—and particularly the universal injunction the district court ordered—offends basic principles of equity and separately inflicts irreparable harm on the government, while doing nothing to remedy the injuries of the parties who have established standing. *See CASA*, 2025 WL 1773631, at *15. If any injunction is allowed, it should be narrowed to the named plaintiffs and those members of the organizations who have submitted declarations establishing their standing.

64

## CONCLUSION

For the foregoing reasons, this Court should vacate the preliminary injunction.  In the absence of vacatur, the Court should limit the scope of the injunction to the named plaintiffs and the current members of the plaintiff associations who have established standing.

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney General*

ERIC D. McARTHUR
   *Deputy Assistant Attorney General*

BRAD HINSHELWOOD

*s/ Jacob Christensen*
JACOB CHRISTENSEN
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7525*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-5048*
   *jacob.christensen@usdoj.gov*

July 2025

65

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains <u>12,149</u> words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

 *s/ Jacob Christensen*
Jacob Christensen

**ADDENDUM**

# TABLE OF CONTENTS

Exec. Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 30, 2025) .................. A1

Exec. Order No. 14,187, 90 Fed. Reg. 8771 (Feb. 3, 2025) ................... A7

Order granting stay in *Nat'l Assoc. of Diversity Officers in Higher Ed. v. Trump*, No. 25-1189 (4th Cir. Mar. 14, 2025) ................. A13

**Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government – Exec. Order No. 14,168,  90 Fed. Reg. 8615 (Jan. 30, 2025)**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 7301 of title 5, United States Code, it is hereby ordered:

Section 1. Purpose. Across the country, ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers. This is wrong. Efforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being. The erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system. Basing Federal policy on truth is critical to scientific inquiry, public safety, morale, and trust in government itself.

This unhealthy road is paved by an ongoing and purposeful attack against the ordinary and longstanding use and understanding of biological and scientific terms, replacing the immutable biological reality of sex with an internal, fluid, and subjective sense of self unmoored from biological facts. Invalidating the true and biological category of "woman" improperly transforms laws and policies designed to protect sex-based opportunities into laws and policies that undermine them, replacing longstanding, cherished legal rights and values with an identity-based, inchoate social concept.

Accordingly, my Administration will defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male.

Sec. 2. Policy and Definitions. It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality. Under my direction, the Executive Branch will enforce all sex-protective laws to promote this reality, and the following definitions shall govern all

A1

Executive interpretation of and application of Federal law and administration policy:

(a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

(b) "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.

(c) "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.

(d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

(e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

(f) "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. *8616 Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

(g) "Gender identity" reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

Sec. 3. Recognizing Women Are Biologically Distinct From Men.

(a) Within 30 days of the date of this order, the Secretary of Health and Human Services shall provide to the U.S. Government, external partners, and the public clear guidance expanding on the sex-based definitions set forth in this order.

(b) Each agency and all Federal employees shall enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct

A2

sexes. Each agency should therefore give the terms "sex", "male", "female", "men", "women", "boys" and "girls" the meanings set forth in section 2 of this order when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications.

(c) When administering or enforcing sex-based distinctions, every agency and all Federal employees acting in an official capacity on behalf of their agency shall use the term "sex" and not "gender" in all applicable Federal policies and documents.

(d) The Secretaries of State and Homeland Security, and the Director of the Office of Personnel Management, shall implement changes to require that government-issued identification documents, including passports, visas, and Global Entry cards, accurately reflect the holder's sex, as defined under section 2 of this order; and the Director of the Office of Personnel Management shall ensure that applicable personnel records accurately report Federal employees' sex, as defined by section 2 of this order.

(e) Agencies shall remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications or other messages. Agency forms that require an individual's sex shall list male or female, and shall not request gender identity. Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology.

(f) The prior Administration argued that the Supreme Court's decision in Bostock v. Clayton County (2020), which addressed Title VII of the Civil Rights Act of 1964, requires gender identity-based access to single-sex spaces under, for example, Title IX of the Educational Amendments Act. This position is legally untenable and has harmed women. The Attorney General shall therefore immediately issue guidance to agencies to correct the misapplication of the Supreme Court's decision in Bostock v. Clayton County (2020) to sex-based distinctions in agency activities. In addition, the Attorney General shall issue guidance and assist agencies in

A3

protecting sex-based distinctions, which are explicitly permitted under Constitutional and statutory precedent.

(g) Federal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology.

Sec. 4. Privacy in Intimate Spaces.

(a) The Attorney General and Secretary of Homeland Security shall ensure that males are not detained in women's prisons or housed in women's detention centers, including through amendment, as necessary, of Part 115.41 of title 28, Code of Federal Regulations and interpretation guidance regarding the Americans with Disabilities Act. *8617

(b) The Secretary of Housing and Urban Development shall prepare and submit for notice and comment rulemaking a policy to rescind the final rule entitled "Equal Access in Accordance with an Individual's Gender Identity in Community Planning and Development Programs" of September 21, 2016, 81 FR 64763, and shall submit for public comment a policy protecting women seeking single-sex rape shelters.

(c) The Attorney General shall ensure that the Bureau of Prisons revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex.

(d) Agencies shall effectuate this policy by taking appropriate action to ensure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by sex and not identity.

Sec. 5. Protecting Rights. The Attorney General shall issue guidance to ensure the freedom to express the binary nature of sex and the right to single-sex spaces in workplaces and federally funded entities covered by the Civil Rights Act of 1964. In accordance with that guidance, the Attorney General, the Secretary of Labor, the General Counsel and Chair of the Equal Employment Opportunity Commission, and each other agency head with enforcement responsibilities under the Civil

A4

Rights Act shall prioritize investigations and litigation to enforce the rights and freedoms identified.

Sec. 6. Bill Text. Within 30 days of the date of this order, the Assistant to the President for Legislative Affairs shall present to the President proposed bill text to codify the definitions in this order.

Sec. 7. Agency Implementation and Reporting.

(a) Within 120 days of the date of this order, each agency head shall submit an update on implementation of this order to the President, through the Director of the Office of Management and Budget. That update shall address:

(i) changes to agency documents, including regulations, guidance, forms, and communications, made to comply with this order; and

(ii) agency-imposed requirements on federally funded entities, including contractors, to achieve the policy of this order.

(b) The requirements of this order supersede conflicting provisions in any previous Executive Orders or Presidential Memoranda, including but not limited to Executive Orders 13988 of January 20, 2021, 14004 of January 25, 2021, 14020 and 14021 of March 8, 2021, and 14075 of June 15, 2022. These Executive Orders are hereby rescinded, and the White House Gender Policy Council established by Executive Order 14020 is dissolved.

(c) Each agency head shall promptly rescind all guidance documents inconsistent with the requirements of this order or the Attorney General's guidance issued pursuant to this order, or rescind such parts of such documents that are inconsistent in such manner. Such documents include, but are not limited to:

(i) "The White House Toolkit on Transgender Equality";

(ii) the Department of Education's guidance documents including:

(A) "2024 Title IX Regulations: Pointers for Implementation" (July 2024);

(B) "U.S. Department of Education Toolkit: Creating Inclusive and Nondiscriminatory School Environments for LGBTQI+ Students";

A5

(C) "U.S. Department of Education Supporting LGBTQI+ Youth and Families in School" (June 21, 2023);

(D) "Departamento de Educaci‾oacute»n de EE.UU. Apoyar a los j‾oacute»venes y familias LGBTQI+ en la escuela" (June 21, 2023);

(E) "Supporting Intersex Students: A Resource for Students, Families, and Educators" (October 2021);

(F) "Supporting Transgender Youth in School" (June 2021); *8618

(G) "Letter to Educators on Title IX's 49th Anniversary" (June 23, 2021);

(H) "Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families" (June 2021);

(I) "Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County" (June 22, 2021);

(J) "Education in a Pandemic: The Disparate Impacts of COVID-19 on America's Students" (June 9, 2021); and

(K) "Back-to-School Message for Transgender Students from the U.S. Depts of Justice, Education, and HHS" (Aug. 17, 2021);

(iii) the Attorney General's Memorandum of March 26, 2021 entitled "Application of Bostock v. Clayton County to Title IX of the Education Amendments of 1972"; and

(iv) the Equal Employment Opportunity Commission's "Enforcement Guidance on Harassment in the Workplace" (April 29, 2024).

Sec. 8. General Provisions.

(a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

A6

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

THE WHITE HOUSE, January 20, 2025.


## Protecting Children from Chemical and Surgical Mutilation – Exec. Order No. 14,187, 90 Fed. Reg. 8771 (Feb. 3, 2025)

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1. Policy and Purpose. Across the country today, medical professionals are maiming and sterilizing a growing number of impressionable children under the radical and false claim that adults can change a child's sex through a series of irreversible medical interventions. This dangerous trend will be a stain on our Nation's history, and it must end.

Countless children soon regret that they have been mutilated and begin to grasp the horrifying tragedy that they will never be able to conceive children of their own or nurture their children through breastfeeding. Moreover, these vulnerable youths' medical bills may rise throughout their lifetimes, as they are often trapped with lifelong medical complications, a losing war with their own bodies, and, tragically, sterilization.

Accordingly, it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called "transition" of a child

from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures.

Sec. 2. Definitions. For the purposes of this order:

(a) The term "child" or "children" means an individual or individuals under 19 years of age.

(b) The term "pediatric" means relating to the medical care of a child.

(c) The phrase "chemical and surgical mutilation" means the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex; and surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions. This phrase sometimes is referred to as "gender affirming care."

Sec. 3. Ending Reliance on Junk Science.

(a) The blatant harm done to children by chemical and surgical mutilation cloaks itself in medical necessity, spurred by guidance from the World Professional Association for Transgender Health (WPATH), which lacks scientific integrity. In light of the scientific concerns with the WPATH guidance:

(i) agencies shall rescind or amend all policies that rely on WPATH guidance, including WPATH's "Standards of Care Version 8"; and

(ii) within 90 days of the date of this order, the Secretary of Health and Human Services (HHS) shall publish a review of the existing literature on best practices for promoting the health of children who assert gender dysphoria, rapid-onset gender dysphoria, or other identity-based confusion.

A8

(b) The Secretary of HHS, as appropriate and consistent with applicable law, shall use all available methods to increase the quality of data to guide practices for improving the health of minors with gender dysphoria, rapid-onset gender dysphoria, or other identity-based confusion, or who otherwise seek chemical or surgical mutilation. *8772

Sec. 4. Defunding Chemical and Surgical Mutilation. The head of each executive department or agency (agency) that provides research or education grants to medical institutions, including medical schools and hospitals, shall, consistent with applicable law and in coordination with the Director of the Office of Management and Budget, immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children.

Sec. 5. Additional Directives to the Secretary of HHS.

(a) The Secretary of HHS shall, consistent with applicable law, take all appropriate actions to end the chemical and surgical mutilation of children, including regulatory and sub-regulatory actions, which may involve the following laws, programs, issues, or documents:

(i) Medicare or Medicaid conditions of participation or conditions for coverage;

(ii) clinical-abuse or inappropriate-use assessments relevant to State Medicaid programs;

(iii) mandatory drug use reviews;

(iv) section 1557 of the Patient Protection and Affordable Care Act;

(v) quality, safety, and oversight memoranda;

(vi) essential health benefits requirements; and

(vii) the Eleventh Revision of the International Classification of Diseases and other federally funded manuals, including the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition.

A9

(b) The Secretary of HHS shall promptly withdraw HHS's March 2, 2022, guidance document titled "HHS Notice and Guidance on Gender Affirming Care, Civil Rights and Patient Privacy" and, in consultation with the Attorney General, issue new guidance protecting whistleblowers who take action related to ensuring compliance with this order.

Sec. 6. TRICARE. The Department of Defense provides health insurance, through TRICARE, to nearly 2 million individuals under the age of 18. As appropriate and consistent with applicable law, the Secretary of Defense shall commence a rulemaking or sub-regulatory action to exclude chemical and surgical mutilation of children from TRICARE coverage and amend the TRICARE provider handbook to exclude chemical and surgical mutilation of children.

Sec. 7. Requirements for Insurance Carriers. The Director of the Office of Personnel Management, as appropriate and consistent with applicable law, shall:

(a) include provisions in the Federal Employee Health Benefits (FEHB) and Postal Service Health Benefits (PSHB) programs call letter for the 2026 Plan Year specifying that eligible carriers, including the Foreign Service Benefit Plan, will exclude coverage for pediatric transgender surgeries or hormone treatments; and

(b) negotiate to obtain appropriate corresponding reductions in FEHB and PSHB premiums.

Sec. 8. Directives to the Department of Justice. The Attorney General shall:

(a) review Department of Justice enforcement of section 116 of title 18, United States Code, and prioritize enforcement of protections against female genital mutilation;

(b) convene States' Attorneys General and other law enforcement officers to coordinate the enforcement of laws against female genital mutilation across all American States and Territories;

(c) prioritize investigations and take appropriate action to end deception of consumers, fraud, and violations of the Food, Drug, and Cosmetic Act by any entity that may be misleading the public about long-term side effects of chemical and surgical mutilation; *8773

A10

(d) in consultation with the Congress, work to draft, propose, and promote legislation to enact a private right of action for children and the parents of children whose healthy body parts have been damaged by medical professionals practicing chemical and surgical mutilation, which should include a lengthy statute of limitations; and

(e) prioritize investigations and take appropriate action to end child-abusive practices by so-called sanctuary States that facilitate stripping custody from parents who support the healthy development of their own children, including by considering the application of the Parental Kidnaping Prevention Act and recognized constitutional rights.

Sec. 9. Enforcing Adequate Progress. Within 60 days of the date of this order, the heads of agencies with responsibilities under this order shall submit a single, combined report to the Assistant to the President for Domestic Policy, detailing progress in implementing this order and a timeline for future action. The Assistant to the President for Domestic Policy shall regularly convene the heads of agencies with responsibilities under this order (or their designees) to coordinate and prepare for this submission.

Sec. 10. Severability. If any provision of this order, or the application of any provision to any person or circumstances, is held to be invalid, the remainder of this order and the application of any of its other provisions to any other persons or circumstances shall not be affected thereby.

Sec. 11. General Provisions.

(a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

A11

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE, January 28, 2025.

FILED: March 14, 2025

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 25-1189
(1:25-cv-00333-ABA)

_____

NATIONAL ASSOCIATION OF DIVERSITY OFFICERS IN HIGHER
EDUCATION; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS;
RESTAURANT OPPORTUNITIES CENTERS UNITED; MAYOR AND CITY
COUNCIL OF BALTIMORE, MARYLAND,

        Plaintiffs - Appellees,

   v.

DONALD J. TRUMP; DOROTHY FINK; DEPARTMENT OF HEALTH AND
HUMAN SERVICES; DEPARTMENT OF EDUCATION; DENISE CARTER;
DEPARTMENT OF LABOR; VINCENT MICONEI; DEPARTMENT OF
INTERIOR; DOUG BURGUM; DEPARTMENT OF COMMERCE; JEREMY
PELTER; DEPARTMENT OF AGRICULTURE; GARY WASHINGTON;
DEPARTMENT OF ENERGY; INGRID KOLB; DEPARTMENT OF
TRANSPORTATION; SEAN DUFFY; DEPARTMENT OF JUSTICE; JAMES
MCHENRY; NATIONAL SCIENCE FOUNDATION; SETHURAMAN
PANCHANATHAN; OFFICE OF MANAGEMENT AND BUDGET; MATTHEW
VAETH,

        Defendants – Appellants.

------------------------------------

AMERICAN CENTER FOR LAW AND JUSTICE,

        Amicus Supporting Appellant.

_____

ORDER

_____

A13

Pending before the court is the government's Motion for a Stay Pending Appeal. The case concerns two Executive Orders that instruct executive agencies to end "diversity, equity, and inclusion" (or "DEI") programs within federal grant and contract processes. *See* Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025); Exec. Order No. 14,173, 90 Fed. Reg. 8633 (Jan. 21, 2025). The plaintiffs—the Mayor and City Council of Baltimore, Maryland and three national associations—moved to preliminarily enjoin the government's enforcement of the Orders, challenging the constitutionality of three of the Orders' provisions under the First and Fifth Amendments.

The district court found the provisions likely unconstitutional and issued a nationwide injunction barring defendants from enforcing those provisions against both the plaintiffs and "similarly situated non-parties." *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, --- F. Supp. 3d ---, 2025 WL 573764, at *29 (D. Md. Feb. 21, 2025). After the government appealed that injunction to this Court, the district court entered an order clarifying that its preliminary injunction "applies to and binds Defendants . . . as well as other federal executive branch agencies, departments, and commissions, and their heads, officers, agents, and subdivisions." *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, --- F. Supp. 3d. ---, 2025 WL 750690, at *4 (D. Md. Mar. 10, 2025). The government now seeks a stay of the district court's preliminary injunction, or asks that it be limited only to the plaintiffs and named defendants.

Having reviewed the record, the district court's opinion, and the parties' briefing, we agree with the government that it has satisfied the factors for a stay under *Nken v. Holder*, 556 U.S. 418, 426 (2009).

2

A14

We therefore grant the government's motion for a stay of the preliminary injunction. The Clerk will set an expedited briefing schedule after consultation with the parties.

Entered at the direction of Chief Judge Diaz, with the concurrence of Judge Harris and Judge Rushing.

3

A15

DIAZ, Chief Judge, concurring:

I'm satisfied for now that the government has met its burden justifying a stay of the district court's injunction pending appeal.[1] So I join in the order granting the government's motion and in Judge Harris's separate opinion explaining why. But I'm compelled to write separately to address what seems to be (at least to some) a monster in America's closet—Diversity, Equity, and Inclusion initiatives.

The Executive Orders charge that DEI (and the related DEIA, which also denotes Accessibility) policies include "dangerous, demeaning, and immoral race- and sex-based preferences" that "deny, discredit, and undermine the traditional American values of hard work, excellence, and individual achievement in favor of an unlawful, corrosive, and pernicious identity-based spoils system." *See* Exec. Order No. 14,173, 90 Fed. Reg. 8633 (Jan. 21, 2025). The Orders seek to terminate all "'equity-based' grants or contracts" that apparently have led to "immense public waste and shameful discrimination." Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025). But neither Order ever defines DEI or its component terms.[2]

---

[1] Like my colleague, I too reserve judgment on how the administration enforces these executive orders, which may well implicate cognizable First and Fifth Amendment concerns. *See* Concurring Op. at 7–8 (Harris, J., concurring). I likewise reserve judgment on the extent to which the government relies on the Orders' savings clause provisions as it enforces the Orders' directives against federal contractors, grantees, and private entities. *See, e.g.*, *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1239–40 (9th Cir. 2018) (declining to give effect to savings clause where that clause "in [] context" would "override clear and specific language," and render "judicial review a meaningless exercise").

[2] As a result, it's unclear what types of programs—formal or informal—the administration seeks to eliminate, and it could not respond to the district court's (Continued)

4

And despite the vitriol now being heaped on DEI, people of good faith who work to promote diversity, equity, and inclusion deserve praise, not opprobrium.  For when this country embraces true diversity, it acknowledges and respects the social identity of its people.  When it fosters true equity, it opens opportunities and ensures a level playing field for all.  And when its policies are truly inclusive, it creates an environment and culture where everyone is respected and valued.  What could be more American than that?

Under the most basic tenets of the First Amendment, there should be room for open discussion and principled debate about DEI programs, and whether its corresponding values should guide admissions, hiring, scholarship, funding, or workplace and educational practices.  And all Americans should be able to freely consider how to continue empowering historically disadvantaged groups, while not "[r]educ[ing]" the individuals within those groups "to an assigned racial [or sex-based] identity."[3]

For almost 250 years, this nation's North Star has been the self-evident truth, "that all men are created equal."  The Declaration of Independence para. 2 (U.S. 1776).  Even when we have fallen short—badly at times—we have stood up, made amends, and moved

---

hypotheticals about the same. *See Nat'l Ass'n of Diversity Officers in Higher Educ.*, 2025 WL 573764, at *22.  At this preliminary stage of the litigation, where the Orders only purport to direct executive policy and actors, we don't find vagueness principles outcome determinative.  But I repeat that agency action that goes beyond the narrow scope set out in this motion could implicate Fifth Amendment vagueness concerns.

[3] *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 795, 797 (2007) (Kennedy, J., concurring in part and concurring in the judgment).

5

A17

forward.  But a country does itself no favors by scrubbing the shameful moments of its past.  Because while history may be static, its effects remain.

From boardrooms to courtrooms to operating rooms to classrooms, previously marginalized Americans are thriving in spaces long closed to them.  And we are the better for it.  Yet despite this success—or because of it—we owe it to ourselves to continue forging conversations that may help us achieve that "more perfect Union."  U.S. Const. prbl.

\*\*\*\*\*

As with most monsters in the closet, what lurks is but a mere shadow, for which the remedy is simply light.

6

A18

PAMELA HARRIS, Circuit Judge, concurring:

I concur in the order granting the government's motion for a stay pending appeal. This is a difficult case that will benefit from more sustained attention than we can give it in the present posture. But for now, I believe the government has shown a sufficient likelihood of success to warrant a stay until we can hear and decide its appeal. *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

As the government explains, the challenged Executive Orders, on their face, are of distinctly limited scope. The Executive Orders do not purport to establish the illegality of all efforts to advance diversity, equity or inclusion, and they should not be so understood. Instead, the so-called "Certification" and "Enforcement Threat" provisions apply only to conduct that violates existing federal anti-discrimination law. Nor do the Orders authorize the termination of grants based on a grantee's speech or activities outside the scope of the funded activities. Rather, the "Termination" provision directs the termination of grants, subject to applicable legal limits, based only on the nature of the grant-funded activity itself. On this understanding, the government has shown the requisite likelihood that the challenged provisions do not on their face violate the First or Fifth Amendment.

But my vote to grant the stay comes with a caveat. What the Orders say on their face and how they are enforced are two different things. Agency enforcement actions that go beyond the Orders' narrow scope may well raise serious First Amendment and Due Process concerns, for the reasons cogently explained by the district court. *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 2025 WL 573764, --- F. Supp. 3d --- (D.

7

A19

Md. Feb. 21, 2025). This case, however, does not directly challenge any such action, and I therefore concur.

Finally, my vote should not be understood as agreement with the Orders' attack on efforts to promote diversity, equity, and inclusion. In my view, like Chief Judge Diaz's, "people of good faith who work to promote diversity, equity, and inclusion deserve praise, not opprobrium." *See* Concurring Op. at 5 (Diaz, C.J., concurring). I appreciate Chief Judge Diaz's concurrence and share his sentiments.

8

A20

RUSHING, Circuit Judge, concurring:

I concur in the order granting the government's motion for a stay pending appeal. The scope of the preliminary injunction alone should raise red flags: the district court purported to enjoin *nondefendants* from taking action against *nonplaintiffs*. *Cf.*, *e.g.*, *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921 (2024) (mem.). But, more than that, the judges of this panel unanimously agree that the entire substance of the preliminary injunction must be stayed, not just trimmed back in scope. That's because the government has made a "strong showing" that it "is likely to succeed on the merits" and that the district court erred in concluding otherwise. *Nken v. Holder*, 556 U.S. 418, 426 (2009) (internal quotation marks omitted). In other words, the government is likely to succeed in demonstrating that the challenged provisions of the Executive Orders—all of which are directives from the President to his officers—do not violate the First or Fifth Amendments.

In addition, as Judge Harris rightly points out, this case does not challenge any particular agency action implementing the Executive Orders. Yet, in finding the Orders themselves unconstitutional, the district court relied on evidence of how various agencies are implementing, or may implement, the Executive Orders. That highlights serious questions about the ripeness of this lawsuit and plaintiffs' standing to bring it as an initial matter. Ripeness and standing doctrines "prevent the judicial process from being used to usurp the powers of the political branches," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013), by keeping courts within their "province"—deciding "the rights of individuals" in actual controversies, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803). Ignoring these limits on judicial power results in courts becoming "virtually continuing monitors of

9

A21

the wisdom and soundness of Executive action." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (internal quotation marks omitted).

We must not lose sight of the boundaries of our constitutional role and the imperative of judicial impartiality.  Any individual judge's view on whether certain Executive action is good policy is not only irrelevant to fulfilling our duty to adjudicate cases and controversies according to the law, it is an impermissible consideration.  A judge's opinion that DEI programs "deserve praise, not opprobrium" should play absolutely no part in deciding this case.  *Supra*, at 5, 8.