No. 25-1279

# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

———————————

PFLAG, INC., et al.,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court for the District of Maryland

———————————

## JOINT APPENDIX – VOLUME I (JA1–JA579)

———————————

JOSHUA BLOCK
HARPER SELDIN
   *American Civil Liberties Union*
    *Foundation*
   *125 Broad Street, Floor 18*
   *New York, NY 10004*
   *Telephone: (212) 549-2500*

DEBORAH A. JEON
ZOE M. GINSBERG
   *American Civil Liberties Union*
    *Foundation of Maryland*
   *3600 Clipper Mill Road, Suite 200*
   *Baltimore, MD 21211*
   *Telephone: (410) 889-8555*
*Counsel for plaintiffs-appellees*

BRETT A. SHUMATE
   *Assistant Attorney General*

ERIC D. McARTHUR
   *Deputy Assistant Attorney General*

BRAD HINSHELWOOD
JACOB CHRISTENSEN
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7525*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-5048*
*Counsel for defendants-appellants*

*Additional Counsel listed on inside cover*

OMAR GONZALEZ-PAGAN
*Lambda Legal Defense and*
  *Education Fund, Inc.*
*120 Wall Street, 19th Floor*
*New York, NY 10005*
*Telephone: (212) 809-8585*

KAREN L. LOEWY
*Lambda Legal Defense and*
  *Education Fund, Inc.*
*815 16th Street NW, Suite 4140*
*Washington, DC 20006*
*Telephone: (202) 804-6245*

CATHERINE E. STETSON
DANIELLE DESAULNIERS
  STEMPEL
SAM H. ZWINGLI
*Hogan Lovells US LLP*
*555 13th Street, N.W.*
*Washington, D.C. 20004*
*Telephone: (202) 637-5491*

*Counsel for plaintiffs-appellees*

NORA HUPPERT
*Lambda Legal Defense and*
  *Education Fund, Inc.*
*3656 N. Halsted Street*
*Chicago, IL 60613*
*Telephone: (312) 663-4413*

JACKSON SKEEN
*Hogan Lovells US LLP*
*125 High Street, Suite 2010*
*Boston, MA 02110*
*Telephone: (617) 702-7747*

*Counsel for plaintiffs-appellees*

# TABLE OF CONTENTS

## VOLUME I

Docket Report ....................................................................... JA1

Amended Complaint (Dkt. 53) ............................................ JA43

Temporary Restraining Order (Dkt. 61) ........................... JA88

Memorandum Opinion (Dkt. 62) ........................................ JA90

Plaintiffs' Motion for Preliminary Injunction
(Dkt. 69 to 69-49) ........................................................ JA143

## VOLUME II

(Continued) Plaintiffs' Motion for Preliminary Injunction
(Dkt. 69-50 to 69-51) ................................................... JA580

Defendants' Opposition to Preliminary Injunction
(Dkt. 90 to 90-1) .......................................................... JA690

Plaintiffs' Reply in Support of Preliminary Injunction
(Dkt. 108 to 108-7) ....................................................... JA777

Memorandum Opinion (Dkt. 115) ..................................... JA922

Preliminary Injunction Order (Dkt. 116) ......................... JA988

Notice of Appeal (Dkt. 132) .............................................. JA990

Notice (Dkt. 140 to 140-36) .............................................. JA991

APPEAL,STAYED

# U.S. District Court
## District of Maryland (Greenbelt)
## CIVIL DOCKET FOR CASE #: 8:25–cv–00337–BAH

PFLAG, Inc. et al v. Donald J. Trump et al
Assigned to: Judge Brendan Abell Hurson
Case in other court:  Fourth Circuit Court of Appeals, 25–01279
Cause: 28:2201 Injunction

Date Filed: 02/04/2025
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**PFLAG, Inc.**                    represented by    **Zachary Benjamin Cohen**
Jenner & Block LLP
1099 New York Ave., NW
Washington, DC 20001
(202) 639–6058
Email: zcohen@jenner.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Johnson**
American Civil Liberties Union
Foundation
125 Broad Street
Ste 17th Floor
New York, NY 10004
212–549–2500
Email: a.johnson@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Chase Strangio**
American Civil Liberties Union
125 Broad St. 18th Fl.
New York, NY 10004
2122847320
Fax: 2125492650
Email: cstrangio@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle C.D. Stempel**
Hogan Lovells US LLP
555 13th ST NW
Washington, DC 20004
202–804–7798
Email: danielle.stempel@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**Deborah A Jeon**
American Civil Liberties Union of
Maryland Foundation
3600 Clipper Mill Rd Ste 350
Baltimore, MD 21211
14108898555
Fax: 14103667838
Email: jeon@aclu–md.org
*ATTORNEY TO BE NOTICED*

**Harper Samuel Seldin**
American Civil Liberties Union
Foundation
125 Broad Street

18th Floor
New York, NY 10004
212–549–2500
Email: hseldin@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jackson Bruce Skeen**
Hogan Lovells US LLP
125 High Street
Suite 2010
Boston, MA 02110
703–774–4743
Email: jackson.skeen@hoganlovells.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer C. Pizer**
Lambda Legal Defense and Education
Fund, Inc
800 South Figueroa Street
Suite 1260
Los Angeles, CA 90017
213–382–7600
Email: jpizer@lambdalegal.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jocelyn Ann Sitton**
Jenner & Block
353 N Clark St
Chicago, IL 60654
312–840–7484
Email: jsitton@jenner.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua A Block**
American Civil Liberties Union
125 Broad St. 18th Fl.
New York, NY 10004
2125492627
Fax: 2125492650
Email: jblock@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kaitlin Galindo**
Jenner & Block
525 Market St, 29th Floor
San Francisco, CA 94105–2708
415–293–5950
Email: kgalindo@jenner.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Karen Loewy**
Lambda Legal Defense & Education Fund,
Inc.
815 16th Street NW, Suite 4140
Washington, DC 20006
202–804–6245
Email: kloewy@lambdalegal.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

JA2

**Laura J. Edelstein**
Jenner & Block LLP
525 Market Street
Ste 29th Floor
San Francisco, CA 94105
415–293–5943
Fax: 628–267–6859
Email: ledelstein@jenner.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Madeleine V. Findley**
Jenner & Block LLP
1099 New York Ave., NW
Suite 900
Washington, DC 20001
202–639–6095
Email: mfindley@jenner.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary–Claire Spurgin**
Jenner & Block LLP
1099 New York Ave., NW Suite 900
Washington, DC 20001
2026393869
Fax: 2026396066
Email: MSpurgin@jenner.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nora Huppert**
Lambda Legal Defense and Education
Fund, Inc.
3656 N Halsted St
Chicago, IL 60613–5974
847–345–2094
Email: nhuppert@lambdalegal.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar Gonzalez–Pagan**
Lambda Legal Defense and Education
Fund Inc.
120 Wall St. 19th Fl.
New York, NY 10005
2128098585
Fax: 2128090055
Email: ogonzalez–pagan@lambdalegal.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Diamond**
Jenner & Block
353 N Clark St
Chicago, IL 60654
312–840–7415
Email: RDiamond@jenner.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sam H. Zwingli**
Hogan Lovells US LLP
555 Thirteenth St NW

Washington, DC 20004
202–637–5600
Fax: 202–637–5910
Email: sam.zwingli@hoganlovells.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zoe Michael Ginsberg**
American Civil Liberties Union of
Maryland
3600 Clipper Mill Rd.
Suite 200
Baltimore, MD 21211
667–219–2626
Email: zginsberg@aclu–md.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| **American Association of Physicians for Human Rights, Inc.** | represented by | **Zachary Benjamin Cohen** |
|---|---|---|

**American Association of Physicians for Human Rights, Inc.**
*doing business as*
GLMA: Health Professionals Advancing
LGBTQ Equality

represented by

**Zachary Benjamin Cohen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Johnson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Chase Strangio**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle C.D. Stempel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Deborah A Jeon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Harper Samuel Seldin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jackson Bruce Skeen**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer C. Pizer**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jocelyn Ann Sitton**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua A Block**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Kaitlin Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Karen Loewy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura J. Edelstein**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Madeleine V. Findley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary–Claire Spurgin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nora Huppert**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar Gonzalez–Pagan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Diamond**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sam H. Zwingli**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zoe Michael Ginsberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Gabe Goe**
*by and through his parent and next friend
George Goe*

represented by **Zachary Benjamin Cohen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Johnson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Chase Strangio**
(See above for address)

JA5

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle C.D. Stempel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Deborah A Jeon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Harper Samuel Seldin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jackson Bruce Skeen**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer C. Pizer**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jocelyn Ann Sitton**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua A Block**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kaitlin Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Karen Loewy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura J. Edelstein**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Madeleine V. Findley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary−Claire Spurgin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nora Huppert**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

JA6

**Omar Gonzalez–Pagan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Diamond**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sam H. Zwingli**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zoe Michael Ginsberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**George Goe**                    represented by   **Zachary Benjamin Cohen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Johnson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Chase Strangio**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle C.D. Stempel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Deborah A Jeon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Harper Samuel Seldin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jackson Bruce Skeen**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer C. Pizer**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jocelyn Ann Sitton**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

JA7

**Joshua A Block**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kaitlin Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Karen Loewy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura J. Edelstein**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Madeleine V. Findley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary–Claire Spurgin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nora Huppert**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar Gonzalez–Pagan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Diamond**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sam H. Zwingli**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zoe Michael Ginsberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bella Boe**
*by and through her parent and next
friend Bruce Boe*

represented by **Zachary Benjamin Cohen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Johnson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

JA8

**Chase Strangio**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle C.D. Stempel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Deborah A Jeon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Harper Samuel Seldin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jackson Bruce Skeen**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer C. Pizer**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jocelyn Ann Sitton**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua A Block**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kaitlin Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Karen Loewy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura J. Edelstein**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Madeleine V. Findley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary–Claire Spurgin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nora Huppert**

JA9

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar Gonzalez–Pagan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Diamond**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sam H. Zwingli**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zoe Michael Ginsberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bruce Boe**                    represented by   **Zachary Benjamin Cohen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Johnson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Chase Strangio**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle C.D. Stempel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Deborah A Jeon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Harper Samuel Seldin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jackson Bruce Skeen**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer C. Pizer**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jocelyn Ann Sitton**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua A Block**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kaitlin Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Karen Loewy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura J. Edelstein**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Madeleine V. Findley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary–Claire Spurgin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nora Huppert**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar Gonzalez–Pagan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Diamond**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sam H. Zwingli**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zoe Michael Ginsberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Cameron Coe**
*by and through their parent and next friend CLAIRE COE*

represented by **Zachary Benjamin Cohen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Johnson**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Chase Strangio**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle C.D. Stempel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Deborah A Jeon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Harper Samuel Seldin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jackson Bruce Skeen**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer C. Pizer**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jocelyn Ann Sitton**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua A Block**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kaitlin Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Karen Loewy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura J. Edelstein**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Madeleine V. Findley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary–Claire Spurgin**
(See above for address)
*PRO HAC VICE*

JA12

*ATTORNEY TO BE NOTICED*

**Nora Huppert**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar Gonzalez–Pagan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Diamond**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sam H. Zwingli**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zoe Michael Ginsberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Claire Coe**                                   represented by   **Zachary Benjamin Cohen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Johnson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Chase Strangio**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle C.D. Stempel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Deborah A Jeon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Harper Samuel Seldin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jackson Bruce Skeen**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer C. Pizer**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

JA13

**Jocelyn Ann Sitton**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua A Block**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kaitlin Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Karen Loewy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura J. Edelstein**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Madeleine V. Findley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary–Claire Spurgin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nora Huppert**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar Gonzalez–Pagan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Diamond**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sam H. Zwingli**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zoe Michael Ginsberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Robert Roe**                                      represented by   **Zachary Benjamin Cohen**
*by and through his parent and next friend*                          (See above for address)
*Rachel Roe*                                                         *LEAD ATTORNEY*

JA14

*ATTORNEY TO BE NOTICED*

**Alexandra Johnson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Chase Strangio**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle C.D. Stempel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Deborah A Jeon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Harper Samuel Seldin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jackson Bruce Skeen**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer C. Pizer**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jocelyn Ann Sitton**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua A Block**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kaitlin Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Karen Loewy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura J. Edelstein**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Madeleine V. Findley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

JA15

**Mary–Claire Spurgin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nora Huppert**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar Gonzalez–Pagan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Diamond**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sam H. Zwingli**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zoe Michael Ginsberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rachel Roe**                    represented by    **Zachary Benjamin Cohen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Johnson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Chase Strangio**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle C.D. Stempel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Deborah A Jeon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Harper Samuel Seldin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jackson Bruce Skeen**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer C. Pizer**

JA16

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jocelyn Ann Sitton**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua A Block**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kaitlin Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Karen Loewy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura J. Edelstein**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Madeleine V. Findley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary–Claire Spurgin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nora Huppert**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar Gonzalez–Pagan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Diamond**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sam H. Zwingli**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zoe Michael Ginsberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

JA17

**Lawrence Loe**                                    represented by   **Zachary Benjamin Cohen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Johnson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Chase Strangio**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle C.D. Stempel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Deborah A Jeon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Harper Samuel Seldin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jackson Bruce Skeen**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer C. Pizer**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jocelyn Ann Sitton**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua A Block**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kaitlin Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Karen Loewy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura J. Edelstein**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Madeleine V. Findley**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary–Claire Spurgin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nora Huppert**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar Gonzalez–Pagan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Diamond**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sam H. Zwingli**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zoe Michael Ginsberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dylan Doe**                    represented by    **Zachary Benjamin Cohen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Johnson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Chase Strangio**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle C.D. Stempel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Deborah A Jeon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Harper Samuel Seldin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jackson Bruce Skeen**
(See above for address)
*PRO HAC VICE*

JA19

*ATTORNEY TO BE NOTICED*

**Jennifer C. Pizer**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jocelyn Ann Sitton**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua A Block**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kaitlin Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Karen Loewy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura J. Edelstein**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Madeleine V. Findley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary–Claire Spurgin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nora Huppert**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar Gonzalez–Pagan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Diamond**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sam H. Zwingli**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zoe Michael Ginsberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **Donald J. Trump** | represented by | **Molissa Heather Farber** |
| *in his official capacity as President of the United States* | | US Attorney's Office |
| | | 36 S Charles St |
| | | 4th Fl |
| | | Baltimore, MD 21201 |
| | | 4102094862 |
| | | Fax: 4109622310 |
| | | Email: molissa.farber@usdoj.gov |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Robert C. Bombard** |
| | | DOJ–Civ |
| | | Civil Division |
| | | 1100 L Street NW |
| | | Ste 12404 |
| | | Washington, DC 20530 |
| | | 202–616–0773 |
| | | Email: robert.bombard2@usdoj.gov |
| | | *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **U.S. Department of Health and Human Services** | represented by | **Molissa Heather Farber** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Robert C. Bombard** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Dorothy A. Fink** | represented by | **Molissa Heather Farber** |
| *in her official capacity as Acting Secretary of the U.S. Department of Health* | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Robert C. Bombard** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Health Resources and Services Administration** | represented by | **Molissa Heather Farber** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Robert C. Bombard** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Diana Espinosa** | represented by | **Molissa Heather Farber** |
| *in her official capacity as Principal Deputy Administrator of the Health Resources and Services Administration* | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Robert C. Bombard** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

**Defendant**

**National Institutes of Health**                   represented by **Molissa Heather Farber**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Robert C. Bombard**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**Matthew J. Memoli**                               represented by **Molissa Heather Farber**
*n his official capacity as Acting NIH*             (See above for address)
*Director*                                          *ATTORNEY TO BE NOTICED*

                                                    **Robert C. Bombard**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**National Science Foundation**                     represented by **Robert C. Bombard**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**Sethuraman Panchanathan**                         represented by **Robert C. Bombard**
*in his official capacity as Director of the*       (See above for address)
*National Science Foundation*                       *ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF MARYLAND**                               represented by **James David Handley**
                                                    Maryland Office of the Attorney General
                                                    Civil Division
                                                    200 Saint Paul Place
                                                    Baltimore, MD 21202
                                                    410–576–6993
                                                    Email: jhandley@oag.state.md.us
                                                    *ATTORNEY TO BE NOTICED*

**Amicus**

**American Academy of Pediatrics et al.**           represented by **Abigail Perri Barnes**
                                                    Covington & Burling LLP
                                                    One CityCenter
                                                    850 Tenth Street, NW
                                                    Washington, DC 20001
                                                    202–662–5183
                                                    Email: abarnes@cov.com
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Cortlin H. Lannin**
                                                    Covington & Burling LLP
                                                    Salesforce Tower
                                                    415 Mission Street
                                                    Suite 5400
                                                    San Francisco, CA 94105
                                                    415–591–7078
                                                    Email: clannin@cov.com
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **D. Jean Veta**
                                                    Covington & Burling LLP
                                                    One City Center

850 Tenth Street, NW
Washington, DC 20001
202–662–5294
Email: jveta@cov.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William R. Isasi**
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001
202–662–5102
Email: wisasi@cov.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Yuval Mor**
Covington & Burling
620 Eighth Avenue
New York, NY 10018
954–707–3236
Email: ymor@cov.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Communications Workers of America,**     represented by    **Kathleen M Keller**
**AFL–CIO**                                                    Bredhoff and Kaiser PLLC
805 15th St NW Ste 1000
Washington, DC 20005
12028422600
Fax: 12028421888
Email: kkeller@bredhoff.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew J. Murray**
Altshuler Berzon LLP
177 Post Street
Suite 300
San Francisco, CA 94108
415–421–7151
Fax: 415–362–8064
Email: mmurray@altber.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Do No Harm, Inc.**                                      represented by    **Nicole J. Moss**
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
202–220–9600
Fax: 202–220–9601
Email: nmoss@cooperkirk.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian W. Barnes**
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
202–220–9600
Email: bbarnes@cooperkirk.com

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David H Thompson**
Cooper and Kirk PLLC
1523 New Hampshire Ave NW
Washington, DC 20036
2022209659
Fax: 2022209601
Email: dthompson@cooperkirk.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John D. Ramer**
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, N.W.
20036
Washington, DC 20036
202–220–9621
Email: jramer@cooperkirk.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

State of Alabama     represented by

**Ian Prior**
America First Legal Foundation
611 Pennsylvania Ave SE
Ste 231
Washington, DC 20003
571–639–6711
Email: ian.prior@aflegal.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Barrett Bowdre**
State of Alabama
Office of the Attorney General
501 Washington Ave.
PO Box 300152
Montgomery, AL 36130–0152
334–353–8892
Email: barrett.bowdre@alabamaag.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edmund G. LaCour , Jr.**
State of Alabama
Office of the Attorney General
Office of the Attorney General
501 Washington Ave
PO BOX 300152
Montgomery, AL 36130–0152
334–353–2196
Email: edmund.lacour@alabamaag.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julia Zsuzsa Haller**
America First Legal Foundation
Senior Counsel
601 Pennsylvania Avenue, NW
Suite 900
S. Building
Washington, DC 20036

JA24

202–352–2615
Email: juli.haller@aflegal.org
*ATTORNEY TO BE NOTICED*

**Amicus**

**State of Alaska**                    represented by   **Ian Prior**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**State of Arkansas**                  represented by   **Ian Prior**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**State of Florida**                   represented by   **Ian Prior**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**State of Georgia**                   represented by   **Ian Prior**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**State of Idaho**                     represented by   **Ian Prior**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**State of Indiana**                   represented by   **Ian Prior**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**State of Iowa**                      represented by   **Ian Prior**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**State of Kansas**                    represented by   **Ian Prior**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**State of Louisiana**                 represented by   **Ian Prior**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**State of Mississippi**                    represented by   **Ian Prior**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**State of Missouri**                       represented by   **Ian Prior**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**State of Montana**                        represented by   **Ian Prior**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**State of Nebraska**                       represented by   **Ian Prior**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**State of North Dakota**                   represented by   **Ian Prior**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**State of Oklahoma**                       represented by   **Ian Prior**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**State of South of Carolina**              represented by   **Ian Prior**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**State of South Dakota**                   represented by   **Ian Prior**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**State of Tennessee**                      represented by   **Ian Prior**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**State of Texas**                          represented by   **Ian Prior**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**State of Virginia**                    represented by **Ian Prior**
                                        (See above for address)
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**State of West Virginia**               represented by **Ian Prior**
                                        (See above for address)
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**State of Arizona**                     represented by **Ian Prior**
                                        (See above for address)
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/04/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number AMDDC−11763091.), filed by Bruce Boe, B.G. a/k/a W.G., by and through her parent and next friend Kristen Chapman, George Goe, Robert Roe, by and through his parent and next friend Rachel Roe, PFLAG, Inc., Cameron Coe, by and through their parent and next friend Claire Coe, Kristen Chapman, Lawrence Loe, Dylan Doe, American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality, Bella Boe, by and through her parent and next friend Bruce Boe, Claire Coe, Rachel Roe, Gabe Goe, by and through his parent and next friend George Goe. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons)(Cohen, Zachary) (Entered: 02/04/2025) |
| 02/04/2025 | 2 | MOTION for Leave to File *Under Pseudonyms, to Waive Requirement Under Local Rule 102.2(a) to Provide Addresses in Complaint Caption, and for a Protective Order* by Bruce Boe, Cameron Coe, by and through their parent and next friend Claire Coe, Claire Coe, Robert Roe, by and through his parent and next friend Rachel Roe, Rachel Roe, PFLAG, Inc., B.G. a/k/a W.G., by and through her parent and next friend Kristen Chapman, Kristen Chapman, Lawrence Loe, Dylan Doe, American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality, Gabe Goe, by and through his parent and next friend George Goe, George Goe, Bella Boe, by and through her parent and next friend Bruce Boe (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Cohen, Zachary) (Entered: 02/04/2025) |
| 02/04/2025 | 3 | NOTICE of Appearance by Deborah A Jeon on behalf of All Plaintiffs (Jeon, Deborah) (Entered: 02/04/2025) |
| 02/04/2025 | 4 | NOTICE of Appearance by Zoe Michael Ginsberg on behalf of All Plaintiffs (Ginsberg, Zoe) (Entered: 02/04/2025) |
| 02/04/2025 | 5 | MOTION to Appear Pro Hac Vice for Chase Strangio (Filing fee $100, receipt number AMDDC−11763517.) by Bruce Boe, Cameron Coe, by and through their parent and next friend Claire Coe, Claire Coe, Robert Roe, by and through his parent and next friend Rachel Roe, Rachel Roe, PFLAG, Inc., B.G. a/k/a W.G., by and through her parent and next friend Kristen Chapman, Kristen Chapman, Lawrence Loe, Dylan Doe, American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality, Gabe Goe, by and through his parent and next friend George Goe, George Goe, Bella Boe, by and through her parent and next friend Bruce Boe(Ginsberg, Zoe) (Entered: 02/04/2025) |
| 02/04/2025 | 6 | MOTION to Appear Pro Hac Vice for Joshua A. Block (Filing fee $100, receipt number AMDDC−11763593.) by Bruce Boe, Cameron Coe, by and through their parent and next friend Claire Coe, Claire Coe, Robert Roe, by and through his parent and next friend Rachel Roe, Rachel Roe, PFLAG, Inc., B.G. a/k/a W.G., by and |

| | | |
|---|---|---|
| | | through her parent and next friend Kristen Chapman, Kristen Chapman, Lawrence Loe, Dylan Doe, American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality, Gabe Goe, by and through his parent and next friend George Goe, George Goe, Bella Boe, by and through her parent and next friend Bruce Boe(Ginsberg, Zoe) (Entered: 02/04/2025) |
| 02/04/2025 | 7 | MOTION to Appear Pro Hac Vice for Harper Seldin (Filing fee $100, receipt number AMDDC–11763613.) by Bruce Boe, Cameron Coe, by and through their parent and next friend Claire Coe, Claire Coe, Robert Roe, by and through his parent and next friend Rachel Roe, Rachel Roe, PFLAG, Inc., B.G. a/k/a W.G., by and through her parent and next friend Kristen Chapman, Kristen Chapman, Lawrence Loe, Dylan Doe, American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality, Gabe Goe, by and through his parent and next friend George Goe, George Goe, Bella Boe, by and through her parent and next friend Bruce Boe(Ginsberg, Zoe) (Entered: 02/04/2025) |
| 02/04/2025 | 8 | MOTION to Appear Pro Hac Vice for Alexandra Johnson (Filing fee $100, receipt number AMDDC–11763626.) by Bruce Boe, Cameron Coe, by and through their parent and next friend Claire Coe, Claire Coe, Robert Roe, by and through his parent and next friend Rachel Roe, Rachel Roe, PFLAG, Inc., B.G. a/k/a W.G., by and through her parent and next friend Kristen Chapman, Kristen Chapman, Lawrence Loe, Dylan Doe, American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality, Gabe Goe, by and through his parent and next friend George Goe, George Goe, Bella Boe, by and through her parent and next friend Bruce Boe(Ginsberg, Zoe) (Entered: 02/04/2025) |
| 02/04/2025 | 9 | PAPERLESS ORDER granting 5 Motion to Appear Pro Hac Vice on behalf of Chase Strangio. Directing attorney Chase Strangio to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/4/2025. (mh4s, Deputy Clerk) (Entered: 02/04/2025) |
| 02/04/2025 | 10 | PAPERLESS ORDER granting 6 Motion to Appear Pro Hac Vice on behalf of Joshua A Block. Directing attorney Joshua A Block to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/4/2025. (mh4s, Deputy Clerk) (Entered: 02/04/2025) |
| 02/04/2025 | 11 | PAPERLESS ORDER granting 7 Motion to Appear Pro Hac Vice on behalf of Harper Seldin. Directing attorney Harper Seldin to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/4/2025. (mh4s, Deputy Clerk) (Entered: 02/04/2025) |
| 02/04/2025 | 12 | PAPERLESS ORDER granting 8 Motion to Appear Pro Hac Vice on behalf of Alexandra Johnson. Directing attorney Alexandra Johnson to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/4/2025. (mh4s, Deputy Clerk) (Entered: 02/04/2025) |
| 02/04/2025 | 13 | MOTION to Appear Pro Hac Vice for Laura J. Edelstein (Filing fee $100, receipt number AMDDC–11763971.) by Bruce Boe, Cameron Coe, by and through their parent and next friend Claire Coe, Claire Coe, Robert Roe, by and through his parent and next friend Rachel Roe, Rachel Roe, PFLAG, Inc., B.G. a/k/a W.G., by and through her parent and next friend Kristen Chapman, Kristen Chapman, Lawrence Loe, Dylan Doe, American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality, Gabe Goe, by and through his parent and next friend George Goe, George Goe, Bella Boe, by and through her parent and next friend Bruce Boe(Cohen, Zachary) (Entered: 02/04/2025) |
| 02/04/2025 | | Case Reassigned to Judge Brendan Abell Hurson. Judge Richard D. Bennett no longer assigned to the case. (kns, Deputy Clerk) (Entered: 02/04/2025) |
| 02/04/2025 | 14 | MOTION to Appear Pro Hac Vice for Karen Loewy (Filing fee $100, receipt number AMDDC–11763993.) by Bruce Boe, Cameron Coe, by and through their parent and next friend Claire Coe, Claire Coe, Robert Roe, by and through his parent and next friend Rachel Roe, Rachel Roe, PFLAG, Inc., B.G. a/k/a W.G., by and through her |

| | | |
|---|---|---|
| | | parent and next friend Kristen Chapman, Kristen Chapman, Lawrence Loe, Dylan Doe, American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality, Gabe Goe, by and through his parent and next friend George Goe, George Goe, Bella Boe, by and through her parent and next friend Bruce Boe(Ginsberg, Zoe) (Entered: 02/04/2025) |
| 02/04/2025 | 15 | MOTION to Appear Pro Hac Vice for Omar Gonzalez–Pagan (Filing fee $100, receipt number AMDDC–11764017.) by Bruce Boe, Cameron Coe, by and through their parent and next friend Claire Coe, Claire Coe, Robert Roe, by and through his parent and next friend Rachel Roe, Rachel Roe, PFLAG, Inc., B.G. a/k/a W.G., by and through her parent and next friend Kristen Chapman, Kristen Chapman, Lawrence Loe, Dylan Doe, American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality, Gabe Goe, by and through his parent and next friend George Goe, George Goe, Bella Boe, by and through her parent and next friend Bruce Boe(Ginsberg, Zoe) (Entered: 02/04/2025) |
| 02/04/2025 | 16 | MOTION to Appear Pro Hac Vice for Nora Huppert (Filing fee $100, receipt number AMDDC–11764039.) by Bruce Boe, Cameron Coe, by and through their parent and next friend Claire Coe, Claire Coe, Robert Roe, by and through his parent and next friend Rachel Roe, Rachel Roe, PFLAG, Inc., B.G. a/k/a W.G., by and through her parent and next friend Kristen Chapman, Kristen Chapman, Lawrence Loe, Dylan Doe, American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality, Gabe Goe, by and through his parent and next friend George Goe, George Goe, Bella Boe, by and through her parent and next friend Bruce Boe(Ginsberg, Zoe) (Entered: 02/04/2025) |
| 02/04/2025 | 17 | MOTION to Appear Pro Hac Vice for Jennifer Pizer (Filing fee $100, receipt number AMDDC–11764088.) by Bruce Boe, Cameron Coe, by and through their parent and next friend Claire Coe, Claire Coe, Robert Roe, by and through his parent and next friend Rachel Roe, Rachel Roe, PFLAG, Inc., B.G. a/k/a W.G., by and through her parent and next friend Kristen Chapman, Kristen Chapman, Lawrence Loe, Dylan Doe, American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality, Gabe Goe, by and through his parent and next friend George Goe, George Goe, Bella Boe, by and through her parent and next friend Bruce Boe(Ginsberg, Zoe) (Entered: 02/04/2025) |
| 02/04/2025 | 18 | MOTION to Appear Pro Hac Vice for Madeleine V. Findley (Filing fee $100, receipt number AMDDC–11764233.) by Bruce Boe, Cameron Coe, by and through their parent and next friend Claire Coe, Claire Coe, Robert Roe, by and through his parent and next friend Rachel Roe, Rachel Roe, PFLAG, Inc., B.G. a/k/a W.G., by and through her parent and next friend Kristen Chapman, Kristen Chapman, Lawrence Loe, Dylan Doe, American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality, Gabe Goe, by and through his parent and next friend George Goe, George Goe, Bella Boe, by and through her parent and next friend Bruce Boe(Cohen, Zachary) (Entered: 02/04/2025) |
| 02/04/2025 | 19 | MOTION to Appear Pro Hac Vice for Jocelyn Sitton (Filing fee $100, receipt number AMDDC–11764281.) by Bruce Boe, Cameron Coe, by and through their parent and next friend Claire Coe, Claire Coe, Robert Roe, by and through his parent and next friend Rachel Roe, Rachel Roe, PFLAG, Inc., B.G. a/k/a W.G., by and through her parent and next friend Kristen Chapman, Kristen Chapman, Lawrence Loe, Dylan Doe, American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality, Gabe Goe, by and through his parent and next friend George Goe, George Goe, Bella Boe, by and through her parent and next friend Bruce Boe(Cohen, Zachary) (Entered: 02/04/2025) |
| 02/04/2025 | 20 | MOTION to Appear Pro Hac Vice for Lillian McGuire (Filing fee $100, receipt number AMDDC–11764287.) by Bruce Boe, Cameron Coe, by and through their parent and next friend Claire Coe, Claire Coe, Robert Roe, by and through his parent and next friend Rachel Roe, Rachel Roe, PFLAG, Inc., B.G. a/k/a W.G., by and through her parent and next friend Kristen Chapman, Kristen Chapman, Lawrence Loe, Dylan Doe, American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality, Gabe Goe, by and through his parent and next friend George Goe, George Goe, Bella Boe, by and through her parent and next friend Bruce Boe(Cohen, Zachary) (Entered: 02/04/2025) |

| | | |
|---|---|---|
| 02/04/2025 | 21 | MOTION to Appear Pro Hac Vice for Rebecca Diamond (Filing fee $100, receipt number AMDDC−11764747.) by Bruce Boe, Cameron Coe, by and through their parent and next friend Claire Coe, Claire Coe, Robert Roe, by and through his parent and next friend Rachel Roe, Rachel Roe, PFLAG, Inc., B.G. a/k/a W.G., by and through her parent and next friend Kristen Chapman, Kristen Chapman, Lawrence Loe, Dylan Doe, American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality, Gabe Goe, by and through his parent and next friend George Goe, George Goe, Bella Boe, by and through her parent and next friend Bruce Boe(Cohen, Zachary) (Entered: 02/04/2025) |
| 02/04/2025 | 22 | MOTION to Appear Pro Hac Vice for Mary−Claire Spurgin (Filing fee $100, receipt number AMDDC−11764777.) by Bruce Boe, Cameron Coe, by and through their parent and next friend Claire Coe, Claire Coe, Robert Roe, by and through his parent and next friend Rachel Roe, Rachel Roe, PFLAG, Inc., B.G. a/k/a W.G., by and through her parent and next friend Kristen Chapman, Kristen Chapman, Lawrence Loe, Dylan Doe, American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality, Gabe Goe, by and through his parent and next friend George Goe, George Goe, Bella Boe, by and through her parent and next friend Bruce Boe(Cohen, Zachary) (Entered: 02/04/2025) |
| 02/04/2025 | 23 | MOTION to Appear Pro Hac Vice for Kaitlin Galindo (Filing fee $100, receipt number AMDDC−11764784.) by Bruce Boe, Cameron Coe, by and through their parent and next friend Claire Coe, Claire Coe, Robert Roe, by and through his parent and next friend Rachel Roe, Rachel Roe, PFLAG, Inc., B.G. a/k/a W.G., by and through her parent and next friend Kristen Chapman, Kristen Chapman, Lawrence Loe, Dylan Doe, American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality, Gabe Goe, by and through his parent and next friend George Goe, George Goe, Bella Boe, by and through her parent and next friend Bruce Boe(Cohen, Zachary) (Entered: 02/04/2025) |
| 02/05/2025 | 24 | NOTICE of Appearance by Danielle C.D. Stempel on behalf of All Plaintiffs (Stempel, Danielle) (Entered: 02/05/2025) |
| 02/05/2025 | 25 | MOTION to Appear Pro Hac Vice for Sam H. Zwingli (Filing fee $100, receipt number AMDDC−11765634.) by Bruce Boe, Cameron Coe, by and through their parent and next friend Claire Coe, Claire Coe, Robert Roe, by and through his parent and next friend Rachel Roe, Rachel Roe, PFLAG, Inc., B.G. a/k/a W.G., by and through her parent and next friend Kristen Chapman, Kristen Chapman, Lawrence Loe, Dylan Doe, American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality, Gabe Goe, by and through his parent and next friend George Goe, George Goe, Bella Boe, by and through her parent and next friend Bruce Boe(Stempel, Danielle) (Entered: 02/05/2025) |
| 02/05/2025 | 26 | MOTION to Appear Pro Hac Vice for Kristina Alekseyeva (Filing fee $100, receipt number AMDDC−11765679.) by Bruce Boe, Cameron Coe, by and through their parent and next friend Claire Coe, Claire Coe, Robert Roe, by and through his parent and next friend Rachel Roe, Rachel Roe, PFLAG, Inc., B.G. a/k/a W.G., by and through her parent and next friend Kristen Chapman, Kristen Chapman, Lawrence Loe, Dylan Doe, American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality, Gabe Goe, by and through his parent and next friend George Goe, George Goe, Bella Boe, by and through her parent and next friend Bruce Boe(Stempel, Danielle) (Entered: 02/05/2025) |
| 02/05/2025 | 27 | MOTION to Appear Pro Hac Vice for Jackson Skeen (Filing fee $100, receipt number AMDDC−11765684.) by Bruce Boe, Cameron Coe, by and through their parent and next friend Claire Coe, Claire Coe, Robert Roe, by and through his parent and next friend Rachel Roe, Rachel Roe, PFLAG, Inc., B.G. a/k/a W.G., by and through her parent and next friend Kristen Chapman, Kristen Chapman, Lawrence Loe, Dylan Doe, American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality, Gabe Goe, by and through his parent and next friend George Goe, George Goe, Bella Boe, by and through her parent and next friend Bruce Boe(Stempel, Danielle) (Entered: 02/05/2025) |
| 02/05/2025 | 28 | PAPERLESS ORDER granting 13 Motion to Appear Pro Hac Vice on behalf of Laura J. Edelstein. Directing attorney Laura J. Edelstein to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. |

| | | |
|---|---|---|
| | | Signed by Clerk on 2/5/2025. (mh4s, Deputy Clerk) (Entered: 02/05/2025) |
| 02/05/2025 | 29 | PAPERLESS ORDER granting 14 Motion to Appear Pro Hac Vice on behalf of Karen Loewy. Directing attorney Karen Loewy to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/5/2025. (mh4s, Deputy Clerk) (Entered: 02/05/2025) |
| 02/05/2025 | 30 | PAPERLESS ORDER granting 15 Motion to Appear Pro Hac Vice on behalf of Omar Gonzalez–Pagan. Directing attorney Omar Gonzalez–Pagan to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/5/2025. (mh4s, Deputy Clerk) (Entered: 02/05/2025) |
| 02/05/2025 | 31 | PAPERLESS ORDER granting 16 Motion to Appear Pro Hac Vice on behalf of Nora Huppert. Directing attorney Nora Huppert to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/5/2025. (mh4s, Deputy Clerk) (Entered: 02/05/2025) |
| 02/05/2025 | 32 | PAPERLESS ORDER granting 17 Motion to Appear Pro Hac Vice on behalf of Jennifer C. Pizer. Directing attorney Jennifer C. Pizer to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/5/2025. (mh4s, Deputy Clerk) (Entered: 02/05/2025) |
| 02/05/2025 | 33 | PAPERLESS ORDER granting 18 Motion to Appear Pro Hac Vice on behalf of Madeleine V. Findley. Directing attorney Madeleine V. Findley to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/5/2025. (mh4s, Deputy Clerk) (Entered: 02/05/2025) |
| 02/05/2025 | 34 | PAPERLESS ORDER granting 19 Motion to Appear Pro Hac Vice on behalf of Jocelyn Sitton. Directing attorney Jocelyn Sitton to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/5/2025. (mh4s, Deputy Clerk) (Entered: 02/05/2025) |
| 02/05/2025 | 35 | Emergency MOTION for Temporary Restraining Order by Bruce Boe, Cameron Coe, by and through their parent and next friend Claire Coe, Claire Coe, Robert Roe, by and through his parent and next friend Rachel Roe, Rachel Roe, PFLAG, Inc., B.G. a/k/a W.G., by and through her parent and next friend Kristen Chapman, Kristen Chapman, Lawrence Loe, Dylan Doe, American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality, Gabe Goe, by and through her parent and next friend George Goe, George Goe, Bella Boe, by and through her parent and next friend Bruce Boe (Attachments: # 1 Memorandum in Support, # 2 Proposed Order, # 3 Exhibit List, # 4 Exhibit A – Omar Gonzalez–Pagan Declaration, # 5 Exhibit A–1 – HRSA Notice, # 6 Exhibit A–2 – Childrens National Statement, # 7 Exhibit A–3 – Childrens Hospital VCU Statement, # 8 Exhibit A–4 – UVA Health Statement, # 9 Exhibit A–5 – Denver Health Statement, # 10 Exhibit A–6 – VA AG Miyares Letter, # 11 Exhibit A–7 – White House Press Release, # 12 Exhibit B – GLMA Alex Sheldon Declaration, # 13 Exhibit C – Dr. Jeffrey Birnbaum Declaration, # 14 Exhibit D – PFLAG Brian K. Bond Declaration, # 15 Exhibit E – Bruce Boe Declaration, # 16 Exhibit F – Claire Coe Declaration, # 17 Exhibit G – Kristen Chapman Declaration, # 18 Exhibit H – George Goe Declaration, # 19 Exhibit I – Rachel Roe Declaration, # 20 Exhibit J – Lawrence Loe Declaration, # 21 Exhibit K – Dylan Doe Declaration, # 22 Exhibit L – Kyle Koe Declaration, # 23 Exhibit M – E.M. Declaration, # 24 Exhibit N – M.V. Declaration, # 25 Exhibit O – Jane Doe 1 Declaration, # 26 Exhibit P – Jane Doe 2 Declaration, # 27 Exhibit Q – Jane Doe 3 Declaration)(Cohen, Zachary) (Entered: 02/05/2025) |
| 02/05/2025 | 36 | QC NOTICE: 1 Complaint filed by Gabe Goe, Lawrence Loe, Dylan Doe, Bruce Boe, Kristen Chapman, PFLAG, Inc., Cameron Coe, American Association of Physicians for Human Rights, Inc., Bella Boe, Claire Coe, Rachel Roe, B.G. a/k/a W.G., Robert Roe, George Goe was filed missing information. **Please provide summons for the U.S. Attorney for Maryland and the U.S. Attorney General as required when suing the Federal Government using the "Notices" category* |

| | | |
|---|---|---|
| | | *and select the "Notice (Other)" event.* (hmls, Deputy Clerk) (Entered: 02/05/2025) |
| 02/05/2025 | 37 | NOTICE by Bruce Boe, Cameron Coe, Claire Coe, Robert Roe, Rachel Roe, PFLAG, Inc., B.G. a/k/a W.G., Kristen Chapman, Lawrence Loe, Dylan Doe, American Association of Physicians for Human Rights, Inc., Gabe Goe, George Goe, Bella Boe re 1 Complaint,,, / *Summons as to the U.S. Attorney for Maryland* (Cohen, Zachary) (Entered: 02/05/2025) |
| 02/05/2025 | 38 | NOTICE by Bruce Boe, Cameron Coe, Claire Coe, Robert Roe, Rachel Roe, PFLAG, Inc., B.G. a/k/a W.G., Kristen Chapman, Lawrence Loe, Dylan Doe, American Association of Physicians for Human Rights, Inc., Gabe Goe, George Goe, Bella Boe re 1 Complaint,,, / *Summons as to the U.S. Attorney General* (Cohen, Zachary) (Entered: 02/05/2025) |
| 02/06/2025 | 39 | PAPERLESS ORDER granting 20 Motion to Appear Pro Hac Vice on behalf of Lillian McGuire. Directing attorney Lillian McGuire to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/6/2025. (mh4s, Deputy Clerk) (Entered: 02/06/2025) |
| 02/06/2025 | 40 | PAPERLESS ORDER granting 21 Motion to Appear Pro Hac Vice on behalf of Rebecca Diamond. Directing attorney Rebecca Diamond to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/6/2025. (mh4s, Deputy Clerk) (Entered: 02/06/2025) |
| 02/06/2025 | 41 | PAPERLESS ORDER granting 22 Motion to Appear Pro Hac Vice on behalf of Mary–Claire Spurgin. Directing attorney Mary–Claire Spurgin to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/6/2025. (mh4s, Deputy Clerk) (Entered: 02/06/2025) |
| 02/06/2025 | 42 | PAPERLESS ORDER granting 23 Motion to Appear Pro Hac Vice on behalf of Kaitlin Galindo. Directing attorney Kaitlin Galindo to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/6/2025. (mh4s, Deputy Clerk) (Entered: 02/06/2025) |
| 02/06/2025 | 43 | Local Rule 103.3 Disclosure Statement by American Association of Physicians for Human Rights, Inc. (Cohen, Zachary) (Entered: 02/06/2025) |
| 02/06/2025 | 44 | Local Rule 103.3 Disclosure Statement by PFLAG, Inc. (Cohen, Zachary) (Entered: 02/06/2025) |
| 02/06/2025 | 45 | PAPERLESS ORDER granting 26 Motion to Appear Pro Hac Vice on behalf of Kristina Alekseyeva. Directing attorney Kristina Alekseyeva to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/6/2025. (mh4s, Deputy Clerk) (Entered: 02/06/2025) |
| 02/06/2025 | 46 | Summons Issued 60 days as to Diana Espinosa, Dorothy A. Fink, Health Resources and Services Administration, Matthew J. Memoli, National Institutes of Health, Donald J. Trump, U.S. Department of Health and Human Services, U.S. Attorney and U.S. Attorney General. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons) (hmls, Deputy Clerk) (Entered: 02/06/2025) |
| 02/06/2025 | 47 | PAPERLESS ORDER granting 27 Motion to Appear Pro Hac Vice on behalf of Jackson Skeen. Directing attorney Jackson Skeen to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/6/2025. (mh4s, Deputy Clerk) (Entered: 02/06/2025) |
| 02/06/2025 | 48 | PAPERLESS ORDER granting 25 Motion to Appear Pro Hac Vice on behalf of Sam H. Zwingli. Directing attorney Sam H. Zwingli to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/6/2025. (mh4s, Deputy Clerk) (Entered: 02/06/2025) |

JA32

| 02/07/2025 | 49 | PAPERLESS ORDER confirming that the Court has scheduled a status teleconference at 2:00pm today. Call–in information has been circulated to counsel. Public Access Line: 646–828–7666 Access ID: 161–5724–8786. Pursuant to Local Rule 506.1, court proceedings may not be photographed, video recorded, audio recorded, broadcast, televised, or otherwise transmitted. Signed by Judge Brendan Abell Hurson on 2/7/2025. (nd4s, Chambers) (Entered: 02/07/2025) |
|---|---|---|
| 02/07/2025 | 50 | NOTICE of Appearance by Molissa Heather Farber on behalf of All Defendants (Farber, Molissa) (Entered: 02/07/2025) |
| 02/07/2025 | 51 | Telephone Conference held on 2/7/2025 before Judge Brendan Abell Hurson.(Court Reporter: Kassandra McPherson) (km13, Deputy Clerk) (Entered: 02/07/2025) |
| 02/07/2025 | 52 | ORDER setting schedule as stated on today's teleconference. Signed by Judge Brendan Abell Hurson on 2/7/2025. (kk5s, Deputy Clerk) (Entered: 02/07/2025) |
| 02/11/2025 | 53 | AMENDED COMPLAINT against All Defendants, filed by Bruce Boe, George Goe, Robert Roe, PFLAG, Inc., Cameron Coe, Dylan Doe, Lawrence Loe, American Association of Physicians for Human Rights, Inc., Bella Boe, Claire Coe, Rachel Roe, Gabe Goe. (Attachments: # 1 Amended Complaint Redline, # 2 Summons, # 3 Summons)(Cohen, Zachary) (Entered: 02/11/2025) |
| 02/11/2025 | 54 | NOTICE of Appearance by Vinita Andrapalliyal on behalf of All Defendants (Andrapalliyal, Vinita) (Entered: 02/11/2025) |
| 02/11/2025 | 55 | RESPONSE in Opposition re 35 Emergency MOTION for Temporary Restraining Order filed by Diana Espinosa, Dorothy A. Fink, Matthew J. Memoli, National Institutes of Health, Donald J. Trump, U.S. Department of Health and Human Services. (Attachments: # 1 Text of Proposed Order)(Andrapalliyal, Vinita) (Entered: 02/11/2025) |
| 02/12/2025 | 56 | NOTICE of Appearance by Christian Daniel on behalf of All Defendants (Daniel, Christian) (Entered: 02/12/2025) |
| 02/12/2025 | 57 | REPLY to Response to Motion re 35 Emergency MOTION for Temporary Restraining Order filed by American Association of Physicians for Human Rights, Inc., Bella Boe, Bruce Boe, Cameron Coe, Claire Coe, Dylan Doe, Gabe Goe, George Goe, Lawrence Loe, PFLAG, Inc., Rachel Roe, Robert Roe. (Attachments: # 1 Consolidated Index of Exhibits, # 2 Exhibit R – Supplemental Declaration of Omar Gonzalez–Pagan, # 3 Exhibit R–1 – Cal Matters News Article – CDC Grant Termination, # 4 Exhibit R–2 – POLITICO Pro News Article – CDC Grant Termination, # 5 Exhibit R–3 – Washington Post News Article – NIH Grant Termination, # 6 Exhibit R–4 – Childrens Hospital of Colorado Letter, # 7 Exhibit R–5 – LA Times News Article – Childrens Hospital of Los Angeles Cessation, # 8 Exhibit R–6 – Detroit Free Press News Article – Corewell Health Cessation, # 9 Exhibit R–7 – Childrens Hospital of Phoenix Letter, # 10 Exhibit R–8 – Tucson Sentinel News Article – Prisma Community Care Cessation, # 11 Exhibit R–9 – CDC Grant Termination Letter, # 12 Exhibit S – Peyton Poe Declaration, # 13 Exhibit T – Jane Doe 4 Declaration, # 14 Exhibit U – Jane Doe 5 Declaration)(Cohen, Zachary) (Entered: 02/12/2025) |
| 02/12/2025 | 58 | Summons Issued 21 days as to National Science Foundation, Sethuraman Panchanathan.(kk5s, Deputy Clerk) (Entered: 02/12/2025) |
| 02/13/2025 | 59 | ORDER re Electronic Devices. Signed by Judge Brendan Abell Hurson on 2/13/2025. (kns, Deputy Clerk) (Entered: 02/13/2025) |
| 02/13/2025 | 60 | Motion Hearing held on 2/13/2025 re 35 Emergency MOTION for Temporary Restraining Order filed by Gabe Goe, Lawrence Loe, Dylan Doe, Bruce Boe, Kristen Chapman, PFLAG, Inc., Cameron Coe, American Association of Physicians for Human Rights, Inc., Bella Boe, Claire Coe, Rachel Roe, B.G. a/k/a W.G., Robert Roe, George Goe before Judge Brendan Abell Hurson.(Court Reporter: Kassandra McPherson) (dg4s, Deputy Clerk) (Entered: 02/13/2025) |
| 02/13/2025 | 61 | ORDER granting 35 Motion for Temporary Restraining Order. Signed by Judge Brendan Abell Hurson on 2/13/2025. (kns, Deputy Clerk) (Entered: 02/13/2025) |
| 02/14/2025 | 62 | MEMORANDUM OPINION. Signed by Judge Brendan Abell Hurson on 2/14/2025. (kns, Deputy Clerk) (Entered: 02/14/2025) |

| 02/14/2025 | 63 | MOTION for Other Relief by Diana Espinosa, Dorothy A. Fink, Health Resources and Services Administration, Matthew J. Memoli, National Institutes of Health, National Science Foundation, Sethuraman Panchanathan, Donald J. Trump, U.S. Department of Health and Human Services (Attachments: # 1 Text of Proposed Order)(Andrapalliyal, Vinita) (Entered: 02/14/2025) |
|---|---|---|
| 02/15/2025 | 66 | LETTER ORDER To Counsel of Record regarding 63 Defendant's Motion to Clarify the Court's February 13, 2025 TRO. Signed by Judge Brendan Abell Hurson on 2/15/2025. (heps, Deputy Clerk) (Entered: 02/18/2025) |
| 02/16/2025 | 64 | RESPONSE to Motion re 63 MOTION for Other Relief *(Non−Opposition)* filed by American Association of Physicians for Human Rights, Inc., Bella Boe, Bruce Boe, Cameron Coe, Claire Coe, Dylan Doe, Gabe Goe, George Goe, Lawrence Loe, PFLAG, Inc., Rachel Roe, Robert Roe.(Cohen, Zachary) (Entered: 02/16/2025) |
| 02/17/2025 | 65 | [Filed in Error]NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 02/13/2025, before Judge Brendan A. Hurson. Court Reporter Kassandra L. McPherson, Telephone number (410) 962−4544; Kassandra_McPherson@mdd.uscourts.gov. Total number of pages filed: 92. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 3/10/2025. Redacted Transcript Deadline set for 3/20/2025. Release of Transcript Restriction set for 5/19/2025.(km10, Court Reporter) Modified on 2/24/2025 (km10). (Entered: 02/17/2025) |
| 02/18/2025 | 67 | ORDER Granting 63 Defendant's Conditional Motion to Clarify Temporary Restraining Order. Signed by Judge Brendan Abell Hurson on 2/18/2025. (heps, Deputy Clerk) (Entered: 02/18/2025) |
| 02/18/2025 | 68 | STATUS REPORT *(Joint)* by Diana Espinosa, Dorothy A. Fink, Health Resources and Services Administration, Matthew J. Memoli, National Institutes of Health, National Science Foundation, Sethuraman Panchanathan, Donald J. Trump, U.S. Department of Health and Human Services(Andrapalliyal, Vinita) (Entered: 02/18/2025) |
| 02/18/2025 | 69 | MOTION for Preliminary Injunction by American Association of Physicians for Human Rights, Inc., Bella Boe, Bruce Boe, Cameron Coe, Claire Coe, Dylan Doe, Gabe Goe, George Goe, Lawrence Loe, PFLAG, Inc., Rachel Roe, Robert Roe (Attachments: # 1 Plaintiffs' Memorandum in Support of Their Motion for Preliminary Injunction, # 2 Proposed Order Granting Plaintiffs' Motion for Preliminary Injunction, # 3 Index of Exhibits, # 4 Exhibit A − Declaration of Omar Gonzalez−Pagan ISO Motion for Preliminary Injunction with Exhibits A−1 through A−18, # 5 Exhibit A−1 − HRSA Memorandum, # 6 Exhibit A−2 − CDC Grant Termination Letter, # 7 Exhibit A−3 − Children's National Statement, # 8 Exhibit A−4 − Children's Hospital of Richmond Statement, # 9 Exhibit A−5 − UVA Health Statement, # 10 Exhibit A−6 − 29 News Article − UVA Health Resumption of Care, # 11 Exhibit A−7 − Denver Health Statement, # 12 Exhibit A−8 − Letter from Jason Miyares, Attorney General of Virginia, to UVA and VCU, # 13 Exhibit A−9 − Children's Hospital of Colorado Letter, # 14 Exhibit A−10 − LA Times News Article Children's Hospital of Los Angeles Cessation, # 15 Exhibit A−11 − Detroit Free Press News Article Corewell Health Cessation of Care, # 16 Exhibit A−12 − Detroit Free Press News Article Corewell Health Resumption of Care, # 17 Exhibit A−13 − Children's Hospital of Phoenix Letter, # 18 Exhibit A−14 − Tucson Sentinel News Article Prisma Community Care Cessation of Care, # 19 Exhibit A−15 − AZ Central News Article Prisma Community Care Resumption of Care, # 20 Exhibit A−16 − White House Statement, # 21 Exhibit A−17 − FDA Notice, # 22 Exhibit A−18 − CDC Notice, # 23 Exhibit B − Declaration of Bruce Boe, # 24 Exhibit C − Declaration of Bella Boe, # 25 Exhibit D − Declaration of George Goe, # 26 Exhibit E − Declaration of Gabe Goe, # 27 Exhibit F − Declaration of Rachel Roe, # 28 Exhibit G − Declaration of Robert Roe, # 29 Exhibit H − Declaration of Claire Coe, # 30 Exhibit I − Declaration of Cameron Coe, # 31 Exhibit J − Declaration of Lawrence Loe, # 32 Exhibit K − Declaration of Dylan Doe, # 33 Exhibit L − Declaration of Alex Sheldon (Executive Director of GLMA), # 34 Exhibit M − Declaration of Brian K. Bond (CEO of PFLAG, Inc.), # 35 Exhibit N − Declaration of E.M., # 36 Exhibit O − Declaration of Jane Doe 1, # 37 Exhibit P − Declaration of Jane Doe 2, # 38 Exhibit Q − Declaration of Jane Doe 3, # 39 Exhibit R − Declaration of Jane Doe 4, # 40 Exhibit S − Declaration of |

JA34

| | | |
|---|---|---|
| | | Jane Doe 5, # 41 Exhibit T – Declaration of Jane Doe 6, # 42 Exhibit U – Declaration of Dr. Peyton Poe, # 43 Exhibit V – Declaration of Dr. Kyle Koe, # 44 Exhibit W – Declaration of Kristen Chapman, # 45 Exhibit X – Declaration of M.V., # 46 Exhibit Y – Declaration of Dr. Jeffrey Birnbaum, # 47 Exhibit Z – Declaration of Dr. Natalie Noe, # 48 Exhibit AA – Declaration of Dr. Armand Antommaria, # 49 Exhibit BB – Declaration of Dr. Dan Karasic, # 50 Exhibit CC – Declaration of Dr. Daniel Shumer, # 51 Exhibit DD – Declaration of Dr. Jack Turban)(Gonzalez–Pagan, Omar) (Entered: 02/18/2025) |
| 02/20/2025 | 70 | STATUS REPORT by Diana Espinosa, Dorothy A. Fink, Health Resources and Services Administration, Matthew J. Memoli, National Institutes of Health, National Science Foundation, Sethuraman Panchanathan, Donald J. Trump, U.S. Department of Health and Human Services (Attachments: # 1 Exhibit A)(Daniel, Christian) (Entered: 02/20/2025) |
| 02/21/2025 | 71 | MOTION to Extend Temporary Restraining Order by American Association of Physicians for Human Rights, Inc., Bella Boe, Bruce Boe, Cameron Coe, Claire Coe, Dylan Doe, Gabe Goe, George Goe, Lawrence Loe, PFLAG, Inc., Rachel Roe, Robert Roe (Attachments: # 1 Proposed Order)(Gonzalez–Pagan, Omar) (Entered: 02/21/2025) |
| 02/21/2025 | 72 | LETTER ORDER to Counsel of Record directing Defendants to respond to 71 MOTION to Extend Temporary Restraining Order by Monday, February 24 at 5pm; directing parties to file a joint status report by Monday, February 24 at 5pm. Signed by Judge Brendan Abell Hurson on 2/21/2025. (bw5s, Deputy Clerk) (Entered: 02/21/2025) |
| 02/21/2025 | 73 | Amicus Curiae APPEARANCE entered by James David Handley on behalf of STATE OF MARYLAND(Handley, James) (Entered: 02/21/2025) |
| 02/21/2025 | 74 | RESPONSE in Support re 69 MOTION for Preliminary Injunction *by amici curiae the Commonwealth of Massachusetts, the States of California and Maryland, and the States of Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Minnesota, Nevada, New Jersey, New York, Oregon, Rhode Island, Vermont, Washington, and the District of Columbia* filed by STATE OF MARYLAND.(Handley, James) (Entered: 02/21/2025) |
| 02/21/2025 | 75 | RESPONSE in Opposition re 71 MOTION to Extend Temporary Restraining Order filed by Diana Espinosa, Dorothy A. Fink, Health Resources and Services Administration, Matthew J. Memoli, National Institutes of Health, National Science Foundation, Sethuraman Panchanathan, Donald J. Trump, U.S. Department of Health and Human Services.(Andrapalliyal, Vinita) (Entered: 02/21/2025) |
| 02/21/2025 | 76 | PAPERLESS ORDER re 75 Response in Opposition to Motion, filed by Matthew J. Memoli, National Institutes of Health, Dorothy A. Fink, U.S. Department of Health and Human Services, National Science Foundation, Diana Espinosa, Sethuraman Panchanathan, Health Resources and Services Administration, Donald J. Trump. The Government's response to Plaintiffs' motion for a preliminary injunction is due by 12:00pm ET on Tuesday, February 25. Plaintiffs' reply is due by 6:00pm ET on Wednesday, February 26. The Court will rule on the motion to extend the TRO after receiving the parties' joint status report on Monday, February 24. Signed by Judge Brendan Abell Hurson on 2/21/2025. (cs10, Chambers) (Entered: 02/21/2025) |
| 02/21/2025 | 77 | STATUS REPORT *(Joint)* by Diana Espinosa, Dorothy A. Fink, Health Resources and Services Administration, Matthew J. Memoli, National Institutes of Health, National Science Foundation, Sethuraman Panchanathan, Donald J. Trump, U.S. Department of Health and Human Services(Daniel, Christian) (Entered: 02/21/2025) |
| 02/21/2025 | 78 | NOTICE of Appearance by Abigail Perri Barnes on behalf of American Academy of Pediatrics et al. (Barnes, Abigail) (Entered: 02/21/2025) |
| 02/21/2025 | 79 | MOTION for Leave to File *Amicus Brief* by American Academy of Pediatrics et al. (Attachments: # 1 Attachment Proposed Amicus Brief, # 2 Text of Proposed Order, # 3 Attachment Disclosure of Corporate Interest)(Barnes, Abigail) (Entered: 02/21/2025) |
| 02/24/2025 | 80 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 02/13/2024, before Judge Brendan A. Hurson. Court Reporter Kassandra L. |

JA35

| | | |
|---|---|---|
| | | McPherson, Telephone number (410) 962–4544; Kassandra_McPherson@mdd.uscourts.gov. Total number of pages filed: 92. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 3/17/2025. Redacted Transcript Deadline set for 3/27/2025. Release of Transcript Restriction set for 5/27/2025.(km10, Court Reporter) (Entered: 02/24/2025) |
| 02/24/2025 | 81 | NOTICE of Appearance by Kathleen M Keller on behalf of Communications Workers of America, AFL–CIO (Keller, Kathleen) (Entered: 02/24/2025) |
| 02/24/2025 | 82 | MOTION to Appear Pro Hac Vice for Matthew J. Murray (Filing fee $100, receipt number AMDDC–11802709.) by Communications Workers of America, AFL–CIO(Keller, Kathleen) (Entered: 02/24/2025) |
| 02/24/2025 | 83 | [FILED IN ERROR] Amicus Curiae APPEARANCE entered by Kathleen M Keller on behalf of Communications Workers of America, AFL–CIO (Attachments: # 1 Attachment Proposed Amicus Brief, # 2 Attachment Proposed Order, # 3 Attachment Disclosure of Corporate Interest)(Keller, Kathleen) Modified on 2/26/2025 (bw5s). (Entered: 02/24/2025) |
| 02/25/2025 | 84 | Amicus Curiae APPEARANCE entered by Nicole J. Moss on behalf of Do No Harm, Inc.(Moss, Nicole) (Entered: 02/25/2025) |
| 02/25/2025 | 85 | MOTION to Appear Pro Hac Vice for David H. Thompson (Filing fee $100, receipt number BMDDC–11804056.) by Do No Harm, Inc.(Moss, Nicole) (Entered: 02/25/2025) |
| 02/25/2025 | 86 | MOTION to Appear Pro Hac Vice for Brian W. Barnes (Filing fee $100, receipt number AMDDC–11804088.) by Do No Harm, Inc.(Moss, Nicole) (Entered: 02/25/2025) |
| 02/25/2025 | 87 | MOTION to Appear Pro Hac Vice for John D. Ramer (Filing fee $100, receipt number AMDDC–11804119.) by Do No Harm, Inc.(Moss, Nicole) (Entered: 02/25/2025) |
| 02/25/2025 | 88 | MOTION for Leave to File *Brief of Amicus Curiae* by Do No Harm, Inc. (Attachments: # 1 Attachment [Proposed] Amicus Brief, # 2 Text of Proposed Order, # 3 Attachment Disclosure of Corporate Interest)(Moss, Nicole) (Entered: 02/25/2025) |
| 02/25/2025 | 89 | PAPERLESS ORDER granting 82 Motion to Appear Pro Hac Vice on behalf of Matthew J. Murray. Directing attorney Matthew J. Murray to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/25/2025. (mh4s, Deputy Clerk) (Entered: 02/25/2025) |
| 02/25/2025 | 90 | RESPONSE in Opposition re 69 MOTION for Preliminary Injunction filed by Diana Espinosa, Dorothy A. Fink, Matthew J. Memoli, National Institutes of Health, National Science Foundation, Sethuraman Panchanathan, Donald J. Trump, U.S. Department of Health and Human Services. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Andrapalliyal, Vinita) (Entered: 02/25/2025) |
| 02/25/2025 | 91 | Amicus Curiae APPEARANCE entered by Ian Prior on behalf of State of Alabama, State of Alaska, State of Arizona, State of Arkansas, State of Florida, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of North Dakota, State of Oklahoma, State of South Dakota, State of South of Carolina, State of Tennessee, State of Texas, State of Virginia, State of West Virginia.(Prior, Ian) Modified on 2/25/2025 (heps). (Entered: 02/25/2025) |
| 02/25/2025 | 92 | RESPONSE in Opposition re 69 MOTION for Preliminary Injunction filed by State of Alabama, State of Alaska, State of Arizona, State of Arkansas, State of Florida, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of North Dakota, State of Oklahoma, State of South Dakota, State of South of Carolina, State of Tennessee, State of Texas, State of Virginia, State of West Virginia.(Prior, Ian) Modified on 2/25/2025 (heps). (Entered: 02/25/2025) |

| 02/25/2025 | 93 | MOTION to Appear Pro Hac Vice for Edmund G. LaCour, Jr. (Filing fee $100, receipt number AMDDC−11805665.) by State of Alabama(Haller, Julia) (Entered: 02/25/2025) |
|---|---|---|
| 02/25/2025 | 94 | MOTION to Appear Pro Hac Vice for Alexander Barrett Bowdre (Filing fee $100, receipt number AMDDC−11805681.) by State of Alabama(Haller, Julia) (Entered: 02/25/2025) |
| 02/26/2025 | 95 | PAPERLESS ORDER granting 85 Motion to Appear Pro Hac Vice on behalf of David H Thompson. Directing attorney David H Thompson to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/26/2025. (mh4s, Deputy Clerk) (Entered: 02/26/2025) |
| 02/26/2025 | 96 | PAPERLESS ORDER granting 86 Motion to Appear Pro Hac Vice on behalf of Brian W. Barnes. Directing attorney Brian W. Barnes to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/26/2025. (mh4s, Deputy Clerk) (Entered: 02/26/2025) |
| 02/26/2025 | 97 | PAPERLESS ORDER granting 87 Motion to Appear Pro Hac Vice on behalf of John D. Ramer. Directing attorney John D. Ramer to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/26/2025. (mh4s, Deputy Clerk) (Entered: 02/26/2025) |
| 02/26/2025 | 98 | QC NOTICE: 83 Amicus Curiae Appearance, filed by Communications Workers of America, AFL−CIO was filed incorrectly.<br>**Wrong event used for Motion and Disclosure of Corporate Interest. The main document indicates you are filing a Motion. Please file the Motion by going to "Motions" and selecting "Leave to File Document". For the Corporate Disclosure, please file by going to "Other Documents" and use the event "Local Rule 103.3 Disclosure Statement. It has been noted as FILED IN ERROR, and the document link has been disabled.* (bw5s, Deputy Clerk) (Entered: 02/26/2025) |
| 02/26/2025 | 99 | QC NOTICE: 88 Motion for Leave to File filed by Do No Harm, Inc. was filed incorrectly.<br>**Wrong event used for Disclosure of Corporate Interest. Please file by going to "Other Documents" and use the event "Local Rule 103.3 Disclosure Statement".* (bw5s, Deputy Clerk) (Entered: 02/26/2025) |
| 02/26/2025 | 100 | Local Rule 103.3 Disclosure Statement by Do No Harm, Inc. (Moss, Nicole) (Entered: 02/26/2025) |
| 02/26/2025 | 101 | Local Rule 103.3 Disclosure Statement by American Academy of Pediatrics et al. (Barnes, Abigail) (Entered: 02/26/2025) |
| 02/26/2025 | 102 | Local Rule 103.3 Disclosure Statement by Communications Workers of America, AFL−CIO (Keller, Kathleen) (Entered: 02/26/2025) |
| 02/26/2025 | 103 | MOTION for Leave to File *Amicus Curiae Brief* by Communications Workers of America, AFL−CIO (Attachments: # 1 Attachment Proposed Order, # 2 Attachment Proposed Amicus Curiae Brief)(Keller, Kathleen) (Entered: 02/26/2025) |
| 02/26/2025 | 104 | QC NOTICE: 93 Motion to Appear Pro Hac Vice filed by State of Alabama needs to be modified. See attachment for details and corrective actions needed regarding the signature(s) on the motion. (mh4s, Deputy Clerk) (Entered: 02/26/2025) |
| 02/26/2025 | 105 | QC NOTICE: 94 Motion to Appear Pro Hac Vice filed by State of Alabama needs to be modified. See attachment for details and corrective actions needed regarding the signature(s) on the motion. (mh4s, Deputy Clerk) (Entered: 02/26/2025) |
| 02/26/2025 | 106 | CORRECTED MOTION to Appear Pro Hac Vice for Edmund G. LaCour, Jr. by State of Alabama. The fee has already been paid.(Haller, Julia) (Entered: 02/26/2025) |
| 02/26/2025 | 107 | CORRECTED MOTION to Appear Pro Hac Vice for Alexander Barrett Bowdre by State of Alabama. The fee has already been paid.(Haller, Julia) (Entered: 02/26/2025) |

| 02/26/2025 | 108 | REPLY to Response to Motion re 69 MOTION for Preliminary Injunction filed by American Association of Physicians for Human Rights, Inc., Bella Boe, Bruce Boe, Cameron Coe, Claire Coe, Dylan Doe, Gabe Goe, George Goe, Lawrence Loe, PFLAG, Inc., Rachel Roe, Robert Roe. (Attachments: # 1 Consolidated Index of Exhibits, # 2 Exhibit EE – Supplemental Declaration of Omar Gonzalez–Pagan ISO Motion for Preliminary Injunction with Exhibit EE–1, # 3 Exhibit EE–1 – Br. of Amici Curiae Clinical Practice Guideline Experts ISO Pet. & Resp't ISO Pet., United States v. Skrmetti, No. 23–477 (U.S. Sept. 3, 2024), # 4 Exhibit FF – Supplemental Declaration of Dr. Armand Antommaria, # 5 Exhibit GG – Supplemental Declaration of Dr. Dan Karasic, # 6 Exhibit HH – Supplemental Declaration of Dr. Daniel Shumer, # 7 Exhibit II – Supplemental Declaration of Dr. Jack Turban)(Gonzalez–Pagan, Omar) (Entered: 02/26/2025) |
| 02/26/2025 | 109 | PAPERLESS ORDER granting 71 MOTION to Extend Temporary Restraining Order filed by Gabe Goe, Lawrence Loe, Dylan Doe, Bruce Boe, PFLAG, Inc., Cameron Coe, American Association of Physicians for Human Rights, Inc., Bella Boe, Claire Coe, Rachel Roe, Robert Roe, George Goe. The Court has received the parties' filings addressing ECF 69, the pending motion for a preliminary injunction, as well as several amicus briefs, which no party has opposed the filing of. The temporary restraining order (TRO), ECF 61, is set to expire on February 27, 2025. Plaintiffs request an extension of the TRO. ECF 71. Defendants oppose an extension. ECF 75. For good cause shown, for the reasons noted in ECF 62, and to afford the Court adequate time to review the amicus briefs and the parties' respective filings, ECF 71 is GRANTED and the TRO at ECF 61 is EXTENDED until March 5, 2025 (or until such time as the Court rules on the motion for a preliminary injunction). Signed by Judge Brendan Abell Hurson on 2/26/2025.(cs10, Chambers) (Entered: 02/26/2025) |
| 02/27/2025 | 110 | PAPERLESS ORDER granting 106 Corrected Motion to Appear Pro Hac Vice on behalf of Edmund G. LaCour, Jr. Directing attorney Edmund G. LaCour, Jr to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/27/2025. (mh4s, Deputy Clerk) (Entered: 02/27/2025) |
| 02/27/2025 | 111 | PAPERLESS ORDER granting 107 Corrected Motion to Appear Pro Hac Vice on behalf of Alexander Barrett Bowdre. Directing attorney Alexander Barrett Bowdre to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/27/2025. (mh4s, Deputy Clerk) (Entered: 02/27/2025) |
| 03/02/2025 | 112 | NOTICE by American Association of Physicians for Human Rights, Inc., Bella Boe, Bruce Boe, Cameron Coe, Claire Coe, Dylan Doe, Gabe Goe, George Goe, Lawrence Loe, PFLAG, Inc., Rachel Roe, Robert Roe */ Plaintiffs' Notice of Supplemental Authority* (Attachments: # 1 Exhibit A – PI Order in Washington v. Trump, # 2 Exhibit B – Order in CASA v Trump)(Gonzalez–Pagan, Omar) (Entered: 03/02/2025) |
| 03/03/2025 | 113 | MOTION to Withdraw as Attorney *Kristina Alekseyva* by American Association of Physicians for Human Rights, Inc., B.G. a/k/a W.G., Bella Boe, Bruce Boe, Kristen Chapman, Cameron Coe, Claire Coe, Dylan Doe, Gabe Goe, George Goe, Lawrence Loe, PFLAG, Inc., Rachel Roe, Robert Roe(Alekseyeva, Kristina) (Entered: 03/03/2025) |
| 03/03/2025 | 114 | PAPERLESS ORDER granting 113 MOTION to Withdraw as Attorney *Kristina Alekseyva* filed by Gabe Goe, Lawrence Loe, Dylan Doe, Bruce Boe, Kristen Chapman, PFLAG, Inc., Cameron Coe, American Association of Physicians for Human Rights, Inc., Bella Boe, Claire Coe, Rachel Roe, B.G. a/k/a W.G., Robert Roe, George Goe. The Clerk is directed to remove Attorney Kristina Alekseyva from the case. Signed by Judge Brendan Abell Hurson on 3/3/2025. (cs10, Chambers) (Entered: 03/03/2025) |
| 03/04/2025 | 115 | MEMORANDUM OPINION. Signed by Judge Brendan Abell Hurson on 3/4/2025. (heps, Deputy Clerk) (Entered: 03/04/2025) |
| 03/04/2025 | 116 | ORDER granting 69 Plaintiffs' Motion for Preliminary Injunction. Signed by Judge Brendan Abell Hurson on 3/4/2025. (heps, Deputy Clerk) (Entered: 03/04/2025) |

| 03/04/2025 | 117 | PAPERLESS ORDER granting 2 Motion for Leave to File *Under Pseudonyms, to Waive Requirement Under Local Rule 102.2(a) to Provide Addresses in Complaint Caption, and for a Protective Order* filed by Plaintiffs; granting 79 Motion for Leave to File *Amicus Brief* filed by American Academy of Pediatrics et al.; granting 88 Motion for Leave to File *Brief of Amicus Curiae* by Do No Harm, Inc.; and granting 103 Motion for Leave to File *Amicus Curiae Brief* by Communications Workers of America, AFL–CIO. Signed by Judge Brendan Abell Hurson on 3/4/2025. (nd4s, Chambers) (Entered: 03/04/2025) |
|---|---|---|
| 03/07/2025 | 118 | Emergency MOTION to Enforce Judgment *for Preliminary Injunction* by American Association of Physicians for Human Rights, Inc., Bella Boe, Bruce Boe, Cameron Coe, Claire Coe, Dylan Doe, Gabe Goe, George Goe, Lawrence Loe, PFLAG, Inc., Rachel Roe, Robert Roe (Attachments: # 1 Memorandum in Support of Motion to Enforce Preliminary Injunction, # 2 Declaration of Joshua Block, # 3 Exhibit A – CMS QSSAM, # 4 Exhibit B – HRSA Notice, # 5 Exhibit C – SAMHSA Notice, # 6 Text of Proposed Order)(Gonzalez–Pagan, Omar) (Entered: 03/07/2025) |
| 03/07/2025 | 119 | PAPERLESS ORDER directing Defendants to respond to 118 Emergency MOTION to Enforce Judgment *for Preliminary Injunction* filed by Gabe Goe, Lawrence Loe, Dylan Doe, Bruce Boe, PFLAG, Inc., Cameron Coe, American Association of Physicians for Human Rights, Inc., Bella Boe, Claire Coe, Rachel Roe, Robert Roe, George Goe BY MONDAY, MARCH 10, 2025, AT NOON. Signed by Judge Brendan Abell Hurson on 3/7/2025. (nd4s, Chambers) (Entered: 03/07/2025) |
| 03/10/2025 | 120 | RESPONSE in Opposition re 118 Emergency MOTION to Enforce Judgment *for Preliminary Injunction* filed by Diana Espinosa, Dorothy A. Fink, Health Resources and Services Administration, Matthew J. Memoli, National Institutes of Health, National Science Foundation, Sethuraman Panchanathan, Donald J. Trump, U.S. Department of Health and Human Services. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Andrapalliyal, Vinita) (Entered: 03/10/2025) |
| 03/10/2025 | 121 | STATUS REPORT by Diana Espinosa, Dorothy A. Fink, Health Resources and Services Administration, Matthew J. Memoli, National Institutes of Health, National Science Foundation, Sethuraman Panchanathan, State of West Virginia, Donald J. Trump, U.S. Department of Health and Human Services (Attachments: # 1 Exhibit)(Daniel, Christian) (Entered: 03/10/2025) |
| 03/10/2025 | 122 | REPLY to Response to Motion re 118 Emergency MOTION to Enforce Judgment *for Preliminary Injunction* filed by American Association of Physicians for Human Rights, Inc., Bella Boe, Bruce Boe, Cameron Coe, Claire Coe, Dylan Doe, Gabe Goe, George Goe, Lawrence Loe, PFLAG, Inc., Rachel Roe, Robert Roe.(Gonzalez–Pagan, Omar) (Entered: 03/10/2025) |
| 03/10/2025 | 123 | SUMMONS Returned Executed by George Goe, Robert Roe, PFLAG, Inc., Dylan Doe, Lawrence Loe, Bruce Boe, Cameron Coe, American Association of Physicians for Human Rights, Inc., Bella Boe, Claire Coe, Rachel Roe, Gabe Goe. Diana Espinosa served on 2/7/2025, answer due 4/8/2025; Dorothy A. Fink served on 2/7/2025, answer due 4/8/2025; Health Resources and Services Administration served on 2/7/2025, answer due 4/8/2025; Matthew J. Memoli served on 2/7/2025, answer due 4/8/2025; National Institutes of Health served on 2/7/2025, answer due 4/8/2025; National Science Foundation served on 2/18/2025, answer due 4/21/2025; Sethuraman Panchanathan served on 2/18/2025, answer due 4/21/2025; Donald J. Trump served on 2/7/2025, answer due 4/8/2025; U.S. Department of Health and Human Services served on 2/7/2025, answer due 4/8/2025. (Attachments: # 1 Exhibit A – Donald Trump Proof of Service, # 2 Exhibit B – Dorothy Fink Proof of Service, # 3 Exhibit C – Erek Barron Proof of Service, # 4 Exhibit D – U.S. Department of Health and Human Services Proof of Service, # 5 Exhibit E – Health Resources and Services Administration Proof of Service, # 6 Exhibit F – Matthew J. Memoli Proof of Service, # 7 Exhibit G – National Institutes of Health Proof of Service, # 8 Exhibit H – National Science Foundation Proof of Service, # 9 Exhibit I – Pamela Bondi Proof of Service, # 10 Exhibit J – Sethuraman Panchanathan Proof of Service)(Gonzalez–Pagan, Omar) (Entered: 03/10/2025) |
| 03/12/2025 | 124 | MOTION to Appear Pro Hac Vice for D. Jean Veta (Filing fee $100, receipt number AMDDC–11836271.) by American Academy of Pediatrics et al.(Barnes, Abigail) (Entered: 03/12/2025) |

| 03/12/2025 | 125 | MOTION to Appear Pro Hac Vice for William R. Isasi (Filing fee $100, receipt number AMDDC−11836615.) by American Academy of Pediatrics et al.(Barnes, Abigail) (Entered: 03/12/2025) |
| 03/12/2025 | 126 | MOTION to Appear Pro Hac Vice for Yuval Mor (Filing fee $100, receipt number AMDDC−11837367.) by American Academy of Pediatrics et al.(Barnes, Abigail) (Entered: 03/12/2025) |
| 03/12/2025 | 127 | MOTION to Appear Pro Hac Vice for Cortlin H. Lannin (Filing fee $100, receipt number AMDDC−11837374.) by American Academy of Pediatrics et al.(Barnes, Abigail) (Entered: 03/12/2025) |
| 03/17/2025 | 128 | PAPERLESS ORDER granting 124 Motion to Appear Pro Hac Vice on behalf of D. Jean Veta. Directing attorney D. Jean Veta to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/17/2025. (mh4s, Deputy Clerk) (Entered: 03/17/2025) |
| 03/17/2025 | 129 | PAPERLESS ORDER granting 125 Motion to Appear Pro Hac Vice on behalf of William R. Isasi. Directing attorney William R. Isasi to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/17/2025. (mh4s, Deputy Clerk) (Entered: 03/17/2025) |
| 03/17/2025 | 130 | PAPERLESS ORDER granting 126 Motion to Appear Pro Hac Vice on behalf of Yuval Mor. Directing attorney Yuval Mor to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/17/2025. (mh4s, Deputy Clerk) (Entered: 03/17/2025) |
| 03/17/2025 | 131 | PAPERLESS ORDER granting 127 Motion to Appear Pro Hac Vice on behalf of Cortlin H. Lannin. Directing attorney Cortlin H. Lannin to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/12/2025. (mh4s, Deputy Clerk) (Entered: 03/17/2025) |
| 03/21/2025 | 132 | NOTICE OF INTERLOCUTORY APPEAL as to 116 Order on Motion for Preliminary Injunction, 115 Memorandum Opinion by Diana Espinosa, Dorothy A. Fink, Health Resources and Services Administration, Matthew J. Memoli, National Institutes of Health, National Science Foundation, Sethuraman Panchanathan, State of West Virginia, Donald J. Trump, U.S. Department of Health and Human Services. (Daniel, Christian) (Entered: 03/21/2025) |
| 03/24/2025 | 133 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 132 Notice of Interlocutory Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(slss, Deputy Clerk) (Entered: 03/24/2025) |
| 03/24/2025 | 134 | USCA Case Number 25−1279 for 132 Notice of Interlocutory Appeal, filed by Matthew J. Memoli, National Institutes of Health, Dorothy A. Fink, U.S. Department of Health and Human Services, National Science Foundation, Diana Espinosa, State of West Virginia, Sethuraman Panchanathan, Health Resources and Services Administration, Donald J. Trump − Case Manager − Anisha Walker. (slss, Deputy Clerk) (Entered: 03/24/2025) |
| 03/28/2025 | 135 | MEMORANDUM AND ORDER denying without prejudice 118 Motion to Enforce the Preliminary Injunction. Signed by Judge Brendan Abell Hurson on 3/28/2025. (kns, Deputy Clerk) (Entered: 03/28/2025) |
| 04/08/2025 | 136 | Joint MOTION to Stay *(Limited)* by Diana Espinosa, Dorothy A. Fink, Health Resources and Services Administration, Matthew J. Memoli, National Institutes of Health, National Science Foundation, Sethuraman Panchanathan, Donald J. Trump, U.S. Department of Health and Human Services (Attachments: # 1 Text of Proposed Order)(Andrapalliyal, Vinita) (Entered: 04/08/2025) |

| | | |
|---|---|---|
| 04/09/2025 | 137 | ORDER granting 136 Joint MOTION to Stay (Limited). Signed by Judge Brendan Abell Hurson on 4/8/2025. (ybs, Deputy Clerk) (Entered: 04/09/2025) |
| 04/09/2025 | 138 | RETURNED DOCUMENT ORDER. Signed by Judge Brendan Abell Hurson on 4/8/2025. (Attachments: # 1 First Page of Returned Document)(c/m 4/9/2025 ybs, Deputy Clerk) (Entered: 04/09/2025) |
| 04/18/2025 | 139 | NOTICE of Appearance by Robert C. Bombard on behalf of All Defendants (Bombard, Robert) (Entered: 04/18/2025) |
| 04/21/2025 | 140 | NOTICE by Diana Espinosa, Dorothy A. Fink, Health Resources and Services Administration, Matthew J. Memoli, National Institutes of Health, National Science Foundation, Sethuraman Panchanathan, Donald J. Trump, U.S. Department of Health and Human Services (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36)(Daniel, Christian) (Entered: 04/21/2025) |
| 05/12/2025 | 141 | ORDER of USCA granting Motion for abeyance 22 . Case 25–1279 placed in abeyance pending a decision by the U.S. Supreme Court in *U.S. v. Skrmetti*, No. 23–477 as to 132 Notice of Interlocutory Appeal, filed by Matthew J. Memoli, National Institutes of Health, Dorothy A. Fink, U.S. Department of Health and Human Services, National Science Foundation, Diana Espinosa, State of West Virginia, Sethuraman Panchanathan, Health Resources and Services Administration, Donald J. Trump (kns, Deputy Clerk) (Entered: 05/12/2025) |
| 05/14/2025 | 142 | MOTION to Withdraw as Attorney *Lillian M. McGuire* by American Association of Physicians for Human Rights, Inc., B.G. a/k/a W.G., Bella Boe, Bruce Boe, Kristen Chapman, Cameron Coe, Claire Coe, Dylan Doe, Gabe Goe, George Goe, Lawrence Loe, PFLAG, Inc., Rachel Roe, Robert Roe(McGuire, Lillian) (Entered: 05/14/2025) |
| 05/14/2025 | 143 | PAPERLESS ORDER granting 142 Motion to Withdraw as Attorney. Attorney Lillian Margaret McGuire terminated. Signed by Judge Brendan Abell Hurson on 5/14/2025. (ybs, Deputy Clerk) (Entered: 05/14/2025) |
| 06/13/2025 | 144 | (FILED IN ERROR) MOTION to Strike *Appearance* by Diana Espinosa, Dorothy A. Fink, Health Resources and Services Administration, Matthew J. Memoli, National Institutes of Health, National Science Foundation, Sethuraman Panchanathan, Donald J. Trump, U.S. Department of Health and Human Services(Andrapalliyal, Vinita) Modified on 6/16/2025 (hmls). (Entered: 06/13/2025) |
| 06/16/2025 | 145 | QC NOTICE: 144 Motion to Strike Appearance filed by Matthew J. Memoli, National Institutes of Health, Dorothy A. Fink, U.S. Department of Health and Human Services, National Science Foundation, Diana Espinosa, Sethuraman Panchanathan, Health Resources and Services Administration, Donald J. Trump was filed using the incorrect event. <br>**Please refile motion under the "Motions" category and select the "Withdraw as Attorney" event. The motion has been terminated, marked FILED IN ERROR, and the document link has been disabled.* (hmls, Deputy Clerk) (Entered: 06/16/2025) |
| 06/24/2025 | 146 | MOTION to Withdraw as Attorney by Diana Espinosa, Dorothy A. Fink, Health Resources and Services Administration, Matthew J. Memoli, National Institutes of Health, National Science Foundation, Sethuraman Panchanathan, Donald J. Trump, U.S. Department of Health and Human Services(Andrapalliyal, Vinita) (Entered: 06/24/2025) |
| 06/24/2025 | 147 | PAPERLESS ORDER granting 146 Motion to Withdraw as Attorney. Attorney Vinita Andrapalliyal terminated. Signed by Judge Brendan Abell Hurson on 6/24/2025. (kk5s, Deputy Clerk) (Entered: 06/24/2025) |
| 07/11/2025 | 148 | NOTICE by Diana Espinosa, Dorothy A. Fink, Health Resources and Services Administration, Matthew J. Memoli, National Institutes of Health, National Science Foundation, Sethuraman Panchanathan, Donald J. Trump, U.S. Department of Health and Human Services *Of Rulemaking* (Daniel, Christian) (Entered: 07/11/2025) |

| 07/11/2025 | 149 | MOTION to Withdraw as Attorney by Diana Espinosa, Dorothy A. Fink, Health Resources and Services Administration, Matthew J. Memoli, National Institutes of Health, National Science Foundation, Sethuraman Panchanathan, Donald J. Trump, U.S. Department of Health and Human Services(Daniel, Christian) (Entered: 07/11/2025) |
|---|---|---|
| 07/14/2025 | 150 | PAPERLESS ORDER granting 149 Motion to Withdraw as Attorney. Attorney Christian S. Daniel terminated. Signed by Judge Brendan Abell Hurson on 7/14/2025. (lr2s, Chambers) (Entered: 07/14/2025) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

<table>
<tr><td>

PFLAG, INC.,
1625 K St. NW, Suite 700,
Washington, DC 20006;

AMERICAN ASSOCIATION OF PHYSICIANS
FOR HUMAN RIGHTS, INC. d/b/a
GLMA: HEALTH PROFESSIONALS
ADVANCING LGBTQ+ EQUALITY,
1629 K St. NW, Suite 300,
Washington, DC 20006;

GABE GOE, by and through his parent and next
friend George Goe (Montgomery County);

GEORGE GOE (Montgomery County);

BELLA BOE, by and through her parent and next
friend Bruce Boe;

BRUCE BOE;

CAMERON COE, by and through their parent and
next friend CLAIRE COE;

CLAIRE COE;

ROBERT ROE, by and through his parent and next
friend Rachel Roe;

RACHEL ROE;

LAWRENCE LOE; and

DYLAN DOE,

     *Plaintiffs*,

              v.

DONALD J. TRUMP, in his official capacity as
President of the United States,
1600 Pennsylvania Ave. NW
Washington, DC 20220;

</td><td>

Civil Action No.  BAH-25-337

**AMENDED COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

</td></tr>
</table>

* Plaintiffs have filed a motion to waive the requirement under Local Rule 102.2(a) to provide their addresses and to permit Plaintiffs Gabe Goe, George Goe, Bella Boe, Bruce Boe, Cameron Coe, Claire Coe, Robert Roe, Rachel Roe, Lawrence Loe, and Dylan Doe to proceed under pseudonyms.

U.S. DEPARTMENT OF HEALTH AND HUMAN
SERVICES,
200 Independence Ave. SW
Washington, DC 20201;

DOROTHY A. FINK, in her official capacity as
Acting Secretary of the U.S. Department of Health
and Human Services,
200 Independence Ave. SW
Washington, DC 20201;

HEALTH RESOURCES AND SERVICES
ADMINISTRATION,
5600 Fishers Lane
Rockville, MD 20857 (Montgomery County);

DIANA ESPINOSA, in her official capacity as
Principal Deputy Administrator of the Health
Resources and Services Administration,
5600 Fishers Lane
Rockville, MD 20857 (Montgomery County);

NATIONAL INSTITUTES OF HEALTH,
9000 Rockville Pike
Bethesda, MD 20892 (Montgomery County);

MATTHEW J. MEMOLI, in his official capacity as
Acting NIH Director,
9000 Rockville Pike
Bethesda, MD 20892 (Montgomery County);

NATIONAL SCIENCE FOUNDATION,
2415 Eisenhower Avenue
Alexandria, VA 22314; and

SETHURAMAN PANCHANATHAN, in his official
capacity as Director of the National Science
Foundation,
2415 Eisenhower Avenue
Alexandria, VA 22314;

   *Defendants*.

Plaintiffs, by and through their attorneys, bring this Complaint against Defendants and in support state the following:

## INTRODUCTION

1. Over the past week, hospitals across the country have abruptly halted medical care for transgender people under nineteen, cancelling appointments and turning away some patients who have waited years to receive medically necessary care for gender dysphoria. This sudden shut-down in care was the direct and immediate result of an Executive Order that President Trump issued on January 28, 2025—*Protecting Children from Chemical and Surgical Mutilation*— directing all federal agencies to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end" gender affirming medical care for people under nineteen (the "Denial of Care Order").[1]

2. The Denial of Care Order, directing that federal funding be immediately revoked from entities that provide gender affirming medical care for patients under nineteen years old, follows on the heels of an earlier Executive Order that President Trump issued on January 20, 2025—*Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (the "Gender Identity Order").[2] The Gender Identity Order declares that gender identity is a "false" idea and commands that federal funds "shall not be used to promote gender ideology."

3. The Executive Orders were issued for the openly discriminatory purpose of preventing transgender people from expressing a gender identity different from their sex

---

[1] Exec. Order No. 14,187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8,771 (Jan. 28, 2025).

[2] Exec. Order No. 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,615 (Jan. 20, 2025).

designated at birth—and expressing governmental disapproval of transgender people who, by definition, have a gender identity that does not align with their sex designated at birth. These Orders are part of a government-wide effort by the Trump Administration to restrict legal protections and essential services for the transgender community.

4. Plaintiffs Gabe Goe, Bella Boe, Cameron Coe, and Robert Roe (the "Minor Plaintiffs"), Plaintiffs Lawrence Loe and Dylan Doe (the "Adult Plaintiffs"), and certain PFLAG members are transgender people under the age of nineteen who have been thriving because they have had access to medically necessary treatment for their gender dysphoria (collectively, the "Transgender Plaintiffs"). President Donald Trump, through the Denial of Care and Gender Identity Orders, unilaterally seeks to terminate access to this health care immediately by directing agencies to withhold funding from entities that "promote gender ideology" or provide medical care to transgender people under nineteen for the purpose of gender transition.

5. These Executive Orders are unlawful and unconstitutional. Under our Constitution, it is Congress, not the President, who is vested with the power of the purse. The President does not have unilateral power to withhold federal funds that have been previously authorized by Congress and signed into law, and the President does not have the power to impose his own conditions on the use of funds when Congress has not delegated to him the power to do so.

6. The Executive Orders unconstitutionally usurp congressional authority by withholding lawfully appropriated federal funds from medical institutions, providers, and researchers, such as GLMA's health professional members. They violate the rights of thousands of transgender people under nineteen, including the Transgender Plaintiffs, by depriving them of necessary medical care solely on the basis of their sex and transgender status. They also infringe upon parents' fundamental rights, including the rights of Plaintiffs George Goe, Bruce Boe, Claire

Coe, and Rachel Roe (the "Parent Plaintiffs") and parent members of PFLAG, by overriding the aligned judgment of parents, adolescents, and their doctors regarding necessary medical care.

7.      President Trump's directives to cut off funding have had concrete and immediate effects.  Hospitals across the country, including those that have provided medical care to the Transgender Plaintiffs, have ended the provision of ongoing and essential gender affirming medical care to transgender patients under nineteen because of the Executive Orders.[3]

8.      A few days after the Executive Orders were issued, Defendant Health Resources and Services Administration ("HRSA") sent notices to grant recipients that HRSA grant funds may not be used for activities that "do not align with" the Executive Orders and any "vestige, remnant, or re-named piece of any programs in conflict with these E.O.s are terminated in whole or in part." So did   the Centers for Disease Control and Prevention ("CDC"), one of the subagencies of Defendant U.S. Department of Health and Human Services ("HHS").

9.      When the President usurps congressional authority and infringes on the constitutional rights of individuals, the essential role of the courts is to "say what the law is." The Executive Orders should be declared unlawful, and the agency defendants should be enjoined from enforcing or implementing them.

**JURISDICTION AND VENUE**

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as this action arises under the laws of the United States and the United States Constitution; 28 U.S.C. § 1346, as a civil action against the United States founded upon the Constitution, an Act of Congress, or an executive

---

[3] News Release, *President Trump is Delivering on His Commitment to Protect Our Kids*, THE WHITE HOUSE (Feb. 3, 2025), https://www.whitehouse.gov/uncategorized/2025/02/president-trump-is-delivering-on-his-commitment-to-protect-our-kids/.

regulation; and 28 U.S.C. § 1361, as an action to compel an officer or employee of the United States or an agency to perform a duty owed to the plaintiff.

11.    An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

12.    Venue is proper under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1) because each defendant is an agency of the United States or an officer of the United States sued in their official capacity; Defendant HRSA and Defendant National Institutes of Health ("NIH") reside in Montgomery County, Maryland; Plaintiffs Gabe and George Goe reside in Montgomery County, Maryland; and a substantial part of the events or omissions giving rise to this action occurred and continue to occur in this district because Gabe and George Goe reside in this district and Defendants HRSA and NIH are among the federal agencies that have been instructed to withhold grants and because Defendant HRSA has already taken action to do so.

## PARTIES

**A.    Plaintiffs**

### 1.    The Member Organization Plaintiffs

13.    Plaintiff PFLAG, Inc. ("PFLAG") is a 501(c)(3) national membership nonprofit organization based in Washington, D.C. and incorporated in California. PFLAG is the first and largest organization dedicated to supporting, educating, and advocating for lesbian, gay, bisexual, transgender, and queer ("LGBTQ+") people, their parents and families, and allies. People become PFLAG members by joining the national organization directly or through one of its nearly 350 local chapters throughout the United States. PFLAG has more than 550,000 members and supporters nationwide, including many families of transgender youth who currently receive or will soon need to access the medical treatment for gender dysphoria that the Executive Orders seek to

prohibit.  PFLAG's mission is to create a caring, just, and affirming world for LGBTQ+ people and those who love them.  Encouraging and supporting parents and families of transgender and gender non-conforming people in affirming and loving their children and helping them access the supports and care they need is central to PFLAG's mission.  PFLAG brings its claims on behalf of its members.  The Transgender Plaintiffs and Parent Plaintiffs are members of PFLAG.

14.    Plaintiff American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ+ Equality ("GLMA") is a 501(c)(3) national nonprofit membership organization based in Washington, D.C. and incorporated in California.  GLMA's mission is to ensure health equity for LGBTQ+ people and equality for LGBTQ+ health professionals in their work and learning environments.  GLMA's membership includes approximately 1,000 member physicians, nurses, advanced practice nurses, physician assistants, researchers and academics, behavioral health specialists, health-profession students, and other health professionals throughout the country.  Their practices represent the major healthcare disciplines and a wide range of health specialties, including primary care, internal medicine, family practice, psychiatry, pediatrics, obstetrics/gynecology, emergency medicine, neurology, and infectious diseases.  GLMA asserts its claims in this lawsuit on behalf of its members, including health professional members who work at medical institutions receiving grant funding from Defendants HRSA and NIH, as well as other subagencies of Defendant HHS.

**2.    The Individual Plaintiffs and Their Families**

**a.    The Goe Family**

15.    Plaintiffs Gabe and George Goe live in Bethesda, Maryland.  George is the father of Gabe, his fourteen-year-old son.  The Goe family are members of PFLAG.

16.    Gabe is transgender and was scheduled to receive medically necessary care that the Executive Orders prohibit.

### b.      The Boe Family

17.      Plaintiffs Bruce Boe and Bella Boe live in New York.  Bruce is the father of Bella, his twelve-year-old daughter.  The Boe family are members of PFLAG.

18.      Bella is transgender and was scheduled to receive medically necessary care that the Executive Orders prohibit.

### c.      The Coe Family

19.      Plaintiffs Cameron and Claire Coe live in New York.  Claire is the mother of Cameron, who is twelve years old.  The Coe family are members of PFLAG.

20.      Cameron is non-binary, is receiving, and was scheduled to receive medically necessary care that the Executive Orders prohibit.

### d.      The Roe Family

21.      Plaintiffs Rachel and Robert Roe live in Massachusetts.  Rachel is the mother of Robert, her sixteen-year-old son.  The Roe family are members of PFLAG.

22.      Robert is transgender and is receiving medically necessary care that the Executive Orders prohibit.

### e.      Lawrence Loe

23.      Plaintiff Lawrence Loe is eighteen years old and lives in New York.  He is a member of PFLAG.

24.      Lawrence is transgender, is receiving, and was scheduled to receive medically necessary care that the Executive Orders prohibit.

### f.      Dylan Doe

25.      Plaintiff Dylan Doe lives in Massachusetts.  He is eighteen years old.  He is a member of PFLAG.

26.     Dylan is transgender, is receiving, and was scheduled to receive medically necessary care that the Executive Orders prohibit.

**B.      Defendants**

27.     Defendant Donald J. Trump is the President of the United States.  He is responsible for the actions and decisions that Plaintiffs challenge in this action.  He is sued in his official capacity.

28.     Defendant U.S. Department of Health and Human Services ("HHS") is a cabinet department of the federal government.  HHS is an "agency" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551(1).  Multiple subagencies, offices, and entities of HHS provide grants and funding to healthcare providers and medical institutions.  In addition to Defendant HRSA and Defendant NIH, these HHS components include, but are not limited to the CDC, the Agency for Healthcare Research and Quality ("AHRQ"), the Substance Abuse and Mental Health Services Administration ("SAMHSA"), and the Administration for Children and Families ("ACF").  HHS also allots Preventive Health and Health Services Block Grants under the Public Health Service Act ("PHSA").

29.     Defendant Dorothy A. Fink is the Acting Secretary of HHS.  She is sued in her official capacity.  Acting Secretary Fink is responsible for all aspects of the operation and management of HHS, implementing and fulfilling HHS's duties under the United States Constitution and statutory law.

30.     Defendant Health Resources and Services Administration ("HRSA") is an agency of HHS located in Rockville, Maryland.  It provides financial support to healthcare providers in the United States through grants to those providers.

31.     Defendant Diana Espinosa is the Principal Deputy Administrator of HRSA.  She is sued in her official capacity.  As Principal Deputy, Defendant Espinosa oversees the design and implementation of HRSA's programs and grants.

32.     Defendant National Institutes of Health ("NIH") is a part of HHS and is the nation's medical research agency and the largest public funder of biomedical research in the world. It is located in Bethesda, Maryland.  NIH offers funding for many types of grants, contracts, and even programs that help repay loans for researchers.

33.     Defendant Matthew J. Memoli is the Acting NIH Director.  He is sued in his official capacity.  He is responsible for setting policy for NIH and for planning, managing, and coordinating the programs and activities of all NIH components, as well as overseeing the overall direction of the agency's activities, and identifying needs and opportunities for NIH.

34.     Defendant National Science Foundation ("NSF") is an independent federal agency that supports research and education in fields of science and engineering through research and education grants, including to medical institutions in which Transgender Plaintiffs receive gender affirming medical care.

35.     Defendant Sethuraman Panchanathan is the Director of the NSF.  He is sued in his official capacity.

36.     Defendants HHS, Acting HHS Secretary Fink, HRSA, HRSA Principal Deputy Espinosa, NIH, Acting NIH Director Memoli, NSF, and NSF Director Panchanathan are referred to collectively as the "Agency Defendants."

## FACTUAL ALLEGATIONS

### A.     Medical Guidelines for Treating Gender Dysphoria

37.     Doctors in hospitals and other medical facilities that receive federal funding have long followed and continue to use evidence-based, well-researched, and widely accepted clinical

practice and medical guidelines to assess, diagnose, and treat adolescents and adults with gender dysphoria, which is a medical condition characterized by the clinically significant distress caused by the incongruence between a person's gender identity and the sex they were assigned at birth.

38.     Decades of clinical experience and a large body of scientific and medical literature support these medical guidelines, which are recognized as authoritative by the major medical associations in the United States.  These guidelines provide a framework for the safe and effective treatment of gender dysphoria, which, if left untreated, can have serious consequences for the health and wellbeing of transgender people, including adolescents.  For some adolescent patients with gender dysphoria, puberty-delaying treatment and hormone therapy are medically indicated.

39.     Gender identity refers to a person's internal sense of belonging to a particular gender.  Everyone has a gender identity, and a person's gender identity is durable and cannot be altered voluntarily or changed through medical intervention.

40.     A person's gender identity usually matches the sex they were designated at birth based on their external genitalia.[4]

41.     Most boys are designated male at birth based on their external genital anatomy, and most girls are designated female at birth based on their external genital anatomy.

42.     But transgender people have a gender identity that differs from their sex designated at birth.  A transgender boy is someone who was designated a female sex at birth but has a male gender identity.  A transgender girl is someone who was designated a male sex at birth but has a female gender identity.  A transgender boy cannot simply turn off his gender identity like a switch, just as a non-transgender (also known as "cisgender") boy cannot turn off his gender identity.

---

[4] The terms "sex designated at birth" or "sex assigned at birth" are more precise than the term "biological sex" because there are many biological sex characteristics, and they do not always align with each other.

43.    The health and wellbeing of all people, including those who are transgender, depends on their ability to live in a manner consistent with their gender identity.  The process by which transgender or nonbinary people begin to live in a manner consistent with their gender identity is known as "social transition."  This can include using a new name, pronouns that correspond to a person's gender identity, and adopting dress or grooming styles that more authentically reflect a person's gender.  For transgender people, the incongruence between their gender identity and sex assigned at birth can cause clinically significant distress.

44.    According to the American Psychiatric Association's *Diagnostic & Statistical Manual of Mental Disorders, Fifth Edition, Text Revision* ("DSM-5-TR"), "gender dysphoria" is the diagnostic term for the condition experienced by some transgender people of clinically significant distress resulting from the lack of congruence between their gender identity and the sex assigned to them at birth.  To be diagnosed with gender dysphoria, the incongruence must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.[5]

45.    Gender dysphoria is a serious medical condition.[6] Treatment for gender dysphoria aims to resolve the distress associated with the incongruence between a transgender person's assigned sex at birth and their gender identity.

46.    If left untreated, gender dysphoria can result in negative mental health outcomes, including severe anxiety and depression, post-traumatic stress disorder, eating disorders, substance abuse, self-harm, and suicidality.

---

[5] Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, Text Revision F64.0 (5th ed. 2022).

[6] *See* Eric Yarbrough et al., Am. Psych. Ass'n, *Gender Dysphoria Diagnosis*, *in* A GUIDE FOR WORKING WITH TRANSGENDER AND GENDER NONCONFORMING PATIENTS (2017).

47.    For many transgender adolescents, the onset of puberty leading to physical changes in their bodies that are incongruent with their gender identities can cause extreme distress. Puberty-delaying medication allows transgender adolescents to pause these changes, thereby minimizing and potentially preventing the heightened gender dysphoria caused by the development of secondary sex characteristics incongruent with their gender identity. Without puberty-delaying medication, an adolescent will undergo changes to their body that may be difficult or impossible to later reverse.

48.    Puberty-delaying treatment is temporary. If an adolescent discontinues the medication, endogenous puberty resumes. Puberty-delaying treatment does not cause infertility.

49.    For some older adolescents and young adults, it may be medically necessary and appropriate to treat them with gender affirming hormone therapy (e.g., testosterone for transgender boys and estrogen and testosterone suppression for transgender girls).

50.    Gender affirming hormone therapy does not necessarily result in a loss of fertility, and many individuals treated with hormone therapy can still biologically conceive children.

51.    As with all medications that could affect fertility, transgender patients—and their parents, in the case of adolescent patients—are counseled on the potential risks of the medical intervention, and treatment is only initiated where patients are properly informed and consent/assent to the care.

52.    Adolescents and young adults who first receive treatment later in puberty and are treated only with gender affirming hormone therapy (and not puberty-delaying treatment) also go through a hormonal puberty consistent with their gender identity. However, they will have undergone physical changes associated with their endogenous puberty that may not be wholly reversed by hormone therapy or even surgery later in life.

53.    Some older adolescents and young adults also may receive chest surgeries, provided they are medically indicated in accordance with established clinical practice guidelines.

54.    Medical treatment recommended for and provided to transgender young people with gender dysphoria can substantially reduce lifelong gender dysphoria and eliminate the medical need for some surgeries or other medical interventions later in life.

55.    Providing gender affirming medical care can be lifesaving treatment and positively change the short- and long-term health outcomes for transgender adolescents.

56.    The treatments used to treat gender dysphoria are also used to treat other conditions. in both adolescents and adults. For example, puberty-delaying medication is used to treat children with central precocious puberty and is used to treat adolescents and adults with hormone-sensitive cancers and endometriosis. For delayed puberty, non-transgender boys are prescribed testosterone and non-transgender girls are prescribed estrogen. Testosterone suppression is also used in non-transgender girls with Polycystic Ovarian Syndrome to reduce some symptoms of the condition, including excess facial hair. And chest surgery is often used to treat gynecomastia in non-transgender adolescents and young adults.

57.    The potential risks associated with these medical interventions when used to treat gender dysphoria are comparable to the risks associated with many other medical treatments to which parents routinely consent on behalf of their children—and that the Executive Orders permit.

58.    The Executive Orders do not prohibit these treatments when used to treat any condition other than gender dysphoria, even though the treatments have comparable risks and side effects to those that can be present when treating gender dysphoria. The use of these treatments for gender dysphoria is not any riskier than for other conditions and diagnoses for which the same treatments are regularly used.

**B.      The Executive Orders**

**1.      The Gender Identity Order**

59.      On January 20, 2025, President Trump issued the Gender Identity Order.

60.      Section 2 of the Gender Identity Order declares: "It is the policy of the United States to recognize two sexes, male and female.  These sexes are not changeable and are grounded in fundamental and incontrovertible reality."

61.      Section 2(a) defines "sex" to mean "an individual's immutable biological classification as either male or female," which is "not a synonym for and does not include the concept of 'gender identity.'"  Section 2(d) defines "female" as "a person belonging, at conception, to the sex that produces the large reproductive cell," and Section 2(e) defines "male" as "a person belonging, at conception, to the sex that produces the small reproductive cell."

62.      Section 2(f) claims that "'[g]ender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true."  It further asserts that "[g]ender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body."

63.      Section 2(g) states that "'[g]ender identity' reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex."

64.      To achieve the objective of eradicating "gender ideology," Section 3(g) of the Executive Order declares: "Federal funds shall not be used to promote gender ideology."  President

Trump directs that "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology."

**2.     The Denial of Care Order**

65.     On January 28, 2025, President Trump issued the Denial of Care Order, which builds on the Gender Identity Order.

66.     Section 1 declares that "it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures."

67.     Section 2 defines "'child' or 'children'" to mean "an individual or individuals under 19 years of age," and it defines "pediatric" as "relating to the medical care of a child."

68.     Section 2 defines the phrase "chemical and surgical mutilation" to mean "the use of puberty blockers . . . to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; the use of sex hormones . . . to align an individual's physical appearance with an identity that differs from his or her sex; and surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions."

69.     To eradicate access to health care provided for the purpose of gender transition, Section 4 of the Denial of Care Order directs the immediate defunding of medical institutions that provide such treatments.  Importantly, the funding instructed to be stripped is not limited to grants used for or related to gender affirming medical care for the purpose of gender transition.  President Trump unilaterally directs that <u>all</u> federal medical and research grants be stripped from medical

institutions, medical schools and hospitals, that provide medically necessary gender affirming medical care to patients under nineteen for the purpose of gender transition, regardless of whether the funds are used for or related to such care.

70.    In Section 4 of the Denial of Care Order, President Trump commands:  "The head of each executive department or agency (agency) that provides research or education grants to medical institutions, including medical schools and hospitals, shall, consistent with applicable law and in coordination with the Director of the Office of Management and Budget, immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children."

71.    Critically, the Gender Identity and Denial of Care Orders do not seek to prohibit federal funding to entities that provide these treatments for all medical conditions; rather, they prohibit federal funding to entities only when the gender affirming medical care is for the purpose of gender transition—that is, to align a patient's gender presentation with an identity different from their sex assigned at birth.

**C.    The Executive Orders Are Part of a Systematic Effort Targeting Transgender People**

72.    The Gender Identity and Denial of Care Orders are part of a broad and sweeping attack President Trump has launched against "gender ideology" and transgender people through a series of discriminatory Executive Orders.  In his first nine full days in office, President Trump signed nine Executive Orders targeting gender identity and transgender people—a rate of approximately one per day.  These orders span military service, health care, education, and employment, part of a systematic and expressly discriminatory attack on gender identity and transgender people.

73.    On his first day in office, President Trump issued Executive Order 14,148, rescinding several Biden Administration Executive Orders that provided protections for transgender people (the "Rescission Order").[7]

74.    President Trump then issued Executive Order 14,183, banning transgender people from serving in the military, and revoked Executive Order 14,004, which had allowed all qualified persons to serve in the military.[8]  As justification, President Trump declared that "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service" and "is not consistent with the humility and selflessness required of a service member."  The language in Executive Order 14,183, on its face, expressly and unequivocally evidences President Trump's discriminatory animus toward transgender people.

75.    President Trump has acted to discriminate against transgender people in other contexts as well.  For example, Executive Order 14,170 forbids government employers from considering gender identity in the hiring process,[9] and Executive Order 14,190 eliminates federal funding for K-12 schools that "directly or indirectly support" the "instruction, advancement, or promotion" of "gender ideology" in their curricula for students or in training materials for instructors.[10]  It also goes beyond the Denial of Care and Gender Identity Orders to prohibit the use of federal funds "to directly or indirectly support or subsidize the social transition of a minor student."  "Social transition" is defined as "the process of adopting a 'gender identity' or 'gender marker' that differs from a person's sex."

---

[7] Exec. Order No. 14,148, *Initial Rescissions of Harmful Executive Orders and Actions*, 90 Fed. Reg. 8237 (Jan. 20, 2025).

[8] Exec. Order No. 14,183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025).

[9] Exec. Order No. 14,170, Reforming the Federal Hiring Process and Restoring Merit to Government Service, Fed. Reg. 8621 (Jan. 20, 2025).

[10] Exec. Order No. 14,190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025).

76.    In addition, federal agencies like the CDC, a subagency of Defendant HHS, have been instructed to remove references to or mentions of terms such as "gender," "transgender," "LGBT," "transsexual," and "non-binary," among others.[11]

**D.    The Impact of the Executive Orders on Medical Care and Harm to Public Health**

77.    The Denial of Care and Gender Identity Orders have had direct and immediate effects on the provision of medical care to transgender people under nineteen.

78.    Medical institutions across the United States that receive federal funding have stopped providing gender affirming medical care for patients younger than nineteen because of the Executive Orders.[12]

79.    Hospitals and other healthcare institutions fear that if they do not stop providing gender affirming medical care to their transgender patients, they will immediately lose significant federal funding for research, medical education, and health care, including research and care unrelated to the provision of treatment of gender dysphoria, and also face lawsuits from the Justice Department.

80.    These fears are exacerbated by the fact that immediately after taking office, the Trump Administration, through the Office of Management and Budget, cut off all federal funds without warning or further administrative process. Two federal lawsuits, two temporary restraining orders, and now an order granting a motion to enforce one of the TROs have been required to stop this unilateral executive action.

---

[11] Jeremy Faust, CDC Orders Mass Retraction and Revision of Submitted Research Across All Science and Medicine Journals. Banned Terms Must Be Scrubbed, INSIDE MED. (Feb. 1, 2025), https://insidemedicine.substack.com/p/breaking-news-cdc-orders-mass-retraction.

[12] Carla K. Johnson, et al., *Denver Health is Pausing Gender-Affirming Care to Comply with Trump Executive Order*, CPR NEWS (Jan. 31, 2025), https://www.cpr.org/2025/01/31/denver-health-pauses-gender-affirming-care/; Jenna Portnoy, *After Trump Order, Hospitals Suspend Some Health Care for Trans Youths*, WASH. POST (Jan. 31, 2025), https://www.washingtonpost.com/dc-md-va/2025/01/31/trans-children-trump-hormones-healthcare/.

81.    Agency Defendants have already taken action to enforce the Gender Identity and Denial of Care Orders. Defendant HRSA issued notices to grant recipients that HRSA grant funds may not be used for activities that "do not align with" the Executive Orders and any "vestige, remnant, or re-named piece of any programs in conflict with these E.O.s are terminated in whole or in part."

82.    CDC similarly issued notices to grant recipients ordering them to "immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting or inculcating gender ideology at every level and activity." (Emphasis added.)

83.    Children's National in Washington, D.C., which provides care to Minor Plaintiff Gabe Goe, receives 70% of its research funding from federal agencies, including 60% from Defendant NIH.  In fiscal year 2023, Children's National received $69.6 million in funding from Defendant NIH and $8.7 million from Defendant HRSA.

84.    On January 30, 2025, two days after the issuance of the Denial of Care Order, Children's National announced that it is pausing its provision of puberty blockers and hormone therapy prescriptions for transgender youth, citing "the guidelines in the Executive Order."[13]  That same day, Minor Plaintiff Gabe Goe was informed that Children's National was no longer issuing new prescriptions or processing refills on existing prescriptions for gender affirming medical care for people under nineteen.  Gabe thus would not be able to start hormone therapy as planned.

85.    Virginia Commonwealth University ("VCU") Health and Children's Hospital of Richmond in Richmond, Virginia receives federal funding, including nearly $7.3 million in grants from Defendant HRSA and nearly $107 million in grants from Defendant NIH in fiscal year 2023.

---

[13] *Children's National Hospital Statement on Executive Order* (Jan. 30, 2025),
https://www.childrensnational.org/about-us/newsroom/2025/statement-on-executive-order.

86.    UVA Health in Charlottesville, Virginia receives federal funding, including more than $200 million in grants from Defendant NIH in fiscal year 2023.

87.    On January 28, 2025, the Attorney General of Virginia Jason Miyares sent a letter to the University of Virginia and Virginia Commonwealth University advising that the Denial of Care Order "directs federal agencies to immediately ensure that medical institutions that receive federal research or education grants end chemical and surgical mutilation of children." He warned that "any hospital or other institution, including agencies of the Commonwealth, that continues to perform chemical and surgical mutilation of children is at risk of losing such grants," and noted that "the grants are not just limited to those related to this subject matter, but could apply to all medical and research grants from federal agencies."[14]

88.    In "response to" the Denial of Care Order and the Attorney General's letter, VCU Health and Children's Hospital of Richmond announced they were suspending gender affirming medical care for patients under nineteen.[15] As a result, on January 29, 2025, hours before a PFLAG transgender adolescent member's scheduled appointment to meet with a doctor at the clinic to continue her hormone treatment for gender dysphoria, VCU Health informed her that her appointment was cancelled.

89.    UVA Health also immediately suspended all gender affirming medical care for patients under nineteen in "response to" the Denial of Care Order and the Attorney General's letter.[16]

---

[14] Letter from Jason Miyares, Attorney General of Virginia, to the University of Virginia and Virginia Commonwealth University (Jan. 28, 2025).

[15] *Transgender*, CHILDREN'S HOSP. OF RICHMOND AT VCU (Feb. 1, 2025), https://www.chrichmond.org/services/transgender/.

[16] *Gender Health Services Impacted by Executive Order*, UVA HEALTH, https://childrens.uvahealth.com/services/transgender-youth-health (last visited Feb. 1, 2025).

19

90.    NYU Langone Health in New York City, New York, which provides care to Minor Plaintiff Cameron Coe, Minor Plaintiff Bella Boe, and Adult Plaintiff Lawrence Loe, receives federal funding, including $5.6 million in grants from Defendants HRSA and NIH in the last twelve months.

91.    Following the issuance of the Denial of Care Order, NYU Langone Health began cancelling appointments for medical care for transgender patients under nineteen.  The day after the Denial of Care Order was issued, NYU Langone informed Minor Plaintiff Cameron Coe that their appointment to receive a puberty blocking implant was cancelled, told Minor Plaintiff Bella Boe that NYU would not be able to schedule Bella's appointment to receive a puberty blocking implant, and informed Adult Plaintiff Lawrence Loe that his gender affirming surgery scheduled for the next week was cancelled.

92.    An NYU doctor said that this denial of care was due to "the new administration." Another employee said the medical team was "awaiting more guidance" before providing care.[17]

93.    Boston Children's Hospital in Boston, Massachusetts, which provides care to Minor Plaintiff Robert Roe, receives federal funding, including more than $27.5 million in grants from Defendant HRSA and more than $245 million in grants from Defendant NIH in fiscal year 2023, and nearly $1.2 million from NSF.

94.    Following the issuance of the Denial of Care Order, Boston Children's Hospital cancelled its immediate appointments with transgender patients under nineteen.  Minor Plaintiff Robert Roe's routine hormone therapy checkup set for January 29, 2025 was cancelled.

---

[17] Joseph Goldstein, *N.Y. Hospital Stops Treating 2 Children After Trump's Trans Care Order*, N.Y. Times (Feb. 1, 2025), https://www.nytimes.com/2025/02/01/nyregion/nyu-langone-hospital-trans-care-youth.html.

95.    Denver Health in Denver, Colorado received more than $25 million in grants from Defendant HRSA and more than $700,000 in grants from Defendant NIH in fiscal year 2023.

96.    Denver Health has stopped providing gender affirming medical care to patients under nineteen in response to the Denial of Care Order.  In a statement, Denver Health acknowledged that the Order would lead to "increased risk of depression, anxiety, and suicidality" among transgender adolescents.  However, it is concerned about the "criminal and financial consequences for those who do not comply [with the Denial of Care Order]," including the loss of participation in federal programs administered by HHS that "represent a significant portion of Denver Health's funding."  The statement asserted: "The loss of this funding would critically impair [Denver Health's] ability to provide care for the Denver community."[18]

97.    Children's Hospital Colorado receives federal funding, including $9.75 million from Defendant HRSA and $50,000 from Defendant NIH during fiscal year 2023.

98.    Children's Hospital Colorado has stopped providing gender affirming medical care to patients under nineteen in response to the Denial of Care Order.[19]  Children's Hospital Colorado issued a statement on February 5, 2025 that "[t]he executive order threatens Children's Hospital Colorado's ability to provide care for the many children who rely on [them]" and "Children's Colorado will transition its model of gender affirming care" to no longer provide medical treatments for gender dysphoria to patients under 19.  The statement acknowledged "the grief and anxiety that these changes will bring for the patients and families who have shown unwavering dedication and commitment to supporting children in embracing their true selves."

---

[18] Melissa Reeves & Jaleesa Irizarry, *UCHealth and Denver Health Pause Gender-Affirming Care for Trans Youth*, 9NEWS (Jan. 31, 2025), https://www.9news.com/article/news/local/local-politics/denver-health-pauses-gender-affirming-surgeries-minors-federal-funding/73-e61f598b-e32d-474e-94b4-4b11d4c5c8af.

[19] John Daley, C*hildren's Hospital Colorado suspends gender affirming treatment, following White House executive order*, CPR News (Fe. 5, 2025), https://www.cpr.org/2025/02/05/childrens-hospital-colorado-suspends-gender-affirming-treatment-following-white-house-executive-order/.

99.    Other hospitals have responded to the Orders by continuing to provide medical care to existing patients but refusing to provide gender affirming medical care to new ones. Children's Hospital Los Angeles ("CHLA") has paused the initiation of hormone therapy for transgender patients under 19 but is allowing existing patients receiving hormone therapy to continue their course of care.[20] CHLA receives federal funding, including $33.5 million from Defendant NIH, $21 million from Defendant HRSA in fiscal year 2023. Corewell Health in Michigan is not beginning any new hormone therapy.[21] Corewell Health receives federal funding, including $2.1 million from Defendant NIH and $1.2 million from Defendant HRSA in fiscal year 2023.

100.    As demonstrated, the Denial of Care and Gender Identity Executive Orders have directly forced medical institutions across the United States to suspend providing critical medical care to their transgender patients under nineteen out of fear that they will lose all federal funding upon which they rely to provide care to their surrounding communities.

101.    On February 3, 2025, the White House issued a press release touting the broad and immediate effects of the Denial of Care Order, stating: "It's already having its intended effect – preventing children from being maimed and sterilized by adults perpetuating a radical, false claim that they can somehow change a child's sex. Hospitals around the country are taking action to downsize or eliminate their so-called 'gender-affirming care' programs."[22]

102.    By directing agencies to withhold <u>all</u> federal funding from entities that "promote gender ideology" and provide gender affirming medical care to patients under nineteen, the Gender

---

[20] Emily Alpert Reyes, *Children's Hospital LA Stops Initiating Hormonal Therapy for Transgender Patients Under 19*, L.A. Times (Feb. 4, 2025), https://www.latimes.com/california/story/2025-02-04/childrens-hospital-to-stop-initiating-hormonal-therapy-for-trans-patients-under-19

[21] Georgea Kovanis, *Corwell Becomes First Michiagan Health System to Limit Gender-Affirming Care for Minors*, Detroit Free Press (Feb. 7, 2025), https://www.freep.com/story/news/health/2025/02/07/transgender-minors-michigan-corewell-beaumont-trump/78307419007/

[22] News Release, *supra* note 3.

Identity and Denial of Care Orders threaten the ability of medical institutions and healthcare providers throughout the U.S. to provide essential health care to their communities, train the next generation of physicians, and support research to address this country's greatest health challenges.

**E.    The Harm of the Executive Orders to the Individual Plaintiffs**

**1.    The Goe Family**

103.    Gabe Goe is fourteen years old and lives in Maryland with his family. He is creative and kind.

104.    Gabe is transgender. He is a boy with a male gender identity, but when he was born, he was designated as female. Gabe has been loved and supported by his family, school, and community since he socially transitioned when he was twelve.

105.    Gabe has been diagnosed with gender dysphoria. Gabe and his family have worked with a multi-disciplinary team at Children's National Hospital in Washington, D.C., including an endocrinologist and a psychologist, to identify appropriate medical treatment for his gender dysphoria, including starting testosterone.

106.    In November 2024, after extensively discussing the risks and benefits with the endocrinologist, along with the requirement for blood testing and psychologist's letter of support, Gabe's family scheduled an appointment for March 2025 to start testosterone.

107.    On January 30, 2025, after the President signed the Denial of Care Order, the psychologist at Children's National told George that because of the Denial of Care Order, she could finish Gabe's evaluation after another appointment, but Children's National was no longer issuing new prescriptions or processing refills on existing prescriptions for gender affirming medical care for people under nineteen. Gabe would not be able to start testosterone as planned.

108.    Gabe has been looking forward to this part of his transition. Treating his gender dysphoria by starting testosterone will allow him to physically develop as a young man, which is how he sees himself and how he presents himself to the world. George is heartbroken for his son, and the rest of Gabe's family is devastated. They are worried that the Denial of Care Order is the first step in enabling other people to discriminate against their son or that the government will look the other way if hate crimes are committed against transgender people like Gabe.

**2.    The Boe Family**

109.    Bella Boe is twelve years old and lives in New York with her family.

110.    Bella is transgender. She is a girl with a female gender identity, but when she was born, she was designated as male.

111.    From the time Bella was a toddler, she would tell her parents she wanted to have long hair and she did not want to have a beard when she grew up. Closer to puberty, Bella told her parents that she identifies as a girl. She has also been diagnosed with gender dysphoria.

112.    Bella's family did not impose gendered expectations on her. Based on her gender expression, she has experienced bullying. Her classmates called her slurs, and they targeted her both in and out of school. One student grabbed Bella, called her trans, and told her to kill herself. She began to miss school and developed depression. Once she moved to a new school, where she can live fully as herself, her wellbeing improved dramatically.

113.    Bella's parents sought medical care for her at NYU Langone Health's Transgender Youth Health Program. After extensive conversations about risks and benefits, Bruce decided in consultation with Bella and her doctors that a puberty blocking implant was the right decision to treat her gender dysphoria by halting the changes of endogenous male puberty before they could cause her further distress.

114.    On January 28, 2025, after President Trump signed the Denial of Care Order, NYU refused to schedule Bella's implant appointment.  NYU told Bella's parents NYU was likely changing its policies on gender affirming medical care in response to the Denial of Care Order. After rescheduling and cancelling again, NYU told Bruce it had shut down all appointments for gender affirming medical care.

115.    Bruce is afraid of the impact that the Executive Orders will have on Bella.  Bella has already started puberty.  She is already fearful, worried, and scared about what she might look like in the future if she does not get the care that she needs.

116.    Because of the Executive Orders, Bella's family is scared that they have no way of getting Bella the care she requires.  Bruce is worried that she will regress and become depressed again without this care.

**3.    The Coe Family**

117.    Cameron Coe is twelve years old and lives in New York with their family.

118.    Cameron is transgender.  They are non-binary, but when they were born, they were designated as male.

119.    From the age of four, Cameron communicated to their parents that they were neither a boy nor a girl.  They began to express their non-binary identity in the fourth grade.

120.    Cameron began seeing a therapist who diagnosed them with gender dysphoria. They also met with doctors at NYU Langone Health to learn about options for medical care.

121.    Once Cameron began to enter puberty, Cameron grew more uncomfortable in their changing body, and they expressed anxiety about going through a masculine puberty.  As puberty continued, they experienced escalating stress, anxiety, and discomfort in their body.

122. The Coe family first went to NYU Langone purely to learn more about potential medical and non-medical options. The doctor they met with counseled them on the available options, including the potential for pubertal suppression. Based on Cameron's escalating distress, blood testing showed high levels of endogenous testosterone, the imminence of permanent physical changes, consultation with doctors, and the need for more time to consider whether to pursue further medical treatment without worrying about Cameron's body changing right now, the Coe family decided to pursue puberty-suppressing medications, with a letter of support from Cameron's therapist. Cameron received an injection of puberty-suppressing medication in fall 2024, with a plan to eventually receive an implant that would last longer.

123. Beginning puberty-suppressing medication had a positive effect on Cameron. They experienced enormous relief after their first injection and started doing better socially.

124. The earliest that Cameron was able to schedule an appointment for a puberty-blocking implant at NYU Langone was January 31, 2025. On January 29, 2025, Cameron's family received a call from NYU Langone informing them that the appointment was cancelled.

125. Cameron's anxiety has increased greatly because of the fear of not being able to continue puberty-blocking medication. This has had negative physical consequences, including stomach pains and insomnia. Cameron's parents are worried about immediate severe distress and suicidality if Cameron remains unable to receive necessary gender affirming medical care.

**4.    The Roe Family**

126. Robert Roe is sixteen years old and lives in Massachusetts with his family. Robert is a smart, active, and involved teenager. He is an honors student and talented at sports.

127.    Robert is transgender.  He is a boy with a male gender identity, but when he was born, he was designated as female.  Because Robert is adopted, he is eligible for health insurance through MassHealth until he turns 26.

128.    Robert started to express his gender identity at two years old.  He began his social transition at eight years old and received a gender dysphoria diagnosis at nine.

129.    Robert has been receiving medical care from GeMS at Boston Children's Hospital for several years.  A team of doctors there thoroughly explained how puberty-delaying medications and hormone replacement therapy work, as well as the benefits and risks of both.

130.    Robert received a puberty-blocking implant at age 12 at GeMS.  He started receiving hormone therapy at age fourteen at GeMS.

131.    Robert had an appointment scheduled at GeMS on January 29, 2025.  It was supposed to be a regular check-up for his hormone therapy, where his providers would do his bloodwork and confirm that his dosage was correct.

132.    But the morning of January 29, a nurse practitioner at GeMS called Robert's mother Rachel to tell her that because of the Denial of Care Order and out of an abundance of caution, GeMS was cancelling all of its appointments for people under the age of 19.

133.    Without access to necessary medical care, Rachel is fearful that Robert will experience significant distress and anxiety.  He never experienced endogenous female puberty because of the blockers; he has only ever lived life as a boy.  He needs testosterone to continue to live his life.  Because of the Executive Orders, Robert's family does not know how else to get him access to the care he needs.

134.    Rachel has seen Robert become a successful, involved, and happy young man.  She is scared of what will happen to his confidence and happiness if he cannot access the care he needs.

**5.  Lawrence Loe**

135.  Lawrence Loe is eighteen years old and lives in New York with his father.

136.  Lawrence is transgender.  He is a man with a male gender identity, but when he was born, he was designated as female.

137.  After starting puberty, Lawrence sought support from a therapist for navigating his strong feelings that something was wrong with his changing body, and he eventually received a formal diagnosis of gender dysphoria.

138.  At thirteen years old, he started a medication to suppress menstruation and manage his distress.  In consultation with his doctors and parents, he began testosterone when he was 16.

139.  Testosterone has had a dramatic positive effect on Lawrence's mental health and wellbeing.  Prior to starting testosterone, he had experienced significant mental health issues due to gender dysphoria.

140.  Lawrence has been looking forward to receiving chest masculinization surgery for six years.  To get an appointment for surgery, he obtained a letter of support signed by his longtime therapist and another mental health professional, and another one signed by his doctor.  His surgery was planned for the first week of February at NYU Langone.  He has been preparing for his surgery by making appropriate arrangements, undergoing blood testing, and attending a pre-operative appointment.  He has been counting down to the day he is able to obtain surgery.  Trying to flatten his chest is physically painful and hard on his skin.

141.  On January 29, 2025, Lawrence received a call from a nurse practitioner at NYU Langone who told him that because of the Denial of Care Order, NYU was cancelling his surgery appointment, and would not reschedule him until after he turned nineteen.

28

142.    Lawrence is devastated, angry, and saddened to think the necessary medical care he has been working toward for so long could be pulled away from him, even though he is an adult.

**6.    Dylan Doe**

143.    Dylan Doe is eighteen years old and lives in Massachusetts.

144.    Next year, Dylan plans to go to college to study linguistics. He already speaks three languages and is learning two more. He wants to help preserve endangered languages.

145.    Dylan is transgender. He is a man with a male gender identity, but when he was born, he was designated as female.

146.    Dylan came out as transgender when he was twelve years old. He was formally diagnosed with gender dysphoria. The year after he came out, he began puberty blockers. When he was fourteen, he began to take testosterone, which he has continued to take since.

147.    Dylan's family decided to move from Tennessee to Massachusetts in 2021 because the anti-transgender laws in Tennessee created a hostile environment.

148.    Dylan lives a full life in Massachusetts. He goes to school, has friends, volunteers in his community, and has a job.

149.    Dylan has gone to a doctor's appointment every four months to receive testosterone.

150.    Dylan had an appointment scheduled for January 31, 2025, where he was supposed to receive testosterone as he normally does.

151.    On January 30, 2025, a provider from the clinic called to tell Dylan that his appointment was cancelled and would need to be postponed because of the Denial of Care Order.

152.    Access to health care makes Dylan's life livable. When he thinks about losing it, he becomes too depressed to function. Before he had access to that care, he was so anxious about not passing as male that it inhibited his social life. Healthcare is an essential part of his life.

153.    If the Denial of Care Order is not enjoined, and Dylan cannot access health care for another year, he will be devastated.  He may have to travel abroad to seek care.  He does not think he should have to leave his doctor or his country to live his life, especially as an adult.

**F.    The Harm of the Executive Orders to Members of PFLAG and GLMA**

**1.    PFLAG**

154.    Since the issuance of the Denial of Care Order, PFLAG has heard from members across the U.S. about their adolescents' appointments for gender affirming medical care being cancelled.

155.    From Massachusetts to Washington to Colorado to New York to Illinois to Maryland and beyond, hospitals and healthcare systems have shut down appointments and cancelled procedures that PFLAG families and their transgender and nonbinary children had scheduled to treat their gender dysphoria as a direct result of the Denial of Care Order.  The cancellations include appointments for young people whose providers had already deemed puberty blockers or hormone therapy to be medically necessary for them.  Eighteen-year-olds—legal adults—also had scheduled surgical procedures cancelled.

156.    The Denial of Care Order has stripped PFLAG families of their ability to obtain medically necessary care to treat their children's gender dysphoria, putting those children at risk of serious mental and physical harm—the very reasons families seek this medical care in the first place.  And it denies them the ability to make the decisions that they, their children, and their children's medical providers know are in their best interests.

157.    The Denial of Care Order has directly harmed and puts at risk the lives of young transgender and non-binary PFLAG members.

2.    **GLMA**

158.    Since President Trump issued the Denial of Care Order, GLMA's members and their patients have been and will continue to be immediately negatively affected.

159.    Many GLMA members are employed by medical institutions that receive federal grants, including some medical provider members that provide medically necessary gender affirming medical care to patients under nineteen.

160.    Many of the medical institutions that employ GLMA's members rely on federal grants and financial assistance from the NIH, HRSA, CDC, and AHRQ, among others, to provide healthcare to their communities, train the next generation of physicians, and support research aimed at addressing this nation's greatest health challenges.  The vast majority of these grants do not relate to the provision of medical interventions for the treatment of gender dysphoria.

161.    Because of the Executive Orders' mandate to strip all federal funding if medical institutions continue to provide gender affirming medical care—even when the funding is not related to gender affirming medical care—some medical institutions that employ GLMA medical provider members already have prohibited GLMA members from providing medically necessary gender affirming medical care to patients under the age of nineteen pursuant to well-established clinical guidelines.

162.    The Executive Orders have created grave uncertainty and distress for GLMA's medical provider members and their patients.  They also are in direct conflict with the Hippocratic oath members swore as doctors and with statutes that GLMA members are required to follow, which prohibit discrimination on the basis of sex and transgender status.

163.    GLMA's members also include individuals who are directors, investigators, or otherwise employed on projects and programs funded by federal grants, including grants from the

NIH, among other federal agencies and entities. Such federal funding is the lifeblood of scientific advancement in medicine.

164.    GLMA members who are directors, investigators, or otherwise employed on projects and programs funded by federal grants fear they will immediately lose all federal research grant funding under the funding mandate of the Executive Orders if their medical institution continues to provide gender affirming medical care to patients under the age of nineteen.

165.    GLMA's members also include health profession students.

166.    Student members will lose their federal tuition assistance under the financial mandate of the Executive Orders if their medical institution continues to provide medically necessary gender affirming medical care to patients under the age of nineteen.

### CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Ultra Vires – Presidential Action in Excess of Authority; Usurping the Legislative Function; Violation of the Bicameralism and Presentment Clauses**
(All Plaintiffs Against All Defendants)

167.    Plaintiffs restate and reallege paragraphs 1 to 166 set forth above.

168.    The President's authority stems from either an act of Congress or the Constitution.

169.    Article II of the Constitution tasks the President to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3.

170.    Article I of the Constitution vests Congress with the powers to make laws and control the public fisc. The Presentment Clause provides that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States." U.S. CONST. art. I, § 7, cl. 2. The Appropriations Clause provides that no "[m]oney shall be drawn from the Treasury, but in Consequence of Appropriations made

by Law," U.S. CONST. art. I, § 7, and the Spending Clause vests Congress with the power to expend Treasury funds for the "general Welfare of the United States." U.S. CONST. art. I, § 8, cl. 1.

171.    As part of its power over the public fisc, Congress distributes millions of dollars every year in healthcare, research, and educational grants. Congress may specify how its grants are used in its annual appropriations bill or by passing federal statutes. None of the Congressional conditions placed on the grants administered or disbursed by the Agency Defendants, or any other of HHS's subagencies condition federal funds on the terminating gender affirming medical care.

172.    No provision of the Constitution authorizes the Executive Branch to enact, amend, or repeal statutes, including appropriations approved and signed into law.

173.    The Executive cannot directly and unilaterally amend or cancel appropriations Congress has duly enacted, nor can he order federal agencies to do so.

174.    Section 4 of the Denial of Care Order directs agencies to terminate all federal grants—without regard to the statute authorizing those grants, any applicable regulations, or the terms governing each grant. Section 3(g) of the Gender Identity Order similarly directs agencies to terminate grants that the Executive considers to "promote gender ideology," again, without regard to the authorizing statute, any applicable regulations, or the terms governing each grant.

175.    By directing agencies to terminate or withhold congressionally appropriated grants based on the President's own policy preferences, the Denial of Care and Gender Identity Orders attempt to amend, repeal, rescind, or circumvent duly enacted federal statutes or appropriations.

176.    By directing agencies to terminate or withhold congressionally appropriated grants, the Denial of Care and Gender Identity Orders attempt to expend public funds to advance the President's policy preferences, rather than those of Congress. These actions exceed the

President's Article II powers, unconstitutionally infringe upon Congress's powers, and attempt to amend federal legislation while bypassing Article I's Bicameralism and Presentment Clauses.

177.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Denial of Care and Gender Identity Orders violate the separation of powers and impermissibly arrogate to the executive power that is reserved to Congress.

178.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing the Agency Defendants, including any subagencies of Defendant HHS, from enforcing or implementing the Denial of Care and the Gender Identity Orders.

### SECOND CLAIM FOR RELIEF
**Ultra Vires – Conflicts with Statutory Law – Discrimination on the Basis of Sex**
(All Plaintiffs Against All Defendants)

179.    Plaintiffs restate and reallege paragraphs 1 to 166 set forth above.

180.    Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116, provides that an individual shall not on the basis of sex "be subjected to discrimination under[ ] any health program or activity, any part of which is receiving Federal financial assistance."

181.    Section 1908 of the Public Health Service Act ("PHSA"), 42 U.S.C. § 300w-7, similarly prohibits discrimination on the basis of sex in programs, services, and activities "receiving Federal financial assistance" through Preventive Health and Health Services Block Grants, which Defendant Fink allots as the Acting Secretary of Defendant HHS. *See* 42 U.S.C. § 300w-1.

182.    Discrimination based on transgender status, including discrimination based on the fact that medical treatment is provided for purpose of gender transition by aligning a patient's gender presentation with an identity different from their sex assigned at birth, constitutes discrimination on the basis of sex under Section 1557 of the ACA and Section 1908 of the PHSA.

183.   Federal law—passed by both houses of Congress and signed by the President—prohibits medical institutions and healthcare entities receiving federal grants from discriminating based on sex as a condition of receiving federal financial assistance.  The Executive Orders attempt to override that statutory scheme with President Trump's unilateral declaration that medical institutions and healthcare entities must do the opposite and deny gender affirming medical care to people under nineteen based solely on the fact that health care is for the purpose of gender transition.

184.   The Gender Identity and Denial of Care Orders facially discriminate based on sex. For example, they direct agencies to withhold grants from entities that "promote gender ideology" or that provide "gender affirming care," *i.e.*, medical care "to align an individual's physical appearance with an identity that differs from his or her sex."

185.   The Executive Orders were issued for the openly discriminatory purpose of preventing transgender people from expressing a gender identity different from their sex designated at birth—and to express governmental disapproval of people who do so.

186.   President Trump does not have the power to override Section 1557 of the ACA or Section 1908 of the PHSA and require federal grantees to engage in precisely the discrimination that those laws prohibit.

187.   Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Gender Identity and Denial of Care Orders are *ultra vires* as they impermissibly direct agencies to take actions in violation of statutory laws that prohibit discrimination on the basis of sex.

188.   Plaintiffs are further entitled to a preliminary and permanent injunction preventing the Agency Defendants, including any subagencies of Defendant HHS, from enforcing or implementing the Denial of Care and the Gender Identity Orders.

**THIRD CLAIM FOR RELIEF**
**Ultra Vires – Conflicts with Statutory Law – Discrimination on the Basis of Disability**
(All Plaintiffs Against All Defendants)

189.    Plaintiffs restate and reallege paragraphs 1 to 166 set forth above.

190.    Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794.

191.    Section 1557 of the ACA similarly prohibits discrimination on the basis of disability by "any health program or activity, any part of which is receiving Federal financial assistance."  42 U.S.C. § 18116.

192.    Gender dysphoria qualifies for protection as a "disability" under the Rehabilitation Act and consequently under Section 1557 of the ACA.

193.    Withholding health care based solely on the fact that the health care is intended to treat gender dysphoria is discrimination based on disability under the Rehabilitation Act and Section 1557 of the ACA.

194.    President Trump does not have the power to override the Rehabilitation Act or Section 1557 of the ACA and require federal grantees to engage in precisely the discrimination that the Rehabilitation Act and Section 1557 prohibit.

195.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Gender Identity and Denial of Care Orders are *ultra vires* and impermissibly direct agencies to take actions that violate statutory law that prohibit discrimination on the basis of disability.

196.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing the Agency Defendants, including any subagencies of Defendant HHS, from enforcing or implementing the Denial of Care and the Gender Identity Orders.

**FOURTH CLAIM FOR RELIEF**
**Violation of Equal Protection Component of the Fifth Amendment**
(Transgender Plaintiffs and PFLAG Against All Defendants)

197.    Plaintiffs restate and reallege paragraphs 1 to 166 set forth above.

198.    The Equal Protection Clause of the Fourteenth Amendment, which is incorporated into the Fifth Amendment, protects individuals from discrimination on the basis of sex.

199.    By directing agencies to withhold grants from entities that "promote gender ideology" or provide gender affirming medical care to transgender people under nineteen, the Gender Identity and Denial of Care Orders discriminate based on sex and transgender status.

200.    The Executive Orders facially discriminate based on sex because they direct agencies to withhold grants from entities that "promote gender ideology" by providing medical care "to align an individual's physical appearance with an identity that differs from his or her sex."

201.    The Executive Orders also facially discriminate based on transgender status because they direct agencies to withhold grants from entities based solely on the fact that those entities provide healthcare for the purpose of gender transition, that is, helping a patient's gender presentation to align with an identity different from their sex assigned at birth.

202.    Agencies are not required to withhold grants from entities that provide the same healthcare for the purpose of helping a patient's gender presentation to align with an identity that corresponds with their sex assigned at birth.

203.    Under any standard of scrutiny, the Executive Orders' deprivation of the right to equal protection of the laws cannot be justified as sufficiently related to an interest in protecting the health and safety of transgender people under nineteen. Instead of protecting health and safety, the Gender Identity and Denial of Care Orders harm transgender people under nineteen, including the Minor Plaintiffs and Adult Plaintiffs, by denying them medically necessary care.

204.    The Gender Identity and Denial of Care Orders were issued for the openly discriminatory purpose of preventing transgender people from expressing a gender identity different from their sex designated at birth—and expressing governmental disapproval of people who do so—which are not legitimate governmental interests under any standard of review.

205.    The Gender Identity and Denial of Care Orders violate the equal protection rights of transgender people under nineteen under the Fifth Amendment.

**FIFTH CLAIM FOR RELIEF**
**Violation of Substantive Due Process Under the Fifth Amendment**
(Parent Plaintiffs and PFLAG Against All Defendants)

206.    Plaintiffs restate and reallege paragraphs 1 to 166 set forth above.

207.    The Due Process Clause of the Fifth Amendment protects the fundamental rights of parents to decide on medical care for their children—an interest that is especially strong when it aligns with the judgment of medical providers and their adolescent children.

208.    By directing agencies to withhold grants from entities that provide gender affirming medical care to minors, the Gender Identity and Denial of Care Orders infringe upon parents' fundamental rights by overriding the aligned judgment of parents, adolescents, and their doctors regarding medically necessary care.

209.    Under any standard of scrutiny, the Executive Orders' infringement on parental rights cannot be justified as sufficiently related to an interest in protecting the health and safety of children. Instead of protecting health and safety, the Gender Identity and Denial of Care Orders harm children by denying them medically necessary care.

210.    The Gender Identity and Denial of Care Orders were issued for the openly discriminatory purpose of preventing transgender people from expressing a gender identity different from their sex designated at birth—and expressing governmental disapproval of people who do so—which are not legitimate governmental interests under any standard of review.

211.    The Gender Identity and Denial of Care Orders unconstitutionally infringe the fundamental rights of parents under the Fifth Amendment.

## SIXTH CLAIM FOR RELIEF
### Violation of First Amendment of the United States Constitution
(Transgender Plaintiffs and Organizational Plaintiffs Against All Defendants)

212.    Plaintiffs restate and reallege paragraphs 1 to 166 set forth above.

213.    The First Amendment prohibits the government from "abridging the freedom of speech." U.S. CONST. amend. 1.

214.    Section 3(g) of the Gender Identity Order directs "[e]ach agency" to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." Section 4 of the Denial of Care Order implements that directive, ordering agencies to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end" gender affirming medical care.

215.    By withholding federal grants, the Orders engage in unconstitutional viewpoint discrimination in violation of the First Amendment and violate the rights of grant recipients and transgender patients.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

A.    Declare that Section 3(g) of the Gender Identity Order and the Denial of Care Order are unconstitutional and unlawful;

B.    Issue temporary, preliminary, and permanent injunctive relief enjoining Agency Defendants, including any subagencies of Defendant HHS, their employees, agents, and successors in office and those in active concert or participation with them, from implementing or enforcing Section 3(g) of the Gender Identity Order and the Denial of

Care Order or otherwise withholding federal funding based on the fact that a healthcare entity provides gender affirming medical care;

C.    Waive the requirement for the posting of a bond of security for the entry of temporary and preliminary relief;

D.    Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees; and

E.    Grant any other and further relief that this Court may deem just and proper.

Date:  February 11, 2025                              Respectfully submitted

Joshua Block*                                        */s/ Zachary B. Cohen*
Harper Seldin*
Chase Strangio*                                      Omar Gonzalez-Pagan*
Alexandra R. Johnson*                                Jennifer C. Pizer*
**American Civil Liberties Union**                   **Lambda Legal Defense**
**  Foundation**                                     **  and Education Fund, Inc.**
125 Broad Street, Floor 18                           120 Wall Street, 19th Floor
New York, NY 10004                                   New York, NY 10005
Telephone: (212) 549-2500                            Telephone: (212) 809-8585
Facsimile:  (212) 549-2650                           Facsimile:  (855) 535-2236
jblock@aclu.org                                      ogonzalez-pagan@lambdalegal.org
hseldin@aclu.org                                     jpizer@lambdalegal.org
cstrangio@aclu.org
a.johnson@aclu.org                                   Karen L. Loewy*
                                                     **Lambda Legal Defense**
Deborah A. Jeon (Fed. Bar No. 06905)                 **  and Education Fund, Inc.**
Zoe M. Ginsberg (Fed. Bar No. 30727)                 815 16th Street NW, Suite 4140
**American Civil Liberties Union**                   Washington, DC 20006
**  Foundation of Maryland**                         Telephone: (202) 804-6245
3600 Clipper Mill Road, Suite 200                    Facsimile:  (855) 535-2236
Baltimore, MD 21211                                  kloewy@lambdalegal.org
Telephone: (410) 889-8555
Facsimile:  (410) 366-7838                           Nora Huppert*
jeon@aclu-md.org                                     **Lambda Legal Defense**
zginsberg@aclu-md.org                                **  and Education Fund, Inc.**
                                                     3656 N. Halsted Street
Laura J. Edelstein*                                  Chicago, IL 60613
Kai N. Galindo*                                      Telephone: (312) 605-3233
**Jenner & Block LLP**                               Facsimile:  (855) 535-2236
525 Market Street, 29th Floor                        nhuppert@lambdalegal.org

San Francisco, CA 94105
Telephone: (628) 267-6800
Facsimile:  (628) 267-6859
LEdelstein@jenner.com
KGalindo@jenner.com

Madeleine V. Findley*
Zachary B. Cohen (Fed. Bar No. 20159)
Mary-Claire Spurgin*
**Jenner & Block LLP**
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Facsimile:  (202) 639-6066
MFindley@jenner.com
MSpurgin@jenner.com


Jocelyn A. Sitton*
Lillian M. McGuire*
Rebecca M. Diamond*
**Jenner & Block LLP**
353 N. Clark Street
Chicago, IL 60654
Telephone: (312) 222-9350
Facsimile:  (312) 527-0484
JSitton@jenner.com
LMcGuire@jenner.com
RDiamond@jenner.com

Catherine E. Stetson**
Danielle Desaulniers Stempel (Fed. Bar No. 20501)
Kristina Alekseyeva*
Sam H. Zwingli*
**Hogan Lovells US LLP**
555 13th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5491
Facsimile:  (202) 637-5910
cate.stetson@hoganlovells.com
danielle.stempel@hoganlovells.com
kristina.alekseyeva@hoganlovells.com
sam.zwingli@hoganlovells.com

Jackson Skeen***
**Hogan Lovells US LLP**
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 702-7747
Facsimile:  (617) 371-1037
jackson.skeen@hoganlovells.com

*Attorneys for Plaintiffs*


*Admitted pro hac vice.*

*\*\*Application for admission forthcoming.*

*\*\*\* Admitted pro hac vice.  Admitted only in D.C.  Supervised by principals of the firm admitted in Massachusetts.*

## CERTIFICATE OF SERVICE

I hereby certify that this Amended Complaint has been served electronically on the following parties:

> DONALD J. TRUMP, in his official capacity as President of the United States
> 1600 Pennsylvania Ave. NW
> Washington, DC 20220
>
> U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
> 200 Independence Ave. SW
> Washington, DC 20201
>
> DOROTHY A. FINK, in her official capacity as Acting Secretary of the U.S.
> Department of Health and Human Services
> 200 Independence Ave. SW
> Washington, DC 20201
>
> HEALTH RESOURCES AND SERVICES ADMINISTRATION
> 5600 Fishers Lane
> Rockville, MD 20857 (Montgomery County)
>
> DIANA ESPINOSA, in her official capacity as Principal Deputy Administrator of
> the Health Resources and Services Administration
> 5600 Fishers Lane
> Rockville, MD 20857 (Montgomery County)
>
> NATIONAL INSTITUTES OF HEALTH
> 9000 Rockville Pike
> Bethesda, MD 20892 (Montgomery County)
>
> MATTHEW J. MEMOLI, in his official capacity as Acting NIH Director
> 9000 Rockville Pike
> Bethesda, MD 20892 (Montgomery County)

I hereby certify that the Amended Complaint will be served concurrently with the Summonses in this matter upon the following defendants by certified mail, return receipt requested:

> NATIONAL SCIENCE FOUNDATION
> 2415 Eisenhower Avenue
> Alexandria, VA 22314
>
> SETHURAMAN PANCHANATHAN,
> in his official capacity as Director of the National Science Foundation
> 2415 Eisenhower Avenue
> Alexandria, VA 22314

Dated: February 11, 2025                    */s/ Zachary B. Cohen*
                                            Zachary B. Cohen

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PFLAG, INC., ET AL.,

    Plaintiffs,

v.                                              Civil No. 25-337-BAH

DONALD J. TRUMP ET AL.,

    Defendants.

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

### ORDER

For the reasons stated in the forthcoming memorandum opinion and those stated at today's hearing, it is hereby **ORDERED** that Plaintiffs' Motion for a Temporary Restraining Order, ECF 35, is GRANTED. It is further

**ORDERED** that Defendants U.S. Department of Health and Human Services ("HHS"), Acting HHS Secretary Dorothy A. Fink, Health Resources and Services Administration ("HRSA"), HRSA Principal Deputy Diana Espinosa, National Institutes of Health ("NIH"), Acting NIH Director Matthew J. Memoli, National Science Foundation ("NSF"), NSF Director Sethuraman Panchanathan, and any subagencies of Defendant HHS, their officers, agents, successors, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, are **RESTRAINED** from conditioning or withholding federal funding based on the fact that a healthcare entity or health professional provides gender affirming medical care to a patient under the age of nineteen under Section 3(g) of Executive Order 14168 and Section 4 of Executive Order 14187; it is further

**ORDERED** that Defendants must provide written notice of the Court's temporary restraining order to all agencies to which the Executive Orders were addressed. The written notice shall instruct those agencies that they may not take any steps to implement, give effect to, or reinstate under a different name the directives in Section 3(g) of Executive Order 14168 or Section 4 of Executive Order 14187 that condition or withhold federal funding based on the fact that a healthcare entity or health professional provides gender affirming medical care to a patient under the age of nineteen. The written notice shall also instruct those agencies to release any disbursements on funds that were paused due to the Executive Orders; it is further

**ORDERED** that the temporary restraining order shall be in effect for fourteen (14) days; it is further

**ORDERED** that Defendants shall file a status report on or before February 20, 2025, apprising the Court of the status of Defendants' compliance with this Order, including by providing a copy of the written notice described above; it is further

**ORDERED** that the parties shall meet and confer and file a joint status report proposing a preliminary injunction briefing schedule on or before February 18, 2025; it is further

**ORDERED** that the security requirement is hereby waived because Defendants will not suffer any costs from the temporary restraining order and imposing a security requirement would pose a hardship for Plaintiffs. Fed. R. Civ. P. 65(c).

Dated: February 13, 2025

Time: 4:25 PM

Brendan A. Hurson
United States District Judge

JA89

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| PFLAG, INC., ET AL., | * | |
| Plaintiffs, | * | |
|  | * | |
| v. | * | |
|  | * | Civil No. 25-337-BAH |
| DONALD J. TRUMP ET AL., | * | |
| Defendants. | * | |
|  | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM OPINION

This matter is before the Court on Plaintiffs' Motion for a Temporary Restraining Order ("TRO"), ECF 35. Yesterday, February 13, 2025, and upon consideration of the parties' filings and after a robust oral argument on the motion, the Court **GRANTED** Plaintiffs' motion and, for the reasons stated on the record, entered a TRO against agency Defendants enjoining the enforcement of particular sections of two Executive Orders as they relate to a prohibition on federal funding for institutions that provide gender affirming medical care for transgender patients under the age of nineteen. In addition to that oral ruling, this memorandum opinion is offered to further explain the Court's reasoning.

In sum, the Court finds that this case presents a straightforward question regarding the separation of powers. The Court also finds that clearly established precedent of the United States Supreme Court and the United States Court of Appeals for the Fourth Circuit compels findings on Plaintiffs' discrimination-related claims. Moreover, the Court finds that Plaintiffs have met the standard for a TRO.

1

First, there is a very strong likelihood that Plaintiffs will succeed on the merits of all three claims that are the subject of their motion for a TRO. The challenged provisions of the Executive Orders place conditions on federal funding that Congress did not prescribe. This, the Constitution simply does not allow as "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Further, given that the Court is bound by the holdings in *Bostock v. Clayton County*, 590 U.S. 644, 662 (2020), *Grimm v. Gloucester County School Board*, 972 F.3d 586, 611 (4th Cir. 2020)*, as amended* (Aug. 28, 2020), and *Kadel v. Folwell*, 100 F.4th 122, 163–64 (4th Cir. 2024), Plaintiffs are likely to succeed on their claims related to discrimination.

Second, Plaintiffs have shown they will face irreparable harm if the challenged portions of the Executive Orders are not enjoined both because they have shown a strong likelihood of success on their constitutional claims, *see Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009), but also because they have provided unassailable documentation that they are suffering from "diminished access to high-quality health care suited to [their] needs." *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 707 (4th Cir. 2019).

Finally, the balance of equities and the public interest weigh in favor of a preliminary injunction as Defendants are not harmed by a prohibition that maintains the status quo and enjoins the enforcement of restrictions likely to be found unconstitutional. *See Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). Moreover, it is "well-established that the public interest favors protecting constitutional rights." *Id.* (citations omitted).

For these reasons, expanded on below, the Court entered the TRO.

2

## I.    BACKGROUND

### A.    Executive Orders

#### 1.    Executive Order 14168

On January 20, 2025, President Trump issued Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (the "Gender Identity Order"[1]). *See* 90 Fed. Reg. 8615 (Jan. 20, 2025). To achieve the stated objective of eradicating gender ideology[2], Section 3(g) of the Gender Identity Order declares: "[f]ederal funds shall not be used to promote gender ideology." *Id.* The Gender Identity Order directs that "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* The Gender Identity Order cites "the Constitution and the laws of the United States of America, including section 7301 of title 5, United States Code," as the authority by which the President promulgated the executive order. *Id.* at Preamble. 5 U.S.C. § 7301 permits the President to "prescribe regulations for the conduct of employees in the executive branch."

#### 2.    Executive Order 14187

On January 28, 2025, President Trump issued Executive Order 14187, titled "Protecting Children from Chemical and Surgical Mutilation" (the "Healthcare Order"[3]). *See* 90 Fed. Reg.

---

[1] Defendants refer to Executive Order 14168 as the "Defending Women EO." ECF 55, at 3.

[2] Section 2(f) of the Gender Identity Order claims that "'[g]ender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." *See* Gender Identity Order § 3(g). It further asserts that "[g]ender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body." *Id.* § 2(f).

[3] Defendants refer to Executive Order 14187 as the "Protecting Children EO." ECF 55, at 3.

3

8771 (Jan. 28, 2025). The Healthcare Order[4] directs all federal agencies[5] to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children."[6] *Id.* § 4. The Healthcare Order cites "the authority vested in [the] President by the Constitution and the laws of the United States of America," as the authority by which the President promulgated the executive order. *Id.* at Preamble.

According to Plaintiffs, "President Trump unilaterally directs that all federal medical and research grants be stripped from medical institutions, medical schools and hospitals, that provide medically necessary gender affirming medical care to patients under nineteen[7] for the purpose of gender transition, regardless of whether the funds are used for or related to such care." ECF 1, at 16–17 ¶ 69 (emphasis in original).[8] Defendants contend that "[t]he EOs do not purport to withhold all federal funding if an institution promotes gender ideology or provides the [referenced]

---

[4] The Court will collectively refer to the Gender Identity Order and Healthcare Order as the "Executive Orders" or "EOs." To be clear, when the Court refers to the Executive Orders, the Court is referring only to the challenged portions (Section 3g of the Gender Identity Order and Section 4 of the Healthcare Order).

[5] The Healthcare Order is specifically directed to "[t]he head of each executive department or agency [] that provides research or education grants to medical institutions." *See* Healthcare Order § 4.

[6] In Section 2(c) of the Healthcare Order, the President acknowledges that "th[e] phrase [chemical and surgical mutilation] sometimes is referred to as 'gender affirming care.'" The Court will refer to the treatment at issue as "gender affirming medical care."

[7] Section 2(a) of the Healthcare Order defines "child" or "children" to mean "an individual or individuals under [nineteen] years of age."

[8] The Court notes that Plaintiffs filed an amended complaint, ECF 53, on February 11, 2025. However, Plaintiffs did not amend the TRO, *see* ECF 35, which cites to the initial complaint, ECF 1. Thus, the Court will cite to the initial complaint in this memorandum opinion.

4

treatments," but instead, "instruct agencies to implement the President's policy preference to the extent permitted by applicable law." ECF 55, at 13.[9]

### 3.    Impact of the Executive Orders

On January 31, 2025, Defendant Health Resources and Services Administration ("HRSA") issued a notice to HRSA grant recipients indicating that "HRSA grant funds may not be used for activities that do not align with" the Executive Orders and any "vestige, remnant, or re-named piece of any programs in conflict with these E.O.s are terminated in whole or in part." ECF 35-5, at 2. The Center for Disease Control and Prevention ("CDC") also issued a notice to grant recipients stating: "[t]o implement the [Gender Identity Order] and in accordance with Office of Personnel Management's Initial Guidance [], you must immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting or inculcating gender ideology at every level and activity . . . that are supported with funds from this award." ECF 57-11, at 2. Like the HRSA notice, the CDC notice indicated that "[a]ny vestige, remnant, or re-named piece of any gender ideology programs funded by the U.S. government under this award are immediately, completely, and permanently terminated." *Id.* Additionally, medical institutions across the United States that receive federal funding have stopped providing gender affirming medical care for patients younger than nineteen as a result of the Executive Orders. *See* ECF 35-6, at 2; ECF 35-7, at 2; ECF 35-8, at 2; ECF 35-9, at 2.

Plaintiffs allege that federal funding makes up a significant portion of certain medical institutions' budgets where the patient Plaintiffs receive care. *See* ECF 1, at 20 ¶ 82 (explaining that Children's National in Washington, D.C. receives 70% of its research funding from federal

---

[9] All citations to page numbers herein refer to the ECF-generated page numbers at the top of the page.

agencies, including 60% from Defendant National Institute of Health[10] ("NIH")); *id.* ¶ 84 (explaining that Virginia Commonwealth University ("VCU") Health and Children's Hospital of Richmond receives nearly $7.3 million in grants from Defendant HRSA and nearly $107 million in grants from Defendant NIH in fiscal year 2023); *id.* ¶ 85 (explaining that UVA Health in Charlottesville, Virginia received more than $200 million in grants from Defendant NIH in fiscal year 2023); *id.* at 21 ¶ 89 (explaining that NYU Langone Health in New York City receives federal funding, including $5.6 million in grants from Defendants HRSA and NIH in the last twelve months); *id.* at 22 ¶ 92 (explaining that Boston Children's Hospital received more than $27.5 million in grants from Defendant HRSA and more than $245 million in grants from Defendant NIH in fiscal year 2023); *id.* ¶ 94 (explaining that Denver Health in Denver, Colorado received more than $25 million in grants from Defendant HRSA and more than $700,000 in grants from Defendant NIH in fiscal year 2023).

After the issuance of the Healthcare Order, each of the aforementioned medical institutions announced that they were either pausing or cancelling gender affirming medical care for transgender youth. *See* ECF 35-6, at 2 (pausing provision of puberty blockers and hormone therapy prescriptions for transgender youth at Children's National); ECF 35-7, at 2 (suspending gender affirming medical care for patients under nineteen at VCU Health and Children's Hospital of Richmond[11]); ECF 35-8, at 2 (suspending all gender affirming medical care for patients under

---

[10] In fiscal year 2023, Children's National received $69.6 million in funding from Defendant NIH and $8.7 million from Defendant HRSA. ECF 1, at 20 ¶ 82.

[11] On January 30, 2025, the Attorney General of Virginia, Jason Miyares, sent a letter to the University of Virginia and VCU advising that the Healthcare Order "directs federal agencies to immediately ensure that medical institutions that receive federal research or education grants end chemical and surgical mutilation of children." ECF 35-10, at 3. He warned that "[a]ny hospital or other institution, including agencies of the Commonwealth, that continues to perform chemical and surgical mutilation of children is at risk of losing such grants," *id.*, and noted that "the grants

6

JA95

nineteen at UVA Health); ECF 35-15, at 4–5 ¶¶ 15, 16 (cancelling appointments for medical care for transgender patients under nineteen at NYU Langone); ECF 35-19, at 4 ¶ 12 (cancelling immediate appointments with transgender patients under nineteen at Boston Children's Hospital); ECF 35-9, at 2 (ceasing gender affirming medical care to patients under nineteen at Denver Health[12]).

On February 3, 2025, the White House issued a press release about the Healthcare Order, stating: "[i]t's already having its intended effect–preventing children from being maimed and sterilized by adults perpetuating a radical, false claim that they can somehow change a child's sex. Hospitals around the country are taking action to downsize or eliminate their so-called 'gender-affirming care' programs." ECF 35-11, at 2–3.

**B.    The Individual Plaintiffs**

There are six individually named transgender Plaintiffs in the instant suit.[13]  The six Plaintiffs are all under nineteen years old.[14]  ECF 1, at 24 ¶ 99; *id.* at 25 ¶ 105; *id.* at 26 ¶ 113; *id.*

---

are not just limited to those related to this subject matter, but could apply to all medical and research grants from federal agencies." *Id.* (emphasis in original).

[12] In a statement, Denver Health acknowledged that the Healthcare Order would lead to "increased risk of depression, anxiety, and suicidality" among transgender adolescents.  ECF 35-9, at 2. However, Denver Health indicated that it is concerned about the "criminal and financial consequences for those who do not comply [with the Healthcare Order]," including the loss of participation in federal programs administered by HHS that "represent a significant portion of Denver Health's funding." *Id.*

[13] There are also four parents named as Plaintiffs.  ECF 1, at 7 ¶ 15; *id.* at 8 ¶ 17; *id.* ¶ 19; *id.* ¶ 21.

[14] The individual plaintiffs have asserted that "[p]roceeding under pseudonyms [] is necessary to protect the Adult Plaintiffs and the Minor Plaintiffs (and by extension, the Parent Plaintiffs) from undue harassment, discrimination, and violence because of the Minor and Adult Plaintiffs' transgender status." ECF 2-1, at 2.  The government does not oppose the motion," but wishes to "reserve[] the right to request that the Court modify any resulting protective order for good cause." ECF 55, at 32 n.11.  The motion to proceed under pseudonyms, ECF 2, is granted.  If the

7

at 27 ¶ 122; *id.* at 30 ¶ 145; *id.* at 9 ¶ 27. All six Plaintiffs have received gender dysphoria

diagnoses. ECF 35-18, at 3 ¶ 9 (Gabe Goe); ECF 35-15, at 4 ¶ 11 (Bella Boe) ECF 35-16, at 4 ¶

12 (Cameron Coe); ECF 35-19, at 3 ¶ 7 (Robert Roe); ECF 35-20, at 3 ¶ 5 (Lawrence Loe); ECF

35-21, at 2 ¶ 6 (Dylan Doe). All of the Plaintiffs are members of PFLAG. ECF 1, at 6–7 ¶ 13.

Plaintiffs were at various stages of obtaining care for gender dysphoria at the time the

Executive Orders were issued. Each Plaintiff reported the discontinuation of gender affirming

medical care after the Healthcare Order was issued. *See* ECF 35-18, at 4 ¶ 14 (Gabe Goe); ECF

35-15, at 4 ¶¶ 14–16 (Bella Boe); ECF 35-16, at 5 ¶¶ 15–17 (Cameron Coe); ECF 35-19, at 4 ¶¶

11–12 (Robert Roe); ECF 35-20, at 4 ¶ 12 (Lawrence Loe); ECF 35-21, at 3 ¶¶ 12–13 (Dylan

Doe).

### The Associational Plaintiffs

Plaintiff PFLAG, Inc. ("PFLAG") is a 501(c)(3) national membership nonprofit

organization. ECF 1, at 6 ¶ 13. PFLAG is an organization dedicated to supporting, educating, and

advocating for lesbian, gay, bisexual, transgender, and queer ("LGBTQ+") people, their parents

and families, and allies. *Id.* PFLAG has "more than 550,000 members[15] and supporters

nationwide, including many families of transgender youth who currently receive or will soon need

to access the medical treatment for gender dysphoria that the Executive Orders seek to prohibit."

*Id.*

Plaintiff American Association of Physicians for Human Rights, Inc. d/b/a GLMA Health

Professionals Advancing LGBTQ+ Equality ("GLMA") is a 501(c)(3) national nonprofit

---

government needs to know the identities of the individual plaintiffs to defend this case, it may file
a request for relief from the Court.

[15] People become PFLAG members by joining the national organization directly or through one
of its nearly 350 local chapters throughout the United States. *Id.*

8

membership organization. ECF 1, at 7 ¶ 14. GLMA's mission is to ensure health equity for LGBTQ+ people and equality for LGBTQ+ health professionals in their work and learning environments. *Id.* GLMA's membership includes approximately 1,000 member physicians, nurses, advanced practice nurses, physician assistants, researchers and academics, behavioral health specialists, health-profession students, and other health professionals throughout the country.[16] *Id.*

### C.    Temporary Restraining Order Hearing

On February 13, 2025, the Court held a hearing on Plaintiffs' motion for a TRO. *See* ECF 60. At the conclusion of the hearing, the Court granted the TRO and notified the parties that a written memorandum opinion would follow.

## II.    LEGAL STANDARD

"Temporary restraining orders [] . . . are 'extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances.'" *Franklin v. BMW Law Group LLC*, Civ. No. DKC-16-455, 2016 WL 9724972, at *1 (D. Md. Apr. 4, 2016) (quoting *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001)); *see also Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). To obtain a temporary restraining order, the Plaintiffs must establish four factors: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm if preliminary relief is not granted; (3) that the balance of equities favors them; and (4) that an injunction is in the public interest.[17] *See Frazier v. Prince*

---

[16] Their practices represent the major healthcare disciplines and a wide range of health specialties, including primary care, internal medicine, family practice, psychiatry, pediatrics, obstetrics/gynecology, emergency medicine, neurology, and infectious diseases. *Id.*

[17] "The substantive requirements for a TRO and a preliminary injunction are identical." *J.O.P. v. U.S. Dep't of Homeland Sec.*, 409 F. Supp. 3d 367, 376 (D. Md. 2019) (citing *U.S. Dep't of Labor v. Wolf Run Mining Co., Inc.*, 452 F.3d 275, 281 n.1 (4th Cir. 2006)).

*George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). When a government entity is a party to the case, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Pursuing Am. Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). The movant "must establish all four elements in order to prevail." *Profiles, Inc. v. Bank of America Corp.*, 453 F. Supp. 3d 742, 746 (D. Md. 2020) (citing *Pashby v. Delia*, 709 F.3d 307, 320–21 (4th Cir. 2013)).

## III.   ANALYSIS

### A.   Ripeness

Defendants assert that the Court is being asked to prematurely judge the constitutionality of a future government policy. ECF 55, at 8. According to Defendants, the case is not ripe for review because "the agency defendants have not yet taken the steps necessary to revoke funding, for example, by identifying specific education or research grants that the agency believes may . . . be conditioned on ending the treatment," and thus, "it is not clear what law the Court would need to apply or what funding would be at stake." ECF 55, at 10. Plaintiffs contend that the issues are fit for judicial review "because Plaintiffs have brought a facial challenge that the President lacks authority to direct agencies to withhold federal grants from an institution because it provides gender affirming medical care." ECF 57, at 4. Plaintiffs further argue that "[i]n light of the Executive Orders' immediate and devastating consequences, Plaintiffs need not await future enforcement to seek judicial relief." *Id.*

When evaluating whether a claim is ripe for review, the Court considers: "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 587 (4th Cir. 2017) (citations omitted), *vacated and remanded on other grounds sub nom. Trump v. Int'l Refugee Assistance*, 583 U.S. 912 (2017). "An action is fit for resolution 'when the issues are purely legal

10

and when the action in controversy is final and not dependent on future uncertainties.'" *Id.* (citing *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006)). "The hardship prong is measured by the immediacy of the threat and the burden imposed on the [plaintiff]." *Id.* (quotation marks and citations omitted).

Plaintiffs have brought a facial challenge, alleging that the Executive Orders violate separation of powers, directly conflict with existing statutes, and violate the Equal Protection Clause of the Fifth Amendment. This legal question is squarely presented for the Court's review and does not depend on future uncertainties. The plain text of the Executive Orders conditions federally funded hospital grants on the denial of gender affirming medical care to transgender youth. *See* Gender Identity Order § 3(g) ("[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology."); Healthcare Order § 4 (directing all federal agencies to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children"). Where the "only uncertainties are how, not if, the policies will be implemented," the validity of the President's directive is fit for review. *Stone v. Trump*, 280 F. Supp. 3d 747, 767 (D. Md. 2017).

Further, Defendants' contention that "no agency defendant has revoked, or initiated proceedings to revoke, any particular grants as a result of the EOs," ECF 55, at 10, is contradicted by the emails sent by the HRSA and CDC. The HRSA issued a notice to all grant recipients stating that: "grant funds may not be used for activities that do not align with" the Executive Orders. ECF 35-5, at 2. The CDC issued a similar notice to grant recipients requiring that all grant recipients: "must immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting or inculcating gender ideology at every level and activity . . . that are

11

supported with funds from this award." ECF 57-11, at 2. Both notices indicated that "[a]ny vestige, remnant, or re-named piece of any gender ideology programs funded by the U.S. government under this award are immediately, completely, and permanently terminated." *Id.;* ECF 35-5, at 2. Further, the White House press release describes the denial of care at several hospitals around the country as the "intended effect" of the Executive Orders. ECF 35-11, at 2. Considering these documents, the Court finds Defendants' argument that the "agency defendants have not yet taken the steps necessary to revoke funding," ECF 55, at 10, to be "little more than a formalistic contrivance." *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Landsowne, LLC*, 713 F.3d 187, 198–199 (4th Cir. 2013) (finding that where defendants' position is unsupported by the record and the plaintiffs have produced evidence that defendants have no intention of abandoning the matter at issue, defendants' "claim of factual uncertainty" does not defeat ripeness). Considering the tangible steps taken by at least two agencies to comply with the Executive Orders, along with the Administration's unequivocal statements outside of the context of this litigation, the legal claims are sufficiently viable and do not depend on future uncertainties.

Additionally, withholding review would certainly impose hardship on Plaintiffs. As noted, Plaintiffs provide ample evidence of disrupted or delayed treatment and its effect. *See* ECF 35-18, at 4 ¶ 14 (Gabe Goe); ECF 35-15, at 4 ¶¶ 14–16 (Bella Boe); ECF 35-16, at 5 ¶¶ 15–17 (Cameron Coe); ECF 35-19, at 4 ¶¶ 11–12 (Robert Roe); ECF 35-20, at 4 ¶ 12 (Lawrence Loe); ECF 35-21, at 3 ¶¶ 12–13 (Dylan Doe).

Plaintiffs have established that the hardships they are suffering, as well as the hardships to PFLAG's members, are caused by the discontinuation of what has been deemed by medical professionals to be essential care. This hardship comes as a result of the conditioning on federal funding outlined in the Executive Orders and is non-speculative, concrete, and potentially

12

catastrophic. Specifically, the sudden denial or interruption of Plaintiffs' medical care has caused or is expected to soon cause unwanted physical changes, depression, increased anxiety, heightened gender dysphoria, severe distress, risk of suicide, uncertainty about how to obtain medical care, impediments to maintaining a social life, and fear of discrimination, including hate crimes. *See* ECF 35-18, at 4–5 ¶¶ 15, 17; ECF 35-15, at 5 ¶ 20; ECF 35-16, at 5 ¶ 18; ECF 35-19, at 4 ¶ 13; ECF 35-20, at 4 ¶¶ 10, 13; ECF 35-21, at 3–4 ¶ 15. Defendants' assertion that these injuries are nothing more than "hypothetical" and "incidental" is blatantly contradicted by the record. ECF 55, at 12. Plaintiffs have demonstrated that hardship would result in the absence of judicial review. *See Stone*, 280 F. Supp. 3d at 767 (finding that plaintiffs had already suffered harmful consequences, including the cancellation and postponement of surgeries, and thus "[w]aiting until after the Directives have been implemented to challenge the alleged violation of constitutional rights only subjects [plaintiffs] to substantial risk of even greater harms").

In light of the above, the Court finds that the legal questions are not dependent on future uncertainties, and withholding review would cause even more hardship to Plaintiffs, thus the claim is ripe for adjudication.

### B.    Mootness

Additionally, Defendants' assertion that the HRSA notice has been "rescinded" does not deprive the federal court of jurisdiction to determine the legality of the Executive Orders. ECF 55, at 10. While not labeled as such, Defendants' assertion functionally invokes the mootness doctrine.

The Court notes at the outset that Defendants appear to argue that the Government has not yet taken any action, while also acknowledging that the HRSA issued a notice to all grant recipients indicating that funds may not be used for activities that do not align with the Executive Orders.

13

JA102

ECF 55, at 10. According to Defendants, that email "has since [been] rescinded." *Id.* Defendants do not raise a formal mootness challenge, but seemingly rely on the HRSA's email recission to bolster their argument that judicial review is "premature," and the case is not yet ripe for adjudication. *Id.* at 8. Having already previously found the case is ripe for adjudication, the Court addresses Defendants' implicit mootness argument out of an abundance of caution.

"Mootness concerns whether there is still a live controversy for the court to adjudicate." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-239 (LLA), --- F. Supp. 3d ---, 2025 WL 368852, at *6 (D.D.C. Feb. 3, 2025). It is well-established that "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine [its] legality." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). If voluntary cessation automatically mooted every case, a defendant would be "free to return to [its] old ways" as soon as the case was dismissed. *Id.* (quoting *City of Mesquite*, 455 U.S. at 289).

To the extent Defendants claim that they have ended (or reversed) any alleged unlawful activity by rescinding the HRSA email, the Court is not persuaded that the Government will refrain from "resum[ing] the challenged activity" in the future. *Pub. Citizen, Inc. v. Fed. Energy Reg. Comm'n*, 92 F.4th 1124, 1128 (D.C. Cir. 2024). As evidenced by the White House press release noting the intended effects of the executive action at issue, the executive is committed to restricting federal funding based on the denial of gender affirming care. ECF 35-11, at 2–3. Importantly, there is "nothing stopping [the agency] from rewording, repackaging, or reissuing the substance of [the HRSA email] if the court were to dismiss this lawsuit." *Nat'l Council of Nonprofits*, 2025 WL 368852, at *7 (finding that "[i]f [d]efendants retracted the memorandum in name only while

continuing to execute its directives, it is far from 'absolutely clear' that the conduct is gone for good").

Moreover, there is ample evidence demonstrating that the funding restrictions remain in full effect, despite the HRSA recission.[18]  Indeed, in reply, Plaintiffs attached a separate notice from the CDC requiring all grant recipients to "immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting or inculcating gender ideology at every level and activity . . . that are supported with funds from this award." ECF 57-11, at 2.  Like the prior HRSA notice, the CDC notice indicated that "[a]ny vestige, remnant, or re-named piece of any gender ideology programs funded by the U.S. government under this award are immediately, completely, and permanently terminated." *Id.*; ECF 35-5, at 2.  Even beyond the explicit notices from agencies, Plaintiffs have presented ample evidence that they continue to be deprived of medical care.  Additionally, the coercive effect on the medical institutions comes from more than just the Administration or the agencies.  For example, a letter from the Attorney General of Virginia interpreted the Executive Orders and warned UVA and VCU that "any hospital or other institution [] that continues to perform [gender affirming care] is at risk of losing such grants," and importantly, "[t]he grants are not just limited to those related to this subject matter, but could apply to all medical and research grants from federal agencies." ECF 35-10, at 3 (emphasis in original).  Thus, it is clear that the recission of the HRSA notice does not render the issue moot.

C.    **Agency Action**

---

[18] Plaintiffs argued at the hearing that the recission of the email was likely to ensure compliance with a temporary restraining order in an unrelated case challenging a blanket freeze in federal funding, *see Nat'l Council of Nonprofits*, 2025 WL 368852 (D.D.C. Feb. 3, 2025), and thus not indicative of an effort to repeal the funding contingencies in the Executive Orders.

15

Defendants assert that Plaintiffs "do not invoke the Administrative Procedure Act (APA) or any other statute providing for a cause of action against an agency." ECF 55, at 9. Defendants further argue that "invoking the APA would be futile" because there is no final agency action "that determined any rights or obligations or otherwise caused legal consequences." *Id.* Plaintiffs acknowledge that they do not seek a TRO pursuant to the APA and point the Court to two cases explaining that the APA waives sovereign immunity for non-APA claims where no final agency action has occurred if the plaintiff seeks equitable relief against an agency. ECF 57, at 5 (citing *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 187 (D.C. Cir. 2006) and *Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 672 (6th Cir. 2013)).

To the extent Defendants argue that the claims are only justiciable under the APA, that claim fails. "The APA generally waives the Federal Government's immunity from a suit 'seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702); *see also Amador v. Mnuchin*, 476 F. Supp. 3d 125, 142 (D. Md. 2020) ("This waiver of sovereign immunity [under 5 U.S.C. § 702] encompasses claims asserted under the APA as well claims arising under non-APA authority that seek equitable relief from agency action.") (citation omitted). The waiver applies regardless of whether a final agency action has occurred. *Trudeau*, 456 F.3d at 187. Plaintiffs seek only declaratory and injunctive relief against federal agencies and officers; thus, the APA unquestionably waives sovereign immunity. This Court has subject matter jurisdiction over Plaintiffs' claims.[19]

---

[19] Defendants also argue that "[i]f and when an agency takes final agency action against a medical institution under the [Executive Order], an injured party may bring suit then." ECF 55, at 10. As established above, Plaintiffs are not required to wait for a final agency action before bringing a

16

### D.    Reviewability

The Supreme Court has consistently "sustain[ed] the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution." *See Bell v. Hood*, 327 U.S. 678, 684 (1946); *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("[I]njunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally."). The Supreme Court has affirmed that "the President's actions may . . . be reviewed for constitutionality." *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *see also Dalton v. Specter*, 511 U.S. 462, 473–74 (1994). And it is "well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Franklin*, 505 U.S. at 815 (Scalia, J., concurring)). Because the Plaintiffs seek injunctive relief restraining federal agencies from enforcing, implementing, or applying Section 3(g) of the Gender Identity Order and Section 4 of the Healthcare Order on the basis that the Executive Orders are unconstitutional, this Court can review Plaintiffs' claims.

As a threshold matter, the Court addresses Defendants' argument that the Executive Orders "do not themselves impose any conditions on funding, and only direct agencies to take actions consistent with applicable law, including [the antidiscrimination statutes at issue here]." ECF 55, at 28. The fact that the Executive Orders merely direct subordinate agency heads to act does not insulate the Executive Orders from judicial review.

"[W]hen 'the President takes measures incompatible with the expressed or implied will of Congress . . . he can rely only upon his own constitutional powers minus any constitutional powers

---

suit for equitable relief. In addition, the Court agrees with Plaintiffs' contention that waiting to seek redress through any of the procedures ordinarily available through the APA is incompatible with the circumstances established here.

of Congress over the matter.'" *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015)

(quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635–638 (1952) (Jackson, J.,

concurring)). Here, the President has not purported to implement these Executive Orders under a

delegation of authority from Congress beyond citing his workplace authority over the Executive

Branch under 5 U.S.C. § 7301. In opposition to the TRO, Defendants have pointed to the

Executive's "Article II[] authority . . . to direct his subordinates to take appropriate steps to further

policy preferences." ECF 55, at 8. They also assert that Plaintiffs do not have a cause of action.

ECF 55, at 11. In doing so, they point to the "extremely limited" scope of the *ultra vires* doctrine.

*Id.* (quoting *Griffith v. Fed. Labor Rel. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988)). Because the

medical institutions are the direct objects of any funding decisions, Defendants argue that Plaintiffs

are only "incidentally harmed depending on how those institutions react." *Id.* at 12.

Defendants cite to *Griffith* for the proposition that "[t]he *ultra vires* doctrine is 'extremely

limited' in 'scope.'" *See* ECF 55, at 11 (citing *Griffith*, 842 F.2d at 493). However, the language

from *Griffith* that Defendants cite appears to apply only to a subset of *ultra vires* claims alleging

that an agency acted beyond its delegated authority. What *Griffith* actually said was that the

"*Leedom v. Kyne* exception," a narrow avenue for "judicial review for claims that an agency

exceeded the scope of its authority or violated a clear statutory mandate," *Paladin Cmty. Mental*

*Health Ctr. v. Sebelius*, 684 F.3d 527, 532 (5th Cir. 2012) (citing *Leedom v. Kyne*, 358 U.S. 184,

188 (1958)), "is intended to be of extremely limited scope," *Griffith*, 842 F.2d at 493 (citing *Kyne*,

358 U.S. 188–89). The Fourth Circuit has explicitly recognized that "a plaintiff [may] file[] suit

seeking equitable relief against federal officials in their official capacities and alleging that those

officials exceeded the scope of their authority *and/or acted unconstitutionally*." *Strickland v.*

18

*United States*, 32 F.4th 311, 363 (4th Cir. 2022) (emphasis added) (first citing *Kyne*, 358 U.S. at 188–89, then citing *Noble v. Union River Logging R.R. Co.*, 147 U.S. 165, 171–72 (1893)).

In *American School of Magnetic Healing v. McAnnulty*, private plaintiffs brought suit to enjoin a subordinate "postmaster from carrying out the order of the Postmaster General." 187 U.S. 94, 101 (1902). The Supreme Court rejected the idea that it could not review the legality of the order:

> That the conduct of the postoffice is a part of the administrative department of the government is entirely true, but that does not necessarily and always oust the courts of jurisdiction to grant relief to a party aggrieved by any action by the head, or one of the subordinate officials, of that Department, which is unauthorized by the statute under which he assumes to act. The acts of all its officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief.

*Id.* at 108. "The reasoning of *McAnnulty* has been employed repeatedly." *Reich*, 74 F.3d at 1327–28 (collecting cases). In *Reich*, the D.C. Circuit considered whether an executive order issued by President Clinton, purportedly issued under the Procurement Act and which forbid agencies from contracting "with employers that permanently replace[d] lawfully striking employees," violated the National Labor Relations Act ("NLRA"). *Id.* at 1324. The D.C. Circuit explained that if the executive order was indeed in conflict with the NLRA, "it is unnecessary to decide whether, in the absence of the NLRA, the President would be authorized (with or without appropriate findings) under the Procurement Act [under which the President had purported to issue the executive order at issue] and the Constitution to issue the Executive Order." *Id.* at 1332. The D.C. Circuit ultimately "conclude[d] that the Executive Order [was] regulatory in nature and [was] pre-empted by the NLRA which guarantees the right to hire permanent replacements." *Id.* at 1339.

Also instructive is *HIAS, Inc. v. Trump*, where the Fourth Circuit considered whether an executive order issued by President Trump during his prior term in office, which "create[d] an

19

JA108

'opt-in' system requiring that both a state and a locality provide their affirmative consent before refugees will be resettled there" violated the Refugee Act. 985 F.3d 309, 315 (4th Cir. 2021). The Fourth Circuit first reviewed the text of the Refugee Act and then determined that the executive order's "license to ignore the statutory criteria plainly is at odds with the careful sequencing process established by Congress," *id.* at 322, and that the order also impermissibly shifted decision-making authority to local governments in conflict with the procedures set up by Congress through the Refugee Act, *id.* at 323–24. Finding that the order was "'incompatible with the overall statutory scheme governing' the refugee resettlement program," *id.* at 325 (citing *Kouambo v. Barr*, 943 F.3d 205, 213 (4th Cir. 2019)), the Fourth Circuit "conclude[d] that the plaintiffs [were] likely to succeed on the merits of their" claim that the executive order violated the Refugee Act, *id.*

Despite generally (and perhaps correctly) pointing out that the *ultra vires* doctrine is narrow, Defendants have not demonstrated that this case falls outside of its admittedly constrained bounds. Moreover, this is not a case where the Court is tasked with determining whether the Executive has acted in excess of a specifically delegated *statutory* authority as the Executive Orders, at least as they pertain to the freeze in federal funding for institutions that provide gender affirming medical care for minors, are not issued pursuant to any relevant statutory delegation.[20]

---

[20] The Gender Identity Order does claim to derive authority from "section 7301 of title 5." Gender Identity Order, Preamble. However, this statute simply provides that "[t]he President may prescribe regulations for the conduct of employees in the executive branch," 5 U.S.C. § 7301, and generally bestows on the President the "discretion-laden power" to regulate the federal workplace, *see Crandon v. United States*, 494 U.S. 152, 180 (1990) (Scalia, J., concurring). This statute essentially codifies "the President's responsibility for the efficient operation of the Executive Branch." *Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 273 n.5 (1974). While other sections of the Gender Identity Order, which are not at issue in this case, may be aimed at regulating the federal workforce, 5 U.S.C. § 7301 cannot provide the basis for the sweeping directive to withhold Congressionally allocated funds. Defendants do not

20

Based on the reasoning in *McAnnulty* and its progeny, the Court determines that the Executive Orders are judicially reviewable to determine whether they were issued within the President's constitutional powers or any powers delegated to him by Congress. *See Zivotofsky*, 576 U.S. at 10; *Youngstown*, 343 U.S. at 635–638 (Jackson, J., concurring).

Additionally, Defendants argue that the harm alleged here is the result of decisions by independent third parties not before this Court because it is the grantee medical institutions, as private actors, that are making the decisions to terminate gender affirming care for those under the age of nineteen. *See* ECF 55, at 9 ("Plaintiffs' claimed harm is not based on any action taken by the agency defendants, but on the decisions of medical institutions to stop providing certain treatments based on their prediction that the agency defendants might take some action in the future to revoke their funding."). Plaintiffs counter that "the Transgender Plaintiffs who have been denied gender affirming medical care have suffered an injury in fact and their injuries flow from 'the predictable effect of [the Orders] on the decisions of third parties.'" ECF 35-1, at 21 (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019)).

For the purposes of Article III standing, "[w]hen the plaintiff is an unregulated party, causation 'ordinarily hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)). "The causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs." *Id.* (citing *Allen v. Wright*, 468 U.S. 737, 757–59 (1984)). In

---

appear to argue otherwise. *See* ECF 55, at 11 (citing to Article II as the source of the authority to implement the challenged portions of the Executive Orders).

short, to establish causation, a plaintiff must show "a predictable chain of events leading from the government action to the asserted injury—in other words, that the government action has caused or likely will cause injury in fact to the plaintiff." *Id.* at 385. Here, Plaintiffs have clearly articulated this "predictable chain of events," *id.*, as the issuance of the Executive Orders led almost immediately to government agencies directing medical institutions to cease providing gender affirming care or risk the loss of all federal funds. Indeed, this case is not one where the Court must speculate on how third parties will respond to the Executive Orders as several medical institutions have already ceased gender affirming care explicitly because of the Executive Orders. *See* ECF 35-6, at 2; ECF 35-7, at 2; ECF 35-8, at 2; ECF 35-9, at 2; *see also* ECF 35-11, at 2–3.

Further, a plaintiff seeking to hold government officials liable for a decision made by a private actor may succeed "only when [the government] has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [government]." *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *see also Robinson v. State of Fla.*, 378 U.S. 153, 156–57 (1964) (finding state action within the purview of the Fourteenth Amendment where Florida regulations "[did] not directly and expressly forbid restaurants" from serving all races but "certainly embod[ied] a state policy putting burdens upon any restaurant that did and therefore "involv[ing] the state] to such a significant extent in bringing about restaurant segregation"); *Peterson v. City of Greenville, S.C.*, 373 U.S. 244, 248 (1963) (finding ordinance requiring restaurant owners to seat customers of different races separately "compell[ed] persons to discriminate against other persons because of race").

The Ninth Circuit's recent decision in *United States v. King County*, 122 F.4th 740 (9th Cir. 2024) is instructive on this point. There, King County, Washington, "promulgated [an] Executive Order . . . direct[ing] county officials to ensure that future leases" at Boeing Field, a

22

JA111

local airport, prohibited airport lessees "from servicing ICE [Immigration and Customs Enforcement] charter flights." *Id.* at 747. "The record demonstrate[d] that the Executive Order had its intended effect almost immediately" as lessees quickly stopped providing services to ICE soon after it was issued. *Id.* 749. The United States sued the county, alleging that the order violated the Supremacy Clause. *Id.* King County argued that the United States lacked standing and that suit was not yet ripe because the order was "a general policy statement with no real legal force or effect." *Id.* at 750. Calling King County's "apparent theory that the Executive Order does nothing and means nothing" a "mischaracterization of the Executive Order and the plain impact it [] had on ICE's operations at Boeing Field," the Ninth Circuit found that the United States had "Article III standing and that its claims are ripe for resolution." *Id.* Relevant to the instant matter, the court rejected the claim that the matter was not justiciable because the decision to stop providing services to ICE "resulted not from the Executive Order but from the [lessees] own 'business' concerns." *Id.* at 751. "[T]hese business concerns," the court observed, "arise most readily from [lessees'] fears that County officials would put [them] out of business at Boeing Field if [they] continued servicing ICE." *Id.* "An asserted business concern that is itself rooted in the Executive Order does not demonstrate a lack of traceability between the Order and the injuries at hand" because the "Executive Order was still—at minimum—a substantial factor motivating the [lessees] to stop servicing ICE," in fact, the court observed, "it was the overriding factor." *Id.* The same logic applies here.

Though it was no doubt true that the lessees in *King County*—much like the gender affirming care providers here—made the decision to stop providing the forbidden services, it was only because they saw "the writing on the wall," felt the government's "pressure," and "immediately fell in line." *Id.* at 752. This is enough to establish causation. *Id.* To find otherwise

23

would be to deny reality as Plaintiffs have amply supported their claim that medical institutions immediately halted all gender affirming medical care for those under the age of nineteen soon after the issuance of the Executive Orders. *See* ECF 35-15, at 4–6 ¶¶ 14–16; ECF 35-16, at 5 ¶¶ 15–17; ECF 35-4 ¶ 14; ECF 35-19, at 4 ¶¶ 11–12; ECF 35-20, at 4 ¶¶ 11–12; ECF 35-21 ¶¶ 11–12. More importantly, these decisions to halt care and cancel appointments came as "a clear (and fairly predictable) response to" the Executive Orders. *King County,* 122 F.4th at 752. And this was exactly the intended effect of the Executive Orders. *See* Healthcare Order § 1 (explaining that the purpose of the EO is to "prohibit or limit these destructive and life-altering procedures"); ECF 35-11, at 2–3 (February 3, 2025 White House press release noting the Healthcare Order "[is] already having its intended effect . . . [h]ospitals around the country are taking action to downsize or eliminate their so-called 'gender-affirming care' programs"). This is enough to show that the medical institutions' purported choice to cease providing the challenged care can be imputed to the government. *See Blum,* 457 U.S. at 1004. It is difficult to imagine how this Court could hold that the Executive Orders did not cause the denial of gender affirming medical care, given that the Executive Orders, along with the subsequent correspondence from the White House and HRSA, describe the denial of gender affirming medical care as the intended purpose of the Executive Orders.

Having established that the hospitals' recission of medical care was directly caused by the Executive Orders, this Court is satisfied that the causal connection is imputed to the individually named Plaintiffs as well. In other words, if the hospitals' decision to withhold gender affirming medical care was caused by the Executive Orders, then it follows that the denial of care experienced by the named Plaintiffs was also causally related to the Executive Orders. ECF 35-1, at 14–18. Defendants' statement that the claims "concern hypothetical downstream actions that

24

JA113

may or may not result from the EOs" is unpersuasive. ECF 55, at 12. The denial of Plaintiffs'

medical care is causally connected to the Executive Orders, regardless of the fact that the medical

institutions are the regulated party, because the medical institutions, as established above, acted in

direct response to the Executive Orders.[21]

### E.    Temporary Restraining Order

Plaintiffs claim that the Executive Orders violate the separation of powers, conflict with

statutory law, and violate the Equal Protection component of the Fifth Amendment. ECF 35.

While the parties discuss all three claims in their briefs, it bears noting that the Court "only needs

to find that Plaintiffs are likely to succeed on one in order for this factor to weigh in favor of a

TRO." *Nat'l Council of Nonprofits*, 2025 WL 368852, at *9 (citation omitted); *see also Profiles,*

*Inc.*, 453 F. Supp. 3d at 747 ("Plaintiffs bear the burden to show that they are likely to succeed on

one of their claims." (citation omitted)). Despite this, the Court will analyze all three claims. The

---

[21] Plaintiffs attach numerous exhibits to the TRO motion that articulate the hospitals' official
statements on gender affirming medical care, which unambiguously cite the Executive Orders as
the reason for ceasing care. *See* ECF 35-6, at 2 ("[Children's National is] currently pausing all
puberty blockers and hormone therapy prescriptions for transgender youth patients, *per the*
*guidelines in the Executive Order* issued by the White House this week."); ECF 35-7, at 2 ("VCU
Health and Children's Hospital of Richmond at VCU have suspended gender-affirming
medications and gender-affirming surgical procedures for patients under 19 years old *in response*
*to an Executive Order* issued by the White House [] on January 28, 2025, and related state guidance
received by VCU on January 30, 2025."); ECF 35-8, at 2 ("*In response to the recent federal*
*executive order* and related Commonwealth of Virginia, Office of Attorney General guidance,
UVA Health has suspended all gender-affirming care for patients under 19 years of age."); ECF
35-9, at 2 ("The executive order . . . includes criminal and financial consequences for those who
do not comply, including placing participation in federal programs including Medicare, Medicaid
and other programs administered by HHS at risk. These programs represent a significant portion
of Denver Health's funding, and *the executive order explicitly states that should we not comply,*
*our participation in these programs is at risk.*") (emphasis added to all). It is difficult to conceive
of clearer causal language than that used by the hospitals here. Thus, the Court is satisfied that the
hospitals acted "in response to" the Executive Orders, which, in turn, led to the denial of medical
care at issue in this case. The injury, that is, the consequences of being denied gender affirming
medical care, is therefore clearly traceable to the challenged conduct: conditioning funding on
refusing to provide such care.

25

Court will first take up Plaintiffs' Separation of Powers argument and focus on whether the Executive Orders exceed the President's Article II powers and unconstitutionally infringe upon the power of Congress by attempting to amend federal legislation while bypassing Article I's Bicameralism and Presentment Clauses. ECF 35-1, at 22.

          1.    <u>Likelihood of Success on the Merits</u>

                *i.*    *Separation of Powers Claim*

                    (1)    Article II does not authorize the President to terminate federal grants authorized by Congress.

The President's authority to act "must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. Neither the Healthcare Order nor the Gender Identity Order identifies a statute authorizing the Executive Branch to amend or terminate federal grants; therefore, in order for the action to be lawful, Article II must provide this authority.[22] Against this backdrop, Plaintiffs first argue that "[f]ederal grants are part of federal law," and "[m]odifying or terminating those grants amounts to modifying or repealing the statutes authorizing them." ECF 35-1, at 23. According to Plaintiffs, "[n]othing in Article II 'authorizes the President to enact, to amend, or to repeal statutes.'" *Id.* (citing *City of New York*, 524 U.S. at 438).

Under Article II, Section 3, the President has an obligation to "take Care that the Laws be faithfully executed." U.S. Const. art. II § 3. "Where Congress has failed to give the President discretion in allocating funds, the President has no constitutional authority to withhold such funds and violates his obligation to faithfully execute the laws duly enacted by Congress if he does so."

---

[22] As noted, the only statutory authority the Gender Identity Order identifies pertains to "regulations for the conduct of employees in the executive branch." Gender Identity Order, Preamble (citing 5 U.S.C. § 7301).

*Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 531 (N.D. Cal. 2017) (citing *City of New York*, 524 U.S. at 439); *see also City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018) ("Because Congress's legislative power is inextricable from its spending power, the President's duty to enforce the laws necessarily extends to appropriations."). Moreover, the President's obligation to execute the laws is "an affirmative one, meaning that failure to act may be an abdication of the President's constitutional role." *Id.* As then-Judge Kavanaugh explained, "a President sometimes has policy reasons (as distinct from constitutional reasons []) for wanting to spend less than the full amount appropriated by Congress for a particular project or program . . . [b]ut in those circumstances, even the President does not have unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).

Defendants admit in the very first line of their response in opposition to the motion for a TRO that the President "issued two Executive Orders directing agencies to take steps, as permitted by law, to condition certain federal grant funding on his policy preferences."[23] ECF 55, at 3. This is a clear violation of the Constitution as "attempt[s] [by the Executive Branch] to place new conditions on federal funds [are] an improper attempt to wield Congress's exclusive spending power and is a violation of the Constitution's separation of powers principles." *Cnty of Santa Clara*, 250 F. Supp. 3d at 531.

---

[23] The Court notes that Defendants cite Article II and *Trump v. United States*, 603 U.S. 593, 608–09 (2024), for the proposition that "if an agency decides to act in a specific manner contrary to law, the federal courts may review (and prevent) that action; but federal courts cannot superintend—let alone proscribe—that policymaking from even taking place." ECF 55, at 11. HRSA and CDC likely acted contrary to law in sending notices to grant recipients requiring compliance with the Executive Orders. Thus, even assuming arguendo that Article II allows for general policymaking, the action at issue goes well beyond the President's "constitutional authority to direct his subordinates to pursue a general policy goal, consistent with all applicable law." ECF 55, at 11 (citing U.S. Const. art. II, §§ 1, 2).

27

*County of Santa Clara* is instructive on how to interpret a challenge to this delicate balance

of power between the President and Congress. There, the court analyzed an executive order that

directed relevant officials to ensure that jurisdictions that willfully refused to comply with a statute

were not eligible to receive federal grants, with limited exceptions for law enforcement purposes.

*Id.* The court explained that the executive order "purports to give the Attorney General and the

Secretary [of Homeland Security] the power to place a new condition on federal funds (compliance

with [a statute]) not provided for by Congress." *Id.* In issuing injunctive relief, the court reasoned

that "the President does not have the power to place conditions on federal funds and so cannot

delegate this power." *Id.*; *see also New York v. Trump,* No. 25-cv-39, 2025 WL 357368, at *2

(D.R.I. Jan. 31, 2025) ("It is no exaggeration to say that 'an agency literally has no power to

act . . . unless and until Congress confers power upon it.'") (citing *La. Pub. Serv. Comm'n v. FCC,*

476 U.S. 355, 374 (1986)).

These fundamental principles compel the same result here. Section 4 of the Healthcare

Order directs "[t]he head of each executive department or agency [] that provides research or

education grants to medical institutions . . . [t]o immediately take appropriate steps to ensure that

institutions receiving Federal research or education grants end the chemical and surgical mutilation

of children." Similarly, Section 3(g) of the Gender Identity Order instructs that "[f]ederal funds

shall not be used to promote gender ideology," and "[e]ach agency shall assess grant conditions

and grantee preferences and ensure grant funds do not promote gender ideology."[24] As in *County*

*of Santa Clara*, Sections 4 and 3(g) of the respective Executive Orders purport to give executive

agencies the power to place a new condition on federal funds not provided for by Congress. In

---

[24] Gender ideology is defined in Section 2(f) of the Gender Identity Order as "permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true."

28

fact, Defendants have not even attempted to show that Congress authorized, explicitly or implicitly, the withholding of federal funds from medical institutions that do not comply with the Administration's policies on healthcare for transgender youth.[25] And it is clear that "when it comes to spending, the President has none of 'his own constitutional power' to 'rely' upon." *City & Cnty. of San Francisco*, 897 F.3d at 1233–34 (citing *Youngstown*, 343 U.S. at 637). Simply put, the President does not have "unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d at 261 n.1. Congress has not authorized the Administration to withhold federal grant monies from medical institutions that provide gender affirming care for transgender youth, thus the Administration exceeded its power under Article II by refusing to spend the funds. *See* U.S. Const. art. I, § 8, cl. 1.

Defendants argue that the Executive Orders "instruct agencies to implement the President's policy preference to the extent permitted by applicable law," and therefore "[d]efinitionally, directing executive agencies to take action *to the extent consistent with applicable law* cannot be interpreted as an order to violate the law." ECF 55, at 13 (emphasis in original). While this admonition to be lawful is unquestionably present in the Executive Orders, courts have repeatedly rejected the argument that simply including "consistent with applicable law" or a similar

---

[25] In fact, a brief review of recent legislative history reflects that while bills banning federal funding for this type of care have been proposed at the federal level, none have passed. The Court takes judicial notice of H.R. 10075, a bill introduced in the House in the 2023-2024 Legislative Session, which attempted the same action that the Executive Orders direct here. *See* H.R. 10075 (prohibiting an entity from receiving Federal funds if such entity provides to any person any medical or surgical intervention for the purpose of assisting an individual's disassociation from his or her sex). This bill failed in Congress. The Court is of course mindful of the fact that "speculation about why a later Congress declined to adopt new legislation offers a 'particularly dangerous' basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt." *Bostock*, 590 U.S. at 670. However, that the challenged portions of the Executive Orders bear strong resemblance to failed legislation supports Plaintiffs' overarching premise that the Executive Orders sought to do what Congress expressly had not—namely, banned funding for institutions that provide gender affirming care for minors and youthful adults.

boilerplate phrase inoculates an otherwise unconstitutional Executive Order from judicial review. *See, e.g., HIAS, Inc.*, 985 F.3d at 325 (rejecting government's attempt to "immunize the Order from review through a savings clause which, if operational, would nullify the 'clear and specific' substantive provisions of the Order" (citation omitted)). There are no magic words that can override an executive order's plain meaning. Rather, any savings clause (or similar directive to follow the law), if it is to be afforded weight, must not be "purely theoretical," and cannot "override the Order's meaning" as derived from the Order's "stated goal." *Id.* Where, as here, the plain text and stated purpose of the Executive Orders evince a clear intent to unlawfully restrict federal funding without Congressional authorization, the mere inclusion of the phrase "consistent with applicable law" cannot insulate these Executive Orders from review. As the Ninth Circuit has pointed out, "[i]f 'consistent with law' precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues." *City & Cnty. of San Francisco*, 897 F.3d at 1240.

Contrary to Defendants' argument, *see* ECF 55, at 14–15, *Building & Construction Trades Dep't v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002) does not counsel a different result. In *Allbaugh*, the D.C. Circuit considered an executive order with a savings clause, ultimately holding that "[t]he mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that, so far, as the present record reveals, is above suspicion in the ordinary course of administration." *Id.* at 33. Unlike *Allbaugh*, and more like the executive order in *City and County of San Francisco*, the Executive Orders here "unambiguously command[] action" such that there is much "more than a 'mere possibility that some agency might make a legally suspect decision.'" 897 F.3d at 1240 (citing *Allbaugh*, 295 F. 3d at 33). In fact, as established above, a legally suspect decision has

30

JA119

already been made by the CDC and HRSA by virtue of the agencies sending out grant termination and compliance notices. Given that the Executive Orders explicitly instruct the executive to develop policies that run afoul of the separation of powers, the apparent simultaneous command to "follow the law" bears a striking resemblance to the "purely theoretical savings clause," in *HIAS*, which the Fourth Circuit held "cannot immunize [the] Order from scrutiny." *HIAS, Inc.*, 985 F.3d at 325.

> (2)    The Executive Orders run afoul of Article I's grant of spending powers to Congress.

Plaintiffs further argue that "[t]he Executive's unilateral attempt to terminate federal grants also infringes on Congress's authority to promulgate law and control public monies." ECF 35-1, at 24. The Court agrees. Article I of the United States Constitution specifically grants the Spending Powers to Congress. "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. The Constitution's allocation of authority with respect to appropriations could not be clearer: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . ." U.S. Const. art. I, § 9, cl. 7. "Incident to [the spending] power, Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal [monies] upon compliance by the recipient with federal statutory and administrative directives.'" *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980)). "Aside from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress." *City & Cnty. of San Francisco*, 897 F.3d at 1232.

"The Appropriations Clause of the Constitution gives Congress exclusive power over federal spending." *Nat'l Council of Nonprofits*, 2025 WL 368852, at *12 (citation omitted). Without it, "the executive would possess an unbounded power over the public purse of the nation[] and might apply all its monied resources at his pleasure." *U.S. Dep't of the Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (quoting 3 Joseph Story, Commentaries on the Constitution of the United States § 1342, at 213–14 (1833)). Indeed, the Clause "was intended as a restriction upon the disbursing authority of the Executive [Branch]." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937); *see also U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53, 76 (D.D.C. 2015) ("Congress's power of the purse is the ultimate check on the otherwise unbounded power of the Executive.").

In keeping with this fundamental principle of our constitutional order, the District Court of the District of Columbia recently enjoined federal agencies from pausing agency grant, loan, and other assistance programs on the basis of other executive actions. *Nat'l Council of Nonprofits*, 2025 WL 368852, at *1. In *National Council of Nonprofits*, a memorandum issued by the Office of Management and Budget ("OMB") directed federal agencies to temporarily pause "all activities related to [the] obligation or disbursement of all Federal financial assistance, and other relevant agency acti[vities] that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." *Id.* In finding that plaintiffs there had demonstrated a likelihood of success on the merits, the court held that "Defendants' actions appear to suffer from infirmities of a constitutional magnitude." *Id.* at 12. In reaching this holding, the court explained the following:

> In 1982, Congress enacted the "Purpose Statute," which requires the appropriation of federal funds in accordance with . . . [they] were made." Any "reappropriation and diversion of the unexpended balance of an appropriation for a purpose other than that for which [it] originally was made" is treated "as a

32

new appropriation." Related laws expressly prohibit the Executive Branch from encroaching on Congress's appropriations power. Most notably, the Impoundment Act of 1974, 2 U.S.C. § 681 *et seq.*, lays out specific procedures whenever the President wishes to suspend appropriations that have already been enacted.

*Id.* (citing 31 U.S.C. § 1301(a), (b), 31 U.S.C. §§ 1341, 1350). Ultimately, the Court held that "a wealth of legal authority supports this fundamental separation of powers," and thus "[t]he appropriations of the government's resources is reserved for Congress, not the Executive Branch."[26]

*Id.*

The same logic applies here, where Defendants have likewise "attempted to wrest the power of the purse away from the only branch of government entitled to wield it." *Nat'l Council of Nonprofits*, 2025 WL 368852, at *12. The challenged portions of the Executive Orders direct the agencies of the Executive Branch to withhold funds appropriated by Congress in order to further an administrative policy on gender ideology. *See* Healthcare Order § 4; Gender Identity Order § 3(g). Regardless of the validity of this policy, it is a plain and simple fact that Congress has not imposed conditions on federal grants regarding gender affirming care. "[I]n those instances where Congress has intended the States to fund certain entitlements as a condition of receiving federal funds, it has proved capable of saying so explicitly."[27] *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17–18 (1981) (citing *King v. Smith*, 392 U.S. 309, 333 (1968)).

---

[26] Judge AliKhan analyzed the separation of powers issue to determine whether the plaintiffs were likely to succeed on the merits of their claim that the agency action was arbitrary and capricious under the APA. The Court concluded that "[i]f Defendants' actions violated the separation of powers, that would certainly be arbitrary and capricious under the APA." *Nat'l Council of Nonprofits*, 2025 WL 368852, at *12. While Plaintiffs do not raise an APA claim here, the separation of powers analysis nevertheless applies.

[27] Defendants attempt to distinguish *National Council of Nonprofits v. Office of Management and Budget* and *New York v. Trump* by claiming that "[b]y their own terms, the [Executive Orders] challenged here direct agencies to impose a new condition on grant funding—not immediately pause existing grant funding." ECF 55, at 16. This argument fails to remedy the inherent separation of powers issue that prohibits the President from "possess[ing] an unbounded power

Plaintiffs also point out that the Executive Orders "appl[y] even to grantees who comply

with the [legitimate] conditions attached to their funding [by Congress] and utilize their funds to

effectuate the program's purposes." ECF 35-1, at 25. Thus, the Executive Orders are

"incompatible with the expressed or implied will of Congress." *Zivotofsky*, 576 U.S. at 10. "The

Executive Branch has a duty to align federal spending and action with the will of the people as

expressed through congressional appropriations, not through 'Presidential priorities.'" *New York*,

2025 WL 357368, at *2 (emphasis omitted). As Chief Judge McConnell of the District of Rhode

Island recently reiterated, "[f]ederal law specifies how the Executive should act if it believes that

appropriations are inconsistent with the President's priorities—it must ask Congress, not act

unilaterally." *Id.* Because there is no evidence that the Administration asked Congress to rescind

appropriated funds, the Court finds that the Executive Orders unconstitutionally intrude upon the

Congressional prerogative to control the public fisc. *See City & Cnty. of San Francisco*, 897 F.3d

at 1235 ("Absent congressional authorization, the Administration may not redistribute or withhold

properly appropriated funds in order to effectuate its own policy goals.").

> (3)    The Executive Orders impermissibly infringe on Article I's
> framework for passing legislation.

Lastly, Plaintiffs argue that "the Orders not only usurp Congressional powers, but bypass

the Legislative branch altogether to sidestep Article I's framework for passing laws." ECF 35-1,

at 25. Defendants argue the Executive Orders "instruct agencies to implement the President's

---

over the public purse of the nation." *U.S. Dep't of the Navy*, 665 F.3d at 1347. Regardless of
whether the executive action is characterized as a "new condition" on grant funding or a "pause"
on grant funding, the case law is clear: if Congress wishes to condition federal research and
education grants on the denial of gender affirming care, it has "proved capable of saying so
explicitly." *Pennhurst State Sch. & Hosp.*, 451 U.S. at 17–18. In the absence of Congressional
action, no amount of re-packaging and re-naming the executive action will cure the
unconstitutionality.

policy preference to the extent permitted by applicable law." ECF 55, at 13. Again, the Court finds that Plaintiffs have the stronger argument.

The Constitution and its history evidence the "unmistakable expression of a determination that legislation by the national Congress be a step-by-step, deliberate and deliberative process." *INS v. Chadha*, 462 U.S. 919, 959 (1983). "The power to enact statutes may only 'be exercised in accord with a single, finely wrought and exhaustively considered, procedure.'" *Clinton*, 524 U.S. at 439–40 (quoting *Chadha*, 462 U.S. at 951). As Justice Kennedy observed, if "the decision to spend [is] determined by the Executive alone, without adequate control by the citizen's Representatives in Congress, liberty is threatened." *Id.* at 451 (Kennedy, J., concurring). "The bicameral requirement, the Presentment Clauses, the President's veto, and Congress's power to override a veto were intended to erect enduring checks on each Branch and to protect the people from the improvident exercise of power by mandating certain prescribed steps." *Chadha*, 462 U.S. at 957–58. "To preserve those checks, and maintain the separation of powers, the carefully defined limits on the power of each Branch must not be eroded." *Id.*

"In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown*, 343 U.S. at 587. Rather, as the Supreme Court has unequivocally stated: "[t]he Constitution limits [the President's] functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad." *Id.* The Executive Orders cannot, therefore, be properly sustained as an exercise of the President's power. The Constitution is "neither silent nor equivocal about who shall make laws which the President is to execute." *Id.* To accomplish what has been attempted by the Executive Orders in this case requires "action in conformity with the express procedures of

35

the Constitution's prescription for legislative action," not unilateral action on the part of the President. *Chadha*, 462 U.S. at 958.

The Court is unpersuaded by Defendants' argument that the challenged portions of the Executive Orders are merely a reflection of the President's "plain[] authority to direct agencies to fully implement the President's agenda, consistent with each individual agency's underlying statutory authorities." ECF 55, at 12. In essence, "the Administration argues that the Executive Order is all bluster and no bite, representing a perfectly legitimate use of the presidential 'bully pulpit,' without any real meaning—'gesture without motion,' as T.S. Eliot put it." *City & Cnty. of San Francisco*, 897 F.3d at 1238. However, the Executive Orders do far more than simply effectuate the President's unquestionably lawful authority to amplify his position on an issue of national importance. Much like the pronouncements at issue in *City and County of San Francisco v. Trump*, the plain language of the Executive Orders here reflects that "the Administration's current litigation position is grounded not in the text of the Executive Order[s] but in a desire to avoid legal consequences." *Id.* As discussed above, the Executive Orders directed agencies to act "immediately" and the funding restrictions were mandatory, thus demonstrating that Defendants' current position that the directives were mere toothless advisements to explore possible routes to effectuating policy appears to be a direct response to litigation, rather than a reasonable interpretation of the plain text of the challenged portions of the Executive Orders. *See HIAS, Inc.*, 985 F.3d at 325 (interpreting an executive order by analyzing its "stated goal," and the "clear and specific substantive provisions").

It is, moreover, well-established that the Administration may not usurp Congress's power just because the administration of healthcare at issue is antithetical to the Administration's policies. Here, the Administration has "[n]ot only . . . claimed for itself Congress's exclusive spending

36

power, [but] also attempted to coopt Congress's power to legislate." *City & Cnty. of San Francisco*, 897 F.3d at 1234. However, "[t]he Constitution [does] not subject this law-making power of Congress to presidential [] control." *Youngstown*, 343 U.S. at 588 (finding a separation of powers violation where "[t]he President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President"). If the President does not wish to disburse funds in the manner appropriated by Congress, "the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *In re Aiken Cnty.*, 725 F.3d at 261 n.1; *see also* U.S. Const. art. I, § 7, cl. 2. Article I does not allow the President to circumvent Bicameralism and Presentment by unilaterally amending or cancelling federal appropriations through an executive order. *See Clinton*, 524 U.S. at 448. This is especially true where, as here, Congress has "considered and thus far rejected legislation accomplishing the goals of the Executive Order." *City & Cnty. of San Francisco*, 897 F.3d at 1234; *see supra* note 25 (noting failed Congressional efforts to ban funding for gender affirming care for minors).

Because the Executive Orders direct agencies to withhold funding on a condition that Congress has not authorized, the President has exceeded his authority. The Plaintiffs have thus sufficiently shown likelihood of success on the merits of their claim that the Executive Orders violate the separation of powers.

## ii.    Contrary to Existing Statutes

Plaintiffs argue that they are likely to succeed on the merits of their second claim for relief—that the Executive Orders are *ultra vires* in that they conflict with statutory law (namely, Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C § 18116, and Section 1908 of the Public Health Service Act ("PHSA"), 42 U.S.C. § 300w-7), both of which prohibit discrimination

on the basis of sex. *See* ECF 35-1, at 26–28. As noted, "when 'the President takes measures incompatible with the expressed or implied will of Congress . . . he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.'" *Zivotofsky*, 576 U.S. at 10 (quoting *Youngstown*, 343 U.S. at 635–638 (Jackson, J., concurring)). The Court has the authority to determine whether the Executive Orders are incompatible with the will of Congress. *See, e.g., Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 385 (2024) (summarizing the function of the Judiciary to interpret statutes dating back to the earliest decisions of the Supreme Court and citing *Marbury v. Madison*, 1 Cranch 137, 177 (1803); *United States v. Dickson*, 15 Pet. 141, 162 (1841); *Decatur v. Paulding*, 14 Pet. 497, 515 (1840)). Bound by precedent from both the Supreme Court and the United States Court of Appeals for the Fourth Circuit, the Court is constrained to conclude that Executive Orders are indeed incompatible with the will of Congress.

Section 1557 of the ACA "provides that, '[e]xcept as otherwise provided . . . an individual shall not, on the ground prohibited under Title VI of the Civil Rights Act . . . [and] Title IX . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance.'" *Kadel*, 100 F.4th at 163–64 (alteration in original) (quoting 42 U.S.C. § 18116(a)). Section 1908 of the PHSA mandates that "[n]o person shall on the ground of sex or religion be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity funded in whole or in part with funds made available under this part." 42 U.S.C. § 300w-7(a)(2).

In *Bostock*, the Supreme Court held that Title VII's prohibition on discrimination on the basis of sex in employment, 42 U.S.C. § 2000e–2(a)(1), encompassed discrimination on the basis

38

JA127

of transgender status. 590 U.S. at 662. Justice Gorsuch, writing for the Court, explained: "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Id.* at 660. "The plain language of Title VII, the Court observed [in *Bostock*], establishes a but-for causation standard." *Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 590 (D. Md. 2021). In *Kadel*,[28] an en banc Fourth Circuit affirmed a district court's application of *Bostock* to Section 1557 of the ACA, explicitly rejecting the idea that *Bostock*'s analysis applied only to Title VII claims. 100 F.4th at 164 (citing *Bostock*, 590 U.S. at 658). Defendants have not presented any argument that the *Kadel* Court's application of *Bostock*'s reasoning should not also extend to Section 1908 of the PHSA, which is nearly identical in wording to Section 1557 of the ACA. Indeed, Defendants appear to concede that *Kadel* compels the outcome the Court reaches here. *See* ECF 55, at 28 n.9 ("The government acknowledges that the Fourth Circuit in *Kadel* held that Section 1557 prohibits discrimination based on transgender status.").[29]

The sections challenged here facially differentiate on the basis of transgender identity. Section 4 of the Healthcare Order directs agency heads to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children." "Chemical and surgical mutilation of children" is defined as

---

[28] Plaintiffs refer to this case as *Kadel II*. Because the Court refers to only one decision this case, it will refer to *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) only as *Kadel*.

[29] To be clear, Defendants take the position that "*Kadel* was wrongly decided and should be overruled." ECF 55, at 5. Given *Kadel*'s binding holding that compels this Court to find that discrimination on the basis of transgender status violates Section 1557 of the ACA, Defendants are constrained to argue that because the Executive Orders are to be carried out "consistent with applicable law, including [the anti-discrimination] statutes," they do not compel discrimination that would violate [the ACA or PHSA]." *See* ECF 55, at 28. However, the Court has already addressed why the phrase "consistent with applicable law" does not make an executive order inherently lawful. *See supra* Section III.E.1.i.(1).

> the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty *in an individual who does not identify as his or her sex*; the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, *to align an individual's physical appearance with an identity that differs from his or her sex*; and surgical procedures that attempt to transform an individual's physical appearance *to align with an identity that differs from his or her sex* or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions. This phrase sometimes is referred to as "gender affirming care."

Healthcare Order § 2(c) (emphasis added). The same course of treatment, such as prescribing puberty blockers or hormones, therefore, is available to a patient who is not "an individual who does not identify as his or her sex" and not undergoing the course of treatment "to align an individual's physical appearance with an identity that differs from his or her sex." *Id.* "This is textbook sex discrimination" under *Kadel* because

> [f]or one, [the Court] can determine whether some patients will be eliminated from candidacy for these surgeries [or other courses of treatment] solely from knowing their sex assigned at birth. And two, conditioning access to these surgeries based on a patient's sex assigned at birth stems from gender stereotypes about how men or women should present.

100 F.4th at 153 (citing *Bostock*, 590 U.S. at 660–74). Indeed, the effect of the Healthcare Order—the cessation of all gender affirming medical care for those under the age of nineteen—tracks precisely with the Executive Order's stated purpose—to "prohibit or limit these destructive and life-altering procedures." Healthcare Order § 1.

Section 3(g) of the Gender Identity Order is admittedly slightly vaguer than Section 4 of the Healthcare Order in that it only proscribes the use of "[f]ederal [grant] funds [to] promote gender ideology." The Gender Identity Order, appears, however, to deny the existence of transgender persons altogether. *See* Gender Identity Order § 1 (describing the purpose of the order as "defend[ing] women's rights and protect[ing] freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically

male"); *id.* § 2 ("It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality."). The Court cannot fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist. Thus, Section 3(g) of the Gender Identity Order can only be read as doing exactly what Section 4 of the Healthcare Order does—cease funding institutions, including medical institutions, that provide gender affirming medical care to patients under the age of nineteen. Thus, as with Section 4 of Healthcare Order, *Kadel* mandates a similar finding of discrimination as to Section 3(g) of the Gender Identity Order.

Plaintiffs accurately note that the Executive Orders foist upon hospitals receiving federal funds an impossible choice: (1) keep providing medical care to transgender patients under the age of nineteen in compliance with the antidiscrimination statutes and risk losing federal funding under the Executive Orders, or (2) stop providing care on the basis of transgender identity in violation of the statutes, but in compliance with the EOs. Defendants counter that there may be a third option: refusing to provide certain types of care to any patient at all. ECF 55, at 28 ("If grantees believe that providing, for example, a given hormone to a cisgender patient for one purpose but not to a transgender patient for a different purpose is discrimination under Sections 1557 or 1908, the grantees may choose not to provide that hormone to anyone."). First, this argument appears to be a tacit admission that compliance with both the Executive Orders and the antidiscrimination statutes is not possible. Second, to say that an entity can evade liability for violations of an antidiscrimination statute by ceasing operations defies credulity and misses the point, especially

41

given *Bostock*'s but-for causation standard.[30]  One "who takes adverse action against someone for

being transgender 'inescapably *intends* to rely on sex in' his decisionmaking." *Hammons*, 551 F.

Supp. 3d at 591 (quoting *Bostock*, 590 U.S. at 661) (emphasis in *Bostock*).  Because the challenged

portions of the Executive Orders are facially discriminatory on the basis of transgender identity,

and therefore sex under *Kadel* and *Bostock*, in violation of Section 1557 of the ACA and Section

1908 of the PHSA, the Court finds that Plaintiffs are likely to succeed on the merits of their *ultra*

*vires* statutory claim.

>          *iii.*    *Equal Protection*

"The Fifth Amendment to the United States Constitution provides, in pertinent part, that

'[n]o person shall . . . be deprived of life, liberty, or property, without due process of law.'"

*Strickland v. United States*, 32 F.4th at 356 (alterations in original) (quoting U.S. Const. amend.

V).  While the Equal Protection Clause of the Fourteenth Amendment applies only to the states,

"'[i]n numerous decisions,' the Supreme 'Court has held that the Due Process Clause of the Fifth

Amendment forbids the Federal Government to deny equal protection of the laws.'" *Id.* (quoting

*Davis v. Passman*, 442 U.S. 228, 234 (1979)).  Equal protection analysis and the "obligations

imposed by the Fifth and the Fourteenth Amendments" are "indistinguishable." *Adarand*

*Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995).  "To succeed on an equal protection claim,

a plaintiff must first demonstrate that he has been treated differently from others with whom he is

similarly situated and that the unequal treatment was the result of intentional or purposeful

discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).  "Once this showing

---

[30] As Plaintiffs point out in reply, forcing medical institutions receiving federal funds to cease
performing certain procedures would likely violate Section 1554 of the ACA. *See* ECF 57, at 10–
11.  The Court need not reach this issue as the challenged portions of the Executive Orders are
facially discriminatory on the basis of transgender identity in violation of Section 1557 of the
ACA, Section 1908 of the PHSA, and *Kadel*.

42

is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.* For the challenged government action to withstand judicial review under intermediate scrutiny, "the government bears the burden of establishing a reasonable fit between the challenged statute and a substantial governmental objective." *Kadel*, 100 F.4th at 156 (quoting *United States v. Chapman*, 666 F.3d 220, 226 (4th Cir. 2012)). "The classification must be based on 'reasoned analysis rather than [on] the mechanical application of traditional, often inaccurate, assumptions.'" *Id.* (alteration in *Kadel*) (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 726 (1982)). "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996).

In *Kadel*, the Fourth Circuit confronted equal protection challenges to North Carolina's and West Virginia's state-funded health plans and their coverage of gender affirming care. 100 F.4th at 133. North Carolina's plan "exclu[ded] . . . '[t]reatment or studies leading to or in connection with sex changes or modifications and related care," and West Virginia's "cover[ed] some gender-affirming care, but not gender-affirming surgery," and did "cover the same surgical procedures when conducted to treat non-gender dysphoria diagnoses. *Id.* at 133–34. Preliminarily, the en banc Fourth Circuit reiterated its holding in *Grimm*, 972 F.3d at 611, that "transgender persons constitute a quasi-suspect class." *Kadel*, 100 F.4th at 143. The Court then held that "gender dysphoria [is] a proxy for transgender identity," that "proxy discrimination [can be] facial discrimination," and that, in that case, "discrimination on the basis of gender dysphoria [was] discrimination on the basis of gender identity." *Id.* Thus, "[b]ecause the [health plan] exclusions discriminate[d] on the basis of transgender identity and sex, they [were] subject to intermediate [or heightened] scrutiny." *Id.* at 155–56.

43

The Court then found that the healthcare insurance exclusions did not satisfy intermediate scrutiny. *Id.* at 156 ("[T]he district court properly rejected the contention that the coverage exclusion is substantially related to [protecting public health from ineffective medicine]."); *id.* at 156–57 ("Without evidence to show that gender-dysphoria treatments are ineffective, the North Carolina Appellants cannot show that the coverage exclusion is narrowly tailored to serve the state's substantial interest in not covering medically ineffective treatment."); *id.* at 157 ("What's more, West Virginia Department of Health and Human Resources Secretary Bill Crouch said he did not know if Medicaid had conducted any research or analysis about the cost of providing access to gender-affirming care[, so] Appellants' proffered rationales were created for the purposes of litigation" and "therefore cannot justify the policy under a heightened-scrutiny analysis." (citing *Virginia*, 518 U.S. at 533)).

Here, as explained above, the Executive Orders discriminate on the basis of transgender identity, and therefore on the basis of sex, so the Court need not conduct the proxy analysis that the Fourth Circuit did in the first instance in *Kadel. See supra* Section III.E.1.ii; *Kadel*, 100 F.4th at 143–52. Thus, the government bears the burden of establishing that the orders are substantially related to an important government interest.[31] *Kadel*, 100 F.4th at 156.

In seeking to meet their burden, Defendants assert that the challenged portions of the Executive Orders are based on the important government interest of "protecting the physical and emotional well-being of youth." *See* ECF 55, at 24–25 (quoting *New York v. Ferber*, 458 U.S. 747, 757 (1982) and citing Healthcare Order § 1). Defendants assert that the Orders are

---

[31] Defendants spend the bulk of its opposition on the equal protection claim arguing that rational basis review, not heightened scrutiny, applies and that *Kadel* was wrongly decided. *See* ECF 55, at 18–24. The Court need not entertain this argument because, as Defendants acknowledge, this Court is bound to follow the Fourth Circuit's decision in *Kadel*, which held that transgender identity is a quasi-suspect class triggering heightened scrutiny. *See* ECF 55, at 18.

44

substantially related to this important government interest because "[e]vidence.abounds that treatments covered by the Protecting Children EO 'are dangerous and ineffective.'" *Id.* at 25 (quoting *Eknes-Tucker v. Governor of Ala.*, 114 F.4th 1241, 1266 (11th Cir. 2024) (Lagoa, J., concurring)). Though Defendants might well have support for this argument, the en banc Fourth Circuit in *Kadel* rejected a similar claim by noting that "those criticisms do not support the notion that gender-dysphoria treatments are ineffective so much as still developing." 100 F.4th at 156; *id.* at 156–57 ("Without evidence to show that gender-dysphoria treatments are ineffective, the North Carolina Appellants cannot show that the coverage exclusion is narrowly tailored to serve the state's substantial interest in not covering medically ineffective treatment."). With this binding precedent in mind, and with a barer record than the one before the Fourth Circuit in *Kadel*, the Court is again constrained to find that Defendants are not likely to meet their burden of showing that the Executive Orders are substantially related to an important government interest.[32] As such, Plaintiffs are likely to succeed on the merits of their Equal Protection claim.

2.      <u>Irreparable Harm</u>

To establish irreparable harm, the plaintiff "must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (2019) (citation omitted). Additionally, the harm "must be irreparable, meaning that it cannot be fully rectified by the final judgment after trial." *Id.* (quotations and citations omitted).

---

[32] Further, Section 4 of the Healthcare Order directs "immediate[]" action. In doing so, it makes no effort to ensure that a patient is weaned off any medical care they are currently undergoing in conjunction with their medical provider. Such an abrupt halt in medical care, even if, as Defendants contend, that care is dangerous or ineffective, cuts against Defendants' argument that the policy is substantially related to protecting children.

The Court notes at the outset that "the prospect of an unconstitutional enforcement 'supplies the necessary irreparable injury.'" *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381-82 (1992)). Additionally, because Plaintiffs have shown a strong likelihood of success on their constitutional claims, the irreparable harm factor is satisfied. *See Mills*, 571 F.3d at 1312 ("It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The Fourth Circuit has also previously held that the irreparable harm prong is satisfied where the plaintiff suffers from "diminished access to high-quality health care suited to the individual plaintiff's needs." *Baker*, 941 F.3d at 707. As Plaintiffs point out, "[t]ransgender adolescents and young adults across the country already have lost care because their providers have cancelled appointments, refused to fill prescriptions, or even shut down their gender affirming medical care programs altogether." ECF 35-1, at 35. Further, "[f]amilies have been forced to watch their children suffer, and medical providers have been compelled to abandon their patients." *Id.* The circumstances in this case yield no justification to depart from the Fourth Circuit's reasoning in *Baker*, as the sudden denial of medical care "visits a tangible harm" on the health and well-being of Plaintiffs. *Baker*, 941 F.3d at 707.

Defendants argue that "[t]here is no reason to think the medical institutions' views on the relevant agencies' likely future behavior would change if the EO were enjoined." ECF 55, at 29. However, as described above, the medical institutions have made clear that the decision to pause or cancel gender affirming care was undertaken as a direct response to the Executive Orders and the threat to withhold federal funding. Thus, enjoining Defendants from withholding funding for

46

institutions that provide prohibited gender affirming medical care would remedy Plaintiffs' harms. Based on the record evidence at this early stage of litigation, the Court has no reason to conclude that the sudden and complete cancelation of gender affirming care at the medical institutions was related to anything other than the fear of losing federal funding pursuant to the challenged portions of the Executive Orders. *See e.g.*, ECF 35-9, at 2 (explaining that "[t]he loss of this funding would critically impair [Denver Health's] ability to provide care for the Denver Community"). As such, enjoining agencies from attaching specific conditions to the hospitals' federal grants would, as far as this Court can tell at this stage, remedy the harm suffered by Plaintiffs.

Lastly, a final judgment after trial cannot rectify the harm caused by Section 4 of the Healthcare Order and Section 3(g) of the Gender Identity Order given that Plaintiffs have shown that the care has already ceased and that each day that passes exacerbates Plaintiffs' injuries, which, as described above, include depression, increased anxiety, heightened gender dysphoria, severe distress, risk of suicide, uncertainty about how to obtain medical care, impediments to maintaining a social life, and fear of discrimination, including hate crimes. *See Koe v. Noggle*, 688 F. Supp. 3d 1321, 1357 (N.D. Ga. 2023) (finding irreparable harm in the absence of a preliminary injunction where "middle-school-age plaintiffs will be unable to obtain [] a course of treatment that has been recommended by their health care providers in light of their individual diagnoses and mental health needs"). The Court concludes that the Plaintiffs have demonstrated they are likely to suffer irreparable harm absent injunctive relief.

       3.   <u>Prejudice and Public Interest</u>

The Court must balance the significant irreparable harms identified above against the harms that the Government asserts will arise from temporarily enjoining enforcement of the challenged provisions of the Executive Orders. Here, the balance of equities and the public interest

weigh in favor of issuing a TRO. *See Ass'n of Cmty Cancer Centers v. Azar*, 509 F. Supp. 3d 482, 501 (D. Md. 2020).

As an initial matter, the Court finds that the Government is in no way harmed by the issuance of a TRO which prevents it from enforcing restrictions likely to be found unconstitutional. *See Leaders of a Beautiful Struggle*, 2 F.4th at 346. And it is "well-established that the public interest favors protecting constitutional rights." *Id.* (citations omitted). Further, the Executive Orders threaten to harm the livelihoods of transgender youth, as well as access to medical care for entire communities if hospitals decide to continue to provide gender affirming medical care and then lose significant federal funding.

Plaintiffs point to affidavits by doctors and researchers that detail the far-reaching effects of these Executive Orders. And importantly, the Executive Orders have been interpreted to mean that *all* of medical institutions' federal funding is in jeopardy if they do not comply, regardless of whether the funding is tied to gender affirming care. *See* ECF 35-9, at 2; ECF 35-10, at 3. As Denver Health acknowledged in their statement regarding the Healthcare Order, federally funded programs represent "a significant portion of Denver Health's funding," and the "loss of this funding would critically impair our ability to provide care for the Denver community." ECF 35-9, at 2. The Government, on the other hand, has adduced no evidence that any harm will result if the grant funding is restored to the status quo. Instead, Defendants simply argue that the "public interest is not advanced when the Executive is disabled from even *considering* a policy, especially one that has been the subject of legislation across the country." ECF 55, at 29 (emphasis in original). As described above, the Executive Orders went well-beyond general policymaking; the Executive Orders condition funding in a manner not prescribed by Congress. Though the Executive is no doubt free to pursue at the federal level the very type of legislation that Defendants

note has been enacted in many states, this process must proceed within the boundaries set by the Constitution. Seeking to effectively enact legislation by executive order clearly exceeds the bounds of Article II and thus does not serve the public interest.

In sum, the Executive Orders threaten to disrupt treatment of patients, stall critical research, and gut numerous programs in medical institutions that rely on federal funding. Accordingly, the Plaintiffs have shown that they are likely to succeed on the merits, that they would suffer irreparable harms absent an injunction, and that the balance of equities and the public interest tip in their favor. The Court will therefore grant a temporary restraining order.

## F.    Scope of Injunction

Having determined that Plaintiffs are entitled to a temporary restraining order, the Court must determine its proper scope. Plaintiffs contend that "PFLAG and GLMA have members 'throughout the country' who have been harmed by the Executive Orders." *See* ECF 35-1, at 36 (citing declarations). Additionally, Plaintiffs maintain that because "the Orders harm the Transgender Plaintiffs through their coercive impact on third parties, an injunction must necessarily extend to those third parties to provide the necessary relief to all of PFLAG and GLMA's members." *Id.*

"Once a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." *Hills v. Gautreaux*, 425 U.S. 284, 293–94 (1976) (citations and internal quotation marks omitted). It is well-established that "district courts have broad discretion when fashioning injunctive relief." *Ostergren v. Cuccinelli*, 615 F.3d 263, 288 (4th Cir. 2010). Nevertheless, the "power[] [is] not boundless." *Id.* "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)

49

(citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Consistent with these principles, courts may issue nationwide injunctions. *See Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308–09 (4th Cir. 1992); *see also Azar*, 509 F. Supp. 3d at 503 ("[F]ederal courts over the years have issued 'hundreds' of nationwide injunctions 'reaching beyond the parties in the lawsuit[,]' especially when such a scope is considered 'necessary to afford complete relief.'" (citing *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp 1, 46 (D.D.C. 2020))). "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance and legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 583 (2017) (per curiam) (denying in part a request to stay a nationwide injunction in a challenge to an executive order suspending entry of foreign nationals from seven countries). Here, Plaintiffs have demonstrated that they are likely to succeed on their claims that the Executive Orders purport to wield powers exclusive to Congress, directly conflict with existing statutes, and, pursuant to *Kadel*, violate the Equal Protection component of the Fifth Amendment, which supports nationwide relief.

As an initial matter, "where a law is unconstitutional on its face, and not simply in its application to certain plaintiffs, a nationwide injunction is appropriate." *Cnty. of Santa Clara*, 250 F. Supp. 3d at 539 (citing *Califano*, 442 U.S. at 702). Additionally, this Court has reasonably cautioned that "a court order should not cause confusion about which companies or providers are subject to a rule and which are not; instead, a court order must be clear and definite." *Azar*, 509 F. Supp. 3d at 504. With this principle in mind, the Court finds that a piecemeal approach is not appropriate in this case. Significant confusion would result from preventing agencies from conditioning funding on certain medical institutions, while allowing conditional funding to persist

as to other medical institutions. And while the TRO is nationwide in scope, it is "limited in that it simply preserves the status quo without requiring the agency to take any affirmative action." *Id.*

Additionally, PFLAG and GLMA are organizational plaintiffs suing on behalf of their members. When associations prevail in obtaining injunctive relief, "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). Here, PFLAG has members who "currently receive or will soon need to access the medical treatment for gender dysphoria that the Executive Orders seek to prohibit." ECF 1, at 6 ¶ 13. Additionally, GLMA includes many "health professional members who work at medical institutions receiving grant funding from Defendants HRSA and NIH as well as other subagencies of Defendant [HHS]." *Id.* at 7 ¶ 14. The members of PFLAG and GLMA are located throughout the country. *See id.* at 6–7 ¶¶ 13, 14. Thus, it follows that an injunction of nationwide scope is necessary to provide complete relief.

Further, the reason the Executive Orders are unconstitutional—namely that, at minimum, they violate the separation of powers—are applicable to jurisdictions throughout the country.[33] The necessity of a nationwide injunction is underscored by the fact that hospitals all over the county could lose access to all federal funding if they continue to provide gender affirming medical care.[34] And if medical institutions stop providing gender affirming medical care, as many have

---

[33] *Kadel* is obviously not binding beyond this Circuit, thus the Court's holding with respect to Equal Protection may clash with the findings of other courts. If this were Plaintiffs' lone claim, the Court might be persuaded that a more limited TRO is appropriate. However, even Defendants appear to concede that the separation of powers issue, if decided in Plaintiffs' favor, would apply equally in all jurisdictions. *See* ECF 55, at 31 (arguing that the statutory and equal protection arguments diverge from authority in other circuits).

[34] The harm of losing this funding extends well beyond the named Plaintiffs or even the transgender community writ large. Some hospitals, like Denver Health have already stated that losing this funding would "critically impair" hospital functioning and deprive all persons in the Denver area

already done, the irreparable harm to Plaintiffs, who live in many different states, has been well-established. *See Richmond Tenants Org.*, 956 F.2d at 1308–09 (upholding nationwide injunction where challenged conduct caused irreparable harm in myriad jurisdictions across the country). The constitutional and statutory violations apply equally to all medical institutions that receive federal grants. Accordingly, the "equities of the case" call for, and the Court will issue, an order temporarily restraining the government from enforcing the contested rule. Given the circumstances, a narrower injunction cannot provide complete relief.

### G.    Security

Plaintiffs ask the Court to waive Rule 65(c)'s bond requirement. Rule 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The district court "has discretion to set the bond amount," but it is "not free to disregard the bond requirement altogether." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999). Security can be waived when complying with the preliminary injunction raises no risk of monetary loss to the defendant. *See Md. Dep't of Human Res. v. U.S. Dept. of Agric.*, 976 F.2d 1462, 1483 n.23 (4th Cir. 1992) (stating that district court has "discretion to set a bond amount of zero where the enjoined or restrained party faces no likelihood of material harm"); 11A Wright, Miller & Kane, Federal Practice & Procedure § 2954, at 293 (2d ed. 1995, April 2011 Supp.) (stating that a "court may dispense with security altogether if the grant of an injunction carries no risk of monetary loss to the defendant"). As explained above, Defendants have shown no evidence of a likelihood of

---

of critical access to healthcare. ECF 35-9, at 2. The Government has not presented factual differences that would compel a different conclusion in any other jurisdictions.

harm, monetary or otherwise. Thus, the Court will not require the posting of security. Defendants may request a bond if they so choose.

IV.    **CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for a Temporary Restraining Order, ECF 35, is **GRANTED**.


Dated: <u>February 14, 2025</u>                              _____/s/_____
                                                                        Brendan A. Hurson
                                                                        United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PFLAG, INC., et al.,

     *Plaintiffs*,

             v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

     *Defendants*.

Civil Action No. BAH-25-337

## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs PFLAG, Inc., and GLMA: Health Professionals Advancing LGBTQ+ Equality ("GLMA") (collectively, the "Member Organization Plaintiffs"); Gabe Goe, by and through his parent and next friend George Goe; George Goe; Bella Boe, by and through her parent and next friend Bruce Boe; Bruce Boe; Cameron Coe, by and through their parent and next friend Claire Coe; Claire Coe; Robert Roe, by and through his parent and next friend Rachel Roe; Rachel Roe; Lawrence Loe; and Dylan Doe (collectively, the "Individual Plaintiffs") hereby move the Court, pursuant to Federal Rule of Civil Procedure 65, for the issuance of an order preliminarily enjoining Defendants U.S. Department of Health and Human Services ("HHS"); Robert F. Kennedy, Jr., in his official capacity as Secretary of HHS; the Health Resources and Services Administration ("HRSA"); Diana Espinosa, in her official capacity as Principal Deputy Administrator of HRSA; the National Institutes of Health ("NIH"); Matthew J. Memoli, in his official capacity as Acting NIH Director; the National Science Foundation ("NSF"); Sethuraman Panchanathan, in his official capacity as Director of NSF; any subagencies of Defendant HHS, their officers, agents, successors, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, from conditioning, withholding, or terminating any federal funding under Section 3(g)

of Executive Order No. 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (the "Gender Identity Order") and Section 4 of Executive Order No. 14,187, *Protecting Children from Chemical and Surgical Mutilation* (the "Denial of Care Order"), based on the fact that a healthcare entity or health professional provides gender affirming medical care to a patient under nineteen, including any healthcare institution from which the Individual Plaintiffs, members of Plaintiff PFLAG, and patients of health professional members of Plaintiff GLMA receive gender affirming medical care, or at which health professional members of Plaintiff GLMA conduct federally-funded work.

As Plaintiffs discuss in greater detail in their Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction, the Denial of Care and Gender Identity Orders are unconstitutional and unlawful.

The grounds for this motion are set forth in the attached memorandum of law and accompanying exhibits.

Dated: February 18, 2025

Respectfully submitted,

Joshua Block*
Harper Seldin*
Chase Strangio*
Alexandra R. Johnson*
**American Civil Liberties Union Foundation**
125 Broad Street, Floor 18
New York, NY 10004
Telephone: (212) 549-2500
Facsimile: (212) 549-2650
jblock@aclu.org
hseldin@aclu.org
cstrangio@aclu.org
a.johnson@aclu.org

Deborah A. Jeon (Fed. Bar No. 06905)
Zoe M. Ginsberg (Fed. Bar No. 30727)

*/s/ Omar Gonzalez-Pagan*

Omar Gonzalez-Pagan*
Jennifer C. Pizer*
**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: (212) 809-8585
Facsimile: (855) 535-2236
ogonzalez-pagan@lambdalegal.org
jpizer@lambdalegal.org

Karen L. Loewy*
**Lambda Legal Defense and Education Fund, Inc.**
815 16th Street NW, Suite 4140
Washington, DC 20006

2

**American Civil Liberties Union
  Foundation of Maryland**
3600 Clipper Mill Road, Suite 200
Baltimore, MD 21211
Telephone: (410) 889-8555
Facsimile:  (410) 366-7838
jeon@aclu-md.org
zginsberg@aclu-md.org

Catherine E. Stetson**
Danielle Desaulniers Stempel (Fed. Bar No.
20501, Renewed 1/31/25)
Kristina Alekseyeva*
Sam H. Zwingli*
**Hogan Lovells US LLP**
555 13th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5491
Facsimile:  (202) 637-5910
cate.stetson@hoganlovells.com
danielle.stempel@hoganlovells.com
kristina.alekseyeva@hoganlovells.com
sam.zwingli@hoganlovells.com

Telephone: (202) 804-6245
Facsimile:  (855) 535-2236
kloewy@lambdalegal.org

Nora Huppert*
**Lambda Legal Defense
  and Education Fund, Inc.**
65 E. Wacker Place, Suite 2000
Chicago, IL 60601
Telephone: (312) 605-3233
Facsimile:  (855) 535-2236
nhuppert@lambdalegal.org

Jackson Skeen***
**Hogan Lovells US LLP**
125 High Street
Suite 2010
Boston, MA 02110
Telephone: (617) 702-7747
Facsimile:  (617) 371-1037
jackson.skeen@hoganlovells.com

*Attorneys for Plaintiffs*

*\*Application for admission pro hac vice
granted.
\*\*Application for admission forthcoming.
\*\*\*Application for admission pro hac vice
granted and admitted only in D.C. Supervised
by principals of the firm admitted in
Massachusetts.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was electronically filed using the Court's

CM/ECF system.  Service was effected by and through the Court's CM/ECF system.


Dated: February 18, 2025                                    */s/ Omar Gonzalez-Pagan*
                                                            Omar Gonzalez-Pagan

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

PFLAG, INC., *et al.*,

       *Plaintiffs*,

          v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

       *Defendants*.

Civil Action No. BAH-25-337

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

i

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 3

      A.    Medical Guidelines for Treating Gender Dysphoria .................................... 3

      B.    The Executive Orders ................................................................................. 5

      C.    The Impact of the Executive Orders on the Provision of Medical
           Care and Harm to Public Health. ............................................................... 7

      D.    The Harm of the Executive Orders to the Individual Plaintiffs ................... 7

      E.    The Harm of the Executive Orders to the Members of PFLAG
           and GLMA ............................................................................................... 12

LEGAL STANDARD ............................................................................................ 15

ARGUMENT ......................................................................................................... 16

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS. .................... 16

      A.    Plaintiffs Have Standing and Their Claims Are Justiciable ......................... 16

      B.    The Executive Orders Are *Ultra Vires* Because They Exceed the
           President's Authority, Infringe Upon Congress's Powers, and
           Violate Article I's Framework for Federal Legislation. .............................. 18

      C.    The Executive Orders Are *Ultra Vires* Because They Conflict
           with Laws that Prohibit Discrimination on the Basis of Sex. ...................... 21

      D.    Plaintiffs Are Likely to Succeed on Their Equal Protection Claim. ............ 22

           1.    The Executive Orders Trigger Heightened Scrutiny. ....................... 22

           2.    The Executive Orders Cannot Survive Heightened
                Scrutiny .......................................................................................... 26

           3.    The Executive Orders Fail Rational Basis Review .......................... 28

II.    THE OTHER FACTORS FAVOR A NATIONWIDE PRELIMINARY
      INJUNCTION ................................................................................................ 29

CONCLUSION ...................................................................................................... 30

<h1 style="text-align:center"><u>TABLE OF AUTHORITIES</u></h1>

**Page(s)**

**Cases**

*In re Aiken Cnty.*,
 725 F.3d 255 (D.C. Cir. 2013) ........................................................................ 19

*Air Evac EMS, Inc. v. McVey*,
 37 F.4th 89 (4th Cir. 2022) ........................................................................... 29

*Armstrong v. Exceptional Child Ctr., Inc.*,
 575 U.S. 320 (2015) ...................................................................................... 17

*Ass'n of Cmty. Cancer Ctrs. v. Azar*,
 509 F. Supp. 3d 482 (D. Md. 2020) ......................................................... 29, 30

*Bostock v. Clayton County*,
 590 U.S. 644 (2020) ...................................................................................... 21

*Brandt v. Rutledge*,
 677 F. Supp. 3d 877 (E.D. Ark. 2023) ..................................................... 26, 27

*Chamber of Com. v. Reich*,
 74 F.3d 1322 (D.C. Cir. 1996) .................................................................. 17, 22

*City of Cleburne v. Cleburne Living Ctr.*,
 473 U.S. 432 (1985) ...................................................................................... 28

*Clinton v. City of New York*,
 524 U.S. 417 (1998) .............................................................................. 18, 19, 21

*Dekker v. Weida*,
 679 F. Supp. 3d 1271 (N.D. Fla. 2023) .................................................... 26, 28

*Dep't of Com. v. New York*,
 588 U.S. 752 (2019) ...................................................................................... 16

*Duke Power Co. v. Carolina Envt'l Study Grp., Inc.*,
 438 U.S. 59 (1978) ........................................................................................ 17

*Gardner v. Toilet Goods Ass'n*,
 387 U.S. 167 (1967) ...................................................................................... 17

*HIAS, Inc. v. Trump*,
 985 F.3d 309 (4th Cir. 2021) ............................................................ 16, 18, 22, 30

ii

*INS v. Chadha*,
    462 U.S. 919 (1983)..................................................................................20

*Kadel v. Folwell*,
    100 F.4th 122 (4th Cir. 2024) (en banc) ...................................................*passim*

*Koe v. Noggle*,
    688 F. Supp. 3d 1321 (N.D. Ga. 2023).......................................................27

*Koontz v. St. Johns River Water Mgmt. Dist.*,
    570 U.S. 595 (2013)..................................................................................19

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
    2 F.4th 330 (4th Cir. 2021) (en banc)........................................................29

*Legend Night Club v. Miller*,
    637 F.3d 291 (4th Cir. 2011) .....................................................................30

*Mayor of Balt. v. Azar*,
    973 F.3d 258 (4th Cir. 2020) .....................................................................19

*Miller v. Brown*,
    462 F.3d 312 (4th Cir. 2006) ................................................................16, 17

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)..................................................................................29

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003)..................................................................................16

*Nken v. Holder*,
    556 U.S. 418 (2009)..................................................................................16

*Ostergren v. Cuccinelli*,
    615 F.3d 263 (4th Cir. 2010) .....................................................................30

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) .....................................................................................19

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979)...............................................................................24, 25

*Planned Parenthood S. Atl. v. Baker*,
    941 F.3d 687 (4th Cir. 2019) .....................................................................29

*Poe v. Labrador*,
    709 F. Supp. 3d 1169 (D. Idaho 2023)........................................................26

*Romer v. Evans*,
    517 U.S. 620 (1996)........................................................................... 29

*South Dakota v. Dole*,
    483 U.S. 203 (1987)........................................................................... 19

*St. Michael's Media v. Mayor & City Council of Balt.*, 566 F. Supp. 3d 327, 351
    (D. Md. 2021)................................................................................... 30

*Train v. City of N.Y.*,
    420 U.S. 35 (1975)...................................................................... 19, 21

*Trump v. United States*,
    603 U.S. 593 (2024)........................................................................... 18

*Washington v. Trump*,
    2025 WL 509617 (W.D. Wash. Feb. 16, 2025) ...................................... 17, 18

*Williams v. Kincaid*,
    45 F.4th 759 (4th Cir. 2022).................................................................. 24

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)...................................................................... 18, 20

*Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) ............................................................................. 20

**Statutes**

5 U.S.C. § 7301 ................................................................................... 19

42 U.S.C. § 300ff ................................................................................. 20

42 U.S.C. § 300ff-1 .............................................................................. 20

42 U.S.C. § 300ff-71 ............................................................................. 20

42 U.S.C. § 300w-7 ............................................................................... 21

42 U.S.C. § 300w-7(a)(2)......................................................................... 2

42 U.S.C. § 18114(1)-(5) ....................................................................... 19

42 U.S.C. § 18116 ................................................................................ 21

42 U.S.C. § 18116(a) ............................................................................. 2

Further Consolidated Appropriations Act, Pub. L. No. 118-47, § 202, 526 (2024).................... 19

iv

**Executive Orders**

Exec. Order No. 14,148, *Initial Rescissions of Harmful Executive Orders and Actions*, 90 Fed. Reg. 8237 (Jan. 20, 2025) ......................................................... 25

Exec. Order No. 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025)............................................................................................................ 1

Exec. Order No. 14,170, *Reforming the Federal Hiring Process and Restoring Merit to Government Service*, 90 Fed. Reg. 8621 (Jan. 20, 2025)........................ 25

Exec. Order No. 14,183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025)............................................................................... 25

Exec. Order No. 14,187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Jan. 28, 2025)................................................... 1

Exec. Order No. 14,190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025)........................................................................ 25

Exec. Order No. 14,201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 5, 2025)......................................................................................... 25

**Other Authorities**

*Transgender*, MERRIAM WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/transgender.................................................................... 24

U.S. CONST. Amendments V, XIV............................................................................. 22

**Constitutional Provisions**

U.S. CONST. art. I § 7 ............................................................................ 16, 17, 18, 19

U.S. CONST. art. I § 8 ............................................................................................. 16

U.S. CONST. Article I, § 7, cl. 2, 3 ......................................................................... 19

U.S. CONST. Article I, § 7, cl. 2 ............................................................................. 20

**INTRODUCTION**

Between January 29, 2025, and February 13, 2025, hospitals across the country abruptly halted medical care for transgender people under the age of nineteen, cancelling appointments and turning away some patients who have waited years to receive medically necessary care for gender dysphoria. This sudden shutdown in care was the direct and immediate result of Executive Order 14,187, issued by President Trump on January 28, 2025, directing all federal agencies to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end" gender affirming medical care for people under nineteen (the "Denial of Care Order").[1] The Denial of Care Order followed on the heels of and built upon Executive Order 14,168, issued on January 20, 2025, which commanded that "[f]ederal funds shall not be used to promote gender ideology," and directed all federal agencies to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology" (the "Gender Identity Order").[2] The President has celebrated the shutdown in care as proof that the Orders are "already having [their] intended effect." Gonzalez-Pagan Decl. Ex. A-16.

On February 13, 2025, this Court issued a temporary restraining order ("TRO") prohibiting Defendants from "conditioning or withholding federal funding based on the fact that a healthcare entity or health professional provides gender affirming medical care to a patient under the age of nineteen under section 3(g) of [the Gender Identity Order] and Section 4 of [the Denial of Care Order]." Dkt. 61. This Court issued its accompanying memorandum opinion on February 14. Dkt. 62 ("TRO Op."). Plaintiffs respectfully request that the Court adopt its analysis from the TRO

---

[1] Exec. Order No. 14,187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Jan. 28, 2025).

[2] Exec. Order No. 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025).

Opinion, particularly as to the justiciability of Plaintiffs' claims (TRO Op. 10-25); the likelihood of success on Plaintiffs' two *ultra vires* claims, which the Court termed the "Separation of Powers Claim" (*id.* at 26-37), and the "Contrary to Existing Statutes" claim (*id.* at 37-42); and its analysis of the remaining factors required to issue preliminary injunctive relief—namely, irreparable harm, balance of the equities, and the public interest. *Id.* at 45-52. Plaintiffs submit this memorandum of law primarily to discuss additional record evidence, including new Plaintiff declarations and new expert declarations, that further supports their claims and, more specifically, supports a finding that Plaintiffs are likely to succeed on their equal protection claim.

As the Court explained in its TRO Opinion, Plaintiffs are likely to succeed on the merits of their claims that these Orders are unlawful and unconstitutional. *Id.* at 26-45. President Trump does not have unilateral power to withhold federal funds Congress has authorized and signed into law, and he cannot impose conditions on the use of funds when Congress has not delegated that authority to him. Under the Constitution, Congress holds the power of the purse and the power to enact legislation. Simply put, "the Administration may not usurp Congress's power just because the administration of healthcare at issue is antithetical to the Administration's policies." *Id.* at 36.

President Trump also does not have the unilateral authority to direct agencies to take actions contrary to constitutional and statutory rights. Section 1557 of the Affordable Care Act ("ACA") and Section 1908 of the Public Health Service Act ("PHSA") prohibit healthcare entities from discriminating based on sex as a condition of receiving federal funding. *See* 42 U.S.C. § 18116(a); 42 U.S.C. § 300w-7(a)(2). President Trump cannot override these statutes and require federal grantees to engage in the same discrimination Congress prohibited. TRO Op. 37-42. Nor does he have the authority to violate the equal protection rights of thousands of transgender people

2

under nineteen, including the Transgender Plaintiffs,[3] by depriving them of necessary medical care solely on the basis of their sex and transgender status. *Id.* at 42-45.

To prevent these unconstitutional Executive Orders from continuing to inflict irreparable harm, the Court should convert the TRO into a preliminary injunction.

## STATEMENT OF FACTS

### A.    Medical Guidelines for Treating Gender Dysphoria

Gender dysphoria is a medical condition characterized by clinically significant distress caused by the incongruence between a person's gender identity and the sex they were assigned at birth. Shumer Decl. ¶¶ 45-58, 77; Antommaria Decl. ¶¶ 21-33; Karasic Decl. ¶¶ 54-63. If left untreated, gender dysphoria can have serious consequences for the health and wellbeing of transgender people, including depression, anxiety, and suicidality. Karasic Decl. ¶¶ 29, 52, 65, 105; Shumer Decl. ¶¶ 46, 129; Turban Decl. ¶ 12. The treatment for gender dysphoria is broadly referred to as gender affirming medical care. Shumer Decl. ¶¶ 45, 77; Karasic Decl. ¶ 87; Turban Decl. ¶ 16.

Doctors in hospitals and other medical facilities receiving federal funding follow evidence-based and widely accepted clinical practice guidelines to assess, diagnose, and treat adolescents and adults with gender dysphoria. Shumer Decl. ¶¶ 45-58, 77; Antommaria Decl. ¶¶ 34-47; Karasic Decl. ¶¶ 54-63. Decades of clinical experience and a large body of scientific and medical literature support these guidelines, which the major medical associations in the United States recognize as authoritative. Antommaria Decl. ¶¶ 34-47; Shumer Decl. ¶¶ 51, 84-101; Karasic Decl. ¶¶ 63, 84-89; Turban Decl. ¶¶ 14-18. These guidelines are evidence-based, and the evidence supporting

---

[3] The Transgender Plaintiffs are Plaintiffs Gabe Goe, Bella Boe, Cameron Coe, and Robert Roe (the "Minor Plaintiffs"), Plaintiffs Lawrence Loe and Dylan Doe (the "Adult Plaintiffs"), and certain PFLAG members under age nineteen who also are transgender.

gender affirming medical care is of comparable quality to the evidence supporting other treatments in pediatrics. Antommaria Decl. ¶¶ 6, 29, 32, 39; Karasic Decl. ¶¶ 60, 62; Shumer Decl. ¶¶ 54, 56. Gender affirming medical care is not experimental, and contrary to the Denial of Care Order's assertions, it is not based on "junk" science. Antommaria Decl. ¶¶ 21, 27, 38; Shumer Decl. ¶ 101.

Medically indicated treatments for some adolescents may include puberty-delaying treatment and hormone therapy. Shumer Decl. ¶¶ 59-60, 62. For many transgender adolescents, the onset of puberty, which leads to physical changes in their bodies that are incongruent with their gender identity, can cause extreme distress. Shumer Decl. ¶ 39; Karasic Decl. ¶ 70; Bond Decl. ¶¶ 15, 18; Bruce Boe Decl. ¶ 26; Claire Coe Decl. ¶ 30; Chapman Decl. ¶¶ 10, 36. Puberty-delaying medication allows transgender adolescents to delay these changes, minimizing and potentially preventing the heightened gender dysphoria caused by the development of secondary sex characteristics incongruent with their gender identity. Shumer Decl. ¶¶ 39, 49, 62, 64-72; Karasic Decl. ¶ 70. Without this treatment, an adolescent's body will undergo changes that can cause extreme distress and may be difficult or impossible to later reverse. Shumer Decl. ¶ 68. For some older adolescents and adults, treatment with gender affirming hormone therapy (e.g., testosterone for transgender boys, and estrogen and testosterone suppression for transgender girls) may be medically necessary. Karasic Decl. ¶ 73. Hormone therapy allows patients to develop physical characteristics that align with their gender identity instead of their sex assigned at birth. Shumer Decl. ¶¶ 62, 72-77; Karasic Decl. ¶ 71. Some transgender male older adolescents and adults may need masculinizing chest surgery to help bring their bodies into alignment with their gender identity. Karasic Decl. ¶ 72, 96. This surgery is much more commonly performed on cisgender boys (as treatment for gynecomastia) than on transgender males. *Id.* ¶ 96. Minors may receive gender affirming medical care only with parental consent. Antommaria Decl. ¶¶ 48, 49; Karasic

4

Decl. ¶ 68; Shumer Decl. ¶ 44. Once a transgender adolescent begins puberty, it is rare for them to later re-identify with their birth-assigned sex. Karasic Decl. ¶ 95, 97; Turban Decl. ¶ 25.

These same treatments used to treat gender dysphoria are also used for other conditions in adolescents and adults. Shumer Decl. ¶¶ 70, 71, 86. Puberty-delaying medication is used to treat children with central precocious puberty and to treat adolescents and adults with hormone-sensitive cancers and endometriosis. Shumer Decl. ¶ 71. For cisgender adolescents experiencing delayed puberty, boys are prescribed testosterone and girls are prescribed estrogen. Shumer Decl. ¶ 86. In general, puberty-delaying medication and hormone therapy are prescribed to cisgender boys and girls to allow them to undergo a typical puberty for boys and girls, respectively. *Id.* Medication to suppress testosterone is also provided to cisgender girls with Polycystic Ovarian Syndrome to reduce some symptoms of the condition, including excess facial hair. *Id.* ¶ 71, n.1.

The potential risks associated with these interventions when used to treat gender dysphoria are comparable to the risks associated with many other medical treatments to which parents routinely consent on behalf of their children, and for which otherwise competent adults can consent on their own. Shumer Decl. ¶ 70; Antommaria Decl. ¶ 57.

**B.    The Executive Orders**

President Trump issued the Gender Identity Order on January 20, 2025. Section 3(g) of the Order declares: "Federal funds shall not be used to promote gender ideology." President Trump further directs that "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds to do not promote gender ideology." *Id.* The Order claims that "'[g]ender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." *Id.* § 2(f). It further asserts that "[g]ender ideology is internally inconsistent, in that it diminishes sex as an identifiable

or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body." *Id.*

On January 28, 2025, President Trump issued the Denial of Care Order, which builds on the Gender Identity Order. Section 4 of the Denial of Care Order directs the immediate defunding of medical institutions that provide gender affirming medical care to patients under age nineteen for the purpose of gender transition. Denial of Care Order § 4. The Orders do not seek to prohibit federal funding to entities that provide these same treatments for other medical conditions; rather, they prohibit federal funding to entities only when the medical care is for the purpose of gender transition—that is, to align a patient's body with a gender identity different from their sex assigned at birth. *Id.* §§ 2(c), 4. Importantly, the Orders are not limited to grants used for or related to gender affirming medical care. Rather, President Trump has unilaterally directed that *all* federal medical and research grants be stopped, regardless of whether the funds are used for or related to gender affirming medical care in any way. *Id.*

The Orders are part of a systematic effort by the Trump Administration to target what it terms "gender ideology" and transgender people. In his first nine full days in office, President Trump signed nine Executive Orders targeting transgender people. Am. Compl. ¶¶ 72-76.

Defendant Health Resources and Services Administration ("HRSA") has issued notices to grant recipients that HRSA grant funds may not be used for activities that "do not align with" the Orders and any "vestige, remnant, or re-named piece of any programs in conflict with these E.O.s are terminated in whole or in part." Gonzalez-Pagan Decl. Ex. A-1.[4]  The Centers for Disease

---

[4] Although the HRSA notice appears to have been temporarily rescinded, "there is ample evidence demonstrating that the funding restrictions remain in full effect, despite the HRSA recission." TRO Op. 15. Indeed, after HHS was ordered to restore webpages it had taken down pursuant to the Gender Identity Order, Defendant HHS's subagencies have appended notices to these webpages that the "Administration rejects gender ideology and condemns the harms it causes to children, by promoting their chemical and surgical mutilation . . . This page does not reflect biological reality and therefore the Administration and this Department reject[] it." Gonzalez-Pagan Decl. Exs. A-17–A-18.

6

Control and Prevention ("CDC") has done the same, ordering grant recipients to "immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting or inculcating gender ideology at every level and activity." Gonzalez-Pagan Decl. Ex. A-2.

C.     The Impact of the Executive Orders on the Provision of Medical Care and Harm to Public Health.

The Orders had direct and immediate effects on the provision of medical care to transgender people under nineteen.[5] As the Court already has found, "medical institutions [across the United States] immediately halted all gender affirming medical care for those under the age of nineteen soon after the issuance of the Executive Orders." TRO Op. 24; *see also* Poe Decl. ¶ 10; Noe Decl. ¶ 6; Gonzalez-Pagan Decl. Exs. A-3–A-15. Hospitals and other healthcare institutions fear that if they do not stop providing gender affirming medical care to transgender patients under nineteen, they will immediately lose significant and essential federal funding, including funds unrelated to the provision of treatment of gender dysphoria. Indeed, the hospitals "unambiguously cite the Executive Orders as the reason for ceasing care." TRO Op. 25 n.21. President Trump has touted these shutdowns as proof that the Orders are "already having [their] intended effect." *See* Gonzalez-Pagan Decl. Ex. A-16.

D.     The Harm of the Executive Orders to the Individual Plaintiffs

**Boe Family:** Bruce Boe and his 12-year-old daughter Bella live in New York City. Bruce Decl. ¶¶ 2-3, 6. Bella is transgender. Bruce Decl. ¶ 6; Bella Decl. ¶ 4. From a young age, Bella strongly identified with typical feminine expression and interests and feared the idea of growing into a man. Bruce Decl. ¶ 6; Bella Decl. ¶ 5. Male puberty feels distressing for Bella because she

---

[5] *See* Am. Compl. ¶¶ 77-99; George Goe Decl. ¶¶ 21-27; Bruce Boe Decl. ¶¶ 23-28; Claire Coe Decl. ¶¶ 28-34; Rachel Roe Decl. ¶¶ 20-28; Chapman Decl. ¶¶ 31-34, 36; Lawrence Loe Decl. ¶¶ 25-28; Dylan Doe Decl. ¶¶ 28-35; Bond Decl. ¶ 14; Jane Doe 1 Decl. ¶ 17; Jane Doe 2 Decl. ¶ 22; Jane Doe 3 Decl. ¶ 14; Jane Doe 4. Decl. ¶ 13; Jane Doe 5 Decl. ¶ 28; Jane Doe 6 Decl. ¶ 18; Sheldon Decl. ¶ 29; Birnbaum Decl. ¶¶ 13-15; Poe Decl. ¶¶ 9-11; Noe Decl. ¶ 6.

7

worries about developing masculine features that may be permanent and are the opposite of who she is as a girl. Bella Decl. ¶ 13. After Bella was diagnosed with gender dysphoria, Bella, her parents, and her doctors at NYU Langone decided to begin puberty delaying medication for Bella. They initiated this treatment only after reviewing the risks, benefits, and alternatives. Bruce Decl. ¶¶ 17, 19; Bella Decl. ¶ 14. But on January 29, 2025, NYU Langone shut down all new procedures and prescriptions related to gender affirming medical care for patients under nineteen because of the Orders. Bruce Decl. ¶ 25. When Bella heard the news, she was distraught. Bruce Decl. ¶ 27. Bella wants to be like the other women in her life when she is older, and needs medical treatment to get there. Bella Decl. ¶¶ 17-18. The Orders prevent Bruce from doing his job as a parent to protect Bella and get her the medical care she needs. Bruce Decl. ¶ 29.

**Coe Family:** Claire Coe lives in New York City with her 12-year-old child Cameron Coe. Claire Decl. ¶¶ 3-4; Cameron Decl. ¶ 2. Cameron is nonbinary. Claire Decl. ¶ 4; Cameron Decl. ¶ 4.[6] Cameron was designated male at birth, but they have consistently expressed a nonbinary identity. Claire Decl. ¶¶ 4-6; Cameron Decl. ¶¶ 4-5, 7. As Cameron started puberty, Claire realized they were increasingly uncomfortable with their body, which manifested in refusing to go swimming or be shirtless and being anxious in public. Claire Decl. ¶ 15; Cameron Decl. ¶ 10. Cameron has since been diagnosed with gender dysphoria and is starting male puberty, which will cause permanent changes to their body. Claire Decl. ¶¶ 21-22, 24; Cameron Decl. ¶ 13. To allow Cameron time to decide which puberty is right for them, Cameron received a three-month puberty blocking injection. Claire Decl. ¶ 22-23, 25; Cameron Decl. ¶¶ 13-14. With puberty blockers, Cameron is less anxious, stressed, and vigilant about their body, can focus on school, and has hope

---

[6] A nonbinary person is a person whose gender identity is neither exclusively male nor exclusively female even though they were designated the sex of male or female at birth. *Cf.* Karasic Decl. ¶ 35. Thus, like other transgender people, their gender identity differs from their birth-designated sex. *See infra* note 9; Karasic Decl. ¶ 41.

about how they look now and will look in the future. Claire Decl. ¶ 26; Cameron Decl. ¶ 14. Cameron had an appointment scheduled at NYU Langone to receive a longer-acting puberty blocker, but NYU Langone cancelled it because of the Orders. Claire Decl. ¶ 29. After two weeks of uncertainty and following the filing of this suit, Cameron was able to get their implant. Claire Decl. ¶ 33; Cameron Decl. ¶ 16. But the Coes are terrified about how Cameron will continue to get care going forward. Claire Decl. ¶¶ 33-34; Cameron Decl. ¶ 16.

**Goe Family:** George Goe and his 14-year-old son Gabe live in Maryland. George Decl. ¶ 2. Gabe came out as transgender at age 12. George Decl. ¶¶ 2, 7; Gabe Decl. ¶ 4. After socially transitioning with a boys' name, he/him pronouns, a boys' haircut, and more masculine clothes, Gabe has become more confident, cracking jokes and taking better care of himself. George Decl. ¶¶ 8-10; Gabe Decl. ¶¶ 13-14. But Gabe's physical body is holding him back, making it hard to keep up his confidence. George Decl. ¶ 11. Puberty caused Gabe to feel at war with his increasingly feminine body, and he experienced severe anxiety and distress. Gabe Decl. ¶ 9. Gabe has been diagnosed with gender dysphoria. George Decl. ¶¶ 12-15; Gabe Decl. ¶ 15. After taking initial steps to control his periods and reviewing the risks, benefits, and alternatives, Gabe's parents, Gabe, and Gabe's doctors at Children's National all decided that testosterone was the appropriate treatment. George Decl. ¶¶ 16-19. Gabe's appointment to start testosterone was scheduled for March 2025. George Decl. ¶ 19. But on January 30, 2025, Children's National told George that because of the Orders, the hospital would not be issuing new prescriptions or processing refills on existing prescriptions for gender affirming medical care for people under nineteen. George Decl. ¶ 22. Now Gabe will suffer because he cannot receive medication for his gender dysphoria. George Decl. ¶ 25.

9

**Roe Family:** Rachel Roe lives in Massachusetts with her 16-year-old son Robert. Rachel Decl. ¶ 3; Robert Decl. ¶¶ 2-3. Robert is transgender. Rachel Decl. ¶ 6; Robert Decl. ¶ 5. Robert has identified as a boy for as long as he can remember. Rachel Decl. ¶ 6; Robert Decl. ¶ 6. When Robert was eight, he began socially transitioning by using a boy's name, he/him pronouns, and presenting himself as a boy. Rachel Decl. ¶ 8; Robert Decl. ¶ 8. At nine, Robert's pediatrician diagnosed him with gender dysphoria. Robert's doctors at Boston Children's Hospital later confirmed the diagnosis. Rachel Decl. ¶¶ 9-10; Robert Decl. ¶ 9. Until Robert started puberty, feeling supported in living as a boy was all he needed to thrive. Rachel Decl. ¶ 10; Robert Decl. ¶ 9. But when Robert's doctors saw he was starting puberty at eleven, they reviewed potential options with Rachel and Robert. Robert started on puberty blockers. Rachel Decl. ¶¶ 11-12; Robert Decl. ¶ 10. Robert thrived while on blockers because he did not have the anxiety of worrying about physical changes that did not match his male identity. Rachel Decl. ¶ 15; Robert Decl. ¶ 10. But Robert could not stay on blockers indefinitely; after reviewing the risks, benefits, and alternatives, Robert started on testosterone, which he has now been on for two years. Rachel Decl. ¶¶ 16-18; Robert Decl. ¶¶ 11, 14. Robert had a routine check-up appointment scheduled on January 29, 2025, but that morning, the hospital informed Rachel that all appointments for patients under nineteen were cancelled due to the Orders. Rachel Decl. ¶¶ 21-22; Robert Decl. ¶¶ 17-18. When he heard, Robert felt numb. Robert Decl. ¶ 19. If he has to stop hormone therapy, he will start female puberty. *Id*. Robert has been clear he is a boy since he was two years old and has been living as a boy since he was eight; it would be alarming and terrifying for him to suddenly develop at sixteen feminine features completely inconsistent with his male identity. Rachel Decl. ¶ 23.

**Lawrence Loe:** Plaintiff Lawrence Loe is an 18-year-old transgender man living in New York City. Loe Decl. ¶ 2. When Lawrence started puberty, he was depressed and unable to

function. *Id.* ¶ 5. After two years, he realized female puberty felt so wrong because he is not a girl; he is a transgender boy. *Id.* ¶¶ 5, 7. Lawrence wanted to take puberty blockers, but his parents could not agree, so he did not receive them. *Id.* ¶ 9. Instead, Lawrence saw a therapist. But his mental health continued to deteriorate. *Id.* ¶ 9. When Lawrence was sixteen, and after receiving a gender dysphoria diagnosis, his parents consented to him starting testosterone—bringing his years of misery to an end. *Id.* ¶¶ 15-16. As his voice deepened and body changed, Lawrence was able to talk in class and to start singing again. *Id.* ¶ 19. Now eighteen, Lawrence still experiences significant dysphoria because he developed breasts during puberty; he cannot leave his room without binding his chest, which is painful. *Id.* ¶ 21. After years of suffering, Lawrence was scheduled for chest masculinization surgery for February 2025 at NYU Langone, after he turned eighteen. *Id.* ¶¶ 22-23. But on January 29, 2025, NYU called Lawrence to cancel his surgery because of the Orders. *Id.* ¶ 25. Lawrence's life is on hold while he waits to get surgery. *Id.* ¶ 28.

**Dylan Doe:**  Dylan Doe is an eighteen-year-old transgender man living in Massachusetts. Doe Decl. ¶¶ 3, 25. As a young child, Dylan would wish on dandelions that he would wake up as a boy. *Id.* ¶ 4. When he was 12, Dylan realized he was a transgender boy. *Id.* ¶ 6. He told his parents and started to socially transition with a new haircut, clothes, he/him pronouns, and a boys' name. *Id.* ¶¶ 7-8. Dylan's therapist diagnosed him with gender dysphoria, and after reviewing the risks, benefits, and alternatives, Dylan's parents, doctors, and Dylan decided that Dylan would start puberty blocking medication to give him more time to explore his identity. *Id.* ¶¶ 13-15. The blockers changed Dylan's life—he felt less panicked, and stopped getting his period, which was a huge source of dysphoria. *Id.* ¶ 16. At fourteen years old, Dylan's parents, his doctors, and Dylan all decided he would start testosterone to continue to live consistent with his identity and expression as a boy. *Id.* ¶¶ 17-18. After a series of anti-transgender bills passed in Tennessee,

Dylan's family moved to Massachusetts, where Dylan found a new doctor. *Id.* ¶¶ 21-22, 26. Dylan sees his doctor every four months for a long-acting form of testosterone and injections to stop his period. *Id.* ¶¶ 26-27. Dylan was supposed to have an appointment for testosterone on January 31, 2025, but the doctor cancelled it because of the Orders. *Id.* ¶¶ 28-31. Dylan is worried and anxious about his continued ability to look like and live as the man he knows himself to be. *Id.* ¶¶ 32-33.

### E. The Harm of the Executive Orders to the Members of PFLAG and GLMA

In addition to the individual plaintiffs in this case, who are all PFLAG members, many other PFLAG members' children are being monitored for the appropriate time to begin puberty blockers and/or hormone therapy as part of a medically prescribed course of care for gender dysphoria. Bond Decl. ¶ 14. Since the Orders, PFLAG has heard from members across the country that their or their children's appointments for gender affirming medical care were cancelled, putting those adolescents and young adults at risk of serious mental and physical harm—the very reasons families seek this medical care in the first place. *Id.*

For example, PFLAG member Kristen Chapman and her 17-year-old daughter, W.G., live in Virginia. Chapman Decl. ¶ 4. W.G. is transgender and has been diagnosed with gender dysphoria. *Id.* ¶ 17. The Chapmans fled Tennessee after it passed a statewide ban on gender affirming medical care for transgender minors, then struggled to find a doctor in Virginia who could continue W.G.'s hormone treatment. *Id.* ¶¶ 19, 21-22, 27-30. Hours before their long-awaited appointment at Children's Hospital of Richmond on January 29, 2025, a member of the VCU staff told the Chapmans that, due to the Orders, VCU would no longer be able to provide W.G. necessary medical treatment. *Id.* ¶¶ 30, 32.

Similar stories from other PFLAG members abound. In response to the Orders, Denver Health cancelled gender affirming medical care appointments, *see* Jane Doe 1 Decl. ¶¶ 16, 17, 19; as did NYU Langone, *see* Jane Doe 3 Decl. ¶¶ 7, 12, 14; Children's Wisconsin, *see* Jane Doe 4

12

Decl. ¶¶ 7, 11, 13-14; and University of Illinois Health, *see* Jane Doe 2 Decl. ¶¶ 15, 18, 22. Some families are on their second or third state seeking care. Jane Doe 6's daughter lost care at Children's Colorado. They had been traveling to Colorado after Oklahoma banned care. Jane Doe 6 Decl. ¶¶ 15, 16. Jane Doe 5 is moving her family from Florida to Maryland so her daughter can receive care at Children's National. But after Children's National cancelled due to the Orders, she pivoted to Children's Hospital Los Angeles, only to face another potential appointment cancellation for the same reason. Jane Doe 5 Decl. ¶¶ 3, 25, 27-30. Each of these families, who initiated this medically necessary care only after a careful and deliberative process with healthcare providers, is terrified about whether they will be able to find providers to resume this care in time to prevent significant and potentially permanent harm to their adolescent children from untreated gender dysphoria.

Since the Denial of Care Order was issued, GLMA's members and their patients have been immediately negatively affected. Sheldon Decl. ¶ 22. Many GLMA members are employed by medical institutions that receive federal grants, including some medical provider members that provide gender affirming medical care to patients under nineteen. *Id.* ¶ 24.

One of GLMA's members is Kyle Koe, a clinician-researcher at Boston Medical Center ("BMC") specializing in sexual and gender minority health who depends on grant funding, including NIH funding. Koe Decl. ¶¶ 3-5. BMC also receives millions of dollars in federal grants, including from Defendants NIH and HRSA, the CDC, and Agency for Healthcare Research and Quality ("AHRQ"), among others. *Id.* ¶ 6. Most of these grants do not relate to medical interventions to treat gender dysphoria. *Id.* As a provider, Kyle treats both cisgender and transgender patients, including for gender dysphoria. *Id.* ¶ 8. Like other healthcare providers, when treating gender dysphoria, he uses the same medications to treat transgender people as he uses to treat cisgender people with hormone deficiencies. *Id.* ¶ 9.

13

Another of GLMA's members is Dr. Jeffrey Birnbaum, an adolescent medicine specialist and board-certified pediatrician at SUNY Downstate Health Sciences University. Birnbaum Decl. ¶¶ 3, 5. He is a clinician and researcher focusing on caring for teens and young adults living with HIV and providing gender affirming medical care, including pubertal suppression and hormone therapy. *Id.* ¶¶ 3, 10. Dr. Birnbaum's research and clinical work, including the primary medical care he provides to HIV+ youth, depend on federal grants, including from Defendants NIH and HRSA, and his institutions do as well, receiving millions of dollars for purposes that have no bearing on treating gender dysphoria. *Id.* ¶¶ 6-8.

Another GLMA member, Dr. Peyton Poe, is a board-certified pediatrician at Children's National in D.C. Their practice includes providing gender-affirming medical care. Poe Decl. ¶¶ 3, 6. Within hours of the Denial of Care Order being signed, Children's National informed providers that "effective immediately, no prescriptions should be written or refilled for gender-affirming medications for patients under 18 years old." *Id.* ¶ 10. The hospital later clarified this applied to patients nineteen and under. *Id.* ¶ 11. Dr. Poe had to contact patients with imminent appointments and inform them they were no longer able to prescribe their medications; they received a flood of messages from patients and families expressing distress, anxiety, and fear in response. *Id.* ¶ 13. Dr. Poe is deeply concerned that disruptions to care may cause transgender adolescents to experience mental health crises, including possible self-harm. *Id.* ¶ 16. Children's National receives extensive federal funding, including from Defendant NIH. *Id.* ¶ 7.

Dr. Natalie Noe, a board-certified physician practicing at a major healthcare system in Colorado, is another GLMA member. Dr. Noe provides gender-affirming medical care to patients under nineteen. Noe Decl. ¶¶ 3-5. Her healthcare institution, which receives substantial federal funding including from Defendants HHS, HRSA, CDC, and NIH, stopped providing new

14

prescriptions for puberty blockers or hormones and performing surgeries as a direct result of the Orders. *Id*. ¶¶ 6, 10. Dr. Noe has had heartbreaking conversations with patients and parents about not being able to provide this care as she always has, and she worries for their mental health; her institution developed a new crisis referral protocol because of the termination of care. *Id*. ¶¶ 7-8.

Because the Orders mandate that all federal funding be stripped from a medical institution if it continues to provide gender affirming medical care—even when the funding is not related to that care—the Orders have placed Drs. Koe, Birnbaum, Poe, and Noe and other clinicians, researchers, and medical institutions in an untenable position. They force physicians, including these GLMA members, to make an impossible choice between denying care to a vulnerable minority community or not being to provide care to anyone at all. Koe Decl. ¶¶ 11-13; Birnbaum Decl. ¶¶ 13-14; Noe Decl. ¶ 10.

One of the guiding ethics of medicine is to treat all patients equally. Sheldon Decl. ¶ 27. To not permit—indeed, to actively forbid—a provider from making individualized assessments of the medical needs of all patients harms patients by preventing them from accessing needed care even at trusted facilities and practices. *Id*. The Orders are causing precisely this harm. *Id.* ¶ 29. Patients and parents have called GLMA members in tears expressing extreme distress. *Id.* GLMA members at institutions that have suspended care have received calls from their patients who are experiencing significant distress and even suicidality. *Id*. And even at institutions that are providing care, the widespread fear has led many patients to express feelings of extreme distress and even suicidality because they fear losing care. *Id.*

## LEGAL STANDARD

To obtain a preliminary injunction, the moving party must show: "(1) the party is likely to succeed on the merits of the claim; (2) the party is likely to suffer irreparable harm in the absence of an injunction; (3) the balance of hardships weighs in the party's favor; and (4) the injunction

serves the public interest." *HIAS, Inc. v. Trump*, 985 F.3d 309, 318 (4th Cir. 2021). The balance

of equities and public interest factors "merge when the Government is the opposing party." *Nken*

*v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS.

### A.    Plaintiffs Have Standing and Their Claims Are Justiciable.

**Standing.** To have standing, "a plaintiff must present an injury that is concrete,

particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and

likely to be redressed by a favorable ruling." *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019)

(cleaned up). The Court already has found that "Plaintiffs have established that the hardships they

are suffering, as well as the hardships to PFLAG's members, are caused by the discontinuation of

what has been deemed by medical professionals to be essential care. This hardship comes as a

result of the conditioning on federal funding outlined in the Executive Orders and is non-

speculative, concrete, and potentially catastrophic." TRO Op. 12-13. Moreover, PFLAG and

GLMA have associational standing to assert claims on behalf of their members, including those

members who have submitted declarations establishing "concrete, particularized, and actual or

imminent" injuries emanating from the Orders. *Dep't of Com.*, 588 U.S. at 766.

**Ripeness.** Determining whether an action is ripe requires courts to evaluate "the fitness of

the issues for judicial decision" and "the hardship to the parties of withholding court

consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). "A case is

fit for judicial decision when the issues are purely legal" and not "dependent on future

uncertainties." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006). Plaintiffs' claims are ripe. *See*

TRO Op. 10-13.

Here, Plaintiffs bring a "facial challenge" to the Orders' constitutionality, and this issue

16

JA168

"does not depend on future uncertainties." TRO Op. 11. The Gender Identity Order declares: "[f]ederal funds shall not be used to promote gender ideology." Gender Identity Order § 3(g). The Denial of Care Order instructed agencies to "immediately" "ensure that institutions receiving Federal research or education grants end" the provision of gender affirming medical care. Denial of Care Order § 4. Agencies, including Defendants HRSA and the CDC, have already acted on these orders and limited how grant recipients may use federal funding. *See* Am. Compl. ¶ 81; Dkt. 35-5; TRO Op. 11-12; Gonzalez-Pagan Decl. ¶ 5. Based on the "tangible steps taken by at least two agencies to comply with the Executive Orders, along with the Administration's unequivocal statements outside of the context of this litigation, the legal claims are sufficiently viable and do not depend on future uncertainties." TRO Op. 12.

The Orders have also had an "immediate and substantial impact upon" Plaintiffs, many of whom have suffered substantial disruptions and delays in their treatment. *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 171 (1967). "[D]elayed resolution of these issues would foreclose any relief from the present injury," particularly to the loss of treatment which may cause lasting, permanent effects. *Duke Power Co. v. Carolina Envt'l Study Grp., Inc.*, 438 U.S. 59, 82 (1978); Shumer Decl. ¶¶ 64, 121. And all Plaintiffs have suffered "immediate harm to their constitutionally protected rights." *Miller*, 462 F.3d at 321.

**Justiciability**. The Executive Orders are also reviewable. *See* TRO Op. 17-25. Private parties may "sue to enjoin unconstitutional actions by state and federal officers." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *see also Washington v. Trump*, 2025 WL 509617, at \*7 (W.D. Wash. Feb. 16, 2025). Thus, even when agency officials are "acting at the behest of the President . . . courts have power to compel subordinate executive officials to disobey illegal Presidential commands." *Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996)

(cleaned up).

Finally, the Orders' boilerplate savings clauses do not "immunize" the Orders from judicial review. *HIAS*, 985 F.3d at 325; *see also Washington v. Trump*, 2025 WL 509617, at *13. The Fourth Circuit has already held that "purely theoretical savings clause[s]," *i.e.*, clauses "with no method or standard for invoking [them], the application of which would undermine the" Orders' substantive requirements, would render judicial review a "meaningless exercise." *HIAS*, 985 F.3d at 325.

**B.    The Executive Orders Are *Ultra Vires* Because They Exceed the President's Authority, Infringe Upon Congress's Powers, and Violate Article I's Framework for Federal Legislation.**

The Executive Orders are *ultra vires* actions that exceed the bounds of Article II, infringe upon Congress's authority under Article I to control the public fisc, and violate Article I's Bicameralism and Presentment Clauses. *See* TRO Op. 26-37.

Federal grants are federal law enacted by Congress, and conditioning or cancelling federal grants amounts to amending or repealing federal law. *Clinton v. City of New York*, 524 U.S. 417, 444 (1998) (cancellations "are the functional equivalent of partial repeals of Acts of Congress"). Defendants admit the Orders "direct agencies to impose a new *condition* on grant funding" to delineate "what sorts of grants the Executive Branch has chosen to subsidize." Dkt. 55 at 4, 14 (emphasis in original); TRO Op. 28. The Orders thus attempt to unilaterally amend federal law.

But the President lacks the power to condition federal funds. "The President's authority to act necessarily 'stem[s] either from an act of Congress or from the Constitution itself.'" *Trump v. United States*, 603 U.S. 593, 607 (2024) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). Neither federal statute nor Article II authorize the President to amend or repeal federal statutes. The Denial of Care Order identifies no statutory authority to "immediately" terminate grants, nor do the HRSA and CDC terminations. The Gender Identity Order cites only a

18

federal law inapplicable to either federal grants or gender affirming medical care. *See* 5 U.S.C. § 7301. This is plainly insufficient. As this Court has already found, "Congress has not authorized the Administration to withhold federal grant monies from medical institutions that provide gender affirming care for transgender youth." TRO Op. 29.

Article II also does not, and cannot, justify the Orders. Nothing in Article II "authorizes the President to enact, to amend, or to repeal statutes," in whole or in part. *Clinton*, 524 U.S. at 438. Nor does the Constitution or any statute vest the President with a general impoundment power. Quite the opposite. The Impoundment Control Act, 2 U.S.C. §§ 683, 684, prohibits the President or federal agencies from impounding lawfully appropriated funds. Courts thus have regularly rejected arguments that the President may refuse to disperse federal funds on a whim, notwithstanding any "policy reasons" for wanting to do so. *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013); *Clinton*, 524 U.S. at 442; *cf. Train v. City of N.Y.*, 420 U.S. 35, 38 (1975).

The Executive's unilateral attempt to terminate federal grants also infringes on Congress's power of the purse. *See* U.S. CONST. art. I, § 7, cl. 2, 3. Only Congress may condition how public funds are spent. *See generally South Dakota v. Dole*, 483 U.S. 203 (1987); *Koontz v. St. Johns River Water Mgmt. Dist.,* 570 U.S. 595 (2013). When Congress intends to place conditions on federal funds, "it has proved capable of saying so explicitly." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17-18 (1981); *see, e.g.*, Further Consolidated Appropriations Act, Pub. L. No. 118-47, § 202, 526 (2024). Critically, Congress has imposed *no* conditions on federal grants regarding gender affirming medical care.[7]

The Orders run roughshod over Congress's authority by conditioning federal grants on

---

[7] Far from delegating open-ended authority to the Executive Branch to "end" particular medical practices, Congress through Section 1554 of the ACA has *prohibited* the Executive Branch from taking action that burdens access to and communications regarding appropriate health care. 42 U.S.C. § 18114(1)-(5); *see also Mayor of Balt. v. Azar*, 973 F.3d 258, 288 (4th Cir. 2020).

19

grantees' immediate agreement to "end" gender affirming medical care and not to promote "gender ideology." Denial of Care Order § 4; Gender Identity Order § 3(g). The Orders thus unconstitutionally subordinate Congress's purpose to the President's preferences. They do "not direct that a congressional policy be executed in a manner prescribed by Congress" but instead direct "that a presidential policy be executed in a manner prescribed by the President." *Youngstown*, 343 U.S. at 588.

The Ryan White HIV/AIDS Program, dispensed by HRSA, exemplifies this incongruity. The Ryan White Program provides grants to provide family-centered care for youth in communities disproportionately affected by the Human Immunodeficiency Virus (HIV). *See* 42 U.S.C. § 300ff; 42 U.S.C. § 300ff-71. Congress placed one condition on these grants: The funds may not be used to provide "individuals with hypodermic needles or syringes so that such individuals may use illegal drugs." 42 U.S.C. § 300ff-1. The Denial of Care Order strips grantees, including Dr. Birnbaum, of their Ryan White Program funding if they also provide evidence-based gender affirming medical care. *See* Birnbaum Decl. ¶¶ 7, 10, 14. Because the Order applies even to grantees who comply with the conditions attached to their funding and utilize their funds to effectuate the program's purposes, the Order forces a Presidential policy that is "incompatible with the expressed or implied will of Congress," *Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015), and unconstitutionally intrudes upon the Congressional prerogative to control the public fisc.

Finally, the Orders not only usurp congressional powers, but unconstitutionally bypass the legislative process altogether. Article I requires that every bill pass in both the House of Representatives and the Senate before it is presented to the President. U.S. CONST. art. I, § 7, cl. 2. "Amendment and repeal of statutes, no less than enactment, must conform with Art. I." *INS v. Chadha*, 462 U.S. 919, 954 (1983). "Article I does not allow the President to circumvent

20

JA172

Bicameralism and Presentment by unilaterally amending or canceling federal appropriations via executive order." TRO Op. 37 (citing *Clinton*, 524 U.S. at 448); *see also Train*, 420 U.S. at 38.

The Orders disregard this fundamental process. Defendants admit that the Orders "impose a new *condition* on grant funding." Dkt. 55 at 14. But imposing additional terms on, or terminating, a grant is equivalent to amending or repealing a federal statute and must abide by Article I's Bicameralism and Presentment requirements. The Orders are a unilateral attempt to modify federal legislation and are not the "product of the 'finely wrought' procedure that the Framers designed." *Clinton*, 524 U.S. at 440.

### C.    The Executive Orders Are *Ultra Vires* Because They Conflict with Laws that Prohibit Discrimination on the Basis of Sex.

The Executive Orders are also *ultra vires* because they impermissibly direct agencies to act in contravention of Section 1557 of the ACA, 42 U.S.C. § 18116, and Section 1908 of the PHSA, 42 U.S.C. § 300w-7, which prohibit health care entities receiving federal financial assistance from discriminating against individuals on the basis of sex. *See* TRO Op. 37-42.

In *Bostock v. Clayton County*, 590 U.S. 644, 660 (2020), the Supreme Court held that discrimination "because of . . . sex" under Title VII includes discrimination based on transgender status. And in *Kadel v. Folwell*, 100 F.4th 122, 164 (4th Cir. 2024) (en banc), the Fourth Circuit held *Bostock*'s reasoning applies to "discrimination on the basis of sex" under Section 1557. There is no reason *Kadel*'s "application of *Bostock*'s reasoning should not also extend to Section 1908 of the PHSA, which is nearly identical in wording to Section 1557 of the ACA." TRO Op. 39.

Here, the Orders "facially differentiate on the basis of transgender identity." *Id.* Allowing or disallowing treatment based on whether the treatment aligns with a person's sex assigned at birth "is textbook sex discrimination" under *Bostock*, and under Section 1557 of the ACA and Section 1908 of the PHSA. *Kadel*, 100 F.4th at 153, 164.

21

As the Court already concluded, "Because the challenged portions of the Executive Orders are facially discriminatory on the basis of transgender identity, and therefore sex under *Kadel* and *Bostock,* in violation of Section 1557 of the ACA and Section 1908 of the PHSA, . . . Plaintiffs are likely to succeed on the merits of their *ultra vires* statutory claim." TRO Op. 42. President Trump does not have the power to "override[]" Section 1557 of the ACA and Section 1908 of the PHSA by requiring federal grantees to engage in precisely the discrimination these statutes prohibit. *See HIAS*, 985 F.3d at 322; *Chamber of Com.*, 74 F.3d at 1330-31.

**D.    Plaintiffs Are Likely to Succeed on Their Equal Protection Claim.**

The Orders also violate the Transgender Plaintiffs' right to equal protection. *See* U.S. CONST. amends. V, XIV. *Kadel* establishes that laws or policies prohibiting gender affirming medical care classify based on sex and transgender status, and thus trigger heightened scrutiny. *See* 100 F.4th at 143, 148-49. Because the Orders cannot survive any level of scrutiny—much less heightened scrutiny—Plaintiffs are likely to succeed on their equal protection claim.

**1.    The Executive Orders Trigger Heightened Scrutiny.**

The Orders trigger heightened scrutiny three times over: They (1) classify based on sex, (2) classify based on transgender status, and (3) were issued at least in part because of—not simply in spite of—their adverse effects on transgender people.

*First*, the Orders prohibit recipients of federal funds from providing necessary medical care to adolescent patients only if the purpose of the care is "to align [their] physical appearance with an identity that differs from his or her sex." Denial of Care Order § 2(c). But the Orders permit the exact same care if it is provided in manner that aligns with a person's sex. This distinction "is textbook sex discrimination." *Kadel*, 100 F.4th at 153.

The Orders draw even more explicitly sex-based lines than those at issue in *Kadel*, as they hinge the operative prohibitions on even more explicitly sex-based terms: Recipients of federal

22

funds may not provide care that "align[s] [a patient's] physical appearance with an identity that differs from his or her sex." Denial of Care Order § 2(c). To know whether a federal fund recipient may continue to provide a given type of care—say, testosterone—to a patient, one must know "his or her sex." The Orders do not prohibit federal fund recipients from providing testosterone to an adolescent who identifies as a boy to align his physical appearance with his male identity if the adolescent was assigned male at birth. But the Orders prohibit that same recipient from providing that treatment if the adolescent's sex assigned at birth was female, because it seeks to "align [his] physical appearance with an identity that differs from his or her sex." *Id.*

The Orders also classify based on sex by explicitly enforcing sex stereotypes and gender conformity. They prohibit medical care intended to "to align an individual's physical appearance with an identity that *differs from his or her sex.*" *Id.* (emphasis added); *see also* Gender Identity Order § 2(f) (defining "gender ideology" as having a gender identity "disconnected from one's sex."). But as *Kadel* explained, "a policy that conditions access to gender-affirming [medical care] on whether [it] will better align the patient's gender presentation with their sex assigned at birth is a policy based on gender stereotypes." 100 F.4th at 154.[8] That, too, is a facial sex-based classification—triggering heightened scrutiny.

*Second*, the Orders classify based on transgender status, which is a quasi-suspect classification triggering heightened scrutiny. TRO Op. 44 n.31. The Denial of Care Order explicitly refers to transgender people in describing the prohibited medical care. *See*, *e.g.*, Denial of Care Order § 7(a). And the Order restricts federal funding only if the care is provided to a patient

---

[8] The same is true for puberty-delaying medication. Birth-assigned males can receive puberty-delaying medication to bring their bodies into alignment with a typical male puberty, but birth-assigned females cannot. Birth-assigned females can receive puberty-delaying medication to bring their bodies into alignment with a typical female puberty, but birth-assigned males cannot. The bans operate when (and only when) a medication is being used "to align an individual's physical appearance with an identity that *differs from his or her sex.*" Denial of Care Order § 2(c) (emphasis added).

23

who possesses "an identity that differs from his or her sex." *Id.* § 2(c).[9] The Orders thus go to "the very heart of transgender status" by excluding "treatments aim[ed] at addressing incongruity between sex assigned at birth and gender identity." *Kadel*, 100 F.4th at 146; *see also Williams v. Kincaid*, 45 F.4th 759, 772 (4th Cir. 2022). As *Kadel* instructs, prohibiting treatments based on whether they are provided for purposes of "gender transition" expressly targets transgender people and, thus, triggers heightened scrutiny. *See* 100 F.4th at 143-49.

*Third*, even if the Executive Orders were facially neutral, they would still trigger heightened scrutiny because they were passed at least in part because of, not simply in spite of, their adverse effects on transgender people and the Trump administration's ideological opposition to gender transition. *See id.* at 168 (Richardson, J., dissenting); *see also*, *e.g.*, *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). The Orders' text makes clear that the Trump Administration intends to restrict transgender people's rights. The Gender Identity Order contrasts so-called "gender ideology" or the "false claim that males can identify as and thus become women and vice versa" with the "biological reality" of assigned sex at birth. Gender Identity Order § 1. It defines sex as an "immutable biological classification" that "does not include the concept of gender identity." *Id.* § 2(a). And the Gender Identity Order asserts that transgender identities are invalid and "false" identities that "[do] not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." *Id.* § 2(f)-(g). It is difficult to "fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist." TRO Op. 41.

For its part, the Denial of Care Order reflects and implements the Gender Identity Order's

---

[9] To possess an identity that differs from one's sex assigned at birth is the definition of being transgender. *See Transgender*, MERRIAM WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/transgender.

ideological opposition to transgender people by seeking to end access to medically necessary care for transgender adolescents and young adults. This objective is evident from the effect and admitted purposes of the restrictions, *see* Gender Identity Order §§ 1, 2(a), (f); Denial of Care Order § 2(c), as well as their tone. Gender affirming medical care is pejoratively called "chemical and surgical mutilation," and described as "maiming and sterilizing" them and "damaging" their "healthy body parts." Denial of Care Order §§ 1, 2(c), 8(d). The Order also draws insulting comparisons between gender affirming medical care and female genital mutilation and suggests that medical care to treat gender dysphoria is "child abuse." *Id.* §§ 8(a)-(b), (e).

The context surrounding these Orders further demonstrates their intent, at least in part, to impose adverse effects on transgender people. *See Feeney*, 442 U.S. at 279. The challenged Orders are just two among a litany of others that expressly target transgender people,[10] including by disparaging the "adoption of a gender identity inconsistent with an individual's sex" as conflicting with a "commitment to an honorable, truthful, and disciplined lifestyle."[11] These Executive Orders are a systematic attack on transgender people's ability to participate in civic life, whether in schools, the workplace, or while traveling; that broader context reinforces that the challenged Orders intend to adversely impact transgender people and that such adverse effects are not merely an incidental byproduct of the Orders targeting gender affirming medical care.

For any and all of these reasons, heightened scrutiny applies.

---

[10] See Am. Compl. ¶¶ 72-76; see, e.g., Exec. Order No. 14,148, *Initial Rescissions of Harmful Executive Orders and Actions*, 90 Fed. Reg. 8237 (Jan. 20, 2025); Exec. Order No. 14,170, *Reforming the Federal Hiring Process and Restoring Merit to Government Service*, 90 Fed. Reg. 8621 (Jan. 20, 2025); Exec. Order No. 14,190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025); Exec. Order No. 14,201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 5, 2025).

[11] Exec. Order No. 14,183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025).

25

## 2.    The Executive Orders Cannot Survive Heightened Scrutiny.

To survive heightened scrutiny, "the government must show that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Kadel*, 100 F.4th at 156 (cleaned up). The Executive Orders assert an interest in "protecting" children but do not substantially advance or even rationally relate to that interest. None of the Order's claims about the banned medical care comport with science or explain why this care alone was singled out for prohibition.

**Effectiveness.** Gender affirming medical care as treatment for an adolescent's or young adult's gender dysphoria is safe and effective. *See Poe v. Labrador*, 709 F. Supp. 3d 1169, 1193 (D. Idaho 2023). This medical treatment "promotes wellness and helps to prevent negative mental health outcomes, including suicidality." Shumer Decl. ¶ 101; Karasic Decl. ¶ 86; *see also Kadel*, 100 F.4th at 136; *Dekker v. Weida*, 679 F. Supp. 3d 1271, 1286 (N.D. Fla. 2023); *Brandt v. Rutledge*, 677 F. Supp. 3d 877, 888 (E.D. Ark. 2023).

The Orders "ignore the benefits that many patients realize from these treatments and the substantial risk posed by for[]going the treatments." *Dekker*, 679 F. Supp. 3d at 1294; *see also* Turban Decl. ¶ 14. "The denial of medically indicated care to transgender people with gender dysphoria not only results in the prolonging of their gender dysphoria, but causes additional distress and poses other health risks, such as depression, posttraumatic stress disorder, and suicidality." Karasic Decl. ¶ 105; *see also* Shumer Decl. ¶¶ 129, 131. Plaintiffs' experiences confirm the benefits of gender affirming medical care to treat gender dysphoria in adolescents and

26

JA178

young adults[12]—and the harm of delaying or denying this care when medically indicated.[13]

**Regret.** The Denial of Care Order asserts, without evidence, that "[c]ountless children soon regret" receiving gender affirming medical care. Denial of Care Order § 1. But the risk of regret is not unique to the treatment of gender dysphoria and cannot justify a sweeping ban that prohibits treatment for all transgender patients under nineteen. *See Brandt*, 677 F. Supp. 3d at 905; Karasic Decl. ¶ 97, 101; Shumer Decl. ¶¶ 77, 100, 120. Scientific studies also indicate that the rates of regret among people receiving gender affirming medical care are exceedingly low, and the vast majority who rely on such treatments to live happy and fulfilling lives never regret receiving it. Karasic Decl. ¶¶ 96-101; Shumer Decl. ¶¶ 77, 120; Turban Decl. ¶¶ 30-33; *see Koe v. Noggle*, 688 F. Supp. 3d 1321, 1350-51 (N.D. Ga. 2023).

**Infertility.** The Denial of Care Order states (again, citing nothing) that people receiving gender affirming medical care "will never be able to conceive children." Denial of Care Order § 1. But puberty-delaying medication and gender-affirming chest surgery have no impact on fertility, and the evidence shows that many adolescents and young adults who receive gender-affirming hormones will remain able to conceive and procreate. Shumer Decl. ¶¶ 67, 81, 82. Moreover, the clinical guidelines recommend that impacts of care on fertility and fertility preservation options be discussed thoroughly with the patient, and in the case of a minor, with parents or guardians. Karasic Decl. ¶ 83. Many other types of pediatric medicine can also impact fertility, but the Orders do not prohibit recipients of federal funding from providing those other forms of medical care. Shumer Decl. ¶ 83.

---

[12] Claire Coe Decl. ¶¶ 21-26; Dylan Doe Decl. ¶¶ 18, 32; George Goe Decl. ¶¶ 23-24; Lawrence Loe Decl. ¶ 18; Rachel Roe Decl. ¶¶ 14, 19.
[13] Bruce Boe Decl. ¶¶ 27-28; Claire Coe Decl. ¶¶ 30-31; Dylan Doe Decl. ¶¶ 32-35; George Goe Decl. ¶¶ 24-27; Lawrence Loe Decl. ¶¶ 24-28; Rachel Roe Decl. ¶ 23.

**Quality of evidence.** The Denial of Care Order refers to the evidence supporting the safety and efficacy of gender affirming medical care as "junk science." Denial of Care Order § 3. To the contrary, clinical guidelines for gender affirming medical care are based on decades of clinical experience and a substantial body of evidence showing the safety and efficacy of medical interventions to treat gender dysphoria. Antommaria Decl. ¶¶ 35-47; Karasic Decl. ¶ 103; Shumer Decl. ¶ 56. The level of evidence supporting medical treatment for gender dysphoria in adolescents is comparable to the evidence of safety and efficacy for many other forms of pediatric medicine. Antommaria Decl. ¶¶ 6, 29, 32, 39; Karasic Decl. ¶ 60. The Orders do not impose a general requirement that grant recipients stop providing all forms of pediatric medicine that are not supported by a particular level of evidence. They prohibit grant recipients from providing those treatments *only* when done for the purpose of providing gender affirming medical care for transgender people. Additionally, there is no scientific evidence of *any* quality that supports withholding gender affirming medical care from patients for whom it is medically indicated. Antommaria Decl. ¶ 37; Karasic Decl. ¶¶ 106-07; Turban Decl. ¶ 39.

### 3.    The Executive Orders Fail Rational Basis Review.

Ultimately, the Orders are substantially related to only one purpose, which they openly declare: mandating gender conformity and preventing transgender people from expressing a gender identity different from their sex designated at birth. The Orders result from "negative attitudes," "fear," and "irrational prejudice," rather than legitimate governmental interests. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448, 450 (1985). But "disapproving [of] transgender status," "discouraging individuals from pursuing their honest gender identities," and "[d]issuading a person from conforming to the person's gender identity rather than to the person's natal sex," are "plainly illegitimate purposes." *Dekker*, 679 F. Supp. 3d at 1292-93. A "bare desire

to harm" transgender people is not a valid governmental interest under any standard of scrutiny. *Romer v. Evans*, 517 U.S. 620, 635 (1996) (citation omitted).

## II.    THE OTHER FACTORS FAVOR A NATIONWIDE PRELIMINARY INJUNCTION.

The other preliminary injunction factors strongly favor Plaintiffs, and only a nationwide injunction can provide complete relief. TRO Op. 49-52.

Plaintiffs have shown a strong likelihood of success on at least three constitutional claims, and the "prospect of an unconstitutional enforcement" alone "supplies the necessary irreparable injury" for emergency relief. *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381-82 (1992)). In addition, acts that "diminish[] access to high-quality health care" cause irreparable harm. *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 707 (4th Cir. 2019). The Orders have done that and more: Transgender adolescents and young adults across the country already have lost care because their providers have cancelled appointments, refused to fill prescriptions, or even shut down their gender affirming medical care programs altogether. Families have been forced to watch their children suffer, and medical providers have been compelled to abandon their patients—directly in response to the Orders. TRO Op. 46-47. While the TRO itself prompted a few institutions to resume care, others await further action by the Court to ensure that treating their patients does not jeopardize their funding in the interim. *See, e.g.*, Noe Decl. ¶¶ 11-12; Gonzalez-Pagan Decl. Exs. A-6, A-15.

The balance of equities and the public interest, which merge when the defendant is the government, also clearly favor relief. *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 501 (D. Md. 2020) ("*ACCC*"). "It is well-established that the public interest favors protecting constitutional rights." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc). "[T]he government is in no way harmed by issuance of an injunction that

29

prevents the state from enforcing unconstitutional restrictions." *Legend Night Club v. Miller*, 637 F.3d 291, 302-03 (4th Cir. 2011). The threat of a deprivation of constitutional rights "will easily outweigh whatever burden the injunction may impose." *St. Michael's Media v. Mayor & City Council of Balt.*, 566 F. Supp. 3d 327, 351 (D. Md. 2021). Indeed, the Orders will have "far-reaching effects": They "threaten to disrupt treatment of patients, stall critical research, and gut numerous programs in medical institutions that rely on federal funding," including programs whose funding is not "tied to gender affirming care." TRO Op. 48-49.

Finally, as the Court recognized, nationwide relief is appropriate. TRO Op. 49-52. "[D]istrict courts have broad discretion when fashioning injunctive relief," *Ostergren v. Cuccinelli*, 615 F.3d 263, 288 (4th Cir. 2010), including to issue nationwide injunctions against executive orders with a nationwide scope. *See HIAS*, 985 F.3d at 326; *ACCC*, 509 F. Supp. 3d at 503 (collecting cases). Here, "an injunction of nationwide scope is necessary to provide complete relief" because PFLAG and GLMA have members throughout the country who have been harmed by the Executive Orders. TRO Op. 51. *See, e.g.*, Bond Decl. ¶¶ 4, 8; Sheldon Decl. ¶¶ 9, 29; *HIAS*, 985 F.3d at 326-27. Moreover, as the Court recognized, a narrower injunction limited to members of PFLAG and GLMA would "cause confusion about which companies or providers are subject to a rule and which are not; instead, a court order must be clear and definite." TRO Op. 50 (quoting *ACCC*, 509 F. Supp. 3d at 504). "Given the circumstances, a narrower injunction cannot provide complete relief." *Id*. at 52.

## CONCLUSION

The Court should convert the TRO into a preliminary injunction, enjoining the Agency Defendants from conditioning or withholding federal funding based on the fact that a healthcare entity or health professional provides gender affirming medical care to a patient under the age of nineteen under section 3(g) of the Gender Identity Order and Section 4 of the Denial of Care Order.

30

Date:  February 18, 2025

Respectfully submitted,

Joshua Block*
Harper Seldin*
Chase Strangio*
Alexandra R. Johnson*
**American Civil Liberties Union**
   **Foundation**
125 Broad Street, Floor 18
New York, NY 10004
Telephone: (212) 549-2500
Facsimile:  (212) 549-2650
jblock@aclu.org
hseldin@aclu.org
cstrangio@aclu.org
a.johnson@aclu.org

Deborah A. Jeon (Fed. Bar No. 06905)
Zoe M. Ginsberg (Fed. Bar No. 30727)
**American Civil Liberties Union**
   **Foundation of Maryland**
3600 Clipper Mill Road, Suite 200
Baltimore, MD 21211
Telephone: (410) 889-8555
Facsimile:  (410) 366-7838
jeon@aclu-md.org
zginsberg@aclu-md.org

Catherine E. Stetson**
Danielle Desaulniers Stempel (Fed. Bar No. 20501)
Kristina Alekseyeva*
Sam H. Zwingli*
**Hogan Lovells US LLP**
555 13th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5491
Facsimile:  (202) 637-5910
cate.stetson@hoganlovells.com
danielle.stempel@hoganlovells.com
kristina.alekseyeva@hoganlovells.com

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan*
Jennifer C. Pizer*
**Lambda Legal Defense**
   **and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: (212) 809-8585
Facsimile:  (855) 535-2236
ogonzalez-pagan@lambdalegal.org
jpizer@lambdalegal.org

Karen L. Loewy*
**Lambda Legal Defense**
   **and Education Fund, Inc.**
815 16th Street NW, Suite 4140
Washington, DC 20006
Telephone: (202) 804-6245
Facsimile:  (855) 535-2236
kloewy@lambdalegal.org

Nora Huppert*
**Lambda Legal Defense**
   **and Education Fund, Inc.**
3656 N. Halsted Street
Chicago, IL 60613
Telephone: (312) 605-3233
Facsimile:  (855) 535-2236
nhuppert@lambdalegal.org

Jackson Skeen***
**Hogan Lovells US LLP**
125 High Street
Suite 2010
Boston, MA 02110
Telephone: (617) 702-7747
Facsimile:  (617) 371-1037
jackson.skeen@hoganlovells.com

*Attorneys for Plaintiffs*

*\*Application for admission pro hac vice
granted.*

*\*\* Application for admission pending.*

31

JA183

*\*\*\*Application for admission pro hac vice granted and admitted only in D.C. Supervised by principals of the firm admitted in Massachusetts.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PFLAG, INC., et al.,

    *Plaintiffs*,

      v.

DONALD J. TRUMP, in his official capacity
as President of the United States, et al.,

    *Defendants*.

Civil Action No. BAH-25-337

### [PROPOSED] ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

This matter is before the Court on Plaintiffs' motion for a preliminary injunction against Defendants U.S. Department of Health and Human Services ("HHS"); Robert F. Kennedy, Jr., in his official capacity as Secretary of HHS; the Health Resources and Services Administration ("HRSA"); Diana Espinosa, in her official capacity as Principal Deputy Administrator of HRSA; the National Institutes of Health ("NIH"); Matthew J. Memoli, in his official capacity as Acting NIH Director; the National Science Foundation ("NSF"); Sethuraman Panchanathan, in his official capacity as Director of NSF; any subagencies of Defendant HHS, their officers, agents, successors, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, enjoining them from conditioning, withholding, or terminating federal funding under Section 3(g) of Executive Order No. 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (the "Gender Identity Order") and Section 4 of Executive Order No. 14,187, *Protecting Children from Chemical and Surgical Mutilation* (the "Denial of Care Order"), based on the fact that a healthcare entity or health professional provides gender affirming medical care to a patient under nineteen, including any healthcare institution from which the Individual Plaintiffs, members of Plaintiff PFLAG, and

patients of health professional members of Plaintiff GLMA receive gender affirming medical care, or at which health professional members of Plaintiff GLMA conduct federally-funded work.

Having considered the motion, the memorandum in support, and the record in this case, and having otherwise been fully advised, the Court finds there is good cause to **GRANT** the motion and hereby **ORDERS** as follows:

The Court may issue a preliminary injunction when a plaintiff establishes that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Court finds that Plaintiffs have carried their burden to satisfy each of those factors and that immediate relief is appropriate.

Therefore, it is hereby **ORDERED** that Plaintiffs' Motion for a Preliminary Injunction is **GRANTED**. It is further **ORDERED** that Defendants HHS, HHS Secretary Kennedy, HRSA, HRSA Principal Deputy Espinosa, NIH, Acting NIH Director Memoli, the NSF, NSF Director Panchanathan, any subagencies of Defendant HHS, their officers, agents, successors, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, are **ENJOINED** from conditioning, withholding, or terminating federal funding under Section 3(g) of the Gender Identity Order and Section 4 of the Denial of Care Order based on the fact that a healthcare entity or health professional provides gender affirming medical care to a patient under nineteen, including any healthcare institution from which the Individual Plaintiffs, members of Plaintiff PFLAG, and patients of health professional members of Plaintiff GLMA receive gender affirming medical care, or at which health professional members of Plaintiff GLMA conduct federally-funded work.

It is further **ORDERED** that the security requirement is hereby waived because Defendants will not suffer any costs from the preliminary injunction and imposing a security requirement would pose a hardship for Plaintiffs. *See* FED. R. CIV. P. 65(c); *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013).

Dated this __ day of February, 2025.          BY THE COURT:

                                              _____

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was electronically filed using the Court's CM/ECF system.  Service was effected by and through the Court's CM/ECF system.


Dated: February 18, 2025                          _/s/ Omar Gonzalez-Pagan_
                                                  Omar Gonzalez-Pagan

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| PFLAG, INC., et al., | |
| *Plaintiffs*, | |
| v. | Civil Action No. BAH-25-337 |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| *Defendants*. | |

**INDEX OF EXHIBITS IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

| Exhibit | Description | Cross Reference to Memorandum |
|---------|-------------|-------------------------------|
| A | Declaration of Omar Gonzalez-Pagan ISO Motion for Preliminary Injunction with Exhibits A-1 through A-18. | – |
| A-1 | HRSA Memorandum | 6 |
| A-2 | CDC Grant Termination Letter | 7 |
| A-3 | Children's National Statement | 7 |
| A-4 | Children's Hospital of Richmond Statement | 7 |
| A-5 | UVA Health Statement | 7 |
| A-6 | 29 News Article - UVA Health Resumption of Care | 7, 29 |
| A-7 | Denver Health Statement | 7 |
| A-8 | Letter from Jason Miyares, Attorney General of Virginia, to UVA and VCU | 7 |
| A-9 | Children's Hospital of Colorado Letter | 7 |
| A-10 | LA Times News Article – Children's Hospital of Los Angeles Cessation | 7 |

| Exhibit | Description | Cross Reference to Memorandum |
|---------|-------------|------------------------------|
| A-11 | Detroit Free Press News Article – Corewell Health Cessation of Care | 7 |
| A-12 | Detroit Free Press News Article – Corewell Health Resumption of Care | 7 |
| A-13 | Children's Hospital of Phoenix Letter | 7 |
| A-14 | Tucson Sentinel News Article – Prisma Community Care Cessation of Care | 7 |
| A-15 | AZ Central News Article – Prisma Community Care Resumption of Care | 7, 29 |
| A-16 | White House Statement | 1, 7 |
| A-17 | FDA Notice | 6 |
| A-18 | CDC Notice | 6 |
| B | Declaration of Bruce Boe | 4, 7, 8, 27 |
| C | Declaration of Bella Boe | 7, 8 |
| D | Declaration of George Goe | 7, 9, 27 |
| E | Declaration of Gabe Goe | 9 |
| F | Declaration of Rachel Roe | 7, 10, 27 |
| G | Declaration of Robert Roe | 10 |
| H | Declaration of Claire Coe | 4, 7, 8, 9, 27 |
| I | Declaration of Cameron Coe | 8, 9 |
| J | Declaration of Lawrence Loe | 7, 10, 27 |
| K | Declaration of Dylan Doe | 7, 11, 27 |

| Exhibit | Description | Cross Reference to Memorandum |
|---------|-------------|-------------------------------|
| L | Declaration of Alex Sheldon (Executive Director of GLMA) | 7, 13, 15, 50 |
| M | Declaration of Brian K. Bond (CEO of PFLAG, Inc.) | 4, 7, 12, 30 |
| N | Declaration of E.M. | – |
| O | Declaration of Jane Doe 1 | 7, 12 |
| P | Declaration of Jane Doe 2 | 7, 13 |
| Q | Declaration of Jane Doe 3 | 7, 12 |
| R | Declaration of Jane Doe 4 | 7, 12 |
| S | Declaration of Jane Doe 5 | 7, 13 |
| T | Declaration of Jane Doe 6 | 7, 13 |
| U | Declaration of Dr. Peyton Poe | 7, 14 |
| V | Declaration of Dr. Kyle Koe | 13, 15 |
| W | Declaration of Kristen Chapman | 4, 7, 12 |
| X | Declaration of M.V. | – |
| Y | Declaration of Dr. Jeffrey Birnbaum | 7, 14, 15, 20 |
| Z | Declaration of Dr. Natalie Noe | 7, 14, 15, 29 |
| AA | Declaration of Dr. Armand Antommaria | 3, 4, 5, 28 |
| BB | Declaration of Dr. Dan Karasic | 3, 4, 5, 8, 26, 27, 28 |
| CC | Declaration of Dr. Daniel Shumer | 3, 4, 5, 17, 26, 27, 28 |
| DD | Declaration of Dr. Jack Turban | 3, 5, 26, 27, 28 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PFLAG, INC., et al.,

     *Plaintiffs*,

     v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

     *Defendants*.

Civil Action No. BAH-25-337

### DECLARATION OF OMAR GONZALEZ-PAGAN IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I, Omar Gonzalez-Pagan, hereby declare and state:

1.     I am over 18 years of age, of sound mind, and fully capable of making this declaration. I have personal knowledge of the facts set forth in this declaration, they are true and correct, and I would be able to testify about these facts if I were called as a witness at a hearing or trial.

2.     I am a licensed attorney in the Commonwealth of Massachusetts and the State of New York. I am Senior Counsel and Health Care Strategist at Lambda Legal, and counsel for Plaintiffs in this action.

3.     I submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

4.     On January 31, 2025, Defendant Health Resources & Services Administration ("HRSA") transmitted via email a notice to recipients of HRSA grants, instructing them to comply with the executive orders at issue. **Exhibit A-1** is a true and correct copy of that email notice.

5. Upon information and belief, on January 31, 2025, as part of its implementation of Executive Order 14,168 (the "Gender Identity Order"), the Centers for Disease Control and Prevention ("CDC") sent a letter to a health center in California terminating a federal grant. The letter stated, in part, that the recipient "must immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting or inculcating gender ideology at every level and activity." **Exhibit A-2** is a true and accurate copy of the notice that accompanied that grant termination.

6. On January 30, 2025, Children's National Hospital issued a statement announcing that it is pausing care in response to the executive orders at issue. *See Children's National Hospital Statement on Executive Order* (Jan. 30, 2025), https://www.childrensnational.org/about-us/newsroom/2025/statement-on-executive-order. **Exhibit A-3** is a true and correct copy of that statement.

7. On or about January 30, 2025, Children's Hospital of Richmond at VCU issued a statement on its website announcing that it is pausing care in response to the executive orders at issue. *See Transgender*, Children's Hosp. of Richmond at VCU (Feb. 1, 2025), https://www.chrichmond.org/services/transgender/. **Exhibit A-4** is a true and correct copy of that statement.

8. On or about January 30, 2025, UVA Health issued a statement on its website announcing that it is pausing care in response to the executive orders at issue. *See Gender Health Services Impacted by Executive Order*, UVA Health, https://childrens.uvahealth.com/services/transgender-youth-health (last visited Feb. 1, 2025). **Exhibit A-5** is a true and correct copy of that statement.

9.     On February 14, 2025, the day after the Court issued a temporary restraining order in this matter, UVA Health resumed offering gender affirming care to patients under 19.   In a statement provided to 29 News, UVA Health wrote, "UVA Health will continue to monitor legal developments in this case and provide our patients with the best care possible under Virginia and federal law." *See* Maggie Glass, *UVA Health resumes gender-affirming care for people under 19 years old*, 29 News (Feb. 14, 2025), https://www.29news.com/2025/02/14/uva-health-resumes-gender-affirming-care-people-under-19-years-old/.  **Exhibit A-6** is a true and correct copy of the news report covering this denial of care.

10.     On or about January 30, 2025, Denver Health issued a statement on its website announcing that it is pausing care in response to the executive orders at issue.  *See Denver Health responds to executive order regarding gender-affirming care*, Denver Health (Jan. 30, 2025), https://www.denverhealth.org/news/2025/01/denver-health-responds-to-executive-order-regarding-gender-affirming-care.  **Exhibit A-**7 is a true and correct copy of that statement.

11.     On January 30, 2025, Jason Miyares, Attorney General of the Commonwealth of Virginia, transmitted a letter to the University of Virginia and Virginia Commonwealth University directing them to comply with the executive orders at issue.  **Exhibit A-8** is a true and correct copy of that letter.

12.     Since Plaintiffs filed their complaint and motion for a temporary restraining order on February 4 and 5, 2025, respectively, additional hospitals cut off necessary care for transgender patients under age nineteen.

13.     On February 5, 2025, Children's Hospital of Colorado sent a letter to patients and their families of the TRUE Center for Gender Diversity, announcing that in light of the January 28, 2025 Denial of Care Order (Executive Order 14,187), it "will transition its model of gender

affirming care" and cease offering hormone-based care "for any patient under 19 years of age" because the executive order "threatens Children's Hospital Colorado's ability to provide care for the many children who rely on us." Children's Hospital of Colorado further stated, "We recognize the grief and anxiety that these changes will bring for the patients and families who have shown unwavering dedication and commitment to supporting children in embracing their true selves." **Exhibit A-9** is a true and correct redacted copy of this notice.

14.     In addition, several hospitals have stopped initiating care for new patients. On February 4, 2025, Children's Hospital Los Angeles issued a statement that it was pausing the initiation of hormonal therapy due to the executive orders. *See* Emily Alpert Reyes, *Children's Hospital L.A. Stops Initiating Hormonal Therapy for Transgender Patients Under 19*, L.A. TIMES (Feb. 4, 2025), https://www.latimes.com/california/story/2025-02-04/childrens-hospital-to-stop-initiating-hormonal-therapy-for-trans-patients-under-19/. **Exhibit A-10** is a true and correct copy of the news report covering this denial of care.

15.     On February 7, 2025, Corewell Health became the first medical system in Michigan to announce that it would be officially "limiting gender-affirming care for minor patients." In a statement provided to the Detroit Free Press, Corewell stated that they would not be "beginning any new hormone therapy regimens for minor patients seeking gender affirming care. **Exhibit A-11** is a true and correct copy of the news report covering this denial of care.

16.     On or about February 12, 2025, Corewell Health reversed its decision and resumed hormone therapy for patients under 19. *See* Georgea Kovanis, *Corewell reverses decision on starting treatments for trans minors*, Detroit Free Press (Feb. 12, 2025), https://www.freep.com/story/news/health/2025/02/12/corewell-health-hormone-therapy-gender-

affirming-treatment-transgender/78460390007/. **Exhibit A-12** is a true and correct copy of the news report covering this resumption of care.

17.     In Arizona, multiple providers have confirmed they are restricting gender affirming care, including medications, due to the Executive Orders. On February 10, 2025, Children's Hospital of Phoenix sent an email to patients informing them that "after careful review of the executive order issued on January 28, 2025, surrounding gender-affirming medical care for children under the age of 19," "Phoenix Children's is indefinitely pausing gender-affirming medical care, specifically puberty blocking and gender-affirming hormonal therapy." **Exhibit A-13** is a true and accurate copy of that notice.

18.     On February 11, 2025, another Phoenix-based provider confirmed it was no longer providing certain gender affirming care services to patients under the age of 19. Prisma Community Care in Phoenix, Arizona—one of America's oldest and largest LGBTQ+ clinics— stated, "Due to President Trump's executive order," it was "no longer able to provide gender-affirming hormone therapy to patients under 19." See Joseph Darius Jaafari, Phoenix-Based LGBTQ+ Clinic Stops Providing Gender Affirming Care to Minors, TUSCON SENTINEL (Feb. 11, 2025), https://www.tucsonsentinel.com/local/report/021125_phx_gender_care/phoenix-based-lgbtq-clinic-stops-providing-gender-affirming-care-minors/. **Exhibit A-14** is a true and correct copy of a news report reporting on this termination of care.

19.     On February 14, 2025, following the temporary restraining order in this matter, Prisma Community Care issued a statement announcing that it would resume all of its gender-affirming care, including hormone therapy, for patients under 19. *See* Stephanie Innes, *Phoenix clinic to resume gender-affirming care for children paused by Trump order*, AZ Central (Feb. 15, 2025),           https://www.azcentral.com/story/news/local/arizona-health/2025/02/15/az-clinic-to-

resume-gender-affirming-care-transgender-people-under-19/78625587007/. **Exhibit A-15** is a true and correct copy of a news report reporting on this resumption of care.

20.    On February 3, 2025, the White House issued a News Release entitled, *President Trump is Delivering on His Commitment to Protect Our Kids*, touting that the executive orders at issue are "already having [their] intended effect." **Exhibit A-16** is a true and correct copy of that News Release.

21.    Upon information and belief, on February 11, 2025, after Defendant HHS was ordered to restore webpages it had taken down pursuant to the Gender Identity Order, Defendant HHS's subagencies appended notices to these webpages that the "Administration rejects gender ideology and condemns the harms it causes to children, by promoting their chemical and surgical mutilation . . . This page does not reflect biological reality and therefore the Administration and th[e] Department reject[] it." **Exhibits A-17 and A-18** are true and correct copies of this language on webpages maintained by the U.S. Food and Drug Administration and the CDC.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 18th day of February, 2025.

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan

# **Exhibit A-1**

**From:** Health Resources and Services Administration <hrsa@public.govdelivery.com>
**Sent:** Friday, January 31, 2025 4:14 PM
**To:** Patrick McGovern <pmcgovern@callen-lorde.org>
**Subject:** Important Message for HRSA Award Recipients



Dear Recipient:

Your Health Resources and Services Administration (HRSA) award is funded in whole or in part with U.S. government funds.

Effective immediately, HRSA grant funds may not be used for activities that do not align with Executive Orders (E.O.) entitled *Ending Radical and Wasteful Government DEI Programs and* Preferencing, *Initial Rescissions of Harmful Executive Orders and Action*, Protecting Children from Chemical and Surgical Mutilation, and *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government (Defending Women)*. Any vestige, remnant, or re-named piece of any programs in conflict with these E.O.s are terminated in whole or in part.

You may not incur any additional costs that support any programs, personnel, or activities in conflict with these E.O.s

If you have any questions, contact us at DGMOCommunications@hrsa.gov.



 **Connect with HRSA**



To learn more about our agency, visit www.HRSA.gov

 Sign up for *eNews*

Follow Us:



Subscriber Services: **Manage Preferences / Unsubscribe** | **Help**
Health Resources and Services Administration
5600 Fishers Lane Rockville, MD 20857

---

This email was sent to **pmcgovern@callen-lorde.org** using GovDelivery Communications Cloud on behalf of: HRSA · 5600 Fishers Lane · Rockville, MD 20857



*This email and its attachments may contain privileged and confidential information and/or protected health information (PHI) intended solely for the use of the individual or entity to whom it is addressed. If you are not the recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any review, dissemination, distribution, printing or copying of this email message and/or any attachments is strictly prohibited and may subject you to criminal or civil penalties. If you have received this transmission in error, please notify the sender immediately and permanently delete this email and any attachments.*

*Redisclosure Notice:*

*This information has been disclosed to you from confidential records which are protected by Federal and State Law which prohibits you from making any further disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law. Any unauthorized further disclosure is a violation of State Law may and may result in a jail sentence, a fine, or both. A general authorization for the release of medical or other information is not sufficient authorization for further disclosure of information regarding HIV-related information, substance use disorder, or genetic testing information.*

You're receiving this message because you're a member of the Trump GAC Ban group from Lambda Legal. To take part in this conversation, reply all to this message.

View group files | Leave group | Learn more about Microsoft 365 Groups

JA200

# **Exhibit A-2**



U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES                    Public Health Service

Centers for Disease Control
and Prevention (CDC)
Atlanta GA 30329-4027

Dear Recipient:

This Centers for Disease Control and Prevention (CDC) award is funded in whole or in part with United States Government funds.

To implement the Executive Order entitled *Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government* (*Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government – The White House)*, and in accordance with Office of Personnel Management's Initial Guidance (Memorandum to Heads and Acting Heads of Departments and Agencies: Initial Guidance Regarding President Trump's Executive Order Defending Women), you must immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting or inculcating gender ideology at every level and activity, regardless of your location or the citizenship of employees or contractors, that are supported with funds from this award. Any vestige, remnant, or re-named piece of any gender ideology programs funded by the U.S. government under this award are immediately, completely, and permanently terminated.

No additional costs must be incurred that would be used to support any gender ideology programs, personnel, or activities.

Any questions should be directed to PRISM@cdc.gov

# **<u>Exhibit A-3</u>**

 

**MENU**

About Us  ›  Newsroom

# Children's National Hospital Statement on Executive Order

January 30, 2025

Children's National is committed to providing compassionate and comprehensive care in accordance with the law. As a result, we are currently pausing all puberty blockers and hormone therapy prescriptions for transgender youth patients, per the guidelines in the Executive Order issued by the White House this week. Children's National already does not perform gender affirming surgery for minors.

We recognize the impact this change will have, and our commitment to creating a better future for children and families remains at the forefront of our mission. We will do everything we can to ensure the same uninterrupted access to mental health counseling, social support, and holistic and respectful care for every patient at Children's National.

We are working directly with patients and providers to ensure every patient has access to the information and support services they need, and we appreciate their continued trust and understanding as we work through these changes.

## Media Contacts

Email us        Call 202-476-4500 📞

# **Exhibit A-4**

UNstoppable care for kids


(/)

• **Home**(/) / **Services**(/services/) / Transgender

# Transgender

## Gender-affirming care statement

VCU Health and Children's Hospital of Richmond at VCU have suspended gender-affirming medications and gender-affirming surgical procedures for patients under 19 years old in response to an **Executive Order issued by the White House** (https://www.whitehouse.gov/presidential-actions/2025/01/protecting-children-from-chemical-and-surgical-mutilation/) on January 28, 2025, and related state guidance received by VCU on January 30, 2025.

Our doors remain open to all patients and their families for screening, counseling, mental health care and all other health care needs.

## Gender-affirming care frequently asked questions

February 1, 2025, 10:30 a.m.

Collapse all

### Are VCU Health and CHoR still offering gender-affirming care?

VCU Health and Children's Hospital of Richmond at VCU have suspended gender-affirming medications and gender-affirming surgical procedures for patients under 19 years old in response to an **Executive Order issued by the White House** (https://www.whitehouse.gov/presidential-actions/2025/01/protecting-children-from-chemical-and-surgical-mutilation/) on January 28, 2025, and related state guidance received by VCU on

January 30, 2025. Our doors remain open to all patients and their families for screening, counseling, mental health care and all other health care needs.

## What happens if someone has an appointment scheduled for this care?

All appointments for our patients have been maintained where we can provide ongoing care and/or discuss care options for patients that do not include prescribing gender-affirming medications and/or performing gender-affirming surgical procedures for patients under 19 years of age. While we are not beginning or continuing gender-affirming medications and/or performing gender-affirming surgical procedures, our providers are available for screening, counseling and general medical and mental health care issues.

## What other options are available?

Screening, counseling and general medical and mental health care continue to be available. We encourage you to speak with your medical provider about specific questions related to your health care.

## Do you expect any changes to this suspension of services?

Like many health systems across Virginia and the country, we are continuing to review the Executive Order issued by the White House and related state guidance. We will continue to monitor developments and respond accordingly with a continued focus on what is best for our patients.

# Gender-affirming care: Defining, belonging and thriving

We hope that every family that walks through our doors feels safe, loved, and affirmed and we are here to work with families to extend this support into the home and community. We are dedicated to providing gender-affirming care that is patient-centered to support each youth's gender journey.

# Becoming who you were meant to be: Our care team is in your corner

Our specialists in endocrinology and adolescent medicine work together to provide well-rounded care for children and teens in a gender-friendly environment.

Care is tailored to each patient and may include:

- Medical evaluation
- Medical hormone management
- Prescription medications
- Mental health care
- Voice therapy
- Letters of medical necessity to address hormone treatment, school issues and/or surgery (as needed)
- Referrals to other medical and surgical specialists (as needed)
- Referrals to peer and family support groups
- Educational materials

## Gender-affirming care road map

Once you call to schedule your initial visit, our team will share our gender-affirming care pre-visit road map to help ensure we have all the documentation we need and most importantly, to let you know what to expect along the way. We look forward to caring for your family.

### Before your first visit

Expand all

### What to bring to your first visit

### What to expect during your first visit

**Comprehensive care**

# Gender resources

It's a boy! It's a girl! Gender is often defined by the external sex organs of an individual and is assigned at birth. But gender identity comes from the brain. It's an individual's psychological sense of their own maleness, femaleness or nonbinary-ness and it cannot be determined by another person.

The traditional model of gender identity was binary, meaning there were only the two choices: male or female, but there are many individuals who don't feel they fit into either category or report that their gender identity doesn't match their body. **Learning about the terms currently used to describe gender can increase our understanding of what a child may be experiencing in this regard.**(/blog/expanding-views-of-gender-greater-awareness-greater-support/) This can also promote acceptance, which is so important, as acceptance, especially from family members, protects these youth from depression, suicidal thoughts and other risk factors

**He She Ze and We** (https://heshezewe.org/)
He She Ze and We serves families with transgender loved ones through support, education and advocacy.

**Side by Side** (https://www.sidebysideva.org/)
Dedicated to creating supportive communities where Virginia's LGBTQ youth can define themselves, belong and flourish.

**Gender Spectrum** (https://genderspectrum.org/)
Global online community for gender-expansive teens, their families and support professionals to connect, collaborate and find resources.

**Family Acceptance Project** (https://familyproject.sfsu.edu/)
A research, intervention, education and policy initiative that works to prevent health and mental health risks for LGBTQ children and youth including homelessness, suicide and HIV in context of their family, cultures and faith communities.

# Exhibit A-5

 **UVAHealth**
Children's

  

« **Services Search**

| In This Section ⌄ |
|---|

# Gender Health Services Impacted by Executive Order

In response to the recent federal executive order and related Commonwealth of Virginia, Office of the Attorney General guidance, UVA Health has suspended all gender-affirming care for patients under 19 years of age. Like many health systems across the country, the University of Virginia and UVA Health are working to analyze and interpret the federal order and related state guidance, as well as monitoring other potential policy changes and impacts to ensure we are always delivering care in accordance with the law.

Patient appointments will be maintained to discuss specific care options in compliance with the most recent guidance.

UVA Health remains committed to being a community of healing, compassion, and respect for all.

## Questions? Contact Us

VISIT THE CLINIC

**Transgender Youth Health**

We offer transgender youth health services for ages 11 to 25.

Our providers have specialized expertise and experience in caring for patients with a range of gender identities and sexual orientations:

- Trans
- Nonbinary
- Intersex
- Asexual

Our services include:

- Education about sex and contraception

We use cookies and similar tools to improve your web experience.

ACCEPT

Read our privacy policy

- Referrals for therapy to help manage anxiety, depression, and ongoing emotional issues
- Puberty blockers that delay sex-related physical changes
- Help finding resources in the community
- Cross-sex hormones, like testosterone and estrogen
- Referrals for gender-affirming surgeries and voice therapy

**Diagnosis From a Mental Health Professional**

In order for one of our clinical providers to discuss treatment, we require a diagnosis of **gender dysphoria**. This term is used when a child's sense of their gender differs from the sex assigned to them at birth.

Our care team can provide referrals to the appropriate mental health professionals.

**For Parents of Trans Youth**

We encourage parents and families to attend appointments. If your parents or family members have questions or need support, we can help. **Find out** how we support parents.

**Have More Questions?**
Check out our trans youth healthcare FAQs.

UVA Health Children's is a community of healing, compassion, inclusion, and respect for all.

We don't discriminate, exclude, or treat patients or visitors differently based on:

- Race
- Age
- Color
- National origin
- Religion
- Disability
- Sexual orientation
- Gender
- Gender identity
- Gender expression

Discrimination and prejudice have no place here. See our non-discrimination policy.

We use cookies and similar tools to improve your web experience.

UVA Health
Children's

JA212

**About UVA Health Children's**  ▼

**Community**  ▼

**Patients & Families**  ▼

**UVA Health System**  ▼

Non-Discrimination Notice

Patient Rights & Policies

Web Privacy

Report Accessibility Barrier

© 2025 Rector and Visitors of the University of Virginia.
All rights reserved.

We use cookies and similar tools to improve
your web experience.

# **Exhibit A-6**



| News | Weather | Sports | 🔍 |

**Closings and Delays** ✕

**2 Weather Alerts In Effect** ✕

ADVERTISEMENT

# UVA Health resumes gender-affirming care for people under 19 years old



The children's hospital halted care in late January to comply with Trump's executive order.

By Maggie Glass
*Published: Feb. 14, 2025 at 5:02 PM CST*



CHARLOTTESVILLE, Va. (WVIR) - Once again, people under the age of 19 can come to UVA Health for gender-affirming care.

This comes after multiple federal courts on Thursday and Friday temporarily blocked President Donald Trump's executive order to restrict gender-affirming care for transgender youth.

It's a reversal leaving some in Charlottesville's trans community feeling in limbo.

"This decision to start again, while sure, is what we want, it makes us really have doubts that they will stand strong in support of us the next time," co-owner of The Beautiful Idea bookstore Senlin Means said.

The children's hospital halted care in late January to comply with Trump's executive order. That sparked protest on the hospital's doorstep.

JA215

Lillian DeCostanza was one of the protesters there that day and is with the Charlottesville Gender Expansive Network, the Rivanna Area Queer Center, and the Safe Open Queer Space for Teens.

"It just really dramatically improves their quality of life," DeCostanza said.

According to its website, the hospital offers puberty blockers and hormone therapy to minors. That can only happen after a medical professional diagnosing the patient with gender dysphoria.

Means said taking away this kind of care for youth has long lasting implications.

"You feel like your community is saying that you and you only can't get it because you don't deserve it," Means said. "That in of itself is devastating."

The hospital wrote in a statement to 29News:

"UVA Health will continue to monitor legal developments in this case and provide our patients with the best care possible under Virginia and federal law."

*Do you have a story idea? Send us your news tip* here.

Copyright 2025 WVIR. All rights reserved.

TabOOlaFeed

▶ Discover

**Amazon's Worst Nightmare: Thousands Canceling Prime for This Clever Hack**
Online Shopping Tools | Sponsored

**New York Student Sentenced To Year In Dubai Prison After Touching Airport Security Guard During Layover - Blavity**
Blavity.com | Sponsored

**Up to 52% Off on Thermal Imaging Devices at OpticsPlanet**
Get Thermal Imaging Optics With Up To 51% Off at OpticsPlanet. Free Shipping on Orders $49+. Shop Brands Like AGM, Pulsar, ATN & More.
OpticsPlanet | Sponsored                                                    Shop Now

**People in Chicago are Loving Martha Stewart's Meal Kit**
Martha Stewart & Marley Spoon | Sponsored

**Look For Any High School Yearbook, It's Free**
Classmates.com | Sponsored

JA216

# **Exhibit A-7**

Home ‹ News

« Return to Search

# Denver Health responds to executive order regarding gender-affirming care

*January 30, 2025*



Denver Health is committed to and deeply concerned for the health and safety of our gender diverse patients under the age of 19 in light of the executive order regarding youth gender-affirming care. We recognize this order will impact gender-diverse youth, including increased risk of depression, anxiety and suicidality.

We are working to understand and comply with the full implications of the broadly worded order. Guidance on changes to medical care is being handled privately so that we can best support our patients and their families. The executive order, which was issued on January 28, 2025, includes criminal and financial consequences for those who do not comply, including placing participation in federal programs including Medicare, Medicaid and other programs administered by HHS at risk. These programs represent a significant portion of Denver Health's funding, and the executive order specifically states that should we not comply, our participation in these programs is at risk. The loss of this funding would critically impair our ability to provide care for the Denver community.

Denver Health is proud to be one of a very small number of providers of comprehensive care services to all of our patients, including to LGBTQ+ and gender-diverse patients. As we navigate the order's requirements, we will continue to provide primary and behavioral health care to all impacted youth and will work to maintain the level of trust we have built with the LGBTQ+ community.

We encourage all patients to continue with their scheduled primary care and behavioral health care visits and discuss changes in medical care with their doctor as needed.

**Denver Health responds to executive order regarding gender...**

Denver Health is committed to and deeply concerned for the health and...

**Denver Health Designated an ACR Comprehensive Breast Imaging...**

Denver Health has been named a Comprehensive Breast Imaging Center by...

**Denver Health introduces naloxone vending machine**

A fatal overdose occurs in Colorado nearly every five hours. In...

**Cases of Psilocybin Exposure Rising**

Rocky Mountain Poison and Drug Safety (RMPDS) has developed data...

**Denver Health welcomes first baby of 2025**

The labor and delivery team at Denver Health welcomed Sammer Andre...

**New family health center to open in SE Denver**

Denver Health plans to open the nonprofit health system's 11th...

All News

**Safety Tips for Holiday Road Trips**

Planning to Hit the Road for the Holidays? The Injury Prevention team...

**Do Mammograms Hurt Seven Things You Can Do to Reduce Painful...**

Do mammograms hurt? It's a common question we get here at the Denver...

**Most Common Winter Sports Injuries and What to Do if One...**

Winter sports injuries often have the same three things in common...

**Addressing Disparities in Breast Cancer Care Among African...**

Racial disparities in breast cancer survival rates among...

**Five Surprising Things You May Not Know About Bariatric Surgery...**

If you're considering getting bariatric surgery (also known as...

**Understanding and Managing Your Risk for Breast Cancer From...**

While understanding and managing your own personal risk for breast...

All Blog Articles

FEB

4

CPR Class for Mom and Partner (expectant parents only)



FEB
5

Labor and Delivery Tour for Expectant Families ●

FEB
5

Lactation (Prenatal Breastfeeding Class) ●

FEB
6

Advanced Professional And Ethical Practice ●

All Classes & Events

# **Exhibit A-8**



# COMMONWEALTH *of* VIRGINIA
### *Office of the Attorney General*

**Jason S. Miyares**
**Attorney General**

202 North 9th Street
Richmond, Virginia 23219
8804-786-2071
FAX 804-786-1991
Virginia Relay Services
800-828-1120

**To:**    University of Virginia and Virginia Commonwealth University

**From:** Attorney General Jason Miyares

**Date:** January 30, 2025

**Re:**    Protecting Children from Chemical and Surgical Mutilation
       *Attorney Client Privilege*

On January 28, 2025, the President issued a federal Executive Order titled "Protecting Children from Chemical and Surgical Mutilation." The full text of the Executive Order can be found here: https://www.whitehouse.gov/presidential-actions/2025/01/protecting-children-from-chemical-and-surgical-mutilation/.

As the Executive Order takes effect immediately, I write to provide this prompt legal advice to enable the Commonwealth—including its agencies—to protect itself from significant legal risk and substantial financial exposure. Given the plain terms of this Executive Order, the chemical and surgical mutilation of children must end immediately. Any institution that continues to engage in such mutilation unacceptably and unjustifiably endangers not only itself and the Commonwealth, but also the vulnerable children of this Commonwealth.

In most relevant part, the Executive Order:

- Defines "child" or "children" as "an individual or individuals under 19 years of age."

- Defines "chemical and surgical mutilation" as "the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an

1

individual's physical appearance with an identity that differs from his or her sex; and surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions. This phrase sometimes is referred to as 'gender affirming care'."

- Directs the head of each federal department or agency that provides research or education grants to medical institutions, including medical schools and hospitals, consistent with applicable law and in coordination with the Director of the Office of Management and Budget, to immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children.

- Directs the Secretary of HHS to, consistent with applicable law, take all appropriate actions to end the chemical and surgical mutilation of children, including regulatory and sub-regulatory actions, which may involve programs including Medicare or Medicaid conditions of participation or conditions for coverage.

- Directs the United States Attorney General to draft, propose, and promote legislation to enact a private right of action for children and parents of children whose healthy body parts have been damaged by medical professionals practicing chemical and surgical mutilation, which should include a lengthy statute of limitations.

The Order directs federal agencies to immediately ensure that medical institutions that receive federal research or education grants end chemical and surgical mutilation of children. Any hospital or other institution, including agencies of the Commonwealth, that continues to perform chemical and surgical mutilation of children is at risk of losing such grants. Of note, the grants are not just limited to those related to this subject matter, but could apply to all medical and research grants from federal agencies. Any state entities that continue to chemically and surgically mutilate children pose multiple substantial and unwarranted risks to the Commonwealth.

In addition, the Executive Order directs the Secretary of HHS to take actions to end these practices, including regulatory and sub-regulatory actions that may involve Medicare or Medicaid conditions of participation / coverage. Any state institution that continues to chemically and surgically mutilate children risks violating such regulations and being terminated from participation in the Medicare and Medicaid programs.

The Executive Order also directs the United States Attorney General to promote legislation to create a private cause of action concerning the identified practices. Such a law would further enable victims to pursue lawsuits and could create significant liability for those institutions and individuals who perform and are involved with the chemical and surgical mutilation of children in addition to the exposure they already face under existing law.

The Executive Order also includes provisions concerning enforcement of genital mutilation and consumer protection laws, proposals to address whistleblower standards, and other matters which warrant additional attention and review.

2

The chemical and surgical mutilation of children must stop immediately. Hospitals and institutions that continue to mutilate children place themselves at significant legal risk and face substantial financial exposure. Given these risks, my office will be closely monitoring this issue and the actions of the Commonwealth's agencies.

3

# Exhibit A-9

## TRUE Center Update 

Participants: Children's Hospital Colorado Care Team

Children's Hospital Colorado Care Team  Feb 5, 9:15 AM

Dear TRUE Patient-Family,

The White House released an executive order on Jan. 28 that directs all federal agencies, including those that provide research funding and patient care funds to hospitals, to take immediate steps to ensure that institutions receiving federal funding, end hormone-based or surgical gender-affirming care for any patient under 19 years of age.  The executive order threatens Children's Hospital Colorado's ability to provide care for the many children who rely on us.

After thorough and thoughtful consideration, Children's Colorado will transition its model of gender affirming care to focus on behavioral health and supportive care services for patients under the age of 19. **By February 15**, we will send a one-time prescription for a 6-month supply of your child's existing active medication to your pharmacy as a single dispense; your existing prescription will be replaced by this new single prescription. The TRUE Center will continue to offer appointments for behavioral health care services and visits with medical providers to discuss specific care options but will not be able to start any new medication treatments. Patients already on hormone therapy should be seen by a healthcare provider every 6 months.

**What does this mean for you?**
- We will send a one-time prescription for a 6-month supply of your child's current injectable puberty blocker or hormone therapy medication to your pharmacy. Please make sure that your pharmacy information is updated in MyChart and pick up your prescription as soon as possible.
- For those receiving puberty blocker injections in the TRUE clinic, we will convert the order from the medical benefit of your insurance to the prescription benefit of your insurance. The medication will then be sent directly from the pharmacy to you, and we will support you to give these injections at home.
- Some insurance plans will only pay for a 3-month supply of medications and there could be an added out-of-pocket cost depending on your plan. Please contact your insurance plan for questions about your benefits.
- If you have questions or concerns about your/your child's prescription, please contact the TRUE Center via MyChart, or call the TRUE Center and ask to speak with one of our nurses.
- We will continue to offer appointments for behavioral health services and medical follow-up visits at the TRUE Center. We encourage patients to continue to come to regularly scheduled follow-up visits to monitor treatments previously prescribed.

Like other hospitals across the country, we will continue to assess the rapidly evolving healthcare landscape and, as we learn more, we will share that information with you.

We recognize the grief and anxiety that these changes will bring for the patients and families who have shown unwavering dedication and commitment to supporting children in embracing their true selves. We will provide a list of community resources in a follow-up message in a few days.

If you have questions or concerns, you can call the TRUE Center at 720-777-8783. If you need emergency assistance, please call 911 or seek care in the nearest emergency care location.

Sincerely,
Children's Hospital Colorado

You cannot reply to this conversation.

MyChart® licensed from Epic Systems Corporation© 1999 - 2025

# Exhibit A-10

USCA4 Appeal: 25-1279    Doc: 34-1    Filed: 07/25/2025    Pg: 234 of 582



# Los Angeles Times

CALIFORNIA

# Children's Hospital L.A. stops initiating hormonal therapy for transgender patients under 19



Children's Hospital Los Angeles in 2020.  (Dania Maxwell / Los Angeles Times)

**By Emily Alpert Reyes**
Staff Writer

Feb. 4, 2025 **Updated** 2:08 PM PT

- Children's Hospital Los Angeles, a major provider of care for transgender youth, says it is pausing the initiation of hormonal therapy for "gender affirming care patients" under the age of 19.

USCA4 Appeal: 25-1279     Doc: 34-1     Filed: 07/25/2025     Pg: 235 of 582

- The move comes one week after President Trump issued an executive order seeking to stop the use of puberty blockers, hormones and other medical procedures for transgender youth.

Children's Hospital Los Angeles said Tuesday that it is pausing the initiation of hormonal therapy for "gender affirming care patients" under the age of 19 as hospital officials assess last week's executive order from President Trump targeting gender-affirming care for young people.

The L.A. hospital, a major provider of care for transgender youth, also said it was maintaining an "existing pause" on gender-affirming surgeries for minors.

In a statement Tuesday, the hospital said it was continuing to carefully evaluate Trump's order last week "to fully understand its implications." Existing patients at CHLA already receiving hormonal treatment may continue with their course of care, a hospital official said.

Trump's executive order sought to stop the use of puberty blockers, hormones and other medical procedures for transgender youth under 19, declaring the U.S. will not fund or support "the so-called 'transition' of a child from one sex to another." Trump has called such medical care a form of "chemical and surgical mutilation."

Many of the most sweeping changes sought by Trump, such as rewriting the rules for the Medicare and Medicaid programs that provide essential funding for hospitals, must go through the rulemaking process, healthcare experts have said. LGBTQ+ advocacy groups have stressed that the executive order will take time to implement.

Yet some U.S. hospitals and clinics have suspended care for transgender youth. The Trump administration touted that health systems in Colorado, Virginia and other states had paused such services or canceled appointments. In New York, the state attorney general recently warned hospitals that stopping such care would violate state law.

USCA4 Appeal: 25-1279    Doc: 34-1    Filed: 07/25/2025    Pg: 236 of 582

LGBTQ+ advocacy groups have vowed to fight the clampdown on gender-affirming care. Families of transgender youth sued Tuesday to try to stop the executive order, represented by the ACLU, Lambda Legal and other firms. Trump's executive orders violate the rights of transgender youth, the groups argued in a legal filing, "by depriving them of necessary medical care solely on the basis of their sex and transgender status."

CHLA said its pause on initiating hormonal therapy for youth began Feb. 1.

In Los Angeles, two parents who spoke anonymously with The Times to protect the privacy of their children said that Children's Hospital Los Angeles had canceled appointments they had for gender-affirming care this week. One said their appointment, to replace a puberty blocker for a child that already had one, had been reinstated after they reached out to physicians.

The CHLA decision was cheered by the California Family Council, whose vice president Greg Burt credited the Trump administration for pressuring hospitals to halt procedures he called dangerous.

ADVERTISEMENT

"The long nightmare of medical institutions prioritizing radical gender ideology over science and ethics is beginning to end," Burt said in a statement. "We urge other hospitals across the nation to follow suit and end these harmful, unproven procedures on children once and for all."

Tony Hoang, executive director of Equality California, an LGBTQ+ civil rights group, called the move by the L.A. hospital alarming.

"Denying or delaying care has dangerous consequences for transgender young people and their families — and we strongly believe hospitals and providers in California must continue to fulfill their ethical and legal duty to care for their patients," Hoang said in a statement.

The American Academy of Pediatrics has stated that it opposes any laws or regulations that discriminate against transgender people "or that interfere in the doctor-patient relationship."

In a statement responding to questions about canceled appointments, CHLA said it "will continue to support our patients and their families with access to robust mental health and social support services, ensuring our patients continue to have access to high-quality care and the best possible health outcomes."

Alejandra Caraballo, clinical instructor at the Cyberlaw Clinic at Harvard Law School, said that at this point, nothing in the order has compelled hospitals to suspend gender-affirming care for youth.

"There are no proposed rules," she said. "None of this is actually following an actual law or regulation that has been enacted."

Caraballo said that halting such care could also amount to unlawful discrimination at the state level if the same care is still provided to other young patients. CHLA said it was not halting hormonal therapy or puberty blockers for cisgender children who might be prescribed them for other medical purposes.

California Atty. Gen. Rob Bonta has called the executive order from Trump "cruel and irresponsible" and said that families seeking gender-affirming care for their children, as

USCA4 Appeal: 25-1279     Doc: 34-1       Filed: 07/25/2025     Pg: 238 of 582

2/11/25, 9:34 PM                Children's Hospital L.A. stops initiating hormone therapy for trans youth - Los Angeles Times
Case 8:25-cv-00337-BAH     Document 69-14     Filed 02/18/25     Page 6 of 6

well as doctors and other medical staff who provide it, are protected by state laws in California.

A spokesperson for Bonta didn't immediately comment Tuesday on whether the move by CHLA complies with state law, saying that his office could not comment on any complaints it had received.

## More to Read

**Column: Trump's all-out assault on transgender rights isn't a sign of strength, but cowardice**

Feb. 7, 2025



**Protesters call for Children's Hospital L.A. to reverse restrictions on transgender care**

Feb. 6, 2025



**Judge blocks transfers of 3 transgender women to men's prison**

Feb. 6, 2025



   **Emily Alpert Reyes**

Emily Alpert Reyes covers public health for the Los Angeles Times.

Copyright © 2025, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information

# Exhibit A-11

# Detroit Free Press

HEALTH

# Corewell becomes first Michigan health system to limit gender-affirming care for minors



**Georgea Kovanis**
Detroit Free Press

Published 1:04 p.m. ET Feb. 7, 2025 | Updated 6:17 p.m. ET Feb. 7, 2025

Corewell Health is the first medical system in the state to announce that it is limiting gender-affirming care for minor patients. It will no longer allow minors seeking such treatment to start new hormone therapy regimens; minor patients already receiving hormone therapy will be allowed to continue their treatments.

The moratorium comes in the wake of President Donald Trump's executive order that threatens to strip federal funding from hospitals that provide such treatments to people under the age of 19.

In a statement provided to the Free Press, Corewell said: "At this time, we are not beginning any new hormone therapy regimens for minor patients seeking gender affirming care. We do not perform gender-affirming surgeries on minors. Our team will continue monitoring federal changes to rules and regulations. We remain committed to providing the highest quality health care to all the patients we serve."

Corewell consists of two divisions. Corewell Health East includes Corewell Health William Beaumont University Hospital in Royal Oak, Corewell Health Beaumont Troy Hospital and other former Beaumont facilities. Corewell Health West includes Corewell Health Helen DeVos Children's Hospital as well as Corewell Health Blodgett Hospital and Corewell Health Butterworth Hospital.

While the health system's policy covers the entire Corewell system, gender affirming care for minors has typically not been provided at Corewell East facilities, a Corewell spokesman said.

USCA4 Appeal: 25-1279    Doc: 34-1    Filed: 07/25/2025    Pg: 241 of 582

Other hospital systems in the state have not commented on whether they are changing the care they provide. The Detroit Medical Center did not respond to requests for comment. Nor did Henry Ford Health System. Michigan Medicine, the medical center at the University of Michigan this week said: "University of Michigan Health teams are assessing the potential impact of this executive order on our healthcare services and the communities we serve. Our priority remains delivering high-quality, accessible care to our patients while ensuring compliance with the latest law."

Meanwhile on Friday, Michigan Attorney General Dana Nessel told hospitals to continue to provide treatment, saying in a statement, "refusing helathcare services to a class of individuals based on their protected status, such as withholding the availability of services from transgender individuals based on their gender identity or their diagnosis of gender dysphoria, while offering such services to cisgender individuals, may constitute discrimination under Michigan law."

Bottom line, she said: "If you are seeking healthcare, continue to do so. If you are providing healthcare in compliance with Michigan law, please continue to do so."

**MORE:** Trump's executive orders force VA workers to 'rat out' others, sparking fear, uncertainty

The nation's transgender population is a small one: About 1.6 million people ages 13 and older identify as transgender, according to UCLA's Williams Institute, a research center focusing on gender identity, sexual orientation and public policy. In 2023, approximately 3% of high school students identified as transgender, according to a study by the U.S. Centers for Disease Control and Prevention.

Transgender youths, through lack of acceptance and stigma, are more likely to struggle with depression and suicidal behavior, and more likely to experience violence and homelessness than peers who identify with the gender they were assigned at birth.

According to a study published in 2022 by the Journal of the American Medical Association, young people who received gender affirming therapies were 60% less likely to experience depression and 73% less likely to experience suicidal ideation or behaviors than youths who did not receive gender-affirming care.

For transgender minors, gender affirming care typically involves puberty blockers followed by hormone therapy. A study by the Harvard School of Public Health found that gender affirming surgery is rarely performed on minors.

USCA4 Appeal: 25-1279    Doc: 34-1    Filed: 07/25/2025    Pg: 242 of 582

Trump's executive order is being challenged in federal court.

*Free Press staff writer Kristen Jordan Shamus contributed to this report.*

*Contact Georgea Kovanis: gkovanis@freepress.com.*

# Exhibit A-12

# Detroit Free Press

HEALTH

# Corewell reverses decision on starting treatments for trans minors

 **Georgea Kovanis**
Detroit Free Press

Published 2:08 p.m. ET Feb. 12, 2025 | Updated 9:55 a.m. ET Feb. 13, 2025

## Key Points

- The change came after outrage from members of the LGBTQ+ community.
- Michigan AG: Health care systems that limit treatment could be violating state laws.

Corewell Health, reversing an earlier decision, will no longer limit hormone therapy for minor patients seeking gender-affirming treatment, the hospital system said.

"We are lifting our pause on new hormone therapies for pediatric patients seeking gender-affirming care," Corewell Health said in a statement. "Care decisions are best made between physicians and their patients and families."

Last week, Corewell became the first hospital system in the state to announce it would no longer allow transgender minors to start new gender-affirming hormone therapy regimens; minor patients already receiving hormone therapy were allowed to continue treatments.

Corewell's moratorium came in the wake of President Donald Trump's executive order threatening to strip federal funding from hospitals that provide the treatments to people under the age of 19.

Michigan Attorney General Dana Nessel last week warned that denying gender-affirming hormone treatments to minors could be a violation of the state's anti-discrimination laws.

Trump's executive order is being challenged in federal court.

Members of the LGBTQ+ community reacted to Corewell's decision last week with outrage. On Feb. 11, more than 40 advocacy and civil rights organizations, including the American

Civil Liberties Union of Michigan and Equality Michigan, sent an open letter to Corewell's board of directors and executives, imploring the hospital system to reinstate the treatments.

Ferndale Pride, which puts on an annual gay pride celebration in downtown Ferndale, revoked Corewell's sponsorship of the event.

Corewell's decision this week to change course was met with praise.

"We see this decision as one that's family-centered, equality-centered, and science-centered," Erin Knott, Equality Michigan executive director, said in a statement. "... So we extend a thank you to the Corewell leadership team for righting the ship."

Corewell consists of two divisions. Corewell Health East includes Corewell Health William Beaumont University Hospital in Royal Oak, Corewell Health Beaumont Troy Hospital and other former Beaumont facilities. Corewell Health West includes Corewell Health Helen DeVos Children's Hospital as well as Corewell Health Blodgett Hospital and Corewell Health Butterworth Hospital.

Corewell East does not typically provide gender-affirming hormone therapy to minors. Corewell West does.

For transgender minors, gender-affirming care typically involves puberty blockers followed by hormone therapy. A study by the Harvard School of Public Health found that gender-affirming surgery is rarely performed on minors.

About 1.6 million people ages 13 and older identify as transgender, according to UCLA's Williams Institute, a research center focusing on gender identity, sexual orientation and public policy. In 2023, roughly 3% of high school students identified as transgender, according to the U.S. Centers for Disease Control and Prevention.

*Contact Georgea Kovanis: gkovanis@freepress.com*

# Exhibit A-13

February 10, 2025

Dear Valued Patient Family,

It is with a heavy heart that we share an important update regarding the services offered at our Gender Clinic. After careful review of the executive order issued on January 28, 2025, surrounding gender-affirming medical care for children under the age of 19, and in close collaboration with clinical leaders and patient families, Phoenix Children's is indefinitely pausing gender-affirming medical care, specifically puberty blocking and gender-affirming hormonal therapy.

It is difficult to imagine how this information may impact your family and the uncertainty it creates. We are committed to reviewing any future guidance from federal agencies related to this executive order to ensure we are compliant with all federal regulations. We are also committed to updating our patient families as quickly as possible as we learn more.

I want to reassure you that all other aspects of the exceptional care offered through our Gender Clinic, including mental health therapy and outpatient rehabilitation services, are available. We are in the process of reaching out to each patient family directly to schedule appointments with members of our clinical team. During this visit, we will review your child's updated individualized care plan, discuss any social and emotional support needs, and offer any relevant resources and referrals.

Please know our care team is here to support you and you can reach out to us directly through the patient portal or at 602-933-0659 with any questions or concerns.

Sincerely,

Vinny L. Chulani, MD
Section Chief, Adolescent Medicine

Ashish S. Patel, MD
Physician in Chief

JA244

# **Exhibit A-14**

Phoenix-based LGBTQ+ clinic stops providing gender affirming care to minors

**LOCAL news**

# Phoenix-based LGBTQ+ clinic stops providing gender affirming care to minors

**Prisma Community Care said they were forced to stop providing gender affirming care to minors in order to comply with grant funds to continue their broader work**

Posted Feb 11, 2025, 3:54 am

Joseph Darius Jaafari
LOOKOUT



Prisma Community Care, formerly known as the Southwest Center for Parsons Center for Health and Wellness.

The same day Phoenix Children's Hospital was shown to have quietly removed a portion of its transgender care services to comply with President Donald Trump's executive order denying care to transgender people under 19 years old, *LOOKOUT* has learned that Prisma Community Care—one of Arizona's oldest and largest LGBTQ+ clinics—has done the same in order to comply with federal grants and contracts.

Prisma Community Care, formerly known as the Southwest Center for HIV and AIDS, told *LOOKOUT* it was required to follow guidelines

JA246

in grants to stop providing gender-affirming care to minors in order to continue offering broader services, including HIV and PrEP care.

Prisma's Director of Marketing and Community Engagement Iris Avila said the provider contacted all affected patients by phone last week to inform them of the change. She said Prisma assured them that mental health services would still be available and that they were working to connect patients with alternative medical providers. The provider never made a public statement about the decision.

"Due to President Trump's executive order and our obligations under federal grant funding, including our Medicaid and Medicare contracts, we were required to comply," Avila said. "We are no longer able to provide gender-affirming hormone therapy to patients under 19."

Avila noted that only a small percentage of Prisma's patients were affected by the decision.

*LOOKOUT* first learned of Prisma's policy change when a Phoenix-based provider, who requested anonymity to avoid being targeted for continuing care, reached out. The provider said a 17-year-old patient was denied continued treatment at Prisma because they were a minor.

The provider said she had contacted Prisma to inquire about its policies after Phoenix Children's Hospital's decision affected some of her patients. Prisma confirmed it was no longer providing gender-affirming care for minors.

Since *LOOKOUT* broke the story about Phoenix Children's Hospital's decision to quietly remove gender-affirming care, community organizers have called for a boycott of its services. Many have expressed concerns online that the change could have life-threatening consequences.

JA247

2/11/25, 7:02 PM

Phoenix-based LGBTQ+ clinic stops providing gender affirming care to minors



Save for education, and on your taxes.

Open an AZ529 Education Savings Plan today.

Learn More

AZ529 ARIZONA'S EDUCATION SAVINGS PLAN

TREASURER KIMBERLY YEE

For Prisma, Avila said no one at the center was happy about the decision, saying that it felt like "whiplash" and emphasized that mental health support is still provided during this period, which she said was "critical."

"We do not agree with this. But compliance is necessary in order to ensure that we can continue providing the services we have to our community," she said. "There's no abandoning them."

Prisma recently had federal funding reinstated after Rep. Yassamin Ansari (D-Phoenix) sent a letter to Acting Health and Human Services Director Dorothy Fink demanding an explanation for the delay in releasing previously promised funds.

Those funds were initially frozen due to Trump's executive order, which prohibited federal funds from benefiting diversity programs.

*This report was first published by the LOOKOUT.*

### Filed under

news, politics & government, family/life, health, local, arizona, nation/world, breaking, Lookout,

### Read more about

donald trump, federal funding, gender, health care, lgbtq, phoenix children's hospital, republicans, southwest center for hivaids, yassamin ansari

— 30 —

### Top headlines



**Tucson's streets are among the deadliest in the U.S. here's why**

Tucson is one of the most deadly cities in the nation for motorists and pedestrian though crashes and deaths fell slightly last year, pedestrian deaths are up by mor percent since 2017, which experts attribute to the direction of city planning and a homeless population. Read more»



# **Exhibit A-15**

USCA4 Appeal: 25-1279    Doc: 34-1    Filed: 07/25/2025    Pg: 254 of 582

2/17/25, 11:34 PM    Phoenix Prisma clinic's gender-affirming care for kids will resume
Case 8:25-cv-00337-BAH    Document 69-19    Filed 02/18/25    Page 2 of 5

# azcentral.

HEALTH

# Phoenix clinic to resume gender-affirming care for children paused by Trump order

 **Stephanie Innes**
Arizona Republic

Published 6:01 a.m. MT Feb. 15, 2025 | Updated 2:36 p.m. MT Feb. 17, 2025

## Key Points   AI-assisted summary ⓘ

- A federal judge temporarily blocked President Trump's executive order that aimed to stop gender-affirming care for transgender youth.
- The judge's decision comes after several clinics nationwide paused care due to the executive order, causing fear and confusion among patients and providers.
- While gender-affirming surgery for minors is illegal in Arizona, the executive order targeted all forms of gender-affirming care, including hormone therapy.

A federal court ruling against President Donald Trump means more Arizona kids can get gender-affirming medical care, at least for now.

A federal district court judge on Thursday issued a temporary restraining order blocking enforcement of a Trump administration executive order that attempted to shut down gender-affirming medical care for transgender people under the age of 19.

The decision means Prisma Community Care in Phoenix (formerly the Southwest Center for HIV/AIDS) will resume all of its gender-affirming care, including hormone medication, for its young patients, according to a written statement the clinic issued Friday.

In Phoenix, Prisma Community Care and Phoenix Children's Hospital previously had confirmed that they paused hormone medication for transgender teens because of Trump's executive order. Prisma Community Care officials began notifying its patients of the pause during the week of Feb. 3.

USCA4 Appeal: 25-1279    Doc: 34-1    Filed: 07/25/2025    Pg: 255 of 582

Officials with Prisma say they are "relieved" to lift the suspension on caring for patients under the age of 19 due to Trump's "discriminatory executive order." The Jan. 28 executive order says that the United States will not fund, sponsor, promote, assist or support the "so-called transition of a child from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures."

Officials with Phoenix Children's Hospital on Sunday said in an email that they had not resumed care at their gender clinic.

Leaders at Prisma say the court ruling was the green light to fully restore care.

"Our health care providers have resumed normal operations, ensuring the delivery of evidence-based, patient-centered care. We are in the process of notifying the affected patients to resume their care," Prisma's statement says.

"We will persist in advocating for our 2SLGBTQIA+ community, celebrating this development as a significant step forward in supporting comprehensive gender-affirming care for all ages and fighting for the health and dignity of our community."

The acronyms LGBTQIA+ and 2SLGBTQIA+ are umbrella terms for a wide range of gender expressions, identities and sexual orientations.

## Fear drove clinics, hospitals to pause care for transgender youth

Trump issued the executive order about transgender youth on the heels of a Jan. 20 executive order that also targets people whose gender identity does not align with their gender at birth. That executive order declares that "it is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality."

While legal experts with the national nonprofit Human Rights Campaign, which advocates for the LGBTQIA+ community, have said that Trump's Jan. 28 order should not have had an effect on the ability of providers to care for transgender kids, some hospitals and other providers of gender-affirming health care, fearing repercussions, put treatment on pause anyway.

Arizona transgender kids weren't the only youth affected by Trump's order. Clinics and hospitals across the country, including in Massachusetts, Maryland, Washington, Colorado,

JA252

USCA4 Appeal: 25-1279     Doc: 34-1        Filed: 07/25/2025     Pg: 256 of 582

2/17/25, 11:34 PM          Phoenix Prisma clinic's gender-affirming care for kids will resume
Case 8:25-cv-00337-BAH     Document 69-19     Filed 02/18/25     Page 4 of 5

and Virginia, abruptly halted medical care for transgender people under age 19, prompting protests.

The American Civil Liberties Union, Lambda Legal, the ACLU of Maryland, and law firms Jenner & Block and Hogan Lovells on Feb. 4 filed a federal lawsuit challenging Trump's order on behalf of transgender young adults and adolescents and their families whose health care has been disrupted.

"Across the country, this unlawful order from the president has sown fear among transgender youth and confusion among their providers," Joshua Block, a senior staff attorney for the ACLU's LGBTQ & HIV Project, said in a written statement after Thursday's decision.

Block said the decision should restore access to health care for transgender youth, as well as protections under the Constitution.

"Providers who've suspended healthcare for their transgender patients should be left with no doubt that they can lift those suspensions and continue to provide healthcare and act in their best medical judgment without risking their funding or worse," Block said.

## Gender-affirming surgery for kids is rare; in Arizona it's illegal

Leaders with the ACLU and Lambda Legal say the judge's order "prohibits federal agencies from conditioning or withholding federal funding based on the fact that a health care entity or health professional provides gender-affirming medical care to a patient under 19."It's already against the law for any child younger than 18 to get gender-affirming surgery in Arizona and even in states where it's legal, such surgeries are rare, several studies have shown.

 A study by researchers at Johns Hopkins University, published Sept. 25, 2023, in the Cureus Journal of Medical Science, identified 108 such surgeries over three years in U.S. kids ages 17 and younger. The study looked at gender-affirming surgeries between 2018 and 2021 through the American College of Surgeons National Surgical Quality Improvement Program Pediatric database and found more than 90% were chest masculanization surgeries.

Prisma and Phoenix Children's Hospital historically have provided hormones such as estrogen, progesterone and testosterone for a small number of kids whose gender identity does not match with their gender at birth. At Prisma, the number of kids who get gender-

affirming care is small: fewer than 20 people, which represents less than 2% of the clinic's patients.

Prisma always has referred patients who want puberty blockers to Phoenix Children's Hospital. Puberty blockers are a type of medication that can temporarily pause puberty and are reversible, the Human Rights Campaign says.

"Phoenix Children's is bound by all federal laws and regulations for the provision of care to its patients," a written statement from the pediatric health system said. "For this reason, Phoenix Children's is indefinitely pausing hormone therapy services within the Gender Clinic to ensure we are in full compliance with the recent executive order."

A spokesperson for Phoenix Children's wrote in an email Sunday that the statement still stands "as our legal and regulatory folks are looking at this closely."

## Bans on gender-affirming care linked to poor mental health outcomes.

The American Medical Association, American Psychological Association and other major medical organizations in the U.S. support gender-affirming care and say that access to such care leads to dramatically reduced rates of suicide attempts, depression, anxiety and substance use, and to improved HIV medication adherence and reduced rates of harmful self-prescribed hormone use.

The American Academy of Child and Adolescent Psychiatry has said that blocking access to timely gender-affirming care has been shown to increase youths' risks for suicidal ideation and other "negative mental health outcomes." The organization recommends youth and their families formulate an individualized treatment plan with their clinician that addresses the youth's mental health needs, "under the premise that all gender identities and expressions are not inherently pathological."

Gender-affirming care programs typically include both a medical side, as well as mental and social wellness components.

*Reach health care reporter Stephanie Innes at Stephanie.Innes@gannett.com or follow her on X, formerly Twitter: @stephanieinnes.*

# Exhibit A-16

Menu                        Search

UNCATEGORIZED

# PRESIDENT TRUMP IS DELIVERING ON HIS COMMITMENT TO PROTECT OUR KIDS

February 3, 2025

Last week, President Donald J. Trump underline(took executive action) to protect American children from irreversible chemical and surgical mutilation.

**It's already having its intended effect — preventing children from being maimed and sterilized by adults perpetuating a radical, false claim that they can somehow change a child's sex.** Hospitals around the country are

JA256

taking action to downsize or eliminate their so-called "gender-affirming care" programs:

- **NEW YORK:** NYU Langone Health has <u>started</u> canceling appointments for so-called "gender-affirming care" involving minors. They canceled appointments for "two 12-year-olds who had been scheduled to receive implants that dispense puberty-blocking medication."

- **COLORADO:** Denver Health <u>announced</u> it would stop performing sex change surgeries on minor children, while UCHealth <u>said</u> it is ending so-called "gender-affirming care" for all minors.

- **VIRGINIA:** VCU Health and Children's Hospital of Richmond have <u>"suspended"</u> providing transgender-related medication and surgeries for minors, while UVA Health has <u>"suspended"</u> all transgender-related services for minors.

- **WASHINGTON, D.C.:** Children's National Hospital has <u>"paused"</u> prescribing puberty blockers and hormone therapies for minors, while Northwest Washington Hospital has <u>done the same</u>.

- **ILLINOIS:** Lurie Children's Hospital of Chicago is <u>"reviewing"</u> their transgender-related services for minors.

- **PENNSYLVANIA:** Children's Hospital of Philadelphia is <u>"closely reviewing"</u> the transgender-related services they provide for minors.

President Trump will always protect American children.

**Promises made, promises kept – again.**

News

JA257

Administration

Issues

**THE WHITE HOUSE**

1600 Pennsylvania Ave NW
Washington, DC 20500

THE WHITE HOUSE

WH.GOV

Copyright

Privacy

# Exhibit A-17



An official website of the United States government Here's how you know

On Oct. 1, 2024, the FDA began implementing a reorganization impacting many parts of the agency. We are in the process of updating FDA.gov content to reflect these changes.

Search   Menu

**IN THIS SECTION: Search For FDA Guidance Documents**

Search for FDA Guidance Documents

GUIDANCE DOCUMENT

# Study of Sex Differences in the Clinical Evaluation of Medical Products

### JANUARY 2025

Download the Draft Guidance Document      Read the Federal Register Notice

Draft

Not for implementation. Contains non-binding recommendations.

This guidance is being distributed for comment purposes only.

Share   Post   Linkedin   Email   Print

## Submit Comments by 04/07/2025

Submit Comments Online

Although you can comment on any guidance at any time (see 21 CFR 10.115(g)(5)), to ensure that the FDA considers your comment on a draft guidance before it begins work on the final version of the guidance, submit either online or written comments on the draft guidance before the close date.

If unable to submit comments online, please mail written comments to:

Dockets Management
Food and Drug Administration

5630 Fishers Lane, Rm 1061
Rockville, MD 20852

All written comments should be identified with this document's docket number: FDA-2024-D-4245

---

**Docket Number:**

FDA-2024-D-4245

**Issued by:**

Center for Biologics Evaluation and Research
Center for Devices and Radiological Health
Center for Drug Evaluation and Research

Per a court order, HHS is required to restore this website as of 11:59 PM on February 11, 2025. Any information on this page promoting gender ideology is extremely inaccurate and disconnected from the immutable biological reality that there are two sexes, male and female. The Trump Administration rejects gender ideology and condemns the harms it causes to children, by promoting their chemical and surgical mutilation, and to women, by depriving them of their dignity, safety, well-being, and opportunities. This page does not reflect biological reality and therefore the Administration and this Department reject it.

This guidance provides recommendations for increasing enrollment of females in clinical trials, analyzing and interpreting sex-specific data, and including sex-specific information in regulatory submissions of medical products.  Clinical trials and non-interventional studies of medical products should be designed to enroll sufficient numbers of females and males to reflect the prevalence of the disease or condition for which the medical product is being investigated to help ensure the generalizability of results and facilitate exploration of potential differences in effects by sex.  When finalized, this guidance will replace the guidance entitled "Guideline for the Study and Evaluation of Gender Differences in the Clinical Evaluation of Drugs" issued in July 1993.

---

**Content current as of:**
01/07/2025

**Regulated Product(s)**
Drugs

**Topic(s)**
Clinical - Medical

☐ Search for FDA
Guidance Documents

FDA Archive            Visitor Information                    FOIA

About FDA            Website Policies / Privacy            HHS.gov

Accessibility            No FEAR Act                        USA.gov

Vulnerability Disclosure
Policy

Contact FDA    ☐    ☐    ☐    ☐    ☐

☐ 1-888-INFO-FDA (1-888-463-6332)

# Exhibit A-18

Youth Risk Behavior Surveillance System (YRBSS) | Youth Risk Behavior Surveillance System (YRBSS) | CDC

 An official website of the United States government

Here's how you know 

search

Per a court order, HHS is required to restore this website as of 11:59PM ET, February 11, 2025. Any information on this page promoting gender ideology is extremely inaccurate and disconnected from the immutable biological reality that there are two sexes, male and female. The Trump Administration rejects gender ideology and condemns the harms it causes to children, by promoting their chemical and surgical mutilation, and to women, by depriving them of their dignity, safety, well-being, and opportunities. This page does not reflect biological reality and therefore the Administration and this Department rejects it.



YOUTH RISK BEHAVIOR SURVEY DATA SUMMARY & TRENDS REPORT

FOR DIETARY, PHYSICAL ACTIVITY, AND SLEEP BEHAVIORS: 2013-2023

Data Summary & Trends Report for Dietary, Physical Activity, and Sleep Behaviors

Report uses YRBS data to describe trends in youth behaviors: diet, physical activity, and sleep.

Learn More

Youth Risk Behavior Surveillance System (YRBSS) | Youth Risk Behavior Surveillance System (YRBSS) | CDC



## YRBS Explorer

This tool provides visualization of YRBSS data and allows public site users to view data.



## Data and Documentation

2023 National and Combined datasets now available in Access and ASCII.



## 2023 Youth Risk Behavior Survey Results

Read top highlights from the 2023 YRBS results.

# Featured

JA265



## YRBSS Reports and Publications

View or download most recent *MMWR* Supplements, related *MMWR* publications, and YRBSS reports.



## Data Summary & Trends

Examine trend data on health behaviors and experiences among U.S. high school students.

YRBS Analysis Tool

Youth Online (2023 data coming early 2025)

YRBS Explorer

YRBS Explorer Help

# YRBSS topics

Youth Risk Behavior Surveillance System (YRBSS) | Youth Risk Behavior Surveillance System (YRBSS) | CDC



## YRBS Supplementary Tables

View 2023 tables those provide background and supplementary information on the YRBS.



## YRBSS Results

View the most recent YRBSS national, state, and local school district results.

## Learn more

- YRBSS Methods

- YRBSS Participation

- YRBSS Questionnaires

- Communication Resources

- YRBSS Results Toolkit

- About YRBSS

- FAQs

JA267

# **<u>Exhibit B</u>**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

PFLAG, INC.; *et al.*,

     *Plaintiffs*,

v.                                                    Civil Action No.

DONALD J. TRUMP, in his official capacity as
President of the United States; *et al.*,

     *Defendants*.

**DECLARATION OF BRUCE BOE**

I, Bruce Boe,[1] pursuant to 28 U.S.C. § 1746, declare as follows:

1.     My name is Bruce Boe. I offer this Declaration in support of Plaintiffs' Motion for Preliminary Injunction. I am over 18 years old, have personal knowledge of the facts set forth in this Declaration, and would testify competently to those facts if called as a witness.

2.     I am a Plaintiff in this action. I am bringing claims on behalf of myself and as the parent and next friend of my daughter, Bella Boe.

3.     I live in New York City with my spouse and my daughter, Bella Boe, who is 12 years old and in seventh grade.

4.     We are members of PFLAG.

5.     My daughter, Bella Boe, is a strong, artistic, and happy child. Her favorite subjects in school are Social Studies and Spanish. She particularly loves drawing cityscapes and designing clothing. She has wonderful friends, including a group of friends she has had since kindergarten.

---

[1] Bruce Boe and Bella Boe are pseudonyms. My family is proceeding under pseudonym to protect our right to privacy and ourselves from discrimination, harassment, and violence, as well as retaliation for seeking to protect our rights.

1

6.      Bella is transgender. She was assigned a male sex at birth, but since she was a toddler she has expressed her gender differently than most boys. She would tell us that she did not want to have a beard or body hair when she grew up, and that she wanted long hair instead. We tried to raise her in a way where she could lead with her own interests. She always identified with female heroes and characters: her Moana doll was her partner in crime. Bella would take female action figures and put them in her toy firetruck. She gravitated toward close friendships with girls. She loved purple, My Little Pony, and purses she made from laminated paper. From a very young age, she gravitated to music by female singers like Adele and Lady Gaga. In pre-K, when asked what she wanted to be when she grew up, she said, "a princess." We tried not to impose gender expectations on Bella about what boys or girls should like or look like, and did not associate her gender non-conforming behavior with being trans. We thought that she might eventually grow up to be gay or queer in some way.

7.      Bella has been in therapy since she was four years old. She has a growth condition that requires consistent monitoring, including of her bone age, and for which she takes growth hormone.

8.      In 5th and 6th grade, Bella had a very distinct style and particular idea of how she wanted to look. She was wearing boys' clothes, but in all black or neutral colors, with a bit of an edgy style. In sixth grade, she asked to dye her hair blue, and we let her. She told us that she was not like the other boys in her grade: she didn't want to dress like them, in sweatpants and sports jerseys. She stopped picking clothes from the boys' sections of stores, and started to pick out girls' clothing, but in more muted colors. She then asked if she could start wearing rompers, which she decorated with pins. She didn't feel safe wearing girls' clothes to school, but she would wear them at home or out in the city. In sixth grade, she started going to GSA meetings at school to meet

2

JA270

other kids and learn more about different kinds of LGBTQ people. We had already taught her about different kinds of families at home, including families that might have two dads or two moms, so she was already familiar with the vocabulary of people being gay, trans, or nonbinary. It was wonderful for her to be with other kids who were gender non-conforming in some way, and she felt very welcomed by the teacher who advised the club. It seemed like the GSA helped her understand how she might fit in the world.

9.      Other than the GSA, the school at large was not accepting of Bella being different. Early in 6th grade Bella got singled out for her blue hair. Older kids called her names in the streets and hallways. On one occasion, she was followed home from school and surrounded in the street by older kids, who took photographs of her and touched her. She had to call the police to get them to let her go. This event terrified her and made her feel unsafe walking to and from school and in the hallways.

10.     In February 2024, when she was 11 years old and still in sixth grade, Bella asked that we try using they/them pronouns at home. But she wanted to wait until seventh grade to start using new pronouns at school, because sixth grade had been very hard for her. Kids at school were using the word "zesty", which she didn't understand, until one of them explained it was an insult meaning gay or flamboyant. She just came home and cried. It was one of her lowest moments. She realized that she couldn't wear girls' clothes to that school because it was not a welcoming community for LGBTQ people. She started to tell us that it just wasn't worth it, that she wasn't worth it, and talked about wanting to stay in the closet entirely about her gender.

11.     In the last few months of sixth grade, things got worse in terms of bullying. Kids would follow her and call her slurs in the hallway and in the streets. One kid grabbed her, called her trans, and told her to kill herself. Bella started missing school, and we had to keep her home

because of her fear. Bella was already in therapy, but she also started seeing a psychiatrist for medication to help with depression and anxiety related to bullying. Bella is a very conscientious student: she has exceptional grades and is a smart kid who takes school very seriously. For her to start missing school was a huge red flag. When it became clear that the school would not take steps to protect her, we requested and received a safety transfer to a different school for the very end of sixth grade. Being a new environment really helped her.

12.    Bella's new school has been a wonderful place for her. I have seen how her ability to be herself at school has dramatically improved her wellbeing. The first Friday at her new school, there was a dance that she went to with two friends. She was glowing: she wore her romper and could be herself and not afraid to dance with her friends.

13.    That summer in 2024, when she was turning 12, we were on vacation on Long Island, and she saw a beautiful sundress in a shop. She loved it, and listened while the storekeeper, who was an older woman, told her all about how she could wear the dress and then pass it on to someone else when she outgrew it. That was the most feminine thing she had ever asked to wear, and she wore it the entire vacation. While we were away, or shortly after we got home, she told us that she felt that she was a transgender girl. My first reaction was, "There's no rush. You have time to figure it out. Let's just sit with it." But it became really clear that's who she felt she was. She also asked if she could take medication to stop going through puberty. We told her that the first step was just getting her more dresses that she felt comfortable wearing. We supported her by taking her shopping and got her a whole new wardrobe. After that point, she started wearing dresses almost every day. She also felt uncomfortable with her genitals, so we found her underwear with padding that she felt more comfortable in. We noticed an immediate response: she started admiring herself in the mirror and feeling beautiful and confident. She was finally able to wear

4

JA272

leggings or pants. I don't know that I would have fully understood Bella's experience if I hadn't seen her joy and how much these small affirming things meant to her.

14.    That summer, we stopped using they/them pronouns for Bella and started using she/her. She also eventually decided that she wanted to go by the name "Bella," in part because her birth name is typically used by boys. Before the start of seventh grade, in the fall of 2024, we told her school as well. We also let her pierce her ears, and she loves wearing pretty flower studs.

15.    Although Bella told us over the summer that she wanted to see a doctor about stopping male puberty, I did not take any steps at that point because I wanted to see if it came up again. But after a few weeks, and definitely by the fall, it became very apparent that she was fully herself as a girl, and that was the future she saw for herself.  Bella was already seeing an endocrinologist at NYU Langone for a growth condition, and that monitoring included regular exams for puberty. She had already started Tanner II and was approaching Tanner III, so puberty was very clearly happening. I could tell that she was uncomfortable with her changing body, but she had a hard time telling us why. Her existing endocrinologist referred us to the Transgender Youth Health Program at NYU Langone Health.

16.    An adolescent medicine specialist diagnosed Bella with gender dysphoria in November 2024. In addition to our own research, we had two doctors visits at the gender clinic, one in November 2024 and the other in January 2025.

17.    At the first appointment, the doctor talked to Bella about her feelings. Bella explained that she did not like her genitals: they made her uncomfortable, especially because they were growing. She also described other things that gave her dysphoria, like the idea of getting a beard, or a boxy body and face, or a deep voice. The doctor explained how puberty blockers work, including that they are really about pausing puberty and buying time to decide whether Bella

wanted to go through boy puberty or girl puberty in the long run. The doctor addressed our concerns, explained about potential risks to bone health, and the need for monitoring and x-rays for bone density. Bella already has bone age scans because of her growth condition, and she was already taking calcium supplements. We covered very similar topics in great depth at the second appointment a few months later. The doctors asked extensive questions about what Bella wanted and made sure to explain how the puberty blockers work, including that they do not do anything except temporarily pause puberty.

18.    Because Bella already had been at the same therapy practice since she was a toddler, her provider was able to evaluate her mental health for puberty blockers.

19.    At first, I was not confident about puberty blockers being right for Bella. But as I saw how she was blooming in her social transition, and the more I learned from her doctors, I realized it was the right choice for Bella. It felt like a big decision, and I took it very seriously. We did not want to rush any important medical decisions. After much discussion and consultation as a family and with Bella's doctor and therapist, we understood that this was an option that we and Bella wanted to pursue, to give her time.

20.    We proceeded with submitting the relevant paperwork to our insurance company, which approved it. We then scheduled an intake with the appropriate unit at NYU so that we could make an appointment for the puberty-blocking implant. Bella has been seeing various providers at NYU since she was a year old, and we wanted to continue her long history of care there with providers we trust and who know Bella.

21.    Because Bella was in a more supportive school, felt seen as a girl, and knew that we were working toward pausing male puberty, her mental health improved. She had been seeing her therapist twice a week because of all the depression and anxiety, but in December we started

6

talking about going to one day a week. Bella was on the upswing, and we wanted her to be able to pick up another after school activity while also continuing to have support around depression, anxiety, and her gender.

22.     On January 28, 2025, my spouse and I called NYU, and they initially refused to schedule an intake appointment. Even after we explained that our insurance had already approved the implant and that the NYU unit was in network, they told us they were reevaluating their policies on gender-affirming medical care because of "the new administration" – which they confirmed meant the new president of the United States. Later that day, the NYU unit scheduled an intake appointment for Bella for 9:00 am on January 29, 2025. They did not explain why they had changed their mind.

23.     On the night of January 28, 2025, the White House issued an Executive Order entitled "Protecting Children from Chemical and Surgical Mutilation" ("Executive Order").

24.     On the morning of January 29, 2025, we took Bella to the appointment, where the clinician explained the procedure, and the staff told us they would schedule the implant for potentially the next day.

25.     But as the day progressed and we did not see an appointment scheduled, I called NYU, which told me that they had shut down all new procedures and prescriptions related to gender-affirming medical care for patients under 19 because of the Executive Order.

26.     Bella has already started puberty. Without a puberty blocker, I am scared Bella will experience distress and anxiety, and I am terrified that the positive changes I have seen in her mental health since switching schools will be reversed.

27.     When I told Bella that NYU had canceled all future appointments related to gender-affirming care for patients under age 19, Bella was fearful, worried, and depressed. The change in

her mental health reminded me of the worst weeks of bullying at her old school: she was distraught and withdrawing from her life. She is scared about what she might look like in the future if she is unable to get the care that she needs because she is scared to look like a boy. Being forced to undergo masculine puberty and having facial or body hair would make her feel different, isolated, and like a person she does not want to be, and she would not feel like herself. It would undermine all the progress that we have made with Bella's social transition. Because of her stress about not getting the puberty blocker, we are keeping her in therapy twice a week.

28.    I am devastated that the White House has sought to prevent my child from accessing the health care that will allow her to continue to be healthy and her authentic self. Before the Executive Order, we were confident that we would be able to secure the care that Bella needs. But because the Executive Order has caused NYU and other providers to halt the provision of this care, we are scared that we have no way of getting Bella the care she requires. We have been making calls all around New York to try to find a provider for her. Bella has missed school as we have been scrambling to find a doctor who will treat her before she starts to experience irreversible changes from male puberty. We found one doctor who may be willing to give her some medication that can block testosterone, but not the long-acting puberty blocker that we still want Bella to receive.

29.    Bella's health and safety are more important to me than anything else. As her father, I have been managing complex medical decisions for her since she was a baby: she has other health conditions, including endocrine ones, that require monitoring, medication, and balancing the risks, benefits, and alternatives. But for her gender dysphoria, because of the Executive Order, I can no longer play that role and do my job as her parent.

30.    I have watched Bella bloom into a happy and creative young person when she is supported as a transgender girl, and I am scared that she will regress and become depressed again if she cannot access the care she needs now. Bella has been through a lot in her life, but she demonstrated incredible resilience. She is brave and so strong. I do not want to see her prevented from accessing the medical care that helps her be who she is.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this _11_ day of February 2025.

*Bruce Boe*
_____
Bruce Boe

# **<u>Exhibit C</u>**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PFLAG, INC.; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. |
| DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*, | |
| *Defendants*. | |

## DECLARATION OF BELLA BOE

I, Bella Boe,[1] hereby declare and state and follows:

1.    I am a Plaintiff in this action. I offer this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction. I have personal knowledge of the facts set forth in this Declaration and could and would testify competently to those facts if called as a witness.

2.    I am a 12-year-old girl. I live in New York City.

3.    I am in seventh grade. I really like school and learning, especially Spanish and Social Studies. I have very good grades. When I'm not at school, I like to make architectural drawings, practice my graphic design skills, and play video games with my friends.

4.    I am a transgender girl.

5.    As a little kid, I was drawn toward things that let me be like a girl. I loved the movie Moana. My dad loves to tell the story of me singing along to the soundtrack with a t-shirt on my

---

[1] Bruce Boe and Bella Boe are pseudonyms. My family is proceeding under pseudonym to protect our right to privacy and ourselves from discrimination, harassment, and violence, as well as retaliation for seeking to protect our rights.

1

head, pretending to have long hair like Moana. My dad loves superhero movies, and as a kid I loved the movie Captain Marvel. In elementary school, I wore my Captain Marvel pajamas to pajama day, but other kids said mean things to me about wearing "girly" pajamas.

6.      I never felt like a boy, but I didn't feel like I could change it. In middle school, I started to learn more about people who are gay, trans, or non-binary. When I was in sixth grade, I asked my parents to start using they/them pronouns for me at home. I did not feel like a boy, and it felt good to use pronouns that fit with who I am. As I went through this process to understand myself, it wasn't safe at my old school to be nonbinary or trans. I was bullied a lot because I was different, even though I wasn't out at school. My parents and I decided that it wasn't safe for me anymore and I had to change schools.

7.      In May 2024 I started my new school where I was able to be myself. I used they/them pronouns and wore clothes that made me feel like me. As sixth grade ended in 2024, I started to explore more feminine clothes and to grow my hair longer. I really liked how my appearance felt and I began to question if I was nonbinary.

8.      That summer, when I was on vacation with my family, I saw a sundress. I thought it was really pretty and that I could see myself in it. It was a special moment. I tried it on, and it made me feel like myself. I realized that I was a trans girl. The dress helped me understand how I wanted to look and feel. I wore the sundress for the rest of the vacation.

9.      During that vacation, I told my parents that I was a trans girl, not nonbinary. I had been thinking about it for a while. My parents told me they would always love me and support me and that they were happy I was discovering who I am. It felt good that people knew, and it made me feel like I could tell more people. I could come out and be myself.

10.     After I came out as a trans girl, I wanted everyone to know that I was using she/her pronouns. I didn't want to be hiding any longer. I bought more girly clothes that feel like me and express who I am.  I also got my ears pierced.

11.     I was already in therapy, and I also worked with my therapist to find a new name. I picked out a list of names I like, but "Bella" felt the most like me. I didn't like that my old name made people think I was a boy. I wanted a name that felt like a girl's name. Lots of names could do that, but Bella felt like mine. When people use Bella I feel a lot more like myself.

12.     Now that I am known as a girl, I feel more comfortable being friends with other girls, even though everyone should be able to be friends with everyone.

13.     I started puberty recently, which has made me sad and uncomfortable. I'm not very far into puberty,  but it doesn't feel right. I worry a lot about growing facial hair and body hair in the future. I know if I had all the things that come with male puberty I would not feel good. I worry that after puberty happens it's irreversible, and I might end up with a deeper voice and facial hair forever. These things are the opposite of who I am as a girl.

14.     In the fall of seventh grade, my parents took me to the doctor to talk about how I was feeling about my body and puberty. The doctor talked to me for a long time about how I feel about my gender and my body. I told the doctor that I felt really uncomfortable with all the changes that my body was going to go through. I understand that puberty blockers will pause puberty and make sure my body stops turning into a man's body. That would help me stop worrying about the future. I want to stop male puberty until I am ready to start female puberty. If I had my choice, I would get a puberty blocker implant so that I did not need to worry for a long time about male puberty starting. Worrying about male puberty makes me less productive. It makes it harder to

3

focus on school. I can make it through the day, but I have to take a break after school before I try to do my homework.

15.    When I get older, I imagine myself as a woman. I do not want to look like a man in a dress when I grow up. The idea gives me so much anxiety.

16.    I know that since NYU cancelled my appointment, my parents have been trying to find care for me somewhere else. I have had to miss school for all those appointments, which is putting me behind. It feels so unfair. Being behind in school just makes me more anxious.

17.    I know that when I get this care, I will be so much happier. I can be like other women in my life when I'm older. I'll feel less scared or embarrassed. I won't have to feel different or jealous of other girls. I'll get to look forward to my future. I want to be a teacher when I grow up so I can support students, especially students like me.

18.    When I think of my future, I am a woman. When I think about my trans journey, I feel complete. I get the picture of who I am. It feels good to know all of this about myself. I feel whole. If I'm going to get to the future I imagine, I need the treatments my doctors say will help.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this _11_ day of February 2025.

_Bella Boe_
Bella Boe

# **<u>Exhibit D</u>**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PFLAG, INC.; *et al.*,

     *Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States; *et al.*,

     *Defendants*.

Civil Action No.

## DECLARATION OF GEORGE GOE

I, George Goe,[1] pursuant to 28 U.S.C. § 1746, declare as follows:

1.     My name is George Goe. I offer this Declaration in support of Plaintiffs' Motion for Preliminary Injunction. I am over 18 years old, have personal knowledge of the facts set forth in this Declaration, and would testify competently to those facts if called as a witness.

2.     I am a Plaintiff in this action. I am bringing claims on behalf of myself and as the parent and next friend of my son, Gabe Goe. I live in Bethesda, Maryland with my partner and my son, Gabe Goe, who is 14 years old and in eighth grade.

3.     Gabe's mother and I are both members of PFLAG.

4.     Gabe is a creative and kind teenager. He likes to draw, play video games, and watch anime and other TV shows.

5.     Gabe is transgender. He was assigned a female sex at birth, but he is male.

---

[1] George Goe and Gabe Goe are pseudonyms. My family is proceeding under pseudonym to protect our right to privacy and ourselves from discrimination, harassment, and violence, as well as retaliation for seeking to protect our rights.

1

6.      Looking back on what Gabe was like as a small child, I am not very surprised that he's a boy. He would always gravitate toward toys and activities associated with boys, and his friends tended to be boys. He would wear camouflage, cargo pants, and t-shirts. In his pretend play, Gabe was always boy characters or imaginary creatures. He never liked playing princess or being called a princess. At Disney World as a toddler, a greeter said to him, "Hello, Princess!" Gabe very clearly replied, "I am not a princess!" In my mind, his preferences could have meant something about his gender or sexuality, or it could have meant nothing. But he definitely leaned toward things he considered "boy" things and away from things he considered "girl" things. But there was never any question that we as a family would accept Gabe for who he is no matter what gender identity he had. He is surrounded by a supportive family and community.

7.      In July of 2023, when Gabe was 12, he told us that he was transgender. He asked for a short hair cut, and I assumed that was just for convenience at camp. But when he got back, he told his mother that he was transgender. Because Gabe finds it hard to talk about his feelings, his mother let me know that Gabe wanted to be called "Gabe" and use he/him pronouns and be treated like a boy going forward. I was happy for Gabe, because he was happier, and was using his voice to tell us who he was. But I felt a sense of loss initially, which was more about my own experience of being happy as a "girl dad." I also had 12 years of raising a daughter and felt like I was starting over with no experience in raising a son. While it took me a little bit to deal with my initial feelings of loss, it was made a lot easier just seeing how happy and comfortable Gabe had become. Deciding to focus on everything he needed to continue to grow and be healthy was an easy decision.

8.      Gabe doesn't like to talk about his feelings, and never really has. He manages a lot of that by himself, and he likes to do his own thinking and research before he comes to me or

another adult for help. So I was not surprised to learn that he had been thinking about his identity as a boy and trying to manage his feelings internally for more than six months before he told us. I also wasn't surprised that he had already picked a new name and a new nickname for himself. As part of his social transition, he also got a more masculine haircut and more masculine clothes. Gabe wanted the image that he projected of himself in the world to match how he saw himself on the inside.

9.      Gabe told us during the summer that he was transgender, and so we made sure that his school knew before he came back in the fall for the next school year, in 7th grade. His school was very supportive, and they made sure that everyone knew and used his new name and he/him pronouns. He had the same teachers before and after his social transition, and they have observed that he is more confident, open, and social now than he was before.  Because he is comfortable inside himself, he can be more confident outside himself. I also know that he doesn't need to worry during the school day about how he is treated, so he just has normal school day worries, not worries about whether he will be treated differently than other kids.

10.     Since Gabe socially transitioned, I have noticed there's been more wisecracking, and more jokes. He is more confident and takes better care of himself. He cares more about how he looks, and he is more intentional about picking out his clothes. Some of that is because he is becoming an older teenager, and also because he is becoming more himself.

11.     But I know that how he feels about his physical body is holding him back, and makes it hard to keep up his confidence. Gabe was diagnosed with gender dysphoria in 2023, when he was 13 years old, by his primary care physician.

12.     He also experiences a lot of dysphoria around getting his period and his voice.  Gabe would always hide getting his period, and completely refused to talk about it. I don't think he even

3

told us when it first happened, and it was difficult to get him to tell us what he needed in terms of supplies and clothes going forward. We tried to model that there was nothing to be embarrassed about. Even though I didn't grow up with sisters and had to learn about some of this myself, I would talk openly with my partner when she got her period about what was happening and what she needed for hygiene supplies, so that Gabe could see it was nothing to hide and I would get him whatever he needed. But he kept hiding that it was happening. We even tried to work out some kind of signal so he could let us know when he got his period without talking about it, but he still refused. He still finds it very difficult to discuss.

13.     In addition to his period, Gabe experiences a lot of dysphoria about his voice. He is very focused on how his voice sounds. We've talked about voice coaching, and he's studied how tone and visual cues can make him sound more like a man. But he's very "in his head" about not being able to talk without being seen as a girl.

14.     Gabe has been working with a wide array of doctors to treat his gender dysphoria. In the fall of 2023, when he was 13 years old, his primary care provider referred us to Children's National Hospital ("Children's National") in Washington, D.C. We got in touch with an endocrinologist there, who then put us in touch with a psychologist specializing in transgender health also at Children's National. He has also seen a gynecologist.

15.     Gabe starting seeing a psychologist, who had a process for evaluating Gabe over a series of appointments to confirm his gender dysphoria and help us determine what medical steps, if any, would be appropriate for him. Because Gabe wants to look like a boy, and especially to sound like a boy, Gabe was interested in testosterone. But we wanted Gabe to be evaluated and to make sure that this was the right choice for him now.

16.     We also took steps to control Gabe's periods because of how severe his dysphoria is. After evaluating Gabe, his doctors explained that he had undergone too much female puberty to start puberty blockers. After talking to his doctors about the risks, benefits, and alternatives to various methods, we decided that we would try an IUD along with medication. Both the IUD and the medication can be either removed or discontinued if Gabe no longer wants them. That has helped some, but it hasn't fully stopped his period. The doctors explained that adding testosterone would help further suppress his periods and treat his dysphoria around menstruating.

17.     We also had Gabe talk with an endocrinologist about testosterone. I was part of all those conversations. We talked about what Gabe's options were and about what timelines were appropriate for when he could, or could not, start medications like testosterone. We also talked about what changes were permanent or not, and what choices he might lose or again depending on what medications we decided he should take. For example, we spoke with a fertility specialist about egg preservation before starting testosterone. We learned that Gabe did not need to make any final decisions. Because he had already gone through female puberty, he could harvest eggs later, if he wanted to do that.

18.     It was clear from our discussions, especially after talking about the risks, benefits, and alternatives, that testosterone was the right choice for Gabe. It would help suppress his periods in ways that other medications would not; it would make his voice deeper; it would help his body and face shape become more masculine. Gabe also understood what testosterone wouldn't do, like make him taller. He is realistic about what testosterone can and cannot change. We've also talked about doing workouts and lifting weights to try to make his body shape more masculine.

19.     These conversations took place over multiple appointments when Gabe was 13 and 14. They involved follow up visits, discussions over risks, benefits, and alternatives. In November

2024, we went for another follow up appointment to extensively go over the risks and benefits with the endocrinologist, who also told us about the blood testing and the letter of support Gabe would need from the psychologist in order to receive testosterone, as well as turning 14. During our November 2024 appointment with the endocrinologist, we scheduled the next appointment with her for March 2025.

20.     About two weeks ago, in mid-January 2025 we finalized the changes to Gabe's birth certificate for his name and gender marker. Unfortunately, that did not get changed in time to revise his passport.

21.     On January 28, 2025, the White House issued an Executive Order entitled "Protecting Children from Chemical and Surgical Mutilation" ("Executive Order").

22.     On January 30, 2025, we reached out to the psychologist at Children's National to ask about what else we needed to do in advance of Gabe's appointment with the endocrinologist in March, when he planned to start testosterone. The psychologist told us she could finish Gabe's evaluation after one more appointment, but, because of the Executive Order, Children's National was no longer issuing new prescriptions or processing refills on existing prescriptions for gender-affirming care for people under 19. Gabe would not be able to start testosterone as planned.

23.     Gabe is especially aware of his body and how his voice sounds because other boys in eighth grade are going through puberty and starting to look like high schoolers. He is also focused on not wanting his breasts to grow any bigger. I know that Gabe does not want a period, and does want a deeper voice, along with a more angular face, and more muscle. He is a boy on the inside and wants his body to reflect that.

24.     Gabe has been looking forward to this part of his transition. Starting testosterone will allow him to develop as a young man, which is how he sees himself and how he presents

himself to the world, at the same time as his peers. Gabe is especially disappointed, as am I, because he knows that the changes from testosterone take a while to manifest. So the longer he waits, the further behind he will be in terms of looking like a man. It is such a big disappointment that he might not be able to start high school living in the body that matches who he is, or feeling like a young man alongside his peers who are turning into young men. Gabe needs to be able to look and feel like the young man he is, and to get the medical care he needs to treat his gender dysphoria.

25.    I don't want my kid's mental health or physical health to block him from growing up. Gabe also has allergies that result in asthma, and we have worked for years with his doctors to make sure that he has the right medication so that he doesn't get asthma attacks while he's running. Similarly, we also want to work on his gender dysphoria, again, as a family and with his doctors. Gabe would struggle with his asthma if we took his medicine away. And now he's going to be struggling because he cannot get this other medication for his gender dysphoria..

26.    Losing access to starting testosterone is especially hard for Gabe because he knows that it is just transgender boys like him who cannot get testosterone; he knows that medication is still available for boys assigned male at birth who are his age. It hurts more that he has been targeted because of who he is to not be able to get this medical care. It feels scarier.

27.    Gabe is very private, so he's only going to share his story of being trans with people he trusts. I worry about him, because I want him to feel confident that his body reflects how he sees himself. I know he wants to be able to make his own choices about who he tells he is trans, and I worry that how his voice sounds or how he looks will take that choice away from him.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this 11th day of February 2025.

_George Goe_

George Goe

# Exhibit E

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| PFLAG, INC.; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. |
| DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*, | |
| *Defendants*. | |

## DECLARATION OF GABE GOE

I, Gabe Goe,[1] pursuant to 28 U.S.C. § 1746, declare as follows:

1.     My name is Gabe Goe. I am a Plaintiff in this action. I offer this Declaration in support of Plaintiffs' Motion for Preliminary Injunction. I have personal knowledge of the facts set forth in this Declaration, and would testify competently to those facts if called as a witness.

2.     I am fourteen years old and in eighth grade. I like to be outdoors and play sports for fun. I like boxing, tennis, snowboarding, and hiking. I also like to go camping, and spent a couple summers in an outdoor camp, where for two weeks I kayaked and camped outside in a tent that I carried and built myself. I had so much fun.

3.     When I come home from school, I will sometimes cook. I can make eggs. I mostly like to play video games and hang out with my friends. I like to make art on my digital tablet or with acrylic paint. I like that you can layer the paint on top of each other to create texture. My dad hangs my paintings on the walls of our home.

---

[1] George Goe and Gabe Goe are pseudonyms. My family is proceeding under pseudonym to protect our right to privacy and ourselves from discrimination, harassment, and violence, as well as retaliation for seeking to protect our rights.

1

4.      I am a transgender boy. When I was born, the doctors and my parents thought I was a girl.

5.      Growing up, I didn't really think about my gender, but I absolutely hated wearing dresses. It felt impossible to wear a dress. I always sit crisscross and in other weird ways with my legs far apart, and I couldn't sit like that in a dress. I hated wearing the color pink, and I wasn't very feminine. I wanted to wear t-shirts and shorts like I do now.

6.      When I was very little, I remember going to Disney with my cousin, and she wanted to go to a princess dinner with me. I cried and begged not to go, and then cried the whole time we were there. I wanted so badly not to be there. Another time at Disney, when one of the greeters said, "Hello, Princess!" I corrected them to say that I was not a princess.

7.      In third grade, I dressed up as Link from Legends of Zelda for Halloween, and I liked it because Link had a sword and was a boy. I also remember dressing up as a Ghostbuster and Spider-Man.

8.      I didn't act like the girls in school, even though there were girls that were less girly and more masculine. I was always trying to compete with boys to show them that I was just as strong or even stronger than they were. I would race them and join in their competitions on the playground. I also liked to wrestle.

9.      When I started puberty, I hated it. I did not feel good about the changes happening, and they made me feel bad about my body. Even when I was not sure why the changes felt weird or bad, I just knew that they were wrong. I did not like growing breasts. I remember the first time I got my period, and it was terrible. It gave me anxiety and dysphoria, like it felt wrong for my body. When everyone else in my grade got their period, they told all of their friends, like it was a

2

JA294

celebration. I didn't tell anyone when I got mine because it didn't feel like something to celebrate. If I had a choice, I would never go through getting a period again.

10.    When I was around twelve years old, I learned about trans people and realized that I was one, too. It helped make sense of how I was feeling about my body changing in ways that didn't feel like me, and why I wished my voice sounded different.

11.    Two weeks before I came out to my parents, I was in an airport, after I had gotten a short hair cut. On the airplane, a flight attendant called me "sir" or "mister." A friend was with me when it happened, and she didn't correct the flight attendant, but made a joke about it. But at that point, I already knew I wanted to be a boy, and so it felt good to be treated like a boy.

12.    When I told my parents that I was transgender, I remember being really, really stressed about telling them. I felt better after telling them, but not totally better, because I was still stressed about telling my friends. I told one of them over text, "By the way, I am a boy," with the transgender pride flag emoji next to it. She had a good reaction, and that made me feel more relaxed.

13.    I picked a new name by myself. I had a few ideas, ones that started with one of my favorite letters. I remember hearing someone say the name I would later pick while I was at camp, and I thought it was a good name because I liked the nickname for it. I really, really disliked my old name because it was very feminine and super common. I also did not like the nicknames for my old name. I now just pretend that the name I use now, "Gabe" was the name I was given at birth. The name I picked, and the nickname, are both names that only boys are given.

14.    My parents told my school about my new name and pronouns. I was surprised at how quickly everyone started using my name and he/him pronouns, and how everyone accepted it.

15.      I still feel anxious about my voice not matching who I am. When I am in public or in places where people do not know me, strangers will often think I am a boy when they see me, and will use male pronouns for me. That is exactly what I want to happen. But as soon as they hear me talk, they start using female pronouns. That is the opposite of what I want. It feels bad when people change the pronouns they use for me, because then I know exactly why they no longer treat me like a boy—my voice. I want to feel that people see me as a boy even after I talk to them, because I am a boy and feel like a boy. My friends see me as a boy because they know I am boy, and I want to be treated like that all the time.

16.      I have also talked to my doctor and my parents about what testosterone can do to help treat my gender dysphoria. I want to go through male puberty because I prefer all the changes that will come with male puberty so that my appearance on the outside will reflect the person that I really am. I want to be in a grown-up male body when I am older. I want a deeper voice most of all. I would like the option to grow facial hair—my dad has a beard—and to get broader shoulders and have more muscle. I know from the doctors that testosterone will help with all of those things, and also help with not getting a period anymore. I know that I might also go bald—like my dad— but I am okay with that if it means a deeper voice and other changes. I would like to be taller, too, but I know that it is unlikely the testosterone can help with that because of my age and how much female puberty I've already had. After going to the doctor's office and talking about testosterone, I knew that was the right choice for me.

17.      I am supposed to start testosterone in March of 2025, a month from now.

18.      I know that there is an Executive Order from the President that is supposed to stop me from getting testosterone. I am scared about losing the ability to start. I want to grow up and be safe as a transgender person in the future, and I want to have the choice of whether or not to tell

4

JA296

people. Right now, as soon as I start talking, people know. Sometimes, when I am far away from where I live and the people who know me as a boy, it doesn't feel safe. Testosterone will help me feel like my body is mine, and it will treat the dysphoria I feel around how I look and sound now.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this 11th day of February 2025.

_Gabe Goe_

Gabe Goe

# **Exhibit F**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PFLAG, INC.; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. |
| DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*, | |
| *Defendants*. | |

## DECLARATION OF RACHEL ROE

I, Rachel Roe,[1] pursuant to 28 U.S.C. § 1746, declare as follows:

1.      My name is Rachel Roe. I offer this Declaration in support of Plaintiffs' Motion for Preliminary Injunction. I am over 18 years old, have personal knowledge of the facts set forth in this Declaration and would testify competently to those facts if called as a witness.

2.      I am a Plaintiff in this action. I am bringing claims on behalf of myself and as the parent and next friend of my son, Robert Roe.

3.      Along with my husband, I am the parent of Robert Roe, my 16-year-old son. We live in Massachusetts. Robert is eligible for health insurance through MassHealth until he turns 26, because he is adopted. MassHealth is Massachusetts' state Medicaid program.

4.      We are members of PFLAG.

---

[1] Rachel Roe and Robert Roe are pseudonyms. My family is proceeding under pseudonym to protect our right to privacy and ourselves from discrimination, harassment, and violence, as well as retaliation for seeking to protect our rights.

5.      My son, Robert, is an incredible teenager. He is smart, active, and very involved in his school, church, and community. He is an honors student carrying a vigorous academic load. He is a committed member of our church and youth group, where he often volunteers to assist Sunday school teachers with their young children and helps the church with its audiovisual needs. He is very talented at sports and is extremely committed to exercise – he manages his own schedule and is very disciplined. He started for his high school's varsity team as a freshman, and he is a leader on the team. He has also won a state championship in one sport and been selected for All-Star teams.

6.      Robert is transgender. He was assigned a female sex at birth, but I knew from a very early age that he did not identify as a girl. Robert started to express his gender identity as early as two years old. Once, when he was two years old, I picked him up from daycare after they had administered the testing that Massachusetts requires every six months. Robert's teacher told me that he would have scored 100% on the test, except that he kept insisting that he was a boy. Even when his teacher gave him many chances to change his answer because she wanted him to receive a perfect score, she told me that he refused, and he continued to insist to her he was a boy.

7.      Robert also resisted girls' clothes from an early age. He would regularly dress up in dragon costumes to avoid having to wear girls' clothes. When Robert would return from his grandparents' house—where they insisted he wear girls' clothes—to our house, the first thing he would do would be to run up the stairs to his older brother's room and change into his older brother's clothes. Eventually, I started to buy him his own boys' clothes to wear. I did not know whether Robert was just going through a phase, or really wanted to be like his older brother, or if he was transgender. But as a parent, I knew that the right answer—no matter which it was—was to tell Robert that I loved him and support him.

2

JA300

8.      By around eight years old, Robert had been consistently asserting that he was a boy, and we decided to begin a process of social transition. Robert began his social transition at around age 8. It was clear to me that Robert was meant to live as a boy, and that he would do better in school and the rest of his life if we let him live that way. For example, he would refuse to use girls' restrooms at school. When Robert started at a new school for third grade, his teacher introduced him by his chosen male name and with male pronouns. He did better in school being himself.

9.      Robert's pediatrician diagnosed him with gender dysphoria diagnosis at the age of nine and referred us to Gender Multispecialty Services (GeMS) at Boston Children's Hospital.

10.      Robert has been receiving medical care from GeMS since he was nine years old. He first met with a team of doctors who explored Robert's gender identity with him, as well as a therapist to assess the status of his mental health. They spoke to him at length and had him do different kinds of evaluations to understand his gender and how he felt about it. They agreed that Robert had gender dysphoria. At first he saw a psychologist or psychology fellow every six months, and then every year. Because Robert was doing well with his social transition and had not yet started puberty, all he needed at that point was to feel supported living as a boy. At every appointment, they assessed whether Robert was consistent in his gender identity and if he had any other mental health conditions that needed to be addressed.

11.      Robert also had appointments with an endocrinologist at GeMS every six months, both for bloodwork to look for signs of puberty and also to discuss with me and with Robert what choices we would have when puberty started. Robert's endocrinologist showed us detailed charts explaining what a female puberty looks like, so that Robert could understand what would happen to his body during puberty and also be able to tell us when he started seeing those changes.

3

JA301

12.    Because of the regular blood tests at GeMS, we were able to discover when Robert's hormone levels starting showing early signs of puberty, around age 11. When the doctors saw that puberty had started, but there had not yet been many physical changes, we discussed again whether that was the right time for Robert to start puberty blockers. Robert knew from his discussions with the doctors what the changes from female puberty would mean for him, and he was clear and consistent that he did not want that to happen. The whole world knew and saw Robert as the boy he is and it was difficult for him to imagine going through physical changes that would compromise that.

13.    Although we had already been talking for several years at that point about what the options would be when puberty started, the doctors again thoroughly explained the risks, benefits, and alternatives. I knew that the risks included potential bone density issues and the anesthesia from the procedure to insert the implant. I also remember the emphasis that the blocker was reversible and it would give Robert more time to mature and decide whether he wanted to undergo a female puberty or not. Although we started talking about fertility, I also understood that was a decision Robert could continue to make with our support in the future, and that the blockers themselves didn't eliminate any choices for him to have biological children. Based on those discussions with doctors, with Robert's father, and with Robert, I decided that benefits of a puberty blocker outweighed the risks, and certainly the alternative of starting female puberty. I wanted Robert to continue growing up and feeling comfortable in his body without worrying about physical changes that did not match who he was.

14.    Based on those discussions, and with my consent and Robert's assent, Robert received a puberty-blocking implant at age 11 at GeMS. Robert continued to see endocrinologists at GeMS to make sure the blocker was working to stop female puberty, and also psychologists to

make sure he was doing well emotionally. Robert did not have negative side effects from the puberty blockers and thrived while on them.

15.    After Robert received the puberty blocker, we had time to let Robert continue to get older and live his life, without the anxiety of worrying about physical changes that did not match Robert's male identity. We also started having conversations with Robert's doctors, and with Robert, about testosterone. We knew that Robert could not be on blockers indefinitely, and at some point would have to undergo either a female puberty or a male puberty.

16.    Eventually, after being on the blocker for about three years, Robert started receiving hormone therapy (testosterone) at age 14 at GeMS.  Again, before we began this treatment, Robert's doctors made sure he understood what male puberty would look like, and that the alternative would be female puberty. Robert's doctors provided us with extensive counseling on the risks, benefits, and alternatives to hormone therapy. For Robert, most of the risks were things he was looking forward to—getting taller, facial hair, a deeper voice—and the things that he wasn't looking forward to, he could live with, like acne or male pattern baldness. Robert's doctors also specifically informed him of the risks to his fertility and repeatedly asked him about whether he would ever want to get pregnant or wanted to undergo female puberty, harvest his eggs, and preserve them. Robert and I also discussed the impact of hormone therapy on his fertility at home, where I asked him these same questions. At every turn, Robert consistently told both me and his doctors that he would not want any of that. Robert wants to be a father to children someday, but, as an adopted child himself with adopted siblings, he knows that there are many ways to make a family. When I asked him if he would ever want to be pregnant, he looked at me as if I were an alien and forcefully told me no. We also talked about the alternatives to testosterone, meaning

letting female puberty start, which Robert was very clear he could not let happen. I also knew, as

his mother, that he would not be himself if he started female puberty.

17.     We also talked about the benefits of starting testosterone at 14, as opposed to a later

time. Robert was mature enough to understand what puberty meant, and also that other boys his

age had started puberty or would be starting soon. As his mother, I agreed with his doctors that

Robert would benefit from going through puberty alongside his peers. Robert also noticed that

boys were starting to look more adult and less like little kids, and that was something he wanted

to do alongside his friends. Robert was clear and consistent that he was ready to start living and

looking like a young man. I was also told, and Robert understood, that the changes from

testosterone would be gradual, and that if at any point Robert did not like the changes, he could

stop increasing or lower his dose.

18.     Based on our consent as Robert's parents and Robert's assent, he started

testosterone. At first, I did his weekly shot for him. Eventually, Robert felt comfortable enough

that he wanted to be responsible for his own shots, and he's been doing that for a while. Robert

lets me know when he needs refills, which I order and pick up for him. We have follow-up

appointments with Robert's endocrinologist at GeMS every six months to assess his dosage levels

and see if they should stay the same or increase. Like with the puberty blockers, he has not

complained of any unwanted side effects from the testosterone.

19.     Robert has been doing very well on testosterone. His voice is getting deeper, he has

grown some facial hair, and he likes getting and feeling taller and stronger. He is very clearly

comfortable in his own skin. Robert has the freedom to be himself because of the medical care that

he has been able to receive as a young person. He is healthy, social, and thriving. He has a close

group of friends who have played sports with him since they were in middle school, and he is

beloved by many of his friends' families, including and especially their little siblings. While some close friends know that he is transgender, most people do not, and it remains his choice who he decides to tell. The friends that do know he is transgender are incredibly supportive, as are their families. To know Robert is to love him.

20.    On January 28, 2025, the White House issued an Executive Order entitled "Protecting Children from Chemical and Surgical Mutilation" ("Executive Order").

21.    Robert had an appointment scheduled at GeMS for Wednesday, January 29, 2025. This appointment was supposed to be a routine check-up regarding Robert's hormone therapy: he would get bloodwork done, his providers would confirm that he was receiving the correct level of testosterone or adjust his dosage if necessary, and that would be it.

22.    But that morning, a Nurse Practitioner whom we had seen at GeMS called me and told me that, because of the Executive Order, the appointment was canceled, and GeMS were canceling all of its appointments for people under age 19 as of that morning.

23.    Without testosterone, I am fearful that Robert will experience significant distress and anxiety. He has never undergone an endogenous female puberty because of the blockers; he has only ever developed and lived life as a boy. He needs testosterone to continue to live his life. If he could not get testosterone, he would start to undergo female puberty, and I am terrified of what that experience would do to his mental health when he has been so consistent and so insistent that he does not want that. This is a child who has been telling me since he was two years old that he is a boy; he is now a 16 year old young man. It would be alarming to him to suddenly start developing a woman's body.

24.    I am also worried that Robert will lose all the physical benefits of the medical care that he has been able to receive up until this point. Robert will likely not require chest

masculinization surgery ("top surgery") because his puberty-blocking implant prevented the growth of breast tissue. If he loses access to medical care and cannot continue to take testosterone, I am worried that female puberty will start and he will need surgery later on.

25.    When the Nurse Practitioner from GeMS called me the morning of January 29 to tell me that they were canceling Robert's appointment, Robert was silent. Since then, Robert has been worried that he may not be able to continue his care. He is scared that female puberty would undo all of the good things in his life, from sports to school to church.

26.    I am devastated that the President has sought to prevent my child from accessing the health care that allows him to be his true self. I would do anything to get Robert the care he needs, even if that meant the time and expense of going abroad to Canada. I do not know if that is even possible, or if Canadian providers would treat him, or have room on their schedules. I do not know if MassHealth would cover that treatment, either. And I would much rather Robert continue to see the providers at GeMS, who we both know and trust. Because of the Executive Order, I do not know how else to get Robert the care he needs.

27.    As a parent to Robert and his siblings, it is my job to assess the risks, benefits, and alternatives to recommended medical care, which I routinely do. It is only in this context of gender affirming medical care for my son Robert that the federal government is preventing me from caring for my children.

28.    The health and safety of my children is more important to me than anything else. I have watched Robert become a successful, involved, and happy young man. As his mother, it is my job to do everything in my power to keep him on that path.

8

JA306

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this ___ day of February 2025.                    _____

                                                                          Rachel Roe

# Exhibit G

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| PFLAG, INC.; *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity<br>as President of the United States; *et al.*,<br><br>    *Defendants*. | Civil Action No. |

## DECLARATION OF ROBERT ROE

I, Robert Roe,[1] pursuant to 28 U.S.C. § 1746, declare as follows:

1.     My name is Robert Roe. I am a Plaintiff in this action. I offer this Declaration in support of Plaintiffs' Motion for Preliminary Injunction. I have personal knowledge of the facts set forth in this Declaration and would testify competently to those facts if called as a witness.

2.     I am sixteen years old.

3.     I live in Massachusetts with my mom Rachel Roe, my dad, and my siblings.

4.     My family belongs to PFLAG.

5.     I am transgender. My sex assigned at birth was female, but I am male.

6.     For as long as I can remember, I have identified as a boy. When I was a little kid, I got a journal full of fill-in-the blank prompts. One of the prompts said, "When I grow up, I want

---

[1] Robert Roe and Rachel Roe are pseudonyms. My family is proceeding under pseudonym to protect our right to privacy and ourselves from discrimination, harassment, and violence, as well as retaliation for seeking to protect our rights.

to be a _____." I think you were supposed to write "firefighter" or something like that. Instead I wrote in the blank spot, "A boy."

7.    When I was in maybe first grade, my elementary school had swim lessons, and before each lesson the boys lined up on one side of the pool and the girls lined up on the other side. It was obvious to me that I should line up with the boys, so I did. It never occurred to me to line up with the girls. My teachers were confused when they called attendance and saw me in the boys' line, not the girls' line, but I knew I was in the right place. I also swam in shorts, not a bathing suit, and with no shirt on. I never liked wearing girls' clothing, especially dresses. When I was five or six years old, my grandmom made me wear a dress for a party. I wore it backwards, so that the bow wasn't on my front. Later, I put on a pair of my brother's pants and tucked it, so it just looked like a regular shirt, and I took off the girly dress shoes and put on a pair of my brother's shoes instead. In school, I would refuse to use the girls' bathroom. I would hold it, or if I had time, run to the single restrooms at the front of the school. If I couldn't hold it or make it, I would go to the boys' restroom.

8.    I started at a new school for third grade, which is when I began going by "Robert" and using male pronouns at school. Since then, I have introduced myself as Robert and as a boy.

9.    When I was about nine, I started seeing doctors at GeMS at Boston Children's Hospital. I have been going there regularly since then. My pediatrician diagnosed me with gender dysphoria and the doctors at GeMS confirmed the diagnosis. During my first few appointments at GeMS, the doctors asked me a lot of questions about how I felt about using the girls' bathroom (not good), wearing a dress at my wedding (definitely not), and other questions about how I wanted to live my life (as a boy). They would mark my answers on a scale from a girl unicorn to a boy unicorn, and all my answers fell on the boy unicorn side. At first, I saw an endocrinologist there

2

every six months, and a psychologist every six months as well. Eventually, they told me I only needed to see a psychologist once a year, because I was doing well living as myself. But at all those appointments, I was asked if I still felt like a boy and wanted to continue living as a boy. I always did, and still do.

10.     I received a puberty blocker at GeMS when I was 11 years old. I had been talking about puberty blockers with my doctors at GeMS, as well as my parents, for several years at that point. The doctors at GeMS explained to me in great detail what a puberty blocker was and showed me charts explaining the puberty I would experience if I did not get a puberty blocker. I knew I did not want any part of that puberty and that I did not want to start looking like a girl. To get the puberty blocking implant, I needed anesthesia. I remember waking up, eating a popsicle, and thinking that I was so happy that I did not have to be a girl.

11.     I will never forget the exact date I started testosterone when I was 14 years old, about two years ago (in 2023). That day was really special to me. Before I started hormone therapy, the doctors at GeMS had many conversations with me about the pros and cons of starting testosterone. They told me that I would likely grow facial hair, develop a deeper voice, and get taller, although I probably will not ever be six feet tall. Those were all things I wanted. They also described risks, like going bald, but most of the risks were things that I wanted (like facial hair) or things that sounded better than going through female puberty.  I also wanted to start the changes of male puberty, since other boys in my class were also starting to stop looking like little kids. I had long conversations with my doctors at GeMS and with my parents about the effect hormone therapy would have on my ability to have biological children. The doctors told me that if I wanted to have biological children, I would have to go through female puberty. I told them that I understood and that I still wanted to proceed with hormone therapy. My mom repeatedly asked

3

JA311

me, as did the doctors, if I wanted to be pregnant when I was older, and the answer for me is definitely not. I want to be a dad, and I am excited to have a family in other ways. I am adopted, so I know that families do not have to be biologically related. I also knew that if I did not start hormone therapy, I would start to look like a girl, and I knew that I still did not want to be a girl.

12.    I started feeling the effects of hormone therapy during my freshman year of high school, particularly regarding my voice. When I heard my voice recorded, I noticed that it was getting deeper and deeper. I was so enthusiastic about that. It felt like an amazing improvement from the way I used to sound. I felt more included, and it felt more me. Every day, I get to be and sound more like myself. Having a deeper voice feels normal to me. I also love having facial hair, which I do not plan to shave.

13.    I have a pretty busy life. Most days I wake up at 4 or 5 am so that I can go to the gym and shower before school. I go to school, and a lot of the time I then have practice for sports. After practice, I sometimes go back to the gym again. I have a close group of friends who have played sports with me since we were all in middle school. Some of my friends have little siblings, and they run up to me in the neighborhood, or want to hang out when I'm at their house. I bought one of them a Spider-Man toy for Christmas last year.  I go to church every Sunday with my family, where I help run the audio-visual for the Zoom feed. I also used to volunteer at the Sunday school, since I love kids. The church has asked me if I'd be willing to come back and work with the younger kids instead of doing the A/V feed. One night a week, I volunteer with our church to serve dinner to people who are homeless, and I participate in our church's youth group. I am excited about our church's upcoming trip to the beach. I also help take care of our family dogs.

14.    Since I started testosterone two years ago, I have regular follow-up appointments with my endocrinologist at GeMS. At first, the appointments were every three months, to make

sure that I was comfortable with the changes that were happening, and to run blood tests to see if I was ready to increase the dose. At first the dose was very small, but it has been going up a little bit at a time. Now, I go every six months to see if I need to increase my dosage of testosterone or if it should stay the same. I have not had unwanted side effects from the testosterone.

15.    I administer my own injection every Sunday. My mom used to do it, but I eventually became comfortable enough to do it myself.

16.    On Tuesday, January 28, 2025, the White House issued an Executive Order entitled "Protecting Children from Chemical and Surgical Mutilation" ("Executive Order").

17.    One of my regular appointments at GeMS was scheduled for January 29, 2025. That appointment was supposed to be a routine check-up, where they would do my bloodwork and decide whether my dosage of testosterone needed to change. I expected that the dose might go up, depending on what the labs said, and that I would get another prescription. I have refills, but only for maybe a few months. Not enough for a whole year, and definitely not three years. And I need to keep getting blood work done to know when it's time to increase my dose.

18.    But the morning of January 29, GeMs called my mom and told her that they had to cancel the appointment because of the Executive Order, and that GeMS was canceling all of its appointments for people under age 19 who need gender affirming medical care.

19.    When my mom told me that GeMS had canceled my appointment because of the Executive Order, I felt numb. If I had to stop my hormone therapy, I would start female puberty and would start to look like a girl. That is not how I feel, and I have never had to live life with my body looking or feeling like someone I am not. It would undo all of the good things that my medical care has done for me. I feel like I would have to start my life over. When I think about losing the physical effects of testosterone, I feel like so many of the things that are good in my life are going

to be taken away from me. I want my voice to get deeper, and to keep growing more facial hair. Even though the changes from testosterone have been just a little bit at a time for the past two years, I know that I am on the right path, and I keep feeling better in my body. If I stopped feeling that way, I would not be comfortable working out, or playing sports, or just hanging out with my friends. Some of my closest friends know I am trans, but most people in my life or who I meet now do not. It is important to me that I have the choice about who know I am trans. If my body changed and I started looking like a woman, I would lose that choice. I would stop being me.

20.    Before the election, my mom talked to me about what might happen to my medical care. She told me there was a chance that something like the Executive Order could happen. I know that my mom will do everything she can to make sure I can get the medical care I need.

21.    I have dreams for my future. I think I might want to become a coach, since I love sports and playing sports, and I love working with kids. I think kids like me because I accept them for who they are, and I think I would be a good dad one day.

22.    I hope this Executive Order is stopped so that I can continue to take testosterone and be myself. It is also important to me to keep seeing doctors at GeMS. I have been going there since I was 9, and had all the conversations with them about myself, how I know I am a guy, and why I want to keep taking testosterone and never go through female puberty. If the Executive Order is not stopped, I will need to find another doctor, and start that process all over again. I also want to continue taking testosterone. I like the changes I've seen with male puberty, and I want to continue growing and looking more like an adult man. This is who I am, losing this would mean losing myself.

23.    My mom has told me she is willing to travel to find this care, but I do not want me or her to have to do that. I know it will be expensive for my family, and I do not want to miss

school, or practice, or my time at our church because we have to travel from Massachusetts for care, even maybe out of the country. I always trusted that Massachusetts was one of the best and safest places for kids like me to get care. People travel here to get care because it is safe. But I am scared that even my home state, Massachusetts, isn't safe anymore.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this 12TH day of February 2025.

Robert Roe

7

JA315

# **Exhibit H**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| PFLAG, INC.; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. |
| DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*, | |
| *Defendants*. | |

**DECLARATION OF CLAIRE COE**

I, Claire Coe,[1] hereby declare and state as follows:

1.    My name is Claire Coe. I offer this Declaration in support of Plaintiffs' Motion for Preliminary Injunction. I am over 18 years old, have personal knowledge of the facts set forth in this Declaration, and would testify competently to those facts if called as a witness.

2.    I am a Plaintiff in this action. I am bringing claims on behalf of myself and as the parent and next friend of my child, Cameron Coe.

3.    My husband and I are the parents of Cameron Coe, our twelve-year-old child. We live in New York City. We are members of PFLAG.

4.    When Cameron was born, they were designated as male at birth, but they are nonbinary.

---

[1] Claire Coe and Cameron Coe are pseudonyms. My family is proceeding under pseudonym to protect our right to privacy and ourselves from discrimination, harassment, and violence, as well as retaliation for seeking to protect our rights.

1
JA317

5.      When Cameron was a toddler, we let them dress however they wanted at home and preschool. We had a variety of clothes, including hand-me-down dresses from their older sibling, as well as pants and shirts. They gravitated toward dresses. Cameron was bundle of joy, smiles, and laughter as a baby and toddler. My husband thought we were lucky that our second child was the easy one. That was true until pre-K, when they started to get the message that who they are was not part of the world.

6.      When Cameron started pre-K, at four years old, they started to feel like there wasn't a place for them because they didn't fit in with boys or girls. The boys' restroom was painted blue, the girls' restroom was painted pink, and boys and girls were often asked to line up separately. It came to a head one day when the kids were asked to pick a theme for dress up day, and the boys picked superheroes and the girls picked princesses. Cameron came home crying, bereft. They didn't know what to do or who to dress up as. We would ask Cameron if they felt more like a boy or a girl, and they would say, "I'm not sure, I kind of just don't feel like either." We didn't have the language for nonbinary then, but Cameron would clearly say, "I don't feel like a boy or a girl."

7.      That same year, we were invited to a New Year's Eve party. Cameron had started asking for their own dresses, not just hand-me-downs, and we bought them one black dress with little red flowers. Cameron still had a boys' short haircut. Cameron wanted to wear the dress to the party, but was nervous. I thought they would be fine, since it was neighbors we knew, and reassured Cameron that they could wear whatever they wanted and be whoever they wanted. But the older kids at the party made fun of them. Cameron was devastated, and I was, too. I worried that I hadn't prepared my child well enough for the world.

8.      Through another parent at our school, we learned about a program for young transgender and gender-expansive people, that offered therapy, resources, and community groups.

There was a supportive playgroup for gender non-conforming children and a support group for parents that met at the same time. We wanted Cameron to meet other gender non-conforming children so they would feel less alone, and we wanted to hear from other parents.

9.    Watching Cameron play with other children who also didn't fit into traditional categories of "girls" and "boys" was incredible. Cameron's relief and joy was palpable. Talking with other parents, though, I heard about how their transgender children, who were older, had struggled with depression, anxiety, and suicidality. I did not want that for Cameron and continued to worry that I hadn't prepared them for a world of gendered expectations, where they didn't seem to be fitting in. Cameron stopped going to the playgroup after a few times, though, because it was mostly trans girls and trans boys, and they didn't see other kids there who felt more in the middle.

10.    In kindergarten, when Cameron was five, Cameron was beloved by their teachers: Cameron is a smart, engaged, and sweet child, who can get other kids engaged and excited. But Cameron butted up against other people's expectations for them. After a physical altercation over Cameron's pink backpack and pink shoes, they tried to present more masculine.

11.    In first grade, when Cameron was six, we started Cameron at a new school, which intentionally had fewer distinctions between boys and girls.

12.    In second grade, when Cameron was seven, though, Cameron started having difficulty in the classroom, but it was unclear why. Sometimes they would just refuse to participate. We found Cameron a therapist to try to work through what was happening.

13.    In third grade, when Cameron was eight, Cameron tried using she/her pronouns for two months, in part because other kids often called them "she" anyway because of Cameron's long hair and more girly clothes, and Cameron was tired of correcting people. But Cameron said that she/her felt wrong, too, and asked us to use they/them pronouns. Around that time, Cameron found

the language of nonbinary, and said that felt like it described their identity, too. Cameron had a small class that year, in part because of the pandemic, and they did so well in an environment where they could just be themselves and not forced to pick between acting or looking more like a boy or a girl. Cameron continued to do well in places where there was room for nonbinary children. For example, the summer after fourth grade, when Cameron was ten, they went to a sleepaway camp that only had one mixed-gender bunk for kids Cameron's age because of the small enrollment. Cameron thrived.

14.     In fifth grade, when Cameron was ten, Cameron's mental health deteriorated. Cameron was in a larger classroom and getting harassed for using they/them pronouns. They seemed to be falling off a cliff. Cameron said, "It's not that I want to die, but I just don't see how I can keep doing this." We found Cameron a new therapist who had a specific focus on gender, and that therapist suspected Cameron had gender dysphoria, but we did not ask for a formal diagnosis. Cameron's anxiety also manifested with insomnia and wracking stomach pains.

15.     After fifth grade, when Cameron was 11, we sent Cameron back to the same summer camp. Because Cameron was older, there was no mixed gender bunk option. After two weeks, the camp called and said we needed to take Cameron home. Cameron just couldn't function in the gendered environment and felt betrayed that the summer camp they had loved so much was just another place that couldn't accommodate who they were. For the rest of the summer, we rented a house by a lake and sent Cameron to day camp. We noticed that Cameron, who used to love to go swimming, had started to refuse to change into a swimsuit or swim at all. Cameron started covering their body and refused to be topless. We weren't sure exactly what the problem was, so we tried giving a Cameron a wetsuit, thinking that would help. I was wrong. Cameron couldn't stand the wetsuit; I had never seen them have such a meltdown. As they were in such distress and

pulling down at the crotch, I realized that Cameron physically couldn't tolerate the thought of someone seeing the outline of their genitals. That was the first time that Cameron expressed not being okay with their body, as opposed to just not being accepted socially. I realized that we needed more help and to see a doctor.

16.    Cameron's therapist and the parent support group we had attended helped us find an endocrinologist, and we took Cameron in for a consultation. Before then, I had not considered that Cameron might need medical interventions for gender dysphoria. Although we took Cameron for the consultation, my hope against hope was that Cameron would listen and decide that they did not need or want anything.

17.    The doctor asked Cameron what was bothering them, and Cameron's main complaint was that they never wanted facial hair or a beard. Cameron would look at their dad and think, "I don't want that face. That's my future, but I don't want it." The doctor laid out different potential options and paths, depending on how Cameron felt or continued to feel. The doctor said Cameron could get things like vocal therapy if their voice got deeper, and could continue to socially transition. The doctor also explained that puberty blockers could be an option, and that Cameron needed to think about what the right path forward would be for them. I was worried that we didn't know the right path forward, or what Cameron's future sexuality would look like. Cameron seemed anxious during and after the conversation.

18.    We talked more about the doctor's visit at home, and Cameron told us that because they felt supported in their new school, and had friends, that they would be okay without blockers. I was massively relieved that they did not ask for puberty blockers. Based on my conversation with the doctor, I knew that puberty blockers were safe, but I didn't know what the plan after blockers

would be for Cameron. I would later learn that Cameron did actually want puberty to stop, but felt pressure from me to say they were fine.

19.    Cameron seemed to be doing well in sixth grade, when they were 11, and turned 12 before the summer. Over the summer 2024, though, it became clear that Cameron had really started to go through male puberty. Cameron grew several inches, and their jaw started to change shape. Their voice dropped. Cameron hoped that their voice was just hoarse from screaming at camp, but their voice stayed low.

20.    This past fall, in 2024, when Cameron started seventh grade as a 12 year old, we continued to talk more about how Cameron was feeling. I also noticed that people we didn't know had started to use he/him pronouns for Cameron more often, even though they were dressing femininely, because of how their body looked. Cameron told me that it felt good when people couldn't tell if they were a boy or a girl, and it felt much worse when people misgendered them as male. I also noticed that Cameron was uncomfortable in their clothes; they started pulling down the crotch of their pants, and trying pull their tunic shirts away from their body when the fabric started to cling. It became clear that Cameron was uncomfortable with anyone noticing the changes that puberty was having on their genitals.

21.    By October of 2024, Cameron came back to me and said that they wanted medical treatment to stop male puberty. Once puberty really started to change their body, they realized that they could not feel good in their body right now with chose changes.

22.    We went back to the endocrinologist, and Cameron consented to getting a physical exam. It had been three or four years since Cameron allowed a doctor to see them fully naked. The physical exam confirmed that Cameron was experiencing puberty, as did blood tests, which showed that Cameron had the increased levels of testosterone that signaled male puberty was

underway, and so much so that the changes would start becoming permanent. At that point, Cameron said that if they really had to choose, they would rather go through female puberty, but what they really wanted was to wait and to have more time before making that decision.

23.    Although we had discussed the risks, benefits, and alternatives the year before, the endocrinologist again reviewed with us the risks, benefits, and alternatives of puberty blockers, including the different kinds of medication that could be options. We understood that blockers were safe, and reversible. We knew that Cameron would need monitoring for bone health. We also knew that, at some point, Cameron would have to decide whether to go through endogenous male puberty or start hormone therapy, but that the blockers would give them time to make that decision.

24.    We received a letter of support from Cameron's therapist, indicating their prior and current diagnosis and symptoms of gender dysphoria.

25.    We then considered whether Cameron should get an injection of puberty blocking medication, for either three months or six months, or whether a longer-acting puberty blocking implant was the better decision. I wanted Cameron to have as much time as they needed, and we were worried about potential future restrictions on gender affirming medical care for transgender and nonbinary young people, so our first choice was the implant; however, the doctor was concerned that, in the time between our appointment that fall and the next available surgical date, Cameron might experience more permanent changes from male puberty. So, we decided as a family that, to address Cameron's immediate medical need to pause puberty, that they would receive a three-month acting pubertal suppression injection, even though that meant delaying when they could receive a longer-acting implant. The plan was after the three-month shot to stop any imminent further changes, Cameron would receive an implant.

26.     Cameron experienced a great deal of relief after receiving this first injection. This relief positively influenced their relationships with others, including with other students and teachers at school. They were less anxious, less stressed, and less vigilant about how their body might be changing. They were happier and lighter. Those positive changes from the three-month puberty blocking injection only further confirmed that a longer-acting implant was the right decision for Cameron.

27.     We made an incredible effort to get Cameron an appointment for the longer-acting implant as soon as the first injection wore off, but the soonest we could receive an appointment with Cameron's doctors at NYU Langone to have the implant placed was Friday, January 31, 2025.

28.     On Tuesday, January 28, 2025, the White House issued an Executive Order entitled "Protecting Children from Chemical and Surgical Mutilation" ("Executive Order").

29.     On Wednesday, January 29, 2025, two days before Cameron's appointment, we received a call from NYU Langone informing us that our appointment would be cancelled.

30.     Cameron's anxiety went through the roof when we told them that their appointment had been cancelled. They missed days of school because of their mental health. Cameron's stomach pains, which they had during their greatest periods of anxiety as a child, returned. Cameron has been waking up at 3:00 A.M., unable to sleep, and their father stays up with them for an hour or two until they go back to bed. Oftentimes, they don't. We are anxious about Cameron's immediate severe distress and potential suicidality if we are unable to continue pubertal suppression for Cameron.

31.     Cameron looks like they are carrying the weight of the world on their shoulders; they are closed off. I no longer see the happy, lighthearted child that I used to have, and that I started to get back after the first puberty blocker shot. Cameron says that most of the time, they

are so unhappy, and the daily struggle of trying not to be unhappy makes it hard to experience joy, even when good things happen.

32.    After NYU Langone cancelled Cameron's appointment, I took the week off from work. It has been a full-time job trying to find alternative providers and options for my child. I have called every lead under the sun to find a new gender clinic or surgeon for Cameron. I have probably called nine or ten places; we have looked as far away as Maryland, and anything within a five-hour drive of New York City. I am taking appointments anywhere I can, no matter when they are, because I have no idea if suddenly another clinic or hospital will call back to say that they are no longer providing gender affirming medical care to new patients, or even at all. A number of clinics have turned us away because they are not taking new patients because of the Executive Order. Others have just not called me back.

33.    After all of those efforts, including scheduling intake appointments at multiple other clinics, we were finally rescheduled for placing the longer-acting implant. That procedure happened the week of February 10. I am so relieved, and so is Cameron. They are visibly lighter, like a weight has been lifted. But I continue to live in fear that Cameron will lose care again. Cameron is 12, and the Executive Order covers people under 19; that is seven years of healthcare and monitoring that my child will need.

34.    All I want is for my child to feel safe and loved in their body, our family, and our community. It is our job as parents to protect our child, and the Executive Order stops me and Cameron's father from making medical decisions for our child to protect them.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this 13th day of February, 2025

_____
Claire Coe

# **<u>Exhibit I</u>**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PFLAG, INC.; *et al.*, | |
|      *Plaintiffs*, | |
| v. | Civil Action No. |
| DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*, | |
|      *Defendants*. | |

## DECLARATION OF CAMERON COE

I, Cameron Coe,[1] hereby declare and state as follows:

    1.    My name is Cameron Coe. I offer this Declaration in support of Plaintiffs' Motion for Preliminary Injunction. I have personal knowledge of the facts set forth in this Declaration and would testify competently to those facts if called as a witness.

    2.    I am twelve years old. I live in New York City with my parents.

    3.    I like art and making things with my hands. I especially like graphic design. I play video games with my friends. I play the drums and taught myself the ukelele. I'm in seventh grade but taking accelerated classes with high school students. I'm interested in engineering and architecture, which is what I want to study in college. It's ambitious, but I want to try. When I'm an adult, I want to design and build houses. I'd like to move upstate and design my own house to live in.

---

[1] Claire Coe and Cameron Coe are pseudonyms. My family is proceeding under pseudonym to protect our right to privacy and ourselves from discrimination, harassment, and violence, as well as retaliation for seeking to protect our rights.

4.      I am nonbinary. I do not feel like a boy or a girl. I use they/them pronouns.

5.      When I was a little kid, I felt free to be myself and that no one was judging me. I never identified with the idea of gender, and words like "boy" and "girl" didn't mean much to me. I remember just running and playing around. Little me didn't know what the word "nonbinary" was, but I have been nonbinary since I was born.

6.      When I was in pre-K, I wore a dress to school. The girls made fun of me. I didn't want to care, but I was also upset. My parents told me that it was okay to wear dresses, and that, if people made fun of me and it became too much, I could also choose to stop wearing dresses. I still wore dresses sometimes. There were other times where I would do things that people made fun of me for, like having a pink backpack or pink shoes. I did not like being made to feel bad about just wearing what I wanted to wear.

7.      In third grade, when I was around nine years old, I first heard the word "nonbinary". I always knew that I was not a specific gender, but the term "nonbinary" helped me better understand who I was, and it gave me easier words to give to other people so they could understand me and support me. I had briefly tried using she/her pronouns, because I wanted to see if that felt better for me. But I quickly realized that they/them pronouns fit me better. Using they/them pronouns made me feel happy, like I was recognized for who I was. When I get asked, "Are you a boy or a girl?" I feel like I can answer, "No." It is true and also grammatically correct.

8.      Being seen as nonbinary makes me feel good, strong, happy, recognized, and loved. I feel supported and a sense of belonging, because I have words to describe who I am and other people can understand who I am better.

9.      About a year ago, when I was 11, I started to go through male puberty. Before that, I had mostly been worried about how people would treat me because of how I dressed or because

2
JA329

I used they/them pronouns. My problems from being nonbinary were because of society, but as long as I was in a school and had friends who accepted me for who I am and how I dress, I felt pretty good. But then my problems became about myself and external judgment of my body.

10.     I became constantly worried that people would notice I was going through male puberty. It's stressful, but it's a very real feeling. It reduces my self confidence, and it's upsetting. I don't like the idea of male puberty, and when I'm in public, I feel so anxious and uncomfortable. I am still dressing and looking androgynous, but I worry that people won't see me that way, and it feels embarrassing. The changes to my body feel violating. It makes me depressed, stressed, anxious. I hate feeling overly self-aware or self-conscious. I feel judged by other people, and myself. I also know that I fiddle with my pants because I don't want them to cling to my body and be revealing. My parents have helped me find underwear that helps some, but the real issue is that my body is changing. When I look at male faces and beards, I realize, that's fine for some people, but not for me. I don't want to grow a beard.

11.     I had already been seeing a therapist to talk about how I felt about my gender. My parents also took me to a doctor to talk about what was upsetting me. I was nervous. The doctor talked about puberty blockers, including what they were and possible side effects. The doctor did a really good job explaining that they just paused puberty for a while and gave people more time to decide whether to go through male puberty or female puberty. I thought about it, and I thought that maybe it was a good idea for me, especially getting more time.

12.     The first time I spoke to a doctor about puberty blockers was last year, when I was 11 and in sixth grade. I originally told my parents that I was okay and didn't need anything. But over the past year, I have gone through more puberty. I am taller, my voice is a little deeper, and there are other changes making my body look more like a male body. So a few months ago, in the

fall of 2024, I asked my parents if we could go back to the doctor to talk about puberty blockers again.

13.     When I talked to the doctor in the fall, I had started seventh grade and turned 12. We talked again about puberty blockers, and also the changes that had happened to my body in the past year. I still didn't feel comfortable with male puberty. The doctor confirmed what I had seen about my own body in terms of changes. The doctor again explained that I have to make a decision at some point about what kind of puberty to go through, because I have to go through puberty to become an adult, but that the blockers would give me more time to make that decision. More time is exactly what I need.

14.     A few months ago, I got a shot of a puberty blocking medication that is supposed to work for three months.  Afterwards I felt happy and less stressed and a little more hopeful. I had one less thing to worry about. I used to think, "Oh my god, why is my body changing." I have much less of that now. It's nice not to have to worry about my body. It's also easier to focus in school, and helpful for my confidence. I have hope, and it's easier for me to feel okay about how I look, because I'm not having more changes from male puberty. I've been able to settle down and relax a little because I'm not worried about my face or body changing.

15.     When my parents told me, though, that my appointment for the puberty blocking implant was cancelled, all of my fears and anxieties came back. I had terrible stomachaches. I've missed school because I feel so bad. I was waking up in the middle of the night. I was worried that I would need to miss more school as we tried to find a new doctor.

16.     Thankfully, I was able to get the implant two weeks after the cancellation. I was immediately so, so relieved and happy. It makes a huge difference in my life not to worry about puberty, and I can stop worrying for now. But I am scared that I will lose care again, and the fear that my body will change and I won't look like who I am could come back. I do not want to feel

4
JA331

like a stranger in my body.


     I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.


Dated this <u>13</u>th day of February, 2025

                                    Cameron Coe

# **<u>Exhibit J</u>**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| PFLAG, INC.; *et al.*, | |
|     *Plaintiffs*, | |
| v. | Civil Action No. |
| DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*, | |
|     *Defendants*. | |

**DECLARATION OF LAWRENCE LOE**

I, Lawrence Loe,[1] pursuant to 28 U.S.C. § 1746, declare as follows:

1.      My name is Lawrence Loe. I am a Plaintiff in this action. I offer this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction. I am over 18 years old, have personal knowledge of the facts set forth in this Declaration, and would testify competently to those facts if called as a witness.

2.      I am 18 years old and a high school student in New York City, where I live with my father.

3.      I am a member of PFLAG.

4.      I am transgender. I was assigned a female sex at birth.

5.      I started puberty when I was 10 years old, in 2017. When puberty started, I knew it was incredibly wrong for me. It was completely awful going through female puberty. My body started to feel wrong. School was miserable for me, because puberty was making me miserable. I

---

[1] Lawrence Loe is a pseudonym. I am proceeding under a pseudonym to protect my right to privacy and myself from discrimination, harassment, and violence, as well as retaliation for seeking to protect my rights.

1

JA334

was completely depressed, but I didn't fully understand why I was so unable to function. I started to explore these very strong feelings that something was not right on my own. It took me two years, until I was 12, in 2019, to understand why puberty felt so wrong for me. Eventually, I realized that female puberty felt so wrong because I was not a girl and that I was transgender.

6.      I started sixth grade in the fall of 2018, when I was still 11. I was struggling in school and couldn't make friends. In seventh grade, in 2019, when I was 12, I told my dad that I was transgender. By November of 2019, we decided that I was doing so poorly in school that I actually needed to switch to a new middle school. When I switched to that new school, I did not want to be seen as a girl, so I cut my hair short and picked a gender-neutral version of my birth name to go by. I was still completely depressed and not sure why.

7.      When I came out to my dad as transgender, I also asked if we could go to a doctor because I was so miserable about puberty, especially getting my period. My parents were separated, but all three of us went to the doctor together.

8.      We had a doctor's appointment in January 2020, just after I turned 13. I filled out a bunch of evaluations and paperwork and explained how puberty was making me feel. The doctor confirmed that what I was feeling was likely gender dysphoria. I learned that there was medication I could take, called puberty blockers, that would stop my body from developing more female characteristics. The doctor explained how those would work, and I said that is what I wanted. It seemed like the doctor agreed with me, as did my father. At some point, I was asked to leave the room, and my parents spoke alone with the doctor for over two hours. My mother would not consent to puberty blockers. But because I was experiencing such severe distress and depression about my period, the doctor suggested that I take a medication that would just suppress my periods, but not otherwise block puberty.

9.      In February 2020, I started to see a therapist who works with LGBTQ people and also treats transgender people. I still see that therapist every week. I talked a lot about how depressed I was because I was going through puberty and was not allowed to take medication to stop it. It felt like that terrible feeling would never end. Going to therapy helped me manage some of my mental health, but it did not fix that terrible feeling of dysphoria.

10.     Not being able to receive puberty blockers was horrific. Even though I knew that there was a medication that existed that would stop these fundamentally wrong changes from happening to me, I could not receive it. The little bit of puberty I had experienced already was awful, and I knew things were only going to get worse. I hated everything that had happened to my body so far, and just had to live and watch while more of it happened. I was on this terrible trajectory and couldn't get off.

11.     Things got worse. Because I was not on puberty blockers, my breasts continued to grow. I started refusing to eat in hopes that by starving myself, my chest would get smaller. I developed an eating disorder. My mental health was the lowest it has ever been. I was self-harming, and I felt hopeless. I realized that if I didn't get help, I wouldn't survive. I asked my parents for more help and started seeing my therapist twice a week. I still had severe dysphoria. But I was determined to turn my life around so I could survive long enough to live in a body that was mine. I adopted a very strict daily routine around meditating, eating, and running, which helped me at least survive. But even though I tried my hardest to be happy, I still had terrible gender dysphoria.

12.     In July 2021, after I had turned 14, I started to see a new doctor. I was still only on medication to suppress my period, but nothing else. We met every few months to see how I was doing. I continued to tell her that I had dysphoria around my body, even though I was on a

3

JA336

menstrual suppressant, and she also diagnosed me with gender dysphoria. I continued to see that doctor until July 2023, after I had turned 16.

13.    In the fall of 2021, I started ninth grade. High school was really rough. I still looked and sounded like a girl, and so I was misgendered all the time. I tried to change the way I dressed so that people would perceive me as a guy, but I was still harassed. I wore a COVID mask longer than other students in part because it helped stop me from being misgendered. Getting misgendered is painful because I am not being seen for who I am, and it reminds me of everything physical about my body that makes me dysphoric, and I have the terrible realization that other people can see that about my body, too, and are pointing it out.

14.    In 2022, when I was a sophomore in high school, I legally changed the name on my birth certificate and my gender marker, and my IDs.

15.    In the summer of 2023, when I was 16, my parents and I met with a family therapist. My gender dysphoria had not gotten better, even with weekly or twice weekly therapy for over three years. Part of our discussion was helping my parents come to a mutual decision about whether I could consider medication to treat my gender dysphoria, aside from the menstrual suppressant.

16.    After both my parents consented, I started with a new doctor that summer to discuss the potential for testosterone. We went over all of the informed consent paperwork with the potential risks and benefits. I already knew the alternative, which was not taking testosterone, and I still had gender dysphoria. A lot of the "side" effects for testosterone were actually just effects that I wanted: a deeper voice, facial and body hair, and changes to my face and body shape. I had also done my own research about what testosterone's effects were on trans guys, including learning about the physical changes that happened. Learning more about trans guys' experiences, I realized that I saw myself in their stories, and that was what I wanted for myself. At that point, I had been

4

JA337

researching and thinking about testosterone for years. My mother was worried, though, that I would become a detransitioner. I wanted to take her concerns seriously, so I watched videos and listened to the experiences of people who had detransitioned. Their reasons for transitioning in the first place seemed very different than my reasons for wanting to transition.

17.     I also discussed fertility, both with my parents and the doctor. As an ethical matter, I do not want to have biological children of my own. As a mental health matter, the idea of being pregnant makes me so dysphoric that I do not think I could endure diving birth to biological children. If I did want children as part of my family, I would adopt. As a medical matter, my own research and the doctor's explanations confirmed that testosterone would be unlikely to cause infertility because I had already gone through female puberty, especially if I stopped testosterone at some point.

18.     I finally started taking testosterone at 16, with my assent and both my parents' consent. After four years of being completely miserable in my body, I was finally happy. The rest of my family noticed that, even before the physical effects of testosterone started, I was already visibly happier. I finally knew that I was on the right track, and I was so excited to be on the right trajectory. I had felt like a freak in my own body, and testosterone made me feel like I could exist in my own skin and be comfortable.

19.     There is a whole list of things that I couldn't do before starting testosterone that I could do after. I hated talking, because I couldn't stand my own voice. With testosterone, I started speaking up in class. I sang a lot as a kid, but I quit because of voice dysphoria. Once my voice started to deepen, I could sing again. I could dress and groom more like myself, which is a little bit emo, without worrying about being seen as a girl. I felt like I could finally go to the gym and enjoy being in my body.

20.     I have been taking testosterone for almost two years now. I do not regret starting and continuing to take testosterone. It was definitely the right decision.

21.     I still continue to have a lot of dysphoria around my chest, because I had grown breasts. I cannot leave my room without wearing a binder or very tight undershirt, which makes it hard to breathe and move, or without adhesive tape, which hurts my skin.

22.     I went to schedule my first consult with a surgeon for chest masculinization surgery in February 2024, after I turned 17, but the soonest appointment was in June 2024. My longstanding existing providers evaluated me and provided me with letters of support. The letter from my therapist was also co-signed by a different mental health professional, and I got a separate medical letter of support from the doctor who prescribes my testosterone. I was not allowed to schedule my surgery until after I already had both letters. After my June 2024 appointment, I scheduled my surgery for after I turned 18, when as a legal adult, I could consent for myself.

23.     After that long process of waiting, I finally got a surgery date for the first week in February 2025 at NYU Langone. I have been looking forward to obtaining chest masculinization surgery for six years. I made arrangements and underwent pre-operative blood testing. My grandmother, who lives on a fixed income, booked a flight to come and help take care of me through mid-March. I have organized all of 2025 around being able to get this surgery.  I spent a lot of money purchasing recovery supplies. I made summer plans based on thinking I would have recovered already.

24.     I have been counting down the days to my surgery. Just knowing that I had my surgery scheduled has made it easier to manage my gender dysphoria. Trying to flatten my chest is physically painful and hard on my skin. But I thought that by this summer, I'd be able to live my life normally. I have a whole list of things that I cannot do now, but that I will be able to do

after I have top surgery. I will be able to run and go swimming without a shirt. I want to learn to skateboard. I will be able to wear white t-shirts with nothing on underneath. I'll be able to sit up straight, and hug people. I'll be able to sleep without a shirt or a binder on, and my pets will be able to lay on my chest. I am also looking forward to having my first relationship, but I don't want that to happen until I feel at home in my body.

25.     On January 28, 2025, the White House issued an Executive Order entitled "Protecting Children from Chemical and Surgical Mutilation" ("Executive Order"). I had a panic attack that my surgery would be cancelled, but everyone told me that I shouldn't worry because nothing could change in the next week.

26.     On January 29, 2025, I received a call from the Nurse Practitioner at NYU Langone with whom I had been working informing me that they have had to cancel my surgery the following week due to the Executive Order.

27.     I have tried not to wallow, but I am devastated at the thought that this medical care that I have been looking forward to and working toward for so long and that is the very thing that is keeping me healthy and hopeful could be taken away. I have reached out to other hospitals about surgery dates, but given how long it took me at NYU Langone, I'm not hopeful. I also do not want to have to go to a surgeon who I am less comfortable with. I have been researching options out of the country, but I don't know that I can afford that, and I would feel safer recovering at home.

28.     My whole life is on hold while I wait to get top surgery. I spent so much of my teenage years being miserable in my body, but holding out hope that, as an adult, I could get the medical care that I needed to treat my gender dysphoria and feel like myself. Now, I can't.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this __ day of February, 2025

                                           _____

                                           Lawrence Loe

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this 10 day of February, 2025

_Lawrence Loe_
Lawrence Loe

# **<u>Exhibit K</u>**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PFLAG, INC.; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. |
| DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*, | |
| *Defendants*. | |

## DECLARATION OF DYLAN DOE

I, Dylan Doe,[1] pursuant to 28 U.S.C. § 1746, declare as follows:

1.    My name is Dylan Doe. I am a Plaintiff in this action. I offer this Declaration in support of Plaintiffs' Motion for Preliminary Injunction. I am over 18 years old, have personal knowledge of the facts set forth in this Declaration, and would testify competently to those facts if called as a witness.

2.    My family is a member of PFLAG.

3.    I am a transgender man and 18 years old. My sex assigned at birth was female, but I am male.

4.    When I was a little kid, I remember wishing on dandelions that I would wake up as a boy. There were many times when I knew that I felt like a boy, not a girl. In first grade, I got a pair of black and blue sneakers, instead of pink ones like I'd been wearing. They were awesome and I loved them. But then when I went to school, other kids made fun of me, and teased me by

---

[1] Dylan Doe is a pseudonym. I am proceeding under pseudonym to protect my right to privacy and myself from discrimination, harassment, and violence, as well as retaliation for seeking to protect my rights.

asking if they were my brother's sneakers. I didn't want to wear them after that. On standardized tests in school, there would be bubbles to fill out at the top that said male or female. It always felt off to me when I saw that it was filled in female on my answer sheets. When I would play pretend with my friends, I played boy characters. I would come up with new names for myself, even when not playing pretend, because I didn't like my birth name, which was feminine.

5.      In fifth grade, I cut my hair short. That summer, a lot of people thought I was a boy, and it felt good to be seen as a boy. I then started to go through female puberty, which I hated. It was an anxiety-filled experience. The day before sixth grade, I got my period for the first time. I had already been anxious about that, and when it happened, it felt totally wrong that female puberty was happening to me at all.

6.      Although I had known that trans women existed, I didn't learn that there were actually trans men, too, until sixth grade when I was 12. At that moment, I realized – this is it. This is me. I spent maybe two months keeping those feelings to myself, though, and didn't tell my parents. My mom could tell that something heavy was weighing on me, but she didn't know what it was, just that I had started to withdraw from my life. One day, when my mom was driving me home, I just started crying and she asked me what was wrong. I told her that I felt better thinking about myself as a boy. After I told her, I just felt so relieved. It felt great to finally be known and seen. My parents were both supportive and loving. When I told my sister, she said that she already knew I was her brother.

7.      At that point, we started using he/him pronouns for me at home. I cut my hair, which had been down to my shoulders, to be much shorter and masculine. I already dressed pretty androgynously, but I also bought more masculine clothes, including emo band t-shirts.

8.      I also wanted to pick a new name. I had a few ideas at first, and then I asked what my parents would have named me if my sex at birth had been male. My dad said, "Dylan." That was a name I had already been considering. When I heard my dad say that name, it felt good. Now "Dylan" has been my name for so many years, it just feels right, like it was always supposed to be my name.

9.      I told a few of my friends at school, at the end of sixth grade. I didn't tell my teachers or many other people because I knew that I would be switching schools for seventh grade. My friends at the new school were all great and supportive, and no one was weird. New people that I met just thought I was a boy, which was nice. But some of my classmates who knew me from before still treated me as a girl, which continued to feel wrong.

10.     My mom found a therapist who specialized in working with trans people. I started seeing her in about 2019, when I was 12. She was the best. I saw her every three or four weeks – I would have seen her more frequently, but she had a very busy schedule. She also ran a therapy group for trans middle schoolers, which I joined. Knowing that I wasn't the only one helped me, and I could talk to them about things in my life that only other trans people would understand.

11.     My therapist diagnosed me with gender dysphoria. She also said that there were two doctors in our part of Tennessee who would treat gender dysphoria in adolescents: one in private practice, and another at a major hospital. My mom wanted me to see the doctor at the major research hospital in part because she knew that the rest of our extended family would be skeptical about me being transgender, and she wanted them to know we had done our research and she had taken me to a major hospital to figure out what to do about my gender dysphoria.

12.     My first appointment with the endocrinologist at that hospital was in seventh grade. It took us a long time to get that appointment.

3

JA346

13.    I talked with the doctor, as did my parents, about how female puberty was so upsetting to me, especially getting my period. That was my main focus when talking to the doctor because that is one of the things that made me feel the most dysphoric about my body.

14.    Because I had just started puberty, one option for me was puberty blockers. We talked with the doctor about the risks, benefits, and alternatives. What stuck out for my parents was the potential concern about bone density.  I got x-rays and other tests to measure bone density and bone age. My mother felt reassured because the doctor explained the research, and it seemed like those potential risks to bone health could be monitored and dealt with.

15.    For me, I understood that the puberty blockers were temporary, that I would need to get a shot every three months for them to work, and that it would give me more time to make a decision about what kind of puberty I wanted to go through.

16.    I started getting puberty blocker shots in the spring of 2020, when I was 13. Starting blockers was best thing ever. Getting those shots made me feel less of a sense of panic. I thought, "I can stop my body from turning me into a girl." The shots also stopped my period, which was huge, because of how dysphoric that made me feel. I had one less thing to worry about, and I felt I now had more time to think about my identity. I knew eventually I could make a decision about hormones on my own time frame.

17.    When I was closer to 14 years old, I talked to my doctor with my parents about potentially taking testosterone, including the side effects and what could or would happen. We all discussed the expected effects like body hair, my voice changing, and my face and body shape becoming more masculine. Those were all things I wanted to happen. We talked about potential side effects, like male pattern baldness, but the benefits outweighed the negatives. We also talked about fertility. I felt back then, as I still do now, that I had no interest in having biological children

4

or being pregnant. I knew that I would need to go through some additional female puberty to have biological children be an option, and I did not want to do that, then or now. Even before I told my mom that I was trans, I knew I wanted to adopt kids. My parents were supportive of that. I also knew that being on testosterone would help feel more comfortable in my own skin, and make my body look the way I see myself. It would also help other people see me the way I see myself and treat me the way I wanted to be treated.

18.    Testosterone helped me very much. I started testosterone in eighth grade, when I was 14. I started first at a low dose, which went up gradually over time. I also had frequent blood tests to make sure what the appropriate dosage was. My doctor checked in to make sure that I liked the changes I was seeing and didn't have side effects that I didn't want. I was relieved that my body had started to develop through male puberty, and it felt like my body was developing the right way.

19.    My parents also changed my birth certificate to show my new name and a male sex marker. That was completed in 2021. I have also changed my passport to reflect my identity as male.

20.    By the time I started ninth grade, in the fall of 2021, no one who met me for the first time had any idea I was trans. I knew a couple people from before I transitioned at my new school, but even some of them only saw me as a boy. One classmate even said how weird it was that I looked just like this girl she knew in sixth grade.

21.    When I started ninth grade, it became clear after a few days that the high school, and Tennessee, was not a welcoming place for me. The principal was not clear with my family whether I could use the boys' restroom after Tennessee's restroom ban, or if I would have to use a single-user restroom that only teachers could access, meaning I'd have to ask for their key card

every time I had to go. My mom was worried about my safety, and whether I'd be treated like a normal student. It also seemed like it would be harder and harder to get gender affirming medical care for me in Tennessee.

22.    Based in part on wanting to keep me safe, my parents decided that our family would move to Massachusetts, and we moved in time for me to start ninth grade again.

23.    When I met all of my new friends, no one had any idea I was trans. I was not super closed off about it, so I would sometimes tell people if it came up. When I told people I'm trans, most people were surprised and said they had no idea, which felt great.

24.    Living in Massachusetts has been wonderful. My school specifically and my school district generally are very welcoming and inclusive. After moving, there have been barely any moments where I've felt different from other people because I'm trans. There are sometimes moments where I think that the cisgender guys in my class don't fully understand my experience, but it is nothing like how people would talk about me in Tennessee or misgender me on purpose. At my old middle school in Tennessee, I wasn't allowed to change my name on my school email address. But at my new school in Massachusetts, I didn't need to worry about that, because I had legally changed my name and gender, and it was a more welcoming environment in Massachusetts. My school has LGBTQ pride events every year, and in my English class, we read books about queer people. I feel comfortable talking to people about being trans when I want to. I also feel comfortable growing my hair longer, because I know I am less likely to be misgendered by doing so. Sometimes, because of my longer hair, sometimes people will assume that I'm a girl, especially if I'm hanging out in a group of girls, and will say something like, "Hello, ladies." But as soon as I talk and they hear my deep voice, they immediately apologize. I know that kind of mistake is not because they think I'm trans, but rather because of my longer hair. But when it happens and they

realize their mistake, they are embarrassed, not me. My voice is deep enough now that I never get misgendered after people talk to me.

25.    I have a full life in Massachusetts. I go to school, have friends, volunteer in my community, and have a job. I feel safe and seen here.

26.    I had to find a new doctor when we moved to Massachusetts. There was a long wait list, but my doctor in Tennessee helped me find a new provider. I have been going to that same provider since we moved here four years ago. I also found a new therapist, who I have been seeing every week since we moved to Massachusetts.

27.    With my doctor's help, I have tried a couple different ways of taking testosterone to find the right method for me, that helps me feel the way I want to and also stops me from getting a period. It sucks when I have breakthrough menstrual bleeding because it makes my gender dysphoria worse. Eventually, I found a method—a long-acting form of testosterone that lasts for four months—that helps address that issue. Every four months, I go to the doctor's office for a procedure that allows me to receive a long-acting form of testosterone. I also go to the doctor every three or four months for injections of another medication to help stop menstruation.

28.    On Tuesday, January 28, 2025, the White House issued an Executive Order entitled "Protecting Children from Chemical and Surgical Mutilation" ("Executive Order").

29.    I first learned about the Executive Order on social media. At first, I did not think it was real.

30.    I had an appointment scheduled for January 31, 2025, where I was supposed to receive testosterone as I normally do.

31.    The day before, on January 30th, a provider from the clinic called to say that my appointment was canceled and would need to be postponed because of President Trump's

7

Executive Order. I have not yet heard anything about getting a new appointment for testosterone. I am still looking for a new provider.

32.    This health care makes my life livable. When I think about losing access to testosterone or the physical effects of gender-affirming care, I get so depressed and cannot function. This healthcare is an essential part of my life. I used to be so, so anxious about not passing as male. It made my life smaller. I want to be able to live my life like any other person, and not be worrying about whether I can continue to access medical care, whether my body will look the way I see myself, or whether other people will see me as trans. I am now a senior in high school, and I haven't had to worry about "passing" as a boy since my freshman year. Now, that worry is back.

33.    My access to this health care influences the decisions I think about, including whether I can travel. In a perfect world, no trans person would need to worry about being misgendered or people being violent toward them, whether they take hormones or not. But being on testosterone makes me feel like myself, and also safer, because I don't have to worry if people won't accept me because they suspect I am trans. When I am taking testosterone, I can just be myself without any extra qualifier of, this is Dylan, but he's trans. Instead I can just be Dylan.

34.    Next year, I am going to college to study linguistics. I speak three languages and am working on learning two more. I want to help preserve endangered languages.

35.    I hope this Executive Order is stopped so that trans young people and young adults like me across the country can continue to access gender affirming medical care. If the Executive Order is not stopped, and I cannot access this healthcare for another year, I will be devastated. I do not know how I will be able to find the medical care I need—I may have to travel abroad. Receiving this medical care as an adolescent has allowed me to become the adult I am today, and I should not have to leave my doctor or my country to continue to live my life.

8

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this ‗‗ day of February, 2025

_____
Dylan Doe

9

# __Exhibit L__

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PFLAG, INC.; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. |
| DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*, | |
| *Defendants*. | |

### DECLARATION OF ALEX SHELDON, EXECUTIVE DIRECTOR OF GLMA: HEALTH PROFESSIONALS ADVANCING LGBTQ+ EQUALITY

I, Alex Sheldon, hereby declare and state and follows:

1.     I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.     I go by they/them pronouns.

3.     I have personal knowledge of the facts set forth in this declaration and would testify competently to those facts if called to do so.

4.     I am the Executive Director of American Association of Physicians for Human Rights, Inc., d/b/a GLMA: Health Professionals Advancing LGBTQ+ Equality ("GLMA"), which is an organizational plaintiff in this case bringing claims on behalf of its members.

5.     I am a professional researcher, strategist, and advocate with over 15 years of experience in the field of human rights, with a particular emphasis on LGBTQ+ rights. Prior to joining GLMA, I was the Head of Research & Social Impact at an LGBTQ+ start-up company, where I specialized in economic inclusion for LGBTQ+ people. Previously, I served as the Deputy Director of the Clinton Global Initiative (CGI) at the Clinton Foundation, and I held roles at

1

JA354

Everytown for Gun Safety, the Movement Advancement Project (MAP), and several international nonprofits.

6.      GLMA is a 501(c)(3) national membership nonprofit organization based in Washington D.C. and incorporated in California. Founded in 1981, GLMA is the world's largest and oldest association of LGBTQ+ healthcare professionals. Our mission is to ensure health equity for lesbian, gay, bisexual, transgender, and queer (LGBTQ+) individuals, and equality for LGBTQ+ health professionals in their work and learning environments. To achieve this mission, GLMA utilizes the scientific expertise of its diverse multidisciplinary membership to inform and drive advocacy, education, and research.

7.      GLMA was originally founded as the American Association of Physicians for Human Rights (AAPHR) and was an offshoot of the Bay Area Physicians for Human Rights (BAPHR), a San Francisco-based physician organization founded to fight discrimination faced by gay and lesbian physicians in the workplace based upon their sexual orientation. AAPHR was founded to take this mission to a national level. Its initial mission focused on responding with policy advocacy and public health research to the growing medical crisis that would become the HIV/AIDS epidemic.

8.      Since being founded, GLMA's mission has broadened to address the full range of health concerns and issues affecting LGBTQ+ people, including ensuring that sound science and research inform health policy and practices regarding the LGBTQ+ community.

9.      GLMA represents the interests of tens of thousands of LGBTQ+ and allied health professionals, as well as millions of LGBTQ+ patients and families. GLMA's membership includes approximately 1,000 member physicians, nurses, advanced practice nurses, physician assistants, researchers and academics, behavioral health specialists, health profession students, and

other health professionals. GLMA's members reside and work across the United States and in several other countries. Their practices represent the major health care disciplines and a wide range of health specialties, including endocrinology, internal medicine, family practice, psychiatry, obstetrics/gynecology, emergency medicine, neurology, and infectious diseases.

10.    Different healthcare professionals can become and are members of GLMA. General membership in GLMA is open to health professionals and health professionals in training, as defined by GLMA's Board of Directors. These different memberships account for practicing health professionals of all disciplines and specialties, with various years of experience, as well as those who are retired and are students. Members who are health professionals or health professionals in training can serve as committee members and have the right to cast an advisory vote.

11.    In addition to general members, GLMA has a "friend" membership for those individuals who are invested in LGBTQ+ health equity but are not directly involved in health professions. Unlike general members, these "health equity supporters" do not have the right to cast an advisory vote.

12.    In addition to our formal members, GLMA serves thousands of people in the community through our programs, events, and services every year.

13.    GLMA's members include health professionals who provide medical interventions as treatment for gender dysphoria to young people under the age of 19 and who work at medical institutions that receive federal grant funding, from subagencies of the U.S. Department of Health & Human Services, including the National Institutes for Health (NIH), Health Resources and Services Administration (HRSA), Centers for Disease Control and Prevention (CDC), Agency for Healthcare Research and Quality (AHRQ), and Substance Abuse and Mental Health Services

Administration (SAMHSA), among others. GLMA's members also include health professionals who conduct federally funded research, including research that is completely unrelated to gender-affirming care, but work at medical institutions that provide medical interventions as treatment for gender dysphoria to young people who are under the age of 19.

14.     GLMA is also partners with the American Medical Association (AMA), the United States Preventative Services Task Force (USPSTF), the National Minority Health (NMH) Alliance, the Reproductive Health Coalition, the American Medical Student Association (AMSA), and the American Academy of Physician Assistants (AAPA), among other medical associations and health organizations.

15.     As part of its mission to ensure health care equity for the LGBTQ+ community as well as equity for LGBTQ+ health care professionals, GLMA is committed to breaking down barriers to comprehensive care for the LGBTQ+ community. This includes GLMA's steadfast commitment to ensure that transgender individuals receive the gender-affirming care they want, need, and deserve.

16.     For example, in 2018, GLMA adopted a formal policy statement on "Transgender Healthcare." This policy statement (127-18-101-21 - Transgender Healthcare) was readopted in 2021. The policy statement reads: "GLMA: Health Professionals Advancing LGBTQ+ Equality considers therapeutic treatments, including hormone therapy, mental health therapy, vocal therapy, hair removal, and gender-affirming surgeries, as medically necessary for the purpose of gender-affirmation or the treatment of gender dysphoria or gender incongruence. These gender-affirming medical and surgical treatments should be covered by all public and private insurance plans."

17.     In 2019, in conjunction with the American Medical Association, GLMA published an issue brief titled "Health insurance coverage for gender-affirming care of transgender patients."

This brief discusses both the positive effects and outcomes of gender-affirming medical care for transgender patients, as well as the negative effects and serious health consequences that transgender patients are denied access to gender-affirming medical care when medically indicated for them. A copy of the issue brief is available at: https://www.ama-assn.org/system/files/2019-03/transgender-coverage-issue-brief.pdf.

18.    In addition, GLMA seeks to promote education and encourages research surrounding LGBTQ+ health issues. As such, our Annual Conference on LGBTQ+ Health regularly includes numerous scientific abstracts and poster presentations relating to LGBTQ+ health issues. Some of this research relates gender-affirming care and the treatment of transgender patients; some of it does not. Since its inception in 1981, GLMA's Annual Conference on LGBTQ+ Health has served as the premier scientific conference for LGBTQ+ and allied health professionals to share innovative health care breakthroughs and interventions, as well as the latest research on LGBTQ+ health. The conference is open to health care providers of all disciplines, researchers, academics, health administrators, policy experts, and others interested LGBTQ+ health.

19.    Because health care equity for the LGBTQ+ community as well as equality for LGBTQ+ health care professionals is our mission, we heard an immediate outcry from members and supporters following the Executive Order 14187, titled "Protecting Children from Chemical and Surgical Mutilation," on January 28, 2025, and Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," on January 20, 2025.

20.    I am aware that Executive Order 14187 (the "Care Denial Order") instructs federal agencies to take immediate steps to ensure that medical institutions, including medical schools and

hospitals, receiving federal grant funding, such as research and education grants, end the provision of puberty-delaying hormone blockers, gender-affirming hormone therapy, or gender-affirming surgeries as treatment for transgender patients with gender dysphoria who are under the age of 19 years old. Similarly, I am aware that Executive Order 14168 (the "Gender Identity Executive Order") requires federal agencies from restricting the use of grant funds to any entities that it considers are promoting "gender ideology," which it defines as recognizing that a person may have a gender identity incongruent with their birth-assigned sex. Throughout this declaration I collectively refer to the "Care Denial Order" and "Gender Identity Order" as "the Executive Orders."

21.     The implementation of these Executive Orders would be devastating for access to care for young transgender people under the age of 19, the vast majority of this care is provided in medical institutions that receive federal grant funding, often times completely unrelated to the provision of gender-affirming medical care. Our members and their patients thus stand to be negatively affected by implementation of the Executive Orders in several ways.

22.     All individuals, including transgender and gender diverse young people, deserve access to respectful, compassionate, and evidence-based care. As outlined in our issue brief mentioned above, gender-affirming medical care improves the health, wellbeing, and quality of life of transgender people with gender dysphoria. Conversely, effectively prohibiting access to this evidence-based and effective medical care leads to negative health outcomes. By threatening to take away all of an institution's federal grant funding because that institution provides gender-affirming care—even when the grants being taken away are not themselves related to gender-affirming care—the Executive Orders put transgender young people across the United States at

risk of being denied critical and oft times lifesaving healthcare services, leading to potentially severe health consequences.  Many of these youth are cared for by GLMA's members.

23.    The Executive Orders are also an affront to healthcare ethics and the principles of equality and inclusivity that should govern healthcare practices.  Healthcare professionals have an ethical obligation to prioritize patient care and well-being, and laws like the Executive Orders undermine this obligation.

24.    The Executive Orders place GLMA's health professional members and the medical institutions in which they work in an untenable position.  If they choose to comply with the Executive Orders, they endanger the health and wellbeing of their transgender adolescent and young adult patients.  If they follow their duty to their patients by providing their transgender adolescent and young adult patients with the best care and the care they need, health professional and medical institutions risk losing essential federal funding, the vast majority of which is unrelated to gender-affirming care, endangering the health and wellbeing of other patients, and significantly hampering their ability to contribute to the scientific and medical knowledge base critical to ensuring and improving the health and wellbeing of all people in the United States.

25.    GLMA, along with many of its sibling medical and health professional associations, such as the American Medical Association, American Psychiatric Association, American Academy of Pediatrics, American Academy of Child and Adolescent Psychiatrists, American Academy of Family Physicians, American College of Obstetricians and Gynecologists, Endocrine Society, Pediatric Endocrine Society, and others, supports the provision of gender-affirming medical care to treat gender dysphoria as evidence-based, safe, and effective medicine.

26.    In addition, transgender patients frequently face heightened stigma and discrimination and are particularly apprehensive in medical encounters. These concerns of the

patients of GLMA's members are magnified by their well-founded belief that the Executive Orders seek to encourage discrimination by healthcare professionals and healthcare institutions.

27.     One of the guiding ethics of medicine is to treat all patients equally.  We do not treat blue-eyed people better than brown-eyed people.  We do not treat women better than men. We do not provide better care to blonde-haired people than red-haired people. Health professionals see people at their most vulnerable; the trust placed in them is sacred.  To tie a healthcare provider's hands, to not permit a provider to make individualized assessments of the medical needs of all patients, hurts patients by preventing them from accessing needed care even at trusted facilities and practices.

28.     If GLMA's health professional members are to provide evidence-based care to their transgender adolescent and young adult patients that is consistent with their oaths, the Executive Orders cannot stand.

29.     If not enjoined, the Executive Orders will harm GLMA's health professional members and the transgender adolescent and young adult patients who GLMA's health professional members treat.  We have heard reports from members of mass confusion and fear across a multitude of medical institutions across the country.  Patients and parents are calling providers in tears and expressing extreme distress.  At institutions that have suspended care in response to the Executive Orders, our members are receiving calls from their patients who are experiencing significant distress and even suicidality as a result of their appointments being canceled.  And even at institutions that are providing care, the widespread fear has led many patients to express feelings of extreme distress and even suicidality as a result of fear of discontinued care.

30.     GLMA exists to foster a world where health care professionals can make decisions to best care for LGBTQ+ individuals.  To prevent our members from being able to provide this oft lifesaving, evidence-based, and effective medical care would significantly hamper our mission to foster health equity for the LGBTQ+ community.

31.     As an organization dedicated to supporting LGBTQ+ medical professionals and advocating for LGBTQ+ health equity, GLMA strongly condemns regressive and discriminatory laws like the Executive Orders and affirms our unwavering commitment to championing equitable and inclusive healthcare for all individuals, without exception.

32.     GLMA stands united in its resolve to fight against such laws that undermine the principles of equality, respect, and evidence-based care

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this 3rd day of February 2025.

_____
Alex Sheldon
Executive Director, GLMA

# **<u>Exhibit M</u>**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

PFLAG, INC.; *et al.*,

      *Plaintiffs*,

   v.

DONALD J. TRUMP, in his official capacity
as President of the United States; *et al.*,

      *Defendants*.

Civil Action No.

**DECLARATION OF BRIAN K. BOND,
CHIEF EXECUTIVE OFFICER OF PFLAG, INC.**

I, Brian K. Bond, hereby declare and state as follows:

    1.   I am over 18 years of age, of sound mind, and fully capable of making this declaration. I have personal knowledge of the facts set forth in this declaration, they are true and correct, and I would testify competently to those facts if called to do so.

    2.   I submit this declaration in support of Plaintiffs' motion for a temporary restraining order.

    3.   I am the Chief Executive Officer of PFLAG, Inc. ("PFLAG"). Founded in 1973, PFLAG is the first and largest organization dedicated to supporting, educating, and advocating for lesbian, gay, bisexual, transgender, and queer ("LGBTQ+") people, and their parents and families, and allies. We are a 501(c)(3) non-profit organization.

    4.   PFLAG has nearly 350 chapters across the country and more than 550,000 members and supporters nationwide. Our members and supporters cross multiple generations of families in major urban centers, small cities, and rural areas across America. PFLAG envisions an equitable

1

USCA4 Appeal: 25-1279  Doc: 34-1  Filed: 07/25/2025  Pg: 367 of 582

USCA4 Appeal: 25-1279      Doc: 34-1      Filed: 07/25/2025      Pg: 368 of 582

and inclusive world where every LGBTQ+ person is safe, celebrated, empowered, and loved. Our mission is to create a caring, just, and affirming world for LGBTQ+ people and those who love them.

5.    Our founder, Jeanne Manford, marched with her son Morty in the 1972 Christopher Street Liberation Day March in New York City and created the very first support group for parents and families of LGBTQ+ people in 1973. Supporting LGBTQ+ people by supporting and strengthening their families has been a core part of our work ever since. Today, the gold standard advocated by PFLAG parents and families—and set forth by pediatricians and therapists—is to accept, support, and affirm LGBTQ+ people's sexual orientation and/or gender identity and expression. Parental rejection is widely understood to be abusive and damaging.

6.    We know, too, that LGBTQ+ youth thrive when supported in their schools and community. So, our work also includes ending bullying, discrimination, and harassment in educational settings by providing training for teachers, administrators, and district leaders, and advocating in the public square to ensure LGBTQ+ people are treated fairly and equally when accessing public accommodations and health care.

7.    We know that change happens and support grows one interaction at a time, one family at a time.

8.    PFLAG is a national membership organization and we have local chapters in 48 states, the District of Columbia, and the United States Virgin Islands.

9.    PFLAG's membership is comprised of chapter members and national members. Individuals can become a PFLAG member by joining the national organization directly or by joining their local chapter, which sends a portion of the member's dues to PFLAG National, also making them national members. In addition to our paid members, PFLAG serves hundreds of

2

thousands of supporters and community members through our programs, events, and services every year.

10.    PFLAG's members play a central role in electing our organizational leadership. Of the 24 members of the PFLAG National Board of Directors, eight are elected directly by our membership. Eight more are elected by the Regional Directors Council, a body of 13 volunteers who are themselves each elected by the members of one of PFLAG's thirteen regions to work with PFLAG National staff to provide support, resources, training, and help to start new affiliates, and to share the perspectives and activities of members with PFLAG National staff. The remaining eight are elected by the Board itself.

11.    As Chief Executive Officer, I am the leader of the professional staff who carry out the work of the PFLAG National office, including supporting the development and work of the PFLAG Chapter Network and promoting PFLAG's presence in the national arena, including through policy advocacy, coalitions with organizations who share our goals, developing trainings and educational materials, and engaging with the media. Supporting the PFLAG Chapter Network is PFLAG National's largest program, and our national staff works closely with chapter leaders and members across the country to reinforce their efforts to establish and grow their chapters by providing them with infrastructure, publications, online learning tools, advocacy support, media training, and countless other services and supports.

12.    Because promoting the wellbeing of LGBTQ+ youth through encouraging and supporting love and affirmation by their families is a core part of our mission and because we have an extensive network of chapters, we heard an immediate outcry from our members and constituents with the President's issuance of Executive Orders targeting LGBTQ+ people, and particularly transgender people. PFLAG members look to us to help them figure out what these

3

Orders mean for them and their children. After Executive Order 14168 issued, we heard almost immediately from parents who were worried about how their children's identities would be treated by the federal government. Then, after Executive Order 14187, we heard from parents for whom the fear had grown exponentially as they worried that their children would lose access to the gender affirming medical care they need—a fear that would unfortunately turn out to be warranted.

13.    PFLAG took various steps to support and provide information to families facing these impacts. On Thursday, January 30, 2025, PFLAG hosted a virtual community meeting for members to create a space for them to be in community with PFLAG and each other. PFLAG has hosted similar online convenings in the past and usually we receive around 200 RSVPs. For this one, we received over 700.

14.    Executive Order 14187 subjects PFLAG's members with a transgender or nonbinary child in need of gender-affirming medical care to a substantial risk of harm. PFLAG has members across the country whose children under the age of 19 are currently receiving or were scheduled to receive puberty blockers, hormone therapy, and/or surgery as part of a medically prescribed course of care for gender dysphoria. In the few short days since Executive Order 14187 issued, PFLAG has heard from members across the country about their children's appointments for gender-affirming medical care being cancelled. From Massachusetts to Washington to Colorado to New York to Illinois to Maryland and beyond, PFLAG families with transgender and nonbinary children had appointments and scheduled procedures to treat their gender dysphoria shut down by hospitals and health care systems as a direct result of the Executive Order. This includes young people whose providers had already deemed puberty blockers or hormone therapy to be medically necessary for them. It also includes 18-year-olds—legal adults—whose scheduled surgical procedures were cancelled. Those families and countless others are being harmed right

4

JA367

now by the issuance of Executive Order 14187, whether because they have had appointments for scheduled care cancelled, are losing access to healthcare providers whose hospitals are ending their provision of gender-affirming care for fear of losing their federal funding, or have otherwise had their imminent plans to obtain the established course of medically necessary care for their transgender or nonbinary children disrupted or foreclosed.

15.    Other current and future PFLAG members with transgender or nonbinary children face a substantial risk of being harmed if Executive Order 14187 is not enjoined, including being denied the right to make medical decisions for their child because the care their child's healthcare providers have declared medically necessary for them has been cut off under threat of losing federal funding or being prevented from obtaining the puberty blockers, hormone therapy, or surgery their child needs solely because they are treatment for gender dysphoria. Executive Order 14187 strips PFLAG families of the ability to obtain medically necessary care recommended by their children's medical providers to treat their children's gender dysphoria, putting those children at risk of serious mental and physical harm—the very reasons families seek this medical care in the first place.

16.    While state-level bans on gender-affirming medical care for minors had already forced some PFLAG members to move or travel to other parts of the country to access the medically necessary care their transgender or nonbinary child needs, to the extent they were able to overcome the logistical and financial costs of doing so, the effects of this Executive Order reach even further, effectively prohibiting nationwide the established course of medical care for their child's health condition, including for 18-year-olds, who have never been barred from accessing care by any state. It will deny them the ability to make the decisions that they, their children, and

5

their children's medical providers know are in their best interests. Executive Order 14187 will put these adolescents' and young adults' lives at risk.

17.    Although these members could challenge Executive Order 14187 in their own right—as the other Plaintiff families are doing—PFLAG brings claims on behalf of its members to represent their interests to shield them from harm, to vindicate their rights to make the medical decisions they, their child, and their medical providers know to be in their child's best interests, and to allow them to maintain their focus on their child's health and wellbeing rather than litigation.

18.    Representing the interests of these members in challenging Executive Order 14187 is directly connected to PFLAG's mission in two ways. First, that mission includes encouraging and supporting parents and families of transgender and gender non-conforming people in affirming and loving their children and helping them access a diversity of support to ensure that their children's needs are met. Executive Order 14187 sends the opposite message and prevents families from meeting their child's needs. Executive Order 14187 bars families from supporting their child's affirmation of their gender identity by seeking the established medically necessary care that has been prescribed for them, depriving them of medically necessary gender-affirming care, resulting in anxiety, depression, and other negative health outcomes associated with denying or cutting off medically necessary care. In order to fulfill our mission to our members, we must fight back against government action that prevents them from doing the very thing we encourage because we know it is in the best interests of transgender and nonbinary youth and their parents and families.

19.    Second, we teach our members to advocate for a caring, just, and affirming world where LGBTQ+ people are safe, celebrated, empowered, and loved, and to advocate for equitable

6

laws and policies that protect them.  We have spoken out against bans on medically necessary care for youth with gender dysphoria like Executive Order 14187 because they directly conflict with parents' abilities to act in their children's best interest and do nothing to protect the health and well-being of youth or anyone who needs access to medical care.  Executive Order 14187 is the antithesis of an equitable law, interfering with and obstructing private decisions made between PFLAG parents, their child, and their child's medical providers to deprive that child of care that is proven to be safe, medically sound, and necessary for treating gender dysphoria.   As an organization dedicated to parents and families of LGBTQ+ youth, we cannot in good faith sit back as our members' fundamental rights to make decisions about their child's medical care are infringed solely because their child is transgender or nonbinary.

20.    PFLAG exists to foster a world where LGBTQ+ children can become thriving, healthy, and happy LGBTQ+ adults. Our members depend on us to provide support and community for them in a society that often still treats their children as worth less than others, attempts to silence them, or denies their very existence.  For our members who have transgender and nonbinary children and are doing nothing more than loving them and following the advice of qualified medical professionals, PFLAG is here to do all we can to support them in those efforts and protect them from harmful, invasive measures like Executive Order 14187.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 3 day of February, 2025.

Brian K. Bond
Chief Executive Officer, PFLAG, Inc.

# **Exhibit N**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PFLAG, INC.; *et al.*,

        *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*,

        *Defendants*.

Civil Action No.

## DECLARATION OF E.M.

I, E.M, hereby declare and state and follows:

1. I am over 18 years of age, of sound mind, and in all respects competent to testify.

2. I have personal knowledge of the facts set forth in this declaration and would testify competently to those facts if called to do so.

3. I live in the State of Washington with my husband and my son, H.M., who is 16.

4. My family is a member of PFLAG.

5. My son is an artist. He likes robotics and singing.

6. When my son was born, his sex was assigned as female. When he was 12 years old, my son told us that he did not feel like a girl and was nonbinary. When he was 14 years old, he realized that he was trans masculine and felt like a boy. We have always loved and supported our son.

7. When my son expressed discomfort around his body, we took him to the Adolescent Center at Factoria Medical Center, which is part of Kaiser Permanente Washington. We consulted with the providers there, including a psychiatrist, to discuss what treatment, if any, would be appropriate for my son. He was asked specific questions about his identity, his discomfort around

1
JA372

his body, and what his goals were. Based on that thorough evaluation, he was diagnosed with gender dysphoria. We then continued to discuss with his providers what options he had for medical treatment. He was too developed for puberty blockers, but we discussed the risks and benefits of testosterone. After careful consultation and consideration, we decided that testosterone was an appropriate medical treatment for his gender dysphoria. He began taking testosterone about two years ago.

8.      My son has been doing well in school. Though many of the people in his school do not understand what it means to be transgender, he has good friends and supportive teachers.

9.      Being on testosterone has dramatically improved my son's life. Because he feels comfortable in his body, he can socialize, attend and do well in school, and live a rich and fulfilling life. Testosterone treats my son's gender dysphoria, and without that distress and anxiety, he is growing into a lovely young man.

10.      On Tuesday, January 28, 2025, the White House issued an Executive Order entitled "Protecting Children from Chemical and Surgical Mutilation" ("Executive Order").

11.      That same day, my son had an appointment at with the provider who prescribes his testosterone. This was a regular checkup that had been scheduled for a couple months. My son drove himself to the appointment. When he got there, he was orally told that because of the Executive Order, Kaiser Permanente was not sure whether they could refill his testosterone because of his age. My son tried to call me, panicked, during the appointment, but I missed his call.

12.      When he got home and told me what happened, I started trying to research why he had been denied care. Without testosterone, I am worried about his gender dysphoria worsening, and his life becoming smaller.

13.    Thankfully, on Thursday, January 30, we received a message from my son's provider that they would be able to continue prescribing his testosterone. I was so relieved, as was my son.

14.    But I am terrified that my son will lose access to care again, and not just while he is a minor, but even after he turns 18. My son cannot wait three years for medical care.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this __ day of February 2025.

_____
E.M.

13.     Thankfully, on Thursday, January 30, we received a message from my son's provider that they would be able to continue prescribing his testosterone. I was so relieved, as was my son.

14.     But I am terrified that my son will lose access to care again, and not just while he is a minor, but even after he turns 18. My son cannot wait three years for medical care.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this 3rd day of February 2025.

_____
E.M.

# Exhibit O

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| PFLAG, INC.; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. |
| DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*, | |
| *Defendants*. | |

**DECLARATION OF JANE DOE 1**

I, Jane Doe 1, hereby declare and state and follows:

1.      I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.      I have personal knowledge of the facts set forth in this declaration and would testify competently to those facts if called to do so.

3.      I live in the State of Colorado with my husband and two children.

4.      One of my children, my son John Doe 1, is almost 15 years old.

5.      My family is a member of PFLAG National and our local PFLAG chapter.

6.      My son is a smart, kind, well-rounded young man. He has great friendships and excels at the passions he pursues.

7.      When my son was born, his sex was assigned as female. He has, from a very early age, told us that he is a boy.

8.      Beginning when he was three years old, and certainly by the time he was four, John Doe would give us evidence that he was a boy. He was insistent and persistent that he was a boy.

9.      In the middle of kindergarten, John socially transitioned at his school. Over one of the school breaks, we talked to his teacher, and he came back to school by introducing himself to his class as a boy, with a new name and pronouns. He had already preferred dressing and styling his hair in a masculine way and now he did so freely and joyfully.  Caring adults in his life would often say to us, "he is clearly more comfortable in his skin now."

10.     When John was 8 years old, we began seeing providers at Denver Health. John Doe had started to show early signs of puberty and was very distressed by the prospect of developing a female body. A provider that saw John diagnosed him with gender dysphoria and recommended a therapist, who John has been seeing since. The more hope he received, the more confident he got. In 3rd grade, he was elected class president.

11.     At Denver Health, we also explored with the providers what options we had for John Doe to avoid the distress of endogenous puberty, and to avoid physical changes that did not match his gender. By 5th grade students in Colorado are expected to have the "knowledge and skills necessary to make personal decisions that promote healthy relationships and sexual and reproductive health."  Based on consultation with doctors and our own research and education, and based on John Doe's strong identity as a boy, we decided that John would receive regular injections of puberty blockers to temporarily pause puberty. John continued receiving injections until he was about 13. Puberty blockers allowed John to continue to live his life as a boy without experiencing distressing changes in his body.

12.     As John got older, we continued to discuss with John and his providers what medical care would be appropriate for John's gender dysphoria. As John approached 12, we discussed testosterone. John wanted to develop as a young man, including facial hair, a deeper

voice, and more muscle mass. It was also not an option for John's health and maturity to remain on puberty blockers indefinitely.

13.    Because John is a boy, and has always known himself to be a boy, going through an endogenous female puberty was not an option for him. After discussing the risks and benefits with his providers, and making sure John understood what the effects of testosterone would be, John began testosterone after turning 12 years old.

14.    John has been doing so well on testosterone. He has a robust social life, activities, and is very engaged in school. He likes being on testosterone because it makes him more masculine, and that is just who he is. His biggest concern is about being outed. He does not tell his friends that he is trans. In his words, he "doesn't ever remember being a girl."

15.    After the election, John's providers at Denver Health told us that they would be there for my son, and not to worry.

16.    On Tuesday, January 28, 2025, the White House issued an Executive Order entitled "Protecting Children from Chemical and Surgical Mutilation" ("Executive Order").

17.    After that Executive Order, John's provider called us    to say that, because of the Executive Order, Denver Health was no longer taking patients and would be ending the provision of gender affirming medical care to those under 19 by the end of February. We will need to find my son a new Primary Care Provider and need continuing appointments to check his hormone levels and a doctor to prescribe testosterone.

18.    My son has always known he is a boy, and has been living his life as a boy since he was 5 years old. He has never undergone endogenous female puberty. We changed his name and gender marker on his birth certificate to reflect his male identity. It would be unthinkable, and

horrifying, for him to be unable to access the medical care that he needs to continue living and developing as a young man until he is 19.

19.     I am so scared and devastated. I have been in tears since the announcement. My son has been seeing his Doctor at Denver Health for years. We know and trust his Doctor and the providers at Denver Health. I do not know how we will find care for our son going forward.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this 3rd day of February 2025.

_____
Jane Doe 1

# Exhibit P

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

PFLAG, INC.; *et al.*,

                *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official capacity
as President of the United States; *et al.*,

                *Defendants*.

Civil Action No.

**DECLARATION OF JANE DOE 2**

    I, Jane Doe 2, hereby declare and state and follows:

1.    I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.    I have personal knowledge of the facts set forth in this declaration and would testify competently to those facts if called to do so.

3.    I live in the State of Illinois with my two children.

4.    One of my children, my son John Doe 2, is 17 years old.

5.    My family is a member of PFLAG.

6.    My son is a thoughtful, loving, artistic young man. He is tender toward our family cats and still loves to spend time with me and his sister.

7.    When my son was born, his sex was assigned as female. That is not who he is, though – he has shown us from a very early age that he is a boy.

8.    Just before seventh grade, John told us that he was transgender. That was not a surprise to us. He has always clearly seen himself as more masculine and always wanted other people to see him that way, too. We did our best to make sure his school environment was safe

1

JA382

and supportive. John had already been dressing and presenting himself as a boy, so we continued to support him with that, as well as using male pronouns and a new name.

9.    After John had socially transitioned for a year, we got his legal name and gender marker changed on his birth certificate and other vital documents. We wanted to make sure that his deadname and sex assigned at birth did not out him against his will as transgender in high school and his adult life. We wanted to make sure that he could grow into an adult and be exactly who he is.

10.    John was also very uncomfortable in a female body. We took a slow and steady approach to all of his care. We found an LGBTQ+ affirming primary care practice and had multiple long conversations with the providers about what options were available. John was also diagnosed with gender dysphoria. He has been seeing a therapist for almost five years.

11.    Because of John's severe gender dysphoria, especially related to his body going through puberty, we decided, in consultation with John's doctors, John, and as a family, that he would start receiving puberty blocking injections. John was very distressed about getting a period or growing breasts. Although I had concerns about the potential risks of blockers, I recognized that John going through a female puberty would be devastating. I became comfortable with the potential risks given the alternative of watching John suffer immensely as his body changed, and especially knowing that blockers were temporary and could be stopped later.

12.    John felt completely relieved once puberty blockers paused the development of female puberty. I could see how relieved he was, and how much better he could participate in life without suffering through the worry and anxiety.

13.    We also discussed, at great length, whether John would start testosterone. Remaining on puberty blockers indefinitely was not an option as John got older, and neither was

going through female puberty. Again, after discussing the risks and benefits with John's providers, as a family, and with John, we decided that John should start testosterone when he was 14 years old, about a year after he started blockers.

14.    Once John started testosterone, he was so excited. He wanted a deeper voice, and to grow a beard and body hair. We marveled with delight when his voice started to drop, even a little bit, and his mustache started to grow in. At first, John was a little disappointed that the changes weren't happening faster. I explained that puberty was a gradual process for everyone, including other boys, and that the changes would take time.

15.    Now that John has been on testosterone for about three years, he's growing into the young man he is supposed to be. The one aspect of his body that is still holding him back is his chest.

16.    Like with John's name and change marker changes, I want him to be able to start his adult life looking and feeling like the person he knows himself to be. As a family, we began discussing John's options for chest masculinization surgery, which would allow him to stop wearing a binder, to swim, and to feel at home in his body.

17.    We received a referral to UI Health for surgery. It was very difficult to get into UI Health because of waiting list times. We put substantial effort into getting that appointment, as well as all the letters of support from providers that John needed.

18.    John had a surgical consult for surgery at UI Health in October, shortly before the election. He was initially scheduled for surgery at the end of March of this year. After the election, he was offered a surgery date at the end of January, which we took.

19.    Throughout January, we continued to take steps toward surgery, including pre-op consulting with his primary provider and the surgeon.

JA384

20.     On Tuesday, January 28, 2025, the White House issued an Executive Order entitled "Protecting Children from Chemical and Surgical Mutilation" (the "Executive Order").

21.     After the Executive Order, I reached out to the surgeon, expressing concern that they would cancel my son's surgery.

22.     On Wednesday, January 29, 2025, the surgeon called to tell me that, because the hospital was worried about losing millions of dollars in funding, the hospital would not allow them to proceed with my son's surgery later that month.

23.     It was an awful few days in our house. My son was devastated, and I had to watch my son carefully to make sure he wouldn't hurt himself in despair.

24.     My son is a good man. He creates beautiful art expressing his feelings about his gender, and what it would mean for him to feel at home in his body. I cannot imagine how he will suffer if he is unable to have surgery until more than a year after he is already a legal adult.

25.     As his mother, I only want what is best for my son. At every step of his journey, I have thought to myself, "what will this decision mean in ten years?" The medical care that my son has received so far has allowed him to live his life and become who he knows himself to be, who he is supposed to be. On my deathbed, if I am thinking about what kind of parent I have been, I know that supporting my son on his journey was the right thing.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this 3<u>rd</u> day of February 2025.

_____
Jane Doe 2

4

JA385

# <u>Exhibit Q</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PFLAG, INC.; *et al.*,

         *Plaintiffs*,

     v.                 Civil Action No.

DONALD J. TRUMP, in his official capacity
as President of the United States; *et al.*,

         *Defendants*.

### DECLARATION OF JANE DOE 3

     I, Jane Doe 3, hereby declare and state and follows:

1.      I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.      I have personal knowledge of the facts set forth in this declaration and would testify competently to those facts if called to do so.

3.      I live in New York City with my husband and our two children.

4.      My family is a member of PFLAG.

5.      One of my children, Jamie Doe, is nine years old.

6.      Jamie was assigned male at birth, but she is not a boy. She is our daughter, and she is transgender.

7.      From 18 months old, my daughter expressed a feminine gender. We would buy Jamie all kinds of clothes in many different colors, but Jamie would only wear pink pajamas. Jamie specifically learned how to change her clothes so that she could put on girly clothes whenever she wanted.

1

JA387

8.    She has been in supportive care, including therapy, off and on since she was 3 years old as needed.

9.    The first time Jamie wore a dress, she was so excited that she changed her clothes in the street. I was worried that someone would say something unkind to her, but instead, an older woman told Jamie, "Oh how beautiful!"

10.    About four years ago, Jamie told us that we should use "she" or "they" pronouns for her, and two years ago that she wanted to be called "Jamie," not by her birth name, which was more stereotypically associated with boys. We asked Jamie's school to make those changes, and they were very accepting and affirming. Jamie has since asked us to change her gender marker to "F" to reflect that she is a girl, and we have changed her vital documents to reflect her name and gender.

11.    About a year ago, we had an intake appointment with a transgender health clinic. We started to look for signs of puberty, which we thought Jamie might be starting. Because Jamie is not a boy, starting a male puberty would be distressing for her. She does not tolerate anyone using male pronouns for her, and being seen as (or being forced to see herself as) male would be enormously distressing. She has been diagnosed with gender dysphoria.

12.    After careful consultation with Jamie's doctors, our own research, and taking into account Jamie's wishes and well-being, we decided that she should get a puberty blocking implant to stop male puberty from progressing. This will give her time to further explore her gender without the distressing changes of a puberty that does not match her gender. After weighing the risks and benefits, including the risks of doing nothing, we decided as her parents that this was the best decision to treat her gender dysphoria and prevent it from worsening in the

2

future. Her psychiatrist wrote a letter of support, and she underwent testing including bone scans. She was scheduled for a pubertal blocking implant at NYU Langone for the last week in January.

13.     On Tuesday, January 28, 2025, the White House issued an Executive Order entitled "Protecting Children from Chemical and Surgical Mutilation" (the "Executive Order").

14.     On Wednesday, January 29, I called NYU Langone to make sure that Jamie's insurance coverage for her implant had gone through. When NYU called back later that afternoon, I assumed it was for details of the surgery. Instead, I was told that NYU was cancelling her surgery and no longer providing any trans-affirming medical care because of the Executive Order. They did not know when they would be able to reschedule.

15.     I am so worried about Jamie. She is a great kid, and doing well in school, where everyone is affirming and supportive. She is definitely not a boy, and a male puberty would be so wrong for her. I am devastated at the thought that I will not be able to get my child the medical care she needs. I have been trying to get her rescheduled somewhere, but I do not know whether I will be able to get her what she needs to stop her gender dysphoria from worsening as she matures.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this 4 day of February 2025.

_Jane Doe 3_
Jane Doe 3

3

JA389

# Exhibit R

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PFLAG, INC.; *et al.*,

            *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*,

            *Defendants*.

Civil Action No.

### DECLARATION OF JANE DOE 4

I, Jane Doe 4, hereby declare and state and follows:

1.    I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.    I have personal knowledge of the facts set forth in this declaration and would testify competently to those facts if called to do so.

3.    I live in the State of Wisconsin with my four children and my spouse.

4.    One of my children, my daughter Jessica Doe, is 13 years old. My spouse and I adopted Jessica when she was two years old, but we served as her foster parents since her birth.

5.    My family is a member of PFLAG.

6.    My daughter is a kind, creative, and brave young woman. She is an incredibly talented artist, and she loves anime. She is also a brilliant chef, who has been cooking for our family since she was six years old.

7.    When my daughter was born, her sex was assigned as male. But that is not who she is. By the time she was three years old, she made it very clear to us that she was a girl, not a boy. We sought to learn more and support her as best we could. She asked us to call her Jessica and to

JA391

use she/her or they/them pronouns by age five. We obtained a legal name change for her in the fall of 2024, and she is open with her peers about being transgender.

8.    When Jessica was five years old, we found a therapist with experience working with transgender youth to help her explore her gender identity and to provide her with a resource for any questions she might have, such as how to navigate school. Jessica has been seeing this therapist for more than eight years now. Her therapist diagnosed Jessica with gender dysphoria.

9.    We set up an appointment with the Gender Health Program at the Children's Hospital of Wisconsin ("Children's Wisconsin") in 2020, when Jessica was approximately 9 years old. Her doctors there explained to us the various options for medical care, if that was something we wanted to pursue, and we had conversations about risks, benefits, and side effects. With time, Jessica's distress over the prospect of undergoing a masculine puberty grew. I remember her crying and telling me that she did not want a beard and did not want her voice to drop. After talking through the side effects and various options transparently and thoroughly with the doctors at Children's Wisconsin, I knew that puberty blockers would be the best medical decision for Jessica, as I did not want her to suffer immensely due to male puberty. We decided, in consultation with the doctors at Children's Wisconsin and Jessica's long-time therapist, that she would start receiving puberty blockers. She began puberty blockers near the end of 2021.

10.    Jessica was extremely scared of undergoing a male puberty. It is clear that puberty blockers have tremendously improved Jesscia's mental health. She told me that the blockers have given her an immense sense of relief. Prior to receiving puberty blockers, Jessica's mental health struggled as a consequence of gender dysphoria, and she was having thoughts of self-harm, and she had to be hospitalized in an outpatient intensive program as a result. She has come a long way since that time, and I believe puberty blockers have been a large reason why. We also discussed at

JA392

great length whether and when Jessica would start estrogen under the care of the doctors at Children's Hospital. We decided again in consultation with the doctors at Children's Hospital, Jessica's therapist, and Jessica, that she should move forward with estrogen to treat her gender dysphoria.

11.     In order to receive a prescription for estrogen, Jessica had to obtain letters of support from her therapist and other doctors, as well as go through bloodwork.  It was a lengthy process, but this past December, Jessica finally received approval to move forward with estrogen as her hormone replacement therapy. We made an appointment at Children's Wisconsin for February 3, 2025 for her to receive her first dose of estrogen.

12.     On Tuesday, January 28, 2025, the White House issued an Executive Order entitled "Protecting Children from Chemical and Surgical Mutilation" (the "Executive Order").

13.     On Thursday, January 30, 2025, I received a call from Children's Wisconsin saying that they were not able to start new gender-affirming medical treatments because of the Executive Order. They told me that they were not able to provide estrogen to her at this time.

14.     On Friday, February 7, 2025, I received another call from Children's Wisconsin informing me that they were not accepting new patients due to the Executive Order, but because Jessica had already established care, they would be able to see us. Although we were able to obtain a prescription for estrogen for Jessica, her doctors stressed that they could not ensure care would continue, and that Jessica's care could be stopped at any time. Jessica and I are both afraid that her healthcare access will be cut off again for reasons outside our control.

15.     Jessica is Black, and she is very aware of the high rates of violence against Black trans women. Jessica often puts on a brave face, but I know that she is disappointed, scared, and

angry about the disruption in her access to this care. She is terrified of what might happen if she does not consistently get the care she needs.

16.    Jessica received her third puberty-blocking implant in November 2024, which will need to be replaced. If Jessica cannot continue to receive gender-affirming care, it would be devastating. Undergoing her endogenous puberty would be irreversible and destructive for her, and it would cause her significant dysphoria. I am terrified that, without being able to continue to have access to the treatment she needs, her mental health will suffer and regress to the state it was before she received blockers and she will begin to self-harm.

17.    As her mother, Jessica's health and safety is my greatest priority. The medical care that she has received so far has allowed her to participate fully in life and to be who she knows she is. I would walk to the ends of the earth to get my daughter the care she needs, and it causes me so much pain to know that her medical care is under threat.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this 9th day of February 2025.

_Jane Doe 4_
Jane Doe 4

JA394

# Exhibit S

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PFLAG, INC., *et al.*,

     *Plaintiffs,*

         v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

     *Defendants.*

Civil Action No. BAH-25-337

## DECLARATION OF JANE DOE 5

I, Jane Doe 5[1], hereby declare and state and follows:

1.    I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.    I have personal knowledge of the facts set forth in this declaration and would testify competently to those facts if called to do so.

3.    I currently reside in Florida but our family is in the process of relocating to Maryland this Spring and Summer.

4.    I am a member of PFLAG.

5.    I have two daughters. My older daughter is thirteen years old, and my younger daughter, Janie, is eleven. Janie is transgender. When she was born, Janie was designated male at birth, but she is a girl.

6.    When Janie was 18 months old, before she could even talk, Janie would toddle around carrying my purse and other feminine accessories. By the time she was two years old, she

---

[1] Jane Doe 5 and Janie are pseudonyms. My family is proceeding under pseudonym to protect our right to privacy and ourselves from discrimination, harassment, and violence, as well as retaliation for seeking to protect our rights.

1

would tell us repeatedly that she is a girl. In every picture we have of her from when she was a toddler Janie was wearing her sister's clothes, carrying purses and dolls, and expressing herself in a typically feminine manner. She never had any interest in toys or clothes typical of boys.

7.      When we spoke with our pediatrician about Janie's feminine expression when Janie was two, he reassured me that it was possible it was a phase or just a normal exploration of different gendered behaviors. I did not know much of anything about transgender children, and my instinct was to just keep steering my daughter back to boys' clothes and haircuts whenever I could.

8.      By the time Janie was three, she would insist on wearing her sister's "Elsa" dress to school over her clothes every day. It became a daily fight over clothes. It was a battle to put pants on her, or any typically boy-looking clothing. Everything came back to her insistence that she was a girl. Janie would even draw herself in pictures with little stick figures with long hair. When she was three years old, our pediatrician recognized that this was not just exploration of different gendered behaviors. Janie persisted in identifying as a girl and our pediatrician diagnosed her with gender dysphoria.

9.      Then, while in pre-kindergarten at age 4, my daughter started to become more and more withdrawn, and it was clear to the family that this was serious. As we continued to battle over clothes, I started to realize that I was breaking my child's will; she was in serious pain. At that point, we told Janie that she could wear what she wanted more. She would wear boys' clothes to pre-K but then we would have a dress for her to change into in the parking lot as soon as she left school. But she continued to cry and fight me when we would get ready for school.

10.      During this time, Janie was also in play therapy. The kids' father and I had divorced and we wanted to make sure that Janie and her sister had someone to talk to. In therapy, Janie would always express herself in dresses and feminine accessories. In therapy she would also

2

JA397

consistently assert that she is a girl.

11.    After school in pre-k, things started to get more serious when Janie started to ask when she could go back to heaven so she could be a girl. It was surprising to hear her speaking like this, and I realized that she was in essence asking to die. She would ask why God made a mistake and when she could become a girl.

12.    I was so heartbroken and worried. I was not sure how to help my child, and I was worried for her safety in the conservative community where we lived. But I could not just ignore it. Janie was not doing well in school. She was withdrawn and increasingly unrecognizable.

13.    As things were escalating with Janie, my sister sent me a documentary about a young trans girl and the family's experience coming to terms with the fact that their daughter is transgender. So much in the documentary resonated for me. At that point, I knew I had to educate myself. I read every book that I could get my hands on. We decided to let Janie grow out her hair and start to wear clothes she felt comfortable in to school. At that time in pre-K, she was still going by her birth name but would try on different names outside of school to see what fit before eventually settling on her current name.

14.    When Janie was around five years old at the end of 2018 or beginning of 2019, our pediatrician referred us to the gender clinic at University of Alabama at Birmingham. At the clinic, the providers confirmed Janie's diagnosis of gender dysphoria that her pediatrician had made two years prior. Because Janie was a long way from puberty, they recommended that we recognize her as a girl through her name, pronoun, hair, and dress and monitor for puberty in the future.

15.    We then went to the University of Florida in Feb of 2019, because we wanted a second expert opinion. It was a four-hour car ride to UF each way, but we were in search of clarity and the best possible care. There, we met with an endocrinologist, a psychologist, and a whole

3

JA398

team. The psychologist again confirmed Janie's diagnosis of gender dysphoria and also recommended that we recognize Janie as a girl and monitor for signs of puberty in the future.

16.     After the two visits with the two clinics, we decided it was essential for Janie to fully socially transition before starting kindergarten. She changed her name, grew out her hair, wore typical girls' clothes and we started to work with the school so she could start kindergarten as her true self.

17.     The difference between Janie on the first day of pre-K and then after she could go to school as herself was night and day. It was like it was a different child. Not only was she happier and more energetic, but her assessment scores were through the roof. She had previously been testing below kindergarten readiness, and then was excelling three months later once she was allowed to socially transition. What changed was that she got to be herself. At that point, all the nightly talk of going back to heaven immediately stopped. The behavioral problems that she was struggling with in pre-K immediately stopped.

18.     After she fully socially transitioned, Janie continued therapy so she would have a place to explore her feelings, her gender and other things that she was grappling with. We also chose to continue care at the University of Florida because even though it was an eight-hour round trip excursion for our family, it was still closer than University of Alabama and we wanted to stay in our home state for care. Though there was no medical intervention appropriate at that time, throughout Janie's early elementary school years, we had regular yearly check-ups with our endocrinologist at the University of Florida to just check-in on how Janie was doing and feeling. We would also meet with the full team, which included not only our endocrinologist but the psychologist and patient advocate as well.

19.     Though Janie's elementary school was very supportive, some kids who had gone

4

to pre-K with Janie knew that she had transitioned. Those kids would regularly bully her and relentlessly harass her. The bullying caused Janie to experience significant anxiety at school and at home.

20.     When her classmates would say to Janie "we know you used to be a boy," she would respond with an elaborate story she made up about how she had not been a boy but that was her twin brother that they were thinking of, and he had died of a lung problem. Her story was so involved and specific – she was working so hard to be free of her past and just live as a girl without harassment.

21.     When Janie was in fourth grade, we decided to switch schools and move her to a school where no one knew her before her transition. At her current school, no one is aware that Janie is trans except for the principal and a few other people in the administration. Janie wanted to stay "stealth" – meaning, not be out as transgender to others – for her safety. All she wants is to be a kid and live as the girl she is.

22.     During fourth grade, Janie also began to grow more anxious about puberty. The thought of developing typically male physical characteristics is unimaginable to Janie who has known and insisted that she is a girl since she was two years old.  In fourth grade, Janie's doctors started to conduct baseline blood tests to monitor for signs of puberty.

23.     In 2023, the state of Florida passed a ban on gender-affirming medical care for transgender adolescents. We started to panic because if the new law stayed in effect, it would mean that Janie could not receive medical treatment at the University of Florida if she needed to begin puberty blockers. I called doctors up and down the east coast, including ones at New York University, Mt. Sinai in New York, and Johns Hopkins in Maryland. We ultimately decided to establish care at Children's National in Washington DC. We flew to DC and met with the doctors,

5

JA400

got blood work, and established Janie as a patient. It was scary to know that my daughter was on the cusp of puberty, anxious about the possibility of developing typical male features when no one knew she was transgender, and then we had to travel hundreds of miles from our home to get care.

24.     Around this time in 2023, Janie also began to experience devastating sleep disruptions from anxiety. She would become terrified at night and unable to fall asleep. She began to sleep with me in my bedroom.

25.     Our family was lucky and for a brief period in May of 2024, the Florida ban on health care was blocked in court. Though it went back into effect shortly after it was first blocked, Janie was able to get her puberty blocker implant in the window the law was not in effect. In March or April of 2024, blood work confirmed that Janie had entered puberty and would need a puberty blocker implant to prevent her body from developing as a man. Before Janie was prescribed the puberty blocker, we spoke extensively with the doctors about the potential side effects of treatment. Not only did we have those conversations in the visit prior to her receiving the implant, but we had basically gone through the conversations in each prior visit. The visit with the University of Florida team before receiving the implant was over two hours, and we went through the most extensive consent form I have ever seen in my life (and I am a lawyer so that is saying something). Our endocrinologist sat with me and Janie and went through each of the seemingly thirty pages to make sure we understood every possible side effect. Janie was also given a Vitamin D supplement and had a bone density scan. We discussed everything as a family and with the medical team and all agreed that the benefits way outweighed the risks.

26.     On the day her blocker was implanted, Janie was ecstatic. She FaceTimed her best friend while she was being wheeled back for the short procedure and was beaming. When we got home that night it was clear that an enormous weight had been lifted. She went back to sleeping in

6

her room with no problem that night after a year of nightly crises around sleep. It was so clear to me at that point that the sleeplessness was just a manifestation of her extreme anxiety about impending puberty. It was like she was being tortured inside.

27.    Prior to January 20, 2025, I felt that we had figured out a way to best protect my daughter. She had her puberty blocker implant. We were moving to Maryland where she could attend supportive schools and access medical care at Children's National Hospital in Washington, D.C.

28.    Then, on January 28th everything changed. President Trump signed the Executive Order entitled "Protecting Children from Chemical and Surgical Mutilation" (the "Executive Order"). Shortly after the Executive Order was issued, I heard that Children's National Hospital would be shutting down care and not prescribing puberty blockers or hormone therapy to patients under 19. Our plans were thrown into disarray. Janie has an implant in her arm currently that she will need removed and replaced by May.

29.    I spoke with our doctor at the University of Florida who referred us to Children's Hospital Los Angeles. Our doctor even personally spoke to the doctor at the Los Angeles Clinic and we were able to get an appointment for March 18, 2025 in Los Angeles.

30.    The day after we got the appointment in Los Angeles, we heard that the clinic there was pausing taking on and seeing new patients as a result of the Executive Order. I have tried to contact the hospital, the clinic, the case managers, and everyone I could to try to find out what we should do now. No one has responded to my many requests.

31.    At this point we are in limbo, and I feel like I am having a 24-hour a day anxiety attack. I am having trouble working or focusing on anything. All I want is to protect my daughter and get her the health care that she needs. I am trying to shield Janie from this as much as I can

7

JA402

but the other day she asked me, "Why do people hate me so much?"

32.    All my daughter wants is to be a kid and live her life. She is such a magical and vivacious child who people can't help but fall in love with. I know with everything inside of me, that my daughter's puberty blockers saved her life and are continuing to save her life. I will do whatever it takes to protect my child. We have started to look at care options out of the United States. I cannot believe it has come to this but losing this treatment could mean losing my child and that is not an option I am willing to entertain.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this 11 day of February 2025.                     _Jane Doe 5_____

                                                        JANE DOE 5

# **Exhibit T**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PFLAG, INC.; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. No. BAH-25-337 |
| DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*, | |
| *Defendants*. | |

## DECLARATION OF JANE DOE 6

I, Jane Doe 6, hereby declare and state and follows:

1.      I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.      I have personal knowledge of the facts set forth in this declaration and would testify competently to those facts if called to do so.

3.      I live in the State of Oklahoma with my children and my spouse.

4.      My family is a member of PFLAG.

5.      One of my children, my daughter Jenna Doe, is 17 years old.

6.      Jenna is a creative, smart, and hardworking young woman. She is taking dual enrollment classes at a local college, and she works part-time at a restaurant. Like any 17-year-old, she loves spending time with her friends.

7.      She is also transgender. My daughter was assigned male at birth, but she is a girl. From a very young age, we knew that Jenna was different, but we did not understand fully until we had the language for it. She made it clear she was not a boy early in her childhood. Jenna gravitated towards dolls and other traditionally feminine toys, and because of the way that she dressed and presented, she would often be identified as a girl by people that we encountered in our

daily life. Around the age of ten, she asked me not to correct people in public who did so. She even sewed herself a dress out of an old curtain and insisted on wearing it to the grocery store. From then on, she only wanted to wear clothing from the girls' section.

8.      At first, when Jenna was younger, I was not sure how best to proceed, so I took her to see a pediatric endocrinologist, purely to learn more about Jenna's experience and what options might be available to us in the future. We had regular visits with that doctor, and eventually, Jenna began to see a therapist who has experience with gender-diverse children. Jenna has received a formal diagnosis of gender dysphoria.

9.      As Jenna grew older, she continued to consistently assert her identity as a girl. She started to go by a different name, and continued to use female pronouns. Eventually, around when Jenna was eleven and was entering puberty, we made the decision in consultation with Jenna's medical providers and therapist to initiate a puberty-blocking medication so that Jenna would not have to undergo her endogenous puberty and we would have time to explore whether a medical transition with hormone therapy was the right decision for Jenna. She received a letter of support from her therapist, and we fully discussed all of the available options with her medical provider before ultimately initiating that medication.

10.      Things were not always great. Living in Oklahoma, Jenna's environment was sometimes challenging, and as she came to understand herself as transgender and started to come out to the people in her life, we lost friends along the way who cut contact with us because they did not understand.

11.      As Jenna's peers began to visibly enter puberty, she experienced worsening gender dysphoria, and her mental health suffered as a result. As Jenna grew further into adolescence, her distress over not experiencing a typically female puberty only deepened, and she began to experience episodes of depression and even suicidality. I was afraid for her safety and well-being.

12.     As Jenna approached the age when she would be eligible to initiate gender-affirming hormone therapy, we continued to see her pediatric endocrinologist and discussed medical options for Jenna. Eventually, after much conversation and consultation as a family with Jenna's doctor, and with an additional letter of support from Jenna's therapist, we made the decision to initiate estrogen around when Jenna was about to turn 14.

13.     Jenna's endocrinologist wanted to take a cautious approach and started Jenna on a very low dose of estrogen. With this low dose, we saw a slight improvement in Jenna's mental health, but it was not until her dose was later adjusted to a more typical level for a transgender girl of her age that I noticed a vast improvement in Jenna's mental health and well-being. Where before she struggled deeply, now she is joyful again, has friends, and loves life. She is truly thriving.

14.     But in 2023, an Oklahoma state law went into effect which banned gender-affirming medical care for minors. This law prevented my daughter from receiving further care in Oklahoma.

15.     In order to ensure that Jenna could continue to receive the medical care that she needs, we established care at the Children's Hospital of Colorado. Since then, we have travelled from our home in Oklahoma to Denver every six months for follow up appointments. When she needs refills of medication, my daughter and I drive what is almost nine hours each way to pick them up. This was disruptive to our lives, but I knew this care was absolutely vital to my daughter's continued well-being.

16.     Our last appointment at Children's Colorado was in December of 2024, though we did not know it at the time.

17.     On Tuesday, January 28, 2025, the White House issued an Executive Order entitled "Protecting Children from Chemical and Surgical Mutilation" (the "Executive Order").

18.     On February 5, 2025, I received a letter from Children's Colorado indicating that the hospital would no longer provide gender-affirming medical care due to the executive order, fearing the loss of federal funds. Jenna's six-month follow-up at Children's Colorado had not yet been scheduled.

19.     This was a difficult day for my family. I felt deep panic and devastation when I received this news. When my daughter heard that she would no longer be able to get care through Children's Colorado, she was also upset, and she told me that she was not sure she could survive losing her healthcare. She does not want to leave Oklahoma—she has a life, a job, and friends here—but when she heard this news, she asked me to promise that if it was the only way for her to continue to receive the care she needs, that we would leave.

20.     Even Jenna's existing prescriptions seem uncertain, as the specialty pharmacy that fills her prescriptions for puberty-blocking medications and estrogen have not contacted us about upcoming refills, which they would normally have done.

21.     Jenna has taught me so much about authenticity and joy. She has made me brave in her own way. She is both a remarkable person and a normal girl. Her medical care has allowed her to enjoy her adolescence and get ready for the adult life she hopes to build. I would do anything to keep my daughter safe and healthy, and I know that this care is what allows her to thrive. No one who has met Jenna would have any doubts about whether this care is right for her.

22.     Jenna turns 18 later this year, and I thought that would protect her from the fear of restrictions placed on the very care that allows her to live the way that she wants to and on her ability to make medical decisions. As she prepares to go off to college, I thought that turning 18 would protect her ability to ensure that her physical characteristics align with her gender identity. But this Executive Order threatens her ability to receive this care even after she turns 18. It is

terrifying to imagine how her mental health might regress if she lost access to gender-affirming medical care.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this *14th* day of February 2025.

_____
Jane Doe 6

# **Exhibit U**

1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PFLAG, INC.; *et al.*,

          *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official capacity
as President of the United States; *et al.*,

          *Defendants*.

Civil Action No. BAH-25-337

### DECLARATION OF DR. PEYTON POE, MD, MPH

I, Peyton Poe,[1] MD, MPH, hereby declare and state and follows:

1.     I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.     I have personal knowledge of the facts set forth in this declaration and would testify competently to those facts if called to do so.

3.     I am a board-certified pediatrician living and working in the greater Washington, D.C. area. I received my medical degree and completed my residency in pediatrics at a major academic medical center. I have a master's degree in public health. I am a clinician and also regularly train fellows, residents, and medical students.

4.     I am licensed to practice medicine in Maryland, Virginia, and Washington, D.C.

5.     I am a member of GLMA: Health Professionals Advancing LGBTQ+ Equality.

---

[1] Peyton Poe is a pseudonym. I am aware of numerous instances in which providers of gender-affirming medical care like me have been doxxed—a form of relentless online harassment from having their private contact information shared publicly—and have had their lives threatened. Accordingly, I am submitting this declaration under a pseudonym to protect my privacy and protect my family and me from harassment and violence.

1

6.     Currently, I work at Children's National Medical Center in Washington, D.C., where one of my clinical focuses is on the care of transgender patients. My practice there includes providing gender-affirming medical care, including gender-affirming hormone therapies, to adolescent and young adult patients.

7.     I am aware that Children's National receives extensive federal funding, including from the National Institutes of Health. The vast majority of the research and care that funding supports has nothing to do with caring for transgender patients or gender affirming medical care.

8.     In my experience, providing gender-affirming care to youth is a multidisciplinary and collaborative practice. In my institution, that collaboration includes endocrinology, adolescent medicine, gynecology, psychiatry, and psychology. We work closely with our patients and, for those patients who have not reached the age of majority, with their parents, to understand patients' experiences and their goals for care. We conduct detailed assessments of physical and mental health for each individual patient. We undertake an extensive counseling and informed consent process for any patient seeking gender-affirming medical care, to ensure patients have a thorough understanding of the risks and benefits of treatment and how to most effectively care for their health while receiving treatment. For patients under the age of 18, all of the assessment and counseling includes full participation of their parents or legal guardians. Even for those who are legal adults, the vast majority access care with the support and participation of their parents. All patients who initiate gender-affirming hormone therapy are closely monitored for safety and effectiveness of treatment and continue to receive regular care until they age out of our programs.

9.     On January 28, 2025, the White House issued Executive Order 14187, which instructs federal agencies to ensure that medical institutions receiving federal grant funding—including medical schools and hospitals—to not provide pubertal suppression, hormone therapy,

2

JA412

or surgeries as treatment for transgender patients with gender dysphoria who are under the age of 19 years old.

10. The evening of January 28—within hours of the Executive Order being signed—a member of Children's National's executive leadership team sent an email to affected staff, saying that the Executive Order "will limit the prescription of puberty blockers and hormone therapy to transgender youth" and that "effective immediately, no prescriptions should be written or refilled for gender-affirming medications for patients under 18 years old."

11. The following day, January 29, a meeting was held with the gender care services team and hospital administrative staff in which we were instructed not to prescribe, fill, or refill medications used as gender-affirming medical care for patients under the age of nineteen. We were also instructed that medical providers could not counsel patients about dosing of such medications, medical and mental health providers could not write letters supporting patients attempting to access hormone therapy or surgical procedures, and our mental health staff could not conduct assessments of readiness for patients seeking to initiate gender-affirming medical care. We were instructed to contact patients under age 19 with upcoming appointments that day or the following days to inform them that we were unable to prescribe or refill medications prescribed for gender affirmation.

12. On January 30, the gender care services team was given specific language to be provided to patients with upcoming appointments to notify them that the hospital would not prescribe or refill prescriptions for hormone therapy for gender affirmation for patients under age 19, "per the directives" of the Executive Order.

13. Because I had several patients with imminent appointments, I had to undertake a heart-breaking task—I had to survey my schedule for upcoming appointments and contact each affected patient to tell them that I could not continue to prescribe the medications they depended

3

on for their physical and mental wellbeing. While some patients cancelled their upcoming appointments, most patients wanted to go ahead with their appointments, knowing that I would be unable to prescribe their medications. I also began to receive a flood of messages from patients and parents, starting on January 29, expressing distress, anxiety, and fear about their or their children's access to their medications.

14.    These conversations and appointments were extremely difficult. Some of the most difficult of these conversations were with patients who have only recently completed the long process to initiate treatment, including waiting to become a new patient, undergoing thorough evaluation of their medical history and mental health, and receiving extensive teaching regarding the details and effects of gender-affirming treatment, and who are now losing access to it so soon after being ready to begin treatment. Similarly difficult were the conversations with patients who have been receiving treatment for several years and are thriving on their medications, who were devastated to learn that I could not refill their medications even if they were going to run out imminently. Likewise, I have had many painful conversations with parents who are desperate to ensure their children can continue their medications and fearful for their children's mental health if medications are discontinued. The few appointments with patients whom I was unable to reach before their appointments, and who came in to see me unaware of this new obstacle to care, were especially difficult, as I had to inform them that I was prohibited from continuing to prescribe the medications they depend on, witnessing their distress and fear firsthand.

15.    At each of these appointments, I assessed my patients' mental health, their level of acute distress, and the strength and availability of their support systems. I encouraged patients to reach out to their mental health providers and provided crisis intervention and suicide prevention resources. Patients who had been thriving under my care, and many of whom had undergone a

4

tremendous and often extremely difficult journey towards initiating gender-affirming medical care, were devastated. Many left their appointments extremely upset, discouraged, and disappointed that the clinic they had trusted with their care was now unwilling to continue to provide that care.

16.    I am deeply concerned that the disruptions to care may cause transgender adolescents and young adults to experience mental health crises.  Access to gender-affirming medications can be lifesaving and allows these young people to succeed in school and social settings. The prospect of any interruption in medical treatment can cause or exacerbate severe distress and poor mental health outcomes, including possible self-harm.  Gender-affirming hormone therapy is not optional or elective; it is essential for their health and wellbeing, and withholding this treatment causes severe harm.

17.    As a physician, I am also devastated. The Executive Order forces me to withhold care from patients, some of whom have been under my care for years, when I know that withholding this care will cause deep harm. The order forces me to act in ways that are deeply at odds with my personal values and with medical ethics. It damages my relationship with my patients and, in turn, damages their relationship with the medical establishment. It causes anxiety and fear for myself and for my patients and their families.  I have dedicated years of my career to providing care to this stigmatized and marginalized population of patients and have seen firsthand how life-changing it can be for them to access affirming care; it is a betrayal of their trust in me and in my institution to offer only mental health support while withdrawing life-sustaining medications.  I care deeply for my patients and their families, with whom I have developed strong and lasting relationships, and I am profoundly honored by their trust in me as their physician.  My patients' pain and anxiety, and their parents' fear for their wellbeing, weighs deeply on my heart and in my mind.

5

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this 10 day of February 2025.

_Peyton Poe_ MD MPH
Peyton Poe, MD, MPH

6

# **Exhibit V**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PFLAG, INC.; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. |
| DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*, | |
| *Defendants*. | |

## DECLARATION OF DR. KYLE KOE, M.D.

I, Kyle Koe, M.D.,[1] hereby declare and state and follows:

1.    I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.    I have personal knowledge of the facts set forth in this declaration and would testify competently to those facts if called to do so.

3.    I am an internal medicine board-certified primary care physician at Boston Medical Center (BMC) and associate professor of medicine at the Boston University Chobanian and Avedisian School of Medicine.  I am a clinician-researcher specializing in sexual and gender minority health, including a focus on primary care outcomes and chronic conditions.  As the research lead for a center at Boston Medical Center, I collaborate with researchers, clinicians, and communities to assess and address the health and wellbeing of patients and communities, including transgender and gender diverse people.

4.    I am a member of GLMA: Health Professionals Advancing LGBTQ+ Equality and have been since 2010.

---

[1] Kyle Koe is a pseudonym.  I am submitting this declaration under a pseudonym to protect my privacy and to protect my family and me from harassment and violence.

1
JA418

5.      As a clinician-researcher at BMC, I depend on grant funding, including federal grants, to conduct my research to better understand and therefore improve the health and wellbeing of patients.  At present, my research includes, *inter alia*, serving as the principal investigator (PI) in two grants provided by the National Institutes for Health.  I have previously served as a subcontract PI in other NIH-funded research studies.  Such federal support is critical in funding scientific endeavors in medicine, as funding innovative science is an essential aspect of the NIH's mission.

6.      In addition, BMC is the recipient of millions of dollars in federal grants, including from the NIH, Health Resources and Services Administration (HRSA), Centers for Disease Control and Prevention (CDC), and Agency for Healthcare Research and Quality (AHRQ), among others.  The vast majority of these grants do not relate to the provision of medical interventions for the treatment of gender dysphoria, a serious medical condition recognized by virtually every major medical organization in the United States.

7.      The aforementioned federal grant funding by the NIH, HRSA, CDC, and AHRQ is critical to improving our medical and scientific knowledge, training the next generation of physicians, and improving access to health care for vulnerable populations, core components of the mission of BMC.

8.      Aside from my research, I also serve as a medical provider.  I treat both cisgender and transgender patients for a variety of medical conditions and ailments.  Among the conditions I treat is gender dysphoria, for which I provide gender-affirming hormones as treatment for a transgender patient's gender dysphoria as young as 17 years of age.

9.      When treating gender dysphoria, healthcare providers use the same medications to treat transgender people as they use to treat cisgender people with hormone deficiencies. The same is true in my practice.

10.     BMC also has a center providing support and care to adolescents and young adults across the gender spectrum, which among its services provides mental health services, puberty-delaying hormone blockers, gender-affirming hormone therapy, and referrals to surgery as treatment for gender dysphoria when medically indicated and appropriate under established clinical guidelines.

11.     I am, however, aware that Executive Order 14187, titled "Protecting Children from Chemical and Surgical Mutilation," issued on January 28, 2025, instructs federal agencies to take immediate steps to ensure that medical institutions, including medical schools and hospitals, receiving federal grant funding, such as research and education grants, do not provide puberty-delaying hormone blockers, gender-affirming hormone therapy, or gender-affirming surgeries as treatment for the gender dysphoria of transgender patients who are under the age of 19 years old.  Similarly, I am aware that Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" and published on January 20, 2025, requires federal agencies from restricting the use of grant funds to any entities that it considers are promoting "gender ideology," which it defines as recognizing that a person may have a gender identity incongruent with their birth-assigned sex.

12.     These executive orders are in direct conflict with the oath I swore as a doctor as well as statutes that I am required to follow.  They have caused me, my patients, and providers and researchers across a myriad of medical institutions like BMC a great deal of distress and confusion.

13.    By threatening to take away all of an institution's federal grant funding because that institution provides evidence-based gender-affirming care—even when the grants being taken away are not themselves related to gender-affirming care—the executive orders have placed clinician-researchers like me and many medical institutions in an untenable position.  The executive orders force physicians and hospitals to make an impossible choice between denying care to a vulnerable minority community or not being to provide care to anyone at all.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this 4th day of February 2025.

Kyle Koe, MD

# Exhibit W

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| PFLAG, INC.; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. |
| DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*, | |
| *Defendants*. | |

## DECLARATION OF KRISTEN CHAPMAN

I, Kristen Chapman, hereby declare and state and follows:

1.      I am over 18 years of age, of sound mind, and in all respects competent to testify. I have personal knowledge of the facts set forth in this Declaration and would testify competently to those facts if called to do so.

2.      I offer this Declaration in support of Plaintiffs' Motion for a Temporary Restraining Order.

3.      I am a Plaintiff in this action. I am bringing claims on behalf of myself and as the parent and next friend of my daughter, B.G. ("Willow").

4.      I am the mother of three wonderful people. I live in Virginia, along with my youngest daughter, Willow, who is 17 years old, and my middle daughter, who is 18 years old. My oldest child is in college in Tennessee.

5.      I love and support all three of my children and wish to provide what is best for them throughout their lives.

6.      Prior to living in Virginia, we lived in Tennessee until 2023, when we moved to ensure to Willow's safety and access to the medical care she needs.

7.      Because of our family's income, Willow is eligible for Medicaid. She has been eligible for and enrolled in Medicaid since we moved to Virginia.

8.      Willow is transgender. When she was born, her sex was designated as "male," even though she is a girl.

9.      Although she was assigned male at birth, Willow has known for most of her life that she is a girl. From a very young age, Willow wore dresses and gravitated toward friendships with girls. Willow has told us that as soon as she could conceptualize gender, she knew she was a girl.

10.     Though Willow had always excelled academically, around the sixth grade, I noticed that she was struggling, and her grades had been going down. It was evident to me that something was bothering her. I now know that she was struggling with her identity and her inability to be her true self at home and in school.

11.     Willow came out first to her friends first. Then one day, in the spring of 2020, while she was upstairs on her laptop and I was downstairs working, Willow sent me a three-word e-mail: "I am trans." She left it to me to inform the rest of the family.

12.     Willow had already decided on her new name, Willow, before coming out and began using it with friends.

13.     Though I had an understanding what being transgender meant, it took Willow's father some time to understand what it meant for Willow to be transgender and use Willow's correct name. At first, he had trouble understanding how Willow could understand her gender so young. In the end, however, after meeting some trans adults, Willow's dad came to understand his daughter better.

14.     To figure out their next steps after she came out, I took Willow, who was then twelve, to her regular pediatrician at Vanderbilt University Medical Center. We were referred to the center's Pediatric Transgender Clinic.

15.     The process for Willow to start the care she needed was prolonged and deliberate. The process, which involved several assessments and evaluations, lasted almost a year before Willow began medical treatment.

16.     Initially, we made an appointment for on or about December 2020 at the Pediatric Transgender Clinic at Vanderbilt Children's Hospital. During our first appointment, we met with Dr. Cassandra Brady.  During our first meeting with Dr. Brady, she talked to us about different endocrine treatments for gender dysphoria, requested a number of blood work, bone scans, and other evaluations that needed to be performed, which in Willow's case also involved an ultrasound. Dr. Brady also noted that Willow would need a letter of support from a mental health professional confirming Willow's gender dysphoria diagnosis.  Dr. Brady also reviewed the potential risks and side effects of puberty blockers with us.  For example, she reviewed the fact that patients must be monitored to ensure that the medication does not have any significant effect on bone density, and that it can initially slow one's growth in height.  We continued to discuss potential side effects with Dr. Brady in most, if not all, of the subsequent visits.

17.     In addition, Willow worked with several mental health professionals, before we found the right therapist for her. And because we were reliant on Medicaid, it was difficult to find the right therapist for her.  Willow's therapist diagnosed her with gender dysphoria.

18.     After consultation with Willow's providers, her father and I discussed the risk and benefits of treatment with puberty blockers and decided that it was the best course of treatment for Willow.  Ultimately, we decided that her being able to be pause puberty so that she did not develop

3
JA425

male characteristics before hormones were indicated for her was the correct path for our family. Our decision was based on ensuring Willow's safety and wellbeing. For example, for Willow's father, it was an important consideration that she could be safer for the rest of her life if she did not develop male characteristics that could out her as transgender.

19.    At the age of thirteen, Willow was finally able to start puberty blockers.

20.    Once Willow was able to start treatment and not have to worry about developing characteristics incongruent with who she knows herself to be, I noticed a positive change. Willow was a kid that even since she was a baby all the way up to middle school, she was very jovial and mischievous, she was like the jokester of the family. But as she grew up, it seemed that we lost her for several years. Once she started treatment, I noticed that she started to come back. My daughter seemed happy and jovial again.

21.    As a next step in Willow's treatment plan, we hoped for Willow to begin taking estrogen around the time she turned sixteen, in December of 2023, so that she could undergo puberty with her peers and be able to grow into adulthood with feminine characteristics.

22.    Yet, in March 2023, Tennessee's governor signed a bill that banned gender-affirming medical treatment for transgender minors in Tennessee.

23.    The passage of the law felt as if a natural disaster had happened to our family.

24.    While on paper, Tennessee's law, which was going into effect in early July, would allow transgender teens like Willow to continue their medical care until March of 2024, I was not sure we could count on that. If Willow could not continue taking puberty blockers until then, she would begin to go through male puberty, which potentially meant more surgeries and other procedures later in life.

25.    Three months after the governor signed Tennessee ban, Vanderbilt University Medical Center informed patients that the previous November, at the Tennessee attorney general's request, it had shared non-anonymized patient records from the Pediatric Transgender Clinic, including photographic documentation and mental-health assessments, with the government.

26.    Because we had been vocal against Tennessee's law, our family had begun receiving death threats, and our home no longer felt safe.  In addition, Willow's closest option for getting puberty-delaying medications would likely have required a four-hundred-and-fifty-mile trip to Peoria, Illinois.  As a result, one day my second oldest child said, "Well then, we've got to go." In response, Willow said, "I want to go."

27.    At the end of July 2023, we moved to Virginia. Willow, who had received her last puberty-blocker shot at the Vanderbilt clinic in late May, was supposed to receive her next one in late August.

28.    We were able to find a family clinic that could provide treatment for Willow's gender dysphoria. After consultation and discussion with us and after reviewing her medical records from Vanderbilt, Willow's new doctor started her on estrogen as treatment for her gender dysphoria in September 2023.

29.    However, because the family clinic did not accept Medicaid, I had to pay for the appointments out-of-pocket. After a few months, it was becoming cost-prohibitive to our family and Willow's doctor recommended that we establish care with the Children's Hospital of Richmond at Virginia Commonwealth University ("VCU").

30.    It took months for us to be able to schedule an appointment at VCU, which required us to transfer Willow's medical records from Vanderbilt and the family clinic in Virginia. In December 2024, we were able to confirm an appointment for January 29, 2025, which could not

be scheduled until they got all the medical records, for Willow to meet with a doctor at the clinic and continue her hormone treatment for gender dysphoria.

31.    On January 28, 2025, the White House issued an Executive Order entitled "Protecting Children from Chemical and Surgical Mutilation" ("Executive Order").

32.    However, a few hours before the appointment, a staff person at the VCU clinic called to me to inform me that "because of everything going on," seemingly in reference to the Executive Order, they would no longer be able to provide the medical treatment that Willow needs.

33.    A statement on the website of Children's Hospital of Richmond at VCU now states, "VCU Health and Children's Hospital of Richmond at VCU have suspended gender-affirming medication and gender-affirming surgical procedures for those under 19 years old in response to a White House executive order and clear guidance from the state provided to VCU." The statement links to Executive Order 14187, titled "Protecting Children from Chemical and Surgical Mutilation," and which was issued on January 28, 2025. A true and accurate copy of the transgender services webpage for Children's Hospital of Richmond at VCU is attached as **Exhibit A**.

34.    It is horrendous and tragic that the President decided to direct federal agencies to withhold federal funding from any institution that provides medical treatments for gender dysphoria for a person under 19 years of age—and that VCU itself decided to stop providing the medical care that young transgender people like Willow need in order to not lose federal funding.

35.    Willow, my middle child, and I moved to Virginia to escape the discrimination we faced in Tennessee and to ensure that Willow would have access to the health care that she needs. Now, however, I feel like the rug has been pulled out from underneath our feet.

35.    Willow, my middle child, and I moved to Virginia to escape the discrimination we faced in Tennessee and to ensure that Willow would have access to the health care that she needs. Now, however, I feel like the rug has been pulled out from underneath our feet.

36.    At present, Willow is without the medication that she needs, and given our very limited income, I am unsure how I will be able to secure Willow's treatment. She has expressed fear about what it will mean for both physically and mentally. Willow has expressed how not being able to access care would mean giving up on the life she envisioned for herself.

37.    No human being should have to need permission to be who they are. Yet, the President's executive order, which lead to VCU suspending my daughter's care, represents a painful invalidation of who my daughter is.

38.    Our family sacrificed so much to move to Virginia from Tennessee to secure access to the health care that Willow needs. To now be in the same position of being able to access this care that has so positively affected my daughter has left us devastated and traumatized.

39.    All I want is for Willow to be safe, healthy, and happy, and for her to be able to dream a future for herself.


I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.


Dated this 3 day of February 2025.

Kristen Chapman

7

JA429

# Exhibit A

**UN**stoppable care for kids



(/)

- **Home**(/) / **Services**(/services/) / Transgender

# Transgender

VCU Health and Children's Hospital of Richmond at VCU have suspended gender-affirming medication and gender-affirming surgical procedures for those under 19 years old in response to a **White House executive order** (https://www.whitehouse.gov/presidential-actions/2025/01/protecting-children-from-chemical-and-surgical-mutilation/) and clear guidance from the state provided to VCU.

We are committed to ensuring that we're always delivering care in accordance with the law. Appointments will be maintained to discuss specific care options for patients in compliance with the most recent guidance.

## Gender-affirming care: Defining, belonging and thriving

We hope that every family that walks through our doors feels safe, loved, and affirmed and we are here to work with families to extend this support into the home and community. We are dedicated to providing gender-affirming care that is patient-centered to support each youth's gender journey.

### Becoming who you were meant to be: Our care team is in your corner

Our specialists in endocrinology and adolescent medicine work together to provide well-rounded care for children and teens in a gender-friendly environment.

Care is tailored to each patient and may include:

- Medical evaluation

JA431

- Medical hormone management

- Prescription medications

- Mental health care

- Voice therapy

- Letters of medical necessity to address hormone treatment, school issues and/or surgery (as needed)

- Referrals to other medical and surgical specialists (as needed)

- Referrals to peer and family support groups

- Educational materials

## Gender-affirming care road map

Once you call to schedule your initial visit, our team will share our gender-affirming care pre-visit road map to help ensure we have all the documentation we need and most importantly, to let you know what to expect along the way. We look forward to caring for your family.

Expand all

## Before your first visit                                                                   +

- You'll be asked to submit medical records from your primary care physician and counselor/therapist (if applicable)

## What to bring to your first visit                                                         +

- Photo identification (parent/guardian)

- Insurance card

- Medical records (if you were unable to have them faxed directly to the clinic)

## What to expect during your first visit                                                    +

JA432

Your first visit will include an intake and informative session. This session will NOT commit you to one set treatment plan. It's an opportunity for us to learn more about you and for you to learn about care options. Your first visit will also include:

- Physical assessment/exam
- Baseline labs (these can be drawn onsite or at another CHoR location at a later date)
- Based on the age of the patient, the doctor may request to conduct a one-on-one discussion to better assess the patient's understanding and readiness for care
- Gender-affirming medications will not be prescribed at the first visit, as the doctor will need to complete a thorough assessment, including reviewing labs, prior to prescribing medication

## Comprehensive care                                                    +

- Our team will be by your side throughout the development of your care plan.
- Our team of endocrinologists, adolescent medicine specialists and psychologists will work to ensure we're addressing all of your medical and mental health care needs.
- We're with you every step of the way! Don't hesitate to ask questions or for referrals to community resources.

## Gender resources

It's a boy! It's a girl! Gender is often defined by the external sex organs of an individual and is assigned at birth. But gender identity comes from the brain. It's an individual's psychological sense of their own maleness, femaleness or nonbinary-ness and it cannot be determined by another person.

The traditional model of gender identity was binary, meaning there were only the two choices: male or female, but there are many individuals who don't feel they fit into either category or report that their gender identity doesn't match their body. **Learning about the terms currently used to describe gender can increase our understanding of what a child may be experiencing in this regard.**(/blog/expanding-views-of-gender-greater-awareness-greater-support/) This can can also promote acceptance, which is so important, as acceptance, especially from family members, protects these youth from depression, suicidal thoughts and other risk factors

**He She Ze and We** (https://heshezewe.org/)

He She Ze and We serves families with transgender loved ones through support, education and advocacy.

**Side by Side** (https://www.sidebysideva.org/)
Dedicated to creating supportive communities where Virginia's LGBTQ youth can define themselves, belong and flourish.

**Gender Spectrum** (https://genderspectrum.org/)
Global online community for gender-expansive teens, their families and support professionals to connect, collaborate and find resources.

**Family Acceptance Project** (https://familyproject.sfsu.edu/)
A research, intervention, education and policy initiative that works to prevent health and mental health risks for LGBTQ children and youth including homelessness, suicide and HIV in context of their family, cultures, and faith communities.

# Related stories





Expanding views of gender: Greater awareness, greater support

**Read more**(/blog/blog-details/?id=f43e4324-a19d-49f5-9aaa-7c113475b15d)

**View all stories**(/blog/)

# Locations

**View all locations**(/locations/)

## Center for Endocrinology, Diabetes and Metabolism

2305 N. Parham Road, Suite 1
Richmond, VA 23229

**View location** (/locations/location-details/?id=27)  ⬚

## Children's Pavilion

1000 East Broad Street
Richmond, VA 23219

⬚  **(804) 828-CHOR (2467)**(tel:(804) 828-CHOR (2467))

**View location** (/locations/location-details/?id=4)  ⬚

**Request an appointment**

**(804) 828-CHOR (2467)**(tel:8048282467)

☐ **Request an appointment**(/patient-and-family-resources/make-an-appointment/)

# <u>Exhibit X</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PFLAG, INC.; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. |
| DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*, | |
| *Defendants*. | |

### DECLARATION OF M.V.

I, M.V., hereby declare and state and follows:

1.      I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.      I have personal knowledge of the facts set forth in this declaration and would testify competently to those facts if called to do so.

3.      I am the mother of three children and live in the State of Maryland.

4.      One of my children, P.V., is currently 17 ½ years old.

5.      P.V. and I are members of PFLAG National.

6.      P.V. is a unique, bright, and determined young adult.

7.      P.V. is an honors student who is a senior in high school. P.V. has taken and excelled in A.P. classes at high school. P.V. is also taking and excelling in college classes at our local community college while still a high school student.

8.      P.V. has been accepted to a number of different colleges. While P.V. is in the process of choosing which college to attend, P.V. has already chosen to major in chemistry and has been offered merit scholarships from multiple colleges both within the State of Maryland and outside the State of Maryland.

9.     Through the college application and selection process, I have been impressed by P.V.'s clear sense of self and considered maturity in making choices about college and the future.

10.     This is consistent with who P.V. has always been as a person. For as long as I can remember, P.V. has had a strong, consistent, and clear sense of self to a degree that has been notable to all who know and love P.V.

11.     Since early childhood, I and others have described P.V. as "persistently P.V." By this I mean that P.V. at core has a sense of self that is not swayed easily by the opinions of others or the outside world. While P.V. is respectful of others and considers thoughtfully the views of others, P.V.'s own core views do not bend readily to peer pressure or outside influence when such views do not align with who P.V. is and what P.V. believes at core.

12.     As a parent, I have sometimes jokingly wished that P.V. would be a little less "quietly determined" and "persistently P.V.", but in truth I deeply admire P.V.'s sense of self and knowledge of who P.V. is at core regardless of who others would like P.V. to be.

13.     P.V. is unfortunately not new to medical care and treatment. P.V. has had multiple medical diagnoses requiring ongoing medical treatment since the age of two. In particular, some of P.V.'s medical conditions have required a maturity beyond P.V.'s years. Specifically, P.V. has been required to take responsibility for and carry lifesaving medication since a young age.

14.     Since at least 2019, if not earlier, it was clear to me, as a mother, that P.V. identified as female.  And in so many ways, this reality scared me. I was afraid of how the world would view P.V. I was afraid how other family members would react. I was afraid P.V. would be rejected and broken by a world that would not understand. I was afraid that the truth of P.V.'s gender identity would put P.V. at risk. Put simply, I was terrified.

15.     However, seeing the pain with which P.V. interacted when not allowed to be true to P.V.'s own sense of self soon showed me that P.V. was at risk regardless. Not seeking medical treatment soon became the riskier choice.

16.     It was hard watching P.V. express pain at people taking pictures, and with having to hear recordings of P.V.'s own voice because those pictures and recordings did not match P.V.'s own sense of who P.V. truly was. If not able to be true to P.V's self, P.V. preferred to disappear altogether. P.V. retreated from others universally. To be clear, P.V. is not someone who loudly proclaims anything about P.V.'s sense of self. Instead, it was a quiet, steady, and immutable reality.

17.     After much soul searching, we made an appointment at Johns Hopkins to ascertain whether P.V. needed and would benefit from gender-affirming care. This was not an easy step or an easy process. It took courage for all of us.

18.     On the basis of extensive communication with P.V. and with social workers and doctors, P.V. was diagnosed with gender dysphoria. While many years ago this would have been an incredibly hard diagnosis for me to hear, the diagnosis was a relief because it was confirmation of what was so clear to everyone around P.V.

19.     P.V.'s physicians had extensive communication with P.V., with me, and with a social worker, and the entire care team carefully considered and discussed risks and side effects before concluding that starting hormone treatment was an appropriate course of medical treatment for P.V.

20.     P.V. began hormone treatment in June of 2024. P.V. showed maturity and clarity, taking responsibility for communicating, with parental supervision, with providers, discussing dosages, and researching all aspects of treatment.

21.     By October 2024, five months into hormone treatment, there was an extraordinary change in P.V. – ironically not so much in appearance as of yet but in the way P.V. interacted with the world. P.V. for the first time, started seeking out communication with others, making friends, and interacting at school. It was as if P.V. had been holding their breath for a lifetime and finally exhaled.

22.     And now, with the issuance of Executive Order 14187, titled "Protecting Children from Chemical and Surgical Mutilation," on January 28, 2025, everything is at risk. P.V. is four months away from adulthood and despite the reality that P.V.'s diagnosis and current treatment plan is the result of lengthy collaboration with multiple professionals including doctors and social workers, the President's Executive Order purports to strip away the considered judgment of all those who have assisted in the medical treatment plan.

23.     P.V., I, and P.V.'s treatment team all agree that gender affirming care is not only appropriate for P.V. but is necessary for P.V. as a human being. While I will always fear that P.V. will be unsafe in the world because of gender identity, I am more afraid that absent the care the medical team and experts and I all concluded was necessary, that P.V. is more at risk.

24.     I cannot conceive of someone who has never sat up all night with this young adult and who has not spoken with their care team and wrestled with these difficult realities up close having the ability to strip this young adult of the personhood this care has affirmed.

25.     I cannot adequately explain the fear – the fear that this Executive Order strips medical decisionmaking from P.V.'s care team as health professionals, from me as the parent, and from P.V. as a soon to be adult. Nor can I properly put into words how the loss of this care puts P.V. at imminent risk both medically and emotionally.

26.    I am a member of PFLAG both at the national and local level because as a parent, I need to be able to stand up for P.V.'s personhood and for my family's right to make medical decisions affecting P.V. based on diagnosis and medical need.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this 2nd day of February 2025.

_____
M.V.

# **Exhibit Y**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| PFLAG, INC.; *et al.*,<br><br>                    *Plaintiffs*,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity<br>as President of the United States; *et al.*,<br><br>                    *Defendants*. | Civil Action No. |

**DECLARATION OF DR. JEFFREY BIRNBAUM, MD, MPH**

I, Jeffrey Birnbaum, hereby declare and state and follows:

1.     I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.     I have personal knowledge of the facts set forth in this declaration and would testify competently to those facts if called to do so.

3.     I am an Associate Professor of Pediatrics at SUNY Downstate Health Sciences University ("SUNY Downstate") and an adolescent medicine specialist and board-certified pediatrician.  I am also the Director of Health & Education Alternatives for Teens ("HEAT"), based at University Hospital at Downstate.  I am a clinician-researcher, having spent most of my career caring for teens and young adults living with HIV, and, for the last twenty years, providing gender-affirming medical care.  I received my medical degree from SUNY Downstate in 1986 and received my Master of Public Health degree at Columbia University in 1991.

4.     I make this declaration in my personal capacity only. It does not necessarily represent the views, positions, or opinions of Downstate Health Sciences University and/or the State University of New York. My statements herein are my own and not made as an employee, representative, or agent of either entity.

1
JA445

5.      I am a member of GLMA: Health Professionals Advancing LGBTQ+ Equality.

6.      I began my work with HEAT in 1992. HEAT began with a focus of providing comprehensive healthcare and support services to HIV-infected and at-risk youth and young adults. In carrying out that work, HEAT expanded to providing transgender young people with gender affirming medical care. In addition to leading HEAT's research, serving as its medical director, and heading the staff, I am also a day-to-day clinician and medical provider.

7.      To do this work, I depend on grant funding, including federal grants. From 2020-2023, I served as Principal Investigator in a grant from the National Institutes of Health (NIH) researching interventions to improve engagement in HIV prevention and care among certain LGBTQ kinship networks.  I recently submitted a multi-million-dollar grant proposal to NIH to expand that work into other communities. The primary medical care I provide to HIV+ youth is also funded by the Health Resources and Services Administration (HRSA), which provides grants under Part D of the Ryan White HIV/AIDS Program. These grants are central to enabling HEAT to provide critical medical care to underserved young people.

8.      In addition, both SUNY Downstate and University Hospital receive millions of dollars in federal grants, including from the NIH and HRSA.  The vast majority of these grants have nothing to do with medical interventions for the treatment of gender dysphoria.

9.      All of this federal grant funding is critical to expanding access to health care for vulnerable, underserved populations, to training health care providers to deliver excellent, culturally-competent medical care, and to advancing medical and scientifical knowledge—the very purposes of both of these institutions.

10.      As a medical provider, I treat patients for a variety of medical conditions, including providing primary care for HIV+ youth.  I also treat patients under the age of nineteen for gender

dysphoria, including with pubertal suppression and/or gender-affirming hormones. HEAT does not provide surgical services but will offer referrals to surgeons for medically indicated surgical care to treat gender dysphoria.

11.     In addition to providing gender-affirming medical care, I also teach about how to care for transgender patients in the Pediatrics Department at SUNY Downstate. This includes lectures for medical students throughout their education on sexual health and transgender health. I also serve as the faculty co-director of the LGBT healthcare pathway, a student-driven health equity initiative.

12.     I am aware that Executive Order 14187, issued on January 28, 2025, instructs federal agencies to ensure that medical institutions receiving federal grant funding—including medical schools and hospitals—do not provide pubertal suppression, hormone therapy, or surgeries as treatment for transgender patients with gender dysphoria who are under the age of 19 years old. I am also aware that Executive Order 14168, issued on January 20, 2025, requires federal agencies to bar federal grant funding of any entity that it considers to promote "gender ideology," which it defines as recognizing that a person may have a gender identity incongruent with their sex assigned at birth—in short, the recognition of transgender people's identities.

13.     These Executive Orders are an existential threat to my ability to do the work and deliver the medical care I provide daily. They have caused me serious distress and confusion about how to navigate my legal and professional obligations to provide medically necessary treatments free from discrimination to patients in need.

14.     The Executive Orders' requirement that federal grant recipients must end the provision of evidence-based gender-affirming care—regardless of whether that funding has anything to do with gender-affirming care—in order to continue to receive those funds leaves

clinician-researchers like me and our institutions in an impossible position. The loss of federal funding would be catastrophic for my work and for the ability of institutions like mine to fulfill their missions; denying medically necessary gender-affirming care as a condition of maintaining those funds would be catastrophic for my transgender patients.

15.    I have spent my career trying to remove barriers to medical care for HIV-affected and transgender young people. These Executive Orders make those barriers nearly insurmountable by threatening medical institutions like mine with the loss of the grant funding that is core to their provision of medical care and research if doctors like me continue to provide medically necessary gender affirming care.


I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this 4th day of February 2025.

Jeffrey Birnbaum, MD, MPH

# **<u>Exhibit Z</u>**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| PFLAG, INC.; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. BAH-25-337 |
| DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*, | |
| *Defendants*. | |

**DECLARATION OF DR. NATALIE NOE, MD**

I, Natalie Noe,[1] MD, MPH, hereby declare and state and follows:

1.     I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.     I have personal knowledge of the facts set forth in this declaration and would testify competently to those facts if called to do so.

3.     I am a physician, licensed in Colorado, and practicing at a major healthcare system in Colorado. I am board certified in a primary care specialty. I am a clinician and also teach medical students and residents.

4.     I am a member of GLMA: Health Professionals Advancing LGBTQ+ Equality.

5.     My practice includes providing medical care to patients with gender dysphoria under the age of 19, including the prescription of puberty blockers and hormones and the referral of 18-year-old adults for gender affirming surgeries. I provide these treatments in the context of

---

[1] Natalie Noe is a pseudonym. I am aware of numerous instances in which providers of gender-affirming medical care like me have been doxxed—a form of relentless online harassment from having their private contact information shared publicly—and have had their lives threatened. Accordingly, I am submitting this declaration under a pseudonym to protect my privacy and protect my family and me from harassment and violence.

JA450

an interdisciplinary model of care that involves behavioral health providers, physicians, nurses, and health educators, as well as collaboration with surgical providers and teams.

6.     In the wake of President Trump's Executive Order on January 28, 2025, my healthcare system stopped providing the standard-of-care treatments for these youth and young adults, including stopping providing new prescriptions for puberty blockers or hormones or performing surgeries.

7.     Since then, I have had dozens of heartbreaking conversations with patients and parents about not being able to provide this necessary medical care as I always have. Most of them are scared about what losing access to medical care will mean for them and about safety in a society in which the President of the United States has targeted transgender people. Parents have expressed a sense of overwhelm and distress, trying to create feelings of safety and stability for their children while panicking behind closed doors. More than one family has mentioned looking into leaving the country for their child's safety and access to care. Some of my patients' families relocated to Colorado from Texas so that their children could access needed medical care, and this is the second round of feeling the world close in around them despite having already gone to heroic lengths to protect their children. Other patients simply have no other means of accessing this care for their children as a financial matter. For families on Medicaid, the cost of trying to pay out of pocket to providers that receive no federal funding would mean having to choose between the medications their child needs and food or bills or housing. Patients have expressed worry about whether turning 19 is really a safe light at the end of the tunnel and what further restrictions are coming. Most critically, parents are worried about the forced cessation of care and what that means for their child's mental health, including their child's ability to survive that loss of care.

8.    I have been evaluating every patient to assess the mental health implications of this to determine whether they are in crisis or present a risk of self-harm, referring to behavioral health colleagues as appropriate. My team instituted a new structure to deal with these crisis referrals because of the termination of care. I have also been offering harm reduction counseling in anticipation that some patients will continue using their existing medicine without supervision because of their access to supervised care being cut off.

9.    As a doctor, not being able to provide this medically necessary care is demoralizing and infuriating. I think of other equally essential forms of suffering-reducing or lifesaving treatments I provide in the course of my regular practice and can only imagine the national horror at the government getting in the way of my ability to do so in other contexts and for other populations. We would never accept it. Being forced to deny gender affirming medical care conflicts with my oath to care for my patients and provide them the best possible care I can and to not hurt them. To tell them that I am not able to provide this care is hurting them and I have no way to ameliorate that harm inside or outside of my institution. The Executive Order makes me feel like I must choose between my duty to these patients and to all the other patients in my healthcare system whose care is potentially in jeopardy from the loss of federal funding. It is rage inducing.

10.    My colleagues feel similarly. I am not unusual in my response of grief, tears, anger, and indignation. We have all talked about it, which is helpful so as not to feel alone in it. I have enormous empathy for the decisions my institution's leadership has had to face around protecting our entire mission from the massive threat to our funding as a result of our providing gender affirming medical care. My institution receives a tremendous amount of its funding from federal sources, including from the Department of Health and Human Services, the Health Resources and

Services Administration, the Centers for Disease Control and Prevention, and the National Institutes of Health. We conduct research, teach medical students, residents, and fellows, and are committed to meeting the health care needs of patients in our community. We cannot fulfill our mission without those federal dollars. But we also have an obligation to our transgender patients who need this medical care.

11.     After the Temporary Restraining Order was issued by Judge Hurson on February 13, 2025, my institution did not resume providing this care. I had hoped that we would have a structure in place to reschedule care immediately once a court had issued an order against the Executive Orders. Unfortunately, I was advised by leaders in my health system that the short time limit of the TRO did not offer enough predictability on which to change practice, given the possibility of needing to stop providing this care again in very short order if the TRO expires without a preliminary injunction in place.

12.     The Executive Orders continue to interfere with my ability to provide my transgender patients with the medical treatments they need.


I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this 17th day of February, 2025.


*Natalie Noe M.D.*

Natalie Noe, M.D.

# **Exhibit AA**

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND**

| | |
|---|---|
| PFLAG, INC.; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. BAH-25-337 |
| DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*, | |
| *Defendants*. | |

**EXPERT DECLARATION OF
ARMAND H. MATHENY ANTOMMARIA, MD, PhD, FAAP, HEC-C**

**INTRODUCTION**

I, Armand H. Matheny Antommaria MD, PhD, hereby declare and state as follows:

1.      I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation. I am over 18 years old, of sound mind, and in all respects competent to testify.

2.      I have actual knowledge of the matters stated herein.

3.      In preparing this declaration, I reviewed Executive Order 14168 of January 20, 2025 "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" and Executive Order 14187 of January 28, 2025 "Protecting Children From Chemical and Surgical Mutilation." In addition to these Executive Orders and the materials cited herein, I have also relied on my years of research and other experience, as set out in my curriculum vitae (CV), attached as **Exhibit A**, in forming my opinions. The materials I have relied upon in preparing this declaration are the same types of materials that experts in my fields of study regularly rely upon when forming opinions on subjects. I may wish to supplement these

1

JA455

opinions or the bases for them as a result of new scientific research or publications or in response to statements and issues that may arise in my areas of expertise.

## OVERVIEW

4.      I am a pediatrician and bioethicist with extensive clinical and research experience. I am the author of 44 peer-reviewed articles, which have been published in high-impact journals including the *Journal of the American Medical Association* and *Annals of Internal Medicine,* and I direct the Ethics Center at Cincinnati Children's Hospital Medical Center. I have reviewed Executive Orders 14168 and 14187 and submit this declaration to explain my disagreement with and concerns about their conclusions.

5.      Executive Order 14168 seeks to end "gender ideology extremism" by recognizing two distinct sexes and excluding references to gender and gender identity. It directs that the definitions of terms like "sex," "male," and "female" given in the Order "govern all Executive interpretation of and application of Federal law and administration policy." Executive Order 14187 seeks to end the "chemical and surgical mutilation of children" including the use of "puberty blockers." I will refer to puberty blockers as gonadotropin releasing hormone (GnRH) agonists or analogs; the use of GnRH analogs, sex hormones, and surgery to treat gender dysphoria collectively as gender-affirming medical care; and the individuals to whom they are prescribed as minors or adolescents although the Orders affect people who are 18 years old too. These Orders seek to achieve their goals, in part, by withholding or withdrawing funding from healthcare entities who provide gender affirming medical care to people under 19 years of age.

6.      There is no sound medical or ethical basis for such actions. Gender-affirming medical care is evidence-based and the evidence for it is comparable to the evidence for many other treatments in pediatrics. The potential benefits and risks of gender-affirming medical care are comparable to those of other forms of medical treatment, treatment for which parents or legal

guardians are capable of providing informed consent and minor adolescents are capable of providing assent.

7.     As a result, the Orders put clinicians and healthcare entities in the untenable position of either violating their ethical duties to promote their patients' well-being and protect them from harm, or losing all federal funding, potentially preventing them from providing any care at all. Either outcome harms patients.

## BACKGROUND AND QUALIFICATIONS

8.     I am the Director of the Ethics Center, the Lee Ault Carter Chair of Pediatric Ethics, and an Attending Physician in the Division of Hospital Medicine at Cincinnati Children's Hospital Medical Center ("Cincinnati Children's"). I am also a Professor in the Departments of Pediatrics and Surgery at the University of Cincinnati College of Medicine.

9.     I received my medical degree from Washington University School of Medicine in St. Louis, Missouri in 2000. I received my PhD in Religious Ethics from The University of Chicago Divinity School in 2000. I completed my pediatrics residency at the University of Utah in 2003.

10.     I have been licensed to practice medicine since 2001 and am currently licensed to practice medicine in Ohio. I have been Board Certified in General Pediatrics since 2004 and in Pediatric Hospital Medicine since the inception of this certification in 2019. I have been certified as a Healthcare Ethics Consultant since the inception of this certification in 2019.

11.     I have extensive experience as a pediatrician and as a bioethicist. I have been in clinical practice since 2003 and 30% of my current effort is dedicated to caring for hospitalized patients. I was Chair of the Ethics Committee at Primary Children's Medical Center in Salt Lake City, Utah from 2005 to 2012 and have been Director of the Ethics Center at Cincinnati Children's since 2012. I regularly consult on the care of patients in the Transgender Health Clinic at Cincinnati Children's and participate in the Clinic's monthly multidisciplinary team meetings. I remain

current with the medical and bioethics literature regarding the treatment of individuals with gender dysphoria, particularly minors. I am also part of Cincinnati Children's team that cares for patients born with differences or disorders of sex development (DSD), also known as intersex traits. I chair Cincinnati Children's Fetal Care Center's Oversight Committee, which provides the Center recommendations on the use of innovative treatments and experimental interventions.

12.    As an academic pediatric hospitalist, I practice and teach evidence-based medicine, including the development and use of clinical practice guidelines. As a bioethicist, I help patients, parents, and healthcare providers address ethical dilemmas and resolve ethical conflicts. This involves analyzing the evidence and reasons supporting different treatment options. I also assist my institution to develop ethically sound policies and procedures.

13.    I am a member of the American Academy of Pediatrics (AAP), the American Society for Bioethics and Humanities (ASBH), the Association of Bioethics Program Directors, and the Society for Pediatric Research. I was a member of the AAP Committee on Bioethics from 2005 to 2011. I have also served as a member of ASBH's Clinical Ethics Consultation Affairs Committee from 2009 to 2014 and recently completed my service on its Healthcare Ethics Consultant Certification Commission.

14.    I am the author of 44 peer-reviewed journal articles, 11 non-peer-reviewed journal articles, 6 book chapters, and 29 commentaries. My peer-reviewed journal articles have been published in high-impact journals, including the *Journal of the American Medical Association* and *Annals of Internal Medicine*. I am also an author of 17 policy statements and technical reports, including 4 as lead author, by the AAP.

15.    I am a member of *Pediatrics'* Executive Editorial Board and its Associate Editor for Ethics Rounds. I am an active peer reviewer for many medical journals, including the *American*

*Journal of Bioethics* and the *Journal of Pediatrics*. I am a member of the Program Committee for ASBH's annual meeting and review abstracts for meetings of other professional organizations, including the Pediatric Academic Societies. I was previously a member of the editorial boards of the *Journal of Clinical Ethics* and the *Journal of Medical Humanities*.

16.    I have previously testified at deposition and/or in court in *Boe v. Marshall*, United States District Court, Middle District of Alabama, No. 2:22-cv-00184-LCB; *Brandt v. Rutledge*, United States District Court, Eastern District of Arkansas, No. 4:21-cv-00450-JM; *Dekker v. Weida*, United States District Court, Northern District of Florida, No. 4:22-cv-00325-RH-MAF; *Doe v. Abbott*, District Court of Travis County, Texas, No. D-1-GN-22-000977; *Misanin v. Wilson,* United   States   District   Court,   Middle   District   of   South   Carolina, No. 2:24-cv-4734-RMG; *Moe v. Yost*, Franklin County Court of Common Pleas, Ohio, Case No. 24-cv-H03-2481; *Noe v. Parson,* Circuit   Court   of   Cole   County,   Missouri, No. 23AC-CC04530; *Van Garderen v. Montana,* Montana Fourth Judicial District Court, Missoula County, No. DV 2023-541; *Voe v. Mansfiled,* United States District Court, Middle District of North Carolina, Case No. 1:19-cv-864-LCB-LPA; and *Zayre-Brown v. North Carolina Department of Public Safety*, United States District Court, Western District of North Carolina, No. 3:22-cv-191-MOC-DCK. The cases in which I have authored reports but have not testified are listed in my CV (**Exhibit A**).

17.    I am being compensated at a rate of $400 per hour for preparation of expert declarations and reports, and for deposition or trial testimony. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I provide.

**TERMINOLOGY**

18.    Executive Order 14187 refers to the use of GnRH agonists, sex hormones, and surgery for the treatment of gender dysphoria as "maiming," "sterilizing," and "mutilation." This

characterization inappropriately conflates potential side-effects of gender-affirming medical care with its intention and overstates the risks of gender-affirming medical care. The purpose of gender-affirming medical care is generally to make an individual's body and appearance more consistent with the individual's gender identity and therefore reduce an individual's dysphoria and increase an individual's well-being. While gender affirming-medical care can have side effects, they are generally proportionate to the benefits as described below. Performing a mastectomy to treat breast cancer or hysterectomy to treat endometrial cancer would similarly be mischaracterized if described as maiming or surgical mutilation.

19.    Executive Order 14187 uses the terms "child and children" in a potentially misleading manner. It defines these terms as "an individual or individuals under 19 years of age." Childhood is commonly understood to be a shorter stage in human development which includes infancy (up to 1 year of age), toddlerhood (1 to 5 years of age), childhood (3 to 11 years of age), and adolescence (12 to 18 years of age). With respect to the use of GnRH agonists and sex hormones for the treatment of gender dysphoria, neither of these interventions are indicated for individuals until they have begun puberty.[1] They, therefore, are generally used during adolescence rather than childhood. Furthermore, the Order defines children as including individuals who are 18 years of age. In contrast, most states consider 18-year-olds to be adults.[2] This Order prevents

---

[1] Hembree WC, Cohen-Kettenis P, Delemarre-van de Waal HA, et al. Endocrine treatment of transsexual persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2009;94(9):3132-3154.

[2] National Center for Youth Law. Minor consent and confidentiality: A compendium of state and federal laws. August 2024. Accessed February 3, 2025.

them from receiving medical care despite being adults who are of legal age to consent to their own medical treatment.

20.     Executive Order 14187 also refers to "rapid-onset gender dysphoria" and "other identity-based confusion." Neither of these terms is a validated medical diagnosis. For example, neither is contained in the *Diagnostic and Statistical Manual of Mental Disorders*.[3] "Identity-based confusion" is also demeaning to individuals with gender dysphoria suggesting that they are confused, rather than that they are experiencing a medical condition. I, therefore, will not use these terms.

## THE TREATMENT OF GENDER DYSPHORIA IS SUPPORTED BY EVIDENCE COMPARABLE TO THE EVIDENCE FOR MANY OTHER MEDICAL TREATMENTS

### Clinical Practice Guidelines

21.     Executive Order 14187 erroneously refers to the evidence for gender-affirming medical care as "junk science" when in fact this evidence is comparable to the evidence for many other types of medical treatments.

22.     Medical professional organizations develop clinical practice guidelines to provide clinicians with helpful, evidence-based recommendations and improve patient care and outcomes. Clinical practice guidelines are developed using systematic processes to select and review scientific evidence. Guidelines typically rate the quality of the evidence and grade the strength of recommendations.[4] One widely used method of grading the quality of the evidence and the strength

---

[3] American Psychiatric Association. Gender Dysphoria. In: *Diagnostic and Statistical Manual of Mental Disorders*. 5th ed., text rev. American Psychiatric Publishing; 2022.

[4] American Academy of Pediatrics Steering Committee on Quality Improvement and Management. Classifying recommendations for clinical practice guidelines. *Pediatrics*. 2004;114(3):874-877.

of recommendations is the Grading of Recommendations Assessment, Development, and Evaluation (GRADE) system.[5]

23.    GRADE states, "In the context of making recommendations, the quality ratings reflect the extent of our confidence that the estimates of an effect are adequate to support a particular decision or recommendation."[6] The GRADE system is more nuanced than the Levels of Evidence Pyramid. In addition to study design, GRADE characterizes the quality of evidence based on risk of bias, consistency, and directness. GRADE distinguishes four levels of evidence: "high," "moderate," "low," and "very-low." These levels are relative to one another and "low" does not necessarily mean poor or inadequate. As discussed below, a recommendation in a clinical practice guideline may be based on "low" or "very low" quality evidence, not just "high" or "moderate" quality evidence.[7]

24.    With respect to study design, randomized controlled trials generally provide "high" quality evidence.[8] In a randomized controlled trial, participants are randomly assigned to a treatment or a comparison group. The major benefit of a randomized trial is that it decreases the likelihood that any differences in the outcomes between the groups is the result of baseline differences between the groups rather than the result of the intervention.[9]

25.    By comparison, observational studies generally constitute "low" quality evidence.[10]

---

[5] Atkins D, Best D, Briss PA, et al. Grading quality of evidence and strength of recommendations. *BMJ*. 2004;328(7454):1490.

[6] Balshem H, Helfand M, Schünemann HJ, et al. GRADE guidelines: 3. Rating the quality of evidence. *J Clin Epidemiol*. 2011;64(4):403.

[7] Balshem H, Helfand M, Schünemann HJ, et al. GRADE guidelines: 3. Rating the quality of evidence. *J Clin Epidemiol*. 2011;64(4):401-406.

[8] Balshem H, Helfand M, Schünemann HJ, et al. GRADE guidelines: 3. Rating the quality of evidence. *J Clin Epidemiol*. 2011;64(4):401-406.

[9] Browner WS, Newman TB, Cummings SR, et al. *Designing Clinical Research*. 5th ed. Wolters Kluwer; 2022.

[10] Balshem H, Helfand M, Schünemann HJ, et al. GRADE guidelines: 3. Rating the quality of evidence. *J Clin Epidemiol*. 2011;64(4):401-406.

Observational studies include cross-sectional and longitudinal studies. In cross-sectional studies, investigators collect data at a single point in time. A cross-sectional design permits investigators to examine potential associations between factors, but it cannot prove one factor caused the other. An example of a cross-sectional study related to gender-affirming medical care is Jack L. Turban and colleagues' study that analyzed data from the 2015 United States (US) Transgender Survey. The survey asked transgender adults, who were recruited through community outreach, about their demographics, past gender-affirming medical care, family support, and mental health outcomes. The investigators found that those who received pubertal suppression had lower odds of lifetime suicidal ideation compared to those who wanted treatment with pubertal suppression but did not receive it.[11] In longitudinal studies, researchers follow individuals over time, making continuous or repeated measures.[12] Examples of longitudinal studies include the studies of the associations between gender-affirming medical care and psychological outcomes discussed below.[13]

26.    While randomized trials generally provide "high" quality evidence and observational studies "low," the quality of a study or group of studies may be moved up or down based on other considerations such as the risk of bias.[14]

27.    The labels "high" and "low" quality evidence can be misleading if the latter is used in the colloquial sense of poor, inadequate, or "junk". While randomized controlled trials are described in the medical literature as "high" quality evidence and observational studies as "low" quality evidence, randomized controlled trials may not be feasible or ethical, may have intrinsic

---

[11] Turban JL, King D, Carswell JM, Keuroghlian AS. Pubertal suppression for transgender youth and risk of suicidal ideation. *Pediatrics*. 2020;145(2):e20191725.

[12] Browner WS, Newman TB, Cummings SR, et al. *Designing Clinical Research*. 5th ed. Wolters Kluwer; 2022.

[13] See, for example, de Vries AL, Steensma TD, Doreleijers TA, Cohen-Kettenis PT. Puberty suppression in adolescents with gender identity disorder: A prospective follow-up study. *J Sex Med*. 2011;8(8):2276-2283.

[14] Balshem H, Helfand M, Schünemann HJ, et al. GRADE guidelines: 3. Rating the quality of evidence. *J Clin Epidemiol*. 2011;64(4):401-406.

methodological limitations, or may be unavailable in some contexts. "High" quality evidence is not required for a treatment to no longer be considered experimental. A particular quality of evidence as specified by the GRADE system does not necessarily entail a particular strength of recommendation; as described below, "low" quality evidence can be sufficient to justify "strong" recommendations.[15]

28.     At times, it may be unethical to conduct randomized trials. For randomized trials to be ethical, clinical equipoise must exist; there must be uncertainty about whether the efficacy of the intervention or the control is greater. Otherwise, it would be unethical to knowingly expose trial participants to an inferior intervention or control. Trials must also be feasible; it would also be unethical to expose individuals to the risks of trial participation without the benefit of the trial generating generalizable knowledge. A randomized trial that is unlikely to find enough people to participate because they believe they might be randomized to an inferior intervention would be unethical because it could not produce generalizable knowledge due to an inadequate sample size.[16]

29.     Pediatric clinical research is less likely to use randomized trials than is clinical research with adults. Potential reasons for this disparity include the low prevalence of pediatric diseases, small market share for therapeutic agents in this population, low level of National Institutes of Health funding, and difficulty enrolling minors in research.[17]

---

[15] Balshem H, Helfand M, Schünemann HJ, et al. GRADE guidelines: 3. Rating the quality of evidence. *J Clin Epidemiol*. 2011;64(4):401-406; Swiglo BA, Murad MH, Schünemann HJ, et al. A case for clarity, consistency, and helpfulness: State-of-the-art clinical practice guidelines in endocrinology using the Grading of Recommendations Assessment, Development, and Evaluation system. *J Clin Endocrinol Metab*. 2008;93(3):666-673.

[16] Emanuel EJ, Wendler D, Grady C. What makes clinical research ethical? *JAMA*. 2000;283(20):2701-2711.

[17] Martinez-Castaldi C, Silverstein M, Baucher H. Child versus adult research: The gap in high quality study design. *Pediatrics*. 2008;122(1):52-57.

30.    The process for assessing the quality of the evidence is separate and distinct from the process for grading the strength of recommendations based on this evidence.[18] When making recommendations, the authors of guidelines consider a variety of factors; the quality of the evidence is only one factor considered in making recommendations. Other considerations include the balance between desirable and undesirable outcomes, confidence and variability in patients' values and preferences, and resource use.[19] The GRADE system distinguishes "strong" and "weak" recommendations; if the authors are highly confident in the balance between desirable and undesirable consequences, they make a "strong" recommendation and, if they are less confident, a "weak" recommendation.[20] The larger the differences between the desirable and undesirable consequences and the smaller the variability in patient values and preferences, the more likely a "strong" recommendation is warranted. "Low" quality evidence may be sufficient to make a "strong" recommendation.[21]

31.    Recommendations for pediatric care made by professional associations in clinical practice guidelines are seldom based on well-designed and conducted randomized controlled trials due to their rarity. Instead, recommendations are frequently based on observational studies or, if such studies are unavailable, expert opinion. The medical use of the term "expert opinion" in this context refers to the consensus of experts when studies are not available.

---

[18] Balshem H, Helfand M, Schünemann HJ, et al. GRADE guidelines: 3. Rating the quality of evidence. *J Clin Epidemiol*. 2011;64(4):401-406.

[19] Andrews JC, Schünemann HJ, Oxman AD, et al. GRADE guidelines: 15. Going from evidence to recommendation-determinants of a recommendation's direction and strength. *J Clin Epidemiol*. 2013;66(7):726-735.

[20] Andrews J, Guyatt G, Oxman AD, et al. GRADE guidelines: 14. Going from evidence to recommendations: The significance and presentation of recommendations. *J Clin Epidemiol*. 2013;66(7):719-725.

[21] Andrews JC, Schünemann HJ, Oxman AD, et al. GRADE guidelines: 15. Going from evidence to recommendation-determinants of a recommendation's direction and strength. *J Clin Epidemiol*. 2013;66(7):726-735.

32.     For example, of the 236 recommendations in the current clinical practice guidelines by the AAP, only 25 (10.6%) are based on Level A evidence (well-designed and conducted randomized controlled trials). Among its 80 "strong" recommendations, 10 (13%) are based on Level X evidence (exceptional situations in which validating studies cannot be performed and there is a clear preponderance of benefit or harm) and among its 117 "moderate" recommendations, 50 (42.7%) are based on Level C evidence (multiple observational studies with inconsistent findings, single or few observational studies, or observational studies with major limitations).[22]

33.     Clinicians cannot tell their patients to come back later after randomized controlled trials have been conducted. Clinicians must make decisions based on the best, currently available evidence, which may be observational studies or expert opinion. The lack of randomized controlled trials and reliance on "low" quality evidence does not mean that there is not reasonable support for a clinical practice guideline recommendation or that a treatment is not medically necessary.

**Clinical Practice Guidelines for the Treatment of Gender Dysphoria**

34.     Gender dysphoria is a medical diagnosis contained in the American Psychiatric Association's (APA's) *Diagnostic and Statistical Manual of Mental Disorders*. This diagnosis is defined by "a marked incongruence between one's experienced/expressed gender and their assigned gender, lasting at least 6 months" which is "associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning."[23]

35.     Gender-affirming medical care, whether for minors or adults, is not experimental in the sense of new or novel. Hormone treatment for gender dysphoria began after estrogen and

---

[22] Antommaria AHM, Kelleher M, Peterson RJ. Quality of evidence and strength of recommendations in American Academy of Pediatrics' guidelines." *Pediatrics*. In press. The AAP's clinical practice guidelines use different terminology than the GRADE approach for describing the quality of the evidence and the strength of recommendations.

[23] American Psychiatric Association. Gender Dysphoria. In: *Diagnostic and Statistical Manual of Mental Disorders*. 5th ed., text rev. American Psychiatric Publishing; 2022.

testosterone became commercially available in the 1930s. The first documented male to female gender-affirming genital surgery was performed in 1931, and Christine Jorgensen famously underwent gender-affirming surgery in 1952.[24] WPATH developed in original SOC in 1979.[25] The first reference to the use of GnRH analogs for the treatment of gender dysphoria in adolescents in the medical literature was in 1998, over 25 years ago.[26] In the same year, the World Professional Association for Transgender Health (WPATH), then called the Harry Benjamin International Gender Dysphoria Association, included recommendations regarding gender-affirming hormones for adolescents in its Standards of Care (SOC).[27] Providers at Children's Hospital Boston began treating minors with gender-affirming hormones at this time.[28] Prospective observational trials of GnRH analogs began recruiting participants in 2000.[29] In 2007, Boston Children's Hospital established its Gender Management Service which provided treatment with GnRH analogs, in addition to gender-affirming hormones.[30] The Endocrine Society published its first clinical practice guideline for gender-affirming medical care, which recommended treatment with GnRH

---

[24] Stryker S. Transgender History. 2nd ed. Seal Press; 2017.

[25] Coleman E, Radix AE, Bouman WP, et al. Standards of care for the health of transgender and gender diverse people, version 8. *Int J Transgend Health*. 2022;23(Suppl 1):S1-S259.

[26] Cohen-Kettenis PT, van Goozen SH. Pubertal delay as an aid in diagnosis and treatment of a transsexual adolescent. *Eur Child Adolesc Psychiatry*. 1998;7(4):246-248. See also Gooren L, Delemarre-van de Waal H. The feasibility of endocrine interventions in juvenile transsexuals. *J Psychol Human Sex*. 1996;8(4):69-74.

[27] Levine SB, Brown G, Coleman E, et al. The standards of care for gender identity disorders. *Int J Transgend*. 1998;2(2). Gender identity disorders is the prior terminology for gender dysphoria. This is the 5th edition of the Standards of Care.

[28] Spack NP, Edwards-Leeper L, Feldman HA, et al. Children and adolescents with gender identity disorder referred to a pediatric medical center. *Pediatrics*. 2012;129(3):418-425.

[29] de Vries AL, Steensma TD, Doreleijers TA, Cohen-Kettenis PT. Puberty suppression in adolescents with gender identity disorder: A prospective follow-up study. *J Sex Med*. 2011;8(8):2276-2283.

[30] Spack NP, Edwards-Leeper L, Feldman HA, et al. Children and adolescents with gender identity disorder referred to a pediatric medical center. *Pediatrics*. 2012;129(3):418-425.

analogs, in 2009[31] and WPATH added recommendations about GnRH analogs in the 7th edition of its Standards of Care in 2012.[32]

36.     The Endocrine Society published its updated clinical practice guideline for the treatment of gender-dysphoric/gender-incongruent persons, including pubertal suppression, sex hormone treatment, and surgery for gender confirmation, in 2017.[33] WPATH's Standards of Care is currently in its 8th version.[34] The treatments outlined in these guidelines are also endorsed by other medical professional associations including the American Academy of Family Physicians,[35] the AAP,[36] the American College of Obstetricians and Gynecologists,[37] the American Medical

---

[31] Hembree WC, Cohen-Kettenis P, Delemarre-van de Waal HA, et al. Endocrine treatment of transsexual persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2009;94(9):3132-3154.

[32] Coleman E, Bockting W, Botzer M, et al. Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. *Int J Transgend*, 2012;13(4):165-232.

[33] Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(11):3869-3903.

[34] Coleman E, Radix AE, Bouman WP, et al. Standards of care for the health of transgender and gender diverse people, version 8. *Int J Transgend Health*. 2022;23(Suppl 1):S1-S259.

[35] American Academy of Family Physicians. Care for the transgender and gender nonbinary patient. December 2023. Accessed February 3, 2025. Available at https://www.aafp.org/about/policies/all/transgender-nonbinary.html#:~:text=The%20American%20Academy%20of%20Family,patients%2C%20including%20children%20and%20adolescents.

[36] Rafferty J, Committee on Psychosocial Aspects of Child and Family Health, Committee on Adolescence, Section on Lesbian, Gay, Bisexual, and Transgender Health and Wellness. Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents. *Pediatrics*. 2018;142(4):e20182162.

[37] American College of Obstetricians and Gynecologists. ACOG Committee Opinion Number 823: Health care for transgender and gender diverse individuals. March 2021. Accessed February 3, 2025. Available at https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2021/03/health-care-for-transgender-and-gender-diverse-individuals/; American College of Obstetricians and Gynecologists' Committee on Gynecologic Practice and Committee on Health Care for Underserved Women. Health care for transgender and gender diverse individuals: ACOG Committee Opinion, Number 823. *Obstet Gynecol*. 2021;137(3):e75-e88.

Association,[38] the APA,[39] the American Psychological Association,[40] and the Pediatric Endocrine Society.[41]

37.    Executive Order 14187 asserts without evidence that WPATH lacks scientific integrity and instructs agencies to rescind or amend all policies that rely on WPATH's guidance. But the WPATH and Endocrine Society guidelines are evidence-based and were developed using methods comparable to other clinical practice guidelines across different areas of medicine. To my knowledge, there are *no* clinical practice guidelines that recommend withholding gender-affirming medical care from all adolescents. Additionally, policies that rely on WPATH's guidance may also rely on other sources for their recommendations. Therefore, even if WPATH's guidance were unreliable, and I am not conceding that it is, policies may nonetheless have a sound basis and rescinding them would not be justified.

38.    Gender-affirming medical care is also not experimental in the sense of unproven. The Endocrine Society clinical practice guideline includes 28 recommendations: 3 (11%) are based on "moderate" and 19 (68%) are based on "low" or "very low" quality evidence. The remaining 6 (21%) recommendations are Ungraded Good Practice Statements. [42] Table 1 (**Exhibit B**).

---

[38] American Medical Association. Removing financial barriers to care for transgender patients H-185.950. 2022. Accessed February 3, 2025. Available at https://policysearch.ama-assn.org/policyfinder/detail/H-185.950?uri=%2FAMADoc%2FHOD.xml-0-1128.xml; Madara JL. Letter to Mr. Bill McBride. April 26, 2021. Accessed February 3, 2025. Available at https://searchlf.ama-assn.org/letter/documentDownload?uri=%2Funstructured%2Fbinary%2Fletter%2FLETTERS%2F2021-4-26-Bill-McBride-opposing-anti-trans-bills-Final.pdf.

[39] American Psychiatric Association. Position statement on treatment of transgender (trans) and gender diverse youth. July 2020. Accessed February 3, 2025. Available at https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-Transgender-Gender-Diverse-Youth.pdf.

[40] American Psychological Association. Transgender, gender identity, and gender expression non-discrimination. August 2008. Accessed February 3, 2025, Available at https://www.apa.org/about/policy/transgender.pdf.

[41] Endocrine Society and Pediatric Endocrine Society. Transgender health: Position statement. December 2020. Accessed February 3, 2025. Available at https://www.endocrine.org/-/media/endocrine/files/advocacy/position-statement/position_statement_transgender_health_pes.pdf.

[42] Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(11):3869-3903.

15

Ungraded Good Practice Statements draw attention to general principles, like shared decision-making, for which direct evidence is unavailable or not systematically apprised.

39.     The quality of the evidence supporting these recommendations is similar to the quality of the evidence supporting the recommendations in the AAP's clinical practice guidelines described above and in other Endocrine Society guidelines for the pediatric population. For example, none of the Endocrine Society's 84 recommendations in its two other guidelines that focus on the pediatric population—guidelines on pediatric obesity and congenital adrenal hyperplasia—is based on "high" quality evidence. Twenty-four (29%) of the recommendations are based on "moderate," and 49 (58%) on "low" or "very low" quality evidence. The remaining recommendations (11, 13%) are Ungraded Good Practice Statements.[43] Table 1 (**Exhibit B**).

40.     With respect to GnRH analogs, the Endocrine Society specifically "suggest[s] that adolescents who meet diagnostic criteria for [gender dysphoria]/gender incongruence, fulfill criteria for treatment, . . . and are requesting treatment should initially undergo treatment to suppress pubertal development."[44] The evidence for this recommendation includes a longitudinal study of a group of 70 transgender adolescents who were evaluated using objective measures prior to both pubertal suppression and sex hormone treatment. The mean length of time between the start of pubertal suppression and sex hormone treatment was 1.88 years and ranged from 0.42 to 5.06 years. The study showed statistically significant decreases in behavioral and emotional

---

[43] Speiser PW, Arlt W, Auchus RJ, et al. Congenital adrenal hyperplasia due to steroid 21-hydroxylase deficiency: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2018;103(11):4043-4088; Styne DM, Arslanian SA, Connor EL, et al. Pediatric obesity-assessment, treatment, and prevention: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(3):709-757.

[44] Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(11):3880.

problems and depressive symptoms, and increases in general functioning.[45]

41.    This is the same level of evidence as supports the use of GnRH analogs for the treatment of central precocious puberty. Central precocious puberty is the premature initiation of puberty, before 8 years of age in people assigned female at birth and before 9 in people assigned male, by the central nervous system. The potential negative effects of precocious puberty include impairment of final adult height as well as antisocial behavior and lower academic achievement. There are no randomized trials evaluating the adult height of treated and untreated individuals. Most studies are observational and compare pretreatment predicted final height with actual final height. These studies have additional limitations including small sample sizes. This "low" quality evidence nonetheless is sufficient to support the use of GnRH analogs as treatment for central precocious puberty.[46] Executive Order 14187 therefore subjects the use of GnRH analogs to a double standard. There are no randomized clinical trials for the use of GnRH analogs to treat precocious puberty or gender dysphoria, but the evidence is deemed sufficient for the former but not the latter.

42.    The evidence supporting the guideline's recommendations regarding gender-affirming hormone treatment in adolescents include Annelou L. C. de Vries and colleagues' longer-term follow-up of individuals after pubertal suppression through sex hormone and gender-affirming surgical treatment. Participants' mean age at their initial assessment was 13.6 years and

---

[45] de Vries AL, Steensma TD, Doreleijers TA, Cohen-Kettenis PT. Puberty suppression in adolescents with gender identity disorder: A prospective follow-up study. *J Sex Med*. 2011;8(8):2276-2283.

[46] Mul D, Hughes IA. The use of GnRH agonists in precocious puberty. *Eur J Endocrinol*. 2008;159(Suppl 1):S3-S8.

their mean age at their final assessment was 20.7 years. The researchers report the resolution of gender dysphoria and improvement in psychological functioning.[47]

43.    The evidence base for gender-affirming medical care in adults does include randomized, double-blind, placebo-controlled trials. One trial compared the effect of testosterone combined with a 5alpha-reductase inhibitor or placebo on muscle strength.[48] It is important to note that this trial compared one form of gender-affirming hormone treatment to another, rather than comparing gender-affirming hormone treatment to no treatment at all.

44.    The evidence base for gender-affirming surgical care generally consists of observational studies. WPATH SOC-8, for example, cites 5 prospective observational studies of gender-affirming chest surgery in individuals assigned female at birth and 8 prospective observational studies of gender-affirming vaginoplasty in individuals assigned male at birth.[49]

45.    As a result of these studies and healthcare providers' subsequent experience, randomized, placebo-controlled trials (trials that compare pharmacological treatment to no pharmacological treatment) of gender-affirming medical care are currently unethical because potential investigators do not have equipoise (as explained above) between pharmacological treatment and no pharmacological treatment; they believe that pharmacological treatment is superior. It is also highly unlikely that a sufficient number of participants would enroll in

---

[47] See de Vries AL, McGuire JK, Steensma TD, Wagenaar EC, Doreleijers TA, Cohen-Kettenis PT. Young adult psychological outcome after puberty suppression and gender reassignment. *Pediatrics*. 2014;134(4):696-704. Additional longitudinal studies of the psychosocial effects of pubertal suppression to treat gender dysphoria include Costa R, Dunsford M, Skagerberg E, Holt V, Carmichael P, Colizzi M. Psychological support, puberty suppression, and psychosocial functioning in adolescents with gender dysphoria. *J Sex Med*. 2015;12(11):2206-2214 and Carmichael P, Butler G, Masic U, et al. Short-term outcomes of pubertal suppression in a selected cohort of 12 to 15 year old young people with persistent gender dysphoria in the UK. *PLoS One*. 2021;16(2):e0243894.

[48] Gava G, Armillotta F, Pillastrini P, et al. A randomized double-blind placebo-controlled pilot trial on the effects of testosterone undecanoate plus dutasteride or placebo on muscle strength, body composition, and metabolic profile in transmen. *J Sex Med*. 2021;18(3):646-655.

[49] Coleman E, Radix AE, Bouman WP, et al. Standards of care for the health of transgender and gender diverse people, version 8. *Int J Transgend Health*. 2022;23(Suppl 1):S1-S259.

randomized, placebo-controlled trials for them to be informative.[50]

46.    Even if such studies could be conducted ethically, they would provide a lower quality of evidence because of intrinsic limitations in their design. For example, it would be impossible to blind/mask the investigators or the participants to whether the participants were receiving the active treatment or a placebo. They would know if participants were in the intervention or the control arm of the study due to the physical changes in their bodies, or the lack thereof, over time. This might bias their perception of the outcomes and lower the rating of the study's quality.[51]

47.    While Executive Order 14187 directs the Secretary of Health and Human Services to "use all available methods to increase the quality of data to guide practices for improving the health of minors with gender dysphoria," it appears to punish investigators and healthcare entities who would conduct such research on gender-affirming medical care (or force them to stop doing so) by threatening to withhold or retract their federal funding. Even if one were to believe that such care was not currently evidence based, which I do not, there is no evidence that it is impossible to be effective and therefore nothing to justify prohibiting any and all research on its use.

## GENERALLY APPLICABLE PRINCIPLES OF INFORMED CONSENT APPLY TO GENDER-AFFIRMING MEDICAL CARE

48.    Before performing any medical intervention, a healthcare provider must generally obtain an adult patient's informed consent. Informed consent is a process in which the provider discloses information, elicits the patient's preferences, offers medical advice, and seeks explicit

---

[50] Chew D, Anderson J, Williams K, May T, Pang K. Hormonal treatment in young people with gender dysphoria: A systematic review. *Pediatrics*. 2018;141(4):e20173742; Reisner SL, Deutsch MB, Bhasin S, et al. Advancing methods for US transgender health research. *Curr Opin Endocrinol Diabetes Obes*. 2016;23(2):198-207.

[51] Browner WS, Newman TB, Cummings SR, et al. *Designing Clinical Research*. 5th ed. Wolters Kluwer; 2022; Atkins D, Best D, Briss PA, et al. Grading quality of evidence and strength of recommendations. *BMJ*. 2004;328(7454):1490.

authorization. In order to participate in the informed consent process, a patient must have medical decision-making capacity. If an adult patient lacks capacity, a proxy decision-maker is generally appointed. The healthcare provider's disclosure should include the nature of the intervention and the reasons for it, as well as its potential benefits, risks, and alternatives, including the alternative of not undergoing the intervention. The patient or the patient's proxy must understand and appreciate this information and express a decision. For the informed consent to be valid, the authorization must be voluntary. Exceptions to the requirement to obtain informed consent exist, such as in the case of an emergency.[52]

49.     Medical decision-making and informed consent in pediatrics is more complex than in adult medicine because it involves both minor patients and their parents or legal guardians. Parents and guardians are afforded substantial, but not unlimited, discretion in making medical decisions for their minor children based on their assessment of the individual child's best interest. They generally care about their children and best understand their children's unique needs.[53]

50.     Healthcare providers also have an ethical obligation to include children and adolescents in medical decision-making to the extent that it is developmentally appropriate. For example, a provider examining a toddler for a possible ear infection should not ask them for permission to look in their ear because the provider intends to look even if they say no. The provider could, however, ask the toddler which ear they would like to have looked in first. As a minor becomes older, the minor should participate more actively in medical decision-making and the minor's assent should be sought. Younger adolescents typically have developed a sense of identity, individual values and preferences, and are developing medical decision-making capacity.

---

[52] Beauchamp TL, Childress JF. *Principles of Biomedical Ethics*. 6th ed. Oxford University Press; 2009.

[53] Diekema DS. Parental refusals of medical treatment: The harm principle as threshold for state intervention. *Theor Med Bioeth*. 2004;25(4):243-264.

Capacity entails the ability to (i) understand the indications and the potential benefits, risks, and alternatives to a treatment, including declining treatment; (ii) appreciate the implications of a treatment decision for their own lives; (iii) evaluate the potential benefits and risks; and (iv) express a preference.[54] Adolescents generally possess comparable medical decision-making capacity to adults. Louis A. Weithorn and Susan B. Campbell, for example, found that 14-year-olds performed similarly to adults with respect to their ability to understand and reason about treatment information.[55]

51.    Executive Order 14187 falsely suggests that adults are trying to change a child's sex though gender-affirming medical care. This is not something that adults are doing to children. The diagnosis of gender-dysphoria is based on the child or adolescent's own gender identity, not a gender identity imposed by the adolescent's parent(s). The adolescent patient's assent is also required for these medical interventions.

52.    The current treatment paradigm for treating gender dysphoria in minors is consistent with general ethical principles instantiated in the practices of informed consent and assent. The Endocrine Society clinical practice guideline extensively discusses the potential benefits, risks, and alternatives to treatment, and its recommendations regarding the timing of interventions are based in part on the treatment's potential risks and the adolescent's decision-making capacity. The guideline recommends that the informed consent process for GnRH analogs and sex hormones include a discussion of the implications for fertility and options for fertility preservation. The Endocrine Society clinical practice guideline also advises delaying gender-

---

[54] Katz AL, Webb SA, Committee on Bioethics. Informed consent in decision-making in pediatric practice. *Pediatrics*. 2016;138(2):e20161485; Kon AA, Morrison W. Shared decision-making in pediatric practice: A broad view. *Pediatrics*. 2018;142(Suppl 3):S129-S132.

[55] Weithorn LA, Campbell SB. The competency of children and adolescents to make informed treatment decisions. *Child Dev*. 1982;53(6):1589-1598.

affirming hormone treatment, which results in partly irreversible physical changes, until an adolescent is developmentally capable of providing informed consent.[56] Lieke J. J. J. Vrouenraets and colleagues found most adolescents with gender dysphoria have sufficient medical decision-making capacity to make decisions regarding GnRH analogs.[57]

### Gender-Affirming Medical Care's Benefits, Risks, and Alternatives

53.     The potential benefits of gender-affirming medical care in minors include improved physical and psychological outcomes. Starting pubertal suppression in early puberty prevents adolescents with gender dysphoria from developing secondary sex characteristics inconsistent with their gender identity, which can be extremely distressing for them, and that may be difficult, if not impossible, to eliminate once the characteristics have fully developed. Sex hormone therapy results in the development of secondary sex characteristics consistent with an individual's gender identity. Potential psychological benefits include increased quality of life and decreased depression, suicidal ideation and suicide attempts, and anxiety.[58]

54.     As with all medical treatments, gender-affirming medical care entails risks. One of the potential risks is negative effects on fertility, but this risk should not be overstated as it is in Executive Order 14187. GnRH analogs do not, by themselves, permanently impair fertility. Children with central precocious puberty are routinely treated with GnRH analogs and have typical

---

[56] See Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab.* 2017;102(11):3869-3903.

[57] Vrouenraets LJJJ, de Vries ALC, de Vries MC, van der Miesen AIR, Hein IM. Assessing medical decision-making competence in transgender youth. *Pediatrics.* 2021;148(6):e2020049643.

[58] See, for example, Baker KE, Wilson LM, Sharma R, Dukhanin V, McArthur K, Robinson KA. Hormone therapy, mental health, and quality of life among transgender people: A systematic review. *J Endocr Soc.* 2021;5(4):1-16.

fertility in adulthood.[59] GnRH analogs are also used for fertility preservation in individuals being treated for cancer.[60]

55.     While treatment for gender dysphoria with gender-affirming hormones may impair fertility, this is not universal and may also be reversible. There are transgender men who became pregnant while on or after discontinuing testosterone therapy.[61] Transgender men and women are also capable of producing eggs and sperm respectively both during and after the discontinuation of gender-affirming hormone treatment.[62]

56.     Additionally, the clinical practice guidelines discussed above recommend that healthcare providers offer individuals considering gender-affirming medical care methods to potentially preserve their fertility.[63]

57.     The risk of infertility is also not unique to treatment for gender dysphoria. For example, parents and legal guardians consent to the treatment of medical conditions for their minor children, including some nonmalignant rheumatologic disorders and hematologic conditions, which may impair fertility.[64]

---

[59] Lazar L, Meyerovitch J, de Vries L, Phillip M, Lebenthal Y. Treated and untreated women with idiopathic precocious puberty: Long-term follow-up and reproductive outcome between the third and fifth decades. *Clin Endocrinol* (Oxf). 2014;80(4):570-576.

[60] Valsamakis G, Valtetsiotis K, Charmandari E, Lambrinoudaki I, Vlahos NF. GnRH analogues as a co-treatment to therapy in women of reproductive age with cancer and fertility preservation. *Int J Mol Sci*. 2022;23(4):2287.

[61] Light AD, Obedin-Maliver J, Sevelius JM, Kerns JL. Transgender men who experienced pregnancy after female-to-male gender transitioning. *Obstet Gynecol*. 2014;124(6):1120-1127.

[62] Leung A, Sakkas D, Pang S, Thornton K, Resetkova N. Assisted reproductive technology outcomes in female-to-male transgender patients compared with cisgender patients: A new frontier in reproductive medicine. *Fertil Steril*. 2019;112(5):858-865; de Nie I, van Mello NM, Vlahakis E, et al. Successful restoration of spermatogenesis following gender-affirming hormone therapy in transgender women. *Cell Rep Med*. 2023;4(1):100858.

[63] Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(11):3869-3903.

[64] Delessard M, Saulnier J, Rives A, Dumont L, Rondanino C, Rives N. Exposure to chemotherapy during childhood or adulthood and consequences on spermatogenesis and male fertility. *Int J Mol Sci*. 2020;21(4):1454; Blumenfeld Z. Chemotherapy and fertility. *Best Pract Res Clin Obstet Gynaecol*. 2012;26(3):379-390; Hirshfeld-Cytron J, Gracia C, Woodruff TK. Nonmalignant diseases and treatments associated with primary ovarian failure: An expanded role for fertility preservation. *J Womens Health (Larchmt)*. 2011;20(10):1467-1477.

58.    While transgender adolescents have higher rates of depression, anxiety, suicidal ideation, and suicide attempts, there are no studies indicating that those higher rates are caused or exacerbated by gender-affirming medical care.[65] Rather, contributing factors include conflict between one's appearance and identity, stigma, and rejection.[66] As discussed above, the available evidence indicates that gender-affirming care improves, rather than worsens, psychological outcomes.

59.    Finally, not knowing all potential harmful effects associated with a medication is not a sufficient reason for the FDA to not approve a medication, let alone for the President to defund and seek to ends its use. The FDA requires post-marketing surveillance of medications' adverse effects because the clinical trials on which the approvals are based cannot identity all possible side effects.[67]

60.    In determining whether the benefits of treatment outweigh the risks, medical providers and patients must also consider the potential alternatives including not providing or receiving the treatment. As stated above, prior to the initiation of gender-affirming medical care, many minors with gender dysphoria have significant, unresolved symptoms that treatment improves. Without medical treatment, these symptoms would persist. The assertion that psychotherapy alone is sufficient to treat gender dysphoria in adolescents is only supported by anecdotal evidence.[68]

---

[65] Haas AP, Eliason M, Mays VM, et al. Suicide and suicide risk in lesbian, gay, bisexual, and transgender populations: Review and recommendations. *J Homosex.* 2011;58(1):10-51.

[66] Bauer GR, Scheim AI, Pyne J, Travers R, Hammond R. Intervenable factors associated with suicide risk in transgender persons: A respondent driven sampling study in Ontario, Canada. *BMC Public Health.* 2015;15:525.

[67] U.S. Food & Drug Administration. Postmarketing Surveillance Programs. April 2, 2020. Accessed February 3, 2025. Available at https://www.fda.gov/drugs/surveillance/postmarketing-surveillance-programs.

[68] See, for example, Levine SB. Transitioning back to maleness. *Arch Sex Behav.* 2018;47(4):1295-1300.

**The Risks and Benefits of Gender-Affirming Medical Care Are Comparable to Those of Other Medical Care to which Individuals (Including Parents and Guardians) May Consent**

61.    Medical care for minors can require weighing potential benefits and risks in the face of uncertainty. There is nothing unique about gender-affirming medical care that justifies singling out this medical care for prohibition based on concern for adolescents' inability to assent or parents or guardians' inability to consent. Medical decisions regarding treatment for gender dysphoria should continue to be left to the discretion of adolescents, their parents or guardians, and their healthcare providers.

62.    The potential risks of gender affirming medical care are comparable to the risks parents and adolescents are permitted to assume in numerous other treatment decisions. As described above, parents can choose treatments that have some chance of damaging their children's gonads and impairing their fertility. Individuals with some types of DSDs, such as complete androgen insensitivity syndrome, are treated with sex hormones, which have comparable risks to the use of these treatments in persons with gender dysphoria.[69] Parents of children with some types of DSDs may even choose to have their children's gonads removed due to the possible elevated risk of malignancy, which causes infertility.[70]

63.    Additionally, while Executive Order 14187 would end the provision of chest surgery for the treatment of gender dysphoria among older adolescents and 18-year-olds, provision of comparable surgeries, such as those for gynecomastia, is unaffected. Gynecomastia in the proliferation of ductal or glandular breast tissue, as opposed to adipose tissue or fat, in individuals who sex assigned at birth is male. While surgeries to treat gynecomastia may at times be performed

---

[69] Lanciotti L, Cofini M, Leonardi A, Bertozzi M, Penta L, Esposito S. Different clinical presentations and management in complete androgen insensitivity syndrome (CAIS). *Int J Environ Res Public Health*. 2019;16(7):1268.

[70] Abacı A, Çatlı G, Berberoğlu M. Gonadal malignancy risk and prophylactic gonadectomy in disorders of sexual development. *J Pediatr Endocrinol Metab*. 2015;28(9-10):1019-1027.

to lessen pain, they are commonly performed to reduce psychosocial distress. Surgery affirms patients' gender identity, that is, to help someone assigned male at birth feel more typically masculine. Risks associated with the procedure include bruising, bleeding, infection, scarring, poor cosmetic outcome, and loss of sensation.[71] There is nothing unique about chest surgery for gender dysphoria that justifies singling this treatment out.

64.    As discussed above, the potential benefits of gender-affirming medical care, including improved psychological outcomes, frequently outweigh the potential risks.

**Potential Regret Does Not Support the Executive Orders**

65.    Patients experiencing regret as a result of any medical treatment is profoundly unfortunate and such individuals should be provided support and additional treatment as needed. Patients expressing regret over having received a certain kind of medical care however, does not justify ending the provision of that medical care.

66.    Executive Order 14187 states that "[c]ountless children soon regret" receiving gender affirming medical care. While there are individuals who received gender-affirming medical care as minors who express regret, the available studies report that rates of regret regarding gender-affirming medical care are very low. For example, Chantal M. Wiepjes and colleagues report that 0.6% of transgender women and 0.3% of transgender men experienced regret.[72] Similarly, R. Hall and colleagues report regret was specifically documented in 1.1% of adult gender-diverse patients.[73] Defunding and ending gender-affirming medical care to prevent regret in a small

---

[71] Nordt CA, DiBVasta AD. Gynecomastia in adolescents. *Curr Opin Pediatr.* 2008;20(4):375-382.

[72] Wiepjes CM, Nota NM, de Blok CJ, et al. The Amsterdam Cohort of Gender Dysphoria Study (1972-2015): Trends in prevalence, treatment, and regrets. *J Sex Med.* 2018;15(4):582-590. This study analyzes all individuals who presented to the clinic, whether they presented as minors or adults. Regret was assessed in individuals who had undergone gender-affirming surgery that included removal of the gonads. This surgery was only performed on adults.

[73] Hall R, Mitchell L, Sachdeva J. Access to care and frequency of detransition among a cohort discharged by a UK national adult gender identity clinic: Retrospective case-note review. *BJPsych Open.* 2021;7(6):e184.

minority of patients would result in harm to the majority of patients who benefit. The potential for regret should nonetheless be disclosed in the informed consent process, and support and services should be provided to individuals who experience regret.

67.     The potential for regret is also not unique to gender-affirming medical care. Parents of children who have undergone feminizing genitoplasty and hypospadias repair (treatments having nothing to do with gender dysphoria) have experienced regret over their decisions.[74] For example, Rachel S. Fisher and colleagues found that 38% of caregivers of infants with congenital adrenal hyperplasia reported some level of regret about their child's surgical care.[75] Executive Order 14187 does not, however, seek to end the provision of these procedures.

## EXECUTIVE ORDER 14187 UNDERMINES THE INTEGRITY OF THE MEDICAL PROFESSION AND LACKS MEDICAL OR ETHICAL JUSTIFICATION

68.     Executive Order 14187 violates the integrity of the medical profession and coerces medical professionals to violate their integrity and ethical duties. The medical profession has processes by which it evaluates treatments and determines whether they are safe and effective. This Executive Order intervenes in these processes replacing medical professionals' judgement with the judgment of the President.

69.     Healthcare providers have an ethical obligation to promote their patients' well-being and to protect them from harm. When providers believe that the potential benefits of gender-affirming medical care outweigh the potential risks for a particular patient, preventing them from

---

[74] Fisher RS, Espeleta HC, Baskin LS, et al. Decisional regret about surgical and non-surgical issues after genitoplasty among caregivers of female infants with CAH. *J Pediatr Urol*. 2022;18(1):27-33; Vavilov S, Smith G, Starkey M, Pockney P, Deshpande AV. Parental decision regret in childhood hypospadias surgery: A systematic review. *J Paediatr Child Health*. 2020;56(10):1514-1520.

[75] Fisher RS, Espeleta HC, Baskin LS, et al. Decisional regret about surgical and non-surgical issues after genitoplasty among caregivers of female infants with CAH. *J Pediatr Urol*. 2022;18(1):27-33.

providing this treatment forces them to violate their ethical obligations to their patients or risk losing federal funding.

70.     There is no medical or ethical basis for treating gender-affirming medical care differently from other care covered by federal funds. Gender-affirming medical care is consistent with generally accepted professional medical standards and is not experimental or investigational. It is endorsed by evidence-based clinical practice guidelines that are themselves based on studies published in the peer-reviewed literature demonstrating that it improves individuals' health outcomes.

71.     Executive Order 14187 not only seeks to withhold or withdraw federal funding for gender-affirming medical care but also perniciously pits one group of patients against one another. It threatens to withhold not only funding for gender-affirming medical care but all research and education grants and Medicare and Medicaid funding from organizations that provide gender-affirming medical care.

## CONCLUSIONS

72.     Treating adolescents with gender dysphoria with gender-affirming medical care under clinical practice guidelines, like the Endocrine Society's, is evidence-based; its potential benefits outweigh its potential risks for many patients; and these risks are well within the range of other medical decisions that adolescents and their parents or guardians have the discretion to make in consultation with their healthcare professionals.

73.     Based on my research and experience as a pediatrician and bioethicist, there is no sound medical or ethical basis to prohibit healthcare professionals and entities from providing gender-affirming medical care to individuals with gender dysphoria under 19 years of age. Doing so puts clinicians and healthcare entities in the untenable position of having to harm their patients and violate their integrity and ethical obligations due to the threat of loss of federal funding.

74.     There is not a sound medical or ethical basis for seeking to end the provision of gender-affirming medical care to patients under 19. Such care is evidence-based and is not experimental. Ending the provision of gender-affirming medical and surgical care is also inconsistent with the Order's silence as to other comparable medical interventions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 12 th day of February 2025

_____
ARMAND H. MATHENY ANTOMMARIA, MD, PhD

29

JA483

# **<u>Exhibit A</u>**

**EXHIBIT A**

**Curriculum Vitae**

Last Updated: February 3, 2025

**PERSONAL DATA**
Armand H. Matheny Antommaria, MD, PhD, FAAP, HEC-C
Birth Place:  Pittsburgh, Pennsylvania
Citizenship:  United States of America

**CONTACT INFORMATION**
Address:  3333 Burnet Ave, ML 15006, Cincinnati, OH 45229
Telephone Number:  (513) 636-4939
Electronic Mail Address:  armand.antommaria@cchmc.org

**EDUCATION**
1983-1987    BSEE    Valparaiso University, with High Distinction
Valparaiso, IN
1983-1987    BS    Valparaiso University (Chemistry), with High Distinction
Valparaiso, IN
1987-1989    MD    Washington University School of Medicine
1998-2000    Saint Louis, MO
1989-2000    PhD    The University of Chicago Divinity School (Religious Ethics)
Chicago, IL
2000-2003    Resident    University of Utah (Pediatrics)
Salt Lake City, UT
2005-2006    Certificate Conflict Resolution Certificate Program, University of Utah
Salt Lake City, UT

**BOARD CERTIFICATION**
2019    Pediatric Hospital Medicine, American Board of Pediatrics
2019    Healthcare Ethics Consultant-Certified, Healthcare Ethics Consultation Certification Commission
2004    General Pediatrics, American Board of Pediatrics

**PROFESSIONAL LICENSES**
2012-Present  Doctor of Medicine, Ohio
2006-2010    Alternative Dispute Resolution Provider—Mediator, Utah
2001-2014    Physician and Surgeon, Utah
2001-2014    Physician and Surgeon Controlled Substance, Utah

**PROFESSIONAL EXPERIENCE**
**Full Time Positions**
2019-Present  *Professor*
Cincinnati Children's Hospital Medical Center, Cincinnati, OH
Department of Surgery
2019-Present  *Professor of Clinical-Affiliated*
University of Cincinnati, Cincinnati, OH
Department of Surgery
2017-Present  *Professor*

A-1

Cincinnati Children's Hospital Medical Center, Cincinnati, OH
Division of Pediatric Hospital Medicine
2017-Present    *Professor of Clinical-Affiliated*
University of Cincinnati, Cincinnati, OH
Department of Pediatrics
2016-2017    *Associate Professor of Clinical-Affiliated*
University of Cincinnati, Cincinnati, OH
Department of Pediatrics
2012-2017    *Associate Professor*
Cincinnati Children's Hospital Medical Center, Cincinnati, OH
Division of Pediatric Hospital Medicine
2012-Present    *Lee Ault Carter Chair in Pediatric Ethics*
Cincinnati Children's Hospital Medical Center
2012-2016    *Associate Professor-Affiliated*
University of Cincinnati, Cincinnati, OH
Department of Pediatrics
2010-2012    *Associate Professor of Pediatrics* (with Tenure)
University of Utah School of Medicine, Salt Lake City, UT
Divisions of Inpatient Medicine and Medical Ethics
2010-2012    *Adjunct Associate Professor of Medicine*
University of Utah School of Medicine, Salt Lake City, UT
Division of Medical Ethics and Humanities
2004-2010    *Assistant Professor of Pediatrics* (Tenure Track)
University of Utah School of Medicine, Salt Lake City, UT
Divisions of Inpatient Medicine and Medical Ethics
2004-2010    *Adjunct Assistant Professor of Medicine*
University of Utah School of Medicine, Salt Lake City, UT
Division of Medical Ethics and Humanities
2003-2004    *Instructor of Pediatrics* (Clinical Track)
University of Utah School of Medicine, Salt Lake City, UT
Divisions of Inpatient Medicine and Medical Ethics
2003-2004    *Adjunct Instructor of Medicine*
University of Utah School of Medicine, Salt Lake City, UT
Division of Medical Ethics

**Part Time Positions**
2024-Present    *Expert Witness*, Report and Deposition
                Misanin, et al., v. Wilson, et al., United States District Court for the Middle
                District of South Carolina. Case No. 2:24-CV-5734-RMG
2024-Present    *Expert Witness,* Report
                Van Garderen, et al., v. Montana, et al., Montana Fourth Judicial District Court,
                Missoula County. Cause No. DV 2023-541.
2024            *Expert Witness*, Report, Deposition, and Testimony
                Moe, et al., v. Yost, et al., Court of Common Pleas, Franklin County, Ohio. Case
                No. 24-CV-002481.
2024            *Expert Witness,* Report and Deposition
                Noe, et al., v. Parson, et al., Circuit Court of Cole County State of Missouri. Case
                No. 23AC-CC04530.
2023-Present    *Expert Witness,* Report
Voe, et al., v. Mansfiled, et al., United States District Court, Middle District of North Carolina.
                Case No. 1:23-CV-864-LCB-LPA
2023-Present    *Expert Witness,* Report and Deposition

Zayre-Brown v. The North Carolina Department of Public Safety, et al., United States District
    Court, Western District of North Carolina, Case No. 3:22-CV-01910-MOC-DCK
2023-Present  *Expert Witness,* Report
Poe, et al., v. Drummond, et al., United States District Court, Northern District of
    Oklahoma, Case No. 23-cv-00177-JFH-SH
2023-Present  *Expert Witness*, Report
L.W., et al., v. Skrmetti, et al., United States District Court, Middle District of
    Tennessee, Case No. 3:23-cv-00376.
2022-2023  *Expert Witness,* Report, Deposition, and Testimony
Dekker, et al., v. Marstiller, et al., United States District Court, Northern District
    of Florida, Case No. 4:22-cv-oo325-RH-MAF
2022- 2025  *Expert Witness,* Report, Deposition, and Testimony
Boe, et al., and United States, v. Marshall, et al., United States District Court,
    Middle District of Alabama Northern Division, Case No. 2:22-cv0-184-LCB.
2022  *Expert Witness,* Report
Jeffrey Walker, et al., v. Steven Marshall, et al., United States District Court,
    Middle District of Alabama Northern Division
2022-Present  *Expert Witness,* Report and Testimony
Jane Doe, et al., v. Greg Abbott, et al., District Court of Travis County, Texas
    353rd Judicial District, Case No. D-1-GN-22-000977
2021-2022  *Expert Witness,* Reports, Deposition, and Testimony
Dylan Brandt, et al., v. Leslie Rutledge, et al., United States District Court,
    Eastern District of Arkansas, Case No.: 5:21-CV-00450-JM-1
2021  *Consultant*
Proctor & Gamble, Cincinnati, OH
2019  *Consultant*
Sanofi Genzyme, Cambridge, MA
2018-2023  *Consultant*
Center for Conflict Resolution in Healthcare, Memphis, TN
2017-2020  *Consultant*
Amicus Therapeutics, Cranbury, NJ
2017  *Expert Witness,* Report
Robert J. Klickovich, MD, PLLC v. Tristate Arthritis & Rheumatology, PSC, *et al.,*
    Commonwealth of Kentucky, Boone Circuit Court, Division III, Civil Action No.
    16-CI-01690
2017  *Consultant*
Sarepta Therapeutics, Cambridge, MA
2014  *Consultant*
Genzyme, A Sanofi Company, Cambridge, MA

**Editorial Experience**
Editorial Board
2020-Present  *Pediatrics,* Associate Editor for Ethics Rounds and Member of the Executive
    Editorial Board
2015-2020  *Journal of Clinical Ethics*
2009-2020  *Journal of Medical Humanities*

Guest Academic Editor
2017  *PLOS|ONE*

Ad Hoc Reviewer:  *Academic Medicine, Academic Pediatrics, AJOB Primary Research,
American Journal of Bioethics, American Journal of Law & Medicine, American Journal of
Medical Genetics, American Journal of Transplantation, Archives of Disease in Childhood,*

A-3

*BMC Medical Ethics, BMJ Open, Canadian Journal of Bioethics, CHEST, Clinical Transplantation, European Journal of Human Genetics, European Journal of Pediatrics, Frontiers in Genetics, Hospital Medicine, International Journal of Health Policy and Management, International Journal of Nursing Studies, Journal of Adolescent and Young Adult Oncology, Journal of Clinical Ethics, Journal of Empirical Research on Human Research Ethics, Journal of General Internal Medicine, Journal of Healthcare Leadership, Journal of Hospital Medicine, Journal of the Kennedy Institute of Ethics, Journal of Law, Medicine & Ethics, Journal of Medical Ethics, Journal of Medical Humanities, Journal of Medicine and Life, Journal of Palliative Care, Journal of Pediatrics, Journal of Pediatric Surgery, Mayo Clinic Proceedings, Medicine, Healthcare and Philosophy, Molecular Diagnosis & Therapy, New England Journal of Medicine, Patient Preference and Adherence, Pediatrics, Pediatrics in Review, Personalized Medicine, PLOS|ONE, Risk Management and Healthcare Policy, Saudi Medical Journal, SSM - Qualitative Research in Health,* and *Theoretical Medicine and Bioethics*

## SCHOLASTIC AND PROFESSIONAL HONORS

| | |
|---|---|
| 2024 | *Member*, Sigma Xi: The Scientific Research Honor Society, Research Triangle Park, NC |
| 2023 | *Digital Health Award,* Bronze Medal in the Digital Health Media/Publications category for *Pediatric Collections: Ethics Rounds: A Casebook in Pediatric Bioethics Part II*, Health Information Resource Center, Libertyville, IL |
| 2021 | *Hidden Gem Award,* Cincinnati Children's Hospital Medical Center, Cincinnati, OH |
| 2019-2023 | *Presidential Citation,* American Society for Bioethics and Humanities, Chicago, IL |
| 2016 | *Laura Mirkinson, MD, FAAP Lecturer,* Section on Hospital Medicine, American Academy of Pediatrics, Elk Grove Village, IL |
| 2016, 2018 | *Certificate of Excellence*, American Society for Bioethics and Humanities, Glenview, IL |
| 2013, 2016 | *Senior Resident Division Teaching Award,* Cincinnati Children's Hospital Medical Center, Cincinnati, OH |
| 2012 | *Role Model*, Quality Review Committee, Primary Children's Medical Center, Salt Lake City, UT |
| 2011 | *Member*, Society for Pediatric Research, The Woodlands, TX |
| 2011 | *Presidential Citation*, American Society for Bioethics and Humanities, Glenview, IL |
| 2009 | *Role Model*, Quality Review Committee, Primary Children's Medical Center, Salt Lake City, UT |
| 2008 | *Nominee,* Physician of the Year, Primary Children's Medical Center, Salt Lake City, UT |
| 2005-2006 | *Fellow,* Medical Scholars Program, University of Utah School of Medicine, Salt Lake City, UT |
| 1995-1997 | *Doctoral Scholar*, Crossroads, A Program of Evangelicals for Social Action, Philadelphia PA |
| 1989-1992 | *Fellow*, The Pew Program in Medicine, Arts, and the Social Sciences, University of Chicago, Chicago, IL |

## ADMINISTRATIVE EXPERIENCE
### Administrative Duties

| | |
|---|---|
| 2023-2024 | *Chair,* Literature Selection Technical Review Committee, National Library of Medicine, Bethesda, MD |
| 2019-Present | *Chair,* Oversight Committee, Cincinnati Fetal Center, Cincinnati, OH |
| 2014-Present | *Chair*, Ethics Committee, Cincinnati Children's Hospital Medical Center, Cincinnati, OH |
| 2012-Present | *Director*, Ethics Center, Cincinnati Children's Hospital Medical Center, Cincinnati, OH |
| 2012-Present | *Chair,* Ethics Consultation Subcommittee, Cincinnati Children's Hospital Medical Center, Cincinnati, OH |
| 2010 | *Co-Chair,* Ethics Subcommittee, Work Group for Emergency Mass Critical Care in Pediatrics, Centers for Disease Control and Prevention, Atlanta, GA |
| 2009 | *Chair*, Ethics Working Group, H1N1 and Winter Surge, Primary Children's Medical Center, Salt Lake City, UT |
| 2005-2012 | *Chair*, Ethics Committee, Primary Children's Medical Center, Salt Lake City, UT |
| 2005-2012 | *Chair*, Ethics Consultation Subcommittee, Primary Children's Medical Center, Salt Lake City, UT |
| 2003-4 | *Chair*, Clinical Pertinence Committee, Primary Children's Medical Center, Salt Lake City, UT |

### Professional & Scientific Committees
Committees

| | |
|---|---|
| 2024-Present | *Member,* Program Committee, American Society for Bioethics and Humanities, Schaumburg, IL |
| 2023-Present | *Member,* Expert Committee, Humanitarian Access Program, Alnylam Pharmaceuticals, Cambridge, MA |
| 2021 | *Member*, EMCO Capacity Collaboration, Ohio Hospital Association, Columbus, OH |
| 2020-2021 | *Member*, Allocation of Scarce Resources Work Group, Ohio Hospital Association, Columbus, OH |
| 2020-2024 | *Member,* Literature Selection Technical Review Committee, National Library of Medicine, Bethesda, MD |
| 2020 | *Member*, Crisis Standards of Care Workgroup, The Health Collaborative, Cincinnati, OH |
| 2019-2023 | *Member,* Healthcare Ethics Consultant Certification Commission, Oak Park, IL |
| 2019 | *Member,* Expert Panel, Pediatric Oncology End-of-Life Care Quality Markers, Institute for Cancer Outcomes & Survivorship, University of Alabama at Birmingham, Birmingham, AL |
| 2018 | *Member,* Resource Planning and Allocation Team Implementation Task Force, Ohio Department of Health, Columbus, OH |
| 2012-2022 | *Member*, Gaucher Initiative Medical Expert Committee, Project HOPE, Millwood, VA |
| 2009-2014 | *Member,* Clinical Ethics Consultation Affairs Committee, American Society for Bioethics and Humanities, Glenview, IL |
| 2005-2011 | *Member,* Committee on Bioethics, American Academy of Pediatrics, Oak Park, IL |

Data Safety and Monitoring Boards

| | |
|---|---|
| 2019-Present | *Member,* Data and Safety Monitoring Board, Sickle Cell Domestic Trials, National Heart, Lung, and Blood Institute, Bethesda, MD |
| 2018-2019 | *Member,* Standing Safety Committee for P-188-NF (Carmeseal-MD$^{TM}$) in Duchenne Muscular Dystrophy, Phrixus Pharmaceuticals, Inc., Ann Arbor, MI |

A-5

| | |
|---|---|
| 2017-Present | *Member*, Observational Study Monitoring Board, Sickle Cell Disease Observational Monitoring Board, National Heart, Lung, and Blood Institute, Bethesda, MD |
| 2016-2018 | *Member,* Observational Study Monitoring Board, Long Term Effects of Hydroxyurea in Children with Sickle Cell Anemia, National Heart, Lung, and Blood Institute, Bethesda, MD |

Reviewer

| | |
|---|---|
| 2020-2024 | *Abstract Reviewer*, American Society for Bioethics and Humanities Annual Meeting |
| 2020 | *Grant Reviewer,* The Croatian Science Foundation, Hvatska zaklada za znanost (HRZZ) |
| 2018 | *Book Proposal Reviewer*, Elsevier |
| 2018-2019 | *Category Leader,* Religion, Culture, and Social Sciences, American Society for Bioethics and Humanities Annual Meeting |
| 2017 | *Timekeeper,* American Society for Bioethics and Humanities Annual Meeting |
| 2017-Present | *Abstract Reviewer,* Pediatric Academic Societies Annual Meeting |
| 2016-2021 | *Workshop Reviewer,* Pediatric Academic Societies Annual Meeting |
| 2016 | *Grant Reviewer*, Innovation Research Incentives Scheme, The Netherlands Organisation for Health Research and Development |
| 2016-2017 | *Abstract Reviewer*, American Society for Bioethics and Humanities Annual Meeting |
| 2014, 2016 | *External Peer Reviewer*, PSI Foundation, Toronto, Ontario, Canada |
| 2014 | *Member,* Scientific Committee, International Conference on Clinical Ethics and Consultation |
| 2013 | *Abstract Reviewer*, American Society for Bioethics and Humanities Annual Meeting |
| 2013 | *Reviewer*, Open Research Area Plus, Agence Nationale de la Research, Deutsche Forschungsgemeinschaft, Economic and Social Research Council, National Science Foundation, and Organization for Scientific Research |
| 2011-2012 | *Abstract Reviewer,* Pediatric Academic Societies Annual Meeting |
| 2011-2013 | *Workshop Reviewer,* Pediatric Academic Societies Annual Meeting |
| 2011-2014 | *Abstract Reviewer*, Pediatric Hospital Medicine Annual Meeting |
| 2011-2012 | *Religious Studies Subcommittee Leader,* Program Committee, American Society for Bioethics and Humanities Annual Meeting |
| 2010 | *Abstract Reviewer*, American Society for Bioethics and Humanities Annual Meeting |

Other

| | |
|---|---|
| 2023 | *Member,* Student Paper Committee, American Society for Bioethics and Humanities |
| 2021 | *Timekeeper,* American Society for Bioethics and Humanities Annual Meeting |
| 2021 | *Mentor,* Early Career Advisor Professional Development Track, American Society for Bioethics and Humanities. |
| 2021 | *Mentor,* Early Career Advisor Paper or Project Track, American Society for Bioethics and Humanities. |
| 2109 | *Mentor*, Early Career Advising Program, American Society for Bioethics and Humanities |
| 2018 | *Passing Point Determination*, Healthcare Ethics Consultant-Certified Examination, Healthcare Ethics Consultant Certification Commission |
| 2018 | *Member*, Examination Committee, Healthcare Ethics Consultant-Certified Examination, Healthcare Ethics Consultant Certification Commission |

2018         *Item Writer*, Healthcare Ethics Consultant-Certified Examination, Healthcare Ethics Consultant Certification Commission

## UNIVERSITY COMMUNITY ACTIVITIES
**Cincinnati Children's Hospital Medical Center**
2025-Present   *Member,* Data Strategy Leadership Committee
2023-Present   *Member,* Artificial Intelligence Governance Council
2023-Present   *Member,* Executive Committee, Discover Together Biobank
2020-Present   *Member,* Faculty Diversity and Inclusion Steering Committee
2020-2022      *Member,* Medical Management of COVID-19 Committee
2020-2021      *Member,* Caregiver Refusal Team
2020-2021      *Member,* COVID-19 Vaccine Allocation Committee
2020            *Member,* Personal Protective Equipment Subcommittee of the COVID-19 Steering. Committee
2018-2019      *Member,* Planning Committee, Center for Clinical & Translational Science & Training Research Ethics Conference
2017-Present   *Member,* Donor Selection Committee
2017-2020      *Member,* Employee Emergency Fund Review Committee
2017            *Member,* Root Cause Analysis Team
2016-2017      *Member,* Planning Committee, Center for Clinical & Translational Science & Training Research Ethics Conference
2015-2019      *Member,* Destination Excellence Medical Advisory Committee
2015-Present   *Member,* Disorders of Sexual Development Case Review Committee
2015-2019      *Member,* Destination Excellence Case Review Committee
2014-2018      *Member,* Genomics Review Group, Institutional Review Board
2014-2017      *Member,* Center for Pediatric Genomics Leadership Committee
2013-2017      *Member,* Genetic Testing Subcommittee, Health Network
2013-2016      *Member,* Schwartz Center Rounds Planning Committee
2013-2014      *Member,* Genomics Ad Hoc Subcommittee, Board of Directors
2012-Present   *Member,* Cincinnati Fetal Center Oversight Committee
2012-Present   *Member,* Ethics Committee
2012-Present   *Member,* G-23
2012-2016      *Member,* Integrated Solid Organ Transplant Steering Committee

**University of Utah**
2009-2012      *Member,* Consolidated Hearing Committee

**University of Utah School of Medicine**
2010-2012      *Member,* Medical Ethics, Humanities, and Cultural Competence Thread Committee
2008-2010      *Member,* Fourth Year Curriculum Committee

**University of Utah Department of Pediatrics**
2010-2011      *Member,* Planning Committee, 25th Annual Biological Basis of Children's Health Conference, "Sex, Gender, and Sexuality"
2009-2012      *Member,* Medical Executive Committee
2005-2012      *Member,* Retention, Promotion, and Tenure Committee
2004-2012      *Interviewer,* Residency Program
2003-2012      *Member,* Education Committee

**Intermountain Healthcare**
2009-2012      *Member,* System-Wide Bioethics Resource Service
2009-2012      *Member,* Pediatric Guidance Council

A-7

**Primary Children's Medical Center**
2012-2012     *Member,* Shared Accountability Organization Steering Committee
2009          *Member,* H1N1 and Winter Surge Executive Planning Team
2005-2010     *Member,* Continuing Medical Education Committee
2005-2010     *Member,* Grand Rounds Planning Committee
2003-2012     *Member,* Ethics Committee

## ACTIVE MEMBERSHIPS IN PROFESSIONAL SOCIETIES
2012-Present   Association of Bioethics Program Directors
2011-Present   Society for Pediatric Research
2000-Present   American Academy of Pediatrics
1999-Present   American Society of Bioethics and Humanities

## FUNDING
**Past Grants**
2015-2019     "Better Outcomes for Children: Promoting Excellence in Healthcare Genomics to
              Inform Policy."
              Percent Effort: 9%
              National Human Genome Research Institute
              Grant Number: 1U01 HG008666-01
              Role: Investigator

2015-2016     "Ethics of Informed Consent for Youth in Foster Care"
Direct Costs: $10,000
Ethics Grant, Center for Clinical and Translational Science and Training
University of Cincinnati Academic Health Center
Role: Co-Investigator

2014-2015     "Extreme Personal Exposure Biomarker Levels: Engaging Community Physicians
              and Ethicists for Guidance"
              Direct Costs: $11,640
              Center for Environmental Genetics
              University of Cincinnati College of Medicine
              Role: Investigator

2014-2015     "Child, Adolescent, and Parent Opinions on Disclosure Policies for Incidental
              Findings in Clinical Whole Exome Sequencing"
              Direct Costs: $4,434
              Ethics Grant, Center for Clinical and Translational Science and Training,
              University of Cincinnati Academic Health Center
              Role: Principal Investigator

2013-2014     "Better Outcomes for Children: GWAS & PheWAS in eMERGEII
Percent Effort: 5%
              National Human Genome Research Institute
              Grant Number: 3U01HG006828-0251
              Role: Investigator

A-8

| 2004-2005 | "Potential Patients' Knowledge, Attitudes, and Beliefs Regarding Participating in Medical Education:  Can They be Interpreted in Terms of Presumed Consent?" Direct Costs: $8,000 Interdisciplinary Research in Applied Ethics and Human Values, University Research Committee, University of Utah Role: <u>Principal Investigator</u> |

**TEACHING RESPONSIBILITIES/ASSIGNMENTS**

**Course and Curriculum Development**

| 2003-2012 | Medical Ethics, Internal Medicine 7560, University of Utah School of Medicine, Taught 1 time per year, Taken by medical students, Enrollment 100 |

**Course Lectures**

| 2018, 2021-Present | Introduction to Biotechnology, "Ethics and Biotechnology" and "Clinical Ethics," BIOL 3027, University of Cincinnati, Taught 1 time per year, Taken by undergraduate students, Enrollment 25. |
| 2018-Present | Biomedical Ethics, "Conscientious Objection in Healthcare" and "Ethical Issues in the Care of Transgender Adolescents," MEDS 4035 & MEDS 4036, University of Cincinnati College of Medicine, Taught 1 time per year, Taken by senior undergraduate students, Enrollment 52. |
| 2016 | Foundations of Healthcare Ethics and Law, "Clinical Ethics," HESA 390, Xavier University. |
| 2014-2020 | Physicians and Society, "Transfusion and the Jehovah's Witness Faith," "Obesity Management: Ethics, Policy, and Physician Implicit Bias," "Embryos and Ethics: The Ethics of Designer Babies," "Ethics and Genetic Testing," and "Ethics and Direct to Consumer Genetic Testing," 26950112 and 26950116, University of Cincinnati School of Medicine, Taken by first and second year medical students, Enrollment 100. |
| 2014-Present | Ethical Issues in Health Care, "Ethical Issues in Managing Drug Shortages: The Macro, Meso, and Micro Levels," HESA 583, College of Social Sciences, Health, and Education Health Services Administration, Xavier University, Taken by health services administration students, Enrollment 25. |
| 2009 | Physical Diagnosis II, Internal Medicine 7160, University of Utah School of Medicine, Taught 1 time per year, Taken by medical students, Enrollment 100 |
| 2003-2012 | Medical Ethics, Internal Medicine 7560, University of Utah School of Medicine, Taught 1 time per year, Taken by fourth year medical students, Enrollment 100 |

**Small Group Teaching**

| 2024 | Clinical Ethics Consortium Tutorial B, BETH 731B, Harvard Medical School, Taught 1 time, Taken by Master of Science in Bioethics students. |
| 2018-Present | Ethics in Research, GNTD 7003-001, University of Cincinnati School of Medicine, Taught 1 time per year, Taken by fellows, MS, and PhD students, Enrollment 110. |
| 2007 | Physical Diagnosis I, Internal Medicine 7150, University of Utah School of Medicine, Taught 1 time per year, Taken by medical students, Enrollment 100 |
| 2003-2012 | Medical Ethics, Internal Medicine 7560, University of Utah School of Medicine, Taught 1 time per year, Taken by fourth medical students, Enrollment 100 |
| 2003 | Pediatric Organ System, Pediatrics 7020, University of Utah School of Medicine, Taught 1 time per year, Taken by medical students, Enrollment 100 |

A-9

**Graduate Student Committees**

2018-2022    *Chair,* Scholarship Oversight Committee, William Sveen, Pediatric Critical Care Fellowship, Cincinnati Children's Hospital Medical Center, Cincinnati, OH

2018-2020    *Member,* Scholarship Oversight Committee, Anne Heuerman, Genetic Counseling, University of Cincinnati, Cincinnati, OH

2017-2019    *Chair,* Scholarship Oversight Committee, Bryana Rivers, Genetic Counseling, University of Cincinnati, Cincinnati, OH

2013-2015    *Mentor,* Sophia Hufnagel, Combined Pediatrics/Genetics Residency, Cincinnati Children's Hospital Medical Center, Cincinnati, OH

2013-2015    *Co-Chair,* Scholarship Oversight Committee, Andrea Murad, Genetic Counseling, University of Cincinnati, Cincinnati, OH

2013-2014    *Member,* Scholarship Oversight Committee, Grace Tran, Genetic Counseling, University of Cincinnati, Cincinnati, OH

2011-2012    *Chair,* Scholarship Oversight Committee, Kevin E. Nelson, MD, PhD, Pediatric Inpatient Medicine Fellowship, University of Utah, Salt Lake City, UT

**Continuing Education Lectures**

2008    Choosing Healthplans All Together (CHAT) Exercise Facilitator, 18th Annual Intermountain Medical Ethics Conference, "Setting Priorities for Healthcare in Utah: What Choices are We Ready to Make?," Salt Lake City, Utah, October 3.

2007    *Speaker,* Infant Medical Surgical Unit, Primary Children's Medical Center, "Withholding and Withdrawing Artificial Nutrition and Hydration: Can It Be Consistent With Care?," Salt Lake City, Utah, September 6.

2007    *Faculty Scholar-in Residence,* Summer Seminar, "The Role of Religion in Bioethics," Utah Valley State College, Orem, Utah, May 1.

2006    *Workshop Leader,* Faculty Education Retreat, "Publications and Publishing in Medical Education," University of Utah School of Medicine, Salt Lake City, Utah, September 15.

2006    *Breakout Session,* 16th Annual Intermountain Medical Ethics Conference, "Donation after Cardiac Death: Evolution of a Policy," Salt Lake City, Utah, March 28.

**Other Educational Activities**

2008    *Instructor,* Contemporary Ethical Issues in Medicine and Medical Research, Osher Lifelong Learning Institute, University of Utah, "Religion and Bioethics: Religiously Based Demands for and Refusals of Treatment," Salt Lake City, Utah, February 7.

2007    *Speaker,* Biology Seminar, Utah Valley State College, "Is He Dead?: Criteria of the Determination of Death and Their Implications for Withdrawing Treatment and Recovering Organs for Transplant," Orem, Utah, September 21.

**PEER-REVIEWED JOURNAL ARTICLES**

1. <u>Armand H. Matheny Antommaria</u>, Matthew Kelleher, and Rachel J. Peterson. (In Press) "Quality of Evidence and Strength of Recommendations in American Academy of Pediatrics' Guidelines." *Pediatrics.*

2. <u>Armand H. Matheny Antommaria</u>. (2024) "Decision Making for Adolescents with Gender Dysphoria." *Perspectives in Biology and Medicine.* 67: 244-60. PMID: 38828602.

3. Erica K. Salter, D. Micah Hester, Lou Vinarcsik, <u>Armand H. Matheny Antommaria</u>, Johan Bester, Jeffrey Blustein, Ellen Wright Clayton, Douglas S. Diekema, Ana S. Iltis, Loretta M. Kopelman, Jay R. Malone, Mark R. Mercurio, Mark C. Navin, Erin Talati Paquette, Thaddeus Mason Pope, Rosamond Rhodes, and Lainie F. Ross, (2023) "Pediatric Decision Making: Consensus Recommendations," *Pediatrics.* 152: e2023061832. PMID: 37555276.

4. William N. Sveen, <u>Armand H. Matheny Antommaria</u>, Stephen Gilene, and Erika L. Stalets. (2023) "Adverse Events During Apnea Testing for the Determination of Death by Neurologic Criteria: A Single Center, Retrospective Pediatric Cohort." *Pediatric Critical Care Medicine.* 24: 399-405. PMID: 36815829.

A-10

5. Erica K. Salter, Jay R. Malone, Amanda Berg, Annie B. Friedrich, Alexandra Hucker, Hillary King, and Armand H. Matheny Antommaria. (2023) "Triage Policies at U.S. Hospitals with Pediatric Intensive Care Units." *AJOB Empirical Bioethics*. 14: 84-90. PMID: 36576201.

6. Armand H. Matheny Antommaria, Elizabeth Lanphier, Anne Housholder, and Michelle McGowan. (2023). "A Mixed Methods Analysis of Requests for Religious Exemptions to a COVID-19 Vaccine Requirement." *AJOB Empirical Bioethics*. 14: 15-22. PMID: 36161802.

7. Anne C Heuerman, Danielle Bessett, Armand H. Matheny Antommaria, Leandra. K. Tolusso, Nicki Smith, Alison H. Norris and Michelle L. McGowan (2022). "Experiences of Reproductive Genetic Counselors with Abortion Regulations in Ohio." *Journal of Genetic Counseling*. 31: 641-652.  PMID: 34755409.

8. Armand H. Matheny Antommaria and Ndidi I. Unaka. (2021) "Counterpoint: Prioritizing Health Care Workers for Scarce Critical Care Resources is Impractical and Unjust. *Journal of Hospital Medicine*. 16: 182-3. PMID 33617445.

9. Gregory A. Grabowski, Armand H. Matheny Antommaria, Edwin H. Kolodny, and Pramod K. Mistry. (2021) "Gaucher Disease: Basic and Translational Science Needs for More Complete Therapy and Management." *Molecular Genetics and Metabolism*. 132: 59-75. PMID: 33419694.

10. Armand H. Matheny Antommaria, Laura Monhollen, and Joshua K. Schaffzin. (2021) "An Ethical Analysis of Hospital Visitor Restrictions and Masking Requirements During the COVID-19." *Journal of Clinical Ethics*. 32(1): 35-44. PMID 33416516.

11. Armand H. Matheny Antommaria (2020) "The Pediatric Hospital Medicine Core Competencies: 4.05 Ethics." *Journal of Hospital Medicine*. 15(S1): 120-121.

12. Armand H. Matheny Antommaria, Tyler S. Gibb, Amy L. McGuire, Paul Root Wolpe, Matthew K. Wynia, Megan K. Applewhite, Arthur Caplan, Douglas S. Diekema, D. Micah Hester, Lisa Soleymani Lehmann, Renee McLeod-Sordjan, Tamar Schiff, Holly K. Tabor, Sarah E. Wieten, and Jason T. Eberl for a Task Force of the Association of Bioethics Program Directors (2020) "Ventilator Triage Policies During the COVID-19 Pandemic at U.S. Hospitals Associated With Members of the Association of Bioethics Program Directors." *Annals of Internal Medicine*. 173(3): 188-194. PMID: 32330224.

13. Armand H. Matheny Antommaria (2020) "Conflicting Duties and Reciprocal Obligations During a Pandemic." *Journal of Hospital Medicine*. 5:284-286. PMID: 32379030.

14. Mary V. Greiner, Sarah J. Beal, and Armand H. Matheny Antommaria (2020) "Perspectives on Informed Consent Practices for Minimal-Risk Research Involving Foster Youth." *Pediatrics*. 45:e20192845. PMID: 32156772.

15. Jennifer deSante-Bertkau, Michelle McGowan, and Armand H. Matheny Antommaria (2018) "Systematic Review of Typologies Used to Characterize Clinical Ethics Consultations." *Journal of Clinical Ethics*. 29:291-304. PMID: 30605439.

16. Andrew J. Redmann, Melissa Schopper, Armand H. Matheny Antommaria, Judith Ragsdale, Alessandro de Alarcon, Michael J. Jutter, Catherine K. Hart, and Charles M. Myer. (2018) "To Transfuse or Not to Transfuse? Jehovah's Witnesses and PostOperative Hemorrhage in Pediatric Otolaryngology." *International Journal of Pediatric Otorhinolaryngology*. 115:188-192. PMID: 30368384.

17. Armand H. Matheny Antommaria, Kyle B. Brothers, John A. Myers, Yana B Feygin, Sharon A. Aufox, Murray H. Brilliant, Pat Conway, Stephanie M. Fullerton, Nanibaa' A. Garrison, Carol R. Horowitz, Gail P. Jarvik, Rongling Li, Evette J. Ludman, Catherine A. McCarty, Jennifer B. McCormick, Nathaniel D. Mercaldo, Melanie F. Myers, Saskia C. Sanderson, Martha J. Shrubsole, Jonathan S. Schildcrout, Janet L. Williams, Maureen E. Smith, Ellen Wright Clayton, Ingrid A. Holm. (2018) "Parents' Attitudes toward Consent and Data Sharing in Biobanks: A Multi-Site Experimental Survey." *AJOB Empirical Research*. 21:1-15. PMID: 30240342.

18. Armand H. Matheny Antommaria and Cynthia A. Prows. (2018) "Content Analysis of Requests for Religious Exemptions from a Mandatory Influenza Vaccination Program for Healthcare Personnel" *Journal of Medical Ethics.* 44: 389-391. PMID: 29463693.

19. Armand H. Matheny Antommaria (2017) "May Medical Centers Give Nonresident Patients Priority in Scheduling Outpatient Follow-up Appointments?" *Journal of Clinical Ethics.* 28: 217-221. PMID: 28930708.

20. Andrea M. Murad, Melanie F. Myers, Susan D. Thompson, Rachel Fisher, and Armand H. Matheny Antommaria (2017) "A Qualitative Study of Adolescents' Understanding of Biobanks and Their Attitudes Toward Participation, Re-contact, and Data Sharing." *American Journal of Medical Genetics: Part A.* 173: 930-937. PMID: 28328120.

21. Saskia Sanderson, Kyle Borthers, Nathaniel Mercaldo, Ellen Wright Clayton, Armand Antommaria, Sharon Aufox, Murray Brillant, Diego Campos, David Carrell, John Connolly, Pat Conway, Stephanie Fullerton, Nanibaa Garrison, Carol Horowitz, Gail Jarvik, David Kaufman, Terrie Kitchner, Rongling Li, Evette Ludman, Cahterine McCarty, Jennifer McCormick, Valerie McManus, Melanie Myers, Aaron Scrol, Janet Williams, Martha Shrubsole, Jonathan Schildcrout, Maureen Smith, and Ingrid Holm (2017) "Public Attitudes Towards Consent and Data Sharing in Biobank Research: A Large Multisite Experimental Survey in the US." *The American Journal of Human Genetics*. 100: 414-427. PMID: 28190457.

22. Maureen E. Smith, Saskia C Sanderson, Kyle B Brothers, Melanie F Myers, Jennifer McCormick, Sharon A Aufox, Martha J Shrubsole, Nanibaa' A Garrison, Nathaniel D Mercaldo, Jonathan S Schildcrout, Ellen Wright Clayton, Armand H. Matheny Antommaria, Melissa Basford, Murray Brilliant, John J Connolly, Stephanie M Fullerton, Carol R Horowitz, Gail P Jarvik, Dave Kaufman, Terrie Kitchner, Rongling Li, Evette J Ludman, Catherine McCarty, Valerie McManus, Sarah C Stallings, Janet L Williams, and Ingrid A Holm (2016) "Conducting a Large, Multi-Site Survey about Patients' Views on Broad Consent: Challenges and Solutions." *BMC Medical Research Methodology.* 16: 162. PMID: 27881091.

23. Angela Lorts, Thomas D. Ryan, Armand H. Matheny Antommaria, Michael Lake, and John Bucuvalas (2016) "Obtaining Consensus Regarding International Transplantation Continues to be Difficult for Pediatric Centers in the United States." *Pediatric Transplant.* 20: 774-777. PMID: 27477950.

24. Sophia B. Hufnagel, Lisa J. Martin, Amy Cassedy, Robert J. Hopkin, and Armand H. Matheny Antommaria (2016) "Adolescents' Preferences Regarding Disclosure of Incidental Findings in Genomic Sequencing That Are Not Medically Actionable in Childhood." *American Journal of Medical Genetics Part A.* 170: 2083-2088. PMID: 27149544.

25. Nanibaa' A. Garrison, Nila A. Sathe, Armand H. Matheny Antommaria, Ingrid A. Holm, Saskia Sanderson, Maureen E. Smith, Melissa McPheeters, and Ellen Wright Clayton (2016) "A Systematic Literature Review of Individuals' Perspectives on Broad Consent and Data Sharing in the United States." *Genetics in Medicine.* 18: 663-71. PMID: 26583683.

26. Kyle B. Brothers, Ingrid A. Holm Janet E. Childerhose, Armand H. Matheny Antommaria, Barbara A. Bernhardt, Ellen Wright Clayton, Bruce D. Gelb, Steven Joffe, John A. Lynch, Jennifer B. McCormick, Laurence B. McCullough, D. William Parsons, Agnes S. Sundaresan, Wendy A. Wolf, Joon-Ho Yu, and Benjamin S. Wilfond (2016) "When Genomic Research Participants Grow Up: Contact and Consent at the Age of Majority." *The Journal of Pediatrics* 168: 226-31. PMID: 26477867.

27. Erin E. Bennett, Jill Sweney, Cecile Aguayo, Criag Myrick, Armand H. Matheny Antommaria, and Susan L. Bratton (2015) "Pediatric Organ Donation Potential at a Children's Hospital." *Pediatric Critical Care Medicine.* 16: 814-820. PMID: 26237656.

28. Anita J. Tarzian, Lucia D. Wocial, and the ASBH Clinical Ethics Consultation Affairs Committee (2015) "A Code of Ethics for Health Care Ethics Consultants: Journey to the Present and Implications for the Field." *American Journal of Bioethics.* 15: 38-51. PMID: 25970392.

29. Armand H. Matheny Antommaria, Christopher A. Collura, Ryan M. Antiel, and John D. Lantos (2015) "Two Infants, Same Prognosis, Different Parental Preferences." *Pediatrics*, 135: 918-923. PMID: 25847802.

30. Stefanie Benoit, Armand H. Matheny Antommaria, Norbert Weidner, and Angela Lorts (2015) "Difficult Decision: What should we do when a VAD supported child experiences a severe stroke?" *Pediatric Transplantation* 19: 139-43. PMID: 25557132.

31. Kyle B. Brothers, John A. Lynch, Sharon A. Aufox, John J. Connolly, Bruce D. Gelb, Ingrid A. Holm, Saskia C. Sanderson, Jennifer B. McCormick, Janet L. Williams, Wendy A. Wolf, Armand H. Matheny Antommaria, and Ellen W. Clayton (2014) "Practical Guidance on Informed Consent for Pediatric Participants in a Biorepository." *Mayo Clinic Proceedings,* 89: 1471-80. PMID: 25264176.

32. Sophia M. Bous Hufnagel and Armand H. Matheny Antommaria (2014) "Laboratory Policies on Reporting Secondary Findings in Clinical Whole Exome Sequencing: Initial Uptake of the ACMG's Recommendations." *American Journal of Medical Genetics Part A*, 164: 1328-31. PMID: 24458369.

33. Wylie Burke, Armand H. Matheny Antommaria, Robin Bennett, Jeffrey Botkin, Ellen Wright Clayton, Gail E. Henderson, Ingrid A. Holm, Gail P. Jarvik, Muin J. Khoury, Bartha Maria Knoppers, Nancy A. Press, Lainie Friedman Ross, Mark A. Rothstein, Howard Saal, Wendy R. Uhlmann, Benjamin Wilfond, Susan M. Wold, and Ron Zimmern (2013) "Recommendations for Returning Genomic Incidental Findings? We Need to Talk!" *Genetics in Medicine*, 15: 854-859. PMID: 23907645.

34. Armand H. Matheny Antommaria (2013) "An Ethical Analysis of Mandatory Influenza Vaccination of Health Care Personnel: Implementing Fairly and Balancing Benefits and Burdens," *American Journal of Bioethics*, 13: 30-37. PMID: 23952830.

35. Joseph A. Carrese and the Members of the American Society for Bioethics and Humanities Clinical Ethics Consultation Affairs Standing Committee (2012) "HCEC Pearls and Pitfalls: Suggested Do's and Don't's for Healthcare Ethics Consultants," *Journal of Clinical Ethics*, 23: 234-240. PMID: 23256404.

36. Christopher G Maloney, Armand H Matheny Antommaria, James F Bale Jr., Jian Ying, Tom Greene and Rajendu Srivastiva (2012) "Factors Associated with Intern Noncompliance with the 2003 Accreditation Council for Graduate Medical Education's 30-hour Duty Period Requirement," *BMC Medical Education* 12: 33. PMID: 22621439.

37. Armand H. Matheny Antommaria, Jill Sweney, and W. Bradley Poss (2010) "Critical Appraisal of: Triaging Pediatric Critical Care Resources During a Pandemic: Ethical and Medical Considerations," *Pediatric Critical Care Medicine,* 11:396-400. PMID: 20453611.

38. Armand H. Matheny Antommaria, Karen Trotochaud, Kathy Kinlaw, Paul N. Hopkins, and Joel Frader (2009) "Policies on Donation After Cardiac Death at Children's Hospitals: A Mixed-Methods Analysis of Variation," *Journal of the American Medical Association,* 301: 1902-8. PMID: 19436017.

39. Kristine M. Pleacher, Elizabeth S. Roach, Willem Van der Werf, Armand H. Matheny Antommaria, and Susan L. Bratton (2009) "Impact of a Pediatric Donation after Cardiac Death Program," *Pediatric Critical Care Medicine,* 10: 166-70. PMID: 19188881.

40. Flory L. Nkoy, Sarah Petersen, Armand H Matheny Antommaria, and Christopher G. Maloney (2008) "Validation of an Electronic System for Recording Medical Student Patient Encounters," *AMIA [American Medical Informatics Association] Annual Symposium Proceedings*, 6: 510-14. PMID: 18999155. Nominated for the Distinguished Paper Award

41. Armand H. Matheny Antommaria, Sean D. Firth, and Christopher G. Maloney (2007) "The Evaluation of an Innovative Pediatric Clerkship Structure Using Multiple Outcome Variables including Career Choice" *Journal of Hospital Medicine*, 2: 401-408. PMID: 18081170.

42. Armand H. Matheny Antommaria (2006) "'Who Should Survive?': One of the Choices on Our Conscience:' Mental Retardation and the History of Contemporary Bioethics." *Kennedy Institute of Ethics Journal*, 16: 205-224. PMID: 17091558.

43. <u>Armand H. Matheny Antommaria</u> (2004) "Do as I Say Not as I Do: Why Bioethicists Should Seek Informed Consent for Some Case Studies." *Hastings Center Report,* 34 (3): 28-34. PMID: 15281724.

44. <u>Armand H. Matheny Antommaria</u> (2004) "A Gower Maneuver:  The American Society for Bioethics and Humanities' Resolution of the 'Taking Stands' Debate." *American Journal of Bioethics,* 4 (Winter): W24-27. PMID: 15035934.

## NON PEER-REVIEWED JOURNAL ARTICLES

1. Katherine Wade and <u>Armand H. Matheny Antommaria</u> (2016) "Inducing HIV Remission in Neonates: Children's Rights and Research Ethics." *Journal of Medicine and Biology*, 58(3): 348-54.  PMID 27157354.

2. <u>Armand H. Matheny Antommaria</u> (2014) "Response to Open Peer Commentaries on 'An Ethical Analysis of Mandatory Influenza." *American Journal of Bioethics,* 14(7): W1-4. PMID: 24978422.

3. <u>Armand H. Matheny Antommaria</u> and Brent D. Kaziny (2012) "Ethical Issues in Pediatric Emergency Medicine's Preparation for and Response to Disasters." *Virtual Mentor*, 14: 801-4. PMID: 23351860.

4. <u>Armand H. Matheny Antommaria,</u> Tia Powell, Jennifer E. Miller, and Michael D. Christian (2011) "Ethical Issues in Pediatric Emergency Mass Critical Care," *Pediatric Critical Care Medicine*, 12(6 Suppl): S163-8. PMID: 22067926.

5. <u>Armand H. Matheny Antommaria</u> and Emily A. Thorell (2011) "Non-Pharmaceutical Interventions to Limit Transmission of a Pandemic Virus: The Need for Complementary Programs to Address Children's Diverse Needs." *Journal of Clinical Ethics,* 22: 25-32. PMID: 21595352.

6. <u>Armand H. Matheny Antommaria</u> (2010) "Conscientious Objection in Clinical Practice: Notice, Informed Consent, Referral, and Emergency Treatment." *Ave Maria Law Review*, 9: 81-99.

7. <u>Armand H. Matheny Antommaria</u> (2008) "Defending Positions or Identifying Interests: The Uses of Ethical Argumentation in the Debate over Conscience in Clinical Practice," *Theoretical Medicine and Bioethics,* 29: 201-12. PMID: 18821078.

8. <u>Armand H. Matheny Antommaria</u> (2008) "How can I give her IV antibiotics at home when I have three other children to care for?: Using Dispute System Design to Address Patient-Provider Conflicts in Health Care." *Hamline Journal of Public Law & Policy*, 29: 273-86.

9. <u>Armand H. Matheny Antommaria</u> (2007) "Alternative Dispute Resolution and Pediatric Clinical Ethics Consultation: Why the Limits of Ethical Expertise and the Indeterminacy of the Best Interests Standard Favor Mediation." *Ohio State Journal on Dispute Resolution,* 23: 17-59.

10. <u>Armand H. Matheny Antommaria</u> (2006) "Jehovah's Witnesses, Roman Catholicism, and Calvinism: Religion and State Intervention in Parental, Medical Decision-Making," *Journal of Law and Family Studies,* 8: 293-316.

11. <u>Armand H. Matheny Antommaria</u> and James F. Bale, Jr. (2002) "Ethical Issues in Clinical Practice: Cases and Analyses," *Seminars in Pediatric Neurology* 9: 67-76. PMID: 11931129.

## REVIEW ARTICLES

<u>Armand H. Matheny Antommaria</u> (2010) "Conceptual and Ethical Issues in the Declaration of Death: Current Consensus and Controversies." *Pediatrics in Review* 31: 427-430. PMID: 20889737.

## BOOKS

1. <u>Armand  H.  Matheny  Antommaria</u>, ed. (2022) *Ethics  Rounds:  A  Casebook  in  Pediatric Bioethics Part II*. Itasca, IL: American Academy of Pediatrics.

A-14

2. Armand H. Matheny Antommaria (1998) *A Retrospective, Political and Ethical Analysis of State Intervention into Parental Healthcare Decisions for Infants with Disabilities*. Wynnewood, Pennsylvania: Evangelicals for Social Action.

**BOOK CHAPTERS**
1. Armand H. Matheny Antommaria (2018) "Against Medical Advice Discharges: Pediatric Considerations." In *Against-Medical-Advice Discharges from the Hospital: Optimizing Prevention and Management to Promote High-Quality, Patient-Centered Care.* David Alfandre. New York, Springer: 143-157.
2. Armand H. Matheny Antommaria (2016) "Conscientious Objection in Reproductive Medicine." In *The Oxford Handbook of Reproductive Ethics.* Leslie Francis. Oxford, Oxford University Press: 209-225.
3. Armand H. Matheny Antommaria (2011) "Patient Participation in Medical Education." In *Clinical Ethics in Pediatrics: A Case-based Approach.* Douglas Diekema, Mark Mercurio, and Mary Beth Adam. Cambridge, Cambridge University Press: 221-225.
4. Armand H. Matheny Antommaria (2011) "State Intervention in Parental Decision Making: *Gone Baby Gone*." In *The Picture of Health: Medical Ethics and the Movies.* Henri Colt, Silvia Quadrelli, and Lester Friedman. Oxford, Oxford University Press: 308-12.
5. Armand H. Matheny Antommaria (2009) "Managing Conflicts of Interest: A Perspective from a Pediatrician." In *Professionalism in Medicine: The Case-Based Guide for Medical Students*. John Spandorfer, Charles Pohl, Thomas Nasca and Susan Lee Rattner. Cambridge, Cambridge University Press: 376-7.
6. Armand H. Matheny Antommaria (2007) "Do-Not-Resuscitate Orders." In *Comprehensive Pediatric Hospital Medicine*. L. B. Zaoutis and V. W. Chiang. Philadelphia, Mosby Elsevier**:** 1200-4.

**OTHER**
**Policy Statements and Technical Reports**
1. American Academy of Pediatrics Committee on Bioethics. Armand H. Matheny Antommaria Lead Author. (2013) "Conflicts between Religious or Spiritual Beliefs and Pediatric Care: Informed Refusal, Exemptions, and Public Funding." *Pediatrics*. 132: 962-965. PMID: 24167167.
2. American Academy of Pediatrics Committee on Bioethics. Armand H. Matheny Antommaria Lead Author. (2013) "Ethical Controversies in Organ Donation After Circulatory Death." *Pediatrics*. 131: 1021-1026. PMID: 23629612.
3. American Academy of Pediatrics Committee on Bioethics and Committee on Genetics and the American College of Medical Genetics and Genomics Social, Ethical, and Legal Issues Committee (2013) "Policy Statement: Ethical and Policy Issues in Genetic Testing and Screening of Children." *Pediatrics*. 131: 620-622. PMID: 23428972.
4. Lainie Friedman Ross, Howard M. Saal, Karen L. David, Rebecca R. Anderson and the American Academy of Pediatrics Committee on Bioethics and Committee on Genetics and the American College of Medical Genetics and Genomics Social, Ethical, and Legal Issues Committee (2013) "Technical Report: Ethical and Policy Issues in Genetic Testing and Screening of Children." *Genetics in Medicine.* 15: 234-245. PMID: 23429433.
5. American Academy of Pediatrics Committee for Pediatric Research and Committee on Bioethics (2012) "Human Embryonic Stem Cell (hESC) and Human Embryo Research." *Pediatrics* 130: 972-977. PMID: 23109685.
6. American College of Obstetricians and Gynecologists, Committee on Ethics and American Academy of Pediatrics, Committee on Bioethics (2011) "Maternal-Fetal Intervention and Fetal Care Centers," *Pediatrics* 128; e473-e478. PMID: 21788223.
7. American Academy of Pediatrics Committee on Pediatric Emergency Medicine and Committee on Bioethics (2011) "Consent for Emergency Medical Services for Children and Adolescents." *Pediatrics* 128: 427-433. PMID: 21788221.

A-15

8. Council on School Health and Committee on Bioethics. Robert Murray and Armand H. Matheny Antommaria Lead Authors. (2010) "Honoring –Do-Not-Attempt Resuscitation Requests in Schools." *Pediatrics* 125; 1073-1077. PMID: 20421255.
9. Committee on Bioethics (2010) "Ritual Genital Cutting of Female Minors." *Pediatrics* 125; 1088-1093. PMID: 20421257.
10. Committee on Bioethics. (2010) "Children as Hematopoietic Stem Cell Donors," *Pediatrics* 125; 392-40. PMID: 20100753.
11. Committee on Bioethics. Armand H. Matheny Antommaria Lead Author. (2009) "Physician Refusal to Provide Information or Treatment Based on Claims of Conscience." *Pediatrics*. 124; 1689-93. PMID: 19948636.
12. Committee on Bioethics (2009) "Pediatrician-Family-Patient Relationships: Managing the Boundaries." *Pediatrics* 124; 1685-8. PMID: 19948635.
13. Douglas S. Diekema, Jeffrey R. Botkin, and Committee on Bioethics (2009) "Forgoing Medically Provided Nutrition and Hydration in Children." *Pediatrics* 124; 813-22. PMID: 19651596.
14. Lainie Friedman Ross, J. Richard Thistlethwaite, Jr., and the Committee on Bioethics (2008) "Minors as Living Solid-Organ Donors." *Pediatrics* 122: 454-61. PMID: 18676567.
15. Mary E. Fallat, John Hutter, and Section on Hematology Oncology and Section on Surgery the Committee on Bioethics (2008) "Preservation of Fertility in Pediatric and Adolescent Patients with Cancer." *Pediatrics* 121; 1461-9. PMID: 18450888.
16. Marcia Levetown and Bioethics and the Committee on Bioethics (2008) "Communicating With Children and Families: From Everyday Interactions to Skill in Conveying Distressing Information." *Pediatrics* 121: 1441-60. PMID: 18450887.
17. American Academy of Pediatrics. Committee on Bioethics (2007) "Professionalism in Pediatrics: Statement of Principles." *Pediatrics* 120:895-7. PMID: 17908776.

**Ethics Rounds**
1. Agustín Silberberg, Thomas Iolster, Christian Pizarro, Adrienne Borschuk, Josefina Castro Méndez, Christian Kreutzer, and Armand H. Matheny Antommaria. (2025) "A Controversial Clinical Case of a Child With Hypoplastic Left Heart Syndrome." *Pediatrics*. Jan 15: e2024065655. Online ahead of print. PMID: 39813140.
2. Imogen Clover-Brown, Bryanna More, Christina G. Andrews, and Armand H. Matheny Antommaria. (2023) "Ethical Issues With Patient-Provider Interactions in an Evolving Social Media Landscape." *Pediatrics*. 151: e2022060066. PMIC 3765789.
3. Maeghann S. Weaver, Marianne E. M. Yee, Courtney E. Lawrence, Armand H. Matheny Antommaria, and Ross M. Fasano. (2023) "Requests for Directed Blood Donations." *Pediatrics*. 151: e2022058183. PMID: 36897227.
4. Erwin Jiayuan Khoo, Devan M. Duenas, Benjamin S. Wilfond, Luke Gelinas, Armand H. Matheny Antommaria. (2023) "Incentives in Pediatric Research in Developing Countries: When Are They Too Much?" *Pediatrics*. 141: e2021055702. PMID: 36660851.
5. Kim Mooney-Doyle, Kimberly A. Pyke-Grimm, Ashley Foster Lanzel, Kathleen E. Montgomery, Jamila Hassan, Anisha Thompson, Rebecca Rouselle, and Armand H. Matheny Antommaria. (2022) "Balancing Protection and Progress in Pediatric Palliative Care Research: Stakeholder Perspectives." *Pediatrics*. 150: e2022057502. PMID: 36069137.
6. Megan H. Pesch, Phoebe Dazinger, Lainie Friedman Ross, and Armand H. Matheny Antommaria. (2022) "An Ethical Analysis of Newborn Congenital Cytomegalovirus Screening." *Pediatrics*. 149: e2021055368. PMID: 35641472.
7. Ian D. Wolfe, Don Brunnquell, Rena Sorensen, and Armand H. Matheny Antommaria. (2022) "Should Tactile Defensiveness Exclude a Life-Sustaining Intervention in an Adolescent With Autism?" *Pediatrics*. 149: e2021054469. PMID: 35229117.
8. Jennifer E. deSante-Bertkau, Timothy K. Knilans, Govind Persad, Patricia J. Zettler, Holly Fernandez Lynch, and Armand H. Matheny Antommaria. (2021) "Off-Label Prescription of COVID-19 Vaccines in Children: Clinical, Ethical, and Legal Issues." *Pediatrics*. 149: e2021054578. PMID: 34615694.

9. Jamilah M. Hackworth, Meera Kotagal, O. N. Ray Bignal, 2nd, Ndidi Unaka, and Armand H. Matheny Antommaria. (2021) "Microaggressions: Privileged Observers' Duty to Act and What They Can Do." *Pediatrics*. 148: e2021052758. PMID: 34417286.
10. Elizabeth Lanphier, Luke Mosley, and Armand H. Matheny Antommaria. (2021) "Assessing Visitor Policy Exemption Requests During the COVID-19 Pandemic." *Pediatrics*. 148: e2021051254. PMID: 33990461.
11. Natalie Lanocha, Tyler Tate, Erica Salter, Nanette Elster, and Armand H. Matheny Antommaria. (2021) "Can Parents Restrict Access to Their Adolescent's Voice?: Deciding About a Tracheostomy." *Pediatrics*. 147: e2021050358. PMID 33785636.
12. Timothy Crisci, Zeynep N. Inanc Salih, Ndidi Unaka, Jehanna Peerzada, and Armand H. Matheny Antommaria. (2021) "What Should an Intern Do When She Disagrees With the Attending?" *Pediatrics*. 147: e2020049646. PMID 33627371.
13. Liza-Marie Johnson, Erica C. Kaye, Kimberly Sawyer, Alex M. Brenner, Stefan J. Friedrichsdorf, Abby R. Rosenberg, Armand H. Mathey Antommaria. (2021) "Opioid Management in the Dying Child With Addiction." *Pediatrics* 147: e2020046219. PMID 33446508.

**Continuing Medical Education**

1. Armand H. Matheny Antommaria (2014) Authored 4 questions. NEJM Knowledge+ Family Medicine Board Review. NEJM Group.
2. Armand H. Matheny Antommaria (2009) "Hot Topics: Ethics and Donation After Cardiac Death [online course]. PediaLink. American Academy of Pediatrics. October 24. http://ethics.ht.courses.aap.org/. Accessed December 14. 2009.

**Editorials**

1. Armand H. Matheny Antommaria, Chris Feudtner, Mary Beth Benner, and Felicia Cohn on Behalf of the Healthcare Ethics Consultant-Certified Certification Commission (2020) "The Healthcare Ethics Consultant-Certified Program: Fair, Feasible, and Defensible, But Neither Definite Nor Finished," *American Journal of Bioethics* 20:1-5. PMID: 32105202.
2. Armand H. Matheny Antommaria and Pamela W. Popp (2020) "The Potential Roles of Surrogacy Ladders, Standby Guardians, and Medicolegal Partnerships, in Surrogate Decision Making for Parents of Minor Children," *Journal of Pediatrics* 220:11-13. PMID 31952849.

**Commentaries**

1. Armand H. Matheny Antommaria. (In Press) "Inaccurate Criteria for Conscientious Objection and Invidious Discrimination Threaten Patients' Access." *American Journal of Bioethics*.
2. Jerry Schwartz, Dawn Nebrig, Laura Monhollen, and Armand H. Matheny Antommaria. (2023) "Transforming Behavior Contracts into Collaborative Commitments with Families." *American Journal of Bioethics*. 23(1): 73-75. PMID: 36594997.
3. Armand H. Matheny Antommaria and Elizabeth Lanphier. (2022) "Supporting Marginalized Decision-Marker's Autonom(ies)." *American Journal of Bioethics*. 22(6):22-24. PMID: 35616965.
4. Mary V. Greiner and Armand H. Matheny Antommaria. (2022) "Enrolling Foster Youth in Clinical Trials: Avoiding the Harm of Exclusion." *American Journal of Bioethics*. 22(4):85-86. PMID: 35420526. Reprinted in (2024) *Challenging Cases in Clinical Research Ethics*. Benjamin S. Wilfond, Liza-Marie Johnson, Devan M. Duenas, and Holly A. Taylor. Boca Raton, FL, CRC Press: 166-167.
5. William Sveen and Armand H. Matheny Antommaria. (2020) "Why Healthcare Workers Should Not Be Prioritized in Ventilator Triage." *American Journal of Bioethics*. 20(7): 133-135. PMID: 32716811.

6. <u>Armand H. Matheny Antommaria</u>, William Sveen, and Erika L. Stalets (2020) "Informed Consent Should Not Be Required for Apnea Testing and Arguing It Should Misses the Point," *American Journal of Bioethics*. 20: 25-27. PMID: 32441602.

7. <u>Armand H. Matheny Antommaria</u> (2019) "Relational Potential versus the Parent-Child Relationship," *Hastings Center Report*. 49(3): 26-27. PMID: 31269255.

8. <u>Armand H. Matheny Antommaria</u>, Robert A. Shapiro, and Lee Ann E. Conard (2019) "Psychological Maltreatment and Medical Neglect of Transgender Adolescents: The Need for Recognition and Individualized Assessment." *American Journal of Bioethics*. 19: 72-74. PMID: 31543011.

9. <u>Armand H. Matheny Antommaria</u> (2018) "Accepting Things at Face Value: Insurance Coverage for Transgender Healthcare." *American Journal of Bioethics*. 18: 21-23. PMID: 31159689.

10. <u>Armand H. Matheny Antommaria</u> and Judith R. Ragsdale (2018) "Shaken, not Stirred: What are Ethicists Licensed to Do?" *American Journal of Bioethics* 18: 56-58. PMID: 29697345.

11. <u>Armand H. Matheny Antommaria</u> (2017) "Issues of Fidelity and Trust Are Intrinsic to Uncontrolled Donation after Circulatory Determination of Death and Arise Again with Each New Resuscitation Method," *American Journal of Bioethics* 17: 20-22. PMID: 28430053.

12. <u>Armand H. Matheny Antommaria</u> (2016) "Conscientious Objection: Widening the Temporal and Organizational Horizons," *The Journal of Clinical Ethics* 27: 248-250. PMID: 27658282.

13. <u>Armand H. Matheny Antommaria</u> and Ron King. (2016) "Moral Hazard and Transparency in Pediatrics: A Different Problem Requiring a Different Solution." *American Journal of Bioethics* 16: 39-40. PMID: 27292846.

14. Armand <u>H. Matheny Antommaria</u> and Richard F. Ittenabch (2016) "Quality Attestation's Portfolio Evaluation Is Feasible, But Is It Reliable and Valid?" *American Journal of Bioethics* 16: 35-38. PMID: 26913658.

15. <u>Armand H. Matheny Antommaria</u> and Kristin Stanley Bramlage (2015) "Enrolling Research Participants in Private Practice: Conflicts of Interest, Consistency, Therapeutic Misconception, and Informed Consent." *AMA Journal of Ethics*. 17:1122-1126. PMID: 26698585.

16. Armand <u>H. Matheny Antommaria</u> (2015) "Characterizing Clinical Ethics Consultations: The Need for a Standardized Typology of Cases." *American Journal of Bioethics* 15: 18-20. PMID: 25970383.

17. <u>Armand H. Matheny Antommaria</u> (2015) "Intensified Conflict Instead of Closure: Clinical Ethics Consultants' Recommendations' Potential to Exacerbate Ethical Conflicts." *American Journal of Bioethics* 15: 52-4. PMID: 25562231.

18. Lainie Friedman Ross and <u>Armand H. Matheny Antommaria</u> (2014) "The need to promote all pediatric stem cell donors' understanding and interests." *Pediatrics* 133: e1356-e1357. PMID: 24777208.

19. <u>Armand H. Matheny Antommaria</u> (2014) "Pubertal Suppression and Professional Obligations: May a Pediatric Endocrinologist Refuse to Treat an Adolescent with Gender Dysphoria." *American Journal of Bioethics* 13: 43-46. PMID: 24422933.

20. <u>Armand H. Matheny Antommaria</u> (2012) "Empowering, Teaching, and Occasionally Advocating: Clinical Ethics Consultants' Duties to All of the Participants in the Process." *American Journal of Bioethics* 12 11-3. PMID: 22852533.

21. <u>Armand H. Matheny Antommaria</u> (2010) "Dying but not Killing: Donation after Cardiac Death Donors and the Recovery of Organs." *Journal of Clinical Ethics* 21: 229-31. PMID: 21089993.

22. <u>Armand H. Matheny Antommaria</u> and Julie Melini (2010) "Is it Reasonable to Refuse to be Seen by a Nurse Practitioner in the Emergency Department?" *American Journal of Bioethics* 10: 15-17. PMID: 20694899.

23. William Meadow, Chris Feudtner, <u>Armand H. Matheny Antommaria</u>, Dane Sommer, John Lantos (2010) "A Premature Baby with Necrotizing Enterocolitis Whose Parents Are Jehovah's Witnesses." *Pediatrics.* 216: 151-155. PMID: 20566607.

24. C. C. Weitzman, S. Schlegel, Nancy Murphy, <u>Armand H. Matheny Antommaria</u>, J. P. Brosco, Martin T. Stein (2009) "When Clinicians and a Parent Disagree on the Extent of Medical Care." *Journal of Developmental and Behavioral Pediatrics.* 30: 242-3. PMID: 19525718. Reprinted as (2010) *Journal of Developmental and Behavioral Pediatrics.* 31: S92-5. PMID: 20414087

25. <u>Armand H. Matheny Antommaria</u> and Susan Bratton (2008) "Nurses' Attitudes toward Donation after Cardiac Death: Implications for Nurses' Roles and Moral Distress." *Pediatric Critical Care Medicine,* 9: 339-40. PMID: 18446100.

26. <u>Armand H. Matheny Antommaria</u> and Nannette C. Dudley (2007) "Should Families Be Present During CPR?" *AAP Grand Rounds,* 17: 4-5.

27. <u>Armand H. Matheny Antommaria</u> (2006) "The Proper Scope of Analysis of Conscientious Objection in Healthcare: Individual Rights or Professional Obligations" *Teaching Ethics*, 7: 127-31.

28. <u>Armand H. Matheny Antommaria</u> and Rajendu Srivastava (2006) "If Cardiologists Take Care of Patients with Heart Disease, What do Hospitalists Treat?: Hospitalists and the Doctor-Patient Relationship." *American Journal of Bioethics*, 6: 47-9. PMID: 16423793.

29. <u>Armand H. Matheny Antommaria</u> (2003) "I Paid Out-of-Pocket for My Son's Circumcision at Happy Valley Tattoo and Piercing: Alternative Framings of the Debate over Routine Neonatal Male Circumcision," *American Journal of Bioethics* 3: 51-3. PMID: 12859817.

## Letters

1. Benjamin S. Wilfond, David Magnus, <u>Armand H Matheny Antommaria</u>, Paul Appelbaum, Judy Aschner, Keith J. Barrington, Tom Beauchamp, Renee D. Boss, Wylie Burke, Arthur L. Caplan, Alexander M. Capron, Mildred Cho, Ellen Wright Clayton, F. Sessions Cole, Brian A. Darlow, Douglas Diekema, Ruth R. Faden, Chris Feudtner, Joseph J. Fins, Norman C. Fost, Joel Frader, D. Micah Hester, Annie Janvier, Steven Joffe, Jeffrey Kahn, Nancy E. Kass, Eric Kodish, John D. Lantos, Laurence McCullough, Ross McKinney, Jr., William Deadow, P. Pearl O'Rourke, Kathleen E. Powderly, DeWayne M. Pursley, Lainie Friedman Ross, Sadath Sayeed, Richard R. Sharp, Jeremy Sugarman, William O. Tarnow-Mordi, Holly Taylor, Tom Tomlison, Robert D. Truog, Yoram T. Unguru, Kathryn L. Weise, David Woodrum, Stuart Youngner (2013) "The OHRP and SUPPORT," *New England Journal of Medicine,* 368: e36. PMID: 23738513.

2. Lainie Friedman Ross and <u>Armand H. Matheny Antommaria</u> (2011) "In Further Defense of the American Academy of Pediatrics Committee on Bioethics 'Children as Hematopoietic Stem Cell Donors' Statement." *Pediatric Blood & Cancer.* 57: 1088-9.

3. <u>Armand H. Matheny Antommaria</u> (2011) "Growth Attenuation: Health Outcomes and Social Services." *Hastings Center Report*, 41(5): 4. PMID: 21980886.

4. Susan Bratton and <u>Armand H. Matheny Antommaria</u> (2010) "Dead Donor Rule and Organ Procurement: The Authors Reply." *Pediatric Critical Care Medicine*, 11: 314-5.

5. <u>Armand H. Matheny Antommaria</u> and Joel Frader (2009) "Policies of Children's Hospitals on Donation After Cardiac Death—Reply." *Journal of the American Medical Association*, 302: 845.

## Case Reports

<u>Armand H. Matheny Antommaria</u> (2002) "Case 4.9: Inappropriate Access to a Celebrity's Medical Records." In *Ethics and Information Technology: A Case-Based Approach to a Health Care System in Transition*, James G. Anderson and Kenneth W. Goodman, 79-80. New York: Springer-Verlag.

**Book Reviews**

1. Armand H. Matheny Antommaria (2024) Review of *Mormonism, Medicine, and Bioethics,* by Courtney S. Campbell. *Mormon Studies Review* 11: 182-8.
2. Armand H. Matheny Antommaria (2023) "An Ambitious Goal: A Grounded, Informed, and Compelling Theological Bioethics." Review of *Disability's Challenge to Theology: Genes, Eugenics, and the Metaphysics of Modern Medicine* by Devan Stahl. *Hastings Center Report* 53(2): 44-45.
3. Armand H. Matheny Antommaria (2021) Review of *When Harry Became Sally: Responding to the Transgender Moment,* by Ryan T. Anderson. *Journal of Medical Humanities* 42: 195-9. PMID 31808021.
4. Armand H. Matheny Antommaria (2012) Review of *The Ethics of Organ Transplantation*, by Steven J. Jensen, ed., *Journal of the American Medical Association* 308: 1482-3.
5. Armand H Matheny Antommaria (2012) Review of *The Soul of Medicine: Spiritual Perspectives and Clinical Practice*, by John R. Peteet and Michael N. D'Ambra, ed., *Journal of the American Medical Association* 308: 87.
6. Armand H. Matheny Antommaria (2009) Review of *Conflicts of Conscience in Health Care: An Institutional Compromise,* by Holly Fernandez Lynch. *American Journal of Bioethics* 9: 63-4.
7. Armand H. Matheny Antommaria (2008) Review of *A Practical Guide to Clinical Ethics Consulting: Expertise, Ethos, and Power*, by Christopher Meyers. *American Journal of Bioethics* 8: 72-3.
8. Armand H. Matheny Antommaria (2004) Review of *Children, Ethics, and Modern Medicine*, by Richard B. Miller. *American Journal of Bioethics* 4: 127-8.
9. Armand H. Matheny Antommaria (2002) Review of *Ward Ethics: Dilemmas for Medical Students and Doctors in Training*, by Thomasine Kushner and David Thomasma, ed. *American Journal of Bioethics* 2: 70-1. PMID: 22494193.
10. Armand H. Matheny Antommaria (1999) Review of *Human Cloning: Religious Responses*, by Ronald Cole-Turner, ed. *Prism* 6 (March/April): 21.
11. Armand H. Matheny Antommaria (1999) Review of *Christian Theology and Medical Ethics: Four Contemporary Approaches*, by James B. Tubbs, Jr. *Journal of Religion* 79 (April): 333-5.
12. Armand H. Matheny Antommaria (1997) Review of *Body, Soul, and Bioethics*, by Gilbert C. Meilaender. *Prism* 4 (May/June): 28.

**Newspaper Articles**

1. W. Bradley Poss and Armand H. Matheny Antommaria (2010) "Mass casualty planning must incorporate needs of children." *AAP News* 31 (July): 38.
2. Robert Murray and Armand H. Matheny Antommaria (2010) "Pediatricians should work with school nurses to develop action plans for children with DNAR orders." *AAP News* 31 (May): 30..
3. Armand H. Matheny Antommaria (2009) "Addressing physicians' conscientious objections in health care." *AAP News* 30 (December): 32.

## UNPUBLISHED POSTER PRESENTATIONS

1. Armand H. Matheny Antommaria. (2018) "Ethical Issues in the Care of International Patients: A Case Study." International Conference on Clinical Ethics and Consultation, Oxford, United Kingdom.
2. Jill S Sweney, Brad Poss, Colin Grissom, Brent Wallace, and Armand H Matheny Antommaria, (2010) "Development of a Statewide Pediatric Pandemic Triage Plan in Utah." Pediatric Academic Societies Annual Meeting, Vancouver, Canada. E-PAS20103713.147.

3. Christopher G. Maloney, <u>Armand H. Matheny Antommaria</u>, James F. Bale, Thomas Greene, Jian Ying, Gena Fletcher, and Rajendu Srivastava (2010) "Why Do Pediatric Interns Violate the 30 Hour Work Rule?" Pediatric Academic Societies Annual Meeting, Vancouver, Canada. E-PAS20101500.596
4. <u>Armand H. Matheny Antommaria</u> and Edward B. Clark (2007) "Resolving Conflict through Bioethics Mediation." 3rd International Conference on Ethics Consultation and Clinical Ethics, Toronto, Canada.
5. Elizabeth Tyson, Tracy Hill, <u>Armand Antommaria</u>, Gena Fletcher, and Flory Nkoy (2007) "Physician Practice Patterns Regarding Nasogastric Feeding Supplementation and Intravenous Fluids in Bronchiolitis Patients." Pediatrics Academic Societies Annual Meeting, Toronto, Canada. E-PAS2007:61300.

## ORAL PRESENTATIONS
### Keynote/Plenary Lectures
<u>International</u>
1. 2021, *Panelist*, Partnership for Quality Medical Donations, Charitable Access Programming for Rare Diseases, "Ethical Issues," Webinar, April 6.
2. 2017, *Invited Speaker*, Spina Bifida Fetoscopic Repair Study Group and Consortium, "Ethics of Innovation and Research in Fetal Surgery," Cincinnati, Ohio, October 26.
3. 2014, *Invited Speaker,* CIC 2013 CCI:  Canadian Immunization Conference, "Condition-of-Service Influenza Prevention in Health Care Settings," Ottawa, Canada, December 2.
4. 2014, *Invited Speaker*, National Conference of the Chinese Pediatric Society, "A Brief Introduction to Pediatric Research and Clinical Ethics," Chongqing, China, September 12.

<u>National</u>
1. 2020, *Panelist*, Children's Mercy Bioethics Center, "Ethical Issues in the COVID Pandemic at Children's Hospitals," Webinar, March 2.
2. 2019, *Invited Speaker*, North American Fetal Therapy Network (NAFTnet), "Ethics of Innovation," Chicago, Illinois, October 12.
3. 2019, *Panelist,* National Society of Genetic Counselors Prenatal Special Interest Group, "Fetal Intervention Ethics," Webinar, September 12.
4. 2017, *Invited Participant,* American College of Epidemiology Annual Meeting, Preconference Workshop, "Extreme Personal Exposure Biomarker Levels: Guidance for Study Investigators," New Orleans, Louisiana, September 24.
5. 2016, *Invited Speaker,* American Academy of Pediatrics National Conference & Exhibition, Joint Program: Section on Hospital Medicine and Section on Bioethics, "Resource Allocation: Do We Spend Money to Save One Patient with Ebola or Over a 1,000?" San Francisco, California, October 23.
6. 2016, *Invited Speaker*, 26th Annual Specialist Education in Extracorporeal Membrane Oxygenation (SEECHMO) Conference, "Ethical Issues in ECMO: The Bridge to Nowhere," Cincinnati, Ohio, June 5.
7. 2015, *Invited Speaker,* Extracorporeal Life Support Organization (ELSO) 26th Annual Conference, "ECMO-Supported Donation after Circulatory Death: An Ethical Analysis," Atlanta, Georgia, September 20.
8. 2014, *Invited Speaker*, Pediatric Evidence-Based Practice 2014 Conference: Evidence Implementation for Changing Models of Pediatric Health Care, "Ethical Issues in Evidence-Based Practice," Cincinnati, Ohio, September 19.
9. 2014, *Invited Speaker,* 6th Annual David Kline Symposium on Public Philosophy: Exploring the Synergy Between Pediatric Bioethics and Child Rights, "Does Predictive Genetic Testing for Adult Onset Conditions that Are Not Medically Actionable in Childhood Violate Children's Rights?" Jacksonville, Florida, March 6.
10. 2010, *Invited Speaker,* Quest for Research Excellence: The Intersection of Standards, Culture and Ethics in Childhood Obesity, "Research Integrity and Religious Issues in Childhood Obesity Research," Denver, Colorado, April 21.

11. 2010, *Invited Speaker*, Symposium on the Future of Rights of Conscience in Health Care: Legal and Ethical Perspectives, J. Reuben Clark Law School at Brigham Young University and the Ave Maria School of Law, "Conscientious Objection in Clinical Practice: Disclosure, Consent, Referral, and Emergency Treatment," Provo, Utah, February 26.
12. 2009, *Invited Speaker*, Pediatric Organ Donation Summit, "Research Findings Regarding Variations in Pediatric Hospital Donation after Cardiac Death Policies," Chicago, Illinois, August 18.
13. 2008, *Meet-the-Experts*, American Academy of Pediatrics National Conference & Exhibition, "Physician Refusal to Provide Treatment: What are the ethical issues?" Boston, Massachusetts, October 11.
14. 2008, *Invited Conference Faulty*, Conscience and Clinical Practice: Medical Ethics in the Face of Moral Controversy, The MacLean Center for Clinical Medical Ethics at the University of Chicago, "Defending Positions or Identifying Interests: The Uses of Ethical Argumentation in the Debate over Conscience in Clinical Practice," Chicago, IL, March 18.
15. 2007, *Symposium Speaker*, Alternative Dispute Resolution Strategies in End-of-Life Decisions, The Ohio State University Mortiz College of Law, "The Representation of Children in Disputes at the End-of-Life," Columbus, Ohio, January 18.
16. 2005, *Keynote Speaker*, Decisions and Families, *Journal of Law and Family Studies* and The University of Utah S.J. Quinney College of Law, "Jehovah's Witnesses, Roman Catholicism, and Calvinism: Religion and State Intervention in Parental, Medical Decision-Making," Salt Lake City, Utah, September 23.

Regional/Local
1. 2024, *Speaker,* Current Trends 2024: Discover Big Ideas for the Smallest Lungs, *"*Ethics for RTs: ECMO and Trachs," Cincinnati, Ohio, November 14.
2. 2024, *Case Expert Commentator*, Center for Bioethics Clinical Ethics Consortium, Harvard Medical School, "Can he be his mother's keeper?", Boston, Massachusetts, February 2.
3. 2023, *Speaker*, Yale Ethics Program, Yale School of Medicine, "Gender-Affirming Care," New Haven, Connecticut, March 8.
4. 2021, *Panelist*, Pediatric Residency Noon Conference, University of Tennessee Health Science Center, "Bioethics Rounds—Ethical Issues in the Care of Transgender Adolescents," Memphis, Tennessee, September 21.
5. 2020, *Keynote Speaker*, 53rd Annual Clinical Advances in Pediatrics, "Referral to a Fetal Care Center: How You Can Help Patients' Mothers Address the Ethical Issues," Kansas City, Kansas, September 16.
6. 2019, *Speaker,* Patient and Family Support Services, Primary Children's Hospital, "Ethical Issues in the Care of Trans Adolescents," Salt Lake City, Utah, December 5.
7. 2019, *Speaker,* Evening Ethics, Program in Medical Ethics and Humanities, University of Utah School of Medicine, "Patients, Parents, and Professionals: Ethical Issues in the Treatment of Trans Adolescents," Salt Lake City, Utah, December 4.
8. 2019, *Speaker,* Pediatric Hospital Medicine Board Review Course, "Ethics, Legal Issues, and Human Rights including Ethics in Research," Cincinnati, Ohio, September 8.
9. 2019, *Speaker,* Advances in Fetology, "Evolving Attitudes Toward the Treatment of Children with Trisomies," Cincinnati, Ohio, September 6.
10. 2019, *Speaker,* Half-Day Ethics Training: Ethics Consultation & Ethics Committees, "Navigating the Rapids of Clinical Ethics Consultation: Intake, Recommendations, and Documentation," Salt Lake City, Utah, June 1.
11. 2019, *Speaker*, Scientific and Ethical Underpinnings of Gene Transfer/Therapy in Vulnerable Populations: Considerations Supporting Novel Treatments, BioNJ, "What Next? An Ethical analysis of Prioritizing Conditions and Populations for Developing Novel Therapies," Cranbury, New Jersey, March 7.
12. 2018, *Panelist*, Periviability, 17th Annual Regional Perinatal Summit, Cincinnati, Ohio, October 12.

A-22

13. 2018, *Speaker,* Regional Advance Practice Registered Nurse (APRN) Conference, "Adults are Not Large Children: Ethical Issues in Caring for Adults in Children's Hospitals," Cincinnati, Ohio, April 26.
14. 2018, *Speaker,* Southern Ohio/Northern Kentucky Sigma Theta Tau International Annual Conference, "Between Hope and Hype: Ethical Issues in Precision Medicine," Sharonville, Ohio, March 2.
15. 2017, *Speaker*, Advances in Fetology 2017, "Ethics of Innovation and Research: Special Considerations in Fetal Therapy Centers," Cincinnati, Ohio, October 27.
16. 2016, *Speaker*, End-of-Life Pediatric Palliative Care Regional Conference, "Ethical/Legal Issues in Pediatric Palliative Care," Cincinnati, Ohio, September 15.
17. 2016, *Speaker*, 26th Annual Bioethics Network of Ohio (BENO) Conference, "When Does Parental Refusal of Medical Treatment for Religious Reasons Constitute Neglect?" Dublin, Ohio, May 29.
18. 2014, *Speaker,* Cincinnati Comprehensive Sickle Cell Center Symposium: Research Ethics of Hydroxyurea Therapy for Sickle Cell Disease During Pregnancy and Lactation, "Ethical Issues in Research with Pregnant and Lactating Women," Cincinnati, Ohio, October 30.
19. 2014, *Speaker,* Advances in Fetology 2014, "The 'Miracle Baby' and Other Cases for Discussion," Cincinnati, Ohio, September 26.
20. 2014, *Speaker,* Advances in Fetology 2014, "'Can you tell me …?': Achieving Informed Consent Given the Prevalence of Low Health Literacy," Cincinnati, Ohio, September 26.
21. 2014, *Panelist*, Center for Clinical & Translational Science & Training, Secrets of the Dead: The Ethics of Sharing their Data, Cincinnati, Ohio, August 28.
22. 2014, *Speaker,* Office for Human Research Protections Research Community Forum: Clinical Research … and All That Regulatory Jazz, "Research Results and Incidental Findings: Do Investigators Have a Duty to Return Results to Participants," Cincinnati, Ohio, May 21.
23. 2013, *Opening Presentation*, Empirical Bioethics: Emerging Trends for the 21st Century, University of Cincinnati Center for Clinical & Translational Science & Training, "Empirical vs. Normative Ethics: A Comparison of Methods," Cincinnati, Ohio, February 21.
24. 2012, *Videoconference,* New York State Task Force on Life and the Law, "Pediatric Critical Care Triage," New York, New York, March 1.
25. 2011, *Presenter,* Fall Faculty Development Workshop, College of Social Work, University of Utah, "Teaching Ethics to Students in the Professions, " Salt Lake City, Utah, November 14.
26. 2011, *Speaker,* 15th Annual Conference, Utah Chapter of the National Association of Pediatric Nurse Practitioners, "Ethical Issues in Pediatric Practice," Salt Lake City, Utah, September 22.
27. 2011, *Speaker*, Code Silver! Active Shooter in the Hospital, Utah Hospitals & Health Systems Association, Salt Lake City, Utah, March 21.
28. 2009, *Speaker,* Medical Staff Leadership Conference, Intermountain Healthcare, "The Ethics of Leadership," Park City, Utah, October 30.
29. 2008, *Speaker*, The Art and Medicine of Caring: Supporting Hope for Children and Families, Primary Children's Medical Center, "Medically Provided Hydration and Nutrition: Ethical Considerations," Salt Lake City, Utah, February 25.
30. 2005, *Speaker*, Utah NAPNAP (National Association of Pediatric Nurse Practitioners) Chapter Pharmacology and Pediatric Conference, "Immunization Update," Salt Lake City, Utah, August 18.
31. 2005, *Keynote Speaker,* 17th Annual Conference, Utah Society for Social Work Leadership in Health Care, "Brain Death:  Accommodation and Consultation," Salt Lake City, March 18.
32. 2004, *Continuing Education Presentation*, Utah NAPNAP (National Association of Pediatric Nurse Practitioners), "Febrile Seizures," Salt Lake City, Utah, April 22.
33. 2004, *Speaker,* Advocacy Workshop for Primary Care Providers, "Ethics of Advocacy," Park City, Utah, April 3.

A-23

34. 2002, *Speaker,* 16th Annual Biologic Basis of Pediatric Practice Symposium, "Stem Cells: Religious Perspectives," Deer Valley, Utah, September 14.

**Meeting Presentations**
International
1. 2024, *Panelist*, International Conference on Clinical Ethics and Consultation, "Clinical Ethicists as Expert Witnesses: A Workshop Based on the Experiences of Clinical Ethicists and Lawyers in Pediatrics," Montreal, Canada, May 31.
2. 2023, *Speaker*, International Conference on Clinical Ethics and Consultation, "Addressing Ethical and Conceptual Issues in Gender-Affirming Medical Care Outside of the Hospital," Rome, Italy, June 8.
3. 2018, *Speaker*, International Conference on Clinical Ethics and Consultation, "A Systematic Review of Typologies Used to Characterize Clinical Ethics Consultations," Oxford, United Kingdom, June 21.

National
1. 2024, Srinivasan Suresh, Sriram Ramgopal, Judith Dexheimer, and <u>Armand H. Matheny Antommaria</u>. *Workshop Presenter*, Pediatric Academic Societies Annual Meeting, "ChatGPT for Pediatricians: You've Heard About It. Noe Learn How to Use It!" Toronto, May 6.
2. 2023, *Speaker*, American Society for Bioethics and Humanities Annual Meeting, "Addressing Restrictions on Gender-Affirming Medical Care in New Spaces: State Houses and Courtrooms," Baltimore, Maryland, October 13.
3. 2023, Kelsey S. Ryan, Rakhi Gupta Bassuray, Leela Sarathy, Sharon Ostfeld, <u>Armand H. Matheny Antommaria</u>, Erin Rholl, Steven R. Leuthner, and Christy L. Cummings. *Workshop Presenter,* Pediatric Academic Societies Annual Meeting, "How Can Newborn Toxicology Testing be Equitable?" Washington, DC, April 30.
4. 2022, *Speaker,* American Society for Bioethics and Humanities Annual Meeting, "A Mixed Methods Analysis of Requests for Religious Exemptions to a COVID-19 Vaccine Requirement." Portland, Oregon, October 27.
5. 2022, *Panelist,* American Society for Bioethics and Humanities Annual Meeting, Pediatric Ethics Affinity Group, "When Ethical Healthcare Is Prohibited By Law, How Do We Respond?" Portland, Oregon, October 27.
6. 2022, *Speaker,* APPD/PAS Fellow Core Curriculum Workshop, Pediatric Academic Societies Annual Meeting, "From Idea to Implementation: Navigating the Ethical Landscape of Pediatric Clinical Research," Denver, Colorado, April 22.
7. 2021, *Panelist,* Pediatric Endocrine Society Annual Meeting, Difference of Sex Development Special Interest Group, Virtual Conference, April 29.
8. 2020, *Speaker,* American Society for Bioethics and Humanities Annual Meeting, "Is This Child Dead? Controversies Regarding the Neurological Criteria for Death," Virtual Conference, October 17.
9. 2020, *Speaker,* American Society for Bioethics and Humanities Annual Meeting, "Contemporary Ethical Controversy in Fetal Therapy: Innovation, Research, Access, and Justice," Virtual Conference, October 15.
10. 2020, *Speaker,* American Society for Bioethics and Humanities Annual Meeting, "K-12 Schools and Mandatory Public Health Programs During the COVID-19 Pandemic," Virtual Conference, October 15.
11. 2019, *Speaker,* American Society for Bioethics and Humanities Annual Meeting, "Ethical Issues in Translating Gene Transfer Studies Involving Children with Neurodegenerative Disorders," Pittsburgh, Pennsylvania, October 26.
12. 2019, *Moderator,* Pediatric Academic Societies Annual Meeting, Clinical Bioethics, Baltimore, Maryland, April 28.
13. 2018, *Presenter,* American Society for Bioethics and Humanities Annual Meeting, "Looking to the Past, Understanding the Present, and Imaging the Future of Bioethics and Medical Humanities' Engagement with Transgender Health," Anaheim, California, October 19.

A-24

14. 2018, *Speaker,* American Society for Bioethics and Humanities Annual Meeting, "Should Vaccination Be a Prerequisite for Sold Organ Transplantation?" Anaheim, California, October 18.

15. 2018, Lindsey Douglas, <u>Armand H. Matheny Antommaria,</u> Derek Williams. *Workshop Presenter*, Pediatric Hospital Medicine Annual Meeting, "IRB Approved! Tips and Tricks to Smooth Sailing through the Institutional Review Board (IRB)." Atlanta, Georgia, July 20.

16. 2018, Alan Schroeder, <u>Armand H. Matheny Antommaria,</u> Hannah Bassett, Kevin Chi, Shawn Ralston, Rebecca Blankenburg, *Workshop Speaker,* Pediatric Hospital Medicine Annual Meeting, "When You Don't Agree with the Plan: Balancing Diplomacy, Value, and Moral Distress," Atlanta, Georgia, July 20.

17. 2018, Alan Schroeder, Hannah Bassett, Rebecca Blankenburg, Kevin Chi, Shawn Ralston, <u>Armand H. Matheny Antommaria.</u> *Workshop Speaker,* Pediatric Academic Societies Annual Meeting, "When You Don't Agree with the Plan: Balancing Diplomacy, Value, and Moral Distress," Toronto, Ontario, Canada, May 7.

18. 2017, *Speaker,* American Society for Bioethics and Humanities Annual Meeting, "Tensions in Informed Consent for Gender Affirming Hormone Therapy and Fertility Preservation in Transgender Adolescents," Kansas City, Missouri, October 19.

19. Lindsey Douglas, <u>Armand H. Matheny Antommaria,</u> and Derek Williams. 2017, *Workshop Leader,* PHM[Pediatric Hospital Medicine]2017, "IRB Approved! Tips and Tricks to Smooth Sailing through the Institutional Review Board (IRB) Process," Nashville, Tennessee, July 21.

20. 2016, *Speaker*, American Society for Bioethics and Humanities Annual Meeting, "Ethical Challenges in the Care of International Patients: Organization, Justice, and Cultural Considerations," Washington, DC, October 9.

21. 2015, *Coauthor,* The American Society of Human Genetics Annual Meeting, "Adolescents' Opinions on Disclosure of Non-Actionable Secondary Findings in Whole Exome Sequencing," Baltimore, Maryland, October 9.

22. 2012, *Speaker*, American Society for Bioethics and Humanities Annual Meeting, "A Public Health Ethics Analysis of the Mandatory Immunization of Healthcare Personnel: Minimizing Burdens and Increasing Fairness," Washington, DC, October 21.

23. <u>Armand H. Matheny Antommaria,</u> Valerie Gutmann Koch, Susie A. Han, Carrie S. Zoubul. 2012, *Moderator,* American Society for Bioethics and Humanities Annual Meeting, "Representing the Underrepresented in Allocating Scarce Resources in a Public Health Emergency: Ethical and Legal Considerations," Washington, DC, October 21.

24. 2012, *Platform Presentation,* Pediatric Academic Societies Annual Meeting, "Qualitative Analysis of International Variation in Donation after Circulatory Death Policies and Rates," Boston, Massachusetts, April 30. Publication 3150.4.

25. 2011, *Speaker,* American Society for Bioethics and Humanities Annual Meeting, "The Intersection of Policy, Medicine, and Ethics during a Public Health Disaster: Special Considerations for Children and Families," Minneapolis, Minnesota, October 13.

26. <u>Armand H. Matheny Antommaria</u> and Joel Frader. 2010, *Workshop Leader,* Pediatric Academic Societies Annual Meeting, "Conscientious Objection in Health Care: Respecting Conscience and Providing Access," Vancouver, British Columbia, Canada. May 1. Session 1710.

27. 2009, *Workshop Leader,* American Society for Bioethics and Humanities Annual Meeting, "Advanced Clinical Ethics Consultation Skills Workshop: Process and Interpersonal Skills," Washington, DC, October 15.

28. 2009, *Platform Presentation*, Pediatric Academic Societies Annual Meeting, "Qualitative Analysis of Donation after Cardiac Death Policies at Children's Hospitals," Baltimore, Maryland, May 2. Publication 2120.6.

29. 2008, *Speaker,* American Society for Bioethics and Humanities Annual Meeting, "Qualitative Analysis of Donation After Cardiac Death (DCD) Policies at Children's Hospitals," Cleveland, Ohio, October 26.

A-25

30. 2007, *Participant,* Hamline University School of Law Biennial Symposium on Advanced Issues in Dispute Resolution, "An Intentional Conversation About Conflict Resolution in Health Care," Saint Paul, Minnesota, November 8-10.
31. *2007, Speaker,* American Society of Bioethics and Humanities Annual Meeting, "Bioethics Consultation and Alternative Dispute Resolution: Opportunities for Collaboration," Washington, DC, October 21.
32. 2007, *Speaker,* American Society of Bioethics and Humanities Annual Meeting, "DNAR Orders in Schools: Collaborations Beyond the Hospital," Washington, DC, October 18.
33. <u>Armand H. Matheny Antommaria</u> and Jeannie DePaulis. 2007, *Speaker,* National Association of Children's Hospitals and Related Institutions Annual Meeting, "Using Mediation to Address Conflict and Form Stronger Therapeutic Alliances," San Antonio, Texas, October 9.
34. 2006, *Speaker,* American Society of Bioethics and Humanities Annual Meeting, "Bioethics Mediation: A Critique," Denver, Colorado, October 28.
35. 2005, *Panelist,* American Society of Bioethics and Humanities Annual Meeting, "How I See This Case: 'He Is Not His Brain,'" Washington, DC, October 20.
36. 2005, *Paper Presentation,* Pediatric Ethics: Setting an Agenda for the Future, The Cleveland Clinic, "'He Is Not His Brain:' Accommodating Objections to 'Brain Death,'" Cleveland, Ohio, September 9.
37. 2004, *Speaker,* American Society for Bioethics and Humanities Spring Meeting, "Verification and Balance: Reporting Within the Constraints of Patient Confidentiality," San Antonio, Texas, March 13.
38. 2002, *Panelist,* American Society for Bioethics and Humanities Annual Meeting, "'Who Should Survive?:' Mental Retardation and the History of Bioethics," Baltimore, Maryland, October 24.

**Invited/Visiting Professor Presentations**
1. 2013, Visiting Professor, "How to Listen, Speak and Think Ethically: A Multidisciplinary Approach," Norton Suburban Hospital and Kosair Children's Hospital, Louisville, Kentucky, May 22.
2. 2010, Visiting Professor, Program in Bioethics and Humanities and Department of Pediatrics, "What to Do When Parents Want Everything Done: 'Futility' and Ethics Facilitation," University of Iowa Carver College of Medicine, Iowa City, Iowa, September 10.

**Grand Round Presentations**
1. 2023, Harvey and Bernice Jones Lecture in Pediatric Ethics, "Too Far or Not Far Enough? Assessing Possible Changes in Determining Death and Procuring Organs," Arkansas Children's Hospital, Little Rock, November 16.
2. 2019, David Green Lectureship, "Establishing Goals of Care and Ethically Limiting Treatment," Primary Children's Hospital, Salt Lake City, Utah, December 5.
3. 2018, "The Ethics of Medical Intervention for Transgender Youth," El Rio Health, Tucson, Arizona, September 29.
4. 2018, Pediatrics, "Patient Selection, Justice, and Cultural Difference: Ethical Issues in the Care of International Patients," Cleveland Clinic, Cleveland, Ohio, April 10.
5. 2018, Bioethics, "Reversibility, Fertility, and Conflict: Ethical Issues in the Care of Transgender and Gender Nonconforming Children and Adolescents," Cleveland Clinic, Cleveland, Ohio, April 9.
6. 2017, Heart Institute, "'Have you ever thought about what you would want—if god forbid— you became sicker?': Talking with adult patients about advance directives," Cincinnati Children's Hospital Medical Center, Cincinnati, Ohio, October 16.

7. 2017, Pediatrics, "Respectful, Effective Treatment of Jehovah's Witnesses," with Judith R. Ragsdale, PhD, MDiv and David Morales, MD, Cincinnati Children's Hospital Medical Center, Cincinnati, Ohio, March 14.
8. 2017, Pediatrics, "Ethical Dilemmas about Discharging Patients When There Are Disagreements Concerning Safety," Seattle Children's Hospital, Seattle, Washington, January 19.
9. 2015, Pediatrics, "'Nonbeneficial' Treatment: What must providers offer and what can they withhold?," Greenville Health System, Greenville, South Carolina, May 10.
10. 2014, Advance Practice Providers, "Common Ethical Issues," Cincinnati Children's Hospital Medical Center, Cincinnati, Ohio, August 13.
11. 2014, Respiratory Therapy, "Do-Not-Resuscitate (DNR) Orders," Cincinnati Children's Hospital Medical Center, Cincinnati, Ohio, July 15.
12. 2013, Heart Institute, "No Not Months.  Twenty-Two *Years*-Old: Transiting Patients to an Adult Model of Care." Cincinnati Children's Hospital Medical Center, Cincinnati, Ohio, October 21.
13. 2013, Division of Neonatology, "This Premature Infant Has a *BRCA1* Mutation!?: Ethical Issues in Clinical Whole Exome Sequencing for Neonatologists." Cincinnati Children's Hospital Medical Center, Cincinnati, Ohio, October 11.
14. 2013, Department of Pediatrics, "Adults are Not Large Children: Ethical Issues in Caring for Adults in Children's Hospitals," Cincinnati Children's Hospital Medical Center, Cincinnati, Ohio, February 26.
15. 2012, "Mandate or Moratorium?: Persisting Ethical Controversies in Donation after Circulatory Death," Cedars-Sinai Medical Center, Los Angeles, California, May 16.
16. 2011, Division of Pediatric Neurology Friday Lecture Series, "Inducing or Treating 'Seizures' with Placebos: Is It Ever Ethical?," University of Utah, Salt Lake City, Utah, October 7.
17. 2011, Department of Surgery, "DNR Orders in the OR and other Ethical Issues in Pediatric Surgery: Case Discussions," Primary Children's Medical Center, Salt Lake City, Utah, October 3.
18. 2009, Department of Pediatrics, "What to Do When Parents Want Everything Done: 'Futility' and Bioethical Mediation," Primary Children's Medical Center, Salt Lake City, Utah, September 17.
19. 2008, Division of Pulmonology and Critical Care, "Futility:  May Clinicians Ever Unilaterally Withhold or Withdraw Medical Treatment?" Utah Valley Regional Medical Center, Provo, Utah, April 17.
20. 2007, Division of Otolaryngology-Head and Neck Surgery, "Advance Directives, Durable Powers of Attorney for Healthcare, and Do Not Attempt Resuscitation Orders:  Oh My!," University of Utah School of Medicine, Salt Lake City, Utah, June 20.

**Outreach Presentations**
1. 2019, *Panelist*, Cincinnati Edition, WVXU, "The Ethics of Human Gene Editing," Cincinnati, Ohio, June 13.
2. 2019, *Speaker,* Adult Forum, Indian Hill Church, "Medical Ethics," Indian Hill, Ohio, March 24.
3. 2016, *Speaker,* Conversations in Bioethics:  The Intersection of Biology, Technology, and Faith, Mt. Washington Presbyterian Church, "Genetic Testing," Cincinnati, Ohio, October 12.
4. 2008, *Speaker,* Science in Society, Co-sponsored by KCPW and the City Library, "Death—Choices," Salt Lake City, Utah, November 20.
5. 2003, *Panelist,* Utah Symposium in Science and Literature, "The Goodness Switch: What Happens to Ethics if Behavior is All in Our Brains?" Salt Lake City, Utah, October 10.
6. 2002, *Respondent*, H. Tristram Englehardt, Jr. "The Culture Wars in Bioethics," Salt Lake Community College, Salt Lake City, Utah, March 29.

**Podcasts**

1. 2025, "Ethics, Wellness, and Compassion," Love Rounds, January 15.
2. 2021, "Ethics of COVID Vaccines in Kids," PHM from Pittsburgh, August 12.
3. 2020, COVID Quandaries: Episode 1, "Is Getting Sick Just Part of the Job?" Hard Call, October 6.

# **<u>Exhibit B</u>**

**EXHIBIT B**

TABLE 1: Strength of Recommendation and Quality of Evidence in Recommendations Made by the Endocrine Society

| Strength of the Recommendation/ Quality of the Evidence[1] | Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons | Pediatric Obesity-Assessment, Treatment, and Prevention | Congenital Adrenal Hyperplasia Due to Steroid 21-Hydroxylase Deficiency |
|---|---|---|---|
| Strong\|High | 0 (0)[2] | 0 (0) | 0 (0) |
| Strong\|Moderate | 3 (11) | 4 (13) | 18 (33) |
| Strong\|Low | 5 (18) | 6 (20) | 13 (25) |
| Strong\|Very Low | 2 (7) | 1 (3) | 1 (2) |
| Weak\|High | 0 (0) | 0 (0) | 0 (0) |
| Weak\|Moderate | 0 (0) | 0 (0) | 2 (4) |
| Weak\|Low | 9 (32) | 5 (17) | 4 (7) |
| Weak\|Very Low | 3 (11) | 12 (40) | 7 (13) |
| Ungraded Good Practice Statement[3] | 6 (21) | 2 (7) | 9 (17) |
| Either Low or Very Low | 19 (68) | 24 (80) | 25 (46) |
| Total | 28 | 30 | 54 |

[1] Quality of the Evidence
High: "Consistent evidence from well-performed RCTs [Randomized Controlled Trials] or exceptionally strong evidence from unbiased observational studies"
Moderate: "Evidence from RCTs with important limitations (inconsistent results, methodological flaws, indirect or imprecise evidence), or unusually strong evidence from unbiased observational studies"
Low: "Evidence for at least one critical outcomes from observational studies, from RCTs with serious flaws, or indirect evidence"
Very Low: "Evidence for at least one of the critical outcomes from unsystematic clinical observations or very indirect evidence"
See Swiglo BA, Murad MH, Schünemann HJ, et al. A case for clarity, consistency, and helpfulness: State-of-the-art clinical practice guidelines in endocrinology using the grading of recommendations, assessment, development, and evaluation system. *J Clin Endocrinol Metab*. 2008;93(3):666-73.

[2] n (%)

[3]Ungraded Good Practice Statement: "Direct evidence for these statements was either unavailable or not systematically appraised and considered out of the scope of this guideline. The intention of these statements is to draw attention to these principles." See Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(11):3869-3903.

Guidelines:
Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(11):3869-3903.
Styne DM, Arslanian SA, Connor EL, et al. Pediatric obesity-assessment, treatment, and prevention: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(3):709-757.
Speiser PW, Arlt W, Auchus RJ, et al. Congenital adrenal hyperplasia due to steroid 21-hydroxylase deficiency: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2018;103(11):4043-4088.

# Exhibit BB

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PFLAG, INC.; *et al.*,

　　　　　　　　　*Plaintiff*,

　　　v.

DONALD J. TRUMP, in his official capacity
as President of the United States; *et al.*,

　　　　　　　　　*Defendants*.

Civil Action No. 8:25-cv-00337

## EXPERT REPORT OF DAN H. KARASIC, M.D.

I, Dan H. Karasic, M.D., hereby declare and state as follows:

1.　　I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.　　I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.

3.　　I have actual knowledge of the matters stated herein.　If called to testify in this matter, I would testify truthfully and based on my expert opinion.

## I.　　BACKGROUND AND QUALIFICATIONS

### A.　　Qualifications

3.　　I am a Professor Emeritus of Psychiatry at the University of California – San Francisco (UCSF).　I have been on faculty at UCSF since 1991.　I have also had a telepsychiatry private practice since 2020.

4.　　I received my Doctor of Medicine (M.D.) degree from the Yale Medical School in 1987.　In 1991, I completed my residency in psychiatry at the University of California – Los

1

Angeles (UCLA) Neuropsychiatric Institute, and from 1990 to 1991, I was a postdoctoral fellow at UCLA in a training program in mental health services for persons living with AIDS.

5.    For over 30 years, I have worked with patients with gender dysphoria.  I am a Distinguished Life Fellow of the American Psychiatric Association and have been the chair of the American Psychiatric Association Workgroup on Gender Dysphoria, as well as the sole author of the chapter on transgender care in the American Psychiatric Press's Clinical Manual of Cultural Psychiatry, Second Edition.

6.    Over the past 30 years, I have provided care for thousands of transgender patients. For 17 years, I was the psychiatrist for the Dimensions Clinic for transgender youth in San Francisco, which treats trans youth 12-25 years old.  I also have provided care for many adolescents in my UCSF faculty practice and my current private practice.

7.    I previously sat on the Board of Directors of the World Professional Association for Transgender Health (WPATH) and am a co-author of WPATH's *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People*, Versions 7 and 8, which are the internationally accepted guidelines designed to promote the health and welfare of transgender, transsexual, and gender variant persons.  For Version 8, I was the lead author on the Mental Health Chapter.

8.    As a member of the WPATH Global Education Initiative, I helped develop a specialty certification program in transgender health and helped train over 2,000 health care providers.

9.    At UCSF, I developed protocols and outcome measures for the Transgender Surgery Program at the UCSF Medical Center.  I also served on the Medical Advisory Board for the UCSF Center of Excellence for Transgender Care and co-wrote the mental health section of the

2

original *Guidelines for the Primary and Gender-Affirming Care of Transgender and Gender Nonbinary People* in 2011 and the revision in 2016.

10.     I have worked with the San Francisco Department of Public Health, helping to develop and implement their program for the care of transgender patients and conducting mental health assessments for gender-affirming surgery.  I served on the City and County of San Francisco Human Rights Commission's LGBT Advisory Committee, and I have been an expert consultant for California state agencies and on multiple occasions for the United Nations Development Programme on international issues in transgender care.

11.     I have held numerous clinical positions concurrent to my clinical professorship at UCSF.  Among these, I served as an attending psychiatrist for San Francisco General Hospital's consultation-liaison service for AIDS care, as an outpatient psychiatrist for HIV-AIDS patients at UCSF, as a psychiatrist for the Transgender Life Care Program and the Dimensions Clinic at Castro Mission Health Center, and the founder and co-lead of the UCSF Alliance Health Project's Transgender Team.  In these clinical roles, I specialized in the evaluation and treatment of transgender patients, including those with gender dysphoria, and HIV-positive patients.  I also regularly provide consultation to psychologists and other psychotherapists working with transgender patients, including those with gender dysphoria.  I have been a consultant in transgender care to the California Department of State Hospitals and the California Department of Corrections and Rehabilitation on the care of incarcerated transgender people.

12.     As part of my psychiatric practice treating individuals diagnosed with gender dysphoria and who receive other medical and surgical treatment for that condition, as well as a co-author of the WPATH Standards of Care and UCSF's *Guidelines for the Primary and Gender-Affirming Care of Transgender and Gender Nonbinary People*, I am, and given the nature of my

3

EXPERT DECLARATION OF DR. DAN H. KARASIC, M.D.

work must be, familiar with additional aspects of medical care for the diagnosis of gender dysphoria, beyond mental health treatment, assessment, and diagnosis.

13.    In addition to this work, I have done research on the treatment of depression.  I have authored many articles and book chapters and edited the book *Sexual and Gender Diagnoses of the Diagnostic and Statistical Manual (DSM): A Reevaluation*.

14.    Since 2018, I have performed over 130 independent medical reviews for the State of California to determine the medical necessity of transgender medical care in appeals of denial of insurance coverage.

15.    My professional background, experiences, publications inclusive of those authored in the past 10 years, and presentations are further detailed in my curriculum vitae ("CV").  A true and correct copy of my CV is attached as **Exhibit A**.

**B.    Compensation**

16.    I am being compensated for my work on this matter at a rate of $400.00 per hour for preparation of declarations and expert reports.  I will be compensated $3,200.00 per day for any deposition testimony or trial testimony.  My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I may provide.

**C.    Previous Testimony**

17.    Over the past four years, I have given expert testimony by deposition or trial in the following cases: *L.B. v. Premera Blue Cross*, No. 3:20-cv-06145-RJB (W.D. Wash.); *Misanin v. Wilson*, No. 2:24-cv-04734-BHH (D.S.C.); *Voe v. Mansfield*, No. 1:23-CV-864-LCB-LPA (M.D.N.C.); *Boe v. Marshall*, No. 2:22-cv-184-LCB (N.D. Ala.); *Doe v. Ladapo*, No. 4:23-cv-00114 (N.D. Fla.); *Dekker v. Weida*, No. 4:22-cv-00325 (N.D. Fla.); *K.C. v. The Individual Members of the Medical Licensing Board of Indiana*, No. 1:23-cv-00595 (S.D. Ind.); *Brandt v.*

EXPERT DECLARATION OF DR. DAN H. KARASIC, M.D.

*Rutledge*, No. 4:21-cv-00450 (E.D. Ark.); *C.P. v. Blue Cross Blue Shield of Illinois*, No. 3:20-cv-06145 (W.D. Wash.); *Kadel v. Folwell*, No. 1:19-cv-00272 (M.D.N.C.); and *Fain v. Crouch*, No. 3:20-cv-00740 (S.D. W. Va.).  To the best of my recollection, I have not given expert testimony at a trial or at a deposition in any other case during this period.

## II.    BASES FOR OPINIONS

18.    In preparing this declaration, I have relied on my training and my decades of clinical experience as a psychiatrist treating patients with gender dysphoria, including adolescents and young adults, as well as my experience conducting research, as set out in my CV (attached hereto as **Exhibit A**), and on the materials listed therein.

19.    I have also relied on my knowledge of the peer-reviewed research regarding the treatment of gender dysphoria, which reflects advancements in the field of transgender health.  I have reviewed the materials listed in the bibliography attached hereto as **Exhibit B**.  The sources cited therein include authoritative, scientific peer-reviewed publications.  They include the documents specifically cited as supportive examples in particular sections of this report.

20.    I have also relied on my knowledge of the clinical practice guidelines for the treatment of gender dysphoria, including my work as a contributing author of the WPATH Standards of Care, Versions 7 and 8, and the UCSF Guidelines.

21.    The materials I have relied upon in preparing this declaration are the same types of materials that experts in my field of study regularly rely upon when forming opinions on the subject. I reserve the right to revise and supplement the opinions expressed in this report or the bases for them if any new information becomes available in the future, including as a result of new scientific research or publications or in response to statements and issues that may arise in my area of expertise.

Expert Declaration of Dr. Dan H. Karasic, M.D.

22.     In addition, I have reviewed the Executive Order 14187, titled "Protecting Children from Chemical and Surgical Mutilation," issued on January 28, 2025 ("EO 14187"), and Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to The Federal Government," issued on January 20, 2025 ("EO 14168"), as well as the Complaint in this case filed on February 4, 2025.

III.    **SUMMARY OF OPINIONS**

23.     Together, the executive orders seek to prohibit medical institutions and providers that receive federal funding from providing medical treatments that are part of widely accepted medical protocols for the treatment of adolescents and adults with gender dysphoria.  The following medical groups, among others, recognize that gender-affirming medical care is safe and effective for adolescents and adults: American Academy of Child and Adolescent Psychiatry, the American Academy of Pediatrics, the American Psychological Association, the American Psychiatric Association, and the American Medical Association, among many other mainstream medical organizations.

24.     The accepted protocols for the treatment of adolescents with gender dysphoria provide for careful mental health assessments, including of co-occurring conditions; stringent criteria for eligibility for each treatment; and a thorough informed consent process with the adolescent and their parents, before any medical interventions are initiated.

25.     Decades of medical research and clinical experience have demonstrated that the banned medical treatments are safe, effective, and medically necessary to relieve gender dysphoria for many adolescents.

6

26.     Gender-affirming medical care for adults is also efficacious and safe as treatment for gender dysphoria, with many decades of clinical experience and research demonstrating its benefits.

27.     I have seen first-hand, countless times over decades of practice, the many benefits of this treatment.  Denying gender-affirming medical care to adolescents and adults under the age of nineteen for whom it is medically indicated puts them at risk of significant harm to their health and well-being, including heightened risk of depression and suicidality.

28.     For adolescents and adults for whom gender-affirming medical care is indicated, no alternative treatments have been demonstrated to be effective.

29.     The denial of medically indicated care to transgender people not only results in the prolonging of their gender dysphoria, but causes additional distress and poses other health risks, such as depression, posttraumatic stress disorder, and suicidality.

## IV.    EXPERT OPINIONS

### A.    Sex and Gender Identity

30.     At birth, infants are assigned a sex, either male or female, based on the appearance of their external genitalia.

31.     While the terms "male sex" and "female sex" are sometimes used in reference to a person's genitals, chromosomes, and hormones, the reality is that sex is complicated and multifactorial.  Aside from external genital characteristics, chromosomes, and endogenous hormones, other factors related to sex include gonads, gender identity, and variations in brain structure and function.

Expert Declaration of Dr. Dan H. Karasic, M.D.

32.     Because these factors may not always be in alignment as typically male or typically female, "the terms biological sex and biological male or female are imprecise and should be avoided." (Hembree, et al., 2017).

33.     EO 14168 defines "sex" as "an individual's immutable biological classification as either male or female," that "does not include the concept of 'gender identity.'" EO 14168 § 2(a). It further defines "Female" as "a person belonging, at conception, to the sex that produces the large reproductive cell," and "[m]ale" as "a person belonging, at conception, to the sex that produces the small reproductive cell." EO 14168 §§ 2(d), (e).

34.     EO 14168's definition of "sex" is not consistent with how it is commonly understood in medicine. According to the American Medical Association, sex is made up of many diverse components. (AMA, 2023). Similarly, the Endocrine Society notes that because a person's sex characteristics "may not [always] be in line with each other …, the terms biological sex and biological male or female are imprecise and should be avoided." (Hembree, et al., 2017).

35.     Gender identity is "a person's deeply felt, inherent sense of being a girl, woman, or female; a man, or male; a blend of male or female; or an alternative gender." (American Psychological Association, 2015, at 834).

36.     Everyone has a gender identity.

37.     Gender identity does not always align with a person's sex assigned at birth.

38.     Gender identity, which has biological bases (Fischer and Cocchetti, 2020), is not merely a product of external influence, nor is it subject to voluntary change.

39.     EO 14168 defines "gender identity" as "a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not

EXPERT DECLARATION OF DR. DAN H. KARASIC, M.D.

provide a meaningful basis for identification and cannot be recognized as a replacement for sex." EO 14168 § 2(g).

40. EO 14168's definition of "gender identity" differs from how this term commonly understood and used in medicine and science. Gender identity does provide a meaningful basis for identification and has been a basis for identification federally as well as in most states, and in many other countries, for years.

41. For most people, their sex assigned at birth, or assigned sex, matches their gender identity. For transgender people, their assigned sex does not align with their gender identity.

42. Based on data from the Williams Institute, approximately 0.6% of the United States population age 13 or older, or about 1.6 million people, identify as transgender. (Herman, et al., 2022).

43. Being transgender is widely accepted as a normal variation in human development. Simply being transgender or gender nonconforming is not a medical condition to be treated and is not considered a mental illness. People who are transgender have no impairment in their ability to be productive, contributing members of society simply because of their transgender status.

44. The DSM-5 revised the diagnostic criteria (and name) of gender dysphoria to recognize the clinical distress as the focus of the treatment, not the patient's transgender status, noting that diagnosis and treatment are "focus[ed] on dysphoria as the clinical problem, not identity per se." (DSM-5, at 451).

45. Similarly, WPATH's Standards of Care, Version 8 states: "The expression of gender characteristics, including identities, that are not stereotypically associated with one's sex assigned at birth is a common and a culturally diverse human phenomenon that should not be seen as inherently negative or pathological. … It should be recognized gender diversity is common to

9

EXPERT DECLARATION OF DR. DAN H. KARASIC, M.D.

JA525

all human beings and is not pathological.  However, gender incongruence that causes clinically significant distress and impairment often requires medically necessary clinical interventions." (Coleman, et al. 2022).

46.    Accordingly, and as documented by multiple leading medical authorities, efforts to change a person's gender identity are ineffective, can cause harm, and are unethical.  (American Psychological Association, 2021; Byne, et al., 2018; Coleman, et al., 2022).

**B.    Gender Dysphoria**

47.    The term "gender dysphoria" refers to the distress related to the incongruence between one's gender identity and attributes related to one's sex assigned at birth.

48.    The diagnosis of Gender Dysphoria (capitalized) is a serious medical condition, and it is codified in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision* (DSM-5-TR) (DSM-5 released in 2013 and DSM-5-TR released in 2022).

49.    "Gender Dysphoria in Children" is a diagnosis applied only to pre-pubertal children.  The criteria for this diagnosis are:

    A.    A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months duration, as manifested by at least six of the following (one of which must be Criterion A1):

        1.    A strong desire to be of the other gender or insistence that one is the other gender (or some alternative gender different from one's assigned gender)

        2.    In boys (assigned gender), a strong preference for cross-dressing or simulating female attire; or in girls (assigned gender), a strong preference for wearing only typical masculine clothing and a strong resistance to the wearing of typical feminine clothing.

        3.    A strong preference for cross-gender roles in make-believe play or fantasy play.

10

    4.  A strong preference for the toys, games, or activities stereotypically used or engaged in by the other gender.

    5.  A strong preference for playmates of the other gender.

    6.  In boys (assigned gender), a strong rejection of typically masculine toys, games, and activities and a strong avoidance of rough-and-tumble play; or in girls (assigned gender), a strong rejection of typically feminine toys, games, and activities.

    7.  A strong dislike of one's sexual anatomy.

    8.  A strong desire for the primary and/or secondary sex characteristics that match one's experienced gender.

B.  The condition is associated with clinically significant distress or impairment in social circles, school, or other important areas of functioning.

50.    The DSM-5-TR has a separate diagnosis of "Gender Dysphoria in Adolescents and Adults," which involves two major diagnostic criteria. The criteria are:

A.    A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months duration, as manifested by at least two of the following:

    1.  A marked incongruence between one's experienced/expressed gender and primary or secondary sex characteristics.

    2.  A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender.

    3.  A strong desire for the primary and/or secondary sex characteristics of the other gender.

    4.  A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).

    5.  A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

    6.  A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

11

EXPERT DECLARATION OF DR. DAN H. KARASIC, M.D.

B.    The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

51.    Gender dysphoria is a condition that is highly amenable to treatment, and the prevailing treatment for it is highly effective.

52.    When untreated, gender dysphoria can cause significant distress including increased risk of depression, anxiety, and suicidality.  This is noted both in adults and adolescents.  These risks decline when transgender individuals are supported and live according to their gender identity.

53.    With access to medically indicated care, transgender people can experience significant and potentially complete relief from their symptoms of gender dysphoria.  Not only is this documented in scientific literature and published data, but I have witnessed this in thousands of patients  over three decades.

**C.    Evidence-Based Guidelines for Treatment of Gender Dysphoria**

54.    The World Professional Association of Transgender Health (WPATH) has issued *Standards of Care for the Health of Transgender and Gender Diverse People* ("WPATH SOC") since 1979.  The current version, published in 2022, is WPATH SOC 8.  The SOC 8 provides guidelines for multidisciplinary care of transgender individuals, including children and adolescents, and describes criteria for medical interventions to treat gender dysphoria, including puberty-delaying medications, hormone treatment, and surgery when medically indicated.

55.    The SOC 8  utilized a rigorous  evidence-based approach to developing the guidelines.  (Coleman, et al., 2022).  The process of developing the SOC 8 was a multistep, several years long effort that started in 2017.  This process is outlined in great detail in Appendix A to SOC 8.

56.    This "process for development of the SOC-8 incorporated recommendations on clinical practice guideline development from the National Academies of Medicine and the World

12

EXPERT DECLARATION OF DR. DAN H. KARASIC, M.D.

Health Organization that addressed transparency, the conflict-of-interest policy, committee composition and group process." (Coleman, et al., 2022, at S247 (citing Institute of Medicine Committee on Standards for Developing Trustworthy Clinical Practice, 2011; World Health Organization, 2019)). And "[t]he SOC-8 revision committee was multidisciplinary and consisted of subject matter experts, health care professionals, researchers and stakeholders with diverse perspectives and geographic representation." (Coleman, et al., 2022, at S247).

57.     WPATH SOC 8's evidence-based recommendations were drafted "based on the results of the systematic, and background literature reviews plus consensus-based expert opinions." (Coleman, et al., 2022, at S250). The recommendations were developed and are based on available evidence supporting interventions, a discussion of risks and harms, as well as feasibility and acceptability within different contexts and country settings. A consensus of the final recommendations was attained using the Delphi process that included all members of the Standards of Care Revision committee, and supportive and explanatory text of the evidence for the statements was written.

58.     The Delphi process is a procedure by which a panel of experts are asked for their opinion on a relevant issue, summarizing and presenting their collective responses and repeating this process for a certain number of rounds. (Shang, 2023; Hsu and Sanford, 2019). It is "a well-established approach to answering a research question through the identification of a consensus view across subject experts." (Barrett and Healey, 2020).

59.     The recommendations submitted to a vote under the Delphi process required approval of 75% of the authors of SOC 8 as a whole. More specifically, for a recommendation to be approved, a minimum of 75% of the voters had to approve the statement. (Coleman, et al., 2022, at S250). With regards to SOC 8, every member of the SOC revision committee voted for

13

EXPERT DECLARATION OF DR. DAN H. KARASIC, M.D.
JA529

each statement.  Following the aforementioned process, recommendations contained in SOC 8, as published in 2022, were approved by 75% or more of the revision committee.

60.     The evidence base supporting the recommendations in the WPATH Standards of Care is  comparable to the evidence base supporting treatment for other conditions.

61.     A clinical practice guideline from the Endocrine Society (the Endocrine Society Guidelines) provides similar guidelines for clinicians to provide safe and effective treatment for gender dysphoria.  (Hembree, et al., 2017).

62.     Each of these guidelines are evidence-based and supported by scientific research and literature, as well as extensive clinical experience.

63.     The protocols and policies set forth by the WPATH Standards of Care and the Endocrine Society Guideline are cited as authoritative by the major professional medical and mental health associations in the United States, including the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, the American Psychological Association, the American College of Obstetrics and Gynecology, the American College of Physicians, and the World Medical Association, among others.  They are also relied upon by clinicians treating patients with gender dysphoria.

### D.     Treatment of Gender Dysphoria

64.     Under the WPATH SOC 8 and the Endocrine Society Guideline, the overarching goal of treatment is to eliminate the distress of gender dysphoria by aligning an individual patient's body and secondary sex characteristics with the patient's gender identity.

65.     The denial of medically indicated care to transgender people with gender dysphoria not only results in the prolonging of their gender dysphoria, but causes additional

14

distress and poses other health risks, such as depression, posttraumatic stress disorder, and suicidality. In other words, lack of access to gender-affirming medical care directly contributes to poorer mental health outcomes for transgender people with gender dysphoria. (Owen-Smith, et al., 2018).

66. For patients for whom gender-affirming medical care is indicated, no alternative treatments have been demonstrated to be effective.

67. In accordance with the WPATH SOC 8 and the Endocrine Society Guidelines, medical interventions to treat gender dysphoria may include treatment with pubertal suppression and/or hormones, and treatment with surgery, based on a patient's age, maturity, and individual needs.

68. For minor patients, all treatment decisions are made in consultation with the patient and the patient's parents or guardian. Consent for medical intervention is provided by the parent or legal guardian in the case of any minor receiving treatment.

69. No medical or surgical treatment for gender dysphoria is provided to pre-pubertal children. For pre-pubertal children, interventions are directed at supporting the child with family, peers, and at school, as well as supportive individual psychotherapy for the child as needed to help manage anxiety and distress that may emerge navigating their transgender identity in the world.

70. Adolescents (which generally refers to minors after the onset of puberty) with gender dysphoria may be treated with medications to pause pubertal changes in the early stages of puberty if the onset of puberty is causing increased distress. Pubertal blockade, which involves methods of temporarily suppressing endogenous puberty, delays the development of secondary sex characteristics, such as breasts or facial hair, and consequently prevents the escalating distress that many transgender adolescents experience with the development of these gender-incongruent

15

characteristics. The pubertal blockade also gives the adolescent more time to understand their gender identity without these potentially distressing changes to their bodies. Once stopped, a patient returns to the stage of pubertal development that had begun when the treatment was initiated.

71.    After ongoing work with mental health professionals and when the adolescent has lived in accordance with their gender identity for a significant period of time, adolescents may be prescribed hormone therapy to treat their persistent gender dysphoria. Gender-affirming hormone therapy involves administering testosterone for transgender boys and estrogen and testosterone suppression for transgender girls. The purpose of this treatment is to attain the appropriate masculinization or feminization of the transgender person that matches as closely as possible to their gender identity. For adolescents, this treatment allows patients to have pubertal changes and development consistent with their gender identity timed alongside their peers. Gender-affirming hormone therapy is a partially reversible treatment. .

72.    Some transgender individuals have persistent gender dysphoria even with other medical interventions and need surgical interventions to help bring their bodies into alignment with their gender identity. Surgical interventions are primarily reserved for adults. However, "[c]hest masculinization surgery can be considered in minors when clinically and developmentally appropriate as determined by a multidisciplinary team experienced in adolescent and gender development." (Coleman, et al. 2022).

73.    Under the WPATH Standards of Care, puberty-delaying medication for transgender adolescents after the beginning of puberty, gender-affirming hormone therapy, and chest surgery for older adolescents may be medically indicated if the following criteria are met: (a) Gender diversity/incongruence is marked and sustained over time; (b) Meets the diagnostic criteria of

EXPERT DECLARATION OF DR. DAN H. KARASIC, M.D.

Gender Dysphoria; (c) Demonstrates the emotional and cognitive maturity required to provide informed consent/assent for the treatment; (d) Mental health concerns (if any) that may interfere with diagnostic clarity, capacity to consent, and gender-affirming medical treatments have been addressed sufficiently so that gender-affirming medical treatment can be provided optimally; (e) Informed of the reproductive effects, including the potential loss of fertility and the available options to preserve fertility.

74.    As with all medical care, the care provided to transgender young people with gender dysphoria is tailored to the unique needs of each patient based on their individual experiences, proximity to specialists, and general health, as well as the clinical experience of practitioners.

75.    The treatment protocols for gender dysphoria are comparable to those for other mental health and medical conditions. Indeed, these or similar procedures are provided for cisgender people with other diagnoses.

### E.    Assessments of Patients with Gender Dysphoria

76.    Treating transgender adolescents and young adults with affirming treatment does not mean steering them in any particular direction, but rather supporting them through their period of exploration of gender expression and increasing self-awareness of their identity. (Coleman, et al., 2012, at 18l; Ehrensaft, 2017).   The WPATH SOC 8 states, "We recommend health professionals working with gender diverse adolescents facilitate the exploration and expression of gender openly and respectfully so that no one particular identity is favored." (Coleman, et al., 2022). The WPATH SOC 8 states "For some youth, obtaining gender-affirming medical care is important while for others these steps might not be necessary." (Coleman, et al., 2022).

77.    The WPATH SOC 8 and the Endocrine Society Guidelines further provide that before any medical or surgical interventions are provided to adolescents, a careful mental health

17

assessment should be conducted to ascertain whether the diagnostic criteria for Gender Dysphoria in Adolescents and Adults are met, and the appropriateness of such care for the patient.

78.    The WPATH SOC 8 recommends that healthcare professionals working with transgender and non-binary adolescents be licensed, hold a postgraduate degree in a relevant clinical field, have received training and developed expertise in working with children and adolescents, including those with autism spectrum disorder, and have received training and developed expertise in gender identity and diversity in youth, and in assessing the ability of youth to assent/consent to care (Coleman, et al., 2022). The SOC 8 further recommends a "comprehensive biopsychosocial assessment" for adolescents "prior to any medically necessary medical or surgical intervention" for gender dysphoria.  The assessment should include gender identity development, social development and support, diagnostic assessment of co-occurring mental health or developmental concerns, and capacity for decision-making (Coleman, et al., 2022).   Such comprehensive assessment is a critical element of providing care before any medically necessary medical or surgical intervention for adolescents with gender dysphoria.

79.    The SOC 8 also highlights the importance of involving parent(s)/guardian(s) in the assessment and treatment process for minors, as well as the ability of the mental health professional to distinguish between Gender Dysphoria and other mental health conditions or developmental anxieties (Coleman, et al., 2022). And as previously noted, a parent or guardian must provide informed consent to any medical treatment for their minor child.

80.    Similarly, the Endocrine Society Guidelines state that only "[mental health professionals] who ha[ve] training/experience in child and adolescent gender development (as well as child and adolescent psychopathology) should make the diagnosis," which usually includes "a complete psychodiagnostic assessment." (Hembree, et al., 2017, at 3877).  It further provides that

EXPERT DECLARATION OF DR. DAN H. KARASIC, M.D.

because gender dysphoria "may be accompanied with psychological or psychiatric problems" it is necessary that clinicians involved in diagnosis and psychosocial assessment meet specific competency requirements and that they undertake or refer for appropriate psychological or psychiatric treatment. *Id.*, at 3876. And "in cases in which severe psychopathology" "interfere[s] with diagnostic work or make[s] satisfactory treatment unlikely, clinicians should assist the adolescent in managing these other issues." *Id.*

81.    In other words, gender-affirming medical interventions for adolescents are prescribed and provided only after a comprehensive psychosocial assessment by a qualified mental health professional who (i) assesses for the diagnosis of gender dysphoria and any other co-occurring diagnoses, (ii) ensures the child can assent and the parents/guardians can consent to the relevant intervention after a thorough review of the risks, benefits and alternatives of the intervention, and (iii) if co-occurring mental health conditions are present, that they do not interfere with the accuracy of the diagnosis of gender dysphoria or impair the ability of the adolescent to assent to care (Coleman, et al., 2022; Hembree, et al., 2017).

82.    For assessing an adult for gender-affirming medical care, WPATH SOC 8 states that the health professional should be licensed and trained in identifying gender dysphoria as well as co-existing mental health and psychosocial concerns, and that medical or surgical treatment should only be recommended when "gender incongruence is marked and sustained," when there is capacity for consent, when other conditions that might affect outcomes have been assessed, and when diagnostic criteria for Gender Dysphoria of DSM 5-TR (in the US) or Gender Incongruence of ICD-11(outside the US) are met.

19

Expert Declaration of Dr. Dan H. Karasic, M.D.

JA535

83.    Before gender affirming medical care is provided to a patient, the WPATH SOC 8 recommends that impacts of care on fertility, and fertility preservation options be discussed thoroughly with the patient, and in the case of a minor, with parents or guardians.

**F.    Gender-Affirming Medical Care for Is Safe and Effective.**

84.    There is a substantial body of research and clinical evidence that gender-affirming medical care is effective in treating gender dysphoria.  This evidence includes scientific studies assessing mental health outcomes for transgender people who are treated with these interventions, including adolescents, and decades of clinical experience, including my own.

85.    The research and studies supporting the necessity, safety, and effectiveness of medical and surgical care for gender dysphoria are the same type of evidence that the medical community routinely relies upon when treating other medical conditions.

86.    Medical treatment for gender dysphoria has been studied for over half a century, and there is substantial evidence that these interventions improve quality of life and measures of mental health.[1]  These studies have looked at the positive impact of puberty-delaying medications,[2]

---

[1] *See, e.g.*, Dopp, et al., 2024; Aldridge, et al., 2021; Almazan, et al., 2021; Baker, et al., 2021; Murad, et al., 2010; Nobili, et al., 2018; Pfafflin & Junge, 1998; T'Sjoen et al. 2019; van de Grift et al., 2018; White Hughto and Reisner, 2016; Wierckx et al., 2014; Cornell, What We Know, 2018.

[2] Studies documenting the positive of puberty-delaying medications include, among others: McGregor, et al., 2024; Turban, et al., 2020; Achille, et al., 2020; Costa, et al., 2015; and de Vries, et al., 2011.

20

EXPERT DECLARATION OF DR. DAN H. KARASIC, M.D.

gender-affirming hormones (in adolescents[3] and adults[4]), and gender affirming chest surgery in adolescents and young adults[5] on gender dysphoria, mental health, and quality of life.

87.    The studies on gender-affirming medical care for adolescents and adults with gender dysphoria are consistent with decades of clinical experience of mental health providers across the U.S. and around the world.  At professional conferences and other settings in which I interact with colleagues, clinicians I meet report that gender-affirming medical care, for those for whom it is indicated, provides great clinical benefit.  In my over 30 years of clinical experience treating gender dysphoric patients, including more than 20 years working with adolescents, I have seen first-hand the benefits of gender-affirming medical care on my patients' health and well-being. I have seen many patients show improvement in mental health, as well as in performance in school, in social functioning with peers, and in family relationships when they experience relief from gender dysphoria with gender-affirming medical care.

88.    Claims that the risks outweigh the benefits of medical treatment are without foundation.  The benefits of medical treatment, and risks of withholding care, for transgender youth and young adults with gender dysphoria are clear, as described and referenced above.  In addition, a treating doctor will not offer gender-affirming medical treatments unless they have concluded after weighing the risks and benefits of care that treatment is appropriate.  The risks and benefits of care are discussed with patients, and in the case of a minor, the minor's parents, who must consent

---

[3] Studies documenting the positive impact of gender-affirming hormones in adolescents include, among others: Chelliah, et al., 2024; Chen, et al., 2023; Turban, et al., 2022; Achille, et al., 2020; Allen, et al., 2019.

[4] Studies documenting the positive impact of gender-affirming hormones in adults include, among others: Shelemy, et al., 2024; Nguyen, et al., 2018; Oda, et al., 2018; Turan, et al., 2018; Fisher, et al., 2016; Keo-Meier, et al., 2015; Colizzi, et al., 2014; Colizzi, et al., 2013.

[5] Studies documenting the positive impact of gender-affirming chest surgery in adolescents and young adults include, among others: Boskey, et al., 2023; Ascha, et al., 2022; Mehringer, et al., 2021; and Olson-Kennedy, et al., 2018.

21

EXPERT DECLARATION OF DR. DAN H. KARASIC, M.D.

to treatment, while the minor provides assent. This process is no different than the informed consent process for other treatments that parents routinely consent to on behalf of their minor children. However, for gender-affirming medical care, there is the additional safeguard of the assessment by a mental health professional, who, in addition to diagnosing gender dysphoria, also assesses a patient's capacity to assent to treatment and ability to understand the risks and benefits of treatment. Indeed, SOC 8 notes that mental health professionals are the best positioned practitioners to conduct these assessments for adolescents and also recommends, for all patients, that a mental health professional address any mental health issues that may interfere with a patient's ability to consent prior to the initiation of gender-affirming care.

89.     Gender-affirming medical interventions provided in accordance with the WPATH SOC 8 and Endocrine Society Guidelines are widely recognized in the medical community as safe, effective, and medically necessary for many adolescents and adults with gender dysphoria. (*See*, *e.g.*, the American Psychological Association, 2024 and 2021; American Academy of Pediatrics, 2018 (reaffirmed in 2023); the American Medical Association, 2021; the Pediatric Endocrine Society, 2021; the American College of Obstetricians and Gynecologists, 2021; the Endocrine Society, 2020; the American Academy of Family Physicians, 2020; the American Psychiatric Association, 2018; and WPATH, 2022).

90.     For all these reasons, I am aware of no basis in medicine or science for barring the provision of gender-affirming medical care as treatment for adolescents or adults with gender dysphoria.

22

EXPERT DECLARATION OF DR. DAN H. KARASIC, M.D.

**G.    EO 14187 Is Based on Misperceptions and Misinformation.**

91.    A few misperceptions or pieces of misinformation have motivated efforts to ban this evidence-based, safe, and effective medical treatment for transgender adolescents and young adults.

92.    One misperception that animates EO 14187 is the false claim that for most youth, gender dysphoria will resolve on its own, making gender affirming medical interventions unnecessary, and causing people to regret the gender affirming medical care that they received. These claims are inaccurate and are often in reference to a body of literature sometimes referred to as "desistance" studies, that found that many pre-pubertal children diagnosed with "Gender Identity Disorder in Children" (a precursor diagnosis to "Gender Dysphoria in Children" in the DSM-III-R and DSM-IV) identified with their sex assigned at birth at a later follow up. But while there are a number of pre-pubertal children who demonstrate an interest or preference for clothing, toys, and games that are stereotypically of interest to members of the "other" gender, some of these children are transgender and some are not. Reliance on this research is therefore misplaced for two reasons.

93.    The first reason is that the children who were the subject of these research endeavors in the late 20th century included both children who are transgender and children who are not. The diagnostic criteria for "Gender Identity Disorder in Children" were different from the diagnostic criteria for "Gender Dysphoria in Children" in meaningful ways that result in the desistance studies grossly overestimating the rate of desistance. "Gender Identity Disorder in Children" did not require identification with a gender other than the one assigned to the person at birth. A diagnosis could be made solely on the basis of gender atypical behavior, such as a boy who prefers playing with dolls and dress-up. This means that a child could be diagnosed with Gender Identity Disorder without ever having a transgender identity and, therefore, any study that

23

selected subjects based on this diagnosis could include individuals who never had a gender identity that differed from the sex they were assigned at birth. This problem with the diagnosis was remedied with the DSM-5 diagnosis of "Gender Dysphoria in Children," which requires a child to have "a strong desire to be of the other gender or an insistence that one is the other gender (or some alternative gender different from one's assigned gender)." (*See also* Zucker, et al., 2013 (noting that the change in the diagnostic criteria was meant to eliminate "false positives")). Under this updated diagnosis, a child could not be diagnosed based solely on gender atypical behavior without identifying as a different sex than the one assigned at birth. Because the desistance studies were all conducted prior to the DSM-5, a child did not need to have a transgender identity to be included in the study. Additionally, in several of these studies, many of the children did not even meet the looser criteria (or were "sub-threshold") for the Gender Identity Disorder diagnosis   but were nevertheless included in the studies based on parents bringing the youth to the gender clinic due to the parents' anxiety about the gender atypical behavior of their children, usually designated male at birth.

94.    It is not surprising that many children in these studies did not identify as transgender at follow-up as these children were never transgender and never identified with a gender different from their assigned sex at birth when enrolled in the studies. In fact, the cohorts from UCLA and Toronto in those studies were all or largely *prepubertal* boys who engaged in feminine behavior, leading their parents in the 1960's, 1970's, and 1980's to bring them to clinical attention before they came out as gay or bisexual. By contrast, the one large modern American study of pre-pubertal children who were using a pronoun other than one that aligned with their sex assigned at birth, found that only 2.5% of them later identified as cisgender. (Olson, et al., 2022). Simply put, these are different populations of gender diverse children with different trajectories.

24

EXPERT DECLARATION OF DR. DAN H. KARASIC, M.D.

95.     The second reason why reliance on "desistance" studies is misplaced is because the desistance studies focus only on pre-pubertal children. Whatever conclusions can be drawn from them about the likelihood of persistence of gender dysphoria in pre-pubertal children, which again is uncertain given the diagnostic limitations identified above, data indicates that once youth reach the beginning of puberty with a persistent transgender identity, desistance is rare. (DeVries, et al., 2011; Wiepjies, et al., 2018; Brik, et al., 2020; Cavve, et al., 2024). This data is consistent with clinical experience. In fact, the Amsterdam and Toronto gender centers that published the desistance data on pre-pubertal children referenced above provided medical interventions to youth whose gender dysphoria persisted into adolescence. (Zucker, et al., 2010; DeVries, et al., 2014). Because no medical treatments are used prior to adolescence, the persistence and desistance rates of pre-pubertal children do not inform the decision whether or not to initiate gender affirming medical treatments in adolescents.

96.     EO 14187 claims that "[c]ountless children soon regret that they have been mutilated," in reference to gender-affirming medical interventions. This statement inappropriately compares this well-established care to mutilation. Mutilation is not part of nor related to gender affirming medical care, however. Gender affirming medical interventions in minors, which are provided to treat the medical condition of gender dysphoria, primarily encompass medications in the form puberty blockers and hormones. Some transgender male older adolescents may need and obtain chest surgery to reduce breast tissue and masculinize the chest. This surgery is much more commonly performed on cisgender boys who have unwanted excess breast tissue (gynecomastia), than on transgender males, however. For example, Dai, et al. (2024) recently found that of the minors who had these surgeries, 97% were cisgender adolescent males and only 3% were transgender adolescent minors. Genital surgery is exceedingly rarely

25

performed in transgender minor adolescents, and in such extremely rare circumstances it is usually on an adolescent young woman who is 17 years old and about to turn 18 and is undergoing treatment prior to going off to college so she can recover at home with her parents.

97.     In addition, regret among those who are treated with gender-affirming medical care is rare. For example, in one study in the Netherlands, none of the youth who received puberty-delaying treatment, hormones, and surgery, and were followed over an 8-year period, expressed regret with regard to receiving their gender-affirming care. (DeVries, 2014). Zucker et al. (2010), summarizing key studies on outcomes for adolescents referred for surgery when they reached the age of majority in the Netherlands, states, "there was virtually no evidence of regret, suggesting that the intervention was effective." These findings about regret being very rare are consistent with my observations in decades of clinical practice.

98.     Similarly, Cavve et al. (2024) examined the outcomes of 548 of the 552 youth referred to the pediatric gender clinic in Perth, Australia. This study is exceptional in medical literature generally for the extremely high share of former patients the researchers were able to reach. Of 196 youth who were started on puberty blockers or hormones, only 2 (1.0%) discontinued medical treatment because of reidentification with birth sex.

99.     Regret rates for gender-affirming surgery in adults (and chest surgery, for adolescents) are also very low. A pooled review across multiple studies of 7,928 patients receiving gender-affirming surgery showed a regret rate of 1%. (Bustos, et al., 2021; see also Dhejne, et al., 2014).

100.     And with regards to chest surgery for adolescents and young adults, a study of 209 gender-affirming mastectomies in transmasculine adolescents aged 12-17, performed at Kaiser Permanente Northern California from 2013 to 2020, showed a regret rate of 1%. (Tang, et al.,

EXPERT DECLARATION OF DR. DAN H. KARASIC, M.D.

2022). Likewise, a recent study found very high satisfaction and very little regret among those receiving gender-affirming mastectomy at one U.S. center following a longitudinal period ranging from 2 to 30 years. Bruce, et al. (2023), reported on 235 patients who had gender-affirming mastectomy at one center from 1990 to 2020. On a scale of 1.0-5.0, the median Satisfaction with Decision score in those who had surgery was 5.0. On a scale of 0.0-100.0, the median Decision Regret score was 0.0. These median scores are the highest satisfaction and lowest regret levels possible on the measures used.

101.    These are all very low regret rates for surgery. A systematic review of regret after surgery found a very low regret rates for gender affirming mastectomy, lower than almost all other breast surgeries. (Thornton, et al., 2024). Many other surgeries not related to gender affirming care had substantially higher regret rates, and there were higher regret rates for non-surgical major life decisions. For example, 47% of women expressed at least some regret after reconstructive breast surgery following mastectomy for breast cancer. (Sheehan, et al., 2008).

102.    Another misperception motivating EO 14187 is that medical treatment for gender dysphoria is not sufficiently supported because some of the evidence cited in support thereof is of "low quality." But this misapprehends the purpose of the GRADE system and how evidence for medical interventions is evaluated. GRADE criteria assign low quality scores to studies not performed by randomized, blinded clinical trials. However, randomly selecting people to receive or not receive gender-affirming medical or surgical interventions is impossible, for practical and ethical reasons. Additionally, the vast majority of medical interventions for all types of care (aside from gender-affirming medical care) are not supported by so-called "high quality" evidence, and systematic reviews of most medical interventions of all types show low or very low GRADE scores. (Fleming, et al., 2016; Howick, et al., 2020).

27

103.    Ultimately, the body of evidence in the scientific and medical literature, as well as the decades of clinical experience with this medical care, demonstrates that gender-affirming medical care is well-established, safe, and effective, and is as robust if not more so than the body of evidence for other medical conditions.

**H.    Harms of Denying Gender-Affirming Care**

104.    The overarching goal of treatment is to eliminate the distress of gender dysphoria by aligning an individual patient's body and presentation with their gender identity.

105.    The denial of medically indicated care to transgender people with gender dysphoria not only results in the prolonging of their gender dysphoria, but causes additional distress and poses other health risks, such as depression, posttraumatic stress disorder, and suicidality.  In other words, lack of access to gender-affirming medical care directly contributes to poorer mental health outcomes for the affected patient population.  (Owen-Smith, et al., 2018).

106.    For patients for whom gender-affirming medical care is indicated, no alternative treatments have been demonstrated to be effective.  To the extent one proposed alternative is psychotherapeutic treatment to encourage identification with a person's assigned sex at birth, the American Psychological Association has stated that such efforts provide no benefit and instead do harm.  (APA, 2021).  Or if an alternative approach is to treat the worsening dysphoria only with therapy, that has not shown to be effective in any research.  (Dopp, et al., 2024). Psychotherapy is a critical treatment modality for many patients, but it does not address the underlying gender dysphoria, which when persistent can only be addressed by bringing a patient's body and sex characteristics into alignment with the patient's gender identity.

107.    I have had patients over the years who were unable to access gender-affirming medical care when it was clinically indicated, including in the years before this care was more

28

widely available, as well as minors who could not access care due to lack of parental consent. In many of these patients, delayed or denied care resulted in increased depression, anxiety, suicidal ideation and self-harm, increased substance use, and a deterioration in school performance. For patients with severe distress due to their gender dysphoria, psychotherapeutic approaches did not alleviate this distress absent medical intervention. Some of my patients had years of intensive mental health interventions, including long-term psychotherapy, without relief of gender dysphoria until receiving medical intervention.

## V.    CONCLUSION

108.    The accepted protocols for the treatment of transgender adolescents with gender dysphoria provide for mental health assessments, including of co-occurring conditions; criteria for eligibility for each treatment; and an informed consent process before medical interventions are initiated.

109.    EO 14187 prohibits medical institutions receiving federal funding from providing widely accepted, evidence-based medical treatments for gender dysphoria in adolescents. It thus seeks to prohibit the only treatments demonstrated to be effective for adolescents and young adults with gender dysphoria for whom gender-affirming medical care is indicated.

110.    Decades of medical research and clinical experience demonstrate that these medical treatments are safe, effective, and medically necessary to relieve gender dysphoria for many adolescents.

111.    Consistent with my first-hand clinical experience over decades of practice, denying gender-affirming medical care to adolescents for whom it is medically indicated puts them at risk of significant harm to their health and well-being, including heightened risk of depression and suicidality.

29

EXPERT DECLARATION OF DR. DAN H. KARASIC, M.D.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 10th day of February 2025.

Dan H. Karasic, M.D.

30

# Exhibit A

**University of California, San Francisco**
# CURRICULUM VITAE

**Name:**      Dan H. Karasic, MD

**Position:**   Professor Emeritus
Psychiatry
School of Medicine

Voice: 415-935-1511

Fax: 888-232-9336

## EDUCATION

| | | | |
|---|---|---|---|
| 1978 - 1982 | Occidental College, Los Angeles | A.B.; Summa Cum Laude | Biology |
| 1982 - 1987 | Yale University School of Medicine | M.D. | Medicine |
| 1987 - 1988 | University of California, Los Angeles | Intern | Medicine, Psychiatry, and Neurology |
| 1988 - 1991 | University of California, Los Angeles; Neuropsychiatric Institute | Resident | Psychiatry |
| 1990 - 1991 | University of California, Los Angeles; Department of Sociology | Postdoctoral Fellow | Research Training Program in Mental Health Services for Persons with AIDS |

## LICENSES, CERTIFICATION

| | |
|---|---|
| 1990 | Medical Licensure, California, License Number G65105 |
| 1990 | Drug Enforcement Administration Registration Number BK1765354 |
| 1993 | American Board of Psychiatry and Neurology, Board Certified in Psychiatry |

## PRINCIPAL POSITIONS HELD

| | | |
|---|---|---|
| 1991 - 1993 | University of California, San Francisco | Health Sciences Psychiatry Clincial Instructor |
| 1993 - 1999 | University of California, San Francisco | Health Sciences Psychiatry Assistant Clinical Professor |

| 1999 - 2005 | University of California, San Francisco | Health Sciences Psychiatry Associate Clinical Professor |
| 2005 - 2020 | University of California, San Francisco | Health Sciences Psychiatry  Clinical Professor |
| 2020-present | University of California, San Francisco | Professor Emeritus of Psychiatry |

## OTHER POSITIONS HELD CONCURRENTLY

| 1980 - 1980 | Associated Western Universities / U.S. Department of Energy | Honors Undergraduate Research Fellow | UCLA Medicine |
| 1981 - 1981 | University of California, Los Angeles; American Heart Association, California Affiliate | Summer Student Research Fellow | UCLA Medicine |
| 1986 - 1987 | Yale University School of Medicine; American Heart Association, Connecticut Affiliate | Medical Student Research Fellow | Psychiatry |
| 1990 - 1991 | University of California, Los Angeles | Postdoctoral Fellow | Sociology |
| 1991 - 2001 | SFGH Consultation-Liaison Service; AIDS Care | Attending Psychiatrist | Psychiatry |
| 1991 - 2001 | AIDS Consultation-Liaison Medical Student Elective | Course Director | Psychiatry |
| 1991 - present | UCSF Positive Health Program at San General Hospital (Ward 86) | HIV/AIDS Outpatient Psychiatrist | Psychiatry Francisco |
| 1991 - present | UCSF AHP (AIDS Health Project/Alliance Health Project) | HIV/AIDS Outpatient Psychiatrist | Psychiatry |
| 1994 - 2002 | St. Mary's Medical Center CARE Unit. The CARE Unit specializes in the care of patients with AIDS dementia. | Consultant | Psychiatry |
| 2001 - 2010 | Depression and Antiretroviral Adherence Study (The H.O.M.E. study: Health Outcomes of Mood Enhancement) | Clinical Director | Psychiatry and Medicine |
| 2003 - 2020 | Transgender Life Care Program and Clinic, Castro Mission Health | Psychiatrist Clinic | Dimensions Center | Dimensions |
| 2013 - 2020 | UCSF Alliance Health Project, Co-lead, Transgender Team | Co-Lead and Psychiatrist | Psychiatry |

## HONORS AND AWARDS

| | | |
|---|---|---|
| 1981 | Phi Beta Kappa Honor Society | Phi Beta Kappa |
| 1990 | NIMH Postdoctoral Fellowship in Health Services for People with AIDS (1990-1991) | National Institute of Mental Health  Mental |
| 2001 | Lesbian Gay Bisexual Transgender Leadership Award, LGBT Task Force of the Cultural Competence and Diversity Program | SFGH Department of Psychiatry |
| 2006 | Distinguished Fellow | American Psychiatric Association |
| 2012 | Chancellor's Award for Leadership in LGBT Health | UCSF |
| 2023 | Alumni Seal Award for Achievement | Occidental College Professional |

## MEMBERSHIPS

1992 - present Northern California Psychiatric Society

1992 - present American Psychiatric Association

2000 - 2019 Bay Area Gender Associates (an organization of psychotherapists working with transgendered clients)

2001 - present World Professional Association for Transgender Health

## SERVICE TO PROFESSIONAL ORGANIZATIONS

| | | |
|---|---|---|
| 1981 - 1982 | The Occidental | News Editor |
| 1984 - 1985 | Yale University School of Medicine | Class President |
| 1989 - 1991 | Kaposi's Sarcoma Group, AIDS Project Los Angeles | Volunteer Facilitator |
| 1992 - 1996 | Early Career Psychiatrist Committee, Association of Gay Lesbian Psychiatrists | Chair and |
| 1992 - 1996 | Board of Directors, Association of Gay and Lesbian  Psychiatrists | Member |
| 1993 - 1993 | Local Arrangements Committee, Association of Gay and Lesbian Psychiatrists | Chair |
| 1994 - 1995 | Educational Program, Association of Gay and Lesbian Psychiatrists, 1995 Annual Meeting | Director |
| 1994 - 1998 | Board of Directors, BAY Positives | Member |
| 1994 - 2020 | Committee on Lesbian, Gay, Bisexual and Transgender | Member |

Issues, Northern California Psychiatric Society

1995 - 1997  Board of Directors, Bay Area Young Positives. BAY   President

Positives is the nation's first community-based organization providing psychosocial and recreational services to HIV-positive youth

1995 - 1997  Executive Committee, Bay Area Young Positives.   Chair

1996 - 2004  Committee on Lesbian, Gay, Bisexual and Transgender        Chair  Issues, Northern California Psychiatric Society

1998 - 2002        City of San Francisco Human Rights Commission,        Member  Lesbian, Gay Bisexual Transgender Advisory Committee

2000 - 2004        Association of Gay and Lesbian Psychiatrists.    Vice President Responsible for the organization's educational programs

2004 - 2005  Association of Gay and Lesbian Psychiatrists        President-elect

2005 - 2007  Caucus of Lesbian, Gay, and Bisexual Psychiatrists of the Chair   American Psychiatric Association

2005 - 2007        Association of Gay and Lesbian Psychiatrists        President

2007 - 2009        Association of Gay and Lesbian Psychiatrists        Immediate Past President

2009 - 2010  Consensus Committee for Revision of the Sexual and        Member Gender Identity Disorders for DSM-V, GID of Adults subcommittee. (Wrote WPATH recommendations as advisory body to the APA DSM V Committee for the Sexual and Gender Identity Disorders chapter revision.)

2010 - 2011  Scientific Committee, 2011 WPATH Biennial Symposium, Member Atlanta

2010 -2022 World Professional Association for Transgender Care        Member Standards of Care Workgroup and Committee (writing seventh and eighth revisions of the WPATH Standards of Care, which is used internationally for transgender care.)

2010 - 2018        ICD 11 Advisory Committee, World Professional   Member  Association for Transgender Health

2012 - 2014        Psychiatry and Diagnosis Track Co-chair, Scientific        Member Committee, 2014 WPATH Biennial Symposium, Bangkok

2014 - 2016        Scientific Committee, 2016 WPATH Biennial Symposium, Member Amsterdam

2014 - 2018        Board of Directors (elected to 4 year term), World        Member  Professional Association for Transgender Health

2014 - 2018        Public Policy Committee, World Professional Association Chair for Transgender Health

2014 - 2018         WPATH Global Education Initiative: Training providers  Trainer and and specialty certification in transgender health                Steering

| | | Committee Member |
|---|---|---|
| 2014 - 2016 | American Psychiatric Association Workgroup on Gender Dysphoria | Member |
| 2016 - present | American Psychiatric Association Workgroup on Gender Dysphoria | Chair |
| 2016 | USPATH: Inaugural WPATH U.S. Conference, Los Angeles, 2017 | Conference Chair |

## SERVICE TO PROFESSIONAL PUBLICATIONS

2011 - present Journal of Sexual Medicine, reviewer

2014 - present International Journal of Transgenderism, reviewer

2016 - present LGBT Health, reviewer

## INVITED PRESENTATIONS - INTERNATIONAL

| 2009 | World Professional Association for Transgender Health, Oslo, Norway | Plenary Session Speaker |
|---|---|---|
| 2009 | World Professional Association for Transgender Health, Oslo, Norway | Symposium Speaker |
| 2009 | Karolinska Institutet, Stockholm Sweden | Invited Lecturer |
| 2012 | Cuban National Center for Sex Education (CENESEX), Havana, Cuba | Invited Speaker |
| 2013 | Swedish Gender Clinics Annual Meeting, Stockholm, Sweden | Keynote Speaker |
| 2013 | Conference on International Issues in Transgender care, United Nations Development Programme - The Lancet, Beijing, China | Expert Consultant |
| 2014 | World Professional Association for Transgender Health, Thailand | Track Chair Bangkok, |
| 2014 | World Professional Association for Transgender Health, Bangkok, Thailand | Invited Speaker |
| 2014 | World Professional Association for Transgender Health, Bangkok, Thailand | Invited Speaker |
| 2015 | European Professional Association for Transgender Health, Ghent, Belgium | Invited Speaker |
| 2015 | European Professional Association for Transgender Health, Ghent, Belgium | Symposium Chair |
| 2015 | Israeli Center for Human Sexuality and Gender Identity, Tel Aviv | Invited Speaker |
| 2016 | World Professional Association for Transgender Health, Amsterdam | Symposium Chair |
| 2016 | World Professional Association for Transgender Health, Amsterdam | Invited Speaker |

| 2016 | World Professional Association for Transgender Health,  Invited Speaker Amsterdam    2017 Brazil Professional Association for Transgender Health,   Sao Paulo |
| --- | --- |
| 2017 | Vietnam- United Nations Development Programme Asia Transgender Health Conference, Hanoi |
| 2018 | United Nations Development Programme Asia Conference on Transgender Health and Human Rights, Bangkok |
| 2018 | World Professional Association for Transgender Health,  Invited Speaker Buenos Aires |
| 2021 | Manitoba Psychiatric Association, Keynote Speaker |
| 2022 | World Professional Association for Public Health, invited speaker, Montreal |

**INVITED PRESENTATIONS - NATIONAL**

| 1990 | Being Alive Medical Update, Century Cable Television | Televised Lecturer |
| --- | --- | --- |
| 1992 | Institute on Hospital and Community Psychiatry, Toronto  Symposium Speaker | |
| 1992 | Academy of Psychosomatic Medicine Annual Meeting, San Diego | Symposium Speaker |
| 1994 | American Psychiatric Association 150th Annual Meeting, Philadelphia | Workshop Chair |
| 1994 | American Psychiatric Association 150th Annual Meeting, Philadelphia | Workshop Speaker |
| 1994 | American Psychiatric Association 150th Annual Meeting, Philadelphia | Paper Session Co-chair |
| 1995 | Spring Meeting of the Association of Gay and Lesbian Psychiatrists, Miami Beach | Symposium Chair |
| 1996 | American Psychiatric Association 152nd Annual Meeting, New York | Workshop Speaker |
| 1997 | American Psychiatric Association Annual Meeting, San Diego | Workshop Speaker |
| 1997 | Gay and Lesbian Medical Association Annual | Invited Speaker Symposium |
| 1998 | American Psychiatric Association Annual Meeting, Toronto | Workshop Chair |
| 1998 | American Psychiatric Association Annual Meeting, Toronto | Workshop Chair |

| 1998 | American Psychiatric Association Annual Meeting, Toronto | Media Session Chair |
| 1998 | American Psychiatric Association Annual Meeting, Toronto | Media Session Chair |
| 1999 | American Psychiatric Association Annual Meeting, Washington, D.C. | Symposium Chair |
| 1999 | American Psychiatric Association Annual Meeting, Washington, D.C. | Symposium Presenter |
| 1999 | American Psychiatric Association Annual Meeting, Washington, D.C. | Workshop Chair |
| 2000 | American Psychiatric Association Annual Meeting, Chicago | Workshop Chair |
| 2000 | National Youth Leadership Forum On Medicine, University of California, Berkeley | Invited Speaker |
| 2001 | American Psychiatric Association Annual Meeting, New Orleans | Workshop Chair |
| 2001 | American Psychiatric Association Annual Meeting, New Orleans | Media Program Chair |
| 2001 | Association of Gay and Lesbian Psychiatrists Symposium, New Orleans | Chair |
| 2001 | Harry Benjamin International Gender Dysphoria Association Biennial Meeting, Galveston, Texas | Invited Speaker |
| 2002 | American Psychiatric Association Annual Meeting, Philadelphia | Media Program Chair |
| 2002 | American Psychiatric Association Annual Meeting, Philadelphia | Workshop Chair |
| 2002 | American Psychiatric Association Annual Meeting, Philadelphia | Workshop Chair |
| 2003 | Association of Gay and Lesbian Psychiatrists CME Conference | Chair |
| 2003 | American Psychiatric Association Annual Meeting, San Francisco | Symposium Chair |
| 2003 | American Psychiatric Association Annual Meeting, San Francisco | Symposium Co-Chair |
| 2003 | American Psychiatric Association Annual Meeting, San Francisco | Workshop Chair |
| 2003 | American Public Health Association Annual Meeting, San Francisco | Invited Speaker |
| 2004 | Mission Mental Health Clinic Clinical Conference | Invited Speaker |

| | | |
|---|---|---|
| 2004 | Association of Gay and Lesbian Psychiatrists Conference, New York | Co-Chair |
| 2004 | Mental Health Care Provider Education Program: Los Angeles. Sponsored by the American Psychiatric Association Office of HIV Psychiatry | Invited Speaker |
| 2005 | American Psychiatric Association Annual Meeting, Atlanta | Workshop Speaker |
| 2005 | Association of Gay and Lesbian Psychiatrists Saturday Symposium | Invited Speaker |
| 2008 | Society for the Study of Psychiatry and Culture, San Francisco | Invited Speaker |
| 2009 | American Psychiatric Association Annual Meeting, San Francisco | Symposium Speaker |
| 2011 | National Transgender Health Summit, San Francisco | Invited Speaker |
| 2011 | National Transgender Health Summit, San Francisco | Invited Speaker |
| 2011 | American Psychiatric Association Annual Meeting, Honolulu, HI | Symposium Chair |
| 2011 | American Psychiatric Association Annual Meeting, Honolulu, HI | Symposium Speaker |
| 2011 | World Professional Association for Transgender Health Conference, Atlanta, GA | Invited Speaker Biennial |
| 2011 | World Professional Association for Transgender Health Conference, Atlanta, GA | Invited Speaker Biennial |

| | | Invited Speaker |
|---|---|---|
| 2011 | World Professional Association for Transgender Health Biennial Conference, Atlanta, GA | |
| 2011 | Institute on Psychiatric Services, San Francisco | Invited Speaker |
| 2012 | Gay and Lesbian Medical Association Annual Meeting | Invited Speaker |
| 2013 | National Transgender Health Summit, Oakland, CA | Invited Speaker |
| 2013 | National Transgender Health Summit, Oakland, CA | Invited Speaker |
| 2013 | National Transgender Health Summit, Oakland, CA | Invited Speaker |
| 2013 | American Psychiatric Association Annual Meeting, San Francisco | Invited Speaker |
| 2013 | Gay and Lesbian Medical Association, Denver, CO | Invited Speaker |
| 2014 | American Psychiatric Association Annual Meeting, New York | Invited Speaker |
| 2014 | Institute on Psychiatric Services, San Francisco | Moderator |
| 2014 | Institute on Psychiatric Services, San Francisco | Invited Speaker |
| 2014 | Institute on Psychiatric Services, San Francisco | Invited Speaker |
| 2015 | National Transgender Health Summit, Oakland, CA | Invited Speaker |
| 2015 | National Transgender Health Summit, Oakland, CA | Invited Speaker |
| 2015 | American Psychiatric Association Annual Meeting, Toronto | Workshop Speaker |
| 2015 | American Psychiatric Association Annual Meeting, Toronto | Course Faculty |
| 2016 | American Psychiatric Association Annual Meeting | Course Faculty |
| 2016 | World Professional Association for Transgender Health Global Education Initiative, Atlanta | Course Faculty |
| 2016 | World Professional Association for Transgender Health Global Education Initiative, Springfield, MO | Course Faculty |
| 2016 | World Professional Association for Transgender Health Global Education Initiative, Fort Lauderdale, FL | Course Faculty |
| 2017 | World Professional Association for Transgender Health, GEI, Los Angeles Course Faculty | |
| | World Professional Association for Transgender Health | |

Surgeon's Training, Irvine, CA Course Faculty

| 2017 | American Urological Association Annual Meeting, San Francisco CA Invited Speaker |
| 2018 | World Professional Association for Transgender Health GEI, Portland OR, Course Faculty |
| 2018 | World Professional Association for Transgender Health GEI, Palm Springs, Course Faculty |
| 2019 | American Society for Adolescent Psychiatry Annual Meeting, San Francisco, Speaker |
| 2019 | American Psychiatric Association Annual Meeting, San Francisco, Session Chair |
| 2020 | Psychiatric Congress, Invited Speaker |
| 2022 | World Professional Association for Transgender Health, Montreal, invited speaker |
| 2023 | National Transgender Health Summit, San Francisco, invited speaker |
| 2023 | American Psychiatric Association Annual Meeting, San Francisco, invited speaker |
| 2023` | US Professional Association for Transgender Health, speaker |
| 2024 | World Professional Association for Transgender Health, Lisbon |

**INVITED PRESENTATIONS - REGIONAL AND OTHER INVITED PRESENTATIONS**

| 1990 | Advanced Group Therapy Seminar, UCLA Neuropsychiatric Institute    Invited Lecturer |
| 1991 | Joint Project of the Southern California AIDS Interfaith Council and UCLA School of Medicine    Symposium Speaker |
| 1991 | Joint Project of the Southern California AIDS Interfaith Council and UCLA School of Medicine    Workshop Panelist |
| 1992 | Advanced Group Therapy Seminar, UCLA Neuropsychiatric Institute    Invited Lecturer |
| 1993 | UCSF School of Nursing  Invited Lecturer |
| 1995 | UCSF/SFGH Department of Medicine Clinical Care Conference    Invited Speaker |
| 1996 | UCSF School of Nursing  Invited Speaker |

| | | |
|---|---|---|
| | | Invited Speaker |
| 1996 | Psychopharmacology for the Primary Care AIDS/Clinician, Invited Lecturer series of four lectures, UCSF Department of Medicine | |
| 1996 | UCSF AIDS Health Project Psychotherapy Internship Training Program | |
| 1996 | UCSF/SFGH Department of Medicine AIDS Quarterly Update | Invited Speaker |
| 1996 | San Francisco General Hospital, Division of Addiction Medicine | Invited Speaker |
| 1996 | UCSF Langley Porter Psychiatric Hospital and Clinics Rounds | Invited Speaker Grand |
| 1997 | UCSF School of Nursing  Invited Speaker | |
| 1997 | UCSF Department of Medicine AIDS Program | Invited Speaker |
| 1997 | Northern California Psychiatric Society Annual Meeting,  Workshop Speaker Monterey | |
| 1997 | San Francisco General Hospital Department of Psychiatry Invited Speaker Grand Rounds | |
| 1997 | San Francisco General Hospital Department of Psychiatry Invited Speaker Grand Rounds | |
| 1997 | Northern California Psychiatric Society LGBT Committee  Chair Fall Symposium | |
| 1997 | Progress Foundation, San Francisco | Invited Speaker |
| 1998 | San Francisco General Hospital Department of Psychiatry Invited Speaker Grand Rounds | |
| 1999 | Northern California Psychiatric Society Annual Meeting,  Invited Speaker  Santa Rosa | |
| 1999 | Northern California Psychiatric Society Annual Meeting,  Invited Speaker  Santa Rosa | |
| 1999 | University of California, Davis, Department of Psychiatry  Invited Speaker Grand Rounds | |
| 1999 | California Pacific Medical Center Department of  Invited Speaker Psychiatry Grand Rounds | |
| 1999 | San Francisco General Hospital Department of Psychiatry Discussant Departmental Case Conference | |
| 2000 | Langley Porter Psychiatric Hospital and Clinics | Invited Speaker Consultation Liaison Seminar |
| 2000 | San Francisco General Hospital, Psychopharmacology  Invited Speaker Seminar | |

| 2000 | UCSF Transgender Health Conference, Laurel Heights Conference Center | Invited Speaker |
| 2000 | Psychiatry Course for UCSF Second Year Medical Students | Invited Lecturer |
| 2000 | Community Consortium Treatment Update Symposium, California Pacific Medical Center, Davies Campus | Invited Speaker |
| 2000 | San Francisco General Hospital Department of Psychiatry Grand Rounds | Invited Speaker |
| 2001 | Psychiatry Course for UCSF Second Year Medical Students | Invited Lecturer |
| 2003 | Tom Waddell Health Center Inservice | Invited Speaker |
| 2003 | San Francisco Veterans Affairs Outpatient Clinic | Invited Speaker |
| 2004 | San Francisco General Hospital Psychiatric Emergency Service Clinical Conference | Invited Speaker |
| 2004 | South of Market Mental Health Clinic, San Francisco | Invited Speaker |
| 2005 | Northern Psychiatric Psychiatric Society Annual Meeting | Invited Speaker |
| 2005 | Equality and Parity: A Statewide Action for Transgender Prevention and Care, San Francisco | Invited Speaker HIV |
| 2005 | San Francisco General Hospital Department of Psychiatry Grand Rounds. | Invited Speaker |
| 2006 | SFGH/UCSF Department of Psychiatry Grand Rounds | Invited Speaker |
| 2007 | UCSF Department of Medicine, HIV/AIDS Grand Rounds, Positive Health Program | Invited Speaker |
| 2007 | California Pacific Medical Center LGBT Health San Francisco LGBT Community Center | Invited Speaker Symposium, |
| 2007 | UCSF CME Conference, Medical Management of HIV/AIDS, Fairmont Hotel, San Francisco | Invited Speaker |
| 2008 | UCSF Department of Medicine, Positive Health Program, HIV/AIDS Grand Rounds | Invited Speaker |
| 2008 | San Francisco General Hospital Psychiatry Grand Rounds | Invited Speaker |
| 2008 | UCSF CME Conference, Medical Management of HIV/AIDS, Fairmont Hotel, San Francisco | Invited Speaker |
| 2010 | Northern California Psychiatric Society Annual Meeting, Monterey, CA | Invited Speaker |
| 2011 | Transgender Mental Health Care Across the Life Span, Stanford University | Invited Speaker |
| 2011 | San Francisco General Hospital Department of Psychiatry Grand Rounds | Invited Speaker |

|      |                                                                                      | Invited Speaker |
|------|--------------------------------------------------------------------------------------|-----------------|
| 2012 | UCSF AIDS Health Project    Invited Speaker 2012 San Francisco Veterans Affairs Medical Center. | |
| 2013 | Association of Family and Conciliation Courts Conference, Invited Speaker Los Angeles, CA | |
| 2014 | UCSF Transgender Health elective    Invited Speaker | |
| 2014 | UCSF Department of Psychiatry Grand Rounds    Invited Speaker | |
| 2014 | California Pacific Medical Center Department of    Invited Speaker Psychaitry Grand Rounds | |
| 2014 | UCLA Semel Institute Department of Psychiatry Grand  Invited Speaker Rounds | |
| 2015 | UCSF Transgender Health elective    Invited Speaker | |
| 2015 | Fenway Health Center Boston, MA (webinar)    Invited Speaker | |
| 2015 | Transgender Health Symposium, Palm Springs    Invited Speaker | |
| 2015 | Transgender Health Symposium, Palm Springs    Co-Chair | |
| 2015 | Santa Clara Valley Medical Center Grand Rounds    Invited Speaker | |
| 2016 | UCSF School of Medicine Transgender Health elective  Invited Speaker | |
| 2016 | Langley Porter Psychiatric Institute APC Case Conference Invited Speaker (2 session series) | |
| 2016 | Zuckerberg San Francisco General Department of Psychiatry Grand Rounds    Invited Speaker | |
| 2016 | UCSF Mini-Medical School Lectures to the Public    Invited Speaker | |
| 2021 | Los Angeles County Department of Mental Health, Invited Speaker | |
| 2023 | Alameda County Department of Behavioral Health, Invited Speaker | |

**CONTINUING EDUCATION AND PROFESSIONAL DEVELOPMENT ACTIVITIES**

| | |
|------|------|
| 2005 | Northern California Psychiatric Society |
| 2005 | Northern California Psychiatric Society Annual Meeting, Napa |
| 2005 | Association of Gay and Lesbian Psychiatrist Annual Conference |
| 2006 | Annual Meeting, American Psychiatric Association, Atlanta |
| 2006 | Annual Meeting, American Psychiatric Association, Toronto |
| 2006 | Institute on Psychiatric Services, New York |
| 2007 | Association of Gay and Lesbian Psychiatrists Annual Conference |

| | |
|---|---|
| 2007 | American Psychiatric Association Annual Meeting, San Diego |
| 2007 | The Medical Management of HIV/AIDS, a UCSF CME Conference |
| 2008 | Society for the Study of Psychiatry and Culture, San Francisco |
| 2009 | American Psychiatric Association, San Francisco |
| 2009 | World Professional Association for Transgender Health, Oslo, Norway |
| 2010 | Annual Meeting of the Northern California Psychiatric Society, Monterey, CA |
| 2011 | Transgender Mental Health Care Across the Life Span, Stanford University |
| 2011 | National Transgender Health Summit, San Francisco |
| 2011 | American Psychiatric Association Annual Meeting, Honolulu, HI |
| 2011 | World Professional Association for Transgender Health Biennial Conference, Atlanta, GA |
| 2011 | Institute on Psychiatric Services, San Francisco |
| 2012 | Gay and Lesbian Medical Association Annual Meeting, San Francisco |
| 2013 | National Transgender Health Summit, Oakland, CA |
| 2013 | American Psychiatric Association Annual Meeting, San Francisco |
| 2013 | Gay and Lesbian Medical Association, Denver, CO |
| 2014 | American Psychiatric Association Annual Meeting, New York |
| 2014 | Institute on Psychiatric Services, San Francisco |
| 2015 | European Professional Association for Transgender Health, Ghent, Belgium |
| 2015 | National Transgender Health Summit, Oakland |
| 2015 | American Psychiatric Association Annual Meeting, Toronto |
| 2016 | American Psychiatric Association Annual Meeting, Atlanta |
| 2016 | World Professional Association for Transgender Health, Amsterdam |

**GOVERNMENT AND OTHER PROFESSIONAL SERVICE**

| | |
|---|---|
| 1998 - 2002 | City and County of San Francisco Human Rights  Member Commission LGBT Advisory Committee |

I am the chair of the American Psychiatric Association Workgroup on Gender Dysphoria, which developed a CME course fort the 2015 and 2016 APA Annual Meetings, and has an larger educational mission to train American psychiatrists to better care for transgender patients. I have been leading education efforts in transgender health at APA meetings since 1998. On the APA Workgroup on Gender Dysphoria, I am a co-author of a paper of transgender issues that has been approved by the American Psychiatric Association as a resource document and is in press for the American Journal of Psychiatry. I am also the sole author of the chapter on transgender care in the American Psychiatric Press's Clinical Manual of Cultural Psychiatry, Second Edition.

I have been active internationally in transgender health through my work as a member of the Board of Directors of the World Professional Association for Transgender Health. I am an author of the WPATH Standards of Care, Version 7, and am Chapter Lead for the Mental Health Chapter of SOC 8.
I chaired of the WPATH Public Policy Committee and was a member of the Global Education Initiative, which developed a specialty certification program in transgender health. I helped plan the 2016 WPATH Amsterdam conference, and was on the scientific committee for the last four biennial international conferences. I was on the founding committee of USPATH, the national affiliate of WPATH, and I chaired the inaugural USPATH conference, in Los Angeles in 2017. As a member of the steering committee of the WPATH Global Educational Initiative, I helped train over 2000 health providers in transgender health, and helped develop a board certification program and examination in transgender health.

**UNIVERSITY SERVICE  UC SYSTEM AND MULTI-CAMPUS SERVICE**

1991 – 2003  HIV/AIDS Task Force  Member

1992 - 1993  HIV Research Group  Member

1992 - 1997      Space Committee                                                    Member

1992 - 2003 Gay, Lesbian and Bisexual Issues Task Force            Member

1994 - 1997      SFGH Residency Training Committee                       Member

1996 - 1997      Domestic Partners Benefits Subcommittee.             Chair

1996 - 2000      Chancellor's Advisory Committee on Gay, Lesbian,   Member Bisexual
                        and Transgender Issues.

1996 - 2003      HIV/AIDS Task Force                                              Co-Chair

1996 - 2003      Cultural Competence and Diversity Program            Member

2009 - present Medical Advisory Board, UCSF Center of Excellence for  Member Transgender
        Health

2010 - 2013 Steering Committee, Child Adolescent Gender Center       Member

2011 – 2017 Mental Health Track, National Transgender Health Summit Chair

**DEPARTMENTAL SERVICE**

1991 - 2003 San Francisco General Hospital, Department of Psychiatry, Member  HIV/AIDS Task Force

1992 - 1993  San Francisco General Hospital, Department of Psychiatry, Member  HIV Research Group

1992 - 1997      San Francisco General Hospital, Department of Psychiatry, Member  Space Committee

1992 - 2003      San Francisco General Hospital, Department of Psychiatry, Member  GLBT Issues Task Force

1994 - 1997      San Francisco General Hospital, Department of Psychiatry, Member Residency Training Committee

1996 - 2003       San Francisco General Hospital, Department of Psychiatry, Member  Cultural Competence and Diversity Program

1996 - 2003      San Francisco General Hospital, Department of Psychiatry, Co-Chair HIV/AIDS Task Force

2012 - 2020 San Francisco Department of Public Health Gender  Member Competence Trainings Committee

2013 - 2020 San Francisco Department of Public Health Transgender      Member Health Implementation Task Force

2014 - 2020San Francisco General Hospital, Department of Psychiatry, Member  Transgender Surgery Planning Workgroup

**PEER REVIEWED PUBLICATIONS**

1. Berliner JA, Frank HJL, **Karasic D**, Capdeville M. Lipoprotein-induced insulin resistance in aortic endothelium. Diabetes. 1984; 33:1039-44.

2. Bradberry CW, **Karasic DH**, Deutch AY, Roth RH. Regionally-specific alterations in mesotelencephalic dopamine synthesis in diabetic rats: association with precursor tyrosine. Journal of Neural Transmission. General Section, 1989; 78:221-9.

3. Targ EF, **Karasic DH**, Bystritsky A, Diefenbach PN, Anderson DA, Fawzy FI. Structured group therapy and fluoxetine to treat depression in HIV-positive persons. Psychosomatics. 1994; 35:132-7.

4. Karasic DH. Homophobia and self-destructive behaviors. The Northern California Psychiatric Physician. 1996; 37 Nov.-Dec. Reprinted by the Washington State Psychiatric Society and the Southern California Psychiatric Society newsletters.

5. Karasic D. Anxiety and anxiety disorders. Focus. 1996 Nov; 11(12):5-6. PMID: 12206111

6. Polansky JS, **Karasic DH**, Speier PL, Hastik KL, Haller E. Homophobia: Therapeutic and training considerations for psychiatry. Journal of the Gay and Lesbian Medical Association. 1997 1(1) 41-47.

7.   Karasic DH. Progress in health care for transgendered people. Editorial. Journal of the Gay and Lesbian Medical Association, 4(4) 2000 157-8.

8.   Perry S, **Karasic D**. Depression, adherence to HAART, and survival. Focus: A Guide to AIDS Research and Counseling. 2002 17(9) 5-6.

9.   Fraser L, **Karasic DH**, Meyer WJ, Wylie, K. Recommendations for Revision of the DSM Diagnosis of Gender Identity Disorder in Adults. International Journal of Transgenderism. Volume 12, Issue 2. 2010, Pages 80-85.

10.  Coleman, E., Bockting, W., Botzer, M., Cohen-Kettenis, P., DeCuypere, G., Feldman, J., Fraser, L., Green, J., Knudson, G., Meyer, W., Monstrey, S., **Karasic D** and 22 others. (2011). Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, 7th Version.  International Journal of Transgenderism, 13:165-232, 2011

11.  Tsai AC, **Karasic DH**, et al. Directly Observed Antidepressant Medication Treatment and HIV Outcomes Among Homeless and Marginally Housed HIV-Positive Adults: A Randomized Controlled Trial. American Journal of Public Health. February 2013, Vol. 103, No. 2, pp. 308-315.

12.  Tsai AC, Mimmiaga MJ, Dilley JW, Hammer GP, **Karasic DH**, Charlebois ED, Sorensen JL, Safren SA, Bangsberg DR. Does Effective Depression Treatment Alone Reduce Secondary HIV Transmission Risk? Equivocal Findings from a Randomized Controlled Trial. AIDS and Behavior, October 2013, Volume 17, Issue 8, pp 2765-2772.

13.  **Karasic DH**. Protecting Transgender Rights Promotes Transgender Health. LGBT Health. 2016 Aug; 3(4):245-7. PMID: 27458863

14.  Winter S, Diamond M, Green J, **Karasic D**, Reed T, Whittle S, Wylie K. Transgender people: health at the margins of society. Lancet. 2016 Jul 23;388(10042):390-400. doi: 10.1016/S0140-6736(16)00683-8. Review./> PMID: 27323925

15.  Grelotti DJ, Hammer GP, Dilley JW, **Karasic DH**, Sorensen JL, Bangsberg DR, Tsai AC. Does substance use compromise depression treatment in persons with HIV? Findings from a randomized controlled trial. AIDS Care. 2016 Sep 2:1-7. [Epub ahead of print]/> PMID: 27590273

16.  Strang JF, Meagher H, Kenworthy L, de Vries AL, Menvielle E, Leibowitz S, Janssen A, Cohen-Kettenis P, Shumer DE, Edwards-Leeper L, Pleak RR, Spack N, **Karasic DH**, Schreier H, Balleur A, Tishelman A, Ehrensaft D, Rodnan L, Kuschner ES, Mandel F, Caretto A, Lewis HC, Anthony LG.
Initial Clinical Guidelines for Co-Occurring Autism Spectrum Disorder and Gender Dysphoria or Incongruence in Adolescents. J Clin Child Adolesc Psychol. 2016 Oct 24:1-11. [Epub ahead of print]/> PMID: 27775428

17.  Milrod C, **Karasic DH**. Age Is Just a Number: WPATH-Affiliated Surgeons' Experiences and Attitudes Toward Vaginoplasty in Transgender Females Under 18 Years of Age in the United States. J Sex Med 2017;14:624–634.

18.  William Byne, Dan H. Karasic, Eli Coleman, A. Evan Eyler, Jeremy D. Kidd, Heino F.L. Meyer-Bahlburg, Richard R. Pleak, and Jack Pula.Gender Dysphoria in Adults:

An Overview and Primer for Psychiatrists.Transgender Health.Dec 2018.57-A3.http://doi.org/10.1089/trgh.2017.0053

19. Identity recognition statement of the world professional association for transgender health (WPATH). International Journal of Transgenderism. 2018 Jul 3; 19(3):1-2. Knudson KG, Green GJ, Tangpricha TV, Ettner ER, Bouman BW, Adrian AT, Allen AL, De Cuypere DG, Fraser FL, Hansen HT, **Karasic KD**, Kreukels KB, Rachlin RK, Schechter SL, Winter WS, Committee and Board of Direct

20. **Karasic, DH** & Fraser, L  Multidisciplinary Care and the Standards of Care for Transgender and Gender Non-conforming Individuals. Schechter, L & Safa, B. (Eds.) Gender Confirmation Surgery, Clinics in Plastic Surgery Special Issue, Vol 45, Issue 3, pp 295-299. 2018 Elsevier,Philadelphia.  https://doi.org/10.1016/j.cps.2018.03.016

21. Milrod C, Monto M, **Karasic DH.** Recommending or Rejecting "the Dimple": WPATHAffiliated Medical Professionals' Experiences and Attitudes Toward GenderConfirming Vulvoplasty in Transgender Women. J Sex Med. 2019 Apr;16(4):586-595. doi:
10.1016/j.jsxm.2019.01.316. Epub 2019 Mar 2.

22. ICD-11 and gender incongruence of childhood: a rethink is needed. Lancet Child Adolesc Health. 2019 10; 3(10):671-673. Winter S, Ehrensaft D, Telfer M, T'Sjoen G, Koh J, Pickstone-Taylor S, Kruger A, Griffin L, Foigel M, De Cuypere G, **Karasic D**. PMID: 31439494.

23. Gender Dysphoria in Adults: An Overview and Primer for Psychiatrists. Focus (Am Psychiatr Publ). 2020 Jul; 18(3):336-350. Byne W, **Karasic DH**, Coleman E, Eyler AE, Kidd JD, Meyer-Bahlburg HFL, Pleak RR, Pula J. PMID: 33343244; PMCID: PMC7587914.

24.    WPATH Standards of Care for the Health of Transgender and Gender Diverse People,  Version 8. E. Coleman, A. E. Radix, W. P. Bouman, G. R. Brown, A. L. C. de Vries, M. B. Deutsch, R. Ettner, L. Fraser, M. Goodman, J. Green, A. B. Hancock, T. W. Johnson, **D. H. Karasic**… J. Arcelus (2022) Standards of Care for the Health of Transgender and Gender Diverse People, Version 8, International
Journal of Transgender Health, 23:sup1, S1-S259, DOI: 10.1080/26895269.2022.2100644

## BOOKS AND CHAPTERS

1. **Karasic DH**, Dilley JW.  Anxiety and depression: Mood and HIV disease.  In: The UCSF AIDS Health Project Guide to Counseling: Perspectives on Psychotherapy, Prevention, and Therapeutic Practice. Dilley JW and Marks R,  eds. Jossey-Bass. San Francisco, 1998,  pp.227-248.

2. **Karasic DH**, Dilley JW. Human immunodeficiency-associated psychiatric disorders. In: The AIDS Knowledge Base, Third Edition. Cohen PT, Sande MA, Volberding PA, eds. Lippincott-Williams &Wilkens, Philadelphia, 1999, pp. 577-584.

3. **Karasic DH** and Drescher J. eds.  Sexual and Gender Diagnoses of the Diagnostic and Statistical Manual (DSM): A Reevaluation. 2005. Haworth Press, Binghamton, NY. (Book Co-Editor)

4. **Karasic DH**. Transgender and Gender Nonconforming Patients. In: Clinical Manual of Cultural Psychiatry, Second Edition. Lim RF ed.  pp 397-410. American Psychiatric Publishing, Arlington VA. 2015.

5. **Karasic DH**. Mental Health Care of the Transgender Patient. In: Comprehensive Care of the Transgender Patient, Ferrando CA ed. pp. 8-11.  Elsevier, 2019.

6. **Karasic DH.** The Mental Health Assessment for Surgery. In: Gender Confirmation Surgery – Principles and Techniques for an Emerging Field. Schechter L ed. Springer Nature, in press 2019.


**OTHER PUBLICATIONS**

1. **Karasic DH**, Dilley JW. HIV-associated psychiatric disorders: Treatment issues.  In: Cohen P, Sande MA, Volberding P, eds., The AIDS  Knowledge Base. Waltham, MA: The Medical Publishing Group/ Massachusetts Medical Society. 1994. pp. 5.31-1-5.

2. **Karasic DH**, Dilley JW.  HIV-associated psychiatric disorders:  Clinical syndromes and diagnosis.  In:  Cohen P, Sande MA, Volberding P, eds., The AIDS  Knowledge Base, Second Edition. Waltham, MA: The Medical Publishing Group/Massachusetts Medical Society. 1994 pp. 5.30-1-5.

3. **Karasic DH**. A primer on transgender care. In: Gender and sexuality. The Carlat Report Psychiatry. April 2012. Vol 10, Issue 4.

4. **Karasic D and Ehrensaft D.** We must put an end to gender conversion therapy for kids. Wired. 7/6/15.


**EXPERT WITNESS AND CONSULTATION ON TRANSGENDER CARE AND RIGHTS**


2008  Consultant, California Department of State Hospitals

2012  Dugan v. Lake, Logan UT

2012 XY v. Ontario http://www.canlii.org/en/on/onhrt/doc/2012/2012hrto726/2012hrto726.html

2014 Cabading v California Baptist University

2014 CF v. Alberta
http://www.canlii.org/en/ab/abqb/doc/2014/2014abqb237/2014abqb237.html

2017 United Nations Development Programme consultant, transgender health care and legal rights in the Republic of Vietnam; Hanoi.

2017- 2018 Forsberg v Saskatchewan; Saskatchewan Human Rights v Saskatchewan
https://canliiconnects.org/en/summaries/54130
https://canliiconnects.org/en/cases/2018skqb159

2018 United Nations Development Programme consultant, transgender legal rights in
Southeast Asia; Bangkok.

2018 Consultant, California Department of State Hospitals

2019, 2021 Consultant/Expert, Disability Rights Washington

2019, 2021 Consultant/Expert, ACLU Washington

2021 Consultant, California Department of Corrections and Rehabilitation

2021 Expert, Kadel v. Folwell, 1:19-cv-00272 (M.D.N.C.).

2021   Expert, Drew Glass v. City of Forest Park - Case No. 1:20-cv-914 (Southern
District Ohio)

2021-2022 Expert, Brandt et al v. Rutledge et al. 4:21-cv-00450 (E.D. Ark.)

2021-2022 Expert, Fain v. Crouch, 3:20-cv-00740 (S.D.W. Va.)

2022 Expert, C.P. v. Blue Cross Blue Shield of Illinois, No. 3:20-cv-06145-RJB (W.D. Wash.)

2022-3 Expert, Dekker, et al. v. Weida, et al., No. 4:22-cv-00325-RH-MAF

2019-2023 Expert, Disability Rights Washington v Washington State Department of
Corrections

2023 Expert, K.C. et al. v Individual Members of the Indiana Licensing Board, et al-  No. 1:23-
CV-595

2023 Expert, Doe, et al v Ladapo -No. 4:23-cv-00114-RH-MAF

2023 Expert, Doe et al v Thornbury -No. 3:23-cv-00230-DJH

2024 Expert Voe v Mansfield, *No. 1:23-CV-864-LCB-LPA*

2024 Expert *Boe v. Marshall, No. 2:22-cv-184-LCB (N.D. Ala.)*

2024 Expert *.B. v. Premera Blue Cross, No. 3:20-cv-06145-RJB (W.D. Wash.)*

2024 Expert *Misanin v. Wilson, No. 2:24-cv-04734-BHH (D.S.C.)*

# **<u>Exhibit B</u>**

# BIBLIOGRAPHY

Achille, C., Taggart, T., Eaton, N. R., Osipoff, J., Tafuri, K., Lane, A., & Wilson, T. A. (2020). Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: preliminary results. *International journal of pediatric endocrinology*, *2020*, 8.

Aldridge, Z., Patel, S., Guo, B., Nixon, E., Bouman, W. P., Witcomb, G. L., & Arcelus, J. (2021). Long-term effect of gender-affirming hormone treatment on depression and anxiety symptoms in transgender people: A prospective cohort study. *Andrology*, 9(6), 1808-1816.

Allen, L. R., Watson, L. B., Egan, A. M., & Moser, C. N. (2019). Well-being and suicidality among transgender youth after gender-affirming hormones. *Clinical Practice in Pediatric Psychology, 7*(3), 302–311.

Almazan, A. N., & Keuroghlian, A. S. (2021). Association Between Gender-Affirming Surgeries and Mental Health Outcomes. *JAMA surgery*, 156(7), 611–618.

American Academy of Child and Adolescent Psychiatry (2019). Statement Responding to Efforts to ban Evidence-Based Care for Transgender and Gender Diverse Youth, https://www.aacap.org/AACAP/Latest_News/AACAP_Statement_Responding_to_Efforts-to_ban_Evidence-Based_Care_for_Transgender_and_Gender_Diverse.aspx.

American Academy of Family Physicians (2020). Care for the Transgender and Nonbinary Patient, www.aafp.org/about/policies/all/transgender-nonbinary.html.

American Academy of Pediatrics (2018). Policy Statement:  Ensuring Comprehensive Care and Support for Transgender and Gender Diverse Children and Adolescents, https://pediatrics.aappublications.org/content/142/4/e20182162.

American College of Obstetricians and Gynecologists (2021). Committee Opinion No. 823: Health Care for Transgender and Gender Diverse Individuals, https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2021/03/health-care-for-transgender-and-gender-diverse-individuals.

American Medical Association. (2023). AMA Resolution: Clarification of Evidence-Based Gender-Affirming Care. https://policysearch.ama-assn.org/policyfinder/detail/gender%20affirming%20care?uri=%2FAMADoc%2FHOD-185.927.xml

American Medical Association. (2023). Issue Brief: Sex and gender in medical education: Best practices for sex and gender diversity in medical education. https://www.ama-assn.org/system/files/cme-issue-brief-sex-gender-medical-education.pdf

American Medical Association (2021). Letter to National Governor's Association , https://searchlf.ama-assn.org/letter/documentDownload?uri=%2Funstructured%2Fbinary%2Fletter%2FLETTERS%2F2021-4-26-Bill-McBride-opposing-anti-trans-bills-Final.pdf.

American Medical Association and GLMA (2019). Issue Brief: Health insurance coverage for gender-affirming care of transgender patients, https://www.ama-assn.org/system/files/2019-03/transgender-coverage-issue-brief.pdf.

American Psychiatric Association. (2022). Diagnostic and statistical manual of mental disorders (5th ed., text rev.). Arlington, VA: American Psychiatric Publishing.

American Psychiatric Association. (2013). Diagnostic and Statistical Manual of Mental Disorders (5th ed.). Arlington, VA: American Psychiatric Publishing.

American Psychiatric Association. (2020). Position Statement on Treatment of Transgender (Trans) and Gender Diverse Youth. https://www.psychiatry.org/getattachment/8665a2f2-0b73-4477-8f60-79015ba9f815/Position-Treatment-of-Transgender-Gender-Diverse-Youth.pdf

American Psychiatric Association (2018). Position Statement on Access to Care for Transgender and Gender Diverse Individuals, https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Access-to-Care-for-Transgender-and-Gender-Diverse-Individuals.pdf.

American Psychological Association. (2024). APA Policy Statement on Affirming Evidence-Based Inclusive Care for Transgender, Gender Diverse, and Nonbinary Individuals, Addressing Misinformation, and the Role of Psychological Practice and Science. https://www.apa.org/about/policy/transgender-nonbinary-inclusive-care.pdf

American Psychological Association (2021). APA Resolution on Gender Identity Change Efforts, https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf.

American Psychological Association (2015). Guidelines for psychological practice with transgender and gender nonconforming people. *American Psychologist*, 70, 832-864.

Ascha, M., Sasson, D. C., Sood, R., Cornelius, J. W., Schauer, J. M., Runge, A., Muldoon, A. L., Gangopadhyay, N., Simons, L., Chen, D., Corcoran, J. F., & Jordan, S. W. (2022). Top Surgery and Chest Dysphoria Among Transmasculine and Nonbinary Adolescents and Young Adults. *JAMA pediatrics*, *176*(11), 1115–1122.

Baker, K. E., Wilson, L. M., Sharma, R., Dukhanin, V., McArthur, K., & Robinson, K. A. (2021). Hormone therapy, mental health, and quality of life among transgender people: A systematic review. *Journal of the Endocrine Society*, 5(4), 1-16.

Barrett D., Heale R. (2020). What are Delphi studies? *Evidence-Based Nursing*, 23:68-69.

Bauer, G. R., Scheim, A. I., Pyne, J., Travers, R., & Hammond, R. (2015). Intervenable factors associated with suicide risk in transgender persons: a respondent driven sampling study in Ontario, Canada. *BMC public health*, *15*, 525.

Boskey, E. R., Jolly, D., Kant, J. D., & Ganor, O. (2023). Prospective Evaluation of Psychosocial Changes After Chest Reconstruction in Transmasculine and Non-Binary Youth. *The Journal of adolescent health: official publication of the Society for Adolescent Medicine*, *73*(3), 503–509.

Brik, T., Vrouenraets, L. J. J. J., de Vries, M. C., & Hannema, S. E. (2020). Trajectories of Adolescents Treated with Gonadotropin-Releasing Hormone Analogues for Gender Dysphoria. *Archives of sexual behavior*, *49*(7), 2611–2618.

Bruce, L., Khouri, A. N., Bolze, A., Ibarra, M., Richards, B., Khalatbari, S., Blasdel, G., Hamill, J. B., Hsu, J. J., Wilkins, E. G., Morrison, S. D., & Lane, M. (2023). Long-Term Regret and Satisfaction With Decision Following Gender-Affirming Mastectomy. *JAMA surgery*, e233352. Advance online publication. https://doi.org/10.1001/jamasurg.2023.3352

Bustos, V. P., Bustos, S. S., Mascaro, A., Del Corral, G., Forte, A. J., Ciudad, P., Kim, E. A., Langstein, H. N., & Manrique, O. J. (2021). Regret after Gender-affirmation Surgery: A Systematic Review and Meta-analysis of Prevalence. *Plastic and reconstructive surgery. Global open*, *9*(3), e3477.

Byne, W., Karasic, D. H., Coleman, E., Eyler, A. E., Kidd, J. D., Meyer-Bahlburg, H. F. L., … Pula, J. (2018). Gender dysphoria in adults: An overview and primer for psychiatrists. *Transgender Health*, *3*(1), 57-70.

Cavve, B. S., Bickendorf, X., Ball, J., Saunders, L. A., Thomas, C. S., Strauss, P., Chaplyn, G., Marion, L., Siafarikas, A., Ganti, U., Wiggins, A., Lin, A., & Moore, J. K. (2024). Reidentification With Birth-Registered Sex in a Western Australian Pediatric Gender Clinic Cohort. *JAMA pediatrics*, *178*(5), 446–453.

Chelliah, P., Lau, M., & Kuper, L. E. (2024). Changes in Gender Dysphoria, Interpersonal Minority Stress, and Mental Health Among Transgender Youth After One Year of Hormone Therapy. *The Journal of Adolescent Health*, S1054-139X(24)00005-3.

Chen D, Berona J, Chan YM, Ehrensaft D, Garofalo R, Hidalgo MA, Rosenthal SM, Tishelman AC, Olson-Kennedy J. (2023). Psychosocial Functioning in Transgender Youth after 2 Years of Hormones. *New England Journal of Med.* 2023 Jan 19;388(3):240-250.

Coleman, E., Radix, A. E., Bouman, W. P., Brown, G. R., de Vries, A. L. C., Deutsch, M. B., Ettner, R., Fraser, L., Goodman, M., Green, J., Hancock, A. B., Johnson, T. W., Karasic, D. H., Knudson, G. A., Leibowitz, S. F., Meyer-Bahlburg, H. F. L., Monstrey, S. J., Motmans, J., Nahata, L., Nieder, T. O., … Arcelus, J. (2022). Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. *International journal of transgender health*, *23*(Suppl 1), S1–S259.

Coleman, E., Bockting, W., Botzer, M., Cohen-Kettenis, P., DeCuypere, G., Feldman, J., ... & Zucker, K. (2012). Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. *International Journal of Transgenderism*, 13(4), 165-232.

Colizzi, M., Costa, R., & Todarello, O. (2014). Transsexual patients' psychiatric comorbidity and positive effect of cross-sex hormonal treatment on mental health: results from a longitudinal study. *Psychoneuroendocrinology*, *39*, 65–73.

Colizzi, M., Costa, R., Pace, V., & Todarello, O. (2013). Hormonal treatment reduces psychobiological distress in gender identity disorder, independently of the attachment style. *The journal of sexual medicine*, *10*(12), 3049–3058.

Colton-Meier, S. L., Fitzgerald, K. M., Pardo, S. T., & Babcock, J. (2011). The effects of hormonal gender affirmation treatment on mental health in female-to-male transsexuals. *Journal of Gay & Lesbian Mental Health*, 15(3), 281-299.

Costa, R., Dunsford, M., Skagerberg, E., Holt, V., Carmichael, P., & Colizzi, M. (2015). Psychological Support, Puberty Suppression, and Psychosocial Functioning in Adolescents with Gender Dysphoria. *The journal of sexual medicine*, *12*(11), 2206–2214.

Crissman, H. P., Berger, M. B., Graham, L. F., & Dalton, V. K. (2017). Transgender Demographics: A Household Probability Sample of US Adults, 2014. *American journal of public health*, *107*(2), 213–215.

Dai, D., Charlton, B. M., Boskey, E. R., Hughes, L. D., Hughto, J. M. W., Orav, E. J., & Figueroa, J. F. (2024). Prevalence of Gender-Affirming Surgical Procedures Among Minors and Adults in the US. *JAMA network open*, *7*(6), e2418814.

Daniel, H., & Butkus, R. (2015). Lesbian, gay, bisexual, and transgender health disparities: Executive summary of a policy position paper from the American College of Physicians. *Annals of Internal Medicine, 163*(2), 135-137.

Danker, S., Narayan, S. K., Bluebond-Langner, R., Schechter, L. S., & Berli, J. U. (2018). Abstract: A Survey Study of Surgeons' Experience with Regret and/or Reversal of Gender-Confirmation Surgeries. *Plastic and Reconstructive Surgery Global Open*, *6*(9 Suppl), 189-189.

de Vries, A. L. C., McGuire, J. K., Steensma, T. D., Wagenaar, E. C. F., Doreleijers, T. A. H., & Cohen-Kettenis, P. T. (2014). Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment. *Pediatrics*, *134*(4), 696-704.

de Vries, A. L., Steensma, T. D., Doreleijers, T. A., & Cohen-Kettenis, P. T. (2011). Puberty suppression in adolescents with gender identity disorder: a prospective follow-up study. *The journal of sexual medicine*, *8*(8), 2276–2283.

Deutsch, M.B. (ed.). (2016). Guidelines for the Primary and Gender-Affirming Care of Transgender and Gender Nonbinary People (2d ed.). San Francisco, CA: UCSF Center of Excellence for Transgender Health.

Dhejne, C., Öberg, K., Arver, S., & Landén, M. (2014). An analysis of all applications for sex reassignment surgery in Sweden, 1960-2010: prevalence, incidence, and regrets. *Archives of Sexual Behavior*, *43*(8), 1535–1545.

Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L., Långström, N., & Landén, M. (2011). Long-term follow-up of transsexual persons undergoing sex reassignment surgery: cohort study in Sweden. *PloS one*, *6*(2), e16885.

Dopp, Alex R., Allison Peipert, John Buss, Robinson De Jesús-Romero, Keytin Palmer, and Lorenzo Lorenzo-Luaces. (2024). Interventions for Gender Dysphoria and Related Health Problems in Transgender and Gender-Expansive Youth: A Systematic Review of Benefits and Risks to Inform Practice, Policy, and Research. Santa Monica, CA: RAND Corporation. https://www.rand.org/pubs/research_reports/RRA3223-1.html.

Drescher, J., Haller, E., & Yarbrough, E. (2018). Position statement on access to care for transgender and gender diverse individuals. Caucus of LGBTQ Psychiatrists and the Council on Minority Mental Health and Health Disparities, American Psychiatric Association.

Durwood, L., McLaughlin, K. A., & Olson, K. R. (2017). Mental Health and Self-Worth in Socially Transitioned Transgender Youth. *Journal of the American Academy of Child and Adolescent Psychiatry*, *56*(2), 116–123.e2.

Endocrine Society (2020). Transgender Health, an Endocrine Society position statement, https://www.endocrine.org/advocacy/position-statements/transgender-health.

Ehrensaft, D. (2017). Gender nonconforming youth: current perspectives. *Adolescent health, medicine and therapeutics*, *8*, 57–67.

Fisher, Alessandra & Cocchetti, Carlotta. (2020). Biological basis of gender identity. 10.1016/B978-0-12-815968-2.00009-8.

Fleming, P. S., Koletsi, D., Ioannidis, J. P., & Pandis, N. (2016). High quality of the evidence for medical and other health-related interventions was uncommon in Cochrane systematic reviews. *Journal of clinical epidemiology*, *78*, 34–42.

Fisher, A. D., Castellini, G., Ristori, J., Casale, H., Cassioli, E., Sensi, C., Fanni, E., Amato, A. M., Bettini, E., Mosconi, M., Dèttore, D., Ricca, V., & Maggi, M. (2016). Cross-Sex Hormone Treatment and Psychobiological Changes in Transsexual Persons: Two-Year Follow-Up Data. *The Journal of clinical endocrinology and metabolism*, *101*(11), 4260–4269.

Green, A. E., DeChants, J. P., Price, M. N., & Davis, C. K. (2022). Association of Gender-Affirming Hormone Therapy With Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth. *The Journal of adolescent health: official publication of the Society for Adolescent Medicine*, *70*(4), 643–649.

Guyatt, G., Oxman, A. D., Akl, E. A., Kunz, R., Vist, G., Brozek, J., Norris, S., Falck-Ytter, Y., Glasziou, P., & deBeer, H. (2011). GRADE guidelines: 1. Introduction—GRADE evidence profiles and summary of findings tables. *Journal of Clinical Epidemiology*, *64*(4), 383–394.

Hatswell AJ, Baio G, Berlin JA, Irs A, Freemantle N. (2016). Regulatory approval of pharmaceuticals without a randomised controlled study: analysis of EMA and FDA approvals 1999-2014. *BMJ Open*. 2016 Jun 30;6(6):e011666.

Hembree, W. C., Cohen-Kettenis, P. T., Gooren, L., Hannema, S., Meyer, W. J., Murad, M. H., … T'Sjoen, G. G. (2017). Endocrine treatment of genderdysphoric/gender-incongruent persons:

An Endocrine Society clinical practice guideline. *The Journal of Clinical Endocrinology & Metabolism*, *102*(11), 3869-3903.

Herman, J.L., Flores, A.R., O'Neill, K.K. (2022). How Many Adults and Youth Identify as Transgender in the United States? The Williams Institute, UCLA School of Law.

Herman, J. (2013). Costs and Benefits of Providing Transition-related Health Care Coverage in Employee Health Benefits Plans: Findings from a Survey of Employers. The Williams Institute, UCLA School of Law. Retrieved from https://escholarship.org/uc/item/5z

Howick, J., Koletsi, D., Pandis, N., Fleming, P. S., Loef, M., Walach, H., Schmidt, S., & Ioannidis, J. P. A. (2020). The quality of evidence for medical interventions does not improve or worsen: a metaepidemiological study of Cochrane reviews. *Journal of clinical epidemiology*, *126*, 154–159.

Hsu, Chia-Chien and Sandford, Brian A. (2019). "The Delphi Technique: Making Sense of Consensus," Practical Assessment, Research, and Evaluation: Vol. 12, Article 10.

Institute of Medicine (2011). Clinical Practice Guidelines We Can Trust. Washington, DC: The National Academies Press.

Inwards-Breland D. Mental Health Outcomes and Receipt of Gender Affirming Care. Presented at the American Academy of Pediatrics 2021 Virtual Conference & Exhibition.

Kaltiala, R, Heino, E., Työläjärvi, & Suomalainen, L. (2020). Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria. *Nordic Journal of Psychiatry*, 74, 213–219.

Keo-Meier, C. L., Herman, L. I., Reisner, S. L., Pardo, S. T., Sharp, C., & Babcock, J. C. (2015). Testosterone treatment and MMPI-2 improvement in transgender men: a prospective controlled study. *Journal of consulting and clinical psychology*, *83*(1), 143–156.

Korpaisarn, S., & Safer, J. D. (2019). Etiology of Gender Identity. *Endocrinology and metabolism clinics of North America*, *48*(2), 323–329.

Kuper, L.E., Stewart, S., Preston, S., Lau, M., & Lopez, X. (2020). Body Dissatisfaction and Mental Health Outcomes of Youth on Gender-Affirming Hormone Therapy. *Pediatrics*. 145. e20193006.

Lane, M., Ives, G. C., Sluiter, E. C., Waljee, J. F., Yao, T. H., Hu, H. M., & Kuzon, W. M. (2018). Trends in Gender-affirming Surgery in Insured Patients in the United States. *Plastic and reconstructive surgery. Global open*, *6*(4), e1738.

Lopez, X., Marinkovic, M., Eimicke, T., Rosenthal, S.M., & Olshan, J.S. (2017). Statement on gender-affirmative approach to care from the pediatric endocrine society special interest group on transgender health. *Current Opinion in Pediatrics*. 29(4): 475-480.

McGregor, K., McKenna, J. L., Williams, C. R., Barrera, E. P., & Boskey, E. R. (2024). Association of Pubertal Blockade at Tanner 2/3 With Psychosocial Benefits in Transgender and Gender Diverse Youth at Hormone Readiness Assessment. *The Journal of adolescent health : official publication of the Society for Adolescent Medicine*, *74*(4), 801–807.

Mehringer, J. E., Harrison, J. B., Quain, K. M., Shea, J. A., Hawkins, L. A., & Dowshen, N. L. (2021). Experience of Chest Dysphoria and Masculinizing Chest Surgery in Transmasculine Youth. *Pediatrics*, *147*(3), e2020013300.

Movsisyan, A., Melendez-Torres, G. J., & Montgomery, P. (2016). Outcomes in systematic reviews of complex interventions never reached "high" GRADE ratings when compared with those of simple interventions. *Journal of clinical epidemiology*, *78*, 22–33.

Murad, M. H., Elamin, M. B., Garcia, M. Z., Mullan, R. J., Murad, A., Erwin, P. J., & Montori, V. M. (2010). Hormonal therapy and sex reassignment: A systematic review and meta-analysis of quality of life and psychosocial outcomes. *Clinical Endocrinology*, 72(2), 214-231.

Nguyen, H. B., Chavez, A. M., Lipner, E., Hantsoo, L., Kornfield, S. L., Davies, R. D., & Epperson, C. N. (2018). Gender-Affirming Hormone Use in Transgender Individuals: Impact on Behavioral Health and Cognition. *Current psychiatry reports*, *20*(12), 110.

Nobili, A., Glazebrook, C., & Arcelus, J. (2018). Quality of life of treatment-seeking transgender adults: A systematic review and meta-analysis. *Reviews in endocrine & metabolic disorders*, *19*(3), 199–220.

Oda, H., & Kinoshita, T. (2017). Efficacy of hormonal and mental treatments with MMPI in FtM individuals: cross-sectional and longitudinal studies. *BMC psychiatry*, *17*(1), 256.

Olson, K. R., Durwood, L., Horton, R., Gallagher, N. M., & Devor, A. (2022). Gender Identity 5 Years After Social Transition. *Pediatrics*, *150*(2), e2021056082.

Olson-Kennedy, J., Warus, J., Okonta, V., Belzer, M., & Clark, L. F. (2018). Chest Reconstruction and Chest Dysphoria in Transmasculine Minors and Young Adults: Comparisons of Nonsurgical and Postsurgical Cohorts. *JAMA pediatrics*, *172*(5), 431–436.

Owen-Smith, A. A., Gerth, J., Sineath, R. C., Barzilay, J., Becerra-Culqui, T. A., Getahun, D., Giammattei, S., Hunkeler, E., Lash, T. L., Millman, A., Nash, R., Quinn, V. P., Robinson, B., Roblin, D., Sanchez, T., Silverberg, M. J., Tangpricha, V., Valentine, C., Winter, S., . . . Goodman, M. (2018). Association between gender confirmation treatments and perceived gender congruence, body image satisfaction, and mental health in a cohort of transgender individuals. *Journal of Sexual Medicine, 15*(4), 591-600.

Padula, W. V., Heru, S., & Campbell, J. D. (2016). Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis. *Journal of general internal medicine*, *31*(4), 394–401.

Park, R. H., Liu, Y. T., Samuel, A., Gurganus, M., Gampper, T. J., Corbett, S. T., Shahane, A., & Stranix, J. T. (2022). Long-term Outcomes After Gender-Affirming Surgery: 40-Year Follow-up Study. *Annals of plastic surgery*, *89*(4), 431–436.

Pediatric Endocrine Society (2021). Pediatric Endocrine Society Opposes Bills that Harm Transgender youth, https://pedsendo.org/news-announcements/the-pediatric-endocrine-society-opposes-bills-that-harm-transgender-youth-2/.

Pediatric Endocrine Society (2020). Position Statement: Transgender Health. https://www.endocrine.org/-/media/a65106b6ae7f4d2394a1ebeba458591d.ashx.

Pfafflin, F., & Junge, A. (1998). Sex reassignment: Thirty years of international follow-up studies after sex reassignment surgery, a comprehensive review, 1961-1991. (Jacobson & Meir, trans.).

Rae, J. R., Gülgöz, S., Durwood, L., DeMeules, M., Lowe, R., Lindquist, G., & Olson, K. R. (2019). Predicting early-childhood gender transitions. *Psychological Science*, 30(5), 669-681.

Rafferty, J., Committee on Psychosocial Aspects of Child and Family Health, Committee on Adolescence, & Section on Lesbian, Gay, Bisexual, and Transgender Health and Wellness (2018). Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents. *Pediatrics*, *142*(4), e20182162.

Roblin, D., Sanchez, T., Silverberg, M. J., Tangpricha, V., Valentine, C., Winter, S., Woodyatt, C., … Goodman, M. (2018). Association Between Gender Confirmation Treatments and Perceived Gender Congruence, Body Image Satisfaction, and Mental Health in a Cohort of Transgender Individuals. *The journal of sexual medicine*, *15*(4), 591–600.

Saraswat, A., Weinand, J.D., & Safer, J. (2015). Evidence supporting the biologic nature of gender identity. *Endocrine Practice, 21 2*, 199-204.

Shang Z. (2023). Use of Delphi in health sciences research: A narrative review. *Medicine*, *102*(7), e32829.

Sheehan, J., Sherman, K. A., Lam, T., & Boyages, J. (2008). Regret associated with the decision for breast reconstruction: the association of negative body image, distress and surgery characteristics with decision regret. *Psychology & health*, *23*(2), 207–219.

Shelemy, L., Cotton, S., Crane, C., & Knight, M. (2024). Systematic review of prospective adult mental health outcomes following affirmative interventions for gender dysphoria. *International Journal of Transgender Health*, 1–21.

Smith, Y., Van Goozen, S., Kuiper, A., & Cohen-Kettenis, P. (2005). Sex reassignment: Outcomes and predictors of treatment for adolescent and adult transsexuals. *Psychological Medicine* 35(1): 89-99.

Steensma, T. D., McGuire, J. K., Kreukels, B. P., Beekman, A. J., & Cohen-Kettenis, P. T. (2013). Factors associated with desistence and persistence of childhood gender dysphoria: a

quantitative follow-up study. *Journal of the American Academy of Child and Adolescent Psychiatry*, *52*(6), 582–590.

Substance Abuse and Mental Health Services Administration. (2015). Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth. HHS Publication No. (SMA) 15-4928. Rockville, MD: Substance Abuse and Mental Health Services Administration.

Tang, A., Hojilla, J. C., Jackson, J. E., Rothenberg, K. A., Gologorsky, R. C., Stram, D. A., Mooney, C. M., Hernandez, S. L., & Yokoo, K. M. (2022). Gender-Affirming Mastectomy Trends and Surgical Outcomes in Adolescents. *Annals of plastic surgery*, *88*(4 Suppl), S325–S331.

Thornton, S. M., Edalatpour, A., & Gast, K. M. (2024). A systematic review of patient regret after surgery- A common phenomenon in many specialties but rare within gender-affirmation surgery. *American journal of surgery*, S0002-9610(24)00238-1. Advance online publication.

Tordoff, D. M., Wanta, J. W., Collin, A., Stepney, C., Inwards-Breland, D. J., & Ahrens, K. (2022). Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care. *JAMA network open*, *5*(2), e220978.

T'Sjoen, G., Arcelus, J., Gooren, L., Klink, D. T., & Tangpricha, V. (2019). Endocrinology of Transgender Medicine. *Endocrine reviews*, *40*(1), 97–117.

Turan, Ş., Aksoy Poyraz, C., Usta Sağlam, N. G., Demirel, Ö. F., Haliloğlu, Ö., Kadıoğlu, P., & Duran, A. (2018). Alterations in Body Uneasiness, Eating Attitudes, and Psychopathology Before and After Cross-Sex Hormonal Treatment in Patients with Female-to-Male Gender Dysphoria. *Archives of sexual behavior*, *47*(8), 2349–2361.

Turban J.L., King, D., Kobe, J., Reisner, S.L., & Keuroghlian, A.S. (2022). Access to gender-affirming hormones during adolescents and mental health outcomes among transgender adults. *PLoS One*. 17(1):e0261039.

Turban, J. L., King, D., Carswell, J. M., & Keuroghlian, A. S. (2020). Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation. *Pediatrics*, *145*(2), e20191725.

U.S. Department of Health and Human Services, Agency for Healthcare Research and Quality (2015). Off-Label Drugs: What You Need to Know. https://www.ahrq.gov/patients-consumers/patient-involvement/off-label-drug-usage.html (last accessed Feb. 15, 2023).

van de Grift, T. C., Elaut, E., Cerwenka, S. C., Cohen-Kettenis, P. T., & Kreukels, B. (2018). Surgical Satisfaction, Quality of Life, and Their Association After Gender-Affirming Surgery: A Follow-up Study. *Journal of sex & marital therapy*, *44*(2), 138–148.

van der Loos, M. A. T. C., Hannema, S. E., Klink, D. T., den Heijer, M., & Wiepjes, C. M. (2022). Continuation of gender-affirming hormones in transgender people starting puberty suppression in adolescence: a cohort study in the Netherlands. *The Lancet. Child & adolescent health*, *6*(12), 869–875.

van der Miesen, A. I. R., Steensma, T. D., de Vries, A. L. C., Bos, H., & Popma, A. (2020). Psychological Functioning in Transgender Adolescents Before and After Gender-Affirmative Care Compared With Cisgender General Population Peers. *Journal of Adolescent Health*, 66(6), 699-704.

Wallien, M. S., & Cohen-Kettenis, P. T. (2008). Psychosexual outcome of gender-dysphoric children. *Journal of the American Academy of Child and Adolescent Psychiatry*, *47*(12), 1413–1423.

What We Know Project, Ctr. for the Study of Inequality, Cornell Univ. (2018). What does the scholarly research say about the effect of gender transition on transgender well-being? (online literature review), *available at* https://whatweknow.inequality.cornell.edu/topics/lgbt-equality/what-does-the-scholarly-research-say-about-the-well-being-of-transgender-people/.

White Hughto, J. M.W., & Reisner, S. L. (2016). A systematic review of the effects of hormone therapy on psychological functioning and quality of life in transgender individuals. *Transgender Health*, 1(1), 21-31.

Wiepjes, C.M., Nota, N. M., de Blok, C.J., Klaver, M., de Vries, A.L., Wensing-Kruger, S.A., ... & Gooren, L.J. (2018). The Amsterdam cohort of gender dysphoria study (1972–2015): trends in prevalence, treatment, and regrets. *The Journal of Sexual Medicine*, 15(4), 582-590.

Wierckx, K., Van Caenegem, E., Schreiner, T., Haraldsen, I., Fisher, A. D., Toye, K., Kaufman, J. M., & T'Sjoen, G. (2014). Cross-sex hormone therapy in trans persons is safe and effective at short-time follow-up: results from the European network for the investigation of gender incongruence. *The journal of sexual medicine*, *11*(8), 1999–2011.

Wittich, C. M., Burkle, C. M., & Lanier, W. L. (2012). Ten common questions (and their answers) about off-label drug use. *Mayo Clinic proceedings*, *87*(10), 982–990.

World Health Organization. (2018). Gender Incongruence. In International Classification of Diseases, 11th Revision, https://icd.who.int/browse11/l-m/en#/http%3A%2F%2Fid.who.int%2Ficd%2Fentity%2F411470068.

Word Health Organization: Regional Office for Europe. WHO/Europe brief – transgender health in the context of ICD-11, https://perma.cc/ABZ4-KMPT?view-mode=client-side&type=image.

World Medical Association. (2017, February 17). WMA statement on transgender people, https://www.wma.net/policies-post/wma-statement-on-transgender-people/.

World Professional Association for Transgender Health. (2018). WPATH Position on

World Professional Association for Transgender Health. (2016). Position Statement on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A. https://www.wpath.org/newsroom/medical-necessity-statement.

Zhang, Q., Goodman, M., Adams, N., Corneil, T., Hashemi, L., Kreukels, B., Motmans, J., Snyder, R., & Coleman, E. (2020). Epidemiological considerations in transgender health: A

systematic review with focus on higher quality data. *International journal of transgender health*, *21*(2), 125–137.

Zucker, K. J., Cohen-Kettenis, P. T., Drescher, J., Meyer-Bahlburg, H. F., Pfäfflin, F., & Womack, W. M. (2013). Memo outlining evidence for change for gender identity disorder in the DSM-5. *Archives of sexual behavior*, *42*(5), 901–914.

Zucker, K., et al (2010) Puberty-Blocking Hormonal Therapy for Adolescents with Gender Identity Disorder: A Descriptive Clinical Study, *Journal of Gay & Lesbian Mental Health*, 15:1, 58-82.