No. 25-1279

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

PFLAG, INC., et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United
States, et al.,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the District of Maryland

_____

**JOINT APPENDIX – VOLUME II (JA580–JA1165)**

_____

JOSHUA BLOCK
HARPER SELDIN
   *American Civil Liberties Union*
     *Foundation*
   *125 Broad Street, Floor 18*
   *New York, NY 10004*
   *Telephone: (212) 549-2500*

DEBORAH A. JEON
ZOE M. GINSBERG
   *American Civil Liberties Union*
     *Foundation of Maryland*
   *3600 Clipper Mill Road, Suite 200*
   *Baltimore, MD 21211*
   *Telephone: (410) 889-8555*
*Counsel for plaintiffs-appellees*

BRETT A. SHUMATE
   *Assistant Attorney General*

ERIC D. McARTHUR
   *Deputy Assistant Attorney General*

BRAD HINSHELWOOD
JACOB CHRISTENSEN
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7525*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-5048*
*Counsel for defendants-appellants*

*Additional Counsel listed on inside cover*

OMAR GONZALEZ-PAGAN
  *Lambda Legal Defense and*
   *Education Fund, Inc.*
  *120 Wall Street, 19th Floor*
  *New York, NY 10005*
  *Telephone: (212) 809-8585*

KAREN L. LOEWY
  *Lambda Legal Defense and*
   *Education Fund, Inc.*
  *815 16th Street NW, Suite 4140*
  *Washington, DC 20006*
  *Telephone: (202) 804-6245*

CATHERINE E. STETSON
DANIELLE DESAULNIERS
 STEMPEL
SAM H. ZWINGLI
  *Hogan Lovells US LLP*
  *555 13th Street, N.W.*
  *Washington, D.C. 20004*
  *Telephone: (202) 637-5491*

*Counsel for plaintiffs-appellees*

NORA HUPPERT
  *Lambda Legal Defense and*
   *Education Fund, Inc.*
  *3656 N. Halsted Street*
  *Chicago, IL 60613*
  *Telephone: (312) 663-4413*

JACKSON SKEEN
  *Hogan Lovells US LLP*
  *125 High Street, Suite 2010*
  *Boston, MA 02110*
  *Telephone: (617) 702-7747*

*Counsel for plaintiffs-appellees*

# TABLE OF CONTENTS

## VOLUME I

Docket Report ........................................................................ JA1

Amended Complaint (Dkt. 53) ............................................ JA43

Temporary Restraining Order (Dkt. 61) ............................ JA88

Memorandum Opinion (Dkt. 62) ........................................ JA90

Plaintiffs' Motion for Preliminary Injunction
   (Dkt. 69 to 69-49) ........................................................ JA143

## VOLUME II

(Continued) Plaintiffs' Motion for Preliminary Injunction
   (Dkt. 69-50 to 69-51) .................................................. JA580

Defendants' Opposition to Preliminary Injunction
   (Dkt. 90 to 90-1) .......................................................... JA690

Plaintiffs' Reply in Support of Preliminary Injunction
   (Dkt. 108 to 108-7) ...................................................... JA777

Memorandum Opinion (Dkt. 115) ...................................... JA922

Preliminary Injunction Order (Dkt. 116) .......................... JA988

Notice of Appeal (Dkt. 132) .............................................. JA990

Notice (Dkt. 140 to 140-36) .............................................. JA991

# **Exhibit CC**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| PFLAG, INC.; *et al.*, | |
| *Plaintiff*, | |
| v. | Civil Action No. 8:25-cv-00337 |
| DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*, | |
| *Defendants*. | |

**EXPERT DECLARATION OF DANIEL SHUMER, M.D.**

I, Daniel Shumer, M.D., hereby declare and state as follows:

1.      I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.      I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.  The opinions expressed herein are my own and do not express the views or opinions of my employer.

3.      I have actual knowledge of the matters stated herein.  If called to testify in this matter, I would testify truthfully and based on my expert opinion.

## I.      BACKGROUND AND QUALIFICATIONS

### A.      Qualifications

4.      I am a Pediatric Endocrinologist, Associate Professor of Pediatrics, and the Clinical Director of the Child and Adolescent Gender Clinic at Mott Children's Hospital at Michigan Medicine. I am also the Medical Director of the Comprehensive Gender Services Program at Michigan Medicine, University of Michigan.

1

5.      I am Board Certified in Pediatrics and Pediatric Endocrinology by the American

Board of Pediatrics and licensed to practice medicine in the state of Michigan.

6.      I received my medical degree from Northwestern University in 2008. After

completing a Residency in Pediatrics at Vermont Children's Hospital, I began a Fellowship in

Pediatric Endocrinology at Harvard University's Boston Children's Hospital. Concurrent with the

Fellowship, I completed a Master of Public Health from Harvard's T.H. Chan School of Public

Health. I completed both the Fellowship and the MPH degree in 2015.

7.      I have extensive experience in working with and treating children and adolescents

with endocrine conditions including differences in sex development (DSD) (also referred to as

intersex conditions), gender dysphoria, type 1 diabetes, thyroid disorders, growth problems, and

delayed or precocious puberty. I have been treating patients with gender dysphoria since 2015.

8.      A major focus of my clinical, teaching, and research work pertains to the

assessment and treatment of transgender adolescents.

9.      I have published extensively on the topic of gender identity in pediatrics and the

treatment of gender dysphoria. I have also reviewed the peer-reviewed literature concerning

medical treatments for gender dysphoria, the current standards of care for the treatment of gender

dysphoria, and research articles on a variety of topics with a focus on mental health in transgender

adolescents.

10.     I am involved in the education of medical trainees.  I was previously the Fellowship

Director in the Division of Pediatric Endocrinology and the Education Lead for the Division of

Pediatric Endocrinology, and I am currently Course Director for a medical student elective in

Transgender Medicine. My additional academic duties as an Associate Professor include teaching

2

several lectures, including those entitled "Puberty," "Transgender Medicine," and "Pediatric Growth and Development."

11.    As a Fellow at Harvard, I was mentored by Dr. Norman Spack. Dr. Spack established the Gender Management Services Clinic (GeMS) at Boston Children's Hospital. While working and training at GeMS, I became a clinical expert in the field of transgender medicine within Pediatric Endocrinology and began conducting research on gender identity, gender dysphoria, and the evaluation and management of gender dysphoria in children and adolescents.

12.    Based on my work at GeMS, I was recruited to establish a similar program assessing and treating gender diverse and transgender children and adolescents at the C.S. Mott Children's Hospital in Ann Arbor. In October 2015, I founded the hospital's Child and Adolescent Gender Services Clinic.

13.    The Child and Adolescent Gender Services Clinic has treated over 1,500 patients since its founding. The clinic provides comprehensive assessment, and when appropriate, treatment with pubertal suppression and hormonal therapies, to patients diagnosed with gender dysphoria. I have personally evaluated and treated over 500 patients with gender dysphoria. The majority of the patients receiving care range between 10 and 21 years old. As the Clinical Director, I oversee the clinical practice, which currently includes 7 physicians, 1 nurse practitioner, 2 social workers, as well as nursing and administrative staff. I also actively conduct research related to transgender medicine, gender dysphoria treatment, and mental health concerns specific to transgender youth.

14.    I also provide care in the Differences/Disorders of Sex Development (DSD) Clinic at Michigan Medicine at Mott Children's Hospital. The DSD Clinic is a multidisciplinary clinic focused on providing care to infants and children with differences in the typical path of sex

3

EXPERT DECLARATION OF DANIEL SHUMER, M.D.

development, which may be influenced by the arrangement of sex chromosomes, the functioning of our gonads (i.e. testes, ovaries), and our bodies' response to hormones. The clinic is comprised of members from Pediatric Endocrinology, Genetics, Psychology, Urology, Gynecology, Surgery, and Social Work. In this clinic I have assessed and treated over 100 patients with DSD.

15.    In my role as Medical Director of the Comprehensive Gender Services Program (CGSP), I lead Michigan Medicine's broader efforts related to transgender services. CGSP is comprised of providers from across the health system including pediatric care, adult hormone provision, gynecologic services, adult surgical services, speech/language therapy, mental health services, and primary care. I run monthly meetings with representatives from these areas to help coordinate communication between Departments. I coordinate strategic planning aimed to improve care within the health system related to our transgender population. I also serve as the medical representative for CGSP in discussions with health system administrators and outside entities.

16.    I have authored numerous peer-reviewed articles related to treatment of transgender youth. I have also co-authored chapters of medical textbooks related to medical management of transgender patients. I have been invited to speak at numerous hospitals, clinics, and conferences on topics related to clinical care and standards for treating transgender children and youth.

17.    The information provided regarding my professional background, experiences, publications, and presentations is detailed in my curriculum vitae, a true and correct copy of the most up-to-date version of which is attached as **Exhibit A**.

## B.    Prior Testimony

18.    In the past four years, I have been retained as an expert and provided testimony at trial or by deposition in the following cases: *Dolney v. Wrigley*, No. 08-2023-CV-2189 (Burleigh

4

Cnty. Dist. Ct., North Dakota); *Misanin v. Wilson*, No. 2:24-cv-4734-RMG (D.S.C.); *Noe v. Parson*, No. 23AC-CC04530 (Cole Cnty. Cir. Ct., Mo.); *Voe v. Mansfield*, No. 1:23-cv-00864 (M.D.N.C.); *Roe v. Herrington*, 4:20-cv-00464 (D. Ariz.); *Doe v. Ladapo*, No. 4:23-cv-00114 (N.D. Fla.); *Loe v. Texas*, No. GN-23-003616 (Travis Cnty. Dist. Ct., Tex.); *Koe v. Noggle*, No. 1:23-cv-02904 (N.D. Ga.); *Dekker v. Weida*, No. 4:22-cv-00325 (N.D. Fla.); *K.C. v. The Individual Members of the Medical Licensing Board of Indiana*, No. 1:23-cv-00595 (S.D. Ind.); *Boe v. Marshall*, No. 2:22-cv-184 (M.D. Ala.); *Roe v. Utah High School Activities Association et al* (Third District Court in and for Salt Lake County, UT); and *Cooper v. USA Powerlifting and Powerlifting Minnesota*, No. 62-CV-21-211 (Ramsey Cnty. Dist. Ct., Minn.).

### C. Compensation

19.     I am being compensated at an hourly rate for the actual time that I devote to this case, at the rate of $400 per hour for any review of records, preparation of reports, declarations, and deposition and trial testimony. My compensation does not depend on the outcome of this litigation, the opinions that I express, or the testimony that I provide.

### D. Bases for Opinions

20.     This report sets forth my opinions in this case and the bases for my opinions.

21.     In preparing this report, I reviewed the Executive Order 14187, titled "Protecting Children from Chemical and Surgical Mutilation," issued on January 28, 2025, and Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to The Federal Government," issued on January 20, 2025, as well as the Complaint in this case filed on February 4, 2025.

22.     I have also reviewed the materials listed in the bibliography attached as **Exhibit B** to this report, as well as the materials listed within my curriculum vitae, which is attached as

EXPERT DECLARATION OF DANIEL SHUMER, M.D.

**Exhibit A**. The sources cited therein include authoritative, scientific peer-reviewed publications. They include the documents specifically cited as supportive examples in particular sections of this report. I may rely on these materials as additional support for my opinions.

23.     In addition, I have relied on my scientific education, training, and years of clinical and research experience, and my knowledge of the scientific literature in the pertinent fields.

24.     The materials I have relied upon in preparing this report are the same types of materials that experts in my field of study regularly rely upon when forming opinions on these subjects.

25.     My opinions are based on my extensive background and experience treating transgender patients.

26.     I may wish to supplement or revise these opinions or the bases for them due to new scientific research or publications or in response to statements and issues that may arise in my area of expertise.

## II.    <u>EXPERT OPINIONS</u>

### A.    MEDICAL AND SCIENTIFIC BACKGROUND ON SEX AND GENDER IDENTITY

27.     *Sex* is comprised of several components (National Academies, 2022). This includes, among others, internal reproductive organs, external genitalia, chromosomes, hormones, gender identity, and secondary sex characteristics.

28.     *Gender identity* is the medical term for a person's internal, innate sense of belonging to a particular sex. Everyone has a gender identity. Diversity of gender identity and incongruence between assigned sex at birth and gender identity are naturally occurring and part of human biological diversity. The term *transgender* refers to individuals whose gender identity does

6

not align with the sex assigned at birth, and *cisgender* refers to individuals whose gender identity does align with the sex assigned at birth (Shumer, et al., 2013).

29.    *Gender identity* does not refer to socially contingent behaviors, attitudes, or personality traits. It is an internal and largely biological phenomenon.

30.    Living consistent with one's gender identity is critical to the health and well-being of any person, including transgender people (Hidalgo, et al., 2013; Shumer, et al., 2013; White Hughto, et al., 2015).

31.    A person's understanding of their gender identity may evolve over time in the natural course of their life. However, attempts to force transgender people to align their gender identity with their birth sex (sometimes decried as "conversion therapy") have been found to be both harmful and ineffective. In one study, transgender adults who recall previous attempts from healthcare professionals to alter their gender identity reported an increase in lifetime suicide attempts and higher rates of severe psychological distress in the present (Turban, et al., 2020a). In another study, exposure to these types of attempts were found to increase the likelihood that a transgender adolescent will attempt suicide by 55% and more than double the risk for running away from home (Campbell, et al., 2002). Those practices have been denounced as unethical by all major professional associations of medical and mental health professionals, such as the American Medical Association, the American Academy of Pediatrics ("AAP"), the American Psychiatric Association, and the American Psychological Association, among others (Fish, et al., 2022).

32.    Scientific research and medical literature across disciplines demonstrates that gender identity, like other components of sex, has a strong biological foundation. For example, there are numerous studies detailing the similarities in the brain structures of transgender and non-

7

transgender people with the same gender identity (Luders, et al., 2009; Rametti, et al., 2011; Berglund, et al., 2008). In one such study, the volume of the bed nucleus of the *stria terminalis* (a collection of cells in the central brain) in transgender women was equivalent to the volume found in cisgender women (Zhou, et al., 1995).

33.     There are also studies highlighting the genetic components of gender identity. Twin studies are a helpful way to understand genetic influences on human diversity. Identical twins share 100% of the same DNA, while fraternal twins share roughly 50% of the same DNA. However, both types of twins share the same environment. Therefore, studies comparing differences between identical and fraternal twin pairs can help isolate the genetic contribution of human characteristics. Twin studies have shown that if an identical twin is transgender, the other twin is much more likely to be transgender compared to fraternal twins, a finding which points to genetic underpinnings to gender identity development (Heylens, et al., 2012).

34.     Note that not *all* identical twins are concordant with gender identity, *i.e.* gender identity is not a Mendelian trait. For some human characteristics there is a clear inheritance pattern whereby a particular gene is responsible for the presence or absence of the characteristic and people with identical DNA (such as identical twins) will *always* be concordant with the characteristic. These characteristics are called Mendelian traits. For example: the presence or absence of freckles or a chin dimple; having medical conditions such as Huntington's disease or Duchenne muscular dystrophy; these are Mendelian traits and identical twins will be concordant with these characteristics 100% of the time (Klug, et al., 2012). Other human characteristics are not at all genetically based (non-heritable), and in these cases identical twins would be no more likely to be concordant in having or not having the characteristic than fraternal twins or siblings. An example of a non-heritable condition is a cancer caused by a mutation that occurs after

8

EXPERT DECLARATION OF DANIEL SHUMER, M.D.

fertilization (Forsberg, et al., 2013). Clearly gender identity is not a Mendelian trait, but the fact that more identical twins are concordant for gender identity than fraternal twins *does* in fact suggest a biological underpinning.

35.    There is also ongoing research on how differences in fetal exposures to hormones may influence gender identity. This influence can be examined by studying a medical condition called congenital adrenal hyperplasia. Fetuses assigned female affected by congenital adrenal hyperplasia produce much higher levels of testosterone compared to fetuses without the condition. While most assigned females with congenital adrenal hyperplasia have a female gender identity in adulthood, the percentage of those with gender dysphoria is higher than that of the general population. This suggests that fetal hormone exposures contribute to the later development of gender identity (Dessens, et al, 2005).

36.    There has also been research examining specific genetic differences that appear associated with gender identity formation (Rosenthal, 2014). For example, one study examining differences in the estrogen receptor gene among transgender women and cisgender male controls found that the transgender individuals were more likely to have a genetic difference in this gene (Henningsson, et al., 2005).

37.    The above studies are representative examples of scientific research demonstrating biological influences on gender identity. Gender identity, like other complex human characteristics, is rooted in biology with important contributions from neuroanatomic, genetic and hormonal variation (Roselli, 2018).

**B.    ASSESSMENT OF GENDER DYSPHORIA IN CHILDREN AND ADOLESCENTS**

38.    Due to the incongruence between their assigned sex and gender identity, transgender people experience varying degrees of gender dysphoria, a serious medical condition

9

Expert Declaration of Daniel Shumer, M.D.

defined in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision* (DSM-5-TR) (APA, 2022).

39.    *Gender Dysphoria* is defined as an incongruence between a patient's assigned sex and their gender identity present for at least six months, which causes clinically significant distress in the person's life.  This distress is further defined as impairment in social, occupational, or other important areas of functioning (APA, 2022). Additional features may include a strong desire to be rid of one's primary or secondary sex characteristics, a strong desire to be treated as a member of the identified gender, or a strong conviction that one has the typical feelings of identified gender (APA, 2022). Usually, patients presenting to pediatric gender clinics who do in fact meet criteria for the diagnosis of gender dysphoria have had symptoms of gender dysphoria much longer than 6 months.

40.    The *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8* ("SOC 8"), published by the World Professional Association for Transgender Health ("WPATH"), provides guidance to providers on how to provide comprehensive assessment and care to this patient population based on medical evidence. These standards recommend involving relevant disciplines, including mental health and medical professionals, to reach a decision with families about whether medical interventions are appropriate and remain indicated through the course of treatment.

41.    In children and adolescents, a comprehensive biopsychosocial assessment is typically the first step in evaluation, performed by a mental health provider with experience in gender identity. The goals of this assessment are to develop a deep understanding of the young person's experience with gender identity, to consider whether the child or adolescent meets criteria for a diagnosis of gender dysphoria, and to understand what options may be desired and helpful

10

EXPERT DECLARATION OF DANIEL SHUMER, M.D.

for the adolescent (Coleman, et al., 2022; Coleman, et al., 2012; Hembree, et al., 2017; Hembree, et al., 2009).

42.    In children and adolescents, the diagnosis of gender dysphoria is made by a qualified health care provider, usually a mental health provider including but not limited to a psychiatrist, psychologist, social worker, or therapist, with expertise in gender identity concerns. It is recommended that children and adolescents diagnosed with gender dysphoria engage with a multidisciplinary team of mental health and medical professionals to formulate a treatment plan, in coordination with the parent(s) or guardian(s), with a goal of reduction of gender dysphoria.

43.    For children younger than pubertal age, the only recommended treatments do not involve medications. For adolescents, additional treatments involving medications may be appropriate.

44.    For transgender adolescents, all treatment decisions are made in consultation with the adolescent and the adolescent's parent or guardian with the parent or guardian providing ultimate consent for treatment.

## C.    EVIDENCE-BASED CLINICAL PRACTICE GUIDELINES FOR THE TREATMENT OF GENDER DYSPHORIA IN CHILDREN AND ADOLESCENTS

45.    The goal of any intervention for gender dysphoria is to reduce dysphoria, improve functioning, and prevent the harms caused by untreated gender dysphoria.

46.    Gender dysphoria is highly treatable and can be effectively managed. If left untreated, however, it can result in severe anxiety and depression, eating disorders, substance abuse, self-harm, and suicidality (Reisner, et al., 2015).

11

47.     Based on longitudinal data, and my own clinical experience, when transgender adolescents are provided with appropriate medical treatment and have parental and social support, they are more likely to thrive and grow into healthy adults (de Vries, et al., 2014).

48.     For pre-pubertal children with gender dysphoria, treatments may include supportive therapy, encouraging support from loved ones, and assisting the young person through elements of a social transition. Social transition may include adopting a new name and pronouns, appearance, and clothing, and correcting identity documents.

49.     Options for treatment after the onset of puberty include the use of gonadotropin-releasing hormone agonists ("GnRHa") for purposes of preventing progression of pubertal development, hormonal interventions such as testosterone and estrogen administration. Gender-affirming chest surgery may be indicated for adults and on rare occasions, for older adolescents. Other surgeries may be indicated for adults (18-years-old or older). These treatment options are based on robust research and clinical experience, which consistently demonstrate safety and efficacy.

50.     Clinical practice guidelines have been published by several long-standing and well-respected medical bodies: the World Professional Association for Transgender Health ("WPATH") and the Endocrine Society (Coleman, et al., 2022; Coleman, et al., 2012; Hembree, et al., 2017; Hembree, et al., 2009). The clinical practice guidelines and standards of care published by these organizations provide a framework for treatment of gender dysphoria in adolescents.

51.     The tenets set forth by WPATH and the Endocrine Society are supported by the major professional medical and mental health associations in the United States, including the American Academy of Pediatrics, the American Medical Association, the American Psychological Association, the American Psychiatric Association, and American Academy of Family Physicians,

EXPERT DECLARATION OF DANIEL SHUMER, M.D.

among others (e.g., Rafferty, et al., 2018 (American Academy of Pediatrics); AMA, 2019; American Psychological Association, 2015; Drescher, et al., 2018 (American Psychiatric Association); Klein, et al., 2018 (AAFP); National Academies, 2020.

52.    WPATH has been recognized as the standard-setting organization for the treatment of gender dysphoria since its founding in 1979. The most recent WPATH Standards of Care ("SOC 8") were published in 2022 and represent expert consensus for clinicians related to medical care for transgender people, based on the best available science and clinical experience (Coleman, et al., 2022).

53.    The purpose of the WPATH Standards of Care is to assist health providers in delivering necessary medical care to transgender people, to maximize their patients' overall health, psychological well-being, and self-fulfillment. The WPATH Standards of Care serve as one of the foundations for the care provided in my own clinic.

54.    The WPATH SOC 8 is based on rigorous review of the best available science and expert professional consensus in transgender health. International professionals were selected to serve on the SOC 8 writing committee. Recommendation statements were developed based on data derived from independent systemic literature reviews. Grading of evidence was performed by an Evidence Review Team which determined the strength of evidence presented in each individual study relied upon in the document (Coleman, et al., 2022).

55.    In addition, the Endocrine Society is a 100-year-old global membership organization representing professionals in the field of adult and pediatric endocrinology. In 2017, the Endocrine Society published clinical practice guidelines on treatment recommendations for the medical management of gender dysphoria, in collaboration with the Pediatric Endocrine Society,

13

EXPERT DECLARATION OF DANIEL SHUMER, M.D.

the European Societies for Endocrinology and Pediatric Endocrinology, and WPATH, among others (Hembree, et al, 2017).

56.    The Endocrine Society Clinical Guidelines were developed through rigorous scientific processes that "followed the approach recommended by the Grading of Recommendations, Assessment, Development, and Evaluation group, an international group with expertise in the development and implementation of evidence-based guidelines." The guidelines affirm that patients with gender dysphoria often must be treated with "a safe and effective hormone regimen that will (1) suppress endogenous sex hormone secretion determined by the person's genetic/gonadal sex and (2) maintain sex hormone levels within the normal range for the person's affirmed gender." (Hembree, et al., 2017).

57.    The AAP is the preeminent professional body of pediatricians in the United States, with over 67,000 members.  The AAP endorses a commitment to the optimal physical, mental, and social health and well-being for youth. The 2018 policy statement titled *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents* further lends support to the treatment options outlined in the WPATH Standards of Care and the Endocrine Society's Clinical Practice Guidelines (Rafferty, et al., 2018).

58.    As a board-certified pediatric endocrinologist, I follow the Endocrine Society Clinical Practice Guidelines and the WPATH Standards of Care when treating my patients.

###    D.    TREATMENT PROTOCOLS FOR GENDER DYSPHORIA

59.    Undergoing treatment to alleviate gender dysphoria is commonly referred to as a transition. The transition process in adolescence typically includes (i) social transition and/or (ii) medications, including puberty-delaying medication and hormone therapy. The steps that make up

14

a person's transition and their sequence will depend on that individual's medical and mental health needs and decisions made between the patient, family, and multidisciplinary care team.

60.     There are no medications considered for transition until after the onset of puberty. Puberty is a process of maturation heralded by production of sex hormones—testosterone and estrogen—leading to the development of secondary sex characteristics. Secondary sex characteristics include testosterone-induced effects such as deepening of the voice, muscular changes, facial and body hair, and estrogen-induced effects such as breast development. There is diversity in the age of pubertal onset; however, most adolescents begin puberty between ages 10 and 12 years.

61.     Gender exploration in childhood is expected and healthy. The majority of prepubertal children exploring their gender do not develop gender dysphoria and are not expected to become transgender adolescents or adults. In contrast, data and personal experience shows that children whose gender dysphoria persists into adolescence are highly likely to be transgender (van der Loos, et al., 2022). Some individuals in this field misinterpret older studies showing that a large percentage of children diagnosed with gender identity disorder did not grow up to be transgender. Those studies include children who would not fulfill the current diagnostic criteria for gender dysphoria and, in any case, have no relevance to this case because no medications are prescribed to prepubertal children.

62.     After the onset of puberty, puberty-delaying medication and hormone-replacement therapy—both individually and in combination—can significantly improve the mental health of adolescents diagnosed with gender dysphoria. These treatments allow for a patient's physiological characteristics to more closely align with gender identity and decreases the likelihood that the

EXPERT DECLARATION OF DANIEL SHUMER, M.D.

young person will be incorrectly identified with their assigned sex, further alleviating their gender dysphoria.

63.     At the onset of puberty, adolescents begin to experience the onset of secondary sex characteristics. Adolescents with differences in gender identity may have intensification of gender dysphoria during this time due to development of secondary sex characteristics incongruent with gender identity. Persistence or intensification of gender dysphoria as puberty begins is used as a helpful diagnostic tool as it becomes more predictive of gender identity persistence into adolescence and adulthood (de Vries, et al., 2012).

### i.    Treatment with puberty-delaying medications

64.     Adolescents diagnosed with gender dysphoria who have entered puberty (Tanner Stage 2) may be prescribed puberty-delaying medications (GnRHa) to prevent the distress of developing permanent, unwanted physical characteristics that do not align with the adolescent's gender identity. Tanner Stage 2 refers to the stage in puberty whereby the physical effects of testosterone or estrogen production are first apparent on physical exam. Specifically, this is heralded by the onset of breast budding in an individual assigned female at birth, or the onset of testicular enlargement in an individual assigned male at birth. For individuals assigned male at birth, Tanner Stage 2 typically occurs between age 9-14, and for those assigned female at birth between age 8-12.

65.     The treatment works by pausing endogenous puberty at whatever stage it is at when the treatment begins, limiting the influence of a person's endogenous hormones on their body. For example, a transgender girl will experience no progression of physical changes caused by testosterone, including facial and body hair, an Adam's apple, or masculinized facial structures. And, in a transgender boy, those medications would prevent progression of breast development,

16

menstruation, and widening of the hips (Coleman, et al., 2022; de Vries, et al., 2012; Deutsch (ed.), 2016; Hembree, et al., 2017; Rosenthal, 2014).

66.  GnRHa have been used extensively in pediatrics for several decades. Prior to their use for gender dysphoria, they were used (and still are used) to treat precocious puberty, puberty that begins at a younger-than-normal age. GnRHa work by suppressing the signal hormones from the pituitary gland (luteinizing hormone [LH] and follicle stimulating hormone [FSH]) that stimulate the testes or ovaries to produce sex hormones. Upon discontinuation of GnRHa, LH and FSH production resume and puberty will also resume.

67.  GnRHa have no long-term implications on fertility. In transgender youth, it is most typical to use GnRHa from the onset of puberty (Tanner Stage 2) until mid-adolescence. While treating, the decision to continue treatment will be continually evaluated. Should pubertal suppression no longer be desired, GnRHa would be discontinued, and puberty would re-commence.

68.  Prior to initiation of GnRHa, providers counsel patients and their families extensively on potential benefits and risks. The designed benefit of treatment is to reduce the risk of worsening gender dysphoria and mental health deterioration. More specifically, use of GnRHa in transmasculine adolescents allows for decreased chest development, reducing the need for breast binding and surgical intervention in adulthood. For transfeminine adolescents GnRHa limits facial and body hair growth, voice deepening, and masculine bone structure development, which greatly reduce distress both at the time of treatment and later in life and reduce the need for later interventions such as voice therapy, hair removal, and facial feminization surgery.

69.  The goal in using GnRHa is to minimize the patient's dysphoria related to progression of puberty and allow for later initiation of puberty consistent with gender identity.

17

EXPERT DECLARATION OF DANIEL SHUMER, M.D.

JA597

When a patient presents for care, the provider assesses the patient's pubertal stage, pubertal history, and individual needs. A patient may present prior to the onset of puberty (Tanner Stage 1), at the onset of puberty (Tanner Stage 2), or further along in puberty (Tanner Stages 3-5). The pubertal stage and individual needs of the patient then direct conversations regarding care options. A patient at Tanner Stage 2 may benefit from GnRHa, while an older patient who has completed puberty may benefit from pubertal initiation with hormones, as described below. I have observed that providing individualized care based on individual patient characteristics, using the WPATH Standards of Care as the foundation of this care, provides significant benefit to patients, minimizes gender dysphoria, and can eliminate the need for surgical treatments in adulthood.

70.    As an experienced pediatric endocrinologist, I treat patients with these same medications for both precocious puberty and gender dysphoria and in both cases the side effects are comparable and easily managed; for both patient populations the risks are greatly outweighed by the benefits of treatment.

71.    In addition, I regularly prescribe GnRHa for patients who do not meet criteria for precocious puberty but who require pubertal suppression. Examples include patients with disabilities who are unable to tolerate puberty at the typical age due to hygienic or behavioral concerns (Yaylacı, 2020); adolescents with short stature who despite growth hormone treatment will have a very short adult height (Pasquino, 2020); and young women with endometriosis (Shim, 2023).[1] GnRHa are also used off-label in adolescent girls undergoing cancer treatment to protect their fertility. Certain types of chemotherapy known as alkylating agents are toxic to the ovary. This toxicity is exacerbated when the ovary is active, as is the case during puberty. GnRHa can be

---

[1] Medications which suppress testosterone production and/or action are also used in non-transgender girls with Polycystic Ovarian Syndrome (PCOS) to reduce some symptoms of the condition, including excess facial hair.

18

used to downregulate ovarian activity which protects or shields the ovary during treatment with alkylating agents. Brancati et al. (2021) describe the utility of this treatment for adolescent girls despite the "off-label" status. As with gender dysphoria, the prescription of GnRHa to treat these conditions is "off-label," yet it is widely accepted within the field of endocrinology, supported by published, peer-reviewed literature, and not considered experimental. The same holds true for other common medications used in pediatric endocrinology: metformin for weight loss; growth hormone for short stature not caused by growth hormone deficiency; and countless medications used to control type 2 diabetes which have an adult indication but whose manufacturers have not applied for a pediatric indication.

### ii.    Treatment with hormone therapy

72.    In mid-adolescence, the patient, their parents, and the patient's care team may discuss the possibility of beginning the use of testosterone or estrogen. In my practice we discuss these treatments for a patient who is currently receiving GnRHa, or patients who have already gone through their endogenous puberty and either did not have access to, desire, or elect for GnRHa treatment. In adult patients, use of GnRHa is uncommon, an instead medical decisions are focused more on testosterone or estrogen therapy.

73.    These hormone therapies are used to treat gender dysphoria in adolescents and adults to facilitate development of sex-specific physical changes congruent with their gender identity. For example, a transgender man prescribed testosterone will develop a lower voice as well as facial and body hair, while a transgender woman prescribed estrogen will experience breast growth, female fat distribution, and softer skin.

74.    Under the Endocrine Society Clinical Guidelines and SOC 8, hormone therapy is an appropriate treatment for transgender adolescents with gender dysphoria when the experience

19

EXPERT DECLARATION OF DANIEL SHUMER, M.D.

JA599

of dysphoria is marked and sustained over time, the adolescent demonstrates emotional and cognitive maturity required to provide an informed consent/assent for treatment, other mental health concerns (if any) that may interfere with diagnostic clarity and capacity to consent have been addressed, and the adolescent has discussed reproductive options with their provider. SOC 8 also highlights the importance of involving parent(s)/guardian(s) in the assessment and treatment process for minors (Coleman, et al., 2022; Hembree, et al., 2017).

75.     Under the Endocrine Society Clinical Guidelines and SOC 8, hormone therapy is an appropriate treatment for transgender adults (age 18 or older) with gender dysphoria when the experience of dysphoria is marked and sustained, other possible causes of apparent gender dysphoria are excluded, any mental and physical health conditions that could negatively impact the outcome of treatment are assessed, and the adult has the capacity to understand the risks and benefits of treatment and provide consent for treatment. There is no special differentiation, or justification for differentiation, between someone who aged 18 compared and someone aged 19(Coleman, et al., 2022; Hembree, et al., 2017).

76.     Similar to GnRHa, the risks and benefits of hormone treatment are discussed with patients (and families, if the patient is a minor) prior to initiation of testosterone or estrogen. When treated with testosterone or estrogen, the goal is to maintain the patient's hormone levels within the normal range for their gender. Laboratory testing is recommended to ensure proper dosing and hormonal levels. If starting hormonal care after completing puberty, discussion of egg or sperm preservation prior to starting treatment is recommended.

77.     Regardless of the treatment plan prescribed, at every encounter with the care team there is a re-evaluation of the patient's gender identity and their transition goals. Should a patient desire to discontinue a medical intervention, the intervention is discontinued. Discontinuation of

EXPERT DECLARATION OF DANIEL SHUMER, M.D.

GnRHa will result in commencement of puberty. Findings from studies in which participants have undergone comprehensive evaluation prior to gender care show low levels of regret (de Vries, et al., 2011; van der Loos, et al., 2022; Wiepjes, et al., 2018). These extremely low rates of regret stand in stark contrast to the high rates of poor psychological functioning that has been documented in adolescents who have not been able to obtain medical treatment for their gender dysphoria (van der Miesen, et al., 2020). The findings of these studies match my own clinical experience. Patients and families undergo thoughtful and comprehensive assessment and counselling prior to initiation of any medical intervention. Treatment follows when appropriate, and always with fully informed patient assent and parental consent. Goals of care are re-evaluated at every visit. By practicing according these evidenced-based principles, I have witnessed the dramatic improvement in the lives of hundreds of patients initially suffering from debilitating gender dysphoria. Patients and parents often describe the care received as "life-saving" and regret regarding care decisions is incredibly low, lower than I experience in other areas of pediatric endocrine care.

### E.     SAFETY AND EFFICACY OF MEDICAL INTERVENTIONS TO TREAT GENDER DYSPHORIA

78.     GnRHa, prescribed for delaying puberty in transgender adolescents, is both a safe and effective treatment. Patients under consideration for treatment are working within a multidisciplinary team of providers all dedicated to making informed and appropriate decisions with the patient and family in the best interest of the adolescent. Physicians providing this intervention are trained and qualified in gender identity concerns and childhood growth and development and are participating in this care out of a desire to improve the health and wellness of transgender youth and prevent negative outcomes such as depression and suicidality.

79.     GnRHa, including injectable leuprolide and implantable histrelin, have rare side effects which are discussed with patients and families prior to initiation. Mild negative effects may

EXPERT DECLARATION OF DANIEL SHUMER, M.D.

include pain at the injection or implantation site, sterile abscess formation, weight gain, hot flashes, abdominal pain, and headaches. These effects can be seen in patients receiving GnRHa for gender dysphoria, or for other indications such as precocious puberty. I counsel patients on maintaining a healthy diet and promote physical activity, and regularly document height and weight during treatment. Nutritional support can be provided for patients at risk for obesity.

80.    Risk of lower bone mineral density in prolonged use of GnRHa can be mitigated by screening for, and treating, vitamin D deficiency when present, and by limiting the number of years of treatment based on a patient's clinical course (Rosenthal, 2014). An exceptionally rare but significant side effect, increased intracranial pressure, has been reported in six patients (five treated for precocious puberty, one for transgender care), prompting an FDA warning in July 2022 (AAP, 2022). These cases represent an extremely small fraction of the thousands of patients who have been treated with GnRHa over decades. Symptoms of this side effect (headache, vomiting, visual changes) are reviewed with families and if they occur the medication is discontinued. The rarity of this side effect was described by Karamanis et al. (2023) as zero cases of increased intracranial pressure were reported in the 410 adolescents prescribed GnRHa for gender dysphoria in Sweden between 2006 and 2016.

81.    GnRHa do not have long-term implications on fertility. This is clearly proven from decades of use in the treatment of precocious puberty (Guaraldi, et al., 2016; Martinerie, et al, 2021). Progression through natal puberty is required for maturation of egg or sperm. If attempting fertility after previous treatment with GnRHa followed by hormone therapy is desired, an adult patient would withdraw from hormones and allow pubertal progression. Assistive reproduction could be employed if needed (T'Sjoen, et al., 2013).

Expert Declaration of Daniel Shumer, M.D.

82.    Patients who initiate hormones after completing puberty are offered gamete preservation prior to hormonal initiation (Coleman, et al., 2022), but even when not undertaken, withdrawal of hormones in adulthood often is successful in achieving fertility when it is desired (Light, et al., 2014; Knudson, et al., 2017).

83.    Discussing the topic of fertility is important, and not specifically unique to treatment of gender dysphoria. Medications used for other medical conditions, such as chemotherapeutics used in cancer treatment, can affect fertility. For all medications with potential impacts on fertility, the potential risks and benefits of both treatment and non-treatment should be reviewed and data regarding risk for infertility clearly articulated prior to the consent or assent of the patient. Risk for fertility changes must be balanced with the risk of withholding treatment.

84.    Review of relevant medical literature clearly supports the benefits of GnRHa treatment on both short-term and long-term psychological functioning and quality of life (e.g., Achille, et al., 2020; Carmichael, et al., 2021; Costa, et al., 2015; de Vries, et al., 2014; de Vries, et al., 2011; Kuper, et al., 2020; Turban, et al., 2020b; van der Miesen, et al., 2020; McGregor, et al., 2024). For example, a 2014 long-term follow-up study following patients from early adolescence through young adulthood showed that gender-affirming treatment allowed transgender adolescents to make age-appropriate developmental transitions while living as their affirmed gender with positive outcomes as young adults (de Vries, et al., 2014). A cross-sectional study comparing 272 adolescents not yet receiving medical treatment, 178 adolescents receiving pubertal suppression, and 651 adolescents from the general population demonstrated that transgender adolescents have poorer psychological well-being before treatment but similar or better psychological functioning when compared to cisgender peers from the general population after the start of specialized gender-affirming care involving pubertal suppression (van der Miesen,

23

et al., 2020). A longitudinal study followed adolescents with gender dysphoria who received psychological support alone followed by continued psychological support plus pubertal suppression. Participants had significantly better psychological functioning after 12 months of GnRHa treatment compared with when they had received psychological support alone (Costa, 2015).

85.    In my own practice, adolescent patients struggling with significant distress at the onset of puberty routinely have dramatic improvements in mood, school performance, and quality of life with appropriate use of GnRHa. Side effects encountered are similar to those seen in other patients treated with these medications and easily managed.

86.    Hormone therapy (testosterone or estrogen) is prescribed to older adolescents with gender dysphoria. As is the case with GnRHa, the need for hormone therapy is not unique to transgender adolescents. Patients with conditions such as delayed puberty, hypogonadism, Turner Syndrome, Klinefelter Syndrome, agonadism, premature ovarian failure, and disorders of sex development all require treatment with these hormones, often times starting in adolescence and continuing lifelong.[2] Without testosterone or estrogen treatment, these patients would be unable to progress through puberty normally, which would have serious medical and social consequences. Whether used in adolescents to treat gender dysphoria, or to treat any of these other conditions, testosterone and estrogen are prescribed with a goal to raise the testosterone or estrogen level into the normal male or female range for the patient's age. Careful monitoring of blood levels and clinical progress are required, however abnormal laboratory results are rare in adolescents

---

[2] Testosterone is used to treat delayed puberty, hypogonadism, Klinefelter Syndrome, agonadism, and disorders of sex development when a masculinizing puberty is required. Estrogen is used to treat delayed puberty, hypogonadism, Turner Syndrome, agonadism, and disorders of sex development when a feminizing puberty is required.

24

prescribed gender-affirming hormones (Millington, et al., 2024). Side effects are also rare, and most are often related to overtreatment, which can be minimized with laboratory monitoring. Additionally, side effects are considered, discussed, and easily managed in all individuals needing hormone therapy regardless of the diagnosis necessitating these medications.

87.    Venous thromboembolism (blood clotting) is a known side effect of estrogen therapy in all individuals prescribed it, including transgender women. Risk is increased in old age, in patients with cancer, and in patients who smoke nicotine. This side effect is mitigated by careful and accurate prescribing and monitoring. In my career, none of my patients have suffered a thromboembolism while on estrogen therapy.

88.    Elevated red blood cell concentration (hematocrit) can occur with treatment with testosterone in all individuals prescribed it, including transgender men. When present, elevated hematocrit is easily managed with reduction of the dose of testosterone.

89.    Treatment of gender dysphoria with testosterone or estrogen is highly beneficial for both short-term and long-term psychological functioning of adolescents with gender dysphoria and withholding treatment from those who need it is harmful (e.g., Achille, et al., 2020; Allen, et al., 2019; Chelliah, et al., 2024; Chen, et al., 2023; de Lara, et al., 2020; de Vries, et al., 2014; Grannis, et al., 2021; Green, et al., 2022; Kaltiala, et al., 2020; Kuper, et al., 2020; Turban, et al., 2022).

90.    Research demonstrating the benefits of hormonal intervention is robust, consisting of large cross-sectional studies and also evaluation of longitudinal cohorts of patients across time. Green et al. (2022) presented cross-sectional data from 11,914 adolescents and demonstrates that gender-affirming hormone therapy is correlated with reduced rates of depression and suicidality among transgender adolescents. Turban et al. (2022) analyzed cross-sectional data from 27,715 transgender adults and found that access to gender-affirming hormone therapy in adolescence is

25

EXPERT DECLARATION OF DANIEL SHUMER, M.D.

JA605

associated with favorable mental health outcomes in adulthood, when compared to individuals who desired but could not access hormonal interventions.

91.    Chen et al. (2023), a longitudinal study followed 315 adolescents for 2 years after starting gender-affirming hormonal treatment, demonstrated improved appearance congruence and psychosocial functioning as a result of treatment. Chelliah et al. (2024) presented longitudinal data from 115 transgender youth and demonstrated reductions in body dissatisfaction, victimization, depression, and anxiety along with improvements in psychosocial functioning when measured one year after initiating medical treatment at a multidisciplinary gender-affirming program.

92.    The efficacy of hormone treatment in transgender adults is similarly robust.  At least 11 longitudinal studies document improvement in various mental health parameters including depression, anxiety, self-confidence, body image and self-image, and general psychological functioning (e.g., Colizzi, et al., 2013; Colizzi, et al., 2014; Corda, et al., 2016; Defreyne, et al., 2018; Fisher, et al., 2016; Heylens, et al., 2014; Keo-Meier, et al., 2015; Manieri, et al., 2014; Motta, et al., 2018; Oda, et al., 2017; Turan, et al., 2018). Nolan, et al. (2023) presented a randomized controlled trial demonstrating reduction in gender dysphoria, depression, and suicidality in transgender adults prescribed testosterone therapy compared to those awaiting treatment.

93.    Recently conducted systematic reviews have examined the effects of gender affirming hormone therapy on psychosocial functioning in adolescents and adults. Doyle, et al., (2023) and Baker, et al. (2021) included data from both adults and adolescents when presenting their findings. Doyle concluded that the body of literature consistently demonstrates that gender affirming hormone therapy reduces depressive symptoms and psychological distress. The systematic review published by Baker, et al., commissioned by WPATH, concluded that the body

Expert Declaration of Daniel Shumer, M.D.

of literature indicates hormone therapy is associated with increased quality of life, decreased depression and decreased anxiety.

94.    Other systematic reviews restricted their analyses to studies of adolescents only, not including adult data. Taylor, et al. (2024) and RAND (Dopp, et al., 2024) both conducted systematic reviews of pubertal suppression and hormonal interventions in adolescents. The Taylor reviews were commissioned by the Cass Review and National Health Service in England. The RAND Review was published by the RAND Corporation, a nonprofit, nonpartisan United States-based research organization aiming to improve policy and decision-making through research and analysis. Both of these reviews analyzed a very similar and overlapping body of evidence.

95.    Taylor and colleagues reviewed scientific literature related to the use of pubertal suppression (Talor 2024a) and gender affirming hormones (Taylor 2024b). These systematic reviews draw upon data from 50 studies related to pubertal suppression and 53 studies related to gender affirming hormone treatment. Using the Newcastle-Ottawa Scale, a validated scale for evaluating cohort studies, the Taylor reviews found there were 26 and 34 studies, respectively, of high (one each) to moderate quality documenting outcomes of adolescent patients receiving these treatments. The studies described in these reports are the same studies that I rely upon to make medical decisions with patients and families.  It is also the same body of literature that I use when stating that these interventions are safe and effective in treating gender dysphoria in adolescence. Indeed, the findings of these studies, as documented in the Taylor reviews, are consistent with the opinions I have expressed in this case. The Taylor reviews conclusion, however, was that there was insufficient data to make conclusions on the effect of pubertal suppression and moderate-quality evidence suggesting mental health may be improved during hormonal treatments.

96.    The RAND review (Dopp, et al., 2024), on the other hand, concluded that, "the

EXPERT DECLARATION OF DANIEL SHUMER, M.D.

available research evidence – although limited – can inform recommendations on interventions for gender dysphoria and related health problems in TGE youth…" With regards to puberty-suppressing medications like GnRHa, the RAND review documented that the studies showed that the medications did suppress the pubertal changes targeted, improved gender dysphoria, and improved mental health functioning.  With regards to hormones, the RAND review found that "the available evidence suggests that HRT produced expected changes in hormone levels and related physical changes targeted for initiation, with associated improvements in body satisfaction and gender dysphoria in each of the [] studies measuring that outcome." It also showed that hormones were associated with increases in mental health functioning and increases in bone density following puberty-suppressing hormones.

97.     Notably, the review points out what is clear to clinicians across all areas of pediatric medicine as it states, "Challenges with certainty of evidence are not unique to interventions for gender dysphoria and related health problems in TGE youth; many fields of study encounter such challenges when using research evidence to inform standards of care. In fact, systemic reviews of the application of GRADE (Fleming et al., 2016; Howick et al., 2020) have found that 22-24 percent of evidence summaries for the primary study outcome were rated as very low certainty, and 81 percent of reviews included no outcomes with evidence that was high certainty…Yet such guidelines have been developed and are used to inform widely applicable population health assessments … Absence of high-certainty evidence on effectiveness is not equivalent to evidence that effects are absent."

98.     The RAND review also speaks specifically about "policies to ban or restrict interventions." The review advises, "evidence-based policymaking decisions about banning or restricting gender dysphoria interventions for TGE youth ought to consider the certainty of whether

EXPERT DECLARATION OF DANIEL SHUMER, M.D.

the policy is preventing harm that exceeds the potential harm of withholding clinical standards of care (Barbee, Deal, and Gonzales, 2022). In this review, the intervention for which harms were most clearly documented was GIECE [gender identity and expression change efforts, i.e. conversion therapy], an alternative to the standards of care. This finding is consistent with a much larger body of research documenting the harmful mental health effects of a broader category of interventions called sexual orientation and gender identity and expression change efforts (SOGIECE; see, e.g., Comer et al., 2024; Daniel and Butkus, 2015; Forsythe et al., 2022; Goodyear et al., 2023; Panozzo, 2013; Przeworski, Peterson, and Piedra, 2021). Therefore, policymakers could consider policies regarding GIECE as a high priority for preventing harm to TGE youth."

99.    A note here regarding jargon related to the grading of evidence. Authors of practice guidelines and systematic reviews often employ standardized scales to denote the strength of evidence. Examples of these scales include GRADE and Newcastle-Ottawa. These scales help authors and readers consider the quantity and quality of evidence used in determining recommendations for care. Each scale utilizes its own jargon, such that a recommendation based on "low" quality evidence according to GRADE may be ranked "moderate" evidence according to Newcastle-Ottawa. As the authors of the RAND report explain, this jargon should not be used determine what is good care, appropriate care, or the standard of care. For example, recommendations based on what is labeled "low" quality evidence may be, and often is, the recommended standard of care.

100.    In fact, across all aspects of care, including pubertal suppression and gender-affirming hormones, the RAND report findings indicated low regret, low dissatisfaction levels, and low side effects and complications in the adolescent patient population across the entire body of literature in the field. This is in-keeping with my own clinical experience.

29

EXPERT DECLARATION OF DANIEL SHUMER, M.D.

101.    In sum, the use of GnRHa, hormones, and chest surgery in adolescents for the treatment of gender dysphoria is the current standard of care and certainly not experimental. This is due to robust evidence of safety and efficacy. The sum of the data supports the conclusion that treatment of gender dysphoria with these interventions promotes wellness and helps to prevent negative mental health outcomes, including suicidality. The data to support these interventions are so strong that withholding such interventions would be negligent and unethical.

### III.    RESPONSE TO THE EXECUTIVE ORDERS

#### A. Response to Executive Order 14168

102.    Section 2 of Executive Order 14168 presents scientific and medical inaccuracies and misstatements. The order defines "sex" as "an individual's immutable biological classification as either male or female … and does not include the concept of "gender identity." The terms "female" and "male" are further defined: "female" defined as "a person belonging, at conception, to the sex that produces the large reproductive cell," and "male" defined as "a person belonging, at conception, to the sex that produces the small reproductive cell." These definitions are oversimplifications that are inaccurate.

103.    As described in Section II.A above, sex is comprised of several components. Sometimes the aspects that comprise a person's sex are discordant with one another. Such is the case for transgender people and those born with Differences/Disorders of Sex Development (DSDs).

104.    At conception, a sperm cell and egg cell combine, each contributing genetic material called DNA to form a zygote (Oliver, Basit, 2023). The DNA contributed by the sperm and the egg are packaged in chromosomes. In humans both the sperm and egg typically contribute 23 chromosomes. The zygote therefore typically has 23 pairs of chromosomes, or a total of 46.

These chromosomes provide "instructions" for dividing, growing, and all other aspects of embryological and fetal development. Two of the chromosomes are termed "sex chromosomes". Typically, the egg contributes an X chromosome, and the sperm contributes either an X or Y chromosome, resulting in a zygote which is either XX (normal female chromosomal sex) or XY (normal male chromosomal sex). Variations in sex chromosomes exists, whereby a zygote may have only one X chromosome (Turner Syndrome), two X chromosomes and one Y chromosome (Klinefelter Syndrome), or other variations (e.g., XYY, XXXY, XYY). The chromosomal sex (sometimes called genetic sex) of the embryo is therefore established at fertilization with XY and XX being the most common variations, with less common variations possible (Rey, et al., 2020).

105.    A zygote has a chromosomal sex but no gonadal sex, no hormonal sex, no anatomic sex, and no gender identity. A zygote may be described as carrying XX chromosomes, XY chromosomes, or other less common sex chromosome configurations, but to label a zygote "female" or "male" is premature. These labels cannot be assigned at conception prior to the process of sex differentiation. Thus, the definitions of "female" and "male" in Section 2 Executive Order 14168 are inaccurate.

106.    As the zygote begins to multiply it becomes an embryo. Genes within the sex chromosomes helps to orchestrate a series of events whereby the embryo develops male or female characteristics in a process called sex differentiation. Embryos with XY chromosomes, for example, develop different in the gonads, genital tract, and external genitalia than embryos with XX chromosomes. The chromosomal or genetic sex drives the undifferentiated primitive gonad to differentiate into a testis or an ovary. Subsequently, internal and external genitalia will typically follow the male pathway in the presence of specific testicular hormones, or the female pathway in the absence of these hormones (Rey et al., 2020).

31

EXPERT DECLARATION OF DANIEL SHUMER, M.D.

107.    However, at every step along this pathway, typical sex differentiation depends on a complex interplay of genetic instructions, cellular changes, production of hormones, and tissue changes in response to these hormones. Individual differences, such as having an atypical chromosomal sex or having genetic mutations in genes required for hormonal production or synthesis of hormone receptors, result in a broad spectrum of variability in sex differentiation. In cases where these individual variation leads to atypical sex differentiation, a fetus will have hormonal production and/or anatomic development discordant with the chromosomal sex (Rey et al., 2020). According to a consensus statement by the Lawson Wilkins Pediatric Endocrine Society (now called the Pediatric Endocrine Society) and the European Society for Paediatric Endocrinology, the term "disorders of sex development" is defined as "congenital conditions in which development of chromosomal, gonadal, or anatomical sex is atypical. These situations, when chromosomal sex, hormonal sex, and or anatomic sex are not fully concordant, are termed DSDs" (Hughes, et al., 2006).

108.    Approximately 1 in 1000 to 4500 infants have a DSD. As a pediatric endocrinologist, I am frequently paged to the nursery to evaluate babies born with genitals which are neither clearly male nor female. This is often a time of uncertainty and distress for parents and families. A multidisciplinary team of experienced providers perform laboratory, genetic, and imaging studies to better understand the sex of the infant. A karyotype test is performed to learn the chromosomal sex. An ultrasound can be helpful to evaluate the appearance of the gonads and internal sex organs. The sex assignment is ultimately made based on the best available evidence and considerations such as the type of DSD, prenatal hormone exposures, fertility considerations, and psychosocial factors (Mehmood, et al., 2023).

32

109. The understanding of this complex topic is aided by providing examples. Androgen insensitivity syndrome is a spectrum of conditions involving mutations involving the androgen receptor. In these conditions, individuals with XY sex chromosomes and testes make testosterone normally. However, the receptor to which testosterone attaches in every cell of the body is faulty. In *complete* androgen sensitivity syndrome (CAIS), testosterone has no ability to activate its receptor, and despite normal production of testosterone from normal testes, there is no masculinization of the genitals during fetal life. Infants with CAIS have normal appearing female genitals, no uterus, and testes in the abdomen. These infants have a male chromosomal sex, a male gonadal sex, an abnormal male internal anatomic sex, and a typical female external anatomic sex. Infants with CAIS are invariably assigned female at birth and typically have a female gender identity when they are able to express a gender identity (Acién, Acién, 2020).

110. In less severe mutations to the androgen receptor, an individual will have less than normal, or partial, response to testosterone at the receptor. The result is a spectrum of presentations at birth classified as *partial* androgen insensitivity syndrome (PAIS); some individuals with external genitals appearing more female, others more male, and some squarely ambiguous (Acién, Acién, 2020). Sex assignment following birth is variable for patients with PAIS despite all of these patients having a male chromosomal sex and gonadal sex. In a report of 118 cases of PAIS, 87 (74%) were assigned male and raised as boys and 31 (26%) were assigned female and raised as girls (Kolesinska, et al., 2014). A separate review of 99 individuals with PAIS found that 9 (9.1%) later expressed a gender identity opposite that of the sex assigned at birth and transitioned to the identified sex (Mazur, 2005).

111. Congenital adrenal hyperplasia (CAH) is a DSD previously described in this report (¶ 35). Fetuses with XX chromosomes affected by CAH produce much higher levels of

33

testosterone compared to fetuses without the condition. This is due to deficiencies in enzymes involved in the synthesis of hormones within the adrenal gland. Sex assignment at birth is variable, with some infants with this condition assigned female, and others male. A literature review including 283 individuals with CAH demonstrated that in patients assigned female 5.3% (13 of 250) had gender identity concerns later in life; in patients assigned male 12.1% (4 of 33) had gender concerns (Dessens, et al., 2005).

112.    5-alpha reductase deficiency (5aRD) is a condition where individuals with typical XY chromosomal sex, normal testes, and normal ability to produce testosterone have an enzymatic deficiency whereby testosterone cannot be converted to the more potent activated version of testosterone called dihydrotestosterone (DHT) (Acién, Acién, 2020). Infants with 5aRD typically have a genital appearance ranging from more female, more male, or frankly ambiguous. Gender identity concerns are extremely common in this condition, with one study suggesting that 63% of infants assigned female at birth later express having a male gender (Cohen-Kettenis, 2005). In the 1970's scientists discovered that in an isolated village in the Dominican Republic approximately 2% of the population carried a XY chromosomal sex with apparent female genitals at birth. These children were raised as girls until puberty, at which time the clitoral structure grew into a small phallus, the body became more masculinized, the voice deepened, and the adolescent lived a life typical of other males in the village. This variation of sex was so common that individuals with this condition were referred to as *guevedoce* (translated as "penis at 12") and were accepted as a normal and valued part of the community (Marks, 2005). In the United States today, when a DSD team and parents elect to assign a female sex to an infant with 5aRD the decision is often made to remove the testes in order to prevent masculinization at puberty (Kumar, Barboza-Meca, 2022).

34

113.    McGee, et al. (2022) describe a case of a patient with ambiguous genitalia born in China and assigned male at birth. Upon adoption in the United States the child clearly identified as female and presented to a pediatric endocrinologist at age 4. The child was reared female and her legal name and gender were changed. At age 11 she entered puberty and developed gender dysphoria related to masculinizing changes. She was treated with puberty blockers at Tanner stage 2, followed by estrogen. She later was treated with gender affirming feminizing genital surgery.

114.    This case highlights the folly and short-sightedness of Section 2 of Executive Order 14168, and by extension, Executive Order 14187. The child described received a sex assignment of male at birth, which, upon learning the child's gender identity, was determined to be incorrect. If the child had been assigned female at birth and born in the United States, she may have had a gonadectomy in infancy. Her providers could have also elected to perform gonadectomy at age 4. Instead, they placed a higher priority on patient autonomy and assent, and used lessons learned from the management of gender dysphoria to make a more careful and cautious, and ultimately successful medical plan.

115.    Across all DSDs the variability of gender identity requires re-evaluation of sex assignment when the infant becomes a child and expresses a gender identity. For this reason, it is recommended that children and adolescents with DSD receive multidisciplinary care and long-term psychological support as it pertains to gender identity (Babu, Shah, 2021). Section 2 of Executive Order 14168 ignores this science and places individuals with DSDs in a precarious and confusing position.

116.    The majority of transgender adolescents to not have a DSD. But the Executive Orders' failure to acknowledge the existence of DSDs illustrates that the definitions in the Executive Orders do not actually reflect "biological truth" or "the biological reality of sex."

35

Instead, the Orders ignore the "biological reality" that not every person can be classified as male or female at conception. The Executive Orders' complete exclusion of gender identity as a sex characteristic with a biological basis is similarly not rooted in "biological truth." They ignore biological basis from which gender identity is derived, as described in paragraphs 32-37 above.

117.    "Gender ideology" is not a medical term. The order claims this term "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." It is fact that some individuals identify with a sex different from what was assigned at birth. Acceptance or lack-of-acceptance of this fact by any "institutions of society" does not make it any more or less true.

118.    "Gender dysphoria" is defined as "disconnected from biological reality" and again ignores there are biological factors underpinning of gender identity. Gender identity is not used as "a replacement for sex" but rather an important aspect of sex.

**B. Response to Section 1 of Executive Order 14187**

119.    Section 1 of Executive Order 14187 contains gross mischaracterizations and falsehoods related to the provision of gender-affirming care for adolescents with gender dysphoria. The order claims that medical professionals are "maiming and sterilizing" patients and that the professionals themselves are changing a child's sex. Adolescents with gender dysphoria have a medical condition for which safe, effective, and evidence-based treatment exists, as described throughout this report. Furthermore, the statement omits the critical importance of the informed consent discussions that must occur between medical providers, patients and their parents at every stage of medical decision making.

120.    This section proceeds to hyperbolically misconstrue the rate of regret amongst

36

EXPERT DECLARATION OF DANIEL SHUMER, M.D.

JA616

adolescents receiving gender affirming care, a rate that is exceedingly low, especially comparted to the extremely high rates of depression and suicidality in untreated patients. In a study of 720 individuals treated with puberty blockers followed by hormones in adolescents, van der Loos et al. (2022) found only 2% had discontinued hormonal treatment in adulthood. Furthermore, the study found no evidence that this 2% discontinued due to regret. More recently, a study by Boskey et al. (2024) sought to the rate of, and reasons for, discontinuation of gender-affirming hormones in transgender adolescents and found that of the 1,050 eligible individuals, only 37 (4%) had discontinued gender-affirming hormones without later restarting hormones and of those who discontinued hormones without restarting, only 5 (0.5%) individuals did so because they reidentified with the gender associated with their sex assigned at birth. By contrast, analysis of survey data of transgender adolescents age 13-17 by Green et al. (2022) suggests treatment with hormonal interventions are associated with nearly 40% lower odds of recent depression and attempting suicide in the past year.

121.    The order suggests that "vulnerable youths' medical bills may rise throughout their lifetimes, as they are often trapped with lifelong medical complications, a losing war with their own bodies, and, tragically, sterilization." While the meaning of this sentence is unclear to me, I contend that just like any chronic medical problem, appropriate treatment of gender dysphoria, especially in adolescence, reduces the cumulative expense of health care costs throughout one's life. A patient never developing unwanted secondary sex characteristics won't require surgical interventions in adulthood. A patient spending a $10 co-pay for estrogen each month (if covered by insurance) may save a lifetime worth of mental health treatments, including hospital admissions to address suicidality. Patients appropriately treated for gender dysphoria are not "losing a war with their own bodies" but rather receiving care which allows them to love their bodies. The

37

flippant comment regarding sterilization is misleading in that the uninformed reader might assume that any-and-all gender affirming medical interventions render patients completely and permanently sterile. As discussed above (¶¶ 81-83) fertility risks are variable and unique to each individual patient's circumstances, fertility preservation options are discussed and utilized when desired, and risk for fertility changes must be balanced with the risk of withholding treatment. This is true for gender affirming care just as it is for all medical treatments with potential impact on fertility. The Executive order oversimplifies a complex and important topic.

### C. Response to Section 2 of Executive Order 14187

122.    Section 2 of Executive Order 14187 defines "child" or "children" to mean "an individual or individuals under 19 years of age." The basis for this definition is not provided; however, in the United States, individuals aged 18 are characterized as adults for purposes of providing informed consent for medical interventions, including gender-affirming medical care.

123.    This section also proceeds to relabel gender-affirming medical care as "chemical and surgical mutilation", a term not only offensive to transgender adolescents and medical providers dedicated to improving their health and well-being, but medically and scientifically inaccurate for reasons made clear throughout this declaration.

124.    Finally, prohibiting medical care to individuals under 19 that "attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions" is written in a way that unintentionally includes care unrelated to gender affirmation. It is medically ambiguous as to whether this order would impact medical management of menstrual irregularities, surgeries to treat testicular or ovarian cancer, use of GnRH agonists to treat precocious puberty, and management of DSDs, for example.

38

EXPERT DECLARATION OF DANIEL SHUMER, M.D.

**D. Response to Section 3(a) of Executive Order 14187**

125.    This section attacks the credibility of WPATH, which as described above publishes evidence-based clinical guidelines for the treatment of gender dysphoria that are considered authoritative by, and whose recommendations receive broad support from, a wide spectrum of medical professional organizations including the American Academy of Pediatrics, the American Medical Association, the American Psychological Association, the American Psychiatric Association, and American Academy of Family Physicians.

126.    The call to action contained in this paragraph, commissioning a review while simultaneously dictating what the result of the review must be, is contrary to the foundation of science and scientific integrity.

127.    One of the most important aspects of the WPATH Standards of Care is the recommendation that gender affirming care be provided by medical professionals working within multidisciplinary care teams. The bringing together of providers with high levels of knowledge and expertise in the assessment and management of gender dysphoria is most practically done at large academic medical institutions, which have the organizational structure and financial resources to develop comprehensive models of care in line with WPATH standards. This Executive order kneecaps the ability to provide multidisciplinary care at the institutions best situated to provide this care.

## IV.    **CONCLUSION**

128.    In summary, banning gender-affirming medical care for adolescents and young adults regardless of individual patient need runs counter to evidence-based best practices and standards of care for the treatment of gender dysphoria.

EXPERT DECLARATION OF DANIEL SHUMER, M.D.

129.    Prohibiting gender-affirming medical care, and coverage thereof, for adolescents with gender dysphoria is likely to have devastating consequences and will result in worse outcomes for countless young persons.  I am concerned that by conditioning federal funding for healthcare institutions on refusing to provide medical treatment for gender dysphoria for people under 19, Executive Order 14187 and Executive Order 14168 might lead to a staggering increase in mental health problems, including depression, anxiety, and suicidality, for adolescents with gender dysphoria across the United States.

130.    In my own clinical practice in Michigan, I have seen an influx of patients from states banning medically proven treatments for gender dysphoria who report not feeling safe living in the community that they have always called home. These patients unfortunately often have to wait long periods of time to resume care and when they are seen, the impact of this delay is devastating on their mental health.  They have described themselves as "refugees" in their own country, moving to avoid discriminatory laws which they know would clearly harm their health or the health of their child. Executive Order 14187 and Executive Order 14168 now seeks to make these medical interventions, consistent with established and medically guidelines, largely unattainable for people under the 19 in the United States.

131.    Barring effective treatment for gender dysphoria will not eliminate transgender people, but will, unfortunately, lead to an increase in mental health problems and suicidality in an already vulnerable population.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of February 2025.

_____
Daniel Shumer, M.D.

40

EXPERT DECLARATION OF DANIEL SHUMER, M.D.

# **<u>Exhibit A</u>**

# Daniel Shumer
## Clinical Associate Professor

## Education and Training
### Education

| | |
|---|---|
| 08/2000-08/2003 | BA, Northwestern University, Evanston, IL |
| 08/2004-05/2008 | MD, Northwestern University, Feinberg School of Medicine, Chicago, IL |
| 07/2013-05/2015 | MPH, Harvard T.H. Chan School of Public Health, Boston, MA |

### Postdoctoral Training

| | |
|---|---|
| 06/2008-06/2011 | Residency, Pediatrics, Vermont Children's Hospital at Fletcher Allen Health Care, Burlington, VT |
| 07/2011-06/2012 | Chief Resident, Chief Resident, Vermont Children's Hospital at Fletcher Allen Health Care, Burlington, VT |
| 07/2012-06/2015 | Clinical Fellow, Pediatric Endocrinology, Boston Children's Hospital, Boston, MA |

## Certification And Licensure
### Certification

| | |
|---|---|
| 10/2011-Present | American Board of Pediatrics, General |

### Licensure

| | |
|---|---|
| 08/2015-Present | Michigan, Medical License |
| 09/2015-Present | Michigan, DEA License |
| 09/2015-Present | Michigan, Controlled Substance |

## Work Experience
### Academic Appointment

| | |
|---|---|
| 10/2015-Present | Clinical Assistant Professor in Pediatrics - Endocrinology, University of Michigan - Ann Arbor, Ann Arbor |
| 04/2022-Present | in Pediatrics - Endocrinology, University of Michigan - Ann Arbor, Ann Arbor |
| 09/2022-Present | Clinical Associate Professor in Pediatrics - Endocrinology, University of Michigan - Ann Arbor, Ann Arbor |

### Administrative Appointment

| | |
|---|---|
| 07/2019-01/2023 | Fellowship Director - Pediatric Endocrinology, Michigan Medicine, Department of Pediatrics, Ann Arbor |
| 07/2020-Present | Medical Director of the University of Michigan Comprehensive Gender Services Program, Oversee the provision of care to transgender and gender non-conforming patients at Michigan Medicine, Michigan Medicine, Ann Arbor |
| 07/2020-01/2023 | Education Lead - Pediatric Endocrinology, University of Michigan - Department of Pediatrics, Ann Arbor |

### Clinical Appointments

| 04/2022-Present | Medical Director in UMMG Faculty Benefits Appt., University of Michigan - Ann Arbor, Ann Arbor |

**Private Practice**

| 08/2013-09/2015 | Staff Physician, Harvard Vanguard Medical Associates, Braintree |

## Research Interests

- Gender dysphoria
- Prader Willi Syndrome

## Clinical Interests

- Gender dysphoria
- Disorders of Sex Development
- Prader Willi Syndrome

## Grants

**Current Grants**

*Newborn Screening Coordinating Center:*
Co-I (Principal Investigator: Ram Menon)
MDHHS
10/2024 - 09/2025

*Transgender Health Outcomes in Orthopedics: A Mixed-Methods Study of Patient and Provider Experiences:*
Co-I (Principal Investigator:Jaimo Ahn)
BCBSF
08/2024 - 07/2026

**Submitted - Open**

U54:*Variations of Sex Development - Translational Research Network:*
Co-I (Principal Investigator:David Sandberg)
NIH-DHHS-US-SubK sourced funding through University of California - Irv
07/2025 - 06/2030

**Past Grants**

*Newborn Screening Coordinating Center:*
Co-I (Principal Investigator:Ram Menon)
MDHHS
10/2023 - 09/2024

*FY23-Project AW (NEWBRSC-UM): Newborn Screening Coordinating Center:*
Co-I (Principal Investigator:Ram Menon)
MDHHS
10/2022 - 09/2023

*A Phase 2b/3 study to evaluate the safety, tolerability, and effects of Livoletide (AZP-531), an unacylated ghrelin analog, on food-related behaviors in patients with Prader-Willi syndrome:*
PI
Millendo Therapeutics
04/2019 - 04/2021

## Honors and Awards

### National

| | |
|---|---|
| 2014 | Annual Pediatric Endocrine Society Essay Competition: Ethical Dilemmas in Pediatric Endocrinology: competition winner - The Role of Assent in the Treatment of Transgender Adolescents |

### Institutional

| | |
|---|---|
| 2012 - 2015 | Harvard Pediatric Health Services Research Fellowship; funded my final two years of pediatric endocrine fellowship and provided tuition support for my public health degree |
| 2016 | The University of Michigan Distinguished Diversity Leaders Award, awarded by The Office of Diversity, Equity and Inclusion to the Child and Adolescent Gender Services Team under my leadership |
| 2019 | Lecturer of the Month, Department of Pediatrics, Michigan Medicine |

## Teaching

### Mentorship

### Resident

| | |
|---|---|
| 07/2020-06/2021 | Rebecca Warwick, Michigan Medicine (co-author on publication #22) |

### Clinical Fellow

| | |
|---|---|
| 07/2017-06/2020 | Adrian Araya, Michigan Medicine (co-author on publication #22, book chapter #4) |
| 12/2020-06/2023 | Jessica Jary, Michigan Medicine - Division of Adolescent Medicine, Clinical and research mentorship |

### Medical Student

| | |
|---|---|
| 09/2017-06/2020 | Michael Ho, Michigan Medicine |
| 07/2019-06/2020 | Hadrian Kinnear, University of Michigan Medical School (co-author on book chapter #3, abstract #3) |
| 07/2019-06/2020 | Jourdin Batchelor, University of Michigan |

### Teaching Activity

### Regional

| | |
|---|---|
| 08/2018-Present | Pediatric Boards Review Course sponsored by U-M: "Thyroid Disorders and Diabetes". Ann Arbor, MI |
| 06/2023-Present | Care for Transgender Children and Adolescents, Wayne State University School of Social Work, Guest Lecturer |
| 10/2023-Present | Care for Transgender Children and Adolescents, Stand With Trans, Guest Lecturer |

### Institutional

| | |
|---|---|
| 12/2015-12/2015 | Pediatric Grand Rounds: "Transgender Medicine - A Field in Transition". Michigan Medicine, Ann Arbor, MI |
| 02/2016-02/2016 | Medical Student Education: Panelist for M1 Class Session on LGBT Health, Doctoring Curriculum. Michigan Medicine, Ann Arbor, MI |
| 02/2016-02/2016 | Psychiatry Grand Rounds: "Transgender Medicine - A Field in Transition". Michigan Medicine, Ann Arbor, MI |
| 03/2016-03/2017 | Pharmacy School Education: "LGBT Health".  University of Michigan School of Pharmacy, Ann Arbor, MI |

| | |
|---|---|
| 04/2016-Present | Course Director: Medical Student (M4) Elective in Transgender Medicine. Michigan Medicine, Ann Arbor, MI |
| 04/2016-04/2016 | Rheumatology Grand Rounds: "Gender Identity". Michigan Medicine, Ann Arbor, MI |
| 05/2016-05/2016 | Lecture to Pediatric Rheumatology Division: "Gender Dysphoria". Michigan Medicine, Ann Arbor, MI |
| 07/2016-07/2016 | Internal Medicine Resident Education: "Gender Identity". Michigan Medicine, Ann Arbor, MI |
| 09/2016-09/2016 | Presentation to ACU Leadership: "Gender Identity Cultural Competencies". Michigan Medicine, Ann Arbor, MI |
| 10/2016-10/2016 | Presentation to Department of Dermatology: "The iPledge Program and Transgender Patients". Michigan Medicine, Ann Arbor, MI |
| 02/2017-02/2017 | Swartz Rounds Presenter. Michigan Medicine, Ann Arbor, MI |
| 02/2017-02/2017 | Lecture to Division of General Medicine: "Transgender Health". Michigan Medicine, Ann Arbor, MI |
| 02/2017-02/2017 | Presentation at Collaborative Office Rounds: "Transgender Health". Michigan Medicine, Ann Arbor, MI |
| 10/2017-10/2017 | Family Medicine Annual Conference: "Transgender Medicine". Michigan Medicine, Ann Arbor, MI |
| 12/2017-12/2017 | Presenter at Nursing Unit 12-West Annual Educational Retreat: "Gender Identity at the Children's Hospital". Michigan Medicine, Ann Arbor, MI |
| 02/2018-Present | Pediatrics Residency Lecturer: "Puberty". Michigan Medicine, Ann Arbor, MI |
| 02/2019-Present | Medical Student (M1) Lecturer: "Pediatric Growth and Development". Michigan Medicine, Ann Arbor, MI |
| 02/2019-02/2020 | Doctors of Tomorrow Preceptor: offering shadowing opportunities to students from Cass Technical High School in Detroit. Michigan Medicine, Ann Arbor, MI |
| 03/2019-03/2019 | Lecture to Division of Orthopedic Surgery: "Transgender Health". Michigan Medicine, Ann Arbor, MI |
| 07/2021-Present | Guest Lecturer, Recurring - SW726 Counseling and Advocacy for LGBTQIA2S+ Youth, University of Michigan School of Social Work |
| 04/2023-Present | Guest Lecturer in Woman and Gender Studies 400 undergraduate course, University of Michigan |
| 07/2023-07/2023 | Care for Transgender Children and Adolescents, University of Michigan School of Nursing, Pediatric Nurse Practitioner Students, Guest Lecturer |
| 10/2023-10/2023 | Morning Report: Serving as an Expert Witness, Michigan Medicine: Pediatrics Residency Program |
| 10/2023-10/2023 | Care for Transgender Children and Adolescents, University of Michigan School of Nursing, Guest Lecturer |
| 10/2024-10/2024 | Early Career Faculty Professional Development Series, Michigan Medicine, Department of Psychiatry, Guest Lecturer |

## Memberships in Professional Societies

| | |
|---|---|
| 2012 - Present | Pediatric Endocrine Society |

## Committee/Service

### National

| | |
|---|---|
| 2014 - 2016 | Pediatric Endocrine Society - Ethics Committee, Other, Member |
| 2017 - Present | Pediatric Endocrine Society - Special Interest Group on Gender Identity, Other, Member |

| 2018 - 2023 | Pediatric Endocrine Society - Program Directors Education Committee, Other, Member |

**Regional**

| 2013 - 2015 | Investigational Review Board - The Fenway Institute, Boston, MA, Other, Voting Member |

**Institutional**

| 2017 - 2019 | Department of Pediatrics at Michigan Medicine; Diversity, Equity, and Inclusion Committee, Other, Fellowship Lead |
| 2017 - 2019 | University of Michigan Transgender Research Group, Other, Director |
| 2020 - Present | AOA Selection Committee, University of Michigan Medical School, Member |
| 2023 - Present | Admissions Committee, University of Michigan Medical School, Member |

## Volunteer Service

**Volunteer**

| 2014 | Camp Physician, Massachusetts, Served at a camp for youth with Type 1 Diabetes |

## Scholarly Activities

## Presentations

**Extramural Invited Presentation**

**Keynote**

1.  Gender-affirming care for pediatric providers, Michigan Chapter of the American Academy of Pediatrics Annual Conference, 09/2021, Grand Rapids, Michigan (virtual due to COVID)

**Speaker**

1.  Grand Rounds, **Shumer D**, Loyola University School of Medicine, 07/2022, Chicago, Illinois

2.  Gender Affirming Care for Adolescents, **Shumer D**, Children's Hospital Detroit, 02/2024, Detroit, MI

**Other**

1.  Gender Identity, Groton School, 04/2015, Groton, MA

2.  Television Appearance: Gender Identity in Youth, Channel 7 WXYZ Detroit, 04/2016, Southfield, MI

3.  It Gets Better: Promoting Safe and Supportive Healthcare Environments for Sexual Minority and Gender Non-Conforming Youth, Adolescent Health Initiative: Conference on Adolescent Health, 05/2016, Ypsilanti, MI

4.  Gender Identity, Humanists of Southeast Michigan, 09/2016, Farmington Hills, MI

5.  Gender Identity, Pine Rest Christian Mental Health Services, 10/2016, Grand Rapids, MI

6.  Pediatric Grand Rounds - Hormonal Management of Transgender Youth, Beaumont Children's Hospital, 11/2016, Royal Oak, MI

7.  Transgender Youth: A Field in Transition, Temple Beth Emeth, 11/2016, Ann Arbor, MI

8.  Transgender Youth: A Field in Transition, Washtenaw County Medical Society, 11/2016, Ann Arbor, MI

9.  Pediatric Grand Rounds: Transgender Youth - A Field in Transition, St. John Hospital, 02/2017, Detroit, MI

10.  Transgender Medicine, Veterans Administration - Ann Arbor Healthcare System, 05/2017, Ann Arbor, MI

11.  Gender Identity, Hegira Programs, 05/2017, Detroit, MI

12.  Care of the Transgender Adolescent, Partners in Pediatric Care, 06/2017, Traverse City, MI

13.  Conference planner, host, and presenter: Transgender and Gender Non-Conforming Youth: Best

Practices for Mental Health Clinicians, Educators, & School Staff; 200+ attendees from fields of mental health and education from across Michigan, Michigan Medicine, 10/2017, Ypsilanti, MI

14.   Endocrinology Grand Rounds: Transgender Medicine, Wayne State University, 11/2017, Detroit, MI

15.   Care of the Transgender Adolescent, St. John Hospital Conference: Transgender Patients: Providing Compassionate, Affirmative and Evidence Based Care, 11/2017, Grosse Pointe Farms, MI

16.   Hormonal Care in Transgender Adolescents, Michigan State University School of Osteopathic Medicine, 11/2017, East Lansing, MI

17.   Working with Transgender and Gender Non-Conforming Youth, Michigan Association of Osteopathic Family Physicians, 01/2018, Bellaire, MI

18.   Community Conversations, Lake Orion, 01/2018, Lake Orion, MI

19.   "I Am Jazz" Reading and Discussion, St. James Episcopal Church, 03/2019, Dexter, MI

20.   Gender Identity, Michigan Organization on Adolescent Sexual Health, 10/2019, Brighton, MI; Port Huron, MI

21.   Ask The Expert, Stand With Trans, 05/2020, Farmington Hills, MI (Virtual due to COVID)

22.   Lets Talk About Hormones, Stand With Trans, 10/2020, Farmington Hills, MI (Virtual due to COVID)

23.   Transgender Medicine, Michigan Association of Clinical Endocrinologists Annual Symposium, 10/2020, Grand Rapids, MI (Virtual due to COVID)

24.   Transgender Youth in Primary Care, Michigan Child Care Collaborative (MC3), 10/2020, Ann Arbor, MI (Virtual due to COVID)

25.   Gender Identity, Universalist Unitarian Church of East Liberty, 04/2021, Virtual due to COVID

26.   Unconscious Bias, Ascension St. John Hospital, 05/2021, Virtual due to COVID

**Intramural Invited Presentation**
**Speaker**

1.   Grand Rounds: Assessment and Management of Gender Dysphoria in Pediatrics, **Shumer D**, Michigan Medicine - Department of Pediatrics, 04/2024, Ann Arbor, MI

2.   Grand Rounds: Care for Transgender Children and Adolescents, **Shumer D**, Goldman P, University of Michigan Department of Family Medicine, 11/2024, Ann Arbor, MI

3.   Grand Rounds: Gender Affirming Care, Evergreen L, **Shumer D**, Michigan Medicine - Department of Psychiatry, 01/2025, Ann Arbor, MI

**Panel**

1.   Gender and Health Panel: Gender Affirming Care for Adolescents, Elevate at The University of Michigan in conjunction with Partners in Health,, 03/2022, Ann Arbor, MI

2.   Providing Gender-Affirming Care, University of Michigan Medical School, OutMD, 10/2023, Ann Arbor, MI

## Publications/Scholarship
(Co-First Author *; Corresponding author **; Co-Last author ***)

## Peer-Reviewed Manuscripts

### Journal Article

1.   **Shumer DE**, Mehringer JE, Braverman LE, Dauber A: Acquired hypothyroidism in an infant related to excessive maternal iodine intake: food for thought. *Endocr Pract.*19(4): 729-731, 01/2013. PM23512394

2.   **Shumer DE**, Spack NP: Current management of gender identity disorder in childhood and adolescence: guidelines, barriers and areas of controversy. *Curr Opin Endocrinol Diabetes Obes.*20(1): 69-73, 02/2013. PM23221495

3.   **Shumer DE**, Thaker V, Taylor GA, Wassner AJ: Severe hypercalcaemia due to subcutaneous fat necrosis: presentation, management and complications. *Arch Dis Child Fetal Neonatal Ed.*99(5): F419-

F421, 09/2014. PM24907163

4.    Tishelman AC, Kaufman R, Edwards-Leeper L, Mandel FH, **Shumer DE**, Spack NP: Serving Transgender Youth: Challenges, Dilemmas and Clinical Examples. *Prof Psychol Res Pr.*46(1): 37-45, 01/2015. PM26807001

5.    **Shumer DE**, Tishelman AC: The Role of Assent in the Treatment of Transgender Adolescents. *Int J Transgend.*16(2): 97-102, 01/2015. PM27175107

6.    **Shumer DE**, Roberts AL, Reisner SL, Lyall K, Austin SB: Brief Report: Autistic Traits in Mothers and Children Associated with Child's Gender Nonconformity. *J Autism Dev Disord.*45(5): 1489-1494, 05/2015. PM25358249

7.    Tishelman AC, Kaufman R, Edwards-Leeper L, Mandel FH, **Shumer DE**, Spack NP: Reply to comment on "Serving Transgender Youth: Challenges, Dilemmas, and Clinical Examples" by Tishelman et al. (2015). *Prof Psychol Res Pr.*46(4): 307, 08/2015. PM26858509

8.    Guss C, **Shumer D**, Katz-Wise SL: Transgender and gender nonconforming adolescent care: psychosocial and medical considerations. *Curr Opin Pediatr.*27(4): 421-426, 08/2015. PM26087416

9.    **Shumer DE**, Nokoff NJ, Spack NP: Advances in the Care of Transgender Children and Adolescents. *Adv Pediatr.*63(1): 79-102, 08/2016. PM27426896

10.    **Shumer DE**, Reisner SL, Edwards-Leeper L, Tishelman A: Evaluation of Asperger Syndrome in Youth Presenting to a Gender Dysphoria Clinic. *LGBT Health.*3(5): 387-390, 10/2016. PM26651183

11.    **Shumer DE**, Harris LH, Opipari VP: The Effect of Lesbian, Gay, Bisexual, and Transgender-Related Legislation on Children. *J Pediatr.*178: 5-6.e1, 11/2016. PM27575000

12.    **Shumer DE**, Abrha A, Feldman HA, Carswell J: Overrepresentation of Adopted Adolescents at a Hospital-Based Gender Dysphoria Clinic. *Transgend Health.*2(1): 76-79, 01/2017. PM28861549

13.    Edwards-Leeper L, **Shumer DE**, Feldman HA, Lash BR, Tishelman AC: Psychological profile of the first sample of transgender youth presenting for medical intervention in a U.S. pediatric gender center. *Psychology of Sexual Orientation and Gender Diversity.*4(3): 374-382, 01/2017

14.    Tishelman AC, **Shumer DE**, Nahata L: Disorders of Sex Development: Pediatric Psychology and the Genital Exam. *J Pediatr Psychol.*42(5): 530-543, 06/2017. PM27098964

15.    Strang JF, Meagher H, Kenworthy L, de Vries AL C, Menvielle E, Leibowitz S, Janssen A, Cohen-Kettenis P, **Shumer DE**, Edwards-Leeper L, Pleak RR, Spack N, Karasic DH, Schreier H, Balleur A, Tishelman A, Ehrensaft D, Rodnan L, Kuschner ES, Mandel F, Caretto A, Lewis HC, Anthony LG: Initial Clinical Guidelines for Co-Occurring Autism Spectrum Disorder and Gender Dysphoria or Incongruence in Adolescents. *J Clin Child Adolesc Psychol.*47(1): 105-115, 01/2018. PM27775428

16.    Mohnach L, Mazzola S, **Shumer D**, Berman DR: Prenatal diagnosis of 17-hydroxylase/17,20-lyase deficiency (17OHD) in a case of 46,XY sex discordance and low maternal serum estriol. *Case Reports in Perinatal Medicine.*8(1)01/2018

17.    Kim C, Harrall KK, Glueck DH, **Shumer D**, Dabelea D: Childhood adiposity and adolescent sex steroids in the EPOCH (Exploring Perinatal Outcomes among Children) study. *Clin Endocrinol (Oxf).*91(4): 525-533, 01/2019. PM31278867

18.    Selkie E, Adkins V, Masters E, Bajpai A, **Shumer D**: Transgender Adolescents' Uses of Social Media for Social Support. *J Adolesc Health.*66(3): 275-280, 03/2020. PM31690534

19.    Araya AC, Warwick R, **Shumer D**, Selkie E: Romantic Relationships in Transgender Adolescents: A Qualitative Study. *Pediatrics.*147(2)02/2021. PM33468600

20.    Vengalil N, **Shumer D**, Wang F: Developing an LGBT curriculum and evaluating its impact on dermatology residents. *Int J Dermatol.*61: 99-102, 01/2022. PM34416015

21.    Warwick RM, Araya AC, **Shumer DE**, Selkie EM: Transgender Youths' Sexual Health and Education: A Qualitative Analysis. *J Pediatr Adolesc Gynecol.*35(2): 138-146, 04/2022. PM34619356

22.    Warwick RM, **Shumer DE**: Gender-affirming multidisciplinary care for transgender and non-binary children and adolescents. *Children's Health Care.*52(1): 91-115, 01/2023

23.    Diaz-Thomas AM, Golden SH, Dabelea DM, Grimberg A, Magge SN, Safer JD, **Shumer DE**, Stanford FC: Endocrine Health and Health Care Disparities in the Pediatric and Sexual and Gender Minority Populations: An Endocrine Society Scientific Statement. *J Clin Endocrinol Metab.*108(7): 1533-1584,

06/2023. PM37191578

24.    Waselewski AC, Klumpner TT, Kountanis JA, Sandberg ES, **Shumer DE**: Dexamethasone for postoperative nausea and vomiting prophylaxis in cesarean delivery and a delayed diagnosis of neonatal congenital adrenal hyperplasia. *International Journal of Obstetric Anesthesia.*Available on line12/2023. PM38195332

25.    Roszell K, **Shumer D**, Orringer J, Wang F: Limited health insurance coverage of injectable neurotoxins and fillers for gender affirmation: a cross-sectional study of Affordable Care Act silver and Medicaid plans. *Int J Womens Dermatol.*10(1): e126, 03/2024. PM38313363

26.    Blaszczak J, Wiener S, Plegue M, **Shumer D**, Shatzer J, Hernandez A: Evaluating the effectiveness of an online curriculum on caring for transgender and nonbinary patients. *Med Educ Online.*29(1): 2311481, 12/2024. PM38320110

## Books

1.    Clara A-V, Bizic M, Bockting WO, Bouman M-B, Bowers ML, Buncamper ME, Capitán L, Castillo M, Chim HW, Colebunders B, Crane C, D'Arpa S, Djordjevic ML, Estes C, Fein LA, Gasgarth R, Hoebeke P, Horne M, Joumblat NR, Kojic S, Levine JP, Lumen N, Meijerink WJ H J, Monstrey SJ, Salgado CJ, **Shumer DE**, Simon D, Sinha VR, Sinha VK, Spack NP, Sputova K, Stanojevic D, Stojanovic B, Tarsha AA, Thomas JP, van der Sluis WB, Volker MK, Weiss RE, Yamaguchi Y, Zhao LC, Zoghbi Y. *Gender Affirmation Medical & Surgical Perspectives.* Thieme, (2017)

## Chapters

1.    **Shumer D**: Coma. In Schwartz MW *The 5-Minute Pediatric Consult,*6, Lippincott Williams & Wilkins, Philadelphia, PA, (2012)

2.    **Shumer D**, Spack N: Medical Treatment of the Adolescent Transgender Patient. In Đorđević M, Monstrey SJ, Salgado CJ Eds. *Gender Affirmation: Medical and Surgical Perspectives,*CRC Press/Taylor & Francis, (2016)

3.    **Shumer DE**, Kinnear HA: Duration of Pubertal Suppression and Initiation of Gender-Affirming Hormone Treatment in Youth. In Finlayson *Pubertal Suppression in Transgender Youth,*Elsevier, (2018)

4.    Araya A, **Shumer DE**: Endocrinology of Transgender Care – Children and Adolescents. In Poretsky, Hembree Ed. *Transgender Medicine: A Multidisciplinary Approach,*Springer, (2019)

5.    **Shumer D**: Health Disparities Facing Transgender and Gender Nonconforming Youth Are Not Inevitable. *Pediatric Collections: LGBTQ+: Support and Care (Part 2: Health Concerns and Disparities),*American Academy of Pediatrics (AAP), (2021), 71-72

## Other

### Commentary

1.    Martin S, Sandberg ES, **Shumer DE**: Criminalization of Gender-Affirming Care - Interfering with Essential Treatment for Transgender Children and Adolescents. *New England Journal of Medicine.*385(7): 579-581, 05/2021. PM34010528

### Comparative Study

1.    Reisner SL, Vetters R, Leclerc M, Zaslow S, Wolfrum S, **Shumer D**, Mimiaga MJ: Mental health of transgender youth in care at an adolescent urban community health center: a matched retrospective cohort study. *J Adolesc Health.*56(3): 274-279, 03/2015. PM25577670

### Editorial

1.    **Shumer D**, Roberts SA: Placing a Report of Bicalutamide-Induced Hepatotoxicity in the Context of Current Standards of Care for Transgender Adolescents. *J Adolesc Health.*74(1): 5-6, 01/2024. PM38103922

### Editorial comment

1.    **Shumer DE**: Health Disparities Facing Transgender and Gender Nonconforming Youth Are Not Inevitable, 01/2018. PM29437859

2.    Martin S, Sandberg ES, **Shumer DE**: Criminalization of Gender-Affirming Care - Interfering with Essential Treatment for Transgender Children and Adolescents, 01/2021

### Erratum

1.    Tishelman AC, Kaufman R, Edwards-Leeper L, Mandel FH, **Shumer DE**, Spack NP: Correction to Serving Transgender Youth: Challenges, Dilemmas, and Clinical Examples, [Professional Psychology: Research and Practice, 46(1), (2015) 37-45]. *Professional Psychology: Research and Practice.*46(4): 249, 08/2015

### Letter

1.    Strang JF, Janssen A, Tishelman A, Leibowitz SF, Kenworthy L, McGuire JK, Edwards-Leeper L, Mazefsky CA, Rofey D, Bascom J, Caplan R, Gomez-Lobo V, Berg D, Zaks Z, Wallace GL, Wimms H, Pine-Twaddell E, **Shumer D**, Register-Brown K, Sadikova E, Anthony LG: Revisiting the Link: Evidence of the Rates of Autism in Studies of Gender Diverse Individuals. *J Am Acad Child Adolesc Psychiatry.*57(11): 885-887, 11/2018. PM30392631

### Letter to editor

1.    **Shumer D**: Doctor as environmental steward, 01/2009. PM19364173

### News

1.    **Shumer DE**, Spack NP: Paediatrics: Transgender medicine--long-term outcomes from 'the Dutch model'. *Nat Rev Urol.*12(1): 12-13, 01/2015. PM25403246

### Other

1.    **Shumer D**: The Effect of Race and Gender Labels in the Induction of Traits. *Northwestern Journal of Race and Gender Criticism.*NA01/2014

2.    **Shumer D**: A Tribute to Medical Stereotypes. *The Pharos, Journal of the Alpha Omega Alpha Medical Society.*Summer07/2017

3.    Mohnach L, Mazzola S, **Shumer D**, Berman DR: Prenatal Diagnosis of 17-hydroxylase/17,20-lyase deficiency (17OHD) in a case of 46,XY sex discordance and low maternal serum estriol. *Case Reports in Perinatal Medicine.*8(1)12/2018

4.    Araya A, **Shumer D**, Warwick R, Selkie E: 37. "I've Been Happily Dating For 5 Years" - Romantic and Sexual Health, Experience and Expectations in Transgender Youth. *Journal of Adolescent Health.*66(2): s20, 02/2020

5.    Araya A, **Shumer D**, Warwick R, Selkie E: 73. "I think sex is different for everybody" - Sexual Experiences and Expectations in Transgender Youth. *Journal of Pediatric and Adolescent Gynecology.*33(2): 209-210, 04/2020

6.    Araya AC, Warwick R, **Shumer D**, Selkie E, Rath T, Ibrahim M, Srinivasan A: Romantic Health in Transgender Adolescents. *Pediatrics.*Pediatrics01/2021

7.    Chiang N, **Shumer D**: Understanding cytomorphologic changes in Pap tests of transgender men on testosterone therapy. *American Journal of Clinical Pathology.*160(Supplement_1): s66-s66, 11/2023

### Podcast

1.    Gaggino L, Shumer WG D: Pediatric Meltdown: Caring for Transgender Youth with Compassion: What Pediatricians Must Know, 01/2020

## Abstract/Posters

1.    **Shumer D**: Overrepresentation of Adopted Children in a Hospital Based Gender Program, World Professional Association of Transgender Health Biennial International Symposium, Amsterdam, The Netherlands, 2016

2.    **Shumer D**: Mental Health Presentation of Transgender Youth Seeking Medical Intervention, World Professional Association of Transgender Health Biennial International Symposium, Amsterdam, The Netherlands, 2016

3.    **Shumer D**, Kinnear H, McLain K, Morgan H: Development of a Transgender Medicine Elective for 4th Year Medical Students, National Transgender Health Summit, Oakland, CA, 2017

4.    Adkins V, Masters E, **Shumer D**, Selkie E: Exploring Transgender Adolescents' Use of Social Media for Support and Health Information Seeking (Poster Presentation), Pediatric Research Symposium, Ann Arbor, MI, 2017

5.    Sandberg E, Baines HK, Aye T, Hart-Unger S, Lopez X, Nikita ME, Nokoff NJ, Persky R, **Shumer D**, Harris RM, Roberts SA: National Assessment for the Need of a Comprehensive Pediatric Gender Affirming Care Curriculum, Poster, Pediatric Endocrine Society Meeting, Virtual, 2021

# **Exhibit B**

**Exhibit B**

**Bibliography**

AAP News. Risk of pseudotumor cerebri added to labeling for gonadotropin-releasing hormone agonists. July 1, 2022 https://publications.aap.org/aapnews/news/20636/Risk-of-pseudotumor-cerebri-added-to-labeling-for?autologincheck=redirected (last visited February 2, 2025).

Achille C, Taggart T, Eaton NR, Osipoff J, Tafuri K, Lane A, Wilson TA. Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: preliminary results. Int J Pediatr Endocrinol. 2020;2020:8. doi: 10.1186/s13633-020-00078-2. Epub 2020 Apr 30. PMID: 32368216; PMCID: PMC7191719.

Acién, P., & Acién, M. (2020). Disorders of Sex Development: Classification, Review, and Impact on Fertility. *Journal of clinical medicine*, *9*(11), 3555. https://doi.org/10.3390/jcm9113555

Akhavan AA, Sandhu S, Ndem I, Ogunleye AA. A review of gender affirmation surgery: What we know, and what we need to know. Surgery. 2021 Jul;170(1):336-340. doi: 10.1016/j.surg.2021.02.013. Epub 2021 Mar 16. PMID: 33741180.

Allen LR, Watson LB, Egan AM, Moser CN. (2019). Well-Being and Suicidality Among Transgender Youth After Gender-Affirming Hormones. *Clinical Practice in Pediatric Psychology*, 7(3), 302-311.

American Medical Association (AMA) and GLMA: Health professionals advancing LGBTQ equality (2019). Health insurance coverage for gender-affirming care of transgender patients. https://www.ama-assn.org/system/files/2019-03/transgender-coverage-issue-brief.pdf

American Psychological Association. (2015). Guidelines for psychological practice with transgender and gender nonconforming people. American Psychologist, 70, 832-864.

American Psychiatric Association. (2022). Diagnostic and statistical manual of mental disorders (5th ed., text rev.). Arlington, VA: American Psychiatric Publishing.

Babu, R., & Shah, U. (2021). Gender identity disorder (GID) in adolescents and adults with differences of sex development (DSD): A systematic review and meta-analysis. *Journal of pediatric urology*, *17*(1), 39–47. https://doi.org/10.1016/j.jpurol.2020.11.017

Baker KE, Wilson LM, Sharma R, Dukhanin V, McArthur K, Robinson KA. Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review. J Endocr Soc. 2021 Feb 2;5(4):bvab011. doi: 10.1210/jendso/bvab011. PMID: 33644622; PMCID: PMC7894249.

Barbee H, Deal C, Gonzales G. Anti-Transgender Legislation-A Public Health Concern for Transgender Youth. JAMA Pediatr. 2022 Feb 1;176(2):125-126. doi: 10.1001/jamapediatrics.2021.4483. PMID: 34747979; PMCID: PMC10204642.

Berglund H, Lindström P, Dhejne-Helmy C, Savic I. Male-to-female transsexuals show sex-atypical hypothalamus activation when smelling odorous steroids. Cereb Cortex. 2008 Aug;18(8):1900-8. doi: 10.1093/cercor/bhm216. Epub 2007 Dec 3. PMID: 18056697.

Boskey ER, Jolly D, Kant JD, Ganor O. Prospective Evaluation of Psychosocial Changes After Chest Reconstruction in Transmasculine and Non-Binary Youth. J Adolesc Health. 2023 Sep;73(3):503-509. doi: 10.1016/j.jadohealth.2023.04.029. Epub 2023 Jun 5. PMID: 37278674.

Brancati, S., Gozzo, L., Longo, L., Vitale, D. C., Russo, G., & Drago, F. (2021). Fertility Preservation in Female Pediatric Patients With Cancer: A Clinical and Regulatory Issue. *Frontiers in oncology*, *11*, 641450. https://doi.org/10.3389/fonc.2021.641450

Campbell T, Rodgers YVM. Conversion therapy, suicidality, and running away: An analysis of transgender youth in the U.S. J Health Econ. 2023 May;89:102750. doi: 10.1016/j.jhealeco.2023.102750. Epub 2023 Mar 17. PMID: 36963209.

Carmichael P, Butler G, Masic U, Cole TJ, De Stavola BL, Davidson S, Skageberg EM, Khadr S, Viner RM. Short-term outcomes of pubertal suppression in a selected cohort of 12 to 15 year old young people with persistent gender dysphoria in the UK. PLoS One. 2021 Feb 2;16(2):e0243894. doi: 10.1371/journal.pone.0243894. PMID: 33529227; PMCID: PMC7853497.

Chelliah P, Lau M, Kuper LE. Changes in Gender Dysphoria, Interpersonal Minority Stress, and Mental Health Among Transgender Youth After One Year of Hormone Therapy. J Adolesc Health. 2024 Jun;74(6):1106-1111. doi: 10.1016/j.jadohealth.2023.12.024. Epub 2024 Feb 9. PMID: 38340124.

Chen D, Berona J, Chan YM, Ehrensaft D, Garofalo R, Hidalgo MA, Rosenthal SM, Tishelman AC, Olson-Kennedy J. Psychosocial Functioning in Transgender Youth after 2 Years of Hormones. N Engl J Med. 2023 Jan 19;388(3):240-250. doi: 10.1056/NEJMoa2206297.

Cohen-Kettenis PT. Gender change in 46,XY persons with 5alpha-reductase-2 deficiency and 17beta-hydroxysteroid dehydrogenase-3 deficiency. Arch Sex Behav. 2005 Aug;34(4):399-410. doi: 10.1007/s10508-005-4339-4. PMID: 16010463.

Coleman E, Radix AE, Bouman WP, Brown GR…Arcelus J. Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. Int J Transgend Health. 2022 Sep 6;23(Suppl 1):S1-S259. doi: 10.1080/26895269.2022.2100644. PMID: 36238954; PMCID: PMC9553112.

Coleman E, Bockting W, Botzer M…Zucker K. (2012). Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. *International Journal of Transgenderism*, 2012 13(4), 165-232.

Colizzi M, Costa R, Pace V, Todarello O. Hormonal treatment reduces psychobiological distress in gender identity disorder, independently of the attachment style. J Sex Med. 2013 Dec;10(12):3049-58. doi: 10.1111/jsm.12155. Epub 2013 Apr 9. PMID: 23574768.

Colizzi M, Costa R, Todarello O. Transsexual patients' psychiatric comorbidity and positive effect of cross-sex hormonal treatment on mental health: results from a longitudinal study. Psychoneuroendocrinology. 2014 Jan;39:65-73. doi: 10.1016/j.psyneuen.2013.09.029. Epub 2013 Oct 10. PMID: 24275005.

Comer JS, Georgiadis C, Schmarder K, Chen D, Coyne CA, Gudiño OG, Kazantzis N, Langer DA, LeBeau RT, Liu RT, McLean C, Sloan DM, Williams MT, Pachankis JE. Reckoning With Our Past and Righting Our Future: Report From the Behavior Therapy Task Force on Sexual Orientation and Gender Identity/Expression Change Efforts (SOGIECEs). Behav Ther. 2024 Jul;55(4):649-679. doi: 10.1016/j.beth.2024.05.006. Epub 2024 May 26. PMID: 38937042.

Corda E, Bandecchi C, Deiana V, Pintor S, Pusceddu R, Oppo A, Mariotti S, Argiolas A, Carpinello B. Body image and gender role perceived in gender dysphoria: Cross-sex hormone therapy effects. 2016 Mar;33(S1):S589

Costa R, Dunsford M, Skagerberg E, Holt V, Carmichael P, Colizzi M. Psychological Support, Puberty Suppression, and Psychosocial Functioning in Adolescents with Gender Dysphoria. J Sex Med. 2015 Nov;12(11):2206-14. doi: 10.1111/jsm.13034. Epub 2015 Nov 9. PMID: 26556015.

Daniel H, Butkus R; Health and Public Policy Committee of American College of Physicians. Lesbian, Gay, Bisexual, and Transgender Health Disparities: Executive Summary of a Policy Position Paper From the American College of Physicians. Ann Intern Med. 2015 Jul 21;163(2):135-7. doi: 10.7326/M14-2482. PMID: 25961598.

de Lara DL, Pérez Rodríguez O, Cuellar Flores I, Pedreira Masa JL, Campos-Muñoz L, Cuesta Hernández M, Ramos Amador JT. Evaluación psicosocial en adolescentes transgénero [Psychosocial assessment in transgender adolescents]. An Pediatr (Engl Ed). 2020 Jul;93(1):41-48. Spanish. doi: 10.1016/j.anpedi.2020.01.019. Epub 2020 Mar 3. PMID: 32144041.

de Vries AL, Cohen-Kettenis PT. Clinical management of gender dysphoria in children and adolescents: the Dutch approach. J Homosex. 2012;59(3):301-20. doi: 10.1080/00918369.2012.653300. PMID: 22455322.

de Vries AL, McGuire JK, Steensma TD, Wagenaar EC, Doreleijers TA, Cohen-Kettenis PT. Young adult psychological outcome after puberty suppression and gender reassignment. Pediatrics. 2014 Oct;134(4):696-704. doi: 10.1542/peds.2013-2958. Epub 2014 Sep 8. PMID: 25201798.

de Vries AL, Steensma TD, Doreleijers TA, Cohen-Kettenis PT. Puberty suppression in adolescents with gender identity disorder: a prospective follow-up study. J Sex Med. 2011

Aug;8(8):2276-83. doi: 10.1111/j.1743-6109.2010.01943.x. Epub 2010 Jul 14. PMID: 20646177.

Defreyne J, T'Sjoen G. Transmasculine Hormone Therapy. Endocrinol Metab Clin North Am. 2019 Jun;48(2):357-375. doi: 10.1016/j.ecl.2019.01.004. PMID: 31027545.

Dessens AB, Slijper FM, Drop SL. Gender dysphoria and gender change in chromosomal females with congenital adrenal hyperplasia. Arch Sex Behav. 2005 Aug;34(4):389-97. doi: 10.1007/s10508-005-4338-5. PMID: 16010462.

Deutsch, MB (ed.). Guidelines for the primary and gender-affirming care of transgender and gender nonbinary people (2nd ed.) 2016. University of California, San Francisco, Department of Family and Community Medicine, Center of Excellence for Transgender Health. https://transcare.ucsf.edu/sites/transcare.ucsf.edu/files/Transgender-PGACG-6-17-16.pdf.

Dopp, Alex R., Allison Peipert, John Buss, Robinson De Jesús-Romero, Keytin Palmer, and Lorenzo Lorenzo-Luaces, Interventions for Gender Dysphoria and Related Health Problems in Transgender and Gender-Expansive Youth: A Systematic Review of Benefits and Risks to Inform Practice, Policy, and Research. Santa Monica, CA: RAND Corporation, 2024. https://www.rand.org/pubs/research_reports/RRA3223-1.html.

Doyle DM, Lewis TOG, Barreto M. A systematic review of psychosocial functioning changes after gender-affirming hormone therapy among transgender people. Nat Hum Behav. 2023 Aug;7(8):1320-1331. doi: 10.1038/s41562-023-01605-w. Epub 2023 May 22. PMID: 37217739; PMCID: PMC10444622.

Drescher, J., Haller, E., & Yarbrough, E. (2018). Position statement on access to care for transgender and gender diverse individuals. Caucus of LGBTQ Psychiatrists. American Psychiatric Association.

Fish JN, Russell ST. Sexual Orientation and Gender Identity Change Efforts are Unethical and Harmful. Am J Public Health. 2020 Aug;110(8):1113-1114. doi: 10.2105/AJPH.2020.305765. PMID: 32639919; PMCID: PMC7349462.

Fisher AD, Castellini G, Ristori J, Casale H, Cassioli E, Sensi C, Fanni E, Amato AM, Bettini E, Mosconi M, Dèttore D, Ricca V, Maggi M. Cross-Sex Hormone Treatment and Psychobiological Changes in Transsexual Persons: Two-Year Follow-Up Data. J Clin Endocrinol Metab. 2016 Nov;101(11):4260-4269. doi: 10.1210/jc.2016-1276. Epub 2016 Oct 4. PMID: 27700538.

Fleming PS, Koletsi D, Ioannidis JP, Pandis N. High quality of the evidence for medical and other health-related interventions was uncommon in Cochrane systematic reviews. J Clin Epidemiol. 2016 Oct;78:34-42. doi: 10.1016/j.jclinepi.2016.03.012. Epub 2016 Mar 29. PMID: 27032875.

Forsberg LA, Absher D, Dumanski JP. (2013). Non-heritable genetics of human disease: spotlight on post-zygotic genetic variation acquired during lifetime. J Med Genet. 2013;50:1-10.

Forsythe A, Pick C, Tremblay G, Malaviya S, Green A, Sandman K. Humanistic and Economic Burden of Conversion Therapy Among LGBTQ Youths in the United States. JAMA Pediatr. 2022 May 1;176(5):493-501. doi: 10.1001/jamapediatrics.2022.0042. PMID: 35254391; PMCID: PMC8902682.

Goodyear T, Delgado-Ron JA, Ashley F, Knight R, Salway T. Sexual Orientation and Gender Identity and Expression Change Efforts and Suicidality: Evidence, Challenges, and Future Research Directions. LGBT Health. 2023 Jul;10(5):339-343. doi: 10.1089/lgbt.2022.0359. Epub 2023 Mar 10. PMID: 36913530; PMCID: PMC11079439.

Grannis C, Leibowitz SF, Gahn S, Nahata L, Morningstar M, Mattson WI, Chen D, Strang JF, Nelson EE. Testosterone treatment, internalizing symptoms, and body image dissatisfaction in transgender boys. Psychoneuroendocrinology. 2021 Oct;132:105358. doi: 10.1016/j.psyneuen.2021.105358. Epub 2021 Jul 17. PMID: 34333318.

Green AE, DeChants JP, Price MN, Davis CK. Association of Gender-Affirming Hormone Therapy With Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth. J Adolesc Health. 2022 Apr;70(4):643-649. doi: 10.1016/j.jadohealth.2021.10.036. Epub 2021 Dec 14. PMID: 34920935.

Guaraldi F, Beccuti G, Gori D, Ghizzoni L. Management of Endocrine Disease: Long-term outcomes of the treatment of central precocious puberty. Eur J Endocrinol. 2016 Mar;174(3):R79-87. doi: 10.1530/EJE-15-0590. Epub 2015 Oct 14. PMID: 26466612.

Hembree WC, Cohen-Kettenis PT, Gooren L, Hannema SE, Meyer WJ, Murad MH, Rosenthal SM, Safer JD, Tangpricha V, T'Sjoen GG. Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline. J Clin Endocrinol Metab. 2017 Nov 1;102(11):3869-3903. doi: 10.1210/jc.2017-01658.

Hembree WC, Cohen-Kettenis P, Delemarre-van de Waal HA, Gooren LJ, Meyer WJ 3rd, Spack NP, Tangpricha V, Montori VM; Endocrine Society. Endocrine treatment of transsexual persons: an Endocrine Society clinical practice guideline. J Clin Endocrinol Metab. 2009 Sep;94(9):3132-54. doi: 10.1210/jc.2009-0345. Epub 2009 Jun 9.

Henningsson S, Westberg L, Nilsson S, Lundström B, Ekselius L, Bodlund O, Lindström E, Hellstrand M, Rosmond R, Eriksson E, Landén M. Sex steroid-related genes and male-to-female transsexualism. Psychoneuroendocrinology. 2005 Aug;30(7):657-64. doi: 10.1016/j.psyneuen.2005.02.006. PMID: 15854782

Heylens G, De Cuypere G, Zucker KJ, Schelfaut C, Elaut E, Vanden Bossche H, De Baere E, T'Sjoen G. Gender identity disorder in twins: a review of the case report literature. J Sex Med. 2012 Mar;9(3):751-7. doi: 10.1111/j.1743-6109.2011.02567.x. Epub 2011 Dec 6. PMID: 22146048.

Heylens G, Verroken C, De Cock S, T'Sjoen G, De Cuypere G. Effects of different steps in gender reassignment therapy on psychopathology: a prospective study of persons with a gender

identity disorder. J Sex Med. 2014 Jan;11(1):119-26. doi: 10.1111/jsm.12363. Epub 2013 Oct 28. PMID: 24344788.

Howick J, Koletsi D, Pandis N, Fleming PS, Loef M, Walach H, Schmidt S, Ioannidis JPA. The quality of evidence for medical interventions does not improve or worsen: a metaepidemiological study of Cochrane reviews. J Clin Epidemiol. 2020 Oct;126:154-159. doi: 10.1016/j.jclinepi.2020.08.005. Epub 2020 Sep 2. PMID: 32890636.

Hidalgo MA, Ehrensaft, D, Tishelman AC, Clark LF, Garofalo R., Rosenthal SM, Spack NP, Olson J. (2013). The Gender Affirmative Model: What We Know and What We Aim to Learn. *Human Development*, 56:285-290.

Hughes, I. A., Houk, C., Ahmed, S. F., Lee, P. A., LWPES Consensus Group, & ESPE Consensus Group (2006). Consensus statement on management of intersex disorders. *Archives of disease in childhood*, *91*(7), 554–563. https://doi.org/10.1136/adc.2006.098319

Kaltiala R, Heino E, Työläjärvi M, Suomalainen L. Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria. Nord J Psychiatry. 2020 Apr;74(3):213-219. doi: 10.1080/08039488.2019.1691260. Epub 2019 Nov 25. PMID: 31762394.

Karamanis G, Frisell T, Holmberg M, Halldin M, Sylvén S, Skalkidou A, Papadopoulos FC. Incidence of Idiopathic Intracranial Hypertension in Individuals With Gonadotropin-Releasing Hormone Analogue Treatment for Gender Dysphoria in Sweden. JAMA Pediatr. 2023 Jul 1;177(7):726-727. doi: 10.1001/jamapediatrics.2023.0656. PMID: 37126330; PMCID: PMC10152371.

Keo-Meier CL, Herman LI, Reisner SL, Pardo ST, Sharp C, Babcock JC. Testosterone treatment and MMPI-2 improvement in transgender men: a prospective controlled study. J Consult Clin Psychol. 2015 Feb;83(1):143-56. doi: 10.1037/a0037599. Epub 2014 Aug 11. PMID: 25111431.

Klein DA, Paradise SL, Goodwin ET. Caring for Transgender and Gender-Diverse Persons: What Clinicians Should Know. Am Fam Physician. 2018 Dec 1;98(11):645-653. PMID: 30485050.

Klug WS, et al. (2012). Essentials of Genetics. Pearson.

Knudson G, De Sutter P. Fertility options in transgender and gender diverse adolescents. Acta Obstet Gynecol Scand. 2017 Oct;96(10):1269-1272. doi: 10.1111/aogs.13188. PMID: 28759117.

Kolesinska Z, Ahmed SF, Niedziela M, et al. Changes over time in sex assignment for disorders of sex development. Pediatrics. 2014 Sep;134(3):e710-5. DOI: 10.1542/peds.2014-1088. PMID: 25092939.

Kumar, G., & Barboza-Meca, J. J. (2022). 5-Alpha-Reductase Deficiency. In *StatPearls*. StatPearls Publishing.

Kuper LE, Stewart S, Preston S, Lau M, Lopez X. Body Dissatisfaction and Mental Health Outcomes of Youth on Gender-Affirming Hormone Therapy. Pediatrics. 2020 Apr;145(4):e20193006. doi: 10.1542/peds.2019-3006. PMID: 32220906.

Light AD, Obedin-Maliver J, Sevelius JM, Kerns JL. Transgender men who experienced pregnancy after female-to-male gender transitioning. Obstet Gynecol. 2014 Dec;124(6):1120-1127. doi: 10.1097/AOG.0000000000000540. PMID: 25415163.

Luders E, Sánchez FJ, Gaser C, Toga AW, Narr KL, Hamilton LS, Vilain E. Regional gray matter variation in male-to-female transsexualism. Neuroimage. 2009 Jul 15;46(4):904-7. doi: 10.1016/j.neuroimage.2009.03.048. Epub 2009 Mar 31. PMID: 19341803; PMCID: PMC2754583.

Mahfouda S, Moore JK, Siafarikas A, Hewitt T, Ganti U, Lin A, Zepf FD. Gender-affirming hormones and surgery in transgender children and adolescents. Lancet Diabetes Endocrinol. 2019 Jun;7(6):484-498. doi: 10.1016/S2213-8587(18)30305-X. Epub 2018 Dec 6. PMID: 30528161.

Manieri C, Castellano E, Crespi C, Di Bisceglie C, Dell'Aquila C, Gualerzi A, Molo M. Medical Treatment of Subjects with Gender Identity Disorder: The Experience in an Italian Public Health Center, *International Journal of Transgenderism*. 2014 15:2, 53-65.

Marinkovic M, Newfield RS. Chest reconstructive surgeries in transmasculine youth: Experience from one pediatric center. International Journal of Transgenderism. 2017 18(4).

Marks L. S. (2004). 5alpha-reductase: history and clinical importance. *Reviews in urology*, *6 Suppl 9*(Suppl 9), S11–S21.

Martinerie L, de Mouzon J, Blumberg J, di Nicola L, Maisonobe P, Carel JC; PREFER study group. Fertility of Women Treated during Childhood with Triptorelin (Depot Formulation) for Central Precocious Puberty: The PREFER Study. Horm Res Paediatr. 2020;93(9-10):529-538. doi: 10.1159/000513702. Epub 2021 Mar 26. PMID: 33774631; PMCID: PMC8686727.

Mazur T. (2005). Gender dysphoria and gender change in androgen insensitivity or micropenis. *Archives of sexual behavior*, *34*(4), 411–421. https://doi.org/10.1007/s10508-005-4341-x

McGee, L. M., Lin-Brande, M., Woods, K., & Seideman, C. A. (2022). Pubertal Suppression and Surgical Management of a Patient With 5-Alpha Reductase Deficiency. *Urology*, *165*, e29–e31. https://doi.org/10.1016/j.urology.2022.03.019

McGregor K, McKenna JL, Williams CR, Barrera EP, Boskey ER. Association of Pubertal Blockade at Tanner 2/3 With Psychosocial Benefits in Transgender and Gender Diverse Youth at Hormone Readiness Assessment. J Adolesc Health. 2024 Apr;74(4):801-807. doi: 10.1016/j.jadohealth.2023.10.028. Epub 2023 Dec 13. PMID: 38099903.

Mehmood, K. T., & Rentea, R. M. (2023). Ambiguous Genitalia and Disorders of Sexual Differentiation. In *StatPearls*. StatPearls Publishing.

Mehringer JE, Harrison JB, Quain KM, Shea JA, Hawkins LA, Dowshen NL. Experience of Chest Dysphoria and Masculinizing Chest Surgery in Transmasculine Youth. Pediatrics. 2021 Mar;147(3):e2020013300. doi: 10.1542/peds.2020-013300. Epub 2021 Feb 3. PMID: 33536330.

Millington K, Lee JY, Olson-Kennedy J, Garofalo R, Rosenthal SM, Chan YM. Laboratory Changes During Gender-Affirming Hormone Therapy in Transgender Adolescents. Pediatrics. 2024 May 1;153(5):e2023064380. doi: 10.1542/peds.2023-064380. PMID: 38567424; PMCID: PMC11035161.

Motta G, Crespi C, Mineccia V, Brustio PR, Manieri C, Lanfranco F. Does Testosterone Treatment Increase Anger Expression in a Population of Transgender Men? J Sex Med. 2018 Jan;15(1):94-101. doi: 10.1016/j.jsxm.2017.11.004. Epub 2017 Nov 27. PMID: 29175227.

National Academies of Sciences, Engineering, and Medicine. (2020). Understanding the Well-Being of LGBTQI+ Populations. Washington, DC: The National Academies Press. https://doi.org/10.17226/25877.

National Academies of Sciences, Engineering, and Medicine; Division of Behavioral and Social Sciences and Education; Committee on National Statistics; Committee on Measuring Sex, Gender Identity, and Sexual Orientation. Measuring Sex, Gender Identity, and Sexual Orientation. Becker T, Chin M, Bates N, editors. Washington (DC): National Academies Press (US); 2022 Mar 9. PMID: 35286054.

Nolan BJ, Zwickl S, Locke P, Zajac JD, Cheung AS. Early Access to Testosterone Therapy in Transgender and Gender-Diverse Adults Seeking Masculinization: A Randomized Clinical Trial. JAMA Netw Open. 2023 Sep 5;6(9):e2331919. doi: 10.1001/jamanetworkopen.2023.31919. PMID: 37676662; PMCID: PMC10485726.

Oda H, Kinoshita T. Efficacy of hormonal and mental treatments with MMPI in FtM individuals: cross-sectional and longitudinal studies. BMC Psychiatry. 2017 Jul 17;17(1):256. doi: 10.1186/s12888-017-1423-y. PMID: 28716082; PMCID: PMC5513327.

Oliver R, Basit H. Embryology, Fertilization. [Updated 2023 Apr 17]. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2025 Jan-. Available from: https://www.ncbi.nlm.nih.gov/books/NBK542186/

Olson-Kennedy J, Warus J, Okonta V, Belzer M, Clark LF. Chest Reconstruction and Chest Dysphoria in Transmasculine Minors and Young Adults: Comparisons of Nonsurgical and Postsurgical Cohorts. JAMA Pediatr. 2018 May 1;172(5):431-436. doi: 10.1001/jamapediatrics.2017.5440. PMID: 29507933; PMCID: PMC5875384.

Panozzo D. Advocating for an End to Reparative Therapy: Methodological Grounding and

Blueprint for Change. Journal of Gay & Lesbian Social Services. Jul 2013:25(3).

Pasquino AM, Pucarelli I, Roggini M, Segni M. Adult height in short normal girls treated with gonadotropin-releasing hormone analogs and growth hormone. J Clin Endocrinol Metab. 2000 Feb;85(2):619-22. doi: 10.1210/jcem.85.2.6387. PMID: 10690865.

Przeworski A, Peterson E, Piedra A. A Systematic Review of the Efficacy, Harmful Effects, and Ethical Issues Related to Sexual Orientation Change Efforts. Clinical Psychology: Science and Practice. Mar 2021:28(1).

Rafferty, J. American Academy of Pediatrics (AAP) Committee on Psychosocial Aspects of Child and Family Health, AAP Committee on Adolescence, AAP Section on Lesbian, Gay, Bisexual, and Transgender Health and Wellness. (2018). Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents. *Pediatrics*. 142(4):e20182162.

Rametti G, Carrillo B, Gómez-Gil E, Junque C, Segovia S, Gomez Á, Guillamon A. White matter microstructure in female to male transsexuals before cross-sex hormonal treatment. A diffusion tensor imaging study. J Psychiatr Res. 2011 Feb;45(2):199-204. doi: 10.1016/j.jpsychires.2010.05.006. Epub 2010 Jun 8. PMID: 20562024.

Reisner SL, Vetters R, Leclerc M, Zaslow S, Wolfrum S, Shumer D, Mimiaga MJ. Mental health of transgender youth in care at an adolescent urban community health center: a matched retrospective cohort study. J Adolesc Health. 2015 Mar;56(3):274-9. doi: 10.1016/j.jadohealth.2014.10.264. Epub 2015 Jan 7. PMID: 25577670; PMCID: PMC4339405.

Rey, R., Josso, N., & Racine, C. (2020). Sexual Differentiation. In K. R. Feingold (Eds.) et. al., *Endotext*. MDText.com, Inc.

Roselli CE. Neurobiology of gender identity and sexual orientation. J Neuroendocrinol. 2018 Jul;30(7):e12562. doi: 10.1111/jne.12562. PMID: 29211317; PMCID: PMC6677266.

Rosenthal SM. Approach to the patient: transgender youth: endocrine considerations. J Clin Endocrinol Metab. 2014 Dec;99(12):4379-89. doi: 10.1210/jc.2014-1919. PMID: 25140398.

Shim JY, Laufer MR, DiVasta AD. Treatment of Adolescent Endometriosis Before, During, and After Use of Gonadotropin-Releasing Hormone Agonists: A Retrospective Cohort Study. J Pediatr Adolesc Gynecol. 2023 Oct;36(5):472-475. doi: 10.1016/j.jpag.2023.05.001. Epub 2023 May 12. PMID: 37178784.

Shumer DE, Spack NP. Current management of gender identity disorder in childhood and adolescence: guidelines, barriers and areas of controversy. Curr Opin Endocrinol Diabetes Obes. 2013 Feb;20(1):69-73. doi: 10.1097/MED.0b013e32835c711e. PMID: 23221495.

Skorochod R, Rysin R, Wolf Y. Age-related Outcomes of Chest Masculinization Surgery: A Single-surgeon Retrospective Cohort Study. Plast Reconstr Surg Glob Open. 2023 Feb

20;11(2):e4799. doi: 10.1097/GOX.0000000000004799. PMID: 36845860; PMCID: PMC9945241.

T'Sjoen G, Van Caenegem E, Wierckx K. Transgenderism and reproduction. Curr Opin Endocrinol Diabetes Obes. 2013 Dec;20(6):575-9. doi: 10.1097/01.med.0000436184.42554.b7. PMID: 24468761.

Taylor J, Mitchell A, Hall R, et al. (2024a). Interventions to suppress puberty in adolescents experiencing gender dysphoria or incongruence: a systematic review. Arch Dis Child. Apr 9:archdischild-2023-326669.

Taylor J, Mitchell A, Hall R, et al. (2024b). Masculinizing and feminizing hormone interventions for adolescents experiencing gender dysphoria or incongruence: a systematic review. Arch Dis Child. Apr 9:archdischild-2023-326670.

Tang A, Hojilla JC, Jackson JE, Rothenberg KA, Gologorsky RC, Stram DA, Mooney CM, Hernandez SL, Yokoo KM. Gender-Affirming Mastectomy Trends and Surgical Outcomes in Adolescents. Ann Plast Surg. 2022 May;88(4 Suppl):S325-S331. doi: 10.1097/SAP.0000000000003135. PMID: 36248210; PMCID: PMC9555285.

Turan Ş, Aksoy Poyraz C, Usta Sağlam NG, Demirel ÖF, Haliloğlu Ö, Kadıoğlu P, Duran A. Alterations in Body Uneasiness, Eating Attitudes, and Psychopathology Before and After Cross-Sex Hormonal Treatment in Patients with Female-to-Male Gender Dysphoria. Arch Sex Behav. 2018 Nov;47(8):2349-2361. doi: 10.1007/s10508-018-1189-4. Epub 2018 Mar 28. PMID: 29594702.

Turban JL, Beckwith N, Reisner SL, Keuroghlian AS. Association Between Recalled Exposure to Gender Identity Conversion Efforts and Psychological Distress and Suicide Attempts Among Transgender Adults. JAMA Psychiatry. 2020a Jan 1;77(1):68-76. doi: 10.1001/jamapsychiatry.2019.2285. PMID: 31509158; PMCID: PMC6739904.

Turban JL, King D, Carswell JM, Keuroghlian AS. Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation. Pediatrics. 2020b Feb;145(2):e20191725. doi: 10.1542/peds.2019-1725. Erratum in: Pediatrics. 2021 Apr;147(4):e2020049767. doi: 10.1542/peds.2020-049767

Turban JL, King D, Kobe J, Reisner SL, Keuroghlian AS. Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. PLoS One. 2022 Jan 12;17(1):e0261039. doi: 10.1371/journal.pone.0261039.

van der Loos MATC, Hannema SE, Klink DT, den Heijer M, Wiepjes CM. Continuation of gender-affirming hormones in transgender people starting puberty suppression in adolescence: a cohort study in the Netherlands. Lancet Child Adolesc Health. 2022 Dec;6(12):869-875. doi: 10.1016/S2352-4642(22)00254-1. Epub 2022 Oct 21. PMID: 36273487.

van der Miesen AIR, Steensma TD, de Vries ALC, Bos H, Popma A. Psychological Functioning in Transgender Adolescents Before and After Gender-Affirmative Care Compared With Cisgender General Population Peers. J Adolesc Health. 2020 Jun;66(6):699-704. doi: 10.1016/j.jadohealth.2019.12.018. Epub 2020 Apr 6. PMID: 32273193.

White Hughto JM, Reisner SL, Pachankis JE. (2015). Transgender stigma and health: A critical review of stigma determinants, mechanisms, and interventions. *Social science & medicine. (1982)*, *147*, 222–231.

Wiepjes CM, Nota NM, de Blok CJM, Klaver M, de Vries ALC, Wensing-Kruger SA, de Jongh RT, Bouman MB, Steensma TD, Cohen-Kettenis P, Gooren LJG, Kreukels BPC, den Heijer M. The Amsterdam Cohort of Gender Dysphoria Study (1972-2015): Trends in Prevalence, Treatment, and Regrets. J Sex Med. 2018 Apr;15(4):582-590. doi: 10.1016/j.jsxm.2018.01.016. Epub 2018 Feb 17. PMID: 29463477.

Yaylacı F, Gül A. Case Report: A Case of Intellectual Disability with Inappropriate and Challenging Sexual Behavior that was Treated with GNRH Analogues. Psychopharmacol Bull. 2020 May 19;50(2):51-55. PMID: 32508367; PMCID: PMC7255840.

Zhou JN, Hofman MA, Gooren LJ, Swaab DF. A sex difference in the human brain and its relation to transsexuality. Nature. 1995 Nov 2;378(6552):68-70. doi: 10.1038/378068a0. PMID: 7477289.

# **Exhibit DD**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PFLAG, INC.; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 8:25-cv-00337-BAH |
| DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*, | |
| *Defendants*. | |

## EXPERT DECLARATION OF JACK TURBAN, M.D., M.H.S

### INTRODUCTION

1.      I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation. I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.      I have actual knowledge of the matters stated herein.

3.      In preparing this report, I reviewed Executive Order 14168 and Executive Order 14187. In addition to those Executive Orders and the materials cited herein, I have also relied on my years of research and other experience, as set out in my curriculum vitae (**Exhibit A**), in forming my opinions. The materials I have relied upon in preparing this report are the same types of materials that experts in my field of study regularly rely upon when forming opinions on the subject, and particular studies that I rely upon are included in the bibliography (**Exhibit B**). I may wish to supplement these opinions or the bases for them as a result of new scientific research or publications or in response to statements and issues that may arise in my area of expertise.

1

**BACKGROUND AND QUALIFICATIONS**

4.      I am currently an Assistant Professor of Child & Adolescent Psychiatry at the University of California, San Francisco (UCSF) School of Medicine, where I am also Affiliate Faculty at the Philip R. Lee Institute for Health Policy Studies. As a member of the faculty at UCSF, I serve as director of the Gender Psychiatry Program in the Division of Child & Adolescent Psychiatry. I also serve as an attending psychiatrist in the adult LGBT psychiatry clinic, and in the eating disorders program. I conduct research focusing on the determinants of mental health among transgender youth and teach medical students, psychology trainees, psychiatry residents, and child and adolescent psychiatry fellows.

5.      I received my undergraduate degree in neuroscience from Harvard College. I received both my MD and Master of Health Science degrees from Yale University School of Medicine. I completed residency training in general psychiatry in the combined Massachusetts General Hospital / McLean Hospital residency training program (Harvard Medical School) and fellowship training in child and adolescent psychiatry at Stanford University. I am board certified in psychiatry by The American Board of Psychiatry and Neurology.

6.      My research focuses on the mental health of transgender youth and gender dysphoria. While at Yale, I was awarded the Ferris Prize for my thesis entitled "Evolving Treatment Paradigms for Transgender Youth." In 2017, I received the United States Preventative Health Services Award for Excellence in Public Health, based on my work related to the mental health of transgender youth. I have lectured on the mental health of transgender youth at Yale School of Medicine, UCSF, Stanford University, and The Massachusetts General Hospital (a teaching hospital of Harvard Medical School). I have given grand rounds presentations around the country and have presented nationally and internationally on topics related to the mental health of transgender people and people experiencing gender dysphoria.

2

JA646

7.      I have served as a manuscript reviewer for numerous professional publications, including *The Journal of The American Medical Association (JAMA)*, *JAMA Pediatrics*, *JAMA Psychiatry*, *The Journal of The American Academy of Child & Adolescent Psychiatry*, *Pediatrics*, *Annals of Internal Medicine, The Journal of Child Psychology and Psychiatry, The Journal of Adolescent Health*, *Academic Psychiatry, Journal of Autism and Developmental Disorders,* and *The American Journal of Public Health*. I have been the lead author for textbook chapters on the mental health of transgender youth, including for *Lewis's Child & Adolescent Psychiatry: A Comprehensive Textbook* and the textbook of The International Academy for Child & Adolescent Psychiatry and Allied Professionals. I am co-editor of the textbook *Pediatric Gender Identity: Gender-Affirming Care for Transgender and Gender Diverse Youth* and a contributing editor for *the Journal of the American Academy of Child & Adolescent Psychiatry*.

8.      I have published extensively on the topic of transgender youth, including eight articles in peer-reviewed journals within the past two years.

9.      In the last four years, I have been retained as an expert and provided testimony in the following cases: *Moe v. Yost*, Franklin County Court of Common Pleas, Ohio, Case No. 24CVH03-2481; *K.C. v. Individual Members of Medical Licensing Board of Indiana, et al.*, No. 1:23-CV-00595 (S.D. Ind. 2023) (deposition); *Poe v. Drummond*, No. 4:23-CV-00277 (N.D. Okla. 2023) (declaration); *Poe et al. v. Labrador et al.*, No. 1:23-CV-269 (D. Idaho 2023) (deposition); *L.W. et al. v. Skrmetti et al.*, No. 3:23-CV-00376 (M.D. Tenn. 2023) (declaration); *Regino v. Staley*, No. 2:23-CV-00032 (E.D. Cal. 2023) (declaration); *PFLAG, Inc. et al. v. Abbott et al.*, Cause No. D-1-GN-22-002569 (459th Judicial District, Travis County, Texas 2022) (evidentiary hearing); *Brandt et al. v. Griffin et al*., No. 4:21-CV-450 (D. Ark. 2021) (deposition and trial testimony); *Hecox et al. v. Little et al.*, No. 1:20-CV-184 (D. Idaho 2020) (declaration).

3

10.     I am being compensated at an hourly rate of $400 per hour for preparation of expert affidavits and reports, and for time spent preparing for or giving deposition or trial testimony. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I provide.

## SUMMARY OF OPINIONS

11.     In this report, I cite relevant literature to support my opinions that: (1) gender-affirming medical interventions improve mental health outcomes for adolescents with gender dysphoria when medically indicated; (2) it is incorrect to deny the existence of gender dysphoria, and there are no evidence-based psychotherapies to treat gender dysphoria; (3) adolescents who experience gender dysphoria at the onset of puberty rarely come to identify with their sex assigned at birth; (4) regret among individuals receiving medical treatment for gender dysphoria is uncommon; and (5) the "Cass Report" does not support banning gender-affirming medical care for adolescent gender dysphoria. Executive Order 14168 and Executive Order 14187 contain numerous misstatements regarding gender identity and gender dysphoria and are incorrect with respect to the scientific and medical evidence regarding the safety and efficacy of gender-affirming medical care for adolescent gender dysphoria.

## GENDER-AFFIRMING MEDICAL INTERVENTIONS IMPROVE MENTAL HEALTH OUTCOMES FOR ADOLESCENTS WITH GENDER DYSPHORIA WHEN MEDICALLY INDICATED

12.     Research shows that gender-affirming medical treatments for adolescent gender dysphoria are consistently linked to reduction in gender dysphoria and overall improved mental health. Denial of such care is expected to lead to adverse mental health outcomes, including, in some instances, worsening suicidality. Of note, under current medical guidelines, comprehensive mental health assessments are completed prior to medical providers initiating gender-affirming medical interventions like pubertal suppression (i.e., gonadotropin-releasing hormone agonists) or

4

gender-affirming hormones (e.g., estrogen or testosterone).[1] Quite contrary to the statement in Executive Order 14187 that medical providers practice care "under the radical and false claim that adults can change a child's sex through a series of irreversible medical interventions," this careful process of evaluating and counseling families includes explaining what such medical interventions do (e.g., change hair patterns, change pitch of one's voice, cause body fat redistribution, among others) and what they do not do (e.g., change one's gametes or reproductive cells).

13.    Executive Order 14187 appears to malign one specific medical organization, the World Professional Association for Transgender Health (WPATH), but it fails to mention that all of the major medical organizations in the United States have highlighted the importance of gender-affirming medical care for adolescents with gender dysphoria and have issued explicit statements opposing bans on this care. These organizations include The American Medical Association, The American College of Physicians, The American Osteopathic Association, The American Academy of Pediatrics, The American Psychiatric Association, The American Academy of Family Physicians, The American Academy of Child & Adolescent Psychiatry, The American College of Obstetricians and Gynecologists, The Endocrine Society, The Pediatric Endocrine Society, among many others.[2]

14.    A substantial body of evidence links gender-affirming medical interventions to improved mental health outcomes for adolescents with gender dysphoria, who, without treatment,

---

[1] Hembree, W. C., Cohen-Kettenis, P. T., Gooren, L., Hannema, S. E., Meyer, W. J., Murad, M. H., ... & T'Sjoen, G. G. (2017). Endocrine treatment of gender-dysphoric/gender-incongruent persons: an endocrine society clinical practice guideline. *The Journal of Clinical Endocrinology & Metabolism*, *102*(11), 3869-3903.

[2] For a list of statements, please see Turban, J. L., Kraschel, K. L., & Cohen, I. G. (2021). Legislation to criminalize gender-affirming medical care for transgender youth. *JAMA*, *325*(22), 2251-2252.

experience higher levels of depression, anxiety, and suicidality. While each of these studies—as with all studies in medicine—has strengths and limitations, and no one study design can answer all questions regarding an intervention, taken together, these studies indicate that gender-affirming medical care improves mental health for adolescents who require such care.

15.    Peer-reviewed cross-sectional and longitudinal studies[3] have found that pubertal suppression is associated with a range of improved mental health outcomes for adolescents with gender dysphoria, including statistically significant improvements in internalizing psychopathology (*i.e.*, anxiety and depression), externalizing psychopathology (*e.g.*, disruptive behaviors), global functioning, and suicidality.[4] For example, in the realm of cross-sectional studies, Turban et al. *Pediatrics* 2020 found that, after controlling for a range of other variables, those who accessed pubertal suppression had lower odds of lifetime suicidal ideation than those

---

[3] A note on methodology: cross-sectional studies examine mental health at a single point in time. For example, van der Miesen et al. 2020 *Journal of Adolescent Health* compared, at a single time point, those who accessed pubertal suppression with those who desired but had not accessed it. van der Miesen, A.I.R., Steensma, T.D., de Vries, A.L.C., *et al.* (2020). Psychological Functioning in Transgender Adolescents Before and After Gender-Affirmative Care Compared with Cisgender General Population Peers. *Journal of Adolescent Health*, 66(6), 699-704. Longitudinal studies examine multiple time points (e.g., looking at levels of suicidality before and after gender-affirming medical care).

[4] See for example, de Vries, A.L., Steensma, T.D., Doreleijers, T.A., & Cohen-Kettenis, P.T. (2011). Puberty suppression in adolescents with gender identity disorder: a prospective follow-up study. *The Journal of Sexual Medicine*, 8(8), 2276-2283; Turban, J.L., King, D., Carswell, J.M., & Keuroghlian, A.S. (2020). Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation. *Pediatrics*, 145(2):e20191725; van der Miesen, A.I.R., Steensma, T.D., de Vries, A.L.C, *et al.* (2020). Psychological Functioning in Transgender Adolescents Before and After Gender-Affirmative Care Compared with Cisgender General Population Peers. *Journal of Adolescent Health*, 66(6), 699-704; and Achille, C., Taggart, T., Eaton, N.R., *et al.* (2020). Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: preliminary results. *International Journal of Pediatric Endocrinology*, 2020(8), 1-5.

who desired but were unable to access this intervention during adolescence.[5] A similar study by van der Miesen et al. in the *Journal of Adolescent Health* compared 272 adolescents who had not yet received pubertal suppression with 178 adolescents who had been treated with pubertal suppression.[6] Those who had received pubertal suppression had statistically significant lower "internalizing psychopathology" scores (a measure of anxiety and depression). Longitudinal studies have yielded similar results.[7] In some instances, longitudinal studies of pubertal suppression have found a non-worsening of mental health, which is considered a good outcome, as without medical intervention, mental health tends to worsen for adolescents with gender dysphoria as puberty progresses in a way that does not align with their gender identity.[8]

16.    Peer-reviewed research studies have likewise found improved mental health outcomes following gender-affirming hormone treatment (*e.g.*, estrogen or testosterone) for individuals with gender dysphoria, including adolescents. These include statistically significant improvements in internalizing psychopathology (*e.g.*, anxiety and depression), general well-being,

---

[5] Turban, J.L., King, D., Carswell, J.M., & Keuroghlian, A.S. (2020). Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation. *Pediatrics*, 145(2):e20191725.

[6] van der Miesen, A.I.R., Steensma, T.D., de Vries, A.L.C., *et al*. (2020). Psychological Functioning in Transgender Adolescents Before and After Gender-Affirmative Care Compared with Cisgender General Population Peers. *Journal of Adolescent Health*, 66(6), 699-704.

[7] See for example, de Vries, A.L., McGuire, J.K., Steensma, T.D., *et al*. (2014). Young adult psychological outcome after puberty suppression and gender reassignment. *Pediatrics*, 134(4), 696-704; and Costa, R., Dunsford, M., Skagerberg, E., Holt, V., *et al.* (2015). Psychological Support, Puberty Suppression, and Psychosocial Functioning in Adolescents with Gender Dysphoria. *Journal of Sexual Medicine*, 12(11), 2206-2214.

[8] Carmichael, P., Butler, G., Masic, U., Cole, T. J., De Stavola, B. L., Davidson, S., ... & Viner, R. M. (2021). Short-term outcomes of pubertal suppression in a selected cohort of 12 to 15 year old young people with persistent gender dysphoria in the UK. *PloS One*, *16*(2), e0243894

7

JA651

and suicidality.[9] For example, Chen et al. followed a cohort of 315 transgender youth receiving gender-affirming hormone treatment and found improvements in anxiety, depression, and life satisfaction.[10] In that study, which was published in the prestigious *New England Journal of Medicine*, parallel-process models were used to show that appearance congruence tracked along with improvements in mental health, indicating that physical changes from gender-affirming hormone treatment were the cause of improved mental health. Similarly, Allen et al. followed a cohort of 47 adolescents with gender dysphoria, and found statistically significant improvements in general well-being and suicidality, as measured by the National Institutes of Health "Ask Suicide Screening Questions" instrument.[11] Cross-sectional studies comparing those who accessed gender-affirming hormones during adolescence to those who did not access these interventions have similarly linked access to gender-affirming hormone treatment during adolescence to lower odds of suicidality.[12]

---

[9] See for example, Chen, D., Berona, J., Chan, Y.M., *et al.* (2023). Psychosocial Functioning in Transgender Youth after 2 Years of Hormones. *New England Journal of Medicine*, 388(3), 240-250; Allen, L.R., Watson, L.B., Egan, A.M., & Moser, C.N. (2019). Well-being and suicidality among transgender youth after gender-affirming hormones. *Clinical Practice in Pediatric Psychology*, 7(3), 302-311; Achille, C., Taggart, T., Eaton, N.R., *et al.* (2020). Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: preliminary results. *International Journal of Pediatric Endocrinology*, 2020(8), 1-5; and López de Lara, D., Pérez Rodríguez, O., Cuellar Flores, I., *et al.* (2020). Psychosocial Assessment in Transgender Adolescents. *Anales de Pediatría (English Edition)*, 93(1), 41-48.

[10] Chen, D., Berona, J., Chan, Y.M., *et al.* (2023). Psychosocial Functioning in Transgender Youth after 2 Years of Hormones. *New England Journal of Medicine*, 388(3), 240-250.

[11] Allen, L.R., Watson, L.B., Egan, A.M., & Moser, C.N. (2019). Well-being and suicidality among transgender youth after gender-affirming hormones. *Clinical Practice in Pediatric Psychology*, 7(3), 302-311.

[12] See for example, Turban, J.L., King, D., Kobe, J., *et al.* (2022). Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. *PLoS One*, 17(1):e0261039; and Green, A.E., DeChants, J.P., Price, M.N., *et al.* (2022). Association of

8

17.    The studies supporting the efficacy and effectiveness of gender-affirming medical care have had substantially long follow-up periods, particularly when compared to other commonly used medications in pediatrics. For example, one study by deVries et al. in the journal *Pediatrics* examined mental health outcomes a mean 5.9 years after starting pubertal suppression.[13] Turban et al. 2022 *PLoS One*, which found associations between access to gender-affirming hormone treatment during adolescence and better mental health outcomes, similarly examined mental health outcomes a mean six to seven years after starting gender-affirming hormones.[14] To put this into context, a major study used by the FDA to approve the medication lurasidone for bipolar depression in children and adolescents followed study participants for six weeks.[15] If the government were to ban all medications that lack at least a decade of long-term follow up studies, that would require banning a substantial proportion of FDA-approved and relied-upon medications.

18.    Overall, as summarized above, existing peer-reviewed published research studies consistently link gender-affirming medical interventions to improved mental health for individuals with gender dysphoria, including adolescents.

---

Gender-Affirming Hormone Therapy with Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth. *Journal of Adolescent Health*, 70(4), 643-649.

[13] de Vries, A.L., McGuire, J.K., Steensma, T.D., *et al.* (2014). Young adult psychological outcome after puberty suppression and gender reassignment. *Pediatrics*, 134(4), 696-704.

[14] Turban J.L., King D., Kobe J., *et al.* (2022). Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. *PLoS One*. 17(1):e0261039.

[15] DelBello, M.P., Goldman, R., Phillips, D., *et al.* (2017). Efficacy and Safety of Lurasidone in Children and Adolescents with Bipolar I Depression: A Double-Blind, Placebo-Controlled Study. *Journal of the American Academy of Child & Adolescent Psychiatry*, 56(12), 1015-1025.

9

## IT IS INCORRECT TO DENY THE EXISTENCE OF GENDER DYSPHORIA, AND THERE ARE NO EVIDENCE-BASED PSYCHOTHERAPIES TO TREAT GENDER DYSPHORIA

19.    There are no evidence-based interventions, other than gender-affirming medical care, that treat adolescent gender dysphoria. There are no evidence-based psychotherapy protocols that have been shown to effectively treat gender dysphoria. In other words, though the executive order quibbles with the strength of the studies that demonstrate the efficacy of gender-affirming medical interventions, there are *no studies of any kind* indicating improved health outcomes from psychotherapy alone to treat gender dysphoria.[16] Under the executive orders, medical and mental health providers would be left with no evidence-based treatment approaches to support their adolescent patients' gender dysphoria. This would be a devastating situation for adolescents and their parents, physicians, and other mental health providers who care for them.

20.    Executive Order 14187 states without elaboration that provision of gender-affirming medical care is based on "junk science" and instructs the Secretary of HHS "use all available methods to increase the quality of data to guide practices for improving the health of minors" with gender dysphoria. However, the executive order makes the collection of such data impossible by directing HHS to terminate all education and research grants regarding the treatment of gender dysphoria.

21.    Though Executive Order 14168 seems to imply that transgender people (i.e., people whose gender identity does not align with their sex at birth) do not exist, the Williams Institute at the University of California, Los Angeles has estimated that there are over 1.6 million transgender

---

[16] Of note, some adolescents with gender dysphoria may also have other co-occurring conditions that should be treated with psychotherapy (*e.g.,* obsessive compulsive disorder should be treated with exposure and response prevention therapy), but these treatments for co-occurring conditions should not be confused with treating gender dysphoria itself.

people in the United States.[17] It is concerning that the Executive Orders also seem to gloss over the established diagnosis of gender dysphoria, the criteria for which are outlined in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders.[18] It also uses the phrase "rapid onset gender dysphoria." The paper that coined the phrase "rapid onset gender dysphoria" was later corrected to emphasize that it is a hypothesis, not a recognized mental health diagnosis.[19]

22. Executive Order 14187 directs the Secretary of Health and Human Services to take action against the World Health Organization's Eleventh Revision of the International Classification of Diseases and the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition based on these medical bodies' recognition of gender dysphoria, gender incongruence, and the existing protocols for treatment of these conditions. It is concerning as a physician to see the government attempt to take control of or act against the medical profession's manuals for diagnoses in what appears to be an attempt to censor specific medical conditions from existence.

23. In the past, some clinicians have described psychotherapeutic strategies that aimed to result in youth with gender dysphoria identifying with their sex assigned at birth, hoping such

---

[17] Herman, J. L., Flores, A. R., & O'Neill, K. K. (2022). How many adults and youth identify as transgender in the United States? Available at: https://williamsinstitute.law.ucla.edu/publications/trans-adults-united-states/. Accessed: February 4, 2025.

[18] American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders: Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision. Arlington, VA: American Psychiatric Association, 2022.

[19] Littman, L. (2019). Correction: Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. *PloS One*, *14*(3), e0214157.

approaches would alleviate gender dysphoria.[20] Such practices, termed "gender identity conversion efforts," have subsequently been linked to adverse mental health outcomes, including suicide attempts.[21] In addition to being harmful, there is no peer-reviewed research to suggest that these gender identity conversion efforts are successful in changing a person from transgender to cisgender. Gender identity conversion efforts have been labelled unethical by major medical organizations including The American Medical Association[22] and The American Academy of Child & Adolescent Psychiatry.[23] The United Nations has called for an end to the practice worldwide.[24]

### ADOLESCENTS WHO EXPERIENCE GENDER DYSPHORIA AT THE ONSET OF PUBERTY RARELY COME TO IDENTIFY WITH THEIR ASSIGNED SEX AT BIRTH

24.    Though the terms "children" and "adolescents" are sometimes used synonymously in common parlance, these terms have specific and distinct meanings in the context of child and adolescent psychiatric research.  In this field, "child" and "children" refer to minors who have not yet reached the earliest stages of puberty (*i.e.,* Tanner Stage 2).  The terms "adolescent" and

---

[20] Meyer-Bahlburg, H.F. (2002). Gender Identity Disorder in Young Boys: A Parent-and Peer-Based Treatment Protocol. *Clinical Child Psychology and Psychiatry*, 7(3), 360-376.

[21] Turban, J.L., Beckwith, N., Reisner, S.L., & Keuroghlian, A.S. (2020). Association Between Recalled Exposure to Gender Identity Conversion Efforts and Psychological Distress and Suicide Attempts Among Transgender Adults. *JAMA Psychiatry*, 77(1), 68-76.

[22] American Medical Association (2018). Health Care Needs of Lesbian, Gay, Bisexual and Transgender and Queer Populations. H-160.991. *Available at* https://policysearch.ama-assn.org/policyfinder/detail/gender%20identity?uri=%2FAMADoc%2FHOD.xml-0-805.xml. Accessed: February 17, 2025.

[23] American Academy of Child & Adolescent Psychiatry (2018). Conversion Therapy. *Available at* https://www.aacap.org/AACAP/Policy_Statements/2018/Conversion_Therapy.aspx. Accessed: February 17, 2025.

[24] United Nations (2020). Practices of so-called "conversion therapy." *Available at* https://digitallibrary.un.org/record/3870697?ln=en&v=pdf. Accessed: February 17, 2025.

12

"adolescents" refer to minors who have begun puberty. Studies of prepubertal children (who are not candidates for gender-affirming medical interventions under any existing clinical guidelines) cannot be conflated with studies of adolescents (who, depending on several factors, may be candidates for various forms of gender-affirming medical interventions).

25.     This distinction is vital in the realm of "desistence" studies (*i.e.*, studies that aim to assess how many young people who identify as transgender will later identify as cisgender). Any suggestion that a majority of transgender minors will come to identify with their assigned sex at birth is not accurate. To the extent such a claim is put forth in defense of Executive Order 14187, it likely inappropriately relies on studies of gender diverse *prepubertal* children, which have, in the past, shown that many of these children will not grow up to be transgender. These studies do not apply to transgender minors who have reached puberty (*i.e.*, "adolescents"). Once a transgender youth begins puberty, it is rare for them to later identify as cisgender.[25] Furthermore, physicians and families must weigh the low risk of a future cisgender identification against the often-substantial risk of deteriorating mental health due to active gender dysphoria. Under existing medical guidelines,[26] any minor who is considering gender-affirming medical or surgical interventions must first work with a mental health professional to conduct a complete

---

[25] See for example de Vries, A.L., McGuire, J.K., Steensma, T.D., *et al*. (2014). Young adult psychological outcome after puberty suppression and gender reassignment. *Pediatrics*, 134(4), 696-704; and Turban, J.L., de Vries, A.L.C., & Zucker, K. (2018). Gender Dysphoria and Gender Incongruence. In Martin A., Bloch M.H., & Volkmar F.R. (Editors): *Lewis's Child and Adolescent Psychiatry: A Comprehensive Textbook, Fifth Edition*. Philadelphia: Wolters Kluwer. This textbook chapter provides comments from the directors of two of the oldest and most established gender clinics in the world.

[26] Hembree, W.C., Cohen-Kettenis, P.T., Gooren, L., *et al*. (2017). Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline. *The Journal of Clinical Endocrinology & Metabolism*, 102(11), 3869-3903.

13

biopsychosocial evaluation, which includes ensuring that an adolescent and their parents understand the complexity of this decision. Such evaluations are designed to minimize regret rates.

26.    Any study regarding prepubertal children and their likelihood of ultimately identifying as transgender should not be used to assess the interventions targeted by the medical care ban, namely, pubertal suppression, hormone therapy, and gender-affirming surgery, since none of these interventions are provided to prepubertal patients with gender dysphoria under current medical guidelines.[27]

27.    Further, the utility of "desistence" studies even for assessing the likelihood that prepubertal children will persist in a transgender identity has been questioned due to their reliance on an outdated diagnosis of "gender identity disorder in children," which did not require a child to identify as a sex different than their sex assigned at birth. This outdated diagnosis therefore likely captured many cisgender "tomboys" or cisgender boys with feminine interests like dresses or dolls, who never identified as transgender and, thus, unsurprisingly did not identify as transgender when followed up with later in life. In contrast, the diagnosis of "gender dysphoria in children" requires one to not merely have gender atypical interests and behaviors; one must identify as a gender different than one's sex assigned at birth. This is a vital distinction. While the diagnostic category of "gender identity disorder" would capture many cisgender children, the diagnostic category of "gender dysphoria," by definition, does not. [28] Of note, a recent study by Princeton professor Dr.

---

[27] *Id.*

[28] The desistance studies have also been criticized for a range of other methodological limitations. Olson, K.R. (2016). Prepubescent Transgender Children: What We Do and Do Not Know. *Journal of the American Academy of Child & Adolescent Psychiatry*, 55(3), 155-156.

14

Kristina Olson et al. found that the vast majority of prepubertal transgender children continued to identify as transgender over a five-year follow-up period.[29]

## REGRET AMONG INDIVIDUALS RECEIVING MEDICAL TREATMENT FOR GENDER DYSPHORIA IS UNCOMMON

28.    Executive Order 14187 states that "[c]ountless children soon regret" receiving gender-affirming medical care. To the contrary, studies indicate that regret among adolescents receiving treatment under existing guidelines is rare.

29.    De-transition and transition regret are distinct concepts, and transition regret is uncommon. Given that de-transition has heterogeneous definitions, I caution against interpreting papers that use the term without clarifying how the phrase is being used.

30.    The term "de-transition" is used inconsistently in literature and may sometimes refer to simply the stopping of medical interventions. But discontinuation of gender-affirming medical interventions does not always coincide with a change in understanding of one's gender identity or with transition-related regret. Rather, transgender adolescent patients who discontinue gender-affirming medical interventions may do so because of external factors (*e.g.*, pressure from family, societal rejection, harassment by peers). For example, a substantial number of currently identified transgender people (13.1%) have "de-transitioned" at some point in their life, with the majority (82.5%) citing external factors like family rejection, societal stigma, or harassment.[30]

---

[29] Olson, K. R., Durwood, L., Horton, R., *et al.* (2022). Gender Identity 5 Years After Social Transition. *Pediatrics*, 150(2):e2021056082. Additionally, while one may ask if a social transition increases likelihood of "persistence," another study from this group (Rae et al. *Psychological Sciences*) found that social transition does not increase gender incongruence. Rae JR, Gülgöz S, Durwood L, *et al.* (2019). Predicting Early-Childhood Gender Transitions. *Psychological Sciences* 30(5), 669-681.

[30] Turban, J. L., Loo, S. S., Almazan, A. N., & Keuroghlian, A. S. (2021). Factors Leading to "Detransition" Among Transgender and Gender Diverse People in the United States: A Mixed-Methods Analysis. *LGBT Health,* 8(4), 273-280.

Given that these people *currently* identify as transgender, it highlights that many people who "de-transition" ultimately transition again in the future. Other transgender patients discontinue treatment because they are satisfied with the results they have attained and do not feel the need for additional treatment.

31.    Studies focused specifically on *regret*, as opposed to the broad heterogeneous category of "de-transition," indicate that regret is uncommon. A recent study by Princeton's Dr. Kristina Olson, examined the experiences of 220 youth who had accessed pubertal suppression and/or gender-affirming hormones during adolescence.[31] At a mean of 4.86 years after beginning pubertal suppression and a mean 3.4 years after starting gender-affirming hormones, participants reported very high levels of satisfaction and very low levels of regret. Of the 220 participants, 9 (4%) expressed any kind of regret, and only 4 (1.8%)[32] stopped treatment.

32.    In 2018, Amsterdam's VUMC Center of Expertise on Gender Dysphoria published the rates of regret among their cohort of 6,793 transgender patients who had undergone gender-affirming medical and/or surgical interventions.[33] Among transgender women with gender dysphoria who underwent gender-affirming surgery, 0.6% experienced regret. Among transgender men with gender dysphoria who underwent gender-affirming surgery, 0.3% experienced regret. Several of those who experienced regret were classified as having "social regret" rather than "true

---

[31] Olson, K. R., Raber, G. F., & Gallagher, N. M. (2024). Levels of Satisfaction and Regret With Gender-Affirming Medical Care in Adolescence. *JAMA Pediatrics*, *178*(12), 1354-1361.

[32] One participant was on pubertal suppression but planned not to continue with care, which would change this percentage to 2.3%.

[33] Wiepjes, C.M., Nota, N.M., de Blok, C.J., *et al.* (2018). The Amsterdam Cohort of Gender Dysphoria Study (1972–2015): Trends in Prevalence, Treatment, and Regrets. *The Journal of Sexual Medicine*, 15(4), 582-590.

16

regret," defined in the study as still identifying as transgender but deciding to reverse their gender-affirming surgery due to factors like "the loss of relatives [being] a large sacrifice." The study also reported that only 1.9% of adolescents who started pubertal suppression did not choose to go onto gender-affirming hormones. In a second study of 143 transgender adolescents who started pubertal suppression, five adolescents (3.5%) decided not to proceed with further gender-affirming medical treatments.[34] One of these adolescents noted that pubertal suppression helped them to better understand their gender identity, and they ultimately identified with their sex assigned at birth. One birth-assigned female had ongoing chest dysphoria but chose to live with a female gender expression regardless, though was dreading further breast development and menstruation. One stopped due to unspecified "psychosocial reasons" but continued to identify as transgender. One identified as gender non-binary and felt they no longer needed treatment. One came to identify with his sex assigned at birth. There was no indication that any of these adolescents *regretted* pubertal suppression; rather, this study shows that the treatment served its goal of allowing adolescents more time to better understand their gender identity before being assessed for additional treatment.

33.    Though there have been scattered and sometimes difficult-to-confirm social media reports of people regretting gender-affirming medical care (as with any form of medical treatment), this must be considered in the context of the 1.6 million transgender people in the United States alone.[35] The largest study to date that aimed to identify people who specifically started then

---

[34] Brik, T., Vrouenraets, L.J.J.J., de Vries, M.C., *et al.* (2020). Trajectories of Adolescents Treated with Gonadotropin-Releasing Hormone Analogues for Gender Dysphoria. *Archives of Sexual Behavior*, 49(7), 2611-2618.

[35] Herman, J. L., Flores, A. R., & O'Neill, K. K. (2022). How many adults and youth identify as transgender in the United States? Available at:

stopped gender-affirming medical interventions identified 100 individuals from around the world.[36] 34% of participants were from outside the United States. In this study, the average age of having started any gender-affirming medical intervention was 21.9 years, suggesting that these individuals were primarily cared for in the adult model of care, not the pediatric model of care, the latter of which requires a comprehensive biopsychosocial mental health assessment designed to minimize regret rates. Among these participants who had discontinued gender-affirming hormones, 34% reported that transition was "a necessary part of their journey" (*i.e.*, important for coming to better understand themselves and their gender identity) and 67.7% reported they were helped in some way by gender-affirming medical care. While it is important to ensure that people are adequately supported in the rare instances of stopping gender-affirming medical interventions,[37] it is essential to contextualize this small number of cases among the 1.4 million transgender people in the U.S. alone, as well as the complexities of their experiences, which do not universally indicate regret.

34.    All treatments in medicine carry risks, benefits, and side effects. It is essential that parents, adolescents, and their doctors be able to work together to weigh these factors and choose a path forward that is *most likely* to improve a young person's health, including their mental health. If the government were to ban all medical treatments with potential adverse side effects or the

https://williamsinstitute.law.ucla.edu/publications/trans-adults-united-states/. Accessed: February 4, 2025.

[36] Littman, L. (2021). Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners. *Archives of Sexual Behavior*, 50(8), 3353-3369.

[37] Turban, J.L., Brady, C., & Olson-Kennedy, J. (2022). Understanding and Supporting Patients With Dynamic Desires for Gender-Affirming Medical Interventions. *JAMA Network Open*, 5(7): e2224722.

possibility of regret, it would ban essentially all of medicine. As one example, the vast majority of people who take the antibiotic penicillin find that their infections resolve; however, a small number of people will experience Stevens-Johnson syndrome (SJS) or toxic epidermal necrolysis (TEN) from the medication—rare and potentially fatal conditions in which the person's skin detaches.[38] Morality rates from SJS/TEN are as high as 50%. The cholesterol-lowering medication atorvastatin (known to many under the brand name Lipitor) is one of the most commonly prescribed medications in the U.S., given its potential to lower cholesterol and subsequently reduce the risk of a heart attack. However, a small number of people will experience rhabdomyolysis as a side effect—a potentially fatal form of muscle breakdown that can cause kidney damage. Though both these medications carry a serious risk of adverse side effects, they help the vast majority of people, and thus should not be—and are not—banned. The responsibility of the clinician is to inform patients about these risks, benefits, and potential side effects, and work with patients and families to identify the best course of action.

35.     As with all medical interventions, gender-affirming medical interventions cannot claim a 100% success rate. However, for the vast majority of adolescents, these interventions improve mental health. Accordingly, it is dangerous to take the only evidence-based treatment option away from families and physicians as they work together to examine existing evidence and their individual case to determine what pathway is most likely to result in favorable mental health outcomes for an adolescent.

---

[38] Lee, E.Y., Knox, C., & Phillips, E.J. (2023). Worldwide Prevalence of Antibiotic-Associated Stevens-Johnson Syndrome and Toxic Epidermal Necrolysis: A Systematic Review and Meta-analysis. *JAMA Dermatology*, 159(4), 384-392.

19

### THE "CASS REPORT" DOES NOT SUPPORT BANNING GENDER-AFFIRMING MEDICAL CARE FOR ADOLESCENTS WITH GENDER DYSPHORIA

36.     The "Cass Report" from the United Kingdom's National Health Service does not support banning gender-affirming medical treatments for adolescent gender dysphoria. While the Cass Report has been heavily critiqued for methodological failings,[39] it also does not recommend banning gender-affirming medical treatments for adolescents. Similar to The Endocrine Society Guidelines,[40] the Cass Report highlights that there are clinical scenarios in which these medications should be made available to pediatric patients.

37.     The Cass Report has much in common with the Endocrine Society Guidelines,[41] as well as with the WPATH Standards of Care.[42] Most critically, all three agree that some adolescents with gender dysphoria will benefit from gender-affirming medical care, while some transgender adolescents are not appropriate candidates. The Cass Report, in describing how gender-related care should be provided in the United Kingdom, notes that those providing care must have the skills "to support both individuals for whom medical intervention is clinically indicated and those for

---

[39] See, for example, McNamara, M., Baker, K., Connelly, K., Janssen, A., Olson-Kennedy, J., Pang, K. C., Scheim, A., Turban, J., & Alstott, A. (2024). An evidence-based critique of "The Cass Review" on gender-affirming care for adolescent gender dysphoria. Available at: https://law.yale.edu/sites/default/files/documents/integrity-project_cass-response.pdf. Accessed: February 10, 2025.

[40] Hembree, W. C., Cohen-Kettenis, P. T., Gooren, L., Hannema, S. E., Meyer, W. J., Murad, M. H., ... & T'Sjoen, G. G. (2017). Endocrine treatment of gender-dysphoric/gender-incongruent persons: an endocrine society clinical practice guideline. *The Journal of Clinical Endocrinology & Metabolism*, *102*(11), 3869-3903.

[41] *Id.*

[42] Coleman, E., Radix, A. E., Bouman, W. P., Brown, G. R., De Vries, A. L., Deutsch, M. B., ... & Arcelus, J. (2022). Standards of care for the health of transgender and gender diverse people, version 8. *International Journal of Transgender Health*, *23*(sup1), S1-S259.

whom it is not."[43]   In an interview with *The New York Times* discussing the report, Dr. Cass emphasized, "there are young people who absolutely benefit from a medical pathway, and we need to make sure those young people have access—under a research protocol, because we need to improve the research—but not assume that's the right pathway for everyone."[44] The WPATH Standards of Care similarly state, "For some youth, obtaining gender-affirming medical treatment is important while for others these steps may not be necessary."[45] This agreement that gender-affirming medical interventions are appropriate for some adolescents is out of step with Executive Order 14187.

38.     The Cass Report, the Endocrine Society Guidelines, and the WPATH Standards of Care also all agree that a comprehensive mental health evaluation should be conducted prior to initiating gender-affirming medical interventions for adolescent gender dysphoria.[46]

39.     Additionally, all three agree that co-occurring mental health conditions should be treated when caring for an adolescent with gender dysphoria. For example, the WPATH Standards of Care state that gender-affirming medical interventions for adolescents should only be considered when, "the adolescent's mental health concerns (if any) that may interfere with

---

[43] The Cass Review, *Independent review of gender identity services for children and young people: Final Report. Available at: https://cass.independent-review.uk/home/publications/final-report/. Accessed: June 3, 2024.*

[44]   *New York Times* interview with Dr. Hilary Cass. Available at: https://www.nytimes.com/2024/05/13/health/hilary-cass-transgender-youth-puberty-blockers.html. Accessed: May 27, 2024.

[45] Coleman, E., Radix, A. E., Bouman, W. P., Brown, G. R., De Vries, A. L., Deutsch, M. B., ... & Arcelus, J. (2022). Standards of care for the health of transgender and gender diverse people, version 8. *International Journal of Transgender Health*, *23*(sup1), S51.

[46]  See Coleman et al 2022 at S1-S259; Hembree et al 2017 at 3870.

21

diagnostic clarity, capacity to consent, and gender-affirming medical treatments have been addressed."[47]

## CONCLUSION

40.     In summary, gender-affirming medical care for adolescent gender dysphoria, when medically indicated, is supported by a substantial body of peer-reviewed scientific evidence that has been collected over more than a decade. Though these treatments, like all medical treatments, carry potential risks and side effects, these potential risks must be weighed against the benefits of treatment and the risks of not providing treatment. There is nothing anomalous about the risks and side effects of treatment for gender dysphoria that would warrant singling out this care for prohibition. It is essential that physicians be able to work with adolescents and their families to weigh potential benefits against potential risks and side effects and provide the care that is appropriate for a given adolescent and their family. Banning these medical interventions would leave physicians without any evidence-based treatments for adolescent gender dysphoria, which, when left untreated, has been linked to dramatic adverse mental health outcomes, including suicidality. For these reasons, all relevant major medical organizations (The American Medical Association, The American Academy of Pediatrics, The American Psychiatric Association, The American Academy of Child & Adolescent Psychiatry, The Endocrine Society, and The Pediatric Endocrine Society, to name a few) oppose bans on gender-affirming medical care for adolescents with gender dysphoria.

---

[47] *Id.* at S1-S259.

22

Dated: February 17, 2025

_Jack L. Turban_

_____

**JACK L. TURBAN, MD, MHS**

# Exhibit A

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
jack.turban@ucsf.edu

## ACADEMIC APPOINTMENTS

**University of California, San Francsisco School of Medicine** San Francisco, CA.          September 2022-Present
*Assistant Professor of Child & Adolescent Psychiatry and Affiliate Faculty in the Philip R. Lee Institute for Health Policy Studies*. Responsibilities include serving as director of the gender psychiatry program, and as an attending psychiatrist in the adult gender and sexual minority clinic, and in the eating disorders clinic, as well as research focusing on the determinants of mental health among transgender and gender diverse youth and the teaching of medical students, residents, and fellows.

## EDUCATION & TRAINING

**Stanford University School of Medicine** Palo Alto, CA          July 2020-June 2022
*Fellow in Child & Adolescent Psychiatry*. Fellow in child and adolescent psychiatry. Research focused on pediatric gender identity and LGBTQ mental health. Served as administrative chief fellow 2021-2022.

**Massachusetts General Hospital & McLean Hospital** Boston, MA          July 2017 – May 2020
*Integrated Adult, Child, & Adolescent Psychiatry Resident*. Resident physician in the integrated adult, child, and adolescent psychiatry program. Research focused on pediatric gender identity and LGBT mental health.

**Yale School of Medicine** New Haven, CT.          August 2012- May 2017
*Doctor of Medicine & Master of Health Science with honors*. Clinical rotations included inpatient pediatrics, inpatient child psychiatry, inpatient adolescent psychiatry, residential adolescent psychiatry, psychiatric consult liaison service, clinical neuromodulation, neurology clinics, and neurosurgery. Completed award-winning masters' thesis as a Howard Hughes Medical Institute (HHMI) medical research fellow on evolving treatment paradigms for transgender youth. Clerkship Grades: All Honors
USMLE: Step 1 (252), Step 2 (256)

**Harvard University** Cambridge, MA          September 2007- May 2011
*B.A. Neurobiology magna cum laude with a secondary in the Dramatic Arts*. Coursework included clinical neuroscience, systems neurobiology, visual neuroscience, positive psychology, neurobiology of behavior, CNS regenerative techniques, neuroanatomy, vertebrate surgery, and extensive coursework in dramatic theory and practice. International study included Spanish language (Alicante, Spain), stem cell biology (Shanghai, China), and studying how visual art may be used as a window into the mechanisms of neural processing (Trento, Italy). Honors thesis completed at The Massachusetts Eye & Ear Infirmary studying inner-ear development and regeneration. GPA: 3.8/4.0

## RESEARCH EXPERIENCE

**UCSF Gender Psychiatry Program** San Francisco, CA          2022-Present
*Principal Investigator*. Directs a research group focused on the determinants of mental health among transgender and gender diverse youth, with a focus on questions relevant to public policy.

**Jack Lewis Turban III MD MHS**

401 Parnassus Ave
San Francisco, CA 94143
jack.turban@ucsf.edu

**The Fenway Institute** Boston, MA
2017-2023
*Post-doctoral Research Fellow.* Utilized data from the National Transgender Discrimination Survey to determine the adult mental health correlates of recalled childhood experiences including exposure to conversion therapy and access to gender-affirming hormonal interventions. PIs: Timothy Wilens, Alex Keuroghlian, & Sari Reisner

**Stanford Division of Child & Adolescent Psychiatry** Palo Alto, CA
2020-2022
*Post-doctoral Resaerch Fellow.* Established the Stanford Evaluation of Gender Affirmation (SEGA) study, which examines the impact of gender-affirming medical and surgical interventions on the mental health of transgender and gender diverse youth. Mentors: Dr. David Hong & Dr. Tandy Aye

**McLean Institute for Technology in Psychiatry** Belmont, MA.
2017-2020
*Post-doctoral Research Fellow.* Conducted cross-sectional studies that examine the associations between geosocial "hook-up apps," internalizing psychopathology, and compulsive sexual behavior. Utilizing the TestMyBrain platform. PI: Laura Germine

**Yale Program for Research on Impulsivity & Impulse Control Disorders** New Haven, CT
2016-2019
*Pre-doctoral Research Fellow.* Conducted a studies of US military veterans who had recently returned from deployment, studying rates and comorbidities of those veterans who exhibit compulsive sexual behavior facilitated by social media. PI: Marc Potenza MD/PhD

**Yale Child Study Center** New Haven, CT 2015-2017
*Pre-doctoral Research Fellow.* Conducted a study to evaluate pediatric attending and medical student knowledge regarding transgender pediatric patient care. Additionally studied participants' personal ethical views regarding pubertal blockade and cross-sex hormone therapy for adolescent patients. PI: Timothy VanDeusen MD

**Yale Department of Dermatology** New Haven, CT 2015-2016
*HHMI Medical Research Fellow.* Studied the potential molecular mediators of Langerhans Cell-mediated UVB-induced epidermal carcinogenesis. Techniques included transgenic mouse models of chronic UV exposure, epidermal sheet preparations, immunohistochemistry, confocal microscopy, flow cytometry, Bioplex analysis, quantitative PCR and tissue culture. PI: Michael Girardi MD

**Yale Department Laboratory Medicine** New Haven, CT 2012-2014
*Pre-doctoral Research Fellow.* Employed mass spectrometry to compare metabolite profiles of recurrent tumor versus radiation-induced necrosis following Gamma Knife Radiosurgery for brain metastases, working to identify novel biomarkers for non-invasive imaging techniques. PI: Tore Eid MD/PhD

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
jack.turban@ucsf.edu

**Yale Department of Neurosurgery** New Haven, CT
2012-2012
*Pre-doctoral Research Fellow*. Developed a database of patients who received gamma knife radiosurgery or whole brain radiation for the treatment of brain metastases. This database is designed to evaluate the relative risks of radiation-induced necrosis following these two treatment modalities.  PI: Veronica Chiang MD

**Eaton-Peabody Laboratory** Cambridge, MA                                          2009-2011
*Undergraduate Rearch Fellow*. Worked at the Massachusetts Eye and Ear Infirmary laboratory, studying stem cells of the inner ear and working toward cochlear hair cell regeneration. PI: Albert Edge PhD

**Novartis Pharmaceuticals** Shanghai, China                                          2009-2009
*Intern*. Worked as a biological research intern, studying the role of Math-1 in inner-ear development and regeneration.

## LEADERSHIP

**UCSF Child & Adolescent Psychiatry Grand Rounds Committee** San Francisco, CA.
2023-Present
*Member*. Works with with committee to select and work with grand rounds speakers for the weekly child and adolescent psychiatry grand rounds series.

**UCSF Department of Psychiatry Advancements & Promotions Committee** San Francisco, CA.
2023-Present
*Member*. Reviews faculty packets for advancements and promotions.

**UCSF Child & Adolescent Psychaitry Fellowship Selection Committee** San Francisco, CA
2022-Present
*Member*. Conducts interviews for applications to the UCSF child and adolescent psychiatry fellowship training program, sits on selection committee, works on recruitment efforts.

**The Upswing Fund**
2020-2023
*Scientific Advisory Board*. Member of the scientific advisory board of a $15M charitable fund to support adolescent minority mental health during the COVID19 pandemic. Funded by Melinda Gates's Panorama Global.

**Stanford Medicine Diversity Cabinet LGBTQ+ / Sexual and Gender Minority Subcommittee**
2021-2022
*Member*. Working to improve Stanford School of Medicine in all aspects relevant to sexual and gender minorities including curriculum, clinical care, and employee support.

**Stanford Pediatric Gender Journal Club**                                          2021-2022
*Founder*. Organizing a monthly journal club focusing on the latest research relevant to the care of transgender and gender diverse youth.

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
jack.turban@ucsf.edu

**MGH Psychiatry Gender Lab Meetings** Boston, MA
2019-2020
*Founder*. Established monthly lab meetings for those in the MGH psychiatry department to discuss ongoing research regarding transgender mental health.

**Yale School of Medicine Cultural Competence Committee** New Haven, CT
2012-2017
*Chair*. Worked with individual course directors to develop course material on cultural competence. Authored case studies on handling pediatric patient sexuality (Professional Responsibility Course), authored a pre-clinical lecture on LGBT healthcare (Ob/Gyn Module), and lectured on transgender pediatric patient care (Pediatrics Clinical Clerkship).

**Dean's Advisory Committee on LGBTQ Affairs (Yale School of Medicine)** New Haven, CT
2016-2017
*Member*. Served on the advisory committee to the Dean of Yale School of Medicine, advising on issues related to LGBTQ affairs.

**Yale HIV Dermatology Roundtable** New Haven, CT
2014-2017
*Founder*. Eighty percent of patients suffering from HIV face a dermatologic manifestation of their disease. Struck by these patients' experience of stigma, I organized a bi-monthly interdisciplinary roundtable to improve research, education, and clinical care in HIV dermatology. Interventions have included primary care provider training on the treatment of genital warts and improved referral systems for cutaneous malignancies.

**Yale Gay & Lesbian Medical Association** New Haven, CT
2013-2017
*President*. Led a group of medical students focused on supporting careers in medicine for LGBT individuals. Organized mixers with LGBT organizations from other graduate schools and with LGBT faculty. Coordinated trips to GLMA national conferences. Worked with the medical school administration to create an LGBT faculty advisor position.

**VOLUNTEER WORK & ADVOCACY**

**American Academy of Child & Adolescent Psychiatry "Break the Cycle"**
2017-2017
*Event Coordinator*. Worked with Dr. Andres Martin to coordinate a fundraising indoor cycling event for the AACAP *Break The Cycle* fundraising campaign to fight children's mental illness.

**Yale Hunger & Homelessness Auction** New Haven, CT                                    2012-2014
*Logistics Co-Chair*. Organized a group of ten students to coordinate entertainment, donations, and event logistics for the Yale annual charity auction. All proceeds for the auction go to support local charities.

**Yale School of Medicine Admissions Committee** New Haven, CT
2015-2017
*Interviewer*. Served as a full voting member of the admissions committee. Responsibilities include student

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
jack.turban@ucsf.edu

interviewing, recruitment, and organizing LGBT-focused activities for admitted students.

**Harvard College Admissions** New Haven, CT
2012-2020
*Interviewer*. Interviewing students from the Boston area for admission to Harvard College.

## SELECTED PEER REVIEWED PUBLICATIONS: ORIGINAL RESEARCH

Lerario M.P., Fusunyan M. Stave C.D., Roldan V., Keuroghlian A.S., **Turban J.L.**, Perez D.L., Maschi T., Rosendale N. (2023) Functional neurological disorder and functional somatic syndromes among sexual and gender minority people: a scoping review. *Journal of Psychosomatic Research*. 174: 111491.

**Turban J.L.**, Dolotina B., Freitag T.M., King D., Keuroghlian A.S. Age of realization of transgender identity and mental health outcomes among transgender and gender diverse adults: examining the "rapid onset gender dysphoria" hypothesis. *Journal of Adolescent Health*. 72(6): 852-859.

**Turban J.L.**, Dolotina B., King D., Keuroghlian A.S. (2022) Sex assigned at birth ratio among transgender and gender diverse adolescents in the United States. *Pediatrics*. 150(3): e202205567.

**Turban J.L.**, King D., Kobe J., Reisner S.L., Keuroghlian A.S. (2022) Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. *PLoS One*, 17(1): e0261039.

Passell E., Rutter L.A., **Turban J.L.**, Scheuer L., Wright N., Germine L. (2021) Generalized Anxiety Disorder Symptoms are Higher Among Same- and Both-Sex Attracted Individuals in a Large, International Sample. *Sexuality Research and Social Policy*. 19: 1440-1451.

Lewis, J. M., Monico, P. F., Mirza, F. N., Xu, S., Yumeen, S., **Turban, J. L.**, Galan A., & Girardi, M. (2021). Chronic UV radiation–induced RORγt+ IL-22–producing lymphoid cells are associated with mutant KC clonal expansion. *Proceedings of the National Academy of Sciences*, 118(37).

**Turban J.L.**, King, D., Li, J.L., Keuroghian, A.S. (2021) Timing of Social Transition for Transgender and Gender Diverse Youth, K-12 Harassment, and Adult Mental Health Outcomes. *Journal of Adolescent Health*. 69(6), 991-998.

**Turban J.L.**, Loo, S. S., Almazan, A. N., Keuroghlian, A.S. (2021) Factors Leading to "Detransition" Among Transgender and Gender Diverse People in the United States: A Mixed-Methods Analysis. *LGBT Health*. 8(4), 273-280.

**Turban, J. L.**, Passell E, Scheer L, Germine L. (2020) Use of Geosocial Networking Applications Is Associated With Compulsive Sexual Behavior Disorder in an Online Sample. *The Journal of Sexual Medicine*. 17(8), 1574-1578.

**Turban, J. L.**, King, D., Carswell, J. M., & Keuroghlian, A. S. (2020). Pubertal suppression for transgender youth and risk of suicidal ideation. *Pediatrics*, *145*(2), e20191725.

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
jack.turban@ucsf.edu

**Turban, J. L.**, Shirk, S. D., Potenza, M. N., Hoff, R. A., & Kraus, S. W. (2020). Posting Sexually Explicit Images or Videos of Oneself Online Is Associated With Impulsivity and Hypersexuality but Not Measures of Psychopathology in a Sample of US Veterans. *The Journal of Sexual Medicine*, *17*(1), 163-167.

**Turban, J. L.**, Beckwith, N., Reisner, S. L., & Keuroghlian, A. S. (2020). Association between recalled exposure to gender identity conversion efforts and psychological distress and suicide attempts among transgender adults. *JAMA Psychiatry*, *77*(1), 68-76.

Acosta, W., Qayyum, Z., **Turban, J. L.**, & van Schalkwyk, G. I. (2019). Identify, engage, understand: Supporting transgender youth in an inpatient psychiatric hospital. *Psychiatric Quarterly*, 90(3), 601-612.

**Turban, J. L.**, King, D., Reisner, S. L., & Keuroghlian, A. S. (2019). Psychological Attempts to Change a Person's Gender Identity from Transgender to Cisgender: Estimated Prevalence Across US States, 2015. *American Journal of Public Health*, 109(10), 1452-1454.

**Turban, J. L.**, Winer, J., Boulware, S., VanDeusen, T., & Encandela, J. (2018). Knowledge and attitudes toward transgender health. *Clinical Teacher*, *15*(3), 203-207.

**Turban, J. L.,** Potenza, M. N., Hoff, R. A., Martino, S., & Kraus, S. W. (2017). Psychiatric disorders, suicidal ideation, and sexually transmitted infections among post-deployment veterans who utilize digital social media for sexual partner seeking. *Addictive Behaviors*, 66, 96-100.

**Turban J. L.\***, Lu, A. Y\*., Damisah, E. C., Li, J., Alomari, A. K., Eid, T., ... & Chiang, V. L. (2017). Novel biomarker identification using metabolomic profiling to differentiate radiation necrosis and recurrent tumor following Gamma Knife radiosurgery. *Journal of Neurosurgery*, 127(2), 388-396.

Kempfle, J. S., **Turban, J. L.,** & Edge, A. S. (2016). Sox2 in the differentiation of cochlear progenitor cells. *Scientific Reports*, 6, 23293.

**SELECTED PEER REVIEWED PUBLICATIONS: COMMENTARY, REVIEWS, & PERSPECTIVES**

**Turban J.L.**, Thornton J., Ehrensaft D. (2025) Biopsychosocial Assessments for Pubertal Suppression to Treat Adolescent Gender Dysphoria. *Journal of the American Academy of Child & Adolescent Psychiatry*. 64(1): 12-16.

**Turban J.L.**, Anderson C.T.M., Spetz J. (2024) Gender Identity and Ethnoracial Disparities in Conversion Effort Exposure. *American Journal of Public Health*. 114(5): 455-457.

**Turban J.L.**, Dolotina B., Freitag T.M., King D., Keuroghlian A.S. (2023) Rapid-Onset Gender Dysphoria Is Not a Recognized Mental Health Diagnosis. *Journal of Adolescent Health*. 73(6): 1163-1164.

Lerario, M. P., Rosendale, N., Waugh, J. L., **Turban, J.**, & Maschi, T. (2023). Functional Neurological Disorder Among Sexual and Gender Minority People. *Neurologic Clinics*. 41(4): 759-781.

Kraschel K.L., Chen A., **Turban J.L.**, Cohen I.G. Legislation restricting gender-affirming care for transgender youth: politics eclipse healthcare. *Cell Reports Medicine*. 3(8): 100719.

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
jack.turban@ucsf.edu

**Turban J.L.**, Brady C., & Olson-Kennedy J. Understanding & Supporting Patients with Dynamic Desires for Gender-affirming Medical Interventions. *JAMA Network Open*. 5(7): e2224722.

Dolotina B. **& Turban J.L.** "Phantom Networks" Prevent Children & Adolescents from Obtaining the Mental Health Care They Need. *Health Affairs*. 41(7).

**Turban J.L.**, Kamceva M, Keuroghlian A.S. Pharmacologic Considerations for Transgender and Gender Diverse People. *JAMA Psychiatry*. 79(6): 629-630.

Dolotina B. & **Turban J.L.**. (2022) A multipronged, evidence-based approach to improving mental health among transgender and gender diverse youth. *JAMA Network Open*. 5(2): e220926.

**Turban J.L.,** Almazan A.N., Reisner S.L., Keuroghlian A.S. (2022) The importance of non-probability samples in minority health research: lessons learned from studies of transgender and gender diverse mental health. *Transgender Health*. [ePub ahead of print]

**Turban J.L.**, Kraschel K.L., Cohen, G.C. (2021) Legislation to Criminalize Gender-affirming Medical Care for Transgender Youth. *JAMA*. 325(22), 2251-2252.

Liu M., **Turban J.L.**, Mayer K.H. (2021) The US Supreme Court and Sexual and Gender Minority Health. *American Journal of Public Health*. 111(7), 1220-1222.

Suto, D.J., Macapagal, K., **Turban, J.L.** (2021) Geosocial Networking Application Use Among Sexual Minority Adolescents. *Journal of the American Academy of Child & Adolescent Psychiatry*. 60(4), 429-431.

**Turban, J. L.**, Keuroghlian, A. S., & Mayer, K. H. (2020) Sexual Health in the SARS-CoV-2 Era. *Annals of Internal Medicine*. 173(5), 387-389.

Suozzi, K., **Turban, J.L.,** & Girardi, M. (2020). Focus: Skin: Cutaneous Photoprotection: A Review of the Current Status and Evolving Strategies. *The Yale Journal of Biology and Medicine*, *93*(1), 55.

Malta, M., LeGrand, S., **Turban, J.L.**, Poteat, T., & Whetten, K. (2020). Gender-congruent government identification is crucial for gender affirmation. *The Lancet Public Health*. 5(4), e178-e179.

**Turban J.L.** (2019). Medical Training in the Closet. *The New England Journal of Medicine*, *381*(14), 1305.

**Turban, J. L.**, & Keuroghlian, A. S. (2018). Dynamic gender presentations: understanding transition and" de-transition" among transgender youth. *Journal of the American Academy of Child and Adolescent Psychiatry*, 57(7), 451-453.

**Turban, J. L.**, Carswell, J., & Keuroghlian, A. S. (2018). Understanding pediatric patients who discontinue gender-affirming hormonal interventions. *JAMA Pediatrics*, *172*(10), 903-904.

**Turban, J. L.** (2018). Potentially Reversible Social Deficits Among Transgender Youth. *Journal of Autism and Developmental Disorders*, 48(12), 4007-4009.

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
jack.turban@ucsf.edu

Turban, J. L., & van Schalkwyk, G. I. (2018). "Gender dysphoria" and autism spectrum disorder: Is the link real?. *Journal of the American Academy of Child & Adolescent Psychiatry*, *57*(1), 8-9.

Turban, J. L., & Ehrensaft, D. (2018). Research review: gender identity in youth: treatment paradigms and controversies. *Journal of Child Psychology and Psychiatry*, *59*(12), 1228-1243.

Turban J. L., Genel, M. (2017) Evolving Treatment Paradigms for Transgender Patients. *Connecticut Medicine*, 81(8), 483-486.

Turban, J., Ferraiolo, T., Martin, A., & Olezeski, C. (2017). Ten things transgender and gender nonconforming youth want their doctors to know. *Journal of the American Academy of Child & Adolescent Psychiatry*, *56*(4), 275-277.

Turban, J. L. (2017). Transgender Youth: The Building Evidence Base for Early Social Transition. *Journal of the American Academy of Child and Adolescent Psychiatry*, 56(2), 101.

Turban, J. L., Martin A. (2017) Book Forum: Becoming Nicole. *Journal of the American Academy of Child & Adolescent Psychiatry*, 56(1): 91-92.

**TEXTBOOKS AND TEXTBOOK CHAPTERS**

Forcier, M., Van Schalkwyk, G., **Turban, J. L.** (Editors). Pediatric Gender Identity: Gender-affirming Care for Transgender & Gender Diverse Youth. Springer Nature, 2020.

Challa M., Scott C., **Turban J.L.** Epidemiology of Pediatric Gender Identity. In Forcier, M., Van Schalkwyk, G., **Turban, J. L.** (Editors). Pediatric Gender Identity: Gender-affirming Care for Transgender & Gender Diverse Youth. Springer Nature, 2020.

Turban J.L., Shadianloo S. Transgender & Gender Non-conforming Youth. In Rey, J.M. (Editor): IACAPAP e-Textbook of Child and Adolescent Mental Health. Geneva. International Association of Child and Adolescent Psychiatry and Allied Professionals, 2018.

Turban, J. L., DeVries, A.L.C., Zucker, K. Gender Incongruence & Gender Dysphoria. In Martin A., Bloch M.H., Volkmar F.R. (Editors): Lewis's Child and Adolescent Psychiatry: A Comprehensive Textbook, Fifth Edition. Philadelphia: Wolters Kluwer 2018.

**SELECTED INVITED GRAND ROUNDS PRESENTATIONS**

Turban JL. Supporting the Mental Health of Transgender and Gender Diverse Youth. Yale Child Study Center Grand Rounds, 2024.

Turban JL. Supporting the Mental Health of Transgender and Gender Diverse Youth. Temple Department of Psychiatry Grand Rounds, 2024.

Turban JL. Supporting the Mental Health of Transgender and Gender Diverse Youth. Penn State Department of Psychiatry Grand Rounds, 2024.

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
jack.turban@ucsf.edu

**Turban JL**. Transgender Youth Mental Health. Maudsley Hospital / Kings College London Grand Rounds, 2023.

**Turban JL.** Resaerch Updates: Supporting the Mental Health of Transgneder and Gender Diverse Youth. Department of Behavioral Health, Wake Forest School of Medicine / Atrium Health, 2023.

**Turban JL**. Supporting the Mental Health of Transgender and Gender Diverse Youth. Child & Adolescent Psychiatry Grand Rounds, Long Island Jewish Medical Center / Zucker Hillside, 2023.

**Turban JL**. Suicidality in Sexual and Gender Minority Youth. Psychiatry Grand Rounds, Boston Children's Hospital, 2023.

**Turban JL**. Opinion Writing to Promote Public Health & Evidence-Based Public Policy. Medical Education Grand Rounds, The University of Vermont Larner College of Medicine, 2022.

**Turban JL**. Research Updates: Supporting the Mental Health of Transgender & Gener Diverse Youth. Division of Child & Adolescent Psychiatry Grand Rounds, Stanford University School of Medicine, 2022.

**Turban JL**. Supporting Transgender & Gender Diverse Youth: Research Updates & Treatment Paradigms. Department of Psychiatry Grand Rounds, University of Nebraska Medical Center, 2022.

**Turban JL**. Supporting the Mental Health of Transgener & Gender Diverse Youth. Department of Pediatrics, Division of Behavioral Health Grand Rounds, University of Utah, 2022.

**Turban JL**. Gender Diverse Youth: Treatment Paradigms & Research Updates. Psychiatry Grand Rounds, Thomas Jefferson University, 2021.

**Turban JL**. Supporting Gender Diverse Youth Throughout Development. Child Psychiatry Grand Rounds, Georgetown, 2021.

**Turban JL**. Understanding Pediatric Gender Identity through Childhood and Adolescence. Grand Rounds, Institute of Living, 2021.

**Turban JL**. Evolving treatment paradigms for transgender youth. Pediatric Grand Rounds, Albany Medical Center, 2021.

**Turban JL**. Evolving Treatment Paradigms for Transgender Youth. Psychiatry Grand Rounds, McLean Hospital (Harvard Medical School), 2021.

**Turban JL**. Einstein Psychiatry Grand Rounds: Evolving Treatment Paradigms for Transgender Youth. Psychiatry Grand Rounds, Einstein Medical Center, 2021.

**Turban JL**. COVID19 and Pediatric Mental Health. Pediatrics Grand Rounds, Stanford University School of Medicine, 2021.

**Turban JL**. Evolving Treatment Paradigms for Transgender Youth. Psychiatry Grand Rounds, Beth Israel

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
jack.turban@ucsf.edu

Deaconess Medical Center (Harvard Medical School), 2020.

## ADDITIONAL INVITED PRESENTATIONS

**Turban JL.** Supporting Transgender Youth Across Development. *Annual Meeting of the International Acaademy of Child & Adolescent Psychiatry*, Rio de Janeiro, 2024.

**Turban JL**. Suicide Prevention for LGBTQ+ Youth. *National Institues of Health*, Bethesda, 2023.

**Turban JL**. NAMI LGBTQ+ Mental Health Roundtable Discussion. *National Alliance on Mental Illness*, San Francisco, 2023.

**Turban JL**. Supporting the Mental Health of Transgender & Gender Diverse Youth. *United Nations NGO Committee on Mental Health*, United Nations, 2023.

**Turban JL** & Spetz J. How to Give Expert Testimony. *UCSF Philip R. Lee Institute for Health Policy Studies Impacting Policy Series*, San Francisco, 2023.

**Turban JL**. The Research on Gender-affirming Care for Transgender Youth. *AusPATH Research Seminar*. Sydney, 2023.

**Turban JL**. Building a Career in Sexual & Gender Minority Health Research. *National Institutes of Health*, Bethesda, 2022.

**Turban JL**. Research Updates: Gender-affirming Care for Transgender Youth. MUSC LGBTQ+ Health Equity Summit,  Medical University of South Carolina, 2022.

**Turban JL**. Keynote: Supporting The Mental Health of Transgender & Gender Diverse Youth. Edythe Kurz Educational Institute Conference, Westchester, 2022.

**Turban JL**, Peters B, Olson-Kennedy J. Gender-Affirming Care: Through a Medical, Surgical, and Mental Health Lens. Critical Issues in Child & Adolescent Mental Health Conference, San Diego, 2022.

**Turban JL**. Improving Mental Health Outcomes for Transgender and Gender Diverse (TGD) Youth Through Gender-affirming Care. National LGBTQIA+ Health Education Center, The Fenway Institute, 2022.

**Turban JL**. Combatting anti-trans legislation through science, data, and writing. State of Queer Mental Health Conference by The Mental Health Association of San Francisco, Online, 2021.

**Turban JL**. Updates on LGBTQ Mental Health. Annual Psychiatric Times World CME Conference, Online, 2021.

**Turban JL.** Imbasciani LGBTQ Health Equity Lecture: Evolving Treatment Paradigms for Transgender and Gender Diverse Youth. University of Vermont Larner College of Medicine, Burlington, 2021.

**Turban JL.** The Emergence of Gender-affirming Care for Transgender & Gender Diverse Youth, United Nations NGO Committee on Mental Health, Oral Presentation, Online, 2021.

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
jack.turban@ucsf.edu

**Turban JL**. Keynote – Transgender & Gender Diverse Youth: Research Updates. Stony Brook Transgender Health Conference, Online, 2021.

**Turban JL**. Opinion Writing on Sensitive Topics. Harvard Media & Medicine Course, Live Lecture, Online, 2021.

**Turban JL**. Gender affirming care for transgender and gender diverse youth: what we know and what we don't. University of Texas Pride Health Institute, Oral Presentation, Online, 2020.

**Turban JL**. Q&A on Transgender Youth Mental Health. PEOPLE in Healthcare at University of Toledo, Oral Presentation, Online, 2020.

**Turban JL**, Pagato S, Gold J, Broglie J, Naidoo U, Alvarado A. Innovation of Student Mental Health during COVID19. Panel to the People, Oral Presentation, Online, 2020.

**Turban JL**, Belkin B, Vito J, Campos K, Scasta D, Ahuja A, Harris S. Discussion on Abomination: Homosexuality and the Ex-Gay Movement. Panelist, The Association of LGBTQ+ Psychiatrists Virtual Session, Oral Presentation, Online, 2020.

**Turban JL**. Is Grindr affecting gay men's mental health? Oral Presentation, UCLA & AETC Coping with Hope, Online, Oral Presentation, 2020.

**Turban JL**, Hall TM, Goldenberg D, Hellman R. Gay Sexuality and Dating. Moderator, The Association of LGBTQ+ Psychiatrists Virtual Session, Oral Presentation, Online, 2020.

## SELECTED CONFERENCE PRESENTATIONS & ABSTRACTS

**Turban JL.** Understanding "De-transition": A Theoretical Framework & Clinical Considerations. Annual Meeting of the American Academy of Child & Adolescent Psychiatry, Seattle, 2024.

**Turban JL.** Legal Epidemiology and Advancing Evidence-Based Public Policy for Sexual and Gender Minority Mental Health. American Psychiatric Association Annual Meeting, Oral Presentation, New York City, 2024.

**Turban JL.** Coffee Talk: Supporting Transgender Youth Across Development. American Psychiatric Association Annual Meeting, Oral Presentation, New York City, 2024

**Turban JL**, Calhoun A, Gold, J. Mission-Based Media Collaborative Work Concerning "Controversial" Topics in Psychiatry. Annual Meeting of The American Psychiatric Association, Oral Presentation, San Francisco, 2023.

**Turban JL,** Ahuja A. Autogynephilia: Historical Context, Clarifications, and Controversy. Annual Meeting of The American Psychiatric Association, Oral Presentation, San Francisco, 2023. [Cancelled]

**Turban JL**. A Systematic Approach for Understanding Gender Identity Evolution. Annual Meeting of The American Academy of Child & Adolesent Psychiatry, Oral Presentation, Toronto, 2022.

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
jack.turban@ucsf.edu

**Turban JL.** Transgender Youth: Evolving Gender Identities and "Detransition." Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Session Chair of Oral Symposium, Toronto, 2022.

**Turban JL**. From The New York Times to Hollywood: Communicating With the Public Through Opinion Writing, Publishing, Social Media, and Consulting for Film and TV, Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Session Chair of Oral Symposium, Toronto, 2022.

**Turban JL**. Writing for the Lay Press to Combat Misinformation Regarding Pediatric Mental Health, Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Oral Presentation, Toronto, 2022.

**Turban JL**. COVID-19 and Psychosexual Dynamics, Annual Meeting of the American Academy of Child & Adolescent Psychiatry, Oral Presentation, Toronto, 2022.

Dolotina B, **Turban JL**, King D, Keuroghlian AS. Age of Realization of Gender Identity and Mental Health Outcomes among Transgender Adults: Evaluating the "Rapid Onset Gender Dysphoria" Hypothesis, Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Poster, Toronto, 2022.

**Turban JL**. Sex ratio among transgender adolescents in the United States. World Professional Association for Transgender Health Scientific Symposium, Oral Presentation, Montreal, 2022.

**Turban JL**. Access To Gender-Affirming Hormones During Adolescence And Mental Health Outcomes Among Transgender Adults. World Professional Association for Transgender Health Scientific Symposium, Oral Presentation, Montreal, 2022.

**Turban JL**, Gold J, Hartselle S, Yen J. From The New York Times to the Big Screen: Communicating With the Public Through Opinion Writing, Publishing, Social Media, and Consulting for Film and TV. Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Session Chair of Oral Symposium, Online, 2021.

**Turban JL**. Creating Change through Opinion Writing in Child & Adolescent Psychiatry. Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Oral Presentation, Online, 2021.

**Turban JL**, Giedinghagen A, Janssen A, Myint M, Daniolos P. Transgender Youth: Understanding "De-transition," Non-linear Gender Trajectories, and Dynamic Gender Identities. Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Session Chair of Oral Symposium, Online, 2021.

**Turban JL**. A framework for understanding dynamic gender identities through internal and external factors. Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Oral Presentation, Online, 2021.

**Turban JL**, Geosocial networking application use among birth-assigned male adolescents. Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Oral Presentation, Online, 2021.

**Turban JL**. LGBTQ Families and the US Supreme Court. Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Oral Presentations, Online, 2021.

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
jack.turban@ucsf.edu

**Turban JL**, King D, Kobe J, Reisner SL, Keuroghlian AS. Access to Gender-affirming Hormones during Adolescence and Mental Health Outcomes among Transgender Adults. Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Poster, Online, 2021.

**Turban JL**. Gender Identity Conversion Efforts: Quantitative Perspectives. Annual Meeting of The American Psychiatric Association, Oral Presentation, Online, 2021.

**Turban JL**. For Worse: Negative Aspects of Social Media for LGBT Youth. Oral Presentation, Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Oral Presentation, Online, 2020.

**Turban JL**. Hookup App Use among Gay and Bisexual Males: Sexual Risk and Associated Psychopathology. Oral Presentation, Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Online, 2020.

**Turban JL**. Communicating with the Public: From The New York Times to The Big Screen. Oral Presentation, Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Online, 2020.

**Turban JL**, McFarland C, Walters O, Rosenblatt S. An Overview of Best Outpatient Practice in the Care of Transgender Individual. Oral Presentation, Annual Meeting of the American Psychiatric Association, Philadelphia, 2020. [Accepted, but cancelled due to COVID19]

**Turban JL**, Lakshmin P, Gold J, Khandai C. #PsychiatryMatters: Combating Mental Health Misinformation Through Social Media and Popular Press. Oral Presentation, Annual Meeting of the American Psychiatric Association, Philadelphia, 2020. [Accepted, but cancelled due to COVID19]

**Turban JL.** The Pen and the Psychiatrist: Outreach and Education Through the Written Word. Oral Presentation, Annual Meeting of the American Academy of Child & Adolescent Psychiatry, Chicago, 2019.

**Turban JL.** For Better and For Worse: Gender and Sexuality Online, Oral Presentation, Annual Meeting of the American Academy of Child & Adolescent Psychiatry, Chicago, 2019.

**Turban JL.** Gender Diverse Young Adults: Narratives and Clinical Considerations, Oral Presentation, Annual Meeting of the American Academy of Child & Adolescent Psychiatry, Chicago, 2019.

**Turban JL.** Transgender Youth: Controversies and Research Updates, Oral Presentation, Annual Meeting of the American Psychiatric Association, San Francisco, 2019.

**Turban JL**, Beckwith N, Reisner S, Keuroghlian A. Exposure to Conversion Therapy for Gender Identity Is Associated with Poor Adult Mental Health Outcomes among Transgender People in the U.S. Poster Presentation, Annual Meeting of the American Academy of Child & Adolescent Psychiatry, Seattle, 2018.

Shirk SD, **Turban JL**, Potenza M, Hoff R, Kraus S. Sexting among military veterans: Prevalence and correlates with psychopathology, suicidal ideation, impulsivity, hypersexuality, and sexually transmitted infections. Oral Presentation, International Conference on Behavioral Addictions, Cologne, Germany, 2018.

**Turban JL**. Gender Identity and Autism Spectrum Disorder. Oral Presentation, Annual Meeting of the American Academy of Child & Adolescent Psychiatry, Washington D.C., 2017.

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
jack.turban@ucsf.edu

**Turban JL**. Tackling Gender Dysphoria in Youth with Autism Spectrum Disorder from the Bible Belt to New York City. Oral Presentation, Annual Meeting of the American Academy of Child & Adolescent psychiatry, Washington D.C., 2017.

**Turban JL.** Affirmative Protocols for Transgender Youth. Oral Presentation, Annual Meeting of the American Academy of Child & Adolescent Psychiatry, Washington D.C., 2017.

**Turban, JL**. Evolving Management of Transgender Youth. Oral Presentation, Klingenstein Third Generation Foundation Conference, St Louis, 2017.

**Turban, JL**, Potenza M, Hoff R, Martino S, Kraus S. Clinical characteristics associated with digital hookups, psychopathology, and clinical hypersexuality among US military veterans. Oral Presentation, International Conference on Behavioral Addictions, Haifa, Israel, 2017.

Lewis J, Monaco P, **Turban JL**, Girardi M. UV-induced mutant p53 ketatinocyte clonal expansion dependence on IL-22 and RORγT. Poster, Society of Investigative Dermatology, Portland, 2017.

**Turban JL**, Winer J, Encandela J, Boulware S, VanDeusen T. Medical Student Knowledge of and Attitudes toward Transgender Pediatric Patient Care. Abstract, Gay & Lesbian Medical Association, St Louis, 2016.

**Turban JL**, Lu A, Damisah E, Eid T, Chiang V. Metabolomics to Differentiate Radiation Necrosis from Recurrent Tumor following Gamma Knife Stereotactic Radiosurgery for Brain Metastases. Oral Presentation, 14th Annual Leksell Gamma Knife Conference, New York City, 2014

**Turban JL**, Lewis J, Girardi M. UVB-induced HMGB1 and extracellular ATP increase Langerhans cell production of IL-23 implicated in ILC3 activation. Poster, Society of Investigative Dermatology, Scottsdale, 2016

**Turban JL**, Lewis J, Girardi M. Characterization of cytokine pathways associated with Langerhans cell facilitation of UVB-induced epidermal carcinogenesis. Poster, American Society of Clinical Investigation, Chicago, 2016.

Lewis J, **Turban JL**, Girardi M, Michael Girardi. Langerhans cells and UV-radiation drive local IL22+ ILC3 in association with enhanced cutaneous carcinogenesis. Poster, Society of Investigative Dermatology, Scottsdale, 2016.

Sewanan L, Zheng D, Wang P, Guo X, Di Bartolo I, Marukian N, **Turban JL**, Rojas-Velazques D, Reisman A. Reflective Writing Workshops Led By Near Peers During Third-Year Clerkships: A Safe Space for Solidarity, Conversation, and Finding Meaning in Medicine. Poster & Workshop, Society of General Internal Medicine, New Haven and Hollywood, 2016.

## AWARDS & HONORS

Distinguished Paper of the Year, *Journal of Adolescent Health* (2024)
Top 10 Faculty Educators, UCSF Department of Psychiatry & Behavioral Sciences (2023)
Top Peer Review Service, *Annals of Internal Medicine* (2022)

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
jack.turban@ucsf.edu

Stanford Child & Adolescent Psychiatry Chief Fellow (2021-2022)
Wasserman Award for Advocacy in Children's Mental Health (2021)
Top Manuscript of The Year - *Pediatrics* (2020)
American Psychiatric Association Child & Adolescent Psychiatry Fellowship (2019-2021)
Ted Stern Scholarship and Travel Award (2019)
Editor's Pick for Best Clinical Perspectives Manuscript – *Journal of The American Academy of Child & Adolescent Psychatry* (2018)
SciShortform Project: Best Shortform Science Writing, Columns & Op-Eds (2018)
Ted Stern Scholarship and Travel Award (2018)
Medaris Grant (2018)
Editor's Pick for Best Clinical Perspectives Manuscript – *Journal of The American Academy of Child & Adolescent Psychatry* (2017)
United States Preventative Health Services Award for Excellence in Public Health (2017)
NBC Pride 30 Innovator (2017)
Ferris Thesis Prize, Yale School of Medicine (2017)
Parker Prize, Yale School of Medicine (2017)
Howard Hughes Medical Institute Medical Research Fellowship (2015-2016)
American Academy of Child and Adolescent Psychiatry Life Members Mentorship Grant (2016)
Student Scholarship, Gender Conference East (2016)
Farr Award for Excellence in Research (2016)
Yale Office of International Medical Education Grant, Buenos Aires, Argentina (2016)
Yale Office of International Medical Education Grant, VU Medical Center, The Netherlands (2016)
Yale Summer Research Grant (2012)
AIG International Scholar, Harvard College (2007-2011)
Harvard International Study Grant, Alicante, Spain (2008)
David Rockefeller International Study Grant, Shanghai, China (2009)

## PROFESSIONAL MEMBERSHIPS & COMMITTEES
American Psychiatric Association, Member
American Academy of Child & Adolescent Psychiatry, Member
American Psychiatry Association, Council on Communications
American Academy of Child & Adolescent Psychiatry, Media Committee
American Academy of Child & Adolescent Psychiatry, Chair of Subcomittee on Interfacing with the Media
World Professional Association for Transgrender Health, Member
US Professional Association for Transgender Health, Member
US Professional Association for Transgender Health, Research Committee
Athlete Ally, Affiliate Scholar
Psychiatric Times, Editorial Board

## ACADEMIC JOURNAL SERVICE & AD HOC PEER REVIEW
PLoS One, *Academic Editor*
JAACAP, *Contributing Editor*
JAMA, Peer Reviewer
JAMA Pediatrics, Peer Reviewer
JAMA Psychiatry, Peer Reviewer
JAMA Network Open, Peer Reviewer

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
jack.turban@ucsf.edu

Annals of Internal Medicine, Peer Reviewer
Pediatrics, Peer Reviewer
Journal of the American Academy of Child & Adolescent Psychiatry, Peer Reviewer
JAACAP Open, Peer Reviewer
Journal of Child Psychology and Psychiatry, Peer Reviewer
Journal of Adolescent Health, Peer Reviewer
Academic Psychiatry, Peer Reviewer
Journal of Autism and Developmental Disorders, Peer Reviewer
American Journal of Public Health, Peer Reviewer
Perspectives on Psychological Science, Peer Reviewer
Transgender Health, Peer Reviewer
Journal of Clinical Medicine, Peer Reviewer
Journal of Sex & Marital Therapy, Peer Reviewer
Brain Sciences, Peer Reviewer
Social Science & Medicine, Peer Reviewer
Sexual Health, Peer Reviewer
Women, Peer Reviewer
Health Affairs, Peer Reviewer
Health Affairs Scholar, Peer Reviewer
European Journal of Eating Disorders, Peer Reviewer

# <u>Exhibit B</u>

## BIBLIOGRAPHY

Achille, C., Taggart, T., Eaton, N.R., *et al.* (2020). Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: preliminary results. *International Journal of Pediatric Endocrinology*, 2020(8), 1-5.

Allen, L.R., Watson, L.B., Egan, A.M., & Moser, C.N. (2019). Well-being and suicidality among transgender youth after gender-affirming hormones. *Clinical Practice in Pediatric Psychology*, 7(3), 302-311.

American Academy of Child & Adolescent Psychiatry (2018). Conversion Therapy. *Available at* https://www.aacap.org/AACAP/Policy_Statements/2018/Conversion_Therapy.aspx. Accessed: February 17, 2025.

American Medical Association (2018). Health Care Needs of Lesbian, Gay, Bisexual and Transgender and Queer Populations. H-160.991. *Available at* https://policysearch.ama-assn.org/policyfinder/detail/gender%20identity?uri=%2FAMADoc%2FHOD.xml-0-805.xml. Accessed: February 17, 2025.

American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders: Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision. Arlington, VA: American Psychiatric Association, 2022.

Brik, T., Vrouenraets, L.J.J.J., de Vries, M.C., *et al.* (2020). Trajectories of Adolescents Treated with Gonadotropin-Releasing Hormone Analogues for Gender Dysphoria. *Archives of Sexual Behavior*, 49(7), 2611-2618.

Coleman, E., Radix, A. E., Bouman, W. P., Brown, G. R., De Vries, A. L., Deutsch, M. B., ... & Arcelus, J. (2022). Standards of care for the health of transgender and gender diverse people, version 8. *International Journal of Transgender Health*, *23*(sup1), S1-S259.

Carmichael, P., Butler, G., Masic, U., Cole, T. J., De Stavola, B. L., Davidson, S., ... & Viner, R. M. (2021). Short-term outcomes of pubertal suppression in a selected cohort of 12 to 15 year old young people with persistent gender dysphoria in the UK. *PloS One*, *16*(2), e0243894.

Chen, D., Berona, J., Chan, Y.M., *et al.* (2023). Psychosocial Functioning in Transgender Youth after 2 Years of Hormones. *New England Journal of Medicine*, 388(3), 240-250.

Costa, R., Dunsford, M., Skagerberg, E., Holt, V., *et al.* (2015). Psychological Support, Puberty Suppression, and Psychosocial Functioning in Adolescents with Gender Dysphoria. *Journal of Sexual Medicine*, 12(11), 2206-2214.

de Vries, A.L., McGuire, J.K., Steensma, T.D., *et al*. (2014). Young adult psychological outcome after puberty suppression and gender reassignment. *Pediatrics*, 134(4), 696-704.

de Vries, A.L., Steensma, T.D., Doreleijers, T.A., & Cohen-Kettenis, P.T. (2011). Puberty suppression in adolescents with gender identity disorder: a prospective follow-up study. *The Journal of Sexual Medicine*, 8(8), 2276-2283.

DelBello, M.P., Goldman, R., Phillips, D., *et al.* (2017). Efficacy and Safety of Lurasidone in Children and Adolescents with Bipolar I Depression: A Double-Blind, Placebo-Controlled Study. *Journal of the American Academy of Child & Adolescent Psychiatry*, 56(12), 1015-1025.

Green, A.E., DeChants, J.P., Price, M.N., *et al.* (2022). Association of Gender-Affirming Hormone Therapy with Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth. *Journal of Adolescent Health*, 70(4), 643-649.

Hembree, W. C., Cohen-Kettenis, P. T., Gooren, L., Hannema, S. E., Meyer, W. J., Murad, M. H., ... & T'Sjoen, G. G. (2017). Endocrine treatment of gender-dysphoric/gender-incongruent persons: an endocrine society clinical practice guideline. *The Journal of Clinical Endocrinology & Metabolism*, *102*(11), 3869-3903.

Herman, J. L., Flores, A. R., & O'Neill, K. K. (2022). How many adults and youth identify as transgender in the United States? Available at: https://williamsinstitute.law.ucla.edu/publications/trans-adults-united-states/. Accessed: February 4, 2025.

Lee, E.Y., Knox, C., & Phillips, E.J. (2023). Worldwide Prevalence of Antibiotic-Associated Stevens-Johnson Syndrome and Toxic Epidermal Necrolysis: A Systematic Review and Meta-analysis. *JAMA Dermatology*, 159(4), 384-392.

Littman, L. (2019). Correction: Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. *PloS One*, *14*(3), e0214157.

Littman, L. (2021). Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners. *Archives of Sexual Behavior*, 50(8), 3353-3369.

López de Lara, D., Pérez Rodríguez, O., Cuellar Flores, I., *et al*. (2020). Psychosocial Assessment in Transgender Adolescents. *Anales de Pediatría (English Edition)*, 93(1), 41-48.

McNamara, M., Baker, K., Connelly, K., Janssen, A., Olson-Kennedy, J., Pang, K. C., Scheim, A., Turban, J., & Alstott, A. (2024). An evidence-based critique of "The Cass Review" on gender-affirming care for adolescent gender dysphoria. Available at: https://law.yale.edu/sites/default/files/documents/integrity-project_cass-response.pdf. Accessed: February 10, 2025.

Meyer-Bahlburg, H.F. (2002). Gender Identity Disorder in Young Boys: A Parent-and Peer-Based Treatment Protocol. *Clinical Child Psychology and Psychiatry*, 7(3), 360-376.

*New York Times* interview with Dr. Hilary Cass. Available at: https://www.nytimes.com/2024/05/13/health/hilary-cass-transgender-youth-puberty-blockers.html. Accessed: May 27, 2024.

Olson, K.R. (2016). Prepubescent Transgender Children: What We Do and Do Not Know. *Journal of the American Academy of Child & Adolescent Psychiatry*, 55(3), 155-156.

Olson, K. R., Durwood, L., Horton, R., *et al.* (2022). Gender Identity 5 Years After Social Transition. *Pediatrics*, 150(2): e2021056082.

Olson, K. R., Raber, G. F., & Gallagher, N. M. (2024). Levels of Satisfaction and Regret With Gender-Affirming Medical Care in Adolescence. *JAMA Pediatrics*, *178*(12), 1354-1361.

Rae JR, Gülgöz S, Durwood L, *et al.* (2019). Predicting Early-Childhood Gender Transitions. *Psychological Sciences* 30(5), 669-681.

The Cass Review, *Independent review of gender identity services for children and young people: Final Report. Available at:* https://cass.independent-review.uk/home/publications/final-report/. Accessed: June 3, 2024.

Turban, J.L., Beckwith, N., Reisner, S.L., & Keuroghlian, A.S. (2020). Association Between Recalled Exposure to Gender Identity Conversion Efforts and Psychological Distress and Suicide Attempts Among Transgender Adults. *JAMA Psychiatry*, 77(1), 68-76.

Turban, J.L., Brady, C., & Olson-Kennedy, J. (2022). Understanding and Supporting Patients With Dynamic Desires for Gender-Affirming Medical Interventions. *JAMA Network Open*, 5(7): e2224722.

Turban, J.L., de Vries, A.L.C., & Zucker, K. (2018). Gender Dysphoria and Gender Incongruence. In Martin A., Bloch M.H., & Volkmar F.R. (Editors): *Lewis's Child and Adolescent Psychiatry: A Comprehensive Textbook, Fifth Edition*. Philadelphia: Wolters Kluwer.

Turban, J.L., King, D., Carswell, J.M., & Keuroghlian, A.S. (2020). Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation. *Pediatrics*, 145(2):e20191725.

Turban, J.L., King, D., Kobe, J., *et al.* (2022). Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. *PLoS One*, 17(1):e026103.

Turban, J. L., Kraschel, K. L., & Cohen, I. G. (2021). Legislation to criminalize gender-affirming medical care for transgender youth. *JAMA*, *325*(22), 2251-2252.

Turban, J. L., Loo, S. S., Almazan, A. N., & Keuroghlian, A. S. (2021). Factors Leading to "Detransition" Among Transgender and Gender Diverse People in the United States: A Mixed-Methods Analysis. *LGBT Health*, 8(4), 273-280.

United Nations (2020). Practices of so-called "conversion therapy." *Available at* https://digitallibrary.un.org/record/3870697?ln=en&v=pdf. Accessed: February 17, 2025.

van der Miesen, A.I.R., Steensma, T.D., de Vries, A.L.C., *et al*. (2020). Psychological Functioning in Transgender Adolescents Before and After Gender-Affirmative Care Compared with Cisgender General Population Peers. *Journal of Adolescent Health*, 66(6), 699-704.

Wiepjes, C.M., Nota, N.M., de Blok, C.J., *et al.* (2018). The Amsterdam Cohort of Gender Dysphoria Study (1972–2015): Trends in Prevalence, Treatment, and Regrets. *The Journal of Sexual Medicine*, 15(4), 582-590.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| PFLAG, INC., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 8:25-cv-337 |
| ) | |
| DONALD J. TRUMP, in his official capacity as ) | |
| President of the United States, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR A PRELIMINARY INJUNCTION**

## CONTENTS

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................3

   I.   The Executive Orders ..................................................................................3

   II.  This Lawsuit...............................................................................................5

STANDARD OF REVIEW ....................................................................................6

ARGUMENT .........................................................................................................7

   I.   Plaintiffs' claims fail at the threshold. .......................................................7

      A. Any claims against the agency defendants are premature because they have not revoked or denied any funding on the basis of the EOs. .................................7

      B. Article II precludes this Court from considering Plaintiffs' claims..............................11

      C. Plaintiffs lack an equitable cause of action. ..................................................11

   II.  Plaintiffs have not established a likelihood of success on the merits. ..............................12

      A. The EOs cannot be ultra vires when they merely direct agencies to act in accordance with applicable law. ..................................................13

      B. Plaintiffs are unlikely to succeed on the merits of their Equal Protection claim. .........17

      C. Plaintiffs are unlikely to succeed on the merits of their statutory sex discrimination claim........................................................25

   III. The remaining factors counsel against granting the requested relief................................26

   IV. Any injunctive relief should be limited to Plaintiffs.........................................................27

   V.  Any injunctive relief should be accompanied by a bond...................................................30

   VI. Any injunctive relief should be stayed...........................................................30

CONCLUSION.....................................................................................................30

# INTRODUCTION

President Trump issued two Executive Orders (EOs) directing agencies to take steps, as permitted by law, to place conditions on certain federal grant funding in accordance with the Administration's policy goals. Executive Order 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025), entitled *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Defending Women EO), sets forth a policy "to recognize two sexes, male and female." *Id.* § 2. It states in relevant part that "each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* § 3(g). Meanwhile, Executive Order 14,187, 90 Fed. Reg. 8771, *Protecting Children from Chemical and Surgical Mutilation* (Protecting Children EO), sets forth a policy that the federal government will not "fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another." *Id.* § 1. It directs the heads of agencies that provide research or educational grants to medical institutions to, "consistent with applicable law and in coordination with the Director of the Office of Management and Budget, immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children." *Id.* § 4. Both orders make clear that they "shall be implemented consistent with applicable law," EO 14,168 § 8(b); EO 14,187 § 11(b), and "shall not be construed to . . . affect . . . the authority granted by law to an executive department or agency, or the head thereof," EO 14,168 § 8(a)(i); EO 14,187 § 11(a)(1).

Plaintiffs, two membership organizations and several individuals, claim the EOs were issued without authority, conflict with two laws prohibiting sex discrimination, and violate the Fifth Amendment's equal protection guarantee. Plaintiffs seek the extraordinary relief of a nationwide preliminary injunction (PI) enjoining the agency defendants from "conditioning or withholding federal funding based on" the provision of "gender affirming medical care." Proposed

Order on Pls.' Mot. for PI at 2, ECF No. 69-2 (Pls.' Proposed Order). But Plaintiffs fail to satisfy any of the requirements for the relief they seek.

Plaintiffs' claims fail at the threshold for multiple reasons. They identify no cause of action against the defendant agencies and cannot sue the President to challenge the EOs. Further, their claims are unripe. The defendant agencies have not denied or revoked any particular grants relied upon by the individual Plaintiffs' providers or association GLMA's members as a result of the EOs. Which grants the agencies can condition consistent with applicable law as directed by the EOs is currently uncertain, and there is no final agency action for the Court to evaluate.

On the merits, Plaintiffs are unlikely to succeed on any of their claims. First, the EOs are not *ultra vires.* The President's authority to direct subordinate agencies to implement his agenda, subject to those agencies' own statutory authorities, is well-established. *See Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) ("[T]he President's power necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926))). By their terms, the EOs require any funding conditions to be implemented consistent with applicable law. Those laws include the executive's delegated authority to administer grants, including the procedural and substantive requirements applicable to individual grants that are set forth by statute and regulation. They also include antidiscrimination statutes like Section 1557 of the Affordable Care Act (ACA), and Section 1908 of the Public Health Services Act (PHSA), and the Constitution, which Plaintiffs paradoxically claim *conflict* with the EOs instead of cabining their scope.

Second, the EOs do not violate the Fifth Amendment's guarantee of equal protection. The framework for scrutinizing governmental action under equal protection doctrine has little

application here, where there is no agency action to scrutinize. The government recognizes that the Fourth Circuit in *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024), held that certain funding restrictions on the provision of similar kinds of treatments implicated suspect classifications, although the government's position is that *Kadel* was wrongly decided and should be overruled. But Plaintiffs' equal protection claim nevertheless fails because the EOs substantially relate to the important governmental interest of safeguarding children from potentially dangerous, ineffective, and unproven treatments. As a result, the EOs satisfy both rational basis and heightened scrutiny.

As to Plaintiffs' statutory sex discrimination claims under Section 1557 of the ACA, 42 U.S.C. § 18116, and Section 1908 of the PHSA, 42 U.S.C. § 300w-7, the EOs expressly require any implementing agency action to be consistent with applicable law, including those statutes, and Plaintiffs have identified no action violating them. Plaintiffs also fail to satisfy the remaining elements for a preliminary injunction.

For these reasons, as explained more fully below, Plaintiffs' PI motion should be denied. If the court nonetheless enters a PI, it should be limited to Plaintiffs, accompanied by a bond, and stayed pending any further review.

## BACKGROUND

### I.     The Executive Orders

On January 20, 2025, President Trump signed the Defending Women EO. It states that "the Executive Branch will enforce all sex-protective laws to promote" the policy "to recognize two sexes, male and female," which "are not changeable." EO 14,168 § 2. In relevant part, the EO directs agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology," *id.* § 3(e), including by "assess[ing] grant conditions and grantee preferences and ensur[ing] grant funds do not promote gender ideology," *id.* § 3(g). The EO makes clear that "[n]othing in this order shall be construed to impair or otherwise affect . . . the authority granted

by law to an executive department or agency," *id.* § 8(a), and that the "order shall be implemented consistent with applicable law," *id.* § 8(b).

On January 28, 2025, President Trump signed the Protecting Children EO. In relevant part, it directs the heads of departments and agencies "that provide[] research or educational grants to medical institutions" to, "consistent with applicable law and in coordination with the Director of the Office of Management and Budget, immediately take appropriate steps to ensure that institutions receiving Federal research or educations grants end the chemical and surgical mutilation of children."[1] EO 14,187 § 4.

The Protecting Children EO does not restrict care but rather announces a policy on what sorts of education and research the Executive Branch has chosen to subsidize, consistent with applicable law. The EO also does not address medical institutions or practices that do not receive federal research or educational grants, like many private, physician-owned practices, even if they receive other federal funding. Like the Defending Women EO, the Protecting Children EO makes clear that "[n]othing in this order shall be construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency," *id.* § 11(a)(i), and that the "order shall be implemented consistent with applicable law," *id.* § 11(b). Further, the Protecting Children EO

---

[1] The EO defines "chemical and surgical mutilation" to mean

the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex; and surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions.

EO 14,187 § 2(c).

contemplates that implementation of its directives will take time: in Section 9, it instructs agencies to submit a progress report within 60 days of the order, "detailing progress in implementing this order and a timeline for future action." EO 14,187 § 9.

A majority of states have gone further and enacted laws and policies to restrict gender-affirming care for minors. *See* KFF, *Policy Tracker: Youth Access to Gender Affirming Care and State Policy Restrictions*, https://perma.cc/M9Y3-D4M2 (last accessed Feb. 24, 2025). Other countries have also recently adopted similar restrictions. Joshua P. Cohen, *Increasing Number Of European Nations Adopt A More Cautious Approach To Gender-Affirming Care Among Minors*, FORBES, June 14, 2023, https://perma.cc/9VM9-W4S4 (last accessed Feb. 24, 2025).

## II.    This Lawsuit

On February 4, 2025, Plaintiffs filed this lawsuit. Compl., ECF No. 1. One week later, Plaintiffs amended their complaint. Am. Compl., ECF No 53. Plaintiffs consist of two membership organizations and several individuals. Am. Compl. ¶¶ 13–26. They sued President Trump, the U.S. Department of Health and Human Services (HHS), two HHS components, the National Science Foundation (NSF), and the heads of those agencies and components. Am. Compl. ¶¶ 27–36.

On February 5, 2025, Plaintiffs filed a motion for a temporary restraining order (TRO). On February 13, this Court granted the motion and restrained Defendants from "conditioning or withholding federal funding based on the fact that a healthcare entity or health professional provides gender affirming medical care to a patient under the age of nineteen under Section 3(g) of Executive Order 14168 and Section 4 of Executive Order 14187." TRO, ECF No. 61; *see also* Memorandum Opinion (TRO Op.), ECF No. 62.

Thereafter, Plaintiffs filed a motion for a PI. Pls.' Mot. for Prelim. Inj., ECF No. 69. Plaintiffs seek to preliminarily enjoin the agency defendants from

conditioning, withholding, or terminating federal funding under Section 3(g) of the Gender Identity Order and Section 4 of the Denial of Care Order based on the fact that a healthcare entity or health professional provides gender affirming medical care to a patient under nineteen, including any healthcare institution from which the Individual Plaintiffs, members of Plaintiff PFLAG, and patients of health professional members of Plaintiff GLMA receive gender affirming medical care, or at which health professional members of Plaintiff GLMA conduct federally-funded work.

Pls.' Proposed Order at 2, ECF No. 69-2.

Plaintiffs raise three claims in their motion: (1) the EOs are *ultra vires* because they purportedly attempt to amend, repeal, rescind, or circumvent duly enacted federal statutes or appropriations; (2) the EOs are *ultra vires* because they allegedly conflict with Section 1557 of the ACA, 42 U.S.C. § 18116, and Section 1908 of the PHSA, 42 U.S.C. § 300w-7; and (3) the EOs violate the equal protection component of the Fifth Amendment. *See* Mem. in Supp. of Pls.' Mot. for Prelim. Inj., ECF No. 69-1 (Pls.' Mem.).

## STANDARD OF REVIEW

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *see also MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power" and is "to be granted only sparingly and in limited circumstances" (citation omitted)). Such an injunction "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 690 (2008). A plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

### I.    Plaintiffs' claims fail at the threshold.

Multiple threshold defects plague Plaintiffs' claims. They identify no cause of action or final agency action that allows them to proceed against the agency defendants. Their claims are unripe because the agency defendants have not revoked or withheld funding based on the challenged portions of the EOs, leaving material questions unanswered about the statutory and regulatory requirements for any grant funding at issue and the scope of funding potentially at stake. Their attempt to prevent the Executive Branch from even considering a Presidential directive runs afoul of Article II. And Plaintiffs fail to demonstrate they are entitled to seek *ultra vires* relief.

> *A. Any claims against the agency defendants are premature because they have not revoked or denied any funding on the basis of the EOs.*

*No statutory cause of action.* Plaintiffs cannot bring claims against the agency defendants.[2] As an initial matter, Plaintiffs do not invoke the Administrative Procedure Act (APA) or any other statute providing for a cause of action against an agency. *See, e.g.*, 5 U.S.C. § 706(2)(A)–(C) (permitting courts to "set aside agency action . . . otherwise not in accordance with law; contrary to constitutional right. . . [or] in excess of statutory jurisdiction"). In any event, invoking the APA would be futile. The APA authorizes challenges to only final agency action. *Id.* § 704. A final

---

[2] Plaintiffs also cannot obtain relief against the President for issuing the EOs. Courts have no authority to second-guess "discretion[ary]" acts taken by the President "in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. 475, 499, 501 (1866); *see also Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring in part); *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *13 (D.C. Cir. Feb. 15, 2025) ("[T]he President enjoys absolute immunity from injunctive actions."). The courts' refusal to police the President's discretionary acts is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982); *see also Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him, and have never submitted the President to declaratory relief." (citation omitted)).

agency action is one that "marks the consummation of the agency's decisionmaking process" and from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 156 (1997); *Genesis Healthcare, Inc. v. Becerra*, 39 F.4th 253, 262 (4th Cir. 2022). Plaintiffs have not shown any action taken by the agency defendants that determined any rights or obligations or otherwise caused legal consequences. Indeed, Plaintiffs' claimed harm is not based on any action taken by the agency defendants, but on the decisions of medical institutions to stop providing certain treatments based on their prediction that the agency defendants might take some action in the future to revoke their funding. *See* Pls.' Mem. at 12–15, 16–17. Furthermore, this Court's determination that the APA supplies the waiver of sovereign immunity for Plaintiffs' lawsuit,[3] TRO Op. at 18, does not provide Plaintiffs with a cause of action, which is a separate inquiry.[4] *See Z St., Inc. v. Koskinen*, 44 F. Supp. 3d 48, 65 (D.D.C. 2014), *aff'd sub nom. Z St. v. Koskinen*, 791 F.3d 24 (D.C. Cir. 2015).

*Ripeness.* For similar reasons, any claims against the agency defendants are not ripe. The ripeness doctrine "require[s] courts to avoid taking premature judicial action, thereby preventing them from becoming entangled in 'abstract disagreements.'" *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)). "A case is fit for adjudication when the action in controversy is final and not dependent on future uncertainties." *Id.* (quotation omitted). In other words, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted).

---

[3] Plaintiffs did not plead a waiver of sovereign immunity under the APA in their Amended Complaint. *See generally* Am. Compl.; *see also Lancaster v. Sec'y of Navy*, 109 F.4th 283, 293 (4th Cir. 2024) ("[I]t is the plaintiff's burden to show that an unequivocal waiver of sovereign immunity exists and that none of the statute's waiver exceptions apply to his particular claim." (internal citation and quotation marks omitted)).

[4] And as discussed *supra*, Plaintiffs cannot assert an *ultra vires* claim, either.

Here, no agency defendant has revoked or denied any particular grants as a result of the EOs. Plaintiffs and the Court note that HRSA and the CDC issued now-rescinded emails to grant recipients that purportedly ripen this dispute. TRO Op. at 11–12; Pls.' Mem. at 23. But those generic emails do not constitute final agency action: neither agency component terminated any funding, let alone identified any specific grants at imminent risk. *See* ECF No. 35-5; ECF No. 57-2; *Nev. v. Dep't of Energy*, 457 F.3d 78, 85 (D.C. Cir. 2006) ("Final agency action pursuant to the Administrative Procedure Act is a crucial prerequisite to ripeness." (cleaned up)). Nor can these emails be considered the final agency response contemplated by the Protecting Children EO. By asking agencies for a progress report and a timeline for future action within 60 days, the EO anticipates final implementation to require more time. EO 14,187 § 9.

This Court also relied on *Stone v. Trump*, 280 F. Supp. 3d 747, 767 (D. Md. 2017), for the proposition that a matter is ripe when "[t]he only uncertainties are how, not if, the policy will be implemented." *Id.*; TRO Op. at 13. But that unsupported statement is doctrinally unsound and especially inapplicable here, where the "how" is crucial to determining whether any ultimate restrictions on funding are lawful. And even if the policy is eventually implemented as to some funding, it is not clear which funds would be implicated or if the plaintiffs here would be affected.

After all, when an agency puts into place any of the EOs' contemplated grant conditions, it must take only appropriate actions "as permitted by law." EO 14168 § 3(e); *see also* EO 14,187 § 4. Because the agency defendants have not withheld or denied specific grants on the basis of the EOs, it is not clear what law the Court would need to apply or what funding would be at stake. The Court cannot determine in the abstract whether the statutory and regulatory requirements for any particular grant program provide the agency with discretion to condition funding on these terms.

For instance, consider the Ryan White HIV/AIDS grant that Plaintiffs highlight. *See* Pls.'

Mem. at 20. Plaintiffs argue that the Protecting Children EO "strips grantees, including [declarant] Dr. Birnbaum, of their Ryan White Program funding if they also provide . . . gender-affirming care." *Id.* But Dr. Birnbaum receives funding under Part D of the program. Decl. of Dr. Jeffrey Birnbaum ¶ 7, ECF No. 69-46. That program funds only outpatient and ambulatory care grants for individuals with HIV/AIDS, not education or research grants. *See* Ex. A. at 18–19 (program notice of funding opportunity, which states that grant funds cannot be used for clinical research or research). Plaintiffs therefore have not established that this grant—which is the only specific example they provide in their briefing—would even be subject to the Protecting Children EO.

Moreover, as discussed in greater detail below, Congress in some circumstances provides the Executive Branch with significant discretion to determine and amend grant conditions. *See* Part II.A, *infra.* This Court thus cannot evaluate whether, in imposing a new or amended condition, an agency has lawfully exercised the discretion afforded to it without knowing the specific condition that has been imposed and the source of agency's authority to impose it. And given the latitude that Congress affords agencies in setting grant conditions in many circumstances, this Court is not free to assume that there are no situations in which an agency could amend a grant in the manner contemplated by the EOs.

Absent the essential context of which, if any, grants held by specific medical institutions are actually at risk, it would be premature to decide the issues now. *See Scoggins*, 718 F.3d at 271 (homeowners' claim based on request for HOA's permission to engage in construction not ripe for review because "final action on the request is still forthcoming and is dependent on future uncertainties"); *Donovan v. Vance*, 576 F. Supp. 3d 816, 824 (E.D. Wash. 2021), *aff'd in part, appeal dismissed in part and remanded,* 70 F.4th 1167 (9th Cir. 2023) ("It is simply too early to know with any degree of certainty whether Plaintiffs' fears of termination will come into

fruition."). If and when an agency takes final agency action against a medical institution under the EO, an injured party may bring suit then, and the Court can decide the matter on the facts presented.

*B. Article II precludes this Court from considering Plaintiffs' claims.*

As explained, the EO charges certain components of the Executive Branch with taking appropriate steps to implement a policy directive by the President, in a manner consistent with all applicable law. The President plainly has the constitutional authority to do just that. *See* Art. II § 1 ("The executive Power shall be vested in a President of the United States of America."); *id.* § 2 ("[h]e may require the Opinion . . . of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices."). Of course, if an agency decides to act in a specific manner contrary to law, the federal courts may review (and prevent) that action; but federal courts cannot superintend that policymaking—let alone proscribe it from even taking place. *See Trump v. United States*, 603 U.S. 593, 608–09 (2024).

*C. Plaintiffs lack an equitable cause of action.*

All of Plaintiffs' claims—statutory and constitutional—depend on this Court's inherent equitable powers to provide a cause of action, remedying what they see as *ultra vires* executive conduct in violation of some binding source of law. But that narrow form of relief, whatever its precise bounds, is not available to the Plaintiffs here.

The *ultra vires* doctrine is "extremely limited" in "scope." *Griffith v. Fed. Labor Rel. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988). Of these limits, one is that it is only available to parties who are the *direct objects* of the allegedly unlawful governmental action. *See Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 153–54 (1951) (Frankfurter, J., concurring) ("[T]he injury must be 'a wrong which directly results in the violation of a legal right.'"). *Ultra vires* relief developed as an equitable remedy to prevent the government from unlawfully acting upon a person—*i.e.*, to prevent a certain restriction or enforcement action from taking place. *See, e.g.*,

*American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110–11 (1902). It is not a tool for those incidentally affected later, empowering them to reach upstream and proactively combat an alleged wrong happening to another. *See Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 902–04 (10th Cir. 2017). And that is this case. All of the hypothetical future actions that Plaintiffs complain about are funding decisions affecting separate medical institutions. But *those* institutions would be the direct objects of any unlawful action. Plaintiffs here may be incidentally harmed depending on how those institutions react (*i.e.*, whether they choose to forgo federal funding or continue certain procedures). But this Court's inherent equitable powers do not provide a cause of action to redress that sort of removed harm. The Court previously analyzed this issue under Article III standing case law to conclude that Plaintiffs have established "causation" between the EO and their claimed injuries. TRO Op. at 23; *see also id.* at 21–24. But Defendants have not challenged Plaintiffs' standing. And, as explained above, more is required to proceed on the limited, equitable claim for *ultra vires* relief. Plaintiffs fail to meet that burden.

Another limit is that *ultra vires* relief must run against a particular government action that "violates some specific command of a statute" or other binding law. *Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 764 (D.C. Cir. 2022). But again, Plaintiffs have not identified any specific source of authority that prevents a presidential order directing subordinates to consider and pursue as appropriate (and as consistent with law) a given policy. All of Plaintiffs' arguments concern hypothetical downstream actions that may or may not result from the EO; but *ultra vires* relief is about stopping actual concrete action, not pretermitting hypothetical future harm.

## II.    Plaintiffs have not established a likelihood of success on the merits.

The President plainly has authority to direct agencies to fully implement his agenda, consistent with each agency's underlying statutory authorities. This well-established authority dooms Plaintiffs' likelihood of succeeding on their claim that the President exceeded his authority

in issuing the EOs. Plaintiffs also are unlikely to succeed on their constitutional and statutory discrimination claims: the EOs do not discriminate based on sex or any other protected class, and they bear a substantial relationship to important governmental objectives regarding the protection of children and adolescents from potentially dangerous and ineffective treatments such that they satisfy any possible standard of constitutional scrutiny anyway.

> A. *The EOs cannot be ultra vires when they merely direct agencies to act in accordance with applicable law.*

Plaintiffs' facial, *ultra vires* claims fail because they rely on characterizations of the EOs that are simply inconsistent with their terms. The EOs do not purport to withhold all federal funding if an institution promotes gender ideology or provides the treatments referenced in the Protecting Children EO. Instead, the EOs instruct agencies to implement the President's policy to the extent permitted by applicable law. The Executive often has discretion to impose other conditions or allocate fixed grants based on priorities. As discussed above, courts have long upheld these types of Presidential directives to agencies.

The Defending Women EO explicitly states that any withholding of federal funds must only be implemented "as permitted by law." EO 14168 § 3(e). The Protecting Children EO likewise requires agencies to act "consistent with applicable law and in coordination with the Director of the Office of Management and Budget" in ending federal research and educational grants to institutions providing the treatments referenced in the EO. EO 14,187 § 4. Further, both EOs include a "General Provision[]," stating that "[n]othing in this order shall be construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency" and that "[t]his order shall be implemented consistent with applicable law." EO 14,168 § 8(a), (b); EO 14,187 § 11(a), (b).

Definitionally, directing executive agencies to take action *to the extent consistent with applicable law* cannot be interpreted as an order to violate the law. It is plainly lawful for the President to instruct agencies to act within their own statutory authorities to implement the President's priorities consistent with applicable law. *See, e.g.*, *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."); *Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981). Indeed, on his first day in office, President Biden issued an analogous executive order, requiring agencies to take action, consistent with applicable law, "to fully enforce . . . laws that prohibit discrimination on the basis of gender identity or sexual orientation. Exec. Order No. 13,988, §§ 1–2, 86 Fed. Reg. 7023, 7023 (Jan. 20, 2021). Those kinds of orders are fairly frequent across presidential administrations.[5]

The D.C. Circuit's decision in *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002) is instructive. There, Plaintiffs challenged an executive order that provided that "to the extent permitted by law," no federal agency and no entity that receives federal assistance for a construction product could require or prohibit bidders or contractors from entering into a project labor agreement. *Id.* at 29. Plaintiffs sued, claiming that

---

[5] Presidents regularly exercise their supervisory authority over how executive officers carry out their statutory responsibilities. *See, e.g.*, Exec. Order No. 12,866, 58 Fed. Reg. 51,735, § 1(b), (Sept. 30, 1993) (directing agencies on how to exercise regulatory authority, "to the extent permitted by law and where applicable"); Exec. Order No. 13,563, 76 Fed. Reg. 3821, § 1(b) (Jan. 18, 2011) (similar); Exec. Order No. 13,279, 67 Fed. Reg. 77,141, § 2 (Dec. 12, 2002) (directing agencies, "to the extent permitted by law," to be guided by certain principles when "formulating and implementing policies that have implications for faith-based and community organizations"); Exec. Order No. 13,765, 82 Fed. Reg. 8351, § 2 (Jan. 20, 2017) (directing agencies to "exercise all authority and discretion available to them" to waive certain requirements "[t]o the maximum extent permitted by law"); Exec. Order. No. 14,004, 86 Fed. Reg. 7475 § 1 (Jan. 25, 2021) (directing the Executive Branch to "consistent with applicable law, use terms and conditions of Federal financial assistance awards and Federal procurements to maximize the use of goods, products, and materials produced in, and services offered in, the United States").

the executive order exceeded the President's constitutional authority. *See id.* at 31–32. The D.C. Circuit rejected this argument, pointing out that the executive order "directs [agencies] how to proceed in administering federally funded projects, but only '[t]o the extent permitted by law.'" *Id.* at 33. "Thus, if an executive agency, such as the FEMA, may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Id.* The court concluded that "[t]he mere possibility that some agency might make a legally suspect decision" in the future is not a ground for an injunction. *Id.* (citing *Reno v. Flores*, 507 U.S. 292, 301 (1993)); *see also Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020) (Katsas, J.) ("We cannot ignore these repeated and unambiguous qualifiers imposing lawfulness and feasibility constraints on implementing the memorandum.").

The Fourth Circuit's decision in *HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021), is not to the contrary. There, the court held that an EO and an implementing agency notice imposed a requirement that was contrary to statute, even though they allowed a "theoretical opportunity for the Secretary to *override*" the unlawful requirement. *Id.* at 325. Imposing a requirement that is contrary to law, but allowing agencies the "discretion" to override it in "limited circumstances," *id.* at 319, is not the same as directing agencies to take actions only to the extent they are consistent with applicable law. The former may be contrary to law, but the latter cannot.[6]

Nor do the EOs challenged here "preclude[] a court from examining whether [they are] consistent with law," rendering "judicial review . . . a meaningless exercise." *HIAS*, 985 F.3d at 325 (quoting *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018)). As the D.C.

---

[6] The EOs' applicability only to the extent consistent with existing law also forecloses Plaintiffs' argument that they conflict with Section 1557 of the ACA, 42 U.S.C. § 18,116, Section 1908 of the PHSA, 42 U.S.C. § 300w-7, or the Fifth Amendment. *See* Pls.' Mem. at 19–27.

Circuit noted, "[i]n the event that an agency does contravene the law in a particular instance, an aggrieved party may seek redress through any of the procedures ordinarily available to it: a bid protest, a motion for administrative reconsideration, or an action in the district court challenging that specific decision." *Allbaugh*, 295 F.3d at 33; *see also* 5 U.S.C § 702.

Plaintiffs and this Court appear to misapprehend the nature of the EOs and of executive authority to administer grants. Contrary to Plaintiffs' argument, the Executive Branch does not uniformly "lack[] the power to condition federal funds." Pls.' Mem. at 18. For example, NIH possesses general authority to fund research, *see* 42 USC §§ 241(a), 284(b), and to exercise discretion to allocate funds and determine research priorities, *id.* § 282(b)(3), (5), (6), (21); *cf. Apter v. Richardson*, 510 F.2d 351, 355 (7th Cir. 1975) ("[T]he Public Health Service Act does confer broad discretion in the funding of training programs."). NIH has exercised this authority, delegated by Congress, to add terms and conditions to grants in accordance with Executive Orders, including Executive Order 13,505, which directed NIH to "support and conduct responsible, scientifically worthy human stem cell research, including human embryonic stem cell research, to the extent permitted by law." Exec. Order 13,505, 74 FR 10,667, 10,667 (2009); *see* NIH Guidelines, 74 FR 32,170–32,175 (July 7, 2009); 45 C.F.R. § 75.210 (authorizing NIH to place terms and conditions on awards); *Sherley v. Sebelius*, 644 F.3d 388, 397 (D.C. Cir. 2011).

This is but one example where the Executive Branch possesses discretion, delegated by Congress, to administer federal grants, including by conditioning or distributing funds according to Presidential policies. Therefore, contrary to the Court's TRO opinion, the President's directive to agencies to take appropriate steps to condition certain grants consistent with applicable law does not facially exceed the President's Article II authority, does not infringe on Congress's spending power, and does not usurp Congress's Article I lawmaking authority. *See* TRO Op. at 31–37.

TROs granted against a separate executive order placing a broad and immediate pause on federal funding, meanwhile, do not counsel in favor of a PI here. *See* TRO, *New York v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I. Jan. 31, 2025), ECF No. 50; *see also* TRO, *Nat'l Council of Nonprofits v. OMB*, 25-cv-239-LLA (D.D.C. Feb. 3, 2025), ECF No. 30. In those cases, the plaintiffs challenged a now-rescinded OMB memorandum "requir[ing] Federal agencies to identify and review all Federal financial assistance programs and supporting activities consistent with the President's policies and requirements." OMB Mem. at 1, M-25-13, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025). The OMB Memo further directed that "[i]n the interim, to the extent permissible under applicable law, Federal agencies must temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders." *Id.* at 2. The EOs at issue here are fundamentally different from the funding pause at issue in those cases. By their own terms, the EOs challenged here direct agencies to impose a new *condition* on grant funding (to the extent consistent with applicable law)—not immediately pause existing grant funding. Thus, the two actions implicate different agency statutory authorities and aspects of the underlying grant agreements. Moreover, no agency defendant has terminated or withheld funding for any grant on the basis of the Defending Women or Protecting Children EOs.

       *B. Plaintiffs are unlikely to succeed on the merits of their Equal Protection claim.*

"[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976). This guarantee "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). To analyze governmental action under the equal protection guarantee, courts "apply different levels of scrutiny to different types of classifications." *Clark v.*

*Jeter*, 486 U.S. 456, 461 (1988). Typically, governmental classifications must be merely "rationally related to a legitimate governmental purpose." *Id.* "Classifications based on race or national origin," on the other hand, are suspect and receive "the most exacting scrutiny." *Id.* "Between these extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny, which generally has been applied to discriminatory classifications based on sex or illegitimacy." *Id.*

As an initial matter, application of any of these tiers of scrutiny is inappropriate here, where there is no agency action to scrutinize. The EOs further do not implicate a suspect or quasi-suspect classification. Although the Fourth Circuit in *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) held that certain funding restrictions on the provision of similar kinds of treatments implicated quasi-suspect classifications, the government's position is that *Kadel* was wrongly decided and should be overruled.[7] In any event, the EOs satisfy both rational and intermediate scrutiny, and Plaintiffs' motion should therefore be denied.

> i.    *EOs directing agencies to explore future options are not amenable to constitutional scrutiny.*

At the threshold, there is a doctrinal mismatch between the EOs—which direct agencies to explore a policy option—and any form of heightened scrutiny. As discussed in Parts I.A and II.A, *supra*, the EOs only direct agencies to gather information and take "appropriate steps," based on what the facts and law allow. EO 14,187 § 4. The EOs do not, as Plaintiffs posit, "prohibit recipients of federal funds" from doing anything. Pls.' Mem. at 22. Plaintiffs seek to pretermit the agencies' information-gathering process, forcing the government to justify policies that it has not

---

[7] Petitions for certiorari in *Kadel* are currently pending before the Supreme Court. The Supreme Court's disposition of those petitions may be affected by its forthcoming decision in *United States v. Skrmetti*, No. 23-477 (U.S.), concerning whether other state laws regarding similar treatments violate the Equal Protection Clause.

even adopted. Defendants are aware of no case requiring that the government must carry a particular evidentiary burden before it can even *contemplate* future action, and Plaintiffs cite none. Plaintiffs therefore have not met their heavy burden to show entitlement to the extraordinary relief of a preliminary injunction.

> ii. *The EOs do not warrant intermediate scrutiny based on sex classification.*

In *Kadel*, the closely-split *en banc* Fourth Circuit held that funding restrictions on coverage for treatments whose purpose was "to align a patient's gender presentation with a gender identity that does not match their sex assigned at birth" amounted to a sex classification, where coverage was not restricted "when the purpose of the surgery is to align a patient's gender presentation with their sex assigned at birth." *Id.* at 153. *Kadel* did not consider conditions tethered solely on provision of certain treatments to adolescents. But in any event, the government respectfully preserves the argument that *Kadel* was wrongly decided.

The EOs do not treat anyone differently on the basis of sex, applying evenhandedly to males and females. The Protecting Children EO directs agencies to take appropriate steps, consistent with applicable law, to ensure that grant recipients do not provide the referenced treatments to members of either sex who are less than 19 years of age. EO 14,187 §§ 2, 4. *See L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 480 (6th Cir. 2023), *cert. granted*, 144 S. Ct. 2679 (U.S.) (that a "key distinction in the laws turns on age" is "eminently reasonable and does not trigger heightened review."). The Defending Women EO similarly rejects the proposition that "there is a vast spectrum of genders that are disconnected from one's sex," EO 14,168 § 2(f)—a position that applies equally to both sexes. Such policies do not privilege or burden one sex over the other, nor apply one regime to men and another to women, making it wholly unlike the classifications the Supreme Court has found to be sex-based. *See, e.g.*, *Miss. Univ. for Women v. Hogan*, 458 U.S.

718 (1982) (university's policy of admitting women, but not men, was sex classification).

Plaintiffs wrongly contend that the Protecting Children EO classifies based on sex because it does not implicate "a given type of care" (e.g., "testosterone") to a boy who seeks to align his appearance with a male identity, but does implicate that type of care for a girl who seeks to align her appearance with a male identity. Pls.' Mem. at 23. This reasoning wrongly "assumes that any administration of these hormones is one treatment," whereas in fact "[u]sing testosterone or estrogen to treat gender dysphoria . . . is a different procedure from using testosterone or estrogen to treat, say, Kleinfelter Syndrome or Turner Syndrome." *Skrmetti*, 83 F.4th at 481; *see also Eknes-Tucker v. Governor of Ala.*, 114 F.4th 1241, 1262 (11th Cir. 2024) (Lagoa, J., concurring in denial of reh'g en banc) (state restriction on similar treatments "discriminates based on purpose, not sex"). That the Protecting Children EO addresses different treatments differently does not implicate the Fifth Amendment's requirement that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

Plaintiffs also wrongly argue the EOs classify based on sex because they "enforc[e] sex stereotypes and gender conformity." Pls.' Mem. at 22. But the Orders do not prescribe how men and women should behave or present themselves, nor do they rely on generalizations relating to "the proper roles of men and women," *Hogan*, 458 U.S. at 726. The EOs instead recognize inherent biological differences between men and women—differences that the Supreme Court and others have long recognized. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 533 (1996) (stating that "[p]hysical differences between men and women . . . are enduring"). Governmental recognition of the "biological" and "undeniable difference[s]" between the sexes "is not a stereotype." *Nguyen v. INS*, 533 U.S. 53, 68, 73 (2001); *see also Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974).

> iii.    *The EOs do not warrant intermediate scrutiny based on trans-identifying classification.*

Plaintiffs next argue that the EOs trigger intermediate scrutiny because they "classify based on transgender status." Pls.' Mem. at 23. The Protecting Children EO targets only specified treatments for minors based on their medical purpose, EO 14,187 § 2, and does not constitute a classification based on "transgender status." Nor does the Defending Women EO's recognition that the "sexes are not changeable," EO 14,168 § 2, "deny the existence," TRO Op. at 40, of persons whose "subjective sense of self" is "disconnected" from that "biological reality," EO 14,168 § 2.

Even if the Court finds that the EOs classify based on trans-identifying status, as it did in its TRO opinion, the government respectfully preserves the argument that the Fourth Circuit's cases treating trans-identifying individuals as a "quasi-suspect class" were wrongly decided. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610 (4th Cir. 2020). Trans-identifying persons do not "exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group." *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987). "The Supreme Court has not recognized any new constitutionally protected classes in over four decades," and lower courts should follow the Supreme Court's lead. *Ondo*, 795 F.3d at 609.

> iv.    *The EOs do not warrant intermediate scrutiny based on discriminatory intent.*

Plaintiffs argue that even if the EOs do not facially classify based on sex, they still warrant intermediate scrutiny because they are animated by discriminatory intent. Pls.' Mem. at 24–25. But Plaintiffs do not come close to the required showing that the Orders are "inexplicable by anything but animus." *Trump v. Hawaii*, 585 U.S. 667, 706 (2018); *see also Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 253 (2022) ("This Court has long disfavored arguments based on alleged legislative motives.").

As set out in the EOs' text and further discussed at Part II.B.v., *infra*, the purpose of the Protecting Children EO is to combat oft-irreversible "medical interventions" that some "children soon regret," leaving them with rising "medical bills," "lifelong medical complications," and other issues. EO 14,187 § 1; *see also* EO 14,168 § 1 (discussing purpose of protecting women's "dignity, safety, and well-being"); *Eknes-Tucker*, 114 F.4th at 1271–75 (declarations discussing physical and mental health issues stemming from similar medical interventions). As the Sixth Circuit explained in *Skrmetti*, "a law premised only on animus toward the transgender community would not be limited" by age, and age limits on serious medical interventions in fact show that the government "plainly had other legitimate concerns in mind." 83 F.4th at 487; *see also id.* at 488 (noting that the "novelty" of similar treatments "also undercuts any claim of animus").

Plaintiffs' contention that the "context surrounding" the EOs shows animus should not be credited. Pls.' Mem. at 25. Plaintiffs cite no authority for the proposition that other orders issued by the President—not before the Court in this case—can or should shed meaningful light on the purposes of the EOs challenged here, and such speculative theories conflict with the Supreme Court's reluctance to engage in wide-ranging motive-based inquiries. *See Dobbs*, 597 U.S. at 253.

> v.   *Important governmental interests animate the President's directive that agencies explore policy options.*

Rational basis review requires only that "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Under intermediate scrutiny, the government must show that the classification "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Virginia*, 518 U.S. at 533 (quotations omitted). Because the EOs do not classify based on any protected characteristic, rational basis review should apply. But the EOs also satisfy intermediate scrutiny, and should therefore be

-22-
JA713

upheld. The Court should not read *Kadel* to bar this conclusion, as the laws at issue in *Kadel* were not limited to treatments for adolescents, nor based on concerns especially applicable to young people. *See* EO 14,187 § 1. To the extent the Court concludes otherwise, Defendants respectfully preserve the argument that *Kadel* was wrongly decided.

The EOs here serve important governmental interests. "A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens," and the Supreme Court has accordingly "sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights." *New York v. Ferber*, 458 U.S. 747, 757 (1982) (quotation omitted). The EOs are based on this governmental interest: as the Protecting Children EO explains,

> Countless children soon regret that they have been mutilated [through the covered treatments] and begin to grasp the horrifying tragedy that they will never be able to conceive children of their own or nurture their children through breastfeeding. Moreover, these vulnerable youths' medical bills may rise throughout their lifetimes, as they are often trapped with lifelong medical complications, a losing war with their own bodies, and, tragically, sterilization.

EO 14,187 § 1.[8] Far from evincing a "bare desire to harm" trans-identifying people, Pls.' Mem. at 28–29, the Protecting Children EO evinces a presidential directive that agencies consider appropriate ways to prevent serious harms to young people under applicable law.

Evidence abounds that treatments covered by the Protecting Children EO "are dangerous and ineffective." *Eknes-Tucker*, 114 F.4th at 1266 (Lagoa, J., concurring); *Skrmetti*, 83 F.4th at 489 (discussing evidence); Tenn. Code Ann. § 68-33-101 (legislative findings that similar treatments "can lead to the minor becoming irreversibly sterile, having increased risk of disease and illness,

---

[8] Although Plaintiffs challenge both EOs, they discuss only the government's interest in protecting the health of adolescents, as particularly addressed in the Protecting Children EO. And they only seek an injunction against the Defending Women EO to the extent it relates to provision of "gender affirming medical care to a patient under nineteen." Pls.' Proposed Order at 2.

or suffering from adverse and sometimes fatal psychological consequences"). Moreover, as the Protecting Children EO references, adolescents cannot necessarily "appreciate the life-altering nature of the[se] medical treatments" such that they are "incapable of knowingly consenting" to their use. *Eknes-Tucker*, 114 F.4th at 1267 (Lagoa, J., concurring). Combined with the fact that "studies show that most children with gender dysphoria grow out of it," *id.*, this results in adolescents later experiencing "regret" about the treatments they were subjected to, EO 14,187 § 1. At minimum, there is a "lack of clear data on how frequently . . . regret occurs," supporting the government's interest in limiting funding for such treatments at this time. *The Cass Review: Independent Review of Gender Identity Services for Children and Young People* ("*Cass Review*") at 22, 179 (Apr. 2024), https://perma.cc/3QVZ-9Y52.

Plaintiffs argue that these treatments are "safe and effective." Pls.' Mem. at 26. But there is ample cause for the EOs' concern about a lack of sufficient medical or scientific evidence of the safety and efficacy of such treatments for gender dysphoria in minors. *See, e.g.*, *Skrmetti*, 83 F.4th at 488–89 (discussing the "unsettled, developing, in truth still experimental[] nature of treatments in this area"); Tenn. Code Ann. § 68-33-101 (similar treatments "are experimental in nature and not supported by high-quality, long-term medical studies"); *Treatment: Gender Dysphoria*, National Health Service (May 28, 2023), https://www.nhs.uk/conditions/gender-dysphoria/treatment/ (explaining that "[p]uberty suppressing hormones are not available to children and young people" for treating gender dysphoria in England "because there is not enough evidence on their clinical safety and effectiveness"); *Cass Review* at 22, 179 (finding "no evidence that puberty blockers improve body image or dysphoria," and stating that "[o]ur current understanding of the long-term health impacts of hormone interventions is limited" and that there is "insufficient/inconsistent evidence about the effects of puberty suppression on . . . fertility");

Annette L. Cantu et al., *Changes in Anxiety & Depression from Intake to First Follow-Up Among Transgender Youth in a Pediatric Endocrinology Clinic*, 5:3 Transgender Health 196 (2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC7906229/ (finding "no change in acute distress" in "transgender youth initiating gender-affirming care").[9]

Plaintiffs repeatedly criticize the EOs as underinclusive because they do not address unrelated medical procedures that could create a "risk of regret," could "also impact fertility," or might not be "supported by a particular level of evidence." Pls.' Mem. at 27–28. That the EOs do not address the entire universe of medical treatments does "not undermine the constitutionality of" the EOs, because at most Plaintiffs suggest that the fit between the government's means and its ends "is not a perfect one," whereas "a reasonable fit is all that is required under intermediate scrutiny." *United States v. Chapman*, 666 F.3d 220, 231 (4th Cir. 2012). Neither law nor reason demands that the government address all conceivable medical harms in a single executive order seeking to address the risk of specific harms. Plaintiffs have not shown that the EOs are so "*grossly* over [or] under-inclusive,*" Harrison v. Kernan*, 971 F.3d 1069, 1075 (9th Cir. 2020) (emphasis added), that there can be no substantial relationship between the government's means and its ends. The EOs satisfy intermediate and rational basis scrutiny, and should not be enjoined.

> *C. Plaintiffs are unlikely to succeed on the merits of their statutory sex discrimination claim.*

Title IX of the Education Amendments of 1972 prohibits certain education entities from subjecting individuals to discrimination "on the basis of sex." 20 U.S.C. § 1681(a). Section 1557 of the ACA, 42 U.S.C. § 18116, and Section 1908 of the PHSA, 42 U.S.C. § 300w-7, in turn, incorporate Title IX's prohibition against health care entities receiving certain federal funding.

---

[9] To the extent Plaintiffs argue that not every covered treatment may present the same risks to fertility, that contention does not gainsay the Protecting Children EO's recognition of fertility risks alongside many other potential risks applicable to one or more of the covered treatments.

In *Bostock v. Clayton County*, 590 U.S. 644 (2020), the Supreme Court held that discrimination "because of [an] individual's . . . sex" under Title VII of the Civil Rights Act of 1964 includes discrimination based on "transgender status." And in *Kadel*, the Fourth Circuit held that *Bostock*'s reasoning applies to Title IX's sex-discrimination prohibition, as incorporated into Section 1557. *See* 100 F.4th at 164. Plaintiffs argue, as this Court found for purposes of its TRO opinion, that the EOs discriminate on the basis of trans-identifying status and that they therefore violate the sex-discrimination prohibitions in Section 1557 and Section 1908 under *Kadel*.

As set out in Part II.B.iii, *supra*, the EOs do not classify based on trans-identifying status in the first place, and Plaintiffs' statutory sex discrimination claim therefore fails. Plaintiffs' claim further lacks merit because the EOs do not themselves impose any conditions on funding: any funding conditions would only be imposed after agencies take further steps to "assess grant conditions," EO 14,168 § 3(g), and must be imposed consistent with "applicable law," EO 14,187 § 4. Thus, the EOs require that funding conditions be imposed in a manner consistent with Section 1557 and Section 1908, as applicable, and the EOs are not *ultra vires*. Plaintiffs' speculation that agencies will nevertheless impose conditions violating those statutes—contrary to the EOs' instructions—is premature. Finally, Defendants respectfully preserve the position that *Kadel* was wrongly decided.

**III.    The remaining factors counsel against granting the requested relief.**

Plaintiffs wrongly contend that they have shown irreparable injury because of the "prospect of an unconstitutional enforcement" against them. Pls.' Mem. at 29 (quoting *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022)). But that prospect is speculative at this point given that the EOs have not been applied to any specific funding or grants. Regardless, as set out herein, Plaintiffs "are unlikely to succeed on the merits of their constitutional claims; therefore, their alleged constitutional injuries do not constitute irreparable harm." *Talleywhacker, Inc. v.*

*Cooper*, 465 F. Supp. 3d 523, 542 (E.D.N.C. 2020). Nor is "access to high-quality health care" at issue, TRO Op. at 46—as discussed, the relevant treatments are not supported by high quality evidence and present serious risks to young people.

On the other side of the coin, the relief Plaintiffs request would effectively disable the President and federal agencies from effectuating the President's agenda consistent with their statutory authorities and constitutional duties. The public interest is not advanced when the Executive is disabled from even *considering* a policy, especially one that has been the subject of legislation across the country. *See* KFF, *Policy Tracker: Youth Access to Gender Affirming Care and State Policy Restrictions*. Thus, the balance of the equities weighs in favor of the Government and relief should be denied.

## IV.     Any injunctive relief should be limited to Plaintiffs.

As explained above, the Court should deny Plaintiffs' motion in its entirety. But even if the Court determines that preliminary injunctive relief is appropriate, it should be limited to the Plaintiffs before this Court. Nationwide injunctions are extraordinary remedies, and the burden is on the plaintiff to prove why one is necessary. Plaintiffs have not demonstrated why an injunction limited to themselves would not suffice. Rather, they relegate this heavy burden to a cursory paragraph at the end of their brief. *See* Pls.' Mem. at 30.

"Article III of the Constitution limits the exercise of the judicial power to 'Cases' and 'Controversies.'" *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 438 (2017) (citation omitted). A federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury." *Gill v. Whitford*, 585 U.S. 48, 50 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)); *see also Doe 2 v. Shanahan*, 917 F.3d 694, 739–40 (D.C. Cir. 2019) (Williams, J., concurring) ("'The Court's constitutionally prescribed role is to vindicate the individual rights of

the people appearing before it.' Nothing more." (quoting *Gill*, 585 U.S. at 72)). Thus, "a plaintiff's judicial 'remedy must be tailored to redress *the plaintiff's* particular injury.'" *Id.* at 740 (quoting *Gill*, 585 U.S. at 73).

Principles of equity reinforce those limitations. A court's equitable authority to award relief is generally confined to relief "traditionally accorded by courts of equity" in 1789. *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318, 319 (1999). And "[u]niversal injunctions have little basis in traditional equitable practice." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring); *see also Florida v. Dep't of Health & Human Servs.*, 19 F.4th 1271, 1282 (11th Cir. 2021) (noting that the "appropriate circumstances" for issuing a nationwide injunction "are rare").

Nationwide injunctions also "take a toll on the federal court system." *Hawaii*, 585 U.S. at 713 (Thomas, J., concurring). "The traditional system of lower courts issuing interlocutory relief limited to the parties at hand . . . encourages multiple judges and multiple circuits to weigh in." *New York*, 140 S. Ct. at 600 (Gorsuch, J., concurring). In contrast, nationwide injunctions "prevent[] legal questions from percolating through the federal courts." *Hawaii*, 585 U.S. at 713 (Thomas, J., concurring). Moreover, "[i]f a single successful challenge is enough to stay the challenged rule across the country, the government's hope of implementing any new policy could face the long odds of a straight sweep, parlaying a 94-to-0 win in the district courts into a 12-to-0 victory in the courts of appeal." *New York*, 140 S. Ct. at 601 (Gorsuch, J., concurring). "A single loss and the policy goes on ice—possibly for good, or just as possibly for some indeterminate period of time until another court jumps in to grant a stay." *Id.* These concerns are apt here. A group of plaintiffs have challenged the same EOs on similar grounds in the Western District of Washington, and have also moved for a preliminary injunction after entry of a TRO. *See* Pls.' Mot.

for Prelim. Inj., ECF No. 169, *Washington*, 2:25-cv-244 (W.D. Wash. Feb. 28, 2025). Here, Plaintiffs' statutory and Equal Protection arguments hinge on Fourth Circuit precedent that diverges from authority in other circuits, and Ninth Circuit law and the reviewing court's analysis may diverge in other relevant respects as well. As a result, this Court should allow "multiple circuits to weigh in," *New York*, 140 S. Ct. at 600 (Gorsuch, J., concurring), and not block the administration's policies beyond what is necessary to provide relief to Plaintiffs.

Permitting nationwide injunctions also undercuts the primary mechanism Congress has authorized to permit broader relief: class actions. It enables all potential claimants to benefit from nationwide injunctive relief by prevailing in a single district court, without satisfying the prerequisites of Federal Rule of Civil Procedure 23, while failing to afford the Government the corresponding benefit of a definitive resolution of the underlying legal issues to all potential claimants if it prevails instead.

Plaintiffs nonetheless contend that a nationwide PI is necessary because the plaintiff associations have "members throughout the country" (though they do not say that they have members in every state, let alone every hospital that receives federal grant funding). Pls.' Mem. at 30. But "injunctive relief operates on specific parties, not geographic territories, and identifying the . . . association members is possible." *Georgia v. President of the U.S.*, 46 F.4th 1283, 1307 (11th Cir. 2022). Nor is nationwide relief appropriate to avoid "confusion" from "preventing agencies from conditioning funds on certain medical institutions, while allowing conditional funding to persist as to other medical institutions." TRO Op. at 50–51; *see also* Pls.' Mem. at 30. It is "inappropriate" to grant overbroad relief due to the mere "lack of uniformity that would result from a well-tailored injunction." *Georgia*, 46 F.4th at 1307. For all these reasons, any PI should be limited to the named Plaintiffs only. And as to the membership organizations, any relief should be

granted only to the members identified in the complaint, and plaintiffs have identified none beyond named Plaintiffs. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring).

**V.      Any injunctive relief should be accompanied by a bond.**

The Defendants also respectfully request that any injunctive relief be accompanied by a bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A bond is appropriate here given that any preliminary relief would potentially mandate that the Executive spend money that may not be recouped once distributed.

**VI.     Any injunctive relief should be stayed.**

To the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized. *See* Fed. R. App. P. 8(a)(1).

<strong>CONCLUSION</strong>

Plaintiffs' motion for a preliminary injunction should be denied.


Dated: February 25, 2025                    Respectfully submitted,

                                            ERIC J. HAMILTON
                                            Deputy Assistant Attorney General

                                            MICHELLE BENNETT
                                            Assistant Director
                                            Federal Programs Branch


                                            */s/ Vinita B. Andrapalliyal*

-30-

VINITA B. ANDRAPALLIYAL
Senior Counsel
CHRISTIAN S. DANIEL
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel.:    (202) 514-0265
vinita.b.andrapalliyal@usdoj.gov
christian.s.daniel@usdoj.gov
*Counsel for Defendants*

Case 8:25-cv-00337-BAH    Document 90-1    Filed 02/25/25    Page 1 of 54

Notice of Funding Opportunity

**Application due February 10, 2025**



HIV/AIDS Bureau
Division of Community HIV/AIDS Programs

# Ryan White HIV/AIDS Program Part D - Women, Infants, Children and Youth (WICY) Grant Supplemental Funding

Opportunity number: HRSA-25-050



# Contents

Before you begin                                                    3

🔍 **Step 1: Review the Opportunity**                                **4**

Basic information                                                   5

Eligibility                                                         6

Program description                                                7

Award information                                                  17

✔ **Step 2: Get Ready to Apply**                                   **21**

Get registered                                                     22

Find the application package                                       22

Application writing help                                           22

✏ **Step 3: Write Your Application**                               **24**

Application contents and format                                    25

💡 **Step 4: Learn About Review and Award**                        **35**

Application review                                                 36

Selection process                                                 41

Award notices                                                     42

⬆ **Step 5: Submit Your Application**                              **43**

Application submission and deadlines                               44

Application checklist                                              45

🕐 **Step 6: Learn What Happens After Award**                      **47**

Post-award requirements and administration                         48

👤 **Contacts and Support**                                        **52**

JA724



# Before you begin

If you believe you are a good candidate for this funding opportunity, secure your SAM.gov and Grants.gov registrations now. If you are already registered, make sure your registrations are active and up-to-date.

### SAM.gov registration (this can take several weeks)

You must have an active account with SAM.gov. This includes having a Unique Entity Identifier (UEI).

See Step 2: Get Ready to Apply

### Grants.gov registration (this can take several days)

You must have an active Grants.gov registration. Doing so requires a Login.gov registration as well.

See Step 2: Get Ready to Apply

### Apply by the application due date

Applications are due by 11:59 p.m. Eastern Time on February 10, 2025.

 To help you find what you need, this NOFO uses internal links. In Adobe Reader, you can go back to where you were by pressing Alt + Left Arrow (Windows) or Command + Left Arrow (Mac) on your keyboard.

Case: 6:25-cv-06043-TDH      Document 503-1      Filed 02/25/25      Page 4 of 52

**Jump to a step**

| 1. Review | 2. Get Ready | 3. Write | 4. Learn | 5. Submit | 6. Award | Contacts |



# Step 1:
# Review the Opportunity

**In this step**

| Basic information | 5 |
| Eligibility | 6 |
| Program description | 7 |
| Award information | 17 |

1. Review   2. Get Ready   3. Write   4. Learn   5. Submit   6. Award   Contacts

Case 8:25-cv-00337-BAH    Document 90-1    Filed 02/25/25    Page 5 of 54

# Basic information

**Health Resources and Services Administration**

HIV/AIDS Bureau

Division of Community HIV/AIDS Programs

This program supports current RWHAP Part D recipients to carry out one short-term activity that can be completed by the end of the 1 year period of performance.

## Summary

Funding under this program supports current RWHAP Part D recipients to carry out one short-term activity that can be completed by the end of the 1 year period of performance.

## Funding detail

**Application type:** Competing Supplement

**Expected total available FY 2025 funding:** $3,000,000

**Expected number and type of awards:** 25 grants

**Funding range per award:** up to $200,000 per organization

The program and awards depend on the appropriation of funds and are subject to change based on the availability and amount of appropriations.

We plan to fund awards in one 12-month budget period for a total 1-year period of performance of August 1, 2025 to July 31, 2026.



Have questions? Go to
**Contacts & Support**

### Key facts

**Opportunity name:** Ryan White HIV/AIDS Program Part D - Women, Infants, Children and Youth (WICY) Grant Supplemental Funding

**Opportunity number:** HRSA-25-050

**Announcement version:** New

**Federal assistance listing:** 93.153

**Statutory authority:** 42 USC §§ 300ff-71 and 300ff-121 (§§ 2671 and 2693 of the Public Health Service Act).

### Key dates

**NOFO issue date:** December 10, 2024

**Informational webinar:** December 17, 2024

**Application deadline:** February 10, 2025, at 11:59 p.m. Eastern Time (ET)

**Expected award date is by:** August 1, 2025

**Expected start date:** August 1, 2025

See other submissions for other time frames that may apply to this NOFO.

# Eligibility

## Who can apply

You can apply if you are a current recipient funded under the following:

- HRSA-22-037 Ryan White HIV/AIDS Program Part D, Coordinated HIV Services and Access to Research for Women, Infants, Children, and Youth (WICY) Existing Geographic Service Areas
- HRSA-22-156 Ryan White HIV/AIDS Program Part D, Coordinated HIV Services and Access to Research for Women, Infants, Children, and Youth (WICY) Limited Existing Geographic Service Areas

## Other eligibility criteria

None.

## Completeness and responsiveness criteria

We will review your application to make sure it meets these basic requirements to move forward in the competition.

We will not consider an application that:

- Is from an organization that does not meet all eligibility criteria.
- Requests funding above the award ceiling shown in the funding range.
- Is submitted after the deadline.

## Application limits

You may not submit more than one application. If you submit more than one application, we will only accept the last on-time submission.

## Cost sharing

This program does not have a cost-sharing requirement. If you choose to share in the costs of the project, we will not consider it during merit review. We will hold you accountable for any funds you add, including through reporting.

# Program description

## Purpose

The purpose of this additional funding is to increase access to high quality family-centered HIV health care services for low-income women, infants, children, and youth, commonly abbreviated as WICY.

HRSA intends funding under this program to support one short-term activity that can be completed by the end of the one-year period of performance. You may propose an expansion of an activity previously supported under the FY2023 or FY2024 RWHAP Part D Supplemental funding (HRSA-23-050; HRSA-24-061) or Part C Capacity Development funding (HRSA-23-052; HRSA-24-062) for either an HIV Care Innovation or Infrastructure Development activity; however, HRSA will not fund the same activity in FY 2025 as HRSA funded previously in FY 2023 or FY 2024. If the proposed project is an expansion of a previously funded activity, you must provide a clear rationale for how the proposed activity builds upon and furthers the objectives of the previously funded activity.

## Background

The HRSA Ryan White HIV/AIDS Program (RWHAP) has five statutory funding parts that provide a comprehensive system of medical care, support, and medications for low-income people with HIV. The goal is better health results, and lower HIV transmission in priority groups.

The HIV care continuum is key to the program. It shows the journey of someone with HIV from diagnosis to effective treatment, leading to viral suppression. Reaching viral suppression boosts the individual's quality of life and prevents HIV transmission.

This continuum also helps programs and planners measure progress and use resources effectively. We require you to assess your outcomes and work with your community and public health partners to improve outcomes across the HIV care continuum. To assess your program, review HRSA's Performance Measure Portfolio.

### Strategic frameworks and national objectives

To address health challenges faced by low-income people with HIV, using national objectives and strategic frameworks is crucial. These frameworks include:

- Healthy People 2030
- National HIV/AIDS Strategy (NHAS) (2022–2025)
- Sexually Transmitted Infections National Strategic Plan for the United States (2021–2025)

- Viral Hepatitis National Strategic Plan for the United States: A Roadmap to Elimination (2021–2025)

These strategies offer guidance on the main principles, priorities, and steps for our national health response. They serve as a blueprint for collective action and impact.

## Expanding the effort

There have been significant accomplishments of the RWHAP:

- From 2018 to 2022, HIV viral suppression among Ryan White program clients improved from 87.1% to 89.6%. For more, see the 2022 Ryan White Services Report (RSR).
- Racial, ethnic, age-based, and regional disparities in viral suppression rates have significantly reduced. For more, see the RWHAP Annual Data Report 2022.
- In 2020, the Ending the HIV Epidemic in the U.S. (EHE) initiative launched to further expand federal efforts to reduce HIV transmission. For the RWHAP, the EHE initiative expands the program's ability to meet the needs of clients, specifically focusing on linking people with HIV who are either newly diagnosed, diagnosed but currently not in care, or are diagnosed and in care but not yet virally suppressed, to the essential HIV care, treatment, and support services needed to help them reach viral suppression.

## Using data effectively

HRSA and CDC promote integrated data sharing and use for program planning, quality improvement, and public health action.

We encourage you to:

- Follow the Data Security and Confidentiality Guidelines for HIV, Viral Hepatitis, Sexually Transmitted Disease, and Tuberculosis Programs.
- Create data-sharing agreements between surveillance and HIV programs.
- Progress towards NHAS goals through integrated data sharing, analysis, and use of HIV data by health departments.
- Complete CD4, viral load, and HIV nucleotide sequence reporting to the state and territorial health departments' HIV surveillance systems. CDC mandates the reporting of all such data to the National HIV Surveillance System (NHSS).
- Use our interactive RWHAP Compass Dashboard to visualize reach, impact, and outcomes of the Ryan White program and to inform planning and decision making. The dashboard gives you a look at national, state, and metro area data and displays client demographics, services, outcomes, and viral suppression. It also includes data about clients in the AIDS Drug Assistance Program (ADAP).

- Develop data-sharing strategies with other RWHAP recipients and relevant entities to reduce administrative burden.
- Use electronic data sources to verify client eligibility when you can. See Policy Clarification Notice 21-02, Determining Client Eligibility & Payor of Last Resort in the Ryan White HIV/AIDS Program.

## Program resources and innovative models

We offer multiple projects and resources to help you. A full list of resources is available on TargetHIV. We urge you to learn about them and use them in your project. For some examples, see Helpful Websites.

# Program requirements and expectations

You may submit a proposal for only one of the following two categories and select one activity under your selected category. Note that if you choose the Infrastructure Development category, there is only one available activity:

- HIV Care Innovation:
  - Strategic Partnerships
  - Doula services
  - Streamlining eligibility for Ryan White Program services
  - Inclusive care for underrepresented communities with disproportionately high rates of HIV
  - Implementing evidence-informed interventions
  - Intimate partner violence screening and counseling
- Infrastructure Development:
  - Electronic health record and data coordination

A description of the activities by category is below.

## HIV Care Innovation activities

### Activity: Strategic Partnerships

**Background**

Strategic, non-traditional partnerships are vital for the success of the Ryan White HIV/AIDS Program in addressing the complex challenge of re-engaging women with HIV who have fallen out of care and early linkage to prenatal care. By strengthening partnerships with organizations beyond the traditional healthcare setting—such as faith-based groups, fraternities and sororities, housing and employment services, educational institutions, domestic violence and family service organizations, mental

health, and social service agencies—the program can access hard-to-reach populations and provide a more whole person care support system. These collaborations can help identify and address barriers to care, such as stigma, transportation, childcare, and economic instability, which disproportionately affect women with HIV. By leveraging the trust and reach of these non-traditional partners, the program can create more effective, culturally competent, and sustainable pathways to re-engagement, ensuring that women with HIV receive the comprehensive, family-centered care they need to achieve optimal health outcomes.

**Directions**

If you select this activity, it must address at least one of the following components **and** address at least one or more of the stages of the HIV care continuum:

**Partnership Development**

- Craft and execute a plan to collaborate with strategic, non-traditional partners (e.g. faith-based organizations, OB/GYNs, midwives, emergency rooms, etc.) that focus on maternal health and HIV/AIDS to engage and/or re-engage women with HIV into care or provide early linkage to prenatal services. The plan should describe how this partnership will address existing or emerging obstacles to care and how the partnership will strengthen your capacity to meet the continuum of maternal health service needs for people with HIV. Develop Memorandums of Understanding (MOUs) or partnership agreements to outline roles, responsibilities, plans for managing services via referrals and linkage to care, and shared goals with these non-traditional partners.

- Develop and maintain a robust network of culturally responsive referral partnerships that include but are not limited to Title V programs, health care providers, mental health services, doulas, Special Supplemental Nutrition Program for Women, Infants, and Children (WIC), Supplemental Nutrition Assistance Program (SNAP), Temporary Assistance to Needy Families (TANF), education and vocational training programs and organizations addressing housing and food insecurity. The partnerships should focus on identifying shared goals, and executing activities that improve coverage, access, and quality of services to women with HIV.

**Training and Capacity Building**

- Train community health workers and/or peer navigators from the community, such as members of faith based organizations with skills to identify and engage priority populations and women with HIV, emphasizing culturally competent care and confidentiality. You can also train peers, especially those with lived experience, to provide support and navigate care systems, offering mentorship and fostering trust within the community.

- Hire a Strategic Partnerships Lead to meet, discuss, and identify maternal and child health-related partners, establish partnerships, educate partners on the RWHAP Part D, and to oversee and implement the partnership plan.
- Develop and promote tools, trainings, and resources for maternal and child health professionals, community organizations, families, state Title V agencies, Healthy Start Programs, and other maternal and child health programs on working with priority populations with HIV and their affected family members.

**Implementation of Evidence-Based Programs**

- Establish and implement pregnancy and child-birth evidence-based support groups or programs, focusing on prenatal care, mental health, and coping strategies for people with HIV and their affected family members.
- Establish and implement pregnancy case management models focusing on monitoring and tracking pregnant people throughout the course of their pregnancy, and post-partum to ensure linkage back to primary HIV medical care.

## Activity: Doula services

**Background**

Improving maternal and infant health are HRSA priorities and are connected to the implementation of government-wide strategies to combat maternal mortality and morbidity, as well as the HRSA Enhancing Maternal Health Initiative. This includes supporting programs or activities that result in:

- a more representative maternal care workforce
- better access to doulas and midwives to improve outcomes for people with HIV before, during, or after pregnancy

A doula is a professional trained in childbirth who provides emotional, physical, and educational support to a person who is expecting, is experiencing labor, or has recently given birth.

Additionally, a postpartum doula provides evidence-based information on topics such as:

- Infant feeding
- Emotional and physical recovery
- Bonding
- Infant soothing
- Basic newborn care

**Directions**

USCA4 Appeal: 25-1279    Doc: 34-2    Filed: 07/25/2025    Pg: 158 of 589

1. Review    2. Get Ready    3. Write    4. Learn    5. Submit    6. Award    Contacts
Case 8:25-cv-00337-BAH    Document 90-1    Filed 02/25/25    Page 12 of 54

If you select this activity, it must address one of the following two components which are critical to the provision of doula care for people with HIV and their families, **and** address at least one or more of the stages of the HIV care continuum:

**Funding a doula to provide supportive services before, during, and after pregnancy to:**

- Provide effective and culturally responsive pregnancy and childbirth education, early linkage to health care and social services, labor coaching, and encouraging parental attachment.
- Provide patient advocacy and support to clients during the prenatal, birth and postpartum period (within 3 months after birth) to ensure their voices, needs and decisions are being heard.
- Assist in the navigation of the health care system during pregnancy and postpartum by linking clients to support services, including mental health support.
- Assist with infant feeding options, particularly with the 2023 update to the Perinatal HIV Clinical Guidelines.
- Assist in the support and education of pregnant and postpartum clients in the following of their HIV indeterminate infants.
- Provide education and support in the prevention of perinatal transmission during and after pregnancy.

**Conducting outreach and building partnerships**

- Activities in this category should address how doulas can conduct outreach and build partnerships with community-based organizations to engage and recruit people with HIV to engage with this program.
- Additional activities include educating clients on the role of doulas during the prenatal, birth and postpartum periods.

**Additional Notices**

- The Ryan White HIV/AIDS Program is the payor of last resort.
- Some states provide partial or full Medicaid reimbursement for doula services.
- It is the responsibility of the applicant to stay up to date on third party payor coverage of doula services and federal, state, and local programs that provide doula services in their service area and state.
- Additionally, some states have qualification standards for doulas (including training and certification requirements) to receive reimbursement from a state's Medicaid program.
- Applicants can use the National Academy for State Health Policy's resource on the current state of doula Medicaid Implementation and the HRSA Maternal and Child

Health Bureau's Healthy Start Community-Based Doulas Supplemental Awardees for FY 2021 and FY 2022 as some of the resources for current coverage and training and certification requirements.

## Activity: Streamlining eligibility for Ryan White Program services

**Background**

Consistent with the efforts of HRSA HAB to implement best practices for facilitating rapid entry to HIV care and treatment, streamlining Ryan White Program eligibility attempts minimizes client burden by utilizing available data sources before requesting additional information from the client.

Available sources of data that could verify eligibility are:

- Health information exchanges
- Medicaid enrollment
- State tax filings
- Enrollment and eligibility information collected from health care marketplaces

Recent reports indicate some program recipients have begun to streamline their eligibility processes across their respective states, jurisdictions, and participating community-based organizations.

Many HIV programs, including Ryan White Program recipients and subrecipients, could benefit from adopting these best practices.

**Directions**

For this activity, you should describe the method(s) you will use to conduct a local/regional systems assessment of:

- Ryan White Program recipient organizations
- Care delivery systems
- Income based federal programs such as:
    ◦ Health Information Exchanges
    ◦ Medicaid
    ◦ Supplemental Nutrition Program for Women, Infants and Children
    ◦ Healthy Start

This assessment should identify current administrative systems, electronic data sources, and tools utilized to determine and confirm client eligibility, and obtain client consent.

Discuss how you will promote sharing and collaboration across all RWHAP Parts and others who engage in the peer-to-peer information exchange.

## Activity: Inclusive care for underrepresented communities with disproportionately high rates of HIV

**Background**

This activity will focus on educating health care professionals and front-line service staff about the health and social needs of underrepresented communities with disproportionately high rates of HIV and how the provision of inclusive care can reduce HIV-related disparities in this population.

**Directions**

If you select this activity, you should implement inclusive care, education, and training in the clinical setting, and establish collaborative networks with other educational and training programs and community-based social service organizations serving underrepresented communities.

The activity must address at least *one* of the following two educational and training components critical to inclusive care for underrepresented communities with disproportionately high rates of HIV in at least one or more stages of the HIV care continuum.

**Educational and training components (choose one of the two options below):**

Didactic Training and Education

- Activities in this category should include training and education for clinical and front-line service staff on topics such as cultural competency, stigma, discrimination, and implicit bias, which can affect the quality of care and health outcomes.
- Educational content should address the social determinants of health and medical and pharmacological management of underrepresented communities with disproportionately high rates of HIV.
- For mental health and psychosocial service providers, learning activities may also include training and education on trauma-informed, person-centered care.

Model of Care Infrastructure and Clinical Application for underrepresented communities with disproportionately high rates of HIV

- Activities in this category should include activities that facilitate an inclusive infrastructure of care.
- Examples may include modifying existing electronic health records (EHR), medical intake, or registration forms to be more inclusive and integrating social determinants of health (SDOH) data into EHR systems.

USCA4 Appeal: 25-1279    Doc: 34-2    Filed: 07/25/2025    Pg: 161 of 589

1. Review    2. Get Ready    3. Write    4. Learn    5. Submit    6. Award    Contacts
Case 8:25-cv-00337-BAH    Document 90-1    Filed 02/25/25    Page 15 of 54

- These activities can assist clinicians in providing more precise health and social risk assessments, making predictions about health care utilization and outcomes in underrepresented communities with disproportionately high rates of HIV, and in providing tailored clinical care.

- This activity may include other structural approaches such as integrating other services that support inclusive care, e.g. onsite pharmacy care, developing referral mechanisms and facilitating referrals to other medical and social support services that support person-centered care for underrepresented communities with disproportionately high rates of HIV.

- This activity may include strategies that create a more physically inclusive and supportive infrastructure.

## Activity: Implementing evidence-informed interventions

**Background**

The NHAS identifies priority populations to reduce disparities and improve HIV outcomes, specifically to include RWHAP Part D WICY populations. The NHAS recommends using viral suppression rates as a disparities indicator because increasing and maintaining viral suppression affects HIV-related deaths and transmissions. Ryan White Program Part D recipients are expected to provide evidence-informed interventions that drive better health outcomes.

**Directions**

If you select this activity, you must select an evidence-informed intervention that aims to improve outcomes for priority WICY populations with HIV.

This activity may include:

- Training and educating staff on a specific intervention.

- Purchasing materials to implement an intervention such as a curriculum or manual, office supplies necessary to implement the intervention, educational packets or kits, etc.

- Strategic communication activities to promote and raise awareness of an intervention.

- Collecting and tracking performance measures to make continuous quality improvements and adaptations, if necessary.

- Evaluating performance measures and health outcomes.

- Establishing processes and procedures such as handling missed visits, recapturing patients lost to care, screening for social determinants of health needs that may inhibit retention in care, or tracking pregnant patients referred out for maternal care and the process for ensuring that those patients return to HIV medical care after delivery, etc.

The proposed intervention must address one or more of the stages of the HIV care continuum for WICY with HIV.

You should choose an intervention from the following resources, which are a library of evidence-informed interventions. Note: that you must specify the intervention and resource library used to identify the intervention in the application.

- Best Practices Compilation
- Compendium of Evidence-Informed Approaches to Improving Health Outcomes for People Living with HIV
- Dissemination of Evidence-Informed Interventions
- Evidence-Informed Interventions
- Compendium of Evidence-Based Interventions and Best Practices for HIV Prevention

## Activity: Intimate partner violence screening and counseling

**Background**

There is an intersection between people who experience Intimate Partner Violence (IPV) and HIV risk and barriers to HIV care and treatment. In addition, pregnant women are more likely to experience IPV throughout the course of their pregnancy; thereby increasing their risk for adverse pregnancy outcomes. Addressing IPV's impact on health requires compassionate patient-centered and trauma-informed services and organizations.

**Directions**

If you select this activity, you should implement IPV screening, using an evidence-based tool and counseling in the clinical setting and establish referral networks to community-based social service organizations that can facilitate access to safe and stable housing, food, emotional support, and access to legal services.

The activity must address one or more of the stages of the HIV care continuum.

For resources to prevent and address intimate partner violence, see the CDC's "Intimate Partner Violence Prevention Resource for Action", the HRSA-developed *Preventing and Responding to IPV: an Implementation Framework for HRSA Supported Settings of Care*, Futures without Violence IPV Counseling and Screening Toolkit, and the National Maternal Mental Health Hotline.

## Infrastructure Development activity

### Activity: Electronic health record and data coordination

**Background**

Coordination and integration of Electronic Health Record (EHR) systems with HIV data can reduce double entries and improve accuracy of data collection and reporting.

**Directions**

Activities in this category can include the purchase of software to interface CAREWare (or other HIV data collection systems) with existing electronic health records to:

- Improve accuracy and efficiency in data collection and reporting.
- Create mapping and workflows to reduce administrative burden.
- Verify and cleanse data.
- Test and verify historical and new data.
- Integrate oral and primary health EHR systems.
- Secure consultant services on system integration and coordination.

The proposed activities in this category must be used to enhance or expand an organization's existing EHR system to improve the quality, safety, and efficiency of patient health care for WICY with HIV.

This activity cannot be used for the purchase of an EHR system.

HAB requires that any EHR component purchased, in whole or in part, with federal funds meet the Office of the National Coordinator for Health Information Technology (ONC) requirements for certification.

To improve the quality of clinical data collected, HAB further requires that any EHR or EHR component be configured to report appropriate clinical data electronically for HAB reporting. More information can be found on ONC's website, HealthIT.gov, linked here.

# Award information

## Funding policies and limitations

### Policies

- We will only make awards if this program receives funding. If Congress appropriates funds for this purpose, we will move forward with the review and award process.

# General limitations

- For guidance on some types of costs we do not allow or restrict, see Project Budget Information in Section 3.1.4 of the Application Guide. You can also see 45 CFR part 75, or any superseding regulation, General Provisions for Selected Items of Cost.

- You cannot earn profit from the federal award. See 45 CFR 75.400(g).

- The salary rate limitation imposed by the current appropriations act applies to this program. As of January 2024, the salary rate limitation is $221,900. Note this limitation may apply in future years and will be updated.

# Program-specific limitations

You cannot use funds under this notice for the following:

- Funding restrictions included in PCN 16-02

- Charges that are billable to third party payors (e.g., private health insurance, prepaid health plans, Medicaid, Medicare, Department of Housing and Urban Development (HUD) funding for housing services, other RWHAP funding including AIDS Drug Assistance Program)

- To directly provide housing or health care services (e.g., HIV care, counseling and testing) that duplicate existing services

- Payments for clinical research

- Payments for nursing home care

- Cash payments to intended clients of RWHAP services

- Purchase or improvement to land

- Purchase, construction, or major alterations or renovations on any building or other facility (see 45 CFR part 75 – subpart A Definitions)

- PrEP or non-occupational Post-Exposure Prophylaxis (nPEP) medications or the related medical services. As outlined in the updated November 16, 2021 RWHAP and PrEP program letter, the RWHAP statute provides grant funds to be used for the care and treatment of people with HIV, thus prohibiting the use of RWHAP funds for PrEP medications or related medical services, such as clinician visits and laboratory costs. RWHAP Part D funds can be used toward psychosocial support services, a component of family-centered care, which may include counseling and testing and information on PrEP to eligible clients' partners and affected family members, within the context of a comprehensive PrEP program.

- Purchase of sterile needles and syringes for the purpose of hypodermic injection of any illegal drug use. Some aspects of syringe services programs are allowable

USCA4 Appeal: 25-1279    Doc: 34-2    Filed: 07/25/2025    Pg: 165 of 589

1. Review        2. Get Ready        3. Write        4. Learn        5. Submit        6. Award        Contacts
Case 8:25-cv-00337-BAH    Document 90-1    Filed 02/25/25    Page 19 of 54

with HRSA's prior approval and in compliance with HHS and HRSA policy. See Syringe Services Programs.

- Development of materials designed to directly promote or encourage intravenous drug use or any type of sexual activity.
- Research
- Foreign travel
- Long-term activities; instead, the activities should be short-term in nature with a targeted completion by the end of the one-year period of performance.

You must have policies, procedures, and financial controls in place. Anyone who receives federal funding must comply with legal requirements and restrictions, including those that limit specific uses of funding.

- Follow the list of statutory restrictions on the use of funds in Section 4.1 (Funding Restrictions) of the Application Guide. We may audit the effectiveness of these policies, procedures, and controls.
- 2 CFR § 200.216 prohibits certain telecommunications and video surveillance services or equipment. For details, see the HRSA Grants Policy Bulletin Number: 2021-01E.

See Manage Your Grant for other information on costs and financial management.

## Indirect costs

Indirect costs are costs you charge across more than one project that cannot be easily separated by project. For example, this could include utilities for a building that supports multiple projects.

To charge indirect costs you can select one of two methods:

**Method 1 – Approved rate.** You currently have an indirect cost rate approved by your cognizant federal agency.

**Method 2 – *De minimis* rate**. Per 2 CFR 200.414(f), if you have never received a negotiated indirect cost rate, you may elect to charge a *de minimis* rate. If you choose this method, costs included in the indirect cost pool must not be charged as direct costs.

This rate is 15% of modified total direct costs (MTDC). See 2 CFR 200.1 for the definition of MTDC. You can use this rate indefinitely.

JA741

## Program income

Program income is money earned as a result of your award-supported project activities. You must use any program income you generate from awarded funds for approved project-related activities. Find more about program income at 45 CFR 75.307.



Jump to a step

| 1. Review | 2. Get Ready | 3. Write | 4. Learn | 5. Submit | 6. Award | Contacts |



# Step 2:
# Get Ready to Apply

**In this step**

| Get registered | 22 |
| Find the application package | 22 |
| Application writing help | 22 |

# Get registered

## SAM.gov

You must have an active account with SAM.gov. This includes having a Unique Entity Identifier (UEI). SAM.gov registration can take several weeks. Begin that process today.

To register, go to SAM.gov Entity Registration and select Get Started. From the same page, you can also select the Entity Registration Checklist to find out what you'll need to register.

When you register or update your SAM.gov registration, you must agree to the financial assistance general certifications and representations. You must agree to those for grants specifically, as opposed to contracts, because the two sets of agreements are different. You will have to maintain your registration throughout the life of any award.

## Grants.gov

You must also have an active account with Grants.gov. You can see step-by-step instructions at the Grants.gov Quick Start Guide for Applicants.

# Find the application package

The application package has all the forms you need to apply. You can find it online. Go to Grants Search at Grants.gov and search for opportunity number HRSA-25-050.

After you select the opportunity, we recommend that you click the Subscribe button to get updates.

# Application writing help

Visit HHS Tips for Preparing Grant Proposals.

Visit HRSA's How to Prepare Your Application page for more guidance.

See Apply for a Grant for other help and resources.

## Join the webinar

For more information about this opportunity, join the webinar on December 17, 2024 at 2:00pm – 4:00pm ET.

Case 8:25-cv-00337-BAH    Document 90-1    Filed 02/25/25    Page 23 of 54

If you are not able to join through your computer, you can call in at 1-833-568-8864.
**meeting ID:** 160 870 9309

**Passcode:** 03658406.

We will record the webinar. If you are not able to join live, you can replay here.

**Have questions?** Go to Contacts and Support.

JA745



**Jump to a step**

| 1. Review | 2. Get Ready | 3. Write | 4. Learn | 5. Submit | 6. Award | Contacts |



# Step 3:
# Write Your Application

**In this step**

Application contents and format                    25

# Application contents and format

Applications include 5 main components. This section includes guidance on each.

Application page limit: 25 pages

Submit your information in English and express whole number budget figures using U.S. dollars.

**Make sure you include each of these:**

| Components | Submission format | Included in the page limit? |
|---|---|---|
| Project abstract | Use the Project Abstract Summary form | No |
| Project narrative | Use the Project Narrative Attachment form | Yes |
| Budget narrative | Use the Budget Narrative Attachment form | Yes |
| Attachments | Insert each in the Other Attachments form | Yes, unless otherwise marked. |
| Other required forms | Upload using each required form | No |

## Required format

You must format your narratives and attachments using our required formats for fonts, size, color, format, and margins. See the formatting guidelines in Section 3.2 of the Application Guide.

## Project abstract

Complete the information in the Project Abstract Summary form. Include a short description of your proposed project. Include the needs you plan to address, the proposed services, and the population groups you plan to serve. For more information, see. Section 3.1.2. of the Application Guide.

In addition, please name your project title "FY 2025 RWHAP Part D WICY Supplemental Funding" and include the following information:

- Identification of the category (HIV Care innovation or Infrastructure Development) and the selected activity.
- A summary of the proposed activity and its intended impact to improve or expand access to HIV primary care or supportive services for low-income WICY with HIV.

- A statement noting if the proposed project is an expansion of a previously funded activity, if applicable.
- The funding amount requested for the one-year period of performance.

# Project narrative

In this section, you will describe all aspects of your project. Project activities must comply with the nondiscrimination requirements.

Use the section headers and the order listed.

## Introduction

**See merit review criterion 1: Need**

- Briefly describe the purpose of your project.
- Clearly indicate the category under which the proposed activity falls, either:
  - HIV Care Innovation
  - Infrastructure Development
- Clearly state if the proposed project is an expansion of a previously funded activity, if applicable.
- Discuss why your local community and organization needs supplemental funding.
- Discuss how the proposed activity will develop, enhance, or expand access to high quality, family-centered HIV primary care services for low-income WICY with HIV.
- If the proposed activity is an expansion of a previously funded activity, clearly describe how the proposed activity builds upon and furthers the objectives of the previously funded activity in maximizing impact.

## Need

**See merit review criterion 1: Need**

For HIV Care Innovation activities only:

- Describe the priority WICY with HIV population(s) in your service area and their unmet health care needs.
  - More specifically, describe how this priority population(s) is disproportionately affected by the HIV epidemic and has poor health outcomes.
- Describe the service needs based on your assessment of the gaps in the HIV care continuum for WICY with HIV in your community.
- Provide data on the 5 stages of the HIV care continuum for your priority WICY population(s) with HIV using the most recent 3 calendar years of available data.

JA748

- You must clearly define the numerator and the denominator for each stage. Use the same numerators and denominators as outlined in the HAB Performance Measure Portfolio.
- Discuss any relevant barriers in the service area that the project hopes to overcome.
- Use and cite demographic data whenever possible.

For the Doula Services activity only: discuss how doula support will be beneficial to your priority population and any anticipated barriers providing doula services to your target population.

For Streamlining RWHAP Eligibility only:

- You should describe the method(s) you will use to conduct a local/regional systems assessment of RWHAP recipient organizations, care delivery systems, and/or income based federal programs, to identify current administrative systems, electronic data sources, and tools utilized to determine client eligibility, confirm eligibility, and obtain client consent.
- Discuss how you will promote sharing and collaboration across all RWHAP Parts and others who engage in the peer-to-peer information exchange.

For the Infrastructure Development activity only:

- Outline the community or organization's needs you plan to address.
- Describe the gaps in organizational capacity that exist due to current limitations in system infrastructure. Include alterations you have made to the current service delivery system and how lessons learned will be applied to this activity.
- Provide information specific to the selected activity and describe how these gaps or limitations are affecting the optimal provision of quality HIV primary care services and/or affecting your organization's ability to optimize your response to the changing health care landscape. Discuss any relevant barriers in the service area that the project hopes to overcome.

## Approach

**See merit review criterion 2: Response**

Tell us how you'll address your stated needs and meet the program requirements and expectations described in this NOFO.

- Describe how you will engage WICY with HIV and/or organizations that represent them in the implementation of this activity, including decision-making.
- Discuss how you will carry out your activity.
- Include the partners and/or agencies or programs you will work with on your proposed activity, if applicable.

- Identify the tasks each partner will perform and the amount of funding, if any.

- Include letters of agreement and/or memoranda of understanding from each partner and/or collaborating agency or agencies as Attachment 6.

- Describe how you intend to share relevant information, lessons learned, and products developed through your funded activity with other providers in the community or collaborators to your project.

- Propose a plan for continuing the project when federal funding ends. We expect you to keep up key strategies or services and actions that have led to improved practices and outcomes for women, infants, children, and youth with HIV.

- If you chose the evidence-informed interventions, specify the intervention proposed. This requirement does not apply to any other activity.

## High-level work plan

**See merit review criteria 2: Response & 4: Impact**

- Describe how you'll achieve each of the objectives during the period of performance.

- Provide a timeline that includes each activity and identifies who is responsible for each.

- Identify how key stakeholders will help plan, design, and carry out all activities, including the application.

- You will also include a more detailed work plan that you will submit as Attachment 1.

## Resolving challenges

**See merit review criterion 2: Response**

- Discuss challenges that you are likely to encounter in your work plan and explain approaches that you'll use to resolve them.

- Describe the specific activities or strategies you will use to mitigate or resolve anticipated challenges in implementing your proposed activity.

## Performance reporting and evaluation

**See merit review criteria 3: Evaluation measures & 5: Resources & capabilities**

**Outcomes**

- Describe the expected outcomes of the funded activities.

- Describe the systems and processes that you'll use to track performance outcomes.

USCA4 Appeal: 25-1279    Doc: 34-2    Filed: 07/25/2025    Pg: 175 of 589

1. Review    2. Get Ready    3. Write    4. Learn    5. Submit    6. Award    Contacts
Case 8:25-cv-00337-BAH    Document 90-1    Filed 02/25/25    Page 29 of 54

**Performance Measurement and Reporting**

- Describe how you'll collect and manage data in a way that helps you improve the way you carry out your activity.
- **For the Strategic Partnerships activity only:** track at minimum, the following measures for the period of performance:
  - Partnership Development
    - The number of strategic partnerships and types of organizations
    - The number of signed MOUs
  - Implementation of Evidence-Based Programs – the number of pregnant women with HIV and people with HIV in the Evidence Based Programs
- **For the Doula Services activity only:** track at a minimum, the following measures for the period of performance:
  - The number of hired or contracted doula(s)
  - The number of RWHAP Part D clients and affected family members that receive doula services and the type of service received
  - The period(s) of support the services were provided (e.g. prenatal, birth, and/or postpartum)

**Program Evaluation**

- Describe the evaluation plan that will be used to monitor ongoing processes and progress toward the goals and objectives. Describe barriers and your plan to overcome them.
- If applicable, describe your plan to evaluate how the project performs and how the results will contribute to your program's clinical quality management (CQM) program.
- Discuss how CQM of this activity contributes to the CQM goals of your RWHAP Part D WICY program.

## Organizational information

**See merit review criterion 5: Resources & capabilities**

- Briefly describe the organizational skills, capabilities, and resources, including staff that will contribute to your organization's ability to carry out the proposed activity.
- Highlight key staff with relevant expertise and experience with similar work. This information should align with the staffing plan provided in Attachment 2 and the biographical sketches of key personnel provided in Attachment 3.

- Describe the organizational resources that you'll use to sustain, without additional funds from the federal government, the project activities or enhancements supported by this award beyond the one year period of performance.
- Describe your experience with the fiscal management of grants and contracts. Include information on your organization's experience managing multiple federal grants.
- Discuss the organization's ability to secure agreements with community-based organizations, health care providers, and consultant services. Additionally, briefly discuss the organization's ability to recruit and hire staff or contract staff within a reasonable timeframe to compete project activities.
- If selecting doula services, please provide the following information:
    ◦ Whether the doula(s) is hired as a full-time employee or as a contractor
    ◦ Your organization's recruitment plan to hire or contract doulas.

# Budget and budget narrative

**See merit review criterion 6: [Support Requested](#)**

The **budget** should follow the instructions in Section 3.1.4. Project Budget Information - Non-Construction Programs (SF-424A) of the [Application Guide](#) and any specific instructions listed in this section. Your budget should show a well-organized plan.

HHS now uses the definitions for [equipment](#) and [supplies](#) in 2 CFR 200.1. The new definitions change the threshold for equipment to the lesser of the recipient's capitalization level or $10,000 and the threshold for supplies to below that amount.

The total project or program costs are all allowable (direct and indirect) costs incurred for the HRSA award activity or project. This includes costs charged to the award and non-federal funds used to satisfy a matching or cost-sharing requirement (which may include maintenance of effort, if applicable).

**Line-Item Budget:** In addition to the SF-424 Application Guide requirements, you must also provide the line-item budget and budget narrative according to each object class category (e.g., Personnel, Fringe Benefits, Travel). The budget allocations on the line-item budget must relate to the activities proposed in the project narrative, including the work plan.

In order to evaluate your adherence to RWHAP Part D statutory budget requirements, submit a program-specific line-item budget for the one-year period of performance, and highlight in bold any administrative costs.

Please note, if awarded the supplemental funds, these new funds should be added to the total amount of the RWHAP Part D base awards received, and the 10 percent administrative cost cap recalculated to include these funds.

For further guidance on the classification of administrative costs, see HAB PCN 15-01 Treatment of Costs under the 10% Administrative Cap for Ryan White HIV/AIDS Program Parts A, B, and D.

Review HAB PCN 16-02 Eligible Individuals and Allowable Uses of Funds for allowable uses of RWHAP funds.

The line-item budget submitted must not exceed the total funding ceiling amount. In addition, the total amount requested on the SF-424A and the total amount listed on the line-item budget must match. Please list personnel separately by position title and the name of the individual for each position title or note if position is vacant. In addition, designate the full-time equivalent (FTE) of each listed personnel. Upload the line-item budget as Attachment 3.

**The budget narrative** supports the information you provide in Standard Form 424-A. See other required forms. It includes an itemized breakdown and a clear justification of the requested costs. The merit review committee reviews both.

As you develop your budget, consider:

- If the costs are reasonable and consistent with your project's purpose and activities.
- The restrictions on spending funds. See Funding policies & limitations.

To create your budget narrative, see detailed instructions in Section 3.1.5 of the Application Guide.

# Attachments

Place your attachments in order in the Other Attachments form.

## Attachment 1: Work plan

Attach the project's work plan. Make sure it includes everything required in the Project narrative section.

- Include a detailed work plan for the 12-month period of performance of August 1, 2025 – July 31, 2026
    - Describe the activity's goal.
    - For all activities, specify the objectives. For the following activities, specify the following in the objectives:
        - **Strategic Partnerships**
            1. Partnership Development

JA753

USCA4 Appeal: 25-1279    Doc: 34-2    Filed: 07/25/2025    Pg: 178 of 589

1. Review    2. Get Ready    3. Write    4. Learn    5. Submit    6. Award    Contacts
Case 8:25-cv-00337-BAH    Document 90-1    Filed 02/25/25    Page 32 of 54

      a. The number of strategic partnerships and types of organizations

      b. The number of fully executed/signed MOUs

   2. Implementation of Evidence-Based Programs – the number of pregnant people with HIV and people with HIV in the programs

- **Doula Services**

   1. The number of hired or contracted doula(s)

   2. The number of RWHAP Part D clients and affected family members that receive doula services and the type of service received

   3. The period(s) of support the services were provided (e.g. prenatal, birth, and/or postpartum)

- ◦ Identify the key action steps that you will use to achieve the proposed goal.

- Use a timeline that includes each step of the proposed activity and target date for each step's completion and identify staff responsible for the activities.

- Identify the measures you will use to evaluate success for each action step.

- The work plan should detail the expected outcomes to demonstrate the impact of the project's activity.

- Detail the expected outcomes which can include changes in knowledge, awareness, attitudes, skills, behaviors, practices, or more. The outcomes must address at least 1 or more of the stages of the HIV care continuum.

- As appropriate, identify meaningful support and collaboration with key partners in planning, designing, and implementing all activities.

- Provide the above information in a table format with the following sections outlined:
  - ◦ Goal and objectives
  - ◦ Action steps
  - ◦ Timeline
  - ◦ Person responsible
  - ◦ Evaluation measures
  - ◦ Outcomes

# Attachment 2: Staffing plan and job descriptions

**See Section 3.1.7 of the [Application Guide](#).**

Include a staffing plan that shows the staff positions that will support the project key information about each. Justify your staffing choices, including education and experience qualifications and your reasons for time you request for each staff position.

For key personnel, attach a one-page job description. It must include the role, responsibilities, and qualifications.

## Attachment 3: Biographical sketches

Include biographical sketches for people who will hold the key positions you describe in Attachment *2*.

For key personnel, include no more than two-page biographical sketches. Do not include personally identifiable information. If you include someone you have not hired yet, provide a letter of commitment from that person with the biographical sketch.

## Attachment 4: Federally negotiated indirect cost rate (if applicable).

Submit a copy of the current agreement.

## Attachment 5: Program specific line item budget

Submit as a PDF document a program-specific line item budget for the 1-year period of performance. SF-424A Section B does not count in the page limit; however, the line-item budget itself does count toward the page limit. Reference section See Section 3.4.1. of the Application Guide. Application Guide.

## Attachment 6: Agreements with other entities and memoranda of understanding (if applicable)

Provide any documents that describe working relationships between your organization and others you refer to in the proposal. Documents that confirm actual or pending contracts or agreements should clearly describe the roles of the contractors and any deliverable. Make sure you sign and date any letters of agreement. If letters of support are required for eligibility, include them in this attachment.

## Attachment 7-15: Other relevant documents (if applicable)

Include here any other documents that are relevant to your application.

# Other required forms

You will need to complete some other forms. Upload the listed forms at Grants.gov. You can find them in the NOFO application package or review them and any available instructions at Grants.gov Forms.

USCA4 Appeal: 25-1279     Doc: 34-2       Filed: 07/25/2025     Pg: 180 of 589

1. Review       2. Get Ready       3. Write       4. Learn       5. Submit       6. Award       Contacts
Case 8:25-cv-00337-BAH      Document 90-1      Filed 02/25/25      Page 34 of 54

| Forms | Submission Requirement |
|---|---|
| Application for Federal Assistance (SF-424) | With application |
| Budget Information for Non-Construction Programs (SF-424A) | With application |
| Disclosure of Lobbying Activities (SF-LLL) | If applicable, with the application or before award |
| Key Contacts | With application. |
| Grants.gov Lobbying Form | With application. |
| Project/Performance Site Location(s) (SF-P/PSL) | With application. |



**Jump to a step**

| 1. Review | 2. Get Ready | 3. Write | 4. Learn | 5. Submit | 6. Award | Contacts |



# Step 4:
# Learn About Review and Award

**In this step**

| Application review | 36 |
| Selection process | 41 |
| Award notices | 42 |

# Application review

## Initial review

We review each application to make sure it meets eligibility criteria, including the completeness and responsiveness criteria. If your application does not meet these criteria, it will not be funded.

We will not review any pages that exceed the page limit.

## Merit review

A panel reviews all applications that pass the initial review. The members use the following criteria.

| Criterion | Total number of points = 100 |
|---|---|
| 1. Need | 20 points |
| 2. Response | 25 points |
| 3. Performance reporting and evaluation | 10 points |
| 4. Impact | 15 points |
| 5. Resources & capabilities | 10 points |
| 6. Support requested | 20 points |

### Criterion 1: Need

**20 points**

See Project Narrative Introduction and Need sections.

The panel will review your application for how well it:

**For the HIV care innovation activities ONLY:**

- How well the application describes the priority WICY population(s) that are the focus of the supplemental funding.
- The extent to which the application justifies the need for RWHAP Part D supplemental funds in the proposed service area and for the WICY population(s) based on the identified gap(s) in its HIV care continuum.
- The completeness of the baseline data reported for each stage in the organization's HIV care continuum for the most recent 3 calendar years of

available data, with clear numerators and denominators that align with the HHS Common HIV Core Indicators.

- How well the application describes the relevant barriers to successfully carry out the project and the steps to be taken to minimize or overcome the stated barriers. For doula services activity only, discuss how doula support will be beneficial to the applicant's priority population and any anticipated barriers providing doula services to the target population.

- For streamlining RWHAP eligibility applications, how well the application describes plans to assess the available systems and sources of data available for use in the proposed activity, and the plans for collaborating with other RWHAP providers on information and data sharing.

- For an expansion of a previously funded activity, how well the application describes the problem and its contributing factors, if applicable.

**For the infrastructure development activity ONLY:**

- How well the application justifies the need for supplemental funding to address the gaps in organizational capacity or the limitations of current infrastructure.

- How well the application justifies the need for supplemental funding that will strengthen the organization's capabilities to provide family–centered HIV primary care services using updated technologies.

- How well the application clearly describes how the system limitations are affecting the optimal provision of quality HIV primary care services.

- How well the application describes the relevant barriers to successfully carry out the project, and the steps to be taken to minimize or overcome the stated barriers.

- For an expansion of a previously funded activity, how well the application describes the problem and its contributing factors, if applicable.

# Criterion 2: Response

**25 points**

See Project Narrative Approach, High-level work plan, and Resolving challenges sections.

The panel will review your application for:

## Approach (15 points)

- How well the activities described in the application will address the problem and meet project objectives.

- How well the application describes how WICY with HIV and organizations that represent them are engaged in the implementation of the activity, including decision-making.
- The clarity and strength of the roles for identified partners in the proposed project, and the tasks for each partner as described in the letters of support/commitment, if applicable.
- For implementation of evidence-informed interventions only, how well the proposed implementation of the selected intervention(s) or training(s) is described.
- The description of intent to share or disseminate relevant information and products developed through the funded activity and lessons learned with other providers in the community and collaborators to this project.
- How well the application describes the impact the proposed activity will have on developing, enhancing, and/or expanding access to high quality, family centered HIV primary care services for low-income WICY with HIV.

## Work Plan (5 points)

- The strength and clarity of the proposed goals and objectives in the work plan (Attachment 1) and their relationship to the identified project.
- How well the application outlines the proposed work plan as evidenced by measurable and appropriate objectives.

## Resolution of Challenges (5 points)

- How well the application outlines challenges likely to be encountered in designing and carrying out the activities in the work plan.
- How well the application explains approaches that they'll use to resolve the challenges.

# Criterion 3: Performance reporting and evaluation

**10 points**

See Project Narrative Evaluation & technical support capacity section.

The panel will review your application for:

- How strong and effective the method is to monitor and evaluate progress toward meeting project goals and objectives.
- Evidence that the evaluative measures will be able to assess:
- To what extent the program objectives have been met.
- To what extent these can be attributed to the project.

- How well the application describes how results are shared with program staff and key stakeholders (including WICY with HIV).
- How well the application describes the program's CQM program, how supplemental CQM activities are linked to the overarching RWHAP CQM work, and other resources devoted to CQM, if applicable.
- Additionally, for the Strategic Partnerships activity only, the extent to which the following measures for the period of performance are outlined:
  - Partnership Development
    - The number of strategic partnerships and types of organizations
    - The number of fully executed/signed MOUs
  - Implementation of Evidence-Based Programs – the number of pregnant women with HIV and people with HIV in the programs.
- Additionally, for the doula specific activity, the extent to which the following measures for the period of performance are outlined:
  - The number of hired or contracted doula(s).
  - The number of RWHAP Part D clients and affected family members that receive doula services and the type of service received.
  - The period(s) of support the services were provided (e.g. prenatal, birth, and/or postpartum).

## Criterion 4: Impact

**15 points**

See Project Narrative High-level work plan section.

The panel will review your application for:

- The extent to which the activities described in the application can address the problem and attain the project objectives.
- How effective are the proposed goals, objectives, and work plan activities (Attachment 1) to address the health outcome gaps in the HIV care continuum for WICY with HIV.
- The extent to which activities outlined in the work plan can reasonably be completed in the 12-month period of performance and the organization presents a plan for sustaining activities without additional federal funds beyond the federal funding period.

# Criterion 5: Resources and capabilities

**10 points**

See Project Narrative Organizational information and Evaluation & technical support capacity sections.

The panel will review your application to determine the extent to which:

- Project personnel or partners are qualified by training and/or experience to implement and carry out the project (Attachment 2).
- The strength and reasonableness of the proposed resources, organizational support, and organizational capacity to sustain project activities without additional federal funds beyond the one year period of performance
- The clarity and strength of the roles for identified partners in the proposed project, and the tasks for each partner as described in the letters of support/ commitment, if applicable.
- The extent to which people with HIV and/or organizations that represent them are engaged in the implementation of the activity, including decision-making.
- Extent to which the organization has the capabilities and the quality and availability of facilities and personnel to fulfill the needs and requirements of the proposed project.
- The staffing plan (Attachment 2) is consistent with the proposed activity.
- The applicant's experience with the administration of multiple grant awards.

# Criterion 6: Support requested

**20 points**

See Budget & budget narrative section.

The panel will review your application to determine:

- How reasonable the proposed budget is in relation to the objectives, the activities, and the anticipated results.
- Extent to which costs, as outlined in the budget and required resources sections, are reasonable and align with the scope of work.
- Extent to which the time and effort of key staff have adequate time devoted to the project to achieve project objectives.
- The budget justification narrative fully explains each line item and justifies the resources requested, including proposed staff.
- The program-specific line-item budget, budget justification narrative, and SF-424A are aligned with each other.

# Risk review

Before making an award, we review the risk that you will not manage federal funds in prudent ways. We need to make sure you've handled any past federal awards well and demonstrated sound business practices. We:

- Review any applicable past performance
- Review audit reports and findings
- Analyze the budget
- Assess your management systems
- Ensure you continue to be eligible
- Make sure you comply with any public policies

We may ask you to submit additional information.

As part of this review, we use SAM.gov Entity Information Responsibility / Qualification to check your history for all awards likely to be more than $250,000 over the period of performance. You can comment on your organization's information in SAM.gov. We'll consider your comments before making a decision about your level of risk.

If we find a significant risk, we may choose not to fund your application or to place specific conditions on the award.

For more details, see 45 CFR 75.205.

# Selection process

When making funding decisions, we consider:

- Merit review results. These are key in making decisions but are not the only factor.
- The amount of available funds.
- Assessed risk.
- The larger portfolio of HRSA-funded projects, including the diversity of project types and geographic distribution.

We may:

- Fund out of rank order.
- Fund applications in whole or in part.
- Fund applications at a lower amount than requested.
- Decide not to allow a recipient to subaward if they may not be able to monitor and manage subrecipients properly.
- Choose to fund no applications under this NOFO.

# Award notices

We issue Notices of Award (NOA) on or around the start date listed in the NOFO. See Section 4 of the Application Guide for more information.

By drawing down funds, you accept the terms and conditions of the award.



Case 1:23-cv-00832-LULL    Document 30-1    Filed 07/25/25    Page 43 of 84

**Jump to a step**

| 1. Review | 2. Get Ready | 3. Write | 4. Learn | 5. Submit | 6. Award | Contacts |



# Step 5:
# Submit Your Application

**In this step**

Application submission and deadlines .......... 44

Application checklist .......... 45

# Application submission and deadlines

Your organization's authorized official must certify your application. See the section on finding the application package to make sure you have everything you need.

Make sure you are current with SAM.gov and UEI requirements. When you register or update your SAM.gov registration, you must agree to the financial assistance general certifications and representations, and specifically with regard to grants.

Make sure that your SAM.gov registration is accurate for both contracts and grants, as these registrations differ. See information on getting registered. You will have to maintain your registration throughout the life of any award.

## Deadlines

**You must submit your application by February 10,2025 at 11:59 p.m. ET.**

Grants.gov creates a date and time record when it receives the application. If you submit the same application more than once, we will accept the last on-time submission.

## Submission method

### Grants.gov

You must submit your application through Grants.gov. You may do so using Grants.gov Workspace. This is the preferred method. For alternative online methods, see Applicant System-to-System.

For instructions on how to submit in Grants.gov, see the Quick Start Guide for Applicants. Make sure that your application passes the Grants.gov validation checks, or we may not get it. Do not encrypt, zip, or password protect any files.

**Have questions?** Go to Contacts and Support.

## Other submissions

### Intergovernmental review

This NOFO is not subject to Executive Order 12372, Intergovernmental Review of Federal Programs. No action is needed.

USCA4 Appeal: 25-1279    Doc: 34-2    Filed: 07/25/2025    Pg: 191 of 589

# Application checklist

Make sure that you have everything you need to apply:

| Component | How to Upload | Included in page limit? |
|---|---|---|
| ☐ **Project abstract** | Use the Project Abstract Summary Form. | No |
| ☐ **Project narrative** | Use the Project Narrative Attachment form. | Yes |
| ☐ **Budget narrative** | Use the Budget Narrative Attachment form. | Yes |
| **Attachments** | Insert each in a single Other Attachments form. | |
| ☐ Work plan | | Yes |
| ☐ Staffing plan & job descriptions | | Yes |
| ☐ Biographical sketches | | No |
| ☐ Federally negotiated indirect cost rate | | No |
| ☐ Program specific line-item budget | | Yes |
| ☐ Letters of agreement & MOUs | | Yes |
| ☐ Other relevant documents (if applicable) | | Yes |
| **Other required forms\*** | Upload using each required form. | |
| ☐ Application for Federal Assistance (SF-424) | | No |
| ☐ Budget Information for Non-Construction Programs (SF-424A) | | No |
| ☐ Disclosure of Lobbying Activities (SF-LLL) | | No |
| ☐ Key Contacts | | No |
| ☐ Grants.gov Lobbying Form | | No |
| ☐ Project/Performance Site Location(s) (SF-P/PSL) | | No |

* Only what you attach in these forms counts against the page limit. The form itself
does not count.

Case 1:25-cv-00872-BAH Document 36-1 Filed 02/25/25 Page 41 of 84

**Jump to a step**

1. Review     2. Get Ready     3. Write     4. Learn     5. Submit     6. Award     Contacts



# Step 6:
# Learn What Happens After Award

**In this step**

Post-award requirements and administration     48

# Post-award requirements and administration

## Administrative and national policy requirements

There are important rules you need to know if you get an award. You must follow:

- All terms and conditions in the Notice of Award (NOA).
- The regulations at 45 CFR part 75, Uniform Administrative Requirements, Cost Principles, and Audit Requirements for HHS Awards, and any superseding regulations. Effective October 1, 2024, HHS adopted the following superseding provisions:
  - 2 CFR 200.1, Definitions, Modified Total Direct Cost.
  - 2 CFR 200.1, Definitions, Equipment.
  - 2 CFR 200.1, Definitions, Supply.
  - 2 CFR 200.313(e), Equipment, Disposition.
  - 2 CFR 200.314(a), Supplies.
  - 2 CFR 200.320, Methods of procurement to be followed.
  - 2 CFR 200.333, Fixed amount subawards.
  - 2 CFR 200.344, Closeout.
  - 2 CFR 200.414(f), Indirect (F&A) costs.
  - 2 CFR 200.501, Audit requirements.
- The HHS Grants Policy Statement (GPS). Your NOA will reference this document. If there are any exceptions to the GPS, they'll be listed in your NOA.
- All federal statutes and regulations relevant to federal financial assistance, including those highlighted in HHS Administrative and National Policy Requirements.
- The requirements for performance management in 2 CFR 200.301.

## Health information technology interoperability

If you receive an award, you must agree to the following conditions when implementing, acquiring, or upgrading health IT. These conditions also apply to all subrecipients.

- Compliance with 45 CFR part 170, subpart B. Make sure your activities meet these standards if they support the activity.
- Certified Health IT for Eligible Clinicians and Hospitals. Use only health IT certified by the ONC Health IT Certification Program for activities related to Sections 4101, 4102, and 4201 of the HITECH Act.

If 45 CFR part 170, subpart B standards cannot support the activity, we encourage you to:

- Use health IT that meets non-proprietary standards.
- Follow specifications from consensus-based standards development organizations.
- Consider standards identified in the ONC Interoperability Standards Advisory.

# Non-discrimination legal requirements

If you receive an award, you must follow all applicable nondiscrimination laws. You agree to this when you register in SAM.gov. You must also submit an Assurance of Compliance (HHS-690). To learn more, see the Laws and Regulations Enforced by the HHS Office for Civil Rights.

Contact the HHS Office for Civil Rights for more information about obligations and prohibitions under federal civil laws or call 1-800-368-1019 or TDD 1-800-537-7697.

The HRSA Office of Civil Rights, Diversity, and Inclusion (OCRDI) offers technical assistance, individual consultations, trainings, and plain language materials to supplement OCR guidance. Visit OCRDI's website to learn more about how federal civil rights laws and accessibility requirements apply to your programs, or contact OCRDI directly at HRSACivilRights@hrsa.gov.

# Executive order on worker organizing and empowerment

Executive Order on Worker Organizing and Empowerment (E.O. 14025) encourages worker organizing and collective bargaining to promote equality of bargaining power between employers and employees.

You can support these goals by developing policies and practices that you could use to promote worker power.

# Cybersecurity

You must create a cybersecurity plan if your project involves both of the following conditions:

- You have ongoing access to HHS information or technology systems.
- You handle personally identifiable information (PII) or personal health information (PHI) from HHS.

You must base the plan based on the NIST Cybersecurity Framework. Your plan should include the following steps:

Identify:

- List all assets and accounts with access to HHS systems or PII/PHI.

Protect:

- Limit access to only those who need it for award activities.
- Ensure all staff complete annual cybersecurity and privacy training. Free training is available at 405(d): Knowledge on Demand (hhs.gov).
- Use multi-factor authentication for all users accessing HHS systems.
- Regularly backup and test sensitive data.

Detect:

- Install antivirus or anti-malware software on all devices connected to HHS systems.

Respond:

- Create an incident response plan. See Incident-Response-Plan-Basics_508c.pdf (cisa.gov) for guidance.
- Have procedures to report cybersecurity incidents to HHS within 48 hours. A cybersecurity incident is:
    - Any unplanned interruption or reduction of quality, or
    - An event that could actually or potentially jeopardize confidentiality, integrity, or availability of the system and its information.

Recover:

- Investigate and fix security gaps after any incident.

# Reporting

If you are funded, you will have to follow the reporting requirements in Section 4 of the Application Guide. The NOA will provide specific details.

You must also follow these program-specific reporting requirements:

Recipient must submit information related to the competing supplement as part of the RWHAP Part D WICY report narrative. Refer to HRSA-22-037; HRSA-22-156 for details on the Non-Competing Continuation Renewal Submission. Additionally, a final report is due 90 days after the period of performance ends. The final report collects:

You must also follow these program-specific reporting requirements:

- Progress reports each year
- Annual performance reports through Electronic Handbooks.
- Information relevant to program-specific goals and progress on the work plan (for example, number of clients served, partnerships)
- Performance measurement data on HIV care continuum stages (to include baseline data and numerator/denominator for each HIV care continuum stage
- Impact of the overall project
- The degree to which the recipient achieved the mission, goal, and objectives outlined in the program
- Recipient accomplishments
- Barriers encountered
- Responses to summary questions regarding the recipient's overall experiences during the 1-year period of performance.
- Recipients will be expected to provide end-of-the-period of performance outcome data and demonstrate the impact of the project's activity.

Further information will be available in the NOA.

The recipient must submit information related to the competing supplement as part of your RWHAP Part D WICY Existing Geographic Service Areas Allocation and Expenditure Reports. Refer to HRSA-22-037; HRSA-22-156 for details.

## Integrity and Performance Reporting

The NOA will contain a provision for integrity and performance reporting in FAPIIS, as 45 CFR part 75 Appendix I, F.3. and 45 CFR part 75 Appendix XII require.



Jump to a step

| 1. Review | 2. Get Ready | 3. Write | 4. Learn | 5. Submit | 6. Award | Contacts |



# Contacts and Support

**In this step**

| Agency contacts | 53 |
| Grants.gov | 53 |
| SAM.gov | 53 |
| Helpful websites | 54 |

# Agency contacts

## Program and eligibility

**Lillian Bell, MPH**

Chief, Central Branch

Attn: RWHAP Part D WICY Grants Supplemental Funding
HIV/AIDS Bureau
Health Resources and Services Administration
Email your questions to this program's in-box: AskPartD@hrsa.gov
Call: 301-443-5671

## Financial and budget

**Kimberly Dews**

Grants Management Specialist

Division of Grants Management Operations, OFAM
Health Resources and Services Administration
Email your questions to this program's in-box: KDews@hrsa.gov
Call: 301-443-0655

## HRSA Contact Center

**Open Monday – Friday, 7 a.m. – 8 p.m. ET, except for federal holidays.**
Call: 877-464-4772 / 877-Go4-HRSA
TTY: 877-897-9910
Electronic Handbooks Contact Center

# Grants.gov

Grants.gov provides 24/7 support. You can call 1-800-518-4726, search the Grants.gov
Knowledge Base, or email Grants.gov for support. Hold on to your ticket number.

# SAM.gov

If you need help, you can call 866-606-8220 or live chat with the Federal Service Desk.

# Helpful websites

- HRSA's How to Prepare Your Application page
- HRSA Application Guide
- HRSA Grants page
- HHS Tips for Preparing Grant Proposals
- Best Practices Compilation
- Center for Innovation and Engagement (CIE)
- Dissemination of Evidence-Informed Interventions (DEII)
- Using Evidence-Informed Interventions to Improve Health Outcomes among People Living with HIV (E2i)
- Ending Stigma through Collaboration and Lifting All to Empowerment (ESCALATE)
- Integrating HIV Innovative Practices (IHIP)
- AIDS Education Training Center Program – National Coordinating Resource Center

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PFLAG, INC., et al.,

    *Plaintiffs*,

            v.

DONALD J. TRUMP, in his official capacity
as President of the United States, et al.,

    *Defendants*.

Civil Action No. 8:25-cv-00337-BAH

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR
## MOTION FOR A PRELIMINARY INJUNCTION

**INTRODUCTION**

Defendants' Opposition ("Opp.") recycles arguments already rejected by this Court and fails to provide any new record evidence to support their assertions that gender affirming medical care is either unsafe or ineffective. The Executive Orders have already imposed irreparable harm, and only a nationwide preliminary injunction can forestall additional harm once the Court's temporary restraining order expires.

**ARGUMENT**

**I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS.**

**A.    Plaintiffs' Claims Are Ripe.**

Plaintiffs' claims are ripe. *See* TRO 10-13. In arguing to the contrary, Defendants erroneously conflate "ripeness" with "final agency action." *See* Opp. 7-10. The "final agency action" requirement applies only to APA claims, not to *ultra vires* claims for equitable relief. *See* TRO 16 n.19; *Texas v. United States DHS*, 123 F.4th 186, 199 n.9 (5th Cir. 2024); *Hawaii v. Trump*, 878 F.3d 662, 682-83 (9th Cir. 2017), *rev'd and remanded*, 585 U.S. 667 (2018); *Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 672 (6th Cir. 2013); *Trudeau v. FTC*, 456 F.3d 178, 187 (D.C. Cir. 2006); *R.I. Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 42 (1st Cir. 2002).

Defendants attempt to forestall ripeness by repeating their false assertion that "no agency defendant has revoked . . . any particular grants as a result of the EOs." Opp. 9. That assertion "is contradicted by" the documentary evidence showing that HRSA and CDC issued notices to grantees that immediately terminated all grants to the extent those grants were being used in a manner that did not align with the Gender Identity or Denial of Care Orders. TRO 11-12. Defendants assert that both of those termination notices have been "rescinded." Opp. 9. But the CDC notice has not been rescinded, and the "rescission" of the HRSA notice is insufficient to moot the need for injunctive relief. TRO 13-15.

Despite sending those blanket termination notices, Defendants now argue that "[t]he Court cannot determine in the abstract whether the statutory and regulatory requirements for any particular grant program provide the agency with discretion to condition funding on these terms." Opp. 9. But Defendants have only themselves to blame. The text of the Orders applies to all grants regardless of their terms, and HRSA and CDC chose to issue blanket termination notices without identifying specific grants at issue. Defendants cannot delay review of their actions by pointing to their own failure to ground those terminations in a particular statutory or regulatory context. The Constitution does not allow Defendants to terminate first and ask questions later.

Defendants also unsuccessfully attempt to illustrate the alleged lack of ripeness by pointing to the funding Dr. Birnbaum receives under Part D of the Ryan White Program. *See* Opp. 9-10. Defendants state that Section 4 of the Denial of Care Order would not strip Dr. Birnbaum of his Part D funding because Section 4 applies only to "research or education" grants, not to outpatient and ambulatory care grants such as Part D of the Ryan White Program. *Id*. Although Plaintiffs welcome Defendants' concession on this point, Defendants fail to mention that (1) Section 3(g) of the Gender Ideology Order applies to all grants, not just research or education grants; (2) Dr. Birnbaum also receives research grants from NIH in addition to his Ryan White funding, *see* Birnbaum Decl. ¶ 7; and (3) Dr. Birnbaum's clinic is part of University Hospital at SUNY Downstate, which receives "millions of dollars in federal grants, including from the NIH and HRSA," *see* Birnbaum Decl. ¶ 8. Under the Executive Orders, all those grants are immediately at risk if Dr. Birnbaum provides gender affirming medical care to his patients under nineteen.

Defendants also ignore a critical element of the test for ripeness: "the hardship to the parties of withholding court consideration." TRO 10 (citation omitted). There is a mountain of evidence documenting the hardships Plaintiffs experienced from the immediate cessation of medical care.

*See* TRO 12-13. Hospitals across the country ceased providing gender affirming medical care for people under nineteen in response to the Orders, inhibited GLMA's members' ability to provide care in accordance with their ethical responsibilities as physicians, and left the Transgender Plaintiffs stranded without the medical care that they need. These shutdowns were "exactly the intended effect of the Executive Orders." *Id.* at 24. As this Court previously recognized, the Executive Orders' immediate consequences require an immediate remedy. *See id.* at 16 n.19.

**B.    Plaintiffs' *Ultra Vires* Claims Are Reviewable.**

Plaintiffs have brought valid *ultra vires* claims. Defendants once again assert that Plaintiffs cannot invoke the Court's equitable jurisdiction for *ultra vires* review because hospitals and other healthcare entities are the "direct objects" of the Executive Order while Plaintiffs are merely "incidentally harmed" by those institutions' response to the Executive Orders' threats. Opp. 12. But Defendants concede that Plaintiffs have Article III standing, and Defendants fail to offer any support for their assertion that *ultra vires* claims impose a more stringent causation requirement.

Defendants cite a Tenth Circuit decision holding that a plaintiff cannot assert claims in equity against a state for statutory violations unless the plaintiff has a substantive right under the statute that has been violated. *Id.* (citing *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 902 (10th Cir. 2017)). But as the Tenth Circuit noted, "[t]he question of who may enforce a statutory right is fundamentally different from the question of who may enforce a right that is protected by the Constitution." *Id.* at 902 n.14 (citation omitted). And the Supreme Court has already recognized a right to equitable relief "under the Constitution to challenge governmental action under . . . separation-of-powers principles." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). Moreover, through their claim that the Orders conflict with Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116, and Section 1908 of the Public Health Service Act ("PHSA"), 42 U.S.C. § 300w-7, Plaintiffs are asserting their own substantive rights to be free

3

from sex discrimination by healthcare entities receiving grants and other federal funding. Plaintiffs may seek equitable relief to vindicate those rights.

### C.    The Orders Violate the Separation of Powers.

The Court already has held Plaintiffs are likely to succeed on their claim that the Executive Orders are *ultra vires* actions violating the separation of powers. *See* TRO 26-37. Defendants' preliminary injunction brief contributes only two new paragraphs and otherwise recycles the same arguments they made in opposing the TRO—arguments that this Court already rejected.

Those new paragraphs do not call into question this Court's previous analysis. Defendants do not assert that the Executive has any inherent Article II power to unilaterally impose conditions on federal grants. Rather, Defendants appear to concede any authority the Executive has for imposing such conditions must be delegated by statute and exercised consistently with the "expressed or implied will of Congress." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015). Yet—as Plaintiffs and the Court have already explained—the Gender Identity and Denial of Care Order cite no statutory authority for unilaterally imposing new conditions on federally appropriated grant funds based on whether a grant recipient provides gender affirming medical care for people under nineteen. The notices issued by HRSA and CDC likewise cite no statutory authority.

Defendants now belatedly attempt to find some statutory delegation that could possibly justify imposing at least *some* conditions on *some* types of grants. But the proper time for identifying the source of statutory authority was *before* Defendants started sending out termination notices, not weeks later as a *post hoc* rationalization. To the extent "it is not clear what law the Court would need to apply or what funding would be at stake," Opp. 10, that is because *Defendants* chose to issue a blanket termination *without* explaining their legal authority for doing so. Defendants must defend the Orders that President Trump actually issued, not some hypothetical

narrower Executive Order that is tailored to statutory schemes on which the Orders did not purport to rely. *Cf. Nat'l Council of Nonprofits v. OMB*, 25 Civ. 239-LLA, Dkt. 51 at 27 (D.D.C. Feb. 25, 2025) ("Defendants cannot take a memorandum that was drafted broadly, interpreted expansively, and implemented categorically and fault Plaintiffs for 'overreading' that directive.").

In any event, none of the statutes dredged up by Defendants with respect to NIH grants actually authorize the President to "condition[] or distribut[e] funds according to Presidential policies." Opp. 16. The statutes vest NIH with discretion regarding grants, but that discretion must be exercised to "carry[] out the purposes of" the *statute*, not the President's own purposes. *See* 42 U.S.C. §§ 282(b), 284(b)(1). And NIH's discretion is further circumscribed by highly detailed provisions mandating the considerations that must inform NIH's decisions. *See, e.g.*, 42 U.S.C. §§ 241, 282(b), 284(b), 289(a). Tellingly, despite gesturing to these statutory provisions, Defendants never argue that prohibiting institutions from providing gender affirming medical care for minors would be a permissible condition for NIH to impose under the Public Health Services Act or any other federal grant statute. *Cf. Biden v. Nebraska*, 143 S. Ct. 2355, 2368 (2023) (delegated authority to modify loan requirements did not include authority for loan forgiveness); *NFIB v. OSHA*, 595 U.S. 109, 117 (2022) (delegated authority to adopt workplace safety conditions did not include authority to mandate COVID vaccination).

Defendants' only specific examples of the President allegedly imposing new conditions on NIH grants are the restrictions different presidents have imposed on using federal funds for research involving embryonic stem cells. Opp. 16. But that is a perplexing example for Defendants to use. Since 1996, Congress has included the Dickey-Wicker Amendment in annual appropriation bills, which prohibits NIH from funding "research in which a human embryo or embryos are destroyed." Pub. L. No. 111–117, § 509(a)(2), 123 Stat. 3034, 3280–81. NIH's corresponding

conditions were therefore adopted pursuant to *Congressional* directive, not by Executive fiat. *See Sherley v. Sebelius*, 644 F.3d 388, 390 (D.C. Cir. 2011). Far from supporting Defendants' argument, this example only highlights that Congress knows how to condition grants—and did not do so regarding gender affirming medical care.

**D.    The Orders Conflict with Statutory Nondiscrimination Requirements.**

The Orders are also *ultra vires* because they conflict with statutes prohibiting healthcare entities receiving federal funding from discriminating based on sex. Defendants acknowledge that the Orders would be unlawful if they directed grantees to engage in conduct that violated Section 1557 of the ACA or Section 1908 of the PHSA. Opp. 26 n.9. And Defendants concede that under *Kadel v. Folwell*, 100 F.4th 122, 153 (4th Cir. 2024) (*en banc*), denying gender affirming medical care to people under nineteen is sex discrimination under those statutes. Opp. 26 n.9. When added together, those concessions definitively establish Plaintiffs' likelihood of success on the merits.

Defendants' only response to the inherent conflict between the Executive Orders and the statutory nondiscrimination requirements set by Congress is to refer back to language stating that agencies should implement the Orders consistent with "applicable law."[1] This argument fails both because "[t]here are no magic words that can override an executive order's plain meaning," TRO 30, and, more fundamentally, because there is simply no action an agency could take to implement the Orders' restrictions on federal funding for healthcare providers that provide gender affirming medical care that would not conflict with these statutory requirements. Section 1557 "imposes an affirmative obligation not to discriminate" on health programs that are recipients of federal funding. *Schmitt v. Kaiser Found. Health Plan of Washington*, 965 F.3d 945, 955 (9th Cir. 2020). Thus, under Section 1557, it does not matter what specific grants are at issue or what funding

---

[1] Unlike *other* sections of the Gender Identity Order, Section 3(g) contains no such limitation.

stream is used. There is simply no scenario in which the new discriminatory condition imposed by the President does not conflict with the nondiscrimination mandate set by Congress.[2]

### E.    The Orders Violate Equal Protection.

#### 1)    The Orders Trigger Heightened Equal Protection Scrutiny.

Under *Kadel*, the Orders trigger heightened scrutiny because they "discriminate on the basis of transgender identity, and therefore on the basis of sex." TRO 44. Defendants' arguments for applying rational basis review cannot be squared with *Kadel*'s controlling precedent. First, *Kadel* squarely rejected Defendants' arguments that heightened scrutiny is not warranted because the Executive Orders apply evenhandedly to males and females. 100 F.4th at 147. Explicit facial classifications do not become neutral "on the assumption that all persons suffer them in equal degree." *Powers v. Ohio*, 499 U.S. 400, 410 (1991). Second, *Kadel* confirmed that restrictions designed to tether a person to their sex assigned at birth enforce sex stereotypes and trigger heightened scrutiny on that basis. 100 F.4th at 154. Stereotypes related to biological differences are not immune from heightened scrutiny. *See id.* Third, *Kadel* also rejected Defendants' argument that the Orders classify based on medical purpose, not transgender status. *See id.* at 146 ("[T]he excluded treatments aim at addressing incongruity between sex assigned at birth and gender identity, the very heart of transgender status."). Finally, *Kadel* reaffirmed that classifications based on transgender status require heightened scrutiny, *see id.* at 143, which forecloses Defendants' attempt to argue otherwise.[3]

---

[2] Congress also has prohibited HHS from taking action that, among other things, "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care" or "impedes timely access to health care services." 42 U.S.C. § 18114(1)–(5). *See Mayor of Baltimore v. Azar*, 973 F.3d 258, 288 (4th Cir. 2020).

[3] Defendants intimate that the Denial of Care Order merely discriminates based on age. Opp. 24. But including an age classification alongside a sex classification does not insulate the Denial of Care Order from heightened scrutiny. *See Craig v. Boren*, 429 U.S. 190, 197 (1976).

Defendants also have no answer to the fact that the Orders independently trigger heightened scrutiny because they were passed at least in part because of their adverse effects on transgender people. *See Pers. Admin. of Mass. v. Feeney*, 442 U.S. 256 (1979). Defendants' reliance on *Trump v. Hawaii*, 585 U.S. 667 (2018), confuses the test for determining whether a measure can only be explained by "animus" under rational basis review with the test for determining whether a discriminatory purpose exists such that a policy is subject to heightened scrutiny. The dispositive question for assessing whether heightened scrutiny is triggered is whether "a gender-based discriminatory purpose has, *at least in some measure*, shaped" the Orders. *Feeney*, 442 U.S. at 276 (emphasis added). That is the case here. PI at 24-25.

**2)  The Orders Fail Heightened Scrutiny.**

Defendants have failed to meet their burden of showing that the Orders "are substantially related to the achievement of [important governmental] objectives." *Kadel*, 100 F.4th at 156 (cleaned up). When this Court granted the TRO, it noted that Defendants had failed to introduce any evidence into the otherwise "bare[] record." TRO 45. Despite having an opportunity to do so, Defendants have not provided any actual evidence to support their criticisms of gender affirming care or respond to the extensive expert testimony produced by Plaintiffs. And, although Defendants' *amici* attempt to pick up the slack, the *amicus* briefs by these non-parties supporting Defendants are filled with highly misleading distortions and mischaracterizations of the record in other cases. *See* Antommaria Reply Decl. ¶¶ 5-17; Karasic Reply Decl. ¶¶ 8-44; Shumer Reply Decl. ¶¶ 8-31; Turban Reply Decl. ¶¶ 4-16.

In the end, Defendants' unsupported criticisms of gender affirming medical care are overstated, untrue, or ultimately applicable to many other forms of medical treatment. PI at 26-28. Far from showing a substantial relationship between their asserted interests and the Orders'

sweeping attack on medical treatment related to gender transition, Defendants have shown no fit at all.

**Effectiveness**. Though Defendants (Opp. 23-24) and their *amici* claim that gender affirming medical care is "dangerous and ineffective," they neither cite nor offer any record evidence to support such claims. The record here demonstrates the opposite: a substantial body of evidence and clinical experience shows that gender affirming medical treatment is safe and effective for treating gender dysphoria, including in patients under 19. *See* Dkts. 69-50 (¶¶ 78-101); 69-49 (¶¶ 86-87). On top of the decades of research and clinical experience showing the benefits of gender affirming medical care, Plaintiffs' experiences further confirm its efficacy. *See* Dkts. 69-27 (¶¶ 14, 18-19); 69-28 (¶¶ 10-12, 19); 69-29 (¶¶ 26, 33); 69-30 (¶¶ 14, 16); 69-31 (¶¶ 18-20); 69-32 (¶¶ 16-18, 32-33). They also show the harm of delaying or denying this care when medically indicated. *See* Dkts. 69-23 (¶¶ 26-30); 69-24 (¶¶ 13-17); 69-25 (¶¶ 23-27); 69-26 (¶¶ 17-18); 69-29 (¶¶ 30-31); 69-30 (¶ 15); 69-31 (¶¶ 9-12, 24, 28).[4]

**Capacity to consent**. Defendants claim that the Orders' disparate treatment is warranted because minors lack the capacity to consent to the medical care at issue. This is not supported by the record. First, and most critically, as with nearly all pediatric medical care, it is a minor's parent or guardian who consents to the treatment, not the minor. *See* Dkts. 69-48 (¶¶ 48-52); 69-49 (¶¶ 68, 88); 69-50 (¶ 44). Second, gender affirming medical care is comparable in potential risk and benefit to many other forms of medical treatment that parents routinely consent to on behalf of their minor children. *See* Dkts. 69-48 (¶¶ 61-63); 69-50 (¶¶ 70-71, 85-86); Antommaria Reply Decl.

---

[4] Defendants wrongly argue the holding from *Kadel* regarding efficacy is not controlling because "the laws at issue in *Kadel* were not limited to treatments for adolescents, nor based on concerns especially applicable to young people." Opp. 23. But Defendants ignore both that the Orders are not limited to treatments for adolescents either, barring care for legal adults, and that two of the plaintiffs in *Kadel* were suing over gender affirming medical care denied to them *as minors. See Kadel v. Folwell*, 620 F. Supp. 3d 339, 355, 364 (M.D.N.C. 2022), *aff'd*, 100 F.4th 122; Am. Compl, *Kadel v. Folwell*, 19 Civ. 272 (M.D.N.C.) (ECF No. 75), ¶¶ 76-89, 99-118.

¶ 12; Shumer Reply Decl. ¶ 18. Third, despite Defendants' singular assertion about protecting "children", the Denial of Care Order restricts care for eighteen-year-old *adults*.

**Fertility**. Though Defendants repeatedly reference the potential effects of gender affirming medical care on fertility, they offer no evidence that the banned treatments impact fertility or that gender affirming medical care uniquely compromises a patient's fertility. As explained in Plaintiffs' opening brief, the Executive Orders single out several treatments which have no impact on fertility and for those that can impact fertility, the medical guidelines provide an extensive process for patients and parents to weigh those potential risks against the potential benefits of treatment and the risk of not providing treatment. Dkts. 69-48 (¶ 52); 69-49 (¶¶ 73, 83); 69-50 (¶¶ 83, 121); Shumer Reply Decl. ¶ 25.[5]

**Regret**. Defendants assert that the potential for regret justifies the Executive Orders. Not so. The record shows that regret is rare and is not unique to the targeted medical treatments. *See* Dkts. 69-48 (¶¶ 66-67); 69-49 (¶¶ 97-101); 69-50 (¶¶ 77, 100, 120); 69-51 (¶¶ 31-34); Dkt. 69-51 ¶¶ 29-30. Transition regret is uncommon, and those who discontinue treatment often do so because of external factors (such as pressure from family, societal rejection, or harassment by peers) rather than because they "regret" initiating treatment. Turban Decl. ¶¶ 29, 30. What is more, longitudinal studies looking at adolescent patients treated with gender affirming medical interventions have shown very low rates of detransition. Shumer Reply Decl. ¶ 28.

**Quality of Evidence**. Defendants (Opp. 30) and their *amici* argue that the efficacy of gender affirming medical care to treat adolescent gender dysphoria is not supported by high-quality evidence. Citing to legislative "findings" in a Tennessee bill, Defendants argue (Opp. 23) that

---

[5] Do No Harm's amicus brief focuses on a potential risk to fertility, but its selective deposition cites from another case are misleading. As Dr. Shumer explains, the potential for fertility preservation remains in place for patients treated with gender affirming medical care, and patients and their parents are extensively counseled about fertility preservation options. Shumer Reply Decl. ¶¶ 19-25; *see also* Dkt. 69-48 (¶ 56).

gender affirming medical care is "experimental." This is false. The record evidence shows the opposite: the quality of evidence demonstrating the efficacy of gender affirming medical treatment is comparable to quality of evidence supporting many other forms of medical treatment routinely prescribed by clinicians and undisturbed by the Orders. PI at 28; *see also* Dkts. 69-48 (¶¶ 6, 29, 32, 39); Dkt. 69-49 (¶¶ 60, 102); Antommaria Reply Decl. ¶¶ 8, 9, 13; Karasic Reply Decl. ¶¶ 33-35, 37; Shumer Reply Decl. ¶¶ 13-14, 16; Gonzalez-Pagan Decl., Ex. EE-1, at 27-33.

*Amicus* Do No Harm's singular focus on select systematic reviews commissioned by entities in Europe and Florida to justify the Orders is misguided. None of the cited reviews justify stripping needed medical treatment from patients who have been informed of the treatments' risks and benefits and who are currently benefiting from that treatment. *See* Turban Reply Decl. ¶¶ 6-17; Antommaria Reply Decl. ¶¶ 5-10; Shumer Reply Decl. ¶¶ 11-17; Karasic Reply Decl. ¶¶ 32-37. As noted above, the systematic reviews for gender affirming medical care find the same level of evidence that most systematic reviews across all areas of medicine find. And notwithstanding the quality of the evidence based on study design, all of these reviews consistently find the same: gender affirming medical interventions are associated with reductions in gender dysphoria, reductions in depression, anxiety, and suicidality, and improvements in quality of life. Turban Reply Decl. ¶ 18; Shumer Reply Decl. ¶ 17; Karasic Reply Decl. ¶ 29.

Finally, Defendants and their *amici* claim that the risks of gender affirming medical care mean that it may be held to a higher standard of evidence than all other forms of medical care (though, as discussed above, these risks are comparable to other forms of medical treatment). But they ignore that "evidence quality is not synonymous with clinical recommendations." Karasic Reply Decl. ¶ 38 (quotation omitted). In addition to the quality of evidence, clinical recommendations must *also* consider the benefits and harms of both treatment and no treatment,

as well as patients' values and preferences. *Id.*; Antommaria Reply Decl. ¶11. Here, Defendants ignore the harms associated with withholding medical treatment for gender dysphoria for those who need it, and that there are no evidence-based alternative treatments to effectively treat gender dysphoria. Antommaria Reply Decl. ¶ 12; Shumer Reply Decl. ¶ 17; Turban Reply Decl. ¶ 4.[6]

**Overinclusive and Underinclusive**. For all these reasons, Defendants have not met their burden of showing that the Orders substantially advance their asserted interest in protecting children. Their proffered critiques of these treatments are not only exaggerated but also true of many other forms of medical treatment untouched by the Orders. Defendants respond "by asserting that all that is demanded under heightened scrutiny is a "reasonable" fit. Opp. 25. But they draw that quote from a Second Amendment case that applied the "intermediate scrutiny" test used for evaluating content neutral speech restrictions. *See United States v. Chapman*, 666 F.3d 220, 231 (4th Cir. 2012). Intermediate scrutiny under the Equal Protection Clause is a different standard and requires a much closer "means-ends" fit. *Sessions v. Morales-Santana*, 582 U.S. 47, 68 (2017).

Here, "the Order[s] [are] underinclusive in that [they] do[] not encompass any similar medical treatments for cisgender youth …, even where those medical treatments pose the same or similar risks." *Washington v. Trump*, No. 2:25-CV-00244-LK, 2025 WL 509617, at *10 (W.D. Wash. Feb. 16, 2025). They are "overinclusive as well," because they are "not limited to minors and instead include[] 18 year olds." *Id.* Defendants' misguided concerns about evidence quality,

---

[6] Alabama et al.'s critique of the WPATH guidelines with extra-record evidence likewise does not justify the Orders' sweeping attempts to end the provision of gender affirming medical care to individuals under 19. Alabama et al.'s brief paints a false narrative belied by the actual record. Karasic Reply Decl. ¶¶ 8-25. Relying on cherry-picked references to evidence in another case, Alabama et al. criticize the WPATH's guidelines but ignore the Endocrine Society's similar guideline, which provides similar robust clinical recommendations for treating gender dysphoria. Turban Reply Decl. ¶ 5. In addition to the Endocrine Society Guideline, every major medical association in the United States recognizes the safety and efficacy of gender affirming medical interventions. *Id.*; Dkts. 69-49 (¶¶ 61-63); 69-50 (¶¶ 50-51, 125). *See also* Gonzalez-Pagan Decl., Ex. EE-1.

efficacy, regret, or fertility do not justify singling out these medical treatments for transgender adolescents and young adults for sweeping attacks by the federal government.

### 3) The Orders Fail Rational Basis Review.

The Orders ultimately fail any standard of review because they are so disconnected from any legitimate government justification and on their face result from "negative attitudes" and "irrational prejudice." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448, 450 (1985). Indeed, the Orders fail any level of scrutiny because they are transparently motivated by a "bare desire to harm" transgender people. *Romer v. Evans*, 517 U.S. 620, 645 (1996) (quotation omitted). The Orders are directly and exclusively aimed at preventing any medical care "to align an individual's physical appearance with an identity that differs from his or her sex" because, according to the President, it is a "false claim" that a person's sex can change. Denial of Care Order 1, 2(c). These goals and assertions are not grounded in concerns about science or medicine but in casting as "false" the idea that "males can identify as and thus become women and vice versa." Gender Identity Order 2(f). As this Court has already recognized, it is difficult to "fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist." TRO 41. The Orders are "inexplicable by anything but animus toward the class it affects." *Romer*, 517 U.S. at 632.

## II.   THE COURT SHOULD ENTER A NATIONWIDE INJUNCTION.

Plaintiffs explained why all the remaining equitable factors favor injunctive relief. PI 29-30. The Court agrees. TRO 45-49. And Defendants barely argue otherwise. Opp. 26.

Instead, Defendants focus on arguing that the Court should not grant nationwide injunctive relief. Opp. 26-30. But, once again, Defendants merely recycle their previous arguments instead of offering new ones. Under Fourth Circuit precedent, "[a] district court may issue a nationwide injunction so long as the court molds its decree to meet the exigencies of the particular case."

*HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (cleaned up). And, as this Court explained in its TRO opinion, "the 'equities of the case' call for" a nationwide injunction and "a narrower injunction cannot provide complete relief." TRO 52.[7]

Even critics of nationwide injunctions agree that injunctions may incidentally benefit third parties when "that benefit [is] merely a consequence of providing relief to the plaintiff." *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring); *accord United States v. Texas,* 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring). Here, as this Court has explained, "because members of PFLAG and GLMA are located throughout the country … an injunction of nationwide scope is necessary to provide complete relief." TRO 51. The evidence demonstrates that by threatening hospitals across the country with the immediate loss of all federal grant funds, the Executive Orders have created an *in terrorem* effect that has coerced hospitals to immediately stop providing gender affirming medical care. And to dispel that *in terrorem* effect, "a court order must be clear and definite." *Id.* at 50 (quotation omitted).

At a minimum, Plaintiffs are entitled to an injunction extending to all members of PFLAG and GLMA, not merely the specific members who filed declarations in this case. *See Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 932 (2024) (Kavanaugh, J., concurring) (explaining that even an

---

[7] *HIAS* remains good law. *Labrador v. Poe by & through Poe*, 144 S. Ct. 921 (2024) (partially staying state-wide injunction). The Fourth Circuit "do[es] not lightly presume that the law of the circuit has been overturned," and "a Supreme Court decision overrules or abrogates [] prior [circuit] precedent only if [circuit precedent is] *impossible* to reconcile with [the Supreme Court's] decision." *United States v. Hunt*, 123 F.4th 697, 702 (4th Cir. 2024) (cleaned up). In *Poe*, "the Court [did] not decide[] the propriety of 'universal injunctions.'" 144 S. Ct. at 937 (Jackson, J., dissenting); *see also id.* at 933 n.4 (Kavanaugh, J., concurring) (joined by Justice Barrett, noting the order addressed the government's likelihood of success on the issue, and thus did not make a definitive decision). Indeed, the Supreme Court recently passed up an opportunity "to resolve definitively the question whether a district court may issue universal injunctive relief." *McHenry v. Texas Top Cop Shop, Inc.*, 145 S. Ct. 1 (2025) (Gorsuch, J., concurring). Absent a definitive holding to the contrary by the Supreme Court, *HIAS* remains controlling precedent in this Circuit. *See Hecox v. Little*, 104 F.4th 1061, 1089 (9th Cir. 2024), *as amended* (June 14, 2024) (rejecting argument that *Poe* abrogates prior circuit precedent and establishes that a "preliminary injunction would necessarily be overbroad as a matter of law if it extends to nonparties").

injunction "as to particular plaintiffs . . . could still have widespread effect" as "the plaintiff [is] an association that has many members"). Under longstanding precedent, injunctive relief extends to *all* an organization's members. *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986); *Warth v. Seldin*, 422 U.S. 490, 515 (1975). While one Justice has argued that those precedents should be overruled, *see FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring), only a majority of the Court has the power to do so.

## III.    THIS COURT SHOULD REJECT THE REQUESTS FOR BOND AND A STAY.

The Court should either waive the bond requirement or impose a nominal bond of zero dollars. *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 1:25-CV-00333-ABA, 2025 WL 573764, *30 (D. Md. Feb. 21, 2025) (collecting examples of courts waiving bond when bond would frustrate Plaintiffs' ability to vindicate constitutional rights).

The Court should also deny Defendants' request for a stay, which would alter the status quo that currently exists under the TRO and undercut this Court's finding that Plaintiffs "are likely to suffer irreparable harm absent injunctive relief." TRO 47. If the Court believes a stay may be warranted, then separate briefing on that question would be appropriate.

Dated: February 26, 2025                           Respectfully submitted,

                                                   */s/ Omar Gonzalez-Pagan*

Joshua Block*                                      Omar Gonzalez-Pagan*
Harper Seldin*                                     Jennifer C. Pizer*
Chase Strangio*                                    **Lambda Legal Defense**
Alexandra R. Johnson*                                **and Education Fund, Inc.**
**American Civil Liberties Union**                 120 Wall Street, 19th Floor
  **Foundation**                                   New York, NY 10005
125 Broad Street, Floor 18                         Telephone: (212) 809-8585
New York, NY 10004                                 Facsimile: (855) 535-2236
Telephone: (212) 549-2500                          ogonzalez-pagan@lambdalegal.org
Facsimile: (212) 549-2650

jblock@aclu.org
hseldin@aclu.org
cstrangio@aclu.org
a.johnson@aclu.org

Deborah A. Jeon (Fed. Bar No. 06905)
Zoe M. Ginsberg (Fed. Bar No. 30727)
**American Civil Liberties Union
  Foundation of Maryland**
3600 Clipper Mill Road, Suite 200
Baltimore, MD 21211
Telephone: (410) 889-8555
Facsimile: (410) 366-7838
jeon@aclu-md.org
zginsberg@aclu-md.org

Catherine E. Stetson**
Danielle Desaulniers Stempel (Fed. Bar No. 20501,
Renewed 1/31/25)
Kristina Alekseyeva*
Sam H. Zwingli*
**Hogan Lovells US LLP**
555 13th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5491
Facsimile: (202) 637-5910
cate.stetson@hoganlovells.com
danielle.stempel@hoganlovells.com
kristina.alekseyeva@hoganlovells.com
sam.zwingli@hoganlovells.com

jpizer@lambdalegal.org

Karen L. Loewy*
**Lambda Legal Defense
  and Education Fund, Inc.**
815 16th Street NW, Suite 4140
Washington, DC 20006
Telephone: (202) 804-6245
Facsimile: (855) 535-2236
kloewy@lambdalegal.org

Nora Huppert*
**Lambda Legal Defense
  and Education Fund, Inc.**
3656 N. Halsted Street
Chicago, IL 60613
Telephone: (312) 605-3233
Facsimile: (855) 535-2236
nhuppert@lambdalegal.org

Jackson Skeen***
**Hogan Lovells US LLP**
125 High Street
Suite 2010
Boston, MA 02110
Telephone: (617) 702-7747
Facsimile: (617) 371-1037
jackson.skeen@hoganlovells.com

*Attorneys for Plaintiffs*

*\*Application for admission pro hac vice
granted.*

*\*\*Application for admission forthcoming.*

*\*\*\*Application for admission pro hac vice
granted and admitted only in D.C. Supervised by
principals of the firm admitted in Massachusetts.*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was electronically filed using the Court's CM/ECF system. Service was effected by and through the Court's CM/ECF system.

Dated: February 26, 2025                    */s/ Omar Gonzalez-Pagan*
                                            Omar Gonzalez-Pagan

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PFLAG, INC., et al.,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, et al.,

*Defendants*.

Civil Action No. BAH-25-337

### CONSOLIDATED INDEX OF EXHIBITS IN SUPPORT OF PLAINTIFFS'
### MOTION FOR PRELIMINARY INJUNCTION

| Exhibit | Description |
|---------|-------------|
| A | Declaration of Omar Gonzalez-Pagan ISO Motion for Preliminary Injunction with Exhibits A-1 through A-18. |
| A-1 | HRSA Memorandum |
| A-2 | CDC Grant Termination Letter |
| A-3 | Children's National Statement |
| A-4 | Children's Hospital of Richmond Statement |
| A-5 | UVA Health Statement |
| A-6 | 29 News Article - UVA Health Resumption of Care |
| A-7 | Denver Health Statement |
| A-8 | Letter from Jason Miyares, Attorney General of Virginia, to UVA and VCU |
| A-9 | Children's Hospital of Colorado Letter |
| A-10 | LA Times News Article – Children's Hospital of Los Angeles Cessation |

| Exhibit | Description |
|---------|-------------|
| A-11 | Detroit Free Press News Article – Corewell Health Cessation of Care |
| A-12 | Detroit Free Press News Article – Corewell Health Resumption of Care |
| A-13 | Children's Hospital of Phoenix Letter |
| A-14 | Tucson Sentinel News Article – Prisma Community Care Cessation of Care |
| A-15 | AZ Central News Article – Prisma Community Care Resumption of Care |
| A-16 | White House Statement |
| A-17 | FDA Notice |
| A-18 | CDC Notice |
| B | Declaration of Bruce Boe |
| C | Declaration of Bella Boe |
| D | Declaration of George Goe |
| E | Declaration of Gabe Goe |
| F | Declaration of Rachel Roe |
| G | Declaration of Robert Roe |
| H | Declaration of Claire Coe |
| I | Declaration of Cameron Coe |
| J | Declaration of Lawrence Loe |
| K | Declaration of Dylan Doe |

| Exhibit | Description |
|---------|-------------|
| L | Declaration of Alex Sheldon (Executive Director of GLMA) |
| M | Declaration of Brian K. Bond (CEO of PFLAG, Inc.) |
| N | Declaration of E.M. |
| O | Declaration of Jane Doe 1 |
| P | Declaration of Jane Doe 2 |
| Q | Declaration of Jane Doe 3 |
| R | Declaration of Jane Doe 4 |
| S | Declaration of Jane Doe 5 |
| T | Declaration of Jane Doe 6 |
| U | Declaration of Dr. Peyton Poe |
| V | Declaration of Dr. Kyle Koe |
| W | Declaration of Kristen Chapman |
| X | Declaration of M.V. |
| Y | Declaration of Dr. Jeffrey Birnbaum |
| Z | Declaration of Dr. Natalie Noe |
| AA | Declaration of Dr. Armand Antommaria |
| BB | Declaration of Dr. Dan Karasic |
| CC | Declaration of Dr. Daniel Shumer |
| DD | Declaration of Dr. Jack Turban |

| Exhibit | Description |
|---------|-------------|
| EE | Supplemental Declaration of Omar Gonzalez-Pagan ISO Motion for Preliminary Injunction with Exhibit EE-1 |
| EE-1 | Br. of Amici Curiae Clinical Practice Guideline Experts ISO Pet. & Resp't ISO Pet., *United States v. Skrmetti*, No. 23-477 (U.S. Sept. 3, 2024). |
| FF | Supplemental Declaration of Dr. Armand Antommaria |
| GG | Supplemental Declaration of Dr. Dan Karasic |
| HH | Supplemental Declaration of Dr. Daniel Shumer |
| II | Supplemental Declaration of Dr. Jack Turban |

# **Exhibit EE**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PFLAG, INC., et al.,

    *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

    *Defendants*.

Civil Action No. BAH-25-337

**SUPPLEMENTAL DECLARATION OF OMAR GONZALEZ-PAGAN IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

I, Omar Gonzalez-Pagan, hereby declare and state:

1.    I am over 18 years of age, of sound mind, and fully capable of making this declaration. I have personal knowledge of the facts set forth in this declaration, they are true and correct, and I would be able to testify about these facts if I were called as a witness at a hearing or trial.

2.    I am a licensed attorney in the Commonwealth of Massachusetts and the State of New York. I am Senior Counsel and Health Care Strategist at Lambda Legal, and counsel for Plaintiffs in this action.

3.    I submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

4.    On September 3, 2024, adolescent medicine specialists, pediatricians, clinicians, methodologists, professors, and researchers submitted an *amicus curiae* brief in support of the petitioner in *United States v. Skrmetti*, No. 23-477 (U.S. argued Dec. 4, 2024), which explains that the WPATH guidelines are supported by decades of scientific research and clinical experience and

that the methodological critiques of the WPATH guidelines advanced by certain State Amici are meritless.  Exhibit **EE-1** is a true and correct copy of that *amicus* brief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 26th day of February, 2025.

/s/ *Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan

# **Exhibit EE-1**

No. 23-477

IN THE

# Supreme Court of the United States

UNITED STATES,

*Petitioner,*

*v.*

JONATHAN SKRMETTI, ATTORNEY GENERAL
AND REPORTER FOR TENNESSEE, *et al.,*

*Respondents,*

*and*

L.W., BY AND THROUGH HER PARENTS AND
NEXT FRIENDS, SAMANTHA WILLIAMS
AND BRIAN WILLIAMS, *et al.,*

*Respondents in Support of Petitioner.*

ON WRIT OF CERTIORARI TO THE UNITED STATES
COURT OF APPEALS FOR THE SIXTH CIRCUIT

**BRIEF OF *AMICI CURIAE* CLINICAL PRACTICE
GUIDELINE EXPERTS IN SUPPORT OF
PETITIONER AND RESPONDENTS IN
SUPPORT OF PETITIONER**

EUGENE E. STEARNS
  *Counsel of Record*
JENEA M. REED
CORAL DEL MAR LÓPEZ
STEARNS WEAVER MILLER WEISSLER
  ALHADEFF & SITTERSON, P.A.
150 West Flagler Street, Suite 2200
Miami, FL 33131
(305) 789-3200
estearns@stearnsweaver.com

*Counsel for Amici Curiae*

332288

*i*

## TABLE OF CONTENTS

*Page*

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . .i

TABLE OF APPENDICES . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF CITED AUTHORITIES . . . . . . . . . . . . . .iii

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . .1

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . .4

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

    A. Clinical Practice Guidelines. . . . . . . . . . . . .7

    B. Methodology for SOC8 . . . . . . . . . . . . . . . . .8

    C. SOC8's Discussion of Adolescent Care. . . .14

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

I. Reliable clinical practice guidelines, like SOC8, are essential to high quality, effective healthcare. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

II. WPATH's SOC8 are the product of a rigorous and reliable development process . . . .20

III. Accepting the critiques offered by State defendants could undermine many other clinical practice guidelines. . . . . . . . . . . . . . . . .25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

*ii*

## TABLE OF APPENDICES

*Page*

APPENDIX A — LIST OF *AMICI CURIAE* . . . . . . .1a

*iii*

**TABLE OF CITED AUTHORITIES**

*Page*

**Statutes and Other Authorities**

45 World Health Organization, Handbook for Guideline Development 130 (2d ed. 2014) (WHO Handbook) . . . . . . . . . . . . . . . . . . 12, 27, 28, 29, 34, 35

Paul E. Alexander, et al., *World Health Organization recommendations are often strong based on low confidence in effect estimates.* 67 J Clin Epidemiol. No. 6 (2014) . . . . . . . . . . . . . . . . . 27, 28, 30

Florence Ashley, et al., *Randomized-controlled trials are methodologically inappropriate in adolescent transgender healthcare*, 25 International Journal of Transgender Health No. 3 (2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Adrian Baker, et al., *A review of grading systems for evidence based guidelines produced by medical specialties*, 10 Clinical Med. (Lond) (2010) . . . . . . . 30

Jizzo R. Bosdriesz, et al., *Evidence-based medicine– When observational studies are better than randomized controlled trials*, Nephrology (Carlton), 25 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Br. for the Petitioner United States of America, (Aug. 27, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Br. of Alabama as *Amicus Curiae* Supporting Respondents in Opp. to Petition for Writ of Certiorari (Feb. 2, 2024) . . . . . . . . . . . . . . . . . . . . . 5, 25

*iv*

*Cited Authorities*

*Page*

Br. of Respondents in Opp. to Petition for Writ of
    Certiorari (Feb. 2, 2024) . . . . . . . . . . . . . . . . . . . . . . . .5

Eli Coleman, et al., *Standards of Care for the Health of
    Transgender and Gender Diverse People, Version
    8*, International Journal of Transgender
    Health (2022) (SOC8) . . . . . . . . . . . . . . . . . . . . . . . . . .3

Colin R. Cooke, et al., *Advancing Clinical Practice
    and Policy through Guidelines: The Role of
    the American Thoracic Society*, 182 Am. J.
    Respir. Crit. Care Med. No. 9 (2013) . . . . . . . . .20, 30

Chunquin Deng, et al., *Challenges of clinical trial
    design when there is lack of clinical equipoise:
    use of a response-conditional crossover design*,
    259 J Neurol. (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . .31

Jeffrey S. Flier, *Publishing Biomedical Research: a
    rapidly evolving ecosystem*, 66 Perspectives in
    Biology & Medicine 358 (2023), *available at*
    https://doi.org/10.1353/pbm.2023.a902032 . . . . . . . .18

Benjamin Freedman, *Equipoise and the Ethics of
    Clinical Research*, 317 N. Engl. J. Med. 3 (1987) . .31

Michael L. Groff, et al., *Publication Trends
    of Pediatric and Adult Randomized
    Controlled Trials in General Medical
    Journals, 2005-2018: A Citation Analysis*, 7
    Child. (Basel) 293 (2020) . . . . . . . . . . . . . . . . . . .27, 28

*v*

*Cited Authorities*

*Page*

Wylie C. Hembree, et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinol. Metab (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

IOM (Institute of Medicine), Clinical Practice Guidelines We Can Trust 15 (2011) (IOM Guidelines) . . . 7, 8, 10, 15, 18, 19, 20, 21, 22, 24, 27, 28, 29, 30, 33, 34, 35, 36, 37

Shiveindra Jeyamchan, et al., *Athletes returning to play after cervical spine or neurobrachial injury*, 1 Curr. Rev. Musculoskelatal Med. (2008) . . .27, 31

Toby J. Lasserson, et al., *Chapter 1.1: Why do a systematic review?, in* Cochrane Handbook for Systematic Reviews of Interventions (Julian Higgins, et al., eds., 2023), *available at* https://training.cochrane.org/handbook/current/chapter-01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

Benjamin A. Lipsky, et al., *2012 Infectious Diseases Society of America clinical practice guidelines for the diagnosis and treatment of diabetic foot infections*, Clin Infect Dis. (2012) . . . . . . . . . . . . .27

Meredithe McNamara, et al., *An Evidence-Based Critique of "The Cass Review" on Gender-affirming Care for Adolescent Gender Dysphoria*, at 11-14 (2024), *available at* https://law.yale.edu/sites/default/files/documents/integrity-project_cass-response.pdf . . . . . . . . . . . . . . . . . . 27, 28, 32, 33

*vi*

*Cited Authorities*

| | *Page* |
|---|---|

NATIONAL ACADEMY OF MEDICINE, *About the National Academy of Medicine,* https://nam.edu/about-the-nam/ (last visited Aug. 27, 2024) . . . . . . . . . . . . . .7

Holger J. Schünemann, et al., *Improving the use of research evidence in guideline development: 1. Guidelines for guidelines*, 4 HEALTH RSCH. POL'Y AND SYS. 21 (2006) . . . . . . . . . . . . . . . . . . . . . . .29

U.S. Dept. of Health and Human Services, *The Belmont Report: Ethical Principles and Guidelines for the Protection of Human Subjects of Research*, at 3 (1979), *available at* https://www.hhs.gov/ohrp/regulations-and-policy/belmont-report/index.html . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

United States Supreme Court Rule 37(6). . . . . . . . . . . . .1

WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, *Chairs of the SOC8 and Lead Evidence Team*, https://www.wpath.org/soc8/Chairs-Evidence-Leads (last visited Aug. 27, 2024) . . . . . . .8

WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, *Establishing the SOC8 Revision Committee and Meet the Chairs and Lead Evidence Team*, https://www.wpath.org/soc8/Revision-Committee (last visited Aug. 27, 2024) . . . . . . . . . . . . . . . . . . . . . .9

USCA4 Appeal: 25-1279    Doc: 34-2    Filed: 07/25/2025    Pg: 234 of 589

Case 8:25-cv-00337-BAH    Document 108-3    Filed 02/26/25    Page 9 of !

*vii*

*Cited Authorities*

Page

World Professional Association for Transgender Health, *SOC8 Contributors*, https://www.wpath.org/media/cms/Documents/SOC%20v8/SOC8%20Full%20Contributor%20List%20-%20FINAL%20UPDATED%2009232021.pdf (last visited Aug. 29, 2024) . . . . . . . . . . . . . . . . . . . . .35

World Professional Association for Transgender Health, *Standards of Care for Transgender and Gender Diverse People, Version 8 Frequently Asked Questions (FAQs)*, at 1-4, https://www.wpath.org/media/cms/Documents/SOC%20v8/SOC8%20FAQs%20-%20WEBSITE2.pdf (last visited Aug. 28, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

1

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are adolescent medicine specialists, pediatricians, clinicians, methodologists, professors, and researchers. They have decades of experience at institutions across the country, ranging from Harvard Medical School to Stanford Medicine Children's Health.[2]

*Amici* have conducted and published randomized-controlled trials and observational medical studies. They also have expertise in the development and use of clinical practice guidelines across medical specialties in the United States.

*Amici* include:

(1) Jenifer R. Lightdale, MD, MPH, Associate Chief of the Division of Gastroenterology, Hepatology and Nutrition at Boston Children's Hospital, and Professor of Pediatrics at Harvard Medical School in Massachusetts;

(2) Neville H. Golden, MD, the Marron and Mary Elizabeth Kendrick Professor of Pediatrics, Emeritus

---

1.    Pursuant to Supreme Court Rule 37.6, *amici curiae* state that no counsel for a party authored this brief in whole or in part, and no person or entity other than *amici curiae* and their counsel made a monetary contribution to its preparation or submission. The views expressed in this brief reflect the *amici*'s opinions as individual researchers and physicians, rather than those of the institutions that employ them. Emphasis is added and citations, internal quotations, and objections are omitted throughout this brief, unless otherwise indicated.

2.    *Amici* join this brief as individuals; institutional affiliation is noted for informational purposes only and does not indicate endorsement by institutional employers of their positions.

2

Active, Past Division Chief of the Division of Adolescent Medicine at Stanford University School of Medicine in California;

(3) Scott E. Hadland, MD, MPH, MS, Chief of the Division of Adolescent and Young Adult Medicine, and Associate Professor of Pediatrics at Mass General for Children/Harvard Medical School in Massachusetts;

(4) Jason Nagata, MD, MSc, Associate Professor of Pediatrics in the Division of Adolescent & Young Adult Medicine at the University of California San Francisco, and affiliated faculty with the Institute for Global Health Sciences and the Center for Sexual and Gender Minority Health;

(5) Kenneth W. Goodman, PhD, Professor and Director of the Institute for Bioethics and Health Policy at the University of Miami in Florida;

(6) Melissa Brouwers, M.D., Professor and Director of the School of Epidemiology and Public Health at the University of Ottawa, Canada, who has served as principal of developers of international standards of practice guideline quality and evaluation;

(7) Mary Butler, PhD, MBA, Associate Professor at the University of Minnesota Division of Health Policy & Management and Co-Director of the Minnesota Evidence-based Practice Center of the School of Public Health;

(8) Doug Haldeman, PhD, professor and chair of the doctoral program in clinical psychology at John F. Kennedy University in California; and

3

(9) Jennifer Yost PhD, RN, FAAN, is a Professor at the M. Louise Fitzpatrick College of Nursing at Villanova University in Pennsylvania where she engages in research aimed at promoting the use research evidence to inform health care decisions based on best available evidence.

(10) Ian J. Saldanha, PhD, is the associate director of the Johns Hopkins Evidence-based Practice Center in Maryland, and an epidemiologist with expertise conducting evidence sytheses and clinical practice guidelines developing and advancing methods to improve them, and teaching methods for their conduct.

(11) Renata Arrington Sanders, MR, MPH, ScM, is the Chief of the Craig-Dalsimer Division of Adolescent Medicine at the Children's Hospital of Philadelphia and a Professor of Pediatrics and Medicine at the Perelman School of Medicine of the University of Pennsylvania.[3]

*Amici* submit this brief to address what the district court found were the "widely accepted guidelines for treating gender dysphoria," namely the World Professional Association for Transgender Health (WPATH) Standards of Care 8 (SOC8).[4] Gender dysphoria "arises from the incongruence that transgender people experience between their gender identity and [assigned] sex at birth."[5]

---

3.  Appendix A contains a complete listing of *amici*.

4.  App. to the Petition for a Writ of Certiorari ("Pet. App.") at 178a-181a (Nov. 6, 2023); *see also* Eli Coleman, et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, International Journal of Transgender Health (2022) (SOC8).

5.  SOC8, consistent with definitions from the World Health Organization and the American Psychiatric Association, defines

4

The district court's consideration of the evidence was correct and *amici* share a significant interest in ensuring that clinical practice guidelines—like SOC8—are reliable and evidence-based. *Amici* submit this brief to outline their concerns about governments making medical decisions in the halls of political power by banning care that is supported by reliable clinical practice guidelines. The State defendants' after-the-fact attempt to justify interfering with good medical practice based on internal communications among the clinicians who developed the guidelines compounds that concern.

Such attacks could deter subject-matter experts from participating in developing guidelines and could discourage candid, uninhibited dialogue among researchers and practitioners, which is essential to the development of reliable clinical guidelines and effective clinical practice.

## SUMMARY OF ARGUMENT

The district court held—as every court to consider the issue has recognized—that a categorical ban on medical care for gender dysphoria cannot survive intermediate scrutiny under the Equal Protection Clause.[6]

While considering whether the Tennessee law was "substantially related to an important state interest," the district court made factual findings about WPATH's

_____

gender dysphoria as: "a state of distress or discomfort that may be experienced because a person's gender identity differs from that which is physically and/or socially attributed to their sex assigned at birth." SOC8 at S7, S15, and S252.

6.  Pet. App. 197a–205a.

JA814

5

guidelines. The district court found that "WPATH [has] published widely accepted guidelines for treating gender dysphoria" "based on scientific research and clinical experience" that are the "prevailing standards of care."[7] The merits briefs here correctly explain how that conclusion was compelled by the record.[8]

Since 1979, WPATH has labored to develop evidence-based clinical guidelines for treating individuals suffering from gender dysphoria. Medical evidence has mounted for over four decades, and every major medical association now recognizes the benefits of puberty blockers and hormones for adolescents with persistent gender dysphoria.

Though WPATH and medical professionals have studied gender dysphoria for decades, some 22 States have banned or restricted medical treatments for adolescents with gender dysphoria in the last 3 years. State defendants in cases defending those bans and in opposition to certiorari here have gone beyond this record to try to rationalize the bans based on a series of methodological critiques of WPATH's clinical practice guidelines.[9] If this Court were to reconsider the district court's factual findings (and it should not), none of the State defendants' critiques—citing sources ranging from newspaper articles to YouTube videos—has merit.

---

7. Pet. App. 60a, 178a, and 252a.

8. *See, e.g.*, Br. for the Petitioner United States of America, at 12 (Aug. 27, 2024); *see also* Pet. App. 183a.

9. *See, e.g.*, Br. of Respondents in Opp. to Petition for Writ of Certiorari, at 9-10 (Feb. 2, 2024); Br. of Alabama as *Amicus Curiae* Supporting Respondents in Opp. to Petition for Writ of Certiorari, at 7-24 (Feb. 2, 2024).

6

Based on reliable evidence, clinical experience, and expert consensus, in September 2022, WPATH issued its eighth and current version of the Standards of Care (SOC8). SOC8 summarizes the most methodologically sound medical studies on gender dysphoria, devotes a new chapter to adolescents, and makes recommendations for care.

WPATH's process for developing SOC8 was transparent, rigorous, iterative, and methodologically sound. It included a steering committee of leading clinicians and academics, an independent systematic evidence review led by a professor from Johns Hopkins University, the evaluation of over 70 pre-existing systematic reviews of evidence on a wide range of issues, and a process for achieving consensus among 119 SOC8 members and applicants who were selected to develop these guidelines. SOC8 meets or exceeds the developmental rigor of other clinical practice guidelines produced by other medical societies in the United States.

For the SOC8 chapter dedicated exclusively to adolescents, the leads were psychologists and psychiatrists practicing and teaching at institutions ranging from Emory School of Medicine to Harvard Medical School. That chapter describes the current evidence and concludes that the data "[t]aken as a whole," shows "early medical intervention" "can be effective and helpful for many."[10]

If this Court accepts State defendants' critiques of SOC8, it could undermine many thousands of clinical guidelines used by practicing physicians in almost every

---

10. SOC8 at S47.

7

field of medicine. In short, the pseudoscientific arguments made by State defendants are based on bad medicine and accepting them threatens to make medicine worse.

## BACKGROUND

WPATH "is an international, multidisciplinary, professional association whose mission is to promote evidence-based care, education, research, public policy, and respect in transgender health."[11] WPATH has over 3,000 members who are health care professionals, social scientists, and legal professionals.[12] Its "evidence-based approach is not only based on the published literature (direct as well as background evidence) but also on consensus-based expert opinion."[13] SOC8, a distinct project sponsored by WPATH, totals 190 pages of text plus 68 pages of references.[14]

### A.  Clinical Practice Guidelines

In 2011, the Institute of Medicine of the National Academies of Sciences (IOM) published *Clinical Practice Guidelines We Can Trust*. IOM, now the National Academy of Medicine, has over 2,400 members elected by their peers in recognition of outstanding achievement.[15] IOM defines "Clinical Practice Guidelines" as "statements

---

11. *Id.* at S5–S258.

12. *Id.* at S5.

13. *Id.* at S247.

14. *Id.* at S178–S246.

15. National Academy of Medicine, *About the National Academy of Medicine*, https://nam.edu/about-the-nam/ (last visited Aug. 27, 2024).

8

that include recommendations intended to optimize patient care that are informed by a systematic review of evidence and an assessment of the benefits and harms of alternative care options."[16]

### B. Methodology for SOC8[17]

*Selection of Steering Committee*: Members of the WPATH Board selected a Guideline Steering Committee, which oversaw the guideline development process.[18] Its Chair, Eli Coleman of the University of Minnesota Medical School, has been a frequent technical consultant to the World Health Organization (WHO) and the Centers for Disease Control and Prevention.[19] The Steering Committee also included as co-chairs a clinical associate professor of medicine at New York University and a professor of mental health and transgender health at the University of Nottingham (UK).[20]

In addition to overseeing the development of SOC8, the Steering Committee reviewed all chapters of the prior Standards of Care and the medical literature to

---

16. IOM (Institute of Medicine), Clinical Practice Guidelines We Can Trust 15 (2011) (IOM Guidelines).

17. This section is based exclusively on WPATH's description of the methodology it used for the development of SOC8. *Amici* did not participate in the development of SOC8.

18. SOC8 at S247 (App. A) (SOC8 Methodology).

19. World Professional Association for Transgender Health, *Chairs of the SOC8 and Lead Evidence Team*, https://www.wpath.org/soc8/Chairs-Evidence-Leads (last visited Aug. 27, 2024).

20. *Id.*

9

recommend statements that needed to be updated and ensure consistency of statements across SOC8.[21]

*Guideline Methodologist and Evidence Review Team:* WPATH worked closely with a guideline methodologist.[22] That guideline methodologist—who also led the Evidence Review Team—is a Professor of Medicine, Epidemiology and Health Policy and Management at Johns Hopkins University.[23]

The Evidence Review Team, the Guideline Steering Committee, and the chapter leads identified the recommendation statements from the prior standards of care that needed to be updated, new areas requiring recommendation statements, and the systematic reviews required.[24]

"A systematic review attempts to collate all empirical evidence that fits pre-specified eligibility criteria in order to answer a specific research question. It uses explicit, systematic methods that are selected with a view to minimizing bias, thus providing more reliable findings from which conclusion can be drawn and decisions made."[25] For statements requiring a systematic review,

---

21.  SOC8 Methodology at S248.

22.  *Id.* at S249.

23.  WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, *Establishing the SOC8 Revision Committee and Meet the Chairs and Lead Evidence Team*, https://www.wpath.org/soc8/Revision-Committee (last visited Aug. 27, 2024)

24.  *Id.*

25.  Toby J. Lasserson, et al., *Chapter 1.1: Why do a systematic review?*, *in* COCHRANE HANDBOOK FOR SYSTEMATIC REVIEWS OF INTERVENTIONS (Julian Higgins, et al., eds., 2023), *available at*

10

the Evidence Review team drafted review questions, specifying the population, interventions, comparisons, and outcomes.[26] SOC8 chapter leads and members evaluated the review questions and provided feedback.[27]

The Evidence Review Team then conducted systematic reviews and presented the results, including evidence tables, to the members of each relevant chapter.[28] The final version of SOC8 considered evidence from over 70 systematic reviews on a huge range of topics, including the effects of puberty blockers and hormones on cardiovascular function, bone health, anxiety, depression, and psychosocial functioning.[29]

―――――――――――

https://training.cochrane.org/handbook/current/chapter-01; *see also* IOM Guidelines at 96.

26. SOC8 Methodology at S248.

27. *Id.*

28. *Id.*

29. *See, e.g.*, SOC8 at S215 (citing "systematic review and meta-analysis" of "[s]ex steroids and cardiovascular outcomes"); at S153 (citing "systematic review and meta-analysis on the impact of sex hormones on bone health"); at S182 (citing "systematic review" on "[h]ormone therapy, mental health, and quality of life among transgender people"); at S190 (citing "systematic review" of "[h]ormonal treatment in young people with gender dysphoria"); at S218 (citing "systematic review" of literature about "[p]revalence of anxiety symptoms and disorders in the transgender population"); at S221 (citing "systematic review and meta-analysis" of "[q]uality of life of treatment-seeking transgender adults"); at S242 (citing "systematic review of the effects of hormone therapy on psychological functioning and quality of life in transgender individuals"); at S193 (citing "systematic review" of "[i]nternational clinical practice guidelines for gender minority/ trans people"); at S201 (citing "systematic review" of "[i]nterventions

11

*Recommendations and Delphi Process:* After months of debates among chapter members, chapter leads and members drafted explicit and actionable recommendation statements.[30]

WPATH then followed a rigorous Delphi process to approve the recommendation statements.[31] The Delphi process is widely-used to develop guidelines and involves "a structured solicitation of expert judgments in three rounds" relying on a panel of experts to reach formal consensus on all statements.[32] The Delphi SOC8 process used the Research and Development/UCLA Appropriateness scale ranging from 1 (strongly disagree) to 9 (strongly agree).[33]

Agreement was defined as 75 percent of the SOC8 members scoring the statement 7, 8, or 9.[34] Recommendations that did not achieve agreement were returned to chapter leads for revision based on voter comments.[35] Once modified, the revised statements went

---

to improve patient comprehension in informed consent for medical and surgical procedures"); at S226 (citing "[a] systematic review of the efficacy, harmful effects, and ethical issues related to sexual orientation change efforts").

30.  SOC8 Methodology at S250.

31.  *Id.*

32.  *See id.*

33.  *Id.*

34.  *Id.*

35.  *Id.*

12

through the Delphi process again.[36] If agreement was not reached after the second round, the statement was revised again based on feedback from voters and then put through a third round of voting.[37] If a statement was not approved after 3 rounds, the statement was removed from SOC8.[38]

*GRADE and Process for Formulating Recommendations:* Once statements passed the Delphi process, chapter members graded each statement using a process adapted from GRADE.[39] Recommendation statements were either for or against an intervention or treatment and strength was indicated as either "we recommend" for a strong recommendation or "we suggest" for a weak recommendation.[40] The strength of the recommendation considered the "balance of potential benefits and harms," "confidence in that balance or quality of evidence," "values and preferences of providers and patients," and "resource use and feasibility."[41]

Strong recommendations were made where one or more of several conditions were met: "the evidence is of high quality"; "estimates of the effect of an intervention/

---

36.  *Id.*

37.  *Id.*

38.  *Id.*

39.  *Id.* GRADE stands for "Grades of Recommendation, Assessment, Development, and Evaluation," and it assesses the statistical degree of certainty that a particular treatment will have its intended effect. *See* 45 WORLD HEALTH ORGANIZATION, HANDBOOK FOR GUIDELINE DEVELOPMENT 130 (2d ed. 2014) (WHO Handbook).

40.  SOC8 Methodology at S250.

41.  *Id.*

13

therapy/strategy (i.e., there is a high degree of certainty effects will be achieved in practice)"; "there are few downsides of therapy/intervention/strategy"; and "there is a high degree of acceptance among providers and patients or those for whom the recommendation applies."[42] Published studies, as well as expert clinical experience, were considered in determining the strength of each recommendation.[43]

After this grading process, "the Chapter Workgroups wrote the text providing the rationale or reasoning for the recommendation" including detailing "the available evidence" and any of its limitations and whether the recommendation was "strong or weak."[44] Then a separate "group of independent clinical academics working in the field of transgender health reviewed the references used in every chaper in order to validate that the references were appropriately used to support the text."[45] And, finally, the guidelines' recommended statements were circulated to renowned international advisors for review.[46]

*Final Comment Period, Publication, and Plan for Updating*: The draft of SOC8 was then posted online for a final six-week-long public comment period.[47] The SOC8 chair, chapter leads, and members reviewed comments

---

42. *Id.*

43. *Id.*

44. *Id.*

45. *Id.* at S251.

46. *Id.*

47. *Id.*

14

and made any necessary changes.[48] Then, WPATH disseminated the standards of care in a special edition of the International Journal of Transgender Health.[49]

SOC8 includes a plan for updating the guidelines based on new evidence or significant changes in the field.[50]

### C.    SOC8's Discussion of Adolescent Care

Relying on the methodology and process discussed above, several chapters in SOC8 address adolescents.[51]

SOC8 added Chapter 6 on adolescents because of "(1) the exponential growth in adolescent referral rates; (2) the increase in studies available specific to adolescent gender diversity-related care; and (3) the unique developmental and gender-affirming care issues of this age group."[52] Chapter 10 recommends adolescents receive guidance on how to disclose information to peers and support with navigating dating and sex, and delves into individualized options (including puberty blockers, and hormonal treatment) for adolescents with intersexuality.[53]  And Chapter 12 and Chapter 16 focus on hormone therapy recommendations for transgender adolescents and adults.[54]

_____

48. *Id.*

49. *Id.*

50. *Id.*

51. *See generally* SOC8 at S9-S10.

52. *Id.* at S9.

53. *See, e.g.*, *id.* at S97, S100.

54. *See, e.g.*, *id.* at S110, S157.

JA824

15

SOC8 states that because of "the emerging nature of knowledge regarding adolescent gender identity development, an individualized approach to clinical care is both ethical and necessary."[55] "As is the case in all areas of medicine, each study has methodological limitations, and conclusions drawn from research cannot and should not be universally applied to all adolescents."[56]

*SOC8 Requires Informed Consent from Parents Before any Treatment:* SOC8 is consistent with IOM's recommendations on informed consent: "Rather than dictating a one-size-fits-all approach to patient care," clinical practice guidelines "should aid clinician and patient decision making by clearly describing and appraising the evidence and reasoning regarding the likely benefits and harms related to specific clinical recommendations."[57] SOC8 specifies that "adolescents, their parents, and care providers should be informed by the nature of the evidence base."[58]

*SOC8 Describes the Evidence of the Potential Benefits and Risks of Medical Interventions:* For consideration by clinicians, parents, and patients, SOC8 reviews the risks and benefits of particular treatments for transgender adolescents in many chapters, including Chapter 6 (Adolescents), Chapter 10 (Intersex), Chapter 12 (Hormone Therapy) and Chapter 16 (Reproductive Health).[59]

---

55. *Id.* at S45.

56. *Id.*

57. IOM Guidelines at 16.

58. *See generally* SOC8 at S9-S10, S43-S66, S110-S119, and S159.

59. *Id.* at S45.

16

SOC8 reviews longitudinal studies that "compared baseline psychological functioning with outcomes after the provision of medical gender-affirming treatments."[60] It concludes that "data consistently demonstrate improved or stable psychological functioning, body image, and treatment satisfaction varying from three months up to two years from the initiation of treatment."[61]

SOC8 also summarizes studies with both a cross-sectional and longitudinal component that have compared transgender adolescents at baseline to cisgender peers and then again after receiving puberty blockers. "At baseline, the transgender youth demonstrated lower psychological functioning compared with cis-gender peers, whereas when undergoing puberty blockers, they demonstrated better function than their peers."[62]

SOC8 also summarizes the results of studies of large-population surveys of transgender individuals. For example, "[i]n a large non-probability sample of transgender adults, Turban et al. (2022) found those who reported access to gender-affirming hormones in adolescence," when "compared with transgender people accessing gender-affirming hormones in adulthood," "had lower odds of past-year suicidality."[63]

SOC8 "addresses the possibility an adolescent may regret gender-affirming decisions made during

---

60. *Id.* at S46.

61. *Id.*

62. *Id.*

63. *Id.* at S47.

JA826

17

adolescence."[64] It explains "[a]t present, no clinical cohort studies have reported on profiles of adolescents who regret their initial decision or detransition after irreversible affirming treatment."[65] Even the individuals who detransitioned did "not regret initiating treatment as they experienced the start of treatment as part of understanding their gender-related care needs."[66] Nonetheless, given the possibility of regret, it directs providers to "present the full range of possible outcomes when assessing transgender adolescents" and to "be prepared to support adolescents who detransition."[67]

In sum, SOC8's recommendations for "early medical intervention" comply with the WHO and IOM recommendations in that health care professionals "only recommend gender-affirming medical treatments," such as puberty blockers, when, among other things, the adolescent has reached puberty, the parents and patient give informed consent, and the adolescent has suffered from persistent, consistent, and insistent gender dysphoria.[68]

---

64. *Id.*

65. *Id.*

66. *Id.*

67. *Id.*

68. *Id.* at S59-S64.

18

## ARGUMENT

### I.  Reliable clinical practice guidelines, like SOC8, are essential to high quality, effective healthcare.

Every day, practicing clinicians make complex decisions about the treatments to recommend to their patients. In weighing treatment options, they must assess the strength of the available scientific evidence supporting each treatment as well as recommendations from subject matter experts based on their clinical experience. Practicing clinicians must also determine the likely risks and benefits of each treatment for a particular patient, given the patient's overall health, co-occurring conditions, values, preferences, and life circumstances.[69] And they must apply their individual clinical experience and knowledge in light of that evidence.[70] In short, familiarity with the existing evidence base, as well as recommendations from subject matter experts, is an essential component of the practice of medicine.

Because clinicians cannot realistically keep up with, let alone critically appraise, every new development in the scientific literature, evidenced-backed guidelines are essential. Every year, more than 30,000 scientific journals publish about 2 million biomedical research papers.[71] Even by 2011, "Physicians could no longer keep up with the

---

69.  IOM Guidelines at ix.

70.  *Id.* at 15.

71.  Jeffrey S. Flier, *Publishing Biomedical Research: a rapidly evolving ecosystem*, 66 PERSPECTIVES IN BIOLOGY & MEDICINE 358, 363 (2023), *available at* https://doi.org/10.1353/pbm.2023.a902032.

19

growing knowledge base: An internist would have to read 33 articles 365 days a year to stay up to date."[72] Given the need to also critically analyze each individual article or paper, "[t]he two situations combined to place clinicians at an increasing risk of drowning in doubtful data."[73] "Critically appraised, synthesized information such as systematic reviews and [clinical practice guidelines] became necessary tools for clinicians desiring to practice" evidence-based medicine.[74]

Clinical practice guidelines evaluate and synthesize the best available evidence for treating certain medical conditions, incorporate practical knowledge provided by subject-matter experts, and weigh other factors likely to affect patient care to formulate clinical recommendations for treatment.[75] This gives practicing clinicians access to current, evidence-based, practical guidance that they can explain to patients and parents, and apply in conjunction with their own clinical expertise.[76]

Clinical practice guidelines also reduce unnecessary variability and uncertainty in medical decision-making, which improves individual patient outcomes as well as overall healthcare quality and safety.[77] These guidelines are also used as tools for evaluating the performance of

---

72.  IOM Guidelines at 34.

73.  *Id.*

74.  *Id.*

75.  *Id.* at 1-2.

76.  *Id.* at 15.

77.  *Id.* at xi, 65.

20

healthcare providers, creating or improving healthcare systems and processes, and educating the public about best practices.[78] Given their potential to enhance public health and their value in everyday clinical decision-making, clinical practice guidelines have become "ubiquitous in our healthcare system."[79]

## II. WPATH's SOC8 are the product of a rigorous and reliable development process.

Before 2011, clinical practice guidelines involved variable and non-standardized processes, which lead to variable quality.[80] "To address the shortcomings of past guidelines," the IOM "published recommendations for trustworthy guidelines, effectively setting the gold standard for what constitutes a high-quality guideline."[81] IOM recognizes that: a systematic review is one step of the process; evidence quality is an input not the sole criterion; and clinical experience is relevant as another input.[82]

Although there are several ways to develop reliable clinical practice guidelines,[83] according to IOM, the most reliable guidelines share the following characteristics:

---

78.  *Id.* at 26-27.

79.  *Id.* at 2.

80.  Colin R. Cooke, et al., *Advancing Clinical Practice and Policy through Guidelines: The Role of the American Thoracic Society*, 182 Am. J. Respir. Crit. Care Med. No. 9, 910-914 (2013).

81.  *Id.* at 910.

82.  IOM Guidelines at 4-5, 20.

83.  *Id.* at 68.

21

a)  They transparently disclose their funding
    sources and explain the development process they
    followed;[84]

b)  They are developed by a multidisciplinary team,
    including patient representatives, clinicians,
    subject-matter experts, and one or more
    methodological experts;[85]

c)  They require members to disclose conflicts of
    interest and, if necessary, take steps to manage
    significant conflicts;[86]

d)  Their recommendations are informed by
    systematic reviews of scientific literature as well
    as clinical experience;[87]

e)  Their recommendations are approved by a
    consensus of members;[88]

f)  They summarize the nature, quality, quantity,
    and consistency of the evidence concerning
    recommended treatments;[89]

g)  They clearly explain the risks and benefits of
    recommended treatments and specify the role

---

84.  *Id.* at 76-78.

85.  *Id.* at 93.

86.  *Id.* at 82-83.

87.  *Id.* at 97.

88.  *Id.* at 87.

89.  *Id.* at 124-125.

22

played by patient preferences, values (including human rights and healthcare inequities), expert opinion, and clinical experience in developing each recommendation;[90]

h)  They indicate the strength of their recommendations;[91] and

i)  They are updated periodically or when new evidence suggests a need for revision.[92]

SOC8 has all these hallmarks of reliability. It provides a detailed description of its development process[93] and discloses funders in the text of the document.[94] It was developed by a diverse team of 119 subject-matter experts, healthcare professionals, researchers, and stakeholders, each of whom applied to participate and completed conflict of interest declarations.[95]

In developing SOC8, WPATH worked closely with a guideline methodologist from Johns Hopkins University—one of the top medical research universities in the United States—to assist with the planning and development of

---

90.  *Id.* at 67.

91.  *Id.* at 5.

92.  *Id.* at 6-9, 26.

93.  SOC8 at S247-51.

94.  *Id.* at S177.

95.  *Id.* at S247.

JA832

23

research questions and systematic reviews.[96] WPATH also contracted with Johns Hopkins' Evidence Review Team to conduct a robust review of all available evidence, including systematic reviews when direct evidence was available.[97] The SOC8 experts and the Evidence Review Team collaborated to identify the questions to be addressed through systematic reviews, and each step of the systematic review process is described in the text of SOC8.[98]

The recommendations in SOC8 were based on newly-conducted evidence reviews in addition to existing evidence reviews, expert opinion, and clinical experience.[99] Consensus on each recommendation was achieved through a widely used group facilitation tool known as the Delphi process, which encouraged rigorous debate and required approval of at least 75 percent of voting members for each recommendation.[100]

SOC8 explains the available evidence, including gaps in the literature and areas of uncertainty, and all references to scientific literature were validated by independent external reviewers before publication.[101] In addition,

---

96.  *Id.* at S249.

97.  *Id.*

98.  *Id.* at S249-50.

99.  *Id.* at S250.

100.  *Id.*

101.  *Id.* at S250-51; *see, e.g.*, *id.* at S45-47 (detailing the body of research supporting the use of puberty blockers and hormones for adolescents, identifying knowledge gaps, and identifying areas for additional research).

24

the explanatory text details potential risks and benefits associated with recommended interventions; provides information about implementing the recommendations; and acknowledges the values, human rights perspectives, patient preferences, and practical considerations that influenced the recommendations.[102]

Once the SOC8 membership committee reached consensus on their recommendations and the explanatory text was initially approved, WPATH distributed the document for review by an international advisory committee and for public comment.[103] Based on the feedback received, revisions to SOC8 were proposed and approved through a second Delphi process.[104] Finally, SOC8 was published, along with a plan to issue a new edition when new evidence or other changes in the field made revisions necessary.[105]

WPATH's process for developing SOC8 was transparent, rigorous, and methodologically sound, resulting in consensus between its findings and those of major medical organizations as to transgender care.[106] It meets or exceeds the developmental rigor of other clinical

---

102.  SOC8 at S250; *see, e.g.*, *id.* at S43-66 (adolescent chapter).

103.  *Id.* at S251; *see also* IOM Guidelines at 91 (describing the benefits of allowing public comment on draft guidelines).

104.  SOC8 at S251.

105.  *Id.*

106.  *See, e.g.,* Wylie C. Hembree, et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinol. Metab 3869-3903 (2017).

25

practice guidelines produced by other medical societies in the United States.[107]

### III. Accepting the critiques offered by State defendants could undermine many other clinical practice guidelines.

State defendants have tried to discredit SOC8 by asserting that there were methodological flaws in its development. But these attacks have no scientific validity. They disregard or distort the applicable scientific methodologies and the practical realities of clinical practice guideline development. SOC8's development process was at least as rigorous as the process typical for clinical practice guidelines in the United States, so the State defendants' attacks would cast doubt on most guidelines used every day nationwide. We address each in turn.

1. State defendants have criticized SOC8 for failing to conduct additional systematic reviews, including a separate review to support each and every individual recommendation.[108] But SOC8 undertook "[a] separate detailed systematic review protocol . . . for each review question or topic, as appropriate" with the assistance

---

107. WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, *Standards of Care for Transgender and Gender Diverse People, Version 8 Frequently Asked Questions (FAQs)*, at 1-4, https://www.wpath.org/media/cms/Documents/SOC%20v8/SOC8%20FAQs%20-%20WEBSITE2.pdf (last visited Aug. 28, 2024).

108. *See, e.g.*, Br. of Alabama as *Amicus Curiae* Supporting Respondents in Opp. to Petition for Writ of Certiorari, at 11-12 (Feb. 2, 2024).

26

of an independent Evidence Review Team under the leadership of a guideline methodologist.[109] SOC8 itself also recognizes and identifies issues that have not yet been systematically studied.[110] SOC8 was guided by its guideline methodologist and independent Evidence Review Team in developing research questions and planning systematic reviews, including determining which questions were eligible for systematic review.[111] As explained above, the final version of SOC8 also considered over 70 pre-existing "systematic reviews" on a huge range of topics, including the effects of puberty blockers and hormones on cardiovascular function, bone health, anxiety, depression, and psychosocial functioning.

In chapter 6 on adolescents, SOC8 conducts a narrative review of existing evidence rather than a systematic review. While acknowledging the limitations of that evidence base, the chapter found that "as a whole, the data show early medical intervention" "can be effective and helpful for many transgender adolescents seeking these treatments."[112]

That chapter then offers targeted recommendations supported by the best available evidence and expert consensus as determined through a rigorous Delphi

---

109.　SOC8 at S3, S8, S41, S46.

110.　*Id.*

111.　*See id.* at S8, S249. Likewise, a systematic review was conducted or relied upon for other chapters addressing adolescent care. *See, e.g.*, *id.* at S120-24, S126, S247, S249-50; *see generally id.* at S178.

112.　*Id.* at S45-47.

27

process.[113] Experts participating in a Delphi process rely on various sources of information and evidence, including their own clinical expertise, systematic reviews, observational studies, and any other relevant evidence. While in theory it might be ideal for every aspect of a clinical practice guideline to be directly supported by a systematic review, in practice this is extraordinarily rare if not impossible.[114] If courts permit the categorical banning of health care because SOC8 lacks systematic review for every single recommendation, that will cast doubt on numerous clinical practice guidelines that are similarly situated.

2. State defendants have criticized SOC8 for relying on so-called "low quality" evidence in developing some recommendations, yet almost all practice guidelines use this common and scientifically valid practice.[115]

In the medical research context, "low quality" is a technical term that refers to a rating under a methodological framework known as GRADE. GRADE assesses the statistical degree of certainty that a particular treatment will have its intended effect.[116] In

---

113.  *Id.* at S49-66.

114.  *See, e.g.,* Shiveindra Jeyamchan, et al., *Athletes returning to play after cervical spine or neurobrachial injury,* 1 Curr. Rev. Musculoskelatal Med. 175-179 (2008); Benjamin A. Lipsky, et al., *2012 Infectious Diseases Society of America clinical practice guidelines for the diagnosis and treatment of diabetic foot infections,* Clin Infect Dis., at 54 (2012).

115.  *See* notes 119-20, below.

116.  WHO Handbook at 110.

28

general, GRADE categorizes randomized controlled trials as "high quality" evidence and nonrandomized trials and observational studies as "low quality."[117] But evidence quality under GRADE cannot be determined mechanistically, and a study's rating can be adjusted up or down after a comprehensive review of several factors according to the raters' individual judgments.[118]

In many clinical domains, including pediatrics, there is little or no high-quality evidence.[119] It is well-established that clinical practice guidelines can make strong treatment recommendations based on so-called "low quality" evidence.[120] As the GRADE system itself

---

117.  *Id.* at 112. Evidence quality cannot be determined mechanistically, and a study's rating can be adjusted up or down after a comprehensive review of several factors according to the raters' individual judgments. *Id.* at 113–21.

118.  *Id.*

119.  "A review of Cochrane systematic reviews across numerous areas of medicine showed that 86.5% of reviews reported moderate (30.8%), low (31.4%) and very-low (24%) levels of evidence. Less than 1 in 7 systematic reviews had evidence of high quality for a primary outcome and less than 1 in 5 systematic reviews had evidence of high quality of any outcome." Meredithe McNamara, et al., *An Evidence-Based Critique of "The Cass Review" on Gender-affirming Care for Adolescent Gender Dysphoria*, at 11-14 (2024), *available at* https://law.yale.edu/sites/default/files/documents/integrity-project_cass-response.pdf. *See also* IOM Guidelines at 26; WHO Handbook at 112-13; Michael L. Groff, et al., *Publication Trends of Pediatric and Adult Randomized Controlled Trials in General Medical Journals, 2005-2018: A Citation Analysis*, 7 Child. (Basel) 293 (2020).

120.  *See, e.g.*, Paul E. Alexander, et al., *World Health Organization recommendations are often strong based on low*

29

makes clear, the evidence rating is only one factor among many that affects the strength of a recommendation.[121] Other factors relevant to clinical recommendations include the degree and strength of expert consensus, the quantity and consistency of available evidence, patient preferences, and value judgments regarding the relative importance of different effects of treatment.[122] These additional factors are considered at the recommendation stage to account for the different purposes of medical research and clinical medicine.[123]

---

*confidence in effect estimates.* 67 J CLIN EPIDEMIOL. NO. 6, 629-634 (2014) (finding that 55.4% of strong recommendations by the WHO were supported only by low quality evidence).

121.  IOM Guidelines at 110; *see also* Holger J. Schünemann, et al., *Improving the use of research evidence in guideline development: 1. Guidelines for guidelines,* 4 HEALTH RSCH. POL'Y AND SYS. 21 (2006) (explaining that "'separating the judgments regarding the quality of evidence from judgments about the strength of recommendations is a critical and defining feature" of GRADE).

122.  IOM Guidelines at 110 (noting quantity and consistency of evidence and value judgments, among other factors); *id.* at 111 (discussing patient preferences and value judgments); *id.* at 113 (explaining that guidelines can make a strong recommendation on low quality evidence if the guideline development group reaches an expert consensus that the benefits of a recommendation outweigh harms); WHO Handbook at 123-125, 128 (listing additional factors, including "acceptability" of a treatment to patients and other stakeholders and the "values and preferences pertain[ing] to the relative importance people assign to the outcomes associated with the intervention").

123.  While the goal of research is to "contribute to generalizable knowledge" by making objective findings that can be replicated, clinical practice is intended "solely to enhance the well-being of an individual patient," which requires a more thorough assessment of the patient's circumstances and a more careful consideration of

30

Unsurprisingly, then, it is not uncommon for clinical practice guidelines to make strong recommendations based on "low quality" evidence –including, for example, WHO's recommendations of which 55.4% were supported only by "low quality" evidence.[124] It is well established that trustworthy guidelines can be produced under these circumstances so long as they follow a transparent and rigorous process, as WPATH did in developing SOC8.[125]

In addition, in many treatment settings, including adolescent transgender care, observational studies may be more valuable than randomized controlled trials.[126] "[S]tudies of efficacy in the idealized settings of the typical randomized, controlled trial" do not always match "studies of effectiveness in real-world practice."[127] GRADE's overreliance on randomized controlled trials "often results in specialist society-based guidelines assigning inappropriately low grades to their recommendations."[128]

---

subjective factors. *See* U.S. Dept. of Health and Human Services, *The Belmont Report: Ethical Principles and Guidelines for the Protection of Human Subjects of Research*, at 3 (1979), *available at* https://www.hhs.gov/ohrp/regulations-and-policy/belmont-report/index.html.

124.  Alexander, note 120, at 629-34.

125.  IOM Guidelines at 26.

126.  Jizzo R. Bosdriesz, et al., *Evidence-based medicine– When observational studies are better than randomized controlled trials*, Nephrology (Carlton), 25, at 737-743 (2020).

127.  Cooke, note 80, at 910-914.

128.  Adrian Baker, et al., *A review of grading systems for evidence based guidelines produced by medical specialties*, 10 Clinical Med. (Lond), at 358 (2010).

31

Many practice guidelines do not show the graded values for the quality of evidence for each recommendation. SOC8 is not an outlier for choosing not to publish the GRADE evidence quality ratings generated by the Evidence Review Team.[129]

Finally, and most importantly, there are ethical constraints on how randomized controlled trials could be conducted, given the current evidence base. "Clinical equipoise is widely accepted as the basis of ethics in clinical research."[130] Equipoise is "a state of genuine uncertainty on the part of the clinical investigator regarding the comparative therapeutic merits of each arm in a trial."[131] Neither providing a control group of transgender adolescents a placebo nor providing a control group any sort of conversion therapy would satisfy the ethical principal of equipoise.[132] These ethical issues also create practical barriers to randomized controlled trials (RCT) because "[r]esearchers and clinicians who are convinced of the effectiveness of gender-affirming care,

---

129.   *See, e.g.*, Jeyamchan, note 114, at 175; Lipsky, note 114, at 54.

130.   Chunquin Deng, et al., *Challenges of clinical trial design when there is lack of clinical equipoise: use of a response-conditional crossover design*, 259 J Neurol. 348-352 (2012).

131.   Benjamin Freedman, *Equipoise and the Ethics of Clinical Research*, 317 N. Engl. J. Med. 3 (1987).

132.   WPATH "recommend[s] against" conversion therapy and gender identity change efforts "because they have been found to be ineffective and are associated with increases in mental illness and poorer psychological functioning." SOC8 at 53. Indeed, conversion therapy "has been linked to increased anxiety, depression, suicidal ideation, [and] suicide attempts." *Id.* at 53.

32

many of whom are leading providers in the field, are []
unlikely to accept involvement with an RCT due to ethical
concerns."[133]

State defendants' criticisms of SOC8 risk undermining
other clinical practice guidelines. "If high-quality evidence
were a prerequisite for medical care, we would all become
worse off."[134]

"All types of pediatric practices begin with a dearth
of evidence and yet must deliver care to a heterogeneous
population in need."[135] In neonatology care for critically
care infants and pediatric critical care more generally,
clinicians "routinely make hundreds (if not thousands) of
high-stakes, evidence informed decisions for their patients
each day."[136] "The evidence that helps answer these and
other questions is rarely 'high quality' (as the term is
used in GRADE).[137] "And yet, clinical outcomes are good
and improving: more children leave intensive care units
better off than ever before."[138] "Most aspects of neonatal
and critical care became accepted clinical practice because
of their immediate and short-term benefits, without

---

133.   Florence Ashley, et al., *Randomized-controlled trials
are methodologically inappropriate in adolescent transgender
healthcare*, 25 International Journal of Transgender Health No. 3,
407-418 (2024).

134.   McNamara, note 119, at 4-5.

135.   *Id.*

136.   *Id.*

137.   *Id.*

138.   *Id.*

33

following patients into adulthood."[139] "The quest for longer and more data is never-ending, but when the answers are not available, patients cannot wait for a cure."[140]

3. WPATH also adhered to well-established best practices in identifying and managing conflicts of interest in drafting SOC8. WPATH required every person involved in the development of SOC8 to declare conflicts of interest.[141] After evaluating these declarations at the beginning and end of the development process, WPATH determined that no significant conflicts of interests existed.[142]

Critics erroneously argue that SOC8 members were conflicted and should have been excluded because they were already WPATH members; because they had previously published on the topic of gender dysphoria; or because a substantial proportion of their income was derived from providing clinical gender-transition care. None of these contentions holds water.

*First*, medical societies routinely restrict guideline development group membership to their own members.[143] To the extent this creates any potential conflict of interest, WPATH appropriately managed that conflict by disclosing it.[144]

---

139. *Id.*

140. *Id.*

141. SOC8 at S249.

142. *Id.* at S177.

143. IOM Guidelines at 38.

144. SOC8 at S248.

JA843

34

*Second*, far from being a liability, subject-matter experts with a history of publications on a relevant topic are essential to guideline development groups. It would be illogical to exclude academics from contributing to clinical practice guidelines in a field because of their expertise in that field. To the extent experts' prior writings might be perceived as an intellectual conflict of interest, WPATH adequately managed that potential conflict by engaging a methodologist and an independent Evidence Review Team to conduct literature reviews and by selecting a multidisciplinary team of diverse members to develop SOC8.[145]

*Third*, concerns about financial conflicts typically arise from members' financial or research ties to sectors such as the pharmaceutical industry.[146] To the extent clinicians involved in developing SOC8 had financial conflicts of interest because they earn income from treating gender dysphoria, those conflicts are unavoidable and insignificant.[147] Indeed, it is customary for guideline

---

145.  *Id.* at S247, S249; *see also* WHO Handbook at 72 (explaining that commissioning a methodologist "help[s] to mitigate the effects of intellectual conflicts of interest"); *id.* at 65 (noting that subject-matter experts with intellectual conflicts of interest may be "deemed essential," and that these conflicts can be managed if "members with diverse perspectives and experiences" are included in the guideline development group).

146.  IOM Guidelines at 61-62.

147.  As WHO recognizes, "[i]ndividuals selected for their technical expertise in a guideline's subject area are critically important" to guideline development groups and should be included along with other members with "a range of expertise and institutional and professional affiliations." WHO Handbook 26; *see also id.* at 67

---

JA844

35

development groups to be comprised of clinicians who are
involved in providing the care or treatment in question.
Excluding the perspectives of practicing clinicians would
severely undercut or even eliminate the utility of the
guideline. In any event, WPATH adequately managed
any financial conflicts related to clinical practice by
publicly disclosing all members' names and affiliations
and by selecting a multidisciplinary guideline development
group.[148]

---

(indicating that "conflicts of interest represent a spectrum; they are
not absolute situations"); *id.* at 67-69 (listing those with substantial
ties to industry—and not clinicians—among those who have conflicts
of interest that must be managed "at the individual level" through
exclusion or other means – indicating that any financial COIs of
clinicians do not require exclusion and can be managed at the group
level); IOM Guidelines at 80 (focusing on concerns raised by authors'
financial ties to commercial entities, including "pharmaceutical
and medical device companies," while noting that clinicians "may
provide valuable insight" on a guideline and "may simply be without
substitutes").

148.  *See* SOC8 at S1-S2 (listing names and affiliations of all
members); *see also* WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER
HEALTH, *SOC8 Contributors*, https://www.wpath.org/media/cms/
Documents/SOC%20v8/SOC8%20Full%20Contributor%20List%20
-%20FINAL%20UPDATED%2009232021.pdf  (last visited Aug.
29, 2024) (providing biographies of all members); WHO Handbook
at 70 (noting that "physicians tend to recommend procedures that
they personally deliver, whereas multidisciplinary groups tend to
be more conservative in their recommendations");  IOM Guidelines
at 61-62 (87 percent of individual authors across 37 guidelines "had
a financial relationship with industry and 59 percent had financial
relationships with companies whose products were considered," yet
"[t]he majority of respondents reported no discussion or disclosure of
financial relationships with industry among panel participants during
the guideline development process."); *see also id.* at 81 (noting that
"COI policies vary with regard to the specific types of information
that must be disclosed").

36

4. State defendants have also sought to undermine SOC8 not with reference to any scientific evidence but, rather, based on internal documents obtained from WPATH. There is nothing remarkable about SOC8 members communicating internally about scientific evidence and outcomes relating to treatments. The State defendants' reliance on cherry-picked statements isolated from thousands of pages of internal correspondence would chill the development of reliable clinical practice guidelines and is irrelevant in light of the widely-accepted evidence supporting the SOC8 recommendations.

*First*, any evaluation of SOC8's trustworthiness must begin with its 190 pages of text plus 68 pages of references and end well short of any speculation about the SOC8 members' states of mind. As the IOM explains: "An explicit statement of how evidence, expertise, and values were weighed by the guideline writers helps users to determine the level of confidence they should have in any individual recommendation."[149] As explained above, SOC8 itself describes its weighing process in great detail and that process was transparent, rigorous, iterative, and included the Delphi process for achieving at least 75 percent agreement on its included recommendations. Scrutinizing what a few members wrote in emails says nothing about the reliability of SOC8.

*Second*, scrutinizing internal communications for evidence of bias is not administrable. Understanding the meaning and context of each communication often will require medical expertise, intimate familiarity with the guideline development process, and a comprehensive

---

149.  IOM Guidelines at 77.

JA846

37

understanding of the timing, nature, and purpose of the communication as related to that process. Furthermore, to evaluate the significance of each communication, courts would have to consider other communications expressing different perspectives; attempt to determine the relative weight each perspective was given at each stage of the process; and extrapolate from that whether and how the communication in question influenced the final guideline recommendations. The diversity of perspectives represented in SOC8's membership and the sheer volume of communications exchanged in the development of SOC8 make this next to impossible. Assessments of guideline development processes are better left to scientific experts using objective measures.

*Third*, experts and clinicians should be free to do their jobs and advocate for their patients without fear that their written communications will be taken out of context and misused in court to harm the patient population they have dedicated their careers to serving. Indeed, IOM recognizes that greater granularity is counterproductive: "The desire to have public access to [guideline development group] deliberations and documents must be blanced with resource and time constraints as well as the need for [guideline development group] members to engage in frank discussion."[150] If SOC8 members' internal communications are subject to judicial scrutiny, it would compromise the ability to engage in robust scientific exchange to ensure best outcomes for patients. Subject-matter experts could be deterred from volunteering to develop future clinical practice guidelines. And members of guideline development groups could be

---

150.   IOM Guidelines at 76.

JA847

38

fearful of engaging in the candid, uninhibited dialogue that is integral to the development of reliable guidelines. They will likely communicate less, and less freely.

\* \* \*

Today, State defendants offer results-oriented, methodological critiques of SOC8, but those critiques are grounded in politics rather than science. Accepting those critiques would have grave consequences for many other fields of medicine, with a chilling effect on clinicians' vital participation in the process of developing clinical guidlelines. Such a result would undermine the accuracy of clinical practice guidelines and the thoroughness of their development process. Ultimately, it could lead to the development of fewer high-quality clinical practice guidelines in the United States, which could mean less guidance for clinicians; lower awareness of scientific evidence supporting particular treatments; less informed clinical judgments; worse patient outcomes; and diminished public health.

39

**CONCLUSION**

This Court should reject State defendants' after-the-fact justifications for disregarding SOC8 in an attempt to support categorical bans on medical treatment, in part because accepting those attacks could compromise clinical guidelines essential to public health and deter future development of reliable guidelines.

Respectfully submitted,

Eugene E. Stearns
    *Counsel of Record*
Jenea M. Reed
Coral Del Mar López
Stearns Weaver Miller
    Weissler Alhadeff
    & Sitterson, P.A.
150 West Flagler Street,
    Suite 2200
Miami, FL 33131
(305) 789-3200
estearns@stearnsweaver.com

*Counsel for Amici Curiae*

September 2024

**APPENDIX**

*i*

**TABLE OF APPENDICES**

*Page*

APPENDIX A — LIST OF *AMICI CURIAE* . . . . . . .1a

1a

## APPENDIX A — LIST OF *AMICI CURIAE*

### List of *Amici Curiae*

1.  Melissa Brouwers, MD.

2.  Mary Butler, PhD, MBA.

3.  Neville H. Golden, MD.

4.  Kenneth W. Goodman, PhD.

5.  Scott E. Hadland, MD, MPH, MS.

6.  Doug Haldeman, PhD.

7.  Jenifer R. Lightdale, MD, MPH.

8.  Jason Nagata, MD, MSc.

9.  Ian J. Saldanha, PhD

10. Renata Arrington Sanders, MD, MPH, ScM

11. Jennifer Yost PhD, RN, FAAN.

# **Exhibit FF**

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

PFLAG, INC., et al.,

    *Plaintiffs*,


       v.

DONALD J. TRUMP, in his official capacity
as President of the United States, et al.,

    *Defendants*.

Civil Action No. 8:25-cv-00337-BAH

## REPLY EXPERT DECLARATION OF
## ARMAND H. MATHENY ANTOMMARIA, MD, PhD, FAAP, HEC-C

### INTRODUCTION

I, Armand H. Matheny Antommaria MD, PhD, hereby declare and state as follows:

1.    I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation. I am over 18 years old, of sound mind, and in all respects competent to testify.

2.    I have actual knowledge of the matters stated herein.

3.    The bases of my opinions are set forth in paragraph 3 of my initial expert declaration. I provide this reply declaration to respond to the arguments contained in the memorandum filed by the Defendants, the amicus brief filed by the organization Do No Harm, Inc., and the amicus brief filed by the State of Alabama and other states.

### OVERVIEW

4.    Contrary to Defendants' Memorandum and Alabama's Brief, no European country has prohibited gender-affirming medical care as the Denial of Care Order has. Do No Harm's Brief mischaracterizes the role of systematic reviews and Alabama's Brief the making of discordant recommendations and the management of potential conflicts of interest.

JA854

**EUROPEAN COUNTRIES**

5.      Contrary to Defendants' Memorandum's statement that "Other countries have also adopted similar restrictions [on gender-affirming care for minors] (5),"[1] no European country has prohibited gender-affirming medical care as the Denial of Care Order has. The only categorical prohibition of a form of gender-affirming medical care appears to be the Finnish Council for Choices in Health Care's statement, "[s]urgical treatments are not part of the treatment methods for dysphoria caused by gender-related conflicts in minors."[2] (It is not clear whether surgical treatments as used in this statement includes masculinizing chest surgery.) Pubertal suppression and gender affirming hormone treatment are nonetheless permitted for minors in Finland.[3]

6.      The United Kingdom's (U.K.'s) regulation of gender-affirming medical care has evolved in several stages. On March 11, 2024, NHS England made gonadotropin-releasing hormone (GnRH) analogs no longer available as "a routine commissioning treatment option" for treating gender dysphoria.[4] GnRH analogs are, however, anticipated to be available through a

---

[1] See also Alabama's Brief 2-3.

[2] Palveluvalikoima. Summary: Medical treatment methods for dysphoria associated with variations in gender identity in minors – recommendations. June 16, 2020. Accessed February 26, 2025. Available at https://palveluvalikoima.fi/documents/1237350/22895008/Summary_minors_en+(1).pdf/fa2054c5-8c35-8492-59d6-b3de1c00de49/Summary_minors_en+(1).pdf?t=1631773838474.

[3] Palveluvalikoima. Summary: Medical treatment methods for dysphoria associated with variations in gender identity in minors – recommendations. June 16, 2020. Accessed February 26, 2025. Available at https://palveluvalikoima.fi/documents/1237350/22895008/Summary_minors_en+(1).pdf/fa2054c5-8c35-8492-59d6-b3de1c00de49/Summary_minors_en+(1).pdf?t=1631773838474.

[4] NHS England. Clinical Policy: Puberty suppressing hormones (PSH) for children and young people who have gender incongruence / gender dysphoria [1927]. March 12, 2024. Accessed February 26, 2025. Available at https://www.england.nhs.uk/wp-content/uploads/2024/03/clinical-commissioning-policy-gender-affirming-hormones-v2.pdf.

clinical study that is currently being designed and was initially anticipated to begin enrollment in late 2024.[5] On March 21, 2024, NHS England announced that gender-affirming hormones are available as "a routine commissioning treatment option" around individuals' 16th birthday.[6] The recommendations contained in Dr. Hilary Cass's final report, issued on April 10, 2024,[7] are largely consistent with the NHS clinical policies pertaining to GnRH analogs and gender-affirming hormone treatment. On May 29, 2024, the Secretary of State for Health and Social Care and the Minister for Health made a temporary prohibition on the private prescription of GnRH analogs to minors for the treatment of gender dysphoria to provide consistency between

---

[5] NHS England. Consultation report for the clinical policy on puberty suppressing hormones for children and adolescents who have gender incongruence / gender dysphoria. March 11, 2024. Accessed February 26, 2025. Available at https://www.england.nhs.uk/publication/clinical-policy-puberty-suppressing-hormones/ under "Puberty suppressing hormones consultation report 11 March 2024."

[6] NHS England. Clinical Commissioning Policy: Prescribing of gender affirming hormones (masculinising and feminising hormones) as part of the Children and Young People's Gender Service. March 21, 2024. Accessed February 26, 2025. Available at https://www.england.nhs.uk/wp-content/uploads/2024/03/clinical-commissioning-policy-prescribing-of-gender-affirming-hormones.pdf.

[7] Cass H. The Cass Review: Independent review of gender identity services for children and young people. April 2024. Accessed February 26, 2025. Available at https://cass.independent-review.uk/home/publications/final-report/.

Following the release of the Cass Review's Final Report, NHS Scotland announced a "pause" in new prescriptions for GnRH analogs and a minimum age of 18 years for new prescriptions of gender affirming hormones. See Sandyford. Gender Service for Young People at Sandyford: Important service update – Young Person's Gender Service. Accessed February 26, 2025. Available at https://www.sandyford.scot/sexual-health-services/gender-service-at-sandyford/gender-young-people-service/. NHS Scotland's Chief Medical Officer Professor Sir Gregor Smith subsequently submitted recommendations to make the services provided by NHS Scotland consistent with those of NHS England and the Cass Review. Scottish Government. Cass Review – implications for Scotland: letter from Chief Medical Officer. July 4, 2024. Accessed February 26, 2025. Available at https://www.gov.scot/publications/cass-review-implications-for-scotland-letter-from-chief-medical-officer-professor-sir-gregor-smith/.

the public and private healthcare systems in the U.K.[8] None of these policies constitute a ban on

gender-affirming medical care comparable to the Order's purported goal.

## SYSTEMATIC REVIEWS

7.      Do No Harm's Brief asserts that systematic reviews represent the highest form of

medical evidence and that systematic reviews of gender-affirming medical care demonstrate that

there is no reliable evidence for gender-affirming medical care. While the "pyramid of standards

of evidence" places systematic reviews and meta-analyses at the top of the pyramid, it is

important to note that systematic reviews are "filtered information" in contrast to "unfiltered

information" (Do No Harm's Brief 3). This means that systematic reviews are not a type of

research study, but rather a summary of research studies. The Grading of Recommendations

Assessment, Development and Evaluation (GRADE) system does not rate the quality of

systematic reviews, but rather the studies contained in systematic reviews. The tool commonly

used to evaluate the quality of systematic reviews is instead the Assessing the Methodological

Quality of Systematic Reviews (AMSTAR) checklist.[9]

8.      Do No Harm's Brief emphasizes that systematic reviews of the literature report that

the level of evidence for gender-affirming medical care is "weak" (5).[10] As I explain in paragraphs

22-27 of my expert declaration, the terms used by the GRADE system to characterize the strength

of the evidence are terms of art, the levels are relative to one another, and "low" does not

---

[8] Legislation.gov.uk. The Medicines (Gonadotrophin-Releasing Hormone Analogues)
(Emergency Prohibition) (England, Wales, and Scotland) Order 2024. May 29, 2024. Accessed
February 26, 2025. Available at https://www.legislation.gov.uk/uksi/2024/727/made.

[9] Shea BJ, Reeves BC, Wells G, et al. AMSTAR 2: a critical appraisal tool for systematic
reviews that include randomised or non-randomised studies of healthcare interventions, or both.
*BMJ*. 2017;358:j4008.

[10] See also Alabama's Brief at 3.

necessarily mean poor or inadequate. Do No Harm's Brief trades on the differences between these technical meanings and the colloquial uses of these terms (9).

9.    Contrary to Do No Harm's Brief's misleading implications, studies of systematic reviews of the evidence for medical interventions generally have found that the majority of the evidence that they identify is low or very-low quality. Padhraig S. Fleming and colleagues, for example, conducted a review of systematic reviews for medical and health-related interventions published on the Cochrane Database of Systematic Reviews between January 1, 2013 and June 30, 2014. They focused on those that incorporated the GRADE approach and examined the quality of evidence for the first listed primary outcome. Of the 608 reviews, 82 (13.5%) reported high, 197 (30.8%) moderate, 193 (31.7%) low, and 126 (24%) very low-quality evidence.[11] In a subsequent study, a related group of authors found that updated reviews did not consistently demonstrate an improvement in the quality of the evidence.[12] The level of evidence supporting gender-affirming medical care is therefore similar to the level of evidence supporting other types of medical treatment.

10.    It should be noted that Do No Harm's Brief provides a narrative, rather than a systematic, review of systematic reviews of gender-affirming medical care. As the Brief notes, "narrative reviews can cherry-pick examples and individual studies—discussing only those that support their conclusions and ignoring those that do not (5)." In fact, a recent systematic review

---

[11] Fleming PS, Koletsi D, Ioannidis JP, Pandis N. High quality of the evidence for medical and other health-related interventions was uncommon in Cochrane systematic reviews. *J Clin Epidemiol*. 2016;78:34-42. See also Howick J, Koletsi D, Ioannidis JPA, et al. Most healthcare interventions tested in Cochrane Reviews are not effective according to high quality evidence: A systematic review and meta-analysis. *J Clin Epidemiol*. 2022;148:160-169 that found only 10.1% of interventions (158 of 1,567) had high quality evidence supporting their benefits.

[12] Howick J, Koletsi D, Pandis N, et al. The quality of evidence for medical interventions does not improve or worsen: A metaepidemiological study of Cochrane reviews. *J Clin Epidemiol*. 2020;126:154-159.

of gender-affirming medical care performed by the RAND Corporation states, "these interventions have not shown the serious risks of harm that would suggest the need for policies to restrict the interventions (35)."[13]

## CLINICAL PRACTICE GUIDELINES

11.      Though Do No Harm's Brief focuses extensively on systematic reviews, systematic reviews do not make treatment recommendations. The Cochrane Collaboration defines systematic reviews as follows: "A systematic review attempts to collate all empirical evidence that fits pre-specified eligibility criteria in order to answer a specific research question. It uses explicit, systematic methods that are selected with a view to minimizing bias, thus providing more reliable findings from which conclusion can be drawn and decisions made."[14] While systematic reviews may provide findings upon which recommendations can be made, they, unlike clinical practice guidelines, do not make treatment recommendations.[15] Citing their conclusions about the quality of the evidence is therefore not sufficient to demonstrate that recommendations for gender-affirming medical care are inappropriate. Clinical practice guidelines consider the benefits and risks of treatments and patients' values and preferences in addition to the quality of evidence in making treatment recommendations.[16]

---

[13] Dopp AR, Peipert A, Buss J, et al. Interventions for gender dysphoria and related health problems in transgender and gender-expansive youth: A systematic review of benefits and risks to inform practice, policy, and research. November 26, 2024. Accessed February 26, 2025. Available at https://www.rand.org/pubs/research_reports/RRA3223-1.html.

[14] Cochrane Collaboration. "What is a systematic review?" in *Cochrane Handbook for Systematic Reviews of Interventions.* Version 5.1.0. ed. Higgins JPT, Green S. March 2011. Accessed February 26, 2025. Available at https://handbook-5-1.cochrane.org/chapter_1/1_2_2_what_is_a_systematic_review.htm.

[15] National Heart, Lung, and Blood Institute. About systematic evidence reviews and clinical practice guidelines. Accessed February 26, 2025. Available at https://www.nhlbi.nih.gov/node/80397.

[16] Andrews JC, Schunemann HJ, Oxman AD, et al. GRADE guidelines: 15. Going from

12.    Do No Harm's Brief asserts that the risks and benefits of gender-affirming medical care justifies treating it differently from other forms of medical care that is supported by the same level of evidence. For many patients the potential benefits of gender-affirming medical care outweigh its potential risks and this risk benefit ratio is favorable to withholding pharmacological and surgical treatment. Do No Harm's Brief also downplays the risks of inadequately treated gender dysphoria, which are great, as discussed in my expert declaration (53-60). While treatments for different clinical conditions do not have identical benefits and risks, they may nonetheless have similar benefits and risks which permit comparison. The risks of a mastectomy in an adolescent with gender dysphoria are similar in kind to the risks of breast reduction surgery in adolescents who do not have gender dysphoria. On the other hand, Do No Harm's Brief overstates the risks of gender-affirming medical care and mischaracterizes my prior statements (11-12). For example, while one risks being infertile while receiving gender-affirming medical care, treatment with GnRH analogs and sex hormones do not inherently result in sterility—permanent infertility.

13.    Alabama's (14) and Do No Harm's (10) Briefs also criticize clinical practice guidelines for making strong recommendations based on low- or very low- quality evidence, as those terms are understood within the GRADE system. Making strong recommendations based on low- or very low-quality evidence is not unique to guidelines about gender-affirming medical care or guidelines produced by the Endocrine Society. For example, 33.9% (121 of 357) of the strong recommendations in all of the Endocrine Society clinical practice guidelines published between 2005 and 2011 and 55.4% (160 of 289) in World Health Organization (WHO) guidelines on a wide variety of topics published between 2007 and 2012 were based on low- or very low-quality

---

evidence to recommendation-determinants of a recommendation's direction and strength. *J Clin Epidemiol*. 2013;66(7):726-735.

evidence.[17] The GRADE approach does not preclude this from being done and identifies 5 situations in which it is appropriate.[18] In Gordon H. Guyatt and his colleagues' study of the Endocrine Society's guidelines, they found that 3 of the 8 strong recommendations based on low- or very low-quality evidence in the first version of the gender-affirming medical care guideline fulfilled these conditions, including "we recommend that suppression of pubertal hormones start when girls and boys first exhibit physical changes of puberty …, but no earlier than Tanner stages 2-3" and "we recommend that GnRH analogues be used to achieve suppression of pubertal hormones."[19] Even if one believed that a strong recommendation for an intervention was not justified by the best available evidence, the requisite correction according to the GRADE guidelines[20] would be to make a weak recommendation for the intervention and not a strong

---

[17] Brito JP, Domecq JP, Murad MH, Guyatt GH, Montori VM. The Endocrine Society guidelines: When the confidence cart goes before the evidence horse. *J Clin Endocrinol Metab*. 2013;98(8):3246-3252; Alexander PE, Bero L, Montori VM, et al. World Health Organization recommendations are often strong based on low confidence in effect estimates. *J Clin Epidemiol*. 2014;67(6):629-634. Dr. Guyatt and his colleagues also conducted a study of guidelines developed by the American College of Cardiology and the American Heart Association, and the American Society of Clinical Oncology. Although these organizations use alternative methods to characterize the quality of the evidence and the strength of the recommendations, Guyatt et al. found that 32.4% (232 of 715) and 21.7% (122 of 561) of their recommendations respectively were discordant—strong recommendations based on low-quality evidence. Yao L, Ahmed MM, Guyatt GH, et al. Discordant and inappropriate discordant recommendations in consensus and evidence based guidelines: Empirical analysis. *BMJ*. 2021;375:e066045.

[18] Andrews JC, Schunemann HJ, Oxman AD, et al. GRADE guidelines: 15. Going from evidence to recommendation-determinants of a recommendation's direction and strength. *J Clin Epidemiol*. 2013;66(7):726-735. One of these five situations is, for example, when there are two alternatives and, although there is low-quality evidence regarding the relative benefit of the first alternative, there is high-quality evidence of the relative harm of the second alternative.

[19] Brito JP, Domecq JP, Murad MH, Guyatt GH, Montori VM. The Endocrine Society guidelines: When the confidence cart goes before the evidence horse. *J Clin Endocrinol Metab*. 2013;98(8):3246-3252. See Supplemental Table 4.

[20] Andrews J, Guyatt G, Oxman AD, et al. GRADE guidelines: 14. Going from evidence to recommendations: The significance and presentation of recommendations. *J Clin Epidemiol*. 2013;66(7):719-725.

recommendation against it.

## CONFLICT OF INTERESTS

14.    Contrary to Alabama Brief's general assertions, clinical expertise is necessary for the development of clinical practice guidelines. The Institute of Medicine (IOM) recommends, "The [guideline development group] should be multidisciplinary and balanced, comprising a variety of methodological experts *and clinicians*, and populations expected to be affected by the [clinical practice guideline] (italics added)."[21] The report states that the clinicians should include both generalists and subspecialists involved in clinical practice guideline-related care processes. The exclusions to the management of conflicts of interest acknowledge, "In some circumstances, a [guideline development group] may not be able to perform its work without members who have [conflicts of interests], such as relevant clinical specialists who receive a substantial portion of their incomes from services pertinent to the [clinical practice guideline]."[22] In the United States (U.S.), it is unclear who would produce clinical practice guidelines if not medical professional organizations.

15.    Alabama's Brief characterizes WHO's and IOM's standards as bare minimums when they are instead ideal standards that individuals and organizations can seek to achieve but that individuals and organizations in all medical specialties infrequently meet in actual practice. The only organization in the U.S. of which I am aware that potentially meets these expectations is the U.S. Preventive Services Task Force (USPSTF). The USPSTF is convened and supported by the U.S. Department of Health and Human Services' Agency for Healthcare Research and

---

[21] Institute of Medicine. *Clinical Practice Guidelines We Can Trust.* The National Academies Press; 2011: 93.

[22] Institute of Medicine. *Clinical Practice Guidelines We Can Trust.* The National Academies Press; 2011: 83.

Quality.[23] It is important to note that the USPSTF does not exclude all potential conflicts of interest but has policies and procedures to manage them.[24] For example, general membership in a professional society need not be disclosed. And while providing public comments, giving expert testimony, and participating in a professional society as an officer must be disclosed, this does not limit the Task Force member's participation in the topic process. The USPSTF is thus able to both recruit members who are highly regarded research, clinicians, and academicians necessary to produce high quality, evidence-based recommendations and maintain public confidence in the integrity of the process.[25] USPSTF's scope is limited to making recommendations about clinical preventive services, like screenings and preventative medications,[26] and recommendations for medical treatments, such as gender-affirming medical care, are outside of its scope. I am unaware of a comparable U.S. organization that develops clinical practice guidelines for medical treatments. The IOM, renamed the National Academy of Medicine, which Alabama's Brief cites, for example, does not produce clinical practice guidelines.

16.    Professional medical organizations provide a valuable service to their members and the patients they treat by using their own resources to develop clinical practice guidelines in the absence of a better alternative. These organizations generally have policies and procedures to

---

[23] U.S. Preventive Services Task Force. About the USPSTF. Accessed February 26, 2025. Available at https://www.uspreventiveservicestaskforce.org/uspstf/about-uspstf.

[24] U.S. Preventive Services Task Force. Conflict of interest disclosures. July 2024. Accessed February 26, 2025. Available at https://www.uspreventiveservicestaskforce.org/uspstf/about-uspstf/conflict-interest-disclosures.

[25] U.S. Preventive Services Task Force. Procedure Manual Section 1. Overview of U.S. Preventive Services Task Force Structure and Processes. Accessed February 26, 2025. Available at https://www.uspreventiveservicestaskforce.org/uspstf/about-uspstf/methods-and-processes/procedure-manual/procedure-manual-section-1#7.

[26] U.S. Preventive Services Task Force. About the USPSTF. Accessed February 26, 2025. Available at https://www.uspreventiveservicestaskforce.org/uspstf/about-uspstf.

manage conflicts of interest and acknowledge remaining potential conflicts of interest in the

published guidelines. The Endocrine Society, for example, requires potential authors to disclose

potential conflicts of interest including relationships with non-commercial organizations and paid

or unpaid expert testimony.[27] Its clinical practice guideline for the endocrine treatment of gender-

dysphoric/gender-incongruent persons includes disclosures of its authors.[28]

**CAUSES**

17.     Contrary to Do No Harm's Brief's implication (13), there are many medical

conditions whose cause is not known but that nonetheless have well established treatments.

Kawasaki disease, for example, is an acute febrile illness in children which causes inflammation

of the blood vessels and, in some cases, ballooning of the blood vessels that supply the heart. The

American Heart Association's (AHA's) clinical practice guideline for the diagnosis, treatment,

and long-term management of this condition states, "Kawasaki disease (KD) is an acute, self-

limited febrile illness of unknown cause that predominantly affects children <5 years of age" and

that "[d]espite 4 decades of investigation, the cause of KD remains unknown." The AHA

nonetheless recommends individuals with Kawasaki disease be treated with intravenous

immunoglobulin (Class 1; Level of Evidence A).[29] The American College of Cardiology

---

[27] Endocrine Society. Conflict of interest policy and procedures for Endocrine Society clinical practice guidelines. June 2019. Accessed February 26, 2025. Available at https://www.endocrine.org/-/media/endocrine/files/cpg/methodology-page-refresh/conflict_of_interest_cpg_final.pdf. The policy at the time the guideline on the endocrine treatment of gender-dysphoric/gender-incongruent persons was published, as best as I can discern, was as follows: Endocrine Society. Clinical practice guideline methodology. 2017. Accessed February 26, 2025. Available at https://web.archive.org/web/20170627174844/http://www.endocrine.org/education-and-practice-management/clinical-practice-guidelines/methodology.

[28] Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(11):3895.

[29] McCrindle BW, Rowley AH, Newburger JW, et al. Diagnosis, treatment, and long-term

Foundation and the AHA use different categories for the quality of evidence and the strength of recommendations[30] than the GRADE system. This treatment recommendation can, nonetheless, be interpreted as a strong recommendation based on high quality evidence.

## CHANGES IN PREVALENCE

18.    The increased number of transgender individuals and those receiving medical treatment, contrary to Do No Harm's Brief's implication (13), does not support the Denial of Care Order. The causes of these changes are likely to be multifactorial including increased social acceptance of transgender individuals and availability of gender-affirming medical care.[31] Changes in demographics are not unique to gender dysphoria and have been seen in other conditions such as autism spectrum disorder and childhood-onset type 1 diabetes.[32] These changes are a justification for further research on gender-affirming medical care rather than prohibiting these treatments and thereby preventing further research on them.

## CONCLUSIONS

19.    Treating adolescents and adults with gender dysphoria with gender-affirming

---

management of Kawasaki disease: A scientific statement for health professionals from the American Heart Association. *Circulation*. 2017;135(17): e927-e999. The quotations appear on pages e928 and e931 respectively.

[30] American College of Cardiology Foundation, American Heart Association. Methodology manual and policies from the ACCF/AHA Task Force on practice guidelines. June 2010. Accessed February 26, 2025. Available at https://www.acc.org/-/media/Non-Clinical/Files-PDFs-Excel-MS-Word-etc/Guidelines/About-Guidelines-and-Clinical-Documents/Methodology/2014/Methodology-Practice-Guidelines.pdf?la=en&hash=157B7835091CF7856B26528717BE14B33BE8226F.

[31] Wiepjes CM, Nota NM, de Blok CJM, et al. The Amsterdam Cohort of Gender Dysphoria Study (1972-2015): Trends in prevalence, treatment, and regrets. *J Sex Med*. 2018;15(4):582-590.

[32] Christensen DL, Maenner MJ, Bilder D, et al. Prevalence and characteristics of autism spectrum disorder among children aged 4 years - Early Autism and Developmental Disabilities Monitoring Network, seven sites, United States, 2010, 2012, and 2014. *MMWR Surveill Summ*. 2019;68(2):1-19; The DIAMOND Project Group. Incidence and trends of childhood type 1 diabetes worldwide 1990-1999. *Diabet Med*. 2006;23(8):857-866.

medical care under clinical practice guidelines, like the Endocrine Society's, is evidence-based; its potential benefits outweigh its potential risks for many patients; and, in the case of adolescents, these risks are well within the range of other medical decisions that adolescents and their parents or guardians have the discretion to make in consultation with their healthcare professionals.

20.     Based on my research and experience as a pediatrician and bioethicist, there is no sound medical or ethical basis to prohibit healthcare professionals and entities from providing gender-affirming medical care to individuals with gender dysphoria under 19 years of age. Doing so puts clinicians and healthcare entities in the untenable position of having to harm their patients and violate their integrity and ethical obligations due to the threat of loss of federal funding.

21.     The documents that I have reviewed in preparing this reply declaration have not caused me to change my mind on these conclusions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on FEB 26, 2025

ARMAND H. MATHENY ANTOMMARIA, MD, PhD

# **Exhibit GG**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

PFLAG, INC.; *et al.*,

        *Plaintiff*,

    v.

DONALD J. TRUMP, in his official capacity as
President of the United States; *et al.*,

        *Defendants*.

Civil Action No. 8:25-cv-00337-BAH

## REPLY EXPERT DECLARATION OF DAN H. KARASIC, M.D.

I, Dan H. Karasic, M.D., hereby declare and state as follows:

1.      I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.      I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.

3.      I have actual knowledge of the matters stated herein.  If called to testify in this matter, I would testify truthfully and based on my expert opinion.

4.      My background, qualifications, and the bases for my opinions are set forth my initial declaration.

5.      I provide this reply expert declaration to respond to the amicus briefs filed by the State of Alabama et al. ("Alabama brief") and Do No Harm, Inc. ("DNH brief").

6.      In preparing this reply expert declaration, I relied on my training and years of research and clinical experience, as set out in my curriculum vitae attached to my initial expert report as **Exhibit A**, and on the materials listed therein; and the materials referenced in my initial declaration and listed in the bibliography attached thereto as **Exhibit B;** and the materials

referenced herein and listed in the supplemental bibliography attached hereto as **Exhibit C**. The sources cited in each of these are the same types of materials that experts in my field of study regularly rely upon when forming opinions on the subject, which include authoritative, scientific peer-reviewed publications.

7.      I reserve the right to revise and supplement the opinions expressed in this report or the bases for them if any new information becomes available in the future, including as a result of new scientific research or publications or in response to statements and issues that may arise in my area of expertise.

## OPINIONS

### The Attempts to Discredit the WPATH Standards of Care, Version 8 Are Baseless.

8.      The Alabama brief characterizes WPATH SOC 8 as a political and legal document. It is not. It cites to materials that represent an anonymized, cherry-picked subset of communications to and from members of WPATH, including those not in leadership roles, as well an email thread and related documents obtained from the U.S. Department of Health and Human Services, in order to weave a false narrative that the WPATH Standards of Care was unduly influenced by outside forces or reflects a particular point of view other than that contained in the published and peer-reviewed WPATH SOC 8 document. However, their assertions are not reflective of the process that led to WPATH SOC 8 nor of its substance.

9.      WPATH SOC 8 the is the most recent version of practice guidelines that were first published as the Standards of Care in 1979 and updated periodically since then.

10.     The process of developing the WPATH Standards of Care, Version 8 was a multistep, several years long effort that started in 2017. This process is outlined in great detail in Appendix A to SOC 8, a copy of which is attached hereto as **Exhibit D**.

11.     The process for the development of SOC 8 involved the following stages:

2

a.  Establishing Guideline Steering Committee including Chair, and Co-Chairs (July 19, 2017);

b. Based on SOC 7, the topics for SOC 8 were reviewed, main questions were developed, and chapters (scope of guidelines) were determined;

c. Selecting Chapter Members based upon expertise (March 2018);

d. Selecting the Evidence Review Team: John Hopkins University (May 2018);

e. Refining topics included in the SOC 8 and review questions for systematic reviews;

f. Conducting systematic reviews (March 2019);

g. Drafting the recommendation statements;

h. Voting on the recommendation statements using a Delphi process (September 2019–February 2022);

i. Grading of the recommendations statements;

j. Writing the text supporting the statements;

k. Independently validating the references used in the supportive text;

l. Finalizing a draft SOC 8 (December 1, 2021);

m. Feedback on the statements by International Advisory Committee;

n. Feedback on the entire draft of the SOC 8 during a public comment period (November 2021–January 2022);

o. Revision of final draft based on comments (January 2022- May 2022);

p. Approval of final draft by Chair and Co-Chairs (June 10, 2022);

q. Approval by the WPATH Board of Directors;

r. Publication of the SOC 8; and

3

s. Dissemination and translation of the SOC 8.

12.    As I noted in my initial declaration, this "process for development of the SOC-8 incorporated recommendations on clinical practice guideline development from the National Academies of Medicine and The World Health Organization that addressed transparency, the conflict-of-interest policy, committee composition and group process." Karasic Declaration ¶ 56 (quoting Coleman, et al., 2022, at S247).

13.    By 2018 (over six years ago), chapter authors were invited to discuss their chapter drafts in meetings with the SOC editors at the WPATH conference in Buenos Aires. And, by 2019, chapter authors were asked to submit their committee's recommendations to the Delphi process. This process is described in paragraphs 58-59 of my initial declaration and in Appendix A to SOC 8.

14.    With regards to SOC 8, every member of the SOC revision committee was instructed to vote for each statement. Response rates for each statement ranged from 74.8%-95.0%. Most statements were approved in 2019. Some statements from the various SOC 8 chapters that did not receive 75% approval on Delphi were revised, using the feedback from a form that accompanied each vote. Most of these votes on the revised statements happened in 2020. Throughout this process members of each chapter committee only saw the statements of other chapters that went to Delphi vote and had an opportunity to vote there and express opinions of each statement with their vote.

15.    Following the aforementioned process, every recommendation contained in SOC 8, as published in 2022, was approved by 75% or more of the revision committee.

4

16.    In late 2021, a draft of the statements and supportive text comprising each chapter was released for public comment.  It was at this point that members of the public, members of WPATH, as well as members of SOC 8 committees could provide feedback on each chapter.

17.    A public comment process with an attempt to address concerns raised through that process is a standard part of guideline development, not evidence of undue political influence. Indeed, "[s]takeholder engagement, of all those potentially affected by the recommendations included in a guideline, is critical … [and] helps to ensure guideline acceptability and feasibility, support for its uptake and the practices recommended, and possible effects on adherence to any treatments and practices recommended."  (Petkovic, et al., 2022).

18.    The Alabama brief alleges that SOC 8 was crafted to advance political and legal goals.  This is false.

19.    The first lawsuit against a ban on gender affirming care for minors was *Brandt v Rutledge*, which was filed in May 2021, long after most of SOC 8 had been written. It is common when developing clinical practice guidelines to make revisions based on public feedback. For SOC 8, the plan to engage in that feedback and revision process based on stakeholder input preceded the recent legal cases, and it is common for stakeholders in clinical practice guidelines to include organizations of healthcare providers such as the American Academy of Pediatrics and governmental bodies such as the Department of Health and Human Services.

20.    The Alabama brief also suggests that Admiral Rachel Levine, the then-Assistant Secretary for Health for the U.S. Department of Health and Human Services, inappropriately influenced the timing and/or content of SOC 8.  This is not true.  As stated above, stakeholder involvement is an important aspect of the development of any clinical practice guideline.  As such, Admiral Levine, as an openly transgender woman, physician, and the nation's Assistant Secretary

5

of Health, was a relevant stakeholder who shared her opinions about the development of SOC 8.

Every stakeholder had the opportunity to provide feedback on the draft of SOC 8 as publicly

released in 2021. Any input from Admiral Levine was simply stakeholder input, and in fact, there

was significant stakeholder input regarding SOC 8 following the public comment process.

21.    SOC 8 included one substantive change based on public feedback, which was the

elimination of suggested age thresholds for the initiation of certain gender affirming medical

interventions for adolescents. But the removal of these thresholds from the *draft* of SOC 8

following public comment and stakeholder input is in keeping with the process outlined for the

development of SOC 8. What's more, removing those suggestions actually continued the

philosophy of care from Standards of Care, Version 7, which made clear that clinical judgment

is paramount. SOC 7, released in 2011, also did not have a minimum age requirement for chest

surgery for transgender boys. When suggested ages were placed in the SOC 8 draft, each

suggested age was followed by the text, "unless there are significant, compelling reasons to take

an individualized approach." And SOC 8 as published states that "an individualized approach to

clinical care is considered both ethical and necessary." (Coleman, et al., 2022, at S45). the

Frequently Asked Questions (FAQs) associated with SOC 8 provide an explanation:

> Minimum ages for providing gender-affirming medical care were removed from
> the SOC-8 and replaced by strengthened criteria to help codify the framework that
> enables every [transgender and gender diverse] adolescent the opportunity to get
> their appropriate medical needs met at the appropriate time; these changes to the
> SOC-8 reflect the fact that one-size-fits-all health care models, especially
> transgender care, are not accurate or appropriate for every individual person.
>
> Prior to its September 2022 release, WPATH announced a public open comment
> period to the draft SOC-8 in December 2021 through January 2022. This comment
> period allowed input and feedback from professionals in the field from around the
> world who were concerned that the listing of ages would lead to further limitations
> to care by creating or reinforcing arbitrary boundaries to care and/or by ignoring
> possible contributing health factors including mental health, family support, or
> other individual health needs. After comments were reviewed and discussed by

chapter authors and co-chairs, it was determined that the specific ages would be removed to ensure greater access to care for more people.

(WPATH, SOC 8 FAQs).

22.    It should be noted that surgery is rare for minors with gender dysphoria, and usually it is just limited to chest surgery for those who need it.  As SOC 8 states, "Chest masculinization surgery can be considered in minors when clinically and developmentally appropriate as determined by a multidisciplinary team experienced in adolescent and gender development." (Coleman, et al., 2022, at S66).  Genital surgery continues to be incredibly rare for minors.  SOC 8 recommends about non-chest surgeries that "an assessment of the adolescent's ability to adhere to postsurgical care recommendations and to comprehend the long-term impacts of these procedures on reproductive and sexual function is crucial."  (Coleman, et al., 2022, at S66).  It further specifically states that phalloplasty "is not recommended …[to] be considered in youth under 18 at this time."  *Id.*

23.    The Alabama brief further claims that WPATH SOC 8's statement of the medical necessity of transgender care was crafted in response to recent legal actions. This is, again, false. In fact, the medical necessity of transgender care has long been WPATH's position. WPATH's position statement on the medical necessity of transgender care dates back to 2008, which based on the Standards of Care Version 6, states in part:

> Medically necessary sex reassignment procedures also include complete hysterectomy, bilateral mastectomy, chest reconstruction or augmentation as appropriate to each patient, (including breast prostheses if necessary), genital reconstruction (by various techniques which must be appropriate to each patient, including, for example, skin flap hair removal, penile and testicular prostheses, as necessary), facial hair removal, and certain facial plastic reconstruction as appropriate to the patient. Furthermore, not every patient will have a medical need for identical procedures; clinically appropriate treatments must be determined on an individualized basis with the patient's physician. These procedures are not "cosmetic" or "elective" or for the mere convenience of the patient, but are understood to be medically necessary for the treatment of the diagnosed condition.

7

(Whittle, et al., 2009).

24.     A very similar statement on medical necessity was released by WPATH in 2016, updated based on Standards of Care Version 7 (WPATH, 2016). The WPATH Board in 2016 upon releasing this update medical necessity determined that the next version of the medical necessity statement would be based on and included in the WPATH SOC 8, and therefore this was among the last text written for SOC 8, as an update of the 2008 and 2016 statements.

25.     The Alabama brief states that practice guidelines should be written by those "sufficiently familiar with the topic, but not professionally engaged in performing, researching, or advocating for the practices under review." But in fact, the Institute of Medicine, the Agency for Healthcare Quality and Research in the United States and Canada, and the UK National Institute for Health and Clinical Excellence, among others, all recommend the inclusion and involvement of individuals with expertise in the pertinent content areas as essential to practice guideline development.  This includes clinicians and researchers in the appropriate field. The diverse group of authors of SOC 8 came from many fields, with expertise in their disciplines as well as in transgender care. It would be atypical for clinical practice guidelines not to include content experts, including clinicians and researchers in the appropriate field, and undermine both the rigor and relevance of the clinical practice guidelines to exclude those actually involved in researching and delivering the care in question.  Indeed, I am unaware of a single well-established and accepted clinical practice guideline in any other field of medicine that excluded experienced clinical practitioners in the relevant field from the guideline development process.

**The Cass Review**

26.     The Alabama and DNH briefs criticize the omission of the Cass Review's Report in the declarations in support of plaintiffs. The Cass Review has been broadly criticized for, among other things, not following established standards for evaluating evidence and evidence quality;

failing to properly account for the balance between benefits and harms, patient values and preferences, and resource utilization in this context; misrepresenting data; and engaging in improper speculation and unfounded assertions. (McNamara, et al., 2024). Similarly, an analysis of the systematic reviews commissioned by the Cass Review using the ROBIS tool to assess risk of bias "resulted in all of the systematic reviews being judged as at a high risk of bias due to both methodological limitations and failure to adequately address these limitations in their conclusions and interpretations." (Noone, et al., 2024). In addition, the primary research commissioned by the Cass Review had several methodological limitations that it failed to disclose, "in stark contrast to the exclusion of research with far fewer limitations from the systematic reviews." *Id.* Thus, the Cass Review has been criticized for applying a "seeming double standard," which "calls into question" its claims that it was systematically reviewing and evaluating the evidence. *Id.* Ultimately, "the Cass Report's application of evidence-based medicine (EBM) to Gender-Affirming Care (GAC) is flawed" and "the Review's understanding of transgender identities and experiences deploys a paternalistic lens that disregards the competence of transgender young people." *Id.*

27.    Because of concerns of its members, the British Medical Association has commissioned a task force to evaluate the Cass Review and its methodology and recommended "a pause to the implementation of the Cass Review's recommendations" and that "transgender and gender-diverse patients [be able to] continue to receive specialist healthcare, regardless of their age." (BMA, 2024). The British Medical Association also expressed concern about the Cass Review's Report's "impact on transgender healthcare provision because of its unsubstantiated recommendations driven by unexplained study protocol deviations, ambiguous eligibility criteria, and exclusion of trans-affirming evidence." *Id.*

28.    While the Cass Review has been firmly criticized for its misapprehension of gender-affirming care and transgender identity, its methodological flaws, and the double standard it applied to gender-affirming care, it is worth noting that it nonetheless concurs with the WPATH Standards of Care and the Endocrine Society Clinical Practice Guidelines that: (1) medical care is appropriate for some transgender youth, (2) a holistic, comprehensive, and individualized assessment is needed, and (3) co-occurring mental health conditions should be properly treated before medically affirming interventions. (McNamara, et al., 2024).

29.    The Cass Review's systematic reviews did show benefits from  gender affirming medical interventions.  For example, with regards to puberty blockers, the review found "*no change* before and after" receiving such treatment in measurements of gender dysphoria and body satisfaction.  (Taylor, et al., 2024a).  This is the desired and expected outcome of this treatment for those measures.  And with regards to hormone therapy, the review found that the studies showed "*reduction in dysphoria*," "*lower dissatisfaction* in those receiving hormone treatment compared with those who had not," and that "evidence from mainly pre-post studies suggests hormones are associated with *improvements in depression, anxiety and other mental health difficulties after 12 months of treatment*," noting that "[m]oderate-quality evidence suggests mental health may be improved during treatment…." (Taylor, et al. 2024b).

30.    Ultimately, NHS England decided to not make puberty blockers available as "a routine commissioning treatment option" for treating gender dysphoria and the Cass Review has recommended their continued availability through a research programme. (NHS, 2024a; Cass, 2024). In addition, gender-affirming hormones continue to be available to minors. (NHS England, 2024b; Cass, 2024).

**Gender Dysphoria**

31.    The DNH brief dismisses Gender Dysphoria as a "psychological condition," as if it does not require medical treatment. Gender Dysphoria is a serious medical condition that warrants medical treatment when appropriate. It is characterized by the distress resulting from the misalignment between a person's gender identity, which has biological bases, and their body (i.e., physical characteristics). Gender Dysphoria is listed as a mental disorder in the Diagnostic and Statistical Manual of Mental Disorders, the DSM-5-TR, because the diagnosis focuses on the significant distress resulting between the incongruence between one's gender identity and body.

**GRADE and Systematic Reviews**

32.    As an initial matter, systematic reviews do not report new research findings but are conducted to assess existing research. The DNH brief refers to some purported systematic reviews of the literature examining gender-affirming care for minors to argue that there is not sufficient evidence supporting the provision of this care.[1]

33.    Further, it is important to put GRADE scores of systematic reviews in context. Chong, et al. (2023) found that only 36% of national guidelines for care were based on strong or moderate GRADE scores. Recommendations were often based on a comparison with alternatives; there is no evidence base to support conversion therapy or other psychotherapeutic interventions as an alternative for those who need gender-affirming medical treatment.

---

[1] Some of the reviews upon which the DNH brief relies, like the Finland and Florida commissioned reviews, are reports largely authored or commissioned by government committees that have not been published in any medical or scientific journals and have not been subjected to the peer-review process.

11

34.    In one large study of systematic reviews, only 5.6% of all medical interventions, and 0.0% of all endocrine interventions had a high GRADE score. Most medical interventions had low or very low GRADE scores. (Howick, et al 2022).

35.    In other studies, including one of all systematic reviews in the Cochrane database published over an 18-month period, only a small percentage of systematic reviews of medical interventions have a high GRADE score; for a majority of systematic reviews of medical interventions, GRADE scores are low or very low. (Fleming et al., 2016, Howick, et al., 2020). In a study of systematic reviews of interventions in anesthesiology, critical care medicine, and emergency medicine, only 10% had high GRADE scores, but banning the practice of anesthesiology, critical care medicine, and emergency medicine has not been contemplated. (Conway, et al, 2017). For complex interventions, for which gender affirming care certainly qualifies, no high GRADE scores were found for systematic reviews of any complex intervention. (Movsisyan, et al., 2016).

36.    It is also worth noting that many of the systematic reviews upon which the DNH brief relies did not involve subject-matter experts in the field of gender medicine. For example, as the draft guideline "Gender incongruence and gender dysphoria in childhood and adolescence - diagnosis and treatment (S2k)" published by the Association of Scientific Medical Societies in Germany (AWMF) in 2024 noted, the Cass Review and the review from Finland purposefully excluded subject-matter experts from participating in the review, at most merely consulted with some externally, and in formulating the recommendations. (DGKJP, 2024). However, this is contrary to recommended practice when conducting systematic reviews. Both the Institute of Medicine (now the National Academy of Medicine) and Cochrane recommend that individuals with subject matter expertise be included in the performance of systematic reviews. (Lasserson, et

al., 2023; IOM, 2011). More specifically, the IOM states that a systematic review team "should include individuals with appropriate expertise and perspectives" and specifically recommends as a requirement that they "include expertise in the pertinent clinical content areas." (IOM, 2011). As Cochrane explains,

> Review teams must include expertise in the topic area under review. Topic expertise should not be overly narrow, to ensure that all relevant perspectives are considered. Perspectives from different disciplines can help to avoid assumptions or terminology stemming from an over-reliance on a single discipline. Review teams should also include expertise in systematic review methodology, including statistical expertise.
>
> Arguments have been made that methodological expertise is sufficient to perform a review, and that content expertise should be avoided because of the risk of preconceptions about the effects of interventions (Gøtzsche and Ioannidis 2012). However, it is important that both topic and methodological expertise is present to ensure a good mix of skills, knowledge and objectivity, because topic expertise provides important insight into the implementation of the intervention(s), the nature of the condition being treated or prevented, the relationships between outcomes measured, and other factors that may have an impact on decision making.

(Lasserson, et al., 2023).

37.     In short, the DNH brief uses systematic reviews in ways they are not intended to be used. If only medical interventions with high GRADE scores were permitted by law, most medical interventions and all complex interventions would be banned. In a study of systematic reviews of interventions in anesthesiology, critical care medicine, and emergency medicine, only 10% had high GRADE scores, but banning the practice of anesthesiology, critical care medicine, and emergency medicine has not been contemplated. (Conway, et al, 2017).

**Clinical Practice Guidelines**

38.     In developing guidelines that provide recommendations on clinical care, panels of experts do consider the evidence of a treatment's efficacy. But "[m]any factors play a role in making recommendations." (Djulbegovic, et al., 2009). They also consider the benefits and harms of both treatment and no treatment, patients' values and preferences, and the resources required to

13

offer treatment. (IOM, 2011; Guyatt, et al., 2008). As such, "evidence quality is not synonymous with clinical recommendations." (McNamara, et al., 2024; see also Platz, 2021 ("While evidence is a fundamental aspect for decision-making in evidence-based practice, it is in itself not a recommendation.")).

39.     Many treatments for other conditions are widely accepted and in use without having been studied through randomized, controlled clinical trials. And many drugs for cancer and hematologic disorders have been FDA approved without a randomized controlled trial. (Hatswell, et al., 2016). Other drugs have been FDA approved with randomized controlled trials for one indication but are commonly used for another condition or in a different population than the one for which it was approved. (Wittich, et al., 2012).

40.     Indeed, recommendations are based on a comparison with alternatives (Platz, 2021); there is no evidence base to support conversion therapy or other psychotherapeutic interventions as an alternative for those who need gender-affirming medical treatment.

41.     Adopting policies prohibiting gender affirming medical interventions is not an alternative, rather it causes harms. Indeed, the introduction and passage of anti-transgender laws and policies like the Executive Orders have been shown to negatively affect the mental health and wellbeing of transgender youth, including increases in suicidality.  For example, one study has documented that suicide attempts by transgender youth rose, often dramatically, in states which passed laws limiting transgender rights. (Lee, et al., 2024).

42.     The harm of providing no treatment for gender dysphoria is not discussed by either the DNH or Alabama briefs. As discussed in my initial declaration (Section H), the denial of medically indicated care to transgender people not only results in the prolonging of their gender

dysphoria, but causes additional distress and poses other health risks, such as depression, posttraumatic stress disorder, and suicidality.

**Additional Reponses**

43.    The DNH brief ignores the many studies documenting decreased suicidality following gender affirming treatment (discussed in the initial declaration) to focus on the lack of data on the impact of care on completed suicides. Measuring impact on completed suicide in youth is difficult even with larger populations, such as youth with depression. However, gender affirming treatment is first a treatment of gender dysphoria itself; it also has the secondary benefit of reducing depression, anxiety, suicidal thoughts and attempts, and overall quality of life.

44.    The DNH brief attempts to draw a distinction between chest masculinization surgery for gender dysphoria in transgender male youth and chest masculinization surgery for gynecomastia in cisgender male youth. Like transgender youth, this surgery in cisgender youth is usually performed only when the youth is distressed by the feminine aspects of his chest. The quality of evidence per a systematic review for gynecomastia treatment in cisgender males is very low. (Fagerlund, et al., 2015). Satisfaction rates for gynecomastia surgery for cisgender males are much lower (Ridha, et al., 2008) than for chest masculinization surgery in transgender males (Bruce, et al., 2023).  Nonetheless, of all the breast reduction chest surgeries performed among minors, both cisgender male minors and transgender minors, in 2019, 97% were performed on cisgender male minors (Dai, et al., 2024).


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 26th day of February 2025.

15

Dan H. Karasic, M.D.

# Exhibit C

## Supplemental Bibliography

American Psychiatric Association. (2022). Diagnostic and statistical manual of mental disorders (5th ed., text rev.). Arlington, VA: American Psychiatric Publishing.

American Psychiatric Association. (2013). Diagnostic and Statistical Manual of Mental Disorders (5th ed.). Arlington, VA: American Psychiatric Publishing.

British Medical Association. Press release: BMA to undertake an evaluation of the Cass Review on gender identity services for children and young people. (July 31, 2024). https://www.bma.org.uk/bma-media-centre/bma-to-undertake-an-evaluation-of-the-cass-review-on-gender-identity-services-for-children-and-young-people.

Bruce, L., Khouri, A. N., Bolze, A., Ibarra, M., Richards, B., Khalatbari, S., Blasdel, G., Hamill, J. B., Hsu, J. J., Wilkins, E. G., Morrison, S. D., & Lane, M. (2023). Long-Term Regret and Satisfaction With Decision Following Gender-Affirming Mastectomy. *JAMA surgery*, e233352. Advance online publication.

Chong, M.C., Sharp, M.K., Smith, S.M. *et al.* (2023). Strong recommendations from low certainty evidence: a cross-sectional analysis of a suite of national guidelines. *BMC Med Res Methodol* 23, 68.

Coleman, E., Radix, A. E., Bouman, W. P., Brown, G. R., de Vries, A. L. C., Deutsch, M. B., Ettner, R., Fraser, L., Goodman, M., Green, J., Hancock, A. B., Johnson, T. W., Karasic, D. H., Knudson, G. A., Leibowitz, S. F., Meyer-Bahlburg, H. F. L., Monstrey, S. J., Motmans, J., Nahata, L., Nieder, T. O., … Arcelus, J. (2022). Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. *International journal of transgender health*, *23*(Suppl 1), S1–S259.

Conway, A., Conway, Z., Soalheira, K., & Sutherland, J. (2017). High quality of evidence is uncommon in Cochrane systematic reviews in Anaesthesia, Critical Care and Emergency Medicine. *European journal of anaesthesiology*, *34*(12), 808–813.

Dai D, Charlton BM, Boskey ER, et al. Prevalence of Gender-Affirming Surgical Procedures Among Minors and Adults in the US. *JAMA Netw Open.* 2024;7(6):e2418814.

Djulbegovic, B., Trikalinos, T.A., Roback, J. *et al.* (2009). Impact of quality of evidence on the strength of recommendations: an empirical study. *BMC Health Serv Res* 9, 120.

Fagerlund, A., Lewin, R., Rufolo, G., Elander, A., Santanelli di Pompeo, F., & Selvaggi, G. (2015). Gynecomastia: A systematic review. *Journal of plastic surgery and hand surgery*, *49*(6), 311–318.

Fleming, P. S., Koletsi, D., Ioannidis, J. P., & Pandis, N. (2016). High quality of the evidence for medical and other health-related interventions was uncommon in Cochrane systematic reviews. *Journal of clinical epidemiology*, *78*, 34–42.

German Society for Child and Adolescent Psychiatry, Psychosomatics and Psychotherapy (DGKJP). (2024). Draft version of the AWMF guideline: Gender incongruence and gender dysphoria in childhood and adolescence - diagnosis and treatment (S2k). AWMF Registry No. 028 – 014. English translation available at: https://www.amqg.ch/_files/ugd/e78aad_83e3b77cc9ad46cc81e9561b20ddd129.pdf.

Guyatt, G. H., Oxman, A. D., Kunz, R., Falck-Ytter, Y., Vist, G. E., Liberati, A., Schünemann, H. J., & GRADE Working Group (2008). Going from evidence to recommendations. *BMJ (Clinical research ed.)*, *336*(7652), 1049–1051.

Hatswell, A. J., Baio, G., Berlin, J. A., Irs, A., & Freemantle, N. (2016). Regulatory approval of pharmaceuticals without a randomised controlled study: analysis of EMA and FDA approvals 1999-2014. *BMJ open*, *6*(6), e011666.

Howick, J., Koletsi, D., Ioannidis, J. P. A., Madigan, C., Pandis, N., Loef, M., Walach, H., Sauer, S., Kleijnen, J., Seehra, J., Johnson, T., & Schmidt, S. (2022). Most healthcare interventions tested in Cochrane Reviews are not effective according to high quality evidence: a systematic review and meta-analysis. *Journal of clinical epidemiology*, *148*, 160–169.

Howick, J., Koletsi, D., Pandis, N., Fleming, P. S., Loef, M., Walach, H., Schmidt, S., & Ioannidis, J. P. A. (2020). The quality of evidence for medical interventions does not improve or worsen: a metaepidemiological study of Cochrane reviews. *Journal of clinical epidemiology*, *126*, 154–159.

Institute of Medicine (US) Committee on Standards for Systematic Reviews of Comparative Effectiveness Research, Eden, J., Levit, L., Berg, A., & Morton, S. (Eds.). (2011). *Finding What Works in Health Care: Standards for Systematic Reviews*. National Academies Press (US).

Lasserson TJ, Thomas J, Higgins JPT. Chapter 1: Starting a review. In: Higgins JPT, Thomas J, Chandler J, Cumpston M, Li T, Page MJ, Welch VA (editors). *Cochrane Handbook for Systematic Reviews of Interventions* version 6.4 (updated August 2023). Cochrane, 2023. Available from www.training.cochrane.org/handbook.

Lee, W. Y., Hobbs, J. N., Hobaica, S., DeChants, J. P., Price, M. N., & Nath, R. (2024). State-level anti-transgender laws increase past-year suicide attempts among transgender and non-binary young people in the USA. *Nature human behaviour*, *8*(11), 2096–2106.

McNamara, M., Baker, K., Connelly, K., et al. (2024). An Evidence-Based Critique of "The Cass Review" on Gender-affirming Care for Adolescent Gender Dysphoria. https://law.yale.edu/sites/default/files/documents/integrity-project_cass-response.pdf

Movsisyan, A., Melendez-Torres, G. J., & Montgomery, P. (2016). Outcomes in systematic reviews of complex interventions never reached "high" GRADE ratings when compared with those of simple interventions. *Journal of clinical epidemiology*, *78*, 22–33.

NHS England. (2024a). Clinical Policy: Puberty suppressing hormones (PSH) for children and young people who have gender incongruence / gender dysphoria [1927]. March 12, 2024. https://www.england.nhs.uk/wp-content/uploads/2024/03/clinical-commissioning-policy-gender-affirming-hormones-v2.pdf.

NHS England. (2024b). Clinical Commissioning Policy: Prescribing of gender affirming hormones (masculinising and feminising hormones) as part of the Children and Young People's Gender Service. March 21, 2024. https://www.england.nhs.uk/wp-content/uploads/2024/03/clinical-commissioning-policy-prescribing-of-gender-affirming-hormones.pdf

Noone, C., Southgate, A., Ashman, A., Quinn, É., Comer, D., Shrewsbury, D., … McLamore, Q. (2024, June 11). Critically Appraising The Cass Report: Methodological Flaws and Unsupported Claims. https://doi.org/10.31219/osf.io/uhndk.

Petkovic, J., Riddle, A., Lytvyn, L., Khabsa, J., Akl, E. A., Welch, V., Magwood, O., Atwere, P., Graham, I. D., Grant, S., John, D., Katikireddi, S. V., Langlois, E., Mustafa, R. A., Todhunter-Brown, A., Schünemann, H., Smith, M., Stein, A. T., Concannon, T., & Tugwell, P. (2022). PROTOCOL: Guidance for stakeholder engagement in guideline development: A systematic review. *Campbell systematic reviews*, *18*(2), e1242.

Platz, T. (2021) Methods for the Development of Healthcare Practice Recommendations Using Systematic Reviews and Meta-Analyses. *Front. Neurol.* 12:699968.

Ridha, H., Colville, R. J., & Vesely, M. J. (2009). How happy are patients with their gynaecomastia reduction surgery?. *Journal of plastic, reconstructive & aesthetic surgery: JPRAS*, *62*(11), 1473–1478.

Taylor, J., Mitchell, A., Hall, R., Heathcote, C., Langton, T., Fraser, L., & Hewitt, C. E. (2024a). Interventions to suppress puberty in adolescents experiencing gender dysphoria or incongruence: a systematic review. *Archives of disease in childhood*, archdischild-2023-326669. Advance online publication.

Taylor, J., Mitchell, A., Hall, R., Langton, T., Fraser, L., & Hewitt, C. E. (2024b). Masculinising and feminising hormone interventions for adolescents experiencing gender dysphoria or incongruence: a systematic review. *Archives of disease in childhood*, archdischild-2023-326670. Advance online publication.

The Cass Review. (2024). Independent review of gender identity services for children and young people: Final report. https://cass.independent-review.uk/home/publications/final-report/

Whittle, et al., WPATH Clarification on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A (June 2008), https://www.researchgate.net/publication/237405846_WPATH_Clarification_on_Medical_Necessity_of_Treatment_Sex_Reassignment_and_Insurance_Coverage_in_the_USA (accessed Feb. 25, 2025).

Wittich, C. M., Burkle, C. M., & Lanier, W. L. (2012). Ten common questions (and their answers) about off-label drug use. *Mayo Clinic proceedings*, *87*(10), 982–990.

World Professional Association for Transgender Health, Standards of Care for Transgender and Gender Diverse People, Version 8 Frequently Asked Questions (FAQs), https://app.wpath.org/media/cms/Documents/SOC%20v8/SOC-8%20FAQs%20-%20WEBSITE2.pdf (accessed Feb. 25, 2025).

World Professional Association for Transgender Health, Position Statement on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A. (Dec. 21, 2016), https://s3.amazonaws.com/amo_hub_content/Association140/files/WPATH-Position-on-Medical-Necessity-12-21-2016.pdf (accessed Feb. 25, 2025).

# Exhibit D

# Appendix A METHODOLOGY

## 1. Introduction

This version of the Standards of Care (SOC-8) is based upon a more rigorous and methodological evidence-based approach than previous versions. This evidence is not only based on the published literature (direct as well as background evidence) but also on consensus-based expert opinion. Evidence-based guidelines include recommendations intended to optimize patient care and are informed by a systematic review of evidence and an assessment of the benefits and harms of alternative care options. Evidence-based research provides the basis for sound clinical practice guidelines and recommendations but must be balanced by the realities and feasibility of providing care in diverse settings. The process for development of the SOC-8 incorporated recommendations on clinical practice guideline development from the National Academies of Medicine and The World Health Organization that addressed transparency, the conflict-of-interest policy, committee composition and group process. (Institute of Medicine Committee on Standards for Developing Trustworthy Clinical Practice, 2011; World Health Organization, 2019a).

The SOC-8 revision committee was multidisciplinary and consisted of subject matter experts, health care professionals, researchers and stakeholders with diverse perspectives and geographic representation. All committee members completed conflict of interest declarations.*

A guideline methodologist assisted with the planning and development of questions, and an independent team undertook systematic reviews that were used to inform some of the statements for recommendations. Additional input to the guidelines was provided by an international advisory committee, legal experts, and feedback received during a public comment period. Recommendations in the SOC-8 are based on available evidence supporting interventions, a discussion of risks and harms, as well as feasibility and acceptability within different contexts and country settings. Consensus of the final recommendations was attained using a Delphi process that included all members of the Standards of Care Revision committee and required that recommendation statements were approved by 75% of members. Supportive and explanatory text of the evidence for the statements were written by chapter members. Drafts of the chapters were reviewed by the Chair and the Co-Chairs of the SOC Revision Committee to ensure the format was consistent, evidence was properly provided, and recommendations were consistent across chapters. An independent team checked the references used in the SOC-8 before the guidelines were fully edited by a single professional. A detailed overview of the SOC-8 Methodology is described below.

## 2. Difference between the methodology of the SOC-8 and previous editions

The main differences in the methodology of the SOC-8 when compared with other versions of the SOC are:

- The involvement of a larger group of professionals from around the globe;
- A transparent selection process to develop the guidelines steering committee as well as to select chapter leads and members;
- The inclusion of diverse stakeholders in the development of the SOC-8
- Management of conflicts of interest
- The use of a Delphi process to reach agreement on the recommendations among SOC-8 committee members
- The involvement of an independent body from a reputable university to help develop the methodology and undertake independent systematic literature reviews where possible
- Recommendations were graded as either "recommend" or "suggest" based upon the strength of the recommendations.
- The involvement of an independent group of clinical academics to review citations.
- The involvement of international organizations working with the transgender and gender diverse (TGD) community, members of WPATH and other professional organizations as well as the general public who provided feedback through a public comment period regarding the whole SOC-8.

## 3. Overview of SOC-8 development Process

The steps for updating the Standards of Care are summarized below:

1. Establishing Guideline Steering Committee including Chair, and Co-Chairs (July 19, 2017)
2. Determining chapters (scope of guidelines)
3. Selecting Chapter Members based upon expertise (March 2018)
4. Selecting the Evidence Review Team: John Hopkins University (May 2018)
5. Refining topics included in the SOC-8 and review questions for systematic reviews
6. Conducting systematic reviews (March 2019)
7. Drafting the recommendation statements
8. Voting on the recommendation statements using a Delphi process (September 2019–February 2022)
9. Grading of the recommendations statements
10. Writing the text supporting the statements
11. Independently validating the references used in the supportive text
12. Finalizing a draft SOC-8 (December 1, 2021)
13. Feedback on the statements by International Advisory Committee
14. Feedback on the entire draft of the SOC-8 during a public comment period (November 2021–January 2022)
15. Revision of Final Draft based on comments (January 2022- May 2022)
16. Approval of final draft by Chair and Co-Chairs (June 10, 2022)
17. Approval by the WPATH Board of Directors
18. Publication of the SOC-8
19. Dissemination and translation of the SOC-8

### 3.1. Establishment of Guideline Steering Committee

The WPATH Guideline Steering Committee oversaw the guideline development process for all chapters of the Standards of Care. Except for the Chair (Eli Coleman) who was appointed by the WPATH board to maintain a continuity from previous SOC editions, members of the Guideline Steering Committee were selected by the WPATH Board from WPATH members applying for these positions. Job descriptions were developed for the positions of Co-Chairs, Chapter Leads, Chapter Members and Stakeholder. WPATH members were eligible to apply by completing an application form and submitting their CV. The Board of WPATH voted for the position of co-chair (one member of the board did not participate in view of conflict of interest). The chairs and co-chairs selected the chapter leads and members (as well as stakeholders) based on the application form and CVs.

The Guideline Steering Committee for Standards of Care 8th Version are:

- Eli Coleman, PhD (Chair) Professor, Director and Academic Chair, Institute for Sexual and Gender Health, Department of Family Medicine and Community Health, University of Minnesota Medical School (USA)
- Asa Radix, MD, PhD, MPH (Co-chair) Senior Director, Research and Education Callen-Lorde Community Health Center Clinical Associate Professor of Medicine New York University, USA
- Jon Arcelus, MD, PhD (Co-chair) Professor of Mental Health and Well-being Honorary Consultant in Transgender Health University of Nottingham, UK
- Karen A. Robinson, PhD (Lead, Evidence Review Team) Professor of Medicine, Epidemiology and Health Policy & Management Johns Hopkins University, USA

### 3.2. Determination of topics for chapters

The Guideline Steering Committee determined the chapters for inclusion in the Standards of Care by reviewing the literature and by reviewing the previous edition of the SOC. The chapters in the Standards of Care 8th Version:

1. Terminology
2. Global Applicability
3. Population estimates
4. Education*
5. Assessment of Adults
6. Adolescent
7. Children
8. Nonbinary
9. Eunuch
10. Intersex
11. Institutional environments
12. Hormone Therapy
13. Surgery and Postoperative Care
14. Voice and communication
15. Primary care
16. Reproductive Health
17. Sexual Health
18. Mental Health

* The Education Chapter was originally intended to cover both education and ethics. A decision was made to create a separate committee to write a chapter on ethics. In the course of writing the chapter, it was later determined topic of ethics was best placed external to the SOC8 and required further in-depth examination of ethical considerations relevant to transgender health.

### 3.3. Selection of chapter members

A call for applications to be part of the SOC-8 review committee (chapter lead or member) was sent to the WPATH membership. The Chairs of the Guideline Steering Committee appointed the members for each chapter, ensuring representation from a variety of disciplines and perspectives.

Chapter Leads and Members were required to be WPATH Full Members in good standing and content experts in transgender health, including in at least one chapter topic. Chapter Leads reported to the Guideline Steering Committee and were responsible for coordinating the participation of Chapter Members. Chapter members reported directly to the Chapter Lead.

Each chapter also included stakeholders as members who bring perspectives of transgender health advocacy or work in the community, or as a member of a family that included a transgender child, sibling, partner, parent, etc. Stakeholders were not required to be full members of WPATH.

The Chapter Members were expected to:

- Participate in the development refinement of review questions
- Read and provide comments on all materials from the Evidence Review Team
- Critically review draft documents, including the draft evidence report
- Review and assess evidence and draft recommendations
- Participate in the Delphi consensus process
- Develop the text to back up the recommendation statements
- Grade each statement to describe the strength of the recommendation
- Review and address the comments from the Chairs during the whole process
- Develop the content of the chapters
- Review comments from public comments and assist in the development of a revision of guidelines
- Provide input and participate in the dissemination of guidelines

Training and orientation for Chapter Leads and Members was provided, as needed. Training content included formulation and refinement of questions (i.e., use of PICO), reviewing the evidence, developing recommendation state-

ments, grading the evidence and the recommendations, and information about the guideline development program and process.

A total of 26 chapter-leads were appointed (some chapters required co-leads), 77 chapter members and 16 stakeholders. A total of 127 were selected. During the SOC process, 8 people left, due to personal or work-related issues. Therefore, there were 119 final authors of the SOC-8.

### 3.4. Selection of the evidence review team

The WPATH Board issued a request for applications to become the Evidence Review Team. For Standards of Care 8th Version the WPATH Board engaged the Evidence Review Team at Johns Hopkins University under the leadership of Karen Robinson.

- Karen A. Robinson, PhD (Lead, Evidence Review Team) Professor of Medicine, Epidemiology and Health Policy & Management Johns Hopkins University, USA

Dr Robinson also guided the steering committee in the development of the SOC-8 by providing advice and training in the development of PICO questions, statements, and the Delphi process as well as undertaking a very rigorous systematic literature review where direct evidence was available.

### Conflict of interest

Members of the Guideline Steering Committee, Chapter Leads and Members, and members of the Evidence Review Team were asked to disclose any conflicts of interest. Also reported, in addition to potential financial and competing interests or conflicts, are personal or direct reporting relationships with a chair, co-chair or a WPATH Board Member or the holding of a position on the WPATH Board of Directors.

### 3.5. Refinement of topics and review of questions

The Evidence Review Team abstracted the recommendation statements from the prior version of the Standards of Care. With input from the Evidence Review Team, the Guideline Steering Committee and Chapter Leads determined:

- Recommendation statements that needed to be updated
- New areas requiring recommendation statements

### 3.6. Conduct the systematic reviews

Chapter Members developed questions to help develop recommendation statements. For the questions eligible for systematic review, the Evidence Review Team drafted review questions, specifying the Population, Interventions, Comparisons, and Outcomes (PICO elements). The Evidence Review Team undertook the systematic reviews. The Evidence Review Team presented evidence tables and other

results of the systematic reviews to the members of the relevant chapter for feedback.

### Protocol

A separate detailed systematic review protocol was developed for each review question or topic, as appropriate. Each protocol was registered on PROSPERO.

### Literature search

The Evidence Review Team developed a search strategy appropriate for each research question including MEDLINE®, Embase™, and the Cochrane Central Register of Controlled Trials (CENTRAL). The Evidence Review Team searched additional databases as deemed appropriate for the research question. The search strategy included MeSH and text terms and was not limited by language of publication or date.

The Evidence Review Team hand searched the reference lists of all included articles and recent, relevant systematic reviews. The Evidence Review Team searched ClinicalTrials. gov for any additional relevant studies.

Searches were updated during the peer review process.

The literature included in the systematic review was mostly based on quantitative studies conducted in Europe, the US or Australia. We acknowledge a bias towards perspectives from the global north that does not pay sufficient attention to the diversity of lived experiences and perspectives within transgender and gender diverse (TGD) communities across the world. This imbalance of visibility in the literature points to a research and practice gap that needs to be addressed by researchers and practitioners in the future in order to do justice to the support needs of all TGD people independent of gender identification.

### Study selection

The Evidence Review Team, with input from the Chapter Workgroup Leads, defined the eligibility criteria for each research question a priori.

Two reviewers from the Evidence Review Team independently screened titles and abstracts and full-text articles for eligibility. To be excluded, both reviewers needed to agree that the study met at least one exclusion criteria. Reviewers resolved differences regarding eligibility through discussion.

### Data extraction

The Evidence Review Team used standardized forms to abstract data on general study characteristics, participant characteristics, interventions, and outcome measures. One reviewer abstracted the data, and a second reviewer confirmed the abstracted data.

### Assessment of risk of bias

Two reviewers from the Evidence Review Team independently assessed the risk of bias for each included study. For

randomized controlled trials, the Cochrane Risk of Bias Tool was used. For observational studies, the Risk of Bias in Non-Randomized Studies—of Interventions (ROBINS-I) tool was used. Where deemed appropriate, existing recent systematic reviews were considered and evaluated using ROBIS.

### Data synthesis and analysis

The Evidence Review Team created evidence tables detailing the data abstracted from the included studies. The members of the Chapter Workgroups reviewed and provided comments on the evidence tables.

### Grading of the evidence

The Evidence Review Team assigned evidence grades using the GRADE methodology. The strength of the evidence was obtained using predefined critical outcomes for each question and by assessing the limitations to individual study quality/risk of bias, consistency, directness, precision, and reporting bias.

### 3.7. Drafting of the Recommendation Statements

Chapter Leads and Members drafted recommendation statements. The statements were crafted to be feasible, actionable, and measurable.

Evidence-based recommendation statements were based on the results of the systematic, and background literature reviews plus consensus-based expert opinions.

The Chair and Co-Chairs and Chapter Leads reviewed and approved all recommendation statements for clarity and consistency in wording. During this review and throughout the process any overlap between chapters was also addressed.

Many chapters had to work closely together to ensure consistency of their recommendations. For example, as there are now separate chapters for childhood and adolescence, to ensure consistency between both chapters, some authors were part of both chapters. For a similar reason, when applicable, a workgroup collaborated with other Chapter Workgroups on topics shared between the chapters (i.e., Assessment of Children, Assessment of Adults, Hormone Therapy, Surgery and Postoperative Care and Reproductive Health).

### 3.8. Approval of the recommendations using the Delphi process

Formal consensus for all statements was obtained using the Delphi process (a structured solicitation of expert judgements in three rounds). For a recommendation to be approved, a minimum of 75% of the voters had to approve the statement. A minimum of 65% of the SOC-8 members had to take part in the Delphi process for each statement. People who did not approve the statement had to provide information as to the reasons for their disapproval, so the statement could be modified (or removed) according to this feedback. Once modified, the statement was put through the Delphi process again. If after 3 rounds the statement

was not approved, the statement was removed from the SOC. Every member of the SOC voted for each statement. There was a response rate between (74.79% and 94.96%) for the statements.

### 3.9. Grading criteria for statements

Once the statements passed the Delphi process, chapter members graded each statement using a process adapted from the Grading of Recommendations, Assessment, Development and Evaluations (GRADE) framework. This a transparent framework for developing and presenting summaries of evidence and provides a systematic approach for making clinical practice recommendations (Guyatt et al., 2011). The statements were graded based on factors such as:

- The balance of potential benefits and harms
- Confidence in that balance or quality of evidence
- Values and preferences of providers and patients
- Resource use and feasibility

The statements were classified as:

- Strong recommendations ("we recommend") are for those interventions/therapy/strategies where:
  - the evidence is of high quality
  - estimates of the effect of an intervention/therapy/strategy (i.e., there is a high degree of certainty effects will be achieved in practice)
  - there are few downsides of therapy/intervention/strategy
  - there is a high degree of acceptance among providers and patients or those for whom the recommendation applies.
- Weak recommendations ("we suggest") are for those interventions/therapy/strategies where:
  - there are weaknesses in the evidence base
  - there is a degree of doubt about the size of the effect that can be expected in practice
  - there is a need to balance the potential upsides and downsides of interventions/therapy/strategies
  - there are likely to be varying degrees of acceptance among providers and patients or those for whom the recommendation applies.

### 3.10. Writing of the text supporting the statements

Following the grading of the statements, the Chapter Workgroups wrote the text providing the rationale or reasoning for the recommendation. This included providing the available evidence, providing details about potential benefits and harms, describing uncertainties, and information about implementation of the recommendation, including expected barriers or challenges among others. References use APA-7 style, to support the information in the text. Links to resources are also provided, as appropriate. The text, including whether a recommendation has been described as strong or weak, was reviewed and approved by the Chair and Co-Chairs.


### 3.11. External validation of references used to support the statements

A group of independent clinical academics working in the field of transgender health reviewed the references used in every chapter in order to validate that the references were appropriately used to support the text. Any queries regarding the references were sent back to the chapters for review.

### 3.12. Finalizing a draft SOC-8

A final SOC-8 draft was made available for comments.

### 3.13. Distribute Standards of Care for review by international advisors

The statements of the recommendations of Standards of Care 8th were circulated among the broader Standards of Care Revision Committee and the WPATH International Advisory Group, which included the Asia Pacific Transgender Network (APTN), the Global Action for Transgender Equality (GATE), the International Lesbian, Gay, Bisexual, Transgender, Intersex Association (ILGA), and Transgender Europe (TGEU).

### 3.14. Public comment period

The revised draft version of the Standards of Care document was posted online for comment from the public, including WPATH members, on the WPATH website. A 6-week period was allocated for comments. A total of 1,279 people made comments on the draft with a total of 2,688 comments.

### 3.15. Revision of final draft based on comments

The Chapter Leads and Guideline Steering Committee considered the feedback and made any necessary revisions. All public comments were read and, where appropriate, integrated into the background text.

As part of this process, 3 new Delphi statements were developed and 2 were modified enough to require a new vote by the SOC-8 committee. This meant a new Delphi process was initiated in January 2022. The results of this Delphi process were accepted by the chapters, and the new statements were added or modified accordingly. The new supportive text was added.

All the new versions of the chapters were reviewed again by the Chair and Co-Chairs and changes or modifications were suggested. Finally, once the Chairs and the Chapter Members were satisfied with the draft, the chapter was finalized.

All new references were double checked by an independent member.

### 3.16. Approval of final draft by Chair and Co-Chairs

Modifications were reviewed by the Chairs and were accepted by them.

### 3.17. Approval by the WPATH Board of Directors

The final document was presented to the WPATH Board of Directors for approval and it was approved on the 20th of June 2022.

### 3.18. Publication of the SOC-8 and dissemination of the Standards of Care

The Standards of Care was disseminated in a number of venues and in a number of formats including publication in the International Journal of Transgender Health (the official scientific journal of WPATH).

### 4. Plan to Update

A new edition of the SOC (SOC-9) will be developed in the future, when new evidence and/or significant changes in the field necessitating a new edition is substantial.

*The development of SOC-8 was a complex process at a time of COVID-19 and political uncertainties in many parts of the world. Members of the SOC-8 worked on the SOC-8 on top of their day-to-day job, and most of the meetings took place out of their working time and during their weekends via Zoom. There were very few face-to-face meetings, most of them linked to WPATH, USPATH or EPATH conferences. Committee members of the SOC-8 were not paid as part of this process.

# Exhibit HH

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| PFLAG, INC.; *et al.*, <br><br> *Plaintiff*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*, <br><br> *Defendants*. | Civil Action No. 8:25-cv-00337-BAH |

**REPLY EXPERT DECLARATION OF DANIEL SHUMER, M.D.**

I, Daniel Shumer, M.D., hereby declare and state as follows:

1.      I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.      I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.  The opinions expressed herein are my own and do not express the views or opinions of my employer.

3.      I have actual knowledge of the matters stated herein.  If called to testify in this matter, I would testify truthfully and based on my expert opinion.

4.      My background, qualifications, and the bases for my opinions are set forth my initial declaration.

5.      I provide this reply expert declaration to respond to the amicus brief filed by the organization known as Do No Harm, Inc. ("DNH brief").

6.      In preparing this reply expert declaration, I relied on my training and years of research and clinical experience, as set out in my curriculum vitae attached to my initial expert report as **Exhibit A**, and on the materials listed therein; the materials referenced in my initial declaration and listed in the bibliography attached thereto as **Exhibit B**; and the materials

referenced herein and listed in the supplemental bibliography attached hereto as **Exhibit C**. The sources cited in each of these are the same types of materials that experts in my field of study regularly rely upon when forming opinions on the subject, which include authoritative, scientific peer-reviewed publications.

7.      I reserve the right to revise and supplement the opinions expressed in this report or the bases for them if any new information becomes available in the future, including as a result of new scientific research or publications or in response to statements and issues that may arise in my area of expertise.

## OPINIONS

8.      Primum non nocere – *first, do no harm*. This phrase often is incorporated into the oath that medical students recite upon donning their white coats for the first time. I remember solemnly repeating the Hippocratic Oath at my white coat ceremony, pledging to keep patient welfare as the central focus of my career and practice. I take this oath extremely seriously. With humility, I understand that the medical advice I give, and the treatments I offer, have important implications on the health and wellbeing of my patients. It is within this context that I practice at the Child and Adolescent Gender Clinic at my institution.

9.      It is not always straightforward to know how to apply the "do no harm" dictum, especially when there are multiple options for treatment, each having potential for benefit and risk (Shmerling, 2020).[1] It is then the role of the pediatrician to outline these possible treatment options with patients and families, explaining what is known and unknown, what are the potential risks, what are the desired benefits, what are the alternatives, and how the relevant body scientific literature helps to inform care decisions.

---

[1] RH Shmerling. *First, do no harm*. Harvard Health Blog (June 22, 2020), https://www.health.harvard.edu/blog/first-do-no-harm-201510138421.

10.    The DNH brief refers to gender affirming care as a "medical scandal" which inflicts grave harms. Like Executive Order 14187, the DNH brief uses hyperbolic language such as "the child trans industry" and "biology-denying interventions" to disparage providers who are dedicated to the health and wellness of patients, while exposing DNH's own biases. The brief misrepresents the state of the evidence and draws inappropriate conclusions.

**Quality of the Evidence**

11.    The DNH brief introduces the "pyramid of standards of evidence" to point out, correctly, that not all evidence is created equal. A case report on a topic doesn't carry as much weight as a large well-constructed clinical trial. Systematic reviews are important in that they review relevant studies related to a particular topic, based on the inclusion/exclusion criteria set forth in advance by the review's authors. What the brief gets wrong is how a body of evidence, including individual studies and systematic reviews, can and should be used to make medical decisions.

12.    The Grading of Recommendations Assessment, Development, and Evaluation (GRADE) method for rating evidence is outlined by the DNH brief. The brief defines terms used by GRADE such as "High Quality Evidence" and "Very Low Quality Evidence." The Endocrine Society utilized the GRADE framework when publishing its Clinical Practice Guideline related to gender affirming care (Hembree, et al., 2017). According to GRADE, the Endocrine Society gender-care guidelines *did* in fact rely on low-quality and very-low-quality evidence in developing its recommendations. It must be understood that "low-quality" does not mean incorrect evidence or bad evidence. It does not mean that the studies relied upon were designed or carried out poorly. What it *does* mean is that there were no studies looking at gender-affirming medical interventions

that were considered of "high quality" *based on study design*, which usually means randomized controlled trials (RCTs).

13.    While randomized control trials are an excellent study design in some contexts, for many complex medical problems RCTs are not feasible and/or are not ethical. If the only medicine practiced was that based on results of RCTs, the list of treatable medical conditions would be extremely short. Note that most of the Endocrine Society Clinical Practice Guidelines for conditions *other* than gender dysphoria *also* rely on "low" or "very-low-quality evidence," according to the GRADE framework.

14.    For example, the Endocrine Society published a Clinical Practice Guideline (CPG) in 2017 titled *Pediatric Obesity – Assessment, Treatment, and Prevention: An Endocrine Society Clinical Practice Guideline* (Styne, et al., 2017)*.* This guideline proposes 30 recommendations and uses the GRADE framework to grade these recommendations. Of the 30 recommendations in the pediatric obesity CPG, 25 are based on "low" or "very-low-quality evidence." For example, recommendations outlining when bariatric surgery should and should not be considered are based on "low-quality" or "very-low-quality" evidence based on the GRADE framework. This recommendation is not graded higher because there is no randomized control trial regarding bariatric surgery in youth, but there is nonetheless enough data through other methods of study to make these recommendations. This is the nature of complex medical problems. If a problem was simple enough to study with an RCT, it would not likely need a Clinical Practice Guideline to catalog and organize the literature and create best-practice recommendations for providers in the field.

15.    Specific to the study of the management of gender dysphoria, RCTs measuring the most meaningful outcome – long-term quality of life – are not feasible and not ethical. Because

the goal of the provision of gender-affirming medical care in adolescents is long term reduction in gender dysphoria and improvement in quality of life and well-being, in order to conduct a meaningful RCT, patients would have to be randomized to treatment versus no treatment, and quality of life would have to be measured many years later in adulthood. The study could not be blinded since patients and families would immediately ascertain which group they were randomized to based on the progression or non-progression of puberty. In addition, due to the current evidence supporting gender-affirming care, it would be unethical to propose a study randomly assigning patients to a placebo group (Ashley, et al., 2023). And patients/families desiring treatment with GnRHa or hormones would be unlikely to consent to such a study for fear of being placed in the placebo group. Therefore, researchers in this field must rely on other types of study design, such as longitudinal cohort studies, which monitor changes in symptoms over the course of treatment (de Vries, et al., 2014), or cross-sectional studies comparing treated and untreated persons (Turban, et al., 2022).

16.    In my initial declaration I introduced the RAND review (Dopp, et al., 2024) which gives critical context to the concerns raised by the DNH brief, and which the DNH brief does not discuss. The RAND review states: "The available research evidence – although limited – can inform recommendations on interventions for gender dysphoria and related health problems in TGE youth…" The review continues, "challenges with certainty of evidence are not unique to interventions for gender dysphoria and related health problems in TGE youth; many fields of study encounter such challenges when using research evidence to inform standards of care. In fact, systemic reviews of the application of GRADE (Fleming et al., 2016; Howick et al., 2020) have found that 22-24 percent of evidence summaries for the primary study outcome were rated as very low certainty, and 81 percent of reviews included no outcomes with evidence that was high

certainty…Yet such guidelines have been developed and are used to inform widely applicable population health assessments … Absence of high-certainty evidence on effectiveness is not equivalent to evidence that effects are absent."

17.    Setting aside for a moment the quality of evidence supporting the safety and efficacy of gender-affirming medical care, let's consider the evidence supporting the alternative. The DNH brief does not provide data supporting an alternative. This is because there is not high-quality, low-quality, or any type of evidence at all demonstrating the safety and efficacy of not treating gender dysphoria where such medical care is clinically indicated. The RAND review articulates this clearly: "evidence-based policymaking decisions about banning or restricting gender dysphoria interventions for TGE youth ought to consider the certainty of whether the policy is preventing harm that exceeds the potential harm of withholding clinical standards of care (Barbee, Deal, and Gonzales, 2022). In this review, the intervention for which harms were most clearly documented was GIECE [gender identity and expression change efforts, i.e. conversion therapy], an alternative to the standards of care."

**Risks and Benefits**

18.    In Section III of the DNH brief, its authors contend that describing how medications like hormones and puberty blockers work in treating other conditions is meaningless when outlining safety. That is false. To be clear, these medications – testosterone, estrogen, and GnRH agonists – do in fact have the same mechanism of action when used to treat disorders of puberty as they do to treat gender dysphoria. There are certainly different considerations that are discussed in the informed consent process depending on the clinical scenario. But it is not appropriate to imply that all knowledge of the risks and benefits of these medications for treatment of other conditions is meaningless or meritless when it comes to treating gender dysphoria. The brief

6

attempts to insert its own value system when comparing risk-benefit considerations for gender-affirming medical care alongside those of whether to use fluoride toothpaste or use an experimental drug to treat cancer. The brief quotes me when I suggest that I wouldn't provide treatments if I had little confidence that they would achieve benefit, which of course is true. In each patient encounter I am working with a patient and their family to weight the evidence and the individualized risks and benefits of treatment against the evidence, risks and benefits of alternatives. This is as true when I see a patient in the Child and Adolescent Gender Clinic, as when I see a patient in the Type 1 Diabetes Clinic.

19.    Both Executive Order 14187 and the DNH brief insinuate that infertility is an inevitable outcome for patients who receive gender affirming medical care. That is not true. The DNH brief cannot claim that puberty blockers cause infertility; it can only correctly point out that progression through puberty – at some point – is needed for maturation of sperm and eggs. So long as gonads remain in place, there remains fertility potential. To be sure, this would require some progression through the puberty associated with the sex assigned at birth.

20.    In the context of gender affirming medical care, concerns about fertility are discussed with adolescent patients and their families when receiving both puberty blockers as treatment and/or gender-affirming hormones. Indeed, SOC 8 recommends that "health care professionals working with transgender and gender diverse adolescents requesting gender-affirming medical or surgical treatments inform them, prior to initiating treatment, of the reproductive effects including the potential loss of fertility and available options to preserve fertility within the context of the youth's stage of pubertal development." (Coleman, et al., 2022).

21.    Egg retrieval and cryopreservation can be offered after a brief cessation of GnRHa treatment but before testosterone (Martin, et al., 2021) and has also been successful during GnRHa

treatment (Rothenberg, et al., 2019).

22.     Even if gender-affirming hormones were introduced following use of GnRHa, these hormones could be discontinued with a goal of progression through endogenous puberty and achieving fertility. The DNH brief is clearly skeptical that a patient who received puberty blockers followed by hormones would have fertility. While fertility potential would likely require discontinuation of gender affirming hormone therapy and progression through endogenous puberty, there has been a study aiming to investigate this question. Caanen, et al. demonstrated that transgender men have similar ovarian morphology to cisgender women, even when treated with GnRHa followed by testosterone. These treatments did not cause the same kinds of ovarian changes which are seen in hyperandrogenic women with polycystic ovarian syndrome and infertility (Caanen, 2017). This lends credence to the expectation that the sequence of puberty blockers to testosterone does not necessarily cause permanent infertility.

23.     Moreover, the above concern applies solely to patients who start treatment with GnRHa at the start of puberty and then go on to receiving gender-affirming hormones.  While this is the course of treatment for some adolescent patients, it is by no means the majority of them.  As with all medical care, medical treatment for gender dysphoria depends on the individualized needs and circumstances of each patient.  And many, if not most, adolescent patients present for care *after* they have already begun pubertal changes, not before.  For example, in my clinical experience, about two-thirds of patients are presenting to care after puberty has already occurred.

24.     For the patients who receive gender-affirming hormone therapy after undergoing endogenous puberty, fertility potential can be achieved by pausing hormone therapy. Withdrawal of hormones in adulthood often is successful in achieving fertility when it is desired (Light, et al., 2014; Knudson, et al., 2017).

25.    That said, the topic of fertility is critically important to discuss with patients and families considering any gender-affirming medical intervention. It should be made clear that endogenous puberty is necessary for fertility potential. It is also critical to understand that the value placed on fertility and the subsequent weight given to the risk for infertility may not be the same for all persons. While fertility may be a very important consideration for some transgender youth and their parents, the same may not be true for others. Persky, et al. 2020 explored these topics with youth and parents, finding that few youth (20%) and parents (13%) found it important to have biological children or grandchildren, and 3% of youth and 33% of parents would be willing to delay gender-affirming medical treatments for fertility preservation. Clearly a person's individual attitudes on fertility can and do change. That said, individual values and priorities affect the weight given to potential risks and benefits in all areas of medicine, including gender-affirming medical care. In my practice, our multidisciplinary team works with every patient and family to identify their values and priorities and how these priorities affect the weight given to potential risks and benefits of medical intervention in the context of the patient's gender dysphoria.

### Additional Responses

26.    The DNH brief presents snippets of my prior testimony out of context and displays them as bullet points, ignoring the full context of my expert opinion on these topics. It points out that I stated, "We do not know what causes gender dysphoria," in a deposition in the *Misanin v. Wilson* case (Tr. 33:18-21). However, in paragraphs 32-27 of my Expert Declaration, I provide a review of what is known about the biology of gender identity, and while do not know the specific etiology of gender dysphoria, we do know that it has a biological basis.

27.    The DNH brief similarly cites to prior deposition testimony for the proposition that we cannot determine whether any particular individual with gender dysphoria will continue to be

transgender in the future (citing *Misanin* Tr. 33:22-25). This statement is presented in a way to imply that there is nothing to guide clinicians in providing anticipatory guidance to patients and families. In fact, after careful evaluation and assessment, providers can indeed provide guidance to patients and families on the likelihood of persistence. *See* Shumer Declaration, ¶¶61-63. As I stated in my initial declaration, "Persistence or intensification of gender dysphoria as puberty begins is used as a helpful diagnostic tool as it becomes more predictive of gender identity persistence into adolescence and adulthood." *Id.*, ¶63.

28. Snippets of Dr. Antommaria's prior testimony are presented in a similar fashion to imply that risks of gender affirming interventions are unknown and unknowable. This is untrue, as discussed in detail in Section E of my initial Expert Declaration. Indeed, van der Loos et al. (2023) does present data from 1,766 patients treated with this sequence of therapies seen between 1997 and 2018 to demonstrate very low rates of detransition.

29. The DNH brief also alludes to purported unknown long-term effect of pubertal suppression on neurodevelopment. There is no evidence for this concern. Indeed, I have difficulty understanding its basis. For example, when considering children with naturally occurring delayed puberty, I find *no* published evidence of negative consequences to brain development compared with children with normally timed puberty. DNH can point to no published evidence in support of this concern in transgender adolescents prescribed GnRHa.

30. Finally, the DNH brief concludes by pointing out correctly that all three Plaintiffs' experts agree that there is no study specifically demonstrating that gender affirming care directly reduces the rate of completed suicide. Completed suicide is a terrible, and fortunately very rare event. In order to study how a particular intervention affects the incidence of a very rare event, it would require an extremely large study. Studies outlining efficacy of gender affirming medical

care rely on more frequent and readily measurable events such as reduction in gender dysphoria, as well as reductions in suicidality, depression, or anxiety, or improvements in quality of life. I agree that using suicidality as a proxy for completed suicide is inappropriate. However, as a clinician, if my patient has a reduction in suicidality, I consider that to be a very positive outcome and can celebrate that outcome with the patient as we work together to continue to treat their gender dysphoria.

## Conclusion

31.    The DNH brief presents inaccurate, incomplete, and inappropriate conclusions and should not be used as justification to deny patients access to essential medical care.


I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of February 2025.


_____
Daniel Shumer, M.D.

# Exhibit C

**Exhibit C**

**Supplemental Bibliography**

Ashley, et al., 2023. Randomized-controlled trials are methodologically inappropriate in adolescent transgender healthcare. *International Journal of Transgender Health*, *25*(3), 407–418. https://doi.org/10.1080/26895269.2023.2218357

Barbee H, Deal C, Gonzales G. Anti-Transgender Legislation-A Public Health Concern for Transgender Youth. JAMA Pediatr. 2022 Feb 1;176(2):125-126. doi: 10.1001/jamapediatrics.2021.4483. PMID: 34747979; PMCID: PMC10204642.

Caanen MR, et al. (2017). Effects of long-term exogenous testosterone administration on ovarian morphology, determined by transvaginal (3D) ultrasound in female-to-male transsexuals. Hum Reprod. 32(7):1457-1464.

de Vries AL, McGuire JK, Steensma TD, Wagenaar EC, Doreleijers TA, Cohen-Kettenis PT. Young adult psychological outcome after puberty suppression and gender reassignment. Pediatrics. 2014 Oct;134(4):696-704. doi: 10.1542/peds.2013-2958. Epub 2014 Sep 8. PMID: 25201798.

Dopp, Alex R., Allison Peipert, John Buss, Robinson De Jesús-Romero, Keytin Palmer, and Lorenzo Lorenzo-Luaces, Interventions for Gender Dysphoria and Related Health Problems in Transgender and Gender-Expansive Youth: A Systematic Review of Benefits and Risks to Inform Practice, Policy, and Research. Santa Monica, CA: RAND Corporation, 2024. https://www.rand.org/pubs/research_reports/RRA3223-1.html.

Coleman E, Radix AE, Bouman WP, Brown GR…Arcelus J. Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. Int J Transgend Health. 2022 Sep 6;23(Suppl 1):S1-S259. doi: 10.1080/26895269.2022.2100644. PMID: 36238954; PMCID: PMC9553112.

Fleming PS, Koletsi D, Ioannidis JP, Pandis N. High quality of the evidence for medical and other health-related interventions was uncommon in Cochrane systematic reviews. J Clin Epidemiol. 2016 Oct;78:34-42. doi: 10.1016/j.jclinepi.2016.03.012. Epub 2016 Mar 29. PMID: 27032875.

Hembree WC, Cohen-Kettenis PT, Gooren L, Hannema SE, Meyer WJ, Murad MH, Rosenthal SM, Safer JD, Tangpricha V, T'Sjoen GG. Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline. J Clin Endocrinol Metab. 2017 Nov 1;102(11):3869-3903. doi: 10.1210/jc.2017-01658.

Howick J, Koletsi D, Pandis N, Fleming PS, Loef M, Walach H, Schmidt S, Ioannidis JPA. The quality of evidence for medical interventions does not improve or worsen: a metaepidemiological study of Cochrane reviews. J Clin Epidemiol. 2020 Oct;126:154-159. doi: 10.1016/j.jclinepi.2020.08.005. Epub 2020 Sep 2. PMID: 32890636.

Knudson G, De Sutter P. Fertility options in transgender and gender diverse adolescents. Acta Obstet Gynecol Scand. 2017 Oct;96(10):1269-1272. doi: 10.1111/aogs.13188. PMID: 28759117.
Light AD, Obedin-Maliver J, Sevelius JM, Kerns JL. Transgender men who experienced pregnancy after female-to-male gender transitioning. Obstet Gynecol. 2014 Dec;124(6):1120-1127. doi: 10.1097/AOG.0000000000000540. PMID: 25415163.

Martin, et al., 2021. Successful oocyte cryopreservation using letrozole as an adjunct to stimulation in a transgender adolescent after GnRH agonist suppression. Fertil Steril. 2021 Aug;116(2):522-527. doi: 10.1016/j.fertnstert.2021.02.025. Epub 2021 Mar 29. PMID: 33795140.

Persky, et al. 2020. Attitudes Toward Fertility Preservation Among Transgender Youth and Their Parents. J Adolesc Health. 2020 Oct;67(4):583-589. doi: 10.1016/j.jadohealth.2020.02.027. Epub 2020 Apr 29. PMID: 32359942; PMCID: PMC7508908.

Rothenberg, et al., 2019. Oocyte Cryopreservation in a Transgender Male Adolescent. New England Journal of Medicine. doi: 10.1056/NEJMc1813275.

Shmerling, RH. First, do no harm. Harvard Health Blog (June 22, 2020), https://www.health.harvard.edu/blog/first-do-no-harm-201510138421.

Styne, et al., 2017. Pediatric Obesity-Assessment, Treatment, and Prevention: An Endocrine Society Clinical Practice Guideline. J Clin Endocrinol Metab. 2017 Mar 1;102(3):709-757. doi: 10.1210/jc.2016-2573. PMID: 28359099; PMCID: PMC6283429.

Turban JL, King D, Kobe J, Reisner SL, Keuroghlian AS. Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. PLoS One. 2022 Jan 12;17(1):e0261039. doi: 10.1371/journal.pone.0261039.

van der Loos MATC, Hannema SE, Klink DT, den Heijer M, Wiepjes CM. Continuation of gender-affirming hormones in transgender people starting puberty suppression in adolescence: a cohort study in the Netherlands. Lancet Child Adolesc Health. 2022 Dec;6(12):869-875. doi: 10.1016/S2352-4642(22)00254-1. Epub 2022 Oct 21. PMID: 36273487.

# **Exhibit II**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PFLAG, INC.; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 8:25-cv-00337-BAH |
| DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*, | |
| *Defendants*. | |

## REPLY DECLARATION OF JACK TURBAN, M.D., M.H.S

## INTRODUCTION

1.      I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation. I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.      I have actual knowledge of the matters stated herein.

3.      I have reviewed the amicus briefs by Do No Harm, Inc. ("DNH") and Alabama et al.  Here, I respond to some of the central points in those briefs. The materials I have relied upon in preparing this declaration are the same types of materials that experts in my field of study regularly rely upon when forming opinions on the subject. I may wish to supplement these opinions or the bases for them as a result of new scientific research or publications or in response to statements and issues that may arise in my area of expertise.

## THE AMICUS BRIEFS ARE MISLEADING REGARDING THE RESEARCH ON GENDER-AFFIRMING MEDICAL INTERVENTIONS AND SUICIDALITY

4.      On page 19 of the DNH brief, the authors provide a discussion of the research examining the impact of gender-affirming medical interventions on suicidality. They note that research has not linked such treatments to a reduction in *completed* suicides.[1] While this is true, it omits the critical fact that research regarding completed suicides is extraordinarily difficult. Only two treatments in psychiatry – clozapine and lithium – have research showing that they reduce *deaths* from suicide. Such a standard is not a reasonable one for deciding whether treatment for a condition is effective and would result in most treatments in psychiatry being vulnerable to government bans and other restrictions. Furthermore, while it is difficult to study completed

---

[1] The amicus brief by Alabama et al. contains a similar discussion on page 8.

suicides,[2] research studies have shown that access to gender-affirming medical treatments during adolescence is associated with lower odds of suicidal ideation and suicide attempts, facts that this amicus brief fails to discuss. For example, a study by Green et al. in the *Journal of Adolescent Health* found that access to gender-affirming hormone treatment during adolescence was associated with lower odds of having attempted suicide in the past year.[3] Of note, separate lines of research have shown that lower-intensity measures of suicidality (e.g., suicidal ideation) are associated with greater risk of future death from suicide.[4]

### THE ALABAMA ET AL. BRIEF PROVIDES A LONG DISCUSSION OF THE WPATH STANDARDS OF CARE WHILE IGNORING STATEMENTS FROM OTHER MAJOR MEDICAL ORGANIZATIONS, INCLUDING CLINICAL GUIDELINES FROM THE ENDOCRINE SOCIETY

5.      Though the amicus brief by Alabama et al. provides a lengthy critique of the World Professional Association for Transgender Health (WPATH), the brief fails to mention that similar guidelines have been issued by the Endocrine Society[5] and the brief provides no critique of the Endocrine Society or the guidelines it has published. Further, the amicus brief fails to note that all major medical organizations, including The American Medical Association, The American

---

[2] One reason for this is that to study completed suicides, researchers often use death records, and these do not routinely annotate whether a person is transgender or suffers from gender dysphoria.

[3] Green, A. E., DeChants, J. P., Price, M. N., & Davis, C. K. (2022). Association of gender-affirming hormone therapy with depression, thoughts of suicide, and attempted suicide among transgender and nonbinary youth. *Journal of Adolescent Health*, *70*(4), 643-649.

[4] Rossom, R. C., Coleman, K. J., Ahmedani, B. K., Beck, A., Johnson, E., Oliver, M., & Simon, G. E. (2017). Suicidal ideation reported on the PHQ9 and risk of suicidal behavior across age groups. *Journal of Affective Disorders*, *215*, 77-84

[5] Hembree, W. C., Cohen-Kettenis, P. T., Gooren, L., Hannema, S. E., Meyer, W. J., Murad, M. H., ... & T'Sjoen, G. G. (2017). Endocrine treatment of gender-dysphoric/gender-incongruent persons: an endocrine society clinical practice guideline. *The Journal of Clinical Endocrinology & Metabolism*, *102*(11), 3869-3903.

2

Psychiatric Association, The American Academy of Pediatrics, and the American Academy of

Child & Adolescent Psychiatry, among many others, have issued explicit statements opposing bans

on gender-affirming medical interventions for adolescent gender dysphoria.[6]

**THE DNH AMICUS BRIEF OVERSTATES THE SIGNIFICANCE AND RELIABILITY OF SYSTEMATIC REVIEWS CONDUCTED BY A FEW INDIVIDUALS OUTSIDE OF THE UNITED STATES, INCLUDING THOSE CONDUCTED AS PART OF THE "CASS REPORT"**

6.      The DNH amicus brief provides a "pyramid of evidence" graphic and strangely

tries to use this graphic to discredit the fact that all major medical organizations oppose bans on

gender-affirming medical interventions.[7] While the graphic accurately highlights that a systematic

review provides more information than a single case-control study or cohort study, it provides no

information reflecting the fact that experts in this field aren't relying on a *single* case-control study

or cohort study, but rather on their evaluation of the full medical literature. While the amicus brief

is correct in noting that a narrative review (e.g., an expert declaration) could conceivably cherry-

pick evidence—or omit evidence that does not align with its conclusions—the brief provides no

such evidence that would contradict any statements made by major medical organizations that have

endorsed this care, nor any statements made in my initial report.

7.      The DNH brief suggests that the systematic reviews that were conducted as part of

the United Kingdom's Cass Report, as well as other systematic reviews out of Europe and Florida,

are the most reliable evidence on the safety and efficacy of gender-affirming medical care for

minors. Although systematic reviews can be valuable, especially to identify and evaluate the

---

[6] See my initial report at ¶13.

[7] *Id.*

3

research for those who haven't closely reviewed it themselves,[8] the quality of systematic reviews varies, and many subjective decisions are made in carrying out systematic reviews and summarizing the literature. Below I discuss some of the significant issues with these reviews and why they do not merit the outsized weight the DNH brief attributes to them.

<u>The United Kingdom's National Health Service "Cass Report" Systematic Reviews</u>

8.      The DNH amicus brief fails to mention that the systematic reviews commissioned by the "Cass Report" have been heavily criticized.[9] One major flaw is that the review authors changed their methodology from their pre-registration. Pre-registration is a process by which researchers upload their study protocol into a database prior to beginning their research project. This prevents researchers from later changing their study protocol if they do not like their results for some reason. Pre-registration prevents bias and is recommended, in particular, for systematic reviews. For example, *The Journal of the American Academy of Child & Adolescent Psychiatry*,

---

[8] The Endocrine Society noted in a statement, "NHS England's recent report, the Cass Review, does not contain any new research that would contradict the recommendations made in our clinical practice guideline on gender-affirming care." The Endocrine Society. Press Release: Endocrine Society Statement in Support of Gender-Affirming Care. Available at: https://www.endocrine.org/news-and-advocacy/news-room/2024/statement-in-support-of-gender-affirming-care. Accessed: May 27, 2024.

[9] See, for example, McNamara, M., Baker, K., Connelly, K., Janssen, A., Olson-Kennedy, J., Pang, K. C., Scheim, A., Turban, J., & Alstott, A. (2024). An evidence-based critique of "The Cass Review" on gender-affirming care for adolescent gender dysphoria. Available at: https://law.yale.edu/sites/default/files/documents/integrity-project_cass-response.pdf. Accessed: February 10, 2025.

4

as of July 1, 2024, requires that all systematic reviews be pre-registered in PROSPERO, the most commonly used pre-registration database.[10]

9.      The authors of the systematic reviews commissioned by the Cass Report team on pubertal suppression and gender-affirming hormones pre-registered their study in PROSPERO.[11] However, the authors then changed their methodology without commenting on the change in their manuscript. In their pre-registration, the authors of the systematic reviews stated that they would assess the quality of research studies using the Mixed Methods Appraisal Tool (MMAT). However, in their final manuscripts, they switched to a different scale: a modified version of the Newcastle-Ottawa Scale. The authors made no reference to this change in their manuscript and provided no rationale. This is a clear divergence from standard academic publishing practices that are designed to minimize bias in the publishing of systematic reviews.

10.     Additionally, the systematic review team commissioned by Cass used idiosyncratic standards in scoring, and thus, excluded studies that contain important evidence. For instance, the Cass team's modified Newcastle-Ottawa scale down scored studies if they used both validated outcome measures *and* unvalidated outcome measures. This approach is problematic, as it results in the exclusion of important findings from the validated measures. The systematic review team's modified Newcastle-Ottawa scale also down scored studies that did not control for age and sex in *every* statistical model. Such down scoring is anomalous, as many of the studies examined followed the standard statistical approach of only adjusting for age and/or sex in the models for

---

[10] Journal of the American Academy of Child & Adolescent Psychiatry. Instructions for Authors. Available at: https://www.jaacap.org/content/authorinfo. Accessed: May 27, 2024.

[11] Fraser, L. et al. The epidemiology, management, and outcomes of children with gender-related distress / gender dysphoria: a systematic review. *PROSPERO*. Available at: https://www.crd.york.ac.uk/prospero/display_record.php?RecordID=289659. Accessed: May 27, 2024.

which age and/or sex were associated with outcome variables. These mid-review subjective calls made by the systematic review team are particularly worrisome since the team did not follow their pre-registration methodology. Because of this scoring system, the reviews commissioned by the Cass Report excluded studies that have made important contributions to the field of treating adolescents with gender dysphoria.

11. In any event, as mentioned in my initial report, even with these significant flaws to the systematic reviews it commissioned, the Cass Report itself recognized that a ban on gender-affirming medical interventions for adolescent gender dysphoria would not be appropriate and highlighted that treatment should still be available to pediatric patients in certain circumstances (circumstances similar to those outlined in the Endocrine Society Guidelines), as I explained in my initial report in ¶36-39. This is in stark contrast to Executive Order 14187, which aims to take this treatment away from all adolescent patients experiencing gender dysphoria.

<u>The Swedish Systematic Review</u>

12. The DNH amicus brief also discusses a systematic review conducted by a research team in Sweden.[12] This systematic review similarly diverged from standard practice in systematic review pre-registration, posting their pre-registration on their own website instead of a third-party neutral database like PROSPERO. Though the published manuscript reports that the study methods are pre-registered on the authors' website, I was unable to find this pre-registration.

13. The Swedish review used the ROBINS-I tool for grading individual studies, excluding studies that, according to that instrument, were considered to have a high risk of

---

[12] Ludvigsson, J. F., Adolfsson, J., Höistad, M., Rydelius, P. A., Kriström, B., & Landén, M. (2023). A systematic review of hormone treatment for children with gender dysphoria and recommendations for research. *Acta Paediatrica*, *112*(11), 2279-2292.

methodological bias. They provided a list of studies that were excluded but did not provide information on how the ROBINS-I was specifically applied to these individual studies to justify their exclusion.

14.    Strangely, studies published in the time period of their literature search, which linked gender-affirming medical interventions to positive mental health outcomes, were not included in their list of excluded or included studies. For example, a study by van der Miesen et al. in the *Journal of Adolescent Health*, published in 2020, which showed that access to pubertal suppression was associated with lower odds of mental health symptoms, was missing from the report altogether. Incidentally, the Cass Report's systematic review rated this same study excluded by the Swedish Review as "high quality" on its modified Newcastle-Ottawa Scale.

<u>The Florida McMaster "Review of Reviews"</u>

15.    The McMaster report,[13] commissioned by the Florida Agency for Health Care Administration, was not peer-reviewed. Following publication, the report was analyzed by a joint team of professors at Yale Law School and Yale School of Medicine.[14] The authors of the Yale publication concluded that the "analysis [was] extremely narrow in scope, inexpert, and so flawed

---

[13] Brignardello-Peterson, R. & Wiercioch, W. (2022) Effects of gender affirming therapies in people with gender dysphoria: an evaluation of the best available evidence. Prepared for the Florida Agency for Health Care Administration.

[14] McNamara et al. (2022) A critical review of the June 2022 Florida Medicaid report on the treatment of gender dysphoria. Available at: https://medicine.yale.edu/lgbtqi/clinicalcare/gender-affirming-care/florida%20report%20final%20july%208%202022%20accessible_443048_284_55174_v3.pdf. Accessed: June 1, 2024.

7

that it merits no scientific weight at all."[15] They went on to explain that the failure of the review team to include a subject matter expert violated the systematic review standards set forth by the National Academy of Medicine (formerly the Institute of Medicine). Specifically, it violated standard 2.1, which requires that a systematic review study team "include experts in pertinent clinical content areas."[16] To emphasize this point, the Yale review explains, "by analogy, one would not rely on, say, two dermatologists to conduct a review of the scientific literature on neurosurgery and to make recommendations for clinical practice."[17]

## The Finnish Report

16.    The DNH amicus brief cites an unofficial translation of a report from Finland's Council for Choices in Health Care in Finland. This document only identified three studies examining the impact of gender-affirming medical interventions on adolescent gender dysphoria, when there are well over a dozen peer-reviewed research studies examining the impact of gender-affirming medical interventions on the mental health of adolescents with gender dysphoria. It is quite clearly not an accurate representation of the full scientific literature.

---

[15] *Id.*

[16] Institute of Medicine (US) Committee on Standards for Systematic Reviews of Comparative Effectiveness Research. (2011) Finding what works in health care: standards for systematic reviews. Available at: https://pubmed.ncbi.nlm.nih.gov/24983062/. Accessed: June 1, 2024.

[17] McNamara et al. (2022) A critical review of the June 2022 Florida Medicaid report on the treatment of gender dysphoria. Available at: https://medicine.yale.edu/lgbtqi/clinicalcare/gender-affirming-care/florida%20report%20final%20july%208%202022%20accessible_443048_284_55174_v3.pdf. Accessed: June 1, 2024.

<u>Examining the Systematic Reviews Together</u>

17.      Examining them together, the systematic reviews upon which the DNH amicus brief relies are highly impacted by subjective methodological decisions (what scale was used when grading evidence, how the scales were adapted if at all, how the final scale was applied, and how the overall body of research was subsequently summarized). To emphasize this point, I list below the studies that were evaluated in both the Cass Report systematic review and the Swedish systematic review. One will see that these two systematic reviews disagreed, based on their assessment of study quality, on whether to include or exclude more than half of the studies:

| Study | "Cass Report" Rating | Swedish Systematic Review Rating |
|---|---|---|
| Achille et al 2020 | Rated low quality (excluded) | Rated low quality (excluded) |
| Allen et al 2019 | Rated moderate quality (included) | Rated low quality (excluded) |
| de Vries et al 2011 | Rated moderate quality (included) | Rated low quality (excluded) |
| Ghelani et al 2020 | Rated moderate quality (included) | Rated low quality (excluded) |
| Hannema et al 2017 | Rated moderate quality (included) | Rated low quality (excluded) |
| Jensen et al 2019 | Rated high quality (included) | Rated low quality (excluded) |
| Lopez de Laura et al 2020 | Rated moderate quality (included) | Rated low quality (excluded) |
| Millington et al 2020 | Rated low quality (excluded) | Rated low quality (excluded) |
| Neyman et al 2019 | Rated low quality (excluded) | Rated low quality (excluded) |
| deVries et al 2014 | Rated low quality (excluded) | Rated of sufficient quality (included) |
| Costa et al 2015 | Rated moderate quality (included) | Rated of sufficient quality (included) |
| Becker-Hebly et al 2020 | Rated low quality (excluded) | Rated of sufficient quality (included) |
| Cantu et al 2020 | Rated low quality (excluded) | Rated of sufficient quality (included) |
| Carmichael et al 2021 | Rated moderate quality (included) | Rated of sufficient quality (included) |
| Hisle-Gorman et al 2021 | Rated moderate quality (included) | Rated of sufficient quality (included) |
| Staphorsius et al 2015 | Rated low quality (excluded) | Rated of sufficient quality (included) |

18.      It is also worth noting that despite diverse ratings of evidence quality, the studies reviewed consistently find that access to treatment is associated with improved mental health and quality of life.

9

**CONCLUSION**

19.     The amicus briefs filed by DNH and Alabama et al. fail to provide a valid rationale

supporting Executive Order 14187. In addition to the issues outlined above, they make a range of

clearly erroneous statements[18] and vague rhetorical statements that lack value.[19] They should not

be provided any weight.

Dated: February 26, 2025

*Jack L. Turban*

_____
JACK L. TURBAN, MD, MHS

---

[18] For example, claiming that adolescents with gender dysphoria are "healthy" on page 6 of the DNH brief, in a strange attempt to claim that the recognized diagnosis of gender dysphoria does not exist.

[19] For example, claiming that gender-affirming medical interventions are "science-denying" without explaining what science is being denied.

10

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| PFLAG, INC., ET AL., | * | |
| Plaintiffs, | * | |
|  | * | |
| v. | * | Civil No. 25-337-BAH |
| DONALD J. TRUMP ET AL., | * | |
| Defendants. | * | |
|  | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### <u>MEMORANDUM OPINION</u>

This matter is currently before the Court on Plaintiffs' motion for a preliminary injunction, ECF 69. To obtain a preliminary injunction, a movant must demonstrate: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Court considered these same factors when it evaluated Plaintiffs' request for entry of a temporary restraining order ("TRO").[1] *See* ECF 60; ECF 62.[2] Upon a renewed review of the whole record, including all filings

---

[1] On February 13, 2025, upon consideration of the parties' filings, and after oral argument on the motion, the Court granted Plaintiffs' motion for a TRO and, for the reasons stated on the record, entered a TRO against the agency Defendants enjoining the enforcement of particular sections of two Executive Orders as they relate to a prohibition on federal funding for institutions that provide gender-affirming medical care for transgender patients under the age of nineteen. ECF 61. In addition to that oral ruling, the Court issued a memorandum opinion on February 14, 2025. ECF 62.

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

1

JA922

in this case subsequent to February 14, 2025, the Court finds no reason to disturb the findings of fact and conclusions of law set forth in its February 14, 2025 memorandum opinion.  ECF 62.

As the Court previously explained, "this case presents a straightforward question regarding the separation of powers," and "clearly established precedent of the United States Supreme Court and the United States Court of Appeals for the Fourth Circuit compels findings on Plaintiffs' discrimination-related claims."  *Id.* at 1.  Nothing presented to the Court since that finding disrupts this analysis.  If anything, more recent filings by Plaintiffs only strengthen the case for the issuance of a preliminary injunction.[3]

The Court finds that Plaintiffs continue to meet their burden of showing that there is a strong likelihood that they will succeed on the merits of all three claims that are the subject of their motion for a preliminary injunction.[4]  The challenged provisions of the Executive Orders place significant conditions on federal funding that Congress did not prescribe.  This, the Constitution simply does not allow, as "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."  *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).  Further, given that the Court is bound by the holdings in *Bostock v. Clayton County*, 590 U.S. 644, 662 (2020), *Grimm v. Gloucester County School Board*, 972 F.3d 586, 611 (4th Cir. 2020)*, as amended* (Aug. 28, 2020), and *Kadel v. Folwell*, 100 F.4th 122, 163–64 (4th Cir. 2024), Plaintiffs are likely to succeed on their claims related to discrimination.

---

[3] To the extent the parties make new arguments in support of or in opposition to the motion for a preliminary injunction, the Court discusses those arguments below.

[4] The Court notes that the parties stipulated that no hearing was necessary on the preliminary injunction.  *See* ECF 77.  A robust and lengthy hearing was held on the TRO, which afforded Defendants the requisite opportunity to be heard.  *See* ECF 60.

2

Plaintiffs have also shown they will face irreparable harm if the challenged portions of the Executive Orders are not enjoined because they have shown a strong likelihood of success on their constitutional claims, *see Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009), and also because they have provided unassailable documentation that they are suffering from "diminished access to high-quality health care suited to [their] needs," *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 707 (4th Cir. 2019).

Finally, the balance of equities and the public interest weigh in favor of a preliminary injunction as Defendants are not harmed by a prohibition that maintains the status quo and enjoins the enforcement of restrictions likely to be found unconstitutional. *See Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). Moreover, it is "well-established that the public interest favors protecting constitutional rights." *Id.* (citations omitted).

For these reasons, expanded on below, the Court **GRANTS** Plaintiffs' motion for a preliminary injunction. ECF 69.

## I.    BACKGROUND

### A.    Executive Orders

#### 1.    Executive Order 14,168

On January 20, 2025, President Trump issued Executive Order 14,168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (the "Gender Identity Order"). *See* 90 Fed. Reg. 8615 (Jan. 20, 2025). To achieve the stated objective of eradicating gender ideology,[5] Section 3(g) of the Gender Identity Order

---

[5] Section 2(f) of the Gender Identity Order claims that "'[g]ender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." *See* Gender Identity Order § 3(g). It further asserts that "[g]ender ideology is internally inconsistent, in that it diminishes sex as an

3

declares: "[f]ederal funds shall not be used to promote gender ideology." *Id.* The Gender Identity

Order directs that "[e]ach agency shall assess grant conditions and grantee preferences and ensure

grant funds do not promote gender ideology." *Id.* The Gender Identity Order cites "the

Constitution and the laws of the United States of America, including section 7301 of title 5, United

States Code," as the authority by which the President promulgated the executive order. *Id.* at

Preamble. 5 U.S.C. § 7301 permits the President to "prescribe regulations for the conduct of

employees in the executive branch."

2.  Executive Order 14,187

On January 28, 2025, President Trump issued Executive Order 14,187, titled "Protecting

Children from Chemical and Surgical Mutilation" (the "Healthcare Order"). *See* 90 Fed. Reg.

8771 (Jan. 28, 2025). The Healthcare Order[6] directs all federal agencies[7] to "immediately take

appropriate steps to ensure that institutions receiving Federal research or education grants end the

chemical and surgical mutilation of children."[8] *Id.* § 4. The Healthcare Order cites "the authority

vested in [the] President by the Constitution and the laws of the United States of America" as the

authority by which the President promulgated the executive order. *Id.* at Preamble.

---

identifiable or useful category but nevertheless maintains that it is possible for a person to be born
in the wrong sexed body." *Id.* § 2(f).

[6] The Court will collectively refer to the Gender Identity Order and the Healthcare Order as the
"Executive Orders" or "EOs." To be clear, when the Court refers to the Executive Orders, the
Court is referring only to the challenged portions (Section 3(g) of the Gender Identity Order and
Section 4 of the Healthcare Order).

[7] The Healthcare Order is specifically directed to "[t]he head of each executive department or
agency [] that provides research or education grants to medical institutions." *See* Healthcare Order
§ 4.

[8] In Section 2(c) of the Healthcare Order, the President acknowledges that "th[e] phrase [chemical
and surgical mutilation] sometimes is referred to as 'gender affirming care.'" The Court will refer
to the treatment at issue as "gender-affirming medical care."

4

According to Plaintiffs, "President Trump unilaterally directs that <u>all</u> federal medical and research grants be stripped from medical institutions, medical schools and hospitals, that provide medically necessary gender-affirming medical care to patients under nineteen[9] for the purpose of gender transition, regardless of whether the funds are used for or related to such care." ECF 53 (amended complaint), at 16–17 ¶ 69 (emphasis in original). Defendants contend that "[t]he EOs do not purport to withhold all federal funding if an institution promotes gender ideology or provides the [referenced] treatments []," but instead, "instruct agencies to implement the President's policy to the extent permitted by applicable law." ECF 90, at 15.

3.    Impact of the Executive Orders

On January 31, 2025, Defendant Health Resources and Services Administration ("HRSA") issued a notice to HRSA grant recipients indicating that "HRSA grant funds may not be used for activities that do not align with" the Executive Orders and commanding that any "vestige, remnant, or re-named piece of any programs in conflict with these E.O.s are terminated in whole or in part."[10] ECF 69-5, at 2. The Center for Disease Control and Prevention ("CDC") also issued a notice to grant recipients stating: "[t]o implement the [Gender Identity Order] and in accordance with Office of Personnel Management's Initial Guidance [], you must immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting or inculcating

_____

[9] Section 2(a) of the Healthcare Order defines "child" or "children" to mean "an individual or individuals under [nineteen] years of age."

[10] The email was rescinded without explanation roughly a week later. ECF 90, at 11. Plaintiffs argued at the hearing that the recission was likely to ensure compliance with a temporary restraining order in an unrelated case challenging a blanket freeze in federal funding, *see Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, No. 25-239 (LLA), --- F. Supp. 3d ---, 2025 WL 368852 (D.D.C. Feb. 3, 2025), and thus not indicative of an effort to repeal the funding contingencies in the Executive Orders.

gender ideology at every level and activity . . . that are supported with funds from this award."[11] ECF 69-6, at 2. Like the HRSA notice, the CDC notice indicated that "[a]ny vestige, remnant, or re-named piece of any gender ideology programs funded by the U.S. government under this award are immediately, completely, and permanently terminated." *Id.* Additionally, medical institutions across the United States that receive federal funding have stopped providing gender-affirming medical care for patients younger than nineteen as a result of the challenged portions of the Executive Orders. *See* ECF 69-7, at 2; ECF 69-8, at 2; ECF 69-9, at 2; ECF 69-11, at 2; ECF 69-13, at 2; ECF 69-14, at 3; 69-17, at 2; ECF 69-18, at 2–3.

Plaintiffs allege that federal funding makes up a significant portion of certain medical institutions' budgets where the patient Plaintiffs receive care. *See* ECF 53, at 20 ¶ 83 (explaining that Children's National in Washington, D.C. receives 70% of its research funding from federal agencies, including 60% from Defendant National Institute of Health[12] ("NIH")); *id.* ¶ 85 (explaining that Virginia Commonwealth University ("VCU") Health and Children's Hospital of Richmond received nearly $7.3 million in grants from Defendant HRSA and nearly $107 million in grants from Defendant NIH in fiscal year 2023); *id.* at 21 ¶ 86 (explaining that UVA Health in Charlottesville, Virginia received more than $200 million in grants from Defendant NIH in fiscal year 2023); *id.* at 22 ¶ 90 (explaining that NYU Langone Health in New York City received federal funding, including $5.6 million in grants from Defendants HRSA and NIH in the last twelve months); *id.* ¶ 93 (explaining that Boston Children's Hospital received more than $27.5 million in grants from Defendant HRSA and more than $245 million in grants from Defendant NIH in fiscal

---

[11] Defendants also characterize the CDC notice as "now rescinded," but provide no further information on this alleged recission. ECF 90, at 11.

[12] In fiscal year 2023, Children's National received $69.6 million in funding from Defendant NIH and $8.7 million from Defendant HRSA. ECF 53, at 20 ¶ 83.

year 2023); *id.* at 23 ¶ 95 (explaining that Denver Health in Denver, Colorado received more than $25 million in grants from Defendant HRSA and more than $700,000 in grants from Defendant NIH in fiscal year 2023); *id.* ¶ 97 (explaining that Children's Hospital Colorado received $9.75 million from Defendant HRSA and $50,000 from Defendant NIH during fiscal year 2023); *id.* at 24 ¶ 99 (explaining that Children's Hospital of Los Angeles received $33.5 million from Defendant NIH and $21 million from Defendant HRSA in fiscal year 2023); *id.* (explaining that Corewell Health in Michigan received $2.1 million from Defendant NIH and $1.2 million from Defendant HRSA in fiscal year 2023).

Members of Plaintiff American Association of Physicians for Human Rights, Inc. d/b/a GLMA Health Professionals Advancing LGBTQ+ Equality ("GLMA") also work at medical institutions that receive significant federal funding from the agency Defendants. *See, e.g.,* ECF 69-43, at 2–3 ¶¶ 3–6 (explaining that GLMA member Kyle Koe is a clinician-researcher at Boston Medical Center, which receives millions of dollars in federal grants from NIH, HRSA, the CDC, and Agency for Healthcare Research and Quality, among others); ECF 69-42, at 2–3 ¶¶ 3, 7 (explaining that GLMA member Peyton Poe is a board-certified pediatrician at Children's National, which receives extensive federal funding, including from Defendant NIH).

After the issuance of the Healthcare Order, medical institutions across the country announced that they were either pausing or cancelling gender-affirming medical care for transgender youth. *See* ECF 69-7, at 2 (pausing provision of puberty blockers and hormone therapy prescriptions for transgender youth at Children's National); ECF 69-8, at 2 (suspending gender-affirming medical care for patients under nineteen at VCU Health and Children's Hospital

7

of Richmond[13]); ECF 69-9, at 2 (suspending all gender-affirming medical care for patients under nineteen at UVA Health[14]); ECF 69-23, at 8–9 ¶¶ 25, 28 (cancelling appointments for medical care for transgender patients under nineteen at NYU Langone); ECF 69-27, at 8 ¶ 22 (cancelling immediate appointments with transgender patients under nineteen at Boston Children's Hospital); ECF 69-11, at 2 (indicating Denver Health is "working to understand and comply with the full implications of the broadly worded and order," and acknowledging that "loss of funding would critically impair our ability to provide care for the Denver community"[15]); ECF 69-13, at 2 (continuing to offer appointments for behavior health care services and visits with medical providers to discuss specific care options at Children's Hospital Colorado, but indicating that patients "will not be able to start any new medication treatments"); ECF 69-14, at 2 (pausing initiation of hormonal therapy for gender-affirming care patients under nineteen at Children's Hospital Los Angeles); ECF 69-17, at 2 (indefinitely pausing gender-affirming medical care for

---

[13] On January 30, 2025, the Attorney General of Virginia, Jason Miyares, sent a letter to the University of Virginia and VCU advising that the Healthcare Order "directs federal agencies to immediately ensure that medical institutions that receive federal research or education grants end chemical and surgical mutilation of children." ECF 69-12, at 2–4. He warned that "[a]ny hospital or other institution, including agencies of the Commonwealth, that continues to perform chemical and surgical mutilation of children is at risk of losing such grants," *id.* at 3, and noted that "the grants are not just limited to those related to this subject matter, but could apply to all medical and research grants from federal agencies." *Id.* (emphasis in original).

[14] UVA Health resumed gender-affirming care for patients under nineteen after "multiple federal courts . . . temporarily blocked President [] Trump's executive order[.]" ECF 69-10, at 2.

[15] In a statement, Denver Health acknowledged that the Healthcare Order would lead to "increased risk of depression, anxiety, and suicidality" among transgender adolescents. ECF 69-11, at 2. However, Denver Health indicated that it is concerned about the "criminal and financial consequences for those who do not comply [with the Healthcare Order]," including the loss of participation in federal programs administered by HHS that "represent a significant portion of Denver Health's funding." *Id.*

patients under nineteen at Phoenix Children's Hospital Gender Clinic); ECF 69-18, at 2 (ceasing gender-affirming care to minors at Prisma Community Care, an LGBTQ+ clinic in Arizona[16]).

On February 3, 2025, the White House issued a press release about the Healthcare Order, stating: "[i]t's already having its intended effect—preventing children from being maimed and sterilized by adults perpetuating a radical, false claim that they can somehow change a child's sex. Hospitals around the country are taking action to downsize or eliminate their so-called 'gender-affirming care' programs." ECF 69-20, at 2–3 (citing the cessation of gender-affirming care at NYU Langone Health, Denver Health, University of Colorado Health, VCU Health and Children's Hospital of Richmond, and Children's National, and the review of transgender-related services at Lurie Children's Hospital of Chicago and Children's Hospital of Philadelphia).

## B.    The Individual Plaintiffs

There are six individually named[17] transgender Plaintiffs in the instant suit.[18]   The six Plaintiffs are all under nineteen years old. ECF 53, at 25 ¶ 103; *id.* at 26 ¶ 109; *id.* at 27 ¶ 117; *id.* at 28 ¶ 126; *id.* at 30 ¶ 135; *id.* at 31 ¶ 143.  All six Plaintiffs have received gender dysphoria diagnoses. ECF 69-25, at 4 ¶ 11 (Gabe Goe); ECF 69-23, at 6 ¶ 16 (Bella Boe) ECF 69-29, at 8 ¶ 24 (Cameron Coe); ECF 69-27, at 4 ¶ 9 (Robert Roe); ECF 69-31, at 4–5 ¶ 12 (Lawrence Loe); ECF 69-32, at 4 ¶ 11 (Dylan Doe).  All of the Plaintiffs are members of PFLAG, Inc. ("PFLAG"). ECF 53, at 6–7 ¶ 13.

---

[16] Prisma Community Care resumed providing gender-affirming care after this Court issued the TRO. ECF 69-19, at 2.

[17] The individual plaintiffs are proceeding under pseudonyms. *See* ECF 62, at 7 n.14.

[18] There are also four parents named as Plaintiffs. ECF 53, at 7 ¶ 15; *id.* at 8 ¶ 17; *id.* ¶ 19; *id.* ¶ 21.

9

Plaintiffs were at various stages of obtaining care for gender dysphoria at the time the Executive Orders were issued. Each Plaintiff reported the discontinuation of gender-affirming medical care after the Healthcare Order was issued. *See* ECF 69-25, at 7 ¶ 22 (Gabe Goe); ECF 69-23, at 8 ¶¶ 22–25 (Bella Boe); ECF 69-29, at 9 ¶¶ 28–29 (Cameron Coe); ECF 69-27, at 8 ¶¶ 21–22 (Robert Roe); ECF 69-31, at 8 ¶ 26 (Lawrence Loe); ECF 69-32, at 8–9 ¶ 31 (Dylan Doe).

### C. The Associational Plaintiffs

PFLAG is a 501(c)(3) national membership nonprofit organization. ECF 53, at 6 ¶ 13. PFLAG is an organization dedicated to supporting, educating, and advocating for lesbian, gay, bisexual, transgender, and queer ("LGBTQ+") people, their parents and families, and allies. *Id.* PFLAG has "more than 550,000 members[19] and supporters nationwide, including many families of transgender youth who currently receive or will soon need to access the medical treatment for gender dysphoria that the Executive Orders seek to prohibit." *Id.*

GLMA is a 501(c)(3) national nonprofit membership organization. *Id.* at 7 ¶ 14. GLMA's mission is to ensure health equity for LGBTQ+ people and equality for LGBTQ+ health professionals in their work and learning environments. *Id.* GLMA's membership includes approximately 1,000 physicians, nurses, advanced practice nurses, physician assistants, researchers and academics, behavioral health specialists, health-profession students, and other health professionals throughout the country.[20] *Id.*

---

[19] People become PFLAG members by joining the national organization directly or through one of its nearly 350 local chapters throughout the United States. ECF 53, at 6 ¶ 13.

[20] Their practices represent the major healthcare disciplines and a wide range of health specialties, including primary care, internal medicine, family practice, psychiatry, pediatrics, obstetrics/gynecology, emergency medicine, neurology, and infectious diseases. ECF 53, at 7 ¶ 14.

**D.    Procedural History**

Plaintiffs brought this suit on February 4, 2025.  ECF 1.  The next day, Plaintiffs filed an emergency motion for a TRO.  ECF 35.  Plaintiffs also filed an amended complaint.  ECF 53.  The Court received additional briefing from the parties on the TRO.  *See* ECF 55 (Defendants' response); ECF 57 (Plaintiffs' reply).  On February 13, 2025, the Court held a lengthy hearing on the TRO.  ECF 60.  After the hearing, the Court issued a TRO, ECF 61, and one day later, issued a written memorandum opinion, ECF 62.  On February 26, the Court granted Plaintiffs' motion to extend the TRO.  ECF 109.  The TRO is in effect until March 5, 2025.  *Id.*

On February 18, 2025, Plaintiffs filed a motion for a preliminary injunction.[21]  ECF 69.  Defendants filed a response in opposition.[22]  ECF 90.  Plaintiffs filed a reply.  ECF 108.  As noted, all parties agree no additional hearing on the motion is needed.  *See supra* note 4.

## II.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." *DiBiase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citations omitted).  To obtain a preliminary injunction, the Plaintiffs must establish four factors: (1) that they are likely to succeed on the merits; (2) that they are likely to

---

[21] The State of Maryland, joined by California, Massachusetts, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Minnesota, Nevada, New Jersey, New York, Oregon, Rhode Island, Vermont, Washington, and the District of Columbia, filed an amicus brief in support of Plaintiffs' motion for a preliminary injunction.  ECF 74.  The American Academy of Pediatrics and the Communications Workers of America also filed motions for leave to file amicus briefs in support of Plaintiffs' motion for a preliminary injunction.  ECF 79; ECF 103.  These motions for leave will be granted.

[22] Do No Harm, Inc. filed a motion for leave to file an amicus brief in opposition to Plaintiffs' motion for a preliminary injunction.  ECF 88.  This motion will be granted.  The States of Alabama, Alaska, Arizona, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Oklahoma, South Dakota, South Carolina, Tennessee, Texas, Virginia, and West Virginia also filed an amicus brief in opposition to Plaintiffs' motion for a preliminary injunction.  ECF 92.

suffer irreparable harm if preliminary relief is not granted; (3) that the balance of equities favors them; and (4) that an injunction is in the public interest. *See Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023) (citing *Winter*, 555 U.S. at 20). When a government entity is a party to the case, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Pursuing Am. Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). The movant "must establish all four elements in order to prevail." *Profiles, Inc. v. Bank of America Corp.*, 453 F. Supp. 3d 742, 746 (D. Md. 2020) (citing *Pashby v. Delia*, 709 F.3d 307, 320–21 (4th Cir. 2013)). "The substantive requirements for a TRO and a preliminary injunction are identical." *J.O.P. v. U.S. Dep't of Homeland Sec.*, 409 F. Supp. 3d 367, 376 (D. Md. 2019) (citing *U.S. Dep't of Lab. v. Wolf Run Mining Co., Inc.*, 452 F.3d 275, 281 n.1 (4th Cir. 2006)).

## III.    ANALYSIS

Plaintiffs seek to convert the TRO into a preliminary injunction and enjoin all Defendants except President Trump from implementing Section 4 of the Healthcare Order or Section 3(g) of the Gender Identity Order. ECF 69. To obtain a preliminary injunction, Plaintiffs must satisfy the same elements as required for a TRO. *See Winter*, 555 U.S. at 20. Generally, the Court's findings on these elements for purposes of the TRO continue to apply and the Court incorporates those findings here. *See* ECF 62. More specifically, and upon consideration of additional evidence presented in the parties' filings and the amicus briefs, the Court makes the following additional findings in relation to a preliminary injunction.

### A.    Ripeness

Defendants assert that the Court is being asked to prematurely judge the constitutionality of a future government policy. ECF 90, at 11. Plaintiffs contend that the issues are fit for judicial review because Plaintiffs "bring a facial challenge to the Orders' constitutionality, and this issue does not depend on future uncertainties." ECF 69-1, at 22–23 (citation omitted). Plaintiffs further

12

argue that "[t]he Orders have also had an 'immediate and substantial impact upon' Plaintiffs, many of whom have suffered substantial disruptions and delays in their treatment." *Id.* at 23 (citing *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 171 (1967)).

When evaluating whether a claim is ripe for review, the Court "balance[s] the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) (quotation marks and citations omitted). "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Id.* (citing *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208 (4th Cir. 1992)). "The hardship prong is measured by the immediacy of the threat and the burden imposed on the [plaintiffs] . . . ." *Id.* (quotation marks and citation omitted) (brackets in original). "When considering hardship, [the court] may consider the cost to the parties of delaying judicial review." *Id.* (citation omitted).

Plaintiffs have brought a facial challenge, alleging that the challenged portions of the Executive Orders violate separation of powers, directly conflict with existing statutes, and violate the equal protection component of the Fifth Amendment's Due Process Clause. This legal question is squarely presented for the Court's review and does not depend on future uncertainties. The plain text of the Executive Orders conditions federally funded hospital grants on the denial of gender-affirming medical care to transgender youth. *See* Gender Identity Order § 3(g) ("[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology"); Healthcare Order § 4 (directing all federal agencies to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children"). Where the "only uncertainties are how, not if, the polic[ies]

13

will be implemented," the validity of the President's directive is fit for review. *Stone v. Trump*, 280 F. Supp. 3d 747, 767 (D. Md. 2017).

Defendants contend that the matter is not ripe because the particular funding at stake is unknown. *See* ECF 90, at 11 ("[I]t is not clear which funds would be implicated or if the plaintiffs here would be affected."); *see also id.* at 12 ("Absent essential context of which, if any, grants held by specific medical institutions are actually at risk, it would be premature to decide the issue now."). But Defendants cannot avoid judicial review through a vagueness problem of their own making. As Plaintiffs point out, "[t]he text of the Orders applies to all grants regardless of their terms, and HRSA and CDC chose to issue blanket termination notices without identifying specific grants at issue," thus it follows that, "Defendants cannot delay review of their actions by pointing to their own failure to ground those terminations in a particular statutory or regulatory context." ECF 108, at 3.

Simply put, Defendants cannot use the broad nature of the Executive Orders as both a sword and a shield. *See Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, No. 25-239 (LLA), --- F. Supp. 3d ---, 2025 WL 597959, at *13 (D.D.C. Feb. 25, 2025) ("Defendants cannot take a memorandum that was drafted broadly, interpreted expansively, and implemented categorically and fault Plaintiffs for 'overreading' that directive."). It is clear from the evidence attached to Plaintiffs' motion that hospitals across the country immediately paused or cancelled gender-affirming care for youth in direct response to the Executive Orders. *See* ECF 69-7, at 2; ECF 69-8, at 2; ECF 69-9, at 2; ECF 69-23, at 8–9 ¶¶ 25, 28; ECF 69-27, at 8 ¶ 22; ECF 69-11, at 2; ECF 69-13, at 2; ECF 69-14, at 2; ECF 69-17, at 2; ECF 69-18, at 2. And the White House itself quickly acknowledged that the cessation of care was the "intended effect." ECF 69-20, at 2–

14

3. Accordingly, the Court need not wait for the agencies to identify specific funding programs affected by the Executive Orders to ripen the case for judicial review.

Additionally, as the Court noted at the TRO hearing, Defendants' theory of ripeness would likely mean that the case never becomes ripe for judicial review, as the *threat* of withholding federal funding, regardless of *which* funding or *how much* funding, was enough to compel the medical institutions to take immediate action. In other words, ripeness cannot hinge on the actual revocation of funding because the *threat* of revocation of funding was enough to compel the medical institutions to pause or cease the challenged care, if fact it was, by the executive's own admission, the "intended effect."[23]  ECF 69-20, at 2–3.

Moreover, HRSA and CDC did not wait for further clarification or implementation guidance before sending out emails to all grant recipients requiring the immediate cessation of gender-affirming care.[24]  The HRSA issued a notice to all grant recipients stating that: "grant funds may not be used for activities that do not align with" the Executive Orders.  ECF 69-5, at 2.  The CDC issued a similar notice to grant recipients requiring that all grant recipients: "must

---

[23] Moreover, if medical institutions fully comply with the Executive Orders, there would presumably never be a revocation of federal funding, and thus, under Defendants' theory of ripeness, the case would be permanently insulated from judicial review because no funding would be revoked, despite the Executive Orders illegally conditioning funding on the provision of gender-affirming medical care.

[24] Defendants refer to the notices as "now-rescinded emails."  ECF 90, at 11.  To the extent Defendants claim that they have ended (or reversed) any alleged unlawful activity by rescinding the HRSA email, the Court is not persuaded that the Government will refrain from "resum[ing] the challenged activity" in the future.  *Pub. Citizen, Inc. v. Fed. Energy Reg. Comm'n*, 92 F.4th 1124, 1128 (D.C. Cir. 2024).  As evidenced by the White House press release noting the intended effects of the executive action at issue, there is ample proof that the Executive is committed to restricting federal funding based on the denial of gender-affirming care.  ECF 69-20, at 2–3.  Importantly, there is "nothing stopping [the agency] from rewording, repackaging, or reissuing the substance of [the HRSA email] if the court were to dismiss this lawsuit."  *Nat'l Council of Nonprofits*, 2025 WL 368852, at *7 (finding that "[i]f [d]efendants retracted the memorandum in name only while continuing to execute its directives, it is far from 'absolutely clear' that the conduct is gone for good").  Thus, the recission of the notices does not render the issue moot.

immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting or inculcating gender ideology at every level and activity . . . that are supported with funds from this award." ECF 69-6, at 2. Both notices indicated that "[a]ny vestige, remnant, or re-named piece of any gender ideology programs funded by the U.S. government under this award are immediately, completely, and permanently terminated." *Id.*; ECF 69-5, at 2. Thus, Defendants' argument that "[t]he Court cannot determine in the abstract whether the statutory and regulatory requirements for any particular grant program provide the agency with discretion to condition funding on these terms," ECF 90, at 11, is plainly at odds with record evidence demonstrating that the agencies did not wait for specific grant programs to be identified before ordering grant recipients to cease all gender-affirming care.[25]

Considering the ample evidence in the record, the Court finds Defendants' argument that "no agency defendant has revoked or denied any particular grants as a result of the [Executive Orders]," ECF 90, at 11, to be "little more than a formalistic contrivance." *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Landsowne, LLC*, 713 F.3d 187, 198–99 (4th Cir. 2013)

---

[25] Defendants contend that "Plaintiffs [] have not established that [the Ryan White HIV/AIDS grant]"—which is the only specific example they provide in their briefing—"would even be subject to the Protecting Children EO" because it is not a federal research or education grant. ECF 90, at 12. However, as an initial matter, the Gender Identity Order plainly applies to all grants, not just research or education grants, and as Plaintiffs point out, "Dr. Birnbaum [a recipient of federal grant funding] also receives research grants from NIH in addition to his Ryan White funding, and [] Dr. Birnbaum's clinic is part of University Hospital at SUNY Downstate, which receives 'millions of dollars in federal grants, including from the NIH and HRSA.'" ECF 108, at 3 (citing ECF 69-46, at 3 ¶¶ 7, 8). The Executive Orders put all of those grants at risk, and in any event, even if Defendants could establish that the Ryan White HIV/AIDS grants were not affected by the Executive Orders, the Court, as previously established, need not wait for specific grants to be identified to review the executive action. Indeed, the HRSA and CDC notices to grant recipients implied a blanket termination. ECF 69-5, at 2; ECF 69-6, at 2. Thus, the Court is unpersuaded by Defendants' attempt to roll back the scope of the Executive Orders. *See Nat'l Council of Nonprofits*, 2025 WL 597959, at *13 ("[R]egardless of how Defendants would have *liked* their guidance to apply, that is a far cry from how it was administered in practice.") (emphasis in original). In short, the Court must presume that the Executive Orders mean what they say.

(finding that where defendants' position is unsupported by the record and plaintiffs have produced evidence that defendants have no intention of abandoning the matter at issue, defendants' "claim of factual uncertainty" does not defeat ripeness). Considering the tangible steps taken by at least two agencies to comply with the Executive Orders, along with the White House's press release, the legal claims are sufficiently viable and do not depend on future uncertainties.[26]

Additionally, withholding review would certainly impose hardship on Plaintiffs. As noted, Plaintiffs provide ample evidence of disrupted or delayed treatment and its effect. *See* ECF 69-25, at 7–8 ¶¶ 22–24 (Gabe Goe); ECF 69-23, at 8 ¶¶ 22–27 (Bella Boe); ECF 69-29, at 9 ¶¶ 28–30 (Cameron Coe); ECF 69-27, at 8 ¶¶ 21–23 (Robert Roe); ECF 69-31, at 8 ¶¶ 26–27 (Lawrence Loe); ECF 69-32, at 8–9 ¶¶ 31–32 (Dylan Doe).

Plaintiffs have established that the hardship they are suffering, as well as the hardship PFLAG's members are experiencing, are caused by the discontinuation of what has been deemed by medical professionals to be essential care. This hardship comes as a result of the conditioning on federal funding outlined in the Executive Orders and is non-speculative, concrete, and potentially catastrophic. Specifically, the sudden denial or interruption of Plaintiffs' medical care has caused or is expected to soon cause unwanted physical changes, depression, increased anxiety, heightened gender dysphoria, severe distress, risk of suicide, uncertainty about how to obtain medical care, impediments to maintaining a social life, and fear of discrimination, including hate crimes. *See* ECF 69-26, at 5–6 ¶ 18; ECF 69-23, at 8–9 ¶ 27; ECF 69-24, at 5 ¶ 16; ECF 69-27, at

---

[26] Defendants also argue that the HRSA and CDC emails "do not constitute final agency action [because] neither agency component terminated any funding, let alone identified any specific grants at imminent risk." ECF 90, at 11. But Plaintiffs have not brought an action under the Administrative Procedures Act ("APA"), as Defendants acknowledge. *Id.* at 9. And final agency action is only required for a claim under the APA, not for *ultra vires* claims for equitable relief. *Trudeau v. FTC*, 456 F.3d 178, 187 (D.C. Cir. 2006).

8 ¶ 23; ECF 69-28, at 6–7 ¶ 19; ECF 69-29, at 9–10 ¶¶ 30–31; ECF 69-31, at 8 ¶¶ 27–28; ECF 69-32, at 9 ¶ 32. Defendants' assertion that these injuries are nothing more than "hypothetical" and "incidental," ECF 90, at 14, is blatantly contradicted by the record. Plaintiffs have demonstrated that hardship would result in the absence of judicial review. *See Stone*, 280 F. Supp. 3d at 767 (finding that plaintiffs had already suffered harmful consequences, including the cancellation and postponement of surgeries, and thus "[w]aiting until after the Directives have been implemented to challenge the[] alleged violation of constitutional rights only subjects [plaintiffs] to substantial risk of even greater harms"). Plaintiffs' claims are ripe for adjudication.

**B.    Reviewability**

Plaintiffs assert *ultra vires* causes of action against the Executive Branch officials and agencies. ECF 53, at 34; ECF 53, at 36. Defendants argue that Plaintiffs' claims fail at the threshold because "Plaintiffs do not invoke the Administrative Procedure Act (APA) or any other statute providing for a cause of action against an agency." ECF 90, at 9 (citing 5 U.S.C. § 706(2)(A)–(C)). However, courts have "never held that a lack of a statutory cause of action is *per se* a bar to judicial review." *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (collecting cases). And critically, "[e]ven if a statute does not provide for judicial review, 'when an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority.'" *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383, 406 (D. Md. 2011) (first citing *Reich*, 74 F.3d at 1328, then citing *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)).

Whether Plaintiffs can assert an equitable *ultra vires* cause of action turns on "whether the relief [they] request[] . . . was traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). "The substantive prerequisites

18

for obtaining an equitable remedy . . . depend on traditional principles of equity jurisdiction." *Id.* at 318–19 (quotations and citation omitted). The relief Plaintiffs request here has traditionally been available. "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.,* 575 U.S. 320, 327 (2015); *see also Harmon v. Brucker,* 355 U.S. 579, 581–82 (1958) ("Generally, judicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers."). And it is "well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" *Reich,* 74 F.3d at 1328 (quoting *Franklin v. Massachusetts,* 505 U.S. 788, 815 (1992) (Scalia, J., concurring)). Indeed, the Fourth Circuit has explicitly recognized that "a plaintiff [may] file[] suit seeking equitable relief against federal officials in their official capacities and alleging that those officials exceeded the scope of their authority *and/or acted unconstitutionally.*" *Strickland v. United States,* 32 F.4th 311, 363 (4th Cir. 2022) (emphasis added) (first citing *Leedom v. Kyne,* 358 U.S. 184, 188–89 (1958), then citing *Noble v. Union River Logging R.R. Co.,* 147 U.S. 165, 171–72 (1893)). And the Supreme Court has affirmed that "the President's actions may . . . be reviewed for constitutionality." *See Franklin,* 505 U.S. at 801.

Additionally, the Supreme Court has rejected the argument that there is no right to equitable relief under the Constitution to challenge governmental action under separation-of-powers principles. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,* 561 U.S. 477, 491 n.2 (2010); *see also Washington v. Trump,* No. 25-cv-244, --- F. Supp. 3d ----, 2025 WL 659057, at *10 (W.D. Wash. Feb. 28, 2025) (finding an equitable cause of action against agency defendants in a nearly identical case). In fact, the Supreme Court has long reviewed constitutional challenges to

19

JA940

executive orders pursuant to this authority. *See, e.g., Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952). And the Supreme Court has consistently "sustain[ed] the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution." *See Bell v. Hood*, 327 U.S. 678, 684 (1946); *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("[I]njunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally.").

The availability of non-statutory judicial review of executive action is not new. In *American School of Magnetic Healing v. McAnnulty*, private plaintiffs brought suit to enjoin a subordinate "postmaster from carrying out the order of the Postmaster General." 187 U.S. 94, 101 (1902). The Supreme Court explicitly rejected the idea that it could not review the legality of the order:

> The acts of all [a government department's] officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief. . . . Otherwise the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law, and is in violation of the rights of the individual.

*Id.* at 108–10. "The reasoning of *McAnnulty* has been employed repeatedly." *Reich*, 74 F.3d at 1327–28 (collecting cases).

*Reich* is instructive. In that case, the United States Court of Appeals for the District of Columbia Circuit considered "whether appellants are entitled to bring a non-statutory cause of action questioning the legality of [an] Executive Order." *Id.* at 1327. In holding that they could, the court reasoned that "courts will 'ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command.'" *Id.* at 1328 (citing *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 681 (1986)). After reviewing the relevant case law, the *Reich*

20

court held that "courts have power to compel subordinate executive officials to disobey illegal Presidential commands." *Id.* (citing *Soucie v. David*, 448 F.2d 1067, 1072 n.12 (D.C. Cir. 1971)).

Moreover, *Reich* helpfully clarified that there is a distinction in reviewability between cases in which "a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority," and cases in which "the presidential action—not one, it should be added, even contemplated by Congress—independently violates [] a statute that delegates no authority to the President to interfere . . . ." 74 F.3d at 1332 (distinguishing *Dalton v. Specter*, 511 U.S. 462 (1994) from the circumstances in *Reich*). The former is not judicially reviewable; the latter is. *Id.* Because Plaintiffs seek injunctive relief enjoining federal agencies from enforcing, implementing, or applying Section 3(g) of the Gender Identity Order and Section 4 of the Healthcare Order on the basis that the Executive Orders are unconstitutional and independently violate statutes that provided no delegation of authority, Plaintiffs have sufficiently alleged equitable *ultra vires* causes of action.

Defendants cite to *Griffith v. Federal Labor Relations Authority* for the proposition that "[t]he *ultra vires* doctrine is 'extremely limited' in 'scope.'" *See* ECF 90, at 13 (citing 842 F.2d 487, 493 (D.C. Cir. 1988)). The Court generally agrees. *See Ancient Coin Collectors Guild*, 801 F. Supp. 2d at 406 ("[W]here *ultra vires* judicial review is available[,] the scope of that review is limited."). However, despite generally (and correctly) pointing out that the *ultra vires* doctrine is narrow, Defendants have not demonstrated that this case falls outside of its constrained bounds. "*[U]ltra vires* review is limited to whether the President has violated the Constitution, the statute under which the challenged action was taken, or other statutes, or did not have statutory authority to take a particular action." *Id.* Plaintiffs have brought a facial challenge, alleging that the Executive Orders violate separation of powers, directly conflict with existing statutes, and violate

21

JA942

the equal protection component of the Fifth Amendment's Due Process Clause, thus bringing this case directly within the purview of the *ultra vires* doctrine. This is not a case where the Court is tasked with determining whether the Executive has acted in excess of a specifically delegated *statutory* authority as the Executive Orders, at least as they pertain to the freeze in federal funding for institutions that provide gender-affirming medical care for those under nineteen, are not issued pursuant to any relevant statutory delegation.[27] Accordingly, based on the reasoning in *McAnnulty* and its progeny, the Court determines that the Executive Orders are judicially reviewable to determine whether they were issued within the President's constitutional powers or any powers delegated to him by Congress. *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015); *Youngstown*, 343 U.S. at 635–38 (Jackson, J., concurring).

Defendants also maintain that "the Court's inherent equitable powers do not provide a cause of action to redress [] removed harm." ECF 90, at 14. Specifically, Defendants argue that "[a]ll of the hypothetical future actions that Plaintiffs complain about are funding decisions affecting separate medical institutions," and thus the medical institutions are the "direct objects of any unlawful action," and Plaintiffs are only "incidentally harmed depending on how these institutions react." *Id.* Plaintiffs respond that "Defendants concede that Plaintiffs have Article III standing, and Defendants

---

[27] The Gender Identity Order does claim to derive authority from "section 7301 of title 5." Gender Identity Order, Preamble. However, this statute simply provides that "[t]he President may prescribe regulations for the conduct of employees in the executive branch," 5 U.S.C. § 7301, and generally bestows on the President the "discretion-laden power" to regulate the federal workplace, *see Crandon v. United States*, 494 U.S. 152, 180 (1990) (Scalia, J., concurring). This statute essentially codifies "the President's responsibility for the efficient operation of the Executive Branch." *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 273 n.5 (1974). While other sections of the Gender Identity Order, which are not at issue in this case, may be aimed at regulating the federal workforce, 5 U.S.C. § 7301 cannot provide the basis for the sweeping directive to withhold Congressionally allocated funds. Defendants do not appear to argue otherwise. *See* ECF 90, at 13 (citing to Article II as the source of the authority to implement the challenged portions of the Executive Orders).

fail to offer any support for their assertion that *ultra vires* claims impose a more stringent causation requirement." ECF 108, at 4.

The Court agrees with Plaintiffs that Defendants have failed to cite any cases to show that *ultra vires* claims require a more stringent causation standard than that demanded by Article III standing jurisprudence. Defendants appear to implicitly invoke Article III standing by arguing that *ultra vires* relief "is not a tool for those incidentally affected later" and does not "empower[]" plaintiffs to "reach upstream and proactively combat an alleged wrong happening to another." ECF 90, at 14. The Court acknowledges Defendants' concession that they "have not challenged Plaintiffs' standing," *id.*, but the Court nonetheless incorporates its previous Article III standing analysis in the TRO memorandum opinion because Defendants have provided no support that a more stringent standard is demanded. Additionally, courts have "an obligation to assure ourselves of jurisdiction under Article III." *Trump v. Hawaii*, 585 U.S. 667, 697 (2018).

For the purposes of Article III standing, "[w]hen the plaintiff is an unregulated party, causation 'ordinarily hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)). "The causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs." *Id.* (citing *Allen v. Wright*, 468 U.S. 737, 757–59 (1984)). In short, to establish causation, a plaintiff must show "a predictable chain of events leading from the government action to the asserted injury—in other words, that the government action has caused or likely will cause injury in fact to the plaintiff." *Id.* at 385. Here, Plaintiffs have clearly articulated this "predictable chain of events," *id.*, as the issuance of the Executive Orders led almost

23

immediately to government agencies directing medical institutions to cease providing gender-affirming care for those nineteen years of age and younger or risk the loss of federal funds. Indeed, this case is not one where the Court must speculate on how third parties will respond to the Executive Orders as medical institutions across the country almost immediately ceased gender-affirming care explicitly because of the Executive Orders. *See* ECF 69-7, at 2; ECF 69-8, at 2; ECF 69-9, at 2; ECF 69-23, at 8–9 ¶¶ 25, 28; ECF 69-27, at 8 ¶ 22; ECF 69-11, at 2; ECF 69-13, at 2; ECF 69-14, at 2; ECF 69-17, at 2; ECF 69-18, at 2.

Further, a plaintiff seeking to hold government officials liable for a decision made by a private actor may succeed "when [the government] has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [government]." *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *see also Robinson v. State of Fla.*, 378 U.S. 153, 156–57 (1964) (finding state action within the purview of the Fourteenth Amendment where Florida regulations "[did] not directly and expressly forbid restaurants" from serving all races but "certainly embod[ied] a state policy putting burdens upon any restaurant that did and therefore "involv[ing the state] to such a significant extent in bringing about restaurant segregation"); *Peterson v. City of Greenville, S.C.*, 373 U.S. 244, 248 (1963) (finding ordinance requiring restaurant owners to seat customers of different races separately "compell[ed] persons to discriminate against other persons because of race" and thus violated the Fourteenth Amendment).

The Ninth Circuit's decision in *United States v. King County*, 122 F.4th 740 (9th Cir. 2024) is instructive on this point. There, King County, Washington, "promulgated [an] Executive Order . . . direct[ing] county officials to ensure that future leases" at Boeing Field, a local airport, prohibited airport lessees "from servicing ICE [Immigration and Customs Enforcement] charter

24

flights." *Id.* at 747. "The record demonstrate[d] that the Executive Order had its intended effect almost immediately" as lessees quickly stopped providing services to ICE soon after it was issued. *Id.* at 749. The United States sued the county, alleging that the order violated the Supremacy Clause. *Id.* King County argued that the United States lacked standing and that suit was not yet ripe because the order was "a general policy statement with no legal force or effect." *Id.* at 750. Calling King County's "apparent theory that the Executive Order does nothing and means nothing" a "mischaracterization of the Executive Order and the plain impact it [] had on ICE's operations at Boeing Field," the Ninth Circuit found that the United States had "Article III standing and that its claims are ripe for resolution." *Id.* Relevant to the instant matter, the court rejected the claim that the matter was not justiciable because the decision to stop providing services to ICE "resulted not from the Executive Order but from the [lessees] own 'business' concerns." *Id.* at 751. "[T]hese business concerns," the court observed, "arise most readily from [lessees'] fears that County officials would put [them] out of business at Boeing Field if [they] continued servicing ICE." *Id.* "An asserted business concern that is itself rooted in the Executive Order does not demonstrate a lack of traceability between the Order and the injuries at hand" because the "Executive Order was still—at minimum—a substantial factor motivating the [lessees] to stop servicing ICE;" in fact, the court observed, "it was the overriding factor." *Id.* The same logic applies here.

Though it was no doubt true that the lessees in *King County*—much like the federally-funded care providers here—made the decision to stop providing the forbidden services, it was only because they saw "the writing on the wall," felt the government's "pressure," and "immediately fell in line." *Id.* at 752. This is enough to establish causation. *Id.* To find otherwise would be to deny reality as Plaintiffs have amply supported their claim that medical institutions

25

JA946

immediately halted gender-affirming care for those under the age of nineteen soon after the issuance of the Executive Orders. *See* ECF 69-7, at 2; ECF 69-8, at 2; ECF 69-9, at 2; ECF 69-23, at 8–9 ¶¶ 25, 28; ECF 69-27, at 8 ¶ 22; ECF 69-11, at 2; ECF 69-13, at 2; ECF 69-14, at 2; ECF 69-17, at 2; ECF 69-18, at 2. More importantly, these decisions to pause or cancel care came as "a clear (and fairly predictable) response to" the Executive Orders. *King Cnty.,* 122 F.4th at 752. And this was exactly the intended effect. *See* Healthcare Order § 1 (explaining that the purpose of the EO is to "prohibit or limit these destructive and life-altering procedures"); ECF 69-20, at 2–3 (February 3, 2025 White House press release noting the Healthcare Order "[is] already having its intended effect . . . [as] [h]ospitals around the country are taking action to downsize or eliminate their so-called 'gender-affirming care' programs"). This is enough to show that the medical institutions' purported choice to cease providing the challenged care can be imputed to Defendants. *See Blum,* 457 U.S. at 1004.

Having established that the hospitals' recission of medical care was directly caused by the Executive Orders, this Court is satisfied that the causal connection is imputed to the individually named Plaintiffs as well. In other words, if the hospitals' decision to withhold the relevant gender-affirming medical care was caused by the Executive Orders, then it follows that the denial of care experienced by the named Plaintiffs was also causally related to the Executive Orders. Defendants' statement that the claims "concern hypothetical downstream actions that may or may not result from the EO[s]" is unpersuasive. ECF 90, at 14. The denial of Plaintiffs' medical care is causally connected to the Executive Orders, regardless of the fact that the medical institutions

are the regulated party, because the medical institutions, as established above, acted in direct response to the Executive Orders.[28]

Finally, Defendants contend that "Plaintiffs have not identified any specific source of authority that prevents a presidential order directing subordinates to consider and pursue as appropriate (and as consistent with law) a given policy." ECF 90, at 14. Defendants mischaracterize the effect of the plain text and directives in the Executive Orders. The Executive Orders do not direct subordinates to simply consider a policy; the challenged portions of the Executive Orders direct subordinates to "immediately take appropriate steps to ensure that

---

[28] Plaintiffs attach numerous exhibits to the preliminary injunction motion that articulate the hospitals' official statements on gender-affirming medical care, which unambiguously cite the Executive Orders as the reason for ceasing care. *See, e.g.,* ECF 69-7, at 2 ("[Children's National is] currently pausing all puberty blockers and hormone therapy prescriptions for transgender youth patients, *per the guidelines in the Executive Order* issued by the White House this week."); ECF 69-8, at 2 ("VCU Health and Children's Hospital of Richmond at VCU have suspended gender-affirming medications and gender-affirming surgical procedures for patients under 19 years old *in response to an Executive Order* issued by the White House [] on January 28, 2025, and related state guidance received by VCU on January 30, 2025."); ECF 69-9, at 2 ("*In response to the recent federal executive order* and related Commonwealth of Virginia, Office of Attorney General guidance, UVA Health has suspended all gender-affirming care for patients under 19 years of age."); ECF 69-11, at 2 ("The executive order . . . includes criminal and financial consequences for those who do not comply, including placing participation in federal programs including Medicare, Medicaid and other programs administered by HHS at risk. These programs represent a significant portion of Denver Health's funding, and *the executive order explicitly states that should we not comply, our participation in these programs is at risk.*") (emphasis added to all). It is difficult to conceive of clearer causal language than that used by the hospitals here. Thus, the Court is satisfied that the hospitals acted "in response to" the Executive Orders, which, in turn, led to the denial of medical care at issue in this case. The injury, that is, the consequences of being denied gender-affirming medical care, is therefore clearly traceable to the challenged conduct: conditioning funding on refusing to provide such care. Defendants have provided no support in the case law for their conclusory assertion that "this Court's inherent equitable powers do not provide a cause of action to redress that sort of removed harm." ECF 90, at 14. As this Court has already established, Plaintiffs have sufficiently established equitable *ultra vires* causes of action, and Defendants concede that Plaintiffs have Article III standing. *Id.* Thus, simply stating that "more is required to proceed on the limited, equitable claim for *ultra vires* relief," *id.*, is inadequate to compel this Court to alter its previous findings that Plaintiffs have suffered concrete harms as a direct result of the Executive Orders and subsequent agency action and that an equitable suit seeking to enjoin the *ultra vires* actions of the Executive would remedy the alleged harms.

27

institutions receiving Federal research or education grants end the chemical and surgical mutilation of children," and mandate that "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *See* Healthcare Order § 4; Gender Identity Order § 3(g). Accordingly, Plaintiffs have identified a source of authority—Articles I and II of the Constitution—that prevent a president from directing subordinates to condition grant funding on conditions not prescribed by Congress. Additionally, through their claim that the Orders conflict with Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116, and Section 1908 of the Public Health Service Act ("PHSA"), 42 U.S.C. § 300w-7, Plaintiffs are seeking equitable relief to vindicate their own substantive rights to be free from discrimination by healthcare entities receiving grants and other federal funding. As such, Plaintiffs have identified specific sources of authority that prevent the challenged action and the action is properly reviewable before this Court.

### C.    Preliminary Injunction

Plaintiffs claim that the Executive Orders violate the separation of powers, conflict with statutory law, and violate the equal protection component of the Fifth Amendment's Due Process Clause. ECF 69-1, at 8. While the parties discuss all three claims in their briefs, it bears noting that the Court "only needs to find that Plaintiffs are likely to succeed on one in order for this factor to weigh in favor of a[n] [injunction]." *See Nat'l Council of Nonprofits*, 2025 WL 368852, at *9 (citation omitted); *see also Profiles, Inc.*, 453 F. Supp. 3d at 747 ("Plaintiffs bear the burden to show that they are likely to succeed on one of their claims." (citation omitted)). Regardless, the Court will analyze all three claims. The Court will first take up Plaintiffs' argument that the Executive Orders are *ultra vires* because they exceed the President's Article II powers and

28

unconstitutionally infringe upon the power of Congress by attempting to amend federal legislation while bypassing Article I's Bicameralism and Presentment Clauses. ECF 69-1, at 24.

        1.    <u>Likelihood of Success on the Merits</u>

          i.    *Ultra Vires – Presidential Action in Excess of Constitutional Authority*

            (1)    Article II does not authorize the President to terminate federal grants authorized by Congress.

The President's authority to act "must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. And it is clear that "when it comes to spending, the President has none of 'his own constitutional powers' to 'rely' upon." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1233–34 (9th Cir. 2018) (citing *Youngstown*, 343 U.S. at 637). Neither the Healthcare Order nor the Gender Identity Order identifies a statute authorizing the Executive Branch to amend or terminate federal grants; therefore, in order for the action to be lawful, Article II must provide this authority.[29] Against this backdrop, Plaintiffs first argue that "[f]ederal grants are federal law enacted by Congress," and "conditioning or cancelling federal grants amounts to amending or repealing federal law." ECF 69-1, at 24 (citing *Clinton*, 524 U.S. at 444). According to Plaintiffs, "[n]either federal statute nor Article II authorize the President to amend or repeal federal statutes." *Id.*

Under Article II, the President has an obligation to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. "Where Congress has failed to give the President discretion in allocating funds, the President has no constitutional authority to withhold such funds and violates his obligation to faithfully execute the laws duly enacted by Congress if he does so." *Cnty. of*

---

[29] As noted, the only statutory authority the Gender Identity Order identifies pertains to "regulations for the conduct of employees in the executive branch." Gender Identity Order, Preamble (citing 5 U.S.C. § 7301).

*Santa Clara v. Trump*, 250 F. Supp. 3d 497, 531 (N.D. Cal. 2017) (citing *Clinton*, 524 U.S. at 439);
*see also City & Cnty. of San Francisco*, 897 F.3d at 1234 ("Because Congress's legislative power
is inextricable from its spending power, the President's duty to enforce the laws necessarily
extends to appropriations."). Moreover, the President's obligation to execute the laws is "an
affirmative one, meaning that failure to act may be an abdication of the President's constitutional
role." *City & Cnty. of San Francisco*, 897 F.3d at 1234. As then-Judge Kavanaugh explained, "a
President sometimes has policy reasons (as distinct from constitutional reasons []) for wanting to
spend less than the full amount appropriated by Congress for a particular project or
program . . . [b]ut in those circumstances, even the President does not have unilateral authority to
refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).

Defendants acknowledge that the President "issued two Executive Orders [] directing
agencies to take steps, as permitted by law, to place conditions on certain federal grant funding in
accordance with the Administration's policy goals."[30] ECF 90, at 3. This is a clear violation of
the Constitution as "attempt[s] [by the Executive Branch] to place new conditions on federal funds
[are] [] improper attempt[s] to wield Congress's exclusive spending power and is a violation of
the Constitution's separation of powers principles." *Cnty. of Santa Clara*, 250 F. Supp. 3d at 531.

*County of Santa Clara* is instructive on how to interpret a challenge to this delicate balance
of power between the President and Congress. There, the court analyzed an executive order that

---

[30] The Court notes that Defendants cite Article II and *Trump v. United States*, 603 U.S. 593, 608–
09 (2024), for the proposition that "if an agency decides to act in a specific manner contrary to
law, the federal courts may review (and prevent) that action; but federal courts cannot
superintend—let alone proscribe—that policymaking from even taking place." ECF 90, at 13.
HRSA and CDC acted contrary to law in sending notices to grant recipients requiring compliance
with the Executive Orders or lose allocated funding. Thus, even assuming that Article II allows
for this type of general policymaking, the action at issue goes well beyond the President's
"constitutional authority" to direct his subordinates to "take appropriate steps to implement a
policy directive." ECF 90, at 13 (citing U.S. Const. art. II, §§ 1, 2).

directed relevant officials to ensure that jurisdictions that willfully refused to comply with a statute were not eligible to receive federal grants, with limited exceptions for law enforcement purposes. *Id.* The court explained that the executive order at issue there "purport[ed] to give the Attorney General and the Secretary [of Homeland Security] the power to place a new condition on federal funds (compliance with [a statute]) not provided for by Congress." *Id.* In issuing injunctive relief, the court reasoned that "the President does not have the power to place conditions on federal funds and so cannot delegate this power." *Id.*

These fundamental principles compel the same result here. Section 4 of the Healthcare Order directs "[t]he head of each executive department or agency [] that provides research or education grants to medical institutions . . . [t]o immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children." Similarly, Section 3(g) of the Gender Identity Order instructs that "[f]ederal funds shall not be used to promote gender ideology," and "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology."[31] As in *County of Santa Clara*, Sections 4 and 3(g) of the respective Executive Orders purport to give executive agencies the power to place a new condition on federal funds not provided for by Congress.

Defendants argue that "[c]ontrary to Plaintiffs' argument, the Executive Branch does not uniformly 'lack[] the power to condition federal funds.'" ECF 90, at 18 (citation omitted). Defendants then cite several provisions of the Public Health Services Act to support the argument that "NIH possesses general authority to fund research and to exercise discretion to allocate funds and determine research priorities." *Id.* (citing 42 U.S.C. §§ 241(a), 284(b), 282(b)(3), (5), (6), (21)).

---

[31] Gender ideology is defined in Section 2(f) of the Gender Identity Order as "permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true."

31

Plaintiffs respond that this is a "belated[] attempt to find some statutory delegation that could possibly justify imposing at least *some* conditions on *some* types of grants," however, according to Plaintiffs, "the proper time for identifying the source of statutory authority was before Defendants started sending out termination notices, not weeks later as a *post hoc* rationalization." ECF 108, at 5 (emphasis in original).

The Court agrees with Plaintiffs' observation that "Defendants must defend the Orders that President Trump actually issued, not some hypothetical narrower Executive Order that is tailored to statutory schemes on which the Orders did not purport to rely." ECF 108, at 5–6 (citation omitted). But even ignoring that neither the Executive Orders nor the HRSA and CDC notices purport to derive authority from any specific statutory provision, Defendants' *post-hoc* invocation of provisions of the Public Health Services Act are nonetheless unpersuasive. Fundamentally, "[a]dministrative agencies are creatures of statute," and "accordingly possess only the authority that Congress has provided." *NFIB v. OSHA*, 595 U.S. 109, 117 (2022); *see also City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (finding that when an executive agency administers a federal statute, the agency's power to act is "authoritatively prescribed by Congress"). "It is no exaggeration to say that 'an agency literally has no power to act . . . unless and until Congress confers power upon it.'" *New York v. Trump*, No. 25-cv-39, 2025 WL 357368, at *2 (D.R.I. Jan. 31, 2025) (citing *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). Moreover, "[a]ny action that an agency takes outside the bounds of its statutory authority is *ultra vires*." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (citing *City of Arlington*, 569 U.S. at 297).

Recognizing the lack of specific authorization by Congress, Defendants do not explicitly argue that conditioning federal funding on medical institutions' denial of gender-affirming care would be a permissible condition for NIH to impose under the Public Health Services Act or any

32

other federal grant statute. Rather, Defendants generally argue, as mentioned above, that the

Executive Branch "does not uniformly lack the power to condition federal funds," ECF 90, at 18

(alteration and citation omitted), and that NIH, for example, "possesses general authority to fund

research, and to exercise discretion to allocate funds and determine research priorities." *Id.* (citing

42 U.S.C. §§ 241(a), 284(b), 282(b)(3), (5), (6), (21)). However, no provision in any of the statutes

Defendants cite authorizes agencies to condition the *entirety* of their federal funding on the denial

of gender-affirming care for those under the age of nineteen, as the Healthcare Order does in

instructing department and agency leadership to "immediately take appropriate steps to ensure that

institutions receiving Federal research or education grants end [the challenged care]."[32]  *See*

Healthcare Order § 4.   Moreover, as Plaintiffs point out, "[t]he statutes vest NIH with discretion

regarding grants, but that discretion must be exercised to 'carry[] out the purposes of' the statute,

not the President's own purposes,"  ECF 108, at 6 (citing 42 U.S.C. §§ 282(b), 284(b)(1)), and

critically, "NIH's discretion is further circumscribed by highly detailed provisions mandating the

considerations that must inform NIH's decision." *Id.* (citing 42 U.S.C. §§ 241, 282(b), 284(b),

---

[32] In fact, a brief review of recent legislative history reflects that while bills banning federal funding for this type of care have been proposed at the federal level, none have passed. The Court takes judicial notice of H.R. 10075, a bill introduced in the House in the 2023-2024 Legislative Session, which attempted the same action that the Executive Orders direct here. *See* H.R. 10075 (prohibiting an entity from receiving Federal funds if such entity provides to any person any medical or surgical intervention for the purpose of assisting an individual's disassociation from his or her sex). This bill failed in Congress. The Court is mindful of the fact that "speculation about why a later Congress declined to adopt new legislation offers a 'particularly dangerous' basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt." *Bostock*, 590 U.S. at 670. However, that the challenged portions of the Executive Orders bear a strong resemblance to failed legislation supports Plaintiffs' overarching premise that the Executive Orders sought to do what Congress expressly had not—namely, banned funding for institutions that provide gender-affirming care for minors and young adults. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023) ("The Secretary's assertion of administrative authority has 'conveniently enabled [him] to enact a program' that Congress has chosen not to enact itself." (citing *West Virginia v. EPA*, 597 U.S. 697, 731 (2022))).

289(a)). Thus, Defendants' attempt to transform statutory language providing agencies some limited discretion in determining research priorities into specific authorization for the action at issue here, which goes well beyond determining research priorities, "stretch[es] the statutory language beyond hope of recognition." *Barr*, 954 F.3d at 32. Notably, the Supreme Court has struck down agencies' attempts to extrapolate broad authority under narrow delegations of power. *See NFIB*, 595 U.S. at 117 (upholding injunction where the act at issue "empower[ed] the Secretary to set workplace safety standards, not broad public health measures"); *see also Biden*, 143 S. Ct. at 2368 (finding that delegated authority to modify loan requirements did not include authority for loan forgiveness). And again, it bears reiterating that the President has not purported to implement these Executive Orders under a delegation of authority from Congress beyond citing his workplace authority over the Executive Branch under 5 U.S.C. § 7301. Under these circumstances, the Court finds that Congress has not authorized the President to withhold federal grant monies from medical institutions that provide gender-affirming care for those under nineteen years of age, thus the Executive Branch exceeded its power under Article II by refusing to spend the funds. *See* U.S. Const. art. I, § 8, cl. 1.

Defendants argue that Plaintiffs "misapprehend the nature of the EOs and of executive authority to administer grants." ECF 90, at 18. For example, Defendants claim that the Executive Branch has authority to condition the receipt of federal research funds without express congressional authorization, noting, for example, that NIH has exercised this authority "to add terms and conditions to grants in accordance with Executive Orders, including Executive Order 13,505, which directed NIH to 'support and conduct responsible, scientifically worthy human stem cell research, including human embryonic stem cell research, to the extent permitted by law.'" *Id.* (citing Exec. Order 13,505, 74 Fed. Reg. 10,667, 10,667 (2009); NIH Guidelines, 74 Fed. Reg.

34

32,170–32,175 (July 7, 2009); 45 C.F.R. § 75.210 (authorizing NIH to place terms and conditions on awards)). According to Defendants, the exercise of NIH's authority, as detailed in *Sherley v. Sebelius,* "is but one example where the Executive Branch possesses discretion, delegated by Congress, to administer federal grants, including by conditioning or distributing funds according to Presidential policies." ECF 90, at 18 (citing 644 F.3d 388, 397 (D.C. Cir. 2011)). Plaintiffs respond that *Sherley* is a "perplexing example for Defendants to use" because the NIH conditions at issue in that case were "adopted pursuant to Congressional directive, not by Executive fiat." ECF 108, at 6–7 (citing *Sherley,* 644 F.3d at 390).

Putting aside that Defendants offer no examples of any court upholding sweeping limitations on *all* federal funding to recipients of the scope at issue here, Plaintiffs appear to have the better argument as to the applicability of *Sherley v. Sebelius. Sherley* involved a challenge to NIH guidelines for research involving embryonic stem cells ("ESCs"). 644 F. 3d at 390 (citing Pub. L. No. 111–117, § 509(a)(2), 123 Stat. 3034, 3280–81). Since 1996, Congress, through the Dickey-Wicker amendment to various appropriations bills, expressly prohibited NIH from funding particular types of research that created or destroyed human embryos. *Id.* After several administrations modified NIH guidelines for implementing this legislative directive, a group of doctors filed suit challenging the implementation of new guidelines issued in 2009 that permitted funding for research conducted on ESCs "derived from embryos" so long as certain conditions were satisfied. *Id.* at 391. After applying the deference afforded to agency actions at the time, *see Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 842–43 (1984), the United States Court of Appeals for the District of Columbia Circuit held that the Dickey-Wicker amendment did not bar funding for the research endorsed by the 2009 NIH guidelines and further determined that NIH's guidance on the subject was reasonable. *Sherley,* 644 F.3d at 393–95.

Here, Defendants point to no statutory authority reflecting the supposed will of Congress as it relates to gender-affirming care for individuals under the age of nineteen. Thus, unlike the narrow *Chevron* inquiry into guidelines interpreting a congressionally authorized funding limitation in *Sherley*, the Court here is tasked with analyzing executive action that comes with no congressional or constitutional authorization at all. Moreover, the challenged guidelines at issue in *Sherley* addressed government funding of a specific subset of research projects, namely those involving ESCs. *Id.* at 391 ("These guidelines therefore recognize the distinction, accepted by Congress, between the derivation of stem cells from an embryo that results in the embryo's destruction, for which Federal funding is prohibited, and research involving [ESCs] that does not involve an embryo nor result in an embryo's destruction, for which Federal funding is permitted.") (citing NIH Guidelines, 74 Fed. Reg. 32,173 (July 7, 2009)). Here, in contrast, the challenged portions of the Executive Orders threaten to revoke *all* government funding to institutions if they continue to provide a specific type of care even if that care is not itself funded by federal dollars. *See* Healthcare Order § 4; Gender Identity Order § 3(g); *see also* ECF 69-11, at 2; ECF 69-12, at 3 (interpreting the EOs to mean all federal funding could be lost, not simply funds being used to provide gender-affirming care for patients under the age of nineteen). To be sure, *Sherley* may provide guidance on the manner in which an administration may advance its policy goals within the balanced framework of checks and balances that the Constitution provides. As the decision makes clear, several administrations had apparently interpreted the Dickey-Wicker amendment differently and instructed NIH to carefully develop guidelines in accordance with their interpretation of that specific limit on funding appropriations. *Sherley,* 644 F. 3d at 391–92. *Sherley* does not, however, go so far as to endorse the withholding of *all* congressionally allocated funds simply because the recipients of those funds are providing a service—here, health care

36

deemed medically necessary and agreed to by doctors, patients, and, when applicable, a patient's parent or guardian—that the executive thinks the recipients should not provide.

Defendants argue that the Executive Orders "instruct agencies to implement the President's policy to the extent permitted by applicable law," ECF 90, at 15, and therefore "[d]efinitionally, directing executive agencies to take action *to the extent consistent with applicable law* cannot be interpreted as an order to violate the law." *Id.* at 16 (emphasis in original). While this admonition to be lawful is unquestionably present in the Executive Orders, courts have repeatedly rejected the argument that simply including "consistent with applicable law" or a similar boilerplate phrase inoculates an otherwise unconstitutional executive order from judicial review. *See, e.g., HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021) (rejecting government's attempt to "immunize the Order from review through a savings clause which, if operational, would nullify the 'clear and specific' substantive provisions of the Order" (citation omitted)). There are no magic words that can override an executive order's plain meaning. Rather, any savings clause (or similar directive to follow the law), if it is to be afforded weight, must not be "purely theoretical," and cannot "override the Order's meaning" as derived from the Order's "stated goal." *Id.* Where, as here, the plain text and stated purpose of the Executive Orders evince a clear intent to unlawfully restrict federal funding without congressional authorization, the mere inclusion of the phrase "consistent with applicable law" cannot insulate these Executive Orders from review. As the Ninth Circuit has pointed out, "[i]f 'consistent with law' precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues." *City & Cnty. of San Francisco*, 897 F.3d at 1240.

Contrary to Defendants' argument, *see* ECF 90, at 18, *Building & Construction Trades Department v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), does not counsel a different result. In

37

*Allbaugh*, the D.C. Circuit considered an executive order with a savings clause, ultimately holding that "[t]he mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that, so far as the present record reveals, is above suspicion in the ordinary course of administration." *Id.* at 33. Unlike *Allbaugh*, and more like the executive order at issue in *City and County of San Francisco*, the Executive Orders here "unambiguously command[] action" such that there is much "more than a 'mere possibility that some agency might make a legally suspect decision.'" *City & Cnty. of San Francisco*, 897 F.3d at 1240 (citing *Allbaugh*, 295 F. 3d at 33). In fact, as established above, a legally suspect decision has already been made by the CDC and HRSA by virtue of the agencies sending out grant termination and compliance notices. Given that the Executive Orders explicitly instruct the executive to develop policies that run afoul of the separation of powers, the apparent simultaneous command to "follow the law" bears a striking resemblance to the "purely theoretical savings clause," in *HIAS*, which the Fourth Circuit held "cannot immunize [the] Order from scrutiny." *HIAS, Inc.*, 985 F.3d at 325.

(2)    The Executive Orders run afoul of Article I's grant of spending powers to Congress.

Plaintiffs further argue that "[t]he Executive's unilateral attempt to terminate federal grants also infringes on Congress's power of the purse." ECF 69-1, at 25. The Court agrees. Article I of the United States Constitution specifically grants the spending powers to Congress. "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. The Constitution's allocation of authority with respect to appropriations could not be clearer: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ." U.S. Const. art. I, § 9, cl. 7. "Incident to [the spending] power, Congress may attach

38

JA959

conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal [monies] upon compliance by the recipient with federal statutory and administrative directives.'" *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980)). "Aside from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress." *City & Cnty. of San Francisco*, 897 F.3d at 1232.

"The Appropriations Clause of the Constitution gives Congress exclusive power over federal spending." *Nat'l Council of Nonprofits*, 2025 WL 368852, at *12 (citation omitted). Without it, "the [E]xecutive would possess an unbounded power over the public purse of the nation[] and might apply all its monied resources at his pleasure." *U.S. Dep't of the Navy v. Fed. Lab. Rel. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (quoting 3 Joseph Story, Commentaries on the Constitution of the United States § 1342, at 213–14 (1833)). Indeed, the Clause "was intended as a restriction upon the disbursing authority of the Executive [Branch]." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937); *see also U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53, 76 (D.D.C. 2015) ("Congress's power of the purse is the ultimate check on the otherwise unbounded power of the Executive.").

In keeping with this fundamental principle of our constitutional order, the District Court of the District of Columbia recently enjoined federal agencies from pausing agency grant, loan, and other assistance programs on the basis of other executive actions. *Nat'l Council of Nonprofits*, 2025 WL 368852, at *1. In *National Council of Nonprofits*, a memorandum issued by the Office of Management and Budget ("OMB") directed federal agencies to temporarily pause "all activities related to [the] obligation or disbursement of all Federal financial assistance, and other relevant agency acti[vities] that may be implicated by the executive orders, including, but not limited to,

39

financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." *Id.* In finding that plaintiffs there had demonstrated a likelihood of success on the merits, the court held that "Defendants' actions appear to suffer from infirmities of a constitutional magnitude." *Id.* at 12. In reaching this holding, the court explained the following:

> In 1982, Congress enacted the "Purpose Statute," which requires the appropriation of federal funds in accordance with "the objects for which . . . [they] were made." Any "reappropriation and diversion of the unexpended balance of an appropriation for a purpose other than that for which [it] originally was made" is treated "as a new appropriation." Related laws expressly prohibit the Executive Branch from encroaching on Congress's appropriations power. Most notably, the Impoundment Act of 1974, 2 U.S.C. § 681 *et seq.*, lays out specific procedures whenever the President wishes to suspend appropriations that have already been enacted.

*Id.* (citing 31 U.S.C. § 1301(a), (b), 31 U.S.C. §§ 1341, 1350). Ultimately, the court held that "a wealth of legal authority supports this fundamental separation of powers," and thus "[t]he appropriation of the government's resources is reserved for Congress, not the Executive Branch."[33] *Id.*

The same logic applies here where Defendants have likewise "attempted to wrest the power of the purse away from the only branch of government entitled to wield it." *Nat'l Council of Nonprofits*, 2025 WL 368852, at *12. The challenged portions of the Executive Orders direct the agencies of the Executive Branch to withhold funds appropriated by Congress in order to further an administrative policy on gender ideology. *See* Healthcare Order § 4; Gender Identity Order § 3(g). Regardless of the validity of this policy, it is a plain and simple fact that Congress has not imposed conditions on federal grants regarding gender-affirming care. "[I]n those instances where

---

[33] Judge AliKhan analyzed the separation of powers issue to determine whether the plaintiffs were likely to succeed on the merits of their claim that the agency action was arbitrary and capricious under the APA. The court concluded that "[i]f Defendants' actions violated the separation of powers, that would certainly be arbitrary and capricious under the APA." *Nat'l Council of Nonprofits*, 2025 WL 368852, at *12. While Plaintiffs do not raise an APA claim here, the separation of powers analysis nevertheless applies.

Congress has intended the States to fund certain entitlements as a condition of receiving federal funds, it has proved capable of saying so explicitly."[34]  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17–18 (1981) (citing *King v. Smith*, 392 U.S. 309, 333 (1968)).

Plaintiffs also point out that the Executive Orders "appl[y] even to grantees who comply with the [legitimate] conditions attached to their funding [by Congress] and utilize their funds to effectuate the program's purposes."  ECF 69-1, at 26.  Thus, the Executive Orders are "incompatible with the expressed or implied will of Congress."  *Zivotofsky*, 576 U.S. at 10.  "The Executive Branch has a duty to align federal spending and action with the will of the people as expressed through congressional appropriations, not through 'Presidential priorities.'"  *New York*, 2025 WL 357368, at *2 (emphasis omitted).  As Chief Judge McConnell of the District of Rhode Island recently reiterated, "[f]ederal law specifies how the Executive should act if it believes that appropriations are inconsistent with the President's priorities—it must ask Congress, not act unilaterally."  *Id.*  Because there is no evidence that the President asked Congress to rescind appropriated funds, the Court finds that the challenged portions of the Executive Orders unconstitutionally intrude upon the congressional prerogative to control the public fisc.  *See City & Cnty. of San Francisco*, 897 F.3d at 1235 ("Absent congressional authorization, the

---

[34] Defendants attempt to distinguish *National Council of Nonprofits v. Office of Management and Budget* and *New York v. Trump* by claiming that "[b]y their own terms, the [Executive Orders] challenged here direct agencies to impose a new *condition* on grant funding[]—not immediately pause existing grant funding."  ECF 90, at 19 (emphasis in original).  This argument fails to remedy the inherent separation of powers issue that prohibits the President from "possess[ing] an unbounded power over the public purse of the nation."  *U.S. Dep't of the Navy*, 665 F.3d at 1347. Regardless of whether the executive action is characterized as a "new condition" on grant funding or a "pause" on grant funding, the case law is clear: if Congress wishes to condition federal research and education grants on the denial of gender-affirming care, it has "proved capable of saying so explicitly."  *Pennhurst State Sch. & Hosp.*, 451 U.S. at 17–18.  In the absence of congressional action, no amount of re-packaging and re-naming the executive action will cure the unconstitutionality.

Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.").

(3)    The Executive Orders impermissibly infringe on Article I's framework for passing legislation.

Lastly, Plaintiffs argue that "the Orders not only usurp Congressional powers, but unconstitutionally bypass the Legislative branch altogether." ECF 69-1, at 26. Defendants argue the Executive Orders "instruct agencies to implement the President's policy to the extent permitted by applicable law." ECF 90, at 15. Again, the Court finds that Plaintiffs have the stronger argument and have shown a likelihood of success on the merits.

As the Supreme Court put it, albeit in a different context, "the question here is not whether something should be done; it is who has the authority to do it." *Biden*, 143 S. Ct. at 2372; *see also Washington*, 2025 WL 2025 WL 659057, at *12 ("The Court's holding here is not about the policy goals that President Trump seeks to advance; rather, it is about reaffirming the structural integrity of the Constitution by ensuring that executive action respects congressional authority."). The Constitution and its history evidence the "unmistakable expression of a determination that legislation by the national Congress be a step-by-step, deliberate and deliberative process." *INS v. Chadha*, 462 U.S. 919, 959 (1983). "The power to enact statutes may only 'be exercised in accord with a single, finely wrought and exhaustively considered, procedure.'" *Clinton*, 524 U.S. at 439–40 (quoting *Chadha*, 462 U.S. at 951). As Justice Kennedy observed, if "the decision to spend [is] determined by the Executive alone, without adequate control by the citizen's Representatives in Congress, liberty is threatened." *Id.* at 451 (Kennedy, J., concurring). "The bicameral requirement, the Presentment Clauses, the President's veto, and Congress's power to override a veto were intended to erect enduring checks on each Branch and to protect the people from the improvident exercise of power by mandating certain prescribed steps." *Chadha*, 462 U.S.

42

at 957. "To preserve those checks, and maintain the separation of powers, the carefully defined limits on the power of each Branch must not be eroded." *Id.* at 957–58.

"In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown*, 343 U.S. at 587. Rather, as the Supreme Court has unequivocally stated: "[t]he Constitution limits [the President's] functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad." *Id.* The Executive Orders cannot, therefore, be properly sustained as an exercise of the President's power. The Constitution is "neither silent nor equivocal about who shall make laws which the President is to execute." *Id.* To accomplish what has been attempted by the Executive Orders in this case requires "action in conformity with the express procedures of the Constitution's prescription for legislative action," not unilateral action on the part of the President. *Chadha*, 462 U.S. at 958.

The Court is unpersuaded by Defendants' argument that the challenged portions of the Executive Orders are merely a reflection of the President's "plain[] authority to direct agencies to fully implement [the President's] agenda, consistent with each agency's underlying statutory authorities." ECF 90, at 14. In essence, "the Administration argues that the Executive Order is all bluster and no bite, representing a perfectly legitimate use of the presidential 'bully pulpit,' without any real meaning—'gesture without motion,' as T.S. Eliot put it." *City & Cnty. of San Francisco*, 897 F.3d at 1238. However, the Executive Orders do far more than simply effectuate the President's unquestionably lawful authority to amplify his position on an issue of national importance. Much like the pronouncements at issue in *City and County of San Francisco v. Trump*, the plain language of the Executive Orders here reflects that "the Administration's current litigation position is grounded not in the text of the Executive Order[s] but in a desire to avoid

43

legal consequences." *Id.* As discussed above, the Executive Orders direct agencies to act "immediately" and the funding restrictions are mandatory, thus demonstrating that Defendants' current position that the directives are mere toothless advisements to explore possible routes to effectuating policy appears to be a direct response to litigation, rather than a reasonable interpretation of the plain text of the challenged portions of the Executive Orders. *See HIAS, Inc.*, 985 F.3d at 325 (interpreting an executive order by analyzing its "stated goal," and the "clear and specific substantive provisions").

It is, moreover, well established that the President may not usurp Congress's power just because the administration of healthcare at issue is antithetical to the President's policies. Here, the President has "[n]ot only . . . claimed for [himself] Congress's exclusive spending power, [but] also attempted to coopt Congress's power to legislate." *City & Cnty. of San Francisco*, 897 F.3d at 1234. However, "[t]he Constitution [does] not subject this law-making power of Congress to presidential [] control." *Youngstown*, 343 U.S. at 588 (finding a separation of powers violation where "[t]he President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President"). If the President does not wish to disburse funds in the manner appropriated by Congress, "the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *In re Aiken Cnty.*, 725 F.3d at 261 n.1; *see also* U.S. Const. art. I, § 7, cl. 2. Article I does not allow the President to circumvent bicameralism and presentment by unilaterally amending or cancelling federal appropriations through an executive order. *See Clinton*, 524 U.S. at 448. This is especially true where, as here, Congress has "considered and thus far rejected legislation accomplishing the goals of the Executive Order." *City & Cnty. of San*

44

*Francisco*, 897 F.3d at 1234; *see supra* note 32 (noting failed congressional efforts to ban funding for gender-affirming care for minors).

Because the Executive Orders direct agencies to withhold funding on a condition that Congress has not authorized, the President has exceeded his authority. The Plaintiffs have thus sufficiently shown likelihood of success on the merits of their *ultra vires* claim that the Executive Orders violate the separation of powers.

*ii.    Ultra Vires - Contrary to Existing Statutes*

Plaintiffs argue that they are likely to succeed on the merits of their second claim for relief—that the Executive Orders are *ultra vires* in that they conflict with statutory law (namely, Section 1557 of the ACA, 42 U.S.C § 18116, and Section 1908 of the PHSA, 42 U.S.C. § 300w-7) which prohibits discrimination on the basis of sex. *See* ECF 69-1, at 27–28. Defendants argue that the Executive Orders "do not classify based on trans-identifying status in the first place," ECF 90, at 33, because the Healthcare Order "targets only specified treatments for minors based on their medical purpose," and the Gender Identity Order merely "recogni[zes] that the 'sexes are not changeable,'" *id.* at 23. Defendants' argument cannot withstand *Kadel*'s rationale, which, as Defendants recognize, is binding on this Court. Defendants do not advance any argument that would disturb the Court's analysis as laid out in the TRO memorandum opinion.

As noted, "when 'the President takes measures incompatible with the expressed or implied will of Congress . . . he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.'" *Zivotofsky*, 576 U.S. at 10 (quoting *Youngstown*, 343 U.S. at 635–38 (Jackson, J., concurring)). The Court has the authority to determine whether the Executive Orders are incompatible with the will of Congress. *See, e.g., Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) (summarizing the function of the Judiciary to interpret

45

statutes dating back to the earliest decisions of the Supreme Court and citing *Marbury v. Madison*, 1 Cranch 137, 177 (1803); *United States v. Dickson*, 15 Pet. 141, 162 (1841); *Decatur v. Paulding*, 14 Pet. 497, 515 (1840)). Bound by precedent from both the Supreme Court and the United States Court of Appeals for the Fourth Circuit, the Court is constrained to conclude that the Executive Orders are indeed incompatible with the will of Congress.

Section 1557 of the ACA "provides that, '[e]xcept as otherwise provided . . . an individual shall not, on the ground prohibited under Title VI of the Civil Rights Act . . . [and] Title IX . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance.'" *Kadel*, 100 F.4th at 163–64 (alteration in original) (quoting 42 U.S.C. § 18116(a)). Section 1908 of the PHSA mandates that "[n]o person shall on the ground of sex . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity funded in whole or in part with funds made available under this part." 42 U.S.C. § 300w-7(a)(2).

In *Bostock*, the Supreme Court held that Title VII's prohibition on discrimination on the basis of sex in employment, 42 U.S.C. § 2000e–2(a)(1), encompassed discrimination on the basis of transgender status. 590 U.S. at 662. Justice Gorsuch, writing for the Court, explained: "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Id.* at 660. "The plain language of Title VII, the Court observed [in *Bostock*], establishes a but-for causation standard." *Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 590 (D. Md. 2021). In *Kadel*, the Fourth Circuit, sitting en banc, affirmed a district court's application of *Bostock* to Section 1557 of the ACA, explicitly rejecting the idea that *Bostock*'s analysis applied only to Title VII claims. 100 F.4th at 164 (citing *Bostock*, 590 U.S. at 658). Defendants did not at the TRO stage, and have not now, presented any argument

46

JA967

that the *Kadel* court's application of *Bostock*'s reasoning should not also extend to Section 1908 of the PHSA, which is nearly identical in wording to Section 1557 of the ACA. Indeed, Defendants appear to concede that *Kadel* compels the outcome the Court reaches here. *See* ECF 90, at 28 ("And in *Kadel*, the Fourth Circuit held that *Bostock*'s reasoning applies to Title IX's sex-discrimination prohibition, as incorporated into Section 1557." (citing *Kadel*, 100 F.4th at 164)); *see also* ECF 55, at 28 n.9 ("The government acknowledges that the Fourth Circuit in *Kadel* held that Section 1557 prohibits discrimination based on transgender status.").[35]

The sections challenged here facially differentiate on the basis of transgender identity. Section 4 of the Healthcare Order directs agency heads to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children." "Chemical and surgical mutilation of children" is defined as

> the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty *in an individual who does not identify as his or her sex*; the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, *to align an individual's physical appearance with an identity that differs from his or her sex*; and surgical procedures that attempt to transform an individual's physical appearance *to align with an identity that differs from his or her sex* or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions. This phrase sometimes is referred to as "gender affirming care."

Healthcare Order § 2(c) (emphasis added). The same course of treatment, such as prescribing puberty blockers or hormones, therefore, is available to a patient who is not "an individual who does not identify as his or her sex" and not undergoing the course of treatment "to align an

---

[35] Defendants maintain the position that "*Kadel* was wrongly decided and should be overruled." ECF 90, at 28. Given *Kadel*'s binding holding that compels this Court to find that discrimination on the basis of transgender status violates Section 1557 of the ACA, Defendants are left only to argue that the Executive Orders "do not classify based on trans-identifying status in the first place," "do not themselves impose any conditions on funding," and "must be imposed consistent with 'applicable law,'" including the ACA and PHSA. *Id.* (quoting Healthcare Order § 4). The Court has already considered and rejected the latter two arguments and will not repeat its reasoning here.

individual's physical appearance with an identity that differs from his or her sex." *Id.* "This is

textbook sex discrimination" under *Kadel* because

> [f]or one, [the Court] can determine whether some patients will be eliminated from
> candidacy for these surgeries [or other courses of treatment] solely from knowing
> their sex assigned at birth. And two, conditioning access to these surgeries based
> on a patient's sex assigned at birth stems from gender stereotypes about how men
> or women should present.

100 F.4th at 153 (citing *Bostock*, 590 U.S. at 660–74). Indeed, the effect of the Healthcare Order—

the cessation of all gender-affirming medical care for those under the age of nineteen—tracks

precisely with the Executive Order's stated purpose, which is to "prohibit or limit these . . .

procedures." Healthcare Order § 1.

Section 3(g) of the Gender Identity Order is admittedly slightly vaguer than Section 4 of

the Healthcare Order in that it only proscribes the use of "[f]ederal [grant] funds [to] promote

gender ideology." The Gender Identity Order, appears, however, to deny the existence of

transgender persons altogether. *See* Gender Identity Order § 1 (describing the purpose of the order

as "defend[ing] women's rights and protect[ing] freedom of conscience by using clear and accurate

language and policies that recognize women are biologically female, and men are biologically

male"); *id.* § 2 ("It is the policy of the United States to recognize two sexes, male and female.

These sexes are not changeable and are grounded in fundamental and incontrovertible reality.").

The Court cannot fathom discrimination more direct than the plain pronouncement of a policy

resting on the premise that the group to which the policy is directed does not exist.[36] Thus, Section

---

[36] To the extent the Court needs to state the obvious, the Fourth Circuit has recognized that there
are "approximately 1.4 million people in the United States who identify as transgender," *Kadel*,
100 F.4th at 135, and it, and the Supreme Court, have repeatedly acknowledged transgender
people's existence. *See, e.g.*, *Grimm*, 972 F.3d at 610 (finding that "transgender people constitute
at least a quasi-suspect class"); *Williams v. Kincaid*, 45 F.4th 759, 773 (4th Cir. 2022) ("In part
because of the long history of discrimination against transgender people, we have held that

48

3(g) of the Gender Identity Order can only be read as doing exactly what Section 4 of the Healthcare Order does—cease funding institutions, including medical institutions, that provide gender-affirming medical care to patients under the age of nineteen. Thus, as with Section 4 of Healthcare Order, *Kadel* mandates a similar finding of discrimination as to Section 3(g) of the Gender Identity Order.

Plaintiffs accurately note that the Executive Orders foist upon hospitals receiving federal funds an impossible choice: (1) keep providing medical care to transgender patients under the age of nineteen in compliance with the antidiscrimination statutes and risk losing federal funding under the Executive Orders, or (2) stop providing care on the basis of transgender identity in violation of the statutes, but in compliance with the EOs.[37] Because the challenged portions of the Executive Orders are facially discriminatory on the basis of transgender identity, and therefore sex under *Kadel* and *Bostock*, in violation of Section 1557 of the ACA and Section 1908 of the PHSA, the Court finds that Plaintiffs are likely to succeed on the merits of their *ultra vires* statutory claim.

### iii.    Equal Protection

To the extent Defendants argue that Plaintiffs cannot succeed on their equal protection claim because they "seek to pretermit the agencies' information-gathering process, forcing the government to justify policies that it has not even adopted," ECF 90, at 20–21, the Court has already addressed this ripeness challenge above. Further, it bears repeating that Plaintiffs only

---

intermediate scrutiny applies to laws that discriminate against them."); *Bostock*, 590 U.S. at 683 ("An employer who fires an individual merely for being . . . transgender defies the law.").

[37] While Defendants attempted to counter this in the TRO briefing, *see* ECF 55, at 28 ("If grantees believe that providing, for example, a given hormone to a cisgender patient for one purpose but not to a transgender patient for a different purpose is discrimination under Sections 1557 or 1908, the grantees may choose not to provide that hormone to anyone."), they do not raise it in opposition to the motion for a preliminary injunction. *See* ECF 90, at 27–28.

49

seek a preliminary injunction enjoining Section 4 of the Healthcare Order and Section 3(g) of the Gender Identity Order to the extent it conditions funding on whether a medical institution provides gender-affirming medical care for those under nineteen. Nothing in this injunction implicates the "information-gathering process."

"The Fifth Amendment to the United States Constitution provides, in pertinent part, that '[n]o person shall . . . be deprived of life, liberty, or property, without due process of law.'" *Strickland*, 32 F.4th at 356 (alterations in original) (quoting U.S. Const. amend. V). While the Equal Protection Clause of the Fourteenth Amendment applies only to the states, "'[i]n numerous decisions,' the Supreme 'Court has held that the Due Process Clause of the Fifth Amendment forbids the Federal Government to deny equal protection of the laws.'" *Id.* (quoting *Davis v. Passman*, 442 U.S. 228, 234 (1979)). The equal protection analyses and the "obligations imposed by the Fifth and the Fourteenth Amendments" are "indistinguishable." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995). "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). "Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.* For the challenged government action to withstand judicial review under intermediate scrutiny, "the government bears the burden of establishing a reasonable fit between the challenged statute and a substantial governmental objective." *Kadel*, 100 F.4th at 156 (quoting *United States v. Chapman*, 666 F.3d 220, 226 (4th Cir. 2012)). "The classification must be based on 'reasoned analysis rather than [on] the mechanical application of traditional, often inaccurate, assumptions.'" *Id.* (alteration in *Kadel*) (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718,

50

JA971

726 (1982)). "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996).

In *Kadel*, the Fourth Circuit confronted equal protection challenges to North Carolina's and West Virginia's state-funded health plans and their lack of coverage for gender-affirming care. 100 F.4th at 133. North Carolina's plan "exclu[ded] . . . '[t]reatment or studies leading to or in connection with sex changes or modifications and related care," and West Virginia's "cover[ed] some gender-affirming care, but not gender-affirming surgery," and did "cover the same surgical procedures when conducted to treat non-gender dysphoria diagnoses." *Id.* at 133–34. Preliminarily, an en banc Fourth Circuit reiterated its holding in *Grimm*, 972 F.3d at 611, that "transgender people constitute a quasi-suspect class." *Kadel*, 100 F.4th at 143. The Court then held that "gender dysphoria [is] a proxy for transgender identity," that "proxy discrimination [can be] facial discrimination," and that, in that case, "discrimination on the basis of gender dysphoria [was] discrimination on the basis of gender identity." *Id.* Thus, "[b]ecause the [health plan] exclusions discriminate[d] on the basis of transgender identity and sex, they [were] subject to intermediate [or heightened] scrutiny." *Id.* at 155–56.

The *Kadel* court then found that the healthcare insurance exclusions did not satisfy intermediate scrutiny. *Id.* at 156 ("[T]he district court properly rejected the contention that the coverage exclusion is substantially related to [protecting public health from ineffective medicine]."); *id.* at 156–57 ("Without evidence to show that gender-dysphoria treatments are ineffective, the North Carolina Appellants cannot show that the coverage exclusion is narrowly tailored to serve the state's substantial interest in not covering medically ineffective treatment."); *id.* at 157 ("What's more, West Virginia Department of Health and Human Resources Secretary Bill Crouch said he did not know if Medicaid had conducted any research or analysis about the

51

cost of providing access to gender-affirming care[, so] Appellants' proffered rationales were created for the purposes of litigation" and "therefore cannot justify the policy under a heightened-scrutiny analysis." (citing *Virginia*, 518 U.S. at 533)).

As noted above, the Court finds that the Executive Orders facially classify on the basis of transgender status. Defendants assert that the Healthcare Order "targets only specified treatments for minors based on their medical purpose," which "does not constitute a classification based on 'transgender status.'" ECF 90, at 23. In making this argument, Defendants ignore that to determine the "medical purpose" of each treatment and to determine whether it is permitted or restricted under the Order necessarily requires the evaluation of a patient's sex assigned at birth and then a determination of whether the treatment is sought to align the patient's physical characteristics with that birth sex or with a different sex—one that aligns with the person's identity.[38] This is precisely what the en banc *Kadel* court described as "textbook sex discrimination." *See Kadel*, 100 F.4th at 153; *see also Bostock*, 590 U.S. at 660–74. Thus, the government bears the burden of establishing that the orders are substantially related to an important government interest.[39] *Kadel*, 100 F.4th at 156.

---

[38] In preliminarily enjoining enforcement of Section 4 of the Healthcare Order and Sections 3(e) and 3(g) of the Gender Identity Order based on Equal Protection grounds, Judge King pointed out that the scope of the Healthcare Order's definition of "chemical and surgical mutilation" extends to transgender individuals seeking hormone treatment for a purpose other than to transition. *See Washington*, 2025 WL 659057, at *15. "[A] *cisgender* teen who needs puberty blockers in the course of cancer treatment could receive them from federally funded institutions, but a *transgender* teen who needs puberty blockers *due to the same diagnosis*—and not to align with the teen's gender identity—could not." *Id.* (emphasis in original) (footnote omitted). This is because, under the Order, "chemical and surgical mutilation" encompasses prescribing puberty blockers to "an individual who does not identify as his or her sex." Healthcare Order § 2(c). While this section describes the use of hormones and surgery as impermissible if prescribed "to align an individual's physical appearance with an identity that differs from his or her sex" and "to align with an identity that differs from his or her sex," it does not qualify the use of puberty blockers in the same way.

In seeking to meet their burden, Defendants argue that the challenged portions of the Executive Orders survive heightened scrutiny because they relate to the important government interest of "safeguarding children from potentially dangerous, ineffective, and unproven treatments." ECF 90, at 5; *see also id.* at 25–27. Setting aside the fact that the Healthcare Order specifically targets gender-affirming medical care for those under *nineteen*, not simply children, the government "cannot immunize itself from violating [constitutional equal protection guarantees] by discriminating against only a subset of a protected group." *Kadel*, 100 F.4th at 146.

Defendants assert that the Orders are substantially related to this important government interest because "[e]vidence abounds that treatments covered by the Protecting Children EO 'are dangerous and ineffective.'" ECF 90, at 25 (quoting *Eknes-Tucker v. Governor of Ala.*, 114 F.4th 1241, 1266 (11th Cir. 2024) (Lagoa, J., concurring); *Williams v. Skrmetti*, 83 F.4th 460, 480 (6th Cir. 2023), *cert. granted*, 144 S. Ct. 2679)). Though Defendants might well have support for their argument, an en banc Fourth Circuit in *Kadel* rejected a similar claim by noting that "those criticisms do not support the notion that gender-dysphoria treatments are ineffective so much as still developing." 100 F.4th at 156; *see also id.* at 156–57 ("Without evidence to show that gender-dysphoria treatments are ineffective, the North Carolina Appellants cannot show that the coverage exclusion is narrowly tailored to serve the state's substantial interest in not covering medically ineffective treatment."). And while *Kadel* did not explicitly address gender-affirming care for

---

[39] While Defendants argue that the Court should evaluate the Executive Orders under rational basis review, rather than heightened scrutiny, ECF 90, at 21–24, the Court need not address this argument because it finds that the facts of this case fit squarely within *Kadel*'s purview. To the extent Defendants argue that "*Kadel* was wrongly decided," *id.* at 21, this Court does not have the authority to overturn an en banc circuit court decision.

minors, as Plaintiffs point out, two plaintiffs in *Kadel* were the parents of transgender adolescents,[40] so *Kadel*'s holding necessarily encompassed gender-affirming care for minors.

In support of the contention that the Executive Order pass constitutional muster, Defendants offer brief citations to the Sixth Circuit's decision in *Skrmetti*, the Tennessee law at issue there (Tenn. Code Ann. § 68-33-101), Judge Lagoa's concurrence in *Eknes-Tucker*, and a United Kingdom National Health Service website that outlines courses of treatment for gender dysphoria in the United Kingdom (*Treatment: Gender Dysphoria*, National Health Service (May 28, 2023), https://www.nhs.uk/conditions/gender-dysphoria/treatment/). *See* ECF 90, at 25–26. Defendants also offer two reports: (1) *The Cass Review: Independent Review of Gender Identity Services for Children and Young People* (Apr. 2024) (hereinafter "Cass Review"), https://perma.cc/3QVZ-9Y52, a report from the United Kingdom, and (2) Annette L. Cantu et al., *Changes in Anxiety & Depression from Intake to First Follow-Up Among Transgender Youth in a Pediatric Endocrinology Clinic*, 5:3 Transgender Health 196 (2020) (hereinafter "Cantu Study"), https://pmc.ncbi.nlm.nih.gov/articles/PMC7906229/. ECF 90, at 26–27. It bears noting, however, that because the Executive Orders themselves do not cite to any of these materials, Defendants merely attempt "to prop up the bare conclusions made in the [Healthcare] EO [and Gender Identity EO] with *post hoc* rationalizations and justifications that are nowhere to be found in the Order[s'] text." *Washington*, 2025 WL 659057, at *22.

Regardless, even if the Executive Orders had explicitly rested on these opinions and reports, the Court is doubtful they would be sufficient to survive the requisite means/ends test.

---

[40] *See* ECF 108, at 10 n.4 (citing *Kadel v. Folwell*, Civ. No. 1:19-cv-00272-LCB-LPA, ECF 75, at 4 ¶¶ 8, 10 (noting that one plaintiff "is the father of . . . an 18-year-old transgender young man" and noting that another "is the father of C.B., a 15-year-old transgender boy"); *see also id.* at 21–24 ¶¶ 76–89 (describing the 18-year-old's experience of obtaining gender-affirming medical care as a minor)).

54

First, "[t]he legal opinions (one a single-judge concurrence) are not evidence, apply rational basis review (not heightened scrutiny) to the laws at issue, and do not address the facts specific to this case (i.e., the particular means and ends of the Executive Orders)." *Id.* Second, the cited reports fail to establish a reasonable fit between the immediate cessation of gender-affirming care for those under nineteen and the purported goal of protecting children. For example, while Defendants cite the Cantu Study for the proposition that it found "'no change in acute distress' in 'transgender youth initiating gender-affirming care,'" ECF 90, at 27 (citing Cantu Study), a more thorough review of the Cantu Study reveals that its conclusions are not as sweeping as Defendants would have the Court believe. The study, as the title suggests, measured only changes in anxiety and depression of transgender youth from their initial intake appointment to their first follow-up appointment, an average period of only about four months. *See* Cantu Study, at 196. The study's other limitations include the fact that "[d]ata collected were limited to one clinic, with a relatively small sample size and only two time points examined." *Id.* at 199. Thus, "[d]ue to sample size," the study's authors acknowledge they "could not examine how age, affirmed gender, or initiation of hormone blockers were associated with changes in symptoms of distress." *Id.* The authors also admit that "patients may not experience the physical effects of [hormone therapy] until 3–6 months following initiation," so "depression and anxiety may not be impacted until visible effects begin to occur," after the first follow-up appointment, *id.,* and thus outside the limited parameters of the study.

Reliance on the Cass Review similarly fails to justify the disparate treatment of transgender youth as a means of protecting them, especially in the face of Plaintiffs' record evidence contesting the veracity of this report, including the declarations of four experts. *See* ECF 69-48 (declaration of Armand H. Matheny Antommaria M.D., Ph.D.); ECF 69-49 (declaration of Dan H. Karasic,

M.D.); ECF 69-50 (declaration of Daniel Shumer, M.D.); ECF 69-51 (declaration of Jack Turban,

M.D. M.H.S.); ECF 108-4 (reply declaration of Dr. Antommaria); ECF 108-5 (reply declaration

of Dr. Karasic); ECF 108-6 (reply declaration of Dr. Shumer); ECF 108-7 (reply declaration of

Dr. Turban).  As Judge King noted:

> [M]edical associations and subject matter experts have criticized [the Cass Review]
> for its author's lack of clinical experience or research qualifications; its "selective
> and inconsistent use of evidence," and "its unfounded medical opinion[s]" that
> "ignor[e] more than three decades of clinical experience in this area as well as
> existing evidence showing the benefits of hormonal interventions on the mental
> health and quality of life of gender diverse young people."

*Washington*, 2025 WL 659057, at *22 (quoting WPATH, *WPATH and USPATH Comment on the*

*Cass Review* 1–2 (May 17, 2024), https://wpath.org/wp-content/uploads/2024/11/17.05.24-

Response-Cass-Review-FINAL-with-ed-note.pdf) (additional citation omitted).  Further, Dr.

Turban points out that the Cass Review's conclusions do not even support a complete ban on

gender-affirming care for minors.  *See* ECF 69-51, at 21 ¶ 36 ("While the Cass Report has been

heavily critiqued for methodological failings, it also does not recommend banning gender-

affirming medical treatments for adolescents." (footnote omitted)); ECF 108-7, at 8 ¶ 11 ("[T]he

Cass Report itself recognized that a ban on gender-affirming medical interventions for adolescent

gender dysphoria would not be appropriate and highlighted that treatment should still be available

to pediatric patients in certain circumstances[.]").[41]

---

[41] To the extent Defendants argue the Executive Orders are aimed at protecting children from later
regretting gender-affirming medical treatment, *see* ECF 90, at 24 (citing Healthcare Order § 1),
Defendants have not demonstrated a reasonable fit because "the [Healthcare] EO takes into
account only the risks associated with regret, making no attempt to balance them against the very
real risks (supported by ample medical data) facing transgender youth who desire gender-affirming
care but do not receive it." *Washington*, 2025 WL 659057, at *21; *see also* ECF 69-48, at 27–28
¶¶ 65–67 (opining that the available literature suggests that regret rates for gender-affirming
medical care are low); ECF 69-49, at 26–28 ¶¶ 96–101 (same); ECF 69-50, at 21–22 ¶ 77 (same);
ECF 69-51, at 16–20 ¶¶ 28–35 (same).

Guided and bound by Fourth Circuit's analysis in *Kadel*, and with a barer record than the one before the Fourth Circuit there, the Court is compelled to find that the Executive Orders' effective ban on all gender-affirming care for those under nineteen by federally funded institutions is not substantially related to the important government interest of protecting children.[42] As such, Plaintiffs are likely to succeed on the merits of their Equal Protection claim.

2.    Irreparable Harm

To establish irreparable harm, a plaintiff "must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (citation omitted). Additionally, the harm "must be irreparable, meaning that it cannot be fully rectified by the final judgment after trial." *Id.* (quotations and citations omitted).

The Court notes at the outset that "the prospect of an unconstitutional enforcement 'supplies the necessary irreparable injury.'"[43] *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381–82 (1992)). Additionally, because Plaintiffs have shown a strong likelihood of success on their constitutional claims, the irreparable harm factor is satisfied. *See Mills*, 571 F.3d at 1312 ("It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time,

---

[42] Further, Section 4 of the Healthcare Order directs "immediate[]" action. In doing so, it makes no effort to ensure that a patient is weaned off any medical care they are currently undergoing in conjunction with their medical provider. Such an abrupt halt in medical care, even if, as Defendants contend, that care is dangerous or ineffective, cuts against Defendants' argument that the policy is substantially related to protecting children.

[43] Defendants merely recycle their ripeness arguments in arguing that Plaintiffs have not shown irreparable harm. *See* ECF 90, at 28 (asserting that the prospect of unconstitutional enforcement "is speculative at this point given that the [Executive Orders] have not been applied to any specific funding or grants"). The Court has already rejected these arguments above and found that the Executive Orders threaten immediate and irreparable injuries, as evidenced by the HRSA and CDC notices and cessation of gender-affirming care at medical institutions throughout the country.

unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))).

The Fourth Circuit has also previously held that the irreparable harm prong is satisfied where the plaintiff suffers from "diminished access to high-quality health care suited to the individual plaintiff's needs." *Baker*, 941 F.3d at 707. As Plaintiffs point out, "[t]ransgender adolescents and young adults across the country already have lost care because their providers have cancelled appointments, refused to fill prescriptions, or even shut down their gender affirming medical care programs altogether." ECF 69-1, at 35. Further, "[f]amilies have been forced to watch their children suffer, and medical providers have been compelled to abandon their patients." *Id.* The circumstances in this case yield no justification to depart from the Fourth Circuit's reasoning in *Baker*, as the sudden denial of medical care "visits a tangible harm" on the health and well-being of Plaintiffs.[44] *Baker*, 941 F.3d at 707.

The medical institutions have made clear that the decision to pause or cancel gender-affirming care was undertaken as a direct response to the Executive Orders and the threat to withhold federal funding. Thus, enjoining Defendants from withholding funding for institutions that provide prohibited gender-affirming medical care would remedy Plaintiffs' harms. Based on the record evidence at this early stage of litigation, the Court has no reason to conclude that the sudden and complete cancellation of gender-affirming care at the medical institutions was related to anything other than the fear of losing federal funding pursuant to the challenged portions of the

---

[44] Defendants argue that lack of access to high-quality health care does not constitute irreparable harm in this case because "the relevant treatments are not supported by high quality evidence and present serious risks to young people." ECF 90, at 29. The Court has already found, however, that the en banc Fourth Circuit in *Kadel* rejected a similar claim on the merits by noting that "those criticisms do not support the notion that gender-dysphoria treatments are ineffective so much as still developing." 100 F.4th at 156; *see also id.* at 156–57.

58

Executive Orders. *See, e.g.,* ECF 69-11, at 2 (explaining that "[t]he loss of this funding would critically impair [Denver Health's] ability to provide care for the Denver Community"). As such, enjoining agencies from attaching specific conditions to the hospitals' federal grants would, as far as this Court can tell at this stage, remedy the harm suffered by Plaintiffs.

Lastly, a final judgment after trial cannot rectify the harm caused by Section 4 of the Healthcare Order and Section 3(g) of the Gender Identity Order given that Plaintiffs have shown that the care has already ceased and that each day that passes exacerbates Plaintiffs' injuries, which, as described above, include depression, increased anxiety, heightened gender dysphoria, severe distress, risk of suicide, uncertainty about how to obtain medical care, impediments to maintaining a social life, and fear of discrimination, including hate crimes. *See Koe v. Noggle,* 688 F. Supp. 3d 1321, 1357 (N.D. Ga. 2023) (finding irreparable harm in the absence of a preliminary injunction where "middle-school-age plaintiffs will be unable to obtain [] a course of treatment that has been recommended by their health care providers in light of their individual diagnoses and mental health needs"). The Court concludes that the Plaintiffs have demonstrated they are likely to suffer irreparable harm absent injunctive relief.

### 3.    Prejudice and Public Interest

The Court must balance the significant irreparable harms identified above against the harms that the Government asserts will arise from temporarily enjoining enforcement of the challenged provisions of the Executive Orders. Here, the balance of equities and the public interest weigh in favor of issuing a preliminary injunction. *See Ass'n of Cmty. Cancer Ctrs. v. Azar,* 509 F. Supp. 3d 482, 501 (D. Md. 2020).

As an initial matter, the Court finds that the Government is not harmed by the issuance of a preliminary injunction which prevents it from enforcing restrictions likely to be found unconstitutional. *See Leaders of a Beautiful Struggle,* 2 F.4th at 346. And it is "well-established

that the public interest favors protecting constitutional rights." *Id.* (citations omitted). Further, the Executive Orders threaten to harm transgender youth, as well as access to medical care for entire communities if hospitals decide to continue to provide gender-affirming medical care and then lose significant federal funding.

Plaintiffs point to affidavits by doctors and researchers that detail the far-reaching effects of these Executive Orders. And importantly, the Executive Orders have been interpreted to mean that *all* of medical institutions' federal funding is in jeopardy if they do not comply, regardless of whether the funding is tied to gender-affirming care. *See* ECF 69-11, at 2; ECF 69-12, at 3. As Denver Health acknowledged in their statement regarding the Healthcare Order, federally funded programs represent "a significant portion of Denver Health's funding," and the "loss of this funding would critically impair our ability to provide care for the Denver community." ECF 69-11, at 2. The Government, on the other hand, has adduced no evidence that any harm will result if the grant funding is restored to the status quo. Instead, Defendants simply argue that the "public interest is not advanced when the Executive is disabled from even *considering* a policy, especially one that has been the subject of legislation across the country." ECF 90, at 29 (emphasis in original) (citation omitted). This Court's ruling here is not intended to prevent the Executive from considering any particular policy. However, as described above, the Executive Orders went well-beyond general policymaking; the Executive Orders condition funding in a manner not prescribed by Congress. Though the Executive is no doubt free to pursue at the federal level the very type of legislation that Defendants note has been enacted in many states, this process must proceed within the boundaries set by the Constitution. Seeking to effectively enact legislation by executive order clearly exceeds the bounds of Article II and thus does not serve the public interest.

In sum, the Executive Orders threaten to disrupt treatment of patients, stall critical research, and gut numerous programs in medical institutions that rely on federal funding. Accordingly, the Plaintiffs have shown that they are likely to succeed on the merits, that they would suffer irreparable harms absent an injunction, and that the balance of equities and the public interest tip in their favor. The Court will therefore grant a preliminary injunction.

### D.    Scope of Injunction

Having determined that Plaintiffs are entitled to a preliminary injunction, the Court must determine its proper scope. Plaintiffs contend that "PFLAG and GLMA have members 'throughout the country' who have been harmed by the Executive Orders." *See* ECF 69-1, at 36 (citations omitted). Additionally, Plaintiffs maintain that "by threatening hospitals across the country with the immediate loss of all federal grant funds, the Executive Orders have created an *in terrorem* effect that has coerced hospitals to immediately stop providing gender affirming medical care." ECF 108, at 15.

"Once a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." *Hills v. Gautreaux*, 425 U.S. 284, 293–94 (1976) (citations and internal quotation marks omitted). It is well established that "district courts have broad discretion when fashioning injunctive relief." *Ostergren v. Cuccinelli*, 615 F.3d 263, 288 (4th Cir. 2010). Nevertheless, the "power[] [is] not boundless." *Id.* "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Consistent with these principles, courts may issue nationwide injunctions. *See Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308–09 (4th Cir. 1992); *see also Azar*, 509 F. Supp. 3d at 503 ("[F]ederal courts over the years

61

have issued 'hundreds' of nationwide injunctions 'reaching beyond the parties in the lawsuit[,]'

especially when such a scope is considered 'necessary to afford complete relief.'" (citing *District*

*of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 46 (D.D.C. 2020))). "Crafting a preliminary

injunction is an exercise of discretion and judgment, often dependent as much on the equities of a

given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance*

*Project*, 582 U.S. 571, 583 (2017) (per curiam) (denying in part a request to stay a nationwide

injunction in a challenge to an executive order suspending entry of foreign nationals from seven

countries). Here, Plaintiffs have demonstrated that they are likely to succeed on their claims that

the challenged portions of the Executive Orders purport to wield powers exclusive to Congress,

directly conflict with existing statutes, and, pursuant to *Kadel*, violate the equal protection

component of the Fifth Amendment's Due Process Clause, which supports nationwide relief.

This Court has reasonably cautioned that "a court order should not cause confusion about

which companies or providers are subject to a rule and which are not; instead, a court order must

be clear and definite." *Azar*, 509 F. Supp. 3d at 504. With this principle in mind, the Court finds

that a piecemeal approach is not appropriate in this case. Significant confusion would result from

preventing agencies from conditioning funding on certain medical institutions, while allowing

conditional funding to persist as to other medical institutions. And while the preliminary

injunction is nationwide in scope, it is "limited in that it simply preserves the status quo without

requiring the agency to take any affirmative action." *Id.*

Moreover, PFLAG and GLMA are organizational plaintiffs suing on behalf of their

members. When associations prevail in obtaining injunctive relief, "it can reasonably be supposed

that the remedy, if granted, will inure to the benefit of those members of the association actually

injured." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). Here, PFLAG has members who "currently

62

JA983

receive or will soon need to access the medical treatment for gender dysphoria that the Executive Orders seek to prohibit." ECF 53, at 6–7 ¶ 13. Additionally, GLMA includes many "health professional members who work at medical institutions receiving grant funding from Defendants HRSA and NIH as well as other subagencies of Defendant [HHS]." *Id.* at 7 ¶ 14. The members of PFLAG and GLMA are located throughout the country. *See id.* at 6–7 ¶¶ 13, 14. Thus, it follows that an injunction of nationwide scope is necessary to provide complete relief.

Further, the reason the challenged portions of the Executive Orders are unconstitutional— namely that, at minimum, they violate the separation of powers—are applicable to jurisdictions throughout the country.[45] The necessity of a nationwide injunction is underscored by the fact that hospitals all over the county could lose access to all federal funding if they continue to provide gender-affirming medical care.[46] And if medical institutions stop providing gender-affirming medical care, as many have already done, the irreparable harm to Plaintiffs, who live in many different states, would continue. *See Richmond Tenants Org.*, 956 F.2d at 1308–09 (upholding nationwide injunction where challenged conduct caused irreparable harm in myriad jurisdictions across the country). The constitutional and statutory violations apply equally to all medical institutions that receive federal grants. Accordingly, the equities of the case call for, and the Court

---

[45] *Kadel* is obviously not binding beyond this Circuit, thus the Court's holding with respect to Equal Protection may clash with the findings of other courts. If this were Plaintiffs' lone claim, the Court might be persuaded that a more limited injunction is appropriate. However, even Defendants appear to concede that the separation of powers issue, if decided in Plaintiffs' favor, would apply equally in all jurisdictions. *See* ECF 90, at 31 (arguing only that the statutory and equal protection arguments diverge from authority in other circuits).

[46] The harm of losing this funding extends well beyond the named Plaintiffs or even the transgender community writ large. Some hospitals, like Denver Health, have already stated that losing this funding would "critically impair" hospital functioning and deprive all persons in the Denver area of critical access to healthcare. ECF 69-11, at 2. The Government has not presented factual differences that would compel a different conclusion in any other jurisdictions.

will issue, an order enjoining Defendants from enforcing the contested provisions of the Executive Orders. Given the circumstances, a narrower injunction cannot provide complete relief.

Defendants contend that it would be inappropriate for the Court to issue a nationwide injunction based on concerns over "mere" lack of uniformity and the geographic variance of PFLAG and GLMA members. ECF 90, at 31. Contrary to Defendants' argument, the Court is not persuaded that a narrower injunction would, in fact, be "well-tailored" to the circumstances of this case. *Id.* (citing *Georgia v. President of the U.S.*, 46 F.4th 1283, 1307 (11th Cir. 2022)). It is not simply lack of uniformity or geographic scope that concern the Court but also the continued coercive effect of the unlawful portions of the Executive Orders under anything less than a nationwide injunction. If the Court were to limit the injunction to the named Plaintiffs alone, as Defendants suggest, that would seemingly give rise to a convoluted scenario where healthcare providers could simultaneously retain federal funding as to the named Plaintiffs and the organizations' members but still lose it as to similarly situated third parties if the medical institutions continue to provide gender-affirming care to those third parties. Defendants appear to entirely ignore the realities regarding how difficult it would be for medical institutions to navigate that situation. In any event, the Fourth Circuit has recently reaffirmed the principle that district courts have the "equitable power[] . . . to issue nationwide injunctions extending relief to those who are similarly situated to the litigants." *CASA, Inc. v. Trump*, Civ. No. 25-1153, at *3 (4th Cir. Feb. 28, 2025) (quoting *Roe v. Dep't of Def.*, 947 F.3d 207, 232 (4th Cir. 2020)).

In short, a more limited injunction would allow the coercive impact of the challenged portions of the Executive Orders to persist and would effectively deny the named Plaintiffs the relief they seek. *See id.* at *4 (upholding nationwide injunction where district court "carefully explained why an injunction limited to the parties—including organizations with hundreds of

thousands of members nationwide—would be unworkable in practice and thus fail to provide complete reliefs to the plaintiffs"). Accordingly, the Court determines that a nationwide injunction is required in order to "provide complete relief to the [P]laintiffs" and is, as such, "no more burdensome to the [D]efendant[s] than necessary." *Roe*, 947 F.3d at 231 (quoting *Madsen*, 512 U.S. at 765).

Finally, "where a law is unconstitutional on its face, and not simply in its application to certain plaintiffs, a nationwide injunction is appropriate." *Cnty. of Santa Clara*, 250 F. Supp. 3d at 539 (citing *Califano*, 442 U.S. at 702); *see also Nuziard v. Minority Bus. Dev. Agency*, 721 F. Supp. 3d 431, 508 (N.D. Tex. 2024), *appeal dismissed*, Civ. No. 24-10603, 2024 WL 5279784 (5th Cir. July 22, 2024). The Court declines to issue an injunction out of proportion with "the extent of the violation established," *Califano*, 442 U.S. at 702, and thus determines that nationwide injunctive relief is warranted under the circumstances.

### E.    Stay Pending Appeal

Defendants request that the Court stay injunctive relief pending the disposition of appeal. ECF 90, at 32. This request is procedurally improper under Federal Rule of Civil Procedure 7. *See* Fed. R. Civ. P. 7(b)(1) ("A request for a court order must be made by motion.").

Even if the request were procedurally proper, the Court denies it. Although the Court has discretion to grant a stay pending appeal, "[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken*, 556 U.S. at 433–34 (citations omitted). Four factors are relevant: (1) "whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits" of the appeal; (2) "whether the applicant will be irreparably injured absent a stay"; (3) "whether issuance of the stay will substantially injure the other parties interested in the proceeding"; and (4) "where the public interest lies." *Id.* at 434. For

all the reasons discussed above, Defendants satisfy none of these factors. Thus, the Court declines to issue a stay pending appeal.

### F.    Security

The Court previously declined to require the posting of security under Rule 65(c). Defendants have now affirmatively requested a bond because "any preliminary relief would potentially mandate that the Executive spend money that may not be recouped once distributed." ECF 90, at 32. Because the Court has found that Plaintiffs are likely to succeed on their claim that the withholding of the funds at issue in this case is unconstitutional, the Court again declines to require a bond. *See Md. Dep't of Human Res. v. U.S. Dep't of Agric.*, 976 F.2d 1462, 1483 n.23 (4th Cir. 1992) (stating that district court has "discretion to set a bond amount of zero where the enjoined or restrained party faces no likelihood of material harm"); *see also Washington*, 2025 WL 659057, at *28 n.29 ("Defendants' assertion that 'any preliminary relief would potentially mandate that the Executive spend money that may not be recouped once distributed,' is unsupported and speculative." (internal citation omitted)).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction, ECF 69, is **GRANTED**. A separate implementing Order will issue.

Dated: March 4, 2025

Brendan A. Hurson
United States District Judge

66

JA987

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| PFLAG, INC., ET AL., | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | Civil No. 25-337-BAH |
| DONALD J. TRUMP ET AL., | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>ORDER</u>

For the reasons stated in the accompanying memorandum opinion, it is hereby **ORDERED** that Plaintiffs' motion for a preliminary injunction, ECF 69, is **GRANTED**.[1] It is further

**ORDERED** that Defendants U.S. Department of Health and Human Services ("HHS"), Robert F. Kennedy, Jr., in his official capacity as Secretary of HHS; the Health Resources and Services Administration ("HRSA"); Diana Espinosa, in her official capacity as Principal Deputy Administrator of HRSA; the National Institutes of Health ("NIH"); Matthew J. Memoli, in his official capacity as Acting NIH Director; the National Science Foundation ("NSF"); Sethuraman Panchanathan, in his official capacity as Director of NSF; any subagencies of Defendant HHS, their officers, agents, successors, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, are **ENJOINED** from conditioning, withholding, or terminating federal funding under Section 3(g) of Executive Order 14,168 and Section 4 of

---

[1] For the purposes of this preliminary injunction, "Defendants" herein refers to all Defendants listed in the amended complaint except President Trump.

Executive Order 14,187, based on the fact that a healthcare entity or health professional provides gender-affirming medical care to a patient under the age of nineteen; it is further

**ORDERED** that Defendants must provide written notice of the Court's preliminary injunction to all Defendants and their employees, contractors, and grantees by March 10, 2025. The written notice shall instruct the aforementioned groups that Defendants may not take any steps to implement, give effect to, or reinstate under a different name the directives in Section 3(g) of Executive Order 14,168 or Section 4 of Executive Order 14,187 that condition or withhold federal funding based on the fact that a healthcare entity or health professional provides gender-affirming medical care to a patient under the age of nineteen. The written notice shall also instruct Defendant agencies to release any disbursements on funds that were paused due to the Executive Orders; it is further

**ORDERED** that the preliminary injunction remains in effect pending further orders from this Court; it is further

**ORDERED** that Defendants shall file a status report on or before March 11, 2025, apprising the Court of the status of Defendants' compliance with this Order, including by providing a copy of the written notice described above; it is further

**ORDERED** that no security bond is required because Defendants will not suffer any costs from the preliminary injunction. Fed. R. Civ. P. 65(c).

Dated: <u>March 4, 2025</u>

Brendan A. Hurson
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

_____

|  |  |  |
|---|---|---|
| PFLAG, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 8:25-cv-337-BAH |
| | ) | |
| DONALD J. TRUMP, in his official capacity as | ) | |
| President of the United States, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

_____)

## NOTICE OF APPEAL

PLEASE TAKE NOTICE that all Defendants in the above-captioned case hereby appeal

to the United States Court of Appeals for the Fourth Circuit from this Court's Memorandum

Opinion (ECF No. 115) and Order (ECF No. 116), both entered March 4, 2025.


Dated: March 21, 2025                 Respectfully submitted,

                                      YAAKOV M. ROTH
                                      Acting Assistant Attorney General

                                      MICHELLE BENNETT
                                      Assistant Branch Director

                                      */s/ Christian S. Daniel*
                                      VINITA B. ANDRAPALLIYAL
                                      Senior Trial Counsel
                                      CHRISTIAN S. DANIEL
                                      Trial Attorney
                                      United States Department of Justice
                                      Civil Division, Federal Programs Branch
                                      1100 L Street NW
                                      Washington, DC 20530
                                      Tel.: (202) 305-0845
                                      vinita.b.andrapalliyal@usdoj.gov
                                      christian.s.daniel@usdoj.gov

                                      *Counsel for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

_____

|  |  |
|---|---|
| PFLAG, INC., *et al.*, | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | )    Civil Action No. 8:25-cv-337 |
|  | ) |
| DONALD J. TRUMP, in his official capacity as | ) |
| President of the United States, *et al.*, | ) |
|  | ) |
| Defendants. | ) |

_____)

### NOTICE

1. Defendants hereby provide notice to the Court of certain past actions by the Centers for Disease Control and Prevention ("CDC") related to the parties' prior briefing on, and the Court's opinion granting, Plaintiffs' motion for preliminary injunction.

2. In Plaintiffs' Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction, ECF No. 69-1, Plaintiffs cited a CDC notice to grant recipients. *See id.* at 6–7. In Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction, ECF No. 90, Defendants stated that the cited CDC notice was "now-rescinded." *Id.* at 9. Defendants further stated that "no agency defendant has revoked or denied any particular grants as a result of the EOs." *Id.* at 9; *see also id.* at 7. In the Court's opinion, the Court stated that Defendants "characterize the CDC notice as 'now rescinded,' but provide no further information on this alleged recission." *See* Memorandum Opinion at 6 n.11, ECF No. 115.

3. In their Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction, Defendants intended to convey that no funding was currently revoked or

actually withheld on the basis of the EOs. Defendants provide the information herein to clarify their statements and the actions taken by CDC prior to the Court's decision granting Plaintiffs' motion for preliminary injunction.

4. On January 31, 2025, CDC sent grant recipients the notice attached as Exhibit 1 and referenced in the Court's opinion. On February 11, 2025, via the agency's grant administration system, GrantSolutions, CDC notified grant recipients that it had rescinded the notice. *See* Exhibit 2.

5. Also on January 31, 2025, CDC terminated 17 grants. *See* Exs. 3–19. Each termination notice stated, *inter alia*, that the termination was "in accordance with the President's Executive Order, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to Federal Government." *Id.* at 5. No funds were de-obligated based on these terminations. On February 11, 2025, CDC reinstated each of those grants through individual Notices of Award. *See* Exs. 20–36.[1]

---

[1] Unique identifying numbers of grant recipients have been redacted from each Notice.

Dated: April 21, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

MICHELLE BENNETT
Assistant Branch Director

*/s/ Christian S. Daniel*
VINITA B. ANDRAPALLIYAL
Senior Counsel
CHRISTIAN S. DANIEL
ROBERT C. BOMBARD
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel.: (202) 305-0845
vinita.b.andrapalliyal@usdoj.gov
christian.s.daniel@usdoj.gov
robert.bombard2@usdoj.gov

*Counsel for Defendants*



Case 8:25-cv-00337-BAH    Document 140-1    Filed 04/21/25    Page 1 of 1
U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES                    Public Health Service

Centers for Disease Control
and Prevention (CDC)
Atlanta GA 30329-4027

Dear Recipient:

This Centers for Disease Control and Prevention (CDC) award is funded in whole or in part with United States Government funds.

To implement the Executive Order entitled *Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government (Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government – The White House),* and in accordance with Office of Personnel Management's Initial Guidance (Memorandum to Heads and Acting Heads of Departments and Agencies: Initial Guidance Regarding President Trump's Executive Order Defending Women), you must immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting or inculcating gender ideology at every level and activity, regardless of your location or the citizenship of employees or contractors, that are supported with funds from this award. Any vestige, remnant, or re-named piece of any gender ideology programs funded by the U.S. government under this award are immediately, completely, and permanently terminated.

No additional costs must be incurred that would be used to support any gender ideology programs, personnel, or activities.

Any questions should be directed to PRISM@cdc.gov

JA994

## View / Reply to Grant Message

**Subject:** UPDATE: Temporary Restraining Order
**Communication Type:** Correspondence    **Category:** Bulk Message

| AUTHOR | MESSAGE | DATE / TIME | ACTIONS |
|---|---|---|---|
| Shirley Byrd | In compliance with the Temporary Restraining Order issued on January 31, 2025, in the United States District Court in the District of Rhode Island, the purpose of this communication is to rescind the following CDC communications effective immediately:January 29, 2025: Cease DEI Activities on ALL CDC funded awardsJanuary 31, 2025: Cease ALL Activities Promoting Gender IdeologyPlease direct questions to PRISM@cdc.gov | 02/11/2025 09:09 AM EST | |

**Add Reply**





# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## Centers for Disease Control and Prevention

**Notice of Award**

Award# 6 NU65PS923735-03-01
FAIN# NU65PS923735
Federal Award Date: 01/31/2025

| Recipient Information |
|---|
| **1. Recipient Name**<br>COMMUNITY WELLNESS PROJECT<br>906 Olive St Ste 904<br>Saint Louis, MO 63101-1431<br>[NO DATA] |
| **2. Congressional District of Recipient**<br>01 |
| **3. Payment System Identifier (ID)** |
| **4. Employer Identification Number (EIN)** |
| **5. Data Universal Numbering System (DUNS)** |
| **6. Recipient's Unique Entity Identifier (UEI)** |
| **7. Project Director or Principal Investigator**<br>Mrs. Dana P Williams<br>Executive Director<br>cwp_group@yahoo.com<br>314-421-9600 |
| **8. Authorized Official**<br>Mr. Monterio D. Pattman<br>Accountant<br>mpattman@cwpstl.org<br>314-421-9600 |

### Federal Agency Information
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Ms. Chamarla Brame
Grants Management Specialist
qpv3@cdc.gov
404.498.4134

**10. Program Official Contact Information**
Brigitte Brown
Program Officer
blc0@cdc.gov
404-498-5023

| Federal Award Information |
|---|
| **11. Award Number**<br>6 NU65PS923735-03-01 |
| **12. Unique Federal Award Identification Number (FAIN)**<br>NU65PS923735 |
| **13. Statutory Authority**<br>This program is authorized under Sections 301 and 318(a) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended. |
| **14. Federal Award Project Title**<br>GIRLS LIKE US |
| **15. Assistance Listing Number**<br>93.939 |
| **16. Assistance Listing Program Title**<br>HIV Prevention Activities_Non-Governmental Organization Based |
| **17. Award Action Type**<br>Terminate |
| **18. Is the Award R&D?**<br>No |

### Summary Federal Award Financial Information

| | |
|---|---|
| **19. Budget Period Start Date** 04/01/2024 **- End Date** 01/31/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0.00 |
| 20a. Direct Cost Amount | $0.00 |
| 20b. Indirect Cost Amount | $0.00 |
| **21. Authorized Carryover** | $0.00 |
| **22. Offset** | $0.00 |
| **23. Total Amount of Federal Funds Obligated this budget period** | $400,000.00 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0.00 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $400,000.00 |
| **26. Period of Performance Start Date** 04/01/2022 **- End Date** 01/31/2025 | |
| **27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Period of Performance** | $1,262,500.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS

**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

| **30. Remarks** |
|---|
| |

Page 1



DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU65PS923735-03-01
FAIN# NU65PS923735
Federal Award Date: 01/31/2025

| **Recipient Information** |
|---|
| **Recipient Name** |
| COMMUNITY WELLNESS PROJECT |
| 906 Olive St Ste 904 |
| Saint Louis, MO 63101-1431 |
| [NO DATA] |
| |
| **Congressional District of Recipient** |
| 01 |
| **Payment Account Number and Type** |
| |
| **Employer Identification Number (EIN) Data** |
| |
| **Universal Numbering System (DUNS)** |
| |
| **Recipient's Unique Entity Identifier (UEI)** |
| |

| **31. Assistance Type** |
|---|
| Cooperative Agreement |
| **32. Type of Award** |
| Other |

**33. Approved Budget**
(Excludes Direct Assistance)

I.  Financial Assistance from the Federal Awarding Agency Only
II. Total project costs including grant funds and all other financial participation

| | | |
|---|---|---:|
| a. | Salaries and Wages | $211,995.00 |
| b. | Fringe Benefits | $40,682.00 |
| c. | Total Personnel Costs | $252,677.00 |
| d. | Equipment | $0.00 |
| e. | Supplies | $19,756.00 |
| f. | Travel | $14,564.00 |
| g. | Construction | $0.00 |
| h. | Other | $60,020.00 |
| i. | Contractual | $52,983.00 |
| j. | **TOTAL DIRECT COSTS** | **$400,000.00** |
| k. | **INDIRECT COSTS** | **$0.00** |
| l. | **TOTAL APPROVED BUDGET** | **$400,000.00** |
| m. | Federal Share | $400,000.00 |
| n. | Non-Federal Share | $0.00 |

**34. Accounting Classification Codes**

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 2-93908J1 | 22NU65PS923735 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 2-9390JS5 | 22NU65PS923735 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-93908J1 | 22NU65PS923735 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390JS5 | 22NU65PS923735 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390KZS | 22NU65PS923735 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-93908J1 | 22NU65PS923735 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |
| 4-9390JS5 | 22NU65PS923735 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |

Page 2



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**  Notice of Award

Centers for Disease Control and Prevention

Award#  6 NU65PS923735-03-01
FAIN#    NU65PS923735
Federal Award Date: 01/31/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

Page 3

## AWARD ATTACHMENTS

COMMUNITY WELLNESS PROJECT                6 NU65PS923735-03-01

**1.** Terms

**TERMS AND CONDITIONS OF AWARD**

**Termination**: The purpose of this amendment is to terminate this award in accordance with the President's Executive Order, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to Federal Government and Office of Personnel Management guidance issued January 29, 2025.

No additional activities can be conducted, and no additional costs may be incurred. Un-obligated balances will be de-obligated.

**Closeout**: Submit all closeout reports identified below within 120 days of the period of performance end date of January 31, 2025. Submit the documentation as a "Grant Closeout" amendment in GrantSolutions. The reporting timeframe is the full period of performance. Please note, if you fail to submit timely and accurate reports, CDC may also pursue other enforcement actions per 45 CFR PART 75.371.

**Final Performance/Progress Report**: This report should include the information specified in the Notice of Funding Opportunity (NOFO). At a minimum, the report will include the following: • Statement of progress made toward the achievement of originally stated aims. • Description of results (positive or negative) considered significant. • List of publications resulting from the project, with plans, if any, for further publication.

**Final Federal Financial Report (FFR, SF-425)**: The FFR should only include those funds authorized and expended during the timeframe covered by the report. The final report must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. Should the amount not match with the final expenditures reported to the Payment Management System (PMS), you will be required to update your reports to PMS accordingly.

**Equipment and Supplies - Tangible Personal Property Report (SF-428)**: A completed SF-428 detailing all major equipment acquired with a unit acquisition cost of $5,000 or more. If no equipment was acquired under the award, a negative report is required



DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Disease Control and Prevention

Notice of Award

Award#  6 NU65PS923736-03-02
FAIN#   NU65PS923736
Federal Award Date: 01/31/2025

## Recipient Information

**1. Recipient Name**
THE DAMIEN CENTER INC
26 N Arsenal Ave
Indianapolis, IN 46201-3808

**2. Congressional District of Recipient**
07

**3. Payment System Identifier (ID)**
███████████

**4. Employer Identification Number (EIN)**
███████

**5. Data Universal Numbering System (DUNS)**
███████

**6. Recipient's Unique Entity Identifier (UEI)**
████████

**7. Project Director or Principal Investigator**
Mr. Dexter Etter
detter@damien.org
317-632-0123

**8. Authorized Official**
Mr. Alan Witchey
awitchey@damien.org
317-632-0123

### Federal Agency Information
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Ms. Chamarla Brame
Grants Management Specialist
qpv3@cdc.gov
404.498.4134

**10. Program Official Contact Information**
Vincent Doan
Program Officer
skn9@cdc.gov
404-498-0548

## Federal Award Information

**11. Award Number**
6 NU65PS923736-03-02
**12. Unique Federal Award Identification Number (FAIN)**
NU65PS923736
**13. Statutory Authority**
This program is authorized under Sections 301 and 318(a) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended.
**14. Federal Award Project Title**
YTG Prevention Program

**15. Assistance Listing Number**
93.939
**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based

**17. Award Action Type**
Terminate
**18. Is the Award R&D?**
No

### Summary Federal Award Financial Information

**19. Budget Period Start Date** 04/01/2024 **- End Date** 01/31/2025

**20. Total Amount of Federal Funds Obligated by this Action**                    $0.00
  20a. Direct Cost Amount                                                          $0.00
  20b. Indirect Cost Amount                                                        $0.00

**21.** Authorized Carryover                                                    $30,000.00

**22.** Offset                                                                     $0.00

**23.** Total Amount of Federal Funds Obligated this budget period           $400,000.00

**24. Total Approved Cost Sharing or Matching, where applicable**                 $0.00

**25. Total Federal and Non-Federal Approved this Budget Period**            $400,000.00

**26. Period of Performance Start Date** 04/01/2022 **- End Date** 01/31/2025

**27.** Total Amount of the Federal Award including Approved
  Cost Sharing or Matching this Period of Performance                      $1,200,000.00

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS
**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

## 30. Remarks

JA1001



DEPARTMENT OF HEALTH AND HUMAN SERVICES    Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU65PS923736-03-02
FAIN# NU65PS923736
Federal Award Date: 01/31/2025

| **Recipient Information** |
|---|
| **Recipient Name** |
| THE DAMIEN CENTER INC |
| 26 N Arsenal Ave |
| Indianapolis, IN 46201-3808 |
| |
| **Congressional District of Recipient** |
| 07 |
| **Payment Account Number and Type** |
| ▮▮▮▮▮ |
| **Employer Identification Number (EIN) Data** |
| ▮▮▮▮▮ |
| **Universal Numbering System (DUNS)** |
| ▮▮▮▮▮ |
| **Recipient's Unique Entity Identifier (UEI)** |
| ▮▮▮▮▮ |

| **31. Assistance Type** |
|---|
| Cooperative Agreement |
| **32. Type of Award** |
| Other |

**33. Approved Budget**
(Excludes Direct Assistance)

I.  Financial Assistance from the Federal Awarding Agency Only
II. Total project costs including grant funds and all other financial participation

| | |
|---|---:|
| a.  Salaries and Wages | $234,255.00 |
| b.  Fringe Benefits | $69,345.00 |
|     c.  Total Personnel Costs | $303,600.00 |
| d.  Equipment | $0.00 |
| e.  Supplies | $11,200.00 |
| f.  Travel | $15,943.00 |
| g.  Construction | $0.00 |
| h.  Other | $60,166.00 |
| i.  Contractual | $0.00 |
| **j.  TOTAL DIRECT COSTS** | **$390,909.00** |
| **k.  INDIRECT COSTS** | **$39,091.00** |
| **l.  TOTAL APPROVED BUDGET** | **$430,000.00** |
| m.  Federal Share | $430,000.00 |
| n.  Non-Federal Share | $0.00 |

| **34. Accounting Classification Codes** |
|---|

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 2-93908J1 | 22NU65PS923736 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 2-93908JS5 | 22NU65PS923736 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-93908J1 | 22NU65PS923736 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-93908JS5 | 22NU65PS923736 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-93908J1 | 22NU65PS923736 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |
| 4-93908JS5 | 22NU65PS923736 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |

Page 2



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**    Notice of Award

Centers for Disease Control and Prevention

Award#  6 NU65PS923736-03-02
FAIN#    NU65PS923736
Federal Award Date: 01/31/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

## AWARD ATTACHMENTS

THE DAMIEN CENTER INC                                         6 NU65PS923736-03-02

**1.** TERMINATION

**TERMS AND CONDITIONS OF AWARD**

**Termination**: The purpose of this amendment is to terminate this award in accordance with the President's Executive Order, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to Federal Government and Office of Personnel Management guidance issued January 29, 2025.

No additional activities can be conducted, and no additional costs may be incurred.  Un-obligated balances will be de-obligated.

**Closeout**: Submit all closeout reports identified below within 120 days of the period of performance end date of January 31, 2025. Submit the documentation as a "Grant Closeout" amendment in GrantSolutions. The reporting timeframe is the full period of performance. Please note, if you fail to submit timely and accurate reports, CDC may also pursue other enforcement actions per 45 CFR PART 75.371.

**Final Performance/Progress Report**: This report should include the information specified in the Notice of Funding Opportunity (NOFO). At a minimum, the report will include the following: • Statement of progress made toward the achievement of originally stated aims. • Description of results (positive or negative) considered significant. • List of publications resulting from the project, with plans, if any, for further publication.

**Final Federal Financial Report (FFR, SF-425)**: The FFR should only include those funds authorized and expended during the timeframe covered by the report. The final report must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. Should the amount not match with the final expenditures reported to the Payment Management System (PMS), you will be required to update your reports to PMS accordingly.

**Equipment and Supplies - Tangible Personal Property Report (SF-428)**: A completed SF-428 detailing all major equipment acquired with a unit acquisition cost of $5,000 or more. If no equipment was acquired under the award, a negative report is required



DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU65PS923741-03-03
FAIN# NU65PS923741
Federal Award Date: 01/31/2025

## Recipient Information

**1. Recipient Name**
The Knights & Orchids Society Inc.
17 Broad St
Selma, AL 36701-4605

**2. Congressional District of Recipient**
07

**3. Payment System Identifier (ID)**

**4. Employer Identification Number (EIN)**

**5. Data Universal Numbering System (DUNS)**

**6. Recipient's Unique Entity Identifier (UEI)**

**7. Project Director or Principal Investigator**
Ms. Traniesa Caldwell
Deputy Director
traniesa.caldwell@tkosociety.com
3344129766

**8. Authorized Official**
Mrs. Jennine Bell
Grantee
jennine@tkosociety.com
334-431-2227

### Federal Agency Information
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Mr. Anthony Fultz
Grant Management Specialist
qjj7@cdc.gov
(404)498-4033

**10. Program Official Contact Information**
Ms. Tanisha Quintanilla
Project Officer
DHP/PDIB
jbk3@cdc.gov
404-639-1991

## Federal Award Information

**11. Award Number**
6 NU65PS923741-03-03
**12. Unique Federal Award Identification Number (FAIN)**
NU65PS923741
**13. Statutory Authority**
This program is authorized under Sections 301 and 318(a) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended.
**14. Federal Award Project Title**
Fast Affirming Innovative Testing and Health Care (FAITH)

**15. Assistance Listing Number**
93.939
**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based

**17. Award Action Type**
Terminate
**18. Is the Award R&D?**
No

### Summary Federal Award Financial Information

**19. Budget Period Start Date** 04/01/2024 - **End Date** 01/31/2025
**20. Total Amount of Federal Funds Obligated by this Action** $0.00
  20a. Direct Cost Amount $0.00
  20b. Indirect Cost Amount $0.00
**21. Authorized Carryover** $0.00
**22. Offset** $0.00
**23. Total Amount of Federal Funds Obligated this budget period** $400,000.00
**24. Total Approved Cost Sharing or Matching, where applicable** $0.00
**25. Total Federal and Non-Federal Approved this Budget Period** $400,000.00
**26. Period of Performance Start Date** 04/01/2022 - **End Date** 01/31/2025
**27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Period of Performance** $2,136,852.00

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS
**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

## 30. Remarks



DEPARTMENT OF HEALTH AND HUMAN SERVICES     Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU65PS923741-03-03
FAIN# NU65PS923741
Federal Award Date: 01/31/2025

## Recipient Information

**Recipient Name**

The Knights & Orchids Society Inc.

17 Broad St

Selma, AL 36701-4605

**Congressional District of Recipient**

07

**Payment Account Number and Type**

███████

**Employer Identification Number (EIN) Data**

███████

**Universal Numbering System (DUNS)**

███████

**Recipient's Unique Entity Identifier (UEI)**

███████

**31. Assistance Type**

Cooperative Agreement

**32. Type of Award**

Other

### 33. Approved Budget

(Excludes Direct Assistance)

I. Financial Assistance from the Federal Awarding Agency Only
II. Total project costs including grant funds and all other financial participation

| | | |
|---|---|---|
| a. | Salaries and Wages | $234,000.00 |
| b. | Fringe Benefits | $58,500.00 |
| | c. Total Personnel Costs | $292,500.00 |
| d. | Equipment | $0.00 |
| e. | Supplies | $14,542.00 |
| f. | Travel | $13,302.00 |
| g. | Construction | $0.00 |
| h. | Other | $43,292.00 |
| i. | Contractual | $0.00 |
| j. | **TOTAL DIRECT COSTS** | **$363,636.00** |
| k. | **INDIRECT COSTS** | **$36,364.00** |
| l. | **TOTAL APPROVED BUDGET** | **$400,000.00** |
| m. | Federal Share | $400,000.00 |
| n. | Non-Federal Share | $0.00 |

### 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 2-93908J1 | 22NU65PS923741 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 2-93908J5 | 22NU65PS923741 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-93908J1 | 22NU65PS923741 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-93908J5 | 22NU65PS923741 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-93908J1 | 22NU65PS923741 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |
| 4-93908J5 | 22NU65PS923741 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |

Page 2

USCA4 Appeal: 25-1279    Doc: 34-2    Filed: 07/25/2025    Pg: 432 of 589



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**  Notice of Award

Centers for Disease Control and Prevention

Award#  6 NU65PS923741-03-03
FAIN#  NU65PS923741
Federal Award Date: 01/31/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

JA1008

# AWARD ATTACHMENTS

The Knights & Orchids Society Inc.                    6 NU65PS923741-03-03

**1.** TERMINATION

TERMS AND CONDITIONS OF AWARD

**Termination**: The purpose of this amendment is to terminate this award in accordance with the President's Executive Order, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to Federal Government and Office of Personnel Management guidance issued January 29, 2025.

No additional activities can be conducted, and no additional costs may be incurred. Un-obligated balances will be de-obligated.

**Closeout**: Submit all closeout reports identified below within 120 days of the period of performance end date of January 31, 2025. Submit the documentation as a "Grant Closeout" amendment in GrantSolutions. The reporting timeframe is the full period of performance. Please note, if you fail to submit timely and accurate reports, CDC may also pursue other enforcement actions per 45 CFR PART 75.371.

**Final Performance/Progress Report**: This report should include the information specified in the Notice of Funding Opportunity (NOFO). At a minimum, the report will include the following: • Statement of progress made toward the achievement of originally stated aims. • Description of results (positive or negative) considered significant. • List of publications resulting from the project, with plans, if any, for further publication.

**Final Federal Financial Report (FFR, SF-425)**: The FFR should only include those funds authorized and expended during the timeframe covered by the report. The final report must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. Should the amount not match with the final expenditures reported to the Payment Management System (PMS), you will be required to update your reports to PMS accordingly.

**Equipment and Supplies - Tangible Personal Property Report (SF-428)**: A completed SF-428 detailing all major equipment acquired with a unit acquisition cost of $5,000 or more. If no equipment was acquired under the award, a negative report is required



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU65PS923744-03-01
FAIN# NU65PS923744
Federal Award Date: 01/31/2025

| Recipient Information |
|---|
| **1. Recipient Name**<br>LONG ISLAND CRISIS CENTER INC<br>2740 Martin Ave<br>Bellmore, NY 11710-3268<br>5166799000126 |
| **2. Congressional District of Recipient**<br>04 |
| **3. Payment System Identifier (ID)**<br>▓▓▓▓▓▓▓▓ |
| **4. Employer Identification Number (EIN)**<br>▓▓▓▓▓▓ |
| **5. Data Universal Numbering System (DUNS)**<br>▓▓▓▓▓ |
| **6. Recipient's Unique Entity Identifier (UEI)**<br>▓▓▓▓▓▓▓ |
| **7. Project Director or Principal Investigator**<br>Mr. Devon  Zappasodi<br>dzappasodi@liccpfy.org<br>516-679-9000 |
| **8. Authorized Official**<br>Ms. Theresa  Buhse<br>Tbuhse@longislandcrisiscenter.org<br>516-826-0244 |

| Federal Agency Information |
|---|
| CDC Office of Financial Resources |
| **9. Awarding Agency Contact Information**<br>Mr. Keith Preciados<br>Grants Management Specialist<br>zpw9@cdc.gov<br>770-488-5392 |
| **10. Program Official Contact Information**<br>Mr. Lennie William Lyons<br>Program Officer<br>szv7@cdc.gov<br>404-718-2581 |

## Federal Award Information

**11. Award Number**
6 NU65PS923744-03-01

**12. Unique Federal Award Identification Number (FAIN)**
NU65PS923744

**13. Statutory Authority**
This program is authorized under Sections 301 and 318(a) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended.

**14. Federal Award Project Title**
Comprehensive High-Impact HIV Prevention Programs for Young Transgender Persons of Color in Queens, Nassau, and Suffolk Counties

**15. Assistance Listing Number**
93.939

**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based

**17. Award Action Type**
Terminate

**18. Is the Award R&D?**
No

### Summary Federal Award Financial Information

| | |
|---|---|
| **19. Budget Period Start Date** 04/01/2024 **- End Date** 01/31/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0.00 |
| 20a. Direct Cost Amount | $0.00 |
| 20b. Indirect Cost Amount | $0.00 |
| **21. Authorized Carryover** | $0.00 |
| **22. Offset** | $0.00 |
| **23. Total Amount of Federal Funds Obligated this budget period** | $400,000.00 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0.00 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $400,000.00 |
| **26. Period of Performance Start Date** 04/01/2022 **- End Date** 01/31/2025 | |
| **27. Total Amount of the Federal Award including Approved Cost  Sharing or Matching this Period of Performance** | $1,200,000.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS

**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

| 30. Remarks |
|---|
| |



DEPARTMENT OF HEALTH AND HUMAN SERVICES     Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU65PS923744-03-01
FAIN# NU65PS923744
Federal Award Date: 01/31/2025

## Recipient Information

**Recipient Name**
LONG ISLAND CRISIS CENTER INC
2740 Martin Ave
Bellmore, NY 11710-3268
5166799000126

**Congressional District of Recipient**
04

**Payment Account Number and Type**
███████████

**Employer Identification Number (EIN) Data**
███████████

**Universal Numbering System (DUNS)**
███████████

**Recipient's Unique Entity Identifier (UEI)**
███████████

**31. Assistance Type**
Cooperative Agreement

**32. Type of Award**
Other

### 33. Approved Budget
(Excludes Direct Assistance)

I.  Financial Assistance from the Federal Awarding Agency Only
II. Total project costs including grant funds and all other financial participation

| | | |
|---|---|---|
| a. Salaries and Wages | | $239,491.00 |
| b. Fringe Benefits | | $48,010.00 |
| c. Total Personnel Costs | | $287,501.00 |
| d. Equipment | | $0.00 |
| e. Supplies | | $16,034.00 |
| f. Travel | | $6,705.00 |
| g. Construction | | $0.00 |
| h. Other | | $89,760.00 |
| i. Contractual | | $0.00 |
| **j. TOTAL DIRECT COSTS** | | **$400,000.00** |
| **k. INDIRECT COSTS** | | **$0.00** |
| **l. TOTAL APPROVED BUDGET** | | **$400,000.00** |
| m. Federal Share | | $400,000.00 |
| n. Non-Federal Share | | $0.00 |

### 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 2-93908J1 | 22NU65PS923744 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 2-9390JS5 | 22NU65PS923744 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-93908J1 | 22NU65PS923744 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390JS5 | 22NU65PS923744 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-93908J1 | 22NU65PS923744 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |
| 4-9390JS5 | 22NU65PS923744 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |

Page 2



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**  Notice of Award

Centers for Disease Control and Prevention

Award#  6 NU65PS923744-03-01
FAIN#   NU65PS923744
Federal Award Date: 01/31/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

## AWARD ATTACHMENTS

LONG ISLAND CRISIS CENTER INC                    6 NU65PS923744-03-01

**1.** Terms

**TERMS AND CONDITIONS OF AWARD**

**Termination**: The purpose of this amendment is to terminate this award in accordance with the President's Executive Order, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to Federal Government and Office of Personnel Management guidance issued January 29, 2025.

No additional activities can be conducted, and no additional costs may be incurred. Un-obligated balances will be de-obligated.

**Closeout**: Submit all closeout reports identified below within 120 days of the period of performance end date of January 31, 2025. Submit the documentation as a "Grant Closeout" amendment in GrantSolutions. The reporting timeframe is the full period of performance. Please note, if you fail to submit timely and accurate reports, CDC may also pursue other enforcement actions per 45 CFR PART 75.371.

**Final Performance/Progress Report**: This report should include the information specified in the Notice of Funding Opportunity (NOFO). At a minimum, the report will include the following: • Statement of progress made toward the achievement of originally stated aims. • Description of results (positive or negative) considered significant. • List of publications resulting from the project, with plans, if any, for further publication.

**Final Federal Financial Report (FFR, SF-425)**: The FFR should only include those funds authorized and expended during the timeframe covered by the report. The final report must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. Should the amount not match with the final expenditures reported to the Payment Management System (PMS), you will be required to update your reports to PMS accordingly.

**Equipment and Supplies - Tangible Personal Property Report (SF-428)**: A completed SF-428 detailing all major equipment acquired with a unit acquisition cost of $5,000 or more. If no equipment was acquired under the award, a negative report is required



# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU65PS923745-03-01
FAIN# NU65PS923745
Federal Award Date: 01/31/2025

## Recipient Information

**1. Recipient Name**
LONG ISLAND GAY & LESBIAN YOUTH INC
3511 35th Ave
Astoria, NY 11106-1206

**2. Congressional District of Recipient**
12

**3. Payment System Identifier (ID)**
███████████

**4. Employer Identification Number (EIN)**
███████████

**5. Data Universal Numbering System (DUNS)**
███████

**6. Recipient's Unique Entity Identifier (UEI)**
███████████

**7. Project Director or Principal Investigator**
Mr. JR Cehonski
Regional Director
jcehonski@lgbtnetwork.org
718

**8. Authorized Official**
Mr. Robert Vitelli
robert@lgbtnetwork.org
631-665-2300

### Federal Agency Information
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Mr. Keith Preciados
Grants Management Specialist
zpw9@cdc.gov
770-488-5392

**10. Program Official Contact Information**
Ruth Moro
Program Officer
ise6@cdc.gov
404-718-8627

## Federal Award Information

**11. Award Number**
6 NU65PS923745-03-01

**12. Unique Federal Award Identification Number (FAIN)**
NU65PS923745

**13. Statutory Authority**
This program is authorized under Sections 301 and 318(a) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended.

**14. Federal Award Project Title**
Safe Spaces Evaluation - Program Year 3 Supplemental Funding Application. Project HEAT

**15. Assistance Listing Number**
93.939

**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based

**17. Award Action Type**
Terminate

**18. Is the Award R&D?**
No

## Summary Federal Award Financial Information

| | | |
|---|---|---|
| **19. Budget Period Start Date** 04/01/2024 - **End Date** 01/31/2025 | | |
| **20. Total Amount of Federal Funds Obligated by this Action** | | $0.00 |
| 20a. Direct Cost Amount | | $0.00 |
| 20b. Indirect Cost Amount | | $0.00 |
| **21. Authorized Carryover** | | $0.00 |
| **22. Offset** | | $0.00 |
| **23. Total Amount of Federal Funds Obligated this budget period** | | $400,000.00 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | | $0.00 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | | $400,000.00 |
| **26. Period of Performance Start Date** 04/01/2022 - **End Date** 01/31/2025 | | |
| **27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Period of Performance** | | $1,262,500.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS

**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

## 30. Remarks

JA1016



DEPARTMENT OF HEALTH AND HUMAN SERVICES    Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU65PS923745-03-01
FAIN# NU65PS923745
Federal Award Date: 01/31/2025

## Recipient Information

**Recipient Name**
LONG ISLAND GAY & LESBIAN YOUTH INC
3511 35th Ave
Astoria, NY 11106-1206

**Congressional District of Recipient**
12

**Payment Account Number and Type**
███████

**Employer Identification Number (EIN) Data**
███████

**Universal Numbering System (DUNS)**
███████

**Recipient's Unique Entity Identifier (UEI)**
███████

**31. Assistance Type**
Cooperative Agreement
**32. Type of Award**
Other

### 33. Approved Budget
(Excludes Direct Assistance)

I. Financial Assistance from the Federal Awarding Agency Only
II. Total project costs including grant funds and all other financial participation

| | |
|---|---:|
| a. Salaries and Wages | $220,990.00 |
| b. Fringe Benefits | $42,165.00 |
|    c. Total Personnel Costs | $263,155.00 |
| d. Equipment | $0.00 |
| e. Supplies | $17,453.00 |
| f. Travel | $3,240.00 |
| g. Construction | $0.00 |
| h. Other | $68,454.00 |
| i. Contractual | $11,334.00 |
| j. TOTAL DIRECT COSTS | $363,636.00 |
| k. INDIRECT COSTS | $36,364.00 |
| l. TOTAL APPROVED BUDGET | $400,000.00 |
| m. Federal Share | $400,000.00 |
| n. Non-Federal Share | $0.00 |

### 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 2-93908J1 | 22NU65PS923745 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 2-9390JS5 | 22NU65PS923745 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-93908J1 | 22NU65PS923745 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390JS5 | 22NU65PS923745 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390KZS | 22NU65PS923745 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-93908J1 | 22NU65PS923745 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |
| 4-9390JS5 | 22NU65PS923745 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |

Page 2

JA1017



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**  Notice of Award

Centers for Disease Control and Prevention

Award#  6 NU65PS923745-03-01
FAIN#   NU65PS923745
Federal Award Date: 01/31/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

## AWARD ATTACHMENTS

LONG ISLAND GAY & LESBIAN YOUTH INC                    6 NU65PS923745-03-01

**1.** TERMINATION

**TERMS AND CONDITIONS OF AWARD**

**Termination**: The purpose of this amendment is to terminate this award in accordance with the President's Executive Order, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to Federal Government and Office of Personnel Management guidance issued January 29, 2025.

No additional activities can be conducted, and no additional costs may be incurred. Un-obligated balances will be de-obligated.

**Closeout**: Submit all closeout reports identified below within 120 days of the period of performance end date of January 31, 2025. Submit the documentation as a "Grant Closeout" amendment in GrantSolutions. The reporting timeframe is the full period of performance. Please note, if you fail to submit timely and accurate reports, CDC may also pursue other enforcement actions per 45 CFR PART 75.371.

**Final Performance/Progress Report**: This report should include the information specified in the Notice of Funding Opportunity (NOFO). At a minimum, the report will include the following: • Statement of progress made toward the achievement of originally stated aims. • Description of results (positive or negative) considered significant. • List of publications resulting from the project, with plans, if any, for further publication.

**Final Federal Financial Report (FFR, SF-425)**: The FFR should only include those funds authorized and expended during the timeframe covered by the report. The final report must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. Should the amount not match with the final expenditures reported to the Payment Management System (PMS), you will be required to update your reports to PMS accordingly.

**Equipment and Supplies - Tangible Personal Property Report (SF-428)**: A completed SF-428 detailing all major equipment acquired with a unit acquisition cost of $5,000 or more. If no equipment was acquired under the award, a negative report is required



# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## Centers for Disease Control and Prevention

**Notice of Award**

Award# 6 NU65PS923750-03-01
FAIN# NU65PS923750
Federal Award Date: 01/31/2025

---

## Recipient Information

**1. Recipient Name**
NORTH JERSEY AIDS ALLIANCE INC
393 Central Ave
Newark, NJ 07103-2842
973-483-3444

**2. Congressional District of Recipient**
10

**3. Payment System Identifier (ID)**
███████████

**4. Employer Identification Number (EIN)**
███████████

**5. Data Universal Numbering System (DUNS)**
███████

**6. Recipient's Unique Entity Identifier (UEI)**
███████████

**7. Project Director or Principal Investigator**
Mr. Jason Dotson
J.dotson@njcri.org
973-483-3444

**8. Authorized Official**
Mr. Joseph Rothenberg
Budget Officer
J.Rothenberg@njcri.org
973-483-3444

### Federal Agency Information
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Mr. Anthony Fultz
Grant Management Specialist
qjj7@cdc.gov
(404)498-4033

**10. Program Official Contact Information**
Deisa Pierre
Program Officer
dgp0@cdc.gov
404-498-5129

---

## Federal Award Information

**11. Award Number**
6 NU65PS923750-03-01

**12. Unique Federal Award Identification Number (FAIN)**
NU65PS923750

**13. Statutory Authority**
This program is authorized under Sections 301 and 318(a) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended.

**14. Federal Award Project Title**
High-Impact HIV Prevention Project for YTG of Color in Newark

**15. Assistance Listing Number**
93.939

**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based

**17. Award Action Type**
Terminate

**18. Is the Award R&D?**
No

---

### Summary Federal Award Financial Information

**19. Budget Period Start Date** 04/01/2024 **- End Date** 01/31/2025

| | |
|---|---|
| **20. Total Amount of Federal Funds Obligated by this Action** | $0.00 |
| 20a. Direct Cost Amount | $0.00 |
| 20b. Indirect Cost Amount | $0.00 |
| **21.** Authorized Carryover | $0.00 |
| **22.** Offset | $0.00 |
| **23.** Total Amount of Federal Funds Obligated this budget period | $400,000.00 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0.00 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $400,000.00 |
| **26. Period of Performance Start Date** 04/01/2022 **- End Date** 01/31/2025 | |
| **27.** Total Amount of the Federal Award including Approved Cost Sharing or Matching this Period of Performance | $1,262,500.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS

**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

---

**30. Remarks**

---



DEPARTMENT OF HEALTH AND HUMAN SERVICES    Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU65PS923750-03-01
FAIN# NU65PS923750
Federal Award Date: 01/31/2025

## Recipient Information

**Recipient Name**
NORTH JERSEY AIDS ALLIANCE INC
393 Central Ave
Newark, NJ 07103-2842

973-483-3444

**Congressional District of Recipient**
10

**Payment Account Number and Type**
▮▮▮▮▮

**Employer Identification Number (EIN) Data**
▮▮▮▮▮

**Universal Numbering System (DUNS)**
▮▮▮▮▮

**Recipient's Unique Entity Identifier (UEI)**
▮▮▮▮▮

**31. Assistance Type**
Cooperative Agreement
**32. Type of Award**
Other

### 33. Approved Budget
(Excludes Direct Assistance)

I. Financial Assistance from the Federal Awarding Agency Only
II. Total project costs including grant funds and all other financial participation

| | |
|---|---:|
| **a.  Salaries and Wages** | $184,995.00 |
| **b.  Fringe Benefits** | $62,898.00 |
| **c.  Total Personnel Costs** | $247,893.00 |
| **d.  Equipment** | $0.00 |
| **e.  Supplies** | $34,344.00 |
| **f.  Travel** | $17,798.00 |
| **g.  Construction** | $0.00 |
| **h.  Other** | $16,103.00 |
| **i.  Contractual** | $12,000.00 |
| **j.  TOTAL DIRECT COSTS** | $328,138.00 |
| **k.  INDIRECT COSTS** | $71,862.00 |
| **l.  TOTAL APPROVED BUDGET** | $400,000.00 |
| **m.  Federal Share** | $400,000.00 |
| **n.  Non-Federal Share** | $0.00 |

### 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 2-93908J1 | 22NU65PS923750 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 2-9390JS5 | 22NU65PS923750 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-93908J1 | 22NU65PS923750 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390JS5 | 22NU65PS923750 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390KZS | 22NU65PS923750 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-93908J1 | 22NU65PS923750 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |
| 4-9390JS5 | 22NU65PS923750 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |

Page 2

USCA4 Appeal: 25-1279      Doc: 34-2      Filed: 07/25/2025      Pg: 447 of 589



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**   Notice of Award

Centers for Disease Control and Prevention

Award#   6 NU65PS923750-03-01
FAIN#    NU65PS923750
Federal Award Date: 01/31/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

Page 3

## AWARD ATTACHMENTS

NORTH JERSEY AIDS ALLIANCE INC                          6 NU65PS923750-03-01

**1.** TERMINATION

**TERMS AND CONDITIONS OF AWARD**

**Termination**: The purpose of this amendment is to terminate this award in accordance with the President's Executive Order, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to Federal Government and Office of Personnel Management guidance issued January 29, 2025.

No additional activities can be conducted, and no additional costs may be incurred. Un-obligated balances will be de-obligated.

**Closeout**: Submit all closeout reports identified below within 120 days of the period of performance end date of January 31, 2025. Submit the documentation as a "Grant Closeout" amendment in GrantSolutions. The reporting timeframe is the full period of performance. Please note, if you fail to submit timely and accurate reports, CDC may also pursue other enforcement actions per 45 CFR PART 75.371.

**Final Performance/Progress Report**: This report should include the information specified in the Notice of Funding Opportunity (NOFO). At a minimum, the report will include the following: • Statement of progress made toward the achievement of originally stated aims. • Description of results (positive or negative) considered significant. • List of publications resulting from the project, with plans, if any, for further publication.

**Final Federal Financial Report (FFR, SF-425)**: The FFR should only include those funds authorized and expended during the timeframe covered by the report. The final report must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. Should the amount not match with the final expenditures reported to the Payment Management System (PMS), you will be required to update your reports to PMS accordingly.

**Equipment and Supplies - Tangible Personal Property Report (SF-428)**: A completed SF-428 detailing all major equipment acquired with a unit acquisition cost of $5,000 or more. If no equipment was acquired under the award, a negative report is required



# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU65PS923752-03-01
FAIN# NU65PS923752
Federal Award Date: 01/31/2025

---

## Recipient Information

**1. Recipient Name**
PUERTO RICAN CULTURAL CENTER
2739 W Division St # 41
Chicago, IL 60622-2854
[NO DATA]

**2. Congressional District of Recipient**
04

**3. Payment System Identifier (ID)**
███████████████

**4. Employer Identification Number (EIN)**
█████████████

**5. Data Universal Numbering System (DUNS)**
██████████

**6. Recipient's Unique Entity Identifier (UEI)**
████████████████

**7. Project Director or Principal Investigator**
Ms. Dezarae Rodriguez
Project Director
dezaraerodriguez@prcc-chgo.org
331-444-6472

**8. Authorized Official**
Mr. Jose Lopez
Authorizing Business Official
joseelopez@prcc-chgo.org
773-394-4935

### Federal Agency Information
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Mr. Keith Preciados
Grants Management Specialist
zpw9@cdc.gov
770-488-5392

**10. Program Official Contact Information**
Veronica McCants
vrm0@cdc.gov
404.639.5194

---

## Federal Award Information

**11. Award Number**
6 NU65PS923752-03-01

**12. Unique Federal Award Identification Number (FAIN)**
NU65PS923752

**13. Statutory Authority**
This program is authorized under Sections 301 and 318(a) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended.

**14. Federal Award Project Title**
High-Impact HIV Prevention Project for YTG of Color in Chicago

**15. Assistance Listing Number**
93.939

**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based

**17. Award Action Type**
Terminate

**18. Is the Award R&D?**
No

### Summary Federal Award Financial Information

**19. Budget Period Start Date** 04/01/2024 - **End Date** 01/31/2025

**20. Total Amount of Federal Funds Obligated by this Action** $0.00
    20a. Direct Cost Amount $0.00
    20b. Indirect Cost Amount $0.00

**21. Authorized Carryover** $0.00

**22. Offset** $0.00

**23. Total Amount of Federal Funds Obligated this budget period** $400,000.00

**24. Total Approved Cost Sharing or Matching, where applicable**

**25. Total Federal and Non-Federal Approved this Budget Period** $400,000.00

**26. Period of Performance Start Date** 04/01/2022 - **End Date** 01/31/2025

**27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Period of Performance** $1,262,500.00

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS

**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

---

## 30. Remarks

---



DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU65PS923752-03-01
FAIN# NU65PS923752
Federal Award Date: 01/31/2025

## Recipient Information

**Recipient Name**
PUERTO RICAN CULTURAL CENTER
2739 W Division St # 41
Chicago, IL 60622-2854
[NO DATA]

**Congressional District of Recipient**
04

**Payment Account Number and Type**
[REDACTED]

**Employer Identification Number (EIN) Data**
[REDACTED]

**Universal Numbering System (DUNS)**
[REDACTED]

**Recipient's Unique Entity Identifier (UEI)**
[REDACTED]

**31. Assistance Type**
Cooperative Agreement

**32. Type of Award**
Other

## 33. Approved Budget
(Excludes Direct Assistance)

I.  Financial Assistance from the Federal Awarding Agency Only
II.  Total project costs including grant funds and all other financial participation

| | |
|---|---:|
| **a.** Salaries and Wages | $266,333.00 |
| **b.** Fringe Benefits | $57,491.00 |
|    **c.** Total Personnel Costs | $323,824.00 |
| **d.** Equipment | $0.00 |
| **e.** Supplies | $10,600.00 |
| **f.** Travel | $3,573.00 |
| **g.** Construction | $0.00 |
| **h.** Other | $50,003.00 |
| **i.** Contractual | $12,000.00 |
| **j. TOTAL DIRECT COSTS** | $400,000.00 |
| **k. INDIRECT COSTS** | $0.00 |
| **l. TOTAL APPROVED BUDGET** | $400,000.00 |
| **m.** Federal Share | $400,000.00 |
| **n.** Non-Federal Share | $0.00 |

## 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 2-9390BJ1 | 22NU65PS923752 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 2-9390JS5 | 22NU65PS923752 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-9390BJ1 | 22NU65PS923752 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390JS5 | 22NU65PS923752 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390KZS | 22NU65PS923752 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-9390BJ1 | 22NU65PS923752 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |
| 4-9390JS5 | 22NU65PS923752 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**  Notice of Award

Centers for Disease Control and Prevention

Award#  6 NU65PS923752-03-01
FAIN#   NU65PS923752
Federal Award Date: 01/31/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

# AWARD ATTACHMENTS

PUERTO RICAN CULTURAL CENTER                                    6 NU65PS923752-03-01

**1.** TERMINATION

**TERMS AND CONDITIONS OF AWARD**

**Termination**: The purpose of this amendment is to terminate this award in accordance with the President's Executive Order, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to Federal Government and Office of Personnel Management guidance issued January 29, 2025.

No additional activities can be conducted, and no additional costs may be incurred.  Un-obligated balances will be de-obligated.

**Closeout**: Submit all closeout reports identified below within 120 days of the period of performance end date of January 31, 2025. Submit the documentation as a "Grant Closeout" amendment in GrantSolutions. The reporting timeframe is the full period of performance. Please note, if you fail to submit timely and accurate reports, CDC may also pursue other enforcement actions per 45 CFR PART 75.371.

**Final Performance/Progress Report**: This report should include the information specified in the Notice of Funding Opportunity (NOFO). At a minimum, the report will include the following: • Statement of progress made toward the achievement of originally stated aims. • Description of results (positive or negative) considered significant. • List of publications resulting from the project, with plans, if any, for further publication.

**Final Federal Financial Report (FFR, SF-425)**: The FFR should only include those funds authorized and expended during the timeframe covered by the report. The final report must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. Should the amount not match with the final expenditures reported to the Payment Management System (PMS), you will be required to update your reports to PMS accordingly.

**Equipment and Supplies - Tangible Personal Property Report (SF-428)**: A completed SF-428 detailing all major equipment acquired with a unit acquisition cost of $5,000 or more. If no equipment was acquired under the award, a negative report is required



DEPARTMENT OF HEALTH AND HUMAN SERVICES
Centers for Disease Control and Prevention

**Notice of Award**

Award# 6 NU65PS923756-03-01
FAIN# NU65PS923756
Federal Award Date: 01/31/2025

## Recipient Information

**1. Recipient Name**
SOMEONE CARES INC OF ATLANTA
1950 Spectrum Cir SE Ste 140A
Marietta, GA 30067-8470

**2. Congressional District of Recipient**
06

**3. Payment System Identifier (ID)**
███████████

**4. Employer Identification Number (EIN)**
███████████

**5. Data Universal Numbering System (DUNS)**
███████████

**6. Recipient's Unique Entity Identifier (UEI)**
███████████

**7. Project Director or Principal Investigator**
Mr. Ronnie Bass
Executive Director
ronniebass@s1catl.org
678-921-2706 x 100

**8. Authorized Official**
Mr. Winston Liburd
Grantee
adolphusliburd@s1catl.org
6789212706 Ext.104

### Federal Agency Information
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Mr. Anthony Fultz
Grant Management Specialist
qjj7@cdc.gov
(404)498-4033

**10. Program Official Contact Information**
Ronald Buchanan
GSF8@cdc.gov
404-639-5200

## Federal Award Information

**11. Award Number**
6 NU65PS923756-03-01

**12. Unique Federal Award Identification Number (FAIN)**
NU65PS923756

**13. Statutory Authority**
This program is authorized under Sections 301 and 318(a) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended.

**14. Federal Award Project Title**
Someone Cares high-impact HIV prevention program for Young Transgender Persons of Color

**15. Assistance Listing Number**
93.939

**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based

**17. Award Action Type**
Terminate

**18. Is the Award R&D?**
No

### Summary Federal Award Financial Information

**19. Budget Period Start Date** 04/01/2024 **- End Date** 01/31/2025

**20.** Total Amount of Federal Funds Obligated by this Action $0.00
   20a. Direct Cost Amount $0.00
   20b. Indirect Cost Amount $0.00

**21.** Authorized Carryover $0.00

**22.** Offset $0.00

**23.** Total Amount of Federal Funds Obligated this budget period $400,000.00

**24.** Total Approved Cost Sharing or Matching, where applicable $0.00

**25.** Total Federal and Non-Federal Approved this Budget Period $400,000.00

**26. Period of Performance Start Date** 04/01/2022 **- End Date** 01/31/2025

**27.** Total Amount of the Federal Award including Approved Cost Sharing or Matching this Period of Performance $1,200,000.00

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS

**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

## 30. Remarks



DEPARTMENT OF HEALTH AND HUMAN SERVICES    Notice of Award

Centers for Disease Control and Prevention

Award#  6 NU65PS923756-03-01
FAIN#   NU65PS923756
Federal Award Date: 01/31/2025

| Recipient Information |
| --- |

**Recipient Name**

SOMEONE CARES INC OF ATLANTA

1950 Spectrum Cir SE Ste 140A

Marietta, GA 30067-8470

**Congressional District of Recipient**

06

**Payment Account Number and Type**

▮▮▮▮▮▮▮▮

**Employer Identification Number (EIN) Data**

▮▮▮▮▮▮

**Universal Numbering System (DUNS)**

▮▮▮▮▮▮▮▮

**Recipient's Unique Entity Identifier (UEI)**

▮▮▮▮▮▮▮▮

**31. Assistance Type**
Cooperative Agreement
**32. Type of Award**
Other

**33. Approved Budget**
(Excludes Direct Assistance)

I.  Financial Assistance from the Federal Awarding Agency Only
II. Total project costs including grant funds and all other financial participation

| | |
| --- | --- |
| **a. Salaries and Wages** | $220,810.00 |
| **b. Fringe Benefits** | $67,678.00 |
| **c. Total Personnel Costs** | $288,488.00 |
| **d. Equipment** | $0.00 |
| **e. Supplies** | $20,346.00 |
| **f. Travel** | $10,898.00 |
| **g. Construction** | $0.00 |
| **h. Other** | $47,917.00 |
| **i. Contractual** | $2,000.00 |
| **j. TOTAL DIRECT COSTS** | $369,649.00 |
| **k. INDIRECT COSTS** | $30,351.00 |
| **l. TOTAL APPROVED BUDGET** | $400,000.00 |
| **m. Federal Share** | $400,000.00 |
| **n. Non-Federal Share** | $0.00 |

| 34. Accounting Classification Codes |
| --- |

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
| --- | --- | --- | --- | --- | --- | --- |
| 2-93908J1 | 22NU65PS923756 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 2-9390JS5 | 22NU65PS923756 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-93908J1 | 22NU65PS923756 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390JS5 | 22NU65PS923756 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-93908J1 | 22NU65PS923756 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |
| 4-9390JS5 | 22NU65PS923756 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |

Page 2

USCA4 Appeal: 25-1279    Doc: 34-2    Filed: 07/25/2025    Pg: 457 of 589



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**   Notice of Award

Centers for Disease Control and Prevention

Award#  6 NU65PS923756-03-01
FAIN#   NU65PS923756
Federal Award Date: 01/31/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

JA1033

# AWARD ATTACHMENTS

SOMEONE CARES INC OF ATLANTA                                    6 NU65PS923756-03-01

**1.** TERMINATION

## TERMS AND CONDITIONS OF AWARD

**Termination**: The purpose of this amendment is to terminate this award in accordance with the President's Executive Order, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to Federal Government and Office of Personnel Management guidance issued January 29, 2025.

No additional activities can be conducted, and no additional costs may be incurred. Un-obligated balances will be de-obligated.

**Closeout**: Submit all closeout reports identified below within 120 days of the period of performance end date of January 31, 2025. Submit the documentation as a "Grant Closeout" amendment in GrantSolutions. The reporting timeframe is the full period of performance. Please note, if you fail to submit timely and accurate reports, CDC may also pursue other enforcement actions per 45 CFR PART 75.371.

**Final Performance/Progress Report**: This report should include the information specified in the Notice of Funding Opportunity (NOFO). At a minimum, the report will include the following: • Statement of progress made toward the achievement of originally stated aims. • Description of results (positive or negative) considered significant. • List of publications resulting from the project, with plans, if any, for further publication.

**Final Federal Financial Report (FFR, SF-425)**: The FFR should only include those funds authorized and expended during the timeframe covered by the report. The final report must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. Should the amount not match with the final expenditures reported to the Payment Management System (PMS), you will be required to update your reports to PMS accordingly.

**Equipment and Supplies - Tangible Personal Property Report (SF-428)**: A completed SF-428 detailing all major equipment acquired with a unit acquisition cost of $5,000 or more. If no equipment was acquired under the award, a negative report is required



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**     Notice of Award

Centers for Disease Control and Prevention

Award#  6 NU65PS923761-03-01
FAIN#     NU65PS923761
Federal Award Date: 01/31/2025

| **Recipient Information** | **Federal Award Information** |
|---|---|

**Recipient Information**

**1. Recipient Name**
BIRMINGHAM AIDS OUTREACH INC
PO BOX 550070
Birmingham, AL 35255-0070

205-322-4197

**2. Congressional District of Recipient**
06
**3. Payment System Identifier (ID)**
▮▮▮▮▮▮▮▮▮▮
**4. Employer Identification Number (EIN)**
▮▮▮▮▮▮▮▮
**5. Data Universal Numbering System (DUNS)**
▮▮▮▮▮▮
**6. Recipient's Unique Entity Identifier (UEI)**
▮▮▮▮▮▮▮▮▮▮
**7. Project Director or Principal Investigator**
Mr. Josh  Bruce
Director of New Initiatives
Josh@birminghamaidsoutreach.org
2053224197
**8. Authorized Official**
Mr. Christopher  Creamer
christopher@birminghamaidsoutreach.org
205 322 4197

**Federal Agency Information**
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Ms. Chamarla Brame
Grants Management Specialist
qpv3@cdc.gov
404.498.4134

**10. Program Official Contact Information**
Ms. Tanisha  Quintanilla
Project Officer
DHP/PDIB
jbk3@cdc.gov
404-639-1991

**Federal Award Information**

**11. Award Number**
6 NU65PS923761-03-01
**12. Unique Federal Award Identification Number (FAIN)**
NU65PS923761
**13. Statutory Authority**
This program is authorized under Sections 301 and 318(a) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended.
**14. Federal Award Project Title**
Transgender Comprehensive High Impact Prevention Project (T-CHIP)

**15. Assistance Listing Number**
93.939
**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based

**17. Award Action Type**
Terminate
**18. Is the Award R&D?**
No

**Summary Federal Award Financial Information**

| | |
|---|---|
| **19. Budget Period Start Date** 04/01/2024 **- End Date** 01/31/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0.00 |
| 20a. Direct Cost Amount | $0.00 |
| 20b. Indirect Cost Amount | $0.00 |
| **21. Authorized Carryover** | $0.00 |
| **22. Offset** | $0.00 |
| **23. Total Amount of Federal Funds Obligated this budget period** | $400,000.00 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0.00 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $400,000.00 |
| **26. Period of Performance Start Date** 04/01/2022 **- End Date** 01/31/2025 | |
| **27. Total Amount of the Federal Award including Approved Cost  Sharing or Matching this Period of Performance** | $2,950,000.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS
**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

**30. Remarks**



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**    Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU65PS923761-03-01
FAIN# NU65PS923761
Federal Award Date: 01/31/2025

## Recipient Information

**Recipient Name**
BIRMINGHAM AIDS OUTREACH INC
PO BOX 550070
Birmingham, AL 35255-0070
205-322-4197

**Congressional District of Recipient**
06

**Payment Account Number and Type**

**Employer Identification Number (EIN) Data**

**Universal Numbering System (DUNS)**

**Recipient's Unique Entity Identifier (UEI)**

**31. Assistance Type**
Cooperative Agreement
**32. Type of Award**
Other

### 33. Approved Budget
(Excludes Direct Assistance)

I.  Financial Assistance from the Federal Awarding Agency Only
II. Total project costs including grant funds and all other financial participation

| | | |
|---|---|---:|
| a. | Salaries and Wages | $229,175.00 |
| b. | Fringe Benefits | $69,355.00 |
| c. | Total Personnel Costs | $298,530.00 |
| d. | Equipment | $1,632.00 |
| e. | Supplies | $39,329.00 |
| f. | Travel | $10,000.00 |
| g. | Construction | $0.00 |
| h. | Other | $20,656.00 |
| i. | Contractual | $0.00 |
| j. | **TOTAL DIRECT COSTS** | **$370,147.00** |
| k. | **INDIRECT COSTS** | **$29,853.00** |
| l. | **TOTAL APPROVED BUDGET** | **$400,000.00** |
| m. | Federal Share | $400,000.00 |
| n. | Non-Federal Share | $0.00 |

### 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 2-93908J1 | 22NU65PS923761 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 2-93908JS5 | 22NU65PS923761 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-93908J1 | 22NU65PS923761 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-93908JS5 | 22NU65PS923761 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-93908J1 | 22NU65PS923761 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |
| 4-93908JS5 | 22NU65PS923761 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |

Page 2



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**    Notice of Award

Centers for Disease Control and Prevention

Award#  6 NU65PS923761-03-01
FAIN#    NU65PS923761
Federal Award Date: 01/31/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

# AWARD ATTACHMENTS

BIRMINGHAM AIDS OUTREACH INC                                    6 NU65PS923761-03-01

**1.** Terms

**TERMS AND CONDITIONS OF AWARD**

**Termination**: The purpose of this amendment is to terminate this award in accordance with the President's Executive Order, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to Federal Government and Office of Personnel Management guidance issued January 29, 2025.

No additional activities can be conducted, and no additional costs may be incurred.  Un-obligated balances will be de-obligated.

**Closeout**: Submit all closeout reports identified below within 120 days of the period of performance end date of January 31, 2025. Submit the documentation as a "Grant Closeout" amendment in GrantSolutions. The reporting timeframe is the full period of performance. Please note, if you fail to submit timely and accurate reports, CDC may also pursue other enforcement actions per 45 CFR PART 75.371.

**Final Performance/Progress Report**: This report should include the information specified in the Notice of Funding Opportunity (NOFO). At a minimum, the report will include the following: • Statement of progress made toward the achievement of originally stated aims. • Description of results (positive or negative) considered significant. • List of publications resulting from the project, with plans, if any, for further publication.

**Final Federal Financial Report (FFR, SF-425):** The FFR should only include those funds authorized and expended during the timeframe covered by the report. The final report must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. Should the amount not match with the final expenditures reported to the Payment Management System (PMS), you will be required to update your reports to PMS accordingly.

**Equipment and Supplies - Tangible Personal Property Report (SF-428)**: A completed SF-428 detailing all major equipment acquired with a unit acquisition cost of $5,000 or more. If no equipment was acquired under the award, a negative report is required



DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Disease Control and Prevention

**Notice of Award**

Award# 6 NU62PS924651-04-01
FAIN# NU62PS924651
Federal Award Date: 01/31/2025

| Recipient Information | Federal Award Information |
|---|---|

**Recipient Information**

**1. Recipient Name**
SOMEONE CARES INC OF ATLANTA
1950 Spectrum Cir SE Ste 140A
Marietta, GA 30067-8470

**2. Congressional District of Recipient**
06
**3. Payment System Identifier (ID)**
███████████
**4. Employer Identification Number (EIN)**
███████████
**5. Data Universal Numbering System (DUNS)**
███████████
**6. Recipient's Unique Entity Identifier (UEI)**
███████████
**7. Project Director or Principal Investigator**
Mr. Ronnie Bass
Executive Director
ronniebass@s1catl.org
678-921-2706 x 100
**8. Authorized Official**
Probyn Cope
Finance Director
Probyncope@s1catl.org
678-921-2706

**Federal Agency Information**
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Mr. Anthony Fultz
Grant Management Specialist
qjj7@cdc.gov
(404)498-4033

**10. Program Official Contact Information**
Ronald Buchanan
GSF8@cdc.gov
404-639-5200

**Federal Award Information**

**11. Award Number**
6 NU62PS924651-04-01
**12. Unique Federal Award Identification Number (FAIN)**
NU62PS924651
**13. Statutory Authority**
Sections 301 and 318 of the PHS Act [42 U.S.C. 241 and 247(c)], as amended
**14. Federal Award Project Title**
REAL/T (Reaching, Educating, Assisting and Liberating Transgender) Family
**15. Assistance Listing Number**
93.939
**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based
**17. Award Action Type**
Terminate
**18. Is the Award R&D?**
No

**Summary Federal Award Financial Information**

| | | |
|---|---|---:|
| **19. Budget Period Start Date** 07/01/2024 **- End Date** 01/31/2025 | | |
| **20. Total Amount of Federal Funds Obligated by this Action** | | $0.00 |
| 20a. Direct Cost Amount | | $0.00 |
| 20b. Indirect Cost Amount | | $0.00 |
| **21. Authorized Carryover** | | $0.00 |
| **22. Offset** | | $0.00 |
| **23. Total Amount of Federal Funds Obligated this budget period** | | $441,625.00 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | | |
| **25. Total Federal and Non-Federal Approved this Budget Period** | | $441,625.00 |
| **26. Period of Performance Start Date** 07/01/2021 **- End Date** 01/31/2025 | | |
| 27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Period of Performance | | $2,097,069.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS
**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

**30. Remarks**



DEPARTMENT OF HEALTH AND HUMAN SERVICES     Notice of Award

Centers for Disease Control and Prevention

Award#   6 NU62PS924651-04-01
FAIN#   NU62PS924651
Federal Award Date: 01/31/2025

| Recipient Information | |
|---|---|
| **Recipient Name** | |
| SOMEONE CARES INC OF ATLANTA | |
| 1950 Spectrum Cir SE Ste 140A | |
| Marietta, GA 30067-8470 | |
| **Congressional District of Recipient** | |
| 06 | |
| **Payment Account Number and Type** | |
| **Employer Identification Number (EIN) Data** | |
| **Universal Numbering System (DUNS)** | |
| **Recipient's Unique Entity Identifier (UEI)** | |

| **31. Assistance Type** |
|---|
| Cooperative Agreement |
| **32. Type of Award** |
| Other |

### 33. Approved Budget
(Excludes Direct Assistance)

I.  Financial Assistance from the Federal Awarding Agency Only
II. Total project costs including grant funds and all other financial participation

| | | |
|---|---|---:|
| a. | Salaries and Wages | $223,375.00 |
| b. | Fringe Benefits | $68,464.00 |
| c. | Total Personnel Costs | $291,839.00 |
| d. | Equipment | $0.00 |
| e. | Supplies | $23,163.00 |
| f. | Travel | $21,272.00 |
| g. | Construction | $0.00 |
| h. | Other | $66,871.00 |
| i. | Contractual | $2,000.00 |
| j. | **TOTAL DIRECT COSTS** | $405,145.00 |
| k. | **INDIRECT COSTS** | $36,480.00 |
| l. | **TOTAL APPROVED BUDGET** | $441,625.00 |
| m. | Federal Share | $441,625.00 |
| n. | Non-Federal Share | $0.00 |

### 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 1-92102PG | 21NU62PS924651 | PS | 41.51 | 93.939 | $0.00 | 75-21-0950 |
| 2-92102PG | 21NU62PS924651 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-92102PG | 21NU62PS924651 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390JV6 | 21NU62PS924651 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-92102PG | 21NU62PS924651 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**   Notice of Award

Centers for Disease Control and Prevention

Award#  6 NU62PS924651-04-01
FAIN#   NU62PS924651
Federal Award Date: 01/31/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

Page 3

# AWARD ATTACHMENTS

SOMEONE CARES INC OF ATLANTA                    6 NU62PS924651-04-01

**1.** TERMINATION

**TERMS AND CONDITIONS OF AWARD**

**Termination**: The purpose of this amendment is to terminate this award in accordance with the President's Executive Order, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to Federal Government and Office of Personnel Management guidance issued January 29, 2025.

No additional activities can be conducted, and no additional costs may be incurred.  Un-obligated balances will be de-obligated.

**Closeout**: Submit all closeout reports identified below within 120 days of the period of performance end date of January 31, 2025. Submit the documentation as a "Grant Closeout" amendment in GrantSolutions. The reporting timeframe is the full period of performance. Please note, if you fail to submit timely and accurate reports, CDC may also pursue other enforcement actions per 45 CFR PART 75.371.

**Final Performance/Progress Report**: This report should include the information specified in the Notice of Funding Opportunity (NOFO). At a minimum, the report will include the following: • Statement of progress made toward the achievement of originally stated aims. • Description of results (positive or negative) considered significant. • List of publications resulting from the project, with plans, if any, for further publication.

**Final Federal Financial Report (FFR, SF-425)**: The FFR should only include those funds authorized and expended during the timeframe covered by the report. The final report must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. Should the amount not match with the final expenditures reported to the Payment Management System (PMS), you will be required to update your reports to PMS accordingly.

**Equipment and Supplies - Tangible Personal Property Report (SF-428)**: A completed SF-428 detailing all major equipment acquired with a unit acquisition cost of $5,000 or more. If no equipment was acquired under the award, a negative report is required



DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Disease Control and Prevention

**Notice of Award**

Award#  6 NU62PS924657-04-01
FAIN#    NU62PS924657
Federal Award Date: 01/31/2025

| Recipient Information | |
|---|---|

**1. Recipient Name**
PUERTO RICAN CULTURAL CENTER
2753 W Division St
Chicago, IL 60622-2854
[NO DATA]

**2. Congressional District of Recipient**
05

**3. Payment System Identifier (ID)**
███████████

**4. Employer Identification Number (EIN)**
███████████

**5. Data Universal Numbering System (DUNS)**
███████

**6. Recipient's Unique Entity Identifier (UEI)**
███████

**7. Project Director or Principal Investigator**
Ms. Dezarae  Rodriguez
Project Director
dezaraerodriguez@prcc-chgo.org
331-444-6472

**8. Authorized Official**
Ms. Nathalie  Tirado
nathaliet@prcc-chgo.org
(773) 598-9225

**Federal Agency Information**
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Mr. Keith Preciados
Grants Management Specialist
zpw9@cdc.gov
770-488-5392

**10. Program Official Contact Information**
Veronica  McCants
vrm0@cdc.gov
404.639.5194

| Federal Award Information | |
|---|---|

**11. Award Number**
6 NU62PS924657-04-01

**12. Unique Federal Award Identification Number (FAIN)**
NU62PS924657

**13. Statutory Authority**
317(k)(2) and 318 of the Public Health Services Act, 42 U.S.C. sections 247 (k)(2) and 247c, as amended

**14. Federal Award Project Title**
Comprehensive High-Impact HIV Prevention Program in Chicago

**15. Assistance Listing Number**
93.939

**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based

**17. Award Action Type**
Terminate

**18. Is the Award R&D?**
No

| Summary Federal Award Financial Information | |
|---|---|

**19.  Budget Period Start Date** 07/01/2024 - **End Date** 01/31/2025

**20.** Total Amount of Federal Funds Obligated by this Action — $0.00
20a. Direct Cost Amount — $0.00
20b. Indirect Cost Amount — $0.00

**21.** Authorized Carryover — $0.00

**22.** Offset — $0.00

**23.** Total Amount of Federal Funds Obligated this budget period — $441,625.00

**24.** Total Approved Cost Sharing or Matching, where applicable

**25.** Total Federal and Non-Federal Approved this Budget Period — $441,625.00

**26.  Period of Performance Start Date** 07/01/2021 - **End Date** 01/31/2025

**27.** Total Amount of the Federal Award including Approved
Cost  Sharing or Matching this Period of Performance — $1,766,500.00

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS

**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

| 30. Remarks |
|---|



DEPARTMENT OF HEALTH AND HUMAN SERVICES    Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU62PS924657-04-01
FAIN# NU62PS924657
Federal Award Date: 01/31/2025

| **Recipient Information** |
|---|
| **Recipient Name** |
| PUERTO RICAN CULTURAL CENTER |
| 2753 W Division St |
| Chicago, IL 60622-2854 |
| [NO DATA] |
| |
| **Congressional District of Recipient** |
| 05 |
| **Payment Account Number and Type** |
| ▆▆▆▆▆ |
| **Employer Identification Number (EIN) Data** |
| ▆▆▆ |
| **Universal Numbering System (DUNS)** |
| ▆▆▆▆▆ |
| **Recipient's Unique Entity Identifier (UEI)** |
| ▆▆▆▆▆▆ |

| **31. Assistance Type** |
|---|
| Cooperative Agreement |
| **32. Type of Award** |
| Other |

| **33. Approved Budget** (Excludes Direct Assistance) | |
|---|---|
| I.  Financial Assistance from the Federal Awarding Agency Only | |
| II. Total project costs including grant funds and all other financial participation | |
| a.  Salaries and Wages | $321,700.00 |
| b.  Fringe Benefits | $61,123.00 |
| c.  Total Personnel Costs | $382,823.00 |
| d.  Equipment | $0.00 |
| e.  Supplies | $15,788.00 |
| f.  Travel | $7,356.00 |
| g.  Construction | $0.00 |
| h.  Other | $35,658.00 |
| i.  Contractual | $0.00 |
| j.  TOTAL DIRECT COSTS | $441,625.00 |
| k.  INDIRECT COSTS | $0.00 |
| l.  TOTAL APPROVED BUDGET | $441,625.00 |
| m.  Federal Share | $441,625.00 |
| n.  Non-Federal Share | $0.00 |

| **34. Accounting Classification Codes** |
|---|

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 1-92102PG | 21NU62PS924657 | PS | 41.51 | 93.939 | $0.00 | 75-21-0950 |
| 2-92102PG | 21NU62PS924657 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-92102PG | 21NU62PS924657 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-92102PG | 21NU62PS924657 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |

JA1047



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**  Notice of Award

Centers for Disease Control and Prevention

Award#  6 NU62PS924657-04-01
FAIN#    NU62PS924657
Federal Award Date: 01/31/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

## AWARD ATTACHMENTS

PUERTO RICAN CULTURAL CENTER                6 NU62PS924657-04-01

**1.** Terms

**TERMS AND CONDITIONS OF AWARD**

**Termination**: The purpose of this amendment is to terminate this award in accordance with the President's Executive Order, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to Federal Government and Office of Personnel Management guidance issued January 29, 2025.

No additional activities can be conducted, and no additional costs may be incurred.  Un-obligated balances will be de-obligated.

**Closeout**: Submit all closeout reports identified below within 120 days of the period of performance end date of January 31, 2025. Submit the documentation as a "Grant Closeout" amendment in GrantSolutions. The reporting timeframe is the full period of performance. Please note, if you fail to submit timely and accurate reports, CDC may also pursue other enforcement actions per 45 CFR PART 75.371.

**Final Performance/Progress Report**: This report should include the information specified in the Notice of Funding Opportunity (NOFO). At a minimum, the report will include the following: • Statement of progress made toward the achievement of originally stated aims. • Description of results (positive or negative) considered significant. • List of publications resulting from the project, with plans, if any, for further publication.

**Final Federal Financial Report (FFR, SF-425)**: The FFR should only include those funds authorized and expended during the timeframe covered by the report. The final report must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. Should the amount not match with the final expenditures reported to the Payment Management System (PMS), you will be required to update your reports to PMS accordingly.

**Equipment and Supplies - Tangible Personal Property Report (SF-428)**: A completed SF-428 detailing all major equipment acquired with a unit acquisition cost of $5,000 or more. If no equipment was acquired under the award, a negative report is required



DEPARTMENT OF HEALTH AND HUMAN SERVICES       Notice of Award

Centers for Disease Control and Prevention

Award#  6 NU62PS924690-04-01
FAIN#   NU62PS924690
Federal Award Date: 01/31/2025

| Recipient Information |
| --- |

**1. Recipient Name**
ALTAMED HEALTH SERVICES CORPORATION
2040 Camfield Avenue
Los Angeles, CA 90040-1502
[NO DATA]

**2. Congressional District of Recipient**
40
**3. Payment System Identifier (ID)**
███████████
**4. Employer Identification Number (EIN)**
███████████
**5. Data Universal Numbering System (DUNS)**
███████████
**6. Recipient's Unique Entity Identifier (UEI)**
███████████████
**7. Project Director or Principal Investigator**
Mrs. Marcy  Kaplan
Director of HIV Services
MKAPLAN@ALTAMED.ORG
2135026158
**8. Authorized Official**
Mr. Paul  Tropea
Director of Grants, Finance & Analysis
ptropea@AltaMed.org
3238897352

| Federal Agency Information |
| --- |

CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Ms. Chamarla Brame
Grants Management Specialist
qpv3@cdc.gov
404.498.4134

**10. Program Official Contact Information**
Nasima Marguerite  Camp
Program Officer
yul9@cdc.gov
404-639-8246

| Federal Award Information |
| --- |

**11. Award Number**
6 NU62PS924690-04-01
**12. Unique Federal Award Identification Number (FAIN)**
NU62PS924690
**13. Statutory Authority**
Sections 301 and 318 of the PHS Act [42 U.S.C. 241 and 247(c)], as amended

**14. Federal Award Project Title**
Comprehensive High-Impact HIV Prevention Programs for Community-Based Organizations

**15. Assistance Listing Number**
93.939
**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based

**17. Award Action Type**
Terminate
**18. Is the Award R&D?**
No

| Summary Federal Award Financial Information |
| --- |

| | |
| --- | --- |
| **19. Budget Period Start Date** 07/01/2024 **- End Date** 01/31/2025 | |
| **20.** Total Amount of Federal Funds Obligated by this Action | $0.00 |
| 20a. Direct Cost Amount | $0.00 |
| 20b. Indirect Cost Amount | $0.00 |
| **21.** Authorized Carryover | $0.00 |
| **22.** Offset | $0.00 |
| **23.** Total Amount of Federal Funds Obligated this budget period | $441,625.00 |
| **24.** Total Approved Cost Sharing or Matching, where applicable | |
| **25.** Total Federal and Non-Federal Approved this Budget Period | $441,625.00 |
| **26. Period of Performance Start Date** 07/01/2021 **- End Date** 01/31/2025 | |
| **27.** Total Amount of the Federal Award including Approved Cost  Sharing or Matching this Period of Performance | $1,766,500.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS
**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

| **30. Remarks** |
| --- |



DEPARTMENT OF HEALTH AND HUMAN SERVICES      Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU62PS924690-04-01
FAIN# NU62PS924690
Federal Award Date: 01/31/2025

### Recipient Information

**Recipient Name**
ALTAMED HEALTH SERVICES CORPORATION
2040 Camfield Avenue
Los Angeles, CA 90040-1502
[NO DATA]

**Congressional District of Recipient**
40

**Payment Account Number and Type**

**Employer Identification Number (EIN) Data**

**Universal Numbering System (DUNS)**

**Recipient's Unique Entity Identifier (UEI)**

**31. Assistance Type**
Cooperative Agreement

**32. Type of Award**
Other

### 33. Approved Budget
(Excludes Direct Assistance)

I.  Financial Assistance from the Federal Awarding Agency Only
II. Total project costs including grant funds and all other financial participation

| | | |
|---|---|---|
| **a.** | **Salaries and Wages** | $238,578.00 |
| **b.** | **Fringe Benefits** | $64,416.00 |
| | **c.  Total Personnel Costs** | $302,994.00 |
| **d.** | **Equipment** | $0.00 |
| **e.** | **Supplies** | $11,051.00 |
| **f.** | **Travel** | $2,901.00 |
| **g.** | **Construction** | $0.00 |
| **h.** | **Other** | $39,203.00 |
| **i.** | **Contractual** | $0.00 |
| **j.** | **TOTAL DIRECT COSTS** | $356,149.00 |
| **k.** | **INDIRECT COSTS** | $85,476.00 |
| **l.** | **TOTAL APPROVED BUDGET** | $441,625.00 |
| **m.** | **Federal Share** | $441,625.00 |
| **n.** | **Non-Federal Share** | $0.00 |

### 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 1-92102PG | 21NU62PS924690 | PS | 41.51 | 93.939 | $0.00 | 75-21-0950 |
| 2-92102PG | 21NU62PS924690 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-92102PG | 21NU62PS924690 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-92102PG | 21NU62PS924690 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |

USCA4 Appeal: 25-1279    Doc: 34-2    Filed: 07/25/2025    Pg: 477 of 589



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**    Notice of Award

Centers for Disease Control and Prevention

Award#  6 NU62PS924690-04-01
FAIN#    NU62PS924690
Federal Award Date: 01/31/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

JA1053

## AWARD ATTACHMENTS

ALTAMED HEALTH SERVICES CORPORATION                 6 NU62PS924690-04-01

**1.** Terms

## TERMS AND CONDITIONS OF AWARD

**Termination**: The purpose of this amendment is to terminate this award in accordance with the President's Executive Order, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to Federal Government and Office of Personnel Management guidance issued January 29, 2025.

No additional activities can be conducted, and no additional costs may be incurred.  Un-obligated balances will be de-obligated.

**Closeout**: Submit all closeout reports identified below within 120 days of the period of performance end date of January 31, 2025. Submit the documentation as a "Grant Closeout" amendment in GrantSolutions. The reporting timeframe is the full period of performance. Please note, if you fail to submit timely and accurate reports, CDC may also pursue other enforcement actions per 45 CFR PART 75.371.

**Final Performance/Progress Report**: This report should include the information specified in the Notice of Funding Opportunity (NOFO). At a minimum, the report will include the following: • Statement of progress made toward the achievement of originally stated aims. • Description of results (positive or negative) considered significant. • List of publications resulting from the project, with plans, if any, for further publication.

**Final Federal Financial Report (FFR, SF-425)**: The FFR should only include those funds authorized and expended during the timeframe covered by the report. The final report must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. Should the amount not match with the final expenditures reported to the Payment Management System (PMS), you will be required to update your reports to PMS accordingly.

**Equipment and Supplies - Tangible Personal Property Report (SF-428)**: A completed SF-428 detailing all major equipment acquired with a unit acquisition cost of $5,000 or more. If no equipment was acquired under the award, a negative report is required



DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Disease Control and Prevention

**Notice of Award**

Award# 6 NU62PS924781-03-03
FAIN# NU62PS924781
Federal Award Date: 01/31/2025

## Recipient Information

**1. Recipient Name**
CARE RESOURCE COMMUNITY HEALTH
CENTERS INC
3510 Biscayne Blvd FL 3rd
Miami, FL 33137-3840
--

**2. Congressional District of Recipient**
24

**3. Payment System Identifier (ID)**
████████████

**4. Employer Identification Number (EIN)**
████████████

**5. Data Universal Numbering System (DUNS)**
████████

**6. Recipient's Unique Entity Identifier (UEI)**
████████████

**7. Project Director or Principal Investigator**
Mr. Douglas   Steele
dosteele@careresource.org
305-576-1234 x 358

**8. Authorized Official**
Dr. Steven  Santiago
Chief Executive Officer
ssantiago@careresource.org
305-576-1234 x 234

## Federal Agency Information
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Mrs. Benita Bosier-Ingram
Grant Management Specialist
ula8@cdc.gov
404-638-7434

**10. Program Official Contact Information**
Rupa  Patel
Program Officer
ntw4@cdc.gov
404-498-5224

## Federal Award Information

**11. Award Number**
6 NU62PS924781-03-03
**12. Unique Federal Award Identification Number (FAIN)**
NU62PS924781
**13. Statutory Authority**
Sections 301 and 318(b) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended

**14. Federal Award Project Title**
Project sTrenGth (Status-neutral Transgender-serving Organizations Ending Together HIV)

**15. Assistance Listing Number**
93.944
**16. Assistance Listing Program Title**
Human Immunodeficiency Virus (HIV)/Acquired Immunodeficiency Virus Syndrome (AIDS) Surveillance

**17. Award Action Type**
Terminate
**18. Is the Award R&D?**
No

### Summary Federal Award Financial Information

| | |
|---|---|
| **19. Budget Period Start Date** 06/30/2024 **- End Date** 01/31/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0.00 |
| 20a. Direct Cost Amount | $0.00 |
| 20b. Indirect Cost Amount | $0.00 |
| **21. Authorized Carryover** | $0.00 |
| **22. Offset** | $0.00 |
| **23. Total Amount of Federal Funds Obligated this budget period** | $500,000.00 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0.00 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $500,000.00 |
| **26. Period of Performance Start Date** 06/30/2022 **- End Date** 01/31/2025 | |
| 27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Period of Performance | $1,599,164.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS
**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

## 30. Remarks



DEPARTMENT OF HEALTH AND HUMAN SERVICES    Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU62PS924781-03-03
FAIN# NU62PS924781
Federal Award Date: 01/31/2025

## Recipient Information

**Recipient Name**
CARE RESOURCE COMMUNITY HEALTH
CENTERS INC
3510 Biscayne Blvd FL 3rd
Miami, FL 33137-3840
--

**Congressional District of Recipient**
24

**Payment Account Number and Type**

▮▮▮▮▮▮▮

**Employer Identification Number (EIN) Data**

▮▮▮▮▮▮▮

**Universal Numbering System (DUNS)**

▮▮▮▮▮▮▮

**Recipient's Unique Entity Identifier (UEI)**

▮▮▮▮▮▮▮

---

**31. Assistance Type**
Cooperative Agreement

**32. Type of Award**
Other

### 33. Approved Budget
(Excludes Direct Assistance)

I.  Financial Assistance from the Federal Awarding Agency Only
II. Total project costs including grant funds and all other financial participation

| | | |
|---|---|---:|
| a. | **Salaries and Wages** | $202,569.00 |
| b. | **Fringe Benefits** | $56,763.00 |
| | c.  **Total Personnel Costs** | $259,332.00 |
| d. | **Equipment** | $0.00 |
| e. | **Supplies** | $12,618.00 |
| f. | **Travel** | $0.00 |
| g. | **Construction** | $0.00 |
| h. | **Other** | $60,000.00 |
| i. | **Contractual** | $115,000.00 |
| j. | **TOTAL DIRECT COSTS** | **$446,950.00** |
| k. | **INDIRECT COSTS** | **$53,050.00** |
| l. | **TOTAL APPROVED BUDGET** | **$500,000.00** |
| m. | **Federal Share** | **$500,000.00** |
| n. | **Non-Federal Share** | **$0.00** |

### 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 2-9390JT6 | 22NU62PS924781 | PS | 41.51 | 93.944 | $0.00 | 75-22-0950 |
| 3-9390JT6 | 22NU62PS924781 | PS | 41.51 | 93.944 | $0.00 | 75-23-0950 |
| 4-9390JT6 | 22NU62PS924781 | PS | 41.51 | 93.944 | $0.00 | 75-24-0950 |

JA1057



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**   Notice of Award

Centers for Disease Control and Prevention

Award#  6 NU62PS924781-03-03
FAIN#   NU62PS924781
Federal Award Date: 01/31/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

Page 3

## AWARD ATTACHMENTS

CARE RESOURCE COMMUNITY HEALTH CENTERS INC       6 NU62PS924781-03-03

**1.** TERMINATION

## TERMS AND CONDITIONS OF AWARD

**Termination**: The purpose of this amendment is to terminate this award in accordance with the President's Executive Order, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to Federal Government and Office of Personnel Management guidance issued January 29, 2025.

No additional activities can be conducted, and no additional costs may be incurred. Un-obligated balances will be de-obligated.

**Closeout**: Submit all closeout reports identified below within 120 days of the period of performance end date of January 31, 2025. Submit the documentation as a "Grant Closeout" amendment in GrantSolutions. The reporting timeframe is the full period of performance. Please note, if you fail to submit timely and accurate reports, CDC may also pursue other enforcement actions per 45 CFR PART 75.371.

**Final Performance/Progress Report**: This report should include the information specified in the Notice of Funding Opportunity (NOFO). At a minimum, the report will include the following: • Statement of progress made toward the achievement of originally stated aims. • Description of results (positive or negative) considered significant. • List of publications resulting from the project, with plans, if any, for further publication.

**Final Federal Financial Report (FFR, SF-425)**: The FFR should only include those funds authorized and expended during the timeframe covered by the report. The final report must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. Should the amount not match with the final expenditures reported to the Payment Management System (PMS), you will be required to update your reports to PMS accordingly.

**Equipment and Supplies - Tangible Personal Property Report (SF-428)**: A completed SF-428 detailing all major equipment acquired with a unit acquisition cost of $5,000 or more. If no equipment was acquired under the award, a negative report is required



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU62PS924782-03-01
FAIN# NU62PS924782
Federal Award Date: 01/31/2025

| Recipient Information | Federal Award Information |
|---|---|

**Recipient Information**

**1. Recipient Name**
ST. JOHN'S COMMUNITY HEALTH
808 W 58th St
Los Angeles, CA 90037-3632
--

**2. Congressional District of Recipient**
37
**3. Payment System Identifier (ID)**
███████████
**4. Employer Identification Number (EIN)**
███████████
**5. Data Universal Numbering System (DUNS)**
█████████
**6. Recipient's Unique Entity Identifier (UEI)**
█████████
**7. Project Director or Principal Investigator**
Mr. Kazumi Yamaguchi
Principal Investigator
kyamaguchi@wellchild.org
323-541-1600 ex 2335
**8. Authorized Official**
Ms. Elena Fernandez
Business Official
efernandez@wellchild.org
323-541-1600 ex 1467

**Federal Agency Information**
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Mrs. Benita Bosier-Ingram
Grant Management Specialist
ula8@cdc.gov
404-638-7434

**10. Program Official Contact Information**
Miss Carla Galindo
Behavioral Scientist
fco4@cdc.gov
404-639-1902

**Federal Award Information**

**11. Award Number**
6 NU62PS924782-03-01
**12. Unique Federal Award Identification Number (FAIN)**
NU62PS924782
**13. Statutory Authority**
Sections 301 and 318(b) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended

**14. Federal Award Project Title**
St. John's Community Health: Community to Clinic Transgender Program

**15. Assistance Listing Number**
93.944
**16. Assistance Listing Program Title**
Human Immunodeficiency Virus (HIV)/Acquired Immunodeficiency Virus Syndrome (AIDS) Surveillance

**17. Award Action Type**
Terminate
**18. Is the Award R&D?**
No

**Summary Federal Award Financial Information**

| | |
|---|---:|
| **19. Budget Period Start Date** 06/30/2024 **- End Date** 01/31/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0.00 |
| 20a. Direct Cost Amount | $0.00 |
| 20b. Indirect Cost Amount | $0.00 |
| **21. Authorized Carryover** | $0.00 |
| **22. Offset** | $0.00 |
| **23. Total Amount of Federal Funds Obligated this budget period** | $500,000.00 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0.00 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $500,000.00 |
| **26. Period of Performance Start Date** 06/30/2022 **- End Date** 01/31/2025 | |
| **27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Period of Performance** | $1,418,845.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS
**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

**30. Remarks**



DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU62PS924782-03-01
FAIN# NU62PS924782
Federal Award Date: 01/31/2025

| **Recipient Information** |
| --- |
| **Recipient Name** |
| ST. JOHN'S COMMUNITY HEALTH |
| 808 W 58th St |
| Los Angeles, CA 90037-3632 |
| -- |
| |
| **Congressional District of Recipient** |
| 37 |
| **Payment Account Number and Type** |
| |
| **Employer Identification Number (EIN) Data** |
| |
| **Universal Numbering System (DUNS)** |
| |
| **Recipient's Unique Entity Identifier (UEI)** |
| |

| **31. Assistance Type** |
| --- |
| Cooperative Agreement |
| **32. Type of Award** |
| Other |

**33. Approved Budget**
(Excludes Direct Assistance)

I. Financial Assistance from the Federal Awarding Agency Only
II. Total project costs including grant funds and all other financial participation

| | | |
| --- | --- | --- |
| a. | Salaries and Wages | $265,879.00 |
| b. | Fringe Benefits | $53,176.00 |
| c. | Total Personnel Costs | $319,055.00 |
| d. | Equipment | $0.00 |
| e. | Supplies | $50,144.00 |
| f. | Travel | $20,870.00 |
| g. | Construction | $0.00 |
| h. | Other | $22,246.00 |
| i. | Contractual | $87,685.00 |
| j. | **TOTAL DIRECT COSTS** | **$500,000.00** |
| k. | **INDIRECT COSTS** | **$0.00** |
| l. | **TOTAL APPROVED BUDGET** | **$500,000.00** |
| m. | **Federal Share** | **$500,000.00** |
| n. | **Non-Federal Share** | **$0.00** |

| **34. Accounting Classification Codes** |
| --- |

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
| --- | --- | --- | --- | --- | --- | --- |
| 2-9390JT6 | 22NU62PS924782 | PS | 41.51 | 93.944 | $0.00 | 75-22-0950 |
| 3-9390JT6 | 22NU62PS924782 | PS | 41.51 | 93.944 | $0.00 | 75-23-0950 |
| 4-9390JT6 | 22NU62PS924782 | PS | 41.51 | 93.944 | $0.00 | 75-24-0950 |



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**   Notice of Award

Centers for Disease Control and Prevention

Award#   6 NU62PS924782-03-01
FAIN#    NU62PS924782
Federal Award Date:   01/31/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

# AWARD ATTACHMENTS

ST. JOHN'S COMMUNITY HEALTH                                    6 NU62PS924782-03-01

**1.** TERMINATION

**TERMS AND CONDITIONS OF AWARD**

**Termination**: The purpose of this amendment is to terminate this award in accordance with the President's Executive Order, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to Federal Government and Office of Personnel Management guidance issued January 29, 2025.

No additional activities can be conducted, and no additional costs may be incurred.  Un-obligated balances will be de-obligated.

**Closeout**: Submit all closeout reports identified below within 120 days of the period of performance end date of January 31, 2025. Submit the documentation as a "Grant Closeout" amendment in GrantSolutions. The reporting timeframe is the full period of performance. Please note, if you fail to submit timely and accurate reports, CDC may also pursue other enforcement actions per 45 CFR PART 75.371.

**Final Performance/Progress Report**: This report should include the information specified in the Notice of Funding Opportunity (NOFO). At a minimum, the report will include the following: • Statement of progress made toward the achievement of originally stated aims. • Description of results (positive or negative) considered significant. • List of publications resulting from the project, with plans, if any, for further publication.

**Final Federal Financial Report (FFR, SF-425)**: The FFR should only include those funds authorized and expended during the timeframe covered by the report. The final report must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. Should the amount not match with the final expenditures reported to the Payment Management System (PMS), you will be required to update your reports to PMS accordingly.

**Equipment and Supplies - Tangible Personal Property Report (SF-428)**: A completed SF-428 detailing all major equipment acquired with a unit acquisition cost of $5,000 or more. If no equipment was acquired under the award, a negative report is required



DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Disease Control and Prevention

**Notice of Award**

Award# 6 NU62PS924783-03-01
FAIN# NU62PS924783
Federal Award Date: 01/31/2025

| Recipient Information |
|---|
| **1. Recipient Name**<br>COMMUNITY HEALTH PROJECT, INC.<br>356 W 18th St<br>New York, NY 10011-4401<br>[NoPhoneRecord] |
| **2. Congressional District of Recipient**<br>08 |
| **3. Payment System Identifier (ID)**<br>███████████ |
| **4. Employer Identification Number (EIN)**<br>███████████ |
| **5. Data Universal Numbering System (DUNS)**<br>███████ |
| **6. Recipient's Unique Entity Identifier (UEI)**<br>█████████ |
| **7. Project Director or Principal Investigator**<br>Dr. Asa Radix<br>Principal Investigator<br>aradix@callen-lorde.org<br>212-271-7275 |
| **8. Authorized Official**<br>Mr. Patrick McGovern<br>Chief Executive Officer<br>pmcgovern@callen-lorde.org<br>(212) 271-7200 X 852 |

| Federal Agency Information |
|---|
| CDC Office of Financial Resources |
| **9. Awarding Agency Contact Information**<br>Mrs. Benita Bosier-Ingram<br>Grant Management Specialist<br>ula8@cdc.gov<br>404-638-7434 |
| **10. Program Official Contact Information**<br>Dejené Parrish<br>Public Health Analyst<br>xht6@cdc.gov<br>404.639.8382 |

| Federal Award Information |
|---|
| **11. Award Number**<br>6 NU62PS924783-03-01 |
| **12. Unique Federal Award Identification Number (FAIN)**<br>NU62PS924783 |
| **13. Statutory Authority**<br>Sections 301 and 318(b) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended |
| **14. Federal Award Project Title**<br>Callen-Lorde Transcend Program to Provide Status Neutral Services for Black, Hispanic and Multi-racial Transgender and Gender Diverse New Yorkers |
| **15. Assistance Listing Number**<br>93.944 |
| **16. Assistance Listing Program Title**<br>Human Immunodeficiency Virus (HIV)/Acquired Immunodeficiency Virus Syndrome (AIDS) Surveillance |
| **17. Award Action Type**<br>Terminate |
| **18. Is the Award R&D?**<br>No |

| Summary Federal Award Financial Information | |
|---|---|
| **19. Budget Period Start Date** 06/30/2024 **- End Date** 01/31/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0.00 |
| 20a. Direct Cost Amount | $0.00 |
| 20b. Indirect Cost Amount | $0.00 |
| **21. Authorized Carryover** | $0.00 |
| **22. Offset** | $0.00 |
| **23. Total Amount of Federal Funds Obligated this budget period** | $500,000.00 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0.00 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $500,000.00 |
| **26. Period of Performance Start Date** 06/30/2022 **- End Date** 01/31/2025 | |
| **27. Total Amount of the Federal Award including Approved<br>Cost Sharing or Matching this Period of Performance** | $1,581,155.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS

**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

| **30. Remarks** |
|---|



DEPARTMENT OF HEALTH AND HUMAN SERVICES    Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU62PS924783-03-01
FAIN# NU62PS924783
Federal Award Date: 01/31/2025

| Recipient Information | |
|---|---|
| **Recipient Name** | |
| COMMUNITY HEALTH PROJECT, INC. | |
| 356 W  18th St | |
| New York, NY 10011-4401 | |
| [NoPhoneRecord] | |
| **Congressional District of Recipient** | |
| 08 | |
| **Payment Account Number and Type** | |
| ▮▮▮▮▮ | |
| **Employer Identification Number (EIN) Data** | |
| ▮▮▮▮▮ | |
| **Universal Numbering System (DUNS)** | |
| ▮▮▮▮▮ | |
| **Recipient's Unique Entity Identifier (UEI)** | |
| ▮▮▮▮▮ | |

| 31. Assistance Type |
|---|
| Cooperative Agreement |
| **32. Type of Award** |
| Other |

### 33. Approved Budget
(Excludes Direct Assistance)

I.  Financial Assistance from the Federal Awarding Agency Only
II. Total project costs including grant funds and all other financial participation

| | |
|---|---:|
| a.  Salaries and Wages | $243,575.00 |
| b.  Fringe Benefits | $104,737.00 |
| c.  Total Personnel Costs | $348,312.00 |
| d.  Equipment | $0.00 |
| e.  Supplies | $0.00 |
| f.  Travel | $3,688.00 |
| g.  Construction | $0.00 |
| h.  Other | $0.00 |
| i.  Contractual | $50,000.00 |
| j.  TOTAL DIRECT COSTS | $402,000.00 |
| k.  INDIRECT COSTS | $98,000.00 |
| l.  TOTAL APPROVED BUDGET | $500,000.00 |
| m.  Federal Share | $500,000.00 |
| n.  Non-Federal Share | $0.00 |

### 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 2-9390JT6 | 22NU62PS924783 | PS | 41.51 | 93.944 | $0.00 | 75-22-0950 |
| 3-9390JT6 | 22NU62PS924783 | PS | 41.51 | 93.944 | $0.00 | 75-23-0950 |
| 4-9390JT6 | 22NU62PS924783 | PS | 41.51 | 93.944 | $0.00 | 75-24-0950 |



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**  Notice of Award

Centers for Disease Control and Prevention

Award#  6 NU62PS924783-03-01
FAIN#   NU62PS924783
Federal Award Date: 01/31/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

## AWARD ATTACHMENTS

COMMUNITY HEALTH PROJECT, INC.                    6 NU62PS924783-03-01

**1.** TERMINATION

**TERMS AND CONDITIONS OF AWARD**

**Termination**: The purpose of this amendment is to terminate this award in accordance with the President's Executive Order, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to Federal Government and Office of Personnel Management guidance issued January 29, 2025.

No additional activities can be conducted, and no additional costs may be incurred.  Un-obligated balances will be de-obligated.

**Closeout**: Submit all closeout reports identified below within 120 days of the period of performance end date of January 31, 2025. Submit the documentation as a "Grant Closeout" amendment in GrantSolutions. The reporting timeframe is the full period of performance. Please note, if you fail to submit timely and accurate reports, CDC may also pursue other enforcement actions per 45 CFR PART 75.371.

**Final Performance/Progress Report**: This report should include the information specified in the Notice of Funding Opportunity (NOFO). At a minimum, the report will include the following: • Statement of progress made toward the achievement of originally stated aims. • Description of results (positive or negative) considered significant. • List of publications resulting from the project, with plans, if any, for further publication.

**Final Federal Financial Report (FFR, SF-425)**: The FFR should only include those funds authorized and expended during the timeframe covered by the report. The final report must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. Should the amount not match with the final expenditures reported to the Payment Management System (PMS), you will be required to update your reports to PMS accordingly.

**Equipment and Supplies - Tangible Personal Property Report (SF-428)**: A completed SF-428 detailing all major equipment acquired with a unit acquisition cost of $5,000 or more. If no equipment was acquired under the award, a negative report is required



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU62PS924784-03-01
FAIN# NU62PS924784
Federal Award Date: 01/31/2025

| Recipient Information | Federal Award Information |
|---|---|

**Recipient Information**

**1. Recipient Name**
WHITMAN-WALKER CLINIC INC
1377 R St. NW Ste 200
Washington, DC 20009-6293
[NoPhoneRecord]

**2. Congressional District of Recipient**
98

**3. Payment System Identifier (ID)**
[REDACTED]

**4. Employer Identification Number (EIN)**
[REDACTED]

**5. Data Universal Numbering System (DUNS)**
[REDACTED]

**6. Recipient's Unique Entity Identifier (UEI)**
[REDACTED]

**7. Project Director or Principal Investigator**
Britt Walsh
Principal Investigator
bwalsh@whitman-walker.org
202-797-4457

**8. Authorized Official**
Ms. Meghan Davies
N/A
mdavies@whitman-walker.org
202-797-4454

**Federal Agency Information**
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Mrs. Benita Bosier-Ingram
Grant Management Specialist
ula8@cdc.gov
404-638-7434

**10. Program Official Contact Information**
Kashif Iqbal
Health Scientist
kai9@cdc.gov
4047188556

**Federal Award Information**

**11. Award Number**
6 NU62PS924784-03-01

**12. Unique Federal Award Identification Number (FAIN)**
NU62PS924784

**13. Statutory Authority**
Sections 301 and 318(b) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended

**14. Federal Award Project Title**
Community to Care: Expanding Access to Status-Neutral Services for Gender Diverse People in DC

**15. Assistance Listing Number**
93.944

**16. Assistance Listing Program Title**
Human Immunodeficiency Virus (HIV)/Acquired Immunodeficiency Virus Syndrome (AIDS) Surveillance

**17. Award Action Type**
Terminate

**18. Is the Award R&D?**
No

### Summary Federal Award Financial Information

| | | |
|---|---|---|
| **19. Budget Period Start Date** 06/30/2024 **- End Date** 01/31/2025 | | |
| **20. Total Amount of Federal Funds Obligated by this Action** | | $0.00 |
| 20a. Direct Cost Amount | | $0.00 |
| 20b. Indirect Cost Amount | | $0.00 |
| **21. Authorized Carryover** | | $0.00 |
| **22. Offset** | | $0.00 |
| **23. Total Amount of Federal Funds Obligated this budget period** | | $500,000.00 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | | $0.00 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | | $500,000.00 |
| **26. Period of Performance Start Date** 06/30/2022 **- End Date** 01/31/2025 | | |
| **27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Period of Performance** | | $1,500,000.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS

**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

**30. Remarks**

JA1071



DEPARTMENT OF HEALTH AND HUMAN SERVICES    Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU62PS924784-03-01
FAIN# NU62PS924784
Federal Award Date: 01/31/2025

| Recipient Information |
|---|
| **Recipient Name** |
| WHITMAN-WALKER CLINIC INC |
| 1377 R St. NW Ste 200 |
| Washington, DC 20009-6293 |
| [NoPhoneRecord] |
| |
| **Congressional District of Recipient** |
| 98 |
| **Payment Account Number and Type** |
| ▮▮▮▮▮ |
| **Employer Identification Number (EIN) Data** |
| ▮▮▮▮▮ |
| **Universal Numbering System (DUNS)** |
| ▮▮▮▮▮ |
| **Recipient's Unique Entity Identifier (UEI)** |
| ▮▮▮▮▮ |

| 31. Assistance Type |
|---|
| Cooperative Agreement |
| **32. Type of Award** |
| Other |

| 33.  Approved Budget |  |
|---|---|
| (Excludes Direct Assistance) |  |
| I.   Financial Assistance from the Federal Awarding Agency Only |  |
| II.  Total project costs including grant funds and all other financial participation |  |
| **a.  Salaries and Wages** | $168,682.00 |
| **b.  Fringe Benefits** | $102,120.00 |
| **c.   Total Personnel Costs** | $270,802.00 |
| **d.  Equipment** | $0.00 |
| **e.  Supplies** | $1,432.00 |
| **f.   Travel** | $4,500.00 |
| **g.  Construction** | $0.00 |
| **h.  Other** | $35,943.00 |
| **i.   Contractual** | $100,000.00 |
| **j.   TOTAL DIRECT COSTS** | $412,677.00 |
| **k.  INDIRECT COSTS** | $87,323.00 |
| **l.   TOTAL APPROVED BUDGET** | $500,000.00 |
| **m.  Federal Share** | $500,000.00 |
| **n.  Non-Federal Share** | $0.00 |

| 34.  Accounting Classification Codes |
|---|

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 2-9390JT6 | 22NU62PS924784 | PS | 41.51 | 93.944 | $0.00 | 75-22-0950 |
| 3-9390JT6 | 22NU62PS924784 | PS | 41.51 | 93.944 | $0.00 | 75-23-0950 |
| 4-9390JT6 | 22NU62PS924784 | PS | 41.51 | 93.944 | $0.00 | 75-24-0950 |

USCA4 Appeal: 25-1279     Doc: 34-2     Filed: 07/25/2025     Pg: 497 of 589



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**   Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU62PS924784-03-01
FAIN#   NU62PS924784
Federal Award Date: 01/31/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

JA1073

# AWARD ATTACHMENTS

WHITMAN-WALKER CLINIC INC                                    6 NU62PS924784-03-01

**1.** TERMINATION

**TERMS AND CONDITIONS OF AWARD**

**Termination**: The purpose of this amendment is to terminate this award in accordance with the President's Executive Order, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to Federal Government and Office of Personnel Management guidance issued January 29, 2025.

No additional activities can be conducted, and no additional costs may be incurred.  Un-obligated balances will be de-obligated.

**Closeout**: Submit all closeout reports identified below within 120 days of the period of performance end date of January 31, 2025. Submit the documentation as a "Grant Closeout" amendment in GrantSolutions. The reporting timeframe is the full period of performance. Please note, if you fail to submit timely and accurate reports, CDC may also pursue other enforcement actions per 45 CFR PART 75.371.

**Final Performance/Progress Report**: This report should include the information specified in the Notice of Funding Opportunity (NOFO). At a minimum, the report will include the following: • Statement of progress made toward the achievement of originally stated aims. • Description of results (positive or negative) considered significant. • List of publications resulting from the project, with plans, if any, for further publication.

**Final Federal Financial Report (FFR, SF-425)**: The FFR should only include those funds authorized and expended during the timeframe covered by the report. The final report must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. Should the amount not match with the final expenditures reported to the Payment Management System (PMS), you will be required to update your reports to PMS accordingly.

**Equipment and Supplies - Tangible Personal Property Report (SF-428)**: A completed SF-428 detailing all major equipment acquired with a unit acquisition cost of $5,000 or more. If no equipment was acquired under the award, a negative report is required



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU65PS923732-03-01
FAIN# NU65PS923732
Federal Award Date: 01/31/2025

---

## Recipient Information

**1. Recipient Name**
ASIAN AND PACIFIC ISLANDER WELLNESS
CENTER, INC.
730 Polk St FL 4
San Francisco, CA 94109-7813
415-292-3400

**2. Congressional District of Recipient**
12

**3. Payment System Identifier (ID)**
[REDACTED]

**4. Employer Identification Number (EIN)**
[REDACTED]

**5. Data Universal Numbering System (DUNS)**
[REDACTED]

**6. Recipient's Unique Entity Identifier (UEI)**
[REDACTED]

**7. Project Director or Principal Investigator**
Ms. Ming Ming Kwan
Chief Operating Officer
mingming@sfcommunityhealth.org
(415) 292-3400 ext.

**8. Authorized Official**
Ms. Amber Curley
Chief Financial Officer
amber@sfcommunityhealth.org
415-292-3420; 308

### Federal Agency Information
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Mr. Ryan Springer
Grants Management Specialist (GMS)
rji2@cdc.gov
678-475-4693

**10. Program Official Contact Information**
Scott R Strobel
Program Officer
oyp8@cdc.gov
111-111-1111

---

## Federal Award Information

**11. Award Number**
6 NU65PS923732-03-01

**12. Unique Federal Award Identification Number (FAIN)**
NU65PS923732

**13. Statutory Authority**
This Program is authorized under section 318 of the Public Health Service Act (42 U.S.C. Section 247c, as amended)

**14. Federal Award Project Title**
San Francisco Bay Transgender Alliance for Health Resources (STAHR): Year 2 Supplemental Funding
SAFE SPACES EVALUATION

**15. Assistance Listing Number**
93.939

**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based

**17. Award Action Type**
Terminate

**18. Is the Award R&D?**
No

### Summary Federal Award Financial Information

| | |
|---|---|
| **19. Budget Period Start Date** 04/01/2024 **- End Date** 01/31/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0.00 |
|    20a. Direct Cost Amount | $0.00 |
|    20b. Indirect Cost Amount | $0.00 |
| **21. Authorized Carryover** | $0.00 |
| **22. Offset** | $0.00 |
| **23. Total Amount of Federal Funds Obligated this budget period** | $400,000.00 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $400,000.00 |
| **26. Period of Performance Start Date** 04/01/2022 **- End Date** 01/31/2025 | |
| **27. Total Amount of the Federal Award including Approved** Cost Sharing or Matching this Period of Performance | $1,262,500.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS

**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

---

## 30. Remarks

---



DEPARTMENT OF HEALTH AND HUMAN SERVICES    Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU65PS923732-03-01
FAIN# NU65PS923732
Federal Award Date: 01/31/2025

## Recipient Information

**Recipient Name**
ASIAN AND PACIFIC ISLANDER WELLNESS
CENTER, INC.
730 Polk St FL 4
San Francisco, CA 94109-7813
415-292-3400

**Congressional District of Recipient**
12

**Payment Account Number and Type**
▮▮▮▮▮▮

**Employer Identification Number (EIN) Data**
▮▮▮▮▮▮

**Universal Numbering System (DUNS)**
▮▮▮▮▮▮

**Recipient's Unique Entity Identifier (UEI)**
▮▮▮▮▮▮

**31. Assistance Type**
Cooperative Agreement
**32. Type of Award**
Other

### 33. Approved Budget
(Excludes Direct Assistance)

I.  Financial Assistance from the Federal Awarding Agency Only
II. Total project costs including grant funds and all other financial participation

| | |
|---|---:|
| **a.  Salaries and Wages** | $118,022.00 |
| **b.  Fringe Benefits** | $29,505.00 |
| **c.  Total Personnel Costs** | $147,527.00 |
| **d.  Equipment** | $0.00 |
| **e.  Supplies** | $31,500.00 |
| **f.  Travel** | $0.00 |
| **g.  Construction** | $0.00 |
| **h.  Other** | $16,512.00 |
| **i.  Contractual** | $163,000.00 |
| **j.  TOTAL DIRECT COSTS** | $358,539.00 |
| **k.  INDIRECT COSTS** | $41,461.00 |
| **l.  TOTAL APPROVED BUDGET** | $400,000.00 |
| **m.  Federal Share** | $400,000.00 |
| **n.  Non-Federal Share** | $0.00 |

### 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 2-93908J1 | 22NU65PS923732 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 2-9390JS5 | 22NU65PS923732 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-93908J1 | 22NU65PS923732 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390JS5 | 22NU65PS923732 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390KZS | 22NU65PS923732 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-93908J1 | 22NU65PS923732 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |
| 4-9390JS5 | 22NU65PS923732 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |

USCA4 Appeal: 25-1279      Doc: 34-2      Filed: 07/25/2025      Pg: 502 of 589



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**   Notice of Award

Centers for Disease Control and Prevention

Award#  6 NU65PS923732-03-01
FAIN#   NU65PS923732
Federal Award Date: 01/31/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

JA1078

## AWARD ATTACHMENTS

ASIAN AND PACIFIC ISLANDER WELLNESS CENTER, INC.          6 NU65PS923732-03-01

**1.** Terms

**TERMS AND CONDITIONS OF AWARD**

**Termination**: The purpose of this amendment is to terminate this award in accordance with the President's Executive Order, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to Federal Government and Office of Personnel Management guidance issued January 29, 2025.

No additional activities can be conducted, and no additional costs may be incurred.  Un-obligated balances will be de-obligated.

**Closeout**: Submit all closeout reports identified below within 120 days of the period of performance end date of January 31, 2025. Submit the documentation as a "Grant Closeout" amendment in GrantSolutions. The reporting timeframe is the full period of performance. Please note, if you fail to submit timely and accurate reports, CDC may also pursue other enforcement actions per 45 CFR PART 75.371.

**Final Performance/Progress Report**: This report should include the information specified in the Notice of Funding Opportunity (NOFO). At a minimum, the report will include the following: • Statement of progress made toward the achievement of originally stated aims. • Description of results (positive or negative) considered significant. • List of publications resulting from the project, with plans, if any, for further publication.

**Final Federal Financial Report (FFR, SF-425)**: The FFR should only include those funds authorized and expended during the timeframe covered by the report. The final report must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. Should the amount not match with the final expenditures reported to the Payment Management System (PMS), you will be required to update your reports to PMS accordingly.

**Equipment and Supplies - Tangible Personal Property Report (SF-428)**: A completed SF-428 detailing all major equipment acquired with a unit acquisition cost of $5,000 or more. If no equipment was acquired under the award, a negative report is required

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Disease Control and Prevention

**Notice of Award**

Award# 6 NU65PS923732-03-02
FAIN# NU65PS923732
Federal Award Date: 02/11/2025

---

### Recipient Information

**1. Recipient Name**
ASIAN AND PACIFIC ISLANDER WELLNESS CENTER, INC.
730 Polk St FL 4
San Francisco, CA 94109-7813
415-292-3400

**2. Congressional District of Recipient**
12

**3. Payment System Identifier (ID)**
██████████

**4. Employer Identification Number (EIN)**
██████████

**5. Data Universal Numbering System (DUNS)**
██████████

**6. Recipient's Unique Entity Identifier (UEI)**
██████████

**7. Project Director or Principal Investigator**
Ms. Ming Ming Kwan
Chief Operating Officer
mingming@sfcommunityhealth.org
(415) 292-3400 ext.

**8. Authorized Official**
Ms. Amber Curley
Chief Financial Officer
amber@sfcommunityhealth.org
415-292-3420; 308

### Federal Agency Information

CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Mr. Ryan Springer
Grants Management Specialist (GMS)
rji2@cdc.gov
678-475-4693

**10. Program Official Contact Information**
Scott R Strobel
Program Officer
oyp8@cdc.gov
111-111-1111

---

### Federal Award Information

**11. Award Number**
6 NU65PS923732-03-02

**12. Unique Federal Award Identification Number (FAIN)**
NU65PS923732

**13. Statutory Authority**
This Program is authorized under section 318 of the Public Health Service Act (42 U.S.C. Section 247c, as amended)

**14. Federal Award Project Title**
San Francisco Bay Transgender Alliance for Health Resources (STAHR): Year 2 Supplemental Funding SAFE SPACES EVALUATION

**15. Assistance Listing Number**
93.939

**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based

**17. Award Action Type**
NGA Revision

**18. Is the Award R&D?**
No

---

### Summary Federal Award Financial Information

**19. Budget Period Start Date** 04/01/2024 **- End Date** 03/31/2025

| | |
|---|---|
| **20. Total Amount of Federal Funds Obligated by this Action** | $0.00 |
| 20a. Direct Cost Amount | $0.00 |
| 20b. Indirect Cost Amount | $0.00 |
| **21. Authorized Carryover** | $0.00 |
| **22. Offset** | $0.00 |
| **23. Total Amount of Federal Funds Obligated this budget period** | $400,000.00 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0.00 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $400,000.00 |
| **26. Period of Performance Start Date** 04/01/2022 **- End Date** 03/31/2027 | |
| **27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Period of Performance** | $1,262,500.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS

**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

---

### 30. Remarks

---

DEPARTMENT OF HEALTH AND HUMAN SERVICES      Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU65PS923732-03-02
FAIN# NU65PS923732
Federal Award Date: 02/11/2025

## Recipient Information

**Recipient Name**
ASIAN AND PACIFIC ISLANDER WELLNESS
CENTER, INC.
730 Polk St FL 4
San Francisco, CA 94109-7813
415-292-3400

**Congressional District of Recipient**
12

**Payment Account Number and Type**

**Employer Identification Number (EIN) Data**

**Universal Numbering System (DUNS)**

**Recipient's Unique Entity Identifier (UEI)**

| **33. Approved Budget** (Excludes Direct Assistance) | |
|---|---|
| I. Financial Assistance from the Federal Awarding Agency Only | |
| II. Total project costs including grant funds and all other financial participation | |
| a. **Salaries and Wages** | $118,022.00 |
| b. **Fringe Benefits** | $29,505.00 |
| c. **Total Personnel Costs** | $147,527.00 |
| d. **Equipment** | $0.00 |
| e. **Supplies** | $31,500.00 |
| f. **Travel** | $0.00 |
| g. **Construction** | $0.00 |
| h. **Other** | $16,512.00 |
| i. **Contractual** | $163,000.00 |
| j. **TOTAL DIRECT COSTS** | **$358,539.00** |
| k. **INDIRECT COSTS** | **$41,461.00** |
| l. **TOTAL APPROVED BUDGET** | **$400,000.00** |
| m. **Federal Share** | **$400,000.00** |
| n. **Non-Federal Share** | **$0.00** |

## 31. Assistance Type
Cooperative Agreement

## 32. Type of Award
Other

### 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 2-9390BJ1 | 22NU65PS923732 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 2-9390JS5 | 22NU65PS923732 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-9390BJ1 | 22NU65PS923732 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390JS5 | 22NU65PS923732 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390KZS | 22NU65PS923732 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-9390BJ1 | 22NU65PS923732 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |
| 4-9390JS5 | 22NU65PS923732 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |

Page 2



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**    Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU65PS923732-03-02
FAIN# NU65PS923732
Federal Award Date: 02/11/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

Page 3

## AWARD ATTACHMENTS

ASIAN AND PACIFIC ISLANDER WELLNESS CENTER, INC.          6 NU65PS923732-03-02

1. Terms and Conditions

**TERMS AND CONDITIONS OF AWARD**

In compliance with the Temporary Restraining Order issued on January 31, 2025, in the United States District Court in the District of Rhode Island, the purpose of this amendment is to **rescind** the **Termination** Notice of Award issued January 31, 2025.

All the other terms and conditions issued with the original award remain in effect throughout the budget period unless otherwise changed, in writing, by the Grants Management Officer.

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU65PS923735-03-02
FAIN# NU65PS923735
Federal Award Date: 02/11/2025

## Recipient Information

**1. Recipient Name**
COMMUNITY WELLNESS PROJECT
906 Olive St Ste 904
Saint Louis, MO 63101-1431
[NO DATA]

**2. Congressional District of Recipient**
01
**3. Payment System Identifier (ID)**

**4. Employer Identification Number (EIN)**

**5. Data Universal Numbering System (DUNS)**

**6. Recipient's Unique Entity Identifier (UEI)**

**7. Project Director or Principal Investigator**
Mrs. Dana P Williams
Executive Director
cwp_group@yahoo.com
314-421-9600

**8. Authorized Official**
Mr. Monterio D. Pattman
Accountant
mpattman@cwpstl.org
314-421-9600

### Federal Agency Information
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Ms. Chamarla Brame
Grants Management Specialist
qpv3@cdc.gov
404.498.4134

**10. Program Official Contact Information**
Brigitte Brown
Program Officer
blc0@cdc.gov
404-498-5023

## Federal Award Information

**11. Award Number**
6 NU65PS923735-03-02
**12. Unique Federal Award Identification Number (FAIN)**
NU65PS923735
**13. Statutory Authority**
This program is authorized under Sections 301 and 318(a) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended.
**14. Federal Award Project Title**
GIRLS LIKE US

**15. Assistance Listing Number**
93.939
**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based

**17. Award Action Type**
NGA Revision
**18. Is the Award R&D?**
No

### Summary Federal Award Financial Information

| | |
|---|---|
| **19. Budget Period Start Date** 04/01/2024 **- End Date** 03/31/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0.00 |
| 20a. Direct Cost Amount | $0.00 |
| 20b. Indirect Cost Amount | $0.00 |
| **21. Authorized Carryover** | $0.00 |
| **22. Offset** | $0.00 |
| **23. Total Amount of Federal Funds Obligated this budget period** | $400,000.00 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0.00 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $400,000.00 |
| **26. Period of Performance Start Date** 04/01/2022 **- End Date** 03/31/2027 | |
| **27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Period of Performance** | $1,262,500.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS
**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

## 30. Remarks

Page 1

DEPARTMENT OF HEALTH AND HUMAN SERVICES    Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU65PS923735-03-02
FAIN# NU65PS923735
Federal Award Date: 02/11/2025

## Recipient Information

**Recipient Name**
COMMUNITY WELLNESS PROJECT
906 Olive St Ste 904
Saint Louis, MO 63101-1431
[NO DATA]

**Congressional District of Recipient**
01

**Payment Account Number and Type**

**Employer Identification Number (EIN) Data**

**Universal Numbering System (DUNS)**

**Recipient's Unique Entity Identifier (UEI)**

---

**31. Assistance Type**
Cooperative Agreement

**32. Type of Award**
Other

| 33. Approved Budget (Excludes Direct Assistance) | |
|---|---|
| I. Financial Assistance from the Federal Awarding Agency Only | |
| II. Total project costs including grant funds and all other financial participation | |
| a. Salaries and Wages | $211,995.00 |
| b. Fringe Benefits | $40,682.00 |
| c. Total Personnel Costs | $252,677.00 |
| d. Equipment | $0.00 |
| e. Supplies | $19,756.00 |
| f. Travel | $14,564.00 |
| g. Construction | $0.00 |
| h. Other | $60,020.00 |
| i. Contractual | $52,983.00 |
| j. TOTAL DIRECT COSTS | $400,000.00 |
| k. INDIRECT COSTS | $0.00 |
| l. TOTAL APPROVED BUDGET | $400,000.00 |
| m. Federal Share | $400,000.00 |
| n. Non-Federal Share | $0.00 |

## 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 2-93008J1 | 22NU65PS923735 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 2-9390JS5 | 22NU65PS923735 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-93008J1 | 22NU65PS923735 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390JS5 | 22NU65PS923735 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390KZS | 22NU65PS923735 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-93008J1 | 22NU65PS923735 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |
| 4-9390JS5 | 22NU65PS923735 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**  Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU65PS923735-03-02
FAIN# NU65PS923735
Federal Award Date: 02/11/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

## AWARD ATTACHMENTS

COMMUNIT  WELLNESS PRO  ECT                    6 NU65PS923735-03-02

1. Terms and Conditions

**TERMS AND CONDITIONS OF AWARD**

In compliance with the Temporary Restraining Order issued on January 31, 2025, in the United States District Court in the District of Rhode Island, the purpose of this amendment is to **rescind** the **Termination** Notice of Award issued January 31, 2025.

All the other terms and conditions issued with the original award remain in effect throughout the budget period unless otherwise changed, in writing, by the Grants Management Officer.

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU65PS923736-03-03
FAIN# NU65PS923736
Federal Award Date: 02/11/2025

## Recipient Information

**1. Recipient Name**
THE DAMIEN CENTER INC
26 N Arsenal Ave
Indianapolis, IN 46201-3808

**2. Congressional District of Recipient**
07

**3. Payment System Identifier (ID)**

**4. Employer Identification Number (EIN)**

**5. Data Universal Numbering System (DUNS)**

**6. Recipient's Unique Entity Identifier (UEI)**

**7. Project Director or Principal Investigator**
Mr. Dexter  Etter
detter@damien.org
317-632-0123

**8. Authorized Official**
Mr. Alan  Witchey
awitchey@damien.org
317-632-0123

### Federal Agency Information
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Ms. Chamarla Brame
Grants Management Specialist
qpv3@cdc.gov
404.498.4134

**10. Program Official Contact Information**
Vincent  Doan
Program Officer
skn9@cdc.gov
404-498-0548

## Federal Award Information

**11. Award Number**
6 NU65PS923736-03-03
**12. Unique Federal Award Identification Number (FAIN)**
NU65PS923736
**13. Statutory Authority**
This program is authorized under Sections 301 and 318(a) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended.
**14. Federal Award Project Title**
YTG Prevention Program

**15. Assistance Listing Number**
93.939
**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based

**17. Award Action Type**
NGA Revision
**18. Is the Award R&D?**
No

### Summary Federal Award Financial Information

| | | |
|---|---|---|
| **19. Budget Period Start Date** 04/01/2024 **- End Date** 03/31/2025 | | |
| **20. Total Amount of Federal Funds Obligated by this Action** | | $0.00 |
| 20a. Direct Cost Amount | | $0.00 |
| 20b. Indirect Cost Amount | | $0.00 |
| **21.** Authorized Carryover | | $30,000.00 |
| **22.** Offset | | $0.00 |
| **23.** Total Amount of Federal Funds Obligated this budget period | | $400,000.00 |
| **24.** Total Approved Cost Sharing or Matching, where applicable | | $0.00 |
| **25.** Total Federal and Non-Federal Approved this Budget Period | | $400,000.00 |
| **26. Period of Performance Start Date** 04/01/2022 **- End Date** 03/31/2027 | | |
| **27.** Total Amount of the Federal Award including Approved Cost Sharing or Matching this Period of Performance | | $1,200,000.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS
**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

## 30. Remarks

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU65PS923736-03-03
FAIN# NU65PS923736
Federal Award Date: 02/11/2025

## Recipient Information

**Recipient Name**
THE DAMIEN CENTER INC
26 N Arsenal Ave
Indianapolis, IN 46201-3808

**Congressional District of Recipient**
07

**Payment Account Number and Type**

**Employer Identification Number (EIN) Data**

**Universal Numbering System (DUNS)**

**Recipient's Unique Entity Identifier (UEI)**

### 31. Assistance Type
Cooperative Agreement

### 32. Type of Award
Other

### 33. Approved Budget
(Excludes Direct Assistance)

I. Financial Assistance from the Federal Awarding Agency Only
II. Total project costs including grant funds and all other financial participation

| | |
|---|---|
| a. **Salaries and Wages** | $234,255.00 |
| b. **Fringe Benefits** | $69,345.00 |
| c. **Total Personnel Costs** | $303,600.00 |
| d. **Equipment** | $0.00 |
| e. **Supplies** | $11,200.00 |
| f. **Travel** | $15,943.00 |
| g. **Construction** | $0.00 |
| h. **Other** | $60,166.00 |
| i. **Contractual** | $0.00 |
| j. **TOTAL DIRECT COSTS** | **$390,909.00** |
| k. **INDIRECT COSTS** | **$39,091.00** |
| l. **TOTAL APPROVED BUDGET** | **$430,000.00** |
| m. **Federal Share** | $430,000.00 |
| n. **Non-Federal Share** | $0.00 |

### 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 2-9300BJ1 | 22NU65PS923736 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 2-9390JS5 | 22NU65PS923736 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-9390BJ1 | 22NU65PS923736 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390JS5 | 22NU65PS923736 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-9390BJ1 | 22NU65PS923736 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |
| 4-9390JS5 | 22NU65PS923736 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |

Page 2



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**   Notice of Award

Centers for Disease Control and Prevention

Award#   6 NU65PS923736-03-03
FAIN#   NU65PS923736
Federal Award Date:   02/11/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

JA1093

## AWARD ATTACHMENTS

T  E DAMIEN CENTER INC                          6 NU65PS923736-03-03

1. Terms and Conditions

**TERMS AND CONDITIONS OF AWARD**

In compliance with the Temporary Restraining Order issued on January 31, 2025, in the United States District Court in the District of Rhode Island, the purpose of this amendment is to **rescind** the **Termination** Notice of Award issued January 31, 2025.

All the other terms and conditions issued with the original award remain in effect throughout the budget period unless otherwise changed, in writing, by the Grants Management Officer.

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU65PS923741-03-04
FAIN# NU65PS923741
Federal Award Date: 02/11/2025

## Recipient Information

**1. Recipient Name**
The Knights & Orchids Society Inc.
17 Broad St
Selma, AL 36701-4605

**2. Congressional District of Recipient**
07

**3. Payment System Identifier (ID)**

**4. Employer Identification Number (EIN)**

**5. Data Universal Numbering System (DUNS)**

**6. Recipient's Unique Entity Identifier (UEI)**

**7. Project Director or Principal Investigator**
Ms. Traniesa  Caldwell
Deputy Director
traniesa.caldwell@tkosociety.com
3344129766

**8. Authorized Official**
Mrs. Jennine  Bell
Grantee
jennine@tkosociety.com
334-431-2227

### Federal Agency Information
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Mr. Anthony Fultz
Grant Management Specialist
qjj7@cdc.gov
(404)498-4033

**10.Program Official Contact Information**
Ms. Tanisha  Quintanilla
Project Officer
DHP/PDIB
jbk3@cdc.gov
404-639-1991

## Federal Award Information

**11. Award Number**
6 NU65PS923741-03-04
**12. Unique Federal Award Identification Number (FAIN)**
NU65PS923741
**13. Statutory Authority**
This program is authorized under Sections 301 and 318(a) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended.
**14. Federal Award Project Title**
Fast Affirming Innovative Testing and Health Care (FAITH)

**15. Assistance Listing Number**
93.939
**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based

**17. Award Action Type**
NGA Revision
**18. Is the Award R&D?**
No

### Summary Federal Award Financial Information

| | | |
|---|---|---|
| **19. Budget Period Start Date** 04/01/2024  - End Date 03/31/2025 | | |
| **20. Total Amount of Federal Funds Obligated by this Action** | | $0.00 |
| 20a. Direct Cost Amount | | $0.00 |
| 20b. Indirect Cost Amount | | $0.00 |
| **21.** Authorized Carryover | | $0.00 |
| **22.** Offset | | $0.00 |
| **23.** Total Amount of Federal Funds Obligated this budget period | | $400,000.00 |
| **24.** Total Approved Cost Sharing or Matching, where applicable | | $0.00 |
| **25.** Total Federal and Non-Federal Approved this Budget Period | | $400,000.00 |
| **26. Period of Performance Start Date** 04/01/2022  - End Date 03/31/2027 | | |
| **27.** Total Amount of the Federal Award including Approved Cost  Sharing or Matching this Period of Performance | | $2,136,852.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS

**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

**30. Remarks**

DEPARTMENT OF HEALTH AND HUMAN SERVICES    Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU65PS923741-03-04
FAIN# NU65PS923741
Federal Award Date: 02/11/2025

## Recipient Information

**Recipient Name**
The Knights & Orchids Society Inc.
17 Broad St
Selma, AL 36701-4605

**Congressional District of Recipient**
07
**Payment Account Number and Type**

**Employer Identification Number (EIN) Data**

**Universal Numbering System (DUNS)**

**Recipient's Unique Entity Identifier (UEI)**

### 31. Assistance Type
Cooperative Agreement
### 32. Type of Award
Other

### 33. Approved Budget
(Excludes Direct Assistance)

I. Financial Assistance from the Federal Awarding Agency Only
II. Total project costs including grant funds and all other financial participation

| | |
|---|---:|
| a. **Salaries and Wages** | $234,000.00 |
| b. **Fringe Benefits** | $58,500.00 |
| c. **Total Personnel Costs** | $292,500.00 |
| d. **Equipment** | $0.00 |
| e. **Supplies** | $14,542.00 |
| f. **Travel** | $13,302.00 |
| g. **Construction** | $0.00 |
| h. **Other** | $43,292.00 |
| i. **Contractual** | $0.00 |
| j. **TOTAL DIRECT COSTS** | **$363,636.00** |
| k. **INDIRECT COSTS** | **$36,364.00** |
| l. **TOTAL APPROVED BUDGET** | **$400,000.00** |
| m. **Federal Share** | **$400,000.00** |
| n. **Non-Federal Share** | **$0.00** |

### 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 2-9300BJ1 | 22NU65PS923741 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 2-9300JS5 | 22NU65PS923741 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-9390BJ1 | 22NU65PS923741 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390JS5 | 22NU65PS923741 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-9390BJ1 | 22NU65PS923741 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |
| 4-9390JS5 | 22NU65PS923741 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU65PS923741-03-04
FAIN# NU65PS923741
Federal Award Date: 02/11/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

## AWARD ATTACHMENTS

T e   ni  ts   Or   ids So  iet  In  .                                6 NU65PS9237  1-03-0

1. Terms and Conditions

**TERMS AND CONDITIONS OF AWARD**

In compliance with the Temporary Restraining Order issued on January 31, 2025, in the United States District Court in the District of Rhode Island, the purpose of this amendment is to **rescind** the **Termination** Notice of Award issued January 31, 2025.

All the other terms and conditions issued with the original award remain in effect throughout the budget period unless otherwise changed, in writing, by the Grants Management Officer.

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Disease Control and Prevention

**Notice of Award**

Award# 6 NU65PS923744-03-02
FAIN# NU65PS923744
Federal Award Date: 02/11/2025

---

### Recipient Information

**1. Recipient Name**
LONG ISLAND CRISIS CENTER INC
2740 Martin Ave
Bellmore, NY 11710-3268
5166799000126

**2. Congressional District of Recipient**
04

**3. Payment System Identifier (ID)**

**4. Employer Identification Number (EIN)**

**5. Data Universal Numbering System (DUNS)**

**6. Recipient's Unique Entity Identifier (UEI)**

**7. Project Director or Principal Investigator**
Mr. Devon  Zappasodi
dzappasodi@liccpfy.org
516-679-9000

**8. Authorized Official**
Ms. Theresa  Buhse
Tbuhse@longislandcrisiscenter.org
516-826-0244

---

**Federal Agency Information**
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Mr. Keith Preciados
Grants Management Specialist
zpw9@cdc.gov
770-488-5392

**10. Program Official Contact Information**
Mr. Lennie William Lyons
Program Officer
szv7@cdc.gov
404-718-2581

---

### Federal Award Information

**11. Award Number**
6 NU65PS923744-03-02

**12. Unique Federal Award Identification Number (FAIN)**
NU65PS923744

**13. Statutory Authority**
This program is authorized under Sections 301 and 318(a) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended.

**14. Federal Award Project Title**
Comprehensive High-Impact HIV Prevention Programs for Young Transgender Persons of Color in Queens, Nassau, and Suffolk Counties

**15. Assistance Listing Number**
93.939

**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based

**17. Award Action Type**
NGA Revision

**18. Is the Award R&D?**
No

---

### Summary Federal Award Financial Information

| | |
|---|---|
| **19. Budget Period Start Date** 04/01/2024  **- End Date** 03/31/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0.00 |
| 20a. Direct Cost Amount | $0.00 |
| 20b. Indirect Cost Amount | $0.00 |
| **21.** Authorized Carryover | $0.00 |
| **22.** Offset | $0.00 |
| **23.** Total Amount of Federal Funds Obligated this budget period | $400,000.00 |
| **24.** Total Approved Cost Sharing or Matching, where applicable | $0.00 |
| **25.** Total Federal and Non-Federal Approved this Budget Period | $400,000.00 |
| **26. Period of Performance Start Date** 04/01/2022  **- End Date** 03/31/2027 | |
| **27.** Total Amount of the Federal Award including Approved Cost  Sharing or Matching this Period of Performance | $1,200,000.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS

**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

---

**30. Remarks**

DEPARTMENT OF HEALTH AND HUMAN SERVICES        Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU65PS923744-03-02
FAIN#   NU65PS923744
Federal Award Date: 02/11/2025

## Recipient Information

**Recipient Name**
LONG ISLAND CRISIS CENTER INC
2740 Martin Ave
Bellmore, NY 11710-3268
5166799000126

**Congressional District of Recipient**
04

**Payment Account Number and Type**

**Employer Identification Number (EIN) Data**

**Universal Numbering System (DUNS)**

**Recipient's Unique Entity Identifier (UEI)**

### 31. Assistance Type
Cooperative Agreement

### 32. Type of Award
Other

### 33. Approved Budget
(Excludes Direct Assistance)

I.   Financial Assistance from the Federal Awarding Agency Only
II.  Total project costs including grant funds and all other financial participation

| | |
|---|---:|
| a.  **Salaries and Wages** | $239,491.00 |
| b.  **Fringe Benefits** | $48,010.00 |
| c.  **Total Personnel Costs** | $287,501.00 |
| d.  Equipment | $0.00 |
| e.  Supplies | $16,034.00 |
| f.  Travel | $6,705.00 |
| g.  Construction | $0.00 |
| h.  Other | $89,760.00 |
| i.  Contractual | $0.00 |
| j.  **TOTAL DIRECT COSTS** | **$400,000.00** |
| k.  **INDIRECT COSTS** | **$0.00** |
| l.  **TOTAL APPROVED BUDGET** | **$400,000.00** |
| m.  **Federal Share** | **$400,000.00** |
| n.  **Non-Federal Share** | **$0.00** |

### 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 2-93908J1 | 22NU65PS923744 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 2-9390JS5 | 22NU65PS923744 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-9390QJ1 | 22NU65PS923744 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390JS5 | 22NU65PS923744 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-9390QJ1 | 22NU65PS923744 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |
| 4-9390JS5 | 22NU65PS923744 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

Centers for Disease Control and Prevention

Notice of Award

Award#   6 NU65PS923744-03-02
FAIN#   NU65PS923744
Federal Award Date:   02/11/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

JA1103

## AWARD ATTACHMENTS

LON   ISLAND CRISIS CENTER INC                                    6 NU65PS9237    -03-02

1. Terms and Conditions

**TERMS AND CONDITIONS OF AWARD**

In compliance with the Temporary Restraining Order issued on January 31, 2025, in the United States District Court in the District of Rhode Island, the purpose of this amendment is to **rescind** the **Termination** Notice of Award issued January 31, 2025.

All the other terms and conditions issued with the original award remain in effect throughout the budget period unless otherwise changed, in writing, by the Grants Management Officer.

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU65PS923745-03-02
FAIN# NU65PS923745
Federal Award Date: 02/11/2025

## Recipient Information

**1. Recipient Name**
LONG ISLAND GAY & LESBIAN YOUTH INC
3511 35th Ave
Astoria, NY 11106-1206

**2. Congressional District of Recipient**
12

**3. Payment System Identifier (ID)**

**4. Employer Identification Number (EIN)**

**5. Data Universal Numbering System (DUNS)**

**6. Recipient's Unique Entity Identifier (UEI)**

**7. Project Director or Principal Investigator**
Mr. JR Cehonski
Regional Director
jcehonski@lgbtnetwork.org
718

**8. Authorized Official**
Mr. Robert Vitelli
robert@lgbtnetwork.org
631-665-2300

### Federal Agency Information
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Mr. Keith Preciados
Grants Management Specialist
zpw9@cdc.gov
770-488-5392

**10. Program Official Contact Information**
Ruth Moro
Program Officer
ise6@cdc.gov
404-718-8627

## Federal Award Information

**11. Award Number**
6 NU65PS923745-03-02

**12. Unique Federal Award Identification Number (FAIN)**
NU65PS923745

**13. Statutory Authority**
This program is authorized under Sections 301 and 318(a) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended.

**14. Federal Award Project Title**
Safe Spaces Evaluation - Project Year 3 Supplemental Funding Application. Project HEAT

**15. Assistance Listing Number**
93.939

**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based

**17. Award Action Type**
NGA Revision

**18. Is the Award R&D?**
No

### Summary Federal Award Financial Information

| | |
|---|---|
| **19. Budget Period Start Date** 04/01/2024 **- End Date** 03/31/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0.00 |
| 20a. Direct Cost Amount | $0.00 |
| 20b. Indirect Cost Amount | $0.00 |
| **21. Authorized Carryover** | $0.00 |
| **22. Offset** | $0.00 |
| **23. Total Amount of Federal Funds Obligated this budget period** | $400,000.00 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0.00 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $400,000.00 |
| **26. Period of Performance Start Date** 04/01/2022 **- End Date** 03/31/2027 | |
| **27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Period of Performance** | $1,262,500.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS

**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

## 30. Remarks

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**     Notice of Award

Centers for Disease Control and Prevention

Award#   6 NU65PS923745-03-02
FAIN#    NU65PS923745
Federal Award Date: 02/11/2025

## Recipient Information

**Recipient Name**
LONG ISLAND GAY & LESBIAN YOUTH INC
3511 35th Ave
Astoria, NY 11106-1206

**Congressional District of Recipient**
12

**Payment Account Number and Type**

**Employer Identification Number (EIN) Data**

**Universal Numbering System (DUNS)**

**Recipient's Unique Entity Identifier (UEI)**

---

**31. Assistance Type**
Cooperative Agreement

**32. Type of Award**
Other

### 33. Approved Budget
(Excludes Direct Assistance)

I.   Financial Assistance from the Federal Awarding Agency Only
II.   Total project costs including grant funds and all other financial participation

| | |
|---|---:|
| a.   **Salaries and Wages** | $220,990.00 |
| b.   **Fringe Benefits** | $42,165.00 |
|     c.   **Total Personnel Costs** | $263,155.00 |
| d.   **Equipment** | $0.00 |
| e.   **Supplies** | $17,453.00 |
| f.   **Travel** | $3,240.00 |
| g.   **Construction** | $0.00 |
| h.   **Other** | $68,454.00 |
| i.   **Contractual** | $11,334.00 |
| j.   **TOTAL DIRECT COSTS** | **$363,636.00** |
| k.   **INDIRECT COSTS** | **$36,364.00** |
| l.   **TOTAL APPROVED BUDGET** | **$400,000.00** |
| m.   **Federal Share** | **$400,000.00** |
| n.   **Non-Federal Share** | **$0.00** |

### 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 2-9300851 | 22NU65PS923745 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 2-9390JS5 | 22NU65PS923745 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-9390851 | 22NU65PS923745 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390JS5 | 22NU65PS923745 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390KZS | 22NU65PS923745 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-9390851 | 22NU65PS923745 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |
| 4-9390JS5 | 22NU65PS923745 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |

JA1107



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU65PS923745-03-02
FAIN# NU65PS923745
Federal Award Date: 02/11/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

JA1108

## AWARD ATTACHMENTS

LON   ISLAND   A    LES  IAN   OUT   INC                          6 NU65PS9237  5-03-02

1. Terms and Conditions

**TERMS AND CONDITIONS OF AWARD**

In compliance with the Temporary Restraining Order issued on January 31, 2025, in the United States District Court in the District of Rhode Island, the purpose of this amendment is to **rescind** the **Termination** Notice of Award issued January 31, 2025.

All the other terms and conditions issued with the original award remain in effect throughout the budget period unless otherwise changed, in writing, by the Grants Management Officer.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

Centers for Disease Control and Prevention

**Notice of Award**

Award# 6 NU65PS923750-03-02
FAIN# NU65PS923750
Federal Award Date: 02/11/2025

## Recipient Information

**1. Recipient Name**
NORTH JERSEY AIDS ALLIANCE INC
393 Central Ave
Newark, NJ 07103-2842
973-483-3444

**2. Congressional District of Recipient**
10

**3. Payment System Identifier (ID)**

**4. Employer Identification Number (EIN)**

**5. Data Universal Numbering System (DUNS)**

**6. Recipient's Unique Entity Identifier (UEI)**

**7. Project Director or Principal Investigator**
Mr. Jason Dotson
J.dotson@njcri.org
973-483-3444

**8. Authorized Official**
Mr. Joseph Rothenberg
Budget Officer
J.Rothenberg@njcri.org
973-483-3444

**Federal Agency Information**
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Mr. Anthony Fultz
Grant Management Specialist
qjj7@cdc.gov
(404)498-4033

**10. Program Official Contact Information**
Deisa Pierre
Program Officer
dgp0@cdc.gov
404-498-5129

## Federal Award Information

**11. Award Number**
6 NU65PS923750-03-02

**12. Unique Federal Award Identification Number (FAIN)**
NU65PS923750

**13. Statutory Authority**
This program is authorized under Sections 301 and 318(a) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended.

**14. Federal Award Project Title**
High-Impact HIV Prevention Project for YTG of Color in Newark

**15. Assistance Listing Number**
93.939

**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based

**17. Award Action Type**
NGA Revision

**18. Is the Award R&D?**
No

### Summary Federal Award Financial Information

| | |
|---|---|
| **19. Budget Period Start Date** 04/01/2024 **- End Date** 03/31/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0.00 |
| 20a. Direct Cost Amount | $0.00 |
| 20b. Indirect Cost Amount | $0.00 |
| **21. Authorized Carryover** | $0.00 |
| **22. Offset** | $0.00 |
| **23. Total Amount of Federal Funds Obligated this budget period** | $400,000.00 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0.00 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $400,000.00 |
| **26. Period of Performance Start Date** 04/01/2022 **- End Date** 03/31/2027 | |
| **27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Period of Performance** | $1,262,500.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS

**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

## 30. Remarks

JA1111

DEPARTMENT OF HEALTH AND HUMAN SERVICES      Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU65PS923750-03-02
FAIN# NU65PS923750
Federal Award Date: 02/11/2025

## Recipient Information

**Recipient Name**
NORTH JERSEY AIDS ALLIANCE INC
393 Central Ave
Newark, NJ 07103-2842
973-483-3444

**Congressional District of Recipient**
10

**Payment Account Number and Type**

**Employer Identification Number (EIN) Data**

**Universal Numbering System (DUNS)**

**Recipient's Unique Entity Identifier (UEI)**

### 31. Assistance Type
Cooperative Agreement
### 32. Type of Award
Other

### 33. Approved Budget
(Excludes Direct Assistance)

I. Financial Assistance from the Federal Awarding Agency Only
II. Total project costs including grant funds and all other financial participation

| | |
|---|---:|
| a. **Salaries and Wages** | $184,995.00 |
| b. **Fringe Benefits** | $62,898.00 |
| c. **Total Personnel Costs** | $247,893.00 |
| d. **Equipment** | $0.00 |
| e. **Supplies** | $34,344.00 |
| f. **Travel** | $17,798.00 |
| g. **Construction** | $0.00 |
| h. **Other** | $16,103.00 |
| i. **Contractual** | $12,000.00 |
| j. **TOTAL DIRECT COSTS** | $328,138.00 |
| k. **INDIRECT COSTS** | $71,862.00 |
| l. **TOTAL APPROVED BUDGET** | $400,000.00 |
| m. **Federal Share** | $400,000.00 |
| n. **Non-Federal Share** | $0.00 |

### 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 2-9300831 | 22NU65PS923750 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 2-9300JS5 | 22NU65PS923750 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-9300831 | 22NU65PS923750 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9300JS5 | 22NU65PS923750 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9300KZS | 22NU65PS923750 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-9300831 | 22NU65PS923750 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |
| 4-9390JS5 | 22NU65PS923750 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU65PS923750-03-02
FAIN# NU65PS923750
Federal Award Date: 02/11/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

## AWARD ATTACHMENTS

NORT    ERSE   AIDS ALLIANCE INC                              6 NU65PS923750-03-02

1. Terms and Conditions

**TERMS AND CONDITIONS OF AWARD**

In compliance with the Temporary Restraining Order issued on January 31, 2025, in the United States District Court in the District of Rhode Island, the purpose of this amendment is to **rescind** the **Termination** Notice of Award issued January 31, 2025.

All the other terms and conditions issued with the original award remain in effect throughout the budget period unless otherwise changed, in writing, by the Grants Management Officer.

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU65PS923752-03-02
FAIN# NU65PS923752
Federal Award Date: 02/11/2025

## Recipient Information

**1. Recipient Name**
PUERTO RICAN CULTURAL CENTER
2739 W Division St # 41
Chicago, IL 60622-2854
[NO DATA]

**2. Congressional District of Recipient**
04

**3. Payment System Identifier (ID)**

**4. Employer Identification Number (EIN)**

**5. Data Universal Numbering System (DUNS)**

**6. Recipient's Unique Entity Identifier (UEI)**

**7. Project Director or Principal Investigator**
Ms. Dezarae Rodriguez
Project Director
dezararodriguez@prcc-chgo.org
331-444-6472

**8. Authorized Official**
Mr. Jose Lopez
Authorzing Business Official
joseelopez@prcc-chgo.org
773-394-4935

### Federal Agency Information
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Mr. Keith Preciados
Grants Management Specialist
zpw9@cdc.gov
770-488-5392

**10. Program Official Contact Information**
Veronica McCants
vrm0@cdc.gov
404.639.5194

## Federal Award Information

**11. Award Number**
6 NU65PS923752-03-02
**12. Unique Federal Award Identification Number (FAIN)**
NU65PS923752
**13. Statutory Authority**
This program is authorized under Sections 301 and 318(a) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended.
**14. Federal Award Project Title**
High-Impact HIV Prevention Project for YTG of Color in Chicago

**15. Assistance Listing Number**
93.939
**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based

**17. Award Action Type**
NGA Revision
**18. Is the Award R&D?**
No

### Summary Federal Award Financial Information

| | |
|---|---:|
| **19. Budget Period Start Date** 04/01/2024 **- End Date** 03/31/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0.00 |
| 20a. Direct Cost Amount | $0.00 |
| 20b. Indirect Cost Amount | $0.00 |
| **21.** Authorized Carryover | $0.00 |
| **22.** Offset | $0.00 |
| **23.** Total Amount of Federal Funds Obligated this budget period | $400,000.00 |
| **24.** Total Approved Cost Sharing or Matching, where applicable | $0.00 |
| **25.** Total Federal and Non-Federal Approved this Budget Period | $400,000.00 |
| **26. Period of Performance Start Date** 04/01/2022 **- End Date** 03/31/2027 | |
| **27.** Total Amount of the Federal Award including Approved Cost Sharing or Matching this Period of Performance | $1,262,500.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS
**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

## 30. Remarks

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU65PS923752-03-02
FAIN#   NU65PS923752
Federal Award Date: 02/11/2025

## Recipient Information

**Recipient Name**
PUERTO RICAN CULTURAL CENTER
2739 W Division St # 41
Chicago, IL 60622-2854
[NO DATA]

**Congressional District of Recipient**
04

**Payment Account Number and Type**

**Employer Identification Number (EIN) Data**

**Universal Numbering System (DUNS)**

**Recipient's Unique Entity Identifier (UEI)**

### 31. Assistance Type
Cooperative Agreement
### 32. Type of Award
Other

### 33. Approved Budget
(Excludes Direct Assistance)

I.   Financial Assistance from the Federal Awarding Agency Only
II.  Total project costs including grant funds and all other financial participation

| | |
|---|---:|
| a.  Salaries and Wages | $266,333.00 |
| b.  Fringe Benefits | $57,491.00 |
| c.  Total Personnel Costs | $323,824.00 |
| d.  Equipment | $0.00 |
| e.  Supplies | $10,600.00 |
| f.  Travel | $3,573.00 |
| g.  Construction | $0.00 |
| h.  Other | $50,003.00 |
| i.  Contractual | $12,000.00 |
| j.  **TOTAL DIRECT COSTS** | **$400,000.00** |
| k.  **INDIRECT COSTS** | **$0.00** |
| l.  **TOTAL APPROVED BUDGET** | **$400,000.00** |
| m.  **Federal Share** | **$400,000.00** |
| n.  **Non-Federal Share** | **$0.00** |

### 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 2-9300BJ1 | 22NU65PS923752 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 2-9300JS5 | 22NU65PS923752 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-9300BJ1 | 22NU65PS923752 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390JS5 | 22NU65PS923752 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390KZS | 22NU65PS923752 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-9300BJ1 | 22NU65PS923752 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |
| 4-9390JS5 | 22NU65PS923752 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |

JA1117



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**    Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU65PS923752-03-02
FAIN# NU65PS923752
Federal Award Date: 02/11/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

Page 3

# AWARD ATTACHMENTS

PUERTO RICAN CULTURAL CENTER                          6 NU65PS923752-03-02

1. Terms and Conditions

**TERMS AND CONDITIONS OF AWARD**

In compliance with the Temporary Restraining Order issued on January 31, 2025, in the United States District Court in the District of Rhode Island, the purpose of this amendment is to **rescind** the **Termination** Notice of Award issued January 31, 2025.

All the other terms and conditions issued with the original award remain in effect throughout the budget period unless otherwise changed, in writing, by the Grants Management Officer.

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Disease Control and Prevention

**Notice of Award**

Award#   6 NU65PS923756-03-02
FAIN#   NU65PS923756
Federal Award Date:   02/11/2025

## Recipient Information

**1. Recipient Name**
SOMEONE CARES INC OF ATLANTA
1950 Spectrum Cir SE Ste 140A
Marietta, GA 30067-8470

**2. Congressional District of Recipient**
06

**3. Payment System Identifier (ID)**

**4. Employer Identification Number (EIN)**

**5. Data Universal Numbering System (DUNS)**

**6. Recipient's Unique Entity Identifier (UEI)**

**7. Project Director or Principal Investigator**
Mr. Ronnie Bass
Executive Director
ronniebass@s1catl.org
678-921-2706 x 100

**8. Authorized Official**
Mr. Winston Liburd
Grantee
adolphusliburd@s1catl.org
6789212706 Ext.104

### Federal Agency Information
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Mr. Anthony Fultz
Grant Management Specialist
qjj7@cdc.gov
(404)498-4033

**10.Program Official Contact Information**
Ronald Buchanan
GSF8@cdc.gov
404-639-5200

## Federal Award Information

**11. Award Number**
6 NU65PS923756-03-02

**12. Unique Federal Award Identification Number (FAIN)**
NU65PS923756

**13. Statutory Authority**
This program is authorized under Sections 301 and 318(a) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended.

**14. Federal Award Project Title**
Someone Cares high-impact HIV prevention program for Young Transgender Persons of Color

**15. Assistance Listing Number**
93.939

**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based

**17. Award Action Type**
NGA Revision

**18. Is the Award R&D?**
No

### Summary Federal Award Financial Information

| | | |
|---|---|---|
| **19. Budget Period Start Date** 04/01/2024 - End Date 03/31/2025 | | |
| **20. Total Amount of Federal Funds Obligated by this Action** | | $0.00 |
| 20a. Direct Cost Amount | | $0.00 |
| 20b. Indirect Cost Amount | | $0.00 |
| **21. Authorized Carryover** | | $0.00 |
| **22. Offset** | | $0.00 |
| **23. Total Amount of Federal Funds Obligated this budget period** | | $400,000.00 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | | $0.00 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | | $400,000.00 |
| **26. Period of Performance Start Date** 04/01/2022 - End Date 03/31/2027 | | |
| **27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Period of Performance** | | $1,200,000.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS

**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

## 30. Remarks



DEPARTMENT OF HEALTH AND HUMAN SERVICES          Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU65PS923756-03-02
FAIN# NU65PS923756
Federal Award Date: 02/11/2025

## Recipient Information

**Recipient Name**

SOMEONE CARES INC OF ATLANTA

1950 Spectrum Cir SE Ste 140A

Marietta, GA 30067-8470

**Congressional District of Recipient**

06

**Payment Account Number and Type**

[redacted]

**Employer Identification Number (EIN) Data**

[redacted]

**Universal Numbering System (DUNS)**

[redacted]

**Recipient's Unique Entity Identifier (UEI)**

[redacted]

### 31. Assistance Type
Cooperative Agreement
### 32. Type of Award
Other

### 33. Approved Budget
(Excludes Direct Assistance)

I.   Financial Assistance from the Federal Awarding Agency Only
II   Total project costs including grant funds and all other financial participation

| | |
|---|---|
| a. **Salaries and Wages** | $220,810.00 |
| b. **Fringe Benefits** | $67,678.00 |
| c. **Total Personnel Costs** | $288,488.00 |
| d. **Equipment** | $0.00 |
| e. **Supplies** | $20,346.00 |
| f. **Travel** | $10,898.00 |
| g. **Construction** | $0.00 |
| h. **Other** | $47,917.00 |
| i. **Contractual** | $2,000.00 |
| j. **TOTAL DIRECT COSTS** | **$369,649.00** |
| k. **INDIRECT COSTS** | **$30,351.00** |
| l. **TOTAL APPROVED BUDGET** | **$400,000.00** |
| m. **Federal Share** | **$400,000.00** |
| n. **Non-Federal Share** | **$0.00** |

### 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 2-9390 8J1 | 22NU65PS923756 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 2-9390 JS5 | 22NU65PS923756 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-9390 8J1 | 22NU65PS923756 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390 JS5 | 22NU65PS923756 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-9390 8J1 | 22NU65PS923756 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |
| 4-9390 JS5 | 22NU65PS923756 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |

JA1122



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**    Notice of Award
Centers for Disease Control and Prevention

Award#  6 NU65PS923756-03-02
FAIN#   NU65PS923756
Federal Award Date:  02/11/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

## AWARD ATTACHMENTS

SOMEONE CARES INC OF ATLANTA                    6 NU65PS923756-03-02

1. Terms and Conditions

**TERMS AND CONDITIONS OF AWARD**

In compliance with the Temporary Restraining Order issued on January 31, 2025, in the United States District Court in the District of Rhode Island, the purpose of this amendment is to **rescind** the **Termination** Notice of Award issued January 31, 2025.

All the other terms and conditions issued with the original award remain in effect throughout the budget period unless otherwise changed, in writing, by the Grants Management Officer.

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU65PS923761-03-02
FAIN# NU65PS923761
Federal Award Date: 02/11/2025

| Recipient Information | | Federal Award Information |
|---|---|---|

**Recipient Information**

**1. Recipient Name**
BIRMINGHAM AIDS OUTREACH INC
PO BOX 550070
Birmingham, AL 35255-0070
205-322-4197

**2. Congressional District of Recipient**
06

**3. Payment System Identifier (ID)**

**4. Employer Identification Number (EIN)**

**5. Data Universal Numbering System (DUNS)**

**6. Recipient's Unique Entity Identifier (UEI)**

**7. Project Director or Principal Investigator**
Mr. Josh Bruce
Director of New Initiatives
Josh@birminghamaidsoutreach.org
2053224197

**8. Authorized Official**
Mr. Christopher Creamer
christopher@birminghamaidsoutreach.org
205 322 4197

**Federal Agency Information**
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Ms. Chamarla Brame
Grants Management Specialist
qpv3@cdc.gov
404.498.4134

**10. Program Official Contact Information**
Ms. Tanisha Quintanilla
Project Officer
DHP/PDIB
jbk3@cdc.gov
404-639-1991

---

**Federal Award Information**

**11. Award Number**
6 NU65PS923761-03-02

**12. Unique Federal Award Identification Number (FAIN)**
NU65PS923761

**13. Statutory Authority**
This program is authorized under Sections 301 and 318(a) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended.

**14. Federal Award Project Title**
Transgender Comprehensive High Impact Prevention Project (T-CHIP)

**15. Assistance Listing Number**
93.939

**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based

**17. Award Action Type**
NGA Revision

**18. Is the Award R&D?**
No

---

**Summary Federal Award Financial Information**

| | |
|---|---|
| **19. Budget Period Start Date** 04/01/2024 **- End Date** 03/31/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0.00 |
| 20a. Direct Cost Amount | $0.00 |
| 20b. Indirect Cost Amount | $0.00 |
| **21. Authorized Carryover** | $0.00 |
| **22. Offset** | $0.00 |
| **23. Total Amount of Federal Funds Obligated this budget period** | $400,000.00 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0.00 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $400,000.00 |
| **26. Period of Performance Start Date** 04/01/2022 **- End Date** 03/31/2027 | |
| **27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Period of Performance** | $2,950,000.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS

**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

**30. Remarks**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**     Notice of Award

Centers for Disease Control and Prevention

Award#   6 NU65PS923761-03-02
FAIN#    NU65PS923761
Federal Award Date: 02/11/2025

## Recipient Information

**Recipient Name**
BIRMINGHAM AIDS OUTREACH INC
PO BOX 550070
Birmingham, AL 35255-0070
205-322-4197

**Congressional District of Recipient**
06
**Payment Account Number and Type**

**Employer Identification Number (EIN) Data**

**Universal Numbering System (DUNS)**

**Recipient's Unique Entity Identifier (UEI)**

**31. Assistance Type**
Cooperative Agreement
**32. Type of Award**
Other

### 33. Approved Budget
(Excludes Direct Assistance)

I.   Financial Assistance from the Federal Awarding Agency Only
II.   Total project costs including grant funds and all other financial participation

| | |
|---|---:|
| a.   **Salaries and Wages** | $229,175.00 |
| b.   **Fringe Benefits** | $69,355.00 |
| c.   **Total Personnel Costs** | $298,530.00 |
| d.   **Equipment** | $1,632.00 |
| e.   **Supplies** | $39,329.00 |
| f.   **Travel** | $10,000.00 |
| g.   **Construction** | $0.00 |
| h.   **Other** | $20,656.00 |
| i.   **Contractual** | $0.00 |
| j.   **TOTAL DIRECT COSTS** | **$370,147.00** |
| k.   **INDIRECT COSTS** | **$29,853.00** |
| l.   **TOTAL APPROVED BUDGET** | **$400,000.00** |
| m.   **Federal Share** | **$400,000.00** |
| n.   **Non-Federal Share** | **$0.00** |

### 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 2-9390SJ1 | 22NU65PS923761 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 2-9390JS5 | 22NU65PS923761 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-9390SJ1 | 22NU65PS923761 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390JS5 | 22NU65PS923761 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-9390SJ1 | 22NU65PS923761 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |
| 4-9390JS5 | 22NU65PS923761 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |

JA1127



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**   Notice of Award

Centers for Disease Control and Prevention

Award#  6 NU65PS923761-03-02
FAIN#  NU65PS923761
Federal Award Date: 02/11/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

Page 3

## AWARD ATTACHMENTS

| IRMIN | AM AIDS OUTREAC | INC | 6 NU65PS923761-03-02 |
|---|---|---|---|

1. Terms and Conditions

**TERMS AND CONDITIONS OF AWARD**

In compliance with the Temporary Restraining Order issued on January 31, 2025, in the United States District Court in the District of Rhode Island, the purpose of this amendment is to **rescind** the **Termination** Notice of Award issued January 31, 2025.

All the other terms and conditions issued with the original award remain in effect throughout the budget period unless otherwise changed, in writing, by the Grants Management Officer.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

Centers for Disease Control and Prevention

**Notice of Award**

Award# 6 NU62PS924651-04-02
FAIN# NU62PS924651
Federal Award Date: 02/11/2025

## Recipient Information

**1. Recipient Name**
SOMEONE CARES INC OF ATLANTA
1950 Spectrum Cir SE Ste 140A
Marietta, GA 30067-8470

**2. Congressional District of Recipient**
06

**3. Payment System Identifier (ID)**

**4. Employer Identification Number (EIN)**

**5. Data Universal Numbering System (DUNS)**

**6. Recipient's Unique Entity Identifier (UEI)**

**7. Project Director or Principal Investigator**
Mr. Ronnie Bass
Executive Director
ronniebass@s1catl.org
678-921-2706 x 100

**8. Authorized Official**
Probyn Cope
Finance Director
Probyncope@s1catl.org
678-921-2706

### Federal Agency Information
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Mr. Anthony Fultz
Grant Management Specialist
qjj7@cdc.gov
(404)498-4033

**10. Program Official Contact Information**
Ronald Buchanan
GSF8@cdc.gov
404-639-5200

## Federal Award Information

**11. Award Number**
6 NU62PS924651-04-02

**12. Unique Federal Award Identification Number (FAIN)**
NU62PS924651

**13. Statutory Authority**
Sections 301 and 318 of the PHS Act [42 U.S.C. 241 and 247(c)], as amended

**14. Federal Award Project Title**
REAL/T (Reaching, Educating, Assisting and Liberating Transgender) Family

**15. Assistance Listing Number**
93.939

**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based

**17. Award Action Type**
NGA Revision

**18. Is the Award R&D?**
No

### Summary Federal Award Financial Information

**19. Budget Period Start Date** 07/01/2024 **- End Date** 06/30/2025

| | |
|---|---|
| **20. Total Amount of Federal Funds Obligated by this Action** | $0.00 |
| 20a. Direct Cost Amount | $0.00 |
| 20b. Indirect Cost Amount | $0.00 |
| **21. Authorized Carryover** | $0.00 |
| **22. Offset** | $0.00 |
| **23. Total Amount of Federal Funds Obligated this budget period** | $441,625.00 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0.00 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $441,625.00 |

**26. Period of Performance Start Date** 07/01/2021 **- End Date** 06/30/2026

| | |
|---|---|
| **27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Period of Performance** | $2,097,069.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS

**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

## 30. Remarks



DEPARTMENT OF HEALTH AND HUMAN SERVICES    Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU62PS924651-04-02
FAIN#  NU62PS924651
Federal Award Date: 02/11/2025

## Recipient Information

**Recipient Name**
SOMEONE CARES INC OF ATLANTA
1950 Spectrum Cir SE Ste 140A
Marietta, GA 30067-8470

**Congressional District of Recipient**
06

**Payment Account Number and Type**
▮▮▮▮▮

**Employer Identification Number (EIN) Data**
▮▮▮▮▮

**Universal Numbering System (DUNS)**
▮▮▮▮▮

**Recipient's Unique Entity Identifier (UEI)**
▮▮▮▮▮

### 31. Assistance Type
Cooperative Agreement
### 32. Type of Award
Other

### 33. Approved Budget
(Excludes Direct Assistance)

I.  Financial Assistance from the Federal Awarding Agency Only
II  Total project costs including grant funds and all other financial participation

| | | |
|---|---|---|
| a. **Salaries and Wages** | | $223,375.00 |
| b. **Fringe Benefits** | | $68,464.00 |
| c. **Total Personnel Costs** | | $291,839.00 |
| d. **Equipment** | | $0.00 |
| e. **Supplies** | | $23,163.00 |
| f. **Travel** | | $21,272.00 |
| g. **Construction** | | $0.00 |
| h. **Other** | | $66,871.00 |
| i. **Contractual** | | $2,000.00 |
| j. **TOTAL DIRECT COSTS** | | **$405,145.00** |
| k. **INDIRECT COSTS** | | **$36,480.00** |
| l. **TOTAL APPROVED BUDGET** | | **$441,625.00** |
| m. **Federal Share** | | $441,625.00 |
| n. **Non-Federal Share** | | $0.00 |

### 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 1-92102PG | 21NU62PS924651 | PS | 41.51 | 93.939 | $0.00 | 75-21-0950 |
| 2-92102PG | 21NU62PS924651 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-92102PG | 21NU62PS924651 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 3-9390JV6 | 21NU62PS924651 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-92102PG | 21NU62PS924651 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |

JA1132



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**  Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU62PS924651-04-02
FAIN# NU62PS924651
Federal Award Date: 02/11/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

JA1133

## AWARD ATTACHMENTS

SOMEONE CARES INC OF ATLANTA                          6 NU62PS92 651-0 -02

1. Terms and Conditions

**TERMS AND CONDITIONS OF AWARD**

In compliance with the Temporary Restraining Order issued on January 31, 2025, in the United States District Court in the District of Rhode Island, the purpose of this amendment is to **rescind** the **Termination** Notice of Award issued January 31, 2025.

All the other terms and conditions issued with the original award remain in effect throughout the budget period unless otherwise changed, in writing, by the Grants Management Officer.

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU62PS924657-04-02
FAIN# NU62PS924657
Federal Award Date: 02/11/2025

## Recipient Information

**1. Recipient Name**
PUERTO RICAN CULTURAL CENTER
2753 W Division St
Chicago, IL 60622-2854
[NO DATA]

**2. Congressional District of Recipient**
05
**3. Payment System Identifier (ID)**
▮▮▮▮▮▮▮
**4. Employer Identification Number (EIN)**
▮▮▮▮▮▮▮
**5. Data Universal Numbering System (DUNS)**
▮▮▮▮▮▮▮
**6. Recipient's Unique Entity Identifier (UEI)**
▮▮▮▮▮▮▮
**7. Project Director or Principal Investigator**
Ms. Dezarae Rodriguez
Project Director
dezararerodriguez@prcc-chgo.org
331-444-6472
**8. Authorized Official**
Ms. Nathalie Tirado
nathaliet@prcc-chgo.org
(773) 598-9225

### Federal Agency Information
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Mr. Keith Preciados
Grants Management Specialist
zpw9@cdc.gov
770-488-5392

**10. Program Official Contact Information**
Veronica McCants
vrm0@cdc.gov
404.639.5194

## Federal Award Information

**11. Award Number**
6 NU62PS924657-04-02
**12. Unique Federal Award Identification Number (FAIN)**
NU62PS924657
**13. Statutory Authority**
317(k)(2) and 318 of the Public Health Services Act, 42 U.S.C. sections 247 (k)(2) and 247c, as amended

**14. Federal Award Project Title**
Comprehensive High-Impact HIV Prevention Program in Chicago

**15. Assistance Listing Number**
93.939
**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based

**17. Award Action Type**
NGA Revision
**18. Is the Award R&D?**
No

### Summary Federal Award Financial Information

| | | |
|---|---|---|
| **19. Budget Period Start Date** 07/01/2024 - End Date 06/30/2025 | | |
| **20. Total Amount of Federal Funds Obligated by this Action** | | $0.00 |
| 20a. Direct Cost Amount | | $0.00 |
| 20b. Indirect Cost Amount | | $0.00 |
| **21.** Authorized Carryover | | $0.00 |
| **22.** Offset | | $0.00 |
| **23.** Total Amount of Federal Funds Obligated this budget period | | $441,625.00 |
| **24.** Total Approved Cost Sharing or Matching, where applicable | | $0.00 |
| **25.** Total Federal and Non-Federal Approved this Budget Period | | $441,625.00 |
| **26. Period of Performance Start Date** 07/01/2021 - End Date 06/30/2026 | | |
| **27.** Total Amount of the Federal Award including Approved Cost Sharing or Matching this Period of Performance | | $1,766,500.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS
**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

## 30. Remarks



DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Disease Control and Prevention

Notice of Award

Award#  6 NU62PS924657-04-02

FAIN#   NU62PS924657

Federal Award Date: 02/11/2025

## Recipient Information

**Recipient Name**

PUERTO RICAN CULTURAL CENTER

2753 W Division St

Chicago, IL 60622-2854

[NO DATA]

**Congressional District of Recipient**

05

**Payment Account Number and Type**

**Employer Identification Number (EIN) Data**

**Universal Numbering System (DUNS)**

**Recipient's Unique Entity Identifier (UEI)**

### 31. Assistance Type

Cooperative Agreement

### 32. Type of Award

Other

### 33. Approved Budget
(Excludes Direct Assistance)

I.   Financial Assistance from the Federal Awarding Agency Only

II.  Total project costs including grant funds and all other financial participation

| | |
|---|---:|
| a.  **Salaries and Wages** | $321,700.00 |
| b.  **Fringe Benefits** | $61,123.00 |
| c.  **Total Personnel Costs** | $382,823.00 |
| d.  Equipment | $0.00 |
| e.  Supplies | $15,788.00 |
| f.  Travel | $7,356.00 |
| g.  Construction | $0.00 |
| h.  Other | $35,658.00 |
| i.  Contractual | $0.00 |
| j.  **TOTAL DIRECT COSTS** | **$441,625.00** |
| k.  **INDIRECT COSTS** | **$0.00** |
| l.  **TOTAL APPROVED BUDGET** | **$441,625.00** |
| m.  **Federal Share** | **$441,625.00** |
| n.  **Non-Federal Share** | **$0.00** |

### 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 1-92102PG | 21NU62PS924657 | PS | 41.51 | 93.939 | $0.00 | 75-21-0950 |
| 2-92102PG | 21NU62PS924657 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-92102PG | 21NU62PS924657 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-92102PG | 21NU62PS924657 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
Centers for Disease Control and Prevention

Notice of Award

Award#  6 NU62PS924657-04-02
FAIN#   NU62PS924657
Federal Award Date:  02/11/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

## AWARD ATTACHMENTS

PUERTO RICAN CULTURAL CENTER                                6 NU62PS92  657-0  -02

1. Terms and Conditions

**TERMS AND CONDITIONS OF AWARD**

In compliance with the Temporary Restraining Order issued on January 31, 2025, in the United States District Court in the District of Rhode Island, the purpose of this amendment is to **rescind** the **Termination** Notice of Award issued January 31, 2025.

All the other terms and conditions issued with the original award remain in effect throughout the budget period unless otherwise changed, in writing, by the Grants Management Officer.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU62PS924690-04-02
FAIN# NU62PS924690
Federal Award Date: 02/11/2025

## Recipient Information

**1. Recipient Name**

ALTAMED HEALTH SERVICES CORPORATION
2040 Camfield Avenue
Los Angeles, CA 90040-1502
[NO DATA]

**2. Congressional District of Recipient**
40

**3. Payment System Identifier (ID)**

**4. Employer Identification Number (EIN)**

**5. Data Universal Numbering System (DUNS)**

**6. Recipient's Unique Entity Identifier (UEI)**

**7. Project Director or Principal Investigator**

Mrs. Marcy Kaplan
Director of HIV Services
MKAPLAN@ALTAMED.ORG
2135026158

**8. Authorized Official**

Mr. Paul Tropea
Director of Grants, Finance & Analysis
ptropea@AltaMed.org
3238897352

### Federal Agency Information

CDC Office of Financial Resources

**9. Awarding Agency Contact Information**

Ms. Chamarla Brame
Grants Management Specialist
qpv3@cdc.gov
404.498.4134

**10. Program Official Contact Information**

Nasima Marguerite Camp
Program Officer
yul9@cdc.gov
404-639-8246

## Federal Award Information

**11. Award Number**
6 NU62PS924690-04-02

**12. Unique Federal Award Identification Number (FAIN)**
NU62PS924690

**13. Statutory Authority**
Sections 301 and 318 the PHS Act [42 U.S.C. 241 and 247(c)], as amended

**14. Federal Award Project Title**
Comprehensive High-Impact HIV Prevention Programs for Community-Based Organizations

**15. Assistance Listing Number**
93.939

**16. Assistance Listing Program Title**
HIV Prevention Activities_Non-Governmental Organization Based

**17. Award Action Type**
NGA Revision

**18. Is the Award R&D?**
No

### Summary Federal Award Financial Information

| | |
|---|---:|
| **19. Budget Period Start Date** 07/01/2024 **- End Date** 06/30/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0.00 |
| 20a. Direct Cost Amount | $0.00 |
| 20b. Indirect Cost Amount | $0.00 |
| **21. Authorized Carryover** | $0.00 |
| **22. Offset** | $0.00 |
| **23. Total Amount of Federal Funds Obligated this budget period** | $441,625.00 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0.00 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $441,625.00 |
| **26. Period of Performance Start Date** 07/01/2021 **- End Date** 06/30/2026 | |
| **27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Period of Performance** | $1,766,500.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS

**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

## 30. Remarks



DEPARTMENT OF HEALTH AND HUMAN SERVICES    Notice of Award

Centers for Disease Control and Prevention

Award#  6 NU62PS924690-04-02
FAIN#   NU62PS924690
Federal Award Date: 02/11/2025

## Recipient Information

**Recipient Name**
ALTAMED HEALTH SERVICES CORPORATION
2040 Camfield Avenue
Los Angeles, CA 90040-1502
[NO DATA]

**Congressional District of Recipient**
40

**Payment Account Number and Type**

**Employer Identification Number (EIN) Data**

**Universal Numbering System (DUNS)**

**Recipient's Unique Entity Identifier (UEI)**

### 31. Assistance Type
Cooperative Agreement

### 32. Type of Award
Other

### 33. Approved Budget
(Excludes Direct Assistance)

I.   Financial Assistance from the Federal Awarding Agency Only
II   Total project costs including grant funds and all other financial participation

| | |
|---|---|
| a.  **Salaries and Wages** | $238,578.00 |
| b.  **Fringe Benefits** | $64,416.00 |
| c.  **Total Personnel Costs** | $302,994.00 |
| d.  Equipment | $0.00 |
| e.  Supplies | $11,051.00 |
| f.   Travel | $2,901.00 |
| g.  Construction | $0.00 |
| h.  Other | $39,203.00 |
| i.   Contractual | $0.00 |
| j.   **TOTAL DIRECT COSTS** | **$356,149.00** |
| k.  **INDIRECT COSTS** | **$85,476.00** |
| l.   **TOTAL APPROVED BUDGET** | **$441,625.00** |
| m.  **Federal Share** | $441,625.00 |
| n.  **Non-Federal Share** | $0.00 |

### 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 1-92102PG | 21NU62PS924690 | PS | 41.51 | 93.939 | $0.00 | 75-21-0950 |
| 2-92102PG | 21NU62PS924690 | PS | 41.51 | 93.939 | $0.00 | 75-22-0950 |
| 3-92102PG | 21NU62PS924690 | PS | 41.51 | 93.939 | $0.00 | 75-23-0950 |
| 4-92102PG | 21NU62PS924690 | PS | 41.51 | 93.939 | $0.00 | 75-24-0950 |



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**   Notice of Award

Centers for Disease Control and Prevention

Award#   6 NU62PS924690-04-02
FAIN#   NU62PS924690
Federal Award Date:   02/11/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

Page 3

## AWARD ATTACHMENTS

ALTAMED  EALT  SER  ICES CORPORATION                    6 NU62PS92  690-0  -02

1. Terms and Conditions

**TERMS AND CONDITIONS OF AWARD**

In compliance with the Temporary Restraining Order issued on January 31, 2025, in the United States District Court in the District of Rhode Island, the purpose of this amendment is to **rescind** the **Termination** Notice of Award issued January 31, 2025.

All the other terms and conditions issued with the original award remain in effect throughout the budget period unless otherwise changed, in writing, by the Grants Management Officer.

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU62PS924781-03-04
FAIN# NU62PS924781
Federal Award Date: 02/11/2025

## Recipient Information

**1. Recipient Name**
CARE RESOURCE COMMUNITY HEALTH CENTERS INC
3510 Biscayne Blvd FL 3rd
Miami, FL 33137-3840
--

**2. Congressional District of Recipient**
24

**3. Payment System Identifier (ID)**

**4. Employer Identification Number (EIN)**

**5. Data Universal Numbering System (DUNS)**

**6. Recipient's Unique Entity Identifier (UEI)**

**7. Project Director or Principal Investigator**
Mr. Douglas  Steele
dosteele@careresource.org
305-576-1234 x 358

**8. Authorized Official**
Dr. Steven  Santiago
Chief Executive Officer
ssantiago@careresource.org
305-576-1234 x 234

### Federal Agency Information
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Mrs. Benita Bosier-Ingram
Grant Management Specialist
ula8@cdc.gov
404-638-7434

**10. Program Official Contact Information**
Rupa  Patel
Program Officer
ntw4@cdc.gov
404-498-5224

## Federal Award Information

**11. Award Number**
6 NU62PS924781-03-04

**12. Unique Federal Award Identification Number (FAIN)**
NU62PS924781

**13. Statutory Authority**
Sections 301 and 318(b) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended

**14. Federal Award Project Title**
Project sTrenGth (Status-neutral Transgender-serving Organizations Ending Together HIV)

**15. Assistance Listing Number**
93.944

**16. Assistance Listing Program Title**
Human Immunodeficiency Virus (HIV)/Acquired Immunodeficiency Virus Syndrome (AIDS) Surveillance

**17. Award Action Type**
NGA Revision

**18. Is the Award R&D?**
No

### Summary Federal Award Financial Information

| | |
|---|---|
| **19.  Budget Period Start Date** 06/30/2024  **- End Date** 06/29/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0.00 |
| 20a. Direct Cost Amount | $0.00 |
| 20b. Indirect Cost Amount | $0.00 |
| **21.** Authorized Carryover | $0.00 |
| **22.** Offset | $0.00 |
| **23.** Total Amount of Federal Funds Obligated this budget period | $500,000.00 |
| **24.** Total Approved Cost Sharing or Matching, where applicable | $0.00 |
| **25.** Total Federal and Non-Federal Approved this Budget Period | $500,000.00 |
| **26. Period of Performance Start Date** 06/30/2022 **- End Date** 06/29/2026 | |
| **27.** Total Amount of the Federal Award including Approved Cost  Sharing or Matching this Period of Performance | $1,599,164.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS

**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

## 30. Remarks

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

Centers for Disease Control and Prevention

**Notice of Award**

Award# 6 NU62PS924781-03-04
FAIN# NU62PS924781
Federal Award Date: 02/11/2025

## Recipient Information

**Recipient Name**
CARE RESOURCE COMMUNITY HEALTH CENTERS INC
3510 Biscayne Blvd FL 3rd
Miami, FL 33137-3840
--

**Congressional District of Recipient**
24

**Payment Account Number and Type**
[redacted]

**Employer Identification Number (EIN) Data**
[redacted]

**Universal Numbering System (DUNS)**
[redacted]

**Recipient's Unique Entity Identifier (UEI)**
[redacted]

**31. Assistance Type**
Cooperative Agreement

**32. Type of Award**
Other

### 33. Approved Budget
(Excludes Direct Assistance)

I. Financial Assistance from the Federal Awarding Agency Only
II. Total project costs including grant funds and all other financial participation

| | |
|---|---:|
| a. **Salaries and Wages** | $202,569.00 |
| b. **Fringe Benefits** | $56,763.00 |
| c. **Total Personnel Costs** | $259,332.00 |
| d. Equipment | $0.00 |
| e. Supplies | $12,618.00 |
| f. Travel | $0.00 |
| g. Construction | $0.00 |
| h. Other | $60,000.00 |
| i. Contractual | $115,000.00 |
| j. **TOTAL DIRECT COSTS** | **$446,950.00** |
| k. **INDIRECT COSTS** | **$53,050.00** |
| l. **TOTAL APPROVED BUDGET** | **$500,000.00** |
| m. **Federal Share** | **$500,000.00** |
| n. **Non-Federal Share** | **$0.00** |

## 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 2-9300JT6 | 22NU62PS924781 | PS | 41.51 | 93.944 | $0.00 | 75-22-0950 |
| 3-9300JT6 | 22NU62PS924781 | PS | 41.51 | 93.944 | $0.00 | 75-23-0950 |
| 4-9300JT6 | 22NU62PS924781 | PS | 41.51 | 93.944 | $0.00 | 75-24-0950 |



**DEPARTMENT OF HEALTH AND HUMAN SERVICES** Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU62PS924781-03-04
FAIN# NU62PS924781
Federal Award Date: 02/11/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

Page 3

## AWARD ATTACHMENTS

CARE RESOURCE COMMUNIT     EALT   CENTERS INC                6 NU62PS92  7  1-03-0

1. Terms and Conditions

**TERMS AND CONDITIONS OF AWARD**

In compliance with the Temporary Restraining Order issued on January 31, 2025, in the United States District Court in the District of Rhode Island, the purpose of this amendment is to **rescind** the **Termination** Notice of Award issued January 31, 2025.

All the other terms and conditions issued with the original award remain in effect throughout the budget period unless otherwise changed, in writing, by the Grants Management Officer.

# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## Centers for Disease Control and Prevention

**Notice of Award**

Award# 6 NU62PS924782-03-02
FAIN# NU62PS924782
Federal Award Date: 02/11/2025

| Recipient Information |
|---|

**1. Recipient Name**
ST. JOHN'S COMMUNITY HEALTH
808 W 58th St
Los Angeles, CA 90037-3632
--

**2. Congressional District of Recipient**
37

**3. Payment System Identifier (ID)**

**4. Employer Identification Number (EIN)**

**5. Data Universal Numbering System (DUNS)**

**6. Recipient's Unique Entity Identifier (UEI)**

**7. Project Director or Principal Investigator**
Mr. Kazumi Yamaguchi
Principal Investigator
kyamaguchi@wellchild.org
323-541-1600 ex 2335

**8. Authorized Official**
Ms. Elena Fernandez
Business Official
efernandez@wellchild.org
323-541-1600 ex 1467

**Federal Agency Information**
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Mrs. Benita Bosier-Ingram
Grant Management Specialist
ula8@cdc.gov
404-638-7434

**10.Program Official Contact Information**
Miss Carla Galindo
Behavioral Scientist
fco4@cdc.gov
404-639-1902

| Federal Award Information |
|---|

**11. Award Number**
6 NU62PS924782-03-02
**12. Unique Federal Award Identification Number (FAIN)**
NU62PS924782
**13. Statutory Authority**
Sections 301 and 318(b) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended

**14. Federal Award Project Title**
St. John's Community Health: Community to Clinic Transgender Program

**15. Assistance Listing Number**
93.944
**16. Assistance Listing Program Title**
Human Immunodeficiency Virus (HIV)/Acquired Immunodeficiency Virus Syndrome (AIDS) Surveillance

**17. Award Action Type**
NGA Revision
**18. Is the Award R&D?**
No

| Summary Federal Award Financial Information |
|---|

**19. Budget Period Start Date** 06/30/2024 **- End Date** 06/29/2025
**20. Total Amount of Federal Funds Obligated by this Action**    $0.00
    20a. Direct Cost Amount    $0.00
    20b. Indirect Cost Amount    $0.00
**21. Authorized Carryover**    $0.00
**22. Offset**    $0.00
**23. Total Amount of Federal Funds Obligated this budget period**    $500,000.00
**24. Total Approved Cost Sharing or Matching, where applicable**    $0.00
**25. Total Federal and Non-Federal Approved this Budget Period**    $500,000.00
**26. Period of Performance Start Date** 06/30/2022 **- End Date** 06/29/2026
**27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Period of Performance**    $1,418,845.00

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS
**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

| 30. Remarks |
|---|

DEPARTMENT OF HEALTH AND HUMAN SERVICES          Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU62PS924782-03-02
FAIN#  NU62PS924782
Federal Award Date: 02/11/2025

## Recipient Information

**Recipient Name**
ST. JOHN'S COMMUNITY HEALTH
808 W 58th St
Los Angeles, CA 90037-3632
--

**Congressional District of Recipient**
37

**Payment Account Number and Type**

**Employer Identification Number (EIN) Data**

**Universal Numbering System (DUNS)**

**Recipient's Unique Entity Identifier (UEI)**

### 31. Assistance Type
Cooperative Agreement

### 32. Type of Award
Other

### 33. Approved Budget
(Excludes Direct Assistance)

I.  Financial Assistance from the Federal Awarding Agency Only
II  Total project costs including grant funds and all other financial participation

| | |
|---|---:|
| a.  **Salaries and Wages** | $265,879.00 |
| b.  **Fringe Benefits** | $53,176.00 |
| c.  **TotalPersonnelCosts** | $319,055.00 |
| d.  Equipment | $0.00 |
| e.  Supplies | $50,144.00 |
| f.  Travel | $20,870.00 |
| g.  Construction | $0.00 |
| h.  Other | $22,246.00 |
| i.  Contractual | $87,685.00 |
| j.  **TOTAL DIRECT COSTS** | **$500,000.00** |
| k.  **INDIRECT COSTS** | **$0.00** |
| l.  **TOTAL APPROVED BUDGET** | **$500,000.00** |
| m.  **Federal Share** | **$500,000.00** |
| n.  **Non-Federal Share** | **$0.00** |

### 34. Accounting Classification Codes

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
|---|---|---|---|---|---|---|
| 2-9390JT6 | 22NU62PS924782 | PS | 41.51 | 93.944 | $0.00 | 75-22-0050 |
| 3-9390JT6 | 22NU62PS924782 | PS | 41.51 | 93.944 | $0.00 | 75-23-0050 |
| 4-9390JT6 | 22NU62PS924782 | PS | 41.51 | 93.944 | $0.00 | 75-24-0950 |



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**    Notice of Award

Centers for Disease Control and Prevention

Award#  6 NU62PS924782-03-02
FAIN#  NU62PS924782
Federal Award Date:  02/11/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

Page 3

JA1153

## AWARD ATTACHMENTS

ST.  O  N S COMMUNIT    EALT                      6 NU62PS92  7  2-03-02

1. Terms and Conditions

**TERMS AND CONDITIONS OF AWARD**

In compliance with the Temporary Restraining Order issued on January 31, 2025, in the United States District Court in the District of Rhode Island, the purpose of this amendment is to **rescind** the **Termination** Notice of Award issued January 31, 2025.

All the other terms and conditions issued with the original award remain in effect throughout the budget period unless otherwise changed, in writing, by the Grants Management Officer.

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Disease Control and Prevention

**Notice of Award**

Award#   6 NU62PS924783-03-02
FAIN#   NU62PS924783
Federal Award Date:   02/11/2025

| Recipient Information |
| --- |

**1. Recipient Name**
COMMUNITY HEALTH PROJECT, INC.
356 W 18th St
New York, NY 10011-4401
[NoPhoneRecord]

**2. Congressional District of Recipient**
08

**3. Payment System Identifier (ID)**

**4. Employer Identification Number (EIN)**

**5. Data Universal Numbering System (DUNS)**

**6. Recipient's Unique Entity Identifier (UEI)**

**7. Project Director or Principal Investigator**
Dr. Asa Radix
Principal Investigator
aradix@callen-lorde.org
212-271-7275

**8. Authorized Official**
Mr. Patrick McGovern
Chief Executive Officer
pmcgovern@callen-lorde.org
(212) 271-7200 X 852

**Federal Agency Information**
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Mrs. Benita Bosier-Ingram
Grant Management Specialist
ula8@cdc.gov
404-638-7434

**10. Program Official Contact Information**
Dejené Parrish
Public Health Analyst
xht6@cdc.gov
404.639.8382

| Federal Award Information |
| --- |

**11. Award Number**
6 NU62PS924783-03-02

**12. Unique Federal Award Identification Number (FAIN)**
NU62PS924783

**13. Statutory Authority**
Sections 301 and 318(b) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended

**14. Federal Award Project Title**
Callen-Lorde Transcend Program to Provide Status Neutral Services for Black, Hispanic and Multi-racial Transgender and Gender Diverse New Yorkers

**15. Assistance Listing Number**
93.944

**16. Assistance Listing Program Title**
Human Immunodeficiency Virus (HIV)/Acquired Immunodeficiency Virus Syndrome (AIDS) Surveillance

**17. Award Action Type**
NGA Revision

**18. Is the Award R&D?**
No

| Summary Federal Award Financial Information |
| --- |

| | |
| --- | --- |
| **19. Budget Period Start Date**   06/30/2024   **- End Date**   06/29/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0.00 |
|     20a. Direct Cost Amount | $0.00 |
|     20b. Indirect Cost Amount | $0.00 |
| **21. Authorized Carryover** | $0.00 |
| **22. Offset** | $0.00 |
| **23. Total Amount of Federal Funds Obligated this budget period** | $500,000.00 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0.00 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $500,000.00 |
| **26. Period of Performance Start Date**   06/30/2022   **- End Date**   06/29/2026 | |
| **27.** Total Amount of the Federal Award including Approved Cost Sharing or Matching this Period of Performance | $1,581,155.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS

**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

| 30. Remarks |
| --- |

JA1156

DEPARTMENT OF HEALTH AND HUMAN SERVICES    Notice of Award

Centers for Disease Control and Prevention

Award# 6 NU62PS924783-03-02
FAIN#   NU62PS924783
Federal Award Date: 02/11/2025

| Recipient Information |
| --- |

**Recipient Name**
COMMUNITY HEALTH PROJECT, INC.
356 W  18th St
New York, NY 10011-4401
[NoPhoneRecord]

**Congressional District of Recipient**
08
**Payment Account Number and Type**

**Employer Identification Number (EIN) Data**

**Universal Numbering System (DUNS)**

**Recipient's Unique Entity Identifier (UEI)**

**31. Assistance Type**
Cooperative Agreement
**32. Type of Award**
Other

**33. Approved Budget**
(Excludes Direct Assistance)

I.  Financial Assistance from the Federal Awarding Agency Only
II  Total project costs including grant funds and all other financial participation

| | |
| --- | --- |
| a.  **Salaries and Wages** | $243,575.00 |
| b.  **Fringe Benefits** | $104,737.00 |
| c.  **Total Personnel Costs** | $348,312.00 |
| d.  Equipment | $0.00 |
| e.  Supplies | $0.00 |
| f.  Travel | $3,688.00 |
| g.  Construction | $0.00 |
| h.  Other | $0.00 |
| i.  Contractual | $50,000.00 |
| j.  **TOTAL DIRECT COSTS** | **$402,000.00** |
| k.  **INDIRECT COSTS** | **$98,000.00** |
| l.  **TOTAL APPROVED BUDGET** | **$500,000.00** |
| m.  **Federal Share** | **$500,000.00** |
| n.  **Non-Federal Share** | **$0.00** |

**34. Accounting Classification Codes**

| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
| --- | --- | --- | --- | --- | --- | --- |
| 2-9390JT6 | 22NU62PS924783 | PS | 41.51 | 93.944 | $0.00 | 75-22-0050 |
| 3-9390JT6 | 22NU62PS924783 | PS | 41.51 | 93.944 | $0.00 | 75-23-0050 |
| 4-9390JT6 | 22NU62PS924783 | PS | 41.51 | 93.944 | $0.00 | 75-24-0050 |



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**   Notice of Award

Centers for Disease Control and Prevention

Award#  6 NU62PS924783-03-02
FAIN#  NU62PS924783
Federal Award Date: 02/11/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

## AWARD ATTACHMENTS

COMMUNIT   EALT  PRO ECT, INC.                    6 NU62PS92  7 3-03-02

1. Terms and Conditions

**TERMS AND CONDITIONS OF AWARD**

In compliance with the Temporary Restraining Order issued on January 31, 2025, in the United States District Court in the District of Rhode Island, the purpose of this amendment is to **rescind** the **Termination** Notice of Award issued January 31, 2025.

All the other terms and conditions issued with the original award remain in effect throughout the budget period unless otherwise changed, in writing, by the Grants Management Officer.

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Disease Control and Prevention

**Notice of Award**

Award# 6 NU62PS924784-03-02
FAIN# NU62PS924784
Federal Award Date: 02/11/2025

| Recipient Information | |
|---|---|

**1. Recipient Name**
WHITMAN-WALKER CLINIC INC
1377 R St. NW Ste 200
Washington, DC 20009-6293
[NoPhoneRecord]

**2. Congressional District of Recipient**
98
**3. Payment System Identifier (ID)**

**4. Employer Identification Number (EIN)**

**5. Data Universal Numbering System (DUNS)**

**6. Recipient's Unique Entity Identifier (UEI)**

**7. Project Director or Principal Investigator**
Britt Walsh
Principal Investigator
bwalsh@whitman-walker.org
202-797-4457

**8. Authorized Official**
Ms. Meghan Davies
N/A
mdavies@whitman-walker.org
202-797-4454

**Federal Agency Information**
CDC Office of Financial Resources

**9. Awarding Agency Contact Information**
Mrs. Benita Bosier-Ingram
Grant Management Specialist
ula8@cdc.gov
404-638-7434

**10.Program Official Contact Information**
Kashif Iqbal
Health Scientist
kai9@cdc.gov
4047188556

| Federal Award Information |
|---|

**11. Award Number**
6 NU62PS924784-03-02
**12. Unique Federal Award Identification Number (FAIN)**
NU62PS924784
**13. Statutory Authority**
Sections 301 and 318(b) of the Public Health Service Act; 42 USC Sections 241 and 247c(a), as amended

**14. Federal Award Project Title**
Community to Care: Expanding Access to Status-Neutral Services for Gender Diverse People in DC

**15. Assistance Listing Number**
93.944
**16. Assistance Listing Program Title**
Human Immunodeficiency Virus (HIV)/Acquired Immunodeficiency Virus Syndrome (AIDS) Surveillance

**17. Award Action Type**
NGA Revision
**18. Is the Award R&D?**
No

| Summary Federal Award Financial Information | |
|---|---|
| **19. Budget Period Start Date** 06/30/2024 **- End Date** 06/29/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0.00 |
| 20a. Direct Cost Amount | $0.00 |
| 20b. Indirect Cost Amount | $0.00 |
| **21.** Authorized Carryover | $0.00 |
| **22.** Offset | $0.00 |
| **23.** Total Amount of Federal Funds Obligated this budget period | $500,000.00 |
| **24.** Total Approved Cost Sharing or Matching, where applicable | $0.00 |
| **25.** Total Federal and Non-Federal Approved this Budget Period | $500,000.00 |
| **26. Period of Performance Start Date** 06/30/2022 **- End Date** 06/29/2026 | |
| **27.** Total Amount of the Federal Award including Approved Cost Sharing or Matching this Period of Performance | $1,500,000.00 |

**28. Authorized Treatment of Program Income**
ADDITIONAL COSTS
**29. Grants Management Officer – Signature**
Ms. Stephanie Latham
Team Lead, Grants Management Officer

| 30. Remarks |
|---|

DEPARTMENT OF HEALTH AND HUMAN SERVICES        Notice of Award

Centers for Disease Control and Prevention

Award#  6 NU62PS924784-03-02
FAIN#   NU62PS924784
Federal Award Date: 02/11/2025

| Recipient Information | | |
|---|---|---|
| **Recipient Name** | | |
| WHITMAN-WALKER CLINIC INC | | |
| 1377 R St. NW Ste 200 | | |
| Washington, DC 20009-6293 | | |
| [NoPhoneRecord] | | |
| **Congressional District of Recipient** | | |
| 98 | | |
| **Payment Account Number and Type** | | |
| ▮▮▮▮▮ | | |
| **Employer Identification Number (EIN) Data** | | |
| ▮▮▮▮▮ | | |
| **Universal Numbering System (DUNS)** | | |
| ▮▮▮▮▮ | | |
| **Recipient's Unique Entity Identifier (UEI)** | | |
| ▮▮▮▮▮ | | |

| 33. Approved Budget | | |
|---|---|---|
| (Excludes Direct Assistance) | | |
| I. Financial Assistance from the Federal Awarding Agency Only | | |
| II. Total project costs including grant funds and all other financial participation | | |
| a. **Salaries and Wages** | | $168,682.00 |
| b. **Fringe Benefits** | | $102,120.00 |
| c. **Total Personnel Costs** | | $270,802.00 |
| d. Equipment | | $0.00 |
| e. Supplies | | $1,432.00 |
| f. Travel | | $4,500.00 |
| g. Construction | | $0.00 |
| h. Other | | $35,943.00 |
| i. Contractual | | $100,000.00 |
| j. **TOTAL DIRECT COSTS** | | **$412,677.00** |
| k. **INDIRECT COSTS** | | **$87,323.00** |
| l. **TOTAL APPROVED BUDGET** | | **$500,000.00** |
| m. **Federal Share** | | **$500,000.00** |
| n. **Non-Federal Share** | | **$0.00** |

| 31. Assistance Type |
|---|
| Cooperative Agreement |
| **32. Type of Award** |
| Other |

| 34. Accounting Classification Codes | | | | | | |
|---|---|---|---|---|---|---|
| FY-ACCOUNT NO. | DOCUMENT NO. | ADMINISTRATIVE CODE | OBJECT CLASS | ASSISTANCE LISTING | AMT ACTION FINANCIAL ASSISTANCE | APPROPRIATION |
| 2-9390JT6 | 22NU62PS924784 | PS | 41.51 | 93.944 | $0.00 | 75-22-0950 |
| 3-9390JT6 | 22NU62PS924784 | PS | 41.51 | 93.944 | $0.00 | 75-23-0950 |
| 4-9390JT6 | 22NU62PS924784 | PS | 41.51 | 93.944 | $0.00 | 75-24-0950 |



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

Centers for Disease Control and Prevention

Notice of Award

Award# 6 NU62PS924784-03-02
FAIN# NU62PS924784
Federal Award Date: 02/11/2025

**Direct Assistance**

| BUDGET CATEGORIES | PREVIOUS AMOUNT (A) | AMOUNT THIS ACTION (B) | TOTAL (A + B) |
|---|---|---|---|
| Personnel | $0.00 | $0.00 | $0.00 |
| Fringe Benefits | $0.00 | $0.00 | $0.00 |
| Travel | $0.00 | $0.00 | $0.00 |
| Equipment | $0.00 | $0.00 | $0.00 |
| Supplies | $0.00 | $0.00 | $0.00 |
| Contractual | $0.00 | $0.00 | $0.00 |
| Construction | $0.00 | $0.00 | $0.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 |

## AWARD ATTACHMENTS

W  ITMAN-WAL  ER CLINIC INC                                    6 NU62PS92  7   -03-02

1. Terms and Conditions

**TERMS AND CONDITIONS OF AWARD**

In compliance with the Temporary Restraining Order issued on January 31, 2025, in the United States District Court in the District of Rhode Island, the purpose of this amendment is to **rescind** the **Termination** Notice of Award issued January 31, 2025.

All the other terms and conditions issued with the original award remain in effect throughout the budget period unless otherwise changed, in writing, by the Grants Management Officer.