No. 25-1279

# In the United States Court of Appeals for the Fourth Circuit

PFLAG, INC., ET AL.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, ET AL.,

Defendants-Appellees.

On Appeal from the U.S. District Court for the District of Maryland, Southern Div., No. 8:25-cv-00337-BAH

**BRIEF OF *AMICI CURIAE* THE CATHOLIC HEALTH CARE LEADERSHIP ALLIANCE, THE CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS, THE NATIONAL CATHOLIC BIOETHICS CENTER, CATHOLIC MEDICAL ASSOCIATION, AND NATIONAL ASSOCIATION OF CATHOLIC NURSES, USA IN SUPPORT OF APPELLANTS AND REVERSAL**

Louis A. Brown Jr.
Michigan Bar No. P70973
Post Office Box 4323
Ormond, Florida 32175
(517) 974-0224
lbrown@christmedicus.org

Jeffrey C. Mateer
David J. Hacker
Jeremiah G. Dys
Kayla A. Toney
  *Counsel of Record*
First Liberty Institute
2001 W. Plano Pkwy, Ste 1600
Plano, TX 75075
(469) 440-7598
ktoney@firstliberty.org

*Counsel for Amici Curiae*
July 30, 2025

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _25-1279_          Caption:   _PFLAG, Inc., et al., v. Donald Trump, et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Catholic Health Care Leadership Alliance, Christian Medical & Dental Associations_
(name of party/amicus)

_National Catholic Bioethics Center, Catholic Medical Association, National Assoc. of Catholic Nurses_

 who is _____amici curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                      ☐ YES ☑ NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                         ☐ YES ☑ NO
        If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: Kayla A. Toney                    Date:        7-30-25

Counsel for: Amici curiae

- 2 -

[Print to PDF for Filing]      [Reset Form]

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................. ii

TABLE OF AUTHORITIES ............................................................ iii

INTERESTS OF *AMICI CURIAE* ..................................................... 1

INTRODUCTION ....................................................................... 3

ARGUMENT ............................................................................. 4

   I.  President Trump's Executive Orders Combatting Gender Ideology Bring Rights of Conscience to the Forefront. ........................... 4

      A. Executive Orders 14187 and 14168 restrict federal funds from being used to promote gender ideology ................................. 4

      B. Forced participation in gender-transition interventions can cause a violation of religious conscience for all members of a medical team. ...... 7

      C. Gender-transition procedures threaten conscience rights whether the patients are minors or adults, but the concerns of healthcare professionals are heightened when minors are involved. .............................. 17

   II.  The Department of Health & Human Services, through the Church Amendments, has the authority and obligation to protect the rights of conscience for healthcare professional. ................................... 21

CONCLUSION ......................................................................... 25

CERTIFICATES OF COMPLIANCE ................................................. 27

CERTIFICATE OF SERVICE ......................................................... 28

## TABLE OF AUTHORITIES

**Cases**

*Burwell v. Hobby Lobby*,
  573 U.S. 682 (2014) ....................................................................... 9, 10

*Kloosterman v. Metropolitan Hospital, et al*,
  No. 1:22-CV-944-JMB-SJB, 2023 WL 12081259 (W.D. Mich. 2024) ............. 12

*Kloosterman v. Metropolitan Hospital*,
  No. 24-1398 (6th Cir. argued Feb. 6, 2024) ....................................... 12

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
  591 U.S. 657 (2020) ...................................................................... 9, 23

*Mahmoud v. Taylor*,
  145 S. Ct. 1332 (2025) ..................................................................... 10

*PFLAG, Inc. v. Trump*,
  No. 25-337, 2025 WL 510050 (D. Md. Feb. 14, 2025) .................................... 5, 6

*Sherbert v. Verner*,
  374 U.S. 398 (1963) .......................................................................... 9

*Trump v. CASA, Inc.*,
  145 S. Ct. 2540 (2025). ...................................................................... 6

*United States v. Skrmetti*,
  145 S. Ct. 1816 (2025) ............................................................... 6, 18, 19

*Washington v. Trump*,
  No. 25-cv-224, 2025 WL 509617 (W.D. Wash. Feb. 16, 2025) .......................... 6

**Regulations**

42 U.S.C. § 300a-7(d) & (e)…………………………………………………………..22, 23

42 U.S.C. § 300a-7(c) …………………………………………………………………..22, 23

119 Cong. Rec. 9,595 (1973) …………………………………………...…………………..22

iii

## Other Authorities

Ainhoa Gomez-Lumbreras & Lorenzo Villa-Zapata, *Exploring Safety in Gender-Affirming Hormonal Treatments: An Observational Study on Adverse Drug Events Using the Food and Drug Administration Adverse Event Reporting System Database*, Annals of Pharmacotherapy 1, 8 (2024) ................................ 17

Am. Coll. of Pediatricians, *Gender Dysphoria in Children* (Nov. 2018).............. 19

Louis Brown Jr., J.D., *Religious Exercise and Civil Rights in Health Care: Upholding Patient Dignity, Rights, and Access to Care*, 18 ST. THOM. J. L. & PUB. POL'Y 246……………………………………………………………..10, 11

*Code of Medical Ethics*, 1.1.7 Physician Exercise of Conscience, American Medical Association ....................................................................... 8, 11

Peggy T. Cohen-Kettenis et al., *The Treatment of Adolescent Transsexuals: Changing Insights*, 5 J. Sexual Med. 1892, 1893 (2008)………………....…..20

Declaration, Doctors Protecting Children (2024) ................................................... 21

Declaration of the Dicastery for the Doctrine of the Faith "Dignitas Infinita" on Human Dignity, 08.04.2024…………………………………………………15

*Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, THE WHITE HOUSE (Jan. 20, 2025) ............ 4, 5

Cecilia Dhejne et al., *Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden*, 6 PLoSOne e16885, e16885 (2011) ..................................................................................... 20

Facts & Statistics, Catholic Health Association of the United States..................... 16

Final Rule, *Safeguarding the Rights of Conscience as Protected by Federal Statutes*, 45 C.F.R. 88 ...................................................................... 23

H. Cass, *Independent Review of Gender Identity Services for Children and Young People: Final Report* (April 2024).............................................................. 19, 20

"Healthcare Equality Index 2024," Human Rights Campaign ............................... 13

iv

"HHS Acts to Protect Health Care Workers' Conscience Rights," U.S. Dep't of Health & Human Services (May 12, 2025)……………………...……..……24

"HHS Investigates a Major Health System in Michigan to Safeguard Health Care Workers' Conscience Rights," U.S. Dep't of Health & Human Services (June 20, 2025) ........................................................................... 24

"HHS Takes Action to Protect Whistleblowers who Defend Children and Launches First Conscience Investigation," U.S. Dep't of Health & Human Services (April 14, 2025)……………………………………………….………....24

"HHS Releases Comprehensive Review of Medical Interventions for Children and Adolescents with Gender Dysphoria," U.S. Dep't of Health & Human Services (May 1, 2025) ........................................................................... 22

*Protecting Children from Chemical and Surgical Mutilation,* THE WHITE HOUSE (Jan. 28, 2025) ........................................................................... 4, 5

Devita Singh et al., *A Follow-Up Study of Boys With Gender Identity Disorder,* 12 Frontiers in Psych. 632784 (2021) ................................................ 20

*Transgender Identification Ethics Statement,* Christian Medical & Dental Associations ........................................................................... 14, 17

## INTERESTS OF *AMICI CURIAE*[1]

*The Catholic Health Care Leadership Alliance* is an alliance of faithful Catholic organizations united to advance the healing ministry of Jesus Christ through Christ-centered Catholic health care and to further an American health care system that protects the life, dignity, and health of the human person from conception to natural death. The Catholic Health Care Leadership Alliance supports the rights of patients and professionals to receive and provide life-affirming health care in accordance with the moral, ethical, and social teachings of Jesus Christ and His Church through ongoing evangelization, education, advocacy, and mutual support. The Catholic Health Care Leadership Alliance has a particular concern for caring for those persons who are vulnerable in society beginning with unborn children who are truly most vulnerable, as well as pregnant mothers, persons with disabilities, and those persons who are materially poor and underserved.

*The Christian Medical & Dental Association (CMDA)* is a non-profit, non-partisan 501(c)(3) organization that provides resources, programs, education, and services under the motto of "changing hearts in healthcare." It provides a public voice for its current membership of approximately 13,000 Christian healthcare

---

[1] All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than *Amici* or their counsel—contributed money that was intended to fund preparing or submitting the brief.

professionals. Founded in 1931, CMDA is committed to bringing hope and healing to the world by educating, encouraging, and equipping healthcare professionals to serve with excellence and compassion, care for all people, and advance Biblical principles of healthcare within the Church and throughout the world. Its mission, philosophy, and examples of its work can be viewed at cmda.org.

CMDA has a longstanding interest in advocating for the dignity of the medical profession. This includes ensuring that Christian members of the medical profession can exercise their work without being forced to compromise their deeply-held religious beliefs and matters of conscience. This includes the belief, based on both faith and science, that only two genders exist—male and female—and that these genders are immutable and nonfluid. CMDA's members nevertheless strive to provide the highest quality medical services to all, including those who may disagree with their views on gender.

*The National Catholic Bioethics Center (NCBC)* is a nonprofit research and educational institute committed to applying the principles of natural moral law, consistent with many traditions including the teachings of the Catholic Church, to ethical issues arising in health care and providing health care in accordance with the moral, ethical, and social teachings of Jesus Christ and His Church through ongoing evangelization, education, advocacy, and mutual support.

***The Catholic Medical Association (CMA)*** has over 2,000 physician members and hundreds of allied health members nationwide. CMA members seek to uphold the principles of the Catholic faith in the science and practice of medicine—including the belief that every person's conscience and religious freedoms should be protected. CMA's mission includes defending its members' right to follow their consciences and Catholic teachings in their professional work. Both the Ethics Committee and the Health Care Policy Committee have lent their time, expertise, and full support to this amicus brief because of its important conscience rights considerations.

***The National Association of Catholic Nurses, USA (NACN-USA)*** is a non-profit 501(c)(3) organization committed to giving nurses the opportunity to promote Catholic moral principles and stimulate desire for professional development. NACN-USA provides educational programs, religious edification, patient advocacy, and an environment integrating faith and health for Catholic nurses. NACN-USA also provides guidance, support, and networking for Catholic nurses, nursing students, and other professionals.

## INTRODUCTION

Religious healthcare professionals face a crisis of conscience: whether to participate in harmful gender-transition interventions that violate their faith, or to risk serious employment consequences, including termination, demotion, loss of job

opportunities, and harassment. Congress intentionally protected the rights of conscience for healthcare professionals when it passed the Church Amendments in 1972. Because the executive branch, specifically the Department of Health & Human Services, is the federal agency responsible for enforcing the Church Amendments, it is well within this statutory authority for the executive branch to take actions to prevent violations of conscience. President Trump's executive orders combatting gender ideology are an important step toward protecting the rights of conscience. This Court should heed the voices of thousands of religious healthcare professionals, whose daily acts of service are the heartbeat of compassionate medical care in the United States.

## ARGUMENT

I.   **President Trump's Executive Orders Combatting Gender Ideology Bring Rights of Conscience to the Forefront.**

   **A. Executive Orders 14187 and 14168 restrict federal funds from being used to promote gender ideology.**

On January 20, 2025, on his first day in office, President Trump signed Executive Order 141168 entitled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (the "Protecting Women EO").[2] In the Protecting Women EO, President Trump declared

---

[2] Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, THE WHITE HOUSE (Jan. 20, 2025),

it to be the policy of the United States "to recognize two sexes, male and female," which are "not changeable and are grounded in fundamental and incontrovertible reality." As part of this policy, President Trump ordered that federal funds should not be used to promote gender ideology.

About one week later, President Trump signed Executive Order 14187 entitled "Protecting Children from Chemical and Surgical Mutilation" (the "Protecting Children EO" and, together with the Protecting Women EO, the "EOs"), in which he declared a federal policy that the United States would no longer fund, sponsor, promote, or support the gender transitions of minors.[3] In connection with this policy, the Protecting Children EO ordered all heads of agencies that provide grants to medical institutions to ensure that institutions receiving such grants ended the chemical and surgical mutilation of minors. The EO defined "child" as an individual under nineteen years old, and "chemical and surgical mutilation" as the use of puberty blockers, sex hormones, and surgical gender transition procedures.

Following the passage of these EOs, two groups of plaintiffs filed similar suits against President Trump, alleging, in sum, that he does not have the constitutional authority to restrict funding in the EOs. *PFLAG, Inc. v. Trump*, No. 25-337-BAH

---

https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government/.

[3] Protecting Children from Chemical and Surgical Mutilation, THE WHITE HOUSE (Jan. 28, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/protecting-children-from-chemical-and-surgical-mutilation/.

(D. Md. 2025); *Washington v. Trump*, No. 25-cv-00244-LK (W.D. Wash. 2025). The *PFLAG* plaintiffs claim the EOs violate separation of powers principles, are contrary to statutes prohibiting discrimination on the basis of sex, and violate Fifth Amendment Equal Protection rights; the *Washington* plaintiffs add an allegation that the EOs usurp state authority in violation of the Tenth Amendment. *PFLAG, Inc. v. Trump*, No. 25-337, 2025 WL 510050, at \*13–21 (D. Md. Feb. 14, 2025); *Washington v. Trump*, No. 25-cv-224, 2025 WL 509617 (W.D. Wash. Feb. 16, 2025). Both groups of plaintiffs were first awarded a temporary restraining order, and then a preliminary injunction purporting to enjoin the EOs nationwide.[4] *Id.*; *PFLAG, Inc. v. Trump*, No. 25-337, 2025 WL 685124 (D. Md. Mar. 4, 2025); *Washington v. Trump*, No. 25-cv-224, 2025 WL 659057 (W.D. Wash. Feb. 28, 2025). The Trump Administration appealed both injunctions.

The *PFLAG* and *Washington* cases focus exclusively on the constitutional authorization for the EOs. Appellants' opening brief explains that under *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), rational basis review applies, and that even if heightened scrutiny were warranted, the Protecting Children EO is substantially related to an important government interest of protecting the health and welfare of children. Opening Br., *PFLAG v. Trump*, at 49-54. But even more is at

---

[4] The Supreme Court has since held that "universal injunctions likely exceed the equitable authority that Congress has granted to federal courts." *Trump v. CASA, Inc.* 145 S. Ct. 2540, 2458 (2025); see Opening Br., *PFLAG v. Trump*, at 58-64.

stake—the conscience rights of medical professionals. These are the individuals who must daily confront all the medical and psychological decisions surrounding gender-transition drugs and procedures for both minors and adults. Under any standard, the federal government has an important interest in protecting the conscience rights of healthcare professionals, and the Protecting Children EO is substantially related to that interest.

> **B. Forced participation in gender-transition interventions can cause a violation of religious conscience for all members of a medical team.**

Every intervention related to gender transition involves a team of medical professionals—physicians, nurses, physician assistants, therapists, and more. These professionals often face intense financial and societal pressure to perform gender-transition drugs and procedures. Medical professionals at multiple levels reasonably fear the loss of their jobs if they fail to participate in gender-transition procedures. Many face ostracization or hostility if they speak up or refuse to participate in such interventions. These individuals feel that they have no choice but to participate in gender-transition drugs and procedures, regardless of the safety and efficacy of these procedures and regardless of their own sincerely held religious objections.

For medical professionals who have no opposition to performing gender-transition drugs and procedures, this reality may not be a problem for them, despite the potential mutilation to the minor, and the lack of current quality evidence to support these interventions. But for the thousands of medical professionals

represented by *amici*, who have moral or religious objections to participating in gender-transition drugs and procedures, this reality causes enormous violations of the rights of conscience. Professionals suddenly find themselves in situations that they likely cannot avoid, where they are required to participate in life-altering procedures or off-label drug uses, even though providing such intervention would violate their religious beliefs, morals, and values, and even though they reasonably believe that such interventions cause lasting harm to the patients seeking them. Yet the Code of Medical Ethics from the American Medical Association recognizes that physicians are "moral agents in their own right" and that "[p]reserving opportunity for physicians to act (or to refrain from acting) in accordance with the dictates of conscience in their professional practice is important for preserving the integrity of the medical profession as well as the integrity of the individual physician, on which patients and the public rely."[5]

Rather than being respected as "moral agents in their own right," medical professionals who hold sincerely held religious objections to gender-transition drugs and procedures are routinely placed in a crisis of conscience. They feel compelled to voice their concerns about providing procedures that violate their sincerely held religious beliefs, but raising such concerns can come at a great professional cost.

---

[5] *Code of Medical Ethics*, 1.1.7 Physician Exercise of Conscience, American Medical Association, https://policysearch.ama-assn.org/policyfinder/detail/1.1.7?uri=%2FAMADoc%2FEthics.xml-E-1.1.7.xml.

The Supreme Court has consistently held that under the Free Exercise Clause, being forced to choose between violating one's faith and incurring financial penalties imposes a burden on religious exercise. In *Sherbert v. Verner*, the Court held that forcing religious adherents to choose between their faith and their livelihood imposed a burden on religious exercise. 374 U.S. 398, 404 (1963) ("[f]orcing [employee] to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work . . . puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.") In *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, the government urged Catholic nuns to fill out a form so other entities could provide contraceptives for their employees. 591 U.S. 657, 668 (2020). The court of appeals found no substantial burden, but the Supreme Court held that the agency action was "arbitrary and capricious for failing to consider an important aspect of the problem," since forcing the nuns' complicity in the contraceptive scheme would violate RFRA. *Id.* at 682. The nuns would be substantially burdened by submitting to a government process that contravened their consciences. *Id.* In *Burwell v. Hobby Lobby*, the government argued that the plaintiff could avoid the substantial burden of escalating daily fines by dropping health insurance coverage altogether. The Court found it was not "a tolerable result to put family-run businesses to the choice of violating their

sincerely held religious beliefs or making all of their employees lose their existing healthcare plans." 573 U.S. 682, 723 (2014). Forcing the families to make that choice constituted a burden on their religious exercise. In *Mahmoud v. Taylor*, the Supreme Court recently held that a similar choice burdened parents' religious exercise so significantly that strict scrutiny was required: "the parents will continue to be put to a choice: either risk their child's exposure to burdensome instruction, or pay substantial sums for alternative educational services. . . . [T]hat choice unconstitutionally burdens the parents' religious exercise." 145 S. Ct. 2332, 2363-64 (2025).

Here, when religious healthcare professionals are forced to choose between their faith and their livelihoods, they experience an unconstitutional burden on their religious exercise. Healthcare professionals are put to the choice: whether to violate their consciences by participating in interventions that they believe are morally wrong and harmful to their patients, or decline to participate and risk employer discipline, termination, loss of income and benefits, and loss of future job opportunities. The right of conscience and the free exercise of religion are the very basis of today's healthcare system as well as the genesis of the American civil rights project that has helped secure the rights of patients in the field of medical care.[6]

---

[6] Louis Brown Jr., J.D., *Religious Exercise and Civil Rights in Health Care: Upholding Patient Dignity, Rights, and Access to Care*, 18 ST. THOM. J. L. & PUB. POL'Y 246.

Religious communities founded the modern healthcare system because of their moral and religious convictions that the sick and suffering have a God-given dignity and therefore a right to receive care for their body, mind, and soul.[7] Violations of medical conscience and religious freedom rights in healthcare settings threaten the foundation of the medical profession and the American healthcare system.[8]

Three recent stories illustrate this problem. First, raising an objection to participating in gender-transition procedures can result in immediate termination—before a patient situation even arises. Medical ethics standards recommend that employees raise conscientious objections before the situation arises, so that patient services and schedules are not disrupted and employers can accommodate in advance. The Code of Medical Ethics specifically recommends that physicians, "[b]efore entering into a patient-physician relationship, make clear any specific interventions or services the physician cannot in good conscience provide because they are contrary to the physician's deeply held personal beliefs."[9] Yet when religious employees voice concerns or objections before a patient situation arises, they face significant retaliation and discrimination.

---

[7] Brown, *Religious Exercise and Civil Rights in Health Care*, *supra* note 6.
[8] *Id*.
[9] *Code of Medical Ethics*, 1.1.7 Physician Exercise of Conscience, American Medical Association, https://policysearch.ama-assn.org/policyfinder/detail/1.1.7?uri=%2FAMADoc%2FEthics.xml-E-1.1.7.xml.

For example, Valerie Kloosterman is a devout Christian and third-generation healthcare professional who served her community as a Physician Assistant at her local clinic in western Michigan for 17 years. *Kloosterman v. Metropolitan Hospital, et al*, No. 1:22-CV-944-JMB-SJB, 2023 WL 12081259 (W.D. Mich. 2024). In 2021, after University of Michigan Health took over her clinic, they introduced mandatory diversity, equity, and inclusion training which required Ms. Kloosterman to affirm statements about gender that violated her religious beliefs and her medical judgment. *Id.* at *3. When she requested a religious accommodation, Michigan Health officials called her "evil" and a "liar," and accused her of contributing to suicide rates. *Id.* at *8. Ms. Kloosterman respectfully explained that she could not participate in or refer for gender-transition procedures or use biology-obscuring pronouns, even though no patient had asked her to do so, meaning that "any harm that Defendant would incur was "purely hypothetical." *Id.* at *15. Three weeks later, the hospital fired Ms. Kloosterman, despite her stellar record of patient care. *Id.* at *2, 4.[10]

Second, if employees wait until they are forced to participate in such procedures and then request a religious accommodation, the violations of conscience

---

[10] Ms. Kloosterman sued in October 2022, bringing religious discrimination claims under Title VII and constitutional claims under the Free Exercise, Free Speech, and Equal Protection clauses, and state law. After more than a year of litigation, and a favorable ruling from the district court allowing Ms. Kloosterman's core claims to proceed, the hospital moved to compel arbitration. The district court granted this motion, and Ms. Kloosterman's appeal is currently pending at the U.S. Court of Appeals for the Sixth Circuit. *Kloosterman v. Metropolitan Hospital*, No. 24-1398 (6th Cir. argued Feb. 6, 2024).

have already occurred. For example, a Christian nurse anesthetist at a major pediatric hospital was forced to participate in supprelin implant procedures on minors, and his conscience and religious beliefs were severely burdened as a result. He eventually requested a religious accommodation, at great personal risk of demotion, discrimination, or termination. His current supervisor agreed to accommodate him, but the injury to his conscience was already done. In situations like these, even if one supervisor is willing to temporarily accommodate, this is kept quiet because of the employer's financial incentives to continue offering the procedures, and because of public pressure from outside metrics such as the Human Rights Coalition's Healthcare Equality Index.[11]

Third, employers may respond to healthcare professionals with religious objections by moving them into a different unit or role with less favorable pay, hours, and promotion opportunities. For example, a nurse in the urology department of a major hospital system requested a religious accommodation, after her conscience was severely burdened by being forced to participate in several gender-transition procedures. Her employer threatened her with termination. Once she retained an attorney, the hospital eventually offered to move her to a different department—yet continued to assign her to gender-transition procedures during these negotiations and

---

[11] *See, e.g.,* "Healthcare Equality Index 2024," Human Rights Campaign, https://www.hrc.org/resources/healthcare-equality-index.

before the transfer occurred. Most healthcare professionals, especially those in lower-paying roles, cannot afford an attorney or are unwilling to take on the risk of pushing back against a proffered accommodation. And healthcare professionals should not be forced to change jobs or leave their area of expertise simply because their employers find gender-transition procedures increasingly lucrative.

In particular, forcing participation in gender-transition interventions violates the conscience rights of Christian and Catholic health care professionals. While "Christian healthcare professionals caring for patients struggling with gender identity to do so with sensitivity and compassion, consistent with the humility and love that Jesus modeled and commanded us to show all people," those same professionals "should not be forced to violate their conscientious commitment to their patients' health and welfare by being required to accept and participate in harmful gender-transition interventions, especially on the young and vulnerable."[12] For medical professionals that profess the Catholic faith and for Catholic healthcare entities, who are also part of the larger Christian community, it is a clear violation of their religious beliefs to participate in gender transition interventions. The Dicastery for the Doctrine of the Faith, the long-established chief office for religious doctrine of the global Catholic Church, with the express endorsement of Pope

---

[12] *Transgender Identification Ethics Statement*, Christian Medical & Dental Associations, https://cmda.org/article/transgender-identification-ethics-statement/.

Francis, issued the landmark Declaration 'Dignitas Infinita' on Human Dignity in 2024. In Dignitas Infinita, the Dicastery for the Doctrine of the Faith unequivocally rejected gender theory and gender-transitioning as contrary to the Catholic faith and a violation of the dignity of the human person:

> "58. Another prominent aspect of gender theory is that it intends to deny the greatest possible difference that exists between living beings: sexual difference. This foundational difference is not only the greatest imaginable difference but is also the most beautiful and most powerful of them. In the male-female couple, this difference achieves the most marvelous of reciprocities. It thus becomes the source of that miracle that never ceases to surprise us: the arrival of new human beings in the world.
>
> 59. In this sense, respect for both one's own body and that of others is crucial in light of the proliferation of claims to new rights advanced by gender theory. This ideology 'envisages a society without sexual differences, thereby eliminating the anthropological basis of the family.'[103] It thus becomes unacceptable that 'some ideologies of this sort, which seek to respond to what are at times understandable aspirations, manage to assert themselves as absolute and unquestionable, even dictating how children should be raised. It needs to be emphasized that 'biological sex and the socio-cultural role of sex (gender) can be distinguished but not separated.''[104] Therefore, all attempts to obscure reference to the ineliminable sexual difference between man and woman are to be rejected: 'We cannot separate the masculine and the feminine from God's work of creation, which is prior to all our decisions and experiences, and where biological elements exist which are impossible to ignore.'[105] Only by acknowledging and accepting this difference in reciprocity can each person fully discover themselves, their dignity, and their identity."[13]

---

[13] Declaration of the Dicastery for the Doctrine of the Faith "Dignitas Infinita" on Human Dignity, 08.04.2024, https://press.vatican.va/content/salastampa/en/bollettino/pubblico/2024/04/08/240408c.html.

A core tenet of Catholicism involves providing health care to the sick as a means of living out their faith.[14] In faithfulness to this deeply held belief, many Catholics work in the medical field, often serving impoverished communities that would otherwise lack access to quality medical care. In fact, Catholic health care professionals and entities are one of the largest groups of health care professionals in the United States. Catholic medical professionals provide medical care to roughly one in seven hospital patients daily.[15] For thousands of Catholic medical professionals, who hold sincere religious objections to performing gender-transition procedures, being forced to participate in gender-transition interventions would violate their consciences and the religious directives of the Catholic Church.[16] Having no other choice, many Catholic medical professionals may be pressured to leave the medical profession altogether, thus harming their already vulnerable patients. Given that Catholic health care professionals make up such a large part of the United States health care system, such a scenario would have a devastating impact on the provision of health care in the country, especially to low-income communities that lack access to affordable options.

---

[14] United States Conference of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care Services* (5th ed. 2009), https://perma.cc/JF47- 7357.
[15] Facts & Statistics, Catholic Health Association of the United States, https://www.chausa.org/about/facts---statistics.
[16] USCCB, *Ethical and Religious Directives for Catholic Health Care Services, supra* note 14.

**C. Gender-transition procedures threaten conscience rights whether the patients are minors or adults, but the concerns of healthcare professionals are heightened when minors are involved.**

Violations of conscience arise regardless of the age of the patient being provided with gender-transition drugs or procedures. Whether a medical professional is treating a minor or an adult, that professional should not be forced to violate their commitment to their own beliefs and their patient's health by being required to participate in procedures that they believe to be morally wrong or medically harmful.[17] Further, if the sex, gender identity, and pronouns of a patient are in flux, it can be impossible for a medical professional to properly treat that patient. If sex is not defined along binary biological lines, or if patient pronouns are charted inconsistently with biological sex, medical professionals face a multitude of risks. Their patients may miss scheduling life-saving screenings, such as sex-specific cancer screenings, or they may receive incorrect doses of medications. And for minors and adults, it is unrealistic to disrupt normal physiology with gender-transition interventions but still expect normal bodily functioning. [18]

---

[17] "[P]rescribing hormonal treatments to children or adolescents to disrupt normal sexual development for the purpose of attempting gender reassignment is ethically impermissible, whether requested by the child, the adolescent, or the parent." *Transgender Identification Ethics Statement*, Christian Medical & Dental Associations, https://cmda.org/article/transgender-identification-ethics-statement/.

[18] Ainhoa Gomez-Lumbreras & Lorenzo Villa-Zapata, *Exploring Safety in Gender-Affirming Hormonal Treatments: An Observational Study on Adverse Drug Events Using the Food and Drug Administration Adverse Event Reporting System Database*, Annals of Pharmacotherapy 1, 8 (2024), doi:10.117/10600 280241231612 (noting the harms and adverse drug reactions from the use of such therapies in the opposite sex for gender transition purposes).

These consequences only grow when gender-transition interventions are imposed on minors. Minors are too young to fully understand the permanent and life-altering ramifications of foregoing the opportunity to conceive or bear biological children or breastfeed them, and thus they are too young to consent to such procedures.[19] Because their brains are not yet fully developed, and given these interventions can begin as early as 8 years old, children and adolescents simply lack the cognitive capacity to truly comprehend the decision whether to undergo gender-transition procedures. *Skrmetti*, 145 S. Ct. at 1846 ("[t]here is no dispute . . . that the 'decision-making capacity' of adolescents 'is developing, but not yet complete;" in particular, "the near certainty of infertility . . . is likely to not be appreciated until the age during which most individuals consider having children'"); *see also id.* at 1846 (Tennessee legislature found that minors 'lack the maturity to fully understand and appreciate' these consequences and may later regret undergoing the treatments.")

Gender-transition interventions on minors have also been proven to lead to harmful medical consequences. For instance, minors who take puberty blockers to suppress natural puberty often suffer from harms to "neurocognitive development,

---

[19] "Responsible informed consent is not possible in light of extremely limited long-term follow-up studies of interventions, and the immature, often impulsive, nature of the adolescent brain. The adolescent brain's prefrontal cortex is immature and is limited in its ability to strategize, problem solve and make emotionally laden decisions that have life-long consequences." Decl., Doctors Protecting Children (2024), https://doctorsprotectingchildren.org/.

18

psychosexual development and longer-term bone health."[20] The American College of Pediatricians has recognized significant harms from puberty blockers, including that they "arrest bone growth, decrease bone accretion, prevent the sex-steroid dependent organization and maturation of the adolescent brain, and inhibit fertility."[21] As the Supreme Court recognized in *Skrmetti*, 145 S. Ct. at 1826, the Tennessee legislature found that "such treatments 'can lead to the minor becoming irreversibly sterile, having increased risk of disease and illness, or suffering from adverse and sometimes fatal psychological consequences," § 68–33–101(b). The consequences from gender-transition surgeries are even more serious.

What is more, gender-transitioning interventions for minors do not necessarily help relieve gender dysphoria. "[T]here is no medical consensus on how best to treat gender dysphoria in children." *Skrmetti*, 145 S. Ct. at 1840 (Thomas, J., concurring). On the contrary, there is a growing mountain of evidence, especially from international sources, that demonstrates the permanent harms of gender-transition procedures.[22] For this reason, NHS England has prohibited puberty blockers for new patients under 18 and instituted a review process for hormone referrals. *Id.*

---

[20] H. Cass, *Independent Review of Gender Identity Services for Children and Young People: Final Report* 196, https://donoharmmedicine.org/wp-content/uploads/2024/04/CassReview_Final.pdf (Apr. 2024).

[21] Am. Coll. of Pediatricians, *Gender Dysphoria in Children* 12 (Nov. 2018), https://tinyurl.com/4znwftd2.

[22] *Skrmetti*, 145 S. Ct. at 1825 (many European countries including Finland, England, Sweden, and Norway have recognized that the "long-term risks" of gender-transition treatments on minors are

According to the Cass Report, "there is no evidence that gender-affirmative treatments reduce" the risk of suicide in transgender people.[23] On the contrary, a Swedish study found that risks of suicide increased substantially in patients who had undergone gender-transition surgery, even 15 and 30 years after the surgery.[24] Furthermore, minors treated with puberty suppression hormones are increasingly detransitioning back to their biological sex. "The current evidence base suggests that children who present with gender incongruence at a young age are most likely to desist before puberty."[25] A dramatic "80-95% of the prepubertal children with GID [gender identity disorder] will no longer experience a GID in adolescence."[26]

Recognizing all these concerns, the American College of Pediatricians, other medical organizations representing over 75,000 physicians and healthcare professionals, including many members of the amici organizations represented here, and over 5,200 individual signatories, recently issued a declaration stating that

---

"largely unknown," "and that the 'risks' … currently outweigh the possible benefits"); *see also* Cass Report, *supra* note 20, at 13 (England's National Health Service concluded that the evidence concerning puberty blockers and hormones for transgender minors is "remarkably weak;" "there is no good evidence on the long-term outcomes of interventions to manage gender-related distress").

[23] Cass Report, *supra* note 20, at 195.

[24] Cecilia Dhejne et al., *Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden*, 6 PLoSOne e16885, e16885 (2011).

[25] Cass Report, *supra* note 20, at 33.

[26] Peggy T. Cohen-Kettenis et al., *The Treatment of Adolescent Transsexuals: Changing Insights*, 5 J. Sexual Med. 1892, 1893 (2008),https://tinyurl.com/58m8uw3h; Devita Singh et al., *A Follow-Up Study of Boys With Gender Identity Disorder*, 12 Frontiers in Psych. 632784, at 1, 8 (2021), doi:10.3389/ fpsyt.2021.632784 (finding 87.8% desistance in "largest sample to date of boys clinic-referred for gender dysphoria.");

"Medical decision making should respect biological reality and the dignity of the person by compassionately addressing the whole person. * * * [Yet,] [g]ender ideology seeks to affirm thoughts, feelings and beliefs, with puberty blockers, hormones, and surgeries that harm healthy bodies, rather than affirm biological reality."[27]

In sum, the medical, psychological, and social consequences faced by minors who seek to transition raise additional concerns for medical professionals who may be forced or pressured to participate in these interventions. These increasingly well-documented medical harms only add to the conscience-based concerns that many medical professionals hold when treating patients with gender dysphoria.

## II.     The Department of Health & Human Services, through the Church Amendments, has the authority and obligation to protect the rights of conscience for healthcare professionals.

Healthcare professionals with conscience objections to treating patients with gender-transition interventions have robust constitutional and statutory protections, but these protections are only as strong as the entities charged with enforcing them. Through the Church Amendments, Congress has indicated a specific intent to protect the conscience rights of medical professionals to decline to participate in any gender-transition intervention that violates their conscience. The Department of Health & Human Services has authority to enforce the Church Amendments. HHS has also

---

[27] Declaration, Doctors Protecting Children (2024), https://doctorsprotectingchildren.org/.

recognized the significant medical and ethical concerns described above. On May 1, 2025, HHS released a comprehensive review of evidence and best practices for minors with gender dysphoria.[28]

The Church Amendments, which were enacted in the 1970s, state that recipients of federal funding cannot require any health care professional to "perform or assist in the performance of any sterilization procedure if [that action] would be contrary to his religious beliefs or moral convictions . . . ." 42 U.S.C. § 300a-7(d) & (e); *see id.* at § 300a-7(c); see 119 Cong. Rec. 9,595 (1973) (statement of Sen. Church). Because most gender-transition procedures result in sterilization, as described above, a medical professional with religious or moral objections to participating in such procedures should be protected by the Church Amendments.

The Church Amendments also prohibit discrimination more broadly against "any physician or other health care personnel, because he performed or assisted in the performance of any lawful health service or research activity, because he refused to perform or assist in the performance of any such service or activity on the grounds that his performance or assistance in the performance of such service or activity would be contrary to his religious beliefs or moral convictions, or because of his

---

[28] "HHS Releases Comprehensive Review of Medical Interventions for Children and Adolescents with Gender Dysphoria," U.S. Dep't of Health & Human Services  (May 1, 2025), https://www.hhs.gov/press-room/gender-dysphoria-report-release.html. The full report is available here: https://opa.hhs.gov/gender-dysphoria-report.

religious beliefs or moral convictions respecting any such service or activity." 42 U.S.C. § 300a-7(c)(2)(b). Under this provision, religious healthcare professionals should not be forced to participate in, or refer for any procedures that violate their religious beliefs or moral convictions, even if those procedures do not necessarily result in sterilization.

What is more, the Church Amendments also protect the rights of individuals from being forced to participate in "health service program[s]" or "research activity funded in whole or in part under a program administered by the Secretary of Health and Human Services if his performance or assistance in the performance of such part of such program or activity would be contrary to his religious beliefs or moral convictions." 42 U.S.C. § 300a-7(d). These statutes protect healthcare professionals from being forced to participate in, or refer for any procedures or research activities that violate their consciences.

Because the Church Amendments do not include a private right of action, the entity charged with enforcing them is the Department of Health & Human Services ("HHS").[29] Under the current administration, HHS is taking this enforcement responsibility seriously. In April 2025, the agency published whistleblower guidance

---

[29] See, e.g., Final Rule, *Safeguarding the Rights of Conscience as Protected by Federal Statutes*, 45 C.F.R. 88, https://www.federalregister.gov/documents/2024/01/11/2024-00091/safeguarding-the-rights-of-conscience-as-protected-by-federal-statutes ("The Department is committed to ensuring compliance with the conscience statutes, including . . . the Church Amendments); *see also Little Sisters of the Poor,* 591 U.S. at 721 n.14 ("HHS's Office for Civil Rights (OCR) 'enforces ... conscience and religious freedom laws' with respect to HHS programs").

and launched an online portal where whistleblowers can submit complaints regarding gender-transition interventions on children.[30] The agency has launched at least three investigations regarding the rights of conscience at major hospital systems. On April 14, 2025, HHS announced an investigation of a "major pediatric teaching hospital allegedly terminating the employment of a whistleblower nurse for exercising her federally protected rights of conscience." Specifically, the nurse requested a "religious accommodation to avoid administering puberty blockers and cross-sex hormones to children, which she opposed due to religious beliefs about the sterilization effects of these interventions."[31] On May 12, 2025, the HHS Office of Civil Rights announced a compliance review of a major hospital system, because it had been notified that ultrasound technicians faced potential termination due to their religious objections to participating in abortion procedures.[32]  On June 20, 2025, HHS announced its investigation into another health system due to its alleged treatment of a religious healthcare provider who requested an accommodation related to her religious beliefs about gender.[33]

---

[30] "HHS Takes Action to Protect Whistleblowers who Defend Children and Launches First Conscience Investigation," U.S. Dep't of Health & Human Services (April 14, 2025), https://www.hhs.gov/press-room/hhs-launches-whistleblower-form-to-protect-kids.html.

[31] *Id.*

[32] "HHS Acts to Protect Health Care Workers' Conscience Rights," U.S. Dep't of Health & Human Services (May 12, 2025), https://www.hhs.gov/press-room/hhs-protects-workers-conscience-rights.html.

[33] "HHS Investigates a Major Health System in Michigan to Safeguard Health Care Workers' Conscience Rights," U.S. Dep't of Health & Human Services (June 20, 2025), https://www.hhs.gov/press-room/ocr-investigates-health-system-in-michigan.html.

Given the extensive concerns regarding rights of conscience and medical ethics described above, HHS is acting well within its statutory and constitutional authority to ensure that medical systems are not forcing their employees to participate in or refer for gender-transition procedures that violate their rights of conscience, or otherwise discriminating against them because of their religious and moral beliefs. The Executive Orders at issue here are in furtherance of that statutory authority.

## CONCLUSION

For all these reasons, *amici* urge this Court should reverse the district court's ruling. At the very least, this Court should consider the impact of its decision on religious healthcare professionals whose constitutional and statutory rights need protection.

Dated: July 30, 2025

Respectfully submitted,

_____

Kayla A. Toney
   *Counsel of Record*
Jeremiah G. Dys
Jeffrey C. Mateer
David J. Hacker
First Liberty Institute
2001 West Plano Parkway, Ste 1600
Plano, TX 75075
(972) 941-4444
ktoney@firstliberty.org

Louis A. Brown Jr.
Michigan Bar No. P70973
Post Office Box 4323
Ormond, Florida 32175
(517) 974-0224
lbrown@christmedicus.org

 *Counsel for Amici Curiae*

**CERTIFICATES OF COMPLIANCE**

I, Kayla A. Toney, hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 5875 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and this total was calculated with the Word Count function of Microsoft Office Word 365;

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, size 14.

July 30, 2025

/s/ *Kayla A. Toney*
_____

Kayla A. Toney

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2025, I served the foregoing amicus brief on all Counsel through the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service on those participants will be accomplished by the CM/ECF system.

July 30, 2025

/s/ *Kayla A. Toney*

Kayla A. Toney