No. 25-1279

# United States Court of Appeals for the Fourth Circuit

PFLAG, INC., ET AL.,

*Plaintiffs-Appellees,*

V.

DONALD J. TRUMP, in his official capacity as President of the United States, ET AL.,

*Defendants-Appellants,*

STATE OF WEST VIRGINIA,

*Defendant.*

On Appeal from the United States District Court
for the District of Maryland at Greenbelt
No. 8:25-cv-00337-BAH, Hon. Brendan A. Hurson

**BRIEF FOR *AMICUS CURIAE*
AMERICAN COLLEGE OF PEDIATRICIANS
IN SUPPORT OF APPELLANTS AND REVERSAL**

Gene C. Schaerr
Edward H. Trent
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com

*Counsel for Amicus Curiae
American College of Pediatricians*

AUGUST 1, 2025

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1279__    Caption: __PFLAG, Inc., et al. v. Donald J. Trump, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__AMERICAN COLLEGE OF PEDIATRICIANS__
(name of party/amicus)

_____

 who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
        If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
        If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
        If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Gene C. Schaerr                    Date:        08/01/2025

Counsel for: American College of Pediatricians

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ......................................................i

TABLE OF AUTHORITIES .....................................................v

IDENTITY AND INTEREST OF *AMICUS CURIAE*
    AND SOURCE OF AUTHORITY TO FILE BRIEF ..........................1

SUMMARY OF ARGUMENT .................................................4

ARGUMENT .....................................................................6

I.     The Executive Orders are Based on a Proper
       Understanding of Gender Incongruence and Dysphoria
       In Children..................................................................7

       A.     "Transitioning" to a Different Sex Is Biologically
              Impossible. ........................................................7

       B.     Gender Incongruence and Dysphoria are Mental
              Health Issues in People with Normal Healthy
              Bodies............................................................9

       C.     In Natural Puberty, Gender Dysphoria Generally
              Desists On Its Own, Without "Gender Affirmation"
              Interventions. .................................................11

II.     The Executive Orders Protect Children...................................14

       A.     Puberty Blockers Harm Children. ...................................15

       B.     Cross-Sex Hormones Harm Children............................21

       C.     "Gender Transition" Surgery Harms Children...............23

       D.     "Gender Transition" Interventions Do Not Lower the
              Risk of Suicide. ...............................................27

E.     Children are Unable to Give Informed Consent to
       "Gender Transition" Procedures. ......................................30

III.    The Executive Orders are Consistent With Sound Medical
        Practice. ........................................................................32

CONCLUSION .................................................................................34

CERTIFICATE OF COMPLIANCE ...............................................35

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Eknes-Tucker v. Governor of Ala.*,
   114 F.4th 1241 (11th Cir. 2024) ............................................................ 33

*United States v. Skrmetti*,
   605 U.S. --, 145 S.Ct. 1816 (2025) ........................ 6, 7, 15, 16, 24, 30, 33

**Rule**

Fed. R. App. P. 29 .................................................................................... 3

**Other Authorities**

Am. Coll. of Pediatricians,
   *Gender Dysphoria in Children*
   (Nov. 2018) ...................................... 8, 9, 11, 12, 13, 14, 16, 19, 25, 29, 31

Am. Coll. of Pediatricians,
   *Mental Health in Adolescents with Incongruence*
   *of Gender Identity and Biological Sex*
   (2024) ...................................... 7, 10, 11, 13, 19, 23, 27, 29, 31

Am. Coll. of Pediatricians,
   *Transgender Interventions Harm Children* ....................... 18, 20, 24, 29

Am. Psych. Ass'n,
   *Diagnostic and statistical manual of mental disorders:*
   *DSM-5* (5th ed. 2013) ................................................................. 8

Attach. to U.S. Dep't Health & Hum. Servs. Resp. to Mots.
   to Seal, *Voe v. Mansfield*, No. 1:23-cv-00864-LCB-LPA
   (M.D.N.C. May 13, 2024), ECF No. 100-1 .......................................... 33

Anna Austin et al.,
   *Adverse childhood experiences related to poor adult*
   *health among lesbian, gay, and bisexual individuals*,
   106 Am. J. Pub. Health 314 (2016) ...................................................... 11

Tracy A. Becerra-Culqui et al.,
*Mental Health of Transgender and Gender
Nonconforming Youth Compared With Their Peers*,
141 Pediatrics e20173845 (2018) ........................................................ 10

Walter O. Bockting,
*Chapter 24: Transgender Identity Development, in*
1 Am. Psych. Ass'n, *APA Handbook of Sexuality and
Psychology* 744 (Deborah L. Tolman & Lisa M. Diamond
eds., 2014) ............................................................................................ 13

Christina Buttons,
*The Global Response to the Cass Review: June 2024 Update*,
buttonslives (May 13, 2024) ................................................................ 33

Hilary Cass for NHS England,
The Cass Review, Final Report
(2024) .................................. 13, 14, 16, 17, 18, 19, 20, 23, 27, 28, 31, 33

*The Cass Review, Final Report, Overview of
Key Findings,* The Cass Review ........................................................... 33

Peggy T. Cohen-Kettenis et al.,
*The Treatment of Adolescent Transsexuals: Changing
Insights*, 5 J. Sexual Med. 1892 (2008) ............................................... 11

Shelley L. Craig et al.,
*Frequencies and patterns of adverse childhood events in
LGBTQ+ youth*, 107 Child Abuse & Neglect 104623 (2020) .............. 11

Paulette Cutruzzula Dreher et al.,
*Complications of the Neovagina in Male-to-Female
Transgender Surgery: A Systematic Review and
Meta-Analysis with Discussion of Management*,
31 Clinical Anatomy 191 (2018) .......................................................... 25

Christel J.M. de Blok et al.,
*Breast Cancer Risk in Transgender People Receiving Hormone
Treatment: Nationwide Cohort Study in the Netherlands*,
365 BMJ l1652 (2019) ......................................................................... 23

Declaration,
  Doctors Protecting Children (2024) .............................. 6, 14, 19, 31, 33

Cecilia Dhejne et al.,
  *Long-Term Follow-Up of Transsexual Persons
  Undergoing Sex Reassignment Surgery: Cohort Study
  in Sweden*, 6 PLoSOne e16885 (2011) ................................. 29

Douglas S. Diekema,
  *Adolescent brain development and medical decision-making*,
  146 Pediatrics e20218F (2020) ............................................. 31

Env't Progress,
  *WPATH Files Excerpts: Exposing the Realities of Gender
  Medicine* ........................................................................ 22, 32

Annette Erlangsen et al.,
  *Transgender Identity and Suicide Attempts and Mortality
  in Denmark*, 329 JAMA 2145 (2023) .................................. 29

Exec. Order No. 14168,
  *Defending Women from Gender Ideology Extremism and
  Restoring Biological Truth to the Federal Government*
  (Jan. 20, 2025) ................................................................. 1, 34

Exec. Order No. 14187,
  *Protecting Children from Chemical and Surgical
  Mutilation* (Jan. 28, 2025).................................. 1, 2, 9, 13, 34

Ainhoa Gomez-Lumbreras & Lorenzo Villa-Zapata,
  *Exploring Safety in Gender-Affirming Hormonal
  Treatments: An Observational Study on Adverse Drug
  Events Using the Food and Drug Administration
  Adverse Event Reporting System Database*,
  Annals of Pharmacotherapy (2024) .............................. 16, 22

Sheila Jeffreys,
  *The transgendering of children: gender eugenics*,
  35 Women's Studies Int'l F. 384 (2012) ......................... 16, 25

Sara B. Johnson et al.,
  *Adolescent maturity and the brain: the promise*
  *and pitfalls of neuroscience research in adolescent health*
  *policy,* 45 J. Adolescent Health 216 (2009) ......................................... 17

Riittakerttu Kaltiala-Heino et al.,
  *Two years of gender identity service for minors:*
  *overrepresentation of natal girls with severe*
  *problems in adolescent development,*
  9 Child & Adolescent Psych. & Mental Health 1 (2015) ..................... 10

Michael Laidlaw & Sarah Jorgensen,
  Comment, *Exploring Safety in Gender-Affirming*
  *Hormonal Treatments: An Observational Study on Adverse*
  *Drug Events Using the Food and Drug Administration*
  *Adverse Event Reporting System Database,*
  Annals of Pharmacotherapy (2024) ..................................................... 21

Jonas F. Ludvigsson et al.,
  *A Systematic Review of Hormone Treatment for*
  *Children with Gender Dysphoria and Recommendations*
  *for Research*, 112 Acta Paediatrica 2279 (2023) ................................. 17

Jonathan P. Massie et al.,
  *Predictors of Patient Satisfaction and Postoperative*
  *Complications in Penile Inversion Vaginoplasty,*
  141 Plastic Reconstructive Surgery 911e (2018) ................................. 25

Rich McHugh,
  *'No Good Evidence' for Teen Gender Surgery:*
  *Plastic Surgeons Head,* NewsNation (Sept. 2, 2024) ........................... 26

Dick Mul et al.,
  *Psychological Assessments Before and After Treatment*
  *of Early Puberty in Adopted Children,*
  90 Acta Paediatrica 965 (2001) ........................................................... 20

Tyler O'Neil,
  *BOMBSHELL FDA Email Turns Transgender 'Health*
  *Care' Narrative on Its Head,* The Daily Signal (Aug. 1, 2024) ........... 19

Pien Rawee et al.,
  *Development of Gender Non-Contentedness During
  Adolescence and Early Adulthood*,
  53 Archives of Sexual Behav. 1813 (2024)............................... 10, 12, 13

Sami-Matti Ruuska et al.,
  *All-cause and Suicide Mortalities Among Adolescents
  and Young Adults Who Contacted Specialised Gender
  Identity Services In Finland In 1996-2019: A Register Study*,
  27 BMJ Mental Health 1 (2024) ........................................28

Leor Sapir,
  *A Consensus No Longer*, City J. (Aug. 12, 2024) .................................26

Lauren Schmidt & Rachel Levine,
  *Psychological outcomes and reproductive issues among
  gender dysphoric individuals,*
  44 Endocrinology & Metabolism Clinics N. Am. 773 (2015) ......... 16, 19

Lauren Schwartz et al.,
  *Emerging and accumulating safety signals for the use
  of estrogen among transgender women*,
  5 Discover Mental Health (2025).........................................21

Devita Singh et al.,
  *A Follow-Up Study of Boys With Gender Identity Disorder*,
  12 Frontiers in Psych. 632784 (2021) ...................................11

*Summary of Key Recommendations from the
  Swedish National Board of Health and Welfare
  (Socialstyrelsen / NBHW), February 2022 update,*
  Soc'y for Evidence-Based Gender Med. (Feb. 27, 2022) ......................20

U.S. Dep't Health Hum. Servs.,
  Treatment for Pediatric Gender Dysphoria: Review of
  Evidence and Best Practices (as corrected 2025) .............. 15, 16, 23, 32

Jonathon Van Maren,
  *World-renowned child psychiatrist calls trans treatments*
  *"possibly one of the greatest scandals in medical history"*,
  The Bridgehead (Sept. 25, 2019).........................................................20

H. Veerman et al.,
  *Functional Outcomes and Urologic Complications After*
  *Genital Gender Affirming Surgery With Urethral*
  *Lengthening In Transgender Men*, 204 J. Urology 104 (2020)............26

Kenneth J. Zucker & Susan J. Bradley,
  *Gender Identity and Psychosexual Disorders*,
  3 FOCUS 598 (2005) ...........................................................................11

## IDENTITY AND INTEREST OF *AMICUS CURIAE* AND SOURCE OF AUTHORITY TO FILE BRIEF[1]

In the face of significant pauses by the international medical community in hormonal and surgical "gender affirmations" for children—pauses driven by several comprehensive reviews of the medical evidence—President Trump issued two Executive Orders ("EOs") at issue here. One seeks to "ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children." Exec. Order No. 14187, §4, *Protecting Children from Chemical and Surgical Mutilation* (Jan. 28, 2025). In further support of this policy, another Executive Order states that "Federal funds shall not be used to promote gender ideology" which consists of "the false claim that males can identify as and thus become women and vice versa[.]" Exec. Order No. 14168, §§3(g), 2(f), *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Jan. 20, 2025). Besides their obvious legal flaws, the district court's

---

[1] No party's counsel authored this brief in whole or in part, and no person other than *amicus* or its counsel contributed money that was intended to fund the preparation or submission of the brief.

objections to these orders rest on deeply flawed science and should be rejected.

EO 14187 wisely prohibits aggressive experimental medical interventions for "gender transition" beginning at the onset of puberty or even earlier. Such interventions include administering puberty blockers, cross-sex hormones, and mutilating surgeries to those under 19 to affirm false sexual identities. And, as more and more "detransitioners" attest, the permanent scars and infertility from these interventions cannot be undone.

These developments are of great concern to *Amicus,* the American College of Pediatricians ("the College" or "ACPeds"), a national organization of nearly 500 board-certified pediatricians or related specialists in 46 states, all dedicated to the health and well-being of children. Formed in 2002, the College is a scientific medical association committed to producing policy recommendations based on the best available scientific research. The College strives to ensure all children reach their optimal physical and emotional health and well-being.

The College's members provide high-quality medical services to children and all patients without discrimination based on sex or any

other characteristic prohibited by law. Based on the Hippocratic Oath and on science, the College categorically rejects "gender transition" procedures because they inherently harm children. *Amicus* has a direct interest in the outcome of this case because it affects the vulnerable population it serves, and the medical services the College's members provide.

*Amicus* is authorized to file this brief by Fed. R. App. P. 29(a)(2) because all parties have consented to its filing.

## SUMMARY OF ARGUMENT

Treatment of children and adolescents experiencing gender incongruity and dysphoria should be based on sound scientific evidence. Consistent with the best medical evidence available, the Executive Orders seek to protect such vulnerable children under age 19 by prohibiting hormonal and surgical efforts at "gender transition."

I. Scientific research shows that children with gender incongruence or dysphoria almost always have significant mental health struggles and/or adverse childhood events that contribute to, if not cause, their dysphoria. And multiple studies show that these children almost always grow out of or desist from such gender incongruity while going through puberty—as long as they are not "affirmed" as being of the opposite sex or gender. Yet when children are placed on puberty blockers and/or cross-sex hormones, they almost always persist in their dysphoria, which can lead to "gender transition" surgeries—all with life-long adverse consequences. The EOs are consistent with this scientific reality, and the district court's decision is not.

II. Puberty blockers, cross-sex hormones, and "gender transition" surgeries have known adverse health consequences while having no

proven long-term mental health benefits. It is just as alarming that these children—often preteens—are incapable of consenting to such life-altering interventions. Here too the EOs are consistent with the best science.

III. The EOs are also consistent with sound medical practice. The appropriate medical treatment for gender dysphoria is to address the child's underlying mental health issues while allowing the child to go through natural puberty. That is what their bodies were meant to do, and what the EOs require. Under the EOs, no child is left "untreated." The EOs ensure instead that treatment focuses on mental distress while giving healthy bodies the chance to grow up.

## ARGUMENT

By prohibiting the use of puberty blockers, cross-sex hormones, and surgical interventions for the purpose of "gender transition," the EOs properly protect minors from harmful, blatantly political "standards" untethered to biological reality and contrary to valid scientific evidence. *See United States v. Skrmetti*, 605 U.S. --, 145 S.Ct. 1816, 1848-49 (2025) (Thomas, J., concurring). The scientific evidence demonstrates both a lack of long-term benefit and significant life-long harms to children subjected to such "gender affirmation" interventions.[2] The district court's decision enjoining the EOs' provisions prohibiting the use of Federal funds for such unproven and dangerous procedures should be reversed.

---

[2] The American College of Pediatricians, other medical organizations representing over 75,000 physicians and healthcare providers, and over 5,200 individual signatories, recently issued a declaration—the Doctors Protecting Children Declaration—stating that "Medical decision making should respect biological reality and the dignity of the person by compassionately addressing the whole person. … [Yet,] [g]ender ideology seeks to affirm thoughts, feelings and beliefs, with puberty blockers, hormones, and surgeries that harm healthy bodies, rather than affirm biological reality." Decl., Doctors Protecting Children (2024), https://doctorsprotectingchildren.org/.

I.      **The Executive Orders are Based on a Proper Understanding of Gender Incongruence and Dysphoria In Children.**

To understand why the EOs and many states prohibit the experimental medical procedures Plaintiffs here demand, it is helpful to briefly establish a foundation on what is known about gender incongruence in children. Indeed, the Supreme Court recently rejected challenges to Tennessee's law containing the same limits on experimental "gender transition" procedures at issue in the EO's. *Skrmetti*, 145 S.Ct. at 1825-26, 1837.

A.      **"Transitioning" to a Different Sex Is Biologically Impossible.**

We begin with the reality that sex is a biological, immutable characteristic—a scientific fact, not a social construct. As ACPeds has previously pointed out, "[f]rom a purely scientific standpoint, human beings possess a biologically determined sex and innate sex differences. No [physician or surgeon] could actually change a person's genes through hormones and surgery. Sex change is objectively impossible."[3] Plaintiffs'

---

[3] Am. Coll. of Pediatricians (ACPeds), *Mental Health in Adolescents with Incongruence of Gender Identity and Biological Sex* (2024), [hereinafter, ACPeds, *Mental Health*] (citing extensive scientific research).

experts attempt to distort this basic understanding of sex by suggesting that "gender identity" is an element of sex (Karasic Decl. ¶¶31, 33 [JA523-524]; Shumer Decl. ¶27 [JA586]), all while noting that gender identity is a *psychological* concept with all other characteristics of sex being biologically based on the binary of male and female. [Karasic Decl. ¶¶35, 48-49, 70, 104-107 (JA524, JA526-27, JA531-32, JA544-45); Shumer Decl. ¶¶28, 39, 49, 64-65 (JA586-87, JA590, JA592, JA596-97)].

While rare,[4] gender dysphoria in children is "a psychological condition in which they experience marked incongruence between their experienced gender and the gender associated with their biological sex. They often express the belief that they are the opposite sex."[5]  This condition is not evidence of an unhealthy or malformed body but a psychological condition where a person's belief about him/herself is inconsistent with his/her sex, a discordance even Plaintiffs' experts

---

[4] Am. Coll. of Pediatricians (ACPeds), *Gender Dysphoria in Children* 1 (Nov. 2018), [hereinafter, ACPeds, *Gender Dysphoria*].  Indeed, "[f]or natal adult males, prevalence ranges from 0.005% to 0.014%, and for natal females, from 0.002% to 0.003%." Am. Psych. Ass'n, *Diagnostic and statistical manual of mental disorders: DSM-5,* at 454 (5th ed. 2013).

[5] ACPeds, *Gender Dysphoria*, *supra* note 4, at 1.

acknowledge. [Karasic Decl. ¶¶49-50 (JA526-28); Shumer Decl. ¶38 (JA589-90)].

Thus, as explained in detail below, efforts to "transition" a child using "gender affirming care," EO 14187, §2(c), is a misnomer—as such procedures are specifically designed to *entrench* a mental health condition of gender incongruence while leading to permanent sterility without resolving underlying mental health issues that contributed to the dysphoria in the first place.

## B. Gender Incongruence and Dysphoria are Mental Health Issues in People with Normal Healthy Bodies.

It follows that gender dysphoria (GD), previously called gender identity disorder (GID), is a problem that resides in the mind, not in the body.

1. As ACPeds has stated: "Children with GD do not have a disordered body—even though they feel as if they do. Similarly, a child's distress over developing secondary sex characteristics does not mean that puberty should be treated as a disease to be halted, because puberty is not, in fact, a disease."[6]  Unsurprisingly, such dysphoria is associated

---

[6] ACPeds, *Gender Dysphoria*, *supra* note 4, at 9.

with a variety of "diverse psychiatric problems."[7]  Accordingly, treating

pediatric gender dysphoria as a mental health disorder is the appropriate

focus for medical providers.[8]

2. Children with  gender incongruity are two to three times more

likely to have suffered from an adverse childhood event such as sexual

abuse, emotional neglect, emotional abuse, or a family member with

---

[7] Pien Rawee et al., *Development of Gender Non-Contentedness During Adolescence and Early Adulthood*, 53 Archives of Sexual Behav. 1813, 1813, 1822 (2024) (internal citations omitted), doi.org/10.1007/s10508-024-02817-5; *see also* ACPeds, *Mental Health*, *supra* note 3, at 3 ("Using five independent cross-sectional datasets consisting of 641,860 individuals, researchers found 'transgender and gender-diverse individuals have, on average, higher rates of autism, other neurodevelopmental and psychiatric diagnoses'"); Riittakerttu Kaltiala-Heino et al., *Two years of gender identity service for minors: overrepresentation of natal girls with severe problems in adolescent development*, 9 Child & Adolescent Psych. & Mental Health art. 9, at 5 (2015)(75% of adolescents seen for gender identity services were or had been undergoing psychiatric treatment for reasons other than GD); Tracy A. Becerra-Culqui et al., *Mental Health of Transgender and Gender Nonconforming Youth Compared With Their Peers*, 141 Pediatrics e20173845 (2018) (teens with gender non-conformity significantly more likely to have underlying psychiatric disorders, psychiatric hospitalizations, and suicidal ideation than peers).

[8] Curiously, one of Plaintiffs' experts suggests that "simply being transgender or gender nonconforming is not a medical condition to be treated and is not considered a mental illness."  Karasic Decl. ¶43 [JA525].  In such a case, the radical hormonal and surgical interventions at issue that irreversibly alter a child's naturally developing body would not be justified at all.

mental illness.[9]  Additionally, "studies suggest that social reinforcement, parental psychopathology, family dynamics, and social contagion facilitated by mainstream and social media, all contribute to the development and/or persistence of GD in some vulnerable children."[10] Accordingly, the available credible evidence suggests that mental health treatment should be the focus for children expressing gender incongruence, not harmful hormonal  and surgical interventions pushed by Plaintiffs.

### C. In Natural Puberty, Gender Dysphoria Generally Desists On Its Own, Without "Gender Affirmation" Interventions.

One reason for this approach is that "80-95% of the prepubertal children with GID will no longer experience a GID in adolescence."[11]  In

---

[9] ACPeds, *Mental Health*, *supra* note 3, at 5 (citing, among others, Anna Austin et al., *Adverse childhood experiences related to poor adult health among lesbian, gay, and bisexual individuals*, 106 Am. J. Pub. Health 314 (2016); Shelley L. Craig et al., *Frequencies and patterns of adverse childhood events in LGBTQ+ youth*, 107 Child Abuse & Neglect 104623 (2020)).

[10] ACPeds, *Gender Dysphoria*, *supra* note 4, at 6 (citing, among others, Kenneth J. Zucker & Susan J. Bradley, *Gender Identity and Psychosexual Disorders*, 3 FOCUS 598 (2005)).

[11] Peggy T. Cohen-Kettenis et al., *The Treatment of Adolescent Transsexuals: Changing Insights*, 5 J. Sexual Med. 1892, 1893 (2008); Devita Singh et al., *A Follow-Up Study of Boys With Gender Identity Disorder*, 12 Frontiers in Psych. 632784, at 1, 8 (2021),

a recent study, Pien Rawee and colleagues followed a study group beginning at age 11 through age 25. According to the study, "children and adolescents referred for gender dysphoric feelings had a more negative self-concept compared to the standardization sample of the questionnaire."[12] However, while that was the case early in puberty, any "gender non-contentedness … decreased with age."[13] The vast majority of children who express discomfort with their sex at the start of puberty overwhelmingly express no such discomfort after going through puberty.[14]

Equally important, while natural desistance predominates, children in such studies who socially "transitioned"[15] in early childhood were more likely (often between 96% and 100% of the time) to have

---

doi.org/10.3389/fpsyt.2021.632784 (finding 87.8% desistance in "largest sample to date of boys clinic-referred for gender dysphoria.").

[12] Rawee et al., *supra* note 7, at 1814.

[13] *Id*. at 1818.

[14] *Ibid*.

[15] Social transitioning "consists of first affirming the child's false self-concept by instituting name and pronoun changes, and facilitating the impersonation of the opposite sex within and outside of the home." ACPeds, *Gender Dysphoria*, *supra* note 4, at 11.

persistent feelings of gender dysphoria.[16]  The same is true for children who are started on puberty blockers to address gender confusion.[17]

In other words, Plaintiffs' transition efforts place children on a path to life-long hormone interventions and sterilization while not resolving their mental health problems.  Yet, when allowed to go through natural puberty, children overwhelmingly desist such incongruence and accept their biological sex.[18]  That is what EO 14187 properly requires for those under 19.  Nothing about this prohibition "denies the existence of transgender people," as the district court suggests.  JA969.  Rather, the reality of such vulnerable children is acknowledged and becomes the

---

[16] Rawee et al., *supra* note 7, at 1814 (citation omitted); *see also* ACPeds, *Mental Health*, *supra* note 3, at 7.

[17] ACPeds, *Gender Dysphoria*, *supra* note 4, at 12 (study of 70 pre-pubertal candidates to receive puberty suppression showed that every child "eventually embraced a transgender identity and requested cross-sex hormones"); Hilary Cass for NHS England, The Cass Review, Final Report 176, §14.24 (2024) [hereinafter, "Cass Review"].

[18] Ironically, the American Psychological Association in their *Handbook of Sexuality and Psychology* states that "[p]remature labeling of gender identity should be avoided.  Early social transition (i.e., change of gender role, …) should be approached with caution to avoid foreclosing this stage of (trans)gender identity development."  Walter O. Bockting, *Chapter 24: Transgender Identity Development, in* 1 Am. Psych. Ass'n, *APA Handbook of Sexuality and Psychology* 744 (Deborah L. Tolman & Lisa M. Diamond eds., 2014).

focus of efforts to address the child's distress—the mental health issues contributing to the dysphoria in the first place.

The evidence-based approach is to simply allow a child to grow up without being "affirmed" in a false sexual identity. This is critical since there is no test to determine which small minority of children experiencing gender incongruence will persist in such feelings into adulthood without social and "medical" affirmation.[19]

## II.    The Executive Orders Protect Children.

It is against this background that the EOs' acknowledgement of biological sex and prohibition of "gender-affirming care" for those under 19 needs to be evaluated—a critical analysis dismissed by the district court. JA974. As shown below, each of the medical interventions used to "transition" a child to impersonate the opposite sex poses significant risks, has not been shown to reduce suicide, and cannot be ethically administered to a child who is incapable of making permanent, life-

---

[19] *See* Doctors Protecting Children Decl., *supra* note 2, ¶4; Cass Review, *supra* note 17, at 193, §16.8; ACPeds, *Gender Dysphoria*, *supra* note 4, at 11-12 ("puberty is suppressed via GnRH agonists as early as age 11 years, and then finally, patients may graduate to cross-sex hormones at age 16 in preparation for sex-reassignment surgery as an older adolescent or adult").

altering decisions such as the decision to become permanently sterile. Indeed, a recent survey of the scientific evidence conducted by the U.S. Department of Health and Human Services confirms these conclusions,[20] with the Supreme Court finding likewise. *Skrmetti*, 145 S.Ct. at 1835-26; *id.* at 1841-45 (Thomas, J. concurring).

### A.    Puberty Blockers Harm Children.

The first medical intervention recommended by "gender affirming care" proponents is hormonal—specifically, delaying or preventing natural puberty with puberty blockers.

1. Puberty blockers interrupt the normal process of sexual development in children. The issue here is not the short-term use of puberty blockers for precocious or early onset puberty, for which they have been approved, but the long-term effects of the off-label use of these drugs for "gender transition" purposes. These drugs were never intended or approved for "gender transition,"[21] and using them for that purpose is

---

[20] U.S. Dep't Health Hum. Servs., Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices (as corrected 2025) [hereinafter "HHS Report"], https://tinyurl.com/2x4enzkn.

[21] Ainhoa Gomez-Lumbreras & Lorenzo Villa-Zapata, *Exploring Safety in Gender-Affirming Hormonal Treatments: An Observational Study on Adverse Drug Events Using the Food and Drug Administration Adverse*

"very different" from use when treating precocious puberty.[22]  Denying

such use, as the district court held, is not "textbook sex discrimination"

(JA967), as the Supreme Court recognized in *Skrmetti*. 145 S.Ct. at 1829-

34.  It is, rather, simply sound science that acknowledges a difference

between male and female children and that certain procedures are

harmful to a child regardless of the child's sex.[23]

Indeed, these drugs have serious side-effects and should thus be

used sparingly:  "In addition to preventing the development of secondary

sex characteristics, GnRH agonists arrest bone growth, decrease bone

accretion, prevent the sex-steroid dependent organization and

maturation of the adolescent brain, and inhibit fertility by preventing the

development of gonadal tissue and mature gametes for the duration of

treatment."[24]

---

*Event Reporting System Database*, Annals of Pharmacotherapy 1, 4 (2024), doi:10.117/10600280241231612.

[22] Cass Review, *supra* note 17, at 173, §14.6.

[23] HHS Report, *supra* note 20, §7.3.

[24] ACPeds, *Gender Dysphoria*, *supra* note 4, at 12 (referencing Lauren Schmidt & Rachel Levine, *Psychological outcomes and reproductive issues among gender dysphoric individuals,* 44 Endocrinology & Metabolism Clinics N. Am. 773 (2015); Sheila Jeffreys, *The transgendering of children: gender eugenics*, 35 Women's Studies Int'l F. 384 (2012); Sara B. Johnson et al., *Adolescent maturity and the brain: the*

Moreover, when it comes to using puberty blockers as "treatment" for gender dysphoria, the Cass Review correctly noted, "[b]locking this experience [of puberty] means that young people have to understand their identity and sexuality based only on their discomfort about puberty and a sense of their gender identity developed at an early stage of the pubertal process. Therefore, there is no way of knowing whether the normal trajectory of the sexual and gender identity may be permanently altered."[25] This is so because, when placing pre-teens on puberty blockers, "[t]heir experience of puberty will then be based on their identified gender, which may have permanent neuropsychological effects."[26] As noted above, this denies the child the opportunity to naturally grow out of the discomfort they feel with their sex at age 11, a desistance that is the norm if they are not "affirmed" in their incongruent identity at such a young age.

---

*promise and pitfalls of neuroscience research in adolescent health policy,* 45 J. Adolescent Health 216 (2009)); *see* Jonas F. Ludvigsson et al., *A Systematic Review of Hormone Treatment for Children with Gender Dysphoria and Recommendations for Research*, 112 Acta Paediatrica 2279, 2280, 2286-90 (2023).

[25] Cass Review, *supra* note 17, at 178, §14.37.

[26] *Id.* at 194, §16.19.

2. While blocking a child's natural development, puberty blockers have not been shown to benefit the child psychologically, contrary to the goal of gender dysphoria treatment.[27]  Rather, studies demonstrate "there is insufficient and/or inconsistent evidence about the effects of puberty suppression on psychological or psychosocial health" of young people.[28]  Indeed, as the Cass Review noted, the fact that only very modest and inconsistent improvements in mental health were seen makes it all the more important to assess whether other treatments may have a greater effect on the distress that young people with gender dysphoria experience during puberty.[29]

Yet, as ACPeds has previously noted, "[t]here is not a single large, randomized, controlled study that documents the alleged benefits and potential harms to gender-dysphoric children from pubertal suppression and decades of cross-sex hormone use.  Nor is there a single long-term,

---

[27] "In fact, the package insert for Lupron, the number one prescribed puberty blocker in America, lists 'emotional instability' as a side effect and warns prescribers to 'Monitor for development or worsening of psychiatric symptoms during treatment.'"  Am. Coll. of Pediatricians (ACPeds), *Transgender Interventions Harm Children,* https://tinyurl.com/4yrj8wbe (last visited July 25, 2025).

[28] Cass Review, *supra* note 17, at 176, §14.28.

[29] *Id.* at 177, §14.29; *see also id.* at 180, §14.55.

large, randomized, controlled study that compares the outcomes of various psychotherapeutic interventions for childhood GD with those of pubertal suppression followed by decades of toxic synthetic steroids."[30]

Beyond this, "[t]here are serious long-term risks associated with the use of social transition, puberty blockers, masculinizing or feminizing hormones, and surgeries, not the least of which is potential sterility."[31] Even the FDA found that use of puberty blockers for gender transition resulted in "increased risk of depression and suicidality, as well as increased seizure risk[.]"[32]  And, as if that were not enough, the Cass Review noted that "brain maturation may be temporarily or permanently disrupted by the use of puberty blockers, which could have a significant

---

[30] ACPeds, *Gender Dysphoria*, *supra* note 4, at 10; *see also* ACPeds, *Mental Health*, *supra* note 3, at 8 (referencing McMaster University Department of Health Research Methods systematic review done at request of the Florida Agency for Health Care Administration); Cass Review, *supra* note 17, at 194, §16.14.

[31] Doctors Protecting Children Decl., *supra* note 2, ¶5 (citing numerous sources); *see also* ACPeds, *Gender Dysphoria*, *supra* note 4, at 13 (citing Schmidt & Levine, *supra* note 25).

[32] Tyler O'Neil, *BOMBSHELL FDA Email Turns Transgender 'Health Care' Narrative on Its Head,* The Daily Signal (Aug. 1, 2024) (reporting on leaked FDA emails noting the results of FDA studies on harms from a "safety review of the GnRH agonist class in pediatric patients in 2016/2017."), https://tinyurl.com/huhcjmra.

impact on the young person's ability to make complex risk-laden decisions, as well as having possible longer-term neuropsychological consequences."[33]

These are some of the reasons the Swedish National Board of Health and Welfare concluded that "the risks of hormonal interventions for gender dysphoric youth outweigh the potential benefits."[34] And that is why, as the renowned Swedish psychiatrist Dr. Christopher Gillberg has said, pediatric transition is "possibly one of the greatest scandals in medical history," while calling for "an immediate moratorium on the use of puberty blockers because of their unknown long-term effects."[35]

---

[33] Cass Review, *supra* note 17, at 178, §14.38; Dick Mul et al., *Psychological Assessments Before and After Treatment of Early Puberty in Adopted Children*, 90 Acta Paediatrica 965, 970 (2001) (finding 7 point drop in intelligence quotient after one year on puberty blockers).

[34] *Summary of Key Recommendations from the Swedish National Board of Health and Welfare (Socialstyrelsen/NBHW), February 2022 update,* Soc'y for Evidence-Based Gender Med. (Feb. 27, 2022), https://tinyurl.com/2je6phjv.

[35] Jonathon Van Maren, *World-renowned child psychiatrist calls trans treatments "possibly one of the greatest scandals in medical history"*, The Bridgehead (Sept. 25, 2019), https://tinyurl.com/34eya7y8; ACPeds, *Transgender Interventions Harm Children, supra* note 28; *see also* Cass Review, *supra* note 17, at 179, §14.49.

**B.    Cross-Sex Hormones Harm Children.**

Cross-sex hormone interventions, often the next step in childhood "gender transition," are equally if not more dangerous, subjecting a young person to high doses of hormones never intended for their bodies. By themselves, these hormones often result in infertility, cardiovascular disease, and other chronic illnesses.[36]   For example, as one researcher has described, females attempting "gender transition" are typically given testosterone to achieve levels "6 to 100 times above normal female circulating testosterone levels"—levels "generally only seen among patients with rare conditions such as benign or malignant androgen producing tumors of the adrenal gland or ovaries or those who misuse androgens in bodybuilding and other sports."[37]   And there are no studies

---

[36] Lauren Schwartz et al., *Emerging and accumulating safety signals for the use of estrogen among transgender women*, 5 Discover Mental Health (2025), https://doi.org/10.1007/s44192-025-00216-3.

[37] Michael Laidlaw & Sarah Jorgensen, Comment, *Exploring Safety in Gender-Affirming Hormonal Treatments: An Observational Study on Adverse Drug Events Using the Food and Drug Administration Adverse Event Reporting System Database*, Annals of Pharmacotherapy 1, 1 (2024), doi:10.1177/10600280241278913.

demonstrating that such doses in children is safe or reversible,[38] but there is evidence of their harm.

In their recent study, Ainhoa Gomez-Lumbreras, MD, PhD, and Lorenzo Villa-Zapata, PharmD, PhD, found there were significant adverse drug reactions to "gender transition" hormone therapy, noting that the drugs used were "unintended for their recipient gender."[39] Indeed, "drugs such as testosterone and spironolactone frequently used in gender-affirming therapies exhibit divergent ADR [adverse drug reaction] patterns in transgender individuals compared with cisgender counterparts."[40]

---

[38] Indeed, such negative adverse reactions are no surprise to WPATH, where one doctor noted, "*I have one transition friend/colleague [sic] who, after about 8-10 years of [testosterone] developed [sic] hepatocarcinoma. To the best of my knowledge, it was linked to his hormone treatment … it was so advanced that he opted for palliative care and died a couple of months later.*"  Env't Progress, *WPATH Files Excerpts: Exposing the Realities of Gender Medicine* 7, https://tinyurl.com/w23aar2n (last accessed July 25, 2025) [hereinafter, "*WPATH Files*"].

[39] Gomez-Lumbreras & Villa-Zapata, *supra* note 21, at 1.

[40] *Id.* at 8; *see also id.* at 4 ("The ADRs for hormone treatments are described on the drug labels, but they typically pertain to the opposite sex of those transitioning for gender reassignment.").  A study from the University Medical Center in Amsterdam followed 2,260 transwomen (men) receiving estrogen and found a 46-fold increase in breast cancer compared to natal Dutchmen.  Christel J.M. de Blok et al., *Breast Cancer*

Finally, those receiving these interventions continue to have serious mental health concerns. For example, a recent Finnish study "demonstrated that transgender individuals who underwent medical transition had increased needs for specialist-level psychiatric care compared to those transgender individuals who presented for care but did not receive medical interventions."[41]

In short, these hormonal treatments permanently harm children and make their psychological conditions worse. Prohibiting the use of hormones in individuals whose bodies, based on their sex, were never intended to have such high levels of those hormones is sound medical practice designed to protect patients from intrinsic harms from the off-label use of powerful medications never intended for such purposes.[42]

## C.    "Gender Transition" Surgery Harms Children

So-called "gender transition" surgeries are even more harmful to children. The concept of surgically altering minors suffering from gender

---

*Risk in Transgender People Receiving Hormone Treatment: Nationwide Cohort Study in the Netherlands*, 365 BMJ l1652, at 1, 3 (2019).

[41] ACPeds, *Mental Health*, *supra* note 3, at 9; *see also* Cass Review, *supra* note 17, at 185-86, §§15.32, 15.34.

[42] HHS Report, *supra* note 20, §§7.4, 7.6.

dysphoria became accepted in the Netherlands in the early 1980s. It was surmised, wrongly, that transitioning patients earlier would benefit their psychological well-being and make the surgical changes in a patient's secondary sex characteristics easier. Unsurprisingly, neither of these two suppositions, which had no scientific foundation to begin with, proved true.

1. As noted above, once a child starts on a path of hormonal interventions, it can often lead to surgical procedures either before or after the child's 19th birthday. These surgeries sterilize the child and permanently change the child's development.[43] Justice Thomas described examples of such surgeries and their intrinsic harm to the child patient in his concurring opinion in *Skrmetti*. 145 S.Ct. at 1843 (Thomas, J. concurring).

There is simply no medical justification for these surgeries that remove healthy body parts and tissue from minors. And it goes without saying that "transgendered individuals who undergo sex reassignment surgery and have their reproductive organs removed are rendered

---

[43] ACPeds, *Transgender Interventions Harm Children*, *supra* note 28.

permanently infertile."[44]   Just as a surgeon should not perform liposuction on a person with anorexia who falsely believes he/she is too fat, so also surgery to "transition" a child who expresses feeling of gender incongruence should be considered unethical, unscientific, and malpractice.

2. Additionally, published data show that the complications of transgender surgery far exceed the complication rates of other cosmetic operations.   For example, the largest single-surgeon experience in vaginoplasty is from the Crane Center in San Francisco, which reported a total complication rate of 70%.[45]

The complication rates for phalloplasty are equally disturbing.  The most experienced surgeons performing this procedure are in the Netherlands.  Yet 63% of their patients reported being unable to void due

---

[44] ACPeds, *Gender Dysphoria*, *supra* note 4, at 13 (citing among others Jeffreys, *supra* note 25).

[45] Jonathan P. Massie et al., *Predictors of Patient Satisfaction and Postoperative Complications in Penile Inversion Vaginoplasty*, 141 Plastic Reconstructive Surgery 911e, 915e-916e & tbl. 2 (2018).  *See also* Paulette Cutruzzula Dreher et al., *Complications of the Neovagina in Male-to-Female Transgender Surgery: A Systematic Review and Meta-Analysis with Discussion of Management*, 31 Clinical Anatomy 191, 193-194 & tbl. 1 (2018).

to scarring in the urethra and required catheterization, and 27-50% reported leaking urine from the base of the false penis, requiring diapers. They also reported a revisional surgery rate of 73%.[46] And it can only be assumed the rates are higher in adolescents who have underdeveloped genitals from years of puberty blockers and cross-sex hormones.

Given these widespread complications, in July 2024, the American Society of Plastic Surgeons (representing 90% of board-certified plastic and reconstructive surgeons in the United States and Canada) cautioned that there is "considerable uncertainty as to the long-term efficacy for … chest and genital surgical interventions" for youth.[47] And Dr. Steven Williams, the Society's president, has publicly stated he would not "even entertain" surgically transitioning minors because there is a lack of data to support it.[48]

---

[46] H. Veerman et al., *Functional Outcomes and Urologic Complications After Genital Gender Affirming Surgery With Urethral Lengthening In Transgender Men*, 204 J. Urology 104, 104, 107 (2020).

[47] Leor Sapir, *A Consensus No Longer*, City J. (Aug. 12, 2024), https://tinyurl.com/2zt898sr.

[48] Rich McHugh, *'No Good Evidence' for Teen Gender Surgery: Plastic Surgeons Head,* NewsNation (Sept. 2, 2024), https://tinyurl.com/bdhr8s39.

### D. "Gender Transition" Interventions Do Not Lower the Risk of Suicide.

Notwithstanding these serious health risks, proponents of hormonal and surgical interventions claim they help reduce the risk of suicide among gender dysphoric children (Karasic Decl. ¶65 [JA530-31]; Shumer Decl. ¶68 [JA597]; Turban Decl. ¶12 [Doc. 59-51]). Indeed, as ACPeds' members have observed, "many parents are specifically told that if they do not accept their children's gender identity via social transition, medical treatment, and surgical operations, they risk losing their children to suicide."[49] Yet the scientific evidence does not support this. And such assertions merely scare a parent into authorizing such harmful interventions.

1. Addressing this very issue, the Cass Review did a detailed analysis of studies on the relationship between gender dysphoria and suicide. The review found that the studies did not support a claim that a "medical pathway … [of] gender-affirming treatment reduces suicide risk."[50]

---

[49] ACPeds, *Mental Health, supra* note 3, at 3.

[50] Cass Review, *supra* note 17, at 186, §15.36; *see generally id*. at 186-187, §§15.36-15.43.

This point was illustrated in a recent Finnish study among a population of 2,083 "gender-referred adolescents," which revealed that the suicide rate in these adolescents was equal to the suicide rate in 16,643 controls when the groups were matched for underlying mental disorders.[51]   In other words, the underlying mental disorder was the cause of the suicide.[52]   And, as the Cass Review concluded, "Tragically deaths by suicide in trans people of all ages continue to be above the national average, but there is no evidence that gender-affirmative treatments reduce this.   The available evidence suggests that these deaths are related to a range of other complex psychosocial factors and to mental illness."[53]

2. Those other factors are borne out in the research, which demonstrates that "gender transition" services generally do not alleviate the underlying mental health and psychosocial issues that contributed to the feelings of gender incongruity in the first place.   While those who

---

[51] *Id.* at 96, §5.66.

[52] Sami-Matti Ruuska et al., *All-cause and Suicide Mortalities Among Adolescents and Young Adults Who Contacted Specialised Gender Identity Services In Finland In 1996-2019: A Register Study*, 27 BMJ Mental Health 1, 3 & tbl. 1 (2024).

[53] Cass Review, *supra* note 17, at 195, §16.22.

identify as transgender have "significantly higher rates of suicide attempts, suicide mortality, suicide-unrelated mortality, and all-cause mortality,"[54] associated with higher incidents of mental health issues, studies show that puberty blockers do not address these issues but may make them worse.[55]

For example, sex reassignment surgery, in the long term, does not result in a level of health equivalent to that of the general population.[56]

---

[54] ACPeds, *Mental Health*, *supra* note 3, at 10 (citing Annette Erlangsen et al., *Transgender Identity and Suicide Attempts and Mortality in Denmark*, 329 JAMA 2145 (2023)).

[55] ACPeds, *Transgender Interventions Harm Children*, *supra* note 28 (quoting Oxford University Professor Michael Biggs, "There was no statistically significant difference in psychosocial functioning between the group given blockers and the group given only psychological support. In addition, there is unpublished evidence that after a year on [puberty blockers] children reported greater self-harm, and the girls also experienced more behavioral and emotional problems and expressed greater dissatisfaction with their body—so *puberty blockers exacerbated gender dysphoria.*" (emphasis added)).

[56] ACPeds, *Gender Dysphoria*, *supra* note 4, at 15 (citing Cecilia Dhejne et al., *Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden*, 6 PLoSOne e16885, e16885 (2011) (finding "considerably lower general health and general life satisfaction" after gender transition services and that "Sex-reassigned persons … had an increased risk for suicide attempts … and psychiatric inpatient care" with "the rate of suicide among post-operative transgender adults was nearly twenty times greater than that of the general population.")).

Taken together, the evidence indicates that "gender transition" services do not relieve the patient's mental health concerns, as advocates claim.

**E.    Children are Unable to Give Informed Consent to "Gender Transition" Procedures.**

As if the inherent harms and lack of benefits from the procedures themselves were not enough to justify the EOs, children with gender incongruence are not even capable of giving informed consent to such interventions. *See Skrmetti*, 145 S.Ct. at 1845-46 (Thomas, J., concurring).

1.  This is obvious when considering the known medical evidence on the development of the juvenile brain. As ACPeds has elsewhere noted, "[t]he immaturity of the adolescent brain has been well described for the past 20 years, and newer research demonstrates how the immaturity affects decision-making. Studies confirm that adolescents, when faced with real life decisions, are much more likely to depend upon their emotions and peer pressure, with less use of their cognitive reasoning skills and with less concern for future consequences. The rise of rapid-onset gender dysphoria in adolescent girls who are high users of social

media is evidence of this."[57]  Indeed, the adolescent brain does not achieve the capacity for full risk assessment until the early to mid-twenties, more than justifying the EO's 19-year-old limit.[58]

2. There is, moreover, a serious ethical problem with allowing minors to receive life-altering medical interventions when they are incapable of providing informed consent for themselves.[59]  Indeed, because doctors do not know the long-term effects of the drugs they prescribe or of the surgeries they perform for "gender transition" purposes, they cannot even provide the necessary information for a child or their parents to give informed consent.  As the Cass Review noted, "[t]he duty of information disclosure is complicated by many 'unknown unknowns' about the long-term impacts of puberty blockers and/or masculinising/feminising hormone during a dynamic developmental period when gender identity may not be settled."[60]  In

---

[57] ACPeds, *Mental Health*, *supra* note 3, at 13 (citing Douglas S. Diekema, *Adolescent brain development and medical decision-making*, 146 Pediatrics e20218F (2020)).

[58] ACPeds, *Gender Dysphoria*, *supra* note 4, at 13.

[59] *Id.* at 14.

[60] Cass Review, *supra* note 17, at 194, §16.18; *see also id*. at 195-96, §§16.25-16.31, 16.34. *See also* Doctors Protecting Children Decl., *supra* note 2, ¶2.

other words, no doctor can obtain genuine, meaningful informed consent from an adolescent to any medical intervention that would render the adolescent infertile for life.[61]

## III. The Executive Orders are Consistent With Sound Medical Practice.

The EOs take rational and necessary steps to protect gender confused children from a lifetime of severe consequences from unproven, harmful medical interventions that do not address the underlying mental health issues that precipitated a child's gender non-contentedness. The exponential danger these procedures pose is evident with the dramatic rise of "rapid onset gender dysphoria" seen today, particularly in teenage girls, and provides another reason to avoid a drugs-first approach for these minors pushed by Plaintiffs. Indeed, with the significant increase in claims of gender incongruity, as well as the social transition and "gender-affirming therapy" provided to young adolescents whose brains are not yet mature, there is less long-term data regarding how many individuals later regret their transition decisions.

---

[61] HHS Report, *supra* note 20, at 159; *WPATH Files*, *supra* note 39, at 4 (a Canadian endocrinologist stated: "*So … [m]ost of the kids are nowhere in any kind of a brain space to really talk about [fertility preservation] in a serious way.*").

Accordingly, addressing the underlying mental health issues rather than "affirming" an incongruent identity is the proper standard of care[62]—a standard jettisoned by WPATH.[63]  This is clear based on the lack of evidence to support the WPATH "standards of care" for these vulnerable youth.[64]  *Skrmetti*, 145 S.Ct. at 1847-49 (Thomas, J., concurring).

Consistent with the Cass Review's findings, "health authorities in a number of European countries have raised significant concerns regarding the potential harms associated with using puberty blockers and hormones to treat transgender minors." *Id.* at 1825.[65]  Accordingly,

---

[62] Doctors Protecting Children Decl., *supra* note 2, ¶¶7-9 (citing sources).

[63] As Justice Thomas noted, "WPATH's lodestar is ideology, not science." *Skrmetti*, 145 S.Ct. at 1848 (Thomas, J., concurring) (quoting *Eknes-Tucker v. Governor of Ala.*, 114 F.4th 1241, 1261 (11th Cir. 2024) (opinion of Lagoa, J.)).  For example, WPATH attempted to stop Johns Hopkins from publishing its findings from commissioned studies because the results did not support WPATH's predetermined conclusions.  Attach. to U.S. Dep't Health & Hum. Servs. Resp. to Mots. to Seal at 1, *Voe v. Mansfield*, No. 1:23-cv-00864-LCB-LPA (M.D.N.C. May 13, 2024), ECF No. 100-1.

[64] Cass Review, *supra* note 17, at Annex A, 1.2; *The Cass Review, Final Report, Overview of Key Findings,* The Cass Review, https://tinyurl.com/ysew5cbu (last visited July 25, 2025).

[65] Christina Buttons, *The Global Response to the Cass Review: June 2024 Update*, buttonslives (May 13, 2024), https://tinyurl.com/y67b8e8k.

the evidence-based EOs properly prohibit such procedures in the treatment of gender dysphoric children.  Such children simply need the opportunity to grow up and the EOs help ensure they get that chance.

## CONCLUSION

Sound medical ethics alone demands an end to the use of puberty blockers, cross-sex hormones, and sex reassignment surgeries in children and adolescents—consistent with EO 14187 and supported by EO 14168.

The judgment of the district court should be reversed.

August 1, 2025                    Respectfully submitted,

*/s/ Gene C. Schaerr*
Gene C. Schaerr
Edward H. Trent
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
Facsimile: (202) 776-0136
gschaerr@schaerr-jaffe.com

*Counsel for Amicus Curiae*
*American College of Pediatricians*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits set forth in Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 6,444 words.

This brief complies with the type-style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Office 2016 in 14-point Century Schoolbook font.

August 1, 2025                          */s/ Gene C. Schaerr*
                                        Gene C. Schaerr

                                        *Counsel for Amicus Curiae*
                                        *American College of Pediatricians*