No. 25-1279

## IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

PFLAG, INC., et al.,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the District of Maryland, No. 8:25-cv-00337, Hon. Brendan A. Hurson

### RESPONSE BRIEF FOR PLAINTIFFS-APPELLEES

Joshua A. Block
**American Civil Liberties Foundation**
125 Broad Street, Floor 18
New York, NY 10004
(212) 549-2500
jblock@aclu.org

Deborah A. Jeon
**American Civil Liberties Union Foundation of Maryland**
3600 Clipper Mill Road, Suite 200
Baltimore, MD 21211
Telephone: (410) 889-8555
jeon@aclu-md.org

Omar Gonzalez-Pagan
**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: (212) 809-8585
ogonzalez-pagan@lambdalegal.org

Catherine E. Stetson
**Hogan Lovells US LLP**
555 13th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5491
cate.stetson@hoganlovells.com

*Counsel for Plaintiffs-Appellees*
[Additional counsel listed on inside cover]

Jennifer C. Pizer
**Lambda Legal Defense**
   **and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: (212) 809-8585
Facsimile: (855) 535-2236
jpizer@lambdalegal.org

Karen L. Loewy
**Lambda Legal Defense**
   **and Education Fund, Inc.**
815 16th Street NW, Suite 4140
Washington, DC 20006
Telephone: (202) 804-6245
Facsimile: (855) 535-2236
kloewy@lambdalegal.org

Nora Huppert
**Lambda Legal Defense**
   **and Education Fund, Inc.**
3656 N. Halsted Street
Chicago, IL 60613
Telephone: (312) 605-3233
Facsimile: (855) 535-2236
nhuppert@lambdalegal.org

Jackson B. Skeen
**Hogan Lovells US LLP**
125 High Street
Suite 2010
Boston, MA 02110
Telephone: (617) 702-7747
Facsimile: (617) 371-1037
jackson.skeen@hoganlovells.com

Harper Seldin
Chase Strangio
Alexandra R. Johnson
**American Civil Liberties Union**
   **Foundation**
125 Broad Street, Floor 18
New York, NY 10004
Telephone: (212) 549-2500
Facsimile: (212) 549-2650
hseldin@aclu.org
cstrangio@aclu.org
a.johnson@aclu.org

Zoe M. Ginsberg
**American Civil Liberties Union**
   **Foundation of Maryland**
3600 Clipper Mill Road, Suite 200
Baltimore, MD 21211
Telephone: (410) 889-8555
Facsimile: (410) 366-7838
zginsberg@aclu-md.org

Danielle Desaulniers Stempel
Sam H. Zwingli
**Hogan Lovells US LLP**
555 13th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5491
Facsimile: (202) 637-5910
danielle.stempel@hoganlovells.com
sam.zwingli@hoganlovells.com

*Attorneys for Plaintiffs*

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................... 1

STATEMENT OF FACTS ........................................................ 4

    A.   Gender Dysphoria And Gender-Affirming Medical Care.............. 4

    B.   The Trump Administration Targets Transgender People And Gender-Affirming Medical Care. ...................................... 6

    C.   The Orders Restrict Access To Necessary Medical Care And Harm Public Health.......................................................... 8

    D.   The Orders Severely Harm Plaintiffs. ......................................10

    E.   Plaintiffs' Lawsuit And The Preliminary Injunction...................13

LEGAL STANDARD ..............................................................16

SUMMARY OF ARGUMENT .................................................17

ARGUMENT...........................................................................21

    I.   THE DISTRICT COURT CORRECTLY CONCLUDED THAT PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS. .........................................21

        A.   Plaintiffs' Claims Are Justiciable.................................22

        B.   Plaintiffs' Separation-of-Powers Claims and ACA and PHSA Claims Are Cognizable.............................23

        C.   The Orders Violate the Separation of Powers. ...............27

            1.   Nothing in the Constitution Authorizes the Orders................................................................28

            2.   No Statute Authorizes the Orders.........................31

            3.   The Saving Clauses Save Nothing. ......................35

**TABLE OF CONTENTS - Continued**

D.  The Orders Conflict with ACA Section 1557 and
    PHSA Section 1908. ....................................................38

E.  The Orders Violate the Equal Protection
    Guarantee. .................................................................43

    1.  Heightened Scrutiny Applies. .............................43

    2.  The Orders Fail Heightened Scrutiny. .................48

    3.  The Orders Are Infused with Animus and
        Cannot Survive Even Rational Basis. ...................52

II.  THE OTHER PRELIMINARY INJUNCTION
     FACTORS WEIGH IN PLAINTIFFS' FAVOR. .....................53

III.  THE INJUNCTION IS NOT OVERBROAD. .........................55

CONCLUSION ...........................................................................60

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    **Page(s)**

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935) ................................................................. 23

*In re Admin. Subpoena No. 25-1431-019*,
No. 1:25-MC-91324-MJJ, 2025 WL 2607784 (D. Mass. Sep. 9,
2025) ........................................................................................... 59

*In re Aiken Cnty.*,
725 F.3d 255 (D.C. Cir. 2013) ................................................. 30

*Air Evac EMS, Inc. v. McVey*,
37 F.4th 89 (4th Cir. 2022) ....................................................... 53

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015) ................................................................. 23

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) ................................................... 30

*Bond v. United States*,
564 U.S. 211 (2011) ............................................................ 23, 24

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020) ............................................................ 38, 40

*C.P. by & through Pritchard v. Blue Cross Blue Shield of Ill.*,
No. 3:20-CV-06145-RJB, 2022 WL 17788148 (W.D. Wash. Dec.
19, 2022) ..................................................................................... 39

*City & Cnty. of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ............................................. 29, 35

*Clinton v. City of New York*,
524 U.S. 417 (1998) (Kennedy, J., concurring) .................... 28, 29

*Dalton v. Specter*,
511 U.S. 462 (1994) ................................................................. 25

## <u>TABLE OF AUTHORITIES - Continued</u>

*Dekker v. Weida*,
  679 F. Supp. 3d 1271 (N.D. Fla. 2023)..................................................... 49

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) ............................................................................... 31

*Diamond Alternative Energy, LLC v. EPA*,
  145 S. Ct. 2121, 2142 (2025) ........................................................... 22, 59

*Doe by Doe v. South Carolina*,
  No. 25-1787, 2025 WL 2375386 (4th Cir. Aug. 15, 2025) (Diaz,
  C.J., concurring), *stay denied*, No. 25A234, 2025 WL 2610400
  (U.S. Sep. 10, 2025) ....................................................................40, 44, 48

*E.E.O.C. v. R.G. & G.R. Harris Funeral Homes, Inc.*,
  884 F.3d 560 (6th Cir. 2018), *aff'd sub nom. Bostock*, 590 U.S. 644.............. 44

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ......................................................................... 24, 31

*Freytag v. Comm'r*,
  501 U.S. 868 (1991) ............................................................................... 23

*Geduldig v. Aiello*,
  417 U.S. 484 (1974) ......................................................................... 40, 42

*General Electric Co. v. Gilbert*,
  429 U.S. 125 (1976) ............................................................................... 40

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020)........................................................38, 44, 48

*Hammons v. Univ. of Md. Med. Sys. Corp.*,
  649 F. Supp. 3d 104 (D. Md. 2023), *appeal dismissed*, 2025 WL
  1743504 (4th Cir. June 24, 2025) ................................................38, 39, 42

*HIAS v. Trump*,
  985 F.3d 309 (4th Cir. 2021)................................................ 24, 25, 35, 38

## <u>TABLE OF AUTHORITIES - Continued</u>

*HSBC Bank USA v. F & M Bank N. Va.*,
 246 F.3d 335 (4th Cir. 2001) .................................................................. 17

*INS v. Chadha*,
 462 U.S. 919 (1983) ............................................................................... 23

*Kadel v. Folwell*,
 100 F.4th 122 (4th Cir. 2024) (en banc), *cert. granted, vacated,
 and remanded*, 145 S. Ct. 2838 (2025) ...................................................... 39

*L.B. v. Premera Blue Cross*,
 No. C23-0953-TSZ, 2025 WL 2326966 (W.D. Wash. Aug. 12,
 2025) ..................................................................................................... 40

*Lange v. Houston Cnty.*,
 No. 22-13626, 2025 WL 2602633 (11th Cir. Sep. 9, 2025) (en
 banc) (Rosenbaum, J., concurring in judgment) .................................... 40, 41

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
 2 F.4th 330 (4th Cir. 2021) (en banc) ................................................... 16, 54

*Leedom v. Kyne*,
 358 U.S. 184 (1958) ............................................................................... 27

*Legend Night Club v. Miller*,
 637 F.3d 291 (4th Cir. 2011) .................................................................. 54

*Lorillard v. Pons*,
 434 U.S. 575 (1978) ............................................................................... 42

*Marbury v. Madison*,
 1 Cranch 137 (1803) .............................................................................. 24

*Mayor of Baltimore v. Azar*,
 973 F.3d 258 (4th Cir. 2020) .................................................................. 33

*Miller v. Brown*,
 462 F.3d 312 (4th Cir. 2006) .................................................................. 23

v

**<u>TABLE OF AUTHORITIES - Continued</u>**

*Muro v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*,
  No. 2:19-cv-10812, 2019 WL 5810308 (E.D. La. Nov. 7, 2019) .................. 41

*Myers v. United States*,
  272 U.S. 52 (1926) ..................................................................... 30

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
  769 F. Supp. 3d 465 (D. Md. 2025)............................................... 37

*National Association of Diversity Officers in Higher Education v. Trump*,
  No. 25-1189 (4th Cir. Mar. 14, 2025)........................................... 37

*New Jersey v. Trump*,
  No. 1:25-cv-10139-LTS (D. Mass. July 25, 2025), ECF No. 203 ............ 56, 57

*New York v. Trump*,
  133 F.4th 51 (1st Cir. 2025)....................................................... 36

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*,
  462 U.S. 669 (1983) ................................................................ 40

*NFIB v. Sebelius*,
  567 U.S. 519 (2012) ................................................................ 28

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................ 54

*NLRB v. Noel Canning*,
  573 U.S. 513 (2014) ................................................................ 24

*Nuclear Regulatory Comm'n v. Texas*,
  605 U.S. 665 (2025) ................................................................ 26

*Off. of Pers. Mgmt. v. Richmond*,
  496 U.S. 414 (1990) ................................................................ 28

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin*,
  418 U.S. 264 (1974) ................................................................ 32

## **TABLE OF AUTHORITIES - Continued**

*Orr v. Trump*,
      778 F. Supp. 3d 394 (D. Mass. 2025)....................................... 45, 46, 47, 52

*Panama Ref. Co. v. Ryan*,
      293 U.S. 388 (1935) ......................................................................... 23, 24

*Pennhurst State Sch. & Hosp. v. Halderman*,
      451 U.S. 1 (1981)...................................................................................... 33

*Planned Parenthood S. Atl. v. Baker*,
      941 F.3d 687 (4th Cir. 2019)................................................................... 53

*Romer v. Evans*,
      517 U.S. 620 (1996) ................................................................................ 52

*S.F. A.I.D.S. Found. v. Trump*,
      No. 25-CV-01824-JST, 2025 WL 1621636 (N.D. Cal. June 9,
      2025)............................................................................................... 35, 45

*Sierra Club v. Trump*,
      929 F.3d 670 (9th Cir. 2019), *remanded on other grounds sub*
      *nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021) .............................24, 31, 34

*Stanford v. Fox Coll.*,
      No. 1:18-cv-3703, 2020 WL 814865 (N.D. Ill. Feb. 19, 2020)...................... 41

*Susman Godfrey LLP v. Exec. Off. of the Pres.*,
      No. 1:25-cv-1107-LLA, 2025 WL 1779830 (D.D.C. 2025).................... 25, 27

*Talbott v. United States*,
      775 F. Supp. 3d 283 (D.D.C. 2025)................................................... 47, 52

*Texas v. United States*,
      798 F.3d 1108 (D.C. Cir. 2015)............................................................... 39

*Train v. City of New York*,
      420 U.S. 35 (1975)........................................................................... 30, 33

*Trump v. American Federation of Government Employees*,
      145 S.Ct. 2635 (2025)............................................................................. 36

## <u>TABLE OF AUTHORITIES - Continued</u>

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ................................................................. 3, 55, 56, 58

*Trump v. United States*,
  603 U.S. 593 (2024) .................................................................... 27

*U.S. Dep't of Navy v. FLRA*,
  665 F.3d 1339 (D.C. Cir. 2012)...................................................... 28, 29

*United States v. Skrmetti*,
  145 S. Ct. 1816 (2025).........................................................*passim*

*United States v. Virginia*,
  518 U.S. 515 (1996) ..................................................................... 48

*United States v. Windsor*,
  570 U.S. 744 (2013) ..................................................................... 52

*Walsh v. Vinoskey*,
  19 F.4th 672 (4th Cir. 2021) ......................................................... 16

*Washington v. Trump*,
  145 F.4th 1013 (9th Cir. 2025)....................................................... 56

*Washington v. Trump*,
  768 F. Supp. 3d 1239 (W.D. Wash. 2025) .................................... 13

*Washington v. Trump*,
  No. 25-1922, Dkt. 26 (9th Cir.) .................................................... 13

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ..................................................................... 33

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ........................................................ 23, 25, 27, 30

## Constitution

Article I, § 7, cl.2...................................................................... 28

**<u>TABLE OF AUTHORITIES - Continued</u>**

Article II, §§ 1, 3 ........................................................................ 30

**Statutes**

5 U.S.C. § 7301 .............................................................. 18, 31, 32

42 U.S.C. § 241 .................................................................. 18, 32

42 U.S.C. § 18114 ...................................................................... 33

Affordable Care Act, 42 U.S.C. § 18116 .................................*passim*

Public Health Service Act, 42 U.S.C. § 300w-7 .....................*passim*

**Regulatory Materials**

*Establishment of Titles and Chapters,* 45 Fed. Reg. 30802, 30959, 30962-63 (May 9, 1980).......................................................... 41

Exec. Order No. 12,564, *Drug-Free Federal Workplace*, 51 Fed. Reg. 32889 (Sep. 15, 1986)................................................................ 32

Exec. Order No. 12,674, *Principles of Ethical Conduct for Government Officers and Employees*, 54 Fed. Reg. 15159 (Apr. 12, 1989).............................................................................................. 32

Exec. Order No. 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) .................................... 1, 35

Exec. Order No. 14,183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025) ........................................ 6, 47

Exec. Order No. 14,187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Jan. 28, 2025) ................................ 1

Exec. Order No. 14,190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025)................................... 6, 7, 47

*Nondiscrimination in Health Programs and Activities,* 81 Fed. Reg. 31375, 31467 (May 18, 2016)................................................................ 42

## <u>TABLE OF AUTHORITIES - Continued</u>

*Nondiscrimination in Health Programs and Activities*, 85 Fed. Reg. 37160, 37179-80 (June 19, 2020) ............................................................ 42

*Nondiscrimination in Health Programs and Activities,* 89 Fed. Reg. 37522, 37699 (May 6, 2024)....................................................................... 42

*Nondiscrimination on the Basis of Sex,* 40 Fed. Reg. 24128 (June 4, 1975)..................................................................................................... 41

### Other Authorities

Gordon Guyatt et al., McMaster University, *Systematic Reviews Related to Gender-Affirming Care* (Aug. 14, 2025), http://bit.ly/41UJR4S ................................................................................ 51

# INTRODUCTION

At the beginning of this year, hospitals across the country abruptly halted medical care for transgender people under nineteen, canceling appointments and turning away patients who in some instances had waited years to receive medically necessary care—care that is well-established and supported by every major U.S. medical organization. This sudden shutdown was the result of a pair of Executive Orders directing federal agencies to immediately ensure that institutions receiving any federal funds ended all gender-affirming medical care for people under nineteen, even if that care was unrelated to federal grants. The two Orders rest on the blatantly discriminatory rationale that being transgender and living in accordance with one's gender identity is a "false claim" that is "destructive," akin to "mutilation," an "attack [on] women," "a stain on our Nation's history," and has "a corrosive impact" on "the entire American system."[1]

Faced with the sudden loss of healthcare, Plaintiffs sought, and the District Court granted, a preliminary injunction to preserve the status quo by preventing Defendants from conditioning, withholding, or terminating federal funding under the challenged provisions of the Orders. As the court explained, Plaintiffs raise

---

[1] Exec. Order No. 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) ("Gender-Identity Order"); *see* Exec. Order No. 14,187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Jan. 28, 2025) ("Denial-of-Care Order").

justiciable, cognizable, meritorious claims asserting that the challenged provisions of the Orders contravene the separation of powers, statutory prohibitions barring discrimination based on sex, and the Constitution's equal protection guarantee.

The Court also found the remaining preliminary injunction factors satisfied: The "discontinuation of what has been deemed by medical professionals to be essential care" could prove "catastrophic," JA938, and there is no public benefit from enforcing the unconstitutional and illegal Orders. And because of the Orders' immediate, sweeping, coercive effect, only a nationwide injunction could protect Plaintiffs' access to gender-affirming medical care.

On appeal, Defendants ask this Court to entertain a singular fiction. In Defendants' view, the Orders do not *do* anything; they merely instruct agencies to maybe consider doing something someday. *E.g.*, Gov't Br. 1. As the District Court concluded, that assertion is divorced from reality, including the Orders' text and their actual effects on the ground. After reviewing more than 600 pages of evidence, JA192-689, JA800-921, the court found that Plaintiffs had produced "unassailable documentation" that the Orders in fact "immediately" had their "intended effect" of causing institutions nationwide to cut off gender-affirming medical care, JA924, JA935.

With that fact-finding established, Defendants' arguments largely fall away. All that remains are their objections to Plaintiffs' discrimination claims based on

*United States v. Skrmetti*, 145 S. Ct. 1816 (2025), and their challenge to the injunction's scope, based on *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). As to the first, this Court's binding precedents hold that *statutory* discrimination based on transgender status *is* sex-based discrimination, and that constitutional discrimination against transgender people is subject to heightened scrutiny. *Skrmetti* does not alter any of that, as this Court recently reaffirmed. As to the second, *CASA* affirmed that district courts have the inherent power to craft an injunction providing complete relief to the parties, even if that injunction incidentally advantages non-parties. As the District Court rightly recognized, the unique facts of this case present just such a situation: Because the Orders immediately (and intentionally) coerced institutions to stop providing gender-affirming medical care to individuals under nineteen, an injunction was needed to counteract the Orders' unconstitutional and illegal threats with sufficient clarity and ensure Plaintiffs could continue accessing this essential care. Given the nature of healthcare at issue and the threat posed by the Orders, an injunction tailored to just the named Plaintiffs and their members or their current providers could not accomplish that goal.

The District Court correctly and thoroughly rejected Defendants' arguments. This Court should affirm.

## STATEMENT OF FACTS

### A.    Gender Dysphoria And Gender-Affirming Medical Care

Gender identity is "a person's internal, innate sense of belonging to a particular sex."  JA586.  It has a strong biological basis and cannot be voluntarily changed.  JA524, JA587-589.  Most people's gender identity aligns with their sex assigned at birth, typically designated based on external genitalia.  JA525.  For transgender people—less than one percent of the population—it does not.  JA525, JA586-587.

Many transgender people experience gender dysphoria, a serious medical condition characterized by clinically significant distress resulting from the incongruence between a person's gender identity and assigned sex.  JA525-526, JA589-590.  Gender dysphoria has long been recognized by medical professionals and is codified in the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision* (DSM-5-TR).  JA526, JA589-590.  Untreated gender dysphoria can have serious consequences for a transgender person's health and well-being, including increased risk of depression, anxiety, and suicidality.  JA528, JA591.

Gender-affirming medical care is a medically accepted, evidence-based treatment protocol for individuals experiencing gender dysphoria.  JA592-593, JA528-538.  Gender-affirming medical care is based on a large body of scientific

and medical literature and supported by every major medical organization in the United States, including the American Academy of Pediatrics, the American Medical Association, and the American Psychiatric Association. JA466-473, JA530, JA536-538, JA648-653. Providers treating individuals with gender dysphoria follow evidence-based and widely accepted clinical practice guidelines to assess, diagnose, and treat their patients. JA528-530, JA591-594; *see* JA466-473.

Gender-affirming medical care can include puberty-delaying medication, hormone therapy, and surgery. JA592, JA530-532. Puberty-delaying medication can temporarily delay the development of secondary sex characteristics dissonant with one's gender identity, which can heighten gender dysphoria. JA531-532, JA596-97. Gender-affirming hormone therapy allows patients to develop physical characteristics aligned with their gender identity. JA599-601, JA532. Some older transgender male adolescents and young adults also undergo masculinizing chest surgery. JA532, JA541-542.

These same treatments are used for other conditions in adolescents and adults. JA598-599, JA604-605. For example, doctors prescribe puberty-delaying medication for central precocious puberty, hormone-sensitive cancers, and endometriosis; hormone therapy for delayed puberty; hormone-suppressing medication for Polycystic Ovarian Syndrome; and masculinizing chest surgery for gynecomastia. JA598, JA604-605, JA541, JA882.

The risks associated with these interventions when used to treat gender dysphoria are comparable to the risks associated with many other medical treatments to which parents routinely consent on behalf of their children, and for which otherwise competent adults can consent on their own. JA477. Gender-affirming medical care also includes an "additional safeguard": a rigorous separate assessment by a mental health professional. JA538.

**B.    The Trump Administration Targets Transgender People And Gender-Affirming Medical Care.**

Immediately following his inauguration, President Trump implemented a systematic plan to eradicate what his Administration terms "gender ideology," meaning any attempt by transgender people to live in accordance with their gender identity or for others to recognize that identity. In a series of executive orders, President Trump directed his Administration to deny transgender people's existence throughout society, including the workplace, schools, restrooms, the military, prisons, research, and the arts. *See*, *e.g.*, Gender-Identity Order §§ 3-5; Exec. Order No. 14,190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025); Exec. Order No. 14,183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025).

This case concerns provisions in two of these executive orders that threaten to withhold congressionally appropriated funds from any medical institution providing gender-affirming medical care to people under nineteen.

First is Section 3(g) of the "Gender-Identity Order," which President Trump issued on his first day in office. The Gender-Identity Order takes aim at what it calls "the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." Gender-Identity Order § 2(f). The Order asserts that "gender ideology" has "a corrosive impact" on "the entire American system." *Id.* § 1. As relevant here, Section 3(g) declares that "[f]ederal funds shall not be used to promote gender ideology" and directs that "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* § 3(g).

The Denial-of-Care Order, issued a week later, implements the Gender-Identity Order by seeking to end access to gender-affirming medical care for transgender adolescents and young adults under nineteen. Section 4 describes gender-affirming medical care as "chemical and surgical mutilation" and directs all federal agencies that "provide[] research or education grants to medical institutions, including medical schools and hospitals," to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end" their provision of gender-affirming medical care for patients under nineteen. Denial-of-

7

Care Order § 4.   The Denial-of-Care Order does not prohibit federal funding to entities providing the same treatments for other conditions.  *Id.* §§ 2(c), 4.   And Section 4 is not limited to grants used for or related to gender-affirming medical care; it directs that *all* federal medical and research grants be terminated if the institution provides *any* gender-affirming medical care to people under nineteen. Section 4 thus attempts to coerce medical institutions to "end" gender-affirming medical care by threatening to withhold unrelated funding if the institutions do not accede to the President's demand.

C.     **The Orders Restrict Access To Necessary Medical Care And Harm Public Health.**

Federal agencies, state and local governments, and regulated entities alike understood the Orders as they were intended:  As the President's press secretary put it, the Orders "cut off the funding for any hospital or any medical facility" providing gender-affirming medical care for patients under nineteen.[2]  The Attorney General of Virginia echoed that interpretation in a letter advising that any hospital that continued to provide gender-affirming medical care would risk all its federal funding:  "[T]he grants are not just limited to those related to this subject matter but could apply to *all* medical and research grants from federal agencies."  JA225.

---

[2]    *White House Press Briefing*, YouTube (July 17, 2025), https://www.youtube.com/watch?v=vbmXja7RkTI.

Federal agencies likewise understood their marching orders. Mere days after the Orders, and without "wait[ing] for further clarification of implementation guidance" or for "specific grant programs to be identified," the Health Resources and Services Administration (HRSA) and the Centers for Disease Control and Prevention (CDC) issued blanket termination notices based on the Orders. JA936-937. The HRSA notices declared that grant funds may not be used for activities that "do not align with" the Orders and any "piece of any programs in conflict with these E.O.s are terminated in whole or in part." JA199-200. The CDC notices similarly directed grant recipients to "immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting or inculcating gender ideology at every level." JA202.

"[A]s a result of the challenged portions of the Executive Orders," medical institutions receiving federal funding "stopped providing gender-affirming medical care for patients younger than nineteen." JA927; *see, e.g.*, JA928-930 & nn.13-15, JA946-947. For example, Denver Health, NYU Langone, Children's Wisconsin, and University of Illinois Health canceled gender-affirming medical care appointments. JA379, JA324, JA392-393, JA384-385. Hospitals that cut off care "unambiguously cite[d] the Executive Orders as the reason." JA948 n.28.

The near-instantaneous hospital shutdowns were the designed outcome. The President touted the shutdowns as proof that the Orders were "having [their]

intended effect." JA256-257. As the President's press secretary announced, the "overwhelming response [from] … medical institutions [who have] followed through with the President's executive orders," *supra* n.2, proved the President had "delivered" on his "repeated[] pledg[e] to end" gender-affirming medical care.[3]

### D. The Orders Severely Harm Plaintiffs.

The Orders had direct, immediate, and severe effects on the provision of gender-affirming medical care to transgender young adults and adolescents.

**The Individual Plaintiffs.** As a result of the Orders, the Individual Plaintiffs, including several parents who pursued gender-affirming medical care for their adolescent children with great care and appropriate medical guidance, have found themselves unable to help their anguished children: Bruce Boe, whose daughter Bella had her treatment canceled at NYU Langone; Claire Coe, whose child Cameron can no longer receive their puberty-blocking medication from NYU Langone; George Goe and his 14-year-old son Gabe, who was told on January 30, 2025, that Children's National would not be issuing new testosterone prescriptions to treat gender dysphoria; and Rachel Roe and her 16-year-old son Robert, whose

---

[3] White House, *President Trump Promised to End Child Sexual Mutilation—and He Delivered* (July 25, 2025), https://www.whitehouse.gov/articles/2025/07/president-trump-promised-to-end-child-sexual-mutilation-and-he-delivered.

routine check-up appointment scheduled on January 29, 2025 was abruptly canceled. JA275, JA289, JA324, JA305.

In addition, on January 29, 2025, Lawrence Loe, an eighteen-year-old transgender man, had his chest masculinization surgery, scheduled for February 2025, abruptly canceled. JA340. And Dylan Doe, another eighteen-year-old transgender man, had his January 31, 2025 routine appointment for long-acting testosterone canceled because of the Orders. JA350-351.

**PFLAG and Its Members.** In addition to the Individual Plaintiffs, who are all PFLAG members, children of many other PFLAG members are being monitored for the appropriate time to begin puberty blockers and/or hormone therapy as part of a medically prescribed course of care for gender dysphoria. JA367-368. After the Orders, PFLAG heard from members across the country that their or their children's appointments for gender-affirming medical care were canceled, putting them at risk of serious mental and physical harm—the very reasons families seek this lifesaving care in the first place. *Id.*

One PFLAG member, for example, fled Tennessee with her transgender daughter after the state banned gender-affirming medical care for transgender minors, then struggled to find a doctor in Virginia who could continue her daughter's treatment. JA426-428. Hours before their long-awaited appointment at Children's Hospital of Richmond on January 29, 2025, a staff member told them that, due to

the Orders, the hospital would not be able to provide the necessary medical treatment.  JA427-428.

Similar stories from other PFLAG members abound.  *See*, *e.g.*, JA396, JA401-402, JA407-408.  These families, who initiated this medically necessary care after a careful and deliberative process with their healthcare providers, do not know whether they will be able to find providers to resume this care in time to prevent significant and potentially permanent harm to their adolescent children from untreated gender dysphoria.

**GLMA and Its Members.**  Plaintiff GLMA's members and their patients also immediately suffered harm because of the Orders.  JA359-360.  Many GLMA members are employed by medical institutions that receive federal grants, including some medical-provider members that provide gender-affirming medical care to patients under nineteen.  JA356-357; *see*, *e.g.*, JA411-512, JA418-419, JA445-446, JA450-451.

Because the Orders mandate that all federal medical and research grants be stripped from a medical institution if it continues providing gender-affirming medical care, the Orders force physicians, including these GLMA members, to make an impossible choice between denying care to a vulnerable minority community or being unable to provide care to anyone at all.  JA420-421, JA447-448, JA452-453.  GLMA members at institutions that have suspended care have received calls from

their patients who are experiencing significant distress and even suicidality. JA361. And at institutions that still provide care, the widespread fear has led many patients to express feelings of extreme distress and at times suicidality because they fear losing care. *Id.*

### E.    Plaintiffs' Lawsuit And The Preliminary Injunction

Plaintiffs' Amended Complaint asserts that Section 3(g) of the Gender-Identity Order[4] and Section 4 of the Denial-of-Care Order violate the Constitution and contravene multiple federal statutes.[5] Plaintiffs moved for a temporary restraining order and then a preliminary injunction, both of which the District Court granted. JA88-142, JA922-987.

The District Court easily concluded that Plaintiffs had standing, and their challenge was ripe. JA933-939, JA944-945. The court rejected Defendants' argument that it was "unknown" how agencies might respond to the Orders or what funding might be "at stake." JA935. The undisputed record evidence showed that

---

[4] Section 3(g) of the Gender-Identity Order is challenged only to the extent that it is construed consistent with the Denial-of-Care Order to require that entities receiving federal funding "end" the provision of gender-affirming medical care to people under nineteen.

[5] A group of States likewise challenged these Orders; that court also granted a preliminary injunction. *Washington v. Trump*, 768 F. Supp. 3d 1239, 1282 (W.D. Wash. 2025). The government's appeal in that case will be fully briefed on October 3, 2025. *Washington v. Trump*, No. 25-1922, Dkt. 26 (9th Cir.).

"hospitals across the country immediately paused or cancelled gender-affirming care for youth in direct response to the Executive Orders" and agencies had already taken steps to "order[] grant recipients to cease all gender-affirming care." JA935, JA937. The court also found that "in the absence of judicial review," Plaintiffs would continue experiencing "hardship" from the "potentially catastrophic" "discontinuation" of this care. JA938-939.

On the merits, the District Court held that Plaintiffs are likely to succeed on all three of their claims for which they sought injunctive relief. *First*, the Orders likely violate the separation of powers. Defendants conceded the Orders instructed agencies to "place conditions on certain federal grant funding." JA951 (citation omitted). But neither the Constitution nor any statute authorizes the President or federal agencies to "condition the *entirety* of their federal funding on the denial of gender-affirming care for those under the age of nineteen." JA954. That "improper attempt to wield Congress's exclusive spending power," JA951 (quotation marks and alterations omitted), and to supersede "Article I's framework for passing legislation," JA963, violated "the separation of powers," JA959.

*Second*, the District Court concluded the Orders likely run afoul of anti-discrimination provisions in Section 1557 of the Affordable Care Act (ACA), 42 U.S.C. § 18116, and Section 1908 of the Public Health Service Act (PHSA), 42 U.S.C. § 300w-7. Defendants contended the Orders discriminated not based on sex

14

or transgender status but rather on "medical purpose." JA966-967 (citation omitted). The District Court disagreed, finding the Orders were "textbook sex discrimination" that "facially differentiate[d] on the basis of transgender identity." JA968-969.

*Third*, the District Court held that Plaintiffs are likely to succeed on their equal-protection claim. The Orders "facially classify on the basis of transgender status" and "fail to establish a reasonable fit between the immediate cessation of gender-affirming care for those under nineteen" and Defendants' asserted interest in "protecting children." JA973-978.

The District Court held that Plaintiffs satisfied the remaining preliminary-injunction factors: Plaintiffs were denied medical care because of the Orders, "each day that passes exacerbates Plaintiffs' injuries," and preliminary relief was necessary to alleviate this harm. JA979-980. The public interest in protecting constitutional rights and the possibility that "entire communities" could lose access to medical care if hospitals lost all their funding because of the Orders also favored granting relief. JA981.

Finally, the court concluded Plaintiffs were entitled to "complete relief," which only a nationwide injunction could provide. JA983-985. The court explained that a "piecemeal approach" would cause "[s]ignificant confusion" for medical institutions and would not fully alleviate the threats to their federal funding. JA984-985. "[A] narrower injunction" thus could not fully halt "the continued coercive

effect of" the challenged portions of the Orders—and the risk that medical institutions would "stop providing gender-affirming medical care" because of the Orders. *Id.*

The District Court thus preliminarily enjoined the Defendants "from conditioning, withholding, or terminating federal funding under" Section 3(g) of the Gender-Identity Order or Section 4 of the Denial-of-Care Order "based on the fact that a healthcare entity or health professional provides gender-affirming medical care to a patient under the age of nineteen." JA988-989. The District Court denied Defendants' request for a stay pending appeal; Defendants did not seek a stay from this Court.[6]

## LEGAL STANDARD

This Court reviews the grant of a preliminary injunction "for abuse of discretion, reviewing factual findings for clear error and legal conclusions de novo." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021) (en banc). "Clear error" is a "very deferential standard of review." *Walsh v. Vinoskey*, 19 F.4th 672, 677 (4th Cir. 2021). Factual findings are clearly erroneous only when "the reviewing court on the entire evidence is left with the definite and

---

[6] On July 28—over four months after noticing their appeal—Defendants again moved the District Court to stay the preliminary injunction pending appeal. Dist. Dkt. 151, 156. That motion remains pending.

firm conviction that a mistake has been committed." *HSBC Bank USA v. F & M Bank N. Va.*, 246 F.3d 335, 338 (4th Cir. 2001).

## SUMMARY OF ARGUMENT

**I.** Plaintiffs are likely to succeed on their claims. Defendants' entire opening brief rests on a central fallacy: that the Orders do not do anything, but instead merely direct agencies to take some later action. The record belies that contention, as the District Court found.

**A.** Plaintiffs have standing. The record shows the Orders immediately injured Plaintiffs by interrupting their gender-affirming medical care, and that hospitals immediately resumed care following the preliminary injunction. Plaintiffs' suit, which alleges purely legal constitutional and statutory violations, is also ripe.

**B.** Plaintiffs' separation-of-powers and PHSA/ACA claims are cognizable. When the President's actions lack a constitutional or statutory basis, plaintiffs may bring suit to vindicate the constitutional separation of powers. That is what Plaintiffs allege here: The President lacked constitutional or statutory authority to issue the Orders, and the Orders in fact conflict with certain prohibitions in the ACA and PHSA. Defendants' argument that Plaintiffs must wait and challenge future agency action contradicts both basic separation-of-powers principles and the District Court's factual findings that the Orders had an immediate *in terrorem* effect even without further agency action.

17

**C.** Neither the Constitution nor an act of Congress authorizes the Orders. As Defendants acknowledge, the Orders amount to a new condition on grant funding. But the Constitution vests Congress with the exclusive power of the purse, and any modification of congressionally approved expenditures must go through Bicameralism and Presentment. The Take Care and Executive Vesting Clauses, which merely grant the President general administrative control over his subordinates, cannot fill this gap.

Nor can the President point to specific congressional authorization for the Orders. A vague reference to the "laws of the United States" is not sufficient; the President must actually identify the source of his authority to permit judicial review. He cannot. 5 U.S.C. § 7301 merely authorizes the President to prescribe regulations governing the federal workplace. And 42 U.S.C. § 241 at most permits certain agencies to exercise discretion over which grants to fund; it does not empower the Executive to demand that organizations stop providing gender-affirming medical care or lose unrelated federal funding.

Boilerplate saving clauses stating the Orders are to be implemented as permitted by law cannot override the Orders' plain text. No law permits the Orders; implementation of the Orders "as permitted by law" is therefore an empty set.

**D.** The Orders violate ACA Section 1557 and PHSA Section 1908. Under this Court's precedents, discrimination under Title IX based on transgender status is

sex-based discrimination. That reasoning applies to Section 1557—which prohibits discrimination on grounds prohibited by Title IX—and to Section 1908, which is nearly identical to Section 1557. The Orders facially discriminate in violation of those prohibitions; they purport to withhold federal grants from healthcare entities that provide gender-affirming medical care, without restricting the same treatments for other patients. *Skrmetti*, which addressed discrimination only under the Equal Protection Clause, does not hold otherwise.

**E.** The Orders violate the Equal Protection guarantee by discriminating against transgender Plaintiffs based on sex and transgender status. But even if the Orders were facially neutral, heightened scrutiny would still apply because the Orders rest on demonstrable animus toward transgender people. Under this Court's precedents, that discrimination is subject to heightened scrutiny; *Skrmetti* did not alter that teaching. And these Orders cannot survive heightened scrutiny. Defendants presented no evidence supporting the Orders' purported rationale of protecting children. On the contrary, the District Court's factual findings show that gender-affirming medical care is a widely accepted, evidence-backed treatment protocol that helps reduce health risks to children and young adults. The fact that the Orders do not prohibit these same treatment protocols for other conditions further confirms the Orders are motivated by anti-transgender animus.

Even if rational-basis review applied, the Orders fail that standard, too. Prejudice toward transgender people and a desire to harm them are not legitimate interests.

**II.**  The District Court correctly held the other preliminary-injunction factors favor Plaintiffs.  The undisputed record evidence shows Plaintiffs were subjected to, and remain threatened by, irreparable harm—including the risk of losing access to lifesaving gender-affirming medical care.   The balance of equities and public interest, which merge where the government is the defendant, likewise favor Plaintiffs.  By conditioning all federal funding on whether an institution provides any gender-affirming medical care, the Orders disrupt many other critical treatments, research, and programs.

**III.**  The District Court did not abuse its discretion in crafting the injunction to provide Plaintiffs with complete relief.   Nationwide injunctions remain appropriate when necessary to provide complete relief to and fully protect the parties—particularly where, as here, Plaintiffs have a strong likelihood of success on the merits.   As the District Court found, because of the Orders' immediate coercive effect, the injunction needed to provide sufficient clarity and certainty to reassure Plaintiffs' medical providers that they could continue providing gender-affirming medical care without risking all of their federal funding.  A piecemeal approach limiting the injunction to only certain Plaintiffs would not suffice, as it

would leave institutions unsure about the status of their funding. And not only would limiting the injunction to certain hospitals make it practically impossible for Plaintiffs to quickly relocate if their providers did cut off care, it would also give the Administration a ready-made list of targets for future enforcement efforts. An injunction extending beyond the named Plaintiffs and their members is appropriate.

## ARGUMENT

## I.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS.

Defendants' entire opening brief is premised on one argument. In their estimation, the challenged provisions of the Orders do not *do* anything; they merely direct "agencies to determine how to carry out the Executive Orders." Gov't Br. 31-33. According to Defendants, "[w]hether viewed as a ripeness issue" or a merits issue, their reading of the Orders renders Plaintiffs' challenge to the Orders "premature," because it depends on "contingent future events," *id.* at 31, 37, and defeats Plaintiffs' challenges because Plaintiffs cannot show that "there is no" permissible action "any agency could possibly take pursuant to the" Orders, *id.* at 1-2, 13, 17-19, 25-26, 31, 34.

Defendants' assertion "is blatantly contradicted by the record." JA939; *see* JA936-938. Their argument on appeal should be considered with the District Court's unchallenged factfinding in front of mind: The Orders prompted the

immediate shutdown of medical care across the country, and President Trump celebrated those immediate shutdowns as proof that the Orders were having their intended effect.

### A.    Plaintiffs' Claims Are Justiciable.

The District Court properly found—and Defendants do not dispute—that Plaintiffs have standing.  JA944, JA110-114.  The Orders immediately disrupted medical care by threatening to halt all medical and research grants to institutions that did not capitulate.  JA935-938.  Indeed, the Administration's own statements demonstrate that President Trump "intended" to shut down hospitals providing gender-affirming medical care.  JA935 (citation omitted).  As the Supreme Court recently reaffirmed in *Diamond Alternative Energy, LLC v. EPA*, "[t]he government generally may not target a business or industry through stringent and allegedly unlawful regulation [of a third party], and then evade the resulting lawsuits by claiming that the targets of its regulation should be locked out of court as unaffected bystanders."  145 S. Ct. 2121, 2142 (2025).  That is especially true because "the regulated party"—here, the hospitals—may not always be "willing to publicly oppose (and possibly antagonize) the government regulator by supporting the plaintiff's suit" or suing in their own name.  *Id.* at 2139.  Indeed, after the District Court issued a temporary restraining order, multiple hospitals immediately resumed care.  JA194-197.

22

Plaintiffs' suit is also ripe. Plaintiffs assert that the Orders violated federal statutes and the Constitution because the President lacked authority to "end" federal funding as the Orders directed. These legal questions are squarely presented and do not hinge on "future uncertainties." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006); *see* JA934. And the Orders have already caused Plaintiffs severe hardship. *See, e.g.*, JA938, JA204, JA206. Withholding judicial review would only exacerbate these significant harms. JA938; *see Miller*, 462 F.3d at 319.

> **B.    Plaintiffs' Separation-of-Powers Claims and ACA and PHSA Claims Are Cognizable.**

The "President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Executive attempts to "aggrandiz[e] its power at the expense of another branch," left unchecked, jeopardize our constitutional separation of powers. *Freytag v. Comm'r*, 501 U.S. 868, 878 (1991).

Private parties have long been allowed to sue to vindicate these "structural principles secured by the separation of powers," even before the Founding. *Bond v. United States*, 564 U.S. 211, 222 (2011); *see, e.g.*, *INS v. Chadha*, 462 U.S. 919 (1983); *Youngstown*, 343 U.S. at 585; *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 421 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *see also Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015)

(identifying "a long history of judicial review of illegal executive action, tracing back to England"). Often labeled as "*ultra vires*" claims in a complaint, such claims are premised on the belief that "[w]hen government acts in excess of its lawful powers," individuals may bring suit to restore constitutional balance. *Bond*, 564 U.S. at 222. Accordingly, private parties may seek redress when the President's actions lack any constitutional or statutory basis and thus violate the Constitution's separation of powers. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *Panama Ref. Co.*, 293 U.S. at 433.

And for as long as private parties have brought such claims, the judiciary—including this Court—has adjudicated them. *See, e.g.*, *HIAS v. Trump*, 985 F.3d 309, 322 (4th Cir. 2021) (plaintiffs likely to succeed on claim that executive order impermissibly "overrides [the Refugee] Act's directive"); *Sierra Club v. Trump*, 929 F.3d 670, 675 (9th Cir. 2019) (reviewing challenge to President's decision to "reprogram" funds for border wall), *remanded on other grounds sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021). After all, it is "the 'duty of the judicial department'—in a separation-of-powers case as in any other—'to say what the law is.'" *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) (quoting *Marbury v. Madison*, 1 Cranch 137, 177 (1803)).

Plaintiffs' suit presents another paradigmatic example of such a claim. Plaintiffs' challenge to the unlawful Orders "is a classic separation-of-powers claim

in the vein of *Youngstown*, where the court was 'asked to decide whether the President was acting within his constitutional power when he issued an [executive] order.'" *Susman Godfrey LLP v. Exec. Off. of the Pres.*, No. 1:25-cv-1107-LLA, 2025 WL 1779830, at *23 (D.D.C. 2025) (quoting *Youngstown*, 343 U.S. at 582); *see* JA939-942. To bring such a claim, a plaintiff must show the absence of any constitutional or "statutory authority" for the President's action. *Dalton v. Specter*, 511 U.S. 462, 473 (1994). That is precisely what Plaintiffs' separation-of-powers claim alleges: The Orders exceed "the President's constitutional powers or any powers delegated to him by Congress." JA943. And Plaintiffs' PHSA/ACA claim alleges the Orders directly conflict with specific statutory prohibitions preventing entities receiving federal funding from engaging in sex discrimination—another prime example of the type of claims this Court regularly reviews. *See HIAS*, 985 F.3d at 322.

In Defendants' view, however, Plaintiffs' challenge is "premature" because Plaintiffs challenged the Orders themselves, rather than future agency action taken pursuant to those Orders. Gov't Br. 37. As previewed above, Defendants argue that the challenged provisions merely direct agencies to "determine on a case-by-case basis" whether to terminate particular grants, and the District Court wrongly "assum[ed]" the Orders would instead "be applied in [a] sweeping fashion." *Id.* at 34. The Orders' text belies this contention. Section 4 of the Denial-of-Care Order

is unambiguous: Agencies must "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children." That leaves no room for discretion, and—unlike other provisions of the Denial-of-Care Order—it does not contemplate further administrative implementation through "regulatory and sub-regulatory action." Denial-of-Care Order § 5. Defendants' interpretation is also irreconcilable with the facts on the ground. The District Court did not "assum[e]" how agencies might react to the Orders, Gov't Br. 34; it *found*, based on undisputed evidence, that agencies had already taken action to broadly cut off care—a result the President celebrated as the Orders "having [their] intended effect." JA926-927, JA935-937, JA959; *see supra* pp. 3, 8, 10, 21-22.

Defendants argue that review of an unauthorized executive act is permissible "*only* when an agency has taken action entirely in excess of its delegated powers and contrary to a specific prohibition in a statute." Gov't Br. 22 (quoting *Nuclear Regulatory Comm'n v. Texas*, 605 U.S. 665, 681 (2025)) (emphasis altered). That is the test for a different subtype of claim: when a plaintiff brings an *ultra vires* claim as an "end-run" around Congress's decision to foreclose judicial review of certain agency actions. *Nuclear Regulatory Comm'n*, 605 U.S. at 681. In those circumstances, where an agency violates an express statutory prohibition, courts infer that an otherwise unreviewable decision is properly subject to challenge.

*Leedom v. Kyne*, 358 U.S. 184, 190 (1958) (citation omitted). But again, Plaintiffs are not challenging agency action taken pursuant to the Orders—they are challenging the Orders. When, as here, litigants argue that the *President* exceeded his constitutional powers, the test is instead whether the Constitution or Congress authorized that action. *Susman Godfrey*, 2025 WL 1779830, at *23. Defendants' objection that Plaintiffs cannot prevail "[b]ecause the Executive Orders merely tell agencies how to exercise their discretion" and Plaintiffs cannot show that no "agency could" hypothetically take lawful action pursuant to the Orders, Gov't Br. 13, 18, 31-32, 37-38, thus collapses for the same reason. *See infra* pp. 34-35.[7]

### C. The Orders Violate the Separation of Powers.

The District Court correctly found that the Orders likely violate the separation of powers. As explained, the President's authority to act must come from either the Constitution or Congress. *See Trump v. United States*, 603 U.S. 593, 607 (2024); *Youngstown*, 343 U.S. at 585. And neither the Constitution nor Congress authorizes the President to condition congressionally appropriated funds on the provision of gender-affirming medical care or recognition of transgender people's identities.

---

[7] Even if *Nuclear Regulatory Commission* applied, Plaintiffs meet that test: as explained *infra* pp. 38-42, the Orders are flatly contrary to the ACA and PHSA's non-discrimination mandates.

### 1. *Nothing in the Constitution Authorizes the Orders.*

The Constitution vests Congress with the "exclusive power over the federal purse." *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1346 (D.C. Cir. 2012). Because "[m]oney is the instrument of policy," *Clinton v. City of New York*, 524 U.S. 417, 451 (1998) (Kennedy, J., concurring), the "power over the purse was one of the most important authorities allocated to Congress," *Dep't of Navy*, 665 F.3d at 1346. When Congress exercises its Spending powers and allocates federal dollars, it "may attach appropriate conditions … to preserve its control over the[ir] use." *NFIB v. Sebelius*, 567 U.S. 519, 579 (2012). The Appropriations Clause reinforces Congress's exclusive control by ensuring that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990). Together, the Spending and Appropriations Clauses "assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Id.* at 427-428. Conditioning, modifying, or terminating federal grants is thus "the functional equivalent of partial repeals of Acts of Congress." *Clinton*, 524 U.S at 444. Any attempt to do so must therefore go through Bicameralism and Presentment. *See generally id.*; U.S. Const. art. I, § 7, cl.2.

The Orders usurp Congress's exclusive authority to condition federal spending and unlawfully wrest lawmaking control from Congress. Pursuant to Article I, Congress appropriated millions in grants, which became federal law once Congress passed, and the President signed, the appropriations bill. *See Clinton*, 524 U.S. at 440. Congress imposed no conditions on grants regarding gender-affirming medical care. Yet the Orders instruct agencies to "immediately" ensure that medical institutions receiving federal funding "end" their provision of gender-affirming medical care to people under nineteen. Denial-of-Care Order § 4; *see* Gender-Identity Order § 3(g).

Below, Defendants recognized this instruction for what it is: a "new *condition* on grant funding." JA708. This should end the case. The President has no constitutional authority to so condition appropriated funds. *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1233-34 (9th Cir. 2018). Nor can he modify those grants, which are federal laws, without going through Article I's Bicameralism and Presentment procedures. *See Clinton*, 524 U.S. at 440, 444. His attempt to do so exemplifies what the Appropriations Clause was designed to prevent: an Executive with "an unbounded power over the public purse of the nation [who] might apply all its monied resources at his pleasure." *Dep't of Navy*, 665 F.3d at 1347 (quoting Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at 213-214 (1833)).

Defendants' counterarguments do not prove otherwise. Defendants suggest that the Take Care Clause or the Executive Vesting Clause justifies the Orders as part of the President's "general administrative control of those executing the laws." Gov't Br. 23-24 (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)); U.S. Const. art. II, §§ 1, 3. The Take Care Clause permits "the President to provide guidance and supervision to his subordinates." *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002). But the Supreme Court has never held that this power authorizes the President to repeal or condition appropriated funds. Defendants have not identified any judicial decision to that effect, either. That stands to reason; such conduct amounts to lawmaking, and the Constitution limits the President's role "in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad." *Youngstown*, 343 U.S. at 587.

Defendants also assert that the President has generalized authority "to direct his subordinates to take action to implement an administration's policy objectives." Gov't Br. 58. But "Congress sets the policy, not the" President. *In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013). Because "the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker," *Youngstown*, 343 U.S. at 587, he may not withhold congressionally allocated funds based on "policy" disagreements, *In re Aiken Cnty.*, 725 F.3d at 260-261 n.1; *Train v. City of New York,* 420 U.S. 35, 44 (1975).

30

### 2. *No Statute Authorizes the Orders.*

Absent constitutional authority, the President must point to a specific congressional authorization permitting him to instruct agencies to withhold lawfully appropriated grants based on his policy preferences regarding the provision of gender-affirming medical care. He cannot. As the District Court concluded, "Congress has not authorized the Administration to withhold federal grant monies from medical institutions that provide gender-affirming care for transgender youth." JA955.

Section 4 of the Denial-of-Care Order vaguely references the "laws of the United States" without identifying a particular statute authorizing the President to instruct agencies to "immediately" terminate or withhold federal health and research grants from entities that provide gender-affirming medical care to people under nineteen. Defendants argue that "no more is required." Gov't Br. 33. That is wrong. Defendants cannot "point[] to" just "any statute" as a source of authority. *Sierra Club*, 929 F.3d at 697. In order for "the President's actions [to] be reviewed for constitutionality," *Franklin*, 505 U.S. at 801, the President must actually identify the source of his authority. Otherwise, judicial review amounts to no more than an "empty ritual." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

Section 3 of the Gender-Identity Order at least cites a federal law, 5 U.S.C. § 7301, but as the District Court explained, Section 7301 merely authorizes the

President to "prescribe regulations for the conduct of employees in the executive branch" in fulfillment of his obligation to manage the federal workplace. JA925; *see Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 273 (1974). Past presidents have invoked Section 7301 to (for example) mandate drug testing or impose ethical standards for federal employees. *See*, *e.g.*, Exec. Order No. 12,564, *Drug-Free Federal Workplace*, 51 Fed. Reg. 32889 (Sep. 15, 1986); Exec. Order No. 12,674, *Principles of Ethical Conduct for Government Officers and Employees*, 54 Fed. Reg. 15159 (Apr. 12, 1989). But the President's authority as an administrator of the federal workplace does not extend to regulating the actions of *private parties* receiving federal funds. It is no surprise, then, that Defendants abandon on appeal any argument based on Section 7301.

Defendants instead offer up a single cite, 42 U.S.C. § 241, a section of the PHSA, which they describe as "confer[ring] broad authority on the Secretary of Health and Human Services to fund research and to award research grants for various purposes." Gov't Br. 28. Thus, Defendants contend, "an agency's implementation" of the Orders "would not conflict with these statutory grant authorizations." *Id.* at 29.

Even setting aside the fact that the Orders themselves do not reference the PHSA, this argument fails. The question is not whether an agency can exercise discretion about what projects to fund; it is whether the statute specifically authorizes

32

the Executive to condition lawfully appropriated funds on the provision of gender-affirming medical care to people under nineteen.  The fact that Congress did not "affirmative[ly] require[]" HHS to issue grants for gender-affirming care, *id.*, says nothing about whether Congress, through the PHSA, authorized HHS to *condition* existing and appropriated grants based on the cessation of gender-affirming medical care—much less that Congress authorized the *President* to do so.  If Congress wanted to do that, it was "capable of saying so explicitly." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17-18 (1981).  It did not.

In fact, Congress has elsewhere prohibited the Executive Branch from taking action that burdens access to appropriate health care—including in the PHSA itself. *See infra* pp. 38-42; 42 U.S.C. § 18114(1)-(5); *Mayor of Baltimore v. Azar*, 973 F.3d 258, 288 (4th Cir. 2020).  Defendants' failure to identify clear congressional authorization, instruction, or delegation is fatal.  *See Train*, 420 U.S. at 45-46 (declining to conclude that Congress provided "the Executive with the seemingly limitless power to withhold funds from allotment and obligation" without expressly saying so); *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (requiring "clear congressional authorization" to delegate lawmaking power).

Defendants instead hypothesize that Congress "*may* create grant programs that leave discretion to the Executive Branch in their implementation" and funding decisions or "*may* … delegate" to the Executive Branch the power "to attach

33

conditions on the receipt of federal funds."  Gov't Br. 27-28 (emphases added).

Whether Congress "may" do so only emphasizes that Congress has *not* done so here.

To the extent Defendants rely (at 27-28) on agencies' discretion over "lump-sum

appropriations," such discretion remains subject to constitutional and statutory

limits.  Besides, the Orders are not limited to grants from these appropriations, nor

do Defendants claim they are.   Tellingly, despite gesturing toward the PHSA,

Defendants never argue that prohibiting institutions from providing gender-

affirming medical care to people under nineteen would be a permissible condition

for the Executive to impose under the PHSA or any other federal grant statute.  After

all, "[a]t the risk of sounding tautological, only if the statute *actually* permits the

action can it *even possibly* give authority for that action."  *Sierra Club*, 929 F.3d at

697.

Unable to point to a statute supporting their argument, Defendants argue that

the District Court "invert[ed] the relevant analysis."  Gov't Br. 31.  Rather than

requiring the *Orders* to identify the "statutory authority supporting their

implementation," the District Court apparently should have required *Plaintiffs* "to

demonstrate that there is *no* hypothetical action that *any* agency could take that

would not manifestly contravene a clear statutory or constitutional prohibition."  *Id.*

at 31-32, 22.  Again, this is not a challenge to agency action.  *Supra* pp. 26-27.

Plaintiffs challenge provisions of the Executive Orders as lacking statutory or

constitutional authority.  The burden was on Defendants to answer that charge.  They

cannot, as demonstrated by their failure to identify any statute authorizing the Orders

in the Orders themselves, in opposing the temporary restraining order, in opposing

the preliminary injunction, or in their opening brief.  As the District Court put it,

"Defendants must defend the Orders that President Trump actually issued, not some

hypothetical narrower Executive Order that is tailored to statutory schemes on which

the Orders did not purport to rely."  JA953 (citation omitted).

### 3.  *The Saving Clauses Save Nothing.*

Defendants argue that the Orders' saving clauses, which nominally stipulate

that the Orders are to be implemented "as permitted by law," cure any constitutional

concerns.  Gov't Br. 18, 25 (quoting Gender-Identity Order § 3(e)); *see* Denial-of-

Care Order § 4 ("consistent with applicable law").  But such boilerplate savings

clauses "cannot override" an Executive Order's "clear" meaning.  *City & Cnty. of

San Francisco*, 897 F.3d at 1239-40; *see HIAS*, 985 F.3d at 325 (rejecting

government's attempt to "immunize the Order from review through a savings clause

which, if operational, would nullify the 'clear and specific' substantive provisions

of the Order").  The Orders' plain text and stated purpose, plus the detailed

evidentiary record, make clear that the Orders sought to unlawfully restrict federal

funding; the savings clause is "purely theoretical."  *HIAS*, 985 F.3d at 325; *see S.F.

A.I.D.S. Found. v. Trump*, No. 25-CV-01824-JST, 2025 WL 1621636, at *27 (N.D.

Cal. June 9, 2025) ("*SFAF*") (rejecting argument that Gender-Identity Order "merely provide[s] general directives to agencies … to yield to all applicable laws before terminating any grant or contract"); *New York v. Trump*, 133 F.4th 51, 69 (1st Cir. 2025) (denying stay pending appeal and concluding that similar "'consistent with the law' caveat was nothing more than window dressing on an unconstitutional directive by the Executive").

*Trump v. American Federation of Government Employees*, 145 S. Ct. 2635 (2025) ("*AFGE*"), is not to the contrary. The Supreme Court there stayed an injunction against an executive order implementing the Department of Government Efficiency's Workforce Optimization Initiative. *Id.* at 2635. Because the order instructed agencies to initiate reductions in force (RIFs) consistent with applicable law, the Supreme Court held the order itself was likely lawful. That makes sense; there is no inherent contradiction between an order directing RIFs and conducting those RIFs in accordance with law. By contrast, the Orders here command agencies to take actions that cannot be accomplished "consistent with applicable law." Moreover, unlike the order in *AFGE*, the Orders here had an immediate effect. *Supra* pp. 10-13; *see* JA944-949. And unlike in *AFGE*, in which a statute may have provided a viable basis for the executive action at issue, *see* Application to Stay the Order at *7, *AFGE*, 2025 WL 1569930 (U.S. June 1, 2025), there is no statute behind which Defendants can retreat to defend the Orders here.

This Court's stay pending appeal in *National Association of Diversity Officers in Higher Education v. Trump*, No. 25-1189 (4th Cir. Mar. 14, 2025) ("*NADOHE*"), also does not change this conclusion. There, the plaintiffs challenged an executive order requiring funding recipients "to certify that [they] do[] not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 769 F. Supp. 3d 465, 471 (D. Md. 2025). As Judge Harris explained, the challenged order "d[id] not purport to establish the illegality of all efforts to advance diversity, equity or inclusion," but only "conduct that violates existing federal anti-discrimination law." A19 (Harris, J., concurring). "Nor d[id] the Orders authorize the termination of grants based on a grantee's … activities outside the scope of the funded activities." *Id.*

The Orders here are altogether different. The Denial-of-Care Order requires grant recipients to "end" all gender-affirming medical care for people under nineteen even though gender-affirming medical care is perfectly legal under existing federal law. *See* JA950-959. And it requires grant recipients to end their provision of gender-affirming medical care for people under nineteen even where that care is entirely unrelated to the threatened grants. The *NADOHE* stay order only underscores the unlawfulness of the Orders here.

**D.     The Orders Conflict with ACA Section 1557 and PHSA Section 1908.**

Plaintiffs are likely to succeed in showing that the Orders impermissibly direct agencies to act contrary to laws enacted by Congress, namely, ACA Section 1557 and PHSA Section 1908, which prohibit healthcare entities receiving federal funding from discriminating based on sex.  The President cannot "override[]" these statutes by requiring federal funding recipients to engage in the same discrimination these statutes prohibit.  *See HIAS*, 985 F.3d at 322.

In *Bostock v. Clayton County*, 590 U.S. 644 (2020), the Supreme Court held that "discrimination based on … transgender status necessarily entails discrimination based on sex" under Title VII.  *Id.* at 669.  Under this Court's binding precedent, *Bostock*'s reasoning extends to Title IX, *see Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), and thus to Section 1557, which prohibits health care programs receiving federal funds from discriminating on grounds prohibited by Title IX, *see Hammons v. Univ. of Md. Med. Sys. Corp.*, 649 F. Supp. 3d 104, 112 (D. Md. 2023), *appeal dismissed*, 2025 WL 1743504 (4th Cir. June 24, 2025).  As the District Court explained, there is no logical basis to conclude that reasoning should not also extend to Section 1908, which is nearly identical to Section 1557.  JA968.

The Orders purport to withhold federal grant funding from healthcare entities that continue providing gender-affirming medical care for people under nineteen—without restricting the same treatments for patients over nineteen and for other medical conditions. That is facially discriminatory under Section 1557. "[I]f a hospital has a policy against performing a [procedure] to treat gender dysphoria—a condition inextricably related to a person's sex—but will perform that [procedure] to treat any other medical diagnosis, the hospital intentionally relies on sex in its decisionmaking." *Hammons*, 649 F. Supp. 3d at 113-114; *accord C.P. by & through Pritchard v. Blue Cross Blue Shield of Ill.*, No. 3:20-CV-06145-RJB, 2022 WL 17788148, at *6 (W.D. Wash. Dec. 19, 2022).[8] Thus, as the District Court properly concluded, the Orders unlawfully require medical institutions to do precisely what the ACA and PHSA forbid. *See* JA970.

*Skrmetti* does not undermine that conclusion. *Skrmetti* held that state laws prohibiting gender-affirming medical care for minors did not facially classify based on sex for purposes of the Equal Protection Clause. 145 S. Ct. at 1837. But *Skrmetti* did not address statutory sex discrimination claims, and thus "said nothing

---

[8] These decisions are consistent with *Kadel v. Folwell*, 100 F.4th 122, 164 (4th Cir. 2024) (en banc), *cert. granted, vacated, and remanded*, 145 S. Ct. 2838 (2025). The Court has not yet scheduled further proceedings in that case. *See Texas v. United States*, 798 F.3d 1108, 1116 (D.C. Cir. 2015) ("[A] GVR has no precedential weight and does not dictate how the lower court should rule on remand.").

whatsoever to cause doubt as to the vitality of *Grimm*'s Title IX holding." *Doe by Doe v. South Carolina*, No. 25-1787, 2025 WL 2375386, at *10 (4th Cir. Aug. 15, 2025) (Diaz, C.J., concurring), *stay denied*, No. 25A234, 2025 WL 2610400, at *1 (U.S. Sep. 10, 2025); *accord L.B. v. Premera Blue Cross*, No. C23-0953-TSZ, 2025 WL 2326966, at *2, *3 n.4 (W.D. Wash. Aug. 12, 2025) ("*Skrmetti* involve[d] a fundamentally different type of claim than the ACA § 1557 claim raised in this case …. [N]othing in *Skrmetti* undermines the validity of *Bostock* or the extension of *Bostock* from Title VII to Title IX and/or ACA § 1557 claims." (citation omitted)).

That is so because *Skrmetti*'s core rationale cannot be applied to sex-discrimination claims under those statutes. *Skrmetti* relied on *Geduldig v. Aiello*, 417 U.S. 484 (1974), which held that pregnancy-based classifications were not facial sex classifications under the Equal Protection Clause. *See Skrmetti*, 145 S. Ct. at 1833. But *Geduldig*'s reasoning does not apply to *statutory* sex-discrimination prohibitions. Indeed, when the Supreme Court applied *Geduldig*'s reasoning to Title VII in *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), Congress swiftly amended Title VII to "unambiguously" reject "the holding and the reasoning" of *Gilbert* and *Geduldig*. *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 678-679 & n.17 (1983); *accord Lange v. Houston Cnty.*, No. 22-13626, 2025 WL 2602633, at *26 (11th Cir. Sep. 9, 2025) (en banc) (Rosenbaum, J., concurring in judgment) ("*Skrmetti* is based on *Geduldig*, whose application both

40

Congress and the Court have emphatically rejected in the Title VII context"); *id.* at *27 (J. Pryor, J., dissenting) (similar). These amendments, which codified the Pregnancy Discrimination Act, reaffirmed that discrimination based on pregnancy is sex discrimination under Title VII.

That conclusion applies equally to Title IX, and by extension to Section 1557 and Section 1908. Consistent with Congress's reaffirmation that Title VII prohibits discrimination based on pregnancy, Title IX's regulations have expressly prohibited discrimination based on pregnancy since their first formulation. *See Nondiscrimination on the Basis of Sex*, 40 Fed. Reg. 24128 (June 4, 1975); *see also Establishment of Titles and Chapters*, 45 Fed. Reg. 30802, 30,959, 30,962-63 (May 9, 1980). And the courts have consistently upheld those regulations, concluding that "discrimination on the basis of pregnancy, childbirth, or related medical conditions is a form of sex discrimination prohibited by Title IX." *Muro v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, No. 2:19-cv-10812, 2019 WL 5810308, at *3 (E.D. La. Nov. 7, 2019); *accord, e.g.*, *Stanford v. Fox Coll.*, No. 1:18-cv-3703, 2020 WL 814865, at *6 (N.D. Ill. Feb. 19, 2020).

The same is true for PHSA Section 1908 (adopted in 1981) and ACA Section 1557 (adopted in 2010). "[W]here, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the

new statute." *Lorillard v. Pons*, 434 U.S. 575, 581 (1978).  Indeed, Section 1557's

regulations have consistently prohibited discrimination based on pregnancy across

presidential administrations.[9]  *See Hammons*, 649 F. Supp. 3d at 117-118 (refusing

to apply *Geduldig* to Section 1557 claim involving gender-affirming medical care

"given Congress's clear disapproval of that reasoning").

These statutory protections thoroughly undermine any analogy to *Skrmetti*.

*Skrmetti* held that because classifications based on pregnancy had previously been

found to be facially sex-neutral under the Equal Protection Clause, restrictions on

gender-affirming medical care are also facially neutral with respect to discrimination

against transgender people.   But for statutory protections, the converse is true.

Because discrimination based on pregnancy *is* discrimination based on sex under

ACA Section 1557 and PHSA Section 1908, restrictions on gender-affirming

medical care are similarly explicit discrimination against transgender people—and

thus sex classifications—under those statutes.  The Orders thus unlawfully command

funding recipients to engage in the very discrimination Congress prohibited.

---

[9] *See*, *e.g.*, *Nondiscrimination in Health Programs and Activities*, 89 Fed. Reg. 37522, 37699 (May 6, 2024); *Nondiscrimination in Health Programs and Activities*, 85 Fed. Reg. 37160, 37179-80 (June 19, 2020); *Nondiscrimination in Health Programs and Activities*, 81 Fed. Reg. 31375, 31467 (May 18, 2016).

### E.     The Orders Violate the Equal Protection Guarantee.

Plaintiffs also are likely to succeed on their claim that the Orders violate Plaintiffs' equal-protection rights. As the District Court found, the Orders not only discriminate against Plaintiffs based on sex and transgender status—requiring heightened scrutiny—but also rest on demonstrable animus toward transgender people.[10]  In that way, the Orders go much further than the targeted statute at issue in *Skrmetti*:  They seek to regulate transgender persons, not just medical procedures. They cannot survive scrutiny.

### 1. *Heightened Scrutiny Applies.*

The District Court correctly held that the Orders are subject to heightened scrutiny because their prohibitions on federal funding for entities providing gender-affirming medical care for people under nineteen facially classify based on sex and transgender status.  JA973.

The Gender-Identity Order and the Denial-of-Care Order operate in tandem. Together, they do not merely regulate a medical procedure; they seek to "regulate[] a class of *persons* identified on the basis of a specified characteristic," *Skrmetti*, 145

---

[10]  That animus unfortunately persists even in this appeal.  Throughout their brief, Defendants refer to transgender people as "trans-identifying individuals."  *See*, *e.g.*, Gov't Br. 8, 44.  This pejorative description is unbecoming of the U.S. Department of Justice.  "Being transgender is widely accepted as a normal variation in human development."  JA525-526; *see* JA587.

S. Ct. at 1834 n.3—namely, people whose gender identity differs from their sex at birth. And the Orders target those people *regardless* of what medical procedures they undergo. *See*, *e.g.*, Gender-Identity Order §§ 1, 2(f), 2(g). The Denial-of-Care Order flatly declares that it is "the policy of the United States" to "not fund, sponsor, promote, assist, or support the so-called 'transition'" of a transgender persons under nineteen. Denial-of-Care Order § 1.[11]

Under this Court's precedent, that facial classification based on sex and transgender status is subject to heightened scrutiny. *See Grimm*, 972 F.3d at 610-611. Because *Skrmetti* did not decide what standard of scrutiny applies to discrimination against transgender people, it did not disturb this Court's holding in *Grimm* that heightened scrutiny applies. *Doe*, 2025 WL 2375386, at *8 ("*Grimm* remains the law of this Circuit").

Even if the Orders were *facially* neutral, however, heightened scrutiny still applies. *Skrmetti* made clear that facially neutral prohibitions on gender-affirming medical care can still be challenged as discriminatory if they are "pretexts designed

---

[11] By targeting those who "transition," the Orders necessarily classify based on transgender status; only transgender people undergo "transition." *See E.E.O.C. v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 577 (6th Cir. 2018) ("Title VII protects transgender persons because of their transgender or transitioning status, because transgender or transitioning status constitutes an inherently gender non-conforming trait."), *aff'd sub nom. Bostock*, 590 U.S. 644.

to effect an invidious discrimination against transgender individuals." 145 S. Ct. at 1833. Thus, even "where a law's classifications are neither covertly nor overtly based on sex," it is still subject to "heightened review" if "it was motivated by an invidious discriminatory purpose." *Id.* at 1832.

That describes the Orders here, which outright proclaim their discriminatory purpose. The Gender-Identity Order declares that it is the official "policy of the United States" to recognize only "two sexes" based on people's "immutable biological classification as either male or female." Gender-Identity Order §§ 2, 2(a). According to the Order, any acknowledgement that transgender people have a gender identity that differs from their sex designated at birth, which it proclaims a "false claim," has "a corrosive impact … on the validity of the entire American system," and undermines "public safety, morale, and trust in government itself," along with our country's "cherished legal rights and values." *Id.* §§ 1, 2(f).

Thus, the Gender-Identity "Order's stated purpose is to deny the existence of transgender persons entirely." *SFAF*, 2025 WL 1621636, at *15. "Viewed as a whole, the language of the Executive Order is candid in its rejection of the identity of an entire group—transgender Americans—who have always existed and have long been recognized in, among other fields, law and the medical profession." *Orr v. Trump*, 778 F. Supp. 3d 394, 415 (D. Mass. 2025). It is difficult to "fathom

discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist." JA969.

The Denial-of-Care Order reflects and implements the Gender-Identity Order's ideological opposition to the existence of transgender people by seeking to end access to medically necessary care for transgender adolescents and young adults. The Denial-of-Care Order is filled with pejorative and inflammatory language, referring to gender-affirming medical care as "chemical and surgical mutilation," accusing doctors and parents of "maiming and sterilizing" children, and describing transgender people as engaged in a "losing war with their own bodies." Denial-of-Care Order §§ 1, 2(c). The Order also draws insulting comparisons between gender-affirming medical care and female genital mutilation and suggests that medical care to treat gender dysphoria is "child abus[e]." *Id.* § 8(a)-(b), (e).

Together, the Orders' broad scope and derogatory language reveal that their animating purpose is to deny the existence of transgender people in general—not to regulate a discrete medical procedure. In sweeping terms, the Gender-Identity Order "imposes a 'broad and undifferentiated disability' on a discrete group of people," *Orr*, 778 F. 3d at 415 (citation omitted), across virtually all aspects of life, *e.g.*, Gender-Identity Order § 3(d) (identity documents); § 3(c), (e) (communications); §§ 3(f), 4 (facilities and housing). The scope and animus underlying this raft of prohibitions stand in contrast to the law challenged in *Skrmetti*, which "d[id] not

regulate any other behavior in which minors might engage for the purpose of expressing their gender identity," "sa[id] nothing at all about names, pronouns, hair styles, attire, recreational activities or hobbies, or career interests," and "impose[d] no restrictions" on medical care for adults. 145 S. Ct. at 1859 (Alito, J., concurring).

The context surrounding these Orders further demonstrates their intent to adversely affect transgender people. The Orders "were part of a constellation of close-in-time executive actions directed at transgender Americans that contained powerfully demeaning language." *Orr*, 778 F. Supp. 3d at 417; *Talbott v. United States*, 775 F. Supp. 3d 283, 330-331 (D.D.C. 2025) (documenting such executive actions). One executive order excluding transgender people from military service declared that a soldier's transgender status "conflicts" with their "commitment to an honorable, truthful, and disciplined lifestyle," and that "[a] man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member." Exec. Order No. 14,183 § 1. Another targets schools that support the ability of transgender youth to socially transition, which—according to the executive order—"sow[s] division, confusion, and distrust" and "undermine[s] the very foundations of personal identity and family unity." Exec. Order No. 14,190 § 1. "Although aimed at different policy goals, each of these related orders, in tone and language, conveys a fundamental moral disapproval of transgender Americans." *Orr*, 778 F. Supp. 3d at 417. They

are part and parcel of a comprehensive policy of denying transgender people's existence. Such intentional discrimination mandates heightened scrutiny. *Grimm*, 972 F.3d at 610-611; *Doe*, 2025 WL 2375386, at *8.

### 2. The Orders Fail Heightened Scrutiny.

To survive heightened scrutiny, the government must "provide an 'exceedingly persuasive justification' for its classification," and demonstrate that the classification is "substantially related to a sufficiently important governmental interest." *Grimm*, 972 F.3d at 608 (citations omitted). Defendants assert an interest in "protecting" children, Gov't Br. 52, and attempt to support that interest by pointing to *Skrmetti*. But *Skrmetti* was a rational-basis case where Tennessee was not required to meet any evidentiary burden to support its claims. It merely had to hypothesize "any reasonably conceivable state of facts that could provide a rational basis for the classification." *Skrmetti*, 145 S. Ct. at 1820 (citation omitted). Heightened scrutiny requires much more: "The burden of justification is demanding and it rests entirely on the State." *United States v. Virginia*, 518 U.S. 515, 533 (1996).

Remarkably, Defendants have presented no evidence to support the Orders' assertions that gender-affirming medical care is unsafe, whether below or on appeal. After thoroughly examining the record, including the unrebutted testimony of Plaintiffs' expert witnesses, the District Court made detailed factual findings that

Defendants' arguments were unlikely to "be sufficient to survive the requisite means/ends test" that heightened scrutiny requires. JA975.

The record evidence demonstrates that gender-affirming medical care is a safe and effective treatment for an adolescent's or young adult's gender dysphoria. This medical treatment "promotes wellness and helps to prevent negative mental health outcomes, including suicidality." JA610; *see* JA536-537, JA545, JA648-653. In asserting otherwise, the Orders "ignore the benefits that many patients realize from these treatments and the substantial risk posed by [forgoing] the treatments." *Dekker v. Weida*, 679 F. Supp. 3d 1271, 1294 (N.D. Fla. 2023); *see* JA649-650. "The denial of medically indicated care to transgender people with gender dysphoria not only results in the prolonging of their gender dysphoria, but causes additional distress and poses other health risks, such as depression, posttraumatic stress disorder, and suicidality." JA544; *see* JA620. Plaintiffs' experiences confirm the benefits of gender-affirming medical care to treat gender dysphoria in adolescents and young adults[12]—and the harm of delaying or denying this care when medically indicated.[13]

In seeking to ban this healthcare, the Denial-of-Care Order asserts without support that "[c]ountless children soon regret" receiving gender-affirming medical

---

[12] *See*, *e.g.*, JA289-290, JA302-303, JA304, JA322-324, JA338, JA348, JA351.

[13] *See*, *e.g.*, JA275-276, JA289-290, JA305, JA324-325, JA339-340, JA351.

care. Denial-of-Care Order § 1. Actual scientific studies indicate that the rates of regret among people receiving gender-affirming medical care are exceedingly low; the vast majority who rely on such treatments to live happy and fulfilling lives never regret it. JA541-543, JA600-601, JA616-617, JA659-662. Any risk of regret, moreover, is not unique to treating gender dysphoria and cannot justify a sweeping prohibition on treatment for all transgender patients under nineteen. JA542-543, JA600-601, JA609, JA616-617, JA662-663.

The Denial-of-Care Order states (again, citing nothing) that people receiving gender-affirming medical care "will never be able to conceive children." Denial-of-Care Order § 1. But the scientific evidence shows that puberty-delaying medication and gender-affirming chest surgery have no impact on fertility, and that many adolescents and young adults who receive gender-affirming hormones remain able to conceive and procreate. JA597, JA602-603, JA902-904. Moreover, the clinical guidelines recommend that impacts of care on fertility and fertility preservation options be discussed thoroughly with the patient, and in the case of a minor, with parents or guardians. JA536. The evidence also shows that many other types of pediatric medicine can also impact fertility, but the Orders do not prohibit recipients of federal funding from providing those other forms of medical care. JA603.

The Denial-of-Care Order also labels all evidence supporting the safety and efficacy of gender-affirming medical care "junk science." Denial-of-Care Order § 3.

50

This is false. Clinical guidelines for gender-affirming medical care are based on decades of clinical experience and a substantial body of evidence showing the safety and efficacy of these medical interventions to treat gender dysphoria. *Supra* pp. 4-5. The level of evidence supporting medical treatment for gender dysphoria in adolescents is comparable to the evidence of safety and efficacy for many other treatments, particularly in pediatrics. JA456-457, JA464, JA466, JA470, JA530. The "strength" of the evidence pertaining to gender-affirming medical care does not justify the Orders. Because double-blind studies are not possible in many fields of medicine, evidence may be technically classified as "low certainty" while still representing the widely accepted standard of care. JA465-466, JA543, JA608, JA858, JA878, JA899. As authors of several systematic reviews have declared: "It is profoundly misguided to cast health care based on low-certainty evidence as bad care or as care driven by ideology, and low-certainty evidence as bad science." Gordon Guyatt et al., McMaster University, *Systematic Reviews Related to Gender-Affirming Care* (Aug. 14, 2025), http://bit.ly/41UJR4S. In any event, the Orders do not require that grant recipients stop care that is not supported by a particular degree of evidence. They prohibit grant recipients from providing those treatments *only* for transgender people. And there is zero scientific evidence—of any quality—that supports withholding gender-affirming medical care from patients for whom it is medically indicated. JA469, JA544-545, JA665-666.

### 3. The Orders Are Infused with Animus and Cannot Survive Even Rational Basis.

Even if rational-basis review did apply, the Orders cannot pass muster under that standard. "The Constitution's guarantee of equality must at the very least mean that a bare [] desire to harm a politically unpopular group cannot justify disparate treatment of that group." *United States v. Windsor*, 570 U.S. 744, 770 (2013). Here, the Orders' text drips with animus. *Supra* pp. 43-48. As such, the Orders "are built on a foundation of irrational prejudice toward fellow citizens whose gender identity does not match their sex assigned at birth." *Orr*, 778 F. Supp. 3d at 418. That the Orders are part of a "flurry of government actions directed at transgender persons" only emphasizes Defendants' hostility toward transgender individuals. *Talbott*, 775 F. Supp. 3d at 331-332; *supra* pp. 43-48. It is impossible to "ignore the moral disapproval conveyed in those orders or the depth and breadth of recent federal action affecting transgender people." *Orr*, 778 F. Supp. 3d at 417.

The President's "bare … desire to harm" transgender people "cannot constitute a legitimate governmental interest." *Romer v. Evans*, 517 U.S. 620, 634 (1996) (citation omitted). "[N]o legitimate purpose overcomes the" Orders' animating "purpose and effect to disparage and to injure" transgender people. *Windsor*, 570 U.S. at 775.

52

## II.    THE OTHER PRELIMINARY INJUNCTION FACTORS WEIGH IN PLAINTIFFS' FAVOR.

The District Court correctly held that the other preliminary injunction factors strongly favor Plaintiffs.  JA978-982.  Defendants hardly contend otherwise.

The undisputed record evidence shows that the individual plaintiffs, PFLAG members, and GLMA members were subjected to and remain threatened with irreparable harm.  Because of institutions' "fear of losing federal funding pursuant to the challenged portions of the Executive Orders," individual plaintiffs and PFLAG members have "already lost care because their providers have canceled appointments, refused to fill prescriptions, or even shut down their gender-affirming medical care programs altogether."  JA979-980 (citation omitted).  Meanwhile, GLMA members "have been compelled to abandon their patients," JA979 (citation omitted), leaving them "demoraliz[ed]" and heartbroken, *see*, *e.g.*, JA451-453.  Acts that "diminish[] access to high-quality health care" cause irreparable harm. *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 707 (4th Cir. 2019).  That is particularly true here, as the denial of care had severe consequences for Plaintiffs and their families, which cannot be rectified after-the-fact.  JA980 (recognizing Plaintiffs' risks of depression, anxiety, and suicide increase for every day without care).  On top of all these specifics, the "prospect of an unconstitutional enforcement" of the challenged provisions itself "supplies the necessary irreparable injury." *Air Evac*

*EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (citation omitted); *accord* JA978.

The District Court also correctly found that the balance of equities and the public interest, which merge when the defendant is the government, *Nken v. Holder*, 556 U.S. 418, 435 (2009), clearly favor relief. The Orders have "far-reaching effects" on the public writ large: They "disrupt treatment of patients, stall critical research, and gut numerous programs in medical institutions that rely on federal funding," including programs unrelated to "gender-affirming care." JA981-982. Moreover, "[i]t is well-established that the public interest favors protecting constitutional rights." *Leaders of a Beautiful Struggle*, 2 F.4th at 346. This is true of the constitutional rights of the very youth and young adults the government purportedly wants to "protect." The threat of deprivation of constitutional rights "easily outweighs whatever burden the injunction may impose." *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011).

Defendants argue that the temporary injunction causes irreparable harm because it intrudes into the workings of the government. Gov't Br. 58. That is wrong. The government "is in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Legend Night Club*, 637 F.3d at 302-303. Defendants' remaining rejoinders, *see* Gov't Br. 56-57, simply rehash their other erroneous arguments: Plaintiffs need not challenge particular

"agency action" to show that the Orders have harmed them and will continue to do so absent an injunction. *Supra* pp. 25-27. Defendants' medical "uncertainty" argument, Gov't. Br. 51, is both irrelevant and wrong; the evidence supporting medical treatment for gender dysphoria in adolescents is comparable to the evidence of safety and efficacy for many other forms of pediatric medicine. *See* JA456, JA464, JA466, JA470, JA530. And the Executive remains free to consider and pursue his preferred policies—whatever the subject matter—"within the boundaries set by the Constitution." JA981.

## III. THE INJUNCTION IS NOT OVERBROAD.

The District Court acted within its discretion in ruling that a nationwide injunction was necessary to provide complete relief to protect Plaintiffs from irreparable harm. JA982-986.

*CASA* does not hold otherwise. The Supreme Court there reaffirmed that a district court may issue a nationwide injunction where, as here, it is necessary to provide "complete relief" to the parties. 606 U.S. at 851. The Court distinguished between "universal" injunctions, designed primarily to protect non-parties, and "traditional, parties-only injunction[s]," which are more limited but "can apply beyond the jurisdiction of the issuing court." *Id.* at 837 n.1 (citation omitted). The Supreme Court held that courts likely do not have the authority to issue "universal" injunctions designed to protect "*anyone*, anywhere." *Id.* But *CASA* reaffirmed

courts' longstanding power to "'administer complete relief *between the parties*,'" particularly where the party has a strong likelihood of succeeding on the merits. *Id.* at 850-53 (citation omitted). A "complete relief" injunction may advantage nonparties, though it does so "only incidentally." *Id.* at 851. Indeed, *CASA* acknowledged that there may be "injuries for which it is all but impossible for courts to craft relief that is complete *and* benefits only the named plaintiffs." *Id.* at 852 n.12. Thus, following *CASA*, multiple courts have recognized the continued need for nationwide injunctions to afford complete relief when the circumstances require it. *See*, *e.g.*, *Washington v. Trump*, 145 F.4th 1013, 1037-39 (9th Cir. 2025); Order, *New Jersey v. Trump*, No. 1:25-cv-10139-LTS (D. Mass. July 25, 2025), ECF No. 203.

That is exactly what the District Court found here. After emphasizing that injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," JA982, the District Court weighed the equities and determined that "a narrower injunction cannot provide complete relief," JA985. As the District Court explained, the challenged provisions of the Orders were designed to—and did—exert an immediate coercive effect on federal funding recipients. JA984. Complete relief therefore needed to provide sufficient clarity and certainty to counteract that *in terrorem* effect and reassure medical providers who may provide care to Plaintiffs that it is safe to continue providing care without

56

risking their federal funding.  JA984-985.  The District Court also recognized that a narrower injunction could not provide complete relief to the members of the organizational plaintiffs, whose members are located across the country.  JA983-984.

A "piecemeal approach" could not achieve that.  JA983.  On the contrary, an injunction limited to the named Plaintiffs would cause "[s]ignificant confusion" for medical institutions, as their federal funding would depend on whether a particular patient or employee was a plaintiff in this case.  *Id.*; *see* JA985.  The more complex the process, the more likely hospitals would deem this too difficult—or too risky—to jeopardize their federal funding for *all patients*, including Plaintiffs.

Similarly, an injunction limited to the hospitals currently providing care to Plaintiffs would effectively prevent Plaintiffs from moving their care, leading to significant delays to their care or the loss of care entirely.  Because medical providers froze care without notice, after the Orders issued, many Plaintiffs had mere hours' notice before providers ceased care.  *See*, *e.g.*, JA275, JA304; *supra* pp. 11-13.  Many Plaintiffs had already relocated, only to find their care in jeopardy again.  *See, e.g.*, JA426-428.  Plaintiffs facing that situation would thus need to find a new medical provider, then ask a court to modify the injunction, which could cause significant delays in care or the loss of care entirely.

Thus, the District Court correctly recognized that anything less than a nationwide injunction "would allow the coercive impact of the challenged portions of the Executive Orders to persist and would effectively deny the named Plaintiffs the relief they seek." JA985. The court also rightly acknowledged that "the extent of the violation established" and Plaintiffs' strong likelihood of succeeding on the merits made this an appropriate case in which to issue complete relief in the form of a nationwide injunction. JA986 (citation omitted); *see CASA*, 60 U.S. at 850-853.[14]

For much the same reasons, Defendants' counterarguments fail. They say that this is *CASA* come again, and the injunction must be narrowed as a result. Gov't Br. 60. But the Supreme Court in *CASA* specifically "decline[d]" to narrow the injunction, leaving that issue to the "lower courts" in the first instance. 606 U.S. at 854. The facts of this case warrant a nationwide injunction to ensure appropriate and effectual "complete relief." *See id.*

Narrowing the injunction to just the institutions identified in Plaintiffs' declarations and individuals who have personally "establish[ed]" their standing also would not be sufficient to confer Plaintiffs "complete relief." Gov't Br. 60-64. As

---

[14] The District Court's comment that its merits conclusions would apply across the country does not undermine its conclusion that a nationwide injunction was necessary to afford Plaintiffs the complete relief to which they were entitled. *See* Gov't Br. 59; JA984-985.

a practical matter—and it is deeply unfortunate that we have come to this point—a court order naming and authorizing only certain institutions to provide gender-affirming medical care gives the Administration a ready-made list of targets for its ongoing intimidation campaign. *See In re Admin. Subpoena No. 25-1431-019*, No. 1:25-MC-91324-MJJ, 2025 WL 2607784, at *7 (D. Mass. Sep. 9, 2025) (quashing subpoena designed to "harass and intimidate" children's hospital into ceasing gender-affirming care); *cf. Diamond Alternative Energy*, 145 S. Ct. at 2139 (highlighting risk that regulated parties might be unwilling to oppose regulators).

But even setting that aside, the challenged actions and harms in this case necessitate a broader approach. JA983-985. This is thus one factual situation in which an injunction extending beyond the named Plaintiffs and their members was necessary to afford Plaintiffs complete, effectual relief.

## CONCLUSION

The District Court's order granting a preliminary injunction should be affirmed.

Respectfully submitted,

*/s/ Joshua A. Block*

Omar Gonzalez-Pagan
Jennifer C. Pizer
**Lambda Legal Defense
  and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: (212) 809-8585
Facsimile: (855) 535-2236
ogonzalez-pagan@lambdalegal.org
jpizer@lambdalegal.org

Karen L. Loewy
**Lambda Legal Defense
  and Education Fund, Inc.**
815 16th Street NW, Suite 4140
Washington, DC 20006
Telephone: (202) 804-6245
Facsimile: (855) 535-2236
kloewy@lambdalegal.org

Nora Huppert
**Lambda Legal Defense
  and Education Fund, Inc.**
3656 N. Halsted Street
Chicago, IL 60613
Telephone: (312) 605-3233
Facsimile: (855) 535-2236
nhuppert@lambdalegal.org

Joshua A. Block
Harper Seldin
Chase Strangio
Alexandra R. Johnson
**American Civil Liberties Union
  Foundation**
125 Broad Street, Floor 18
New York, NY 10004
Telephone: (212) 549-2500
Facsimile: (212) 549-2650
jblock@aclu.org
hseldin@aclu.org
cstrangio@aclu.org
a.johnson@aclu.org

Deborah A. Jeon
Zoe M. Ginsberg
**American Civil Liberties Union
  Foundation of Maryland**
3600 Clipper Mill Road, Suite 200
Baltimore, MD 21211
Telephone: (410) 889-8555
Facsimile: (410) 366-7838
jeon@aclu-md.org
zginsberg@aclu-md.org

Catherine E. Stetson
Danielle Desaulniers Stempel
Sam H. Zwingli

Jackson B. Skeen
**Hogan Lovells US LLP**
125 High Street
Suite 2010
Boston, MA 02110
Telephone: (617) 702-7747
Facsimile: (617) 371-1037
jackson.skeen@hoganlovells.com

**Hogan Lovells US LLP**
555 13th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5491
Facsimile: (202) 637-5910
cate.stetson@hoganlovells.com
danielle.stempel@hoganlovells.com
sam.zwingli@hoganlovells.com

*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,997 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ Joshua A. Block*
Joshua A. Block