No. 25-1279

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

PFLAG, INC., *et al.*,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

*Defendants-Appellants*.

---

*On Appeal from the United States District Court
for the District of Maryland*

---

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER
## AS *AMICUS CURIAE* IN SUPPORT OF
## PLAINTIFFS-APPELLEES AND AFFIRMANCE

---

Elizabeth B. Wydra
Brianne J. Gorod
Miriam Becker-Cohen
Nina Henry
CONSTITUTIONAL
  ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW
Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## TABLE OF CONTENTS

<strong>Page</strong>

TABLE OF AUTHORITIES ............................................................ ii

INTEREST OF *AMICUS CURIAE* .................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................... 1

ARGUMENT ...................................................................... 7

  I.    To Guard Against the Risk of a Tyrannical President, the Framers Vested Control of Appropriations and Spending in Congress, Ensuring the Structural Separation of the Sword and the Purse ........................... 7

  II.   For Over Two Hundred Years, Congress Has Jealously Guarded Its Power of the Purse Through Federal Legislation Governing Spending ............................................................... 15

  III.  The Challenged Executive Orders Violate the Separation of Powers Through Executive Usurpation of Congress's Authority Over Spending and Appropriations ................................................. 18

  CONCLUSION ......................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*CFPB v. Cmty. Fin. Servs. Ass'n of Am.*,
  601 U.S. 416 (2024) ......................................................... 3, 10

*Citizens for Resp. & Ethics in Wash. v. OMB*,
  No. 25-cv-1051, 2025 WL 2025114 (D.D.C. July 21, 2025) ............. 18

*Citizens for Resp. & Ethics in Wash. v. OMB*,
  No. 25-5266, slip op. (D.C. Cir. Aug. 9, 2025) ................................ 18

*City & County of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) ........................................................ 20, 23

*City of New Haven v. United States*,
  809 F.2d 900 (D.C. Cir. 1987) ........................................................ 17

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ....................................................... 1, 19, 20

*Fullilove v. Klutznick*,
  448 U.S. 448 (1980) ........................................................ 12

*Harrington v. Bush*,
  553 F.2d 190 (D.C. Cir. 1977) ......................................... 15

*In re Aiken County*,
  725 F.3d 255 (D.C. Cir. 2013) ......................................... 6

*INS v. Chadha*,
  462 U.S. 919 (1983) ........................................ 6, 19, 20, 23

*J.W. Hampton, Jr., & Co. v. United States*,
  276 U.S. 394 (1928) ...................................................... 19

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Kendall v. United States ex rel. Stokes*,
   37 U.S. 524 (1838)............................................................ 20, 21

*OPM v. Richmond*,
   496 U.S. 414 (1990).......................................................... 14

*Rochester Pure Waters Dist. v. EPA*,
   960 F.2d 180 (D.C. Cir. 1992)........................................... 10

*South Dakota v. Dole*,
   483 U.S. 203 (1987)........................................................... 12, 19

*United States v. Butler*,
   297 U.S. 1 (1936).............................................................. 12

*United States v. McIntosh*,
   833 F.3d 1163 (9th Cir. 2016) .......................................... 14

*United States v. Midwest Oil Co.*,
   236 U.S. 459 (1915) .......................................................... 20

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*,
   665 F.3d 1339 (D.C. Cir. 2012).......................................... 3, 10, 15

*Widakuswara v. Lake*,
   No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ................ 22

*Widakuswara v. Lake*,
   No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) .............. 22

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952)........................................................... 2, 18, 19

CONSTITUTIONAL PROVISIONS

Articles of Confederation of 1781, art. IX, para. 6 ............................... 10

iii

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

Del. Const. of 1776, art. VII.................................................................. 10

Mass. Const. of 1780, ch. 2, § 1, art. XI................................................ 10

U.S. Const. art. I, § 8, cl. 1 ................................................... 5, 11, 12

U.S. Const. art. I, § 7, cl. 2 ...................................................... 19, 22

U.S. Const. art. I, § 9, cl. 7 .................................................. 5, 13, 19

U.S. Const. art. II, § 3 ........................................................... 7, 20, 22

## STATUTES AND LEGISLATIVE MATERIALS

Act of Mar. 3, 1809, ch. 28, 2 Stat. 535.................................... 15

Act of Feb. 12, 1868, ch. 8, 15 Stat. 35 .................................. 15

Act of July 12, 1870, ch. 251, 16 Stat. 251.............................. 16

An Act Declaring the Rights and Liberties of the Subject and Settling
the Succession of the Crown (Bill of Rights), 1689, 1 W. & M., c.2,
§ 4 (Eng.) .......................................................................... 9

Financial Services and General Government Appropriations Act,
Pub. L. No. 117-103, 748, 136 Stat. 239 (2022) ................................ 18

Financial Services and General Government Appropriations Act,
Pub. L. No. 117-328, 136 Stat. 4650 (2022) ..................................... 18

General Appropriations Act of 1951, ch. 896, Pub. L. No. 81-759,
64 Stat. 595 (1950)........................................................ 16

H.R. Rep. No. 117-393 (2022) ................................................. 18

iv

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Impoundment Control Act of 1974. Pub. L. No. 93-344, tit. X,
88 Stat. 297 ........................................................................ 17

Pub. L. No. 118-47, div. B. tit. VII, 138 Stat. 460 (2024) ...................... 18

S. Rep. No. 93-688 (1974) ...................................................... 17

2 U.S.C. § 683 ................................................................. 6, 17

2 U.S.C. § 684(b) .............................................................. 6, 17

31 U.S.C. § 1301(a) ........................................................... 6, 15

31 U.S.C. § 1341 ................................................................ 16

31 U.S.C. § 1341(a)(1)(A) ....................................................... 6

31 U.S.C. § 1342 ................................................................ 16

31 U.S.C. § 1349 ................................................................ 16

31 U.S.C. § 1350 ................................................................ 16

31 U.S.C. § 1512 ................................................................ 16

31 U.S.C. § 1513 ................................................................ 16

31 U.S.C. § 1517(a) ............................................................. 16

31 U.S.C. § 1518 ................................................................ 16

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

OTHER AUTHORITIES

Bruce Ackerman, *Taxation and the Constitution*,
99 Colum. L. Rev. 1 (1999)................................................................. 11

William Blackstone, *Commentaries on the Laws of England* (1791
ed.)...................................................................................................... 8

Brutus, Va. J. (Dec. 6, 1787), *reprinted in 8 The Documentary History of
the Ratification of the Constitution by the States: Virginia* (John P.
Kaminski et al. eds., 1988)................................................................ 13

Exec. Order No. 14,168, *Defending Women from Gender Ideology
Extremism and Restoring Biological Truth to the Federal
Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025).............................. 2

Exec. Order No. 14,187, *Protecting Children from Chemical and
Surgical Mutilation*, 90 Fed. Reg. 8771 (Jan. 28, 2025) .................... 2, 7

Gerhard Casper, *Appropriations of Power*,
13 U. Ark. Little Rock L.J. 1 (1990) ................................................. 8

Josh Chafetz, *Congress's Constitution: Legislative Authority and the
Separation of Powers* (2017)............................................................. 8, 13

*The Debates in the Several State Conventions on the Adoption of the
Federal Constitution* (Jonathan Elliot ed., 1836).............................. 3, 5, 13

*The Federalist No. 30* (Clinton Rossiter ed., 1961) .............................. 5, 11

*The Federalist No. 31* (Clinton Rossiter ed., 1961) .............................. 11

*The Federalist No. 47* (Clinton Rossiter ed., 1961) .............................. 14

*The Federalist No. 51* (Clinton Rossiter ed., 1961) .............................. 3

*The Federalist No. 58* (Clinton Rossiter ed., 1961) .............................. 12

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*The Federalist No. 78* (Clinton Rossiter ed., 1961) .............................. 12

Paul F. Figley & Jay Tidmarsh, *The Appropriations Power and Sovereign Immunity*,
107 Mich. L. Rev. 1207 (2009) .......................................................... 9

Alexander Hamilton, *Report on the Subject of Manufactures* (1791) .... 12

An Impartial Citizen, Petersburg Va. Gazette (Jan. 10, 1788), *reprinted in* 8 *The Documentary History of the Ratification of the Constitution by the States: Virginia* (John P. Kaminski et al. eds., 1988) .............. 13

David Lindsay Keir, *The Constitutional History of Modern Britain Since 1485* (9th ed. 1966) ........................................................................... 8

Letter to Joseph Jones (May 31, 1780), *in* 18 *The Writings of George Washington from the Original Manuscript Sources 1745-1799* (John C. Fitzpatrick ed., 1931)..................................................................... 11

F.W. Maitland, *The Constitutional History of England* (1908).............. 8, 9

*The Records of the Federal Convention of 1787* (Max Farrand ed., 1911)................................................................................. 4, 10, 12, 14

Robert J. Reinstein, *The Limits of Executive Power*,
59 Am. U. L. Rev. 259 (2009)........................................................... 7, 9

Richard D. Rosen, *Funding "Non-Traditional" Military Operations: The Alluring Myth of a Presidential Power of the Purse*,
155 Mil. L. Rev. 1 (1998)................................................................... 4

Neil M. Soltman, *The Limits of Executive Power: Impoundment of Funds*, 23 Cath. U. L. Rev. 359 (1973) ............................................ 17

Joseph Story, *Commentaries on the Constitution of the United States* (1833) ................................................................................................. 14

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and preserve the rights, freedoms, and structural safeguards that it guarantees, and accordingly has an interest in this case.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

This case is about whether our Constitution, which indisputably commits the power of the purse to the people's representatives in Congress, allows the President to unilaterally impose conditions on federal funding not found in any statutory provision. The answer is no. As the Supreme Court has made clear, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). That principle applies with special force here, in the context of spending and appropriations, where the President enjoys none of "his own constitutional

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to the brief's preparation or submission. All parties consent to its filing.

1

powers." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952)

(Jackson, J., concurring).

Notwithstanding these limitations on presidential power, shortly after taking

office President Trump issued an executive order commanding federal agencies to

"immediately take appropriate steps to ensure that institutions receiving Federal

research or education grants end" gender-affirming medical care for people under

the age of nineteen.  Exec. Order No. 14,187, *Protecting Children from Chemical*

*and Surgical Mutilation*, 90 Fed. Reg. 8771, 8772 (Jan. 28, 2025).  That order built

upon another, which proclaimed that "[f]ederal funds shall not be used to promote

gender ideology."  Exec. Order No. 14,168, *Defending Women from Gender*

*Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90

Fed. Reg. 8615, 8616 (Jan. 20, 2025).  Together, these orders resulted in a sudden

and devastating shutdown of medically necessary care for children and teenagers

across the country experiencing gender dysphoria.

Neither executive order cited any statute authorizing the executive branch to

amend or terminate federal grants in this fashion.  Nor do Defendants point to any

such authority in their opening brief.  Thus, the "President's power, if any" to issue

these orders "must stem . . . from the Constitution itself."  *Youngstown*, 343 U.S. at

586.

The Constitution grants no such authority. Indeed, the text and history of the relevant constitutional provisions point in precisely the opposite direction. They show that President Trump's unilateral effort to effectuate his own policy preferences through the amendment of federal appropriations statutes usurps Congress's power of the purse, in violation of our Constitution's separation of powers.

To the Framers of our Constitution, perhaps no tenet was more central to the preservation of liberty than the need to separate the powers of the sword and the purse. As Alexander Hamilton put it, "neither one nor the other shall have both, because this would destroy that division of powers on which political liberty is founded, and would furnish one body with all the means of tyranny." 2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 348-49 (Jonathan Elliot ed., 1836) ["*Elliot's Debates*"]. "The power over the purse" was thus "one of the most important authorities allocated to Congress in the Constitution's 'necessary partition of power among the several departments.'" *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (Kavanaugh, J.) (quoting *The Federalist No. 51*, at 320 (Clinton Rossiter ed., 1961) (James Madison))).

While the choice to vest Congress with control over appropriations and spending was "uncontroversial" at the Founding, *CFPB v. Cmty. Fin. Servs. Ass'n*

*of Am.*, 601 U.S. 416, 431 (2024), that consensus marked the culmination of centuries of struggle in England.  Historically, British kings had used their royal prerogatives both to legislate and to tax and spend without the approval of Parliament.  The result was a blurring of the lines between the monarch's pocket money and the national treasury, leading kings to spend public funds however they pleased.  Only after the Glorious Revolution, when "[t]he whole basis for the monarchy had transformed," Richard D. Rosen, *Funding "Non-Traditional" Military Operations: The Alluring Myth of a Presidential Power of the Purse*, 155 Mil. L. Rev. 1, 42 (1998), were royal attempts to seize the purse strings finally squelched.

In "defining the . . . powers" of the new nation, the American Founders firmly rejected the historic "Prerogatives of the British Monarch."  1 *The Records of the Federal Convention of 1787*, at 65 (Max Farrand ed., 1911) ["*Farrand's Records*"] (James Wilson).  Indeed, almost every post-Revolution state constitution vested the spending and appropriations authorities in a legislative body.  Even the Articles of Confederation, despite leaving the federal government without the critical power to raise revenue through taxation, granted the appropriations power to the Confederation Congress.

Against that backdrop, when the Framers gathered in Philadelphia to draft the new Constitution, there was no question that Congress would be granted the

powers to tax, spend, and appropriate funds.  The authority "to pay the Debts and provide for the common Defence and general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1, was deemed "indispensable" to the ability of the federal government to do its job, *The Federalist No. 30*, *supra*, at 188 (Alexander Hamilton).  At the same time, the choice to vest this sweeping power in Congress—the people's representatives—was designed to check executive power by giving the legislature complete control over payments from the Treasury.  That is why, as Edmund Randolph explained at the Virginia ratifying convention, the new office of the President need not be feared: "He can handle no part of the public money except what is given him by law."  3 *Elliot's Debates*, *supra*, at 201.

While the Spending Clause affirmatively empowers Congress, the text of the Appropriations Clause evinces a clear limitation on executive authority.  Phrased in the negative, it declares that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7. Because appropriations must be made "by Law," *id.*, and the President's role in lawmaking is highly circumscribed, he has no power to spend funds, rescind funds, or alter the terms of appropriations statutes without Congress's authorization.

In recognition of these constitutional principles, Congress has repeatedly passed legislation reasserting its power of the purse in the face of executive overreach.  This practice dates back to the Founding.  For instance, the Tenth

Congress passed the precursor to what is now called the Purpose Statute, providing that "[a]ppropriations shall be applied only to the objects for which [they] were made." 31 U.S.C. § 1301(a). Congress then passed the Antideficiency Act in 1870, explicitly prohibiting the executive branch from spending more than Congress appropriates. *Id.* § 1341(a)(1)(A). And with the Impoundment Control Act of 1974, Congress made clear that the President is prohibited from deferring funds for policy reasons, 2 U.S.C. § 684(b), or rescinding funds without obtaining Congress's approval, *id.* § 683. These laws, along with others passed more recently to enhance accountability and transparency in apportionment decisions, reaffirm Congress's exclusive power of the purse.

The upshot of this constitutional text and history is that the President has no power to, for "policy reasons[,] . . . spend less than the full amount appropriated by Congress for a particular project or program." *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.). Where Congress has not delegated any authority to the executive branch to attach conditions to federal funds, the President may not use an executive order to make an end-run around the "step-by-step, deliberate and deliberative process" the Framers prescribed for legislating, including in the realm of spending and appropriations. *INS v. Chadha*, 462 U.S. 919, 959 (1983). To the contrary, the Constitution requires that the President "take

Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, even when he disagrees with those laws or thinks they should say something that they do not say.

These principles all support the district court's injunction. Because Congress neither passed legislation imposing the conditions President Trump now seeks to impose, nor delegated to him the discretion to do so, he does not get to declare it "the policy of the United States" not to "fund, sponsor, promote, assist, or support" gender-affirming care. 90 Fed. Reg. at 8771. Rather, *Congress* establishes the policy of the United States through its laws, including appropriations statutes—enacted through the democratic process of bicameralism and presentment prescribed by our Constitution. Those statutes provide no support for the challenged executive orders. This Court should reject the executive branch's usurpation of Congress's power of the purse and affirm.

## ARGUMENT

I.  **To Guard Against the Risk of a Tyrannical President, the Framers Vested Control of Appropriations and Spending in Congress, Ensuring the Structural Separation of the Sword and the Purse.**

**A.** When the Framers wrote the Constitution more than two centuries ago, they took pains to deny the President the kind of sweeping powers the King of England had enjoyed. In the sixteenth and seventeenth centuries, British Kings had used their royal prerogatives both to legislate, and to tax and spend, without the approval of Parliament. *See, e.g.*, Robert J. Reinstein, *The Limits of Executive*

*Power*, 59 Am. U. L. Rev. 259, 272-77 (2009).  Historically, the British monarch was entitled to various sources of "ordinary" revenue, such as rents from crown lands and fines imposed in royal courts.  1 William Blackstone, *Commentaries on the Laws of England* 286, 289 (1791 ed.).  Parliament had no say in how "the king's revenue" was spent, and there was no firm distinction "between the national revenue and the king's private pocket money."  F.W. Maitland, *The Constitutional History of England* 309, 433 (1908).  "[U]nconstrained by the need to consult the representatives of the people," Gerhard Casper, *Appropriations of Power*, 13 U. Ark. Little Rock L.J. 1, 4 (1990) (quotation marks omitted), English kings generally spent public money on whatever they pleased.  For many kings, that meant war with other European nations.

But because the crown's "ordinary" revenue often fell short when funding these endeavors, *see* Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of Powers* 46 (2017), there developed a second stream of "*extraordinary* revenue," financed by taxes specially levied for the king's use, 1 Blackstone, *supra*, at 306-07.  These grants of "extraordinary" tax revenue required Parliamentary authorization, David Lindsay Keir, *The Constitutional History of Modern Britain Since 1485*, at 38 (9th ed. 1966), and, increasingly, Parliament also "claimed the power to appropriate the supplies granted to the king," "to say that they shall be spent in this or that manner," Maitland, *supra*, at

183-84. Parliament asserted that authority only sporadically until its struggle with the Stuart kings led to a reconfiguration of the British constitution around the principle of parliamentary supremacy.

After decades of struggle marked by civil war and regicide, Parliament finally succeeded in curtailing the King's abuses of power attendant to his sweeping authority over the purse. Following the Glorious Revolution, "in granting money to the crown," Parliament always "appropriated the supply to particular purposes more or less narrowly defined." *Id.* at 433. At the same time, the Bill of Rights of 1689 prohibited the various devices the King had used to raise money on his own, providing that "levying money for or to the use of the Crown by pretence of prerogative, without grant of Parliament, for longer time, or in other manner than the same is or shall be granted, is illegal." An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown (Bill of Rights), 1689, 1 W. & M., c.2, § 4 (Eng.). Finally, in 1782, Parliament eliminated the King's prerogative to determine how the "civil list"—the domestic budget—would be spent. Paul F. Figley & Jay Tidmarsh, *The Appropriations Power and Sovereign Immunity*, 107 Mich. L. Rev. 1207, 1229 (2009).

**B.** In drafting the Constitution, "the prerogatives that had been discredited in England were naturally rejected by the Framers." Reinstein, *supra*, at 307. After the American Revolution, most state governments required legislative

9

authorization for the withdrawal of any funds from a state treasury. *See, e.g.*, Del. Const. of 1776, art. VII; Mass. Const. of 1780, ch. 2, § 1, art. XI. The Articles of Confederation similarly granted the Confederation Congress exclusive authority to "ascertain the necessary sums of Money to be raised for the service of the united states, and to appropriate and apply the same for defraying the public expenses," although they failed to give the central government the power to levy taxes, instead relying on the states for raising revenue. Articles of Confederation of 1781, art. IX, para. 6.

Still, "[b]y the time of the Constitutional Convention, the principle of legislative supremacy over fiscal matters engendered little debate and created no disagreement." *CFPB*, 601 U.S. at 431. It was "uncontroversial" that the authority to raise, spend, and appropriate funds should "reside in the Legislative Branch" rather than with the chief executive. *Id.*; *see* 2 *Farrand's Records*, *supra*, at 131, 274 (debate limited to whether power of the purse should be further confined to the *direct* representatives of the people in the House of Representatives). The Framers thus gave Congress, not the President, "exclusive power over the federal purse." *Dep't of Navy*, 665 F.3d at 1346 (Kavanaugh, J.) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)).

In the Taxing and Spending Clause, the Framers granted Congress the affirmative power to raise revenue and spend funds. The Clause articulates the

first and one of the most sweeping enumerated powers the Constitution confers

upon Congress, providing the power "[t]o lay and collect Taxes, Duties, Imposts

and Excises, to pay the Debts and provide for the common Defence and general

Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  It responded to the

Articles of Confederation's failure to grant Congress the authority to tax and spend

for the defense and general interests of the union, creating such an ineffectual

central government that, according to George Washington, it nearly cost

Americans victory in the Revolutionary War.  *See* Letter to Joseph Jones (May 31,

1780), *in* 18 *The Writings of George Washington from the Original Manuscript

Sources 1745-1799*, at 453 (John C. Fitzpatrick ed., 1931).

Indeed, it was the need "to provide adequate fiscal powers for the national

government" that motivated the Framers to write a new Constitution.  Bruce

Ackerman, *Taxation and the Constitution*, 99 Colum. L. Rev. 1, 6 (1999).

Alexander Hamilton called the power to raise and spend funds "an indispensable

ingredient in every constitution," *The Federalist No. 30*, *supra*, at 188, deeming

"revenue" "the essential engine by which the means of answering the national

exigencies must be procured," *The Federalist No. 31*, *supra*, at 195.  James

Madison similarly explained that "[t]his power over the purse may, in fact, be

regarded as the most complete and effectual weapon . . . for obtaining a redress of

11

every grievance, and for carrying into effect every just and salutary measure." *The Federalist No. 58*, *supra*, at 359.

The Framers thus adopted Edmund Randolph's recommendation that Congress should have the power "to pay the Debts and provide for the common Defence and general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1; *see* 2 *Farrand's Records*, *supra*, at 493, 497, choosing a phrase that was as "comprehensive as any that could have been used," Alexander Hamilton, *Report on the Subject of Manufactures* 54 (1791). This Clause authorizes Congress to "attach conditions on the receipt of federal funds . . . 'to further [its] broad policy objectives,'" *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980)), including even those "objectives not thought to be within Article I's 'enumerated legislative fields,'" *id.* at 207 (quoting *United States v. Butler*, 297 U.S. 1, 65 (1936)). The Founders were resolute in their conviction that such sweeping authority should be granted to the people's representatives in Congress—the branch that "not only commands the purse but prescribes the rules by which the duties and rights of every citizen are to be regulated," *The Federalist No. 78*, *supra*, at 465 (Alexander Hamilton).

At the same time that they empowered Congress through the Spending Clause, the Framers limited executive authority over federal funding through the Appropriations Clause: "[n]o Money shall be drawn from the Treasury, but in

Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The Appropriations Clause's simple, uncontroversial command was repeatedly invoked during the ratification debates to assuage "Anti-Federalist fears of a tyrannical president." Chafetz, *supra*, at 57. Alexander Hamilton explained that "where the purse is lodged in one branch, and the sword in another, there can be no danger." 2 *Elliot's Debates*, *supra*, at 349. George Nicholas emphasized that "[a]ny branch of government that depends on the will of another for supplies of money, must be in a state of subordinate dependence, let it have what other powers it may." 3 *id.* at 17; *see, e.g.*, 3 *id.* at 201 (James Madison) (responding to allegations that the President would be king by explaining that "[t]he purse is in the hands of the representatives of the people"); 4 *id.* at 330 (Charles Pinckney) ("With this powerful influence of the purse, [Congress] will be always able to restrain the usurpations of the other departments.").

Popular writings and treatises similarly conveyed that because the President could not "appropriate the public money to any use, but what is expressly provided by law," the President's powers would leave "dignity enough for the execution" of the office "without the possibility of making a bad use of it." An Impartial Citizen, Petersburg Va. Gazette (Jan. 10, 1788), *reprinted in* 8 *The Documentary History of the Ratification of the Constitution by the States: Virginia* 295 (John P. Kaminski et al. eds., 1988); *see, e.g.*, Brutus, Va. J. (Dec. 6, 1787), *reprinted in* 8 *The*

13

*Documentary History of the Ratification of the Constitution by the States: Virginia*
215 (John P. Kaminski et al. eds., 1988) (Appropriations Clause mandates that
"any evils which may arise from an improper application of the public money must
either originate with, or have the assent of the immediate Representatives of the
people"). As Joseph Story put it, the Appropriations Clause prevents the executive
from "apply[ing] all [the United States'] monied resources at his pleasure."
3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at
213-14 (1833).

The text and history of the Spending and Appropriations Clauses thus
embody the fundamental principle that "[a]ny exercise of a power granted by the
Constitution to one of the other branches of Government is limited by a valid
reservation of congressional control over funds in the Treasury." *OPM v.
Richmond*, 496 U.S. 414, 425 (1990). The Clauses play a critical role in the
"Constitution's separation of powers among the three branches of government,"
*United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016), protecting against
the tyranny that would arise if "the legislative and executive powers [were] united
in the same person or body," *The Federalist No. 47*, *supra*, at 302 (James Madison)
(quoting Montesquieu); *see* 3 *Farrand's Records*, *supra*, at 149 (James McHenry)
("[T]here can be no regulation more consistent with the Spirit of Economy and free
Government [than] that it shall only be drawn forth under appropriation by Law.").

14

## II.    For Over Two Hundred Years, Congress Has Jealously Guarded Its Power of the Purse Through Federal Legislation Governing Spending.

Since the earliest days of the Republic, Congress has exercised its "plenary power to give meaning to the [Appropriations Clause]" through federal laws. *Harrington v. Bush*, 553 F.2d 190, 194-95 (D.C. Cir. 1977).  These laws both reinforce and underscore Congress's exclusive power of the purse, guarding against executive efforts to impose non-statutory conditions on federal funding or withhold federal funding without congressional approval.

The story begins in the Tenth Congress with the predecessor of what is known today as the Purpose Statute.  *See* 31 U.S.C. § 1301(a) (current version). By passing that law, Congress commanded that "the sums appropriated by law for each branch of expenditure in the several departments shall be solely applied to the objects for which they are respectively appropriated, and to no other."  Act of Mar. 3, 1809, ch. 28, 2 Stat. 535, 535.  As originally enacted, the law included a narrow exception for instances when Congress was on recess and the secretary of a department petitioned the President for funds "necessary for the public service," *id.*, but even this limited exception was later repealed by Congress, *see* Act of Feb. 12, 1868, ch. 8, 15 Stat. 35, 36.  The foundational principle that appropriations must be carried out as authorized by Congress has been a "core tenet of appropriations law" ever since.  *Dep't of Navy*, 665 F.3d at 1348 (Kavanaugh, J.).

15

A few decades later, Congress passed the first version of the Antideficiency Act, making it unlawful "for any department of the government to expend . . . any sum in excess of appropriations made by Congress for that fiscal year."  Act of July 12, 1870, ch. 251, § 7, 16 Stat. 251.  Congress subsequently amended the law to strengthen it, including by authorizing administrative and criminal penalties for certain violations, *see* 31 U.S.C. §§ 1349-50, 1518.  The law's core provisions establish an apportionment process, *id.* §§ 1512-13, prohibit accepting voluntary services, *id.* § 1342, and prohibit obligating funds in advance or in excess of an appropriation, *id.* §§ 1341, 1517(a).

Notably, in 1950, Congress amended the Antideficiency Act to clarify that "reserves may be established to provide for contingencies, or to effect savings whenever savings are made possible by or through changes in requirements, greater efficiency of operations, or other developments subsequent to the date on which such appropriation was made available."  General Appropriations Act of 1951, ch. 896, § 1211(a)-(c)(2), Pub. L. No. 81-759, 64 Stat. 595, 765-66 (1950). Although the full text and structure of the 1950 amendment made clear that it modernized and reaffirmed the central requirements of existing law, President Nixon abused the Act's new provision permitting reserves for "other developments," relying on it to unilaterally cut billions of dollars from federal programs that conflicted with his policy priorities.  *See* Neil M. Soltman, *The*

*Limits of Executive Power: Impoundment of Funds*, 23 Cath. U. L. Rev. 359, 369 (1973).

Nixon's unauthorized cuts resulted in an explosion of litigation and congressional "furor," leading to a "reassert[ion]" of Congress's "control over the budgetary process" with the passage of the Impoundment Control Act of 1974. *City of New Haven v. United States*, 809 F.2d 900, 906 (D.C. Cir. 1987).  To avoid presidential subversion of congressional policy, the Impoundment Control Act deleted the Antideficiency Act's provision that had authorized the establishment of a reserve for "other developments," *see* Pub. L. No. 93-344, tit. X, § 1002, 88 Stat. 297, 332 (1974), making clear that "[t]he apportionment process is to be used only for routine administrative purposes such as to avoid deficiencies in Executive branch accounts, not for the making of policy or the setting of priorities," S. Rep. No. 93-688, at 72 (1974).  Congress thus expressly prohibited the President from deferring spending for policy reasons, 2 U.S.C. § 684(b), or rescinding appropriated funds without affirmative congressional approval, *id.* § 683.

More recently, Congress has also enacted statutes requiring the Office of Management and Budget (OMB) to report its apportionment decisions to the public, and agencies to report to Congress any delays or unlawful conditions imposed on appropriated funds by the executive branch through the apportionment process.  Financial Services and General Government Appropriations Act, Pub. L.

No. 117-103, §§ 204(a)-(d), 748, 136 Stat. 239, 256-57, 306 (2022); Financial

Services and General Government Appropriations Act, Pub. L. No. 117-328,

§§ 204, 748-49, 136 Stat. 4650, 4667, 4718 (2022).  These transparency and

reporting requirements were implemented to ensure that the executive treats

appropriations statutes as "laws like any other," which "can be rescinded only

through the bicameralism and presentment procedures that the Constitution

prescribes."  H.R. Rep. No. 117-393, at 12 (2022).  The measures have been

enacted in subsequent appropriations laws, *e.g.*, Pub. L. No. 118-47, div. B. tit.

VII, §§ 748-49, 138 Stat. 460, 586-87 (2024), reaffirming Congress's plenary

power of the purse and pushing back against unauthorized executive attempts to

usurp that power.[2]

## III.  The Challenged Executive Orders Violate the Separation of Powers Through Executive Usurpation of Congress's Authority Over Spending and Appropriations.

The President's authority to act "must stem either from an act of Congress or

from the Constitution itself."  *Youngstown*, 343 U.S. at 585.  As to the former,

although Congress has the exclusive power to spend and "attach conditions on the

---

[2] In March 2025, the OMB ceased complying with the requirement to make apportionments public, leading to multiple lawsuits.  In July, a district court ordered the OMB to restore the public website with apportionment data, *Citizens for Resp. & Ethics in Wash. v. OMB*, No. 25-cv-1051, 2025 WL 2025114, at *1 (D.D.C. July 21, 2025), and the OMB complied after the D.C. Circuit denied its motion seeking a stay pending appeal, *Citizens for Resp. & Ethics in Wash. v. OMB*, No. 25-5266, slip op. at 2 (D.C. Cir. Aug. 9, 2025) (per curiam).

receipt of federal funds," *Dole*, 483 U.S. at 206, it may delegate the authority to impose conditions on federal grants to the executive branch provided that it cabins the executive's discretion with an "intelligible principle," *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

In this case, however, there is no statutory delegation. Indeed, the challenged executive orders do not even purport to rely on any law authorizing the executive to withhold federal funds from medical institutions that provide gender-affirming care, as the district court noted. *See* JA 950. Neither order so much as alludes to a statute that expressly or implicitly delegates to the executive branch the discretion to alter or terminate federal grants under these circumstances.

Thus, in the absence of congressional authorization, the Executive Orders are only lawful if authorized by the Constitution itself. And, as discussed above, the Constitution requires that appropriations be "made by Law," U.S. Const. art. I, § 9, cl. 7, meaning that spending must be authorized by the "single, finely wrought and exhaustively considered, procedure" of bicameralism and presentment set forth in the Constitution. *Clinton*, 524 U.S. at 439-40 (quoting *Chadha*, 462 U.S. at 951); *see* U.S. Const. art. I, § 7, cl. 2. Under that procedure, "except for recommendation and veto, [the President] has no legislative power," *Youngstown*, 343 U.S. at 655 (Jackson, J., concurring), for the Constitution simply "does not confer upon him any power to enact laws or to suspend or repeal such as the

19

Congress enacts," *United States v. Midwest Oil Co.*, 236 U.S. 459, 505 (1915); *see, e.g.*, *Clinton*, 524 U.S. at 447 (President lacks "unilateral power to change the text of duly enacted statutes").

This means that the President may not use an executive order to make an end-run around the "step-by-step, deliberate and deliberative process" the Framers prescribed for legislating, including in the realm of spending and appropriations. *Chadha*, 462 U.S. at 959. Where Congress has neither imposed any restriction on funding for institutions that provide gender-affirming care nor delegated that authority to the executive, the President has no "unilateral power to change the text of duly enacted statutes." *Clinton*, 524 U.S. at 447.

To the contrary, the Constitution requires that the President "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, even when he disagrees with those laws or thinks they should say something that they simply do not say. Of course, this is true in the context of appropriations—after all, "[b]ecause Congress's legislative power is inextricable from its spending power, the President's duty to enforce the laws necessarily extends to appropriations." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018). As the Supreme Court put it in *Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838), "[t]o contend that the obligation imposed on the President to see the laws faithfully

20

executed, implies a power to forbid their execution, is a novel construction of the constitution, and is entirely inadmissible." *Id.* at 613.

In *Kendall*, the Supreme Court unanimously rejected newly appointed Postmaster General Amos Kendall's claim that he could withhold money that Congress had, by statute, required him to spend. *Id.* Notably, in *Kendall*, as here, the executive branch asserted a policy justification for withholding the appropriated funds: the Postmaster General claimed the funding rescission was necessary because his predecessor had negotiated a contract tainted by political favoritism. *Id.* at 608-09.

But the Court soundly rejected the notion that the executive could condition federal funding because of Kendall's asserted moral high ground: "The act required by the law to be done by the postmaster general is simply to credit the relators with the full amount of the award of the solicitor. This is a precise, definite act, purely ministerial; and about which the postmaster general had no discretion whatever." *Id.* at 613. Put another way, the executive's policy justifications for withholding funds—however sound they might be—were irrelevant because the executive lacked discretion to withhold the funds in the first place. Allowing the executive branch's policy preferences to displace those of Congress "would be clothing the President with a power entirely to control the

21

legislation of congress," a principle "which has no countenance for its support in any part of the constitution." *Id.*

The same applies here. If President Trump wants to end federal funding for institutions that provide gender-affirming care, he is welcome to recommend such a law to Congress, and Congress can decide whether such a law would be sound policy and consistent with other constitutional provisions. *See* U.S. Const. art. II, § 3 (authorizing the President to "recommend to [Congress's] Consideration such Measures as he shall judge necessary and expedient"). In the future, President Trump may also attempt to veto any appropriations statutes that fund hospitals or other institutions without any such restriction. *Id.* art. I, § 7, cl. 2 (granting the President the power to veto laws presented to him, while authorizing Congress to override a veto by a two-thirds vote in each House). But for now, he may not direct his subordinates to refrain from execution of duly enacted appropriations statutes through the unilateral imposition of grant conditions. Doing so amounts to the "effective[] repeal[]" of those "duly enacted law[s]" in violation of "the separation of powers, the Presentment Clause, the Appropriations Clause, the Spending Clause, and the Take Care Clause." *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *12 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting); *see Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355, at *1 (D.C. Cir. May 28,

2025) (en banc) (vacating panel decision "substantially for the reasons explained by Judge Pillard").

Thus, as the Ninth Circuit has succinctly put it, "[a]bsent congressional authorization, the [executive branch] may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & County of San Francisco*, 897 F.3d at 1235. This rule ensures that the executive branch does not undermine the careful "choices [that] were consciously made by men who had lived under a form of government that permitted arbitrary governmental acts to go unchecked." *Chadha*, 462 U.S. at 959.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's

judgment.

Respectfully submitted,

/s/ Brianne J. Gorod
Elizabeth B. Wydra
Brianne J. Gorod
Miriam Becker-Cohen
Nina Henry
CONSTITUTIONAL
    ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: September 26, 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because it contains 5,314 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that the attached *amicus curiae* brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Executed this 26th day of September, 2025.

/s/ Brianne J. Gorod
Brianne J. Gorod

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on September 26, 2025.

I certify that all parties in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 26th day of September, 2025.

/s/ Brianne J. Gorod
Brianne J. Gorod

*Counsel for Amicus Curiae*