No. 25-1279

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

————————

PFLAG, INC., *et al.*,

*Plaintiffs-Appellees,*

*v.*

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

*Defendants-Appellants.*

————————

On Appeal from the United States
District Court for the District of Maryland

————————

## BRIEF OF MASSACHUSETTS, EIGHTEEN OTHER STATES, AND THE DISTRICT OF COLUMBIA AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES

————————

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*
ALLYSON SLATER
  *Director, Reproductive Justice Unit*
TASHA J. BAHAL
GERARD J. CEDRONE
  *Deputy State Solicitors*
JAK KUNDL
  *Assistant Attorney General*
One Ashburton Place
Boston, MA 02108
(617) 963-2066
tasha.bahal@mass.gov

September 26, 2025

# TABLE OF CONTENTS

Introduction and Interest of Amici Curiae ............................................... 1

Argument ..................................................................................................... 4

    I.    Amicus States prohibit discrimination based on gender identity and protect access to gender-affirming care for transgender adolescents ........................................................... 5

    II.    The Executive Orders are harming the Amicus States and their residents. .................................................................. 9

        A.    Cutting off medically indicated treatments for gender dysphoria will harm the health of transgender adolescents. ............................................. 10

        B.    The Administration's actions are causing providers to deny care. ............................................... 17

        C.    The interference with healthcare facilities will have adverse downstream effects on Amicus States ...................................................................... 24

Conclusion ................................................................................................. 27

# TABLE OF AUTHORITIES

**Cases:**

*Cnty. of Santa Clara v. Trump*,
  250 F. Supp. 3d 497 (N.D. Cal. 2017)................................................25

*Doe v. Ladapo*,
  676 F. Supp. 3d 1205 (N.D. Fla. 2023) ...............................................13

*Michigan v. DeVos*,
  481 F. Supp. 3d 984 (N.D. Cal. 2020)................................................25

*United States v. North Carolina*,
  192 F. Supp. 3d 620 (M.D.N.C. 2016)................................................25

**Statutes:**

Cal. Bus. & Prof. Code §§850.1, 852, 2253, 2761.1...................................7

Cal. Civ. Code §56.109....................................................................6

Cal. Civ. Code §§51(b), 51(e)(5) .......................................................5

Cal. Gov't Code §§12940(a), 12955.....................................................5

Cal. Ins. Code §10133.13.................................................................8

Colo. Rev. Stat. §§10-16-121(1)(f), 12-30-121, 13-21-133,
  16-3-102, 16-3-301 ....................................................................6

Colo. Rev. Stat. §10-4-109.6(1) .......................................................7

Colo. Rev. Stat. §12-30-121 ...........................................................7

Conn. Gen. Stat. §§10-15c .............................................................5

Conn. Gen. Stat. §§19a-17e, 20-579a, 52-571m.....................................7

Conn. Gen. Stat. §§19a-17e, 52-146w, 52-146x, 52-571m,
  52-571n, 54-155b ......................................................................6

D.C. Code §2-1401.01 *et seq.* .......................................................5

Del. Code tit. 6, ch. 45 & 46 .......................................................5

Del. Code tit. 18, §2304 ...........................................................7

Del. Code tit. 19, ch. 7 .............................................................5

Haw. Rev. Stat. §§368-1, 378-2, 489-3, 515-3 .................................... 5

215 Ill. Comp. Stat. 5/356z.60(b) ...................................................... 7

225 Ill. Comp. Stat. 60/22(C)f ......................................................... 7

735 Ill. Comp. Stat. 40/28-5, *et seq.* ............................................... 6

775 Ill. Comp. Stat. 5/1-102(A), 5/1-103(O-1), 5/1-103(Q) ..................... 5

Mass. Gen. Laws ch. 12, §11I½(b)-(d) .............................................. 6

Mass. Gen. Laws ch. 112, §§5F½, 77, 128 ........................................ 7

Mass. Gen. Laws ch. 147, §63 ......................................................... 6

Mass. Gen. Laws ch. 151B, §4; ........................................................ 5

Mass. Gen. Laws ch. 272, §§92A, 98 .............................................. 5, 9

Mass. Gen. Laws ch. 276, §13 ......................................................... 6

Md. Code Ann., Educ. §26-704 ....................................................... 5

Md.  Code Ann., Health-Gen. §15-151 ............................................. 6

Md. Code Ann., Health Occ. §1-227 ................................................. 7

Md. Code Ann., Ins. §15-1A-22 ....................................................... 7

Md. Code Ann., State Gov't §§20-606, 20-705 ................................... 5

Md. Code Ann., State Pers. & Pens. §2-312; 2023 ............................... 6

Me. Rev. Stat. tit. 5, §4551 *et seq.* ................................................. 5

Me. Rev. Stat. tit. 14, §9001, *et seq.* .............................................. 6

Me. Rev. Stat. tit. 22, §§1508 ......................................................... 6

Me. Rev. Stat. tit. 22, §3174-MMM .................................................. 7

Minn. Laws, ch. 29 ....................................................................... 6

Minn. Stat. §62Q.585 .................................................................... 7

Minn. Stat. §256B.0625, subd. 3a .................................................... 6

Minn. Stat. §§363A.03, subd. 50; 363A.01 *et seq.* .............................. 5

Nev. Rev. Stat. §§118.100, 284.150(3), 439.994, 449.101(1),
    613.330…................................................................................ 5

iii

N.J. Stat. Ann. §§10:5-1 *et seq.*, 17:48-6oo, 18A:36-41 ............................5

N.J. Stat. Ann. §17:48-6oo ..........................................................................7

N.Y. Civil Rights Law §40-c .......................................................................5

N.Y. Educ. Law §6531-b ..............................................................................7

N.Y. Exec. Law §§296...................................................................................5

N.Y. Exec. Law §837-x .................................................................................6

Or. Rev. Stat. §§15.430, 24.500, 414.769, 435.210, 435.240.....................6

Or. Rev. Stat. §§659A.006, 659A.030, 659A.403, 659A.421

Or. Rev. Stat. §§675.070, 675.540, 675.745, 677.190, 678.138,
    685.110, 689.405 ....................................................................................7

Or. Rev. Stat. §676.313 ................................................................................7

R.I. Gen. Laws §§11-24-2, 23-17-19, 28-5-5, 28-5.1-12, 28-6-18,
    34-37-2, 34-37-4, 34-37-4.3, 34-37-5.2, 34-37-5.3, 34-37-5.4 ..............5

Vt. Stat. Ann. tit. 8, §§4724, §4088m ........................................................7

Vt. Stat. Ann. tit. 9, §§4502, 4503 .............................................................5

Vt. Stat. Ann. tit. 12, §7301 *et seq.* ...........................................................6

Vt. Stat. Ann. tit. 21, §495 ..........................................................................5

Wash. Rev. Code §§49.60.030(1), 49.60.040(2), 49.60.040(29),
    49.60.215 ................................................................................................5

Wash. Rev. Code §7.115 *et seq.* .................................................................6

**Regulations:**

Cal. Code Regs. tit. 10 §2561.2, subd. (a) (2012) .....................................7

3 Code Colo. Regs. §702-4, Reg. 4-2-42, §5(A)(1)(o) ..............................7

50 Ill. Adm. Code §2603.35 .........................................................................7

89 Ill. Adm. Code §140.440(h) .....................................................................6

89 Ill. Adm. Code §140.413(a)(16) ..............................................................6

244 Code Mass. Regs. §9.03(13) .................................................................8

N.Y. Comp. Codes R. & Regs. tit. 9, §466.13 ............................................5

N.Y. Comp. Codes R. & Regs. tit. 10, §405.7(c)(2) ................................... 6

N.Y. Comp. Codes R. & Regs. tit. 11, §52.75 ........................................... 7

Or. Admin. R. 836-053-0441 ....................................................................... 7

**Executive Orders:**

Exec. Order No. 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,615 (Jan. 20, 2025) ................................... 1

Exec. Order No. 14,187, *Protecting Children from Chemical and Surgical Mutilation,* 90 Fed. Reg. 8,771 (Jan. 28, 2025) ..................... 1

**Treatises:**

Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 512-514 (5th ed., text rev. 2022) ............................ 10

**Other Authorities:**

Amy E. Green et al., *Association of Gender-Affirming Hormone Therapy with Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*, 70 J. Adolescent Health 643 (2022) ............................................................. 15

Andrew Dyer, *San Diego Military Family Reacts to Loss of Gender-Affirming Medical Coverage*, KPBS (Jan. 7, 2025) .............. 13

Annelou L.C. de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics 696 (2014) ......................................................................... 16

Anya Kamnetz, *"It Shouldn't Be Happening Here": Parents of Trans Children in NYC Are Outraged as Hospitals Quietly Shift Their Approach to Gender-Affirming Care,* The Cut (Feb. 4, 2025) .................................................................................................. 20

Aubrey Whelan, *Nemours Children's Hospital Cuts Back on Gender-Affirming Care for New Patients*, Phila. Inquirer (Jul. 8, 2025) .................................................................................................. 27

Catalina Jaramillo, *Trump Misleads on Transgender Issues*, FactCheck (Apr. 8, 2025) ................................................................... 16

*CHKD Suspends Hormone Therapy, Puberty Blockers for Gender-Affirming Care Following Trump Exec. Order*, WTKR (Feb. 3, 2025) ................................................................................................ 32

Clara Harter, *Stanford Medicine Ends Surgeries for Transgender Minors Amid Pressure from Trump Administration*, L.A. Times (June 25, 2025) ................................................................................. 28

Diana M. Tordoff et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, 5 JAMA Network Open 1 (Feb. 25, 2022) ............................................. 15

Emily Witt, *Where Do Trans Kids Go from Here?*, New Yorker (Feb. 19, 2025) ........................................................................... 29

Garima Garg et al., *Gender Dysphoria: Cont. Ed. Activity*, StatPearls (July 11, 2023) .................................................... 14

*Gender Development Program*, Children's Nat'l, https://www. childrensnational.org/get-care/departments/gender-development-program ................................................................................... 32

Gender-Affirming Care Covered by MassHealth, https://www. mass.gov/info-details/gender-affirming-care-covered-by-masshealth .................................................................................... 9

Hanna Webster, *'I'm Very Worried': Pittsburgh Parents Navigate UPMC's Curtailing of Gender Services for Ages 18 and Under*, Pittsburgh Post-Gazette (Jun. 26, 2025) ................................. 30

Ian Wolfe, *Bioethics & Gender Affirming Care*, Univ. of Minn. Ctr. for Bioethics, https://bioethics.umn.edu/news/bioethics-gender-affirming-care (Sept. 6, 2022) ............................................... 21

Jaeyoon Park, *The "Science" Behind Trump's Anti-Trans War is Incredibly Weak*, The Nation (Jun. 9, 2025) .......................... 16

Jenna Portnoy, *After Trump Order, Hospitals Suspend Some Trans Health Care for Youth*, Wash. Post (Jan. 31, 2025) ............... 20

Jo Cavallo, *How the Elimination of Federal Gender-Related Grants and DEI Programs Is Impacting LGBTQ+ Health Research: A Conversation With Mandi Pratt-Chapman, PhD*, ASCO Post (Jun. 10, 2025) ............................................................. 3

vi

Julia C. Sorbara et al., *Mental Health and Timing of Gender-Affirming Care*, 146 Pediatrics 1 (2020) ............................................. 18

Julie Sharp, *Children's Hospital Los Angeles to Close Trans Youth Center*, CBS News (June 13, 2025) .................................................... 25

Kaitlin McCallum, *Yale Follows Connecticut Children's in Gutting Pediatric Gender Care*, Hartford Courant (Jul. 24, 2025) ........... 26, 27

Kelsey Butler & Laura Nahmias, *NYC Hospitals Halt Some Gender Affirming Care After Trump Order*, Bloomberg (Feb. 5, 2025).......... 30

Kyle Davidson, *Advocates Warn of Harms to Trans Youth as Corewell Health Ends Gender Affirming Care for Minors*, Michigan Advance (Sept. 11, 2025) ..................................................... 28

Landon D. Hughes et al., *"These Laws Will Be Devastating": Provider Perspectives on Legislation Banning Gender-Affirming Care for Transgender Adolescents*, 69 J. Adolescent Health 976 (2021) ............................................................................................ 35

Leif Le Mahieu, *Health Care Provider Puts Stop to Trans Surgeries on Kids*, Daily Wire (Jul. 23, 2025) .................................... 33

Lucy Albright, *Philadelphia-Based Hospital System Ends Gender-Affirming Surgeries for People Under 19*, WITF (May 30, 2025) ...... 31

Mack Liederman, *Rush Medical Center Rolls Back Gender-Affirming Care for Minors*, Block Club Chi. (Jul. 15, 2025) ............. 26

Marijn Arnoldussen et al., *Self-Perception of Transgender Adolescents After Gender-Affirming Treatment: A Follow-Up Study into Young Adulthood*, 9 LGBT Health 238 (2022) ................. 17

Martha Bebinger, *Mass. Clinics Still Provide Trans Care for Kids. The Future Is Uncertain*, WBUR (Jan. 31, 2025)............................... 20

Mass. Bd. of Reg. in Medicine Policy 16-01: Policy on Gender Identity and the Physician Profile Program, *available at* https://www.mass.gov/lists/physician-regulations-policies-and-guidelines ........................................................................................ 11

Mass. Div. of Ins. Bulls. 2021-11, 2014-03 ............................................ 10

Megan Trotter, *UPMC Workers to Join Community Groups in March for Transgender Health Care*, TRIBLive (Sept. 5, 2025)........ 31

Melissa Jenco, *AAP speaks out against HHS report on gender dysphoria, infringement on physician-patient relationship*, AAPNews (May 1, 2025) ...................................................... 16

Meredith Willse, *Penn State Health Joins Growing List of Hospital Systems Banning Some Forms of Gender-Affirming Care*, York Dispatch (Apr. 25, 2025) .................................. 30

Meredithe McNamara et al., *An Evidence Based Critique of "The Cass Review" on Gender-Affirming Care for Adolescent Gender Dysphoria*, at 7 (2024) ..................................................... 22

Molly Manning, *VCU Health Ends Gender-Affirming Care Again, Now for All Youth Patients*, The Commonwealth Times (Jul. 30, 2025) ............................................................................... 32

N.J.A.C. Executive Order No. 326 (2023) ................................................. 8

Nev. Medicaid Servs. Manual §608 .......................................................... 9

News Release, Am. Acad. of Pediatrics, Leading Physician Groups Oppose Infringements on Medical Care, Patient-Physician Relationship (May 1, 2025) .................................................. 22

News Release, President Trump Marks Six Months in Office with Historic Successes (July 20, 2025) ...................................... 23

News Release, President Trump Promised to End Child Sexual Mutilation—and He Delivered (Jul. 25, 2025) ........................... 23, 27

Nico Lang, *Children's Hospital LA Shuts Down Trans Youth Clinic, Leaving Families Scrambling*, L.A. Public Press (June 13, 2025) ............................................................................... 25

Oscar Taube, *The Science Doesn't Support Trump's Order on Transition Care*, Balt. Sun (Feb. 9, 2025) ................................ 16

*Outlawing Trans Youth: State Legislatures and the Battle over Gender-Affirming Healthcare for Minors,* 134 Harv. L. Rev. 2163 (2021) ............................................................................... 35

Press Release, Gender-Affirming Care Statement, Children's Hospital of Richmond at VCU (Jul. 29, 2025) .................................. 32

R.I.  Gender Dysphoria/Gender Nonconformity Coverage Guidelines (Oct.  28, 2015) .................................................... 9

R.I. Health Ins. Bull. 2015-03 ................................................................ 10

Scott J. Schweikart, *What's Wrong with Criminalizing Gender-Affirming Care of Transgender Adolescents?*, 25 AMA J. Ethics 414 (June 2023) ................................................................ 21

Sonja Sharp, *Children's Hospital Los Angeles Halts Transgender Care Under Pressure from Trump*, L.A. Times (June 12, 2025) ........ 24

*Statement form UCHealth on GAC, 2-5-2025*, U. Colo. Anschutz (Feb. 5, 2025) ................................................................ 29

Stephanie Innes, *Phoenix Medical Providers Halt Some Gender-Affirming Care for Teens Because of Trump Order*, AZ Central (Feb. 13, 2025) ................................................................ 28

Swedish Nat'l Bd. of Health & Welfare, *Care of Children and Adolescents with Gender Dysphoria: Summary of National Guidelines* (Dec. 2022) ................................................................ 22

Sydney Isenberg, *Denver Health Suspends Gender-Affirming Surgeries for People Under 19 Following Trump Executive Order*, Denver7 (Jan. 30, 2025) ................................................................ 29

U. Chi. Med., *Trans CARE (Clinic for Affirmation and Reproductive Equity): Important Update to Gender-Affirming Pediatric Care Services*, UChicago Med., https://www.uchicagomedicine.org/conditions-services/transgender-care-services/trans-care (Jul. 18, 2025) ................................................................ 26

UCLA Sch. of Law Williams Inst., *Shield Laws for Reproductive and Gender-Affirming Health Care: A State Law Guide* ................ 9

Violet Miller, *UChicago Discontinues Gender-Affirming Care for Minors*, Chi. Sun-Times (Jul. 18, 2025) ................................................................ 26

Wilson Y. Lee et el., *State-Level Anti-Transgender Laws Increase Past-Year Suicide Attempts Among Transgender and Non-Binary Young People in the USA*, 8 Nat. Hum. Behav. 2096 (Sept. 26, 2024) ................................................................ 19

Yasemin Smallens, *"They're Ruining People's Lives": Bans on Gender-Affirming Care for Transgender Youth in the US*, Hum. Rts. Watch (Jun. 3, 2025) ................................................................. 19

**INTRODUCTION AND INTEREST OF AMICI CURIAE**

Plaintiffs challenge two discriminatory executive orders that would functionally exclude transgender people from American public life. The first order (Gender Identity Order) tries to deny the existence of transgender and gender diverse people, and erase the well-established medical condition of gender dysphoria.[1] Declaring it "the policy of the United States to recognize two sexes, male and female," the order prohibits the use of federal funds to promote what the order calls "gender ideology."[2] The second order (Denial of Care Order) disparages gender-affirming medical care as "mutilation" and directs federal agencies to use their considerable reach to defund or investigate the provision of gender-affirming care to people younger than nineteen.[3] The Commonwealth of Massachusetts, the States of California, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New

---

[1] Exec. Order No. 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,615 (Jan. 20, 2025).

[2] *Id.*

[3] Exec. Order No. 14,187, *Protecting Children from Chemical and Surgical Mutilation,* 90 Fed. Reg. 8,771 (Jan. 28, 2025).

1

Jersey, New York, Oregon, Rhode Island, Vermont, Washington, Wisconsin, and the District of Columbia (Amici or Amicus States) submit this brief to underscore the severe and immediate harms that these unlawful orders will cause if allowed to go into effect.

Despite the lower court's injunction, the Gender Identity and Denial of Care Orders (collectively, Executive Orders) as implemented have cut off access to oftentimes life-saving gender-affirming treatments, overriding the thoughtful decisions of young people, the informed judgments of their parents and guardians, and the patient-focused clinical assessments of their medical providers. A wealth of medical evidence makes clear that access to age-appropriate, medically necessary gender-affirming care significantly improves outcomes for individuals with gender dysphoria. Ending that access has caused immediate injury to the health and safety of young people in many states, including some Amici. But the damage does not stop there: the orders have caused needless chaos in the healthcare system and strained the Amicus States' already overextended resources. And critical research into transgender healthcare, such as cancer treatment and suicide prevention, has been decimated.[4]

---

[4] *See, e.g.,* Jo Cavallo, *How the Elimination of Federal Gender-Related*

Amici have a strong interest in mitigating those harms and preventing further harms. Each Amicus State deeply supports the rights of transgender people to live with dignity, to be free from discrimination, and to participate fully and equally in all aspects of civic life. To that end, many Amicus States have enacted laws protecting transgender residents, including laws prohibiting discrimination on the basis of gender identity in public schools, employment, housing, and elsewhere, as well as laws allowing residents to change the sex designation on their identity documents.

Amici also have an interest in this case as regulators of the practice of medicine. Within their jurisdictions, the Amicus States are responsible for licensing doctors and other medical professionals and enforcing standards of care. Pursuant to that responsibility, and in keeping with their commitment to the health and safety of transgender residents, many Amicus States have enacted laws safeguarding access to gender-affirming healthcare and protecting people who lawfully provide or help

---

*Grants and DEI Programs Is Impacting LGBTQ+ Health Research: A Conversation With Mandi Pratt-Chapman, PhD*, ASCO Post (Jun. 10, 2025), https://tinyurl.com/4khbkpy9 (describing losses to scientific understanding, damage to quality of healthcare for transgender communities caused by termination of research funding).

others access such care.  In the experience of those Amicus States, these laws are necessary to secure the rights and dignity of transgender residents and the wellbeing of the Amicus States' communities as a whole.

For all these reasons, as well as the reasons advanced by Plaintiffs, the Court should affirm the district court's preliminary injunction.  Defendants should remain enjoined from enforcing Section 3(g) of the Gender Identity Order and Section 4 of the Denial of Care Order.

## ARGUMENT

Many Amicus States have enacted laws and policies that, unlike the Executive Orders, adhere to medical standards of care by defending transgender people's access to clinically indicated gender-affirming treatments.  The Executive Orders unlawfully seek to override the Amicus States' judgment in that respect, infringing on their historic power to protect the health and safety of their residents and to regulate the medical profession.  Worse, the orders pose a grave threat to the health of transgender adolescents—and risk downstream harms to families, medical providers, communities, and the Amicus States themselves.

## I.    Amicus States prohibit discrimination based on gender identity and protect access to gender-affirming care for transgender adolescents.

Consistent with state policy judgments about protecting vulnerable populations and prohibiting discrimination on the basis of sex, many Amici have enacted civil-rights protections for transgender people in education, employment, healthcare, housing, public accommodations, and other parts of public life.[5]  They have also taken steps to safeguard access to gender-affirming care for transgender people, exercising their sovereign judgment that such safeguards promote public health and wellbeing.

For instance, Massachusetts and many other Amicus States expressly recognize a legal right to gender-affirming care and shield people

---

[5] *See, e.g.*, Mass. Gen. Laws ch. 151B, §4; Mass. Gen. Laws ch. 272, §§92A, 98; Cal. Civ. Code §§51(b), 51(e)(5); Cal. Gov't Code §§12940(a), 12955; Md. Code Ann., Educ. §26-704; Conn. Gen. Stat. §§10-15c, 46a-58 *et seq.*; Del. Code tit. 6, ch. 45 & 46; Del. Code tit. 19, ch. 7; D.C. Code §2-1401.01 *et seq.*; Haw. Rev. Stat. §§368-1, 378-2, 489-3, 515-3; 775 Ill. Comp. Stat. 5/1-102(A), 5/1-103(O-1), 5/1-103(Q); Me. Rev. Stat. tit. 5, §4551 *et seq.*; Md. Code Ann., State Gov't §§20-606, 20-705; Minn. Stat. §§363A.03, subd. 50; 363A.01 *et seq.*; Nev. Rev. Stat. §§118.100, 284.150(3), 439.994, 449.101(1), 613.330; N.J. Stat. Ann. §§10:5-1 *et seq.*, 17:48-6oo, 18A:36-41; N.Y. Exec. Law §§296, 296-a, 296-b; N.Y. Civil Rights Law §40-c; N.Y. Comp. Codes R. & Regs. tit. 9, §466.13; Or. Rev. Stat. §§659A.006, 659A.030, 659A.403, 659A.421; R.I. Gen. Laws §§11-24-2, 23-17-19, 28-5-5, 28-5.1-12, 28-6-18, 34-37-2, 34-37-4, 34-37-4.3, 34-37-5.2, 34-37-5.3, 34-37-5.4; Vt. Stat. Ann. tit. 9, §§4502, 4503; Vt. Stat. Ann. tit. 21, §495; Wash. Rev. Code §§49.60.030(1), 49.60.040(2), 49.60.040(29), 49.60.215.

in their States who access, provide, or assist with the provision of that care from civil or criminal penalties by out-of-state jurisdictions that out-law it.[6] Amici also cover gender-affirming care through their State Medicaid programs,[7] and they prohibit State-regulated health insurance plans from withholding coverage from individuals based on their gender identity or gender dysphoria, thereby ensuring that transgender resi-

---

[6] *See, e.g.*, Mass. Gen. Laws ch. 12, §11I½(b)-(d); Mass. Gen. Laws ch. 147, §63; Mass. Gen. Laws ch. 276, §13; Cal. Civ. Code §56.109; Colo. Rev. Stat. §§10-16-121(1)(f), 12-30-121, 13-21-133, 16-3-102, 16-3-301; Conn. Gen. Stat. §§19a-17e, 52-146w, 52-146x, 52-571m, 52-571n, 54-155b; 735 Ill. Comp. Stat. 40/28-5, *et seq.*; Me. Rev. Stat. tit. 14, §9001, *et seq.*; Me. Rev. Stat. tit. 22, §§1508; Md. Code Ann., State Pers. & Pens. §2-312; 2023; Minn. Laws, ch. 29; N.Y. Exec. Law §837-x; N.Y. Comp. Codes R. & Regs. tit. 10, §405.7(c)(2); Or. Rev. Stat. §§15.430, 24.500, 414.769, 435.210, 435.240; Vt. Stat. Ann. tit. 12, §7301 *et seq.*; Wash. Rev. Code §7.115 *et seq.*; N.J.A.C. Executive Order No. 326 (2023); *see also* UCLA Sch. of Law Williams Inst., *Shield Laws for Reproductive and Gender-Affirming Health Care: A State Law Guide*, https://williamsinstitute.law.ucla.edu/publications/shield-laws-fact-sheets.

[7] *See, e.g.,* Gender-Affirming Care Covered by MassHealth, https://www.mass.gov/info-details/gender-affirming-care-covered-by-masshealth; Md. Code Ann., Health-Gen. §15-151; 89 Ill. Adm. Code §§140.413(a)(16), 140.440(h); Minn. Stat. §256B.0625, subd. 3a; Nev. Medicaid Servs. Manual §608, *available at* https://bit.ly/NVMedicaid; R.I. Gender Dysphoria/Gender Nonconformity Coverage Guidelines (Oct. 28, 2015), *available at* https://bit.ly/RI-Guidelines.

dents enjoy the same coverage for medically necessary treatment as cis-gender residents.[8]

Along similar lines, many Amicus States prohibit their licensing authorities from penalizing licensed medical professionals who provide gender-affirming care. For example, many Amici have enacted laws that exclude the provision of gender-affirming care from the definition of "professional misconduct" and that shield medical providers from facing professional discipline based solely on an out-of-state conviction or adverse license action resulting from the provision of gender-affirming care.[9]

---

[8] *See, e.g.*, Mass. Gen. Laws ch. 272, §§92A, 98; Cal. Code Regs. tit. 10 §2561.2, subd. (a) (2012); 3 Code Colo. Regs. §702-4, Reg. 4-2-42, §5(A)(1)(o); Del. Code tit. 18, §2304; 215 Ill. Comp. Stat. 5/356z.60(b); 50 Ill. Adm. Code §2603.35; Me. Rev. Stat. tit. 22, §3174-MMM; Md. Code Ann., Ins. §15-1A-22; Minn. Stat. §62Q.585; N.J. Stat. Ann. §17:48-6oo; N.Y. Comp. Codes R. & Regs. tit. 11, §52.75; Or. Admin. R. 836-053-0441; Vt. Stat. Ann. tit. 8, §§4724, §4088m; Mass. Div. of Ins. Bulls. 2021-11, 2014-03, *available at* https://www.mass.gov/lists/doi-bulletins; R.I. Health Ins. Bull. 2015-03, *available at* https://bit.ly/RI-2015-03.

[9] *See, e.g.,* Mass. Gen. Laws ch. 112, §§5F½, 77, 128; Cal. Bus. & Prof. Code §§850.1, 852, 2253, 2761.1; Conn. Gen. Stat. §§19a-17e, 20-579a, 52-571m; Colo. Rev. Stat. §12-30-121; Md. Code Ann., Health Occ. §1-227; N.Y. Educ. Law §6531-b; Or. Rev. Stat. §§675.070, 675.540, 675.745, 677.190, 678.138, 685.110, 689.405; 225 Ill. Comp. Stat. 60/22(C). Relatedly, some Amicus States bar medical malpractice insurers from discriminating against medical professionals solely because they provide gender-affirming care. *See, e.g.,* Colo. Rev. Stat. §10-4-109.6(1); Or. Rev. Stat. §676.313.

Some of those State licensing boards—like the Boards of Registration in Medicine and in Nursing in Massachusetts—also instruct licensees that they shall not withhold or deny care based on a patient's gender identity.[10] Other Amicus States, meanwhile, mandate training for healthcare professionals to ensure that patients who identify as transgender, gender diverse, and intersex receive trans-inclusive care.[11]

Taken together, the above laws and policies reflect many States' commitment to preserving the integrity of the medical profession, protecting the equality of all people, and ensuring that people with gender dysphoria are not denied medically necessary healthcare. In the experience of many Amicus States, these laws and policies are essential to address long-standing inequities in the healthcare system. Unlike the Executive Orders, the laws and policies discussed above adhere to medical standards of care and respect the doctor-patient relationship, thereby preserving the integrity and ethics of the medical profession. More importantly, Amici's laws result in better health outcomes for transgender

---

[10] *See* 244 Code Mass. Regs. §9.03(13); Mass. Bd. of Reg. in Medicine Policy 16-01: Policy on Gender Identity and the Physician Profile Program, *available at* https://www.mass.gov/lists/physician-regulations-policies-and-guidelines.

[11] *See, e.g.*, Cal. Ins. Code §10133.13.

adolescents, safeguarding their physical, emotional, and financial well-being. The Executive Orders undermine the Amicus States' sovereign authority in protecting the health and safety of our residents.

## II. The Executive Orders are harming the Amicus States and their residents.

The Executive Orders' attempt to terminate gender-affirming care for transgender adolescents is as cruel as it is unjustified. Allowing the orders to go into effect would impose tremendous physical, emotional, and psychological harm on an already vulnerable population. Transgender young people are terrified, with some "say[ing] things like, 'I don't even know why I should exist—my government hates me.'"[12] Further, by threatening to strip federal funding from all institutions that provide gender-affirming care—even if the funds are unrelated to such care—Defendants have sown chaos and confusion in the healthcare system. In the face of such uncertainty and fear, clinics across the country have shuttered their doors to young people in critical need of care. Though many courageous providers remain, residents in Amicus States are at constant

---

[12] Andrew Dyer, *San Diego Military Family Reacts to Loss of Gender-Affirming Medical Coverage*, KPBS (Jan. 7, 2025), https://www.kpbs. org/news/military/2025/01/07/san-diego-military-family-reacts-to-loss-of-gender-affirming-medical-coverage.

risk of that care being disrupted. Defendants' orders are also placing burdens on the Amicus States themselves: the Amicus States have been forced to take steps to mitigate the potential consequences that would flow from the orders if they took effect.

### A. Cutting off medically indicated treatments for gender dysphoria will harm the health of transgender adolescents.

Many transgender individuals suffer from gender dysphoria, a medical condition characterized by a mismatch between a person's gender identity and the sex they were designated at birth that results in clinically significant distress.[13] Left untreated, gender dysphoria can substantially affect quality of life and cause "symptoms of depression and anxiety, substance use disorders, a negative sense of well-being and poor self-esteem, and an increased risk of self-harm and suicidality."[14]

There is considerable medical evidence that gender-affirming care improves the symptoms of gender dysphoria, and that denying gender-affirming care to young people with gender dysphoria can have tragic

---

[13] Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 512-514 (5th ed., text rev. 2022).

[14] Garima Garg et al., *Gender Dysphoria: Cont. Ed. Activity*, StatPearls (July 11, 2023), https://www.ncbi.nlm.nih.gov/books/NBK532313.

consequences for their physical and mental well-being. For example, an analysis conducted in 2021 found that, for teenagers under the age of eighteen, use of gender-affirming hormone therapy was associated with lower odds of recent depression and lower odds of attempting suicide compared to adolescents who wanted, but did not receive, such therapy.[15] Another study concluded that, for teenagers and young adults ages thirteen to twenty, receiving gender-affirming care, including puberty blockers and gender-affirming hormones, was associated with 60% lower odds of moderate or severe depression and 73% lower odds of having suicidal thoughts over a twelve-month period.[16] A longitudinal study that followed transgender adolescents from their intake at a gender clinic into young adulthood reported that gender-affirming treatment resulted in significant improvement in global functioning and psychological well-be-

---

[15] Amy E. Green et al., *Association of Gender-Affirming Hormone Therapy with Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*, 70 J. Adolescent Health 643, 647-648 (2022), https://doi.org/10.1016/j.jadohealth.2021.10.036.

[16] Diana M. Tordoff et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, 5 JAMA Network Open 1, 6-7 (Feb. 25, 2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2789423.

ing and that the participants' life satisfaction, quality of life, and subjective happiness were comparable to their cisgender peers.[17]   Another study found significant improvement in teenagers' sense of self-worth after starting hormone therapy.[18]   In light of the clinical and research-based evidence on the significant benefits and limited risks, major medical organizations—"includ[ing] the American Academy of Pediatrics, American Academy of Child and Adolescent Psychiatry, American Academy of Family Physicians, American College of Obstetricians and Gynecologists, American College of Physicians, American Medical Association,

---

[17] Annelou L.C. de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics 696, 702 (2014), https://doi.org/10.1542/peds.2013-2958; *see also* Oscar Taube, *The Science Doesn't Support Trump's Order on Transition Care*, Balt. Sun (Feb. 9, 2025), https://www.baltimoresun.com/2025/02/09/the-science-doesnt-support-trumps-order-on-transition-care-guest-commentary; Jae-yoon Park, *The "Science" Behind Trump's Anti-Trans War is Incredibly Weak*, The Nation (Jun. 9, 2025), https://www.thenation.com/article/society/trump-hhs-trans-care-report; Melissa Jenco, *AAP speaks out against HHS report on gender dysphoria, infringement on physician-patient relationship*, AAPNews (May 1, 2025), https://tinyurl.com/4r2xcx7r; Catalina Jaramillo, *Trump Misleads on Transgender Issues*, FactCheck (Apr. 8, 2025), https://www.factcheck.org/2025/04/trump-misleads-on-transgender-issues.

[18] Marijn Arnoldussen et al., *Self-Perception of Transgender Adolescents After Gender-Affirming Treatment: A Follow-Up Study into Young Adulthood*, 9 LGBT Health 238, 242-244 (2022), https://www.liebertpub.com/doi/epdf/10.1089/lgbt.2020.0494.

American Psychiatric Association, and at least a dozen more"—"have formally recognized" the benefits of gender-affirming care.[19]

Forcing adolescents with gender dysphoria to wait until they are nineteen years old to access gender-affirming care causes significant harm. Not only are those individuals denied medical treatment that could alleviate their anxiety, depression, and other symptoms, but their symptoms are also likely to worsen while they wait. That is because, without treatment, individuals with gender dysphoria will undergo the puberty and associated physiological changes typical of those with their sex assigned at birth—and therefore inconsistent with the gender with which they identify. One 2020 study showed that adolescents who begin gender-affirming treatment at later stages of puberty are five times more likely to be diagnosed with depression and four times more likely to have anxiety disorders than adolescents who seek treatment in early puberty.[20] As the authors concluded, "[gender incongruent] youth who present to [gender-affirming medical care] later in life are a particularly

---

[19] *Doe v. Ladapo*, 676 F. Supp. 3d 1205, 1213 (N.D. Fla. 2023).

[20] *See* Julia C. Sorbara et al., *Mental Health and Timing of Gender-Affirming Care*, 146 Pediatrics 1, 5-6 (2020), https://publications.aap.org/pediatrics/article/146/4/e20193600/79683/Mental-Health-and-Timing-of-Gender-Affirming-Care.

high-risk subset of a vulnerable population."[21]

The Executive Orders will also harm young people because they contain no exceptions allowing the continuation of ongoing care. In other words, the orders would not only bar new patients from accessing medically necessary treatments, but they would also withdraw care from adolescents who are *already receiving it*. The sudden discontinuation of these vital treatments will needlessly harm adolescents who have been thriving—potentially resurrecting or even amplifying former mental health struggles that the treatment had helped mitigate.[22] As one father explained, withdrawing access to his daughter's medication would be "catastrophic," causing him to fear for her health and safety.[23] Echoing

---

[21] *Id.*

[22] Yasemin Smallens, *"They're Ruining People's Lives": Bans on Gender-Affirming Care for Transgender Youth in the US*, Hum. Rts. Watch (Jun. 3, 2025), https://www.hrw.org/report/2025/06/03/theyre-ruining-peoples-lives/bans-on-gender-affirming-care-for-transgender-youth; *see* Wilson Y. Lee et el., *State-Level Anti-Transgender Laws Increase Past-Year Suicide Attempts Among Transgender and Non-Binary Young People in the USA*, 8 Nat. Hum. Behav. 2096, 2097 (Sept. 26, 2024) (study finding suicide attempts increased by as much as 72% after enactment of laws banning gender-affirming care).

[23] Anya Kamnetz, *"It Shouldn't Be Happening Here": Parents of Trans Children in NYC Are Outraged as Hospitals Quietly Shift Their Approach to Gender-Affirming Care,* The Cut (Feb. 4, 2025), https://www.thecut.com/article/parents-react-nyc-hospitals-denying-gender-affirming-care.html.

this statement, a Massachusetts mother said that her child is "thriving while in treatment after years of struggling in school and at home."[24]  A Washington, D.C., parent said gender-affirming care saved her son's life after he was suicidal.[25]  The Executive Orders purport to know better than these parents.  In stepping into their shoes—and depriving their children of care—the orders will cause real and lasting harm to transgender adolescents.

The Executive Orders also threaten to interfere with the doctor-patient relationship by preventing doctors from discussing the risks and benefits of available treatments for gender dysphoria and preventing patients (and their parents and caregivers) from making informed decisions about the care they wish to receive.[26]  That outcome goes against the

---

[24] Martha Bebinger, *Mass. Clinics Still Provide Trans Care for Kids. The Future Is Uncertain*, WBUR (Jan. 31, 2025), https://www.wbur.org/news/2025/01/31/trans-health-care-massachusetts-trump-funding.

[25] Jenna Portnoy, *After Trump Order, Hospitals Suspend Some Trans Health Care for Youth*, Wash. Post (Jan. 31, 2025), https://wapo.st/46ujUdP.

[26] *See* Ian Wolfe, *Bioethics & Gender Affirming Care*, Univ. of Minn. Ctr. for Bioethics, https://bioethics.umn.edu/news/bioethics-gender-affirming-care (Sept. 6, 2022); *see also* Scott J. Schweikart, *What's Wrong with Criminalizing Gender-Affirming Care of Transgender Adolescents?*, 25 AMA J. Ethics 414, 417 (June 2023), https://bit.ly/Schweikart-AMA (opining that bans on gender-affirming healthcare for adolescents

weight of the medical evidence: even those studies that question the appropriateness of certain types of gender-affirming care for adolescents still affirm the need for an individualized determination of necessary care.[27]  Such interference by the federal government with the doctor-patient relationship will cause lasting harm to doctors and transgender patients in the Amicus States.  As the American Academy of Pediatrics has lamented:

> [A]ll patients must have access to evidence-based, comprehensive medical care, and . . . physicians must be able to practice medicine that is informed by their education, training, and experience without threat of criminalization.  Politics should not get in the way of evidence-based care and a strong patient-physician relationship.[28]

---

"undermin[e] . . . trust in patient-physician relationships, which promotes a chilling effect that harms the practice of medicine more broadly").

[27] Meredithe McNamara et al., *An Evidence Based Critique of "The Cass Review" on Gender-Affirming Care for Adolescent Gender Dysphoria*, at 7 (2024), *available at* https://bit.ly/McNamara-Cass; *see also* Swedish Nat'l Bd. of Health & Welfare, *Care of Children and Adolescents with Gender Dysphoria: Summary of National Guidelines* (Dec. 2022), *available at* https://bit.ly/SV-2023-1-8330.

[28] News Release, Am. Acad. of Pediatrics, Leading Physician Groups Oppose Infringements on Medical Care, Patient-Physician Relationship (May 1, 2025), https://www.aap.org/en/news-room/news-releases/aap/2025/leading-physician-groups-oppose-infringements-on-medical-care-patient-physician-relationship.

## B. The Administration's actions are causing providers to deny care.

The Executive Orders are part of a broader attack on gender-affirming care by the current Administration. The Administration has been open about the goal of these targeted efforts: its press releases have boasted that "[h]ospitals and hospital systems across the country have halted . . . 'gender-affirming care' for minors following [the Denial of Care Order]."[29] In other words, the *intended result* of the Administration's efforts is the denial of medical treatments to adolescents, as recognized by the District Court of Massachusetts.[30] And those results are starting to

---

[29] News Release, President Trump Marks Six Months in Office with Historic Successes (July 20, 2025), https://www.whitehouse.gov/articles/2025/07/president-trump-marks-six-months-in-office-with-historic-successes; *see also* News Release, President Trump Promised to End Child Sexual Mutilation—and He Delivered (Jul. 25, 2025), https://www.whitehouse.gov/articles/2025/07/president-trump-promised-to-end-child-sexual-mutilation-and-he-delivered.

[30] Relying, in part, on the right of states to regulate the practice of medicine, the District of Massachusetts recently quashed a subpoena issued to Boston Children's Hospital seeking information related to the provision of gender-affirming care. In relevant part, the Court noted: "It is abundantly clear that the true purpose of issuing the subpoena is to interfere with the Commonwealth of Massachusetts' right to protect GAC within its borders, to harass and intimidate BCH to stop providing such care, and to dissuade patients from seeking such care." Order, *In re Administrative Subpoena*, 1:25-mc-91324-MJJ (Dkt. No. 33) (Sept. 09, 2025).

materialize: under the cumulative weight of the Administration's targeted actions against providers of gender-affirming care, many providers are scaling back or halting this care altogether.

In California, for example, the nation's the largest provider of gender-affirming care for adolescents, Children's Hospital Los Angeles (CHLA), recently announced the closure of the Center for Transyouth Health and Development (CTYHD)—one of the few facilities in the country providing puberty blockers, hormone replacement therapy, mental health services, and surgical procedures for transgender adolescents on public insurance.[31]  In a June 12, 2025, letter to nearly 3,000 patient families, CHLA announced the complete closure of CTYHD, effective July 22, 2025, due to "significant operational, legal, and financial risks stemming from the shifting policy landscape at both the state and federal levels."[32] Remaining providers in the Los Angeles region do not have capacity to quickly absorb thousands of additional patients.  As one parent of two

---

[31] Sonja Sharp, *Children's Hospital Los Angeles Halts Transgender Care Under Pressure from Trump*, L.A. Times (June 12, 2025), https://www. latimes.com/california/story/2025-06-12/childrens-hospital-of-los-angeles-transgender-care.

[32] Julie Sharp, *Children's Hospital Los Angeles to Close Trans Youth Center*, CBS News (June 13, 2025), https://www.cbsnews.com/losangeles/news/childrens-hospital-los-angeles-close-trans-youth-center.

longtime patients of CTYHD shared, the consequences of CTYHD's closure will be "life and death" for some of the transgender individuals who will no longer have access to care.[33]

A similar story is playing out elsewhere. In Chicago, one hospital has stopped providing puberty blockers and hormone replacement therapy for new patients under 18,[34] while another made the "difficult decision" to suspend gender-affirming treatments after the federal government issued over 20 subpoenas to providers.[35] In Connecticut, the two main providers of care for transgender adolescents have elected to stop providing gender-affirming treatments to patients under 19—leaving

---

[33] Nico Lang, *Children's Hospital LA Shuts Down Trans Youth Clinic, Leaving Families Scrambling*, L.A. Public Press (June 13, 2025), https://lapublicpress.org/2025/06/chla-shuts-down-trans-youth-clinic.

[34] Mack Liederman, *Rush Medical Center Rolls Back Gender-Affirming Care for Minors*, Block Club Chi. (Jul. 15, 2025), https://blockclubchicago.org/2025/07/15/rush-medical-center-rolls-back-gender-affirming-care-for-minors-as-pressure-from-trump-mounts.

[35] Violet Miller, *UChicago Discontinues Gender-Affirming Care for Minors*, Chi. Sun-Times (Jul. 18, 2025), https://chicago.suntimes.com/health/2025/07/18/uchicago-discontinues-gender-affirming-care-for-minors; *see also* U. Chi. Med., *Trans CARE (Clinic for Affirmation and Reproductive Equity): Important Update to Gender-Affirming Pediatric Care Services*, UChicago Med., https://www.uchicagomedicine.org/conditions-services/transgender-care-services/trans-care (Jul. 18, 2025).

hundreds of people without access to lifesaving care.[36]  Both hospitals highlighted federal pressures, with one noting the "federal executive orders and administrative actions relating to gender-affirming care for patients under age 19."[37]  In Delaware, meanwhile, Nemours Children's Hospital has stopped offering gender-affirming care beyond behavioral health services for new patients.  A spokesperson for the hospital cited "actions from federal agencies directed at healthcare providers related to gender-affirming care."[38]

The Administration has celebrated these impacts.  In a press release titled "President Trump Promised to End Child Sexual Mutilation—and He Delivered,"[39] the White House published a list of providers

---

[36] Kaitlin McCallum, *Yale Follows Connecticut Children's in Gutting Pediatric Gender Care*, Hartford Courant (Jul. 24, 2025), https://archive.ph/0ixxQ.

[37] *Id.*

[38] Aubrey Whelan, *Nemours Children's Hospital Cuts Back on Gender-Affirming Care for New Patients*, Phila. Inquirer (Jul. 8, 2025), https://archive.ph/c6YyL.

[39] News Release, *supra* n. 29.  In the months following the White House announcement, more providers have either ended or adapted the provision of gender-affirming care, and this landscape will likely continue to change.  *See, e.g.,* Kyle Davidson, *Advocates Warn of Harms to Trans Youth as Corewell Health Ends Gender Affirming Care for Minors*, Michigan Advance (Sept. 11, 2025), https://tinyurl.com/4n3kf8br.

who have been forced to change their practices as a result of the on-slaught of pressure from the Defendants, including:

- **Phoenix Children's Hospital:** Within days of the issuance of the Denial of Care Order, Phoenix Children's Hospital "indefinitely paused" the provision of hormone therapy to adolescents in its gender clinic "to ensure . . . full compliance with the recent executive order."[40]

- **Stanford Medicine:** Effective June 2, "[a]fter careful review of the latest actions and directives from the federal government and following consultations with clinical leadership, including our multidisciplinary LGBTQ+ program and its providers, Stanford Medicine paused providing gender-related surgical procedures as part of [its] comprehensive range of medical services for LGBTQ+ patients under the age of 19."[41]

- **Denver Health:** Immediately after the issuance of the Denial of Care Order, Denver Health indefinitely suspended gender-affirming surgeries for minors, citing the "criminal and financial consequences for those that do not comply" with the Order.[42]

- **University of Colorado Health:** On February 2, UCHealth announced that, in order to comply with the Denial of Care Order, it

---

[40] Stephanie Innes, *Phoenix Medical Providers Halt Some Gender-Affirming Care for Teens Because of Trump Order*, AZ Central (Feb. 13, 2025), https://archive.ph/7sGFx.

[41] Clara Harter, *Stanford Medicine Ends Surgeries for Transgender Minors Amid Pressure from Trump Administration*, L.A. Times (June 25, 2025), https://archive.ph/GY2fX.

[42] Sydney Isenberg, *Denver Health Suspends Gender-Affirming Surgeries for People Under 19 Following Trump Executive Order*, Denver7 (Jan. 30, 2025), https://www.denver7.com/news/pride/denver-health-suspends-gender-affirming-surgeries-for-minors-following-trump-executive-order.

suspended the provision of therapies outlined in the executive order to patients under 19.[43]

- **Mount Sinai Hospital:** Within days of the issuance of the Denial of Care Order, Mount Sinai and other New York hospitals cancelled scheduled surgical procedures for patients under 19 and informed some parents that they would not provide hormone therapy treatments to new patients under 19.[44]

- **New York-Presbyterian Hospital:** In early February, NYP removed references to the provision gender-affirming care to adolescents from its website, stating that it was "working to comply with applicable state and federal laws."[45]

- **Penn State Health:** Effective April 7, 2025, PSH stopped providing gender-affirming surgeries to 18-year-olds and gender-affirming hormone therapies to new patients under 19, in order "to comply with the [Denial of Care Order]."[46]

- **University of Pittsburgh Medical Center:** In March 2025, UPMC stopped providing hormone treatments to any new patients under 19. Citing "executive branch memos, directives, subpoenas and other guidance from the Trump administration," UPMC ended all gender-affirming care services to patients under

---

[43] *Statement form UCHealth on GAC, 2-5-2025*, U. Colo. Anschutz (Feb. 5, 2025), https://www.cuanschutz.edu/federaltransition/updates/statement-from-uchealth-on-gac---2-5-2025.

[44] Emily Witt, *Where Do Trans Kids Go from Here?*, New Yorker (Feb. 19, 2025), https://www.newyorker.com/news/the-lede/where-do-trans-kids-go-from-here.

[45] Kelsey Butler & Laura Nahmias, *NYC Hospitals Halt Some Gender Affirming Care After Trump Order*, Bloomberg (Feb. 5, 2025), https://www.yahoo.com/news/nyc-hospitals-halt-gender-affirming-222456366.html.

[46] Meredith Willse, *Penn State Health Joins Growing List of Hospital Systems Banning Some Forms of Gender-Affirming Care*, York Dispatch (Apr. 25, 2025), https://tinyurl.com/mf9ummv6.

19 in June 2025.[47]  A therapist in one UPMC outpatient center specializing in suicide prevention reported that she was told "to expect an increase of patients."[48]

- **University of Pennsylvania Health System:** In order to "comply[] with federal government requirements," in May 2025, UPenn Health System ceased offering gender-affirming surgeries to patients under 19.[49]

- **Children's Hospital of Richmond at VCU:** Immediately following the issuance of the Denial of Care Order, the Children's Hospital of Richmond paused the provision of gender-affirming care to patients under 19.  In February 2025, CHR resumed care for existing patients, however, on July 29, 2025, CHR once again ended the provision of all gender-affirming care to patients under 19,[50] "based upon current understanding of federal and state directives."[51]

- **Children's Hospital of The King's Daughters:** Shortly after the Denial of Care Order, on February 3 CHKD suspended the use

[47] Hanna Webster, *'I'm Very Worried': Pittsburgh Parents Navigate UPMC's Curtailing of Gender Services for Ages 18 and Under*, Pittsburgh Post-Gazette (Jun. 26, 2025), https://tinyurl.com/yfnu8w6p.

[48] Megan Trotter, *UPMC Workers to Join Community Groups in March for Transgender Health Care*, TRIBLive (Sept. 5, 2025), https://triblive.com/news/health-now/upmc-workers-to-join-community-groups-in-march-for-transgender-health-care.

[49] Lucy Albright, *Philadelphia-Based Hospital System Ends Gender-Affirming Surgeries for People Under 19*, WITF (May 30, 2025), https://tinyurl.com/2uvrr848.

[50] Molly Manning, *VCU Health Ends Gender-Affirming Care Again, Now for All Youth Patients*, The Commonwealth Times (Jul. 30, 2025), https://tinyurl.com/2z74d8x2.

[51] Press Release, Gender-Affirming Care Statement, Children's Hospital of Richmond at VCU (Jul. 29, 2025), https://www.chrichmond. org/services/transgender.

of hormone therapy and puberty blockers in order to treat gender dysphoria in patients under 19.[52]

- **Children's National Hospital:** Citing "increasing legal and regulatory risks," Children's National Hospital in Washington, D.C., has announced that it will "discontinu[e] the prescription of gender-affirming medications" effective August 30, 2025.[53]

- **Kaiser Permanente:** In response to pressure from the Trump Administration, on July 23, California healthcare giant Kaiser Permanente announced that it would pause all gender-affirming surgeries for patients under 19, effective August 29.[54]

Nowhere in the post from the White House is there an acknowledgement of the thousands of patients and families who will be severely impacted by these closures and terminations of care.

## C. The interference with healthcare facilities will have adverse downstream effects on Amicus States.

Not only have these federal actions harmed transgender and intersex individuals suffering from gender dysphoria, as well as their families and caregivers, but the actions are harming Amicus States as well. As

---

[52] *CHKD Suspends Hormone Therapy, Puberty Blockers for Gender-Affirming Care Following Trump Exec. Order*, WTKR (Feb. 3, 2025), https://www.wtkr.com/news/health/chkd-suspends-hormone-therapy-puberty-blockers-for-gender-affirming-care.

[53] *Gender Development Program*, Children's Nat'l, https://www.childrensnational.org/get-care/departments/gender-development-program.

[54] Leif Le Mahieu, *Health Care Provider Puts Stop to Trans Surgeries on Kids*, Daily Wire (Jul. 23, 2025), https://www.dailywire.com/news/health-care-puts-stop-to-trans-surgeries-on-kids.

described above, the Executive Orders have interfered with healthcare facilities in Amicus States and have the potential to interfere with state agency operations, causing irreparable harm. *See, e.g., Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017), *reconsideration denied*, 267 F. Supp. 3d 1201, (N.D. Cal. 2017); *Michigan v. DeVos*, 481 F. Supp. 3d 984, 995-996 (N.D. Cal. 2020). The potential that state healthcare facilities may lose funding, and the budgetary uncertainty that would result, requires Amicus States to take steps to mitigate the risk of losing federal funds. This uncertainty interferes with Amicus States' ability to budget, plan for the future, and properly serve their residents. *See Cnty. of Santa Clara*, 250 F. Supp. 3d at 537; *see also United States v. North Carolina*, 192 F. Supp. 3d 620, 629 (M.D.N.C. 2016) (finding irreparable harm where unavailability of funds was "likely to have an immediate impact on [the state's] ability to provide critical resources to the public, causing damage that would persist regardless of whether funding [was] subsequently reinstated").

Implementation of the Executive Orders will also result in States facing a population of transgender adolescents in crisis. Transgender ad-

olescents who are denied gender-affirming care are likely to require additional, more costly physical and mental healthcare, now and down the road.[55]  The Executive Orders are already causing (and will continue to cause) serious harm to this population, affecting their ability to thrive at school and at home.

***

The harm caused by the Executive Orders is not abstract or hypothetical.  Some transgender adolescents are not receiving the healthcare they need *right now*, regardless of what medical providers, parents, caregivers, and guardians believe is best for their medical needs.  As discussed above, this increases the risk of anxiety, depression, and suicidality for the adolescents denied care.  The Administration has celebrated hospitals and clinics that have ceased gender-affirming care as a result

---

[55] Landon D. Hughes et al., *"These Laws Will Be Devastating": Provider Perspectives on Legislation Banning Gender-Affirming Care for Transgender Adolescents*, 69 J. Adolescent Health 976, 979 (2021) ("[P]roviders described how denial of evidence-based, gender-affirming care for [transgender and gender-diverse youth] will necessitate more serious and costly interventions including avoidable surgeries later in life"); *see generally Outlawing Trans Youth: State Legislatures and the Battle over Gender-Affirming Healthcare for Minors,* 134 Harv. L. Rev. 2163 (2021) (explaining how puberty blockers and hormone replacement therapies allow transgender adolescents to avoid intense psychological distresses, including anxiety, depression, and suicidal behavior).

of the Executive Orders, demonstrating that the health and well-being of transgender adolescents was never the goal.

## CONCLUSION

The Court should affirm the district court's order.

September 26, 2025                    Respectfully submitted.

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*

 /s/ *Tasha J. Bahal*
ALLYSON SLATER
  *Director, Reproductive Justice Unit*
TASHA J. BAHAL
GERARD J. CEDRONE
  *Deputy State Solicitors*
JAK KUNDL
  *Assistant Attorney General*
One Ashburton Place
Boston, MA 02108
(617) 963-2066
tasha.bahal@mass.gov

(Listing of counsel continued on next page)

27

ROB BONTA
*Attorney General of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
  *Attorney General of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
  *Attorney General of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
  *Attorney General of Delaware*
820 N. French Street
Wilmington, DE 19801

ANNE E. LOPEZ
  *Attorney General of Hawai'i*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
  *Attorney General of Illinois*
115 S. LaSalle St.
Chicago, IL 60603

AARON M. FREY
  *Attorney General of Maine*
6 State House Station
Augusta, ME 04333-0006

ANTHONY G. BROWN
  *Attorney General of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

DANA NESSEL
  *Attorney General of Michigan*
P.O. Box 30212
Lansing, Michigan 48909

KEITH ELLISON
  *Attorney General of Minnesota*
State Capitol 102
75 Rev. Dr. M. L. King Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
Attorney General of Nevada
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119

MATTHEW J. PLATKIN
  *Attorney General of New Jersey*
25 Market Street
Trenton, NJ 08625

LETITIA A. JAMES
  *Attorney General of New York*
28 Liberty Street
New York, NY 10005

DAN RAYFIELD
  *Attorney General of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
  *Attorney General of Rhode Island*
150 South Main Street
Providence, RI 02903

NICHOLAS W. BROWN
  *Attorney General of Washington*
P.O. Box 40100
Olympia, WA 98504

BRIAN L. SCHWALB
  *Attorney General of*
    *the District of Columbia*
400 6th Street NW
Washington, DC 20001

CHARITY R. CLARK
  *Attorney General of Vermont*
109 State Street
Montpelier, VT 05609

JOSHUA L. KAUL
  *Attorney General of Wisconsin*
P.O. Box 7857
Madison, WI 53707

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with type-volume limits of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. R. 32(f), the brief contains 5,389 words.

The foregoing brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and (6) because the brief has been prepared in Microsoft Word using 14-point Century Schoolbook, a proportionally spaced typeface.

/s/ *Tasha J. Bahal*
Tasha J. Bahal
 *Assistant Attorney General*
One Ashburton Place
Boston, MA 02108
(617) 963-2066
tasha.bahal@mass.gov

*Counsel for Amici Curiae*