IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

|  |  |
|---|---|
| PFLAG, INC., et al.,<br><br>Plaintiffs-Appellees,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>Defendants-Appellants. | No. 25-1279 |

**MOTION FOR STAY PENDING APPEAL**

Defendants-appellants President Donald J. Trump, et al., respectfully seeks a stay of the district court's universal preliminary injunction entered on March 4, 2025. The injunction prohibits defendants from implementing two Executive Orders that direct federal agencies under the President's supervision to exercise their discretion, to the extent they may do so consistent with applicable law, to avoid the federal funding of gender ideology and specified sex transition interventions for children under age 19. Plaintiffs oppose this motion.

The district court's universal preliminary injunction was flawed when issued. But subsequent decisions of the Supreme Court and this

Court have confirmed that the district court's reasoning was mistaken at every turn.

*First*, plaintiffs' suit hinges on the assertion that agencies would act unlawfully in the future under as-yet-unidentified statutory authorities in rescinding, conditioning, or otherwise affecting grant funds for plaintiffs' medical providers or employers, despite the Executive Orders' direction that the agencies comply with the law in implementing the President's policies. Those claims are premature, and in any event, plaintiffs cannot meet the high bar for a facial ultra vires claim. The Supreme Court has recently stayed an injunction resting on similar reasoning, and this Court has reversed multiple essentially identical injunctions. *Trump v. American Fed'n of Gov't Emps.* (*AFGE*), 145 S. Ct. 2635 (2025); *Sustainability Inst. v. Trump*, 165 F.4th 817, 831-34 (4th Cir. 2026); *Sols. in Hometown Connections v. Noem*, 165 F.4th 835, 844 (4th Cir. 2026). The legitimacy of any future action taken to implement the Orders could be subject to review at that time. *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump* (*NADOHE*), 167 F.4th 86, 102 (4th Cir. 2026).

*Second*, the district court's injunction cannot be squared with the Supreme Court's decision in *United States v. Skrmetti*, 605 U.S. 495 (2025), which held that classifications based on age and medical use warrant rational basis review and that legislation banning sex transition interventions for minors plainly satisfied rational basis review. As this Court recently explained, the same principle governs plaintiffs' statutory sex-discrimination claims as well. *See Anderson v. Crouch*, --- F.4th ---, No. 22-1927, 2026 WL 667919 (4th Cir. Mar. 10, 2026).

*Third*, even if plaintiffs were entitled to a preliminary injunction, the district court's universal preliminary injunction sweeps far beyond "administer[ing] complete relief *between the parties.*" *Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025) (quotation omitted). The district court's order, which predated *CASA*, ignored this fundamental principle.

This Court should stay the preliminary injunction pending appeal, or at the very least, it should be stayed except as to the 16 identified individuals.

# STATEMENT

## A. Background

President Trump issued two Executive Orders at issue here shortly after he took office in January 2025. As relevant here, the "Defending Women EO" directs federal agencies to take necessary steps "as permitted by law" to assess grant conditions and grantee preferences to ensure that federal grant funds do not promote "gender ideology." Exec. Order No. 14,168, § 3(e), *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615, 8616 (Jan. 30, 2025). The "Protecting Children EO" directs agencies that provide research or education grants to medical institutions to take appropriate steps "consistent with applicable law" to ensure that institutions receiving federal research or education grants end the "chemical and surgical mutilation" of children, defined as including the use of "puberty blockers," "sex hormones," or "surgical procedures" in the treatment of gender dysphoria. Exec. Order No. 14,187, §§ 2(c), 4, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771, 8771-72 (Feb. 3, 2025).

**B. Procedural History**

1. Plaintiffs consist of six trans-identifying individuals, certain parents, and two organizations, PFLAG, Inc., and GLMA. JA930-31. In support of plaintiffs' motion for preliminary injunction, six PFLAG members and four GLMA members submitted declarations. JA377-409; JA411-21; JA445-53.

Plaintiffs brought a lawsuit facially challenging the portions of these Executive Orders concerning the funding of gender ideology and sex transition interventions. JA925 n.6. Plaintiffs alleged that the Executive Orders violated the separation of powers, the Equal Protection component of the Fifth Amendment, and the anti-sex-discrimination provisions of the Affordable Care Act (ACA) and the Public Health Service Act (PHSA), and sought a preliminary injunction. The district court entered a universal preliminary injunction on March 4, 2025, enjoining defendants from implementing these policy directives and denying the government a stay pending appeal. JA922-87.

2. The government appealed the universal preliminary injunction. After the Supreme Court's decisions in *Skrmetti*, *CASA*, and *AFGE*, and

this Court's grant of a stay in *NADOHE*, *see* A7-A16,[1] the government filed in the district court a motion to stay the injunction pending appeal on July 28, 2025.

3. In the meantime, the government and plaintiffs submitted their merits briefs in this Court. On October 1, 2025, this Court stayed the briefing schedule in light of the lapse of appropriations to the Department of Justice. ECF 78. During the lapse, this Court tentatively calendared the case for oral argument during the Court's January 2026 sitting, ECF 82, and after appropriations were restored, the Court ordered the reply brief to be filed on December 8, 2025, ECF 101. On November 21, 2025, however, the Court *sua sponte* placed this appeal "in abeyance pending a decision by this court in *Anderson v. Crouch*, No. 22-1927." ECF 111.

4. After this Court issued its decision in *Anderson v. Crouch*, --- F.4th ---, No. 22-1927, 2026 WL 667919 (4th Cir. Mar. 10, 2026), the government moved to resume briefing and schedule oral argument in

---

[1] Citations to "A__" refer to page numbers in the Addendum attached to this motion.

this Court's May 2026 sitting.  ECF 116.  This Court denied the motion, leaving this appeal in abeyance indefinitely.  ECF 121.

5.  On March 30, 2026, the government notified the district court of the government's intent to file a motion for a stay pending appeal in this Court.  On April 1, the district court denied the stay motion.  D. Ct. ECF 166 (A1-A6).

## ARGUMENT

The familiar factors governing the grant of a stay pending appeal—likelihood of success on the merits, irreparable injury, the balance of the equities, and the public interest—strongly counsel in favor of a stay here.  *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

## I.     The Government Is Likely to Succeed on the Merits.

The district court issued a universal injunction premised on a series of erroneous conclusions.  Plaintiffs cannot challenge hypothetical actions agencies might take in the future, and even if they could, they cannot meet the high bar for a facial ultra vires challenge.  Moreover, the Executive Orders at issue satisfy rational basis review under *United States v. Skrmetti*, 605 U.S. 495 (2025), and *Anderson v. Crouch*, --- F.4th ---, No. 22-1927, 2026 WL 667919 (4th Cir. Mar. 10, 2026), and for

the same reasons do not violate the anti-sex-discrimination provisions of the ACA and the PHSA. And in all events, the district court's universal injunction is plainly improper after *Trump v. CASA, Inc.*, 606 U.S. 831 (2025).

**A.** Plaintiffs cannot prevail on their so-called "separation of powers" claim. Plaintiffs' claim challenging hypothetical future actions taken pursuant to the Executive Orders has no prospect of success, whether those flaws are viewed as threshold impediments or as a failure to meet the standards for a facial ultra vires claim.

1. The district court concluded that plaintiffs are likely to succeed on what they call a "separation of powers" claim challenging the Executive Orders. That claim does not challenge any particular action taken by any agency to implement the Orders. The claim instead hinges on the notion that federal agencies carrying out these instructions will do so in an unlawful manner that harms plaintiffs, even though the Executive Orders specifically direct the agencies to act "as permitted by law," Defending Women EO § 3(e), and "consistent with applicable law," Protecting Children EO § 4. Moreover, plaintiffs

8

assert that by directing such unlawful action, the Executive Orders trench on Congress's Article I spending powers.

In other words, plaintiffs assert that despite the instruction to carry out the Executive Orders' directives consistent with law, agencies will in the future terminate or condition as-yet-unidentified grants in violation of as-yet-unidentified statutory authorities, and that the particular grants that are allegedly unlawfully terminated or conditioned would injure them by causing institutions at which they work or are patients to cease providing the particular interventions at issue here.

Every step in that chain is mistaken. To start, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotation omitted); *see Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013); *see also NADOHE*, 167 F.4th 86, 98 n.4 (4th Cir. 2026) (observing that ripeness often overlaps with the injury-in-fact prong of standing).

This case is entirely about such contingent events. The Protecting Children EO instructs agencies that "provide[] research or education grants to medical institutions, including medical schools and hospitals," to take "appropriate steps," "consistent with applicable law," to "ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children." Protecting Children EO § 4; *see id.* § 11(b). Similarly, the Defending Women EO directs agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology" and to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." Defending Women EO § 3(e), (g); *see id.* § 8(b).

The Executive Orders are not self-executing and do not identify any specific funding that could or should be terminated, conditioned, or otherwise affected. Before any action could occur, the agency administering each grant would have to determine that terminating the grant was consistent with the applicable statutes, regulations, and grant terms. The Orders contemplate that implementation, directing agency heads to report on progress made in implementing each Order, including (for the Protecting Children EO) "a timeline for future action."

10

Protecting Children EO § 9; Defending Women EO § 7(a).  Plaintiffs'

subjective fear that one or more of the defendant agencies here will

make such a determination as to an institution at which they work or

are a patient is no substitute for a concrete indication for a particular

grant program that there will be a live controversy.  And that live

controversy would not resemble the present lawsuit:  if an agency made

such a determination for any individual grant or grant program, any

legal challenge would center on whether the agency's assessment in

that regard was lawful.

Both this Court and the Supreme Court have recently reiterated

these principles.  In *AFGE*, the Supreme Court stayed a preliminary

injunction against an executive order and memorandum that directed

agencies to undertake "reductions in force" at federal agencies

"consistent with applicable law."  Exec. Order No. 14,210, § 3(c),

*Implementing the President's "Department of Government Efficiency"*

*Workforce Optimization Initiative*, 90 Fed. Reg. 9669, 9670 (Feb. 14,

2025).  The Supreme Court explained that a stay was appropriate

because the district court did not have before it the actual plans and

thus could not assess their legality, *AFGE*, 145 S. Ct. 2635, 2635 (2025),

with Justice Sotomayor emphasizing the same point in her concurrence, *id.* (Sotomayor, J., concurring in the grant of stay).  This Court took the same course in staying a preliminary injunction issued against two executive orders that instructed agencies to "terminate, to the maximum extent allowed by law," all "DEI" programs within federal grant and contract processes.  *NADOHE*, 167 F.4th at 94 (quotation omitted).  In issuing a stay, members of this Court emphasized that the case "d[id] not challenge any particular agency action implementing the Executive Orders," A15 (Rushing, J., concurring), that the executive orders merely "direct executive policy and actors," A10 n.2 (Diaz, C.J., concurring), and that the executive orders did "not on their face violate" the Constitution, A13 (Harris, J., concurring); *see also* A15 (Rushing, J., concurring) (highlighting "serious questions about the ripeness of [the] lawsuit").

The district court suggested that these decisions have no impact here because they "do not contain analysis of the *Nken* factors."  A3.  But this Court in *NADOHE* expressly discussed those factors, *see* A8, and *AFGE* necessarily relied on them in granting a stay.  The district court erred in ignoring these on-point authorities.

2. Moreover, even if plaintiffs could proceed at this point, their facial challenge to the Executive Orders as ultra vires could not succeed. To succeed on an ultra vires claim, plaintiffs would have to show that an agency would take "action entirely in excess of its delegated powers and contrary to a *specific prohibition* in [the] statute." *Sustainability Inst. v. Trump*, 165 F.4th 817, 832 (4th Cir. 2026) (quotation omitted). And plaintiffs' burden is even greater in this facial challenge: they must demonstrate that there is *no* action that *any* agency could take that would not be contrary to some specific statutory prohibition. *See Reno v. Flores*, 507 U.S. 292, 301 (1993) (explaining that a facial challenge requires showing that "no set of circumstances exists" under which the Executive Orders would be valid).

The district court did not apply this standard. It instead granted relief on the premise that the government was required to identify "specific authorization" for any hypothetical future actions consistent with the Executive Orders, JA953, JA955, and asserted that the government's failure to identify in advance such statutory authorities meant that the President had usurped Congress's Article I powers, JA959-66.

This Court's precedent makes clear that was erroneous. As this Court recently explained, nonstatutory review claims come in two varieties: ultra vires claims alleging violation of a federal statute, which are "strictly limited" and subject to the principles outlined above, and constitutional claims, which "are not subject to the same restrictions." *Sustainability Inst.*, 165 F.4th at 830 (quotation omitted). Importantly, "the Supreme Court has foreclosed efforts to recast statutory claims as constitutional ones" to avoid the more stringent standards for statutory ultra vires claims. *Id.* at 831. Thus, if plaintiffs "assert that because executive officials and agencies violated statutes, they also violated the Constitution," then the "core" of those claims are statutory. *Id.* In *Sustainability Institute*, for example, the plaintiffs asserted "that the Government's freeze and termination of their grants" would be inconsistent with the statutes governing those grants and thus would "violate[] the Constitution's 'separation of powers' and the Presentment Clauses." *Id.* at 830. Those claims, the Court explained, were statutory, because "Congress gave the Executive authority to issue grants under the various statutes," and "[t]hose alleged statutory violations are the predicate for Plaintiffs' constitutional claims." *Id.* at

14

832. The plaintiffs' ultra vires claims failed in that context because they could not identify any "statute 'specific[ally] prohibit[ing]' the Government from freezing or terminating their grants" or "tell[ing] the Government that it must contract specifically with Plaintiffs." *Id.* at 833 (first and second alterations in original); *accord Sols. in Hometown Connections v. Noem*, 165 F.4th 835, 844 (4th Cir. 2026) (rejecting similar claims for same reasons).

Exactly the same is true here. Plaintiffs contend that "[f]ederal grants are federal law enacted by Congress, and conditioning or cancelling federal grants amounts to amending or repealing federal law," JA950, and the district court concluded that because "Congress has not authorized" the withholding of funds "the Executive Branch exceeded its power," JA955; *accord* JA960-66. Thus, plaintiffs' assertions of constitutional violations depend entirely on the claim that the relevant statutory authorities do not authorize agencies to terminate or condition any grants within their purview. "Those alleged statutory violations are the predicate for Plaintiffs' constitutional claims because without the appropriations statutes there could be no improper withholding of funds," and thus plaintiffs' claims are statutory

15

ultra vires claims. *Sustainability Inst.*, 165 F.4th at 832. And here, too, plaintiffs have identified no statute requiring that agencies provide grants to the particular institutions plaintiffs have identified here. Indeed, this case is even more straightforward than *Sustainability Institute*: plaintiffs here have brought a *facial* challenge, which would require them to show that they meet the ultra vires standard as to *every* possibly relevant grant program. Plaintiffs have not attempted to meet that standard.

In denying a stay, the district court suggested that *Sustainability Institute* had no bearing because it involved a "direct challenge[] to grant terminations by grant recipients." A3. But the district court gave no reason why the identity of the plaintiff would alter the fundamental nature of the claim and the showing that must be made to prevail.

The district court also treated as "boilerplate," JA958, the Executive Orders' instruction that they are to be effectuated "as permitted by law," Defending Women EO § 3(e), or "consistent with law," Protecting Children EO § 4. Indulging that assumption would not salvage plaintiffs' facial ultra vires claims, but it is also wrong on its own terms. The President has wide latitude to "determine his policy

16

priorities and instruct his agents to make funding decisions based on them." *NADOHE*, 167 F.4th at 101.  It is no surprise that he would direct agencies to carry out his policies to the maximum extent permitted by law, and in those circumstances, "if an executive agency … may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002).  And as this Court has noted, were an agency to disregard legal limits in taking actions with respect to particular grants or grant programs, "then plaintiffs can sue *those* actors for terminating *those* contracts." *NADOHE*, 167 F.4th at 102.

**B.**  The government also is likely to prevail on its argument that the Executive Orders do not violate the Equal Protection component of the Fifth Amendment or the anti-sex-discrimination statutes.

1.  Under *Skrmetti*, the Executive Orders are subject to rational-basis review because they make classifications based on "age" and "medical use," not sex or transgender status.  605 U.S. at 511; *see*

*Anderson*, 2026 WL 667919, at *6. Like the Tennessee law in *Skrmetti*, the Orders address specific interventions (puberty blockers, sex hormones, and surgical procedures) for a particular medical use (treatment of gender dysphoria) in minors, and thus classify based on age and medical use. *See Skrmetti*, 605 U.S. at 511-13. In denying the government's stay motion, the district court repeated its prior conclusion that the Executive Orders "facially classify based on transgender status," A4, but it did not attempt to square that with *Skrmetti*. Under *Skrmetti*, the Executive Orders are subject to rational basis review.

The Executive Orders "clearly meet[]" rational basis review because they are rationally related to a legitimate governmental interest. *Skrmetti*, 605 U.S. at 522. Like the Tennessee legislature in *Skrmetti*, the Executive Orders note that sex transition interventions could lead to "irreversible" outcomes, "lifelong medical complications," and "sterilization" for minors. *Compare* Protecting Children EO § 1 (discussing President's findings), with *Skrmetti*, 605 U.S. at 516-17, 522-23 (discussing state's findings). The President also observed that sex transition interventions could cause "these vulnerable youths'

18

medical bills [to] rise throughout their lifetimes," which the government has a legitimate interest in mitigating. Protecting Children EO § 1; *see Anderson*, 2026 WL 667919, at *9. Thus, it was rational for the Executive Orders to direct agencies to take steps consistent with law to end federal funding for sex transition interventions.[2]

2. *Skrmetti* also forecloses plaintiffs' statutory sex-discrimination claims. The ACA prohibits discrimination "on the basis of sex," *see* 42 U.S.C. § 18116(a) (incorporating standard from 20 U.S.C. § 1681(a)), and the PHSA prohibits discrimination "on the ground of sex," 42 U.S.C. § 300w-7(a)(2). In *Bostock v. Clayton County*, 590 U.S. 644 (2020), the Supreme Court explained in the analogous Title VII context that these statutes employ a "traditional but-for causation standard." *Id.* at 656. In applying that standard to the ACA and the PHSA here, this Court is "bound to follow the Supreme Court's instructions [in *Skrmetti*] about the correct way to apply *Bostock*." *Anderson*, 2026 WL 667919, at *10.[3] Applying *Skrmetti*'s interpretation of *Bostock*, this

---

[2] Even if the Executive Orders were subject to heightened scrutiny, they would satisfy that standard. Opening Br. 52-54.

[3] The district court observed that "a petition for rehearing en banc remains pending" in *Anderson*. A5. But the district court is required to

*Continued on next page.*

Court held that West Virginia's refusal to provide coverage for sex-change surgeries in its Medicaid plan "did not discriminate because of sex" because "a patient's diagnosis—not sex or transgender status—is the but-for cause of the ability or inability to obtain coverage under the plan." *Id.* at *10-11.  So too here:  "changing a minor's sex or transgender status does not alter" the application of the Executive Orders which express the President's grant policies based on medical use and age.  *Skrmetti*, 605 U.S. at 520.  Thus, the Executive Orders do not violate either the ACA or the PHSA's anti-sex-discrimination clauses.

**C.**  Even if the Court determines that a full stay is not warranted, it should at the very least stay the universal aspect of the injunction, which grants relief that applies to nonparties and association plaintiffs' unidentified members.  *See CASA*, 606 U.S. at 861 (granting stays to the extent injunctions went beyond remedying plaintiffs' injuries); *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 921 (Mem.) (2024) (similar).

---

follow *Anderson* as the law of this circuit.  *See, e.g.*, *In re Zermeno-Gomez*, 868 F.3d 1048, 1052-53 (9th Cir. 2017) (noting that decision is precedential even before mandate issues); *Martin v. Singletary*, 965 F.2d 944, 945 n.1 (11th Cir. 1992) (same).

In *CASA*, the Supreme Court explained that a district court's remedial power under the Judiciary Act is limited to granting relief to the parties before the court. 606 U.S. at 856. Universal injunctions—which "prohibit enforcement of a law or policy against *anyone*"—exceed this authorization, and *CASA* makes clear that "federal courts lack authority to issue them." *Id.* at 837, 856. As this Court has recognized after *CASA*, "the universal injunction ... falls outside the bounds of a federal court's equitable authority," and "[a]t least without special statutory authorization, the federal courts have no power to impose them." *Chamber of Com. of the U.S. v. Lierman*, 151 F.4th 530, 543 (4th Cir. 2025) (first part quoting *CASA*, 606 U.S. at 847).

The district court's award of a universal injunction to plaintiffs contravenes the cardinal principle that "courts generally 'may administer complete relief *between the parties*.'" *CASA*, 606 U.S. at 851. That principle applies straightforwardly here: the individual plaintiffs and other members of PFLAG who submitted declarations allege that they received treatment, or were scheduled to receive treatment, affected by the Executive Orders, and identified the institutions providing treatment. JA49-51; JA377-409; JA423-29. Similarly, the

21

members of GLMA who submitted declarations identified the institutions at which they work and for which they fear the loss of federal funds. JA411-16; JA418-21; JA445-48; JA450-53. Those injuries would be fully remedied by an injunction that barred application of the Executive Orders to the identified institutions. Enjoining the government from acting as to other similarly situated institutions or entities to which plaintiffs have identified *no* connection "would not render [plaintiffs'] relief any more complete," and the district court's injunction is thus overbroad. *CASA*, 606 U.S. at 853.

The district court's various rationales for its universal injunction cannot be squared with *CASA*. In denying a stay, the court repeated the suggestion that a narrower injunction could lead to institutions "retain[ing] federal funding as to the named Plaintiffs and the organizations' members but still los[ing] it as to similarly situated third parties." A5. But as just discussed, an injunction limited to the institutions to which plaintiffs have established a connection would fully remedy their injuries without creating anything like the district court's concern.

More generally, the district court's view that a "piecemeal approach" could result in "[s]ignificant confusion" for regulated parties and plaintiffs, JA983, was squarely rejected in *CASA*, which explained that "confusion or piecemeal litigation" cannot justify universal relief because "under the Judiciary Act, federal courts lack authority to issue" universal injunctions. 606 U.S. at 855-56. The court also believed universal relief was justified because its merits conclusions would be "applicable to jurisdictions throughout the country," JA984; *accord* JA983, JA986, but as *CASA* explained, "the question is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." 606 U.S. at 852. Similarly, *CASA* rejected the argument that a universal injunction is appropriate because the plaintiffs include membership organizations with members "located throughout the country," JA984, emphasizing that "the complete-relief principle" cannot "justif[y] the award of relief to nonparties." 606 U.S. at 851; *see id.* at 865 (Thomas, J., concurring).

The injunction also should be stayed because it inappropriately extends to all members of plaintiff associations regardless of whether

23

they have established standing.  An injunction may—at most—"provide complete relief to *each plaintiff with standing to sue*."   *CASA*, 606 U.S. at 861 (emphasis added); *see Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 281 (1986) (holding labor union had standing to represent "those of its members injured by the [challenged] policy").

Here, plaintiffs do not assert that all of their members have standing to bring this suit.  Only 10 members submitted declarations alleging injury from the Executive Orders.  JA 377-409; JA411-21; JA445-53.  This Court has never endorsed the notion that an injunction awarded to an organization applies to all its members regardless of whether they have established actual injury, and the Supreme Court has made clear that "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (quotation omitted).

## II.   The Remaining Factors Strongly Counsel in Favor of a Stay.

The remaining stay factors likewise favor the requested stay.

**A.**  Allowing the injunction to stand undermines important interests of the government and the public, whose interests "merge" in

this context, *Nken*, 556 U.S. at 435.  The Executive Orders seek to protect the health and welfare of children in the face of scientific "uncertainty" about the safety of chemical and surgical interventions on minors.  *Cf. Skrmetti*, 605 U.S. at 504 (observing that "more than 20 States" have banned these interventions for minors).  The Supreme Court has "sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights."  *New York v. Ferber*, 458 U.S. 747, 757 (1982).  This case is no different.

In addition, the district court's injunction improperly intrudes on the President's authority to "determine his policy priorities and instruct his agents to make funding decisions based on them."  *NADOHE*, 167 F.4th at 101 (citing 2 C.F.R. § 200.340(a)(4)).  The injunction inflicts irreparable harm by disregarding "the workings of a coordinate branch of the Government."  *INS v. Legalization Assistance Project of the L.A. Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers).

That irreparable harm is compounded by the universal nature of the district court's preliminary injunction.  As the Supreme Court

explained in *CASA*, "[w]hen a federal court enters a universal injunction against the Government, it 'improperly intrudes' on 'a coordinate branch of the Government' and prevents the Government from enforcing its policies against nonparties," and that injury "justif[ies] interim relief." 606 U.S. at 859 (alterations omitted); *see id*. at 860.

Fresh irreparable harm will accrue every day that the universal injunction remains in effect. Due to circumstances outside the government's control, *see supra* pp. 6-7, the appeal in this case remains in abeyance for the indefinite future, and even once the case is removed from abeyance, there may be further briefing, oral argument, and time for a decision before the injunction could be vacated. Plaintiffs have refused to ameliorate the harms inflicted by continued delay; when asked, they did not consent to a stay of the preliminary injunction as it extends beyond plaintiffs. ECF 116 at 5.

The passage of time since the universal preliminary injunction was issued last March does not negate the necessity for a stay. As discussed above, the irreparable harm inflicted by the universal injunction does not change because of the passage of time; the universal

injunction today inflicts irreparable harm in precisely the same manner as the universal injunction in *CASA*. 606 U.S. at 859-60. And the injunction prevents the President from directing agencies to carry out his policies to the extent consistent with law, making the intrusion on "a coordinate branch of the Government" especially apparent here. *Id.* at 859 (quotation omitted). There is no principle of adverse possession that allows a district court to engage in that intrusion indefinitely. That is particularly true where, as discussed above, every subsequent decision of the Supreme Court and this Court has undermined the premises of the district court's injunction. Nor is there any force to the district court's observation that the government did not seek a stay from the Ninth Circuit in a different case challenging the same Executive Orders; the injunction at issue there is limited to the plaintiffs, and unlike this indefinitely-abeyed appeal, oral argument was held in that case last month. A3 n.3.

**B.** By contrast, plaintiffs will not experience irreparable harm by a stay. Plaintiffs do not challenge any actual agency action taken pursuant to the Executive Orders, and the mere prospect than an agency might act unlawfully in the future—notwithstanding the

27

directives of the Executive Orders to comply with the law—does not qualify as irreparable harm. Similarly, the district court's view that plaintiffs face irreparable harm from "diminished access to high-quality health care," JA979 (quotation omitted), not only depends on assumptions about how third parties not before the Court will act, but also must be considered alongside the Supreme Court's recognition that there is at minimum "medical and scientific uncertainty" about the risks and benefits associated with sex transition interventions for minors, *Skrmetti*, 605 U.S. at 524-25; *see also id.* at 530 (Thomas, J., concurring) ("[T]here is no medical consensus on how best to treat gender dysphoria in children."), including concerns about irreversible consequences that children may come to regret as adults, *see id.* at 532-36 (citing studies). And at a minimum, insofar as the injunction is overbroad, plaintiffs would face no harm from a stay of the universal aspect of the injunction "because they will remain protected by the preliminary injunction[] to the extent necessary and appropriate to afford them complete relief." *CASA*, 606 U.S. at 861.

**CONCLUSION**

For the foregoing reasons, the universal preliminary injunction should be stayed pending appeal, or at the very least, it should be stayed except as to the 16 identified individuals.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*
ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*
BRAD HINSHELWOOD

 */s/ Andrew Shi*
ANDREW SHI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7214*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 532-4453*
  *Andrew.Shi@usdoj.gov*

APRIL 2026

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5164 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/ Andrew Shi*
Andrew Shi

**ADDENDUM**

# TABLE OF CONTENTS

Order denying stay (D. Ct. ECF 166) ............................................. A1-A6

Order granting stay in *Nat'l Assoc. of Diversity Officers in Higher Ed. v. Trump*, No. 25-1189 (4th Cir. Mar. 14, 2025) .............A7-A16

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| PFLAG, INC., ET AL., | * |
| Plaintiffs, | * |
|  | * |
| v. | *      Civil No. 25-337-BAH |
| DONALD J. TRUMP ET AL., | * |
| Defendants. | * |
|  | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### <u>ORDER</u>

On March 4, 2025, this Court issued a preliminary injunction enjoining all Defendants, except President Trump,[1] from implementing Section 3(g) of Executive Order 14,168 and Section 4 of Executive Order 14,187 by "conditioning, withholding, or terminating federal funding" for any healthcare entity or medical provider based on the entity or provider's provision of "gender-affirming care for patients under nineteen." ECF 116 (preliminary injunction order), at 1–2; ECF 115 (memorandum opinion). The preliminary injunction is currently on appeal at the United States Court of Appeals for the Fourth Circuit. *See* ECF 132 (notice of interlocutory appeal)

On July 28, 2025, Defendants moved to stay the injunction pending appeal, ECF 151, arguing primarily that Plaintiffs are not likely to succeed on the merits of their claims, citing primarily *Trump v. Am. Fed'n of Gov't Emps.*, 606 U.S. ___, 145 S. Ct. 2635 (2025) (*AFGE*), *United States v. Skrmetti*, 605 U.S. 495 (2025), and *Trump v. CASA, Inc.*, 606 U.S. 831 (2025).

---

[1] For convenience, the Court refers to the parties subject to the preliminary injunction as "Defendants."

A1

*See* ECF 151-1, at 2–3.[2] Defendants also argue that they are irreparably harmed by the injunction. *Id.* at 11–12. Plaintiffs oppose the stay request, ECF 155, and Defendants filed a reply, ECF 156. On March 30, 2026, Defendants filed a notice of supplemental authority, directing the Court's attention to *Sustainability Institute v. Trump*, 165 F.4th 817, 830–32 (4th Cir. 2026), *Solutions in Hometown Connections v. Noem*, 165 F.4th 835, 844 (4th Cir. 2026), *National Association of Diversity Officers in Higher Education v. Trump*, 167 F.4th 86, 101–02 (4th Cir. 2026), and *Anderson v. Crouch*, 2026 WL 667919, --- F.4th --- (4th Cir. Mar. 10, 2026). *See* ECF 164. Plaintiffs filed a response to that supplemental authority. ECF 165.

"The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken v. Holder*, 556 U.S. 418, 433–34 (2009) (citations omitted). The Court considers four factors: (1) "whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits" of the appeal; (2) "whether the applicant will be irreparably injured absent a stay"; (3) "whether issuance of the stay will substantially injure the other parties interested in the proceeding"; and (4) "where the public interest lies." *Id.* at 434. When a government entity is a party to the case, the third and fourth factors merge, *id.* at 435, but the first two factors are the "most critical," *id.* at 434.

The Court previously denied Defendants' request for a stay pending appeal as procedurally improper because they did not seek such relief in a motion as required by the Federal Rules. *See* ECF 115, at 65–66. Besides the procedural issue, the Court also denied the initial stay request "[e]ven if the request were procedurally proper" for the same reasons it granted the preliminary injunction in Plaintiffs' favor. *See id.* Five months later, while proceedings in this Court remained stayed pending review of the preliminary injunction in the Fourth Circuit, Defendants filed the

---

[2] The Court cites to the ECF-generated page numbers at the top of the page.

instant motion.  ECF 151.  Thus, Defendants' motion essentially seeks reconsideration of a determination currently under consideration by the appellate court.  *See Washington v. Trump*, Civ. No. 25-244-LK (W. D. Wash. Nov. 10, 2025), ECF 297 (order denying motion to stay preliminary injunction and noting that the motion was effectively a procedurally improper motion to reconsider), at 4–6.  Further, their delay in seeking a stay belies Defendants' claim of irreparable harm.  *See id.* at 7–8.[3]  As Plaintiffs point out, Defendants waited five months after the Court issued the preliminary injunction to seek this stay and have not "point[ed] to any harm they have suffered" since then.  *See* ECF 155, at 6–8.

Nor is the Court convinced that Defendants have made the requisite strong showing of likelihood of success on the merits of all the claims at issue in the preliminary injunction.  First, the decisions staying preliminary injunctions by the Supreme Court in *AFGE* and by the Fourth Circuit in *National Association of Diversity Officers in Higher Education v. Trump*, *see* Order, No. 25-1189 (4th Cir. Mar. 14, 2025), ECF 29, do not contain analysis of the *Nken* factors to guide the Court to conclude that a stay of the preliminary injunction is warranted.  Defendants' argument that *Sustainability Institute* and *Solutions in Hometown Connections* preclude all of Plaintiffs' *ultra vires* claims because "generalized claims that the Executive Branch has intruded on Congress's spending power by terminating or conditioning funding are in fact *statutory* claims subject to the limits on ultra vires review[,]" including a "showing that a particular action was expressly barred by a statute," ECF 164, at 2, does not persuade.  Those cases concerned direct challenges to grant terminations by grant recipients and are not on all fours with the case at bar,

---

[3] Further underscoring this point is the fact that Defendants have not sought a stay from the Fourth Circuit despite this Court's initial denial of the stay request.  Nor, apparently, has the Government sought a stay of the preliminary injunction issued in *Washington v. Trump* from the Ninth Circuit. *See Washington v. Trump*, No. 25-1922 (9th Cir.).  The Government's dilatory actions in this case and an analogous one do not paint the picture of a party irreparably harmed.

where Plaintiffs' impacted rights do not stem from a contract. Defendants also argue that *National Association of Diversity Officers in Higher Education* compels a stay because the Fourth Circuit "emphasiz[ed] that the Executive Order there directed agencies to act 'to the maximum extent allowed by law' and that claims that particular grants were improperly terminated could be litigated through suits over those particular grants." ECF 164, at 2. The Court has already explained why the challenged provisions of the Executive Orders are more than just "'an outward-facing' policy directive from the President to his agents," *Nat'l Ass'n of Diversity Officers in Higher Educ.*, 167 F.4th at 101, and is not persuaded that its conclusion is no longer tenable. *See* ECF 115, at 37–38.

Next, Defendants argue that under *Skrmetti*, the Executive Orders do not discriminate based on sex or transgender status and therefore survive rational basis review. ECF 151-1, at 6–8. Plaintiffs contend that heightened scrutiny still applies to these Executive Orders after *Skrmetti*, as the Executive Orders at issue in this case facially classify based on transgender status, and "*Skrmetti* did not decide what standard of scrutiny applies to discrimination against transgender people." ECF 155, at 14. Defendants point to the recent decision of *Anderson v. Crouch* for the proposition that "a regulation based on medical diagnosis or treatment 'does not turn on . . . sex or transgender status,' and thus does not trigger heightened scrutiny under the Equal Protection Clause." ECF 164, at 2 (quoting *Anderson*, 2026 WL 667919, at *5). And further, Defendants contend that *Anderson* forecloses any statutory discrimination claim. *See id.* at 2–3. While Defendants make a cursory argument that the Executive Orders survive rational basis review under *Skrmetti* in the motion to stay, *see* ECF 151-1, at 6–8, the parties have not fully briefed the question,

and the Court declines to grant a stay on that basis at this late juncture, especially where a petition

for rehearing en banc remains pending in *Anderson*.[4]

Finally, Defendants argue that the preliminary injunction is overbroad because it extends

beyond the parties to the case and is impermissible after *CASA*. *See id.* at 8–11. It bears noting

that Defendants have not moved to modify the preliminary injunction on this basis. In *CASA*, the

Supreme Court cautioned that in determining the scope of an injunction, "the question is not

whether an injunction offers complete relief to *everyone* potentially affected by an allegedly

unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court.*"

606 U.S. at 852 (emphasis in original) (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

Indeed, this inquiry guided the Court in issuing the preliminary injunction. *See* ECF 115, at 61

("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide

complete relief to the plaintiffs." (quoting *Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753,

765 (1994)) (citing *Califano*, 442 U.S. at 702)); *id.* at 64 ("If the Court were to limit the injunction

to the named Plaintiffs alone, as Defendants suggest, that would seemingly give rise to a

convoluted scenario where healthcare providers could simultaneously retain federal funding as to

the named Plaintiffs and the organizations' members but still lose it as to similarly situated third

parties if the medical institutions continue to provide gender-affirming care to those third parties.

Defendants appear to entirely ignore the realities regarding how difficult it would be for medical

institutions to navigate that situation."); *id.* ("In short, a more limited injunction would allow the

coercive impact of the challenged portions of the Executive Orders to persist and would effectively

deny the named Plaintiffs the relief they seek."); *id.* at 65 ("Accordingly, the Court determines that

---

[4] Further, as Plaintiffs point out, "the panel in *Anderson* did not analyze whether the policy at issue was pretextual with regard to any claim." ECF 165, at 2.

a nationwide injunction is required in order to 'provide complete relief to the [P]laintiffs' and is, as such, 'no more burdensome to the [D]efendant[s] than necessary.'" (quoting *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020) and *Madsen*, 512 U.S. at 765)). The Court declines to stay the preliminary injunction pending appeal on this basis.

Because Defendants have not met their burden of demonstrating irreparable harm or making a strong showing of likelihood of success on the merits (on *all* the claims in the preliminary injunction), it is, by the United States District Court for the District of Maryland, hereby **ORDERED** that Defendants' motion to stay the injunction pending appeal, ECF 151, is **DENIED**.

Dated: <u>April 1, 2026</u>

/s/
_____
Brendan A. Hurson
United States District Judge

FILED: March 14, 2025

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 25-1189**
**(1:25-cv-00333-ABA)**

———————

NATIONAL ASSOCIATION OF DIVERSITY OFFICERS IN HIGHER EDUCATION; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; RESTAURANT OPPORTUNITIES CENTERS UNITED; MAYOR AND CITY COUNCIL OF BALTIMORE, MARYLAND,

Plaintiffs - Appellees,

v.

DONALD J. TRUMP; DOROTHY FINK; DEPARTMENT OF HEALTH AND HUMAN SERVICES; DEPARTMENT OF EDUCATION; DENISE CARTER; DEPARTMENT OF LABOR; VINCENT MICONEI; DEPARTMENT OF INTERIOR; DOUG BURGUM; DEPARTMENT OF COMMERCE; JEREMY PELTER; DEPARTMENT OF AGRICULTURE; GARY WASHINGTON; DEPARTMENT OF ENERGY; INGRID KOLB; DEPARTMENT OF TRANSPORTATION; SEAN DUFFY; DEPARTMENT OF JUSTICE; JAMES MCHENRY; NATIONAL SCIENCE FOUNDATION; SETHURAMAN PANCHANATHAN; OFFICE OF MANAGEMENT AND BUDGET; MATTHEW VAETH,

Defendants – Appellants.

-----------------------------------

AMERICAN CENTER FOR LAW AND JUSTICE,

Amicus Supporting Appellant.

———————

ORDER

———————

A7

Pending before the court is the government's Motion for a Stay Pending Appeal. The case concerns two Executive Orders that instruct executive agencies to end "diversity, equity, and inclusion" (or "DEI") programs within federal grant and contract processes. *See* Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025); Exec. Order No. 14,173, 90 Fed. Reg. 8633 (Jan. 21, 2025).  The plaintiffs—the Mayor and City Council of Baltimore, Maryland and three national associations—moved to preliminarily enjoin the government's enforcement of the Orders, challenging the constitutionality of three of the Orders' provisions under the First and Fifth Amendments.

The district court found the provisions likely unconstitutional and issued a nationwide injunction barring defendants from enforcing those provisions against both the plaintiffs and "similarly situated non-parties." *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, --- F. Supp. 3d ---, 2025 WL 573764, at *29 (D. Md. Feb. 21, 2025).  After the government appealed that injunction to this Court, the district court entered an order clarifying that its preliminary injunction "applies to and binds Defendants . . . as well as other federal executive branch agencies, departments, and commissions, and their heads, officers, agents, and subdivisions." *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, --- F. Supp. 3d. ---, 2025 WL 750690, at *4 (D. Md. Mar. 10, 2025).  The government now seeks a stay of the district court's preliminary injunction, or asks that it be limited only to the plaintiffs and named defendants.

Having reviewed the record, the district court's opinion, and the parties' briefing, we agree with the government that it has satisfied the factors for a stay under *Nken v. Holder*, 556 U.S. 418, 426 (2009).

2

A8

We therefore grant the government's motion for a stay of the preliminary injunction. The Clerk will set an expedited briefing schedule after consultation with the parties.

Entered at the direction of Chief Judge Diaz, with the concurrence of Judge Harris and Judge Rushing.

3

A9

DIAZ, Chief Judge, concurring:

I'm satisfied for now that the government has met its burden justifying a stay of the district court's injunction pending appeal.[1] So I join in the order granting the government's motion and in Judge Harris's separate opinion explaining why. But I'm compelled to write separately to address what seems to be (at least to some) a monster in America's closet—Diversity, Equity, and Inclusion initiatives.

The Executive Orders charge that DEI (and the related DEIA, which also denotes Accessibility) policies include "dangerous, demeaning, and immoral race- and sex-based preferences" that "deny, discredit, and undermine the traditional American values of hard work, excellence, and individual achievement in favor of an unlawful, corrosive, and pernicious identity-based spoils system." *See* Exec. Order No. 14,173, 90 Fed. Reg. 8633 (Jan. 21, 2025). The Orders seek to terminate all "'equity-based' grants or contracts" that apparently have led to "immense public waste and shameful discrimination." Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025). But neither Order ever defines DEI or its component terms.[2]

---

[1] Like my colleague, I too reserve judgment on how the administration enforces these executive orders, which may well implicate cognizable First and Fifth Amendment concerns. *See* Concurring Op. at 7–8 (Harris, J., concurring). I likewise reserve judgment on the extent to which the government relies on the Orders' savings clause provisions as it enforces the Orders' directives against federal contractors, grantees, and private entities. *See, e.g.*, *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1239–40 (9th Cir. 2018) (declining to give effect to savings clause where that clause "in [] context" would "override clear and specific language," and render "judicial review a meaningless exercise").

[2] As a result, it's unclear what types of programs—formal or informal—the administration seeks to eliminate, and it could not respond to the district court's
(Continued)

4

A10

And despite the vitriol now being heaped on DEI, people of good faith who work to promote diversity, equity, and inclusion deserve praise, not opprobrium.  For when this country embraces true diversity, it acknowledges and respects the social identity of its people.  When it fosters true equity, it opens opportunities and ensures a level playing field for all.  And when its policies are truly inclusive, it creates an environment and culture where everyone is respected and valued.  What could be more American than that?

Under the most basic tenets of the First Amendment, there should be room for open discussion and principled debate about DEI programs, and whether its corresponding values should guide admissions, hiring, scholarship, funding, or workplace and educational practices.  And all Americans should be able to freely consider how to continue empowering historically disadvantaged groups, while not "[r]educ[ing]" the individuals within those groups "to an assigned racial [or sex-based] identity."[3]

For almost 250 years, this nation's North Star has been the self-evident truth, "that all men are created equal."  The Declaration of Independence para. 2 (U.S. 1776).  Even when we have fallen short—badly at times—we have stood up, made amends, and moved

---

hypotheticals about the same.  *See Nat'l Ass'n of Diversity Officers in Higher Educ.*, 2025 WL 573764, at *22.  At this preliminary stage of the litigation, where the Orders only purport to direct executive policy and actors, we don't find vagueness principles outcome determinative.  But I repeat that agency action that goes beyond the narrow scope set out in this motion could implicate Fifth Amendment vagueness concerns.

[3] *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 795, 797 (2007) (Kennedy, J., concurring in part and concurring in the judgment).

A11

forward.  But a country does itself no favors by scrubbing the shameful moments of its past.  Because while history may be static, its effects remain.

From boardrooms to courtrooms to operating rooms to classrooms, previously marginalized Americans are thriving in spaces long closed to them.  And we are the better for it.  Yet despite this success—or because of it—we owe it to ourselves to continue forging conversations that may help us achieve that "more perfect Union."  U.S. Const. prbl.

*****

As with most monsters in the closet, what lurks is but a mere shadow, for which the remedy is simply light.

6

A12

PAMELA HARRIS, Circuit Judge, concurring:

I concur in the order granting the government's motion for a stay pending appeal. This is a difficult case that will benefit from more sustained attention than we can give it in the present posture. But for now, I believe the government has shown a sufficient likelihood of success to warrant a stay until we can hear and decide its appeal. *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

As the government explains, the challenged Executive Orders, on their face, are of distinctly limited scope. The Executive Orders do not purport to establish the illegality of all efforts to advance diversity, equity or inclusion, and they should not be so understood. Instead, the so-called "Certification" and "Enforcement Threat" provisions apply only to conduct that violates existing federal anti-discrimination law. Nor do the Orders authorize the termination of grants based on a grantee's speech or activities outside the scope of the funded activities. Rather, the "Termination" provision directs the termination of grants, subject to applicable legal limits, based only on the nature of the grant-funded activity itself. On this understanding, the government has shown the requisite likelihood that the challenged provisions do not on their face violate the First or Fifth Amendment.

But my vote to grant the stay comes with a caveat. What the Orders say on their face and how they are enforced are two different things. Agency enforcement actions that go beyond the Orders' narrow scope may well raise serious First Amendment and Due Process concerns, for the reasons cogently explained by the district court. *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 2025 WL 573764, --- F. Supp. 3d --- (D.

7

A13

Md. Feb. 21, 2025).  This case, however, does not directly challenge any such action, and I therefore concur.

Finally, my vote should not be understood as agreement with the Orders' attack on efforts to promote diversity, equity, and inclusion.  In my view, like Chief Judge Diaz's, "people of good faith who work to promote diversity, equity, and inclusion deserve praise, not opprobrium."  *See* Concurring Op. at 5 (Diaz, C.J., concurring).  I appreciate Chief Judge Diaz's concurrence and share his sentiments.

8

A14

RUSHING, Circuit Judge, concurring:

I concur in the order granting the government's motion for a stay pending appeal. The scope of the preliminary injunction alone should raise red flags: the district court purported to enjoin *nondefendants* from taking action against *nonplaintiffs*. *Cf.*, *e.g.*, *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921 (2024) (mem.). But, more than that, the judges of this panel unanimously agree that the entire substance of the preliminary injunction must be stayed, not just trimmed back in scope. That's because the government has made a "strong showing" that it "is likely to succeed on the merits" and that the district court erred in concluding otherwise. *Nken v. Holder*, 556 U.S. 418, 426 (2009) (internal quotation marks omitted). In other words, the government is likely to succeed in demonstrating that the challenged provisions of the Executive Orders—all of which are directives from the President to his officers—do not violate the First or Fifth Amendments.

In addition, as Judge Harris rightly points out, this case does not challenge any particular agency action implementing the Executive Orders. Yet, in finding the Orders themselves unconstitutional, the district court relied on evidence of how various agencies are implementing, or may implement, the Executive Orders. That highlights serious questions about the ripeness of this lawsuit and plaintiffs' standing to bring it as an initial matter. Ripeness and standing doctrines "prevent the judicial process from being used to usurp the powers of the political branches," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013), by keeping courts within their "province"—deciding "the rights of individuals" in actual controversies, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803). Ignoring these limits on judicial power results in courts becoming "virtually continuing monitors of

9

A15

the wisdom and soundness of Executive action." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (internal quotation marks omitted).

We must not lose sight of the boundaries of our constitutional role and the imperative of judicial impartiality. Any individual judge's view on whether certain Executive action is good policy is not only irrelevant to fulfilling our duty to adjudicate cases and controversies according to the law, it is an impermissible consideration. A judge's opinion that DEI programs "deserve praise, not opprobrium" should play absolutely no part in deciding this case. *Supra*, at 5, 8.

10

A16