IN THE

# United States Court of Appeals for the Fourth Circuit

PFLAG, INC., et al.,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the District of Maryland,
Case No. 25-cv-00337, The Honorable Brendan A. Hurson

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STAY THE PRELIMINARY INJUNCTION PENDING APPEAL

Joshua Block
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, Floor 18
New York, NY 10004
Telephone: (212) 549-2500
jblock@aclu.org

Deborah A. Jeon
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF MARYLAND
3600 Clipper Mill Road, Suite 200
Baltimore, MD 21211
Telephone: 410-889-8550 x120
jeon@aclu-md.org

Catherine E. Stetson
HOGAN LOVELLS US LLP
555 13th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5491
cate.stetson@hoganlovells.com

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
   EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: (212) 809-8585
ogonzalez-pagan@lambdalegal.org

*Counsel for Plaintiffs-Appellees*
(Additional counsel listed on inside cover)

Harper Seldin
Alexandra R. Johnson
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
125 Broad Street, Floor 18
New York, NY 10004
Telephone: (212) 549-2500
hseldin@aclu.org
a.johnson@aclu.org

Danielle Desaulniers Stempel
Sam H. Zwingli
Claire Housley
HOGAN LOVELLS US LLP
555 13th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5491
danielle.stempel@hoganlovells.com
sam.zwingli@hoganlovells.com
claire.housley@hoganlovells.com

Jackson B. Skeen
HOGAN LOVELLS US LLP
125 High Street
Suite 2010
Boston, MA 02110
Telephone: (617) 702-7747
jackson.skeen@hoganlovells.com

Karen L. Loewy
LAMBDA LEGAL DEFENSE
  AND EDUCATION FUND, INC.
815 16th Street NW, Suite 4140
Washington, DC 20006
Telephone: (202) 804-6245
kloewy@lambdalegal.org

Nora Huppert
LAMBDA LEGAL DEFENSE
  AND EDUCATION FUND, INC.
3656 N. Halsted St.
Chicago, IL 60613
Telephone: (312) 605-3233
nhuppert@lambdalegal.org

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ................................................................................... 1

STATEMENT OF THE CASE .................................................................. 3

    A. Background ................................................................................... 3

    B. Procedural History ....................................................................... 7

ARGUMENT ......................................................................................... 8

    I.    Defendants Are Unlikely To Succeed On The Merits ................... 9

        A. Plaintiffs' Separation-Of-Powers Claim Is Ripe And Cognizable ............. 9

        B. Plaintiffs' Equal Protection And Section 1557 Claims Remain Viable .............. 15

        C. The Scope Of The Injunction Was Appropriate To Meet The Harm Faced By Plaintiffs ............... 17

    II.    The Balance Of Harms And Equities Favor Plaintiffs ................... 19

        A. Defendants Will Not Suffer Irreparable Harm Absent A Stay ................ 19

        B. Plaintiffs Will Face Significant, Irreparable Harm From A Stay ............. 21

CONCLUSION ..................................................................................... 23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*43 Air Evac EMS, Inc. v. McVey*,
    37 F.4th 89 (4th Cir. 2022) ...................................................................22

*Ass'n of Am. Railroads v. Hudson*,
    144 F.4th 582 (4th Cir. 2025) ..............................................................18

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) .............................................................................19

*Dalton v. Specter*,
    511 U.S. 462 (1994) .........................................................................13, 14

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) .............................................................................13

*Diamond Alt. Energy, LLC v. EPA*,
    606 U.S. 101 (2025) .............................................................................10

*HIAS, Inc. v. Trump*,
    985 F.3d 309 (4th Cir. 2021) ...............................................................15

*In re Admin. Subpoena No. 25-1431-019*,
    800 F. Supp. 3d 229 (D. Mass. 2025) ....................................................6

*In re Children's Nat'l Hosp.*,
    No. 1:25-CV-03780-JRR, 2026 WL 160792 (D. Md. Jan. 21, 2026) ....6

*Labrador v. Poe ex rel. Poe*,
    144 S. Ct. 921 (2024) ...........................................................................20

*Long v. Robinson*,
    432 F.2d 977 (4th Cir. 1970) .................................................................9

*Mills v. District of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009) ...........................................................22

Page(s)

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*,
915 F.3d 197 (4th Cir. 2019) ......................................................................20, 21

*National Association of Diversity Officers in Higher Educ. v. Trump*,
167 F.4th 86 (4th Cir. 2026) ..................................................................12

*Nken v. Holder*,
556 U.S. 418 (2009)..............................................................1, 9, 19

*Ostergren v. Cuccinelli*,
615 F.3d 263 (4th Cir. 2010) ..................................................................17

*Panama Refining Co. v. Ryan*,
293 U.S. 388 (1935)..................................................................15

*Planned Parenthood S. Atl. v. Baker*,
941 F.3d 687 (4th Cir. 2019) ..................................................................22

*Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*,
872 F.2d 75 (4th Cir. 1989) ..................................................................20

*Ruckelshaus v. Monsanto Co.*,
463 U.S. 1315 (1983)..............................................................9, 20

*San Francisco A.I.D.S. Found. v. Trump*,
786 F. Supp. 3d 1184 (N.D. Cal. 2025)...........................................................16

*Sols. in Hometown Connections v. Noem*,
165 F.4th 835 (4th Cir. 2026) ..................................................................14

*Sustainability Inst. v. Trump*,
165 F.4th 817 (4th Cir. 2026) ..................................................................14

*Trump v. American Federation of Government Employees*,
145 S. Ct. 2635 (2025)..................................................................11

*Trump v. CASA*,
606 U.S. 831 (2025)..............................................................2, 17, 19

Page(s)

*United States v. Skrmetti*,
605 U.S. 495 (2025)........................................................................16

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952).................................................................13, 14

STATUTES:

EXECUTIVE MATERIALS:

Executive Order 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025)..................................3, 4

Executive Order 14,187, 90 Fed. Reg. 8771 (Jan. 28, 2025)..................................3, 4

*Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 5, 2025) ................4

*Medicare and Medicaid Programs; Hospital Condition of Participation: Prohibiting Sex-Rejecting Procedures for Children*, 90 Fed. Reg. 59463 (Dec. 19, 2025) ........................................................................19

*Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025).................................................................4

OTHER AUTHORITIES:

Sonja Sharp, *Children's Hospital Los Angeles Halts Transgender Care Under Pressure From Trump*, L.A. Times (June 12, 2025), https://perma.cc/W7UW-RX6K ........................................................................5

Kevin Tidmarsh, *California's Largest Children's Hospital System Ends Gender-Affirming Care for Youth*, NPR (Feb. 6, 2026), https://perma.cc/WK5Y-CM52 ........................................................................5

*Ultra Vires*, Black's Law Dictionary (12th ed. 2024)

U.S. Dep't of Justice, *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children* (July 9, 2025), https://perma.cc/V4YW-34JU ........................................................................6

## INTRODUCTION

The District Court issued a preliminary injunction in this case on March 4, 2025, enjoining Defendants from "conditioning, withholding, or terminating federal funding" under Section 3(g) of President Trump's Executive Order 14168 (the Gender Identity Order) and Section 4 of Executive Order 14187 (the Denial-of-Care Order). *See* JA922-987. In its decision, the District Court denied Defendants' request to stay the preliminary injunction pending appeal. Defendants appealed the preliminary injunction—though they did not seek to stay the injunction pending appeal at that time. To the contrary, the parties agreed to stay the district court proceedings pending this appeal in light of Defendants' representation that they would not seek a stay in this Court. *See* ECF No. 155-2.[1] In accordance with this agreement, Defendants filed their Opening Brief before this Court on July 25, 2025 but did not make an accompanying stay request. *See* Doc. 33.

Reprising many of the merits arguments they made in their Opening brief, Defendants now seek a stay pending appeal of the District Court's March 4, 2025 preliminary injunction order—*a request that comes to this Court over one year after the injunction was entered*. *See* Doc. 122 (Stay Mot.). They are not entitled to this "extraordinary remedy." *Nken v. Holder*, 556 U.S. 418, 428 (2009).

---

[1] In this response, unless otherwise noted, references to "ECF No." refer to the district court docket in this case, and references to "Doc." refer to the appellate court docket in this case.

"A stay is an intrusion into the ordinary processes of administration and judicial review," *id.* at 427 (citation and quotation omitted), and Defendants cannot carry their heavy burden to show that the equities favor such an intrusion. Defendants waited over one year to seek a stay from this Court; they will suffer no irreparable harm from maintaining the current injunction while their appeal proceeds. On the other hand, a stay would be immensely detrimental to Plaintiffs and the public. As the District Court recognized, allowing the unconstitutional provisions in the Orders to remain in effect would jeopardize medical care nationwide and risk serious harm to Plaintiffs from delayed medical care—including potentially adverse health risks such as depression, anxiety, and even suicide.

Defendants identify various cases they now claim call into question the District Court's order. None of them does so, as we explain below. Nor is there any merit to the Defendants' request to narrow the injunction's scope. The District Court appropriately exercised its discretion and tailored the preliminary injunction to grant "complete relief *to the plaintiffs before the Court*," *Trump v. CASA*, 606 U.S. 831, 852 (2025) (emphasis in original). This Court and others across the country have repeatedly declined to stay or narrow other nationwide preliminary injunctions in cases where the circumstances similarly necessitated a broad scope of relief.

The Court should deny Defendants' motion for a stay pending appeal.

## A. Background

***The Executive Orders***. Since taking office, the Trump Administration has engaged in a systemic effort to target transgender Americans.[2] Resp. Br. 6-8. This case concerns two Executive Orders President Trump issued during his first nine days in office targeting transgender people and gender-affirming medical care: Executive Order 14168 (the Gender Identity Order), 90 Fed. Reg. 8615 (Jan. 20, 2025), and Executive Order 14187 (the Denial-of-Care Order), 90 Fed. Reg. 8771 (Jan. 28, 2025).

Issued on January 20, 2025, the Gender Identity Order commanded that "[f]ederal funds shall not be used to promote gender ideology" and directed all federal agencies to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." 90 Fed. Reg. at 8616.

Issued on January 28, 2025, Section 4 of the Denial-of-Care Order directs federal agencies to immediately defund medical institutions that provide gender-

---

[2] Gender identity is "a person's internal, innate sense of belonging to a particular sex." Resp. Br. 4. Many transgender people experience gender dysphoria, a medical condition characterized by clinically significant distress caused by the incongruence between a person's gender identity and the sex they were assigned at birth. *Id.* at 4-5. If left untreated, gender dysphoria can have serious consequences for the health and wellbeing of transgender people, including depression, anxiety, and suicidality. *Id.* The treatment for gender dysphoria is broadly referred to as gender-affirming medical care. *Id.*

affirming medical care to patients under the age of nineteen.  90 Fed. Reg. at 8772. The Orders do not seek to prohibit federal funding to entities providing these same medications and services for other medical conditions; they prohibit federal funding only when the medical care is for the purpose of gender transition—that is, to align a patient's body with a gender identity different from their sex assigned at birth.  *Id.* at 8771-72.  The Orders also are not limited to grants used for or related to gender-affirming medical care: they directed an end to *all* federal medical and research grants to institutions providing gender-affirming medical care, regardless of whether the funds are used for or related to such care.

The Orders are two of several executive orders targeting transgender people and gender-affirming medical care.  Resp. Br. 6-8.  They are premised on the Administration's belief that having a gender identity that differs from one's birth assigned sex—i.e., being transgender—is a "false claim" that has "a corrosive impact" on "the entire American system," Gender Identity Order, 90 Fed. Reg. at 8615; is antonymic with "an honorable, truthful, and disciplined lifestyle," *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757, 8757 (Jan. 27, 2025); and is a source of "endangerment, humiliation, and silencing of women and girls," *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279, 9279 (Feb. 5, 2025).

**Harms to Plaintiffs**.  The Orders had direct and immediate effects on the provision of medical care to transgender people under nineteen.

4

Soon after the Orders issued, "medical institutions [across the United States] immediately halted all gender-affirming medical care for those under the age of nineteen." JA946-947; *see also*, *e.g.*, Kevin Tidmarsh, *California's Largest Children's Hospital System Ends Gender-Affirming Care for Youth*, NPR (Feb. 6, 2026), https://perma.cc/WK5Y-CM52; Sonja Sharp, *Children's Hospital Los Angeles Halts Transgender Care Under Pressure From Trump*, L.A. Times (June 12, 2025), https://perma.cc/W7UW-RX6K. As the District Court noted, these hospitals "unambiguously cite[d] the Executive Orders as the reason for ceasing care," JA948 n.28, concluding that if they did not stop providing gender-affirming medical care to transgender patients under nineteen, they would lose essential federal funding—including funds unrelated to the provision of treatment of gender dysphoria. Hospitals explained that continuing to care for transgender youth "jeopardize[d their] ability to care for 'hundreds of thousands' of other children," leaving "no viable alternative" than to stop providing care. Sharp, *supra*. President Trump touted these shutdowns as proof that the Orders were "already having [their] intended effect." JA930, 947 (quotation marks omitted).

Plaintiffs immediately felt the Orders' effects, too. For example, Plaintiffs Gabe Goe, Robert Roe, and Lawrence Loe had their care cancelled at Children's National, Boston Children's Hospital, and NYU Langone respectively because of

the Executive Orders.[3] JA284, 289 (Children's National); JA299, 301-305 (Boston Children's Hospital); JA334, 339-340 (NYU). And hours before PFLAG member Kristen Chapman and her 17-year-old transgender daughter were to attend a long-awaited appointment at Children's Hospital of Richmond for hormone treatment, they were told the hospital could no longer provide the treatment—again due to the Orders. JA423, 425, 427-428. Each of these Plaintiffs, PFLAG members, and their families—who initiated this medically necessary care only after a careful and deliberative process with healthcare providers—remain terrified that the Executive Orders, if enforced, will prevent them from finding providers willing to care for them in time to prevent significant and potentially permanent harm to their adolescent children from untreated gender dysphoria.

The Orders also mandate that all federal funding be stripped from a medical institution if it continues to provide gender-affirming medical care—even when the funding is unrelated to that care. That places many GLMA members—such as Doctors Kyle Koe, Jeffrey Birnbaum, Peyton Poe, and Natalie Noe, all of whom

---

[3] These hospitals are among the twenty-plus hospitals that the Department of Justice targeted with subpoenas for transgender patients' medical records. *See In re Children's Nat'l Hosp.*, No. 1:25-CV-03780-JRR, 2026 WL 160792 (D. Md. Jan. 21, 2026); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229 (D. Mass. 2025); U.S. Dep't of Justice, *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children* (July 9, 2025), https://perma.cc/V4YW-34JU.

research or provide gender-affirming medical care at hospitals who receive federal funding—in an untenable position: either deny care to a vulnerable minority community or risk the ability to provide care to anyone at all. JA418-420 (Dr. Koe); JA445-448 (Dr. Birnbaum); JA411-415 (Dr. Poe); JA450-453 (Dr. Noe). The Orders thus pose harms not only to GLMA's members, but also to its members' patients.

## B. Procedural History

Plaintiffs sued the Administration on February 4, 2025; they sought an emergency motion for a temporary restraining order the next day, which the District Court granted on February 13, 2025 after a lengthy hearing. JA932. Plaintiffs subsequently moved for a preliminary injunction, which the District Court granted. *See generally id.* In a thorough opinion, the District Court found Plaintiffs were likely to succeed on their arguments that the Executive Orders were ultra vires in violation of Article II and Article I, ran afoul of Section 1557 of the Affordable Care Act, and violated the Fifth Amendment's Equal Protection Clause.[4] JA950-978. The District Court also concluded that Plaintiffs and the public would suffer

---

[4] A group of States separately challenged the Executive Orders. *Washington v. Trump*, No. 2:25-cv-244-LK (W.D. Wash. Feb. 28, 2025). The district court granted injunctive relief and later denied the Government's motion to stay the injunction. *Id.*, Dkts. 233, 297. The government has not sought a stay of that preliminary injunction from the Ninth Circuit, further undermining their assertion of irreparable harm to the government in this case. *See Washington v. Trump*, No. 25-1922 (9th Cir.).

irreparable harm absent a preliminary injunction and that Defendants would suffer no similarly substantial countervailing injury. The District Court also denied Defendants' request for a stay of the injunction pending appeal. *Id.* at 65-66.

While Defendants sought interlocutory appeal before this Court, the parties submitted a joint motion to stay proceedings in the District Court based, in part, on Defendants' assurances that it did not intend to seek a stay of the preliminary injunction pending appeal. ECF No. 136; *see also* ECF No. 155-2 (email noting Defendants did not intend to seek a stay of the preliminary injunction).

Five months later, in July 2025, Defendants changed course and sought to stay the preliminary injunction before the District Court. ECF No. 151. Eight months after that, while Defendants' first belated stay motion was pending, Defendants filed a notice of supplemental authority stating that if the District Court did not rule on its pending motion by April 2, 2026, Defendants would seek relief from this Court. ECF No. 164. The District Court denied Defendants' pending motion. ECF No. 166 (Stay Denial Order). The court explained that Defendants' "delay in seeking a stay belie[d] [their] claim of irreparable harm," and that Defendants had not "made the requisite strong showing of likelihood of success on the merits" of the appeal. *Id.* at 3.

Now—over a year after the District Court entered its preliminary injunction— Defendants for the first time seek the extraordinary relief of a stay from this Court.

Such relief would upend the *status quo*, sow chaos and confusion, and harm Plaintiffs.

## ARGUMENT

Appellate courts "will grant a stay pending appeal only under extraordinary circumstances, and a district court's conclusion that a stay is unwarranted is entitled to considerable deference." *Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1316-17 (1983) (Blackmun, J., in chambers) (citation omitted). "[W]hen a party seek[s] a stay … following the denial of a similar motion by a trial judge, the burden of persuasion on the moving party is substantially greater than it was before the trial judge." *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970) (collecting cases).

The Court considers four factors in deciding whether such "extraordinary circumstances" are present: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 426 (citation omitted). Defendants cannot meet this heavy burden.

## I. Defendants Are Unlikely To Succeed On The Merits.

To obtain a stay pending appeal, the moving party must make a "strong showing" on the merits. *Nken*, 556 U.S. at 434 (quotation marks omitted). Defendants cannot clear that high bar here.

### A. Plaintiffs' Separation-Of-Powers Claim Is Ripe And Cognizable.

**1.** Defendants argue that Plaintiffs' separation-of-powers claim is not ripe because it relies on "contingent future events," which they describe as an agency "determin[ing] that terminating [a] grant was consistent with the applicable statutes, regulations, and grant terms." Stay Mot. 9-10.

This argument mistakes Plaintiffs' separation-of-powers claim for one challenging final agency action. Plaintiffs challenge provisions of the Executive Orders *themselves*, the effects of which caused "actual and imminent" harm and do "not depend on future uncertainties." JA978, 934.

"The plain text of the Executive Orders conditions federally funded hospital grants on the denial of gender-affirming medical care to transgender youth." JA934. The Orders' effects were sudden and dramatic: Hospitals around the country immediately ceased care, citing the Executive Orders as the basis for their decision. *Supra* pp. 5-7; JA935. The White House lauded these closures as the Orders' "intended effect." ECF No. 35-11, at 2. "[B]ecause the *threat* of revocation of funding was enough to compel the medical institutions to pause or cease the

10

challenged care," as the District Court explained, there is a live controversy *now*. JA936[5]; *see also Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 101, 120 (recognizing that Article III requirements permit "the targets of government regulations" to challenge "regulations that threaten their businesses").

If Defendants were correct that this case remains unripe until agencies identify "specific funding that could or should be terminated," Stay Mot. 10, this case would likely "never become[] ripe" for judicial review—despite the Orders' illegality and the "actual" harm Plaintiffs have already suffered from the cessation in care and the "imminent" harm risked by further cessations in care, JA936, 978 & n.23. Because "the *threat* of withholding federal funding, regardless of *which* funding or *how much* funding, was enough to compel the medical institutions to take immediate action," the Orders achieve their goal without agencies ever needing to identify specific funding for termination. JA936 (emphasis in original). Plaintiffs need not wait for further agency action.

Defendants' purported "on-point authorities," Stay Mot. 8-12, do not, in fact, bolster their argument. The Supreme Court's emergency-docket decision in *Trump v. American Federation of Government Employees* (*AFGE*), held that the President's

---

[5] While Plaintiffs need not demonstrate agency action implementing these unlawful orders, *infra* p. 13-15, the record belies Defendants' assertion (Stay Mot. 11) that there is no "concrete indication" that federal agencies will terminate or condition federal grants, JA926-927; ECF No. 118.

instructions to initiate reductions in work force "consistent with applicable law" were likely lawful. 145 S. Ct. 2635 (2025). But *AFGE* did not discuss ripeness *at all*, much less hold that the plaintiffs' claims relied on "contingent future events." Stay Mot. 10. And *AFGE* provides little "guid[ance]" here, Stay Denial Order at 3, as the legal claims raised were materially distinguishable, Resp. Br. 36 (explaining potential statutory authority to order reductions in workforce in *AFGE*).

*National Association of Diversity Officers in Higher Educ. v. Trump* (*NADOHE*) is similarly unavailing. 167 F.4th 86 (4th Cir. 2026). Defendants cite this Court's preliminary assessment of that case when it granted the government's request for a stay, *see* Stay Mot. 12, but this Court's subsequent merits decision found that plaintiffs' challenges "[were] constitutionally ripe," *NADOHE*, 167 F.4th at 99. The Court reasoned that the executive orders "contain straightforward directives pointedly telling agencies to terminate grants and contracts in specified circumstances" and that the "agencies have little discretion when it comes to enforcement." *Id.* at 100 (citation modified). Likewise, the Executive Orders here are more than just "an outward-facing policy directive from the President to his agents," Stay Denial Order at 4 (quotation marks omitted), but instead "evince a clear intent to unlawfully restrict federal funding without congressional authorization," JA958. The Orders provoked immediate compliance demonstrating that, just as in *NADOHE*, "*defendants* are the ones speculating by suggesting that

12

the agencies will disregard these clear mandates when implementing the" Orders. *NADOHE*, 167 F.4th at 100 (citation modified, emphasis in original).

**2.** Defendants also renew their arguments that Plaintiffs' separation-of-powers claim should fail because, they contend, the claim did not meet the standard for nonstatutory review of ultra vires agency action. Stay Mot. 13-17. These (re)arguments make the same categorical error Defendants made in their district court and appellate briefing—that Plaintiffs' claims seek review of ultra vires *agency* action—when Plaintiffs, in fact, are challenging the *President*'s authority. *See* Resp. Br. 26-27.

It is a familiar refrain that "[t]he President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). There is a long history in this country's precedents of "ultra vires" claims, in which plaintiffs challenge presidential conduct taken in absence of any constitutional or statutory basis.[6] Resp. Br. 23-24. There is an equally long history of the federal courts providing redress for such claims. *Id.* Ultra vires claims against the President either turn on "issues of statutory interpretation," *Dalton v. Specter*, 511 U.S. 462, 474 n.6

---

[6] "Ultra vires" claims assert that a federal officer has acted without authority or "beyond the scope of power allowed or granted" by law. *Ultra Vires*, Black's Law Dictionary (12th ed. 2024).

(1994) (concerning cases where the President's "only source of … authority is statutory"), or the familiar tripartite framework set out in Justice Jackson's concurrence in *Youngstown*, *see Dames & Moore v. Regan,* 453 U.S. 654, 660 (1981) (holding President exceeded his authority under federal law and evaluating conduct under *Youngstown*).

A separate line of cases concerns review of ultra vires *agency* action, including a "narrow" category of cases involving what courts call "nonstatutory" review of agency action. *Sustainability Inst. v. Trump*, 165 F.4th 817, 830 (4th Cir. 2026). This Court's cases in *Sustainability Institute* and *Solutions in Hometown Connections* are illustrative. In both cases, plaintiffs challenged federal agencies' authority to freeze or terminate specific grants to specific entities. *Sustainability Inst.*, 165 F.4th at 829 n.8; *Sols. in Hometown Connections v. Noem*, 165 F.4th 835, 841 (4th Cir. 2026). After determining that it lacked jurisdiction to decide such claims under the Administrative Procedure Act, this Court asked whether plaintiffs demonstrated eligibility for nonstatutory review, which required showing that the agencies had "taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute." *Sustainability Inst.*, 165 F.4th at 830 (citation omitted); *Sols. in Hometown Connections*, 165 F.4th at 844. Plaintiffs in those cases failed to meet this standard. *Id.*

Here, Plaintiffs challenge the President's authority to issue the Executive Orders, not an agency's authority to lawfully terminate particular grants. Defendants' appeal to cases involving nonstatutory review of agency actions, like *Sustainability Institute* and *Solutions in Hometown Connections*, is misplaced. Instead, the proper inquiry is whether "the Constitution authorized the President's actions." *Dalton*, 511 U.S. at 473 (citing *Youngstown*, 343 U.S. at 587, and *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)). The District Court appropriately questioned the President's "specific authorization" for the Orders—consistent with *Youngstown* and *Dalton*—and found none. JA953.

**3.** Finally, in a single paragraph, Defendants object to the District Court's treatment of the Executive Orders' language that "they are to be effectuated 'as permitted by law,'" protesting that "[t]he President has wide latitude to 'determine his policy priorities.'" Stay Mot. 16-17. This critique fails to engage with the District Court's reasoned analysis explaining that this language cannot "immunize the Order[s] from review," including at the preliminary injunction stage. JA958 (quoting *HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021)). And, as already explained, the problem is not with the President "direct[ing] agencies to carry out his policies to the maximum extent permitted by law," Stay Mot. 17; the problem is that the President lacked authority to instruct agencies to implement *this* policy, Resp. Br. 30.

**B.    Plaintiffs' Equal Protection And Section 1557 Claims Remain Viable.**

Repackaging their merits brief on appeal, Defendants claim that the Executive Orders here are analogous to the Tennessee law at issue in *Skrmetti*, which the Supreme Court subjected to rational-basis review.  Stay Mot. 17.  As Plaintiffs have explained, even if the Orders do not facially classify based on sex or transgender status (they do), JA968-970, they were "motivated by an invidious discriminatory purpose," *United States v. Skrmetti*, 605 U.S. 495, 516 (2025), and thus are subject to heightened scrutiny, Resp. Br. 44-48.

*Skrmetti* likewise does not "foreclose[] plaintiffs' statutory sex-discrimination claims."  Stay Mot. 19.  *Skrmetti*'s effect on statutory sex-discrimination claims is currently the subject of an *en banc* petition before this Court.  *See* Pet. Reh'g En Banc, *Anderson v. Crouch*, No. 22-1927, ECF No. 167 (4th Cir. Mar. 24, 2026).  As the *Anderson* petitioners explain, *Skrmetti*'s constitutional framework has no application in the statutory context; Congress intended for anti-discrimination statutes like Section 1557 to stand distinct from equal protection jurisprudence.  *See generally id.*

Critically, neither *Skrmetti* nor *Anderson* analyzed whether the laws at issue in those cases were adopted as pretext for invidious discrimination, as Plaintiffs argue here.  Premised on the belief that being transgender is "false," the Orders attempt to "deny the existence of transgender persons altogether."  JA96, 129.  In

16

the District Court's words:  "The Court cannot fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist."  JA130; *San Francisco A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184, 1215-16 (N.D. Cal. 2025) (explaining the Gender Identity Order "necessarily singles out transgender people and excludes them from being able to benefit from federal funds").

**C.     The Scope Of The Injunction Was Appropriate To Meet The Harm Faced By Plaintiffs.**

Rehashing yet another argument from their appellate briefing, Defendants request that this Court stay the preliminary injunction because it "grants relief … to nonparties and association plaintiffs' unidentified members."  Stay Mot. 20.[7]  But "district courts have broad discretion when fashioning injunctive relief."  *Ostergren v. Cuccinelli*, 615 F.3d 263, 288 (4th Cir. 2010).  The Supreme Court's decision in *CASA* reaffirmed that a district court may issue a broad injunction where, as here, it is necessary to provide "complete relief" to the plaintiffs before the Court.  606 U.S. at 851.  And the Court recognized that "complete relief" may advantage nonparties, though it does so "only incidentally."  *Id.*  The District Court here did not abuse its discretion in entering preliminary injunctive relief, and the scope of that relief maps onto *CASA*'s limiting principles.

---

[7] Defendants have not sought to modify the injunction on this basis.  Stay Denial Order 5.

The District Court reasonably determined that a narrower injunction could not provide Plaintiffs with "complete relief." JA982-986. Limiting injunctive relief to the named Plaintiffs "and other members of PFLAG [and GLMA] who submitted declarations" as Defendants suggest, Stay Mot. 21-22,[8] would "give rise to a convoluted scenario where healthcare providers could simultaneously retain federal funding as to [those parties] but still lose it as to similarly situated third parties if the medical institutions continue to provide gender-affirming care to those third parties," JA985. That two-tiered system would prove impossible to administer, given the size and scope of GLMA and PFLAG's membership across the country. JA983-984; JA355 (describing GLMA's membership base throughout the country); JA364-365 (same as to PFLAG). It also ignores that associational standing does not require the identification or participation of each of an association's members. *Assn. of Am. Railroads v. Hudson*, 144 F.4th 582, 589-590 (4th Cir. 2025) ("[A]n action seeking prospective declaratory and injunctive relief … is indeed the very type of relief for which associational standing was originally recognized" and need not "require the participation of an association's individual members.") (citation omitted).

Alternatively, limiting relief to the institutions to "which plaintiffs have established a connection" via their declarations, Stay Mot. 22, "would effectively

---

[8] Defendants now challenge associational standing—in two paragraphs—but that issue was not fully briefed below or on appeal. Stay Mot. 23-24.

prevent Plaintiffs from moving their care, leading to significant delays to their care or the loss of care entirely," Resp. Br. 57. Plaintiffs have already had to relocate and change providers in the wake of the Orders. And the Administration also recently conceded that these transfers in care will likely continue, estimating that *half* of adolescents receiving gender-affirming medical care in hospitals will need to find alternative providers in the near future. *See Medicare and Medicaid Programs; Hospital Condition of Participation: Prohibiting Sex-Rejecting Procedures for Children*, 90 Fed. Reg. 59463, 59475 (Dec. 19, 2025). Limiting relief to specific hospitals significantly reduces the number of "alternative providers" overall, thereby impairing Plaintiffs' ability to transfer care as needed. Rather, the only way to provide "complete relief to the plaintiffs before the Court," *CASA*, 606 U.S. at 852, is by ensuring that Plaintiffs may access this care as needed wherever they must move. Resp. Br. 57. If this relief advantages nonparties, it does so "only incidentally." *CASA*, 606 U.S. at 851.

Finally, the District Court found that "the reason the challenged portions of the Executive Orders are unconstitutional"—they violate the separation of powers (among other problems)—is "applicable to jurisdictions throughout the country." JA984; *see* JA986. Thus, a broad injunction is both necessary to provide complete relief to Plaintiffs and appropriate in that it is not more burdensome on Defendants than necessary. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

**II.     The Balance Of Harms And Equities Favor Plaintiffs.**

**A.     Defendants Will Not Suffer Irreparable Harm Absent A Stay.**

To obtain a stay pending appeal, the movant must show that they "will be irreparably injured absent a stay," *Nken*, 556 U.S. at 434 (quotation marks omitted), meaning the harm "cannot be fully rectified by the final judgment after trial," JA978 (quoting *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019)).  "If the moving party has not demonstrated irreparable harm, then this Court can avoid delving into the merits." *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 929 (2024) (Kavanaugh, J., concurring). Here, Defendants' failure to make any showing of irreparable harm caused by the preservation of the *status quo ante litem*, as demonstrated by their conduct over the past year, dooms their request for a stay.

Defendants have waited over *one year* to seek to stay the preliminary injunction before this Court and waited months before seeking a stay from the District Court.  They do so now despite having secured Plaintiffs' consent to stay district court proceedings based on a promise that they would *not* seek such a stay. ECF No. 155-2.  Defendants' "failure to act with greater dispatch tends to blunt [their] claim of urgency and counsels against the grant of a stay." *Ruckelshaus*, 463 U.S. at 1318; *Benisek v. Lamone*, 585 U.S. 155, 160 (2018) (per curiam) (explaining a party's "unnecessary … delay" in seeking interim relief "weigh[s] against their

request" for relief); *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (noting that delay in seeking emergency relief "indicate[s] an absence of … irreparable harm").

Nor is Defendants' sole claimed injury—that the injunction "intrudes on the President's authority to determine his policy priorities"—irreparable. Stay Mot. 25 (quotation marks omitted). Defendants make no attempt to explain how the preliminary injunction prevents the President from *determining* anything, much less how this injury "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline,* 915 F.3d at 216. As the District Court explained, its ruling "is not intended to prevent the Executive from considering any particular policy." JA981; JA988-989. Indeed, it has done so. *E.g.*, 90 Fed. Reg. 59463. Here, the problem is that "the Executive Orders went well-beyond general policymaking; the Executive Orders condition funding in a manner not prescribed by Congress." JA981. The preliminary injunction thus prevents the Administration's attempt to usurp Congress's authority.

Unable to demonstrate any harm to themselves, Defendants invoke a public interest in "protect[ing] the health and welfare of children." Stay Mot. 24-25. Depriving children of medically necessary and scientifically supported medical care does not protect the health and welfare of children. Resp. Br. 4-6, 8. The Executive Orders also jeopardize "*all* of medical institutions' federal funding …, regardless of

21

whether the funding is tied to gender-affirming care." JA981. As a result, staying the preliminary injunction "threaten[s] to disrupt treatment of patients, stall critical research, and gut numerous programs in medical institutions that rely on federal funding." JA982. Thus, the public interest strongly favors denying a stay pending appeal.

### B. Plaintiffs Will Face Significant, Irreparable Harm From A Stay.

Unlike Defendants, Plaintiffs will face significant irreparable harm from a stay for three independent reasons. *First*, "the prospect of an unconstitutional enforcement supplies the necessary irreparable injury." *43 Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (quotation marks omitted). Because Plaintiffs have established that they are likely to succeed on their constitutional claims, that alone satisfies the irreparable harm requirement. JA978; *see, e.g.*, *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009).

*Second*, "the irreparable harm prong is satisfied where the plaintiff suffers from 'diminished access to high-quality health care suited to the individual plaintiff's needs.'" JA979 (quoting *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 706-707 (4th Cir. 2019) (plaintiff irreparably injured when denied the "right to the qualified and willing family-planning provider of her choice"). A stay here not only threatens to deny Plaintiffs "access to [their] *preferred* provider[s]," *Baker*, 941 F.3d at 707, but access to *any* provider at all, *supra* pp. 5-7, 19.

22

*Third*, "a final judgment after trial cannot rectify the harm caused by" allowing the Executive Orders to go back into effect. JA980. As a result of the cessation in care following the Orders, Plaintiffs attested that they faced "depression, increased anxiety, heightened gender dysphoria, severe distress, risk of suicide, uncertainty about how to obtain medical care, impediments to maintaining a social life, and fear of discrimination, including hate crimes." JA980. Those injuries cannot be remedied by a final judgment. A stay would immediately catapult Plaintiffs back into that same state, and "each day that passes" where the Executive Orders remain in effect will further "exacerbate[]" those irreparable harms. *Id.*

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion for a stay pending appeal.

Respectfully submitted,

April 10, 2026

/s/ Catherine E. Stetson
Catherine E. Stetson
HOGAN LOVELLS US LLP
555 13th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637 - 5491
cate.stetson@hoganlovells.com

*Counsel for Plaintiffs-Appellees*
(Additional counsel listed on
 inside cover)

Joshua Block
AMERICAN CIVIL LIBERTIES UNION
     FOUNDATION
125 Broad Street, Floor 18
New York, NY 10004
Telephone: (212) 549-2500
jblock@aclu.org

Deborah A. Jeon
AMERICAN CIVIL LIBERTIES UNION
     FOUNDATION OF MARYLAND
3600 Clipper Mill Road, Suite 200
Baltimore, MD 21211
Telephone: 410-889-8550 x120
jeon@aclu-md.org

Harper Seldin
Alexandra R. Johnson
AMERICAN CIVIL LIBERTIES UNION
     FOUNDATION
125 Broad Street, Floor 18
New York, NY 10004
Telephone: (212) 549-2500
hseldin@aclu.org
a.johnson@aclu.org

Danielle Desaulniers Stempel
Sam H. Zwingli
Claire Housley
HOGAN LOVELLS US LLP
555 13th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5491
danielle.stempel@hoganlovells.com
sam.zwingli@hoganlovells.com
claire.housley@hoganlovells.com

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
     EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: (212) 809-8585
ogonzalez-pagan@lambdalegal.org

Karen L. Loewy
LAMBDA LEGAL DEFENSE
     AND EDUCATION FUND, INC.
815 16th Street NW, Suite 4140
Washington, DC 20006
Telephone: (202) 804-6245
kloewy@lambdalegal.org

Nora Huppert
LAMBDA LEGAL DEFENSE
     AND EDUCATION FUND, INC.
3656 N. Halsted St.
Chicago, IL 60613
Telephone: (312) 605-3233
nhuppert@lambdalegal.org

Jackson B. Skeen
HOGAN LOVELLS US LLP
125 High Street
Suite 2010
Boston, MA 02110
Telephone: (617) 702-7747
jackson.skeen@hoganlovells.com

*Counsel for Plaintiffs-Appellees*

24

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this response complies with the type-volume requirements of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,195 words.  This response was prepared in 14-point Times New Roman font, a proportionally spaced typeface, using Microsoft Word.


April 10, 2025                                    /s/ Catherine E. Stetson
                                                 Catherine E. Stetson

                                                 *Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 10, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

April 10, 2025                              /s/ Catherine E. Stetson
                                            Catherine E. Stetson

                                            *Counsel for Plaintiffs-Appellees*