IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

PFLAG, INC., et al.,

  Plaintiffs-Appellees,

   v.

DONALD J. TRUMP, in his official
 capacity as President of the United
 States, et al.,

  Defendants-Appellants.

No. 25-1279

**REPLY IN SUPPORT OF MOTION FOR STAY PENDING
APPEAL**

The universal preliminary injunction here cannot be squared with

intervening authority, including *Trump v. CASA, Inc.*, 606 U.S. 831

(2025), *United States v. Skrmetti*, 605 U.S. 495 (2025), *Sustainability

Institute v. Trump*, 165 F.4th 817 (4th Cir. 2026), and *Anderson v.

Crouch*, 169 F.4th 474 (4th Cir. 2026). These precedents, among others,

eviscerate both the injunction's underlying rationale and its universal

scope.

Plaintiffs' opposition fails meaningfully to engage with these

decisions. Under plaintiffs' telling, "[n]one" of these precedents makes

*any* difference to *any* aspect of the district court's sweeping injunction. Opp. 2. Plaintiffs ignore *Skrmetti* by insisting that the Executive Orders facially classify based on sex or transgender status, Opp. 16, and they recast *CASA* as merely "reaffirm[ing]" the district court's universal injunction, Opp. 17. But these landmark decisions, along with this Court's precedents on ultra vires review and statutory discrimination claims, underscore that the injunction is flawed in every respect.

The balance of equities also favor a stay. The government's irreparable harm—including from a universal injunction intruding on the Executive Branch's functions—deepens every day while the underlying appeal remains in abeyance indefinitely. This Court should stay the preliminary injunction pending appeal, or at minimum, stay it except as to the 16 identified individuals. Mot. 5.

## I.  The Government Is Likely to Succeed on the Merits.

The universal injunction contravenes numerous intervening decisions from the Supreme Court and this Court.

**A.** Plaintiffs' "separation of powers" claim is neither ripe nor viable. This claim hinges on plaintiffs' belief that federal agencies carrying out the Executive Orders in the future will do so in an

unlawful manner against plaintiffs' medical providers and employers, thus harming plaintiffs. But the Orders do none of those things. For starters, they specifically direct agencies to act "as permitted by law," Exec. Order No. 14,168, § 3(e), *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615, 8616 (Jan. 30, 2025) (Defending Women EO), and "consistent with applicable law," Exec. Order No. 14,187, § 4, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771, 8772 (Feb. 3, 2025) (Protecting Children EO). Plaintiffs aver (Opp. 15) that this language has no meaning. That ignores basic principles of interpretation by rendering the clauses meaningless, and plaintiffs make no effort to square their view with the general principles that the President has authority to "instruct his agents to make funding decisions" based on "policy priorities," *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump* (*NADOHE*), 167 F.4th 86, 101 (4th Cir. 2026), and that in those circumstances an agency must carry out the order only to the extent permitted by law, *Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002); *see Trump v. American Fed'n of Gov't Emps. (AFGE)* (granting stay in challenge to Executive Order

3

not yet implemented by agencies); *id.* (Sotomayor, J., concurring in the grant of stay).

In addition, the Orders are not self-executing: agencies must "take appropriate steps" to implement them and provide the President "a timeline for future action." Protecting Children EO §§ 4, 9; *see* Defending Women EO § 7(a) (similar). This Court in *NADOHE* held that a challenge to a similar executive order was unripe because the relevant provision involved only "intra-governmental" action that was not "certainly impending." 167 F.4th at 97 (quotation omitted). Although *NADOHE* held that other provisions of that executive order were ripe for challenge, those provisions gave rise to a live controversy because the plaintiffs "had grants cancelled" based on them. *Id.* at 98-99. Under *NADOHE*, plaintiffs here—who are not even recipients of federal funding—cannot manufacture a live controversy before an agency has taken a specific step implementing the Executive Orders.

Even if ripe, plaintiffs' facial claim also cannot satisfy ultra vires review. Mot. 13-17. They do not dispute that their facial challenge requires them to show that "no set of circumstances exists" under which the Executive Orders could be validly implemented. *Reno v. Flores*, 507

4

U.S. 292, 301 (1993) (quotation omitted). While plaintiffs rehash the distinction between ultra vires and constitutional challenges, Opp. 13-15, they ignore entirely this Court's articulation of the difference between those claims, *see* Mot. 14-16. In *Sustainability Institute*, this Court explained that a claim is fundamentally statutory—and thus subject to ultra vires review—when plaintiffs "assert that because executive officials and agencies violated statutes, they also violated the Constitution." 165 F.4th at 831. That is precisely the case here: plaintiffs assert that any "freeze [or] termination" of grants based on the Executive Orders would be inconsistent with the statutes governing those grants and thus would "violate[] the Constitution's 'separation of powers' and the Presentment Clauses," which is fundamentally a statutory claim. *Id.* at 830 (quotation omitted). Because "Congress gave the Executive authority to issue grants," it is "demonstrably incorrect" for plaintiffs to characterize their lawsuit as challenging the "absence of any statutory authority whatsoever." *Id.* at 832 (emphases and quotation omitted); *see* Mot. 14-15.

Plaintiffs have no answer to *Sustainability Institute* and do not claim they could possibly satisfy the standards for ultra vires review.

Plaintiffs suggest (Opp. 13-14) that *Sustainability Institute* does not apply to presidential action, but this Court made clear that "claims simply alleging that *the President* has exceeded his statutory authority are not constitutional claims freely reviewable at equity but statutory ones subject to ultra vires review." 165 F.4th at 831 (alteration omitted) (emphasis added) (quoting *Dalton v. Specter*, 511 U.S. 462, 473 (1994)). And plaintiffs' characterization of *Sustainability Institute* as involving "federal agencies' authority to freeze or terminate specific grants to specific entities," and thus ultra vires review of agency actions, Opp. 14-15, only underscores the remarkable nature of plaintiffs' suit. If an actual recipient of federal funds that has suffered an actual termination of grant funding is subject to the requirements governing ultra vires suits, there is no reason why plaintiffs here—who are not themselves grant recipients and have brought this suit based on speculation about future agency action inconsistent with the governing statutes—should be in any better position.

**B.** *Skrmetti* forecloses plaintiffs' constitutional and statutory discrimination claims. Mot. 17-20. Plaintiffs cannot explain how the Executive Orders facially classify based on sex or transgender status—

6

they merely assert that "they do," in plain disregard of *Skrmetti*. Opp. 16. Under *Skrmetti*, rational basis applies, and the Orders "clearly meet[]" that standard. 605 U.S. at 522.

Plaintiffs try to escape *Skrmetti* by contending that the Executive Orders were motivated by an invidious discriminatory purpose or animus. Opp. 16 (citing Response Br. 44-48). The district court did not adopt this theory, and for good reason: to succeed, plaintiffs would have to show that the Orders cannot "reasonably be understood to result from a justification independent of unconstitutional grounds." *Trump v. Hawaii*, 585 U.S. 667, 705 (2018); *see also Trump v. Orr*, 146 S. Ct. 44, 46 (2025) (granting stay where trans- and non-binary-identifying plaintiffs challenged executive order requiring U.S. passports to state biological sex at birth because record did not show that policy "lack[s] any purpose other than a bare ... desire to harm a politically unpopular group" (alterations in original) (quotation omitted)).

Given *Skrmetti*'s express recognition of such permissible justifications, which are likewise invoked in the Orders themselves, Mot. 18-19, plaintiffs cannot possibly succeed on an animus claim. *See* 605 U.S. at 516-17. Like the law in *Skrmetti* which "encourage[d]

minors to appreciate their sex" and prohibited sex transition interventions "that might encourage minors to become disdainful of their sex," *id.* (quotation omitted), similar language in the Executive Orders "reflect[s] the [President]'s concerns regarding the use of" sex transition interventions, *id.* at 517, and protecting children in the face of scientific "uncertainty" about the safety of chemical and surgical interventions on minors, *id.* at 524-25. Because the Orders supply "rational, nondiscriminatory reasons why the law targets who or what it does," the Court "cannot presume an intent to discriminate." *Anderson*, 169 F.4th at 484-86.

Turning to the statutory discrimination claims, plaintiffs are wrong that *Skrmetti*'s "framework has no application in the statutory context," Opp. 16, because *Skrmetti* "proceeded to explain why even under *Bostock* [*v. Clayton County,* 590 U.S. 644 (2020)]'s reasoning" in the statutory context, the state law banning sex transition interventions "did not discriminate because of sex," *Anderson*, 169 F.4th at 493. Applying *Skrmetti*'s reading of *Bostock*, sex or transgender status is not a "but for" cause here because "changing a minor's sex or transgender status does not alter" the application of the Executive

Orders given that they are based on medical use and age. *Skrmetti*, 605 U.S. at 520. Although a petition for rehearing en banc is pending in *Anderson*, plaintiffs do not dispute that *Anderson* is the law of this circuit. Mot. 19 n.3. Thus, plaintiffs' statutory discrimination claims also fail.

**C.** At a minimum, this Court should stay the universal aspect of the injunction. Rather than "reaffirm[]" the district court's rationales for a universal injunction, Opp. 17, *CASA* held that "the universal injunction … falls outside the bounds of a federal court's equitable authority under the Judiciary Act," 606 U.S. at 847. Plaintiffs contend that the "size and scope" of their members "across the country" necessitates a universal injunction, Opp. 18, but that was the theory on which the district court in *CASA* granted a universal injunction, *see CASA, Inc. v. Trump*, 763 F. Supp. 3d 723, 746 (D. Md. 2025), which the Supreme Court rejected. 606 U.S. at 851-52; *see id.* at 865 (Thomas, J., concurring). Plaintiffs also suggest that a universal injunction is necessary because they might transfer their care to a different medical provider, Opp. 18-19, but these "'some day' intentions" are insufficient to establish standing, much less an injury warranting universal relief,

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992). More fundamentally, plaintiffs are "wrong to characterize the universal injunction as simply an application of the complete-relief principle." *CASA*, 606 U.S. at 852. That would circumvent *CASA*'s holding by "us[ing] the complete-relief principle to revive the universal injunction." *Id.* at 865 (Thomas, J., concurring).

Plaintiffs also fail to grapple with *CASA*'s instruction that an injunction may—at most—"provide complete relief to *each plaintiff with standing to sue*." *CASA*, 606 U.S. at 861 (emphasis added). Even where an association can establish standing on behalf of some members to have a case adjudicated on its merits, standing is not synonymous with the appropriate scope of relief. *See Collins v. Yellen*, 594 U.S. 220, 258 n.24 (2021) ("What we said about standing … should not be misunderstood as a holding on a party's entitlement to relief …."). Plaintiffs have not identified a single authority postdating *CASA* supporting its view that once an association has established standing, all of its members—regardless of whether they are injured—are automatically entitled to an injunction as well, and plaintiffs make no claim that all of their members are injured by the Executive Orders at

issue here. Because the district court failed to tailor the injunction to the sixteen named individuals, the injunction "falls outside the bounds of a federal court's equitable authority under the Judiciary Act" for that reason as well. *CASA*, 606 U.S. at 847.

## II. The Remaining Factors Strongly Counsel in Favor of a Stay.

The government has a strong interest in protecting the health and welfare of children in the face of scientific "uncertainty" about the safety of chemical and surgical interventions on minors, *Skrmetti*, 605 U.S. at 524-25, which may lead to "irreversible" outcomes, Protecting Children EO § 1. And as *CASA* explained, a universal injunction imposes irreparable harm on the Executive Branch's functions and that alone "justif[ies] interim relief." 606 U.S. at 859.

Plaintiffs claim there is no irreparable harm because over a year has elapsed since the district court entered the preliminary injunction. Opp. 20-22. They rely on *Benisek v. Lamone*, 585 U.S. 155 (2018), but the delay there "largely arose from a circumstance within plaintiffs' control" and the district court made "undisputedly diligent efforts" to resolve the dispute. *Id.* at 159-60. The opposite is true here: it is undisputed that the district court declined to act on the government's

11

stay motion for over eight months, and the government was diligent in seeking to resume proceedings in this appeal after the Court decided *Anderson*, the case for which this appeal was held in abeyance. Mot. 5-7. Given the denial of the government's motion to resume briefing and schedule oral argument in this appeal—which plaintiffs opposed—the government has no control over the fact that the underlying appeal on the merits is in abeyance indefinitely, intruding on the President's authority to direct his subordinates with every passing day. Nor have plaintiffs pointed to any harm or disruption that has resulted from their enjoyment of this unsupportable injunction over the last year that would render a stay inappropriate. *See Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 79-80 (4th Cir. 1989) (nine-month delay creating "costly disruptions" precluded equitable relief).

Moreover, none of plaintiffs' cases supports the notion that the irreparable harm stemming from a *universal* injunction can somehow be attributed to (or negated by) a party's delay. *CASA* established that a universal injunction inflicts irreparable injury on "a coordinate branch of the Government" and therefore "is enough to justify interim relief."

606 U.S. at 859 (quotation omitted).  That compels the same finding of irreparable harm here.

Plaintiffs also repeatedly reference—without quoting—the government's statement in March 2025 that it was not seeking a stay. Opp. 1, 8, 20.  The government stated that it was "not planning to seek a stay of the [injunction] as things currently stand, but we'd reserve the right to seek a stay depending on any subsequent orders."  D. Ct. ECF 155-2.  The steady stream of precedent undermining every aspect of the district court's injunction, as well as the indefinite delay in resolving this appeal, has plainly changed where things stand.[1]

By contrast, plaintiffs will not experience irreparable harm from a stay.  Plaintiffs claim that the Executive Orders necessarily impose irreparable harm if they are unconstitutional, but that conflates two distinct elements of the stay analysis, *Nken v. Holder*, 556 U.S. 418, 434 (2009), and in any event the Orders are constitutional, Mot. 17-19.

---

[1] The government's decision not to seek a stay in *Washington v. Trump*, No. 25-1922 (9th Cir.), does not affect its right to seek a stay here.  *Contra* Opp. 7 n.4.  The injunction in *Washington* was not universal in scope and that case was on a path to a more rapid resolution, unlike this overbroad injunction that is indefinitely in abeyance.

Plaintiffs claim that a stay would threaten their ability to access to "*any* provider at all," Opp. 22, but that is contradicted by the record, *see, e.g.*, JA325 (while Executive Orders were in effect, declarant successfully sought care for child at different medical provider), and plaintiffs' representations elsewhere, Opp. 19 (plaintiffs "relocate[d] and change[d] providers in the wake of the Orders"). Nothing suggests that if the status quo were restored, agencies would implement the Orders in a way that would cause *all* medical providers in the country— regardless of whether they receive federal funding—to cease providing sex transition interventions to plaintiffs. And to the extent plaintiffs have had to relocate or find care *after* the Executive Orders were enjoined, a stay would not impose irreparable harm because plaintiffs' inability to access care in those situations would not be traceable to the Orders.

**CONCLUSION**

The universal preliminary injunction should be stayed pending appeal, or at minimum, stayed except as to the 16 identified individuals.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

BRAD HINSHELWOOD

 */s/ Andrew Shi*
ANDREW SHI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7214*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 532-4453*
  *Andrew.Shi@usdoj.gov*

APRIL 2026

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(c) because it contains 2598 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Andrew Shi*
Andrew Shi