**No. 25-1279**

## IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

PFLAG, INC., et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Maryland

### REPLY BRIEF FOR APPELLANTS

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

BRAD HINSHELWOOD
ANDREW SHI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7214*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 532-4453*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ ii

INTRODUCTION ............................................................................1

ARGUMENT ..................................................................................4

I.    Plaintiffs Are Not Likely To Succeed on the Merits........................4

      A.    Plaintiffs' "Separation of Powers" Claims Are Neither Ripe Nor Viable ................................................................4

      B.    The Executive Orders Do Not Discriminate Based On Sex Or Transgender Status .................................................18

            1.    *Skrmetti* Forecloses Plaintiffs' Equal Protection Claim ...............................................................19

            2.    *Skrmetti* and *Anderson* Foreclose Plaintiffs' Statutory Discrimination Claims ...............................24

II.    Plaintiffs Also Failed to Establish the Remaining Preliminary Injunction Factors .....................................................26

III.    At Minimum, the District Court's Universal Injunction Is Overbroad..................................................................................28

CONCLUSION ..............................................................................35

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                              **Page(s)**

*Anderson v. Crouch,*
  169 F.4th 474 (4th Cir. 2026) .................. 3, 4, 18, 19, 20, 22, 24, 25, 26

*Bostock v. Clayton County,*
  590 U.S. 644 (2020) ........................................................................ 25

*Building & Constr. Trades Dep't v. Allbaugh,*
  295 F.3d 28 (D.C. Cir. 2002) ............................................................ 17

*CASA, Inc. v. Trump,*
  763 F. Supp. 3d 723 (D. Md. 2025) .................................................. 29

*Chamber of Com. of the U.S. v. Lierman,*
  151 F.4th 530 (4th Cir. 2025) .......................................................... 29

*Dalton v. Specter,*
  511 U.S. 462 (1994) ........................................................................ 16

*Davilla v. Enable Midstream Partners L.P.,*
  913 F.3d 959 (10th Cir. 2019) .......................................................... 22

*Diamond Alternative Energy, LLC v. EPA,*
  606 U.S. 100 (2025) ........................................................................ 10

*Doe v. Trump,*
  157 F.4th 306 (1st Cir. 2025) .......................................................... 31

*HIAS, Inc. v. Trump,*
  985 F.3d 309 (4th Cir. 2021) ............................................................ 18

*INS v. Legalization Assistance Project of the L.A. Cnty. Fed'n of Lab.,*
  510 U.S. 1301 (1993) ...................................................................... 28

*Los Angeles v. Lyons,*
  461 U.S. 95 (1983) ........................................................................ 6, 7

*Lujan v. Defenders of Wildlife,*
 504 U.S. 555 (1992) ....................................................................... 33

*Miller v. Brown,*
 462 F.3d 312 (4th Cir. 2006) ........................................................ 8

*Mullin v. Doe,*
 --- U.S. ---, No. 25-1083, 2026 WL 1825840 (U.S. June 25, 2026) ..... 22

*National Ass'n of Diversity Officers in Higher Educ. v. Trump,*
 167 F.4th 86 (4th Cir. 2026) .................................... 2, 8, 9, 12, 17, 28

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.,*
 287 F.3d 1 (1st Cir. 2002) ............................................................. 22

*New Jersey v. Trump,*
 800 F. Supp. 3d 180 (D. Mass.) ..................................................... 31

*Nken v. Holder,*
 556 U.S. 418 (2009) ...................................................................... 27

*Nuclear Regul. Comm'n v. Texas,*
 145 S. Ct. 1762 (2025) .............................................................. 7, 11

*Reno v. Flores,*
 507 U.S. 292 (1993) .................................................................. 7, 12

*Scoggins v. Lee's Crossing Homeowners Ass'n,*
 718 F.3d 262 (4th Cir. 2013) ......................................................... 5

*Sherley v. Sebelius,*
 644 F.3d 388 (D.C. Cir. 2011) ...................................................... 21

*Solutions in Hometown Connections v. Noem,*
 165 F.4th 835 (4th Cir. 2026) ...................................................... 13

*Sustainability Inst. v. Trump,*
 165 F.4th 817 (4th Cir. 2026) ......................... 2, 11, 12, 13, 15, 16, 17

*Texas v. United States,*
   523 U.S. 296 (1998) ............................................................ 5

*Trump v. CASA, Inc.,*
   606 U.S. 831 (2025) ............................... 1, 3, 28, 29, 30, 31, 34

*Trump v. Hawaii,*
   585 U.S. 667 (2018) ...................................................... 22, 24

*Trump v. New York,*
   592 U.S. 125 (2020) ........................................................ 6, 7

*Trump v. Orr,*
   146 S. Ct. 44 (2025) ......................................................... 22

*United States v. Skrmetti,*
   605 U.S. 495 (2025) .............................. 1, 4, 19, 20, 21, 23, 25, 26, 28

*Washington v. Trump,*
   145 F.4th 1013 (9th Cir. 2025) ........................................... 31

## Statutes:

42 U.S.C. § 300w-7(a)(2) ...................................................... 25

42 U.S.C. § 18116(a) .......................................................... 25

20 U.S.C. § 1681(a) ........................................................... 25

## Regulations:

2 C.F.R. § 200.340(a)(4) ...................................................... 28

**INTRODUCTION**

The government's opening brief demonstrated that the universal preliminary injunction here rested on multiple errors.  Plaintiffs' suit—which challenges hypothetical future agency actions taken under as-yet-unidentified statutory authorities to implement the challenged Executive Orders, based on a claim that any such action would be a violation of the "separation of powers" because it would be carried out without statutory authority—is premature and cannot satisfy the standard for a facial nonstatutory ultra vires claim.  Plaintiffs' Fifth Amendment and statutory discrimination claims cannot survive the Supreme Court's decision in *United States v. Skrmetti*, 605 U.S. 495 (2025), which held that legislation banning certain sex-transition interventions for minors makes classifications based on age and medical use and therefore warrants rational basis review under the Equal Protection Clause.  And the district court's universal injunction cannot be sustained in light of *Trump v. CASA, Inc.*, 606 U.S. 831 (2025).

Those propositions were clear enough before.  But in the 11 months since the government's opening brief, a steady stream of precedent from this Court has left no doubt about the errors in the

district court's approach.  In *National Association of Diversity Officers in Higher Education v. Trump* (*NADOHE*), 167 F.4th 86 (4th Cir. 2026), this Court rejected as premature a challenge to a provision of another executive order that directed agencies to determine how to carry out a policy objective, explaining that such a challenge "rest[s] 'on a highly attenuated chain of possibilities' that 'does not satisfy the requirement that threatened injury must be certainly impending.'"  *Id.* at 97 (alteration in original) (quotation omitted).  *NADOHE* thus underscores the prematurity of plaintiffs' suit here.

Similarly, in *Sustainability Institute v. Trump*, this Court addressed a purported "separation of powers" claim materially identical to the claim here and explained that such a claim is fundamentally statutory when plaintiffs "assert that because executive officials and agencies violated statutes, they also violated the Constitution."  165 F.4th 817, 831 (4th Cir. 2026).  This Court explained that such ultra vires claims fail unless plaintiffs can identify a "statute 'specific[ally] prohibit[ing]' the Government from freezing or terminating" particular grants or "tell[ing] the Government that it must contract specifically with" particular recipients.  *Id.* at 833 (first and second alterations in

2

original).  That is exactly the standard articulated in the government's opening brief.  *See* Opening Br. 21-22.  Plaintiffs' arguments—which depend entirely on their characterization of their claims as *constitutional* claims, rather than ultra vires claims—cannot be reconciled with *Sustainability Institute*.

Finally, in *Anderson v. Crouch*, 169 F.4th 474 (4th Cir. 2026), this Court held that *Skrmetti*'s reasoning applies not only to equal protection claims but also forecloses statutory sex-discrimination claims.  Plaintiffs' sex-discrimination claims based on the Affordable Care Act (ACA) and the Public Health Service Act (PHSA) thus plainly cannot survive.

Because plaintiffs cannot carry their burden to show a likelihood of success on the merits, the injunction should be vacated.  But at minimum, even if the district court did not err in entering the preliminary injunction, vacatur in part is warranted because the universal aspect of the preliminary injunction runs headlong into the Supreme Court's instruction that an injunction must be narrowly tailored to "administer complete relief *between the parties*."  *CASA*, 606 U.S. at 851 (quotation omitted).

## ARGUMENT

### I.    Plaintiffs Are Not Likely To Succeed on the Merits

The district court issued a universal injunction premised on a series of erroneous conclusions.  Plaintiffs cannot challenge hypothetical actions agencies might take in the future, and even if they could, they cannot meet the high bar for a facial ultra vires challenge.  Moreover, the Executive Orders at issue satisfy rational basis review under *United States v. Skrmetti*, 605 U.S. 495 (2025), and *Anderson v. Crouch*, 169 F.4th 474 (4th Cir. 2026), and for the same reasons do not violate the anti-sex-discrimination provisions of the ACA and the PHSA.

### A.    Plaintiffs' "Separation of Powers" Claims Are Neither Ripe Nor Viable

Plaintiffs cannot prevail on their so-called "separation of powers" claim.  Plaintiffs' claim challenging hypothetical future actions taken pursuant to the Executive Orders has no prospect of success, whether those flaws are viewed as threshold impediments or as a failure to meet the standards for a facial ultra vires claim.

Our opening brief explained (Opening Br. 17-38) that plaintiffs' "separation of powers" claim suffers from multiple related flaws. Plaintiffs do not challenge any particular action taken by any agency to

implement the Orders.  Rather, their claim hinges on the notion that federal agencies will in the future terminate or condition as-yet-unidentified grants in violation of as-yet-unidentified statutory authorities and that the particular grants that are allegedly unlawfully terminated or conditioned would injure them by causing institutions at which they work or are patients to cease providing the particular interventions at issue here.  And it requires making those assumptions even though the Executive Orders specifically direct the agencies to act "as permitted by law," Defending Women EO § 3(e), and "consistent with applicable law," Protecting Children EO § 4.  It is thus unclear at present how the agencies will implement the Orders or whether that implementation will affect in any way the institutions in which plaintiffs have an interest, much less affect them in an unlawful manner.  The claim here is thus "not ripe for adjudication" because "it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotation omitted); *see Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013).

5

*Trump v. New York*, 592 U.S. 125 (2020), underscores these principles. There, President Trump issued a memorandum that "announced a policy of excluding 'from the apportionment base aliens who are not in a lawful immigration status,'" and called for "implementation 'to the maximum extent feasible and consistent with the discretion delegated to the executive branch.'" *Id.* at 129-30 (quotation omitted). A group of plaintiffs sued before the memorandum had been implemented. *Id.* at 130. The Supreme Court, however, held that "standing and ripeness inquiries both lead to the conclusion that judicial resolution of this dispute is premature." *Id.* at 134. It explained that because "the President qualified his directive by providing that the Secretary should gather information 'to the extent practicable' and that aliens should be excluded 'to the extent feasible,'" "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy [was] 'no more than conjecture' at th[at] time." *Id.* (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983)). And the Court reached that conclusion even though the plaintiffs—like plaintiffs here—asserted that any action to exclude

6

aliens from the apportionment base would be unlawful. *Id.* at 130. The same principles govern here.

Moreover, even if plaintiffs' claim were ripe, because plaintiffs cannot challenge any actual agency action under the APA, the only claim they could possibly bring is a facial nonstatutory ultra vires claim. That claim would require showing that there is *no* action that *any* agency could take that would not be contrary to an *express prohibition* in a statute. *See Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 680-82 (2025); *Reno v. Flores*, 507 U.S. 292, 301 (1993). As we explained (Opening Br. 31-35), the district court did not apply anything like that standard, and plaintiffs cannot meet it.

1. Plaintiffs' attempts to avoid this result cannot be reconciled with precedent from the Supreme Court and this Court. Plaintiffs do not dispute that no agency has taken any operative actions to implement the Executive Orders, much less that an agency has made a grant determination as to an institution at which they work or are a patient. Opening Br. 31 n.1. Nor can they establish that it is certain how agencies will implement the Orders. Their subjective fear that some future action could occur is no substitute for a concrete indication

7

for a particular grant program that there will be a live controversy. And that live controversy would not resemble the present lawsuit: if an agency took an action for any individual grant or grant program, any legal challenge would center on whether the agency's action was lawful under the statutes and regulations governing that program. A central purpose of ripeness doctrine is to ensure presentation of legal issues "in clean-cut and concrete form," not the sort of litigation about hypothetical actions under as-yet-unidentified statutory authorities plaintiffs seek to engage in here. *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) (quotation omitted).

That result was already clear from existing precedent, and subsequent precedent from this Court only confirms the point. In *NADOHE*, 167 F.4th 86 (4th Cir. 2026), this Court considered a challenge to an executive order that included a provision directing agency heads "to prepare a report, within 120 days of the Order, identifying '[a] plan of specific steps or measures to deter [diversity, equity, and inclusion] programs or principles (whether specifically denominated 'DEI' or otherwise) that constitute illegal discrimination or preferences.'" *Id.* at 94. Plaintiffs—grant recipients—asserted that this

8

provision caused them to "fear retribution" and thus "restrict 'their speech and conduct in support of diversity, equity, and inclusion.'" *Id.* This Court rejected that argument, explaining that any injury to the grantees "rest[s] 'on a highly attenuated chain of possibilities' that 'does not satisfy the requirement that threatened injury must be certainly impending'"—specifically, assuming that the plan would include cutting funds, that the President would adopt that plan, that plaintiffs themselves would be among the organizations whose funding was cut, and that an agency actually does cut their funding. *Id.* at 97. And the Court observed that, although framed as an injury-in-fact problem, the same "speculation also creates a ripeness problem." *Id.* at 98 n.4. Although the Court held that *other* challenges to different provisions of that executive order were ripe, those provisions gave rise to a live controversy because the plaintiffs "had grants cancelled" based on them, or because the executive order left agencies no discretion in implementing them as to those grantees. *Id.* at 98-99.

Rather than identify and challenge any concrete action taken in response to the Executive Orders, plaintiffs assert that some third-party institutions reacted to the prospect of the Orders' implementation

9

by suspending the interventions at issue here and that the independent actions of those third parties suffice to show that the case is ripe. Resp. Br. 22-23. In essence, plaintiffs' view is that they are identically positioned to hospitals or other institutions and thus can bring suit to challenge the Orders just as a hospital or other institution could. But here, *no* institution has yet been regulated by the Executive Orders, which are not self-executing. Grantees themselves could not sue based on speculation about possible future effects on their grant funding from how agencies might implement the Orders; that suit would share the same flaws that plague this case and the suit in *NADOHE*. Plaintiffs here—who are not themselves grantees—cannot be in any better position than the institutions whose grant funding might conceivably be affected.

The case plaintiffs cite (Resp. Br. 22)—*Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100 (2025)—is a non sequitur. There, California had issued vehicle emissions standards that regulated car manufacturers, and the Supreme Court held that fuel producers could sue to challenge those regulations. *Id.* at 106-07, 112-20. There was no dispute in that case that California had actually issued regulations that

10

governed the conduct of car manufacturers. Here, by contrast, no agency has yet taken action that would actually affect the funding of hospitals or other institutions. Nothing in *Diamond Alternative Energy*—or any other case plaintiffs have cited—suggests that the fuel producers could sue immediately if, for example, California's governor had directed a state agency to restrict vehicle emissions to the extent consistent with law, even if some car manufacturers began to independently anticipate possible future regulations by altering their car designs. Plaintiffs identify no case premising ripeness—or for that matter, the injury-in-fact prong of standing—on things third parties do in anticipation of action agencies have not yet taken.

2. Moreover, even if plaintiffs' suit were ripe, their facial challenge to the Executive Orders as ultra vires could not succeed. To succeed on an ultra vires claim, plaintiffs would have to show that an agency would take "action entirely in excess of its delegated powers and contrary to a *specific prohibition* in [the] statute." *Sustainability Inst. v. Trump*, 165 F.4th 817, 832 (4th Cir. 2026) (quoting *Nuclear Regul. Comm'n*, 605 U.S. at 681). And because plaintiffs have brought a facial challenge, their burden is even greater: they must demonstrate that

11

there is *no* action that *any* agency could take that would not be contrary to some specific statutory prohibition. *See Reno*, 507 U.S. at 301; *see also NADOHE*, 167 F.4th at 100 ("Facial invalidation is, manifestly, strong medicine that has been employed by [courts] sparingly and only as a last resort." (alteration in original) (quotation omitted)).

Plaintiffs resist application of this framework by asserting that they have brought a constitutional "separation of powers" claim and thus are not subject to the limitations applicable to an ultra vires claim. Resp. Br. 24-27. But that assertion cannot be reconciled with this Court's decision in *Sustainability Institute*. There, this Court explained that nonstatutory review claims come in two varieties: ultra vires claims alleging violation of a federal statute, which are "strictly limited," and constitutional claims, which "are not subject to the same restrictions." *Sustainability Inst.*, 165 F.4th at 830 (quotation omitted). Importantly, "the Supreme Court has foreclosed efforts to recast statutory claims as constitutional ones" to avoid the more stringent standards for statutory ultra vires claims. *Id.* at 831. Thus, if plaintiffs "assert that because executive officials and agencies violated statutes,

12

they also violated the Constitution," then the "core" of those claims are statutory and subject to the limits on ultra vires review. *Id.*

In *Sustainability Institute*, for example, the plaintiffs asserted "that the Government's freeze and termination of their grants" would be inconsistent with the statutes governing those grants and thus would "violate[] the Constitution's 'separation of powers' and the Presentment Clauses." 165 F.4th at 830. Those claims, the Court explained, were statutory, because "Congress gave the Executive authority to issue grants under the various statutes," and "[t]hose alleged statutory violations are the predicate for Plaintiffs' constitutional claims." *Id.* at 832. The plaintiffs' ultra vires claims thus failed because they could not identify any "statute 'specific[ally] prohibit[ing]' the Government from freezing or terminating their grants" or "tell[ing] the Government that it must contract specifically with Plaintiffs." *Id.* at 833 (first and second alterations in original); *accord Solutions in Hometown Connections v. Noem*, 165 F.4th 835, 844 (4th Cir. 2026) (rejecting similar claims for same reasons).

Exactly the same is true here. Plaintiffs contend that "[f]ederal grants are federal law enacted by Congress, and conditioning or

13

cancelling federal grants amounts to amending or repealing federal law," JA950 (citation modified), and the district court concluded that because "Congress has not authorized" the withholding of funds "the Executive Branch exceeded its power," JA955; *accord* JA960-966. Plaintiffs repeat those assertions in their brief here, contending that "neither the Constitution nor Congress authorizes the President to condition congressionally appropriated funds" in this context, Resp. Br. 27, that the President's instructions amount to an attempt to "modify those grants, which are federal laws," Resp. Br. 29, and that there is no "specific congressional authorization permitting [the President] to instruct agencies to withhold lawfully appropriated grants," Resp. Br. 31.

Plaintiffs' assertions of constitutional violations thus depend entirely on the claim that the relevant statutory authorities do not authorize agencies to terminate or condition any grants within their purview. "Those alleged statutory violations are the predicate for Plaintiffs' constitutional claims because without the appropriations statutes there could be no improper withholding of funds," and plaintiffs' claims are statutory ultra vires claims. *Sustainability Inst.,*

14

165 F.4th at 832. And here, too, plaintiffs have identified no "statute 'specific[ally] prohibit[ing]' the Government from freezing or terminating their grants" or "tell[ing] the Government that it must contract specifically with" any particular institutions. *Id.* at 833 (first and second alterations in original). Indeed, this case is even more straightforward than *Sustainability Institute*: plaintiffs here have brought a *facial* challenge, which would require them to show that they meet the ultra vires standard as to *every* possibly relevant grant program, which plaintiffs simply cannot do.[1]

Although *Sustainability Institute* post-dates plaintiffs' response brief, they argued in stay papers before this Court that *Sustainability Institute* could be distinguished on the ground that it only applies to "ultra vires *agency* action" and not "the President's authority to issue the Executive Orders." ECF 125 at 14-15. But *Sustainability Institute* is express that "claims simply alleging that *the President* has exceeded his statutory authority are not constitutional claims freely reviewable

---

[1] In a footnote, plaintiffs suggest—for the first time—that they could meet this standard based on their statutory discrimination claims. Resp. Br. 27 n.7. But as discussed below (*see infra* pp. 24-26), those claims are foreclosed by this Court's precedent.

at equity but statutory ones subject to ultra vires review." 165 F.4th at

831 (emphasis added) (citation modified) (quoting *Dalton v. Specter*, 511

U.S. 462, 473-74 (1994)).  And plaintiffs' characterization of

*Sustainability Institute* as involving "federal agencies' authority to

freeze or terminate specific grants to specific entities," and thus ultra

vires review of agency actions, ECF 125 at 14-15, only underscores the

remarkable nature of plaintiffs' suit.  If an actual recipient of federal

funds that has suffered an actual termination of grant funding is

subject to the requirements governing ultra vires suits, there is no

reason why plaintiffs here—who are not themselves grant recipients

and have brought this suit based on speculation about future agency

action inconsistent with the governing statutes—should be in any better

position.

This Court's cases also dispose of plaintiffs' contention that the

Executive Orders' instructions to carry out their directives in a manner

consistent with law are "boilerplate" or "purely theoretical."  Resp. Br.

35 (quotation omitted).  As an initial matter, indulging that assumption

would not salvage plaintiffs' facial ultra vires claims, because plaintiffs

still cannot show that an agency would take "action entirely in excess of

16

its delegated powers and contrary to a *specific prohibition* in [the] statute," *Sustainability Inst.*, 165 F.4th at 832 (quotation omitted), much less that every action would be of that type.

In any event, there is no reason to disregard the text of the Executive Orders here. This Court has explained that generally "[t]he President may determine his policy priorities and instruct his agents to make funding decisions based on them." *NADOHE*, 167 F.4th at 101. Those provisions expressly require that "[a]gencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology," Defending Women EO § 3(e), and "consistent with applicable law … immediately take appropriate steps to … end the chemical and surgical mutilation of children," Protecting Children EO § 4. In light of that principle, and the general directive to do so consistent with law, "if an executive agency … may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002). And although plaintiffs cite (Resp. Br. 35) this Court's decision in *HIAS,*

17

*Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021), as supporting their attempt to disregard the plain text of the Orders here, they decline to grapple with the fact that this Court refused to give effect to the language in that executive order only *after* an agency had actually implemented the order, giving this Court a concrete dispute to review under the APA. *HIAS*, 985 F.3d at 315, 317-18, 325; Opening Br. 35-36.

**B.    The Executive Orders Do Not Discriminate Based On Sex Or Transgender Status**

Our opening brief established that under the Supreme Court's decision in *Skrmetti*, the Executive Orders make classifications based on age and medical use, not transgender status, and do not violate the equal protection component of the Fifth Amendment because they are rationally related to the government's objectives.  Opening Br. 38-53. Plaintiffs' attempts to evade *Skrmetti* are unpersuasive.  Plaintiffs' statutory discrimination claims also fail because, as this Court has already held, the reasoning of *Skrmetti* applies with equal force to statutory discrimination claims.  *See Anderson*, 169 F.4th at 494 n.17 ("Plaintiffs' argument that … *Skrmetti* do[es] not apply to statutory claims does not work.").

18

### 1. *Skrmetti* Forecloses Plaintiffs' Equal Protection Claim

Under *Skrmetti*, the Executive Orders are subject to rational-basis review because they make classifications based on "age" and "medical use," not sex or transgender status. 605 U.S. at 511. This Court recently applied *Skrmetti* to hold that a State's Medicaid plan excluding reimbursement for certain sex-transition interventions was subject to rational basis review and "violate[d] neither the Equal Protection Clause nor the Affordable Care Act." *Anderson*, 169 F.4th at 480.

The Executive Orders "clearly meet[]" rational basis review. *Skrmetti*, 605 U.S. at 522. Similar to the Tennessee legislature's findings in *Skrmetti*, the Executive Orders note that pediatric sex-transition procedures could lead to "irreversible" outcomes, "lifelong medical complications," and "sterilization" for minors. *Compare* Protecting Children EO § 1 (discussing President's findings), *with Skrmetti*, 605 U.S. at 516-17, 522-23 (discussing state's findings). The President further identified another concern: pediatric sex-transition procedures could cause "these vulnerable youths' medical bills [to] rise throughout their lifetimes." Protecting Children EO § 1; *see Anderson*, 169 F.4th at 491 ("West Virginia's cost concerns alone carry the

19

[challenged insurance policy excluding sex-change surgeries] over the rational-basis threshold."). Based on these legitimate concerns, it was rational for the Executive Orders to direct agencies to take steps to end federal funding for pediatric sex-transition procedures. *Cf. Anderson*, 169 F.4th at 492 ("Simply put, if a State can reasonably ban it, of course a State can reasonably refuse to pay for it.").

Plaintiffs recognize that under *Skrmetti*, "restrictions on gender-affirming medical care are … facially neutral with respect to discrimination against transgender people." Resp. Br. 42. They briefly assert that the Executive Orders here instead "facially classify based on sex and transgender status," Resp. Br. 43, but they notably do not cite or quote the actual procedures singled out, which are virtually identical to the procedures addressed in *Skrmetti*. *Compare Skrmetti*, 605 U.S. 506 (describing Tennessee law prohibiting surgical interventions or provision of puberty blockers and cross-sex hormones "for treating transgender minors"), *with* Protecting Children EO § 2(c) (listing same procedures for same reasons). The challenged actions directed by the Executive Orders are likewise tied to these medical uses based on age—namely, "ensur[ing] that institutions receiving Federal research or

20

education grants end" these practices.  Protecting Children EO § 4; *see*

JA969-970 ("Section 3(g) of the [Defending Women EO] can only be read

as doing exactly what Section 4 of the [Protecting Children EO]

does ….").  The Executive Orders here are thus facially neutral in the

same manner as the Tennessee statute at issue in *Skrmetti*.[2]

Plaintiffs primarily attempt to evade *Skrmetti* by arguing that the

Executive Orders are "motivated by an invidious discriminatory

purpose," and therefore either are subject to heightened scrutiny, Resp.

Br. 44-48 (quotation omitted), or fail rational basis review, *id.* at 52.

The district court did not pass on this argument, so it cannot support

affirmance of *this* preliminary injunction.  *See, e.g.*, *Sherley v. Sebelius*,

644 F.3d 388, 397-98 (D.C. Cir. 2011) ("[P]laintiffs have not identified,

nor have we found, any precedent for upholding a preliminary

---

[2] Plaintiffs assert in a footnote that the Protecting Children EO's reference to gender "transition" means that the Executive Orders "necessarily classify based on transgender status."  Resp. Br. 44 n.11; *see* Protecting Children EO § 1 (stating that "it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another").  That too is inconsistent with *Skrmetti*, which repeatedly referred to the regulated medical uses of surgery, puberty blockers, and cross-sex hormones as "sex transition treatments."  605 U.S. at 502-08 (using phrase "sex transition treatments" numerous times to collectively refer to these regulated medical uses).

21

injunction based upon a legal theory not embraced by the district court."); *Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 974 (10th Cir. 2019) (similar); *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 13 (1st Cir. 2002) (similar).

But even aside from that basic flaw, plaintiffs' argument fails on its own terms. A court "can only presume discriminatory intent when a law *both* overwhelmingly affects a suspect class *and* there's no logical reason for the distinction the law makes other than targeting that suspect class." *Anderson*, 169 F.4th at 484. If the Court "can identify rational, nondiscriminatory reasons why the law targets who or what it does, then [it] cannot presume an intent to discriminate." *Id.*; *see also Trump v. Hawaii*, 585 U.S. 667, 705 (2018) (upholding presidential proclamation because it could "reasonably be understood to result from a justification independent of unconstitutional grounds"); *Trump v. Orr*, 146 S. Ct. 44, 46 (2025) (granting the government a stay where plaintiffs "failed to establish that the Government's choice to display biological sex [on new passports] lack[s] any purpose other than a bare ... desire to harm a politically unpopular group." (quotation omitted)); *Mullin v. Doe*, --- U.S. ---, No. 25-1083, 2026 WL 1825840, at *3, *12

22

(U.S. June 25, 2026) (reversing grant of interim relief in equal protection challenge to the termination of Haiti's Temporary-Protected-Status designation because the President's statements "in substance all expressed policy views that could rest on race-neutral justifications").

That high standard is plainly not met here. As discussed above, *Skrmetti* makes clear that there are rational, nondiscriminatory reasons for States to ban these interventions for minors outright. *See* 605 U.S. at 516-17 (explaining that Tennessee's law banning sex-transition interventions for minors "do[es] not … evince sex-based stereotyping" because the law "proclaimed a legitimate, substantial, and compelling interest in protecting minors from physical and emotional harm" (quotation omitted)); *id.* at 504 (recognizing that more than 20 States have enacted laws banning similar sex-transition interventions for minors out of similar concerns). The Executive Orders here echo those reasons. *See, e.g.*, Protecting Children EO § 1 (finding a "dangerous trend" that "impressionable children" are being "maim[ed] and steriliz[ed]" "through a series of irreversible medical interventions"); Defending Women EO § 2 ("It is the policy of the United States to recognize two sexes, male and female."). Such reasons surely equally

23

support a decision to avoid funding such interventions for minors to the extent consistent with law.  Because the Orders "put forth legitimate, nondiscriminatory reasons" for opposing these interventions for minors, "it cannot be said that [they] obviously … discriminate by proxy against transgender persons."  *Anderson*, 169 F.4th at 490-91.

Plaintiffs attempt to manufacture a discriminatory purpose from "the Orders' broad scope and derogatory language," Resp. Br. 43-46; *see also id.* at 47-48 (citing other executive orders not challenged here), but the quoted statements from the Executive Orders merely provide context for the government's concerns about funding sex-transition interventions for minors and the uncertain and life-changing risks associated with those procedures.  That plaintiffs disagree with those characterizations does not make the Executive Orders "inexplicable on grounds other than an intent to discriminate against a suspect class." *Anderson*, 169 F.4th at 490; *see Hawaii*, 585 U.S. at 706.

### 2. *Skrmetti* and *Anderson* Foreclose Plaintiffs' Statutory Discrimination Claims

*Skrmetti* also forecloses plaintiffs' statutory sex-discrimination claims.  As our opening brief explained (Opening Br. 54-55), the ACA prohibits discrimination "on the basis of sex," 42 U.S.C. § 18116(a)

(referencing 20 U.S.C. § 1681(a)), and the PHSA prohibits discrimination "on the ground of sex," 42 U.S.C. § 300w-7(a)(2).  In *Bostock v. Clayton County*, 590 U.S. 644 (2020), the Supreme Court explained in the analogous Title VII context that these statutes employ a "traditional but-for causation standard."  *Id.* at 656.  And in *Skrmetti*, the Court explained that "changing a minor's sex or transgender status does not alter the application of " the Tennessee law; therefore, under *Bostock's* "but-for causation standard," neither sex nor transgender status is the but-for cause of a minor's inability to obtain a sex transition intervention that is prohibited by the Tennessee law.  *Skrmetti*, 605 U.S. at 520-21.

Since our opening brief, this Court has adopted that understanding of the relationship between *Skrmetti* and *Bostock*.  In *Anderson*, this Court addressed statutory discrimination claims under the ACA.  And in interpreting that statute, the Court explained that "[e]ven though *Skrmetti* did not address" antidiscrimination statutes, the Court is "still bound to follow the Supreme Court's instructions [in *Skrmetti*] about the correct way to apply *Bostock*."  *Anderson*, 169 F.4th at 493.

25

Thus, in *Anderson*, this Court held that West Virginia's refusal to provide coverage for sex-change surgeries in its Medicaid plan "did not discriminate because of sex" given that "a patient's diagnosis—not sex or transgender status—is the but-for cause of the ability or inability to obtain coverage under the plan." 169 F.4th at 493. So too here: "changing a minor's sex or transgender status does not alter" the application of the Executive Orders which express the President's grant policies based on medical use and age. *Skrmetti*, 605 U.S. at 520.

Plaintiffs' pre-*Anderson* suggestion that "*Skrmetti*'s core rationale cannot be applied to sex-discrimination claims under" the ACA and PHSA, Resp. Br. 40, thus fails under binding precedent. *See Anderson*, 169 F.4th at 494 ("*Skrmetti*'s approach to *Bostock* controls").

## II.    Plaintiffs Also Failed to Establish the Remaining Preliminary Injunction Factors

Plaintiffs also cannot satisfy the remaining preliminary injunction factors—irreparable harm, the balance of equities, and the public interest.

Plaintiffs cannot show irreparable harm. They do not face irreparable harm from the prospect that an agency may someday take some action that would cut off funding at one of their medical providers

26

or employers. And nothing suggests that if the status quo were restored, agencies would implement the Executive Orders in a way that would cause *all* medical providers in the country—regardless of whether they receive federal funding—to cease providing sex transition interventions to plaintiffs. *See, e.g.*, JA325 (while Executive Orders were in effect, declarant successfully sought care for child at different medical provider). And to the extent plaintiffs have had to relocate or find care *after* the Executive Orders were enjoined, vacatur of the injunction would not impose irreparable harm because plaintiffs' inability to access care in those situations would not be traceable to the Executive Orders.

The balance of equities and the public interest factors, which "merge" in this context, *Nken v. Holder*, 556 U.S. 418, 435 (2009), also weigh against plaintiffs. Plaintiffs contend that the public interest favors protecting constitutional rights, Resp. Br. 54, but the Executive Orders do not violate the equal protection component of the Fifth Amendment; rather, they express the government's strong interest in protecting the health and welfare of children, in the face of "medical and scientific uncertainty" about the risks and benefits associated with "sex

27

transition" interventions for minors, *Skrmetti*, 605 U.S. at 524 (quotation omitted); *id.* at 524-25; *see also id.* at 530 (Thomas, J., concurring) ("[T]here is no medical consensus on how best to treat gender dysphoria in children."), including concerns about irreversible consequences that children may come to regret as adults, *see id.* at 532-36 (citing studies).  Moreover, plaintiffs fail to engage with the fact that the universal injunction intrudes "into the workings of a coordinate branch of the Government" *INS v. Legalization Assistance Project of the L.A. Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers), by interfering with the President's authority to "determine his policy priorities and instruct his agents to make funding decisions based on them," *NADOHE*, 167 F.4th at 101 (citing 2 C.F.R. § 200.340(a)(4)), and thus inflicts irreparable harm on the government.

## III.   At Minimum, the District Court's Universal Injunction Is Overbroad

Even if the Court affirms the preliminary injunction as to the plaintiffs, the district court's universal injunction is overbroad.  The Supreme Court's decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), which post-dates the district court's decision here, makes clear that "the universal injunction … falls outside the bounds of a federal court's

28

equitable authority under the Judiciary Act," so "federal courts lack authority to issue them." *Id.* at 847, 856; *see also Chamber of Com. of the U.S. v. Lierman*, 151 F.4th 530, 543 (4th Cir. 2025).

Plaintiffs acknowledge these principles but attempt to justify the district court's universal relief as necessary to provide them "complete relief." Resp. Br. 55-56. But those arguments do not bear scrutiny. For one, plaintiffs contend that a universal injunction is necessary to provide complete relief to their "members [who] are located across the country." Resp. Br. 57. That is precisely the theory on which the district court in *CASA* granted a universal injunction, *see CASA, Inc. v. Trump*, 763 F. Supp. 3d 723, 746 (D. Md. 2025), which the Supreme Court stayed, *CASA*, 606 U.S. at 861; *see id.* at 865 (Thomas, J., concurring) (noting that Court "readily dispatche[d]" with argument that "a 'plaintiff-specific injunction' would be difficult to administer and would subject the associations' members to the burden of having 'to identify and disclose to the government' their membership"). There is similarly no need to grant universal relief reaching every institution in the United States to provide relief to organizational members here.

29

That is particularly apparent given that the organizations here have identified just 16 individuals—whether plaintiffs in their own right or members of the organizations—to demonstrate standing. Plaintiffs do not grapple with our argument that the injunction should be limited to those identified individuals because they are the only ones who could have established standing. Opening Br. 61-64. Nor do they dispute our observation—based on plaintiffs' own description of their memberships—that "many or all of the unidentified members lack standing themselves to assert the claims in the complaint." Opening Br. 63; *see generally* Resp. Br. 58-59. But an injunction may—at most— "provide complete relief to *each plaintiff with standing to sue*." *CASA,* 606 U.S. at 861 (emphasis added). Given that plaintiffs themselves have failed to identify members who receive or provide care at numerous institutions across the country, they can hardly claim that they have demonstrated injury from future actions under the Executive Orders involving those institutions. Thus, the preliminary injunction must be limited to the named plaintiffs and the current members of the plaintiff associations who have established standing. Opening Br. 65.

30

The cases on which plaintiffs rely underscore the point. Resp. Br. 56 (citing *Washington v. Trump*, 145 F.4th 1013 (9th Cir. 2025); *New Jersey v. Trump*, 800 F. Supp. 3d 180 (D. Mass.), *aff'd in part, vacated in part, remanded sub nom.*, *Doe v. Trump*, 157 F.4th 36 (1st Cir. 2025)). As the Ninth Circuit observed in *Washington*, "[t]he Supreme Court … held that the universal scope of the injunction was impermissible insofar as it was based on individual and associational plaintiff standing." 145 F.4th at 1021. And although those cases affirmed universal injunctions, they did so premised on the unique injuries of the State plaintiffs in those cases, which presented a "more complicated" case for universal relief. *CASA*, 606 U.S. at 853; *see Washington*, 145 F.4th at 1021; *Doe*, 157 F.4th at 81. Plaintiffs here do not articulate any injury comparable to the State plaintiffs' there, much less provide any persuasive basis for concluding that injunctive relief addressing their specific injuries would be insufficient.

Plaintiffs also claim that a "piecemeal" injunction would cause "[s]ignificant confusion" in its operation. Resp. Br. 57. But *CASA* rejected this sort of policy basis for an injunction, explaining that these "policy" arguments are "beside the point." 606 U.S. at 855-56. And

31

plaintiffs' confusion argument cannot stand on its own terms.  As we explained (Opening Br. 60-61), the plaintiffs and organizational members here allege that they received treatment, were scheduled to receive treatment, or provide treatment at specific institutions.  JA49-51; JA377-409; JA411-416; JA418-421; JA423-429; JA445-448; JA450-453.  An injunction that applied to the institutions at which the identified plaintiffs or members actually work or receive treatment would remedy their injuries.

Plaintiffs assert that institutions might be confused because "their federal funding would depend on whether a particular patient or employee was a plaintiff in this case."  Resp. Br. 57.  But plaintiffs do not explain why it would be confusing for an institution to determine if it is among the institutions identified by one of the individual plaintiffs or organizations here.  To the extent plaintiffs' purported "confusion" is premised on other unidentified members, that only underscores why it would be inappropriate to grant relief to such unidentified members who have never established standing or articulated any particular harm.

32

Plaintiffs also suggest that a universal injunction is necessary because they might someday transfer their care to a different medical provider. Resp. Br. 57. But these "'some day' intentions" are insufficient to establish standing, much less an injury warranting universal relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992). And plaintiffs apparently do not dispute that, if their speculative concerns materialize, the district court could modify the preliminary injunction to address those issues. Resp. Br. 57. In no event do those speculative concerns, however, justify an injunction that sweeps far beyond the plaintiffs and their medical providers to cover everyone, everywhere.

Plaintiffs also suggest that nothing short of a universal injunction would prevent "the Administration" from "target[ing]" medical providers that provide care to plaintiffs, citing unrelated litigation. Resp. Br. 59. Rhetoric aside, plaintiffs are not specific about what purported injury this universal injunction would redress, much less why it is one that they have standing to seek. Here, plaintiffs have *already* identified the institutions that provide them care; a universal injunction would not insulate those institutions any more or less from the policies

33

in the Executive Orders than a tailored injunction. Opening Br. 60-61.

Of course, institutions remain free to make their own decisions about

whether to bring their own lawsuits or whether to provide these

particular inventions going forward. And in any event, *CASA* rejected

policy considerations as justifying a universal injunction, explaining

that "the policy pros and cons are beside the point." 606 U.S. at 856.

At bottom, plaintiffs are "wrong to characterize the universal

injunction as simply an application of the complete-relief principle" in

this case. *CASA*, 606 U.S. at 852. That would circumvent *CASA*'s

holding by "us[ing] the complete-relief principle to revive the universal

injunction." *Id.* at 865 (Thomas, J., concurring).

## CONCLUSION

For the foregoing reasons, this Court should vacate the preliminary injunction. In the absence of vacatur, the Court should limit the scope of the injunction to the 16 identified individuals who have established standing.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

BRAD HINSHELWOOD

<u>*/s/ Andrew Shi*</u>
ANDREW SHI
*Attorneys, Appellate Staff*
*Civil Division, Room 7214*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-4453*
*Andrew.Shi@usdoj.gov*

June 2026

35

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,481 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Andrew Shi*
Andrew Shi