No. 25-1279

IN THE

# United States Court of Appeals for the Fourth Circuit

PFLAG, INC., et al.,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the District of Maryland,
Case No. 25-cv-00337, The Honorable Brendan A. Hurson

**PLAINTIFFS' SUR-REPLY**

Joshua A. Block
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, Floor 18
New York, NY 10004
Telephone: (212) 549-2500
jblock@aclu.org

Deborah A. Jeon
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF MARYLAND
3600 Clipper Mill Road, Suite 200
Baltimore, MD 21211
Telephone: 410-889-8550 x120
jeon@aclu-md.org

Catherine E. Stetson
HOGAN LOVELLS CADWALADER US LLP
555 13th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5491
cate.stetson@hlc.com

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
  EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: (212) 809-8585
ogonzalez-pagan@lambdalegal.org

*Counsel for Plaintiffs-Appellees*
(Additional counsel listed on inside cover)

Harper Seldin
Alexandra R. Johnson
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION
125 Broad Street, Floor 18
New York, NY 10004
Telephone: (212) 549-2500
hseldin@aclu.org
a.johnson@aclu.org

Danielle Desaulniers Stempel
Sam H. Zwingli
Claire Housley
Carly Heying
HOGAN LOVELLS CADWALADER US LLP
555 13th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5491
danielle.stempel@hlc.com
sam.zwingli@hlc.com
claire.housley@hlc.com

Jackson B. Skeen
HOGAN LOVELLS CADWALADER US LLP
125 High Street
Suite 2010
Boston, MA 02110
Telephone: (617) 702-7747
jackson.skeen@hlc.com

Karen L. Loewy
LAMBDA LEGAL DEFENSE
   AND EDUCATION FUND, INC.
815 16th Street NW, Suite 4140
Washington, DC 20006
Telephone: (202) 804-6245
kloewy@lambdalegal.org

Nora Huppert
LAMBDA LEGAL DEFENSE
   AND EDUCATION FUND, INC.
3656 N. Halsted St.
Chicago, IL 60613
Telephone: (312) 605-3233
nhuppert@lambdalegal.org

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................i

INTRODUCTION ........................................................................................1

ARGUMENT ...............................................................................................4

    I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE
           MERITS OF THEIR CLAIMS ..................................................4

          A.     Defendants' Characterization of the Orders Conflicts
                with the Orders' Plain Text and the Uncontested Facts as
                Found by the District Court.................................................4

          B.     Plaintiffs' Separation-of-Powers Claim Is Justiciable and
                Meritorious ...........................................................................5

          C.     The Executive Orders Violate the Equal Protection
                Clause, the ACA, and the PHSA.........................................17

    II.     PLAINTIFFS SATISFY THE REMAINING FACTORS
           FOR EQUITABLE RELIEF ...................................................22

    III.    THE DISTRICT COURT'S INJUNCTION ALIGNS
           WITH *CASA* ......................................................................24

CONCLUSION ...........................................................................................29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Am. Sch. of Magnetic Healing v. McAnnulty*,
 187 U.S. 94 (1902)................................................................................13

*Anderson v. Crouch*,
 169 F.4th 474 (4th Cir. 2026).........................................2, 17, 18, 20, 21

*Ass'n of Am. Universities v. Dep't of Def.*,
 792 F. Supp. 3d 143 (D. Mass. 2025).....................................................27

*Choice Women's Res. Ctrs., Inc. v. Davenport*,
 146 S. Ct. 1114 (2026).............................................................................7

*Dalton v. Specter*,
 511 U.S. 462 (1994)...............................................................................15

*Dames & Moore v. Regan*,
 453 U.S. 654 (1981)...............................................................................14

*Dep't of Com. v. New York*,
 588 U.S. 752 (2019).................................................................................9

*Endocrine Soc'y v. FTC*,
 No. 26-cv-00512, 2026 WL 1257289 (D.D.C. May 7, 2026) .................19

*Franklin v. Massachusetts*,
 505 U.S. 788 (1992)...............................................................................14

*Garfield County v. Trump*,
 179 F.4th 814 (10th Cir. 2026)...............................................................14

*Grimm v. Gloucester Cnty. Sch. Bd.*,
 972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020).........................17

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
 2 F.4th 330 (4th Cir. 2021)...............................................................7, 23

*Leedom v. Kyne*,
 358 U.S. 184 (1958)...........................................................................2, 14

ii

## TABLE OF AUTHORITIES—Continued

Page(s)

*Legend Night Club v. Miller*,
637 F.3d 291 (4th Cir. 2011)..................................................................23

*Liberty Mut. Ins. Co. v. Friedman*,
639 F.2d 164 (4th Cir. 1981)..................................................................16

*Miller v. Brown*,
462 F.3d 312 (4th Cir. 2006)....................................................................8

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
526 U.S. 172 (1999)..........................................................................12, 13

*Mullin v. Doe*,
146 S. Ct. 2121 (2026)............................................................................21

*NAACP v. Bureau of Census*,
945 F.3d 183 (4th Cir. 2019)....................................................................8

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
167 F.4th 86 (4th Cir. 2026)............................................... 10-12, 23

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
775 F. Supp. 3d 100 (D.D.C. 2025)........................................................5

*New Hampshire Indonesian Cmty. Support v. Trump*,
157 F.4th 29 (1st Cir. 2025)..................................................................26

*New York v. Cathedral Acad.*,
434 U.S. 125 (1977)...............................................................................29

*North Carolina v. Covington*,
581 U.S. 486 (2017).................................................................................3

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025)..........................................................................14, 16

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
523 U.S. 726 (1998)...............................................................................10

iii

# TABLE OF AUTHORITIES—Continued

Page(s)

*Oregon Council for Humans. v. U.S. DOGE Serv.*,
794 F. Supp. 3d 840 (D. Or. 2025) ...............................................................27

*Planned Parenthood S. Atl. v. Baker*,
941 F.3d 687 (4th Cir. 2019).........................................................................22

*Salomon & Ludwin, LLC v. Winters*,
150 F.4th 268 (4th Cir. 2025).......................................................................20

*San Francisco AIDS Found. v. Trump*,
786 F. Supp. 3d 1184 (N.D. Cal. 2025) ........................................................19

*Sustainability Inst. v. Trump*,
165 F.4th 817 (4th Cir. 2026)..................................................................15, 16

*Talbott v. United States*,
176 F.4th 720 (D.C. Cir. 2026) .........................................................18, 19, 21

*Thakur v. Trump*,
163 F.4th 1198 (9th Cir. 2025)......................................................................23

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)..............................................................3, 24-26, 28-29

*Trump v. Cook*,
No. 25A312, 2026 WL 1855613 (U.S. June 29, 2026) ................................13

*Trump v. New York*,
592 U.S. 125 (2020).......................................................................................9

*United States v. Skrmetti*,
605 U.S. 495 (2025).................................................................2, 3, 18, 20

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*,
429 U.S. 252 (1977).....................................................................................21

*Walsh v. Vinoskey*,
19 F.4th 672 (4th Cir. 2021)..........................................................................26

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Warth v. Seldin*,
    422 U.S. 490 (1975)..................................................................................26

*West Virginia v. B.P.J. by Jackson*,
    No. 24-38, 2026 WL 1868739 (U.S. June 30, 2026)....................................17

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)..........................................................................8, 12, 16

**STATUTES:**

5 U.S.C. § 704 ...............................................................................................8

5 U.S.C. § 7301 .............................................................................................15

**REGULATIONS:**

Exec. Order No. 14,168, *Defending Women from Gender Ideology
    Extremism and Restoring Biological Truth to the Federal
    Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025)..............................................1

Exec. Order No. 14,173, *Ending Illegal Discrimination and Restoring
    Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025)......................11

Exec. Order No. 14,183, *Prioritizing Military Excellence and
    Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025) ............................................19

Exec. Order No. 14,187, *Protecting Children from Chemical and
    Surgical Mutilation*, 90 Fed. Reg. 8771 (Jan. 28, 2025) ...............................1

Exec. Order No. 14,201, *Keeping Men Out of Women's Sports*,
    90 Fed. Reg. 9279 (Feb. 11, 2025) ..............................................................19

**OTHER AUTHORITIES:**

*Ultra Vires*, Black's Law Dictionary (12th ed. 2024)......................................12, 13

The White House, *President Trump Promised to End Child Sexual
    Mutilation—and He Delivered* (July 25, 2025),
    https://perma.cc/7H6F-ZQPX......................................................................8

## TABLE OF AUTHORITIES—Continued

Page(s)

The White House, *Supreme Court Bolsters President Trump's Push to
  Eliminate Transgender Insanity* (June 30, 2026),
  https://perma.cc/484A-4MDN ........................................................................1

Wright & Miller, 33 Fed. Prac. & Proc. § 8301 (2d ed.) ..........................................14

**INTRODUCTION**

In January 2025, President Trump issued the Gender-Identity and Denial-of-Care Orders as part of the Administration's campaign to "eliminate" so-called "transgender insanity."[1] The Orders threatened to terminate all federal funding for medical institutions, schools, and hospitals unless those entities ended all gender-affirming medical care for people under nineteen—regardless of whether that care was federally funded, medically necessary, or lawful in their state.[2] Hospitals nationwide responded by shuttering their gender-affirming medical care services, "unambiguously cit[ing] the Executive Orders as the reason for ceasing care." JA114.

Defendants' Reply Brief offers no persuasive reason for this Court to vacate the District Court's preliminary injunction, much less demonstrates an abuse of the District Court's broad discretion to fashion appropriate equitable relief. Defendants' Reply rests on a fundamental mischaracterization of the Orders. It recasts them as mere directives for future agency review, ignoring the Orders' plain text and the

---

[1] The White House, *Supreme Court Bolsters President Trump's Push to Eliminate Transgender Insanity* (June 30, 2026), https://perma.cc/484A-4MDN.

[2] Exec. Order No. 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) (Gender-Identity Order); *see* Exec. Order No. 14,187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Jan. 28, 2025) (Denial-of-Care Order).

1

District Court's unrebutted factual findings regarding their immediate effects. Defendants also mischaracterize Plaintiffs' separation-of-powers claim challenging the *President's* authority to condition federal funds as one concerning *agency implementation* of the President's Orders.  Relying on this inaccurate framing, Defendants ask this Court to apply a heightened standard for *ultra vires* claims that is reserved for nonstatutory review of agency action taken in violation of a statute. *See Leedom v. Kyne*, 358 U.S. 184, 188 (1958).  But that heightened standard does not apply here because Plaintiffs have brought a constitutional separation-of-powers claim against the implementation of the President's orders to immediately condition and terminate federal funding.  Such claims are not subject to the limitations on *ultra vires* challenges that apply in administrative-procedure cases for statutory violations.

Defendants' arguments regarding the Equal Protection Clause, the Affordable Care Act (ACA), and the Public Health Service Act (PHSA) likewise fail. Defendants argue that the Orders do not discriminate based on sex or transgender status under *United States v. Skrmetti*, 605 U.S. 495 (2025), and *Anderson v. Crouch*, 169 F.4th 474 (4th Cir. 2026).  That is wrong.  The Executive Orders at issue here are far broader than the healthcare regulations in *Skrmetti* and *Anderson*.  They facially classify based on sex and transgender status because they do not seek merely to regulate (however misguidedly) transgender healthcare; rather, they deny transgender people's existence.  And, even if the Orders were deemed facially

2

neutral, both *Skrmetti* and *Anderson* recognized that even facially neutral healthcare regulations are subject to heightened scrutiny when they are "motivated by an invidious discriminatory purpose." *Skrmetti*, 605 U.S. at 516. The Orders unequivocally evince that invidious discriminatory purpose—a proposition Defendants scarcely attempt to refute.

Finally, the District Court's preliminary injunction aligns with the Supreme Court's guidance in *Trump v. CASA*, 606 U.S. 831 (2025). The preliminary injunction ensures "complete relief *to the plaintiffs before the court*," *id.* at 851-852—including all affected members of PFLAG and GLMA, not just members who have already filed declarations. Defendants' contrary arguments ignore the practical realities of administering plaintiff-by-plaintiff or hospital-by-hospital relief. Equitable remedies must "tak[e] account of what is necessary, what is fair, and what is workable." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (per curiam) (citation omitted). The District Court correctly concluded that the relief it granted was the narrowest workable relief that could provide complete relief to Plaintiffs, and its preliminary injunction should be affirmed.

## ARGUMENT

**I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.**

**A.    Defendants' Characterization of the Orders Conflicts with the Orders' Plain Text and the Uncontested Facts as Found by the District Court.**

Defendants' Reply, like their Opening Brief, attempts to defend a hypothetical executive order. *See, e.g.*, Reply Br. 4-5, 7-8; Resp. Br. 21.  Defendants describe an executive order that merely advised various agencies to investigate whether the grant statutes they administer give the agency discretion to withhold grants from entities providing gender-affirming medical care.

That is not what the Orders said, and it is not what the Orders did.  The Denial-of-Care Order implements the Gender-Identity Order by requiring all federal agencies to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children."  JA925; Resp. Br. 25-26.  The agencies immediately began following those instructions by terminating grants first and asking questions later.

Defendants assert that "Plaintiffs do not dispute that no agency has taken any operative actions to implement the Executive Orders."  Reply Br. 7.  That is false. As Plaintiffs have explained, and as the District Court found, the Centers for Disease Control and Prevention (CDC) and Health Resources and Services Administration (HRSA) immediately complied with the Orders by sending termination notifications

4

to grantees without identifying any statutory basis for doing so. JA926-927; Resp. Br. 9. The agencies subsequently purported to rescind those termination notices in response to litigation, *see* JA926-927, JA936, but the District Court concluded that those rescissions were a strategic response to litigation that did not moot the case, *see* JA926.[3]

As the District Court concluded, "Defendants must defend the Orders that President Trump actually issued, not some hypothetical narrower Executive Order that is tailored to statutory schemes on which the Orders did not purport to rely." JA953. "Defendants cannot take [an Executive Order] that was drafted broadly, interpreted expansively, and implemented categorically and fault Plaintiffs for 'overreading' that directive." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100, 123 (D.D.C. 2025); *accord* JA953.

### B. Plaintiffs' Separation-of-Powers Claim Is Justiciable and Meritorious.

**1.** Defendants' Reply Brief reiterates their well-worn contention (*see* Reply Br. 1-2, 14; JA703, JA698-702) that Plaintiffs' separation-of-powers claim is unripe because it depends on "hypothetical actions agencies might take in the future" to

---

[3] After the District Court issued its preliminary injunction, Defendants notified the District Court of 17 *additional* grant terminations that CDC issued on January 31, 2025, then rescinded on February 11, 2025, after Plaintiffs filed suit. JA992.

"terminate or condition" grants, so any injury is "speculative." Reply Br. 1, 4-5, 7.[4] Defendants' argument continues to misunderstand the source of Plaintiffs' injuries and confuses constitutional ripeness with the Administrative Procedure Act's (APA) "finality" requirement.

Start with the source of Plaintiffs' injury: the Executive Orders themselves. As the District Court explained, Plaintiffs suffered immediate injury when their physicians or employers ceased providing gender-affirming services nationwide in response to the Executive Orders. JA935-936. Hospitals "unambiguously cit[ed] the Executive Orders as the reason" for ending care. JA927 n.28. The Orders presented hospitals with a Hobson's choice: offer gender-affirming medical care services and lose *all* federal funding for *all* other patients or terminate gender-affirming medical care services and maintain funding for their other patients. JA360 (explaining this "untenable position"); JA324, JA948 n.28; JA360, JA367-368, JA379, JA392-393, JA384-385. That is why the District Court concluded that the hospitals' "decision to pause or cancel gender-affirming care was undertaken as a direct response to the Executive Orders and the threat to withhold federal funding." JA979; *see* JA927.

---

[4] Though Defendants limit their ripeness challenge to the separation-of-powers claim, Plaintiffs' other claims are ripe for the same reasons.

Similarly, Defendants fundamentally misapprehend the nature of Plaintiffs' injuries when they accuse Plaintiffs of asserting injuries belonging only to hospitals or other federal funding recipients. Reply Br. 8-9, 15. Hospitals, medical institutions, or other grantees may suffer a "pocketbook" injury from the discontinuation of funding when a grant or grant program is terminated—but Plaintiffs' injuries are different. Plaintiffs are third parties who are not injured by the termination of federal funds *per se*, but by the termination of medical care, including care completely unrelated to any federal funding stream. If a medical institution had lost its federal funding but continued to provide gender-affirming medical care to people under nineteen, then Plaintiffs would not have been injured. Plaintiffs were injured because of steps that medical institutions took in response to the coercive threat to withhold federal funds, not because of any actual loss of federal funding. *Cf. Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1127 (2026) ("[T]he value of a sword of Damocles is that it hangs—not that it drops.").

Defendants do not challenge the District Court's factual finding that the hospitals' cessation in care was a direct response to the Executive Orders—much less assert that this finding was clearly erroneous. *See Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc). Nor could they; the White House has publicly and repeatedly crowed—including on the same day Defendants filed their Opening Brief—that the hospitals' cessation in care

7

showed that the Orders were having their "intended effect," a statement Defendants neither acknowledge nor bother to refute. JA256-258; *see* The White House, *President Trump Promised to End Child Sexual Mutilation—and He Delivered* (July 25, 2025), https://perma.cc/7H6F-ZQPX. It is disingenuous, at best, for the government to laud the Orders' "intended effect" to the public while disclaiming the Orders as the cause of that effect during litigation.

Defendants' arguments also confuse the APA's "finality" requirement with constitutional ripeness. Courts typically may consider an APA claim only upon "final agency action." 5 U.S.C. § 704. But Plaintiffs have not brought an APA claim; they have brought a separation-of-powers claim. That claim is constitutionally ripe because the issue is fit for judicial review and delayed adjudication would exacerbate Plaintiffs' harm. *NAACP v. Bureau of Census*, 945 F.3d 183, 192 (4th Cir. 2019).

Plaintiffs' claim is fit for review because Plaintiffs present a "purely legal" question, *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006): whether the President had authority—"either from an act of Congress or from the Constitution itself," *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)—to condition federal funding on the denial of gender-affirming medical care to transgender youth.

And there is no need to wait for "future uncertainties" to reveal themselves, *Miller*, 462 F.3d at 319, because the Orders have *already* caused Plaintiffs harm. The District Court found that hospitals' cessation in care in direct response to the Orders

injured Plaintiffs by causing "unwanted physical changes, depression, increased anxiety, heightened gender dysphoria, severe distress, risk of suicide, uncertainty about how to obtain medical care, impediments to maintaining a social life, and fear of discrimination, including hate crimes" from the cessation in their treatment. JA938. Defendants do not (and cannot) dispute that factual finding. Therefore, Plaintiffs do not raise a mere "subjective fear [of] future" harm, Reply Br. 12-13; they have *already* suffered it. Delaying adjudication would only compound Plaintiffs' injuries. JA934, JA938.

Defendants' cited cases do not help their cause. Reply Br. 6-9. Defendants point to *Trump v. New York*, 592 U.S. 125 (2020), as holding that when executive orders set out a "general statement of policy" and direct agencies to implement that policy "to the extent practicable," legal challenges do not ripen until the agency implements the orders. Reply Br. 5-7. But the plaintiffs in *Trump* had not yet suffered injury from either the executive order or an agency action because the challenged policy required them neither "to do anything" nor "to refrain from doing anything" and thus inflicted "no concrete harm." *Trump*, 592 U.S. at 133-134. The District Court here, in contrast, found that Plaintiffs *have* suffered "concrete harm from the challenged policy itself," *id.* at 134, and its "predictable effect[s] . . . on the decisions of third parties," *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019); *see* JA944-948. In fact, the Executive Orders' threats to federal funding posed such an

existential risk to hospitals that the Orders themselves "force[d]" the hospitals "to modify [their] behavior" by ending gender-affirming care services "in order to avoid future adverse consequences." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 734 (1998). "[B]ecause the *threat* of revocation of funding was enough to compel the medical institutions to pause or cease the challenged care," JA936, there is a live controversy *now*.

Defendants' reliance on *National Association of Diversity Officers in Higher Education v. Trump* (*NADOHE*), 167 F.4th 86 (4th Cir. 2026), is unavailing for much the same reason. *See* Reply Br. 8-9. Indeed, if anything, *NADOHE* supports Plaintiffs.

The *NADOHE* plaintiffs challenged three provisions in two executive orders concerning diversity, equity, and inclusion (DEI) programs within federal grant and contract processes. The "Termination Provision" directed all agencies to, among other things, "terminate, to the maximum extent allowed by law" all DEI or "equity-related" grants or contracts. *NADOHE*, 167 F.4th at 94. The "Certification Provision" instructed agency heads to "include in every contract or grant award" a requirement that recipients certify their compliance with federal anti-discrimination law and that they do "not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id*. The "Enforcement Threat Provision" ordered the " 'heads of all agencies, with the assistance of the Attorney

10

General' to prepare a report, within 120 days of the Order, identifying '[a] plan of specific steps or measures to deter DEI programs or principles (whether specifically denominated 'DEI' or otherwise) that constitute illegal discrimination or preferences." *Id.* (quoting Exec. Order No. 14,173 § 4(b)(iii), *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025)).

This Court held that the plaintiffs' claims regarding the Termination and Certification Provisions were justiciable: Those provisions "contain[ed] straightforward directives pointedly telling agencies to terminate grants and contracts in specified circumstances." *NADOHE*, 167 F.4th at 100 (brackets, ellipses, and quotation marks omitted). The same is true here. Section 3(g) of the Gender-Identity Order mandates that agencies "shall . . . ensure grant funds do not promote gender ideology" and Section 4 of the Denial-of-Care Order similarly states that agencies "shall . . . immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children." Just like *NADOHE*, this "text reveals that agencies have little discretion when it comes to enforcement." 167 F.4th at 100. And, although not necessary to establish ripeness here, the record also reveals "examples of agencies acting consistently with those directives by terminating or suspending grants." *Id.*; *compare* JA936-938 ("HRSA and CDC did not wait for further clarification or

11

implementation guidance before sending out emails to all grant recipients requiring the immediate cessation of gender-affirming care.").

As for the Enforcement Threat Provision, this Court concluded that the *NADOHE* plaintiffs lacked standing to challenge that provision because they had not sufficiently alleged injury-in-fact.  Instead, the plaintiffs' injury "rest[ed] 'on a highly attenuated chain of possibilities'" concerning how the agency's report would be implemented, including that the report would recommend "cutting funds for organizations that engage in DEI, even though the [Enforcement Threat Provision] does not mention funding" or that the plan would even "include[] plaintiffs." *NADOHE*, 167 F.4th at 99.  But as explained, Plaintiffs' injury here does not turn on how federal agencies implement the Orders.  Rather, hospitals' "decision[s] to pause or cancel gender-affirming care [were] undertaken as a direct response to the Executive Orders."  JA935, JA948.  And Plaintiffs suffered as a result.  JA938-939, JA947-948 & n.28, JA979-980.

**2.**  Plaintiffs are likely to succeed on the merits of their separation-of-powers claim.  It is "black letter law," *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188-189 (1999), that "[t]he President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself," *Youngstown*, 343 U.S. at 585.  When the President has acted *ultra vires*—without authority or "beyond the scope of power allowed or granted" by law, *Ultra Vires*,

12

Black's Law Dictionary (12th ed. 2024)—federal courts have jurisdiction to review the President's conduct. *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902); *see Trump v. Cook*, No. 25A312, 2026 WL 1855613, at *11 n.2 (U.S. June 29, 2026) ("We have often held that plaintiffs may sue 'in equity' without a congressionally-provided cause of action to prevent an injurious act by a public officer.") (quotation marks omitted). Because the President here has "pointed to no colorable source of authority" for the Executive Orders, *Mille Lacs Band*, 526 U.S. at 189, and the Orders otherwise "place a new condition on federal funds not provided for by Congress," JA952, the District Court correctly found that Plaintiffs were likely to succeed on the merits of their separation-of-powers claim. JA950-966.

Defendants resist this straightforward conclusion by claiming that the District Court applied the wrong legal standard. Reply Br. 11-18. Instead of inquiring into the *President*'s source of authority for the Orders, Defendants assert that Plaintiffs needed to show "that there is *no* action that *any* agency could take that would not be contrary to an *express prohibition* in a statute." *Id.* at 7, 11. But as Plaintiffs have previously explained, Opp'n to Mot. for Stay Pending Appeal, Dkt. 125 at 13-15 (Stay Opp'n); Resp. Br. 23-24, 26-27, Defendants are mistaken for at least two reasons.

13

*First*, the restrictive standard on which Defendants rely applies to "nonstatutory *ultra vires* review" of agency action—not *ultra vires* presidential action. When Congress passed the APA in 1946, it significantly cabined nonstatutory review of *ultra vires* agency action. Wright & Miller, 33 Fed. Prac. & Proc. § 8301 (2d ed.). To prevent equitable nonstatutory review of agency action from becoming "an easy end-run around the limitations of" the APA, the Court held in *Leedom*, 358 U.S. at 188, that nonstatutory review of agency action applies "only when an agency has taken action entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute." *Nuclear Regul. Comm'n v. Texas* (*NRC*), 605 U.S. 665, 681 (2025) (quotation marks omitted).

But the APA does not even apply to the President, *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992), so the APA did not displace pre-existing nonstatutory *ultra vires* review of presidential actions. As the Tenth Circuit has explained, claims that the President acted *ultra vires* "are likely not an 'easy end-run' around any statutory judicial-review limitations." *Garfield County v. Trump*, 179 F.4th 814, 830 (10th Cir. 2026). That is why Defendants are unable to identify a single case applying the *Leedom* standard to executive orders. That is also why courts have continued to review *ultra vires* challenges to presidential actions, even following the APA's passage, without applying the restrictive *Leedom* standard. *See, e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654, 660 (1981) (holding President exceeded his authority

14

under IEEPA and evaluating conduct under *Youngstown* despite the lack of any express statutory prohibition on President's action).

*Second*, as Defendants acknowledge, this Court already held in *Sustainability Institute v. Trump*, 165 F.4th 817 (4th Cir. 2026), that the restrictive test for *ultra vires* claims does not apply to constitutional separation-of-powers claims in the vein of *Youngstown*. Reply Br. 12 (citing *Sustainability Inst.*, 165 F.4th at 830). This Court explained in *Sustainability Institute* that to state such a constitutional claim (as opposed to a statutory claim) the plaintiff must allege that the President acted in the "*absence* of *any* statutory authority," not merely that he "acted in excess of such authority." *Dalton v. Specter*, 511 U.S. 462, 473 (1994); *see Sustainability Inst.*, 165 F.4th at 831-832.

That is precisely what Plaintiffs allege here. Section 4 of the Denial-of-Care Order vaguely references the "laws of the United States" without identifying any statute authorizing the President to instruct agencies to "immediately" terminate or withhold federal health and research grants from entities that provide gender-affirming medical care to people under nineteen. As for the Gender-Identity Order, as the District Court observed, the only statutory authority that Order "identifies pertains to 'regulations for the conduct of employees in the executive branch,'" JA950, which "cannot provide the basis for the sweeping directive to withhold Congressionally allocated funds," JA943; *see* 5 U.S.C. § 7301. Consistent with the

15

President's Orders, agencies immediately began terminating grants based solely on the Executive Orders without citing any statutory authority whatsoever. That places this case squarely within the set of constitutional claims reviewable under *Sustainability Institute*.

Defendants respond that Plaintiffs' suit really concerns "hypothetical future agency actions taken under as-yet-unidentified statutory authorities." Reply Br. 1. But the Executive Orders have already harmed Plaintiffs in multiple respects. *Supra* pp. 6-10. That the immediate termination of funding—and threat of more to come— was completed based on "as-yet-unidentified statutory authorities" is precisely the constitutional problem. *Sustainability Inst.*, 165 F.4th at 831-832. And where the executive order in question cannot "trace[ ] its lawmaking authority to a particular statute," *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 171 (4th Cir. 1981), the President's authority to impose his own conditions on federal funding "must be found in some provisions of the Constitution," *Youngstown*, 343 U.S. at 587. Plaintiffs' argument that no such power exists is therefore a "constitutional" claim in the vein of *Youngstown*.

Finally, even if *Leedom* applied to Plaintiffs' separation-of-powers claim, the challenged provisions of the Orders *are* "contrary to a specific prohibition in a statute," *NRC*, 605 U.S. at 681 (quotation marks and emphasis omitted); they discriminate against Plaintiffs based on their transgender status and therefore their

16

sex, which is prohibited by Section 1557 of the ACA and Section 1908 of the PHSA.

Response Br. 38-42.

### C.     The Executive Orders Violate the Equal Protection Clause, the ACA, and the PHSA.

Plaintiffs are likely to prevail on their equal-protection claim. The Orders trigger heightened scrutiny because, under this Court's precedent, "heightened scrutiny applies to . . . sex-based classifications" and "transgender people constitute at least a quasi-suspect class." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607 (4th Cir. 2020).[5] And for all the same reasons that Plaintiffs are likely to prevail on their equal-protection claim, they are also likely to prevail on their claim that the Orders discriminate based on sex, in violation of Section 1557 of the ACA and Section 1908 of the PHSA. *See Anderson*, 169 F.4th 474.[6]

As explained in Plaintiffs' Response Brief, the Executive Orders go much further than the targeted healthcare regulations at issue in *Skrmetti* and *Anderson*:

---

[5] Neither *Skrmetti* nor the Supreme Court's decision in *West Virginia v. B.P.J. by Jackson*, No. 24-38, 2026 WL 1868739 (U.S. June 30, 2026), decided whether classifications based upon transgender status warrant heightened scrutiny under the Equal Protection Clause. As the Government has conceded, *Grimm* therefore remains good law. *See* Opening Br. 48; *see also* Reply Br. 21-23 (not disputing that "heightened scrutiny" applies if the Orders are deemed to classify on the basis of sex or transgender status).

[6] Plaintiffs maintain that *Anderson* was wrongly decided insofar as it applied *Skrmetti*'s approach to *Bostock v. Clayton County*, 590 U.S. 644 (2020), to statutory sex-discrimination claims.

17

Their broad scope seeks to regulate transgender persons, not just medical procedures. Resp. Br. 43-44; *see Talbott v. United States*, 176 F.4th 720, 751 (D.C. Cir. 2026) (Rogers, J., concurring in part and dissenting in part). As noted, the Gender-Identity Order singles out and demeans transgender people as persons; indeed, it repudiates their very existence. The Gender-Identity Order explicitly refers both to "gender identity" and transgender people, Gender-Identity Order § 2(f); declares their existence to be "unmoored from biological facts," *id.* § 1; deems their identities to be "false," *id.* § 2(f); orders their exclusion from government recognition and protection, *id.* §§ 3(b)-(d), (f), 4; and coerces others to do the same through manipulating federal funding, *id.* § 3(e), (g). And the Denial-of-Care Order reflects and implements the Gender-Identity Order's ideological opposition to the existence of transgender people. Resp. Br. 46; *see* Denial-of-Care Order § 4.

Defendants have confirmed as much, describing the Gender-Identity and Denial-of-Care Orders as part of "President Trump's push to eliminate transgender insanity." *See supra* n.1.[7] This so-called "push," which encompasses a broad array of executive orders and actions, *see id.* (detailing Administration's actions); Resp.

---

[7] Unlike the use of "the terms 'sex change' and 'transsexual' as adjectives to describe 'treatment' or 'surgery'" in *Anderson*, the Orders here refer to transgender people to describe the persons they target. 169 F.4th at 486. In other words, the Orders seek to "regulate[] a class of persons identified on the basis of a specified characteristic." *Skrmetti*, 605 U.S. at 519.

Br. 6-8, 46-48, is premised on the Administration's dehumanizing, inaccurate rhetoric to cast transgender people, gender-affirming medical care, and transgender-inclusive policies as an existential threat to "the validity of the entire American system," Gender-Identity Order § 1; as antithetical to "an honorable, truthful, and disciplined lifestyle," lacking "humility and selflessness," Exec. Order No. 14,183 § 1, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025); and as a source of "endangerment, humiliation, and silencing of women and girls," Exec. Order No. 14,201 § 1, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 11, 2025).

These are not mere policy preferences. The Orders seek to erase transgender people and to punish the organizations that provide them necessary services and care, as multiple courts have recognized. *See, e.g.*, *San Francisco AIDS Found. v. Trump*, 786 F. Supp. 3d 1184, 1216 (N.D. Cal. 2025) ("[T]he Gender Order necessarily singles out transgender people and excludes them from being able to benefit from federal funds."); *Endocrine Soc'y v. FTC*, No. 26-cv-00512, 2026 WL 1257289, at *2 (D.D.C. May 7, 2026) (the Orders "exhorted federal agencies to put a stop to any acknowledgment of gender dysphoria or that some individuals are transgender"); *cf. Talbott*, 176 F.4th at 746 (Wilkins, J.) (military ban premised "on a non-legitimate state interest to harm the politically unpopular group of transgender persons"). As the District Court aptly observed, one "cannot fathom discrimination more direct

19

than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist." JA969.

In addition, as explained in Plaintiffs' Response Brief, even if the Orders were deemed facially neutral, they would still be subject to heightened scrutiny because they are "motivated by an invidious discriminatory purpose." *Skrmetti*, 605 U.S. at 516; *see* Resp. Br. 44-48. Unable to show otherwise, Defendants argue that this Court cannot consider Plaintiffs' assertion of animus because "[t]he district court did not pass on this argument." Reply Br. 21. That is wrong. Plaintiffs preserved the animus argument below, *see* JA60 (amended complaint), JA177 (preliminary-injunction motion), and this Court may affirm the grant of a preliminary injunction "on any grounds supported by the record," *Salomon & Ludwin, LLC v. Winters*, 150 F.4th 268, 277 (4th Cir. 2025).

Defendants also misleadingly maintain that this Court "can only presume discriminatory intent when a law *both* overwhelmingly affects a suspect class *and* there's no logical reason for the distinction the law makes other than targeting that suspect class." Reply Br. 22 (quoting *Anderson*, 169 F.4th at 484). This assertion, however, selectively quotes *Anderson*'s discussion of when discriminatory intent may be presumed from a facially neutral classification that "uses a proxy to camouflage intentional discrimination based on a protected trait." 169 F.4th at 484 (citation omitted). But that has no relevance here. *Anderson* itself explained that

20

even if "a State has legitimate interests in" its facial classification, "additional evidence of discriminatory intent" may trigger heightened scrutiny. *Id.* at 486. Plaintiffs here have provided that additional evidence in spades. *See* Resp. Br. 44-48. The context surrounding these specific Executive Orders further demonstrates their intent to impose adverse effects on transgender people. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977).

Finally, Defendants' cite to *Mullin v. Doe*, 146 S. Ct. 2121 (2026), does not move the needle. Reply Br. 22-23. In that case, the Court emphasized that the termination of Temporary Protected Status itself did not contain any "overtly" discriminatory language. *Mullin*, 146 S. Ct. at 2138. Not so here, where the Orders themselves describe transgender individuals as "wrong," "unhealthy," "false," and a "stain on our Nation's history," Gender-Identity Order §§ 1, 2; Denial-of-Care Order § 1, and where Defendants themselves have described the Orders as part of their crusade to eliminate "transgender insanity," *supra* n.1. "If we are at the point where invidious reasons that were expressly given for a classification can be completely ignored and replaced with our imagined non-invidious reasons, then equal protection jurisprudence has truly become bankrupt." *Talbott*, 176 F.4th at 747 (Wilkins, J.).

In light of such "plain" statements of discriminatory intent, JA130, the Orders are subject to heightened scrutiny—which Defendants make no attempt to argue the

21

Orders can withstand. Indeed, the Orders evince a level of animus that could not survive even rational-basis review. Resp. Br. 52.

## II. PLAINTIFFS SATISFY THE REMAINING FACTORS FOR EQUITABLE RELIEF.

Plaintiffs were subjected to and remain threatened with irreparable harm. "[T]he irreparable harm prong is satisfied where the plaintiff suffers from 'diminished access to high-quality health care suited to the individual plaintiff's needs.'" JA979 (quoting *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 706-707 (4th Cir. 2019)). Individual Plaintiffs and PFLAG members have "already lost care because their providers have canceled appointments, refused to fill prescriptions, or even shut down their gender-affirming medical care programs altogether," as a result of institutions' "fear of losing federal funding pursuant to the challenged portions of the Executive Orders." JA979-980 (citation omitted). And GLMA members "have been compelled to abandon their patients." JA979 (citation omitted). The injunction remains necessary to ensure that Plaintiffs are not deprived of access to essential, lifesaving medical care, which cannot be rectified after-the-fact. *See* JA980 (recognizing Plaintiffs' risks of depression, anxiety, and suicide increase for every day without care); Stay Opp'n 22-23.

The balance of equities and the public interest likewise favor relief. *See* Resp. Br. 54. The Orders have "far-reaching effects" on the public writ large: They jeopardize "*all* medical institutions' federal funding . . . regardless of whether the

funding is tied to gender-affirming care." JA981. Without the injunction, the Orders "threaten to disrupt treatment of patients, stall critical research, and gut numerous programs in medical institutions that rely on federal funding," including programs unrelated to "gender-affirming care." JA981-982. And "[i]t is well-established that the public interest favors protecting constitutional rights," *Leaders of a Beautiful Struggle*, 2 F.4th at 346, which "easily outweighs whatever burden the injunction may impose," *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011).

By contrast, Defendants' claimed harm—interference with the President's ability to set policy priorities, Reply Br. 28—is illusory, as their belated stay request confirms, *see* Mot. for Stay Pending Appeal, Dkt. 122 at 25 (claiming same harm justified a stay); *see also* Order, Dkt. 129 at 10-11 (Benjamin, J. concurring) (explaining that the government's "unreasonabl[e] delay[ ] in seeking a stay" was "inconsistent with its plea of irreparable injury"). Although the President generally "may determine his policy priorities and instruct his agents to make funding decisions based on them," *NADOHE*, 167 F.4th at 101, he "cannot suffer harm from an injunction that merely ends an unlawful practice," *Thakur v. Trump*, 163 F.4th 1198, 1207 (9th Cir. 2025) (citation omitted). As the District Court explained, its ruling does not "prevent the Executive from considering any particular policy." JA981. Rather, the problem is that "the Executive Orders went well-beyond general policymaking" by "condition[ing] federal funding in a manner not prescribed by

23

Congress." *Id.* The preliminary injunction merely prevents the Administration's attempt to usurp Congress's authority. *See* Stay Opp'n 20-22.

## III. THE DISTRICT COURT'S INJUNCTION ALIGNS WITH *CASA*.

Defendants also assert that the challenged injunction runs afoul of *CASA*. Reply Br. 28-34. That is wrong; the injunction affords relief only as necessary to "administer complete relief between the parties." *CASA*, 606 U.S. at 851 (citation and emphasis omitted).

To start, the District Court did not indiscriminately bestow relief on parties and nonparties alike. The court considered the specific facts before it and expressly concluded that the *only* way to afford complete relief was to enjoin the Orders' enforcement in their entirety. *See* JA985-986. The Individual Plaintiffs and members of Plaintiff PFLAG were scheduled to receive medical care at hospitals across the United States; they had that care canceled because of the Executive Orders. *E.g.*, JA275, JA289, JA324, JA305, JA426-428. Plaintiffs and their members across the country thus needed to seek care elsewhere to avoid potentially irreversible consequences of terminating their care. *Id.* Because the Orders "effectively prohibit[ed] nationwide the established course of medical care" for gender dysphoria, finding new care would be all but impossible absent injunctive relief encompassing all providers of this care. JA368-369.

24

The harm to Plaintiff GLMA's provider-members further exemplifies why broad relief was necessary. The Orders' "threat[ ] to take away all of an institution's federal grant funding because that institution provides gender-affirming care—even when the grants being taken away are not themselves related to gender-affirming care"—placed *all* of GLMA's members and the medical institutions at which they work in an "untenable" all-or-nothing position. JA359-360. These providers had to choose whether to comply with the Orders—thus preserving access to federal funds but "endanger[ing] the health and wellbeing" of their transgender patients—or offer this medically-necessary care at the risk of losing "essential federal funding" needed for other patients and "significantly hampering" their scientific and research work dedicated to the "health and wellbeing of all people in the United States." JA360. And once operations were shuttered, resuming care at the drop of a hat or for a single patient could pose significant practical hurdles—whether due to staff shortages, renewed setup costs, or other obstacles.

To provide Plaintiffs and their members complete relief, then, the District Court had "only one feasible option," *CASA*, 606 U.S. at 851: enjoin Defendants from applying the Orders to hospitals providing gender-affirming medical care. JA985-986. Anything short of that could not guarantee any Plaintiff's adequate access to care or guarantee hospitals the necessary funding and security required to keep providing that care. The District Court accordingly found that hospital-by-

25

hospital relief "would allow the coercive impact of the challenged portions of the Executive Orders to persist and would effectively deny the named Plaintiffs the relief they seek."  JA985.

Defendants fail to clear the high bar required to establish that the District Court's factual findings were clearly erroneous.  *See Walsh v. Vinoskey*, 19 F.4th 672, 677 (4th Cir. 2021).  Defendants hypothesize that the District Court could have narrowed the injunction to "16 individuals—whether plaintiffs in their own right or members of the organizations" who had already submitted declarations detailing their harms—and "the institutions at which the identified plaintiffs or members actually work or receive treatment."  Reply Br. 30-32.  That is wrong.

For one thing, relief flows to "each plaintiff with standing to sue."  *CASA*, 606 U.S. at 861.  For PFLAG and GLMA—whose associational standing Defendants have never challenged, JA703—that means relief necessarily must be tailored to *all* of PFLAG's and GLMA's injured members across the country, not only to the individual Plaintiffs or the particular members identified in the preliminary injunction filings.  *See Warth v. Seldin*, 422 U.S. 490, 515 (1975) (injunctive relief "inure[s] to the benefit of those members of the association actually injured").  *CASA* did not abrogate that settled principle, as multiple courts have recognized.  *See New Hampshire Indonesian Cmty. Support v. Trump*, 157 F.4th 29, 35-36 (1st Cir. 2025) (providing relief to organizations' members post-*CASA*), *cert. denied*, No. 25-899,

26

2026 WL 1871309 (U.S. June 30, 2026); *see also Ass'n of Am. Universities v. Dep't of Def.*, 792 F. Supp. 3d 143, 183 (D. Mass. 2025) ("[N]o additional showing is necessary to afford relief to all [ ] members of Organizational Plaintiffs."); *Oregon Council for Humans. v. U.S. DOGE Serv.*, 794 F. Supp. 3d 840, 896 (D. Or. 2025) ("Within the principles of . . . associational standing, the Court properly may order injunctive relief for the Federation's members.").

Defendants' suggestion that injunctive relief should be limited to the "identified individual[ ]" Plaintiffs, Reply Br. 30, entirely ignores the need to provide relief for PFLAG's affected members and the patients of GLMA's provider members. Defendants' proposal to limit relief to the individual Plaintiffs or the institutions where they are currently receiving care also ignores the practical realities of healthcare, where patients may have to switch providers as a result of life circumstances, such as changes in insurance coverage or relocation. *See, e.g.*, JA350, JA427-428; *see also, e.g.*, JA620. Limiting the injunction in this way would prevent the individual Plaintiffs from transferring their care to another hospital, because the revived Orders would, in effect, force every hospital *not actively serving an individual Plaintiff* to end its gender-affirming care programs. JA368-369. Defendants brush aside Plaintiffs' concerns regarding transfers of care as mere "some day intentions." Reply Br. 33 (citation omitted). But, as noted, transfers of

27

care are routine—even before the Administration began its anti-transgender campaign in earnest.

Defendants retort that Plaintiffs could simply ask the District Court to modify the injunction to cover new hospitals as needed. Reply Br. 32-33. But as the District Court explained, that approach "ignores the realities regarding how difficult it would be for medical institutions to navigate" this "convoluted scenario." JA985. Even if a court could later modify the injunction, providers who have already halted care may not be in a position to resume services for a single patient for the reasons already explained. As a result, the court could not simply "peel off just the portion of the [Orders] that harmed the plaintiff." *CASA*, 606 U.S. at 852.

The District Court also explained that "preventing agencies from conditioning funding on certain medical institutions, while allowing conditional funding to persist as to other medical institutions," would cause "[s]ignificant confusion." JA983. This type of "patchwork scheme" is "not especially workable or sustainable or desirable." *CASA*, 606 U.S. at 872 (Kavanaugh, J., concurring). The resulting "disuniformity" threatens "chaos [that] is not good for the law or the country." *Id.* PFLAG's 550,000 members reside across the United States, and GLMA's over-1,000 members are associated with medical institutions across the country, JA983-984; *see also* JA355-356; JA364-365, meaning that a plaintiff-by-plaintiff or a hospital-by-hospital approach would lead to a "scattershot system of federal law" across the

28

country, *CASA*, 606 U.S. at 872 (Kavanaugh, J., concurring). Adequate relief here thus requires an "indivisible remedy." *Id.* at 865 (Thomas, J., concurring).

As the Supreme Court has explained, "equitable remedies are a special blend of what is necessary, what is fair, and what is workable." *New York v. Cathedral Acad.*, 434 U.S. 125, 129 (1977). Defendants cannot simply propose the unworkable and be done with it, particularly where they have offered no evidence to rebut the District Court's detailed findings supporting its decision granting preliminary relief on a nationwide basis as necessary to provide complete relief to Plaintiffs.

## CONCLUSION

For the foregoing reasons, and those in Plaintiffs' Response Brief, the District Court's preliminary injunction should be affirmed.

Respectfully submitted,

July 29, 2026

/s/ Catherine E. Stetson
Catherine E. Stetson
HOGAN LOVELLS CADWALADER US LLP
555 13th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5491
cate.stetson@hlc.com

*Counsel for Plaintiffs-Appellees*
(Additional counsel listed on
next page)

29

Joshua Block
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, Floor 18
New York, NY 10004
Telephone: (212) 549-2500
jblock@aclu.org

Deborah A. Jeon
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF MARYLAND
3600 Clipper Mill Road, Suite 200
Baltimore, MD 21211
Telephone: 410-889-8550 x120
jeon@aclu-md.org

Harper Seldin
Alexandra R. Johnson
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, Floor 18
New York, NY 10004
Telephone: (212) 549-2500
hseldin@aclu.org
a.johnson@aclu.org

Danielle Desaulniers Stempel
Sam H. Zwingli
Claire Housley
HOGAN LOVELLS CADWALADER US LLP
555 13th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5491
danielle.stempel@hlc.com
sam.zwingli@hlc.com
claire.housley@hlc.com

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: (212) 809-8585
ogonzalez-pagan@lambdalegal.org

Karen L. Loewy
LAMBDA LEGAL DEFENSE
    AND EDUCATION FUND, INC.
815 16th Street NW, Suite 4140
Washington, DC 20006
Telephone: (202) 804-6245
kloewy@lambdalegal.org

Nora Huppert
LAMBDA LEGAL DEFENSE
    AND EDUCATION FUND, INC.
3656 N. Halsted St.
Chicago, IL 60613
Telephone: (312) 605-3233
nhuppert@lambdalegal.org

Jackson B. Skeen
HOGAN LOVELLS CADWALADER US LLP
125 High Street
Suite 2010
Boston, MA 02110
Telephone: (617) 702-7747
jackson.skeen@hlc.com

*Counsel for Plaintiffs-Appellees*

30

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this response complies with the type-volume requirements of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 6,499 words. This response was prepared in 14-point Times New Roman font, a proportionally spaced typeface, using Microsoft Word.

July 29, 2026                          /s/ Catherine E. Stetson
                                       Catherine E. Stetson

                                       *Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 29, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


July 29, 2026                                    /s/ Catherine E. Stetson
                                                 Catherine E. Stetson

                                                 *Counsel for Plaintiffs-Appellees*