**U.S. Department of Justice**
Civil Division, Appellate Staff
950 Pennsylvania Ave. NW
Washington, DC 20530

Tel: (202) 532-4453

August 25, 2026

VIA CM/ECF

Nwamaka Anowi
Clerk of the Court
U.S. Court of Appeals for the Fourth Circuit
1100 East Main Street, Suite 501
Richmond, Virginia 23219-3517

RE: *PFLAG, Inc. v. Trump*,
No. 25-1279 (4th Cir.)

Dear Ms. Anowi:

Pursuant to Fed. R. App. P. 28(j), we write to notify the Court of *Trump v. California*, No. 26A124 (U.S. Aug. 24, 2026), a copy of which is attached. In *California*, the Supreme Court stayed an injunction that barred the government from implementing an executive order regarding election integrity. The executive order required the Secretary of Homeland Security to create and transmit to each state a state citizenship list, Op. 2; directed the Attorney General to prioritize the investigation and prosecution of election fraud, *id.*; and ordered the United States Postal Service to initiate a proposed rulemaking, *id.* The order required each of these steps to be "implemented consistent with applicable law." *Id.*

The Supreme Court concluded that the United States was likely to succeed on the merits of its argument that the district court lacked jurisdiction, relying on the "related doctrines" of standing and ripeness. Op. 3. The Court explained that the executive order "is an internal directive from the President to his subordinates mandating that certain agencies pursue certain policies" and that "[i]t neither requires nor forbids anything of anyone outside the Executive Branch." Op. 2. The Court then reviewed each challenged provision of the executive order, explaining that plaintiffs' challenges were not justiciable because in each instance plaintiffs' suit depended on an attenuated "chain of inferences" about the agencies' implementation of the order, such that the "true source of any injury" would be

agency action that might be taken in the future. Op. 4 (quotations omitted); *see* Op. 7-8. And the Court further emphasized that plaintiffs could not manufacture standing by taking action in anticipation of steps the agencies might take in the future. Op. 5; *see* Op. 8.

The principles articulated in *California* apply with full force here. Plaintiffs' claims hinge on assertions that federal agencies will in the future terminate or condition as-yet unidentified grants in violation of as-yet-unidentified statutory authorities, even though the Executive Orders here specifically direct the agencies to act "as permitted by law" and "consistent with applicable law." *See* Opening Br. 18-23; Reply Br. 4-11.

Sincerely,

*/s/ Andrew Shi*
Andrew Shi

cc: Counsel of Record (via CM/ECF)

# SUPREME COURT OF THE UNITED STATES

No. 26A124

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* CALIFORNIA, ET AL.

ON APPLICATION FOR STAY

No. 26A139

ALABAMA, ET AL. *v.* CALIFORNIA, ET AL.

ON APPLICATION FOR STAY

[August 24, 2026]

PER CURIAM.

The President recently issued an Executive Order regarding election integrity. A group of States sued the Government in the District of Massachusetts, contending that the Order unconstitutionally infringes on their authority to administer elections. The District Court agreed and enjoined the Government from implementing the Order. In doing so, the District Court rejected the Government's argument that it lacked jurisdiction over the States' claims because the States lack standing to bring them. The Government has asked us to stay the injunction, arguing that it is likely to succeed on the merits of its jurisdictional argument, that the injunction is causing it irreparable harm, and that the equities do not favor leaving the injunction in place while the Government's appeal is pending. We agree and grant the stay.

I

About five months ago, President Trump issued an Executive Order designed to maintain public confidence in federal elections. See Exec. Order No. 14399, 91 Fed. Reg. 17125 (2026). The Order is an internal directive from the President to his subordinates mandating that certain agencies pursue certain policies. It neither requires nor forbids anything of anyone outside the Executive Branch. Three sections of the Order are relevant here.

*First*, §2(a) orders the Secretary of Homeland Security to "take appropriate action to" create and send "State Citizenship List[s]" to each State. *Ibid.* These Lists will catalog the residents of each State who are U. S. citizens and "who will be above the age of 18 at the time of an upcoming Federal election." *Ibid.* States are not required to use the Lists, and the Secretary may compile and transmit them only "[t]o the extent feasible and consistent with applicable law." *Id.*, at 17125–17126.

*Second*, §2(b) requires the Attorney General to "prioritize the investigation and, as appropriate, the prosecution of State and local officials or any others" who issue federal ballots to ineligible voters. *Id.*, at 17126.

*Third*, §3(b) directs the Postal Service to "initiate a proposed rulemaking" that includes several "[p]roposed provisions." *Ibid.* One such provision is that outbound ballot envelopes must contain a unique barcode to facilitate tracking. *Ibid.* The Order does not demand that any proposed provision appear in the final rule. *Id.*, at 17126–17127.

All provisions of the Order must "be implemented consistent with applicable law." *Id.*, at 17127.

A few days after the Order was issued, a group of States and the District of Columbia (hereinafter "States") filed suit in the District of Massachusetts. As relevant here, the States argued that §§2 and 3 are unconstitutional and sought to enjoin their implementation; the Government countered that the States' suit is not justiciable because the

Order does not injure them. The District Court largely agreed with the States and entered a final judgment forbidding the Government to implement §§2 and 3 as to them for the upcoming midterms. After the First Circuit denied the Government's request for a stay, the Government sought a stay from this Court.

To secure a stay pending appeal, the Government must show that it is likely to succeed on the merits and that it is likely to suffer irreparable harm without a stay. See *Trump* v. *Cook*, 609 U. S. ___, ___ (2026) (slip op., at 8). It must also demonstrate that the balance of equities does not counsel against relief. See *ibid.* Of these factors, the likelihood of success on the merits and the likelihood of irreparable harm "are the most critical." *Nken* v. *Holder*, 556 U. S. 418, 434 (2009).[1]

## II

As to the first factor: The Government is likely to prevail on the merits of its argument that the District Court lacked jurisdiction to enter the judgment.

Two related doctrines of justiciability block the States' suit. One is standing, which requires "an injury that is concrete, particularized, and imminent rather than 'conjectural or hypothetical.'" *Carney* v. *Adams*, 592 U. S. 53, 60 (2020). The other is ripeness, which forbids federal courts to adjudicate disputes that are "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump* v. *New York*, 592 U. S. 125, 131 (2020) (*per curiam*). Because "standing is not dispensed in gross," we address each challenged provision of the Order separately. *TransUnion LLC* v. *Ramirez*, 594 U. S. 413, 431 (2021).

[1] The States do not dispute that this application presents a significant legal question. *Trump* v. *Cook*, 609 U. S., at ___ (slip op., at 8).

A

Section 2(a) directs the Secretary of Homeland Security to take appropriate action to create and distribute State Citizenship Lists. This provision is an internal directive from the President to a subordinate. It imposes no obligations on the States, so they "suffer no concrete harm from" it. *Trump* v. *New York*, 592 U. S., at 134. And without concrete harm, there is no standing. *TransUnion*, 594 U. S., at 442.

The true "source of any injury" to the States would be the downstream action that the Secretary "*might* take in the future" to implement §2(a). *Trump* v. *New York*, 592 U. S., at 133–134. Emphasis on might. Section 2(a) can be implemented only "[t]o the extent feasible and consistent with applicable law." 91 Fed. Reg. 17125. And as the Court explained in another case involving a Presidential directive with a similar qualifier: "Any prediction how the Executive Branch might eventually implement" §2(a) while balancing feasibility and lawfulness "is 'no more than conjecture' at this time." *Trump* v. *New York*, 592 U. S., at 131. The Secretary's "eventual action will reflect both legal and practical constraints, making any prediction about future injury just that—a prediction." *Id*., at 133; see 91 Fed. Reg. 17125.

To see why, consider the unduly long "chain of inferences" necessary to support the States' supposedly concrete injury. *Clapper* v. *Amnesty Int'l USA*, 568 U. S. 398, 414–415, n. 5 (2013). The District Court first had to speculate about whether it would be "feasible" for the Secretary to create and transmit the Lists before the midterms. 91 Fed. Reg. 17125. But §2(a) "may not prove feasible to implement in any manner whatsoever." *Trump* v. *New York*, 592 U. S., at 132. The court then had to guess how the Secretary might tailor his implementation to be "consistent with applicable law." 91 Fed. Reg. 17125. Next, the court had to predict what "action" the Secretary would deem "appropriate" for implementing §2(a). *Ibid.* After all that, the court

still had to estimate whether those actions would be taken "in a manner substantially likely to harm" the States. *Trump* v. *New York*, 592 U. S., at 132. But Article III prohibits federal courts from stacking hypothetical on hypothetical to speculate that harm will eventually materialize. *Clapper*, 568 U. S., at 414–415, n. 5. Adjudicating this claim requires a prediction not only about *whether* the Secretary will act before the midterms, but also about the shape that any such action might ultimately take. Article III demands more certainty.

The lower courts saw it differently, concluding that the States suffered "a present injury" from §2(a) because it required them "to begin planning now on how to comply with" it. App. to Application in No. 26A124, pp. 7a–8a. But the States "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U. S., at 416. And the hypothetical future harm that the States fear—the Secretary's implementation of §2(a)—is far from "certainly impending." *Ibid.* By allowing the States "to bring this action based on costs they incurred in response to a speculative threat," the District Court "improperly water[ed] down the fundamental requirements of Article III." *Ibid.*

Perhaps recognizing the weakness of that standing rationale, the Court of Appeals added another: §2(a) infringes the States' sovereign authority to create election rules. But §2(a) does no such thing. Instead, it simply directs the Secretary to take certain actions if appropriate, feasible, and lawful. 91 Fed. Reg. 17125–17126. This internal directive does *not* regulate the States' voter registration processes. Nor does it impinge on the States' authority "'to create and enforce a legal code' for elections." Contra, App. to Application in No. 26A124, p. 13a.

B

The States lack standing to challenge §2(b) for much the same reason: It does nothing to them. This provision directs the Attorney General to "prioritize" the investigation and prosecution of those who violate existing federal laws by issuing ballots to ineligible voters. 91 Fed. Reg. 17126 (collecting statutes). Setting prosecutorial priorities lies within the President's Article II power. And his decision to prioritize the prosecution of certain offenses does not inflict a traditionally recognized harm on the States. See *TransUnion*, 594 U. S., at 424–425.

The States try to avoid this straightforward analysis by misreading the Order. They insist that §2(b) credibly threatens them with prosecution if they do not use the Citizenship Lists from §2(a). See Opposition to Applications 21–22, 29–30; see also *post*, at 2–3 (SOTOMAYOR, J., dissenting); *post*, at 14–15 (JACKSON, J., dissenting). But that view is inconsistent with the text of §2. The States concede that §2(a) does not require them to use the Lists at all (assuming they receive them in the first place). Opposition to Applications 21. So it is logically impossible for a State to "violate" §2(a)—and §2(b) does not suggest otherwise. Section 2(b) directs the Attorney General to "prioritize" prosecutions of those who violate federal election laws. It then provides an array of *existing statutes* for the Attorney General to enforce. 91 Fed. Reg. 17126. Absent is any reference to Citizenship Lists. Without a textual basis for their concerns, the States lack a "well-founded fear" that they will be prosecuted for not using the Lists. *Virginia* v. *American Booksellers Assn., Inc.*, 484 U. S. 383, 393 (1988).

The States' reference to certain state laws allowing 17-year-olds to vote in primary elections is a red herring. See Opposition to Applications 29–30. Because §2(b) defines eligible voters as otherwise qualified citizens who are "18 years of age or older," 91 Fed. Reg. 17126, the States insist that they face a real threat of prosecution if they deliver a

ballot to a 17-year-old who is eligible to vote in a primary under state law. Not so. Section 7(b) of the Order requires §2(b) to "be implemented consistent with applicable law." *Id.*, at 17127. And on top of that, §2(b) limits itself to only "appropriate" prosecutions. *Id.*, at 17126. Given these provisions, the Government has unsurprisingly disavowed any intention to prosecute state officials for lawfully providing ballots to 17-year-olds.

C

Last is the States' challenge to §3, which directs the Postal Service to issue a notice of proposed rulemaking. According to the States, this internal directive demands that they overhaul their existing election procedures. See Opposition to Applications 24–26; see also *post*, at 1, 3, 7 (opinion of JACKSON, J.). It does not. Section 3 orders the Postal Service to initiate the process of proposing a rule that might bind the States in the future. It is not a proposed rule, let alone a final rule. And it imposes no legal requirements on the States (or, for that matter, on anyone outside the Executive Branch).

The District Court's conclusion that this internal directive inflicts an Article III injury on the States necessarily rests on an "attenuated chain of inferences." *Clapper*, 568 U. S., at 414–415, n. 5. At the time this suit was filed—the time when standing is measured—the District Court had to engage in a string of speculations to find this suit justiciable. It first had to speculate about whether the Postal Service would propose a rule. Then it had to speculate about how the agency would weigh the comments it received. Cf. *Perez* v. *Mortgage Bankers Assn.*, 575 U. S. 92, 96 (2015) (emphasizing that agencies typically "must consider and respond to significant comments"). Then it had to speculate about whether the agency would issue a final rule. See *Long Island Care at Home, Ltd.* v. *Coke*, 551 U. S. 158, 175 (2007) (explaining that a proposed rule is "simply a

proposal," and an agency "might choose to adopt the proposal or to withdraw it"). Then it had to speculate about what the final rule would say. Cf. *Encino Motorcars, LLC* v. *Navarro*, 579 U. S. 211, 218 (2016) (noting that the final rule "took the opposite position from the proposed rule"). Finally, after all that, the District Court still had to speculate about whether the text of a hypothetical final rule would harm the States. It should go without saying that the District Court made a decision "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump* v. *New York*, 592 U. S., at 131.

The States cannot preemptively concretize their injury by expending funds before the Postal Service finalizes a rule. Spending money to hedge against a "speculative threat" does not constitute an Article III injury. *Clapper*, 568 U. S., at 416. Though it may sometimes be "a reasonable reaction" to "incu[r] certain costs" in advance of a final rule, those costs cannot establish standing when the final rule remains a "hypothetical future harm that is not certainly impending." *Ibid.* Federal courts review final rules, not proposed rules—and certainly not antecedent internal directives to propose a rule. If the Postal Service's final rule harms the States, they may challenge that rule.

## III

The remaining stay factors also favor relief. The Government is likely to suffer irreparable harm without a stay. The District Court's breach of Article III interferes with the internal operations of the Executive Branch. See *INS* v. *Legalization Assistance Project of Los Angeles County Federation of Labor*, 510 U. S. 1301, 1306 (1993) (O'Connor, J., in chambers). The injunction bars Homeland Security from trying to compile Citizenship Lists for about half the States in the Union. It purports to forbid the Attorney General to implement the President's enforcement priorities as to

those same States.[2] And it prevents the Postal Service from so much as initiating a rulemaking that could yield a rule applicable to these States. Because reversal of the District Court's judgment would come too late for the 2026 midterms, the District Court's errors deal "a serious setback" to the Executive's "goals" while this litigation unfolds. *Coleman* v. *Paccar Inc.*, 424 U. S. 1301, 1307 (1976) (Rehnquist, J., in chambers). When a federal court "improperly intrudes on a coordinate branch" in this way, interim relief is justified. *Trump* v. *CASA, Inc.*, 606 U. S. 831, 859 (2025) (alterations and internal quotation marks omitted).

Fighting this Court's precedent, JUSTICE JACKSON maintains that "[t]he Government is not injured in the slightest" because the Order contemplates that the Government will engage in "patently unlawful conduct." *Post*, at 7. That, however, remains to be seen. And though JUSTICE JACKSON wishes it were otherwise, an applicant can show "irreparable harm from a threshold error without also showing that, at the end of the day, it will prevail on the underlying merits." *CASA*, 606 U. S., at 860. Such harm exists here because the injunction meddles in "the workings of" the Executive Branch, preventing it from even trying to lawfully

---

[2] The principal dissent suggests that, if the Order does not legally bind the States, then the Government cannot suffer irreparable harm from the injunction. See *post*, at 3 (opinion of SOTOMAYOR, J.). The dissent reasons that this is so because the injunction merely prohibits prosecutions "'stemming from violations or purported violations of the unconstitutional provisions in'" the Order. *Ibid.* And if it is impossible to violate the Order, then the injunction targets a null set of conduct, so the Government suffers no harm at all. *Ibid.* But the injunction is far broader than the dissent lets on. It declares all of §2 ultra vires as to the States, blocks the Government from "giving effect to" §2 as to the States, and requires the Government "to prevent explicit or implicit implementation of" §2 as to the States. Final Judgment in No. 1:26–cv–11581 (D Mass.), ECF Doc. 207, pp. 2–4. It is the breadth of these provisions—and the resulting intrusion into the Executive Branch's internal operations—that irreparably harms the Government.

implement the Order. *Legalization Assistance Project*, 510 U. S., at 1306.

Finally, "the balance of equities does not counsel against awarding the Government interim relief." *CASA*, 606 U. S., at 861. The Executive Order makes no demand of the States, so staying the District Court's injunction will not concretely harm them. That is why this suit was not justiciable in the first place.

* * *

The Court's disposition of this application does not mean that any measure taken by the Government to implement the Order will necessarily be lawful. On that score, time will tell. But the Order itself does not harm the States, so the District Court lacked jurisdiction to bar the Government from trying to implement it. And for the reasons discussed, that injunction is likely to irreparably harm the Government if it remains in place while the appellate process runs its course.

Accordingly, the application for stay presented to JUSTICE JACKSON in No. 26A124 and by her referred to the Court is granted. The injunction entered by the United States District Court for the District of Massachusetts in case No. 1:26–cv–11581 is stayed pending the disposition of the appeal in the United States Court of Appeals for the First Circuit and disposition of a petition for a writ of certiorari in this Court, if such a writ is timely sought. Should certiorari be denied, this stay shall terminate automatically. In the event certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court. The application for stay presented to JUSTICE JACKSON in No. 26A139 and by her referred to the Court is denied as moot.

# SUPREME COURT OF THE UNITED STATES

No. 26A124

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* CALIFORNIA, ET AL.

ON APPLICATION FOR STAY

No. 26A139

ALABAMA, ET AL. *v.* CALIFORNIA, ET AL.

ON APPLICATION FOR STAY

[August 24, 2026]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN joins, dissenting.

Today's decision does not address whether the President's attempts to interfere with States' administration of the November 2026 elections are lawful. Nor does it suggest that the Executive Branch has any constitutional or statutory authority to implement the President's directives. Instead, today's decision merely postpones adjudication of those challenges. Nonetheless, because I believe the respondent States' challenges are justiciable now, I respectfully dissent.

A commonsense reading of the Executive Order, corroborated by the Government's own representations, makes clear that the respondent States face a sufficiently concrete and imminent injury to satisfy Article III. Section 2 of the Executive Order has two subsections. Subsection 2(a) orders the Secretary of Homeland Security to create state Citizenship Lists of "confirmed" citizens who will be over the age of 18 as of an upcoming federal election. Subsection 2(b) then directs the Attorney General to

prioritize the investigation and prosecution of state and local officials who provide ballots to individuals who are not eligible to vote, citing statutes prohibiting non-citizens from voting. The majority accepts the Government's invitation to divorce 2(a) from 2(b), parsing the text of each subsection individually but refusing to read §2 as a unified whole. According to the majority, the investigations and prosecutions that subsection 2(b) prioritizes might have nothing to do with the citizenship lists that the immediately preceding subsection 2(a) orders to be created. The clear import of §2, however, is that the Federal Government will use its lists of "confirmed" citizens, which it has conceded will be incomplete, App. to Application for Stay 5a, to initiate those investigations and prosecutions.

Far from disclaiming such intention, the Government has admitted that the lists "might be used solely to facilitate this sort of post-election law-enforcement activity," Govt. Brief in Opposition in No. 1:26–cv–11581 (D Mass.), ECF Doc. 157, p. 47, and that a State's "refusal to consider" the Federal Government's list "could conceivably, depending on the circumstances, be relevant evidence of an intent to violate, or to facilitate the violation of, the federal laws prohibiting non-citizen voting that the Attorney General is directed to prioritize for enforcement under Section 2(b)," Reply Brief in No. 26A124, p. 13. To pretend that the lists assembled pursuant to 2(a) bear no relation to the prosecutions directed by 2(b) is to ignore the structure of the Executive Order and the Government's words alike. As this Court has long recognized, "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around," *Bantam Books, Inc.* v. *Sullivan*, 372 U. S. 58, 68 (1963), and the respondent States have standing based on the credible threat that the Government will initiate investigations and prosecutions because they refuse to use the lists. See *First Choice Women's Resource Centers, Inc.*

v. *Davenport*, 608 U. S. 174, 183 (2026) ("Because this standard tolerates suits involving 'actual or imminent' injuries, a party need not always wait for the government to take coercive action against it before filing suit to challenge the government's conduct. Instead, a litigant may bring a pre-enforcement suit seeking prospective relief against government officials so long as it faces 'a credible threat of enforcement.'" (quoting *Susan B. Anthony List* v. *Driehaus*, 573 U. S. 149, 161 (2014)).

Nor can I agree that the Government suffers irreparable harm from the portion of the District Court's injunction tailored to these threatened prosecutions. The majority suggests that the injunction "purports to forbid the Attorney General to implement the President's enforcement priorities as to those same States." *Ante*, at 8–9. But this portion of the injunction prohibits the Department of Justice and the Attorney General only from "initiating any investigation or prosecution of Plaintiff States . . . stemming from violations or purported violations of the unconstitutional provisions in Sections 2 and 3 of the EO." Final Judgment in No. 1:26–cv–11581 (D Mass.), ECF Doc. 207, p. 4, ¶2.C. If, as the majority explains, it is "logically impossible for a State to 'violate' §2(a)," and §3 "imposes no legal requirements on the States," *ante*, at 6–7, this portion of the injunction would be toothless. If that is true, it is hard to see how the Government suffers any harm at all, much less irreparable harm, from this portion of the injunction.*

The same is true for the §2(a) injunction. If, as the Government insists, §2(a) "simply give[s] States a valuable tool that can help in vetting their own lists of registered voters if they wish to use it," Reply Brief in No. 26A124, p.

---

*The majority responds by pointing to other portions of the injunction. *Ante*, at 9, n. 2 (quoting ECF Doc. 207, pp. 2–4, ¶¶1, 2.A, 2.D). Here, I address only the part of the injunction tailored to the threat of §2(b) prosecutions based on the §2(a) lists. See ECF Doc. 207, p. 4, ¶2.C.

4, the Government suffers no harm if it cannot provide that "tool" to the States who do not want it and will not use it.

As to §3, the respondent States assert that *any* interference with the States' "authority to create and administer a mail voting program" is unlawful. Amended Complaint in No. 1:26–cv–11581 (D Mass.), ECF Doc. 65, ¶169; see *id.*, ¶¶167–178. If that is true, then no future implementation could be "consistent with applicable law," and the States need not wait to challenge the precise contours of a final rule.

The majority says it was speculative to think there would be a final rule at all when this suit was filed, seemingly accepting the Government's representation that it may not actually implement the Executive Order. Yet even as the Government represents that it may not implement the Executive Order at all for purposes of defeating standing, it insists that it seeks to implement the Executive Order immediately for purposes of establishing irreparable harm. See Application 28–29 ("The irreparable harm is the government's inability to implement the order as to the *November 2026* election in the respondent States"). The Government cannot have it both ways.

Because I believe the structure of the Executive Order, the Government's representations, and the equities counsel against emergency relief requiring the States to wait to bring their serious challenges to the Executive Order, I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

No. 26A124

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* CALIFORNIA, ET AL.

ON APPLICATION FOR STAY

No. 26A139

ALABAMA, ET AL. *v.* CALIFORNIA, ET AL.

ON APPLICATION FOR STAY

[August 24, 2026]

JUSTICE JACKSON, dissenting.

The President has issued an Executive Order demanding changes to the standard vote-by-mail systems that the States have traditionally administered. The District Court held that the President's Order is unlawful, the Government does not defend the lawfulness of the Order before this Court, and no judge or Justice has held (or holds today) that the Order comports with the Constitution. Still, the Court sees fit to grant the Government equitable relief to proceed with implementing the challenged Order on the grounds that, because the Government had not yet issued a final rule at the time the complaint was filed, the Plaintiff States lacked a concrete injury for Article III purposes.

This ruling violates well-established precedents concerning this Court's equitable discretion and needlessly injects chaos and uncertainty into the upcoming midterm elections. It also lets another shoe drop in the Kafkaesque nightmare that our precedents have been steadily creating for certain plaintiffs who seek to bring election-related challenges. The Court has held for a while now that even valid

election-related legal claims can come too late. See *Purcell* v. *Gonzalez*, 549 U. S. 1, 4–6 (2006) (*per curiam*). Today's revelation is that such claims can also *come too early*—never mind that an election is looming and related harms are presently occurring. Never mind, too, that the Government (which controls the timing of proposed and final rules) can easily game the system.

To be sure, the Court has not foreclosed States from challenging this blatantly unconstitutional Order. But it declines to explain *when*, exactly, is the right time to bring a meritorious election-rule claim challenging unconstitutional interference with electoral processes. The majority just signals that *these* claimants had to wait—even though the election cycle had started and despite facing pocketbook costs, threats of prosecution, and an affront to their sovereignty—before receiving the relief to which they are likely entitled.

I respectfully dissent. States administering elections and the voting public that relies on them to do so deserve clarity, not caginess or confusion. The Court does a disservice to all concerned by distorting Article III standing and ripeness principles to issue a ruling that contributes to pre-election chaos instead of quashing it, and by using its equitable authority to facilitate a patently inequitable result.

## I

### A

Our Constitution expressly delegates the power to conduct federal elections to the States. See U. S. Const., Art. I, §4; see also *Watson* v. *Republican National Committee*, 609 U. S. ___, ___ (2026) (slip op., at 1); *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779, 805 (1995). Accordingly, "elections in this country" have long been "administered at the state and local level." H. R. Rep. No. 107–329, pt. 1, p. 31 (2001). This "dispersal of responsibility for election administration has made it impossible for a single centrally

controlled authority to dictate how elections will be run, and thereby be able to control the outcome." *Id*., at 32. State-run elections are thus both foundational to democracy and a key part of the self-governance scheme our Constitution establishes.

On March 31, 2026, President Trump attempted to alter this longstanding, constitutionally assigned structure by issuing Executive Order No. 14399, 91 Fed. Reg. 17125. This mandate is entitled "Ensuring Citizenship Verification and Integrity in Federal Elections." The Order states (without citing evidence) that, "[t]o enhance election integrity via the United States Mail," "additional measures are necessary." *Ibid*. It then lays out a series of directives, three of which are relevant here.

Section 2(a) directs the Secretary of Homeland Security to compile lists of the U. S. citizens who reside in each State (Citizenship Lists), and send those lists to the States prior to any federal election. Section 2(b) directs the federal investigation and prosecution of state and local election officials who issue federal ballots to individuals not eligible to vote in federal elections. Section 3 mandates proposed rulemaking requiring both that "all outbound ballot mail" sent by States and localities to voters "must be mailed" in envelopes with new federal markings and barcodes, and that the United States Postal Service (USPS) "shall not transmit mail-in or absentee ballots from any individual" voter unless a State has successfully managed to "enrol[l]" that voter with USPS such that the individual's name appears on the appropriate list. *Id*., at 17126.

The Order thus requires a fundamental overhaul of the States' existing mail-in ballot systems—changing from a state-administered process to one in which the Federal Government controls who gets a ballot and whose vote counts. Under the regime the Order envisions, States can only offer ballots to citizens whose names appear on the appropriate lists, forcing States to give their voter lists to the Federal

Government in order to have their voters' ballots processed by USPS. *Ibid*. And USPS can interdict and refuse to transmit mail-in ballots submitted by individuals who are not on the right list. See *ibid.*; see also A. Sella, Postmaster General Confirms Plan to Hold Back Mail Ballots Under Proposed Rule, N. Y. Times, June 24, 2026.

Moreover, and notably, due to the Order, a State's election officials face possible federal investigation and prosecution if they fail to compile and use the new Citizenship Lists for administering federal elections. The Government admits this. See, *e.g.*, Reply in Support of Application for Stay 13 (stating that "a State's refusal to consider" a Citizenship List could "be relevant evidence of an intent to violate, or to facilitate the violation of, the federal laws prohibiting non-citizen voting that the Attorney General is directed to prioritize for enforcement under Section 2(b)").

B

Four days after President Trump signed Executive Order No. 14399, 23 States and the District of Columbia (collectively, the Plaintiff States) filed a lawsuit challenging the Order as unlawful and seeking to enjoin its implementation. They alleged that §§2 and 3 of the Executive Order are ultra vires and also violate the Constitution's Elections and Electors Clauses, the Tenth Amendment's anticommandeering doctrine, and the separation of powers.

On June 25, 2026, the District Court granted the Plaintiff States' motion for summary judgment and issued a permanent injunction, narrowly barring implementation of §§2 and 3 only as to the Plaintiff States and only for the 2026 election cycle. ___ F. Supp. 3d ___, ___ (Mass. 2026), App. to Application for Stay 28a–64a (App.). The District Court found that election officials in the Plaintiff States faced actual and imminent harm because, even in advance of any final rule, their "statutory obligations" to train local election officials, create new legal-guidance documents, and

communicate with voters required immediate action in response to the Executive Order. *Id.*, at 42a.[1] The District Court also concluded that the President lacked legal authority to implement §§2 and 3, and that his mandate impermissibly interfered with the Plaintiff States' constitutionally assigned duty to administer elections. *Id.*, at 45a–61a.

The Government appealed the District Court's summary judgment ruling and permanent injunction to the U. S. Court of Appeals for the First Circuit; it also requested that the District Court's injunction be stayed while the appeal was pending. In a 2-to-1 panel decision, the appeals court denied the stay request, concluding that the Plaintiff States had shown imminent injuries from resource diversion, pocketbook losses, the risk of prosecution, and federal interference with the Plaintiff States' sovereign interests in conducting elections. See ___ F. 4th ___, ___–___ (CA1 2026), App. 7a–14a. The First Circuit further determined that the balance of the equities favored the Plaintiff States, given the significant harms those sovereigns would face due to the Order while attempting to administer the November election in an orderly fashion. *Id.*, at 15a–16a.[2]

---

[1] See also, *e.g.*, Opposition to Applications 26; Decl. of G. Rosenberg in No. 1:26–cv–11581 (D Mass.), ECF Doc. 100–7, ¶23 (detailing that certain state officials "have had to divert time from the[ir] planned trainings" to create new "guidance on this [Executive Order]" to communicate with local officials); Decl. of D. Dawson, ECF Doc. 100–19, ¶9 (noting that officials have already had to respond to numerous inquiries from confused and concerned voters); Decl. of S. Holmes, ECF Doc. 100–4, ¶43 (same).

[2] One of the three panel jurists concurred in part and dissented in part. See ___ F. 4th, at ___, App. 16a (opinion of Dunlap, J.). Judge Dunlap agreed that the Plaintiff States had suffered harm and had Article III standing as to §3's ballot-change mandate. *Id.*, at ___, App. 18a. He also agreed that the Plaintiff States were sufficiently harmed for standing purposes by the "imminent enforcement [in §2(b)] of a voting-age requirement (not established by federal statute) that conflicts with certain

II

The Government now asks us for a stay of the District Court's injunction. This Court is obligated to hold the Government (just like any other party) to a high bar when seeking a stay under these circumstances. See *Edwards* v. *Hope Medical Group for Women*, 512 U. S. 1301, 1302 (1994) (Scalia, J., in chambers) ("[W]hen a district court judgment is reviewable by a court of appeals that has denied a motion for a stay, the applicant seeking an overriding stay from this Court bears an especially heavy burden" (internal quotation marks omitted)).

At a minimum, the successful stay applicant must make a "strong showing" that it is likely to succeed on the merits, that it will suffer irreparable harm while the case proceeds, and that, on balance, the equities—including the public's interest—favor a stay. *Nken* v. *Holder*, 556 U. S. 418, 426 (2009); see also *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*). The Government has not come anywhere close to carrying this burden here.

A

Begin with irreparable harm. The President is only conceivably harmed by an injunction barring executive action if that court order is preventing him from doing something *the law permits him to do*. But here the Government has not even bothered to assert, much less demonstrate, that the President has the constitutional authority to issue an order that directs the manner in which the mail-in ballot aspect of federal elections is to be administered. This means that the Government has failed to establish irreparable harm. And, to be clear, contrary to the majority's

States' laws permitting voting by certain 17-year-olds in primaries." *Id.*, at ____, App. 17a. But he disagreed with the majority's view that §§2(a) and 2(b)—shorn of its unlawful enforcement in relation to certain 17-year-olds and standing alone—caused States any imminent injuries. See *id.*, at ______, App. 17a–18a.

contentions (*ante*, at 9 (citing *Trump* v. *CASA*, 606 U. S. 831 (2025))), the District Court's injunction is not harming the Government.

The Constitution plainly assigns the power to conduct federal elections *to the States*. See Art. I, §4. The President does not have any legal authority to require that elections be conducted in accordance with his preferences, or to withhold delivery of mail-in ballots that are not formatted consistent with the President's wishes. "The action [Executive Order No. 14399] contemplates would involve the President, *whom the Constitution vests with no express authority over the conduct of elections*, undertaking a substantial and unfunded overhaul of election procedures—including the implementation of a nationwide reform to Postal Service mail-handling processes—on the threshold of the November election." *DSCC* v. *Trump*, 2026 WL 2168617, *5 (CADC, July 28, 2026) (emphasis added). The Government is not injured in the slightest by an injunction stopping it from engaging in this patently unlawful conduct.[3]

[3] Our holding in *Trump* v. *CASA*, 606 U. S. 831 (2025), is thus inapposite to the irreparable harm analysis here. *CASA*'s conclusion that universal injunctions were irreparably harmful to the Government—because they "improperly intrud[e] on a coordinate branch" and "preven[t] the Government from enforcing its policies against nonparties," *id*., at 859 (internal quotation marks and alterations omitted)—presupposes that the Executive Branch has the lawful authority to enforce its policies in the first place. Not so here, as I have explained. Moreover, the District Court's injunction "does nothing to prevent the federal defendants from taking steps today to implement the [Executive Order] for federal elections in all [S]tates after November 3, 2026." ___ F. 4th, at ___, App. 15a. And even if the Government is harmed by the injunction's narrow restriction preventing implementation of the Order ahead of this November's elections, that harm is obviously self-inflicted. See *O'Brien* v. *Skinner*, 409 U. S. 1240, 1242 (1972) (Marshall, J., in chambers). The Executive Order itself created the time crunch here: With an eye toward the November elections, the Order set the date for the issuance of a final rule regulating mail-in ballots as July 29, 2026, regardless of the States' late-August envelope-mailing deadlines. Given that choice, the

Ironically, as presented here, the Government's ripeness and standing arguments contradict its contention that the District Court's injunction causes irreparable harm. The Government says that it does not know "whether and to what extent it may compile the relevant lists" or "[w]hat role, if any, a State's future decision to disregard its Citizenship List may play in a future investigation and prosecution"; it insists that "much remains uncertain as to what a final USPS rule might include or what the contents or uses of any DHS lists might be." Application for Stay 3 (first and third quotations); Reply in Support of Application for Stay 5 (second quotation). But if implementation of Executive Order No. 14399 was hypothetical and uncertain at the time the Plaintiff States filed this lawsuit, how can it be that a limited injunction narrowly preventing implementation harmed the Government? When the Government is unsure of what action it intends to take or whether it is even lawful to take any action, an injunction limiting such action is (by the Government's own admission) irrelevant, not harmful.

That straightforward analysis is enough to dispose of, and dispense with, today's misguided stay request.[4] At bottom, the Government's irreparable-harm argument is "just another species of the far-fetched contention that the President must be injured whenever he is prevented from doing

---

Government should not be heard to complain about the limited time it has to litigate the Plaintiff States' challenges.

[4] It suffices because stay applications turn on harm assessments—if it were otherwise, the applicant could just wait to get a merits ruling from the lower court. A party with no harm from an injunction (or with less harm than his opponent) has no justification for asking this Court to involve itself in the pending lower-court proceedings. Thus, in my view, a stay applicant seeking our intervention needs to show not only that his interim injury is irreparable but also urgency—*i.e.*, that immediate relief is required. See *Labrador* v. *Poe*, 601 U. S. 1110, 1130 (2024) (JACKSON, J., dissenting from grant of stay). The Government has not cleared either hurdle here.

as he wishes." *Trump* v. *Orr*, 607 U. S. ___, ___ (2025) (JACKSON, J., dissenting from grant of stay) (slip op., at 10). But the majority proceeds to probe the justiciability of the Plaintiff States' complaint (as if *the States* were the ones seeking our intervention), and thereby inappropriately transforms our discretionary emergency docket into a forum for mandatory review of this Administration's arguments.

The Court should have remained focused on what matters under our stay precedents: whether the District Court's injunction is harming the Government in a manner that warrants equitable relief. Where a significant underlying dispute as to the lawfulness of the Government's behavior is pending in the lower courts, allowing the Government to obtain interim relief based on isolated, threshold concerns about the justiciability of the plaintiffs' claims facilitates a patently inequitable Catch-Me-If-You-Can approach to pursuing the President's policy agenda.[5]

B

Even assuming *arguendo* that the Executive suffers some harm due to the District Court's injunction, the balance of the equities and the public's interest strongly favor

[5] Under this approach, the Executive can intentionally act in harmful ways that violate the law, decline to defend the legal merits of its unlawful actions, and nevertheless put challengers on the defensive (by thwarting injunctions on the basis of alleged flaws with the form of plaintiffs' legal claims), thereby extending its unlawful activity for as long as possible. See, *e.g.*, *CASA*, 606 U. S., at 839 (considering only threshold procedural questions while the underlying merits issues festered). This is a noxious litigation strategy that should be a red flag for courts. It forestalls resolution of the merits, prolongs unjustified harms, and wounds public confidence in the judiciary's ability to award actual relief for meritorious challenges. Furthermore, if sowing chaos is the Government's ultimate goal, as it is here (see Part IV, *infra*), the effectiveness of judicial review is substantially undercut when the Court shunts all consideration of the lawfulness of the Government's conduct at the stay stage and greenlights significant harms in the interim.

maintaining this injunction. Properly evaluating these stay factors requires comparing the real-world impact of granting a stay versus the practical consequences of denying one. See *Barnes* v. *E-Systems, Inc. Group Hospital Medical & Surgical Ins. Plan*, 501 U. S. 1301, 1305 (1991) (Scalia, J., in chambers). That comparison yields a strikingly straightforward answer here.

Denying a stay permits the Plaintiff States to prepare for the rapidly approaching election cycle per usual, without undue interference or unjustified threats of prosecution against state officials attempting to carry out their duties. These election officials are busy finalizing the equipment and materials that will be used for the upcoming election, cross-checking the registration and qualifications of eligible voters, and training the staff and volunteers who will be distributing ballots and otherwise conducting the election in those particular localities.[6] A denial of this stay request would greatly reduce the risk that these critical electoral processes will be disrupted. Denying this stay would also allow USPS to implement new rules regarding the mail-in ballot procedures applicable to election cycles occurring after the November 2026 election.

Granting the stay, by contrast, risks severe disruption of the upcoming midterm elections. Indeed, even before a final rule, the Order and proposed rule had already caused significant friction. See, *e.g.*, Opposition to Applications 26 (describing the "challenging and costly" tasks of having to "compile and convert voluminous data for submission to USPS, train election officials, educate voters, and change" the format of mail-in ballots, at the expense of other "important election-preparation work"); Plaintiffs' Statement of Undisputed Material Facts, ECF Doc. 105, ¶¶22–30, 47–

[6] See, *e.g.*, Opposition to Applications 26–30; Decl. of J. Lean, ECF Doc. 100–1, ¶8; Decl. of M. Tassinari, ECF Doc. 100–2, ¶¶36, 81; ECF Doc. 100–4 ¶35; Decl. of A. Albence, ECF Doc. 100–8 ¶75; Decl. of D. Barber, ECF Doc. 100–15, ¶49.

57, 60–63; ECF Doc. 100–4, ¶¶32–41.[7] A stay grant puts the Plaintiff States in a precarious position: Their election officials would have to scramble in the coming weeks to challenge or attempt to take on the potentially impossible task of complying with the President's new mail-in ballot regime. See ___ F. 4th, at ___–___, App. 9a–10a ("[I]f the district court's injunction is lifted, the Plaintiff States will promptly be forced to divert staff resources and incur costs flowing from the EO in the coming days and weeks"). The Plaintiff States have secured an injunction to stave off those potential harms—lifting that relief keeps this Sword of Damocles dangling over them, threatening to undo the complicated work that election officials are currently undertaking to protect their citizens' electoral interests.[8]

Granting this stay also risks the kinds of on-the-ground chaos this Court has previously decried in the elections context but does not even address today. See *Purcell*, 549 U. S.,

---

[7] These, by the way, are *facts*: The District Court considered evidence and made findings about the detrimental consequences of allowing the Order to stand. See ___ F. Supp. 3d, at ___–___, App. 35a–44a. Under this Court's precedents, those findings are entitled to "clear error" deference. See *Alexander* v. *South Carolina State Conference of NAACP*, 602 U. S. 1, 18 (2024). We cannot simply set them aside or ignore them. See *Cooper* v. *Harris*, 581 U. S. 285, 298–299 (2017); *Anderson* v. *Bessemer City*, 470 U. S. 564, 575 (1985); *Glossip* v. *Gross*, 576 U.S. 863, 882 (2015) ("Where an intermediate court reviews, and affirms, a trial court's factual findings, this Court will not lightly overturn the concurrent findings of the two lower courts" (internal quotation marks omitted)). But nowhere does this Court's order suggest or conclude that the lower courts' harm-related factfinding was clearly erroneous.

[8] This is another way in which today's case differs from *CASA*. In *CASA*, the Court found that the balance-of-the-equities factor favored the Government because the plaintiffs experienced "*no* harm" from the Court's partial stay blocking the universal nature of the injunction, as they would "remain protected . . . to the extent necessary and appropriate to afford them complete relief." 606 U. S., at 861 (emphasis added). The stay here leaves the Plaintiff States completely (and needlessly) unprotected in the interim, experiencing harm before they can obtain relief through future litigation.

at 4–5; see also *Democratic National Committee* v. *Wisconsin State Legislature*, 592 U. S. ___, ____ (2020) (KAVANAUGH, J., concurring in denial of application to vacate stay) (slip op., at 2) (acknowledging that "running a statewide election is a complicated endeavor" involving "a massive coordinated effort" of "thousands of state and local officials"). The Court's concerns about judicial interventions that stress election officials and confuse the voting public seem to have inexplicably vanished, for today's ruling requires the Plaintiff States to bring their legal challenges *closer in time* to the upcoming elections despite any resulting confusion. Forget tamping down the chaos by ensuring that claims are resolved well before Election Day; the majority now delays resolution of potentially meritorious challenges, compounding the uncertainties.[9]

The Court's ruling imposes needless harms on the Plaintiff States in the interim (before they can again obtain relief) and does nothing to promote the public's interest in well-ordered elections practices and the institutions the

[9] Today's ruling injects additional unknowns into the already fraught pre-election period. Beyond whether the proposed election-related rule changes are lawful, one must now wonder whether, when the Government announces a rule change, a resulting legal challenge is *too late, too early, or just right?* (And, of course, only this Court knows the answer.) Today's tolerance for delayed resolution of the Plaintiff States' legal claims is impossible to square with our admonishment in *Bost* v. *Illinois Bd. of Elections*, 607 U. S. 71, 80 (2026) (directing lower courts *not* to apply justiciability doctrines in ways that "channel . . . election disputes to shortly before election day"). The last-minute litigation the majority now endorses could also prompt further chaos, as election officials would have to communicate the twists and turns of late-breaking legal developments to voters on the fly. Voters who disproportionately rely on voting by mail—including those who are elderly or physically disabled—would then be on a knife's edge, having to cast their ballots without knowing the results of the litigation churning in the background. It makes no practical sense to require the Plaintiff States (parties with sovereign interests, constitutional duties, and valid election-related claims) to wait until the eve of an election to file these kinds of lawsuits.

Constitution tasks with safeguarding democratic norms. Our precedents require balancing the equities precisely to avoid this kind of damaging and pointless outcome.

III

Because the harm-related stay factors weigh heavily against granting these stay applications (see Part II, *supra*), the Government—and the Court itself—focuses almost exclusively on the merits of the Government's threshold arguments about standing and ripeness. But under this Court's precedent, the Government's likelihood-of-success effort also fails.

A

"[T]o establish [Article III] standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC* v. *Ramirez*, 594 U. S. 413, 423 (2021) (citing *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560–561 (1992)). Ripeness and standing originate from the same Article III case-or-controversy requirement, and those two concepts often "boil down to the same question." *Susan B. Anthony List* v. *Driehaus*, 573 U. S. 149, 157, n. 5 (2014) (internal quotation marks omitted).

Here, the Plaintiff States have both actual and imminent injuries due to the Executive Order. Each suffices to make the present controversy justiciable. See *TransUnion*, 594 U. S., at 423.

First and foremost, the undisputed record evidence shows that the Order is injuring state and local officials *right now*, as the lower courts found. See ___ F. 4th, at ___–___, App. 7a–8a; ___ F. Supp. 3d, at ___–___, App. 41a–42a. The facts establish that the Order has already placed "an incredible strain" on state election officials who, due to their

obligations to plan and prepare for elections well in advance, must devote time and resources *today* to "coordinate the implementation of the changes articulated in the [Order]," on "compressed timelines" and with "limited resources." See ___ F. 4th, at ___, App. 8a. And the Government does not, and cannot, contest this. The majority reaches the opposite conclusion by simply ignoring the District Court's findings of fact and the record developed below. See n. 7, *supra*.

The Court's suggestion that these realities do not matter for standing purposes because the Order constitutes a mere "internal directive," *ante,* at 2, is both factually wrong and legally irrelevant. The Order explicitly directs federal officials to transmit the Citizenship Lists to the States, who are then threatened with prosecution if they fail to use those lists. And the legal test for justiciable harm is not whether the injury was caused by an outward-facing order as opposed to an "internal" one. Instead, the relevant inquiry is whether a plaintiff has been, or will imminently be, injured by the directive they seek to challenge.[10] See *Lujan*, 504 U. S., at 560–561.

Officials in the Plaintiff States are also presently impacted by an existing "credible threat of criminal prosecution." ___ F. 4th, at ___, App. 13a. That threat of prosecution burdens the Plaintiff States' "sovereign interests" and has already facilitated "unprecedented levels of involvement by federal officials in how [S]tates administer elections" as directed by the Order. *Ibid.* (internal quotation marks omitted). But the majority contends that "[w]ithout

---

[10] To appreciate the fallacy of the Court's injury analysis, imagine a purely "internal" directive that a President sends to the Postal Service mandating that it not deliver mail-in ballots sent in by voters in disfavored States. That mandate is no less injurious because the President is only directing the "internal" conduct of his subordinates. States and voters would obviously have Article III standing to challenge that patently unlawful directive, internal or not.

a *textual* basis for their concerns,"—meaning apparently that there is no basis for prosecuting state officials in the Order's language or the text of any statute—"the States lack a well-founded fear that they will be prosecuted for not using the Lists." *Ante,* at 6 (internal quotation marks omitted). Yet even if prosecution is textually unfounded, the Government has made it explicitly clear, *including before this Court*, that it might well prosecute any state officials who resist implementing the Citizenship Lists regardless. See Reply in Support of Application for Stay 13. Such threats clearly suffice for standing purposes, for we have long held that, "where threatened action by *government* is concerned," plaintiffs need not wait and expose themselves to prosecution "before bringing suit to challenge the basis for the threat." *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U. S. 118, 128–129 (2007) (emphasis in original).[11]

The Plaintiff States also had Article III standing because, in addition to their current injuries, they faced a significant risk of harm in the immediate future due to the President's Order. See *TransUnion*, 594 U. S., at 423. These Plaintiffs had "certainly impending pocketbook injuries from [the Order's] direction that USPS control the design of envelopes in all federal voting-by-mail processes," given that "several

[11] The fact that the President's Order was not fully implemented before this suit was filed does not render these Plaintiffs' claims nonjusticiable. Finality is not a prerequisite to Article III standing: Nonfinal acts can still cause injury. In any event, the Plaintiff States are complaining about a "final" act—the President has unequivocally issued an allegedly ultra vires and unconstitutional Executive Order directing his subordinates to act in a manner that is causing present and imminent harm. The majority seems to forget that the Plaintiff States have not brought Administrative Procedure Act claims that might logically falter due to a purported lack of finality (and even then, those claims would fail for want of *a cause of action*, not for nonjusticiability). The Court glosses over what we have long said Article III standing requires (actual injury), opting instead to rest its conclusion on a brand-new, made-up finality barrier for injured plaintiffs who want to have their constitutional claims adjudicated.

states had already purchased mail-ballot envelopes" for the 2026 elections. ___ F. 4th, at ___, App. 11a. The States would also almost certainly have had to bear other "significant" financial "costs" from having to "update training materials for local election officials and their staffs." *Ibid.* And the on-the-ground chaos that would indisputably follow from last-minute implementation of the President's directives risked imminent harm to these States' sovereign interests in conducting orderly elections.

In short, although the Order had yet to be formalized into a final rule when the complaint was filed, "the specificity of [its] stated timelines and the inescapable legal requirements and impending deadlines that States currently face in facilitating mail-in and absentee balloting for immediately upcoming elections together establish sufficient concrete injury from the [Order] in this unusual case." ___ F. 4th, at ___, App. 18a (Dunlap, J., concurring in part and dissenting in part).

B

1

For its part, the Court has opted to take a blinders-on approach to evaluating the merits of the Government's arguments about the Order's directives, present impact, and anticipated effects, despite this Court's admonition that courts "are not required to exhibit a naiveté from which ordinary citizens are free." *Department of Commerce* v. *New York*, 588 U. S. 752, 785 (2019) (internal quotation marks omitted). The majority's assertion that the courts below had to "stac[k] hypothetical on hypothetical to speculate that harm will eventually materialize," *ante,* at 5, for example, blinks reality. It also unfairly characterizes the lower courts' careful factfinding and written opinions.

Consider the Court's strained attempt to establish that the District Court relied on a "chain of inferences," *ante,* at 7, an effort that begins with the contention that the District

Court "first had to speculate about whether the Postal Service would propose a rule," *ibid.* Quite to the contrary, the record reveals that the District Court just looked at the facts. No speculation about whether USPS would "propose a rule" was needed because the Executive Order explicitly directs the Postmaster General "*to initiate a proposed rulemaking* . . . within 60 days." 91 Fed. Reg. 17126 (emphasis added). The Order further details the content of that rule, stating that the proposed rule "shall include, at minimum," "[p]roposed provisions specifying that all outbound ballot mail must be mailed in an envelope that . . . bears a unique Intelligent Mail barcode." *Ibid.* The Order also demands that the proposed rule expressly provide "that the USPS shall not transmit mail-in or absentee ballots from any individual unless those individuals have been enrolled on a State-specific list." *Ibid.* So, the Court's conclusion that the District Court engaged in sheer speculation about whether a proposed rule would issue and what it might say, *ante,* at 7, is a stunning misinterpretation of the factual record.

That USPS *actually proposed a rule* in response to the Order further demonstrates that the District Court did not, in fact, speculate about the Order's effects. On these facts, the Order's impact was not even remotely hypothetical. The proposed rule, which USPS promulgated on June 2, 2026, lays out new standards for ballot envelope design—exactly as the Order directs—and incorporates the Order's mandate "limit[ing] the distribution of mail-in ballots to individuals included in" lists submitted by States and overseen by the Federal Government. ___ F. 4th, at ___, App. 18a (opinion of Dunlap, J.).

There was also no need for the District Court to prognosticate when the Government's own evidence demonstrates its intent to proceed full steam ahead with implementing

the Order; nothing in this record portrays any hesitation.[12] This very stay application is a testament to imminent action: The Government asked us to lift the District Court's injunction *precisely because* it insisted that it must be permitted to implement the Order by promulgating a final rule ahead of the November election. See Application for Stay 2. There is simply no factual basis for the Court's contention that the lower courts were engaged in speculation or its suggestion that the Government might yet abandon the full court press the President's Order has prompted.

The majority's analysis thus fails to draw obvious inferences about the Order's downstream effects from the undisputed facts in this record. It also sidesteps a key factual finding: that the Plaintiff States are imminently injured by an Order directing *any* changes to their balloting materials or systems before the November elections. See ___ F. 4th, at ___, App. 11a ("[T]he summary judgment record reflects that *any* change to the kind of envelopes state and local officials must use for voting by mail will necessarily force the Plaintiff States to incur monetary and operational costs" (emphasis in original)). The Court chastises the District Court for "guess[ing]" and "speculat[ing]" regarding the exact "shape" of the final rule. *Ante,* at 4–5. But such precision is immaterial when well-supported findings of fact indicate that any alteration is injurious.

2

The Court applies language from our precedents to these misconstrued facts, primarily relying on two cases: *Trump* v. *New York*, 592 U. S. 125 (2020) (*per curiam*), and *Clapper*

---

[12] See, *e.g*., Decl. of S. Monteith, ECF Doc. 194–2, ¶7 ("Consistent with the Proposed Rule, the Postal Service has been taking steps to create a Postal Service portal that state and local election officials . . . will utilize to provide their lists to the Postal Service of voters who are mailed ballots" with the intent that States "will be preparing to mail their first mail-in ballots by the end of August [2026]").

v. *Amnesty Int'l USA*, 568 U. S. 398 (2013). But the reasoning of those cases is not applicable here.

Start with *New York*. There, the implications of the challenged memorandum were distant in time, and the plaintiffs conceded that its effect had dissipated by the time the case reached this Court. See 592 U. S., at 129–133. Here, by contrast, Executive Order No. 14399 sets strict deadlines for implementation, and the effects of that government action on election planning are already upon us. The *New York* plaintiffs' standing argument was further complicated by the fact that the Government conceded that it could not "feasibly implement the memorandum" as written. 592 U. S., at 133. The Government has made no such concession here. Far from it: USPS officials have instead confirmed that the Government is well on its way to implementing procedures consistent with the proposed rule. See Decl. of S. Monteith, ECF Doc. 194–2, ¶7.

The majority's reliance on *Clapper* is likewise misplaced. The no-standing determination in that case involved attorneys who were not directly targeted, had no statutory duties requiring them to act, and were perceived by this Court to be attempting to "manufacture standing merely by inflicting harm on themselves." 568 U. S., at 410–416. Here, the opposite is true. The rule changes the President has ordered federal authorities to make target state election officials. See 91 Fed. Reg. 17125 (requiring federal officials to "transmit to the chief election official of each State" the Citizenship Lists); *id.*, at 17126 (requiring the Attorney General to "prioritize the investigation and, as appropriate, the prosecution of State and local officials"). And the Plaintiff States have not manufactured the complained-of harms; "[they] have no practical choice but to respond to the [Order] now." ___ F. 4th, at ___, App. 9a.

One case that the Court's order does *not* mention is our ruling just last Term in *Bost* v. *Illinois Bd. of Elections*, 607 U. S. 71 (2026). In *Bost*, we assessed the standing of a

political candidate who wanted to challenge a new election rule that extended a ballot-receipt deadline. *Id.*, at 71–72. The Court concluded that political candidates who challenge election-rule changes easily clear Article III's harm hurdle based solely on the risk that an unlawful rule poses to their general interest in a fair election—*i.e.*, they do not need to demonstrate any other actual injury. See *id.*, at 77. *The majority holds the opposite now.* Today, less than a year after issuing *Bost*, the Court concludes that States with even greater fair-election interests do *not* have standing to sue even when the election-rule changes they seek to challenge pose significant risks of injury to those interests.[13]

In short, none of the justiciability cases the Court relies on supports its conclusion on the facts presented here. And there is obvious tension between today's reasoning and *Bost*'s.[14] So the Government has failed to demonstrate a *strong likelihood* of success on the merits of its standing and

[13] It is true that candidate Bost challenged a *final* election rule, while the Plaintiff States sought to assail an Executive Order that directs USPS to *propose* one. But that distinction makes no difference: Proposed orders can cause injuries. See n. 11, *supra*. *Bost* found standing based upon the general risk of harm to a candidate's fair-election interests, and that same interest is similarly threatened here, albeit under circumstances that are far less speculative than in *Bost*. But today we find that the risk of harm to the Plaintiff States' interests is not sufficient to confer standing. This means either *Bost* is wrong or today's decision is indefensible (or both).

[14] One more note on this: Two Justices in *Bost* concluded that a candidate's voluntary spending to guard against the possibility that the challenged rule would impact the election's outcome—a highly speculative risk—counted as a classic pocketbook injury that sufficed to confer Article III standing. See 607 U. S., at 83 (BARRETT, J., concurring in judgment). Today's ruling embraces (but then misapplies) the antithesis, adopting the Court's (original) principle regarding self-inflicted economic harms: that "[s]pending money to hedge against a 'speculative threat' does not constitute an Article III injury." *Ante*, at 8 (quoting *Clapper*, 568 U. S., at 416). Thus, the gap between *Bost* and today's analysis might be greater than the fair-election-interest flip-flop I've described.

ripeness arguments, as our stay precedents require. See *Nken*, 556 U. S., at 426. The contention that sovereign States with a constitutionally assigned duty to administer elections do not have a concrete injury when the President orders his subordinates to interfere with the ballot-distribution plans those States are in the midst of executing (the majority's bottom line) is not a strong argument.

IV

In the end, though, what makes today's ruling so off-base is the Court's lack of situational awareness regarding this equitable judgment. It treats the Government's stay application as if the whole point is merely to demonstrate that the Plaintiff States' claims are not justiciable. Taking its eye off the ball, the majority misses the Government's actual objective: to secure our imprimatur for its effort to foment chaos ahead of the November elections.

Consider (as the Court has failed to do) what the Government has and has not argued, as well as how it has behaved. In seeking this stay, the Government has not made any effort to prove that the enjoined mail-in ballot directives are lawful. Nor has it worked diligently to ensure that the vote-by-mail changes the President has ordered were finalized timely so as to be effectively implemented ahead of the November elections.

Instead, the Government has nonsensically insisted that the mail-in voting changes it is planning to implement were too speculative and distant for the Plaintiff States to challenge them in court, while simultaneously asserting that it needs emergency relief right now to immediately implement those changes. This suspect scenario appears tailor-made to weaponize this case as a means of destabilizing the nation's vote-by-mail systems through court-assisted procedural maneuvers. And the Government seems well on its way to accomplishing that tactical objective, as evidenced by its decision to delay issuance of a final rule beyond July

29, 2026, while this Court considered its stay application. See 91 Fed. Reg. 44880 (2026).[15]

Rather than swallow the Government's gamesmanship whole, the Court should have given this empty, strategic, and bad-faith stay bid the swift rejection it deserves. Cf. *Olmstead* v. *United States*, 277 U. S. 438, 483–484 (1928) (Brandeis, J., dissenting) ("The governing principle has long been settled. It is that a court will not redress a wrong when he who invokes its aid has unclean hands. . . . Where the government is the actor, the reasons for applying it are even more persuasive"); *Niz-Chavez* v. *Garland*, 593 U. S. 155, 172 (2021) ("If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them").[16] Notwithstanding the perceived legal merits

---

[15] Reconciling the Government's request for this Court's urgent intervention, on the one hand, with the fact that the stay it has requested has been treated as a justification for *postponing* implementation of the planned election-rule changes, on the other, is a struggle—and an obvious tell. Either the Government wanted a new mail-in voting process for the midterm elections or it didn't. If it did, one would have expected it to go ahead and promptly promulgate a final rule on or before July 29, 2026 (even if doing so undercut the stay application's justiciability arguments). And if it didn't, its stay request is pointless. Either way, it seems that delaying a final rule—and working instead to secure a Court order that blesses the strategy of proposing contestable changes, and prompting chaos, while keeping valid legal claims at bay—was more beneficial to the Government than actually implementing the mail-in voting policy changes it is now urging.

[16] If nothing else, rejecting this stay request now would prevent the Government from potentially asserting that the *Purcell* principle bars a new complaint, contrary to its current representations. See Application for Stay 5 (promising that "the [Plaintiff States] can pursue claims" after the issuance of a final rule, and that "courts can [then] resolve any legal questions presented"). Given all that has happened, *Purcell* would be an odd and inequitable fit. Judicial estoppel would plainly preclude it. And it cannot logically be the case that the Plaintiff States are deemed too early to challenge the Executive Order's proposed rule changes now, but are later denied judicial review on the ground that their subsequent

of the Government's standing and ripeness arguments, stay applications call for an *equitable* judgment. And, all things considered, there is no way to rationally conclude that equity favors the Government here.

* * *

This is not a close call. The Government suffers no harm from an injunction limiting unlawful actions, much less "hypothetical" and "speculative" acts that the Government says it was not even sure it would take. Denying this stay request preserves the status quo in the fraught period ahead of a national election. Granting it, on the other hand, risks significant harm, including continued affronts to the Plaintiff States' sovereign interests, a strain on their pocketbooks, and the possibility that last-minute rule changes will cause confusion on the ground, jeopardizing the public's interest in a fair and orderly election cycle. There is also more than enough evidence in the record here to support the lower courts' conclusion that these harms were actual or imminent when the Plaintiff States filed their complaint such that these claims are presently justiciable.

In any event, this Court should not have gone out of its way to error correct the District Court's purported misapplication of our standing and ripeness doctrines, especially given the Government's abject failure to defend the Executive's underlying legal authority and all that is at stake in disputes involving last-minute changes to election rules. When the Government's obvious goal is to interfere with the Plaintiff States' practices and prerogatives in a manner that the Constitution does not authorize, it is both a serious legal error and a grave misuse of our equitable emergency powers to let the Executive proceed even one step further.

---

challenges to the Order's chaotic prompting of a new mail-in ballot rule comes too close to the election.